JEFFREY A. MISHKIN (admitted *pro hac vice*)
ANTHONY J. DREYER (admitted *pro hac vice*)
KAREN HOFFMAN LENT (admitted *pro hac vice*)
SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
Four Times Square
New York, NY 10036
Telephone: (212) 735-3000
Facsimile:  (917) 777-2000
Email: jeffrey.mishkin@skadden.com
Email: anthony.dreyer@skadden.com
Email: karen.lent@skadden.com

RAOUL D. KENNEDY (SB No. 40892)
SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
525 University Avenue
Palo Alto, CA 94301
Telephone: (650) 470-4500
Facsimile:  (650) 470-4570
Email: raoul.kennedy@skadden.com

Attorneys for Defendant
NATIONAL COLLEGIATE ATHLETIC
ASSOCIATION
[Additional Counsel Listed on Signature Page]

# UNITED STATES DISTRICT COURT

# NORTHERN DISTRICT OF CALIFORNIA

# OAKLAND DIVISION

| | |
|---|---|
| IN RE NATIONAL COLLEGIATE ATHLETIC ASSOCIATION ATHLETIC GRANT-IN-AID CAP ANTITRUST LITIGATION<br><br>This Document Relates to:<br><br>ALL ACTIONS | MDL Docket No. 14-md-2541-CW |
| MARTIN JENKINS, et al.,<br><br>                Plaintiffs,<br><br>         v.<br><br>NATIONAL COLLEGIATE ATHLETIC ASSOCIATION, et al.,<br><br>                Defendants. | Case No. 14-cv-02758-CW<br><br>**NOTICE OF MOTION AND MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION TO DISMISS THE COMPLAINTS**<br><br>Date:         October 9, 2014<br>Time:        2:00 p.m.<br>Courtroom:  Courtroom 2, 4th Floor<br>Before:     Hon. Claudia Wilken |

TO ALL PARTIES AND THEIR COUNSEL OF RECORD:

Please take notice that on October 9, 2014, at 2:00 p.m., or as soon thereafter as the matter may be heard by the Court, at the courtroom of the Honorable Claudia Wilken, Courtroom 2, 4th Floor, United States District Court, 1301 Clay Street, Oakland, California, Defendants National Collegiate Athletic Association, the Pac-12 Conference, The Big Ten Conference, The Big 12 Conference, the Southeastern Conference, the Atlantic Coast Conference, the American Athletic Conference, Conference USA, the Mid-American Conference, the Mountain West Conference, the Sun Belt Conference and the Western Athletic Conference will and hereby do move the Court, pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure, for an order dismissing both the Plaintiffs' Consolidated Amended Complaint, *In re NCAA Athletic Grant-in-Aid Cap Antitrust Litig.*, No. 4:14-md-2541-CW (N.D. Cal. filed July 11, 2014) and the Complaint and Jury Demand—Class Action Seeking Injunction and Individual Damages, *Jenkins, et al. v. NCAA, et al.*, Case No. 4:14-cv-02758-CW (N.D. Cal. filed Mar. 17, 2014) (collectively, the "Complaints") with prejudice.  This motion to dismiss is brought on the grounds that the claims in the Complaints fail to state a claim against Defendants upon which relief can be granted.


DATED: September 4, 2014

                                    **SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP**


                                    By:_____/s/ Jeffrey A. Mishkin_____

                                            Jeffrey A. Mishkin
                                            Anthony J. Dreyer
                                            Karen Hoffman Lent
                                            Raoul D. Kennedy

                                            Attorneys for Defendant
                            NATIONAL COLLEGIATE ATHLETIC
                                              ASSOCIATION

**PROSKAUER ROSE LLP**                    **MAYER BROWN LLP**


By: _____/s/ Scott P. Cooper_____     By: _____/s/ Andrew S. Rosenman_____
    Scott P. Cooper (SBN 96905)                Andrew S. Rosenman (SBN 253764)
    Jennifer L. Jones (SBN 284624)             Britt M. Miller (*pro hac vice*)
    Sarah Kroll-Rosenbaum (SBN 272358)         71 South Wacker Drive
    Shawn S. Ledingham Jr. (SBN 275268)        Chicago, IL 60606-4637
    2049 Century Park East, Suite 3200         Telephone: (312) 782-0600
    Los Angeles, CA 90067                      Facsimile: (312) 701-7711
    Telephone: (310) 557-2900                  Email: arosenman@mayerbrown.com
    Facsimile: (310) 557-2193                  Email: bmiller@mayerbrown.com
    Email: scooper@proskauer.com
    Email: jljones@proskauer.com               Richard J. Favretto (*pro hac vice*)
    Email: skroll-rosenbaum@proskauer.com      1999 K Street, N.W.
    Email: sledingham@proskauer.com            Washington, D.C. 20006-1101
                                               Telephone: (202) 263-3000
    Attorneys for Defendant                    Facsimile: (202) 263-3300
    PAC-12 CONFERENCE                          Email: rfavretto@mayerbrown.com

                                               Attorneys for Defendant
                                               THE BIG TEN CONFERENCE, INC.

1  **POLSINELLI PC**                          **ROBINSON BRADSHAW & HINSON**

2

3  By: _____/s/ Leane K. Capps_____    By: _____/s/ Robert W. Fuller_____
4        Leane K. Capps (*pro hac vice*)          Robert W. Fuller, III (*pro hac vice*)
         Saint Ann Court                          Nathan C. Chase Jr. (SBN 247526)
5        2501 N. Harwood Street, Suite 1900       Mark W. Merritt (*pro hac vice*)
         Dallas, TX 75201                         Lawrence C. Moore, III (*pro hac vice*)
6        Telephone: (214) 397-0030                Amanda R. Pickens (*pro hac vice*)
         Email: lcapps@polsinelli.com             101 N. Tryon St., Suite 1900
7                                                 Charlotte, NC 28246
         Amy D. Fitts (*pro hac vice*)            Telephone: (704) 377-2536
8        120 W. 12th Street                       Facsimile: (704) 378-4000
         Kansas City, MO 64105                    Email: nchase@rbh.com
9        Telephone: (816) 218-1255                Email: rfuller@rbh.com
         Email: afitts@polsinelli.com             Email: mmerritt@rbh.com
10                                                Email: lmoore@rbh.com
         Wesley D. Hurst (SBN 127564)             Email: apickens@rbh.com
11       2049 Century Park East, Suite 2300
         Los Angeles, CA 90067                    Mark J. Seifert (SBN 217054)
12       Telephone: (310) 556-1801                Robert R. Moore (SBN 113818)
         Email: whurst@polsinelli.com             ALLEN MATKINS LECK GAMBLE
13                                                MALLORY & NATSIS LLP
         Attorneys for Defendants                 Three Embarcadero Center, 12th Floor
14       THE BIG 12 CONFERENCE, INC. AND          San Francisco, CA 94111
         CONFERENCE USA                           Telephone: (415) 837-1515
15                                                Facsimile: (415) 837-1516
                                                  Email: mseifert@allenmatkins.com
16                                                Email: rmoore@allenmatkins.com

17                                                Attorneys for Defendant
                                                  SOUTHEASTERN CONFERENCE
18

19

20

21

22

23

24

25

26

27

28

**NOTICE OF MOTION AND MOTION TO DISMISS**          **MDL No. 14-md-02541-CW**
                                                     **Case No. 14-cv-02758-CW**

**SMITH MOORE LEATHERWOOD LLP**          **COVINGTON & BURLING LLP**

By: _____/s/ D. Erik Albright_____
D. Erik Albright (*pro hac vice*)
300 North Greene Street, Suite 1400
Greensboro, NC 27401
Telephone:  (336) 378-5368
Facsimile: (336) 433-7402
Email: erik.albright@smithmoorelaw.com

Jonathan P. Heyl (*pro hac vice*)
101 N. Tryon Street, Suite 1300
Charlotte, NC 28246
Telephone: (704) 384-2625
Facsimile: (704) 384-2909
Email: jon.heyl@smithmoorelaw.com

Charles LaGrange Coleman, III (SBN 65496)
HOLLAND & KNIGHT LLP
50 California Street, Suite 2800
San Francisco, CA 94111-4624
Telephone: (415) 743-6900
Facsimile: (415) 743-6910
Email: ccoleman@hklaw.com

Attorneys for Defendant
THE ATLANTIC COAST CONFERENCE

By: _____/s/ Benjamin C. Block_____
Benjamin C. Block (*pro hac vice*)
1201 Pennsylvania Avenue, N.W.
Washington, DC 20004-2401
Telephone: (202) 662-5205
Facsimile: (202) 778-5205
Email: bblock@cov.com

Matthew D. Kellogg (SBN 280541)
One Front Street
San Francisco, CA 94111-5356
Telephone: (415) 591-6000
Facsimile: (415) 591-6091
Email: mkellogg@cov.com

Attorneys for Defendant
AMERICAN ATHLETIC CONFERENCE

**WALTER HAVERFIELD LLP**

**BRYAN CAVE LLP**

By: _____/s/ R. Todd Hunt_____
R. Todd Hunt (*pro hac vice*)
The Tower at Erieview
1301 E. 9th Street, Suite 3500
Cleveland, OH 44114-1821
Telephone: (216) 928-2935
Facsimile: (216) 916-2372
Email: rthunt@walterhav.com

Attorneys for Defendant
MID-AMERICAN CONFERENCE

By: _____/s/ Adam Brezine_____
Adam Brezine (SBN 220852)
560 Mission Street, 25th Floor
San Francisco, CA 94105
Telephone: (415) 674-3400
Facsimile: (415) 675-3434
Email: adam.brezine@bryancave.com

Richard Young (*pro hac vice* application to be filed)
Brent Rychener (*pro hac vice* application to be filed)
90 South Cascade Avenue, Suite 1300
Colorado Springs, CO 80903
Telephone: (719) 473-3800
Facsimile: (719) 633-1518
Email: richard.young@bryancave.com
Email: brent.rychener@bryancave.com

Attorneys for Defendant
MOUNTAIN WEST CONFERENCE

**JONES WALKER**

**BRADLEY DEVITT HAAS & WATKINS, P.C.**

By: _____/s/ Mark A. Cunningham_____
Mark A. Cunningham (*pro hac vice*)
201 St. Charles Avenue
New Orleans, LA 70170-5100
Telephone: (504) 582-8536
Facsimile: (504) 589-8536
Email: mcunningham@joneswalker.com

Attorneys for Defendant
SUN BELT CONFERENCE

By: _____/s/ Jon T. Bradley_____
Jon T. Bradley
(*pro hac vice* application to be filed)
2201 Ford Street
Golden, CO 80401
Telephone: (303) 384-9228
Facsimile: (303) 384-9231
Email: jon@goldenlawyers.com

Attorneys for Defendant
WESTERN ATHLETIC CONFERENCE

## FILER'S ATTESTATION

I, Jeffrey A. Mishkin, am the ECF user whose identification and password are being used to file this NOTICE OF MOTION AND MOTION TO DISMISS. In compliance with Local Rule 5-1(i)(3), I hereby attest that all signatories hereto concur in this filing.

_____/s/ Jeffrey A. Mishkin_____

# *TABLE OF CONTENTS*

TABLE OF AUTHORITIES ........................................................................................................ ii

PRELIMINARY STATEMENT ................................................................................................. 1

BACKGROUND ........................................................................................................................ 2

I.      THE PARTIES ................................................................................................................ 2

II.     THE OPERATION OF DEFENDANTS' JOINT VENTURE ........................................... 3

III.    THE COMPLAINTS ...................................................................................................... 4

ARGUMENT .............................................................................................................................. 5

I.      PLAINTIFFS HAVE NOT ALLEGED A PLAUSIBLE THEORY OF RELIEF IN
        LIGHT OF THIS COURT'S DECISION IN *O'BANNON* ............................................ 6

II.     LIMITS ON STUDENT-ATHLETE COMPENSATION ARE CONSISTENT
        WITH FEDERAL COURT DECISIONS HOLDING THAT NCAA ELIGIBILITY
        RULES, INCLUDING SUCH COMPENSATION LIMITS, ARE PROCOMPETI-
        TIVE ............................................................................................................................. 9

III.    PLAINTIFFS IN THE CONSOLIDATED ACTIONS ARE NOT ENTITLED TO
        ANY RELIEF UNDER CALIFORNIA'S UNFAIR COMPETITION ACT .................... 14

        A.      Plaintiffs in the Consolidated Actions Fail to Allege an "Unlawful, Unfair or
                Fraudulent Business Act or Practice" ................................................................ 14

        B.      Plaintiffs Are Not Entitled to a Remedy Under the UCL ..................................... 16

CONCLUSION .......................................................................................................................... 18

1

2

*TABLE OF AUTHORITIES*

3

**CASES**

4

5

*Agnew v. NCAA*,
    683 F.3d 328 (7th Cir. 2012) ............................................................11, 13, 14

6

*Aleksick v. 7-Eleven, Inc.*,
    205 Cal. App. 4th 1176 (2012) ................................................................15

7

8

*American Needle, Inc. v. National Football League*,
    560 U.S. 183 (2010)...............................................................................9, 10

9

*Ashcroft v. Iqbal*,
    556 U.S. 662 (2009)............................................................................... 5, 17

10

*In re ATM Fee Antitrust Litigation*,
    554 F. Supp. 2d 1003 (N.D. Cal. 2008) ..................................................10

11

*Banks v. NCAA*,
    977 F.2d 1081 (7th Cir. 1992) .................................................................11

12

13

*Bassett v. NCAA*,
    528 F.3d 426 (6th Cir. 2008) ..................................................................12

14

*Bell Atlantic Corp. v. Twombly*,
    550 U.S. 544 (2007).................................................................................5

15

16

*Bowers v. NCAA*,
    9 F. Supp. 2d 460 (D.N.J. 1998) .............................................................12

17

*Broadcast Music, Inc. v. Columbia Broadcast System, Inc.*,
    441 U.S. 1 (1979)....................................................................................9

18

19

*Cel-Tech Communications, Inc. v. L.A. Cellular Telephone Co.*,
    20 Cal. 4th 163 (1999) ......................................................................14, 16

20

*In re Century Aluminum Co. Securities Litigation*,
    729 F.3d 1104 (9th Cir. 2013) ..............................................................5, 9

21

22

*Chavez v. Whirlpool Corp.*,
    93 Cal. App. 4th 363 (2001) ...................................................................16

23

*Colony Cove Props., LLC v. City of Carson*,
    640 F.3d 948 (9th Cir. 2011) ...................................................................3

24

25

*County of Tuolumne v. Sonora Community Hospital*,
    236 F.3d 1148 (9th Cir. 2001) ................................................................15

26

*Davis v. HSBC Bank, Nev., N.A.*,
    691 F.3d 1152 (9th Cir. 2012) .................................................................3

27

28

*DocMagic, Inc. v. Ellie Mae, Inc.,*
    745 F. Supp. 2d 1119 (N.D. Cal. 2010) ...................................................16

*Feitelberg v. Credit Suisse First Boston, LLC,*
    134 Cal. App. 4th 997 (2005) ...................................................................17

*Gaines v. NCAA,*
    746 F. Supp. 738 (M.D. Tenn. 1990)........................................................12

*Groth-Hill Land Co. v. GM LLC,*
    No. C13-1362 TEH, 2013 WL 3853160 (N.D. Cal. July 23, 2013) .................17

*Ice Cream Distributors of Evansville, LLC v. Dreyer's Grand Ice Cream, Inc.,*
    No. 09-5815 CW, 2010 WL 3619884 (N.D. Cal. Sept. 10, 2010), *aff'd,*
    487 F. App'x 362, 363 (9th Cir. 2012) .....................................................16

*Jones v. NCAA,*
    392 F. Supp. 295 (D. Mass. 1975) ...........................................................12

*Justice v. NCAA,*
    577 F. Supp. 356 (D. Ariz. 1983) ............................................................12

*Korea Supply Co. v. Lockheed Martin Corp.,*
    29 Cal. 4th 1134 (2003) ..........................................................................17

*Law v. NCAA,*
    134 F.3d 1010 (10th Cir. 1998) ...............................................................13

*LiveUniverse, Inc. v. MySpace, Inc.,*
    304 F. App'x 554 (9th Cir. 2008) ............................................................15

*Lozano v. AT&T Wireless Services, Inc.,*
    504 F.3d 718 (9th Cir. 2007) ...................................................................16

*Madrid v. Perot Systems Corp.,*
    130 Cal. App. 4th 440 (2005) ..............................................................16, 17

*Marucci Sports, L.L.C. v. NCAA,*
    751 F.3d 368 (5th Cir. 2014) ...................................................................11

*McCormack v. NCAA,*
    845 F.2d 1338 (5th Cir. 1988) .................................................................11

*NCAA v. Board of Regents of the University of Oklahoma,*
    468 U.S. 85, 102 (1984)..........................................................1, 9, 10, 11

*In re NCAA I-A Walk-On Football Players Litigation,*
    398 F. Supp. 2d 1144 (W.D. Wash. 2005).................................................13

*O'Bannon v. NCAA,*
    No. C 09-3329 CW, 2014 WL 3899815 (N.D. Cal. Aug. 8, 2014) .......................... *passim*

*Rock v. NCAA,*
    928 F. Supp. 2d 1010 (S.D. Ind. 2013)......................................................13

*Smith v. NCAA*,
    139 F.3d 180 (3d Cir. 1998), *vacated on other grounds*, 525 U.S. 459 (1999)................12

*Texaco Inc. v. Dagher*,
    547 U.S. 1 (2006).................................................................................................10

*Ubiquiti Networks, Inc. v. Kozumi USA Corp.*,
    No. C 12-2582 CW, 2013 WL 368365 (N.D. Cal. Jan. 29, 2013)...................15

*White v. NCAA*,
    No. 06-999 Dkt. No. 72 (C.D. Cal. Sept. 20, 2006).........................................13

**STATUTES**

15 U.S.C. § 1 .............................................................................................................1

20 U.S.C. § 1087*ll*....................................................................................................1

Cal. Bus. & Prof. Code § 17200, *et seq.* ...............................................................14

Cal. Educ. Code §§ 67450-67454 ...........................................................................15

Fed. R. Civ. P. 8(a)(2)...............................................................................................5

Fed. R. Civ. P. 12(b)(6).............................................................................................5

*PRELIMINARY STATEMENT*

Plaintiffs ask this Court to hold that *any* agreement among the National Collegiate Athletic Association ("NCAA") and its member conferences and schools to limit *in any way* the amount of compensation that student-athletes may receive while they are in school constitutes an unreasonable restraint of trade in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1 ("Section 1").[1] Such a holding would directly conflict with this Court's decision and injunction, issued on August 8, 2014, in *O'Bannon v. NCAA*, No. C 09-3329 CW, 2014 WL 3899815 (N.D. Cal. Aug. 8, 2014). In that case, this Court held that appropriate limits on the amount of compensation that student-athletes may receive while in school are lawful under Section 1 because they serve the procompetitive goals of (i) maximizing consumer demand for amateur student-athlete intercollegiate sports and (ii) integrating student-athletes into the academic communities of their schools, which in turn improves the education the schools offer. *Id*. at *12, 15-17, 29-37.  Accordingly, this Court determined that the NCAA and its members may—consistently with federal antitrust law—agree to limit the compensation that student-athletes in Division I ("D-I") men's basketball and Football Bowl Subdivision ("FBS") football may receive each year for their participation in intercollegiate athletics, provided that those limits are not less than (i) the full cost of attendance, as defined in 20 U.S.C. § 1087*ll*, and (ii) $5,000 per student-athlete, distributed on a deferred basis.  *O'Bannon*, 2014 WL 3899815, at *35-37.[2]

_____

[1] Plaintiffs in the consolidated actions also assert a claim against the NCAA and the Pac-12 Conference for alleged violation of California's Unfair Competition Act.  (CAC ¶¶ 545-549.)

[2] The NCAA and its members concur in the legal proposition that the antitrust laws permit them to adopt limits on the amount of compensation that student-athletes may receive for their participation in intercollegiate athletics.  Nevertheless, the NCAA and its member conferences and schools respectfully disagree with the Court's ruling in *O'Bannon*, including its determination that the challenged rules constituted an unreasonable restraint of trade, as well as with the Court's determinations of (a) the appropriate cap on student-athlete compensation, (b) who—as between the Court and the NCAA—should be permitted to set that cap, and (c) the legal significance of the Supreme Court's statements in *NCAA v. Board of Regents of the University of Oklahoma*, 468 U.S. 85, 101-02 (1984), that the NCAA's eligibility and compensation rules are procompetitive because they differentiate collegiate sports from professional sports and thus give consumers a product that might otherwise be unavailable.

**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS**

**MDL No. 14-md-02541-CW Case No. 14-cv-02758-CW**

1

Plaintiffs ask this Court to decide, contrary to its conclusion in *O'Bannon*, that *no* rule limiting student-athlete compensation is permissible under the antitrust laws.  Plaintiffs cannot allege any plausible theory that can reconcile the relief they seek in this case with the decision and injunction in *O'Bannon* or the numerous federal court decisions holding that NCAA eligibility rules—including rules prohibiting payment for athletic performance—are procompetitive.  Plaintiffs' complaints in these coordinated and consolidated actions conflict with applicable law and should be dismissed for failure to state a claim for which relief can be granted.

## BACKGROUND

## I.   THE PARTIES

Plaintiffs are nineteen current and former student-athletes—including sixteen members of the *O'Bannon* plaintiff class—who received grant-in-aid athletic scholarships to play intercollegiate football or basketball.  (CAC[3] ¶¶ 24-138; JC[4] ¶¶ 15-22.)  Defendants are the NCAA and eleven of its member conferences:  the Pac-12 Conference, The Big Ten Conference, The Big 12 Conference, the Southeastern Conference, the Atlantic Coast Conference, the American Athletic Conference, Conference USA, the Mid-American Conference, the Mountain West Conference, the Sun Belt Conference and the Western Athletic Conference.  (CAC ¶¶ 139-182; JC ¶¶ 23-25.)   The NCAA is an unincorporated not-for-profit educational organization composed of more than 1,200 member colleges, universities and athletic conferences (CAC ¶ 139), including the eleven defendant conferences.  The NCAA membership is divided into three divisions—Division I, Division II, and Division III.  (CAC ¶ 273.)  Together the members of the defendant conferences include more than 125 Division I schools across the country.  (CAC ¶¶ 147, 153, 157, 161, 165, 169, 171, 173, 175, 177.)

---

[3] Consolidated Amended Complaint, *In re NCAA Athletic Grant-in-Aid Cap Antitrust Litig.*, No. 4:14-md-2541-CW (N.D. Cal. July 11, 2014) ("CAC").  Three of the plaintiffs in the consolidated amended complaint are former college women's basketball players, who were not members of the *O'Bannon* class.  (CAC ¶¶ 129-138.)  The individual complaint filed by plaintiff Dax Dellenbach has been consolidated into the consolidated amended complaint.  (Dkt. No. 86)

[4] Complaint and Jury Demand—Class Action Seeking Injunction and Individual Damages, *Jenkins, et al. v. NCAA, et al.*, Case No. 4:14-cv-02758-CW (N.D. Cal. Mar. 17, 2014) ("JC").

## II.     THE OPERATION OF DEFENDANTS' JOINT VENTURE

The NCAA's "Basic Purpose," as set out in Article I of the organization's Constitution, is "to maintain intercollegiate athletics as an integral part of the educational program and the athlete as an integral part of the student body and, by so doing, retain a clear line of demarcation between intercollegiate athletics and professional sports."  (NCAA Constitution art. 1.3.1.)[5]  Each NCAA division is governed by a set of bylaws that details the rules and regulations necessary to achieve these essential objectives.  (NCAA Constitution art. 5.2.2.)  These bylaws set forth eligibility standards with which student-athletes and the colleges and universities they attend must comply in order to compete in NCAA-sanctioned athletics.  As a sanctioning body, the NCAA is charged with enforcing its eligibility standards.  (NCAA Bylaw 19.01.1.)  One of the most fundamental and long-established participation criteria set out in the Division I bylaws is that "[o]nly an amateur student-athlete is eligible for intercollegiate athletics participation in a particular sport."  (NCAA Bylaw 12.01.1.)  This eligibility standard is supported by a series of rules that preclude student-athletes from receiving payment for athletic participation while ensuring that the scholastic needs of student-athletes can be met through adequate financial aid.  (NCAA Bylaws 12.1.2, 15.01.1.)

Division I sets minimum financial aid requirements to ensure that a large number of men and women student-athletes receive adequate financial aid for their education.  (NCAA Bylaw 20.9.3.2.)[6]  Institutions that wish to participate in FBS football are subject to more demanding fi-

---

[5] In considering a motion to dismiss, the Court may consider "allegations contained in the pleadings, exhibits attached to the complaint, and matters properly subject to judicial notice."  *Colony Cove Props., LLC v. City of Carson*, 640 F.3d 948, 955 (9th Cir. 2011) (citation omitted).  Such matters include documents the contents of which are alleged in the complaint but not attached as exhibits, provided their authenticity is not questioned.  *Davis v. HSBC Bank, Nev., N.A.*, 691 F.3d 1152, 1160 (9th Cir. 2012).  In this case, plaintiffs make allegations about the content of the NCAA's Constitution and bylaws, the authenticity of which are not questioned (*see, e.g.*, CAC ¶¶ 12, 140), but do not attach the Constitution and bylaws as exhibits to the complaints.  This Court may, therefore, properly consider the NCAA's Constitution and bylaws on this motion.  *See* Request for Judicial Notice in Support of Defendants' Motion to Dismiss the Complaints, filed simultaneously herewith.

[6] The NCAA member colleges and universities must offer "extensive opportunities for participation in varsity intercollegiate athletics for both men and women."  (NCAA Bylaw 20.9.2(d).)  Accordingly, college athletic programs include a multitude of team and individual sports, for both

*(cont'd)*

---

**MEMORANDUM OF POINTS AND AUTHORITIES IN**
**SUPPORT OF DEFENDANTS' MOTION TO DISMISS**

**MDL No. 14-md-02541-CW**
**Case No. 14-cv-02758-CW**

3

nancial aid requirements and must provide a minimum of 200 grants-in-aid or $4 million in athletically related grants-in-aid to student-athletes across the minimum sixteen different varsity intercollegiate sports that the schools are required to support.  (NCAA Bylaw 20.9.9.4, 20.9.6(a), (b), 20.9.9.1.)  Before this Court's decision in *O'Bannon*, colleges and universities within Division I could provide student-athletes with "full grant-in-aid" athletic scholarships limited to "tuition and fees, room and board, and required course-related books."  (NCAA Bylaw 15.02.5.)  In *O'Bannon*, this Court ruled that the NCAA may limit the amount of compensation that may be paid to FBS football players and D-I men's basketball players while they are in school, but may not set that limitation below the student's full "cost of attendance," *O'Bannon*, 2014 WL 3899815, at *36, an amount calculated by a school's financial aid office separately for each student, using federal regulations, and which may include tuition, fees, room, board, books, supplies, transportation, and "other expenses related to the attendance at the institution."  (NCAA Bylaw 15.02.2.)

## III.     THE COMPLAINTS

The complaints in these actions seek to invalidate, for certain sports and at certain schools, *any* NCAA eligibility rule that limits *in any way* the amount of compensation that a student-athlete may receive for participation in intercollegiate athletics.  In their complaint, plaintiffs Martin Jenkins, Jonathan Moore, Kevin Perry and William Tyndall, all of whom are members of the *O'Bannon* plaintiff class, challenge "all NCAA rules, along with all rules of each Power Conference, that are applicable to the FBS Football Players Market and the D-I Men's Basketball Players Market . . . and that prohibit, cap, or otherwise limit the remuneration that players in each of [the alleged] markets may receive for their athletic services."  (JC ¶ 42.)[7]  In the consolidated amended complaint, the remaining plaintiffs, twelve of whom are also members of the *O'Bannon* plaintiff class, "specifically challenge" the application of NCAA Bylaw 15.1 to the institutions that partici-

_____
*(cont'd from previous page)*
male and female athletes, in addition to football and basketball.  (*See, e.g.*, NCAA Bylaws 17.02.12.1, 17.02.12.2.)

[7] The *Jenkins* plaintiffs identify the rules they challenge as "including" NCAA Bylaws 12.01.4, 12.1.2, 12.1.2.1, 13.2.1, 13.2.1.1, 13.5.1, 13.5.2, 13.6.2, 13.6.4, 13.6.7.1, 13.6.7.4, 13.6.7.5, 13.6.7.7, 15.02.2, 15.02.5, 15.1, 16.02.3, 16.1.4, and 16.11.2 "individually, and as interpreted and applied in conjunction with each other."  (JC ¶ 42.)

1   pate in FBS football, D-I men's basketball, and D-I women's basketball.  (CAC ¶¶ 1, 297.)  Bylaw

2   15.1 provides that "[a] student-athlete shall not be eligible to participate in intercollegiate athletics

3   if he or she receives financial aid that exceeds the value of the cost of attendance."  (NCAA Bylaw

4   15.1.)

5        Plaintiffs seek an injunction that, contrary to the injunction this Court entered in *O'Bannon*,

6   would prohibit the NCAA and its member conferences from adopting any limitations whatsoever

7   on the amount of compensation that may be paid to student-athletes while they are in school.

8   (CAC ¶ 15; JC at p. 41.)  In addition, the *Jenkins* plaintiffs seek damages on behalf of themselves

9   only (JC at p. 41), and plaintiffs in the consolidated action seek damages on behalf of a class of

10  student-athletes.  (CAC ¶¶ 9, 502(c), 541.)

11                            *ARGUMENT*

12       A motion to dismiss is proper under Federal Rule of Civil Procedure 12(b)(6) where the

13  pleadings "fail[ ] to state a claim upon which relief can be granted."  Fed. R. Civ. P. 12(b)(6).  To

14  state a claim for relief, Federal Rule of Civil Procedure 8(a)(2) requires "a short and plain state-

15  ment of the claim showing that the pleader is entitled to relief."  Fed. R. Civ. P. 8(a)(2).  The Court

16  must dismiss the complaint when it fails to "state a claim to relief that is plausible on its

17  face."  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007); *see also Ashcroft v. Iqbal*, 556 U.S.

18  662, 679 (2009) ("only a complaint that states a plausible claim for relief survives a motion to dis-

19  miss").  "Determining whether a complaint states a plausible claim for relief will . . . be a context-

20  specific task that requires the reviewing court to draw on its judicial experience and common

21  sense."  *Iqbal*, 556 U.S. at 679.  In this Circuit, plausibility must be assessed in light of previous

22  judicial decisions.  *See In re Century Aluminum Co. Secs. Litig.*, 729 F.3d 1104, 1106-08 (9th Cir.

23  2013) (concluding that, where judicial experience and common sense suggest that, in light of earli-

24  er precedent, the plaintiff cannot meet all of the elements of his claim, the plaintiff cannot state a

25  plausible claim for relief unless he has alleged specific facts from which the court can reasonably

26  infer that his situation is different from the situation presented in that prior precedent).

27       As demonstrated below, plaintiffs have not alleged any facts that plausibly entitle them to

28  relief following the *O'Bannon* decision, and their complaints should be dismissed with prejudice.

---

**MEMORANDUM OF POINTS AND AUTHORITIES IN**          **MDL No. 14-md-02541-CW**
**SUPPORT OF DEFENDANTS' MOTION TO DISMISS**          **Case No. 14-cv-02758-CW**

1   In *O'Bannon*, this Court held that appropriate limits on student-athlete compensation comply with

2   federal antitrust law.  And the Court's holding that such limits are lawful aligns both with founda-

3   tional antitrust principles regarding joint ventures and with the holdings of other federal courts that

4   have considered the antitrust legality of the very bylaws plaintiffs challenge here.

5   **I.      PLAINTIFFS HAVE NOT ALLEGED A PLAUSIBLE THEORY OF**

6           **RELIEF IN LIGHT OF THIS COURT'S DECISION IN *O'BANNON***

7           Plaintiffs ask this Court to prohibit *any* NCAA rules limiting student-athlete compensation

8   as a violation of Section 1.  But this Court has already held that the legitimate procompetitive goals

9   of maximizing consumer demand for the NCAA's product of intercollegiate amateur sports and

10  integrating student-athletes into their academic communities are furthered by appropriate limits on

11  student-athlete compensation.  In light of this Court's ruling in *O'Bannon*, plaintiffs cannot show

12  that they are entitled to the relief they seek.

13          In *O'Bannon*, this Court considered "whether the NCAA violates antitrust law by agreeing

14  with its member schools to restrain their ability to compensate Division I men's basketball and

15  FBS football players any more than the current association rules allow."  *O'Bannon*, 2014 WL

16  3899815, at *37.  The Court held that the challenged NCAA rules limiting the amount of compen-

17  sation that student-athletes could be paid while in school "yield some limited procompetitive bene-

18  fits by marginally increasing consumer demand for the NCAA's product and improving the educa-

19  tional services provided to student-athletes."  *Id.* at *36.

20          The Court determined, however, that the challenged rules were overly restrictive, and that

21  the plaintiffs had identified "less restrictive ways" of achieving the NCAA's procompetitive goals

22  in two respects.  *Id.*  First, the Court held that allowing schools to award stipends, "provided that

23  the stipends do not exceed the cost of attendance as that term is defined in the NCAA's bylaws,"

24  would "limit the anticompetitive effects of the NCAA's current restraint without impeding the

25  NCAA's efforts to achieve its stated purposes."  *Id.* at *16.  Recognizing the procompetitive value

26  of maximizing consumer demand for the NCAA's product—amateur intercollegiate athletics—the

27  Court held that a "stipend capped at the cost of attendance would not violate the NCAA's own def-

28  inition of amateurism because it would only cover educational expenses."  *Id.*  The Court further

---

**MEMORANDUM OF POINTS AND AUTHORITIES IN
SUPPORT OF DEFENDANTS' MOTION TO DISMISS**

**MDL No. 14-md-02541-CW
Case No. 14-cv-02758-CW**

6

1    concluded that the award of a stipend capped at the cost of attendance would facilitate the integra-

2    tion of student-athletes into academic life.  *Id.*  Second, the Court concluded that "permitting

3    schools to make limited payments to student-athletes above the cost of attendance would not harm

4    consumer demand for the NCAA's product."  *Id.* at *17.  The Court held that the antitrust laws

5    would *not* be violated, however, if the NCAA and its members, in their discretion, were to adopt

6    rules that restricted such additional payments, for example, by agreeing that such payments would

7    be capped at $5,000 per student-athlete per year, by agreeing that student-athletes would not be

8    paid more or less based on their athletic ability or the quality of their performances, by agreeing

9    that such additional payments would be distributed equally among team members at any school, or

10   by agreeing that the payments would be derived only from revenues generated from the use of the

11   student-athletes' own names, images, and likenesses.  *Id.* at *17, *37.  The Court further concluded

12   that allowing the schools to hold those limited payments in trust for student-athletes "until *after*

13   student-athletes leave school would further minimize any potential impact on consumer demand"

14   and would not interfere with "schools' efforts to educate student-athletes or integrate them into

15   their schools' academic communities."  *Id.* at *17.[8]

16        Having held that the challenged NCAA rules were overly restrictive, the Court ruled that it

17   would "enter an injunction to remove any unreasonable elements" of that restraint.  *Id.* at *36.  In

18   entering its permanent injunction, the Court held that it would "not preclude the NCAA from im-

19   plementing rules capping the amount of compensation that may be paid to student-athletes while

20   they are enrolled in school; however, the NCAA will not be permitted to set this cap below the cost

21   of attendance, as the term is defined in its current bylaws."  *Id.*  Moreover, with respect to those

22   revenues to be held in trust for FBS football and D-I basketball players, the Court held that the

23   NCAA may "set a cap on the amount of money that may be held in trust," provided that the NCAA

---

25   [8] The Court rejected the plaintiffs' third proposed alternative—allowing student-athletes to receive
26   money for endorsements—because this proposal "would undermine the efforts of both the NCAA
     and its member schools to protect against the 'commercial exploitation' of student-athletes."  *Id.* at
27   *17.  The Court held that the NCAA's past failure on occasion to prevent the commercial exploita-
     tion of student-athletes "does not justify expanding opportunities for commercial exploitation of
28   student-athletes in the future."  *Id.*

1   may not set the cap at "less than five thousand dollars (in 2014 dollars) for every year that the stu-

2   dent-athlete remains academically eligible to compete." *Id*. at *37.  And to ensure that the NCAA

3   may "achieve its goal of integrating academics and athletics," the Court held that the NCAA may

4   "enforc[e] its existing rules—or enact[ ] new rules—to prevent student-athletes from using the

5   money held in trust for their benefit to obtain financial benefits while they are still in school [and]

6   may enact and enforce rules ensuring that no school may offer a recruit a greater share of licensing

7   revenue than it offers any other recruit in the same class on the same team." *Id*. at *37.

8         Importantly, although the plaintiffs in *O'Bannon* originally focused on payments for "name,

9   image and likeness" rights, the Court's conclusions apply broadly to all compensation for student-

10  athletes above a full grant-in-aid.  Just as in the instant case, the plaintiffs in *O'Bannon* sought to

11  prove "a restraint of trade in a market for recruits' athletic services." *Id*. at *23.  The Court ex-

12  plained that:

13        [T]he sellers in this market are the recruits; the buyers are FBS football and Division
      I basketball schools; the product is the combination of the recruits' athletic services
14        and licensing rights; and the restraint is the agreement among schools not to offer
      any recruit more than the value of a full grant-in-aid.  In the absence of this restraint,
15        schools would compete against one another by offering to pay more for the best re-
      cruits' athletic services and licensing rights—that is, they would engage in price
16        competition.

17  *Id*.  This Court's description of the product market, the restraint and the alleged effects of the re-

18  straint in *O'Bannon* precisely describes the product market, the restraint and the alleged effects of

19  the restraint that plaintiffs assert here.

20        The Court further recognized that many of the NCAA restrictions remain intact, stating:
      Nothing in the injunction will preclude the NCAA from continuing to enforce all of
21        its other existing rules which are designed to achieve its legitimate procompetitive
      goals.  This includes its rules on prohibiting student-athletes from endorsing com-
22        mercial products, setting academic eligibility requirements, prohibiting schools from
      creating athlete-only dorms, and setting limits on practice hours.  Nor shall anything
23        in this injunction preclude the NCAA from enforcing its current rules limiting the
      total number of football and basketball scholarships each school may award, which
24        are not challenged here.

25  *Id*. at *37.

26        Plaintiffs in the instant actions now ask this Court to enjoin *any* rules that limit *in any way*

27  the amount of compensation that a student-athlete may receive while he or she is in school.  Plain-

28  tiffs seek to be compensated immediately for their participation in intercollegiate sports in an un-

---

**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS**          **MDL No. 14-md-02541-CW**
**Case No. 14-cv-02758-CW**

1  limited amount based on their individual athletic ability or the quality of their individual perfor-

2  mances.  Such a claim is entirely inconsistent with this Court's decision in *O'Bannon*.  Indeed,

3  plaintiffs contend that defendants would *still* be liable for an antitrust violation if, in compliance

4  with this Court's *O'Bannon* injunction, they adopted the *very* student-athlete compensation limits

5  that this Court approved and from which this Court "remove[d] any unreasonable elements."  *Id.* at

6  *36.

7       Plaintiffs have not alleged any plausible antitrust theory that would reconcile the relief they

8  seek in this case with what this Court has already held in *O'Bannon* to be permissible under the

9  federal antitrust laws.  Just as the plaintiffs in *Century Aluminum* failed to include allegations

10  showing "that their situation [was] different" from previous cases and thus failed to state a plausi-

11  ble claim, 729 F.3d at 1107-08, plaintiffs in the present case have failed to make allegations distin-

12  guishing their situation from that upon which the Court ruled in *O'Bannon*, and thus have failed to

13  state a plausible claim for further relief.  Accordingly, this Court should dismiss plaintiffs' com-

14  plaints in their entirety.

15  **II.  LIMITS ON STUDENT-ATHLETE COMPENSATION ARE CONSISTENT WITH FEDERAL COURT DECISIONS HOLDING THAT NCAA ELIGIBILITY RULES,**

16  **INCLUDING SUCH COMPENSATION LIMITS, ARE PROCOMPETITIVE**

17       The Court's recognition in *O'Bannon* that the NCAA may lawfully adopt and enforce ap-

18  propriate bylaws limiting the amount of compensation paid to student-athletes is consistent with

19  Supreme Court and court of appeals decisions recognizing both joint venture principles and the

20  procompetitive nature of NCAA eligibility rules, including those that limit student-athlete compen-

21  sation.  As this Court held, collaborative actions undertaken by joint ventures should be analyzed

22  under the rule of reason.  *O'Bannon*, 2014 WL 3899815, at *18; *see also American Needle, Inc. v.*

23  *Nat'l Football League*, 560 U.S. 183, 203 (2010) ("When 'restraints on competition are essential if

24  the product is to be available at all,' *per se* rules of illegality are inapplicable, and instead the re-

25  straint must be judged according to the flexible Rule of Reason." (citing *NCAA v. Board of Regents*

26  *of Univ. of Okla.*, 468 U.S. 85, 101 (1984))); *Broadcast Music, Inc. v. Columbia Broad. Sys., Inc.*,

27

28

1    441 U.S. 1, 23-24 (1979).[9]  Indeed, joint venturers are generally permitted to collaborate with re-

2    spect to any "business practice . . . [that] involves the core activity of the joint venture itself." *Tex-*

3    *aco Inc. v. Dagher*, 547 U.S. 1, 7-8 (2006); *see also In re ATM Fee Antitrust Litig.*, 554 F. Supp. 2d

4    1003, 1013 (N.D. Cal. 2008).  And the Supreme Court has consistently recognized that restraints

5    by joint ventures that relate to the availability and preservation of the venture's product—just the

6    kinds of restraints at issue here—may be found procompetitive "in the twinkling of an eye," with

7    no need for elaborate analysis under the rule of reason.  *American Needle*, 560 U.S. at 203; *see also*

8    *Board of Regents*, 468 U.S. at 101, 109.

9           In *Board of Regents*, the Supreme Court explained that "the NCAA seeks to market a par-

10   ticular brand of football—college football.  The identification of this 'product' with an academic

11   tradition differentiates college football from and makes it more popular than professional sports to

12   which it might otherwise be comparable, such as, for example, minor league baseball."  468 U.S. at

13   101-02.  The Court confirmed the validity of NCAA rules "defining the conditions of the contest,

14   the eligibility of participants, or the manner in which members of a joint enterprise shall share the

15   responsibilities and the benefits of the total venture."  *Id.* at 117.  The Court recognized that the

16   integrity of the product could not be preserved "except by mutual agreement; if an institution

17   adopted such restrictions unilaterally, its effectiveness as a competitor on the playing field might

18   soon be destroyed."  *Id.* at 102.[10]

19          Thus, the Court concluded, the NCAA plays a vital role "in enabling college football to

20   preserve its character."  *Id.* at 102.  In performing this critical role, the NCAA "enables a product to

21   be marketed which might otherwise be unavailable."  *Id.*  "[I]ts actions widen consumer choice—

22   ───────────────────

23   [9] Thus, to the extent plaintiffs assert that the challenged NCAA rules constitute a *per se* violation of Section 1 (CAC ¶¶ 512-20; JC ¶ 126), that claim is barred.

24   [10] The essential characteristics that distinguish the "amateur collegiate sports" product are apparent
25   from its very name—the participants are not professional athletes and are college students repre-
     senting their chosen schools.  To preserve these characteristics, the NCAA and its members have
     long required adherence to two fundamental concepts:  athletes must be students and athletes must
26   not be paid to play.  (NCAA Bylaws 12.01.1, 12.02.9, 12.1.2.)  Among other things, the NCAA
     bylaws require student-athletes to enroll in collegiate study—attending class and maintaining satis-
27   factory academic standing—and permit them to receive financial aid that is limited to supporting
     their education.

28

**MEMORANDUM OF POINTS AND AUTHORITIES IN**          **MDL No. 14-md-02541-CW**
**SUPPORT OF DEFENDANTS' MOTION TO DISMISS**          **Case No. 14-cv-02758-CW**

1  not only the choices available to sports fans but also those available to athletes—and hence can be

2  viewed as procompetitive." *Id.* "There can be no question," the Court held, that "the preservation

3  of the student-athlete in higher education adds richness and diversity to intercollegiate athletics and

4  is entirely consistent with the goals of the Sherman Act." *Id.* at 120.

5         Five federal courts of appeals and numerous district courts have similarly concluded that

6  NCAA eligibility rules, including the rules prohibiting the payment of wages or salaries to student-

7  athletes for participation in their chosen sport, are lawful under the antitrust laws.  The Fifth Cir-

8  cuit, for example, in *McCormack v. NCAA*, 845 F.2d 1338 (5th Cir. 1988), held that NCAA rules

9  restricting student-athlete compensation to scholarships and limited financial benefits were reason-

10  able as a matter of law.  In affirming the district court's dismissal on the pleadings, the Fifth Circuit

11  expressly rejected the plaintiffs' attempt to undermine the NCAA's commitment to amateurism on

12  the grounds that the NCAA permitted student-athletes to be awarded athletic scholarships:  "That

13  the NCAA has not distilled amateurism to its purest form does not mean its attempts to maintain a

14  mixture containing some amateur elements are unreasonable." *Id.* at 1345.  Rather, the Fifth Cir-

15  cuit succinctly stated that it had "little difficulty in concluding that the challenged restrictions are

16  reasonable." *Id.* at 1344-45; *see also Marucci Sports, L.L.C. v. NCAA*, 751 F.3d 368, 374 (5th Cir.

17  2014) (eligibility rules "are presumptively procompetitive and are not generally deemed unlawful

18  restraints on trade").

19         Similarly, the Seventh Circuit in *Agnew v. NCAA*, 683 F.3d 328 (7th Cir. 2012), recognized

20  that the NCAA's eligibility rules "have been blessed by the Supreme Court, making them presump-

21  tively procompetitive." *Id.* at 341.  Challenges to NCAA rules prohibiting payment for athletic

22  performance, therefore, are properly "deemed procompetitive 'in the twinkling of an eye'"—that is,

23  at "the motion-to-dismiss stage." *Id.* at 347 n.8.  The court held that there was no need for "proof

24  of the procompetitive nature of the NCAA's 'no payment' rules on a case-by-case basis." *Id.* at

25  343 n.7.  Rather, the "no payment" rules themselves are "clearly" procompetitive. *Id.*  Moreover,

26  the court held, if the challenged rule "is, on its face, supportive of the 'no payment' and 'student-

27  athlete' models," it is procompetitive as a matter of law with no further antitrust analysis required

28  or warranted. *Id.*; *see also Banks v. NCAA*, 977 F.2d 1081, 1089-90 (7th Cir. 1992) ("None of the

**MEMORANDUM OF POINTS AND AUTHORITIES IN**            **MDL No. 14-md-02541-CW**
**SUPPORT OF DEFENDANTS' MOTION TO DISMISS**           **Case No. 14-cv-02758-CW**

1   NCAA rules affecting college football eligibility restrain trade in the market for college players.”);

2   *Gaines v. NCAA*, 746 F. Supp. 738, 747 (M.D. Tenn. 1990) (holding that the NCAA eligibility

3   rules are “overwhelmingly procompetitive, are justified by legitimate business reasons, and conse-

4   quently cannot be viewed as having any unreasonably exclusionary or anticompetitive effect”);

5   *Justice v. NCAA*, 577 F. Supp. 356, 382 (D. Ariz. 1983) (holding NCAA rules barring compensa-

6   tion and extra benefits to student-athletes did not violate antitrust laws because they are “directly

7   related to the NCAA objectives of preserving amateurism and promoting fair competition”).

8          The Third and Sixth Circuits also have concluded that the NCAA eligibility rules are lawful

9   on the ground that such rules are non-commercial and thus not subject to antitrust review at all.  In

10  *Smith v. NCAA*, 139 F.3d 180 (3d Cir. 1998), *vacated on other grounds*, 525 U.S. 459 (1999), the

11  Third Circuit affirmed the dismissal of an antitrust challenge on the pleadings, holding that “the

12  Sherman Act does not apply to the NCAA’s promulgation of eligibility requirements” because “the

13  eligibility rules are not related to the NCAA’s commercial or business activities.  Rather than in-

14  tending to provide the NCAA with a commercial advantage, the eligibility rules primarily seek to

15  ensure fair competition in intercollegiate athletics.”  139 F.3d at 185-86; *see also Bowers v. NCAA*,

16  9 F. Supp. 2d 460, 497 (D.N.J. 1998) (holding NCAA eligibility rules not subject to antitrust re-

17  view).  And although it was an alternative ground for dismissal, the Third Circuit recognized in

18  *Smith* that the eligibility rule challenged there, a bylaw concerning graduate student-athlete eligibil-

19  ity, “so clearly survives a rule of reason analysis that we do not hesitate upholding it by affirming

20  an order granting a motion to dismiss.”  *Smith*, 139 F.3d at 187.

21         Likewise, the Sixth Circuit in *Bassett v. NCAA*, 528 F.3d 426 (6th Cir. 2008), held that

22  “[s]imilar to the eligibility rules in *Smith*, NCAA’s rules on recruiting student athletes, specifically

23  those rules prohibiting improper inducements and academic fraud, are all explicitly non-

24  commercial.”  *Id.* at 433; *see also Gaines*, 746 F. Supp. at 743-45 (“[T]he [NCAA] eligibility Rules

25  challenged by Gaines are not subject to antitrust analysis.”); *Jones v. NCAA*, 392 F. Supp. 295, 303

26

27

28

**MEMORANDUM OF POINTS AND AUTHORITIES IN**      **MDL No. 14-md-02541-CW**
**SUPPORT OF DEFENDANTS’ MOTION TO DISMISS**      **Case No. 14-cv-02758-CW**

1  (D. Mass. 1975) (Sherman Act does not "reach[ ] the actions of N.C.A.A. members in setting eligi-

2  bility standards for intercollegiate athletics").[11]

3        Even the Tenth Circuit, which upheld an antitrust challenge to the NCAA's restriction on

4  coaches' salaries in *Law v. NCAA*, 134 F.3d 1010 (10th Cir. 1998), recognized that the NCAA

5  rules prohibiting student-athletes from being paid for their participation in intercollegiate athletics

6  are lawful under the antitrust laws.  As the court in *Law* explained, "[t]he 'product' made available

7  by the NCAA in this case is college basketball; the horizontal restraints necessary for the product

8  to exist include rules such as those forbidding payments to athletes and those requiring that athletes

9  attend class, etc."  *Id.* at 1018 (citation omitted); *see also Rock v. NCAA*, 928 F. Supp. 2d 1010,

10  1026 (S.D. Ind. 2013) ("[T]he Court concludes that the Division III prohibition on athletics-based

11  financial aid is presumptively pro-competitive as a matter of law and grants the NCAA's motion to

12  dismiss that claim with prejudice.");[12] *In re NCAA I-A Walk-On Football Players Litig.*, 398 F.

13  Supp. 2d 1144, 1148 (W.D. Wash. 2005) (recognizing that "courts have regularly upheld NCAA

14  bylaws protecting amateurism in college athletics" because "[t]he law is clear that athletes may not

15  be 'paid to play'").[13]

16  _____

17  [11] The court in *Bassett* explained that "[v]iolation of the applicable NCAA rules gives the violator a

18  decided competitive advantage in recruiting and retaining highly prized student athletes.  It also violates the spirit of amateur athletics by providing remuneration to athletes . . . for their commit-

19  ments to play for the violator's football program."  528 F.3d at 433.  Because the NCAA eligibility rules "are *anti-commercial* and designed to promote and ensure competitiveness amongst NCAA

20  member schools," they are not, as a matter of law, subject to antitrust scrutiny.  *Id.*

21  [12] *Rock v. NCAA* is still pending with certain claims having survived the NCAA's motion to dis-

22  miss.  928 F. Supp. 2d at 1024-27.  But the survival of those claims does not help plaintiffs in these actions.  Under the explicit framework established by the Seventh Circuit in *Agnew* (the predeces-

23  sor to *Rock*), the bylaws challenged in *Rock*, which establish the limitation on the number of schol-arships that may be awarded, are financial aid rules, rather than eligibility rules that—like the by-laws challenged here—are entitled to a presumption of validity.  *Agnew*, 683 F.3d at 341.

24  [13] The challenged bylaws in *In re NCAA I-A Walk-On Football Players Litigation*, were also found

25  not to be eligibility rules, so the fact that the plaintiffs there made it past the pleading stage is irrel-evant to plaintiffs' claims here.  398 F. Supp. 2d at 1149.  In *White v. NCAA*, No. 06-999 Dkt. No.

26  72 (C.D. Cal. Sept. 20, 2006), in which the court denied a motion to dismiss, the plaintiffs chal-lenged the NCAA's rule that limited student-athlete compensation to less than the full cost of at-

27  tendance.  The plaintiffs in *White* did not assert, as plaintiffs here allege, that the antitrust laws pro-hibit any rule limiting in any way the amount of compensation that student-athletes may receive for

28  their participation in intercollegiate athletics.  *White* is therefore irrelevant to the instant motion.

1    In sum, the decisions of the Supreme Court, five federal courts of appeals and numerous

2 federal district courts have recognized that, as a matter of law, the NCAA, as a joint venture pro-

3 ducing the unique product of intercollegiate amateur athletics, may adopt and enforce eligibility

4 rules, including rules that limit the amount of compensation that student-athletes may receive for

5 their participation in college sports.  Because these eligibility rules define the very product that the

6 NCAA and its member institutions create—intercollegiate amateur athletics—the procompetitive

7 nature of the "no payment" rule need not be tested on a case-by-case basis.  *Agnew*, 683 F.3d at

8 343 n.7.  This Court's conclusion in *O'Bannon* that the NCAA and its members may lawfully

9 adopt and enforce some limitations on the amount of compensation that student-athletes may re-

10 ceive for their participation in intercollegiate athletics is consistent with those decisions.  Because

11 plaintiffs cannot plead a plausible claim that any such limitation violates the antitrust laws, they

12 cannot show that they are entitled to the relief they seek, and their antitrust claims should be dis-

13 missed in their entirety.

14 **III.    PLAINTIFFS IN THE CONSOLIDATED ACTIONS ARE NOT ENTITLED
       TO ANY RELIEF UNDER CALIFORNIA'S UNFAIR COMPETITION ACT**

15

16    **A.    *Plaintiffs in the Consolidated Actions Fail to Allege an
             "Unlawful, Unfair or Fraudulent Business Act or Practice"***

17    In the consolidated amended complaint, plaintiffs assert two predicates for their claim that

18 the NCAA and the Pac-12 violated the Unfair Competition Act, Cal. Bus. & Prof. Code § 17200, *et*

19 *seq.* ("UCL"):  (i) violation of federal and state antitrust laws; and (ii) violation of California's

20 "Student Athlete Bill of Rights."  (CAC ¶¶ 547-548.)  Neither alleged predicate satisfies the UCL's

21 requirement that plaintiffs plead that defendants engaged in an "unlawful, unfair or fraudulent

22 business act or practice."  *Cel-Tech Commc'ns, Inc. v. L.A. Cellular Tel. Co.*, 20 Cal. 4th 163, 180

23 (1999) (quoting Section 17200).[14]

24 _____

25 [14] Plaintiffs in the consolidated actions do not assert a violation of Section 17200 under the fraudu-
     lent prong.  Indeed, the word "fraudulent" appears only in the most conclusory fashion in the con-
26   solidated amended complaint, where plaintiffs allege that "Defendants' conduct . . . constitutes un-
     fair, unlawful and/or fraudulent business practices" and that "[t]he conduct is unfair, unlawful,
27   and/or fraudulent because, among other things, it violates the federal Sherman Act as well as Cali-
     fornia's antitrust laws."  (CAC ¶ 547.)

28

1   As explained in the foregoing sections, plaintiffs have failed to plead a cognizable federal

2   antitrust claim, and thus cannot base their UCL claim on that same allegedly "unlawful" conduct.

3   *LiveUniverse, Inc. v. MySpace, Inc.*, 304 F. App'x 554, 557-58 (9th Cir. 2008) ("a finding that the

4   conduct is not an antitrust violation precludes a finding of unfair competition"); *see also Aleksick v.*

5   *7-Eleven, Inc.*, 205 Cal. App. 4th 1176, 1185 (2012) ("When a statutory claim fails, a derivative

6   UCL claim also fails.").  For the same reasons, plaintiffs cannot base their UCL claim on an al-

7   leged violation of California antitrust law.  *See County of Tuolumne v. Sonora Cmty. Hosp.*, 236

8   F.3d 1148, 1160 (9th Cir. 2001) ("The analysis under California's antitrust law mirrors the analysis

9   under federal law because the Cartwright Act was modeled after the Sherman Act." (citation omit-

10  ted)); *Ubiquiti Networks, Inc. v. Kozumi USA Corp.*, No. C 12-2582 CW, 2013 WL 368365, at *9

11  (N.D. Cal. Jan. 29, 2013) ("California courts have long recognized that a claimant's failure to state

12  a Sherman Act claim will likewise condemn its claims under the Cartwright Act.").  And, while

13  plaintiffs in the consolidated actions allege that the NCAA and the Pac-12 violated "California's

14  policy of protecting the well-being of California's college athletes" by "depriving Plaintiffs and

15  Class Members of basic economic rights" (CAC ¶ 548), the consolidated amended complaint does

16  not identify what these "basic economic rights" are, and none of the rights set forth in the Student

17  Athlete Bill of Rights is at issue in this case.[15]

18      Plaintiffs also cannot allege any independently "unfair" conduct.  To be "unfair," the con-

19  duct must "threaten[ ] an incipient violation of an antitrust law, or violate[ ] the policy or spirit of

20  one of those laws because its effects are comparable to or the same as a violation of the law, or

21

22

23

_____

24  [15] The Student Athlete Bill of Rights seeks to ensure that student-athletes who have suffered injury in the course of collegiate athletic activity receive proper medical care (Cal. Educ. Code § 67453), that all student-athletes have an opportunity to complete their college educations (*id.*

25  § 67452(a)(1)-(3)), that student-athletes receive training in basic financial and life skills (*id.* § 67452(b)), and that students enjoy certain basic due process rights regarding the withdrawal of

26  financial aid and other discipline (*id.* § 67452(a)(4), (c)) and requests to transfer institutions (*id.* § 67452(d)).  Plaintiffs do not allege that the NCAA's bylaws or the Pac-12's conduct violate any

27  of these articulated rights.  California has not included in the Student Athlete Bill of Rights a right to receive compensation for participating in intercollegiate athletics.  *See id.* §§ 67450–67454.

28

**MEMORANDUM OF POINTS AND AUTHORITIES IN**            **MDL No. 14-md-02541-CW**
**SUPPORT OF DEFENDANTS' MOTION TO DISMISS**           **Case No. 14-cv-02758-CW**

1  otherwise significantly threaten[ ] or harm[ ] competition." *Cel-Tech*, 20 Cal. 4th at 187.[16]  Plain-

2  tiffs cannot satisfy the *Cel-Tech* test because, as explained above, they have not alleged any action-

3  able violation of the antitrust laws or the Student Athlete Bill of Rights.  *See Chavez v. Whirlpool*

4  *Corp.*, 93 Cal. App. 4th 363, 375 (2001) ("If the same conduct is alleged to be both an antitrust vio-

5  lation and an 'unfair' business act or practice for the same reason—because it unreasonably re-

6  strains competition and harms consumers—the determination that the conduct is not an unreasona-

7  ble restraint of trade necessarily implies that the conduct is not 'unfair' toward consumers.");

8  *DocMagic, Inc. v. Ellie Mae, Inc.*, 745 F. Supp. 2d 1119, 1146-47 (N.D. Cal. 2010) (granting mo-

9  tion to dismiss where the plaintiff failed to allege facts showing that the defendant's conduct vio-

10  lated the Sherman Act and, as a result, any claims the plaintiff asserted under the "unfair" prong

11  "necessarily fail[ed] as well").

12  **B.   Plaintiffs Are Not Entitled to a Remedy Under the UCL**

13

14  The UCL is a statute that expressly makes available only specific, limited forms of relief—

15  injunctive relief or restitution.  In the absence of an entitlement to one of those forms of relief, a

16  party does not state a cause of action under the UCL.  *Madrid v. Perot Sys. Corp.*, 130 Cal. App.

17  4th 440, 467 (2005) ("Since plaintiff failed to present a viable claim for restitution or injunctive

18  relief (the only remedies available) . . . , plaintiff's complaint failed to state a viable UCL claim.").

19  Because plaintiffs here are not entitled to either injunctive relief or restitution, their UCL claim

20  must be dismissed.  *See id.*; *Ice Cream Distribs. of Evansville, LLC v. Dreyer's Grand Ice Cream,*

21  *Inc.*, No. 09-5815 CW, 2010 WL 3619884, at *9 (N.D. Cal. Sept. 10, 2010) (Wilken, J.) (granting

22  dismissal of UCL claim where plaintiff failed to plead entitlement to injunctive relief or restitu-

23

24  [16] In *Lozano v. AT&T Wireless Services, Inc.*, 504 F.3d 718 (9th Cir. 2007), the Ninth Circuit held
that federal courts may apply the *Cel-Tech* test or, alternatively, a test "balancing the harm to the

25  consumer against the utility of the defendant's practice."  *Id.* at 735-36.  As the court recognized,
however, the California Supreme Court had previously rejected this same "balancing" test in the

26  context of competitor UCL claims as "'too amorphous' and 'provid[ing] too little guidance to
courts and businesses.'"  *Id.* at 735 (quoting *Cel-Tech*, 20 Cal. 4th at 185).  Even if this Court were

27  to apply the balancing test, it has already recognized in *O'Bannon*, after weighing the allegedly un-
lawful effects of the conduct, that the NCAA was justified in placing restrictions on student-athlete

28  compensation.

1   tion), *aff'd*, 487 F. App'x 362, 363 (9th Cir. 2012).  Because plaintiffs are not entitled to an injunc-

2   tion beyond the relief provided in *O'Bannon*, they cannot establish that there is a "threat that the

3   misconduct to be enjoined is likely to be repeated in the future."  *Madrid*, 130 Cal. App. 4th at 465;

4   *Feitelberg v. Credit Suisse First Boston, LLC*, 134 Cal. App. 4th 997, 1012, 1022 (2005) (injunc-

5   tive relief foreclosed where conduct was the subject of a federal consent judgment compelling de-

6   fendants to stop the conduct plaintiff sought to enjoin); *Groth-Hill Land Co. v. GM LLC*, No. C13-

7   1362 TEH, 2013 WL 3853160, at *18 (N.D. Cal. July 23, 2013).  Further, plaintiffs have not al-

8   leged that defendants received any money that was taken from, or "owned" by, them.  Indeed,

9   plaintiffs do not allege that they paid anything to defendants—or even to the non-party colleges

10  and universities they attended.  Instead, plaintiffs admit the opposite:  they allege that they received

11  athletic grants-in-aid from the schools they attended covering tuition, fees, and room and board.

12  (CAC ¶ 497.)  Plaintiffs therefore are not entitled to restitution.  *Madrid*, 130 Cal. App. 4th at 455

13  (restitution is only available to "return . . . money to those persons from whom it was taken or who

14  had an ownership interest in it"); *Feitelberg*, 134 Cal. App. 4th at 1012-13; *see also Korea Supply*

15  *Co. v. Lockheed Martin Corp.*, 29 Cal. 4th 1134, 1144-45 (2003).

16          Because plaintiffs in the consolidated actions cannot plausibly assert a violation of, or an

17  entitlement to relief under, the UCL, this claim must be dismissed with prejudice.  *Iqbal*, 556 U.S.

18  at 679.

19

20

21

22

23

24

25

26

27

28

## CONCLUSION

For the foregoing reasons, defendants' motion to dismiss the complaints in these coordinated actions should be GRANTED with prejudice and without leave to amend.

DATED: September 4, 2014

**SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP**


By:    _____/s/ Jeffrey A. Mishkin_____
Jeffrey A. Mishkin
Anthony J. Dreyer
Karen Hoffman Lent
Raoul D. Kennedy

Attorneys for Defendant
NATIONAL COLLEGIATE ATHLETIC ASSOCIATION


**PROSKAUER ROSE LLP**                    **MAYER BROWN LLP**


By:    _____/s/ Scott P. Cooper_____          By:    _____/s/ Andrew S. Rosenman_____
Scott P. Cooper (SBN 96905)              Andrew S. Rosenman (SBN 253764)
Jennifer L. Jones (SBN 284624)            Britt M. Miller (*pro hac vice*)
Sarah Kroll-Rosenbaum (SBN 272358)     71 South Wacker Drive
Shawn S. Ledingham Jr. (SBN 275268)    Chicago, IL 60606-4637
2049 Century Park East, Suite 3200        Telephone: (312) 782-0600
Los Angeles, CA 90067                   Facsimile: (312) 701-7711
Telephone: (310) 557-2900               Email: arosenman@mayerbrown.com
Facsimile: (310) 557-2193               Email: bmiller@mayerbrown.com
Email: scooper@proskauer.com
Email: jljones@proskauer.com            Richard J. Favretto (*pro hac vice*)
Email: skroll-rosenbaum@proskauer.com   1999 K Street, N.W.
Email: sledingham@proskauer.com         Washington, D.C. 20006-1101
                                       Telephone: (202) 263-3000
Attorneys for Defendant                 Facsimile: (202) 263-3300
PAC-12 CONFERENCE                      Email: rfavretto@mayerbrown.com

                                       Attorneys for Defendant
                                       THE BIG TEN CONFERENCE, INC.

---

| MEMORANDUM OF POINTS AND AUTHORITIES IN | MDL No. 14-md-02541-CW |
|---|---|
| SUPPORT OF DEFENDANTS' MOTION TO DISMISS | Case No. 14-cv-02758-CW |

18

| | |
|---|---|
| **POLSINELLI PC** | **ROBINSON BRADSHAW & HINSON** |

By: _____/s/ Leane K. Capps_____
Leane K. Capps (*pro hac vice*)
Saint Ann Court
2501 N. Harwood Street, Suite 1900
Dallas, TX 75201
Telephone: (214) 397-0030
Email: lcapps@polsinelli.com

Amy D. Fitts (*pro hac vice*)
120 W. 12th Street
Kansas City, MO 64105
Telephone: (816) 218-1255
Email: afitts@polsinelli.com

Wesley D. Hurst (SBN 127564)
2049 Century Park East, Suite 2300
Los Angeles, CA 90067
Telephone: (310) 556-1801
Email: whurst@polsinelli.com

Attorneys for Defendants
THE BIG 12 CONFERENCE, INC. AND
CONFERENCE USA

By: _____/s/ Robert W. Fuller_____
Robert W. Fuller, III (*pro hac vice*)
Nathan C. Chase Jr. (SBN 247526)
Mark W. Merritt (*pro hac vice*)
Lawrence C. Moore, III (*pro hac vice*)
Amanda R. Pickens (*pro hac vice*)
101 N. Tryon St., Suite 1900
Charlotte, NC 28246
Telephone: (704) 377-2536
Facsimile: (704) 378-4000
Email: nchase@rbh.com
Email: rfuller@rbh.com
Email: mmerritt@rbh.com
Email: lmoore@rbh.com
Email: apickens@rbh.com

Mark J. Seifert (SBN 217054)
Robert R. Moore (SBN 113818)
ALLEN MATKINS LECK GAMBLE MAL-
LORY & NATSIS LLP
Three Embarcadero Center, 12th Floor
San Francisco, CA 94111
Telephone: (415) 837-1515
Facsimile: (415) 837-1516
Email: mseifert@allenmatkins.com
Email: rmoore@allenmatkins.com

Attorneys for Defendant
SOUTHEASTERN CONFERENCE

**SMITH MOORE LEATHERWOOD LLP**          **COVINGTON & BURLING LLP**

By:  _____/s/ D. Erik Albright_____          By:  _____/s/ Benjamin C. Block_____
D. Erik Albright (*pro hac vice*)                Benjamin C. Block (*pro hac vice*)
300 North Greene Street, Suite 1400              1201 Pennsylvania Avenue, N.W.
Greensboro, NC 27401                             Washington, DC 20004-2401
Telephone:  (336) 378-5368                       Telephone: (202) 662-5205
Facsimile: (336) 433-7402                        Facsimile: (202) 778-5205
Email: erik.albright@smithmoorelaw.com           Email: bblock@cov.com

Jonathan P. Heyl (*pro hac vice*)                Matthew D. Kellogg (SBN 280541)
101 N. Tryon Street, Suite 1300                  One Front Street
Charlotte, NC 28246                              San Francisco, CA 94111-5356
Telephone: (704) 384-2625                        Telephone: (415) 591-6000
Facsimile: (704) 384-2909                        Facsimile: (415) 591-6091
Email: jon.heyl@smithmoorelaw.com                Email: mkellogg@cov.com

Charles LaGrange Coleman, III (SBN 65496)        Attorneys for Defendant
HOLLAND & KNIGHT LLP                             AMERICAN ATHLETIC CONFERENCE
50 California Street, Suite 2800
San Francisco, CA 94111-4624
Telephone: (415) 743-6900
Facsimile: (415) 743-6910
Email: ccoleman@hklaw.com

Attorneys for Defendant
THE ATLANTIC COAST CONFERENCE

| | |
|---|---|
| **WALTER HAVERFIELD LLP** | **BRYAN CAVE LLP** |

By: _____/s/ R. Todd Hunt_____
       R. Todd Hunt (*pro hac vice*)
       The Tower at Erieview
       1301 E. 9th Street, Suite 3500
       Cleveland, OH 44114-1821
       Telephone: (216) 928-2935
       Facsimile: (216) 916-2372
       Email: rthunt@walterhav.com

       Attorneys for Defendant
       MID-AMERICAN CONFERENCE

By: _____/s/ Adam Brezine_____
       Adam Brezine (SBN 220852)
       560 Mission Street, 25th Floor
       San Francisco, CA 94105
       Telephone: (415) 674-3400
       Facsimile: (415) 675-3434
       Email: adam.brezine@bryancave.com

       Richard Young (*pro hac vice* application to be filed)
       Brent Rychener (*pro hac vice* application to be filed)
       90 South Cascade Avenue, Suite 1300
       Colorado Springs, CO 80903
       Telephone: (719) 473-3800
       Facsimile: (719) 633-1518
       Email: richard.young@bryancave.com
       Email: brent.rychener@bryancave.com

       Attorneys for Defendant
       MOUNTAIN WEST CONFERENCE

| | |
|---|---|
| **JONES WALKER** | **BRADLEY DEVITT HAAS & WATKINS, P.C.** |

By: _____/s/ Mark A. Cunningham_____
       Mark A. Cunningham (*pro hac vice*)
       201 St. Charles Avenue
       New Orleans, LA 70170-5100
       Telephone: (504) 582-8536
       Facsimile: (504) 589-8536
       Email: mcunningham@joneswalker.com

       Attorneys for Defendant
       SUN BELT CONFERENCE

By: _____/s/ Jon T. Bradley_____
       Jon T. Bradley
       (*pro hac vice* application to be filed)
       2201 Ford Street
       Golden, CO 80401
       Telephone: (303) 384-9228
       Facsimile: (303) 384-9231
       Email: jon@goldenlawyers.com

       Attorneys for Defendant
       WESTERN ATHLETIC CONFERENCE

## FILER'S ATTESTATION

    I, Jeffrey A. Mishkin, am the ECF user whose identification and password are being used to file this MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF DEFEND-ANTS' MOTION TO DISMISS. In compliance with Local Rule 5-1(i)(3), I hereby attest that all signatories hereto concur in this filing.

                    */s/ Jeffrey A. Mishkin*