Jeffrey L. Kessler (admitted *pro hac vice*)
David G. Feher (admitted *pro hac vice*)
David L. Greenspan (admitted *pro hac vice*)
WINSTON & STRAWN LLP
200 Park Avenue
New York, NY 10166-4193
Telephone: (212) 294-6700
Facsimile: (212) 294-4700
*jkessler@winston.com*
*dfeher@winston.com*
*dgreenspan@winston.com*

Sean D. Meenan (SBN 260466)
WINSTON & STRAWN LLP
101 California Street
San Francisco, CA 94111
Telephone: (415) 591-1000
Facsimile: (415) 591-1400
*smeenan@winston.com*

Counsel for *Jenkins* Plaintiffs

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

### OAKLAND DIVISION

| | |
|---|---|
| **IN RE: NATIONAL COLLEGIATE ATHLETIC ASSOCIATION ATHLETIC GRANT-IN-AID CAP ANTITRUST LITIGATION** | **Case No. 4:14-md-02541-CW** |
| THIS DOCUMENT RELATES TO: | **Case No. 4:14-cv-02758-CW** |
| *Jenkins, et al. v. NCAA, et al.* | **SECOND AMENDED COMPLAINT– CLASS ACTION SEEKING INJUNCTION** |

1        Plaintiffs, by their undersigned attorneys, for their Complaint herein allege as follows:

2                              **INTRODUCTION**

3        1.     The Defendants in this action—the National Collegiate Athletic Association

4 ("NCAA") and five major NCAA conferences that have agreed to apply NCAA restrictions (the

5 "Power Conferences")—earn billions of dollars in revenues each year through the hard work, sweat,

6 and sometimes broken bodies of top-tier college football and men's basketball athletes who perform

7 services for Defendants' member institutions in the big business of college sports.  However, instead

8 of allowing their member institutions to compete for the services of those players while operating

9 their businesses, Defendants have entered into what amounts to cartel agreements with the avowed

10 purpose and effect of placing a ceiling on the compensation that may be paid to these athletes for

11 their services.  Those restrictions are pernicious, a blatant violation of the antitrust laws, have no

12 legitimate pro-competitive justification, and should now be struck down and enjoined.

13        2.     The Plaintiffs—three top-tier college football and men's basketball players, along

14 with the class members whom the players seek to represent—are exploited by Defendants and their

15 member institutions under false claims of amateurism.   The Defendants and their member

16 institutions have lost their way far down the road of commercialism, signing multi-billion dollar

17 contracts wholly disconnected from the interests of "student athletes," who are barred from receiving

18 the benefits of competitive markets for their services even though their services generate these

19 massive revenues.  As a result of these illegal restrictions, market forces have been shoved aside and

20 substantial damages have been inflicted upon a host of college athletes whose services have yielded

21 riches only for others.  This class action is necessary to end the NCAA's unlawful cartel, which is

22 inconsistent with the most fundamental principles of antitrust law.

23        3.     This class action is brought to permanently enjoin violations by each Defendant of the

24 federal antitrust laws.

25        4.     Plaintiffs, and the classes of football and basketball players whom the player

26 Plaintiffs seek to represent, are athletes who have performed services for Defendants' member

27 institutions in top-tier college football and men's basketball competitions.  These classes of athletes

28 have entered into financial agreements with Defendants' member institutions that sponsor and

operate football and men's basketball programs subject to the rules of the NCAA and the member conferences that have all agreed to apply NCAA restrictions.

5.      Defendants have jointly agreed and conspired with their member institutions to deny Plaintiffs the ability to provide and/or market their services as football and men's basketball players in top-tier college football and men's basketball markets through a patently unlawful price-fixing and group boycott arrangement.

6.      The Defendants' agreed-upon rules impose an artificial and unlawful ceiling on the remuneration that players may receive for their services as football and men's basketball players in the multi-billion dollar college sports industry.  Under NCAA and Power Conference rules, players may receive only tuition, required institutional fees, room and board, and required course-related books in exchange for their services as college football and men's basketball players.  This amount is defined by the NCAA as a "full grant-in-aid" and commonly referred to as an "athletic scholarship."

7.       These agreements to price-fix players' compensation, and to boycott any institutions or players who refuse to comply with the price fixing agreement, are *per se* illegal acts under Section 1 of the Sherman Act, 15 U.S.C. § 1.  They also constitute an unreasonable restraint of trade under the rule of reason, whether under a "quick look" or full-blown rule of reason analysis.

8.      As a result of Defendants' anticompetitive agreements, Plaintiffs and other similarly situated current and future college football and men's basketball players in the relevant markets described in more detail below have received and/or will receive less remuneration for their playing services than they would receive in a competitive market.  A permanent injunction, on behalf of the proposed injunctive class, is the only relief that can bring these unlawful restrictions to an end.

## JURISDICTION AND VENUE

9.      These claims arise and are brought under Section 1 of the Sherman Antitrust Act, 15 U.S.C. § 1.

10.      This Court has jurisdiction pursuant to 15 U.S.C. §§ 4 and 15, and 28 U.S.C. §§ 1331, 1337 and 1367, in that this action arises under federal antitrust laws.

1        11.     Venue is proper in the District of New Jersey pursuant to 28 U.S.C. § 1391 and 15

2    U.S.C. § 22.  Venue is proper in the Northern District of California, for purposes of coordinated

3    pretrial proceedings only, pursuant to 28 U.S.C. § 1407 and the June 17, 2014, Transfer Order filed

4    by the United States Judicial Panel on Multidistrict Litigation.  Pursuant to the same authority,

5    Plaintiffs reserve their right for this action to be remanded to the District of New Jersey upon the

6    conclusion of pretrial proceedings.

7        12.     Each of the Defendants can be found, resides, has an agent, or transacts business in

8    the District of New Jersey, and the unlawful activities were or will be carried on in part by one or

9    more of the Defendants within that district.  The District of New Jersey is home to eight universities

10    that operate Division I football and/or men's basketball programs, including Fairleigh Dickinson

11    University, Monmouth University, New Jersey Institute of Technology, Princeton University, Rider

12    University, Rutgers University ("Rutgers"), Saint Peter's University, and Seton Hall University

13    ("Seton Hall").  Rutgers is a member of Defendant the Big Ten Conference.  Additionally, the

14    NCAA has conducted its Division I men's basketball championship within the district, has

15    contracted for services related to such event in the district, and has distributed revenue to universities

16    within the district.  Further, NCAA member institutions recruit the talents of football and men's

17    basketball players from the district and conduct transactions within the district, including the

18    offering and signing of athletic scholarship agreements, which are the subject of the unlawful

19    restrictions that are challenged in this action.

20        13.     Defendants earn billions of dollars from television agreements that are the product of

21    their unlawful restrictions, which revenues are earned in part from telecasts that are disseminated in

22    the District of New Jersey.

23                      **THE PARTIES**

24        14.     Plaintiff Martin Jenkins is a college football player who was recruited by several

25    NCAA Division I and Power Conference member institutions.  In 2010, Jenkins was offered and

26    accepted a full grant-in-aid to play football at Clemson University ("Clemson"), located in Clemson,

27    South Carolina, a Division I member of the NCAA and the Atlantic Coast Conference, where he

28    participated as a member of the football team until December 2014.

15.     Pursuant to NCAA and conference rules, the athletics-based remuneration provided to Jenkins by Clemson during each year of his participation with the football team has been equal to, and no more than, the highest amount permitted under the artificial restraints imposed on athlete compensation by Defendants.  Several other NCAA Division I member institutions offered Jenkins a full grant-in-aid to play football, the amounts of which were also capped by rules imposed by Defendants.

16.     Plaintiff Nigel Hayes is a college basketball player who was recruited by several NCAA Division I and Power Conference member institutions.  In 2013, Hayes was offered and accepted a full athletics-based grant-in-aid to play basketball at the University of Wisconsin, Madison ("Wisconsin"), located in Madison, Wisconsin, a Division I member of the NCAA and the Big Ten Conference.

17.     Pursuant to NCAA and conference rules, the athletics-based remuneration provided to Hayes by Wisconsin during each year of his participation with the basketball team has been equal to the highest amount permitted under the artificial restraints imposed on athlete compensation by the Defendants.  Several other NCAA Division I member institutions offered Hayes a full grant-in-aid to play basketball, the amounts of which were also capped by rules imposed by the Defendants.

18.     Plaintiff Alec James is a college football player who was recruited by several NCAA Division I and Power Conference member institutions.  In 2013, James was offered and accepted a full athletics-based grant-in-aid to play football at University of Wisconsin, Madison, located in Madison, Wisconsin, a Division I member of the NCAA and the Big Ten Conference.

19.     Pursuant to NCAA and conference rules, the athletics-based remuneration provided to James by Wisconsin during each year of his participation with the football team has been equal to the highest amount permitted under the artificial restraints imposed on athlete compensation by the Defendants.  Several other NCAA Division I member institutions offered James a full grant-in-aid to play football, the amounts of which were also capped by rules imposed by the Defendants.

20.     Defendant NCAA is an unincorporated association of more than 1,200 colleges, universities, and athletic conferences located throughout the United States.  The NCAA maintains its headquarters and principal place of business at 700 W. Washington Street in Indianapolis, Indiana.

The NCAA is engaged in interstate commerce in the business of, among other things, governing the big business of top-tier college football and men's basketball in the United States, as well as owning and operating the multi-billion dollar NCAA Division I Men's Basketball Championship.

21.    The remaining Defendants are the five Power Conferences, each of which is engaged in interstate commerce in the business of, among other things, governing the big business of top-tier college football and men's basketball engaged in by their members, including by selling broadcast rights to their members' competitions.

22.    Upon information and belief, each of the five Power Conferences is a separately owned entity.  The Power Conferences are:

- The Atlantic Coast Conference ("ACC"), an unincorporated association that identified itself, as of 2011, as a tax-exempt organization under Section 501(c)(3) of the U.S. Internal Revenue Code, with its principal place of business at 4512 Weybridge Lane, Greensboro, North Carolina 27407;

- The Big Twelve Conference, Inc. ("Big 12"), a corporation organized under the laws of Delaware that identified itself, as of 2011, as a tax-exempt organization under Section 501(c)(3) of the U.S. Internal Revenue Code, with its principal place of business at 400 East John Carpenter Freeway, Irving, Texas 75062;

- The Big Ten Conference ("Big Ten"), a corporation organized under the laws of Delaware that identified itself, as of 2011, as a tax-exempt organization under Section 501(c)(3) of the U.S. Internal Revenue Code, with its principal place of business at 5440 Park Place, Rosemont, Illinois 60018;

- The Pac-12 Conference ("Pac-12"), an unincorporated association that identified itself, as of 2011, as a tax-exempt organization under Section 501(c)(3) of the U.S. Internal Revenue Code, with its principal place of business at 1350 Treat Boulevard, Suite 500, Walnut Creek, California 94597;

- The Southeastern Conference ("SEC"), an unincorporated association that identified itself, as of 2011, as a tax-exempt organization under Section 501(c)(3) of the U.

SECOND AMENDED COMPLAINT – CLASS ACTION SEEKING INJUNCTION
MDL No. 4:14-md-02541-CW; Case No. 4:14-cv-02758-CW

1    Internal Revenue Code, with its principal place of business at 2201 Richard Arrington

2    Boulevard North, Birmingham, Alabama 35203.

3    **CLASS ACTION ALLEGATIONS**

4    23.    Each of Plaintiffs Martin Jenkins and Alec James (collectively, the "Football

5    Plaintiffs"), and Plaintiff Nigel Hayes (the "Basketball Plaintiff"), is representative of an injunctive-

6    relief class, as defined by Rule 23(b)(1) and/or Rule 23(b)(2) of the Federal Rules of Civil

7    Procedure, and brings this action on behalf of himself and his respective class members as described

8    in Paragraphs 24-25 below.

9    24.    The class represented by the Football Plaintiffs is comprised of any and all NCAA

10   Division I Football Bowl Subdivision ("FBS") football players who, at any time from the date of this

11   Complaint through the date of the final judgment, or the date of the resolution of any appeals

12   therefrom, whichever is later, received or will receive a written offer for a full grant-in-aid as defined

13   in NCAA Bylaw 15.02.5, or who received or will receive such a full grant-in-aid (the "Football

14   Class").

15   25.    The class represented by the Basketball Plaintiff is comprised of any and all NCAA

16   Division I men's basketball players who, at any time from the date of this Complaint through the

17   date of the final judgment, or the date of the resolution of any appeals therefrom, whichever is later,

18   received or will receive a written offer for a full grant-in-aid as defined in NCAA Bylaw 15.02.5, or

19   who received or will receive such a full grant-in-aid (the "Basketball Class").

20   26.    Each of the Football Class and the Basketball Class is so numerous and

21   geographically so widely dispersed that joinder of all members is impracticable.

22   27.    There are questions of law and fact common to each class.  Each Plaintiff's claims are

23   typical of the claims of the class that he represents, and each Plaintiff will fairly and adequately

24   protect the interests of the respective class that he represents.

25   28.    Each person in each class is, has been, and/or will be subject to uniform agreements,

26   rules, and practices among the Defendants that restrain competition for player services, including,

27   but not limited to, the NCAA Bylaws and conference rules set forth herein, and any and all similar

28

6

player restraints that are or will be uniformly imposed by the Defendants on members of each class. Indeed, the NCAA rules at issue apply uniformly to all members of each respective class.

29.     The financial aid agreements signed by NCAA players are virtually identical throughout NCAA Division I for college football and men's basketball players as a result of the unlawful restrictions that apply uniformly to all member institutions of the NCAA and the other defendants.

30.     The prosecution of separate actions by individual members of each class would create the risk of:

(a)     inconsistent or varying adjudications with respect to individual class members that would establish incompatible standards of conduct for the party opposing the class; or

(b)     adjudications with respect to individual class members that, as a practical matter, would be dispositive of the interests of the other members not parties to the individual adjudications or would substantially impair or impede their abilities to protect their interests.

31.     In construing and enforcing their uniform agreements, rules, and practices, and in taking and planning to take the actions described in this Complaint, the Defendants have acted or refused to act on grounds that apply generally to each of the classes, so that final injunctive relief or corresponding declaratory relief would be appropriate for each of the classes as a whole.

## NATURE OF INTERSTATE TRADE AND COMMERCE

32.     Defendants and/or their member institutions are engaged in the businesses of governing and/or operating major college football and men's basketball businesses, including the sale of tickets and telecast rights to the public for the exhibition of the individual and collective football or basketball talents of players such as Plaintiffs.   To conduct these businesses, the Defendants' member institutions would, absent the restrictions at issue in this action, compete with each other for the services of athletes, such as Plaintiffs, who are recruited to perform services as football or basketball players for the various member institutions of the Defendants.

33.     The Defendants' and their member institutions' operation of and engagement in the respective businesses of top-tier college football and men's basketball involves a substantial volume of interstate trade and commerce, including, inter alia, the following interstate activities:   travel;

7

communications; purchases and movement of equipment; broadcasts of games; advertisements; promotions; sales of tickets and concession items; sales of merchandise and apparel; employment of coaches and administrative personnel; employment of referees; and negotiations for all of the above.

34.    The Defendants' and their member institutions' aforesaid interstate transactions involve billions of dollars in collective annual expenditures and receipts.

35.    The Plaintiffs have been recruited by one or more of the Defendants' member institutions in interstate commerce as top-tier college football or men's basketball players.

### THE ILLEGAL AGREEMENTS TO RESTRAIN COMPETITION

36.    The anticompetitive agreements of the Defendants are neither secret, nor in dispute. They are documented and published in the NCAA Division I Manual (the NCAA's rule book) and the rulebooks of each of the Power Conferences.  These rules constitute horizontal agreements in that they are proposed, drafted, voted upon, and agreed upon by NCAA members, including all of the Power Conference defendants, that compete with each other for the services of top-tier college football and men's basketball players.  The anticompetitive rules are also strictly enforced, so that member institutions have no choice but to comply with them or face penalties, including a boycott by the other member institutions of any institutions or players who do not comply.

37.    NCAA Constitution Article 5.01.1 provides, "All legislation of the Association that governs the conduct of the intercollegiate athletics programs of its member institutions shall be adopted by the membership in Convention assembled."  Additionally, NCAA Constitution Article 3.2.4.1 provides that members "agree to administer their athletics programs in accordance with the constitution, bylaws, and other legislation of the Association."

38.    Plaintiffs bring this suit to challenge, as illegal agreements, all NCAA rules, along with all rules of each Power Conference, that are applicable to the FBS Football Players Market and the D-I Men's Basketball Players Market (described below), and that prohibit, cap, or otherwise limit the remuneration that players in each of those markets may receive for their athletic services, including but not limited to NCAA Bylaws 12.01.4, 12.1.2, 12.1.2.1, 13.2.1, 13.2.1.1, 13.5.1, 13.5.2, 13.6.2, 13.6.4, 13.6.7.1, 13.6.7.4, 13.6.7.5, 13.6.7.7, 15.02.2, 15.02.5, 15.1, 16.02.3, 16.1.4, and 16.11.2 (individually, and as interpreted and applied in conjunction with each other).

8

39.     NCAA Bylaw 15 sets forth "Financial Aid" rules, many of which impose restrictions on the amount and nature of, and method by which, remuneration may be provided to athletes. Bylaw 15.1 provides that an athlete may receive remuneration on the basis of athletics ability, but such remuneration is strictly limited to "the value of a full grant-in-aid."  Under Bylaw 15.02.5, a full grant-in-aid "consists of tuition and fees, room and board, and required course-related books." An athlete may receive remuneration beyond this amount only if such additional pay is unrelated to athletic ability; however, even those amounts are subject to a cap.  Bylaw 15.1 states that, "A student-athlete shall not be eligible to participate in intercollegiate athletics if he or she receives financial aid that exceeds the value of the cost of attendance."  Cost of attendance is defined in Bylaw 15.02.2 as "an amount calculated by an institutional financial aid office, using federal regulations, that includes the total cost of tuition and fees, room and board, books and supplies, transportation, and other expenses related to attendance at the institution."  Standing alone, these rules demonstrate a horizontal agreement among competitors to cap the amount of remuneration schools may provide athletes for their services, despite how much money those athletes may generate for their institutions and Defendants.

40.     The NCAA falsely claims that the above-mentioned grants-in-aid, which are awarded specifically on the basis of athletic ability, are not to be considered payments.  Bylaw 12.01.4 states, "A grant-in-aid administered by an educational institution is not considered to be pay or the promise of pay for athletics skill, provided it does not exceed the financial aid limitations set by the Association's membership."  This bylaw is necessary because Bylaw 12 specifically prohibits any payment to athletes on the basis of the athletic services that they provide.  Bylaw 12.1.2 provides:

> An individual loses amateur status and thus shall not be eligible for intercollegiate competition in a particular sport if the individual (a) Uses his or her athletics skill (directly or indirectly) for pay in any form in that sport; (b) Accepts a promise of pay even if such pay is to be received following completion of intercollegiate athletics participation; (c) Signs a contract or commitment of any kind to play professional athletics, regardless of its legal enforceability or any consideration received, except as permitted in Bylaw 12.2.5.1; (d) Receives, directly or indirectly, a salary, reimbursement of expenses or any other form of financial assistance from a professional sports organization based on athletics skill or participation, except as permitted by NCAA rules and regulations; (e) Competes on any professional athletics team per Bylaw 12.02.9, even if no pay or remuneration for expenses was received, except as permitted in Bylaw 12.2.3.2.1; (f) After initial full-time collegiate

enrollment, enters into a professional draft (see Bylaw 12.2.4); or (g) Enters into an agreement with an agent.

41.     Bylaw 12.1.2.1 then delineates 20 different rules about the forms of prohibited payment, including, among others: any salary, cash (or the equivalent thereof), unauthorized educational expenses, and "preferential treatment, benefits and services."

42.     Bylaw 16 also prohibits benefits on the basis of athletic ability.  Bylaw 16.11.2 provides, "The student-athlete shall not receive any extra benefit."  Under Bylaw 16.02.3:

> An extra benefit is any special arrangement by an institutional employee or representative of the institution's athletics interests to provide a student-athlete or the student-athlete family member or friend a benefit not expressly authorized by NCAA legislation.  Receipt of a benefit by student-athletes or their family members or friends is not a violation of NCAA legislation if it is demonstrated that the same benefit is generally available to the institution's students or their family members or friends or to a particular segment of the student-body (e.g., international students, minority students) determined on a basis unrelated to athletics ability.

43.     Under Bylaw 16.1.4, "Awards received for intercollegiate athletics participation may not be sold, exchanged or assigned for another item of value, even if the student-athlete's name or picture does not appear on the award."  In fact, this bylaw is interpreted to apply in perpetuity such that even after an athlete exhausts his NCAA eligibility, the sale of an award constitutes an NCAA violation.

44.     Bylaw 13 restricts schools from providing prospective athletes with recruiting inducements.   Bylaw 13.2.1 states, "An institution's staff member or any representative of its athletics interests shall not be involved, directly or indirectly, in making arrangements for or giving or offering to give any financial aid or other benefits to a prospective student-athlete or his or her relatives or friends, other than expressly permitted by NCAA regulations."   Bylaw 13.2.1.1 delineates specific prohibitions, including: cash, gifts, loans, clothing, employment arrangements, free and/or reduced-cost housing or services, and "any tangible item."

45.     Limitations also are placed on the number and length of expense-paid visits schools may provide prospective athletes, and on the value of meals, transportation, and entertainment provided during such visits.  Bylaw 13.6.2 provides, "A member institution may finance only one visit to its campus for a prospective student-athlete."  Under Bylaw 13.6.4, "An official visit to an

10

1   institution shall not exceed 48 hours."   Additionally, Bylaw 13.6.7.1 states, "An institution may

2   provide entertainment, which may not be excessive, on the official visit only for a prospective

3   student-athlete and the prospective student-athlete's parents (or legal guardians) or spouse and only

4   within a 30-mile radius of the institution's main campus."   According to Bylaw 13.6.7.4, "The

5   institution … shall not provide cash to a prospective student-athlete for entertainment purposes."

6   However, under Bylaw 13.6.7.5, the institution may provide cash to a student host responsible for

7   entertaining the prospective athlete up to "$40 for each day of the visit to cover all actual costs of

8   entertaining the student host(s) and the prospective student-athlete (and the prospective student-

9   athlete's parents, legal guardians or spouse), excluding the cost of meals and admission to campus

10  athletics events."   Further, Bylaw 13.6.7.7 states, "The cost of actual meals, not to exceed three per

11  day, on the official visit for a prospective student-athlete and the prospective student-athlete's

12  parents, legal guardians, spouse or children need not be included in the $40-per-day entertainment

13  expense.  Meals must be comparable to those provided to student-athletes during the academic year.

14  A reasonable snack (e.g., pizza, hamburger) may be provided in addition to the three meals."

15  Although transportation to and from campus may be provided to the athlete, under Bylaw 13.5.2.1,

16  "Use of a limousine or helicopter for such transportation is prohibited."

17       46.   The Power Conferences, as NCAA members, have agreed to the rules cited above and

18  have codified their own rules which may be more restrictive, but not more liberal, than NCAA rules.

19  Power Conference rules evidencing agreements among conference members to restrain competition

20  for player services include the following:

21            (a)   ACC Constitution Article II ("General Purpose"): " … The Conference aims

22                  to … (e) Coordinate and foster compliance with Conference and NCAA

23                  rules."   ACC Bylaw Article II: "Member institutions are bound by NCAA

24                  rules and regulations, unless Conference rules are more restrictive."

25            (b)   Big Ten Bylaw 14.01.3 ("Compliance with NCAA and Conference

26                  Legislation"):   "The Constitution and Bylaws of the National Collegiate

27                  Athletic Association shall govern all matters of student-athlete eligibility

28                  except to the extent that such rules are modified by the Conference Rules and

Agreements."

 (c) Big 12 Bylaw 1.3.2 ("Adherence to NCAA Rules"):  "All Members of the Conference are committed to complying with NCAA rules and policies … In addition, the conduct of Members shall be fully committed to compliance with the rules and regulations of the NCAA and of the Conference …"  Big 12 Bylaw 6.1 ("Eligibility Rules"):  "A student-athlete must comply with appropriate minimum requirements of the NCAA and the Conference in order to be eligible for athletically-related aid … " Big 12 Bylaw 6.5.3 ("Financial Aid Reports"):  "Each institution shall comply with all financial aid legislation of the NCAA and the conference . . . "

 (d) Pac-12 Bylaw 4.2 ("Application of NCAA Legislation"):  "The Conference is a member of the NCAA, therefore, all member institutions are bound by NCAA rules and regulations unless the Conference rules are more demanding."  Pac-12 Executive Regulation 3-1:  "The rule of the [NCAA] shall govern all matters concerning financial aid to student-athletes except to the extent that such rules are modified by the CEO Group."

 (e) SEC Bylaw Article 5.01.1 ("Governance"):  "The Conference shall be governed by the Constitution, Bylaws, and other rules, regulations, and legislation of the Conference and the NCAA."  SEC Bylaw Article 15.01 ("General Principles"):  "Any scholarship or financial aid to a student-athlete must be awarded in accordance with all NCAA and SEC regulations."

 47. These anticompetitive agreements are strictly enforced to punish any NCAA and Power Conference members that do not adhere completely to the letter of these restraints.  NCAA Constitution Article 1.3.2 provides, "Member institutions shall be obligated to apply and enforce this legislation, and the enforcement procedures of the Association shall be applied to an institution when it fails to fulfill this obligation."  Additionally, NCAA Constitution Article 2.8.3 provides, "An institution found to have violated the Association's rules shall be subject to such disciplinary and corrective actions as may be determined by the Association."  Accordingly, all NCAA members are

1    forced to abide by the illegal restraints as co-conspirators with Defendants or face punishment.

2         48.     Formalized enforcement procedures are codified in Bylaw 19 of the NCAA Division I

3    Manual.   Bylaw 19.01.2 provides, "The enforcement program shall hold institutions, coaches,

4    administrators and student-athletes who violate the NCAA constitution and bylaws accountable for

5    their conduct, both at the individual and institutional levels."

6         49.     Central to enforcement is the requirement that NCAA institutions report any instance

7    of noncompliance.   More than 3,000 "secondary" violations (now known as Level 3 and 4

8    violations) are reported by member institutions each year.   Additionally, the NCAA employs

9    approximately 60 full-time staff members in its enforcement department to investigate NCAA

10    violations and bring charges against schools.   Approximately 20 "major" violations (now known as

11    Level 1 and 2 violations) are processed by the NCAA enforcement staff each year, although many

12    more cases are investigated.   Schools charged with violating the rules must appear before the NCAA

13    Committee on Infractions, which makes factual findings and imposes penalties for deviating from

14    the agreed upon restraints.   Penalties include fines, scholarship reductions, recruiting restrictions,

15    and even a "death penalty" in which a school is banned from competing in a sport for a year or more.

16                                **RELEVANT MARKETS**

17         50.     This action involves two distinct relevant markets, with at least one relevant market

18    applicable to each Plaintiff, and to each of the Football Class and the Basketball Class:   (i) the

19    market for NCAA Division I Football Bowl Subdivision ("FBS") football player services (the "FBS

20    Football Players Market"); and (ii) the market for NCAA Division I men's basketball player services

21    (the "D-I Men's Basketball Players Market").   Each of these markets represents the highest level of

22    intercollegiate competition for each sport, and each is distinct in that it offers a unique opportunity

23    for player services for which there is no substitute for Plaintiffs or class members.

24    **FBS Football Players Market**

25         51.     The FBS Football Players Market is comprised of 128 colleges and universities that

26    operate football programs at the highest level of intercollegiate football competition and is

27    distinguished from its Division I subordinate, the Football Championship Subdivision ("FCS"),

28    formerly known as Division I-AA, and lower levels of NCAA football, in that FBS college football

1   programs have larger football budgets, higher attendance levels, greater revenues, and more athletic
2   scholarships for athletes than do FCS institutions and those schools that compete in lower levels of
3   NCAA football (i.e., Divisions II and III).

4       52.    Although both the FBS and FCS abide by the rules set by the NCAA Football Rules
5   Committee, their postseason formats are significantly different.  As its name indicates, the FBS
6   postseason competition is marked by invitational "bowl" games (35 in the 2013-14 football season),
7   rather than an NCAA-sponsored championship tournament (as is the case for the FCS).

8       53.    Starting with the 2014-15 football season, the FBS postseason features the newly
9   created College Football Playoff ("CFP") consisting of four teams that compete in two semifinal
10  games for a chance to advance to a national championship game.  The postseason "bowl" games,
11  including the new CFP, are some of the most lucrative properties in the sports industry and generate
12  billions of dollars annually.

13      54.    Each year between late August and January, FBS teams compete against each other
14  over the course of a 12-game football schedule, not including conference championships or
15  postseason bowl games.  Historically, regular-season college football games were played on
16  Saturdays, but, to maximize television viewership and gain additional revenue from the sale of
17  media rights, some games are now played in "primetime" on Monday, Tuesday, Wednesday,
18  Thursday, and Friday nights, despite interference with the academic courses in which the athletes are
19  required to be enrolled.

20      55.    The FBS Football Players Market is unique in that the athletes who compete in the
21  market are the most talented football players outside of the National Football League ("NFL").

22      56.    In the FBS Football Players Market, colleges and universities—the member
23  institutions of the NCAA and the Power Conference defendants—compete for the services of the
24  most talented college football players in the country, but cannot offer a penny more than a full grant-
25  in-aid.  The Defendants ban athletically related remuneration to players in the FBS Football Market
26  above a full grant-in-aid, which does not even cover a player's full cost of attendance.

27      57.    The FBS Football Players Market is national in scope.  Colleges seek out players
28  from across the country, including players in this district.  For example, the geographic diversity

represented by the 2014 recruiting class signed by the University of Miami (located in Miami, Florida) includes players from Arizona, California, New Jersey, and North Carolina; the 2014 class signed by The Ohio State University (located in Columbus, Ohio) includes players from Florida, Pennsylvania, New Jersey, and Texas; and the 2014 class signed by West Virginia University (located in Morgantown, West Virginia) includes players from California, Florida, Mississippi, Oklahoma, and Pennsylvania.

58.     The FBS Football Players Market is the highest level at which football athletes of traditional college age can provide their services.  Indeed, the NFL expressly bans from its league players who have not chronologically passed the level of a college 'junior," i.e., three years must elapse following high school graduation.

59.     There is no reasonable alternative opportunity in which these athletes can provide their football services.  Other professional or semi-professional football leagues available to college athletes, or lower level college divisions, do not offer nearly the level of competition, coaching instruction, funding, or attention as FBS football for players who are not yet eligible to play in the NFL.  Moreover, most FBS football players never play in the NFL, so that FBS football is the last chance they have to realize the economic benefits of their talents as football players.

**D-I Basketball Players Market**

60.     The D-I Men's Basketball Players Market is comprised of 351 colleges and universities that operate basketball programs at the highest level of intercollegiate athletics. Between November and April each year, these teams compete against each other on the basketball court to produce the highly valued sports entertainment product known as D-I men's college basketball, and especially the uniquely valuable NCAA Men's Division I Basketball Championship, colloquially known as the "NCAA Tournament" or "March Madness."  The broadcast rights for the NCAA Tournament generate billions of dollars, none of which is shared with Plaintiffs or class members.

61.     The D-I Men's Basketball Players Market is distinguished from lower levels of NCAA basketball competition (i.e., Divisions II and III) in key ways.  D-I basketball programs have larger basketball budgets, higher attendance levels, greater revenues, and more athletic scholarships

than schools that compete in lower divisions.

62.    In the D-I Men's Basketball Players Market, colleges and universities compete for the services of the most talented college basketball players in the country, but cannot offer a penny more than a full grant-in-aid, which does not even cover a student's full cost of attendance.

63.    The D-I Men's Basketball Players Market is national in scope.  Colleges seek out talent from across the country.  For example, the geographic diversity represented by the 2014 recruiting class signed by Duke University ("Duke") (located in Durham, North Carolina) includes players from Florida, Illinois, Minnesota, and Texas; the 2014 class signed by the University of California, Los Angeles ("UCLA") (located in Los Angeles, California) includes players from Georgia, New Jersey, and Virginia; and the 2014 class signed by the University of Michigan (located in Ann Arbor, Michigan) includes players from California, Florida, and Oregon.

64.    There is no reasonable alternative opportunity in which these top-tier college basketball athletes can provide their services.  Other lower-level college divisions and semi-professional leagues do not offer nearly the level of competition, coaching instruction, funding, or attention as D-I basketball.  And most D-I college basketball players are never able to play in the National Basketball Association ("NBA") (which prohibits any such players from even applying until one year after their high school classes have graduated), so that D-I basketball is the only chance these athletes have to realize the economic benefit of their talents as basketball players.

**A Few Exceptions**

65.    In either one or both of FBS football and D-I men's basketball, a limited number of institutions participate in athletic competition but, because of their special character, do not offer grants-in-aid based on athletics.  Those schools are mainly the United States Military Academy, the United States Naval Academy, and the United States Air Force Academy (the "Service Academies"), and members of the Ivy League—Brown University, Columbia University, Cornell University, Dartmouth College, Harvard University, Princeton University, the University of Pennsylvania, and Yale University.

66.    The Service Academies are members of NCAA Division I-A and participate in the FBS and D-I men's basketball, but they offer full scholarships and stipends to all students who

16

attend those schools (not only athletes) in exchange for required military service following graduation. NCAA rules governing athletic scholarships have no effect on the Service Academies or their student-athletes. Due to these differentiating elements, the Service Academies are not reasonable substitutes for the other colleges and universities that compete in the FBS and D-I men's basketball, and they are not included in the relevant markets in this case.

67. The Ivy League schools participate in D-I men's basketball but do not participate in the FBS. Ivy League schools have some of the nation's highest academic admission standards, which apply to all prospective Ivy League students, including athletes, and Ivy League schools do not provide scholarships on the basis of athletics. NCAA restrictions on athletic scholarships thus do not directly affect the Ivy League. Due to these differentiating elements, the Ivy League schools are not reasonable substitutes for the other colleges and universities that compete in the FBS and D-I men's basketball, and they are not included in the relevant markets in this case.

## BACKGROUND OF THE UNLAWFUL RESTRAINTS

### Formation of The NCAA Cartel

68. Founded in 1906 in response to circumstances far removed from today's big time college sports businesses, the NCAA issues rules that govern the administration of intercollegiate athletics. The colleges, universities, and athletic conferences that form the NCAA's membership collectively agree upon these rules. The NCAA operates and oversees the business of college football and college basketball.

69. Although no formalized rulebooks existed in the earliest years of the NCAA, payment to athletes in any form was prohibited at the NCAA's very beginning. The NCAA eventually allowed its member schools to provide athletes with tuition payments and related expenses at price-fixed amounts, but nothing more.

70. Originally, the NCAA was comprised of a single division with a uniform set of rules. Over time, the NCAA split into three divisions, with individual rules for each division. The separate divisions reflect not only philosophical differences among the schools related to the commercial scale of college sports, but also economic differences. An early example of such a divergence occurred in 1949 when the University of Chicago, a former football powerhouse and

1   charter member of the Big Ten, withdrew from the conference due to what the university president

2   viewed as the incompatibility of higher education and the increasing commercialization of major

3   college sports.

4       71.     The NCAA maintains that its foundational concept is amateurism, which it claims

5   dictates, among other things, that athletes not receive pay for their participation in athletics.  Yet,

6   coaches, athletic directors, conference presidents, and NCAA executives are paid millions of dollars

7   off the backs of the services provided by top-tier college football and basketball athletes.  There is

8   nothing "amateur" about the billions of dollars generated by FBS football and D-I men's basketball.

9   **Competition Among NCAA Institutions for Player Services**

10      72.     For decades, NCAA institutions have ferociously competed with each other for the

11  services of football and men's basketball athletes, but only within the constraints of the rules that

12  prohibit any financial compensation to athletes beyond the price-fixed limits set by the NCAA and

13  its conferences.  The NCAA and the Power Conferences have promulgated and enforced numerous

14  rules designed to limit this competition for athletes.  In areas outside these financial payment

15  restrictions, competition for the services of football and men's basketball athletes has only escalated

16  over time, demonstrating the competitive forces that have been restrained by the Defendants'

17  restrictions on remuneration to top-tier college football and men's basketball athletes.

18      73.     The demand for the services of top-tier football and men's basketball athletes is

19  greater than ever, and such services are only growing in value.  These athletes are so desired that

20  national media outlets closely track recruitments from as early as freshman year in high school until

21  National Signing Day, the date when high-school seniors are permitted to sign letters of intent to

22  attend NCAA institutions.  Websites operated by media giants including ESPN and Yahoo! Sports

23  create and maintain profiles of thousands of high school football and basketball players, along with

24  in-depth statistics and analysis of their recruitments, including lists of universities that are recruiting

25  the young men, the dates of "official visits" to campuses, and whether the athletes have been offered

26  or accepted athletic scholarships.  Numerous scouting services and publications sell subscriptions

27  with detailed information about the top prospects each year.  Media outlets generate lists and

28  rankings of the top prospects, which are then discussed on television and radio at length for weeks

and months leading up to National Signing Day.  None of this attention has anything to do with how these athletes perform anywhere but on the athletic field, which, in turn, generates huge amounts of revenue for FBS football and D-I men's basketball programs.

74.     On National Signing Day, usually the first Wednesday in February for football, many high-school football players hold nationally televised press conferences to announce where they intend to play college football.  Media outlets such as ESPN broadcast the signing decisions and provide commentary and analysis throughout the day (and for several days thereafter).

75.     Competitor institutions boast of their sustained athletic success and notable alumni who play or have played in the NBA or NFL.  Coaches bombard athletes with handwritten letters, sometimes sending dozens of letters in one day.  And, perhaps most visibly, Power Conference schools are locked in an "arms race" to appeal to recruits—building expanded stadiums and arenas, luxury locker rooms and training facilities, high-end dorms, and specialized tutoring centers.  The Power Conference schools also spend millions of dollars on coaches, all while the athletes are restricted from receiving any compensation beyond their NCAA capped "scholarships."

76.     As a result of the ever-increasing economic incentives to field the best teams and win games, FBS and D-I men's basketball programs would clearly compete economically with one another for player services if not for NCAA and Power Conference restrictions.  Such competition would provide fair compensation to these athletes for the billions of dollars in revenue that they help generate.

**The Big Business of College Football and Basketball**

77.     FBS college football and Division I men's college basketball are, combined, among the most lucrative products in U.S. sports.  Upon information and belief, the 65 schools in the five Power Conferences reported **$5.15 billion** in total revenue in 2011-12.

78.     The massive revenues earned by the NCAA, the Power Conferences, and their member institutions are in significant part generated from long-term contracts with national television and cable-networks for the rights to broadcast their football and basketball games.

79.     In 2010, the NCAA announced a fourteen-year agreement with CBS and Turner Sports for the rights to broadcast the NCAA Tournament on television.  Upon information and

1    belief, the deal, which also includes a digital rights component, is valued at more than **$11 billion**,

2    and is worth 41% more than the previous broadcast rights contract for the NCAA Tournament.

3    Conference partners and member schools split more than $740 million of this revenue annually.

4         80.    Upon information and belief, in November 2012, ESPN agreed to pay **$5.64 billion**

5    over twelve years—an average of $470 million annually—to broadcast the College Football Playoff

6    (CFP), a college football postseason tournament featuring two semifinal games and a national

7    championship game that rotate among several venues that bid for the right to host CFP games.  Upon

8    information and belief, the participating schools and conferences have announced that revenue from

9    the CFP will be distributed under a formula that pays the Power Conferences and the University of

10   Notre Dame ("Notre Dame") 73% of the CFP's revenue, an average of roughly $343.1 million per

11   year.  (Notre Dame is a member of the ACC for the purposes of D-I men's basketball, but is an

12   independent school for the purposes of FBS football.)

13        81.    In addition, upon information and belief, ESPN has agreed to pay a total of

14   approximately $220 million more annually to the major conferences for the rights to broadcast

15   additional "major" football bowl games.  For instance, ESPN will pay $80 million more per year

16   between 2015 and 2026 to broadcast the Rose Bowl.  In years when that game is not part of the CFP,

17   the Rose Bowl's partner conferences—the Big Ten and Pac-12—will divide that incremental $80

18   million among their twenty-six member schools.  (The Big Ten increased to 14 teams at the start of

19   the 2014 football season when Rutgers and the University of Maryland joined the conference.)

20   Similarly, ESPN has agreed to pay substantially the same money to broadcast the Champions Bowl,

21   an annual pairing of the conference champions from the SEC and Big 12.

22        82.    Upon information and belief, during the 2014-15 season, the Power Conferences and

23   Notre Dame will receive approximately **$1.099 billion** in revenue from television partners for

24   regular season football games, irrespective of the additional revenue generated by the CFP.  By the

25   2019-20 season, that number will grow to **$1.633 billion**.

26        83.    Upon information and belief, when all football broadcast revenue sources are

27   combined, the Power Conferences and Notre Dame will receive at least **$1.6 billion** from television

28   partners in 2015 and **$2.343 billion** by 2020.

84.     Television contracts signed by individual conferences granting the right to broadcast their football and basketball games during the regular seasons are equally staggering.  For example, upon information and belief:

        (a)    The ACC receives **$3.6 billion** from ESPN through 2026-27, a per-school average of $17.1 million per year.

        (b)    The Big 12 receives **$1.17 billion** from Fox through 2024-25 and $480 million from ESPN through 2015-16, a per-school average of $15 million per year.

        (c)    The Big Ten receives **$2.8 billion** from its own Big Ten Network through 2031-32, **$1 billion** from ESPN through 2016-17, $145 million from Fox through 2016 just to broadcast the conference football championship game, and $72 million from CBS through 2016-17, a per-school average of $20.7 million per year

        (d)    The Pac-12 receives a combined **$3 billion** from Fox and ESPN through 2023-24, a per-school average of $20.8 million per year.

        (e)    The SEC receives **$2.25 billion** from ESPN through 2023-24 and $825 million from CBS through 2023-24, a per-school average of $14.6 million per year.

85.     Flush with cash and unable to compete for athletes on the basis of financial remuneration, colleges have directed their resources and competitive efforts to, among other things, the hiring of head coaches, instead of players.  For example, upon information and belief, more than half of the head football coaches in the Power Conferences are paid at least $2 million annually, and several head coaches are paid in excess of $4 million annually, excluding endorsement revenue and other income, which can also be quite substantial.

86.     As media revenues have exploded, numerous NCAA schools have also switched athletic conferences to maximize their revenue, showing little or no loyalty to their former conferences and purported principles of amateurism.  A raft of conference shifts has taken place in the past few years, with teams often now located nowhere near the geographical locations of their

1   fellow conference members, helping to generate television revenues but disregarding the welfare of

2   athletes who have to travel thousands of miles in the service of creating income for their schools.

3   For example, West Virginia University is at least 800 miles from every other school in its

4   conference, the Big 12.

5       87.   The frenzy for new media revenues has resulted in a host of changes among

6   conferences, and litigation involving spurned conferences and schools that left one conference for

7   another.  The NCAA and its members have unleashed this chaos with little regard for the athletes.

8   **The NCAA's History of Antitrust Violations**

9       88.   Rather than permit their members to engage in competition for player services as the

10  financial success of these sports has exploded, the Defendants have combined and conspired to

11  eliminate such competition for NCAA players through price-fixing arrangements.  This has been,

12  and continues to be, accomplished by the Defendants jointly adopting and imposing rules that have

13  the purpose and effect of preventing players from offering their services in competitive markets.

14      89.   The NCAA has a history of violating federal antitrust law.  As a result, over the years,

15  numerous parties have brought and successfully prosecuted multiple antitrust lawsuits against the

16  NCAA.

17      90.   In 1984, the Supreme Court of the United States ruled that the NCAA violated

18  Section 1 of the Sherman Act by limiting the number of live televised football games under the

19  media plan it adopted for the 1982-85 football seasons.  In conjunction with the plan, the NCAA

20  announced that it would punish any member institution that abided by a competing agreement with

21  another network to televise more live games.  The Court granted injunctive relief and held that this

22  scheme unlawfully restrained the market for live broadcasts of college football.  *NCAA v. Board of*

23  *Regents*, 468 U.S. 85 (1984).

24      91.   The NCAA's anticompetitive behavior was further illustrated in *Law v. NCAA*, in

25  which the Court of Appeals for the Tenth Circuit upheld a summary judgment ruling that an NCAA

26  cap on part-time coaches' salaries at $16,000 per year was an unlawful restraint of trade under

27  Section 1 of the Sherman Act that could be condemned under a "quick look" analysis.  The Tenth

28  Circuit also upheld a permanent injunction that enjoined the NCAA from enforcing or attempting to

22

1    enforce salary limitations on the specific class of coaches who had sued.  The Court of Appeals held

2    that the presence of a horizontal agreement to fix compensation was presumptively anticompetitive,

3    and that the NCAA had failed to present even a triable issue concerning whether the salary restraint

4    was procompetitive.  *Law v. NCAA*, 134 F.3d 1010 (10th Cir. 1998).

5          92.      In *Metropolitan Intercollegiate Basketball Association v. NCAA*, No. 01-cv-00071-

6    MGC (S.D.N.Y.), five of the NCAA's own member institutions sued the NCAA under the antitrust

7    laws, alleging that the NCAA engaged in anticompetitive behavior to harm the National Invitational

8    Tournament ("NIT"), which was in competition with the NCAA Tournament.  That action resulted

9    in the NCAA paying a significant settlement to the schools and agreeing to the NIT's continued

10    operation.

11          93.      College athletes have previously sought relief from the NCAA's restraints on

12    remuneration, resulting in the NCAA agreeing to temporary remedies but with the restraints left

13    standing.

14          94.      Specifically, in *White v. NCAA*, a class of college football and basketball players

15    challenged NCAA rules limiting student-athlete compensation to the value of a grant-in-aid as a

16    horizontal agreement that unreasonably restrained trade and violated the Sherman Act.  The

17    plaintiffs alleged that the grant-in-aid limitation suppressed competition in the market for talented

18    student-athletes.  The effect on competition was never tested through an evidentiary proceeding, as

19    the parties settled before trial.  However, before the *White* settlement, the court certified a class and

20    denied an NCAA motion to dismiss, ruling that plaintiffs had adequately pled a relevant market and

21    harm to competition.  *White*, No. 06-999, Dkt. No. 72, slip op. at 3-4 (C.D. Cal. Sept. 20, 2006).

22          95.      The short-term settlement in *White*, which has since expired, with its class members

23    no longer attending NCAA schools, did not end the NCAA's anticompetitive behavior restricting

24    player compensation.

25    **The Restraints Have No Justifiable Pro-Competitive Effect**

26          96.      The cap on remuneration for the services of athletes in the Football Class and the

27    Basketball Class have no pro-competitive purpose and cannot be justified on any claimed basis that

28    it promotes "competitive balance."  Indeed, competitive balance has never existed in FBS football or

D-I men's basketball, and there is no credible competitive balance value in these sports to preserve.

97.   Among FBS schools, a gaping schism exists between members of the Power Conferences and all others.  For instance, no school outside of a Power Conference (not including Notre Dame) has ever played in the Bowl Championship Series ("BCS") championship game that has determined the college football national champion in the sixteen years of the BCS through the 2013-14 season.[1]  And, only seven teams from outside of a Power Conference have ever appeared in any of the 72 BCS bowl games, with these non-Power Conference teams securing just ten of 144 possible berths in those games.  Going further back, fully 50 percent of the teams that finished among the top eight of the Associated Press's year-end football poll between 1950 and 2006 were from just 13 schools.

98.   Even among the Power Conference FBS teams, competitive balance does not exist. For example, an SEC team won the BCS national championship *seven years in a row* until 2014, when an SEC team finally lost in the BCS championship game to a team from the ACC.

99.   The Power Conference teams receive an overwhelming share of revenue as well. Upon information and belief, the new CFP media deal will deliver 73% of its **$5.64 billion** value to Power Conference teams.  Demand for Power Conference football is so much greater than the demand for non-Power Conference football that the Power Conference teams benefit from lucrative league-specific (and sometimes school-specific) television deals and their own proprietary cable networks that the other FBS schools cannot match.

100.   Competitive balance is also completely lacking in D-I men's basketball.  Since the NCAA Tournament expanded its field to 64 teams or more in 1985, only three non-Power Conference teams have won a national championship (not counting Louisville, which joined the ACC in July of this year).  Only seven teams from outside a Power Conference have even appeared in the championship game during this period, with non-Power Conference teams securing just ten of 58 possible berths.  Nearly half of the teams in the national semifinals (the "Final Four") between 1950 and 2013—over more than 60 years covering more than 250 team appearances—have been

---

[1] The BCS started in 1998 and was replaced in the 2014-15 football season by the CFP.

1    from just 13 schools.

2        101.   Parity also does not exist among the Power Conference schools.   A few examples

3    make this evident.  In the Big 12, the University of Kansas has won the conference championship ten

4    straight years.   In the ACC, Duke has been such a favorite that, during the ten years ending in the

5    2012-13 season, after 25 of its 31 loses away from its home court (an average of just three per

6    season), opposing fans rushed the court in jubilation because an upset was so unlikely.   In the Pac-

7    12, either the University of Arizona or UCLA has won at least a share of the conference

8    championship in 22 of the past 30 seasons.

9        102.   Upon information and belief, the Power Conference teams receive an overwhelming

10   share of basketball revenue as well.  Because NCAA Tournament money is effectively allocated to

11   conferences based on cumulative wins over a set number of years, and because the Power

12   Conference teams are generally so much stronger than their counterparts from less successful

13   conferences, the Power Conferences reap a greater share of NCAA Tournament proceeds.

14   Additionally, as in football, demand for Power Conference basketball is so much greater than the

15   demand for non-Power Conference basketball that the Power Conference teams benefit from

16   lucrative league-specific (and sometimes school-specific) television deals and their own proprietary

17   cable networks that the other D-I men's basketball schools cannot match.

18       103.   The disparity between the Power Conferences and all other schools was further

19   demonstrated at the end of 2013, when the Power Conferences proposed a new governance structure

20   designed to increase their independence from the less economically successful schools and expand

21   grants-in-aid by offering a modest $2,000 annual stipend to athletes.   These proposals just illustrate

22   the tip of the compensation iceberg that players would and should receive, if not for the unlawful

23   NCAA and Power Conference restrictions.

24                     **IRREPARABLE INJURIES OF PLAINTIFFS
25                     AND THE FOOTBALL AND BASKETBALL CLASSES**

26       104.   Upon information and belief, the Defendants intend to continue to impose their

27   artificial caps on remuneration with anticompetitive effects in the relevant markets alleged above.

28   Absent such restrictions, the Plaintiffs and the class members would be able to seek remuneration

1   from colleges beyond that currently permitted under NCAA rules.  Plaintiffs and the class members

2   will suffer severe and irreparable harm if Defendants continue to prevent Plaintiffs and the class

3   members from offering their services to NCAA member institutions free of these restraints.

4        105.    The injuries that the Plaintiffs and the class members are incurring and will continue

5   to incur will not be fully compensable by monetary damages.  This is particularly true due to the

6   short length of NCAA careers and the difficulty in estimating and proving the amount of monetary

7   damages suffered by Plaintiffs as a result of the Defendants' unlawful conduct.

8        106.    Moreover, most class members will never have a career in the NFL or the NBA, and

9   many will never receive a college degree.  Most class members thus will not receive *any* economic

10  benefit from their roles in generating billions of dollars for FBS football and D-I men's college

11  basketball.

12       107.    The threatened injuries to the Plaintiffs and the class members are irreparable,

13  warranting the issuance of injunctive relief for the class.

14  **Martin Jenkins**

15       108.    Plaintiff Martin Jenkins was a starting defensive back for the Clemson Tigers.  Out of

16  high school, Jenkins ranked as the 38th best cornerback in the nation according to ESPN.com and

17  was named an All-Southeast Region pick by PrepStars.  He was recruited by numerous FBS schools,

18  including several from the Power Conferences, and he received multiple athletic scholarship offers

19  for his football talents.

20       109.    In 2010, Jenkins accepted a one-year athletic scholarship from Clemson, limited to

21  the amount of a full grant-in-aid as required under the rules agreed upon by Defendants and their

22  member institutions.  The athletic scholarship was renewed for each of the 2011-12, 2012-13, 2013-

23  14, and 2014-15 academic years.

24       110.    Upon information and belief, in 2012, Clemson's athletics department generated more

25  than $70 million in revenue, the vast majority of which came from football.  But for the illegal

26  restraints imposed by the Defendants under NCAA and conference rules, to which Jenkins was

27  subjected, Jenkins would have received and would receive greater remuneration for his services as a

28  football athlete.

1    **Nigel Hayes**

2    111.   Plaintiff Nigel Hayes is a starting forward for the Wisconsin Badgers.  In high school,

3    Hayes was a two-time All-State selection and named an ESPN Top-100 recruit for the class of 2013.

4    He was recruited by numerous NCAA Division I schools, including several from the Power

5    Conferences, and he received multiple athletic scholarship offers for his basketball talents.

6    112.   In 2013, Hayes accepted a one-year athletic scholarship from Wisconsin, limited to

7    the amount of a full grant-in-aid as required under the rules agreed upon by Defendants and their

8    member institutions.   The athletic scholarship was renewed for the 2014-15 academic year.

9    Currently, Hayes is receiving an athletic scholarship from Wisconsin and has three more seasons of

10   NCAA eligibility.

11   113.   Upon information and belief, in 2012, Wisconsin's athletics department generated

12   more than $149 million in revenue.  But for the illegal restraints imposed by the Defendants under

13   NCAA and conference rules, to which Hayes is current subjected, Hayes would have received and

14   would receive greater remuneration for his services as a basketball athlete.

15   **Alec James**

16   114.   Plaintiff Alec James is a defensive end for the Wisconsin Badgers.  During his senior

17   year of high school, James was the 2012 Wisconsin Football Coaches Association Defensive Player

18   of the Year, ranked as the No. 1 recruit in the state of Wisconsin, according to ESPN, and a

19   unanimous choice for first-team all-state, all-conference, and all-area.   He was recruited by

20   numerous NCAA Division I schools, including from the Power Conferences, and he received

21   multiple athletic scholarship offers for his football talents.

22   115.   In 2013, James accepted a one-year athletic scholarship from Wisconsin, limited to

23   the amount of a full grant-in-aid as required under the rules agreed upon by Defendants and their

24   member institutions.   The athletic scholarship was renewed for the 2014-15 academic year.

25   Currently, James is receiving an athletic scholarship from Wisconsin and has three more seasons of

26   NCAA eligibility following this year.

27   116.   Upon information and belief, in 2012, Wisconsin's athletics department generated

28   more than $149 million in revenue.  But for illegal the restraints imposed by the Defendants under

1  NCAA and conference rules, to which James is currently subjected, James would have received

2  greater remuneration for his services as a football athlete.

3  ## CAUSE OF ACTION - COUNT I

4  **Violation of Section 1 of the Sherman Act, 15 U.S.C. § 1**

5      117.    Plaintiffs repeat and re-allege each of the allegations contained in paragraphs 1

6  through 116.

7      118.    The restraints imposed by Defendants limiting the remuneration that the Defendants'

8  member institutions may provide to members of the Football Class and members of the Basketball

9  Class constitute an anticompetitive, horizontal agreement among competitors to fix artificially the

10  remuneration for the services of the members of each class in violation of Section 1 of the Sherman

11  Act.  The restraints also constitute an unlawful group boycott of any institutions or players who

12  would not comply with these unlawful price fixing arrangements.

13      119.    The restraints operate as a perpetual horizontal price-fixing agreement, and group

14  boycott, each of which is *per se* unlawful.

15      120.    The restraints also constitute an unreasonable restraint of trade under the rule of

16  reason, whether under a "quick look" or full-blown rule of reason analysis.  Defendants have market

17  power in the relevant markets for the services of top-tier college football and men's basketball

18  players.

19      121.    Defendants' price-fixing agreement and group boycott is a naked restraint of trade

20  without any pro-competitive purpose or effect.  Less restrictive rules can be implemented to achieve

21  any purported procompetitive objectives of Defendants.

22      122.    Each of the Defendants is a participant in this unlawful contract, combination, or

23  conspiracy.

24      123.    The Plaintiffs and class members have suffered and will continue to suffer antitrust

25  injury by reason of the continuation of this unlawful contract, combination, or conspiracy.  NCAA

26  and Power Conference rules have injured and will continue to injure Plaintiffs and the class

27  members by depriving them of the ability to receive market value for their services as college

28  football and men's basketball players in a free and open market.

124. Monetary damages are not adequate to compensate Plaintiffs or other class members for the irreparable harm they have and will continue to suffer, warranting injunctive relief.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for judgment with respect to their Complaint as follows:

1. Declaring that Defendants' rules and agreements that prohibit, cap or otherwise limit remuneration and benefits to players in the Football Class or the Basketball Class for their athletic services to member institutions violate Section 1 of the Sherman Act, and enjoining said rules as they apply to those class members;

2. Enjoining the Defendants from restraining any Defendant member institution from negotiating, offering, or providing remuneration to members of the Football Class and members of the Basketball Class in compensation for their services as athletes;

3. Awarding Plaintiffs and the class they represent their costs and disbursements in this action, including reasonable attorneys' fees; and

4. Granting Plaintiffs and class members such other and further relief as may be appropriate.

Dated: February 13, 2015                     Respectfully submitted,

By:   */s/ Jeffrey L. Kessler*
       Jeffrey L. Kessler (admitted *pro hac vice*)
       David G. Feher (admitted *pro hac vice*)
       David L. Greenspan (admitted *pro hac vice*)
       WINSTON & STRAWN LLP
       200 Park Avenue
       *New York, NY 10166-4193*
       Telephone: (212) 294-6700
       Facsimile: (212) 294-4700
       *jkessler@winston.com*
       *dfeher@winston.com*
       *dgreenspan@winston.com*

SECOND AMENDED COMPLAINT – CLASS ACTION SEEKING INJUNCTION
MDL No. 4:14-md-02541-CW; Case No. 4:14-cv-02758-CW