1   Steve W. Berman (*pro hac vice*)
    Ashley Bede (*pro hac vice*)
2   HAGENS BERMAN SOBOL SHAPIRO LLP
    1918 Eighth Avenue, Suite 3300
3   Seattle, WA 98101
    Telephone: (206) 623-7292
4   Facsimile: (206) 623-0594
    steve@hbsslaw.com
5   ashleyb@hbsslaw.com

6   Bruce L. Simon (96241)
    Aaron M. Sheanin (214472)
7   Benjamin E. Shiftan (265767)
    PEARSON, SIMON & WARSHAW, LLP
8   44 Montgomery Street, Suite 2450
    San Francisco, CA 94104
9   Telephone:  (415) 433-9000
    Facsimile:  (415) 433-9008
10  bsimon@pswlaw.com
    asheanin@pswlaw.com
11  bshiftan@pswlaw.com

12  Counsel for *Consolidated Plaintiffs*
    *Interim Co-Lead Class Counsel*
13
    [Additional counsel listed on signature page]
14

Jeffrey L. Kessler (*pro hac vice*)
David G. Feher (*pro hac vice*)
David L. Greenspan (*pro hac vice*)
WINSTON & STRAWN LLP
200 Park Avenue
New York, NY 10166-4193
Telephone: (212) 294-6700
Facsimile: (212) 294-4700
*jkessler@winston.com*
*dfeher@winston.com*
*dgreenspan@winston.com*

Derek J. Sarafa (*pro hac vice*)
WINSTON & STRAWN LLP
35 W. Wacker Dr.
Chicago, IL 60601
Telephone: (312) 558-5600
Fax: (312) 558-5700
*dsarafa@winston.com*

Sean D. Meenan (SBN 260466)
WINSTON & STRAWN LLP
101 California Street
San Francisco, CA 94111
Telephone: (415) 591-1000
Facsimile: (415) 591-1400
*smeenan@winston.com*

Counsel for *Jenkins Plaintiffs*
*Interim Class Counsel*

[Additional counsel listed on signature page]

15

16

17

18                      **UNITED STATES DISTRICT COURT**

19                     **NORTHERN DISTRICT OF CALIFORNIA**

20                            **OAKLAND DIVISION**

| | |
|---|---|
| 21   IN RE: NATIONAL COLLEGIATE ATHLETIC ASSOCIATION ATHLETIC 22  GRANT-IN-AID CAP ANTITRUST LITIGATION 23  ———————————————— 24  THIS DOCUMENT RELATES TO: 25  ALL ACTIONS | Case No.  4:14-md-02541-CW  CONSOLIDATED PLAINTIFFS' AND *JENKINS* PLAINTIFFS' AMENDED JOINT MOTION FOR CLASS CERTIFICATION  Date:       May 14, 2015 Time:      2:00 p.m. Courtroom:  2, 4th Floor Before:    Hon. Claudia Wilken |

26

27

28

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## NOTICE OF MOTION AND MOTION

**TO ALL PARTIES AND THEIR COUNSEL OF RECORD:**

PLEASE TAKE NOTICE THAT on May 14, 2015 at 2:00 p.m. in Courtroom 2 of the Honorable Claudia Wilken, the Consolidated Class Plaintiffs and the *Jenkins* Plaintiffs (collectively "Plaintiffs") will and hereby do move the Court pursuant to Federal Rule of Civil Procedure 23 for an order: (1) certifying the proposed classes defined below; and (2) appointing  Hagens Berman Sobol Shapiro LLP/Pearson, Simon & Warshaw, LLP as Co-Lead Class Counsel for Consolidated Class Plaintiffs and Winston & Strawn LLP as Class Counsel for the *Jenkins* Plaintiffs.  This motion is based on this submission, the accompanying declarations, the pleadings and other documents on file in this case, and any argument presented to the Court.

## STATEMENT OF ISSUES TO BE DECIDED

The issues for this Court to decide for Consolidated Plaintiffs are (1) whether the Court should certify under Fed. R. Civ. P. 23(b)(2) the proposed classes defined below as a class action; (2) whether the Court should appoint Plaintiffs John Bohannon, Chris Stone, Chris Davenport, and Justine Hartman as Class representatives; and (3) whether the Court should appoint interim class counsel Hagens Berman Sobol Shapiro LLP and Pearson, Simon & Warshaw, LLP as co-lead class counsel.

The issues for this Court to decide for *Jenkins* Plaintiffs are (1) whether the Court should certify under Fed. R. Civ. P. 23(b)(2) the proposed classes defined below as a class action; (2) whether the Court should appoint Plaintiffs Martin Jenkins, Alec James, and Nigel  Hayes as class representatives; and (3) whether the Court should appoint interim class counsel Winston & Strawn LLP as class counsel.

# TABLE OF CONTENTS

**Page**

MEMORANDUM OF POINTS AND AUTHORITIES ................................................................ 1

I.    INTRODUCTION .................................................................................................................. 1

II.   STATEMENT OF FACTS .................................................................................................... 4

    A.   The NCAA Bylaws Are An Illegal Restraint ................................................................ 4

    B.   Due to Defendants' Agreement to Cap Grant-In-Aid Amounts, Plaintiffs and
    the Class Members Suffer Depressed Prices for Their Athletic Services.................... 6

    C.   Defendants Are Enjoying Exponential Revenue Increases ........................................... 8

    D.   The Restraints Do Not Serve Any Pro-Competitive Purposes ..................................... 9

        1.   Amateurism................................................................................................... 9

        2.   Competitive Balance ................................................................................... 10

        3.   Integration of Academics and Athletics...................................................... 10

        4.   Output Levels .............................................................................................. 10

        5.   The Restraint Is a Naked Attempt to Contain Costs ................................... 10

III.  PROPOSED CLASSES AND REPRESENTATIVE PLAINTIFFS.................................... 11

    A.   Consolidated Plaintiffs' Proposed Classes and Representative Plaintiffs ................. 11

    B.   Jenkins Plaintiffs' Proposed Classes and Representative Plaintiffs .......................... 13

IV.   ARGUMENT....................................................................................................................... 15

    A.   Legal Standard For Class Certification...................................................................... 15

    B.   Plaintiffs Meet the Standards for Class Certification under Rule 23(a) ..................... 16

        1.   The classes are so numerous that joinder is impracticable. ........................... 16

        2.   The classes present common issues of law and fact. ..................................... 18

        3.   The factual and legal claims asserted are typical for all members of
        each of the proposed classes, each of whom has the same claims as the
        named plaintiffs. ........................................................................................... 19

        4.   The Named Plaintiffs and their counsel fairly and adequately represent
        the interests of each of the proposed classes and will continue to
        vigorously prosecute this action on their behalf. ........................................... 21

    C.   Plaintiffs Satisfy the Requirements for Injunctive and Declaratory Relief Class
    Certification Under Rule 23(B)(2).............................................................................. 22

VI.    CONCLUSION.................................................................................................................... 25

AMENDED JOINT MOTION FOR CLASS CERTIFICATION - CASE NO. 4:14-MD-02541-CW

# TABLE OF AUTHORITIES

**Page(s)**

## CASES

*Abdullah v. U.S. Sec. Assocs., Inc.*,
 731 F.3d 952 (9th Cir. 2013) ........................................................................................17

*Akaosugi v. Benihana Nat'l Corp.*,
 282 F.R.D. 241 (N.D. Cal. 2012)..................................................................................17

*Chamberlan v. Ford Motor Co.*,
 402 F.3d 952 (9th Cir. 2005) ........................................................................................15

*Gen. Tel. Co. of Sw. v. Falcon*,
 457 U.S. 147 (1982).......................................................................................................19

*In re High-Tech Emp. Antitrust Litig.*,
 985 F. Supp. 2d 1167 (N.D. Cal. 2013) ...................................................................17, 18

*In re NCAA Student-Athlete Name & Likeness Licensing Litig.*,
 2013 WL 5979327 (N.D. Cal. Nov. 8, 2013) ........................................................ *passim*

*In re Rubber Chems. Antitrust Litig.*,
 232 F.R.D. 346 (N.D. Cal 2005)...............................................................................16, 17

*O'Bannon v. Nat'l Collegiate Athletic Ass'n*,
 7 F. Supp. 3d 955 (N.D. Cal. 2014) ...................................................................... *passim*

*White v. NCAA*,
 No. 06-cv-0999-RGK, slip op. (C.D. Cal Oct. 19, 2006) ...............................16, 18, 20

## STATUTES

Sherman Antitrust Act, 15 U.S.C. § 1.........................................................................11, 13

## FEDERAL RULES

Fed. R. Civ. P. 23 ................................................................................................... *passim*

## MEMORANDUM OF POINTS AND AUTHORITIES

## I.      INTRODUCTION

Consolidated Plaintiffs and the *Jenkins* Plaintiffs jointly move for class certification in their respective actions to challenge, under federal antitrust law, National Collegiate Athletic Association ("NCAA") and select member conference rules limiting the compensation schools may pay to Division I football and basketball players for their athletic services to an amount specified as a "Grant-in-Aid" ("GIA").  This limit is based upon a far-reaching and comprehensive conspiracy between the NCAA, its conferences, and member institutions.  Unlike most conspiracies—which begin with whispers and thrive upon secrecy—this restriction on competition has been reduced to writing by the NCAA for all the world to see and explicitly agreed to by its conferences and member institutions.

In particular, Defendants have agreed to NCAA Bylaws stating that no college will pay an athlete any compensation for his or her athletic services that exceeds the value of a GIA.  Failure to comply results in draconian penalties for both the school, including a boycott by other schools, and the player, including permanent ineligibility.  This uniform agreement among Division I schools and conferences gives Defendants monopsony power because they are the only game in town when it comes to compensating college athletes for their services – if a top-tier athlete does not like the system or the compensation being offered, he or she has no reasonably close alternative.[1]  Absent this restraint, colleges would offer scholarships that cover at least the full costs of attendance, as well as additional compensation outside of the GIA.

Consolidated Plaintiffs and the *Jenkins* Plaintiffs each seek injunctive relief in their respective actions to remedy this unlawful restraint through separate proposed classes.  Consolidated Plaintiffs seek, among other relief, an injunction to close the gap between GIAs and the actual cost of attending school.  GIAs are capped by NCAA rules at an amount that indisputably is less than the actual cost of attendance because they do not cover "incidental" costs such as gas, laundry, and other necessities, which generally amount to thousands of dollars a year.  Consolidated Am. Compl.

---

[1] A monopsony is a market in which only one buyer interfaces with many sellers.  Monopoly is a similar concept, except that it refers to a seller having dominant power, instead of a buyer having dominant power.

("CAC") at ¶ 4, ECF No. 60.  Consolidated Plaintiffs seek to represent classes of Division I athletes who currently receive GIA for participation in football, men's basketball, and women's basketball to enjoin the application of such rules capping the amount of financial aid available to anything below the actual cost of attendance.  Consolidated Plaintiffs seek to enjoin the application of NCAA rules to the extent they (1) do not allow schools to pay the full cost of attendance, and (2) prohibit some compensation above the GIA.  The Consolidated Plaintiffs thus seek to enjoin Defendants' anticompetitive rules that cap the GIA and set at zero the amount top tier athletes can receive for their athletic services.  Consolidated Plaintiffs also seek to certify a damages class, which they will do in separate briefing.

The *Jenkins* Plaintiffs seek to enjoin the application of NCAA and conference rules to the extent that they prohibit colleges from compensating players above any GIA.  Separate and apart from the fact that the GIA amount is artificially low is the fact that NCAA and conference rules prevent schools from paying any compensation *beyond* the GIA on the basis of athletics.  This would be true even if the GIA covered the full cost of attendance.  The *Jenkins* Plaintiffs seek to enjoin Defendants' anticompetitive rules that cap at zero the amount that top-tier college football and men's basketball players can receive for their athletic services, from their colleges or conferences, apart from (or above) their GIA.  The *Jenkins* Plaintiffs do not pursue any claim for damages in this action and will not seek to certify a damages class.

All of these classes satisfy the threshold requirements of numerosity, commonality, typicality and adequacy of representation under Rule 23(a).  For numerosity, the members of each proposed class—which include all current top-level NCAA football players, men's basketball players and women's basketball players—indisputably number in the tens of thousands.  For commonality, there are numerous common questions of law and fact for each proposed class, such as whether the NCAA and conference rules at issue have harmed competition in the identified relevant markets, whether applying the restrictions in these markets has any legitimate procompetitive justifications, and whether less restrictive alternatives would achieve any purported procompetitive justifications for the restraints.

1    For typicality, the representatives' claims are typical of those of his or her respective class, as

2    they all involve an injunctive relief challenge to the limitation on college-paid compensation beyond

3    the specified GIA for athletic services.  As for adequacy, these representatives will adequately

4    represent the interests of their respective class because, among other reasons, there are no internal

5    conflicts with each class and each representative has indicated his or her willingness to diligently

6    represent the interests of his or her respective class.  Plaintiffs and the classes they seek to represent

7    will have the assistance of counsel that this Court has already found to be adequate, and appointed as

8    interim co-lead counsel in the Consolidated Action and interim lead counsel in the *Jenkins* action.

9    Plaintiffs also readily satisfy the requirements of Rule 23(b)(2) based upon the class-wide

10   application of the restraints at issue.  Defendants have enacted and actively enforce rules that bar any

11   compensation that colleges and conferences can pay Division I football and men's and women's

12   basketball athletes for their athletic services outside the GIA.  CAC at ¶¶ 1-2, 12; *Jenkins* Second

13   Am. Compl. ("JAC2") at ¶¶ 4-6, ECF No. 142. There is no dispute over the content of the rules, the

14   application of the rules, nor the universality with which they apply to all members of the putative

15   classes.  CAC at ¶¶ 2, 140-41, 284; JAC2 at ¶ 36.

16   The suitability of injunctive class treatment for this matter is even clearer than it was for the

17   injunctive class this Court recently certified in *In re NCAA Student-Athlete Name & Likeness*

18   *Licensing Litig.*, No. C 09-01967 CW, 2013 WL 5979327 at *3 (N.D. Cal. Nov. 8, 2013)

19   ("*O'Bannon Class Cert.*").  There, the Court certified a (b)(2) class of current and former student-

20   athletes who compete, or competed, in Division I football and men's basketball whose images,

21   likenesses, and/or names may have been used in broadcasts or video games.  Here, Plaintiffs ask the

22   Court to certify clearly identified classes of current athletes, all of whom undisputedly have been,

23   and are currently, subject to the NCAA's rules prohibiting colleges and conferences from paying the

24   athletes any compensation for their services over the price-fixed GIA.  Following this Court's

25   rationale in *O'Bannon Class Cert.* mandates certification of the injunctive relief classes here.

26

27

28

## II.    STATEMENT OF FACTS[2]

**A.    The NCAA Bylaws Are An Illegal Restraint**

Defendants and their member institutions have collectively agreed to impose rules that prohibit any compensation schools or conferences may provide to their Division I football and men's and women's basketball athletes outside of the GIA.  CAC at ¶¶ 1, 2, 284; JAC2 at ¶ 6.  These agreed-upon restrictions artificially cap compensation for athletic services by the schools and conferences at the value of a full GIA, as defined in NCAA Bylaw 15.02.5.[3]  Under that rule, a full GIA is limited to "tuition, required institutional fees, room and board, and required course-related books."  CAC at ¶ 297; JAC2 at ¶¶ 6, 39; Def. Atlantic Coast Conference ("ACC") Answer at ¶ 6, ECF No. 152 (Nov. 6, 2014) (admitting compensation limits imposed by GIA); Def. Big 12 Answer at ¶ 6, ECF No. 155 (Nov. 6, 2014) (same); Def. Big Ten Answer at ¶ 6, ECF No. 162 (Nov. 6, 2014) (same); Def. Pac-12 Answer at ¶ 6, ECF No. 153 (Nov. 6, 2014) (same); Def. Southeastern Conference ("SEC") Answer at ¶ 6, ECF No. 150 (Nov. 6, 2014) (same).  "A student-athlete may receive institutional financial aid based on athletic ability (per Bylaw 15.02.4.1)[4] and educational expenses awarded per Bylaw 15.2.6.4 *up to the value of a full grant-in aid*[.]"  NCAA Bylaw 15.1 (emphasis added).  This means that items such as gas, laundry and other items are not covered – and cannot be covered – by the full GIA.

These restraints prohibit Division I college football and men's and women's basketball athletes from receiving for their athletic performances payment of any kind from their schools or conferences, except that defined as "financial aid."  CAC at ¶¶ 298-99; JAC2 at ¶ 39.  "Any student-athlete who receives financial aid other than that permitted by the Association shall not be eligible

---

[2] This summary of facts is based on the CAC, the JAC2, public sources and statements, and the declarations and exhibits thereto attached to the original Joint Motion for Class Certification.  ECF No. 163 (4:14-md-02541); ECF No. 105 (4:14-cv-02758).  This summary of facts provides a succinct background in consideration of this Court's existing familiarity with the parties and underlying facts.

[3] Berman Decl., Ex. 1 (NCAA Bylaw 15.02.5).

[4] Berman Decl., Ex. 1 (NCAA Bylaw 15.02.2); see also NCAA Bylaw 15.02.2.1 (providing the calculation of cost of attendance).  Recently one of the Conference Defendants proposed new benefits for athletes, including covering the full cost of attendance.  Berman Decl., Ex. 2 (Pac-12 Conference, Pac-12 Universities Propose Sweeping Changes to Student-Athlete Benefits, Pac-12 News (Oct. 1, 2014), available at http://pac-12.com/article/2014/10/01/pac-12-universities-propose-sweeping-changes-student-athlete-benefits (last visited Oct. 1, 2014)).

for intercollegiate athletics."  NCAA Bylaw 15.01.2.[5]  Defendants refuse to recognize this as "pay," while perpetuating an exploitative system they disingenuously refer to as "amateurism" while the schools make hundreds of millions of dollars from the extraordinary work and efforts of class members.  CAC at ¶¶ 7, 298-99, 478; JAC2 at ¶ 71.  Bylaw 12.01.4 states, "A grant-in-aid administered by an educational institution is not considered to be pay or the promise of pay for athletics skill, provided it does not exceed the financial aid limitations set by the Association's membership,"[6] JAC2 at ¶ 40, and Bylaw 12.1.2 categorically prohibits any pay to an athlete in any form for the use of "his or her athletics skill (directly or indirectly)."  *Id*.  Other NCAA and conference rules reinforce this absolute ban on any compensation by the schools or conferences outside of the GIA.  *See, e.g.*, NCAA Bylaws 12.1.2.1 ("Prohibited Forms of Pay") and 16.11.2.1 (prohibiting the receipt of "extra benefits");[7] *see also* ACC Answer at ¶ 41 (admitting that Bylaw 12.1.2.1 imposes additional restrictions on payments); Big 12 Answer at ¶ 41 (same); Big Ten Answer at ¶ 41 (same); Def. NCAA Answer at ¶ 41, ECF No. 157 (Nov. 6, 2014) (same); Pac-12 Answer at ¶ 41 (same); SEC Answer at ¶ 41 (same).

The Conferences, along with their member institutions, have agreed to the NCAA rules and enacted their own rules prohibiting compensation to class members for their services.  CAC at ¶¶ 146-81; JAC2 at ¶ 46.[8]  All of these anticompetitive restrictions are enforced so rigidly that member institutions have no choice but to comply with them or face draconian penalties, including a boycott by the other member institutions of any noncompliant schools or players.  CAC at ¶¶ 286-94; JAC2 at ¶ 36.  Nor do Defendants make any secret of their anticompetitive rules and their class-wide application: the content of the compensation rules is beyond dispute and published annually in the NCAA Manual and the Conference Defendants' rulebooks.  CAC at ¶¶ 2, 140-41, 284; JAC2 at ¶ 36.

The Court heard expert testimony in *O'Bannon v. Nat'l Collegiate Athletic Ass'n*, 7 F. Supp. 3d 955 (N.D. Cal. 2014) ("*O'Bannon Findings*") that these rules and the precise restraint at issue

---

[5] Berman Decl., Ex. 1 (NCAA Bylaw 15.02.5).
[6] *Id.* (NCAA Bylaw 12.01.4).
[7] *Id.* (NCAA Bylaw 12.1.2).
[8] Kessler Decl., Exs. 1-6 (2014-2015 NCAA Division I Manual, 2012-2013 Atlantic Coast Conference Constitution, 2013-2014 Big Ten Conference Bylaws, 2014-2015 Big 12 Conference Bylaws, 2014-2015 Pac-12 Conference Bylaws, and 2013-2014 Southeastern Conference Bylaws).

restrain competition:[9]

> Dr. Noll testified that these rules restrain competition among schools for recruits. *If the grant-in-aid limit were higher, schools would compete for the best recruits by offering them larger grants-in-aid. Similarly, if total financial aid was not capped at the cost of attendance, schools would compete for the best recruits by offering them compensation exceeding the cost of attendance.* This competition would effectively lower the price that the recruits must pay for the combination of education and athletic opportunities that the schools provide. As Dr. Noll explained, "if the scholarship value is suppressed, that means the net price paid by a student-athlete to attend college is higher." Trial Tr. 105:24-107:1. Thus, he explained, because the NCAA has the power to and does suppress the value of athletic scholarships through its grant-in-aid rules, it has increased the prices schools charge recruits. *Id.* 127:20-129-13.

## B. Due to Defendants' Agreement to Cap Grant-In-Aid Amounts, Plaintiffs and the Class Members Suffer Depressed Prices for Their Athletic Services

The anticompetitive rules imposed by Defendants barring any compensation for athletic services performed by Division I football and men's and women's basketball players constitute a horizontal agreement among competitors – the restrictions are proposed, drafted, voted upon, and agreed to by NCAA members, including all of the Conference Defendants, that otherwise would compete with each other for the services of these players. CAC at ¶ 284;JAC2 at ¶¶ 36, 56, 62, 72. Schools engage in fierce competition for the athletic services of class members in virtually every manner other than economic compensation due to the anticompetitive rules that apply, and cause antitrust injury, to the proposed classes. JAC2 at ¶¶ 56, 62, 72, 85; ACC Answer at ¶¶ 56, 72 (admitting that schools compete for and recruit student-athletes); Big Ten Answer at ¶¶ 56, 62, 72 (same). Because of Defendants' anticompetitive agreements, Plaintiffs and other similarly situated current and future Division I college football and men's and women's basketball players in the relevant markets have received and/or will receive less compensation for their playing services than they would receive in a competitive market. JAC2 at ¶ 8; *see also* ACC Answer at ¶¶ 56, 72 (admitting to restrictions on athletically related aid that an athlete may receive); Big 12 Answer at ¶ 72 (same); Big Ten Answer at ¶¶ 56, 62, 72 (same); Pac-12 Answer at ¶ 72 (same); SEC Answer at ¶ 72 (same).

NCAA member institutions and Division I coaches have openly stated that they would

---

[9] *O'Bannon Findings*, 7 F. Supp. 3d at 972 (emphasis added).

compensate athletes more than the capped grant-in-aid amount, but are prohibited by Defendants from doing so.[10]  For example, the University of Nebraska's chancellor Harvey Perlman, "the Big Ten's representative on NCAA reform," acknowledged the constraint to Sports Illustrated: "The fact is with all this revenue we have, we can spend it on anything we want under current NCAA regulations, except to benefit student-athletes."[11]  The Pac-12's University of Washington president Michael Young has publicly noted that students on academic scholarships receive more than athletes who are compensated for their athletic services.  He told Sports Illustrated, "[i]t seems when one thinks about simple equity, from that perspective, it's hard to argue that these kids shouldn't get something."[12]  The SEC's University of Florida president Bernie Machen also supports a change, citing the exponential revenue growth in college athletics:  "It has been entirely spent on facilities and coaches' salaries.  The amount spent on students has not increased at all after this additional money has gone to college sports.  That's just embarrassing."[13]  Even the Atlantic Coast Conference Commissioner John Swofford agrees with the opportunity to "enhance[e] fundamentally the concept of the athletic grant made that we have now."[14]  Further, the Big 12's Commissioner Bob Bowlsby recognized that the relevant market would see more competitive offers for athletic services if the restraint were removed.  In a television interview, Commissioner Bowlsby stated, "I could certainly advocate for some measure of incremental payment to student athletes . . . [T]hey all work hard, and they all deserve the consideration."[15]

Under the current NCAA Constitution and Bylaws, Plaintiffs and class members receive artificially depressed compensation for their labor services in the relevant labor markets.  But for

---

[10] *See* CAC at ¶¶ 368-422 (outlining the admissions of the NCAA and Conference Defendants that they would pay above the grant-in-aid amount).

[11] Berman Decl., Ex. 3 (Pete Thamel, *College Sports Leaders Say Major NCAA Overhaul Imminent*, Sports Illustrated (June 16, 2014), available at http://www.si.com/college-football/2013/11/11/ncaa-overhaul (last visited Oct. 31, 2014)).

[12] Berman Decl., Ex. 4 (Andy Staples, *Q&A with Washington President Michael Young*, Sports Illustrated (Mar. 8, 2012), available at http://www.si.com/more-sports/2012/03/08/washington-young-playoff (last visited Oct. 31, 2014)).

[13] Berman Decl., Ex. 5 (Andy Staples, *Full-cost-of-attendance Scholarship Debate Could Break up the FBS*, Sports Illustrated (Mar. 8, 2012), available at http://www.si.com/more-sports/2012/03/08/presidents-scholarships (last visited Oct. 31, 2014)).

[14] Berman Decl., Ex. 6 (Steve Wiseman, *ACC Notebook: Swofford, K Talk ACC, College Basketball*, The Herald Sun (Oct. 16, 2013), available at http://www.heraldsun.com/sports/x559274460/ACC-NOTEBOOK-Swofford-K-talk-ACC-college-basketball (last visited Oct. 31, 2014)).

[15] CAC at ¶ 403.

AMENDED JOINT MOTION FOR CLASS CERTIFICATION - CASE NO. 4:14-MD-02541-CW

1   those rules, and the conspiracy to apply and enforce them, that compensation would be higher.  As

2   Dr. Noll testified in *O'Bannon Findings*, if the GIA limit were higher, schools would compete for

3   the best recruits by offering them larger GIAs.  Dr. Noll explained, "if the scholarship value is

4   suppressed, that means the net price paid by a student-athlete to attend college is higher."  Trial Tr.

5   105:24-107:1.  Similarly, if total compensation was not capped, schools would compete for the best

6   recruits by offering them compensation outside of the GIA, exceeding the cost of attendance.

7   **C.**    **Defendants Are Enjoying Exponential Revenue Increases**

8        Meanwhile, Defendants are enjoying unprecedented revenue increases.  In 2011, Division I

9   of the NCAA reported over $3 billion in revenue.[16]  The trend of increased revenue for Defendants is

10   further exemplified by the top ten highest earning colleges based on football money; for those top

11   ten schools, revenue was at less than $300 million in 2000 and grew to over $759 million in 2011.[17]

12   Thanks to massive television and media contracts, Defendant Conferences are receiving as much as

13   $3.6 billion for fifteen year exclusive broadcasting rights (effective through 2026-27) and a

14   minimum of $146 million for seven years of basketball and six years of football first tier

15   broadcasting rights (effective through 2020).[18]  These contracts are just for the regular season – for

16   instance, NCAA's March Madness increases the profits even more.[19]

17        Defendants, the NCAA member institutions, and the coaches – not the players – are

18   benefiting financially from these staggering revenues.  On average, major college football head

19   coaches are paid $1.81 million a year, with about 50 coaches earning $2 million or more and three

20   earning over $5 million a year.[20]  Division I men's basketball head coaches whose teams played in

21   the 2012 NCAA tournament made an average salary of $1.4 million – with bonuses from $20,000 to

22

---

23   [16] CAC at ¶ 211.

24   [17] CAC at ¶ 462 (citing Eric Chemi, *The Amazing Growth in College Football Revenues*, Business Week (Sept. 26, 2013), available at http://www.businessweek.com/articles/2013-09-26/the-amazing-growth-in-college-football-revenues (last visited Oct. 29, 2014)).

25   [18] CAC at ¶ 437 (citing Kristi Dosh, *A Comparison: Conference Television Deals*, ESPN (Mar. 19, 2013), available at http://espn.go.com/blog/playbook/dollars/post/_/id/3163/a-comparison-conference-television-deals (last visited Oct. 29, 2014)).

26   [19] CAC at ¶ 454 (citing NCAA Release, *NCAA Reach 14-Year Agreement*, NCAA (Apr. 22, 2010)), available at http://www.ncaa.com/news/basketball-men/2010-04-21/cbs-sports-turner-broadcasting-ncaa-reach-14-year-agreement (last visited Oct. 29, 2014)).

27   [20] Berman Decl., Ex. 7 (USA Today, *2013 NCAAF Coaches' Salaries* (Nov. 6, 2013), available at http://www.usatoday.com/sports/college/salaries/ncaaf/coach/ (last visited Oct. 29, 2014)).

28

$100,000 for qualifying for the NCAA Sweet Sixteen tournament.[21]  Similarly, Division I women's basketball head coaches are seeing a rise in salaries, including the University of Connecticut's head coach, who is now six months into a $10.86 million contract through 2017-18.[22]

Unlike the restraint on GIAs, the NCAA has not capped the amount that member institutions may spend on coaching staff salaries or facilities.  *O'Bannon Findings*, 7 F. Supp. 3d at 1004.  As Pac-12 Conference Commissioner Larry Scott explained, "There's not an even playing field in TV exposure.  There's not an even playing field in coaches and coaches['] salaries.  There's not an even playing field in stadiums."[23]

**D.     The Restraints Do Not Serve Any Pro-Competitive Purposes**

The restraints described above apply to all athletes who receive GIAs and participate in Division I FBS football, Division I men's basketball, and Division I women's basketball.  Although Defendants can be expected to offer several justifications, all are without merit and the Court has already rejected most of them in *O'Bannon*.

**1.     Amateurism**

The NCAA will likely assert that the GIA restraint is not illegal because it preserves amateurism.  It does not appear that the NCAA truly believes this assertion, however, as the head of the NCAA, Dr. Mark Emmert, "testified that raising the grant-in-aid limit to cover the full cost of attendance would not violate the NCAA's amateurism rules."[24]  In any event, the NCAA proffered this defense in *O'Bannon* and the Court rejected it.[25]

The Court found also that the NCAA did not provide credible evidence that demand for the NCAA's product would decrease if student athletes were permitted "under certain circumstances" to receive a limited share of revenues.[26]  Most Conference Defendants have conceded that the restraint

---

[21] CAC at ¶ 446 (citing Nancy Hart, *The Average Salary of a College Basketball Coach*, Houston Chronicle, available at http://work.chron.com/average-salary-college-basketball-coach-2102.html (last visited Oct. 29, 2014)).

[22] CAC at ¶ 452 (citing Associated Press, *Geno Auriemma Signs New Deal*, ESPN (Mar. 27, 2013), available at http://espn.go.com/womens-college-basketball/story/_/id/9105319/geno-auriemma-signs-new-contract-stay-uconn-huskies (last visited Oct. 29, 2014)).

[23] Berman Decl., Ex. 8 (John Henderson, *Commissioner Larry Scott wants Pac-12 Athletes to Get More of the Conference Pie*, The Denver Post (June 15, 2011), available at http://www.denverpost.com/ci_18275207 (last visited Oct. 31, 2014)).

[24] *O'Bannon Findings*, 7 F. Supp. 3d at 983.

[25] *O'Bannon Findings*, 7 F. Supp. 3d at 973-78.

[26] *O'Bannon Findings*, 7 F. Supp. 3d at 976.

is unfair and they favor payment of full cost of attendance.[27] Here, Conference Defendants admit that payment of the full cost of attendance would not decrease demand for their product.[28] The *Jenkins* Plaintiffs further assert that there would be no decrease in demand for the highest level of men's basketball or football if schools were permitted to make their own decisions about whether and how much to compensate their players outside of the GIA.

### 2. Competitive Balance

The NCAA will likely assert that the restraints are needed to maintain competitive balance. The Court heard extensive testimony on this issue and rejected this defense: "The Court finds that the NCAA's current restrictions on student-athlete compensation do not promote competitive balance."[29] The Consolidated Plaintiffs here will submit the same testimony the Court considered in *O'Bannon* (among other evidence) to rebut this defense, as well as new evidence wherein conference officials are competing about the GIA and cost of attendance.[30] The *Jenkins* Plaintiffs will present similar evidence and entirely new evidence to rebut this defense.

### 3. Integration of Academics and Athletics

Defendants will likely asset that this restriction on GIA amounts is reasonable and pro-competitive because it permits the integration of academics and athletics. The NCAA argued this in *O'Bannon*, averring that the payment of large sums of money would "create a wedge" between student athletes and others on campus.[31] The Court rejected this defense.

### 4. Output Levels

Defendants are likely to argue that the rules are reasonable and pro-competitive because they increase the number of scholarships. But, as the Court found in *O'Bannon*, the number of schools participating in football and basketball continues to increase.[32]

### 5. The Restraint Is a Naked Attempt to Contain Costs

There is no reasonable justification or legal defense for the GIA cap or the restrictions

---

[27] CAC at ¶¶ 368-422.
[28] *Id.*
[29] *O'Bannon Findings*, 7 F. Supp. 3d at 978.
[30] Berman Decl., Ex. 9 (*O'Bannon* Trial Tr. at 228:20-234:2; 296:14-299:18; 865:11-866:2; 1151:20-1152:14; 1774:23-1775:6; 453:8-22; 3127:2-21).
[31] *O'Bannon Findings*, 7 F. Supp. 3d at 980.
[32] *O'Bannon Findings*, 7 F. Supp. 3d at 980-81.

1    prohibiting any compensation to players outside of the GIA in the top level of men's basketball and

2    football.  In particular, neither the cap nor the other restrictions are necessary to promote any interest

3    in preserving the NCAA's dubious version of "amateurism."  Rather, the NCAA's restrictions are

4    simply cost containment mechanisms that enable it and its member institutions to preserve more of

5    the benefits of their lucrative enterprise for themselves.[33]

6            After the NCAA's Division I Board of Directors recently approved a proposal to allow so-

7    called "stipends" to cover the gap between the capped GIA and the true cost of attendance as being

8    fully compatible with the NCAA principles of "amateurism," the NCAA's members overrode that

9    approval and rejected it.[34]  The rejection was because of a desire to control costs, and not for a pro-

10   competitive objective.[35]  However, under the antitrust laws, Defendants' desire to save costs – and

11   thereby increase profits at the expense of other participants in the market – is not a legitimate

12   justification for the GIA cap or any other horizontal agreement to restrict price or output.

13           **III.    PROPOSED CLASSES AND REPRESENTATIVE PLAINTIFFS**

14           Each set of classes, along with their representative plaintiffs, is described below.

15   A.    **Consolidated Plaintiffs' Proposed Classes and Representative Plaintiffs**

16           Consolidated Plaintiffs seek certification of three classes of top-tier college football, men's

17   basketball, and women's basketball athletes, under Fed. R. Civ. P. 23(a) and 23(b)(2), to pursue

18   class-wide injunctive relief against Defendants' restrictions capping the amount of financial aid

19   available to anything below the actual cost of attendance as unreasonable restraints of trade in

20   violation of the Sherman Antitrust Act, 15 U.S.C. § 1.  Consolidated Plaintiffs also challenge any

21   bylaws that prohibit compensation above the full cost of attendance.  The proposed classes are:

22           • **Division I Football FBS Class**: all persons who at the time the *Alston*
23              Complaint was filed through the date of judgment received athletic grants-in-
                aid for participation in college football from a college or university that is a
24              member of the NCAA's Division I Football Bowl Subdivision ("FBS").

25           • **Men's Division I Basketball Class**: all persons who at the time the *Alston*
                Complaint was filed through the date of judgment received athletic grants-in-
26              aid for participation in men's college basketball from a college or university
                that is a member of the NCAA's Division I conferences any time between the
27              date of this motion and the date of judgment in this case.

28   _____
     [33] *See* CAC ¶ at 429 (detailing schools' admissions of cost containment).
     [34] CAC ¶ at 430.
     [35] CAC ¶¶ at 429-31.

- **Women's Division I Basketball Class**: all persons who at the time the *Alston* Complaint was filed through the date of judgment received athletic grants-in-aid for participation in women's college basketball from a college or university that is a member of the NCAA's Division I conferences any time between the date of this motion and the date of judgment in this case.[36]

Consolidated Plaintiffs representatives are Chris Stone, John Bohannon, Chris Davenport, and Justine Hartman.

Chris Stone is a Division I football athlete at Arkansas State University, a member of Defendant Sun Belt Conference, and is receiving a full athletics-based GIA. CAC at ¶¶ 114-15. In high school, Stone was named to the all-state football team twice and named to the Elite 11 by the Southeast Sun three times. *Id.* at ¶ 114. He was ranked as a two-star recruit by Rivals.com and as the ninety-eighth best tight end in the country by Scout.com, and was All-Sun Belt Conference. *Id.* Stone was recruited by numerous FBS schools and received multiple full GIA offers for his football ability. Stone is currently starting defensive end for Arkansas State University and has one remaining season of NCAA eligibility. *Id.* at ¶ 115.

John Bohannon was a Division I men's basketball athlete at University of Texas-El Paso ("UTEP"), a member of Defendant Conference USA, and received a full athletics-based GIA each year until he exhausted his NCAA eligibility. CAC at ¶¶ 121-22. Out of high school, he rated the 29th best center in the country by ESPN and was named to the all-state team. *Id.* Bohannon was recruited by numerous Division I schools and received multiple full GIA offers for his basketball ability. *Id.* at ¶ 121. At the time of filing the CAC, he was second in UTEP history in blocks and field goal percentage, fifth in rebounds, seventeenth in scoring, and was All-Conference USA. *Id.*

---

[36] Consolidated Plaintiffs and the members of the Consolidated Class are subject to identical unlawful practices, regardless of which school they attended or which of the two sports they played. The proposed Consolidated Classes do not include any NCAA Football Bowl Subdivision football players and any men's or women's Division I basketball players that played for any college or university in the Ivy League or any of the Service Academies, neither of which offers grants-in-aid to athletes. CAC at ¶ 498.

- 12 -

Chris Davenport is a Division I men's basketball athlete at the University of North Florida ("UNF"), a member of Defendant Atlantic Sun Conference, and is receiving a full athletics-based GIA.  CAC at ¶¶ 125-26.  In high school, Davenport led his team to a state championship and his prep squads to a combined 85-12 record over his final three seasons.  *Id.* at ¶ 125.  He was named MVP of the Wally Keller Classic as a junior in high school.  *Id.*  Davenport was recruited by numerous Division I schools and received multiple full GIA offers for basketball.  *Id.* at 126.  He is currently a forward for UNF and is in his second season of NCAA eligibility.  *Id.* at ¶¶ 125-26.

Justine Hartman is a Division I women's basketball athlete at the University of California—Berkeley ("UCB"), a member of Defendant Pac-12 Conference, and is receiving a full athletics-based GIA. CAC at ¶¶138A, D-E.[37]  In high school, Hartman led her team to national prominence, earned spots on two All-American teams, and was MVP of the Nike Tournament of Champions.  *Id.* at ¶ 138B.  She was ranked as the No. 7 recruit in the nation and No. 2 post player by ESPN-W HoopGurlz.  *Id.* at ¶ 138C.  Hartman was recruited by numerous Division I schools and received multiple full GIA offers for basketball.  *Id.* at ¶ 138B, D.  She is currently a forward for UCB and in her last season of NCAA eligibility.  *Id.* at ¶¶ 138D-E.

These class representatives and the members of the proposed classes are/were subject to identical unlawful practices, regardless of which school they attended or which of the two sports they played.

**B.     Jenkins Plaintiffs' Proposed Classes and Representative Plaintiffs[38]**

The *Jenkins* Plaintiffs seek certification of two classes of top-tier college football and men's basketball athletes, under Fed. R. Civ. P. 23(a) and 23(b)(2), to pursue class-wide injunctive relief and challenge NCAA and Power Conference restrictions that prohibit colleges from compensating players above any GIA, even if it were to cover the full cost of attendance, as unreasonable restraints of trade in violation of the Sherman Antitrust Act, 15 U.S.C. § 1.  The proposed injunctive classes are:

---

[37] On February 19, 2015, the Court signed a stipulation and proposed order (ECF No. 197) adding the two plaintiffs in the *Hartman, et al. v. National Collegiate Athletic Association, et al.*, Case No. 4:15-cv-00178, action to the CAC, as well as several of their claims.

[38] Upon completion of pretrial proceedings and discovery, *Jenkins* will be heard in the District of New Jersey.  *See* June 18, 2014 Case Management Conference Tr. 15:20-16:1.

- **Football Class**: All NCAA Division I Football Bowl Subdivision ("FBS") football players who, at any time from the date of the Complaint through the date of the final judgment, or the date of the resolution of any appeals therefrom, whichever is later, received or will receive a written offer for a full grant-in-aid as defined in NCAA Bylaw 15.02.5, or who received or will receive such a full grant-in-aid (the "Football Class"). (JAC2 at ¶ 24).

- **Basketball Class**: All NCAA Division I men's basketball players who, at any time from the date of the Complaint through the date of the final judgment, or the date of the resolution of any appeals therefrom, whichever is later, received or will receive a written offer for a full grant-in-aid as defined in NCAA Bylaw 15.02.5, or who received or will receive such a full grant-in-aid (the "Basketball Class"). (*Id.* at ¶ 25).

The *Jenkins* Plaintiffs are three top-tier, Division I college football and men's basketball players who are or have been subject to Defendants' restraints that prohibit compensation for athletic services by schools and conferences outside of the specified GIA in the relevant markets. *Id.* at ¶¶ 2, 14-19, 109-116. Plaintiff Martin Jenkins was a Division I football athlete at Clemson University, where he received a full athletics-based GIA each year until he exhausted his eligibility in December 2014. *Id.* at ¶¶ 14-15, 109. Out of high school, Jenkins ranked as the 38th best cornerback in the nation according to ESPN.com and was named an All-Southeast Region pick by PrepStars. *Id.* at ¶ 108. Numerous FBS schools recruited him, including several schools from the Power Conferences, and he received multiple athletic scholarship offers for his football talents. *Id.* Jenkins was a starting defensive back for the nationally ranked Clemson Tigers. *Id.*

Plaintiff Alec James is a Division I football athlete at University of Wisconsin, Madison, where he is currently receiving a full athletics-based GIA. *Id.* at ¶¶ 18, 115. During his senior year of high school, James was the 2012 Wisconsin Football Coaches Association Defensive Player of the Year, ranked as the No. 1 recruit in the state of Wisconsin, according to ESPN, and a unanimous choice for first-team all-state, all-conference, and all-area. *Id.* at ¶ 114. He was recruited by numerous NCAA Division I schools, including from the Power Conferences, and he received multiple athletic scholarship offers for his football talents. *Id.* James is a defensive end for the for the nationally ranked Wisconsin Badgers. *Id.*

Plaintiff Nigel Hayes is a Division I men's basketball athlete at University of Wisconsin, Madison, where he is currently receiving a full athletics-based GIA. *Id.* at ¶¶ 16, 112. In high school, Hayes was a two-time all-state selection and named an ESPN Top-100 recruit for the class of

2013. *Id.* at ¶ 111.  He was recruited by numerous NCAA Division I schools, including several from the Power Conferences, and he received multiple athletic scholarship offers for his basketball talents. *Id.*  Hayes is a starting forward for the nationally ranked Wisconsin Badgers.  *Id.*

Each of these college athletes was recruited by several of Defendants' member schools and currently receives or received a full GIA for his athletic services capped at the value set by the NCAA.  *Id.* at ¶¶ 14-19, 28, 108, 111, 114.  All members of each class, numbering in the thousands, are subject to the same uniform rules that prevent them from receiving any compensation from schools for their athletic services beyond the specification of a full GIA in NCAA Bylaw 15.02.5. *Id.* at ¶¶ 24-30, 39.

## IV.    ARGUMENT

### A.    Legal Standard For Class Certification

Plaintiffs easily satisfy the requirements for injunctive class certification under Rules 23(a) and (b).  To certify a class, Plaintiffs must satisfy each element of Rule 23(a) and one of the subsections of 23(b).  *O'Bannon Class Cert.*, 2013 WL 5979327, at *2.  Rule 23(a) provides that class certification is appropriate if: "(1) the class is so numerous that joinder of all members is impracticable; (2) there are questions of law or fact common to the class; (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and (4) the representative parties will fairly and adequately protect the interests of the class."  *Id.*  Plaintiffs must satisfy each element.  *Id.* (citing *Gen. Tel. Co. of Sw. v. Falcon*, 457 U.S. 147, 158-61 (1982); *Doninger v. Pac. Nw. Bell, Inc.*, 564 F.2d 1304, 1308 (9th Cir. 1977)).  In considering class certification, "the court must take the substantive allegations of the complaint as true."  *Id*. (citing *Blackie v. Barrack*, 524 F.2d 891, 901 (9th Cir. 1975)).  The court may look beyond the pleadings to determine whether certification is proper.  *Id*. (citing *Wal-Mart Stores, Inc. v. Dukes*, 131 S. Ct. 2541, 2551 (2011)).  However, "a rigorous analysis does not always result in a lengthy explanation or in-depth review of the record."  *Chamberlan v. Ford Motor Co.*, 402 F.3d 952, 961 (9th Cir. 2005) (quoting *Falcon*, 457 U.S. at 160).

Once Plaintiffs satisfy the threshold requirements of Rule 23(a), they must also fulfill one of the Rule 23(b) subsections.  *O'Bannon Class Cert.*, 2013 WL 5979327, at *2.  Plaintiffs seek

certification of the proposed classes as injunctive and declaratory relief classes under Fed. R. Civ. P. 23(b)(2).  That section provides, "A class action may be maintained if Rule 23(a) is satisfied and if … the party opposing the class has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole."  Fed. R. Civ. P. 23.  Certification under this rule is appropriate "if class members complain of a pattern or practice that is generally applicable to the class as a whole.  Even if some class members have not been injured by the challenged practice, a class may nevertheless be appropriate."  *O'Bannon Class Cert.*, 2013 WL 5979327, at *7 (quoting *Walters v. Reno*, 145 F.3d 1032, 1047 (9th Cir. 1998)).  "Rule 23(b)(2) does not require a court 'to examine the viability or bases of class members' claims for declaratory and injunctive relief, but only to look at whether class members seek uniform relief from a practice applicable to all of them.'"  *Id.* (quoting *Rodriguez v. Hayes*, 591 F.3d 1105, 1125 (9th Cir. 2010)).

The classes of athletes that Plaintiffs seek to represent are indistinguishable from the class certified in *White v. NCAA*, No. 06-cv-0999-RGK, slip op. at 2-3 (C.D. Cal Oct. 19, 2006),[39] where the NCAA did not dispute numerosity, commonality, or typicality.  *Id.*  There, it only challenged adequacy on the basis of an alleged conflict of interest in seeking damages, which is inapplicable to these injunctive-relief-only classes.  Regardless, that argument of a purported conflict was rejected.  *Id.* at 3.  The classes proposed here are also substantially similar to the injunctive relief class this Court certified in *O'Bannon Class Cert*.  The propriety of injunctive relief class certification here is beyond question under these precedents.

**B.     Plaintiffs Meet the Standards for Class Certification under Rule 23(a)**

    **1.        The classes are so numerous that joinder is impracticable.**

Each of Plaintiffs' proposed classes, which number in the thousands, easily meets the numerosity requirement.  The first prong of Rule 23(a) dictates certification where the class is so

---

[39] The class in that case included: "The individuals who received athletic-based GIAs from colleges and universities that sponsor: (i) football programs included in NCAA Division 1-A ("Major College Football" programs); or (ii) men's basketball programs sponsored by colleges or universities in the ACC, Big East, Big 10, Big 12, Pac-10, SEC, Mountain West, WAC, Atlantic 10, Conference USA, Mid-American, Sun Belt, West Coast, Horizon League, Colonial Athletic Association, or Missouri Valley Conferences ("Major College Basketball" programs), at any time between February 17, 2002 and the present."  *White* at 2.

1    numerous that joinder of all members is impracticable.  Fed. R. Civ. P. 23.  This requirement is

2    satisfied when the proposed class members number in the thousands.  *O'Bannon Class Cert.*, 2013

3    WL 5979327, at *3 (citing *In Re Citric Acid Antitrust Litig.*, No. 95-1092, 1996 WL 655691, at *3

4    (N.D. Cal. Oct. 2, 1996)).  "Plaintiffs do not need to state the exact number of potential class

5    members, nor is a specific number of class members required for numerosity."  *In re Rubber Chems.*

6    *Antitrust Litig.*, 232 F.R.D. 346, 350 (N.D. Cal 2005) (citing *Bates v. United Parcel Service*, 204

7    F.R.D. 440, 444 (N.D. Cal. 2001)).  "A court may make common sense assumptions to support a

8    finding that joinder would be impracticable."  *Id.* (citing 1 Robert Newberg, *Newberg on Class*

9    *Actions* § 3:3 (4th ed. 2002)) ("Where the exact size of the class is unknown but general knowledge

10   and common sense indicate that it is large, the numerosity requirement is satisfied.").

11         Similar to the injunctive relief class this Court certified in *O'Bannon*, thousands of potential

12   class members are in each of the proposed classes.  The Football Bowl Subdivision ("FBS") is

13   comprised of 128 colleges and universities that operate football programs at the highest level of

14   intercollegiate football.  CAC at ¶ 193; JAC2 at ¶ 51.  Likewise, NCAA Division I comprises 351

15   colleges and universities that operate men's and women's basketball programs at the highest level of

16   intercollegiate athletics.  JAC2 at ¶ 60.  And NCAA Bylaws allow Division I schools to award up to

17   85 scholarships in FBS football, 13 in men's basketball, and 15 in women's basketball.  *See* NCAA

18   Bylaws 15.5.1, 15.5.5.1, and 15.5.6.1.  That means that for any single year, there are tens of

19   thousands of putative class members for the proposed *Jenkins* classes and the proposed Consolidated

20   Plaintiffs classes.

21         Given these numbers, membership in each of the proposed classes is so numerous that

22   joinder of all respective members is impracticable.  The members of all classes are ascertainable and

23   sufficiently definite despite the size of the classes.[40]  All members of each of the classes enter into

24   written financial aid agreements with the university to which they provide their athletic services.

25   CAC at ¶¶ 27-28, 56-57, 118, 129, 132; JAC2 at ¶¶ 4, 29.  Such records, which are maintained by

26   the schools, allow for the identification of the finite number of class members proposed here for each

27

28   _____

[40] *Akaosugi v. Benihana Nat'l Corp.*, 282 F.R.D. 241, 255 (N.D. Cal. 2012) ("[A]n implied prerequisite to class certification is that the class must be sufficiently definite.")

1    class during the class period.  Further, the nationwide geographical dispersion of the proposed

2    classes also supports certification.  *See In re Rubber Chems. Antitrust Litig.*, 232 F.R.D. at 350-51.

3              **2.      The classes present common issues of law and fact.**

4              Numerous common questions of law and fact obviously are shared among the proposed class

5    members.  "[A]ll that Rule 23(a)(2) requires is 'a *single* significant question of law or fact.'"

6    *Abdullah v. U.S. Sec. Assocs., Inc.*, 731 F.3d 952, 957 (9th Cir. 2013) (citing *Mazza v. Am. Honda*

7    *Motor Co.*, 666 F.3d 581, 588 (9th Cir. 2012) (emphasis in original)); *see also O'Bannon Class*

8    *Cert.*, 2013 WL 5979327, at *4 ("The Ninth Circuit has made clear that Rule 23(a)(2) may be

9    satisfied even if fewer than all legal and factual questions are common to the class.") (citing *Meyer*

10   *v. Portfolio Recovery Assocs., LLC*, 707 F.3d 1036, 1041 (9th Cir. 2012)).

11             "[C]ourts have consistently held that the very nature of a conspiracy antitrust action compels

12   a finding that common questions of law and fact exist."  *In re High-Tech Emp. Antitrust Litig.*, 985

13   F. Supp. 2d 1167, 1180 (internal quotation marks omitted) (quoting *In re TFT-LCD (Flat Panel)*

14   *Antitrust Litig.*, 267 F.R.D. 583, 593 (N.D. Cal. 2010), *amended in part by* No. 08-1827, 2011 WL

15   3268649 (N.D. Cal. July 28, 2011)).  This is because "[a]ntitrust liability alone constitutes a common

16   question that 'will resolve an issue that is central to the validity' of each class member's claim 'in

17   one stroke.'"  *High-Tech.*, 985 F. Supp. 2d at 1180 (quoting *Dukes*).  As such, commonality is

18   "usually met in the antitrust [ ] context when all class members' claims present common issues

19   including (1) whether the defendant's conduct was actionably anticompetitive under antitrust

20   standards; and (2) whether that conduct produced anticompetitive effects within the relevant product

21   and geographic markets."  *O'Bannon Class Cert.*, 2013 WL 5979327, at *4 (quoting *Sullivan v. DB*

22   *Invs., Inc.*, 667 F.3d 273, 336 (3d Cir. 2011) (Scirica, J., concurring), *cert. denied*, 132 S. Ct. 1876

23   (2012)).  This Court has determined that common questions related to market size, harm to

24   competition, and the legitimacy of procompetitive justifications, "all of which may be resolved by

25   class-wide proof and argument, are typically sufficient to satisfy commonality in antitrust class

26   actions."  *O'Bannon Class Cert.*, 2013 WL 5979327, at *4.

27             Just like the class certified by this Court in *O'Bannon*, Plaintiffs in this case "have identified

28   several common questions of law and fact that must be resolved to determine whether the NCAA

violated federal antitrust law." *Id.* at *4.  To name only a few, Plaintiffs have pleaded facts that raise questions for all proposed classes regarding whether NCAA rules have harmed competition in the identified markets, whether there are any legitimate procompetitive justifications, and whether there are any less restrictive alternatives to achieve any purported procompetitive justifications.  CAC at ¶¶ 142, 312, 478, 488, 514, 527-28, 539-40, 554; JAC2 at ¶¶ 59, 64, 96, 121.  These common questions are nearly identical to those in *White*, where the court certified a class of college athletes who alleged that the NCAA and "its member institutions entered into a horizontal agreement to adhere to a grant-in-aid … cap in their financial aid awards to student athletes."  *White* at 1.

Similarly, the court in *In re NCAA I-A Walk-On Football Players Litigation* held that "[b]ecause commonality is not disputed and because the nature of this antitrust lawsuit makes it clear that common issues exist, the Court finds the commonality requirement satisfied in this case."  No. C04-1254C, 2006 WL 1207915, at *5 (W.D. Wash May 3, 2006) ("*Walk-On Players*").[41]  Plaintiffs have satisfied the commonality requirements for the proposed classes.

### 3.   The factual and legal claims asserted are typical for all members of each of the proposed classes, each of whom has the same claims as the named plaintiffs.

Given the universality of the application of the applicable NCAA rules to all class members, the claims of the representative parties are typical of those of the classes.  Rule 23(a)'s typicality requirement is met where "the claims or defenses of the representative parties are typical of the claims or defenses of the class."  Fed. R. Civ. P. 23  "This requirement is usually satisfied if the named plaintiffs have suffered the same or similar injuries as the unnamed class members, the action is based on conduct which is not unique to the named plaintiffs, and other class members were injured by the same course of conduct."  *O'Bannon Class Cert.*, 2013 WL 5979327, at *4  (citing

---

[41] In *Walk-On Players*, plaintiffs sought to certify a class comprised of "all students who during the period starting four years from the filing of the complaint were on the football pre-season practice rosters of NCAA Division I-A schools, but who did not receive a full grant-in-aid from their school." *Walk-On Players*, 2006 WL 1207915, at *2.  Plaintiffs challenged rules that restrict the maximum number of scholarships a team can award.  *Id.* at *1.  In discussing commonality, the court stated, "As one district court has noted, '[a]ntitrust price-fixing conspiracy cases, by their nature, deal with common legal and factual questions about the existence, scope and effect of the alleged conspiracy.'"  *Id.* at *5 (quoting *Cumberland Farms, Inc. v. Browning-Ferris Indus. Inc.,* 120 F.R.D. 642, 646 (E.D. Pa. 1988)).  The court in *Walk-On Players* denied certification because the named plaintiffs did not satisfy the adequacy requirement due to conflicts of interest among class members—issues that are not present in this case.  *Id.* at *9.

1    *Hanon v. Dataproducts Corp.*, 976 F.2d 497, 508 (9th Cir. 1992)).  Every "class representative must

2    be part of the class and possess the same interest and suffer the same injury as the class members."

3    *Falcon*, 457 U.S. at 156 (quoting *E. Tex. Motor Freight Sys., Inc. v. Rodriguez*, 431 U.S. 395, 403

4    (1977) (internal quotation marks omitted)).  "In antitrust cases, this uniformity of class members'

5    injuries, claims, and legal [theories] is typically sufficient to satisfy Rule 23(a)(3)."  *O'Bannon Class*

6    *Cert.*, 2013 WL 5979327, at *5 (citing *Walk-On Players*, 2006 WL 1207915, at *6).

7         As was true in *O'Bannon*, here "the Plaintiffs' interests are closely aligned with those of

8    absent class members."  *Id.* at *5.  All of the named Plaintiffs are FBS football or Division I men's

9    or women's basketball players who currently receive or previously received athletically based GIAs.

10   CAC at ¶¶ 115, 122, 126, 138E; JAC2 at ¶¶ 109, 112, 115.  Each was offered and accepted an

11   athletic scholarship for services on his or her respective football or basketball team.  CAC at ¶¶ 115,

12   122, 126, 138E; JAC2 at ¶¶ 109, 112, 115.  All of them are or were subject to the compensation

13   limits challenged as unlawful restraints, CAC at ¶¶ 115, 122, 126, 138D, I; JAC2 at ¶¶ 110, 113,

14   116, and each named Plaintiff has an interest in seeking an injunction to prevent Defendants from

15   continuing to enforce these illegal agreements in restraint of trade.  The exact same can be said of

16   each absent member of the proposed classes, all of whom suffer the same harm and share the same

17   interests.  As the court ruled in *White*, "Plaintiffs and all members of the proposed class allege they

18   were affected by the GIA cap in the same way."  *White* at 3.  The same can be said of the no-

19   compensation rules challenged here.

20        Typicality in this case is also similar to *Walk-On Players*, where the legal theory and facts

21   supporting a possible finding of antitrust harm were identical for all class members.  *Walk-On*

22   *Players*, 2006 WL 1207915, at *6.  There the court ruled that, "[t]he legal theory to be advanced by

23   all class members – that the NCAA and its members violated the Sherman Act – is identical.  *Id*.

24   The facts going to the violation are also identical for each class member.  "*All* of the factual and

25   legal inquiries will be the same to establish the market, illegality, characterization of Bylaw 15.5.5 as

26   a horizontal restraint, injury to competition, and the propriety of an injunction."  *Id.* (emphasis in

27   original).  The same rationale applies to Plaintiffs and the proposed classes here.  Moreover, there

28   are no unique defenses to these named Plaintiffs' claims that would not apply equally to the Class.

1   Accordingly, Rule 23(a)(3) is satisfied.

2       **4.      The Named Plaintiffs and their counsel fairly and adequately represent the
            interests of each of the proposed classes and will continue to vigorously
3           prosecute this action on their behalf.**

4           Plaintiffs and their counsel will adequately represent the proposed classes.  Class certification

5   requires demonstrating that "the representative parties will fairly and adequately protect the interests

6   of the class."  Fed. R. Civ. P. 23(a).  Under Fed. R. Civ. P. 23(g), a similar standard is required of

7   class counsel.   Adequacy contemplates (1) whether "named plaintiffs and their counsel have

8   conflicts of interest with other class members" and (2) if "named plaintiffs and their counsel [will]

9   prosecute the action vigorously on behalf of the class[.]"  *O'Bannon Class Cert.*, 2013 WL 5979327,

10  at *5 (quoting *Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1020 (9th Cir. 1998)).

11          The named Plaintiffs are adequate representatives of each of their respective proposed

12  classes.  Their interests are aligned with all class members in challenging the lawfulness of the

13  restraints that impose bans on the compensation they can receive from schools or conferences for

14  their athletic services apart from the GIA.  They can be trusted to protect the interests of those class

15  members who are not present and prosecute the action vigorously on their behalf.

16          Likewise, counsel for both *Jenkins* and Consolidated Plaintiffs are well-qualified and easily

17  meet the "adequacy" standard. [42]   Co-lead counsel for Consolidated Plaintiffs, Steve Berman, is the

18  co-founder and managing partner of Hagens Berman.  The firm is considered to be one of the top

19  plaintiff's firms in the country.  Berman has received numerous awards and recognitions for his

20  success in historic class actions and has secured numerous awards and settlements in the billions of

21  dollars.[43]  He has a long history of challenging the NCAA's conduct including cases such as *Walk-

22  On*, *Agnew*, *Keller* and *In re NCAA Student Concussion Litigation*.  Co-lead counsel Bruce L.

23  Simon—and his firm Pearson, Simon & Warshaw, LLP—enjoys a national reputation for

24  prosecuting large, complex antitrust class actions.[44]  The firm has obtained hundreds of millions of

25  dollars in settlements and verdicts on behalf of their clients, and has received various awards and

26  recognitions for their work.[45]      For example, in 2013, Simon received a CLAY award from

27  _____
    [42] The descriptions of each lawyer and their firm is their own.
    [43] Berman Decl., Ex. 10 (firm resume).
28  [44] Simon Decl., Ex. 1 (firm resume); *see also* ECF No. 50-4.
    [45] *Id.*

1    California Lawyer magazine as one of the attorneys of the year for his work in the *In re TFT-LCD*

2    *(Flat Panel) Antitrust Litigation* trial and settlements.[46]

3         Lead counsel for *Jenkins* Plaintiff, Winston & Strawn, has the skills, experience, and

4    resources necessary to serve effectively as class counsel for its two putative classes. *See* Smith Decl.

5    ¶¶ 9-10, Klempner Decl. ¶¶ 10-11, Huma Decl. ¶¶ 7-11, *Jenkins* Pls.' Opp'n to *Floyd* Pls.' Mot. to

6    Appoint Counsel, ECF Nos. 49-2, -3, and -4, *In re NCAA Athletic Grant-in-Aid Cap Antitrust Litig.*,

7    14-md-02541-CW (N.D. Cal. July 2, 2014). The Winston team—including Jeffrey Kessler, who is

8    one of the leading sports attorneys in the country—has a history of representing athletes in some of

9    the most notable legal challenges regarding athlete's rights and has invested, and will continue to

10   invest, significant resources in prosecuting this case. *See* Kessler Decl., *Jenkins* Pls.' Opp'n to *Floyd*

11   Pls.' Mot. to Appoint Counsel, ECF No. 49-1, *id.* The Court previously appointed Winston &

12   Strawn as interim lead class counsel for the *Jenkins* Plaintiffs, Order, ECF No. 82, *id.* (Aug. 22,

13   2014), and should also appoint Mr. Kessler and his team as class counsel in this case for the putative

14   classes in *Jenkins*.

15   **C.   Plaintiffs Satisfy the Requirements for Injunctive and Declaratory Relief Class Certification Under Rule 23(B)(2)**

16

17        Finally, given the universality of the application of the challenged NCAA compensation

18   rules, the injunctive and declaratory relief sought would provide uniform relief to all members of the

19   proposed classes. Rule 23(b)(2) applies where the defendants have "acted or refused to act on

20   grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory

21   relief is appropriate respecting the class as a whole." F. R. Civ. P. 23(b)(2). As this Court held in

22   *O'Bannon*, class certification is appropriate under Rule 23(b)(2) "because an injunction would offer

23   all class members 'uniform relief' from this harm." *O'Bannon Class Cert.*, 2013 WL 5979327, at *7

24   (citing *Rodriguez v. Hayes*, 591 F.3d 1105, 1125 (9th Cir. 2010)). There is no dispute that the

25   NCAA and Conference Defendants have collectively agreed to both fix the amount of the GIA at a

26   level below the cost of attendance and to  ban any compensation that colleges and conferences may

27   provide to Division I college football and men's and women's basketball players for their athletic

28

---

[46] *Id.*

1   services beyond the GIA.  CAC at ¶¶ 297-311; JAC2 at ¶ 36.  There also is no question these agreed-

2   upon restrictions apply uniformly to each member of each of the proposed classes and inflict harm

3   upon them.  CAC at ¶¶ 311, 508; JAC2 at ¶¶ 28-29.

4          The restraints at issue – as described in the complaints in each case – are extensive, agreed

5   upon, and published annually in the NCAA Manual and the respective rulebooks of each Conference

6   Defendant.  CAC at ¶ 284; JAC2 at ¶ 36.  As discussed earlier, *see infra* § II, Defendants construe

7   the rules in combination to prohibit Plaintiffs and members of the proposed classes from receiving

8   any GIA above the fixed amount and any compensation or economic benefit from colleges or

9   conferences for their athletic services beyond the value of a full GIA.  Enforcement of these

10  regulations is strict and punitive, CAC at ¶¶ 286-96; JAC2 at ¶¶ 36-37, conditioning any athlete's

11  ability to participate in Division I football or men's or women's basketball upon forgoing any

12  compensation beyond a fixed GIA and threatening any noncompliant school with a group boycott.

13  CAC at ¶¶ 297-99; JAC2 at ¶¶ 36-37.  In plain terms, NCAA Bylaw 15.1 provides:

14               A student-athlete shall not be eligible to participate in intercollegiate
                 athletics if he or she receives financial aid that exceeds the value of the
15               cost of attendance.  A student-athlete may receive institutional
                 financial aid based on athletics ability (per Bylaw 15.02.4.1) and
16               educational expenses awarded per Bylaw 15.2.6.4 up to the value of a
                 full GIA, plus any other financial aid up to the cost of attendance.
17               JAC2 at ¶ 39.

18         Taken in concert with several additional NCAA Bylaws, these restraints prohibit all college

19  football and men's and women's basketball athletes from receiving any compensation or economic

20  benefit of any kind from their schools or conferences for their athletic performances outside of a

21  price-fixed GIA.  And Conference Defendants further implement this anticompetitive system by

22  adopting NCAA standards and promulgating complementary compensation limits.  CAC at ¶¶ 146-

23  81; JAC2 at ¶¶ 46-47.

24         As a result, all members of each of the proposed classes are denied participation in the

25  highest level of college football and men's and women's basketball if they receive compensation for

26  their athletic services from their schools or conferences beyond the specified GIA.  Injunctive relief

27  prohibiting these unlawful restraints would offer uniform relief from this harm to all members of

28  each proposed class.

Further, as this Court noted in *O'Bannon*, Consolidated Plaintiffs can seek to certify Rule 23(b)(2) classes and a separate (b)(3) class:[47]

> Plaintiffs seek to certify one class under Rule 23(b)(2) to pursue declaratory and injunctive relief and another class under Rule 23(b)(3) to pursue monetary relief. Nothing in the federal rules or existing case law prevents them from seeking certification under both of these provisions. *See In re Apple, AT&T iPad Unlimited Data Plan Litig.*, 2012 WL 2428248 (N.D. Cal.) (explaining that "a court may certify a Rule 23(b)(2) class for injunctive relief and a separate class for individual damages or, if the damage claims do not meet Rule 23(b)(3) standards, certify the Rule 23(b)(2) class alone" (citing *Schwarzer, Tashima & Wagstaff*e, Cal. Practice Guide: Federal Civil Procedure Before Trial § 10:404 (2011))).

Accordingly, the classes satisfy the requirements for certifying injunctive and declaratory relief classes under Rule 23(b)(2).

---

[47] *O'Bannon Class Cert.*, 2013 WL 5979327, at *7.

# VI.   CONCLUSION

Plaintiffs request the Court to certify each of the proposed classes of college football and men's and women's basketball athletes under Rules 23(a) and (b)(2).

Dated: February 20, 2015

Respectfully submitted,

By ____/s/ Steve W. Berman_____
    Steve W. Berman (*pro hac vice*)
    Ashley Bede (*pro hac vice*)
    HAGENS BERMAN SOBOL SHAPIRO
    LLP
    1918 Eighth Avenue, Suite 3300
    Seattle, WA 98101
    Telephone: (206) 623-7292
    Facsimile: (206) 623-0594
    steve@hbsslaw.com
    ashleyb@hbsslaw.com

    Bruce L. Simon (96241)
    Aaron M. Sheanin (214472)
    Benjamin E. Shiftan (265767)
    PEARSON, SIMON & WARSHAW, LLP
    44 Montgomery Street, Suite 2450
    San Francisco, CA 94104
    Telephone: (415) 433-9000
    Facsimile: (415) 433-9008
    bsimon@pswlaw.com
    asheanin@pswlaw.com
    bshiftan@pswlaw.com

    Jeff D. Friedman (173886)
    Jon T. King (205073)
    HAGENS BERMAN SOBOL SHAPIRO
    LLP
    715 Hearst Avenue, Suite 202
    Berkeley, CA 94710
    Telephone: (510) 725-3000
    Facsimile: (510) 725-3001
    Email: jonk@hbsslaw.com

    Counsel for *Consolidated Plaintiffs*
    *Interim Co-Lead Class Counsel*

By /s/ Elizabeth C. Pritzker_____
    Elizabeth C. Pritzker (146267)
    Jonathan K. Levine (220289)
    Bethany L. Caracuzzo (190687)
    Shiho Yamamoto (264741)
    PRITZKER LEVINE LLP
    180 Grand Avenue, Suite 1390

By ____/s/ Jeffrey L. Kessler_____
    Jeffrey L. Kessler (*pro hac vice*)
    David G. Feher (*pro hac vice*)
    David L. Greenspan (*pro hac vice*)
    WINSTON & STRAWN LLP
    200 Park Avenue
    New York, NY 10166-4193
    Telephone: (212) 294-6700
    Facsimile: (212) 294-4700
    *jkessler@winston.com*
    *dfeher@winston.com*
    *dgreenspan@winston.com*

    Derek J. Sarafa (*pro hac vice*)
    WINSTON & STRAWN LLP
    35 W. Wacker Dr.
    Chicago, IL 60601
    Telephone: (312) 558-5600
    Fax: (312) 558-5700
    *dsarafa@winston.com*

    Sean D. Meenan (SBN 260466)
    WINSTON & STRAWN LLP
    101 California Street
    San Francisco, CA 94111
    Telephone: (415) 591-1000
    Facsimile: (415) 591-1400
    *smeenan@winston.com*

    Counsel for *Jenkins* Plaintiffs
    *Interim Class Counsel*

Oakland, CA 94612
Telephone: (415) 692-0772
Facsimile: (415) 366-6110
ecp@pritzkerlevine.com
jkl@pritzkerlevine.com
bc@pritzkerlevine.com
sy@pritzkerlevine.com

*Additional Class Counsel*

AMENDED JOINT MOTION FOR CLASS CERTIFICATION - CASE NO. 4:14-MD-02541-CW

**ATTESTATION PURSUANT TO CIVIL LOCAL RULE 5-1(i)(3)**

Pursuant to Civil Local Rule No. 5-1(i)(3), I declare that concurrence has been obtained from each of the above signatories to file this document with the Court.  I shall maintain records to support this concurrence for subsequent production to the Court, if so ordered, or for inspection upon request by a party, until one year after final resolution of the action (including appeal, if any).


/s/ Steve W. Berman
STEVE W. BERMAN

1

**CERTIFICATE OF SERVICE**

2

I hereby certify that on February 20, 2015, I electronically filed the foregoing document

3

using the CM/ECF system which will send notification of such filing to the e-mail addresses

4

registered in the CM/ECF system, as denoted on the Electronic Mail Notice List.

5

6

/s/ Steve W. Berman
STEVE W. BERMAN

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28