Raoul D. Kennedy (SBN 40892)
SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
525 University Avenue, Suite 1100
Palo Alto, CA 94301
Telephone: (650) 470-4500
Facsimile: (650) 470-4570
raoul.kennedy@skadden.com

Jeffrey A. Mishkin (*pro hac vice*)
Karen Hoffman Lent (*pro hac vice*)
SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
Four Times Square
New York, NY 10036
Telephone: (212) 735-3000
Facsimile: (212) 735-2000
jeffrey.mishkin@skadden.com
karen.lent@skadden.com

Attorneys for Defendants
NATIONAL COLLEGIATE ATHLETIC
ASSOCIATION and WESTERN ATHLETIC
CONFERENCE
[Additional Counsel Listed on Signature Page]

# IN THE UNITED STATES DISTRICT COURT

## FOR THE NORTHERN DISTRICT OF CALIFORNIA

### OAKLAND DIVISION

| | |
|---|---|
| IN RE NATIONAL COLLEGIATE ATHLETIC ASSOCIATION ATHLETIC GRANT-IN-AID CAP ANTITRUST LITIGATION<br><br>This Document Relates to:<br><br>ALL ACTIONS | MDL Docket No. 14-md-02541-CW |
| MARTIN JENKINS, et al.,<br><br>               Plaintiffs,<br><br>        v.<br><br>NATIONAL COLLEGIATE ATHLETIC ASSOCIATION, et al.,<br><br>               Defendants. | Case No. 14-cv-02758-CW<br><br>**DEFENDANTS' OPPOSITION TO PLAINTIFFS' AMENDED JOINT MOTION FOR CLASS CERTIFICATION**<br><br>Date:      July 23, 2015<br>Time:     2:00 p.m.<br>Courtroom: Courtroom 2, 4th Floor<br>Before:   Hon. Claudia Wilken |

REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED

### *Table of Contents*

Preliminary Statement.................................................................................................1

Statement of Facts.......................................................................................................2

Argument ......................................................................................................................4

I.  PLAINTIFFS HAVE MADE NO EFFORT TO ESTABLISH THAT THEY MEET
    THE REQUIREMENTS OF RULE 23. ....................................................................4

II. CONFLICTS AMONG PUTATIVE CLASS MEMBERS PRECLUDE THE
    NAMED PLAINTIFFS FROM FAIRLY AND ADEQUATELY PROTECTING
    THE INTERESTS OF ALL ABSENT CLASS MEMBERS. ...............................7

    A.  The Substitution Effect Prevents Certification In These Actions............................9

    B.  The Economics Of Superstars Dictates That Many Putative Class Members
        Would Be Harmed By The Requested Relief. ......................................................12

    C.  Plaintiffs Offer No Support For Their Assertion That All Putative Class
        Members Would Receive Higher Compensation If The Requested Injunctive
        Relief Were Granted. ........................................................................................14

III. CONFLICTS AMONG PUTATIVE CLASS MEMBERS RENDER INJUNCTIVE
     RELIEF INAPPROPRIATE RESPECTING THE CLASSES AS A WHOLE. ...............17

IV. NONE OF THE CONSOLIDATED PLAINTIFFS HAS STANDING TO PURSUE
    THE INJUNCTIVE RELIEF THEY SEEK AND THEIR MOTION FOR CLASS
    CERTIFICATION SHOULD BE DENIED. ..............................................................19

Conclusion ...................................................................................................................21

| DEFENDANTS' OPPOSITION TO PLAINTIFFS' | MDL No. 14-md-02541-CW |
| AMENDED JOINT MOTION FOR CLASS CERTIFICATION | Case No. 14-cv-02758-CW |

i

1

2

### ***Table of Authorities***

3

**<u>Cases</u>**

4

*Allied Orthopedic Appliances, Inc. v. Tyco Healthcare Grp. L.P.*, 247 F.R.D. 156 (C.D. Cal.
5
    2007) .......................................................................................................................8

6
*Amchem Prods., Inc. v. Windsor*, 521 U.S. 591 (1997)..............................................4, 8

7
*Berger v. Compaq Computer Corp.*, 257 F.3d 475 (5th Cir. 2001).................................5

8
*Bieneman v. City of Chicago*, 864 F.2d 463 (7th Cir. 1988) ...........................................8

9
*Blackman v. District of Columbia*, 633 F.3d 1088 (D.C. Cir. 2011) ............................17

10
*Denney v. Deutsche Bank AG*, 443 F.3d 253 (2d Cir. 2006) .........................................20

11
*Ellis v. Costco Wholesale Corp.*, 657 F.3d 970 (9th Cir. 2011) ...................................19

12
*Funeral Consumers Alliance, Inc. v. Service Corp. Int'l*, 695 F.3d 330 (5th Cir. 2012) .............20

13
*Gates v. Rohm & Haas Co.*, 655 F.3d 255 (3d Cir. 2011)............................................19

14
*General Tel. Co. v. Falcon*, 457 U.S. 147 (1982)...........................................................5

15
*Halvorson v. Auto-Owners Ins. Co.*, 718 F.3d 773 (8th Cir. 2013)..............................20

16
*Herskowitz v. Apple, Inc.*, 301 F.R.D. 460 (N.D. Cal. 2014).......................................18

17
*In re Cardizem CD Antitrust Litig.*, 332 F.3d 896 (6th Cir. 2003) ...............................19

18
*In re Deepwater Horizon*, 753 F.3d 509 (5th Cir. 2014) ..............................................20

19
*In re Korean Air Lines Disaster of Sept. 1, 1983*, 829 F.2d 1171 (D.C. Cir. 1987) .....................19

20
*In re Managerial, Prof'l & Technical Emps. Antitrust Litig.*, No. 02-CV-2924, 2006 WL
    38937 (D.N.J. Jan. 5, 2006) ..................................................................................18

21
*In re NCAA I-A Walk-On Football Players Litigation*, No. C 04-1254 C, 2006 WL 1207915
22
    (W.D. Wash. May 3, 2006)..............................................................................1, 8, 9

23
*In re NCAA Student-Athlete Name & Likeness Licensing Litigation*, No. C 09-CV-1967
    CW, 2013 WL 5979327 (N.D. Cal. Nov. 8, 2013) ..................................... *passim*

24
*Lemon v. Int'l Union of Operating Eng'rs, Local No. 139*, 216 F.3d 577 (7th Cir. 2000)............17

25
*Lewallen v. Medtronic USA, Inc.*, No. 01-20395, 2002 WL 31300899 (N.D. Cal. Aug. 28,
26
    2002) ......................................................................................................................19

27
*Mateo v. V.F. Corp.*, No. C 08-05313-CW, 2009 WL 3561539 (N.D. Cal. Oct. 27, 2009)............8

28

| | |
|---|---|
| **DEFENDANTS' OPPOSITION TO PLAINTIFFS'** | **MDL No. 14-md-02541-CW** |
| **AMENDED JOINT MOTION FOR CLASS CERTIFICATION** | **Case No. 14-cv-02758-CW** |

1    *Mayfield v. Dalton*, 109 F.3d 1423 (9th Cir. 1997) ........................................................8

2    *Mazza v. American Honda Motor Co.*, 666 F.3d 581 (9th Cir. 2012) ...........................20

3    *Pickett v. Iowa Beef Processors*, 209 F.3d 1276 (11th Cir. 2000)...................................8

4    *Reeb v. Ohio Dep't of Rehab. & Corr.*, 435 F.3d 639 (6th Cir. 2006) ...........................17

5    *Retired Chicago Police Ass'n v. City of Chicago*, 7 F.3d 584 (7th Cir. 1993)................8

6    *Richardson v. L'Oreal USA, Inc.*, 991 F. Supp. 2d 181 (D.D.C. 2013) ...................17, 18

7    *Rodriguez v. Hayes*, 591 F.3d 1105 (9th Cir. 2010) ...................................................18

8    *Sweet v. Pfizer*, 232 F.R.D. 360 (C.D. Cal. 2005) ......................................................18

9    *Wal-Mart Stores, Inc. v. Dukes*, 131 S. Ct. 2541 (2011) ......................................4, 5, 18

10    *Walters v. Reno*, 145 F.3d 1032 (9th Cir. 1988) .........................................................18

11    *White v. NCAA*, No. CV 06-0999-RGK, 2006 WL 8066803 (C.D. Cal. Oct. 19, 2006)...............13

12    *Zehel-Miller v. Astrazenaca Pharm., LP*, 223 F.R.D. 659 (M.D. Fla. 2004) ................17

13    **Statutes**

14    20 U.S.C. § 1681, *et seq*...................................................................................15

15    Fed. R. Civ. P. 23 ................................................................................... *passim*

16    **Other Authorities**

17    44 Fed. Reg. 71413 (Dec. 11, 1979) ..........................................................................15

18

19

20

21

22

23

24

25

26

27

28    **DEFENDANTS' OPPOSITION TO PLAINTIFFS'**      **MDL No. 14-md-02541-CW**
     **AMENDED JOINT MOTION FOR CLASS CERTIFICATION**      **Case No. 14-cv-02758-CW**

### ***Preliminary Statement***

Defendants National Collegiate Athletic Association ("NCAA") and eleven Division I conferences submit that class certification should be denied for one simple and fundamental reason: the named plaintiffs seek relief that would benefit them but would *harm* many of the absent putative class members they purport to represent. In these circumstances, the named plaintiffs simply cannot fairly and adequately protect the interests of the absent class members, as required by Fed. R. Civ. P. 23(a)(4), and injunctive relief respecting the class as a whole plainly is not appropriate, as required by Fed. R. Civ. P. 23(b)(2).

This point is not fairly debatable. The named plaintiffs seek an injunction that would allow unlimited compensation for Football Bowl Subdivision ("FBS") football players and Division I men's and women's basketball players. This requested relief would be sure to produce vigorous recruitment of and substantial payments to the most talented athletes—a group that allegedly includes the named plaintiffs themselves, each of whom is described in his or her complaint as having been a high school star. But there can be no doubt that the requested injunction *also* would lead to the *reduction* or *elimination* of scholarships and athletic opportunities for many of the thousands of less renowned student-athletes whom the named plaintiffs claim to represent as unnamed class members, and who would suffer as resources are funneled to the athletic superstars.

The reality that some absent class members are benefited by the challenged NCAA rules and would be injured by the requested injunctive relief makes class certification impermissible. None of the decisions on which plaintiffs rely in support of their request for certification, notably including this Court's decision in *In re NCAA Student-Athlete Name & Likeness Licensing Litigation*, No. C 09-CV-1967 CW, 2013 WL 5979327 (N.D. Cal. Nov. 8, 2013) ("*O'Bannon*"), involved a circumstance where the absent class members would have been harmed by award of the requested relief; indeed, in *In re NCAA I-A Walk-On Football Players Litigation*, No. C 04-1254 C, 2006 WL 1207915 (W.D. Wash. May 3, 2006), on which plaintiffs here rely, the court denied class certification precisely because the inherently conflicting interests of putative class members would have required the named plaintiffs to undercut the interests of absent class members. We are not aware

---

1 | of *any* decision that has ever certified a class in the face of such manifestly conflicting intra-class

2 | interests.  This case, we respectfully submit, should not be the first.

3 | ### *Statement of Facts*

4 | The NCAA's mission is "to maintain intercollegiate athletics as an integral part of the edu-

5 | cational program and the athlete as an integral part of the student body and, by so doing, retain a

6 | clear line of demarcation between intercollegiate athletics and professional sports." (NCAA Con-

7 | stitution art. 1.3.1.[1]) "Only an amateur student-athlete is eligible for intercollegiate athletics partic-

8 | ipation in a particular sport." (Division I Bylaw 12.01.1.)  The NCAA's eligibility rules both (i)

9 | preserve the amateur student-athlete collegiate model and (ii) encourage colleges and universities

10 | to spread their athletics-based financial aid among a large number of student-athletes, rather than

11 | concentrate those funds on the recruitment of a handful of superstar players.  These rules ensure

12 | that more student-athletes are able to afford a college education and to participate in broad sports

13 | programs, including many non-revenue sports.

14 | Invoking the Sherman Act, plaintiffs challenge the NCAA and conference rules that limit

15 | athletics-based financial aid to educational expenses and prohibit payments above the cost of at-

16 | tendance based on athletic skill or performance.[2]  In their complaint, plaintiffs Martin Jenkins, Ni-

17 | gel Hayes, and Alec James challenge all NCAA and conference rules that "prohibit, cap, or other-

18 | wise limit the remuneration that players in each of [the alleged] markets may receive for their ath-

19 | letic services." (JAC ¶ 38.)[3]  In the consolidated amended complaint, the remaining plaintiffs

20 |

---

[1] A copy of the relevant provisions of the NCAA Constitution and Division I Bylaws is attached as Exhibits 2, 3 and 4, respectively, of the Declaration of Jeffrey A. Mishkin in Support of Defendants' Opposition to Plaintiffs' Amended Joint Motion for Class Certification, submitted herewith.

[2] Several named plaintiffs ███████████████████████████████████████ (*See, e.g.*, Jenkins Dep. at 113; Hayes Dep. at 10-11, 201; Hartman Dep. at 225.)  A copy of the relevant excerpts from the transcripts of the depositions of plaintiffs Nigel Hayes, Alec James, Martin Jenkins, Justine Hartman and John Bohannon is attached as Exhibits 5, 6, 7, 8 and 9, respectively, of the Declaration of Jeffrey A. Mishkin in Support of Plaintiffs' Opposition to Plaintiffs' Amended Joint Motion for Class Certification, submitted herewith.

[3] Five conferences—the Pac-12 Conference, The Big Ten Conference, Inc., the Big 12 Conference, Inc., the Southeastern Conference, and the Atlantic Coast Conference—are named as defendants in

*(cont'd)*

| DEFENDANTS' OPPOSITION TO PLAINTIFFS' | MDL No. 14-md-02541-CW |
| AMENDED JOINT MOTION FOR CLASS CERTIFICATION | Case No. 14-cv-02758-CW |

1   "specifically challenge" the application of Division I Bylaw 15.1 to the institutions that participate

2   in FBS football and Division-I men's and women's basketball.  (CAC ¶¶ 1, 297.)[4]  Bylaw 15.1

3   provides that a student-athlete "shall not be eligible to participate in intercollegiate athletics if he or

4   she receives financial aid that exceeds the value of the cost of attendance."  (Division I Bylaw

5   15.1.)

6          In seeking to prohibit the NCAA and its member conferences from applying any limitations

7   on the amount of financial aid that student-athletes may receive, the *Jenkins* plaintiffs assert that

8   the challenged rules have deprived putative class members "of the ability to receive market value

9   for their services as college football and men's basketball players in a free and open market."  (JAC

10   ¶ 123.)  Likewise, the CAC plaintiffs assert that the rules "arbitrarily restrict[ ] athletics financial

11   aid to amounts that are less than the athletes would receive in a competitive market."  (CAC ¶ 15.)

12          The three *Jenkins* plaintiffs and two CAC plaintiffs[5] now move to certify five differently

13   defined putative injunctive relief classes consisting of current and former FBS football players, Di-

14   vision I men's basketball players and Division I women's basketball players.  (Pl. Br. at 11-14.)[6]

15          For the reasons explained below, certification of these classes is inappropriate.  None of the

16   proposed representative plaintiffs has established that he or she can fairly and adequately protect

17   the interests of absent putative class members or that the requested injunctive relief is appropriate

18   _____
    *(cont'd from previous page)*
    the *Jenkins* complaint.  (*Jenkins* Second Amended Complaint, No. 4:14-cv-2758 (Feb. 13, 2015)
19   ("JAC") ¶ 22.)

20   [4] Those conferences named in the *Jenkins* complaint plus six additional conferences—the Ameri-
     can Athletic Conference, Conference USA, Inc., the Mid-American Conference, the Mountain
21   West Conference, the Sun Belt Conference, and the Western Athletic Conference—are named as
     defendants in the consolidated amended complaint.  (Consolidated Amended Complaint, No. 4:14-
22   md-2541 (July 11, 2014) ("CAC") ¶¶ 146-82.)

23   [5] In their amended joint motion, CAC plaintiffs proffered four putative class representatives, but
     withdrew two of those representatives during discovery.
24

25   [6] The CAC plaintiffs also seek past damages, but that relief is not at issue on this motion.  The
     CAC plaintiffs apparently intend separately to move for certification of several damages classes
     under Rule 23(b)(3), but have not yet done so.  In addition, the CAC plaintiffs assert a claim for
26   violation of California's Unfair Competition Act (CAC ¶¶ 545-549), but the joint motion does not
     seek to certify a Rule 23(b)(2) class to pursue that claim.  (*See* Consolidated Plaintiffs' and *Jenkins*
27   Plaintiffs' Amended Joint Motion for Class Certification (Feb. 20, 2015) (Dkt. No. 200) ("Pl. Br.")
     at 11.)
28

DEFENDANTS' OPPOSITION TO PLAINTIFFS'          MDL No. 14-md-02541-CW
AMENDED JOINT MOTION FOR CLASS CERTIFICATION   Case No. 14-cv-02758-CW
                        3

1   respecting the classes as a whole.  In addition, three of the five moving plaintiffs—Mr. Jenkins and

2   the two CAC plaintiffs— ████████████████████████████████████

3   ████████████ (Jenkins Dep. at 98, 116; Hartman Dep. at 246; Bohannon Dep. at 8, 22; Pl.

4   Br. at 12-14), leaving no representative whatsoever to pursue injunctive relief against the six con-

5   ference defendants that are named only in the consolidated amended complaint.[7]

6                                      ***Argument***

7   I.    **PLAINTIFFS HAVE MADE NO EFFORT TO ESTABLISH**
         **THAT THEY MEET THE REQUIREMENTS OF RULE 23.**

8        "The class action is an exception to the usual rule that litigation is conducted by and on be-

9   half of the individual named parties only."  *Wal-Mart Stores, Inc. v. Dukes*, 131 S. Ct. 2541, 2550

10  (2011) (citation omitted).  To justify departing from that rule, the named plaintiff "must be part of

11  the class and 'possess the same interest and suffer the same injury' as the class members."  *Id.* (ci-

12  tation omitted).  "Rule 23(a) ensures that the named plaintiffs are appropriate representatives of the

13  class whose claims they wish to litigate."  *Id.*

14       The standards that govern class certification are well settled.  Under Rule 23(a), the party

15  seeking certification must demonstrate that:  "(1) the class is so numerous that joinder of all mem-

16  bers is impracticable, (2) there are questions of law or fact common to the class, (3) the claims or

17  defenses of the representative parties are typical of the claims or defenses of the class, and (4) the

18  representative parties will fairly and adequately protect the interests of the class."  *Id.* at

19  2548.  These are "threshold requirements applicable to all class actions."  *Amchem Prods., Inc. v.*

20  *Windsor*, 521 U.S. 591, 613 (1997).  In addition, a plaintiff seeking certification under Rule

21  23(b)(2) must establish that "the party opposing the class has acted or refused to act on grounds

22  that apply generally to the class, so that final injunctive relief . . . is appropriate respecting the class

23  as a whole."  Fed. R. Civ. P. 23(b)(2).

24  _____

25  [7] As noted above, six defendants—the American Athletic Conference, Conference USA, the Mid-
    American Conference, the Mountain West Conference, the Sun Belt Conference, and the Western
26  Athletic Conference—are named as defendants only in the consolidated amended complaint.
    (CAC ¶¶ 169-82.)  They have not been named as defendants in the *Jenkins* complaint, which is the
27  only complaint with a plaintiff with standing to seek injunctive relief.  Consequently, an injunctive
    class cannot be certified with respect to these six conferences under any circumstances.
28

**DEFENDANTS' OPPOSITION TO PLAINTIFFS'**          **MDL No. 14-md-02541-CW**
**AMENDED JOINT MOTION FOR CLASS CERTIFICATION**   **Case No. 14-cv-02758-CW**
                              4

1    It is fundamental that plaintiffs bear the burden of *proving* that they have met the require-

2   ments of Rule 23.  "Rule 23 does not set forth a mere pleading standard.  A party seeking class cer-

3   tification must affirmatively demonstrate his compliance with the Rule—that is, he must be pre-

4   pared to prove that there are *in fact* sufficiently numerous parties, common questions of law or fact,

5   etc." *Wal-Mart*, 131 S. Ct. at 2551.  Thus, as the Supreme Court has repeatedly held, the district

6   court must "probe behind the pleadings before coming to rest on the certification question" and

7   must determine, "after a rigorous analysis, that the prerequisites of Rule 23(a) have been satisfied."

8   *Id.* (quoting *General Tel. Co. v. Falcon*, 457 U.S. 147, 160-61 (1982)).  "[A]ctual, not presumed,

9   conformance with Rule 23(a) remains . . . indispensable."  *Falcon*, 457 U.S. at 160; *see also Berger*

10  *v. Compaq Computer Corp.*, 257 F.3d 475, 481 (5th Cir. 2001) ("Adequacy [of representation un-

11  der Rule 23(a)] is for the plaintiffs to demonstrate; it is not up to defendants to disprove.").

12   Plaintiffs in this case have offered *no* evidence in support of their motion and have made no

13  effort to prove *in fact* that the requirements of Rule 23 have been met.  Instead, they merely rely on

14  the conclusory allegations in their complaints and this Court's class certification decision in

15  *O'Bannon*.  The entirety of their support for the adequacy of their representation consists of two

16  passages in their brief:  "As for adequacy, these representatives will adequately represent the inter-

17  ests of their respective class because, among other reasons, there are no internal conflicts with each

18  class and each representative has indicated his or her willingness to diligently represent the inter-

19  ests of his or her respective class." (Pl. Br. at 3.)  "The named Plaintiffs are adequate representa-

20  tives of each of their respective proposed classes.  Their interests are aligned with all class mem-

21  bers in challenging the lawfulness of the restraints that impose bans on the compensation they can

22  receive from schools or conferences for their athletic services apart from the GIA.  They can be

23  trusted to protect the interests of those class members who are not present and prosecute the action

24  vigorously on their behalf." (*Id.* at 21.)

25   These assertions fall far short of meeting the burden that Rule 23 imposes on plaintiffs.

26  Plaintiffs appear to assume that all FBS football players and men's and women's basketball players

27  would receive more money if the challenged rules were eliminated, and thus would benefit from

28  the injunctive relief that plaintiffs seek.  Plaintiffs also assume—and ask this Court to assume—

---

**DEFENDANTS' OPPOSITION TO PLAINTIFFS'**
**AMENDED JOINT MOTION FOR CLASS CERTIFICATION**

**MDL No. 14-md-02541-CW**
**Case No. 14-cv-02758-CW**

1   that each and every Division I institution has the resources necessary to meet the increased costs

2   that would result from the elimination of the challenged rules without reducing the number of

3   scholarships it offers. But plaintiffs proffer neither factual nor economic evidence to support those

4   assumptions, and without such evidence, plaintiffs cannot prevail on this motion.[8]

5          Plaintiffs' reliance on *O'Bannon* does not make up for their lack of evidence. In

6   *O'Bannon*, this Court certified a Rule 23(b)(2) injunctive class only after concluding that an intra-

7   class conflict did not exist for the unique reason (not present here) that the group license sought in

8   *O'Bannon* would not cause class members to compete against one another for compensation. Spe-

9   cifically, the injunctive relief sought in *O'Bannon* was, by definition, equally beneficial to each and

10  every putative class member: "Plaintiffs' model propose[d] that damages be allocated equally

11  among the members of every football and basketball team" according to a "group licensing"

12  scheme, notwithstanding that, in a free market, "some putative class members—such as star ath-

13  letes—would command a higher price for their name, image, and likeness rights than others."

14  2013 WL 5979327, at *5-6 (emphasis added). "This distinction is important," the Court explained,

15  "because it renders irrelevant any differences in the value of each class member's individual pub-

16  licity rights." *Id.* at *6. Thus, each member of the injunctive class in *O'Bannon* had an identical

17  interest in obtaining the requested injunctive relief.

18         The injunction that plaintiffs seek in this case is markedly different from the injunction

19  sought in *O'Bannon*. Unlike the injunctive class members in *O'Bannon*, who had identical inter-

20  ests in obtaining the requested injunctive relief, the putative class members in this case have differ-

21  ent and conflicting interests in retaining or eliminating the challenged eligibility rules. The re-

22  quested injunction here will cause student-athletes to compete against one another for compensa-

23  tion and, depending on the differences in the value of each class member's individual talent and

24  skill, some putative class members will be harmed by the elimination of the challenged rules.

25

---

26  [8] Nor may plaintiffs simply rely on expert testimony provided in other cases, such as *O'Bannon*, to
    which the defendant conferences were not parties. Local Rule 7-5(a) makes clear that a moving
27  party's factual contentions must be supported by affidavits or declarations submitted in connection
    with the motion.
28

**DEFENDANTS' OPPOSITION TO PLAINTIFFS'**          **MDL No. 14-md-02541-CW**
**AMENDED JOINT MOTION FOR CLASS CERTIFICATION**   **Case No. 14-cv-02758-CW**

1    Plaintiffs simply assume that, in a "free and open" labor market in which student-athletes

2 individually negotiate for the amount of their compensation, all FBS football players and Division I

3 men's and women's basketball players will receive more financial aid than they do now.  But in

4 their deposition testimony, the named plaintiffs █████████████████████████████████

5 ████████████████████████████████████████████████████████████████████████████

6 ████████████████████████████████████████████████  (*See, e.g.,*

7 James Dep. at 291-92; Hartman Dep. at 246.)

8    Plaintiffs do not address this adverse effect anywhere in their motion papers.  They assert

9 that they and "other *similarly situated* current and future Division I college football and men's and

10 women's basketball players" would benefit from the injunction they seek and that, "if total com-

11 pensation was not capped, schools would compete for the *best* recruits by offering them compensa-

12 tion outside of the GIA, exceeding the cost of attendance." (Pl. Br. at 6, 8 (emphasis added).)

13 These assertions beg the question, however, whether the named plaintiffs can fairly and adequately

14 protect the interests of those putative class members who are not "similarly situated" to "the best

15 recruits" and would be harmed by the proposed injunction.  The named plaintiffs have not demon-

16 strated that they can fairly and adequately protect the interests of *those* putative class members.

17    Having failed to make even the slightest effort to prove that they can fairly and adequately

18 protect the interests of all absent class members, as required by Rule 23(a)(4), or that the injunction

19 they seek is appropriate for the classes as a whole, as mandated by Rule 23(b)(2), plaintiffs cannot

20 prevail on their motion for class certification.

21 **II.   CONFLICTS AMONG PUTATIVE CLASS MEMBERS PRECLUDE THE**
      **NAMED PLAINTIFFS FROM FAIRLY AND ADEQUATELY PROTECTING**
22    **THE INTERESTS OF ALL ABSENT CLASS MEMBERS.**

23    Even if plaintiffs had made some attempt to meet the requirements of Rule 23, that effort

24 could not have succeeded.  The record evidence, including the deposition testimony of the named

25 plaintiffs and the economic evidence submitted by defendants, demonstrates that conflicts among

26 putative class members render it impossible for the proposed representative plaintiffs—or indeed

27 any student-athlete—to fairly and adequately protect the interests of all members of the proposed

28 classes.  While some putative class members might receive compensation in addition to—and per-

1  haps significantly in excess of—their current athletic scholarships if the proposed injunction were

2  granted, many putative class members would receive less financial aid than they currently receive,

3  and perhaps no aid at all.  This conflict of interest between those putative class members who

4  would benefit from the elimination of the challenged rules and those who benefit from the continu-

5  ation of those same rules precludes class certification.

6  Rule 23(a)(4) is designed "to uncover conflicts of interest between named parties and the

7  class they seek to represent." *Amchem*, 521 U.S. at 625; *see also Mateo v. V.F. Corp.*, No. C 08-

8  05313 CW, 2009 WL 3561539, at *5 (N.D. Cal. Oct. 27, 2009) (Wilken, J.) (adequacy criterion

9  requires courts to determine whether "the named plaintiffs . . . have any conflicts of interest with

10 other class members" (citation omitted)).  "[A] class cannot be certified when its members have

11 opposing interests or when it consists of members who benefit from the same acts alleged to be

12 harmful to other members of the class." *Pickett v. Iowa Beef Processors*, 209 F.3d 1276, 1280

13 (11th Cir. 2000); *see also Mayfield v. Dalton*, 109 F.3d 1423, 1427 (9th Cir. 1997) (conflicts render

14 plaintiffs inadequate class representatives where "there were undoubtedly people among the broad

15 class proposed . . . who did not oppose the [challenged policies], and who, in fact, approved of it

16 and wished the policies fully enforced"); *Bieneman v. City of Chicago*, 864 F.2d 463, 465 (7th Cir.

17 1988) (affirming denial of class certification because some class members would "undoubtedly de-

18 rive great benefit" from maintenance of the status quo).  The existence of conflicts among class

19 members "is a matter of particular concern in a case such as this one [seeking] certification under

20 Federal Rule of Civil Procedure 23(b)(2) which does not allow class members to opt out of the

21 class action." *Retired Chicago Police Ass'n v. City of Chicago*, 7 F.3d 584, 598 (7th Cir. 1993).

22 Where, as here, "some plaintiffs claim to have been harmed by the same conduct that benefited

23 other members of the class," "the named representatives [cannot] 'vigorously prosecut[e] the inter-

24 ests of the class,'" and class certification must be denied. *Allied Orthopedic Appliances, Inc. v.*

25 *Tyco Healthcare Grp. L.P.*, 247 F.R.D. 156, 177 (C.D. Cal. 2007) (citation omitted).

26 Conflicts of interest among class members led the court in the *Walk-On* litigation to deny

27 class certification after finding that the proposed class representatives could not adequately protect

28 the interests of absent class members.  2006 WL 1207915, at *8-9.  That case involved a challenge

| DEFENDANTS' OPPOSITION TO PLAINTIFFS' | MDL No. 14-md-02541-CW |
|---|---|
| AMENDED JOINT MOTION FOR CLASS CERTIFICATION | Case No. 14-cv-02758-CW |

1    to the NCAA's limit on the number of grant-in-aid scholarships that each school could award; the

2    plaintiffs were walk-on players who were effectively precluded from receiving scholarships under

3    that rule. *See id.* at *1. In resisting class certification, the NCAA noted that each class member

4    would have to prove that "he (and not other teammates) actually would have been awarded [a

5    walk-on] scholarship[]" and "that players from other schools would not have been preferred over

6    him for one of his school's [additional] scholarships." *Id.* at *7. This, the NCAA argued, created a

7    conflict of interest among the members of the class. *Id.* The court agreed, finding that one class

8    member's success in proving that he would have received a scholarship in the absence of the chal-

9    lenged bylaws would necessarily come at the expense of all the other class members. *Id.* at *8-9.

10        Similar conflicts are inherent in this case. As explained below, several independent eco-

11   nomic effects of the requested injunction ensure that many putative class members who currently

12   benefit from the challenged eligibility rules would be financially harmed if the named plaintiffs

13   succeed in enjoining the application of those rules. First, the substitution effect, which this Court

14   recognized in *O'Bannon*, would cause many current student-athletes to be displaced by other stu-

15   dent-athletes, and thereby to lose their athletic scholarships. Second, the economics of superstars

16   would skew compensation in a "free and open" labor marketplace so that only superstar student-

17   athletes would likely earn substantial compensation, while many putative class members would

18   receive little or no financial aid. Coupled with findings (i) that the value of the athletics-based fi-

19   nancial aid that many student-athletes receive exceeds the value of their contribution to their teams'

20   revenue generation and (ii) that talented walk-on athletes are willing and able to play FBS football

21   and Division I basketball with no financial aid whatsoever, the economics of superstars leads to the

22   conclusion that many putative class members would lose some or all of their current athletic schol-

23   arships if the challenged rules were struck down.

24       **A.     *The Substitution Effect Prevents Certification In These Actions.***

25       The evidence establishes that, if the challenged rules were eliminated, some student-athletes

26   would displace putative class members by choosing schools that offer higher compensation, re-

27   maining in college longer, or playing FBS football or Division I basketball when they otherwise

28   would not have done so. Plaintiff Jenkins, for instance, testified that he was sure that his team-

---

**DEFENDANTS' OPPOSITION TO PLAINTIFFS'**          **MDL No. 14-md-02541-CW**
**AMENDED JOINT MOTION FOR CLASS CERTIFICATION**    **Case No. 14-cv-02758-CW**

9

1 mates who left Clemson early to play professional football would have stayed at Clemson longer if

2 they had been paid to play college football. (Jenkins Dep. at 244.) Plaintiff James likewise testi-

3 fied ███████████████████████████████████████ (James Dep. at 281-83.)

4 Similarly, plaintiff Bohannon, who currently plays in the National Basketball Association Devel-

5 opment League, ████████████████████████████████████████████████

6 ██████████████████████████████ (Bohannon Dep. at 182.) And several of the pro-

7 posed representative plaintiffs ████████████████████████████████████████

8 ████████████████████ (Hayes Dep. at 60-61, 198-99; Jenkins Dep. at 100; Hartman Dep. at 83-

9 86; Bohannon Dep. at 180-82.) Necessarily, if players were to make such decisions in response to

10 the grant of the injunction the named plaintiffs seek, they would displace other putative class mem-

11 bers.

12         In *O'Bannon*, this Court recognized this substitution effect and acknowledged that, if the

13 NCAA eligibility rules were changed, some student-athletes would be displaced. 2013 WL

14 5979327, at *8-9. This Court found that some putative class members would be harmed by the

15 elimination of the existing rules if, as a result, those class members were displaced by other stu-

16 dent-athletes. *Id.* Although the Court discussed the substitution effect in the context of its denial

17 of class certification under Rule 23(b)(3), the same displacement effect would occur if injunctive

18 relief were granted under Rule 23(b)(2), and the same harm to displaced class members would re-

19 sult.

20         This Court also recognized in *O'Bannon* that, "without the ban on student-athlete pay,

21 competition among Division I schools for student-athletes would increase substantially. That in-

22 creased competition for student-athletes, combined with the potentially higher costs of recruiting

23 and retaining those student-athletes, would have likely driven some schools into less competitive

24 divisions, thereby insulating entire teams from the specific harms that Plaintiffs allege in this suit."

25 *Id.* at *9. Plaintiffs here, like the plaintiffs in *O'Bannon*, "have not provided a feasible method for

26 determining which members of the [putative classes] would still have played for Division I

27 teams—and, thus, suffered the injuries alleged here—in the absence of the challenged restraints."

28 *Id.*

| DEFENDANTS' OPPOSITION TO PLAINTIFFS' | MDL No. 14-md-02541-CW |
|---|---|
| AMENDED JOINT MOTION FOR CLASS CERTIFICATION | Case No. 14-cv-02758-CW |
| 10 | |

1    In the instant case, if the requested injunctive relief were granted, the substitution effect

2  would cause displacement of putative class members for several reasons.  Consistent with this

3  Court's findings in *O'Bannon*, defendants' economics expert, Dr. Janusz A. Ordover, has deter-

4  mined that many scholarship student-athletes choose to leave their team before exhausting their

5  eligibility, often to play professional football or basketball, thus making available to another player

6  an athletic scholarship that would not otherwise be open. (Ordover Rep.[9] ¶¶ 21-23.)  Dr. Ordover

7  concluded that, applying economic principles and assuming that plaintiffs prevail in their effort to

8  eliminate the challenged rules, many of those student-athletes who now leave college to play pro-

9  fessional football or basketball would, if they were paid to play college sports, stay in school long-

10  er, thereby displacing other putative class members.  (*Id.* ¶¶ 24-28.)  He further concluded that

11  many student-athletes who transfer out of schools with FBS football or Division I basketball pro-

12  grams would likely have remained enrolled at their FBS football or Division I basketball schools if

13  they were paid to play college sports.  (*Id.* ¶¶ 29-31.)

14    Dr. Ordover also found that many new players would compete for a scholarship to play

15  FBS football or Division I basketball if there were no limits on the level of player compensation.

16  (*Id.* ¶ 32.)  These players currently opt not to attend college at all or to attend a school without an

17  FBS football or Division I basketball program.  Some of these new players currently play at non-

18  FBS or non-Division I schools or in foreign professional leagues.  (*Id.* ¶¶ 33-44.)  Dr. Ordover con-

19  cluded that these new players would displace putative class members who presently receive athlet-

20  ics-based scholarships.  (*Id.*)

21    In sum, the substitution effect, which the plaintiffs and this Court acknowledged in

22  *O'Bannon*, would cause numerous putative class members to be displaced and to lose their athletic

23  scholarships.  These putative class members would be harmed by the injunctive relief that plaintiffs

24

25

---

26  [9] Expert Report of Janusz A. Ordover, Ph.D., dated April 30, 2015 ("Ordover Rep.").  A copy of
the Ordover Report is attached as Exhibit 1 of the Declaration of Jeffrey A. Mishkin in Support of
27  Defendants' Opposition to Plaintiffs' Amended Joint Motion for Class Certification, submitted
herewith.
28

| DEFENDANTS' OPPOSITION TO PLAINTIFFS' | MDL No. 14-md-02541-CW |
|---|---|
| AMENDED JOINT MOTION FOR CLASS CERTIFICATION | Case No. 14-cv-02758-CW |

1    seek.  Accordingly, the named plaintiffs cannot fairly and adequately protect the interests of those

2    putative class members.

3    **B.    The Economics Of Superstars Dictates That Many Putative**
     **Class Members Would Be Harmed By The Requested Relief.**

4    Some putative class members who would not be displaced by others as a result of the re-

5    quested injunction would nevertheless be injured if the requested relief were granted.  As Dr. Or-

6    dover has explained, the economics of superstars would result in the payment of compensation to

7    student-athletes according to the value of their contribution to their team's revenue generation.

8    This tying of compensation to contribution would result in skewed compensation levels, with su-

9    perstar athletes being paid substantially more than less talented players, and many players being

10   paid less than they currently receive in financial aid.  The economics of superstars describes the

11   phenomenon, observed in many fields and especially in professional sports and the arts, of com-

12   pensation being paid disproportionately to the most talented or most valuable participants, with

13   many other participants paid at a relative minimum compensation level.  (Ordover Rep. ¶¶ 45-48.)

14   Currently, the challenged rules prevent any payments to FBS football players and Division I bas-

15   ketball players above the cost of attendance, and thus the economics of superstars does not now

16   affect putative class members.  But the analysis of several proxies, including Football Champion-

17   ship Subdivision football scholarship levels, student-athlete recruitment data, and the salaries of

18   professional football and basketball players, makes it clear that, in a "free and open" marketplace

19   in which schools pay student-athletes based on performance, the economics of superstars would

20   drive the payments to superstar student-athletes up and the payments to less talented student-

21   athletes down to a "minimum" level—which, in college sports, would be zero, given the availabil-

22   ity and willingness of walk-on players to play without scholarships or other remuneration.  (*Id.* ¶¶

23   49-68.)

24   Consequently, while the elimination of the current eligibility rules would likely cause su-

25   perstar players to receive substantial compensation, many putative class members who presently

26   receive more in financial aid than the value of their contribution to their team's revenue generation

27   would lose some or all of their athletic scholarships.  And because plaintiffs cannot advocate for

28

DEFENDANTS' OPPOSITION TO PLAINTIFFS'                    MDL No. 14-md-02541-CW
AMENDED JOINT MOTION FOR CLASS CERTIFICATION            Case No. 14-cv-02758-CW

1   some artificial minimum payment—a proposition that would be antithetical to the "free and open"

2   marketplace they espouse—the minimum level of compensation would be set by the ready availa-

3   bility and willingness of talented walk-on players who are prepared and able to play FBS football

4   or Division I basketball without any compensation whatsoever.  Several of the named plaintiffs tes-

5   tified ███████████████████████████████

6   (*See, e.g.,* Hayes Dep. at 157-64; James Dep. at 218-21; Jenkins Dep. at 260-64; Bohannon Dep. at

7   169.)  In an openly competitive marketplace, those student-athletes prepared to offer their services

8   for free would set the minimum compensation level for all student-athletes.

9        Dr. Ordover's analysis is consistent with that of several economists who traditionally have

10   supported greater compensation for student-athletes, including Dr. Noll, plaintiffs' expert in

11   *O'Bannon.* (*Id.* ¶¶ 69-73.)  These experts have concluded that as many as 40% of Division I men's

12   basketball players, for instance, receive athletics-based financial aid that exceeds the value of their

13   contribution to their team's revenue generation.  In a "free and open" marketplace, in which remu-

14   neration is based on value to the team's revenue generation, those student-athletes—all of them

15   putative class members in these actions—would lose some or all of their current financial aid.

16        In this regard, plaintiffs' reliance on the class certification decision in *White v. NCAA*, No.

17   CV 06-0999-RGK, 2006 WL 8066803 (C.D. Cal. Oct. 19, 2006), is misplaced.  (*See* Pl. Br. at 16,

18   19-20.)  Unlike plaintiffs here, the plaintiffs in *White* did not seek an injunction to permit a "free

19   and open" marketplace for student-athlete compensation, but asked only to certify a damages class

20   to recover the difference between the maximum allowable level of grant-in-aid and the cost of at-

21   tendance.  2006 WL 8066803, at *1.  Certification in *White* therefore did not implicate the econom-

22   ics of superstars that arises in the completely unfettered free market that plaintiffs seek here.

23   Moreover, the court in *White* expressly granted the NCAA leave to move for decertification at the

24   conclusion of discovery, and the NCAA so moved, but the parties settled before the court issued a

25   decision on decertification.  *Id.* at *6.

26        In sum, if the injunctive relief that plaintiffs seek were granted, the economics of superstars

27   would harm the many putative class members who would lose some or all of their current athletic

28   scholarships as schools concentrated their resources on compensating superstars.  Less talented or

---

**DEFENDANTS' OPPOSITION TO PLAINTIFFS'**              **MDL No. 14-md-02541-CW**
**AMENDED JOINT MOTION FOR CLASS CERTIFICATION**       **Case No. 14-cv-02758-CW**

1  less valuable student-athletes would be compensated in amounts equal to the value of their contri-

2  bution to their team's revenue generation, but, in many instances, that compensation would be less

3  than the athletics-based financial aid that those putative class members currently receive.  In these

4  circumstances, neither the named plaintiffs nor any other group of representative plaintiffs can fair-

5  ly and adequately protect the interests of all absent putative class members.

6      **C.**    ***Plaintiffs Offer No Support For Their Assertion That All Putative***
        ***Class Members Would Receive Higher Compensation If The***
7          ***Requested Injunctive Relief Were Granted.***

8        The substitution effect and the economics of superstars are two expected and independent

9  economic effects of the relief that plaintiffs seek, yet plaintiffs do not address either effect.  In-

10  stead, plaintiffs assert, with no factual or economic proof whatsoever, that compensation to all pu-

11  tative class members would be higher in the absence of the challenged rules.  (Pl. Br. at 7-8.)

12  Plaintiffs simply want this Court to believe, based on plaintiffs' bald assertion that all Division I

13  schools are "[f]lush with cash" (JAC ¶ 85), that, in a "free and open" marketplace, all 351 Division

14  I institutions would provide athletic scholarships and other compensation to all putative class

15  members at levels at least equal to their current athletic scholarships.

16        There is not a shred of evidence to support such a belief.  Indeed, the facts contradict it.

17  Most Division I institutions face serious financial constraints and, if plaintiffs succeed in eliminat-

18  ing the challenged rules, those constraints would likely lead many—if not most—Division I institu-

19  tions to reduce athletic scholarships for some putative class members even as some institutions in-

20  crease scholarships for others.  Plaintiffs proffer no evidence—as is their burden on this motion—

21  that all Division I schools would, or even financially could, continue to offer full scholarships to all

22  putative class members if the requested injunction were granted.

23        Most Division I athletics departments operate at a financial deficit.  College athletics pro-

24  grams generally produce less revenue than they require to operate.  (Ordover Rep. ¶¶ 75-86.)  Even

25  when examined separately, most FBS football programs, most Division I men's basketball pro-

26  grams and all Division I women's basketball programs operate at deficits.  (*Id.*)  The requested in-

27  junction would exacerbate these deficits, intensify the bidding wars for the most talented student-

28  athletes and likely cause some schools to reevaluate the wisdom of continuing to offer FBS football

---

**DEFENDANTS' OPPOSITION TO PLAINTIFFS'**
**AMENDED JOINT MOTION FOR CLASS CERTIFICATION**

**MDL No. 14-md-02541-CW**
**Case No. 14-cv-02758-CW**

14

1 │ or Division I basketball programs.  As this Court acknowledged in *O'Bannon*, "increased competi-

2 │ tion for student-athletes, combined with the potentially higher costs of recruiting and retaining

3 │ those student-athletes, would . . . likely drive[ ] some schools into less competitive divisions," 2013

4 │ WL 5979327, at *9, where hundreds (or even thousands) of putative class members would not re-

5 │ ceive the financial aid they currently receive.

6 │       In fact, even under the existing rules limiting financial aid to the cost of attendance, many

7 │ schools have begun to evaluate whether they can afford to continue to offer such athletic programs,

8 │ especially the extremely expensive FBS football.  (Ordover Rep. ¶¶ 90-92.)  For example, in Au-

9 │ gust 2014, the athletic director of the University of Hawaii (an FBS school in the Mountain West

10 │ Conference) stated that, in the face of a $2 million budget deficit, "There's a very real possibility of

11 │ football going away."  (*Id.* ¶ 90.)  Similarly, Kent State (an FBS school in the Mid-American Con-

12 │ ference) recently commenced "a sweeping look at its athletics program that could include deciding

13 │ whether any sports should be cut."  (*Id.*)  And in December 2014, University of Alabama at Bir-

14 │ mingham (an FBS school in Conference USA) dropped FBS football altogether, determining that

15 │ the program was too expensive to be sustainable.  (*Id.* ¶ 91.)  It therefore simply is not true, and

16 │ surely cannot be presumed to be true, that all Division I institutions from which putative class

17 │ members presently receive athletic scholarships are "flush with cash" or would be able to continue

18 │ funding all student-athlete scholarships at or above current levels if the eligibility rules were elimi-

19 │ nated.

20 │       The effect of the requested injunctive relief on the financial constraints faced by most Divi-

21 │ sion I institutions would be magnified by Title IX to the Education Amendments of 1972, 20

22 │ U.S.C. § 1681, *et seq.*  The Department of Education's Office of Civil Rights has construed Title

23 │ IX to require proportional equality of athletic financial assistance and other benefits and opportuni-

24 │ ties to male and female student-athletes.  *See generally* 44 Fed. Reg. 71413 (Dec. 11, 1979).  If the

25 │ requested injunctive relief were granted, the requirement that institutions provide proportionally

26 │ equal scholarships to women athletes would substantially increase the financial pressures faced by

27 │ Division I schools, likely tipping the balance for some of those schools to withdraw from FBS

28 │ football or Division I basketball altogether.

---

**DEFENDANTS' OPPOSITION TO PLAINTIFFS'**
**AMENDED JOINT MOTION FOR CLASS CERTIFICATION**

**MDL No. 14-md-02541-CW**
**Case No. 14-cv-02758-CW**

1    Many Division I schools would undoubtedly look for ways to reduce the financial pressures

2  of a completely "free and open" marketplace for student-athlete services without having to with-

3  draw from FBS football or Division I basketball entirely.  Plaintiffs' own testimony suggests

4  ways—each of which would harm some putative class members—in which many schools could

5  meet that challenge by reducing the number of scholarship players.  Some plaintiffs testified, for

6  instance, ███████████████████████████████  (*See, e.g.*, Hartman Dep. at 241-

7  43; Jenkins Dep. at 256-57.)  They also testified that walk-on players are as talented as some schol-

8  arship players.  Alec James testified that the University of Wisconsin has "a strong walk-on tradi-

9  tion" with as many as fifty walk-on players on the football team, many of whom get substantial

10 playing time.  (James Dep. at 218-19.)  ███████████████████  (*See, e.g.*,

11 Hayes Dep. at 157-64; Jenkins Dep. at 260-64; Bohannon Dep. at 169.)  To the extent that schools

12 opt to reduce the number of scholarship athletes on their football and basketball teams in response

13 to the grant of plaintiffs' requested injunction, putative class members who now receive athletic

14 scholarships will be disadvantaged.

15    Plaintiffs' unsupported assertion that schools could increase student-athlete compensation

16 by reducing the compensation of head coaches is economic nonsense.  As an initial matter, head

17 coaches who earn the multi-million dollar salaries on which plaintiffs focus are rare; most Division

18 I head coaches earn far less, and reductions in their salaries would not permit substantial increases

19 in student-athlete financial aid.  (Ordover Rep. ¶ 89.)  More importantly, coaches are not market

20 substitutes for student-athletes and there is thus no economic basis for assuming that increasing

21 student-athlete compensation would encourage Division I institutions to spend *less* on head coach-

22 es.  (*Id.* ¶¶ 87-88.)  To the contrary, the economic evidence shows that college football and basket-

23 ball head coaches who are paid significant compensation are likely in the same market as the head

24 coaches of professional football and basketball teams, and their salaries are far more directly af-

25 fected by the level of compensation for coaches of professional teams than by the level of financial

26 aid for student-athletes.  (*Id.*)  As plaintiff Alec James testified, student-athletes want coaches who

27 are of the caliber of professional league coaches.  (James Dep. at 49-53.)  Thus, coaches' salaries

28

1 are unlikely to provide an adequate source of revenue with which to increase the athletic scholar-

2 ships.

3      Because, in response to the grant of an injunction like the one plaintiffs seek, some Division

4 I schools will likely reduce scholarship levels for many putative class members (and, in some cas-

5 es, perhaps shutter their programs altogether), the requested injunctive relief would have diverse

6 effects on individual putative class members, harming many.  For this additional reason, the pro-

7 posed representative plaintiffs cannot fairly and adequately protect the interests of the putative

8 classes they seek to represent.  Accordingly, their motion for class certification should be denied.

9 **III. CONFLICTS AMONG PUTATIVE CLASS MEMBERS**
         **RENDER INJUNCTIVE RELIEF INAPPROPRIATE**
10       **RESPECTING THE CLASSES AS A WHOLE.**

11      The conflicts that preclude the named plaintiffs from fairly and adequately protecting the

12 interests of absent putative class members also prevent this Court from finding that putative class

13 members possess the common interest necessary to make class-wide injunctive relief appropriate

14 under Rule 23(b)(2).  For this independent reason, plaintiffs' motion for class certification should

15 be denied.

16      To certify a class under Rule 23(b)(2), plaintiffs bear the burden of showing that defendants

17 "acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or

18 corresponding declaratory relief is appropriate respecting the class as a whole." Fed. R. Civ. P.

19 23(b)(2).  The lower courts have characterized this requirement in terms of cohesiveness and ho-

20 mogeneity: "Rule 23(b)(2) operates under the presumption that the interests of the class members

21 are cohesive and homogeneous." *Lemon v. Int'l Union of Operating Eng'rs, Local No. 139*, 216

22 F.3d 577, 580 (7th Cir. 2000).  Indeed, "the defining characteristic of [a 23(b)(2) class] is the ho-

23 mogeneity of the interests of the members of the class." *Reeb v. Ohio Dep't of Rehab. & Corr.*,

24 435 F.3d 639, 649 (6th Cir. 2006).  Thus, "cohesiveness is a significant touchstone of a (b)(2)

25 class," *Blackman v. District of Columbia*, 633 F.3d 1088, 1094 (D.C. Cir. 2011), and "assumptions

26 of homogeneity and class cohesiveness . . . underlie (b)(2) certification." *Richardson v. L'Oreal*

27 *USA, Inc.*, 991 F. Supp. 2d 181, 202 (D.D.C. 2013) (alterations in original, citation omitted).  In

28 short, "a Rule 23(b)(2) class cannot be certified unless it is cohesive." *Zehel-Miller v. Astrazenaca*

1 │ *Pharm., LP*, 223 F.R.D. 659, 664 (M.D. Fla. 2004); *accord Herskowitz v. Apple, Inc.*, 301 F.R.D.

2 │ 460, 481 (N.D. Cal. 2014) (denying class certification for lack of "cohesiveness").

3 │      "Intra-class conflicts . . . demonstrate that certifying the class under (b)(2) would be inap-

4 │ propriate because of the lack of cohesiveness of the class." *Richardson*, 991 F. Supp. 2d at 203;

5 │ *accord In re Managerial, Prof'l & Technical Emps. Antitrust Litig.*, No. 02-CV-2924, 2006 WL

6 │ 38937, at *9 (D.N.J. Jan. 5, 2006) (declining to certify a 23(b)(2) class on cohesion grounds when

7 │ "enjoining [defendants'] conduct would not provide relief generally applicable to the class because

8 │ it would have potentially conflicting effects on different members").[10] The conflicts among puta-

9 │ tive class members render certification under Rule 23(b)(2) inappropriate here. Where, as ex-

10 │ plained above, many absent class members are actually *benefited* by the challenged rules, all puta-

11 │ tive class members do not have a common interest in seeking the invalidation of those rules. To

12 │ the contrary, the interests of those putative class members who are benefited by the challenged

13 │ rules align with the interests of *defendants* in preserving those rules. Accordingly, the named

14 │ plaintiffs cannot prove that their putative classes are cohesive or that the injunctive relief they seek

15 │ is "appropriate respecting the class as a whole." Fed. R. Civ. P. 23(b)(2). For this independent

16 │ reason, the motion for class certification should be denied.

17 │      In addition, some courts, including district courts within this circuit, have determined that

18 │ putative classes lack cohesiveness, and therefore are not certifiable under Rule 23(b)(2), when in-

19 │ dividual issues predominate. *See, e.g., Sweet v. Pfizer*, 232 F.R.D. 360, 374 (C.D. Cal. 2005)

20 │ ("even though Rule 23(b)(2), unlike Rule 23(b)(3), does not specifically contain predominance and

21 │ superiority requirements, a class under Rule 23(b)(2) must not be overrun with individual issues");

22 │

─────────────────────────────

23 │ [10] The Ninth Circuit decisions in *Walters v. Reno*, 145 F.3d 1032 (9th Cir. 1998), and *Rodriguez v.*
24 │ *Hayes*, 591 F.3d 1105 (9th Cir. 2010), are not to the contrary. Those cases stand for the proposi-
     │ tion that all putative class members need not be injured or injured in the same way by the chal-
25 │ lenged conduct for certification under Rule 23(b)(2) to be appropriate. But they do not contradict
     │ the well-established principle that a putative class may not be certified if some members of the pu-
26 │ tative class are in fact benefited by the challenged conduct and would actually be harmed by the
     │ proposed injunction. Given the manifest intra-class conflicts here, this case presents no occasion
27 │ for this Court to address whether *Walters* and *Rodriguez* are consistent with the Supreme Court's
     │ more recent statement in *Wal-Mart* that "Rule 23(b)(2) applies only when a single injunction or
28 │ declaratory judgment would provide relief to each member of the class." 131 S. Ct. at 2557.

1 | *Lewallen v. Medtronic USA, Inc.*, No. C 01-20395, 2002 WL 31300899, at *3 (N.D. Cal. Aug. 28,

2 | 2002) ("Even though [Rule 23(b)(2)] does not contain a predominance and superiority requirement,

3 | the requisite cohesiveness is lacking where individual issues predominate."). The Third Circuit,

4 | where the *Jenkins* action originated and whose law merits "close consideration" on this motion,[11]

5 | likewise has recently held that "'disparate factual circumstances of class members' may prevent a

6 | class from being cohesive and, therefore, make the class unable to be certified under Rule

7 | 23(b)(2)." *Gates v. Rohm & Haas Co.*, 655 F.3d 255, 264 (3d Cir. 2011) (citation omitted). Here,

8 | where individualized inquiry would be necessary to determine which class members are benefited

9 | by the existing rules and thus would be harmed by the requested injunction, the putative classes are

10 | not cohesive, and cannot be certified under Rule 23(b)(2).

11 | **IV.    NONE OF THE CONSOLIDATED PLAINTIFFS HAS STANDING**

**TO PURSUE THE INJUNCTIVE RELIEF THEY SEEK AND THEIR**

12 | **MOTION FOR CLASS CERTIFICATION SHOULD BE DENIED.**

13 | Finally, although the CAC plaintiffs proffered Chris Stone, John Bohannon, Chris Daven-

14 | port and Justine Hartman as named plaintiffs to represent the three putative classes asserted in the

15 | consolidated amended complaint (Pl. Br. at 12-13), over the course of discovery, Messrs. Stone and

16 | Davenport both withdrew as injunctive class representatives, leaving Ms. Hartman and Mr. Bohan-

17 | non—both basketball players—as the sole named plaintiffs seeking to represent the three putative

18 | CAC injunctive relief classes. As a result, the CAC plaintiffs no longer have a proposed repre-

19 | sentative for their putative FBS football class. Moreover, ███████████████████████

20 | ██████████████████████████████ (Hartman Dep. at 246; Bohannon Dep. at 8, 22;

21 | Pl. Br. at 12-13), and accordingly neither has standing to sue for injunctive relief at all. *See, e.g.*,

22 | *Ellis v. Costco Wholesale Corp.*, 657 F.3d 970, 986, 988 (9th Cir. 2011) (holding former Costco

23 | employees did not have standing and were not adequate representatives to pursue injunctive relief);

24 |

25 |

26 |

27 | [11] *See, e.g.*, *In re Cardizem CD Antitrust Litig.*, 332 F.3d 896, 911 n.17 (6th Cir. 2003) (law of a transferor forum merits "close consideration" in MDL actions) (citing *In re Korean Air Lines Disaster of Sept. 1, 1983*, 829 F.2d 1171, 1176 (D.C. Cir. 1987)).

28 |

**DEFENDANTS' OPPOSITION TO PLAINTIFFS'**          **MDL No. 14-md-02541-CW**
**AMENDED JOINT MOTION FOR CLASS CERTIFICATION**   **Case No. 14-cv-02758-CW**

19

1  *Funeral Consumers Alliance, Inc. v. Service Corp. Int'l*, 695 F.3d 330, 342-43 (5th Cir. 2012)

2  (named plaintiffs who are not threatened with injury lack standing to seek injunctive relief).[12]

3      The failure of the CAC plaintiffs to proffer a proposed class representative with standing to

4  seek injunctive relief precludes this Court from certifying an injunctive relief class against six of

5  the smaller conference defendants.  As previously noted, the American Athletic Conference, Con-

6  ference USA, Inc., the Mid-American Conference, the Mountain West Conference, the Sun Belt

7  Conference, and the Western Athletic Conference are named as defendants only in the consolidated

8  amended complaint.  (CAC ¶¶ 169-82.)  They have not been named as defendants in the *Jenkins*

9  complaint, the only complaint in which a proposed representative plaintiff continues to have stand-

10  ing to seek injunctive relief.  In short, absent a class representative with standing to seek injunctive

11  relief, no injunctive relief class may be certified with respect to these six conferences.

12      Plaintiffs cannot cure that defect now.  The CAC plaintiffs have stipulated, and this Court

13  ordered, that plaintiffs would not proffer any additional student-athletes as class representatives on

14  this motion after February 20, 2015.[13]  Accordingly, there are no proposed representative plaintiffs

15  with standing to seek injunctive relief on behalf of the putative CAC classes, and the motion to cer-

16  tify those classes should be denied on this independent basis.

17

18

19

20

---

21  [12] To the extent that plaintiffs' putative classes include absent class members who, like Ms. Hart-

22  man and Mr. Bohannon, are no longer eligible to play college sports and thus lack standing to pur-
sue injunctive relief, those putative classes suffer from an additional infirmity.  As the Ninth Cir-

23  cuit recently held, "[n]o class may be certified that contains members lacking Article III standing."
*Mazza v. American Honda Motor Co.*, 666 F.3d 581, 594 (9th Cir. 2012) (quoting *Denney v.*

24  *Deutsche Bank AG*, 443 F.3d 253, 264 (2d Cir. 2006)); *see also In re Deepwater Horizon*, 753 F.3d
509, 513 n.1 (5th Cir. 2014) (same).  Before this Court may certify plaintiffs' putative classes,

25  therefore, it must be satisfied that "each member must have standing and show an injury in fact that
is traceable to the defendant and likely to be redressed in a favorable decision."  *Halvorson v. Auto-*

26  *Owners Ins. Co.*, 718 F.3d 773, 778 (8th Cir. 2013).

27  [13] Stipulation and [Proposed] Order Permitting Substitution of Plaintiffs and Resetting Schedule for
Injunctive relief Class Certification, No. 4:14-md-2541 (Feb. 13, 2015) (Dkt. No. 193), at 2; Order

28  granting Stipulation entered by Hon. Claudia Wilken (Feb. 13, 2015) (Dkt. No. 195).

| DEFENDANTS' OPPOSITION TO PLAINTIFFS' | MDL No. 14-md-02541-CW |
|---|---|
| AMENDED JOINT MOTION FOR CLASS CERTIFICATION | Case No. 14-cv-02758-CW |

1

***Conclusion***

2

For the foregoing reasons, plaintiffs' motion for class certification should be denied.

3

DATED: April 30, 2015

4

5

**SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP**

6

7

By: _____/s/ Jeffrey A. Mishkin_____
Jeffrey A. Mishkin (*pro hac vice*)
Karen Hoffman Lent (*pro hac vice*)

8

9

Attorneys for Defendants
NATIONAL COLLEGIATE ATHLETIC ASSOCIATION
and WESTERN ATHLETIC CONFERENCE

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1
2

**PROSKAUER ROSE LLP**                    **MAYER BROWN LLP**

3
4
By: _____/s/ Scott P. Cooper_____     By: _____/s/ Britt M. Miller_____
       Scott P. Cooper (SBN 96905)              Andrew S. Rosenman (SBN 253764)
5      Jennifer L. Jones (SBN 284624)           Britt M. Miller (*pro hace vice*)
       Jacquelyn N. Ferry (SBN 287798)          71 South Wacker Drive
6      2049 Century Park East, Suite 3200       Chicago, IL 60606
       Los Angeles, CA 90067                    Telephone: (312) 782-0600
7      Telephone: (310) 557-2900                Facsimile: (312) 701-7711
       Facsimile: (310) 557-2193                arosenman@mayerbrown.com
8      scooper@proskauer.com                    bmiller@mayerbrown.com
       jljones@proskauer.com
9      jferry@proskauer.com
                                                Richard J. Favretto (*pro hac vice*)
10                                              1999 K Street, N.W.
       Attorneys for Defendant                  Washington, DC  20006
11     PAC-12 CONFERENCE                        Telephone:  (202) 263-3000
                                                Facsimile:  (202) 263-3300
12                                              rfavretto@mayerbrown.com

13                                              Attorneys for Defendant
                                                THE BIG TEN CONFERENCE, INC.
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**DEFENDANTS' OPPOSITION TO PLAINTIFFS'**          **MDL No. 14-md-02541-CW**
**AMENDED JOINT MOTION FOR CLASS CERTIFICATION**   **Case No. 14-cv-02758-CW**

22

**POLSINELLI PC**

**ROBINSON BRADSHAW & HINSON**

By: _____/s/ Leane K. Capps_____
Leane K. Capps (*pro hac vice*)
Saint Ann Court
2501 N. Harwood Street, Suite 1900
Dallas, TX 75201
Telephone: (214) 397-0030
lcapps@polsinelli.com

Amy D. Fitts (*pro hac vice*)
120 W. 12th Street
Kansas City, MO 64105
Telephone: (816) 218-1255
afitts@polsinelli.com

Wesley D. Hurst (SBN 127564)
2049 Century Park East, Suite 2300
Los Angeles, CA 90067
Telephone: (310) 556-1801
whurst@polsinelli.com

Attorneys for Defendants
THE BIG 12 CONFERENCE, INC. and
CONFERENCE USA, INC.

By: _____/s/ Robert W. Fuller_____
Robert W. Fuller, III (*pro hac vice*)
Nathan C. Chase Jr. (SBN 247526)
Mark W. Merritt (*pro hac vice*)
Lawrence C. Moore, III (*pro hac vice*)
Amanda R. Pickens (*pro hac vice*)
101 N. Tryon St., Suite 1900
Charlotte, NC 28246
Telephone: (704) 377-2536
Facsimile: (704) 378-4000
nchase@rbh.com
rfuller@rbh.com
mmerritt@rbh.com
lmoore@rbh.com
apickens@rbh.com

Mark J. Seifert (SBN 217054)
Robert R. Moore (SBN 113818)
ALLEN MATKINS LECK GAMBLE MAL-
LORY & NATSIS LLP
Three Embarcadero Center, 12th Floor
San Francisco, CA 94111
Telephone: (415) 837-1515
Facsimile: (415) 837-1516
mseifert@allenmatkins.com
rmoore@allenmatkins.com

Attorneys for Defendant
SOUTHEASTERN CONFERENCE

1

**SMITH MOORE LEATHERWOOD LLP**       **COVINGTON & BURLING LLP**

2

3   By: _____/s/ D. Erik Albright_____       By: _____/s/ Benjamin C. Block_____

4   D. Erik Albright (*pro hac vice*)              Benjamin C. Block (*pro hac vice*)
    Gregory G. Holland (*pro hac vice*)            One CityCenter
    300 North Greene Street, Suite 1400            850 Tenth Street, N.W.

5   Greensboro, NC 27401                           Washington, DC 20001-4956
    Telephone:  (336) 378-5368                     Telephone: (202) 662-5205

6   Facsimile: (336) 433-7402                      Facsimile: (202) 778-5205
    erik.albright@smithmoorelaw.com                bblock@cov.com

7   greg.holland@smithmoorelaw.com

8   Jonathan P. Heyl (*pro hac vice*)              Matthew D. Kellogg (SBN 280541)
    101 N. Tryon Street, Suite 1300                One Front Street

9   Charlotte, NC 28246                            San Francisco, CA 94111-5356
    Telephone: (704) 384-2625                      Telephone: (415) 591-6000

10  Facsimile: (704) 384-2909                      Facsimile: (415) 591-6091
    jon.heyl@smithmoorelaw.com                     mkellogg@cov.com

11
    Charles LaGrange Coleman, III (SBN 65496)      Attorneys for Defendant

12  HOLLAND & KNIGHT LLP                           AMERICAN ATHLETIC CONFERENCE
    50 California Street, Suite 2800

13  San Francisco, CA 94111-4624
    Telephone: (415) 743-6900

14  Facsimile: (415) 743-6910
    ccoleman@hklaw.com

15
    Attorneys for Defendant

16  THE ATLANTIC COAST CONFERENCE

17

18

19

20

21

22

23

24

25

26

27

28

---

1 | WALTER HAVERFIELD LLP

**BRYAN CAVE LLP**

2

3 | By: _____/s/ R. Todd Hunt_____

By: _____/s/ Adam Brezine_____

R. Todd Hunt (*pro hac vice*)

Adam Brezine (SBN 220852)

4 | The Tower at Erieview

560 Mission Street, 25th Floor

1301 E. 9th Street, Suite 3500

San Francisco, CA 94105

5 | Cleveland, OH 44114-1821

Telephone: (415) 674-3400

Telephone: (216) 928-2935

Facsimile: (415) 675-3434

6 | Facsimile: (216) 916-2372

adam.brezine@bryancave.com

rthunt@walterhav.com

7

Richard Young (*pro hac vice*)

Attorneys for Defendant

Brent Rychener (*pro hac vice*)

8 | MID-AMERICAN CONFERENCE

90 South Cascade Avenue, Suite 1300

Colorado Springs, CO 80903

9

Telephone: (719) 473-3800

Facsimile: (719) 633-1518

10 |

richard.young@bryancave.com

brent.rychener@bryancave.com

11

Attorneys for Defendant

12 |

MOUNTAIN WEST CONFERENCE

13

**JONES WALKER LLP**

14

15 | By: _____/s/ Mark A. Cunningham_____

Mark A. Cunningham (*pro hac vice*)

16 | 201 St. Charles Avenue

New Orleans, LA 70170-5100

17 | Telephone: (504) 582-8536

Facsimile: (504) 589-8536

18 | mcunningham@joneswalker.com

19 | Attorneys for Defendant

SUN BELT CONFERENCE

20

21 | **FILER'S ATTESTATION**

22

23 | I, Jeffrey A. Mishkin, am the ECF user whose identification and password are being used to

file DEFENDANTS' OPPOSITION TO PLAINTIFFS' AMENDED JOINT MOTION FOR

24

CLASS CERTIFICATION.  In compliance with Local Rule 5-1(i)(3), I hereby attest that all signa-

25

tories hereto concur in this filing.

26 | /s/ Jeffrey A. Mishkin

27

28

| DEFENDANTS' OPPOSITION TO PLAINTIFFS' | MDL No. 14-md-02541-CW |
|---|---|
| AMENDED JOINT MOTION FOR CLASS CERTIFICATION | Case No. 14-cv-02758-CW |
| 25 | |

**CERTIFICATE OF SERVICE**

I hereby certify that on April 30, 2015, I electronically filed the foregoing document using the CM/ECF system which will send notification of such filing to the e-mail addresses registered in the CM/ECF system, as denoted on the Electronic Mail Notice List.

/s/ Jeffrey A. Mishkin

**DEFENDANTS' OPPOSITION TO PLAINTIFFS'**
**AMENDED JOINT MOTION FOR CLASS CERTIFICATION**

**MDL No. 14-md-02541-CW**
**Case No. 14-cv-02758-CW**

26