Raoul D. Kennedy (SBN 40892)
SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
525 University Avenue, Suite 1100
Palo Alto, CA 94301
Telephone: (650) 470-4500
Facsimile: (650) 470-4570
raoul.kennedy@skadden.com

Jeffrey A. Mishkin (*pro hac vice*)
Karen Hoffman Lent (*pro hac vice*)
SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
Four Times Square
New York, NY 10036
Telephone: (212) 735-3000
Facsimile: (212) 735-2000
jeffrey.mishkin@skadden.com
karen.lent@skadden.com

Attorneys for Defendants
NATIONAL COLLEGIATE ATHLETIC
ASSOCIATION and WESTERN ATHLETIC
CONFERENCE
[Additional Counsel Listed on Signature Page]

# IN THE UNITED STATES DISTRICT COURT

## FOR THE NORTHERN DISTRICT OF CALIFORNIA

### OAKLAND DIVISION

| | |
|---|---|
| IN RE NATIONAL COLLEGIATE ATHLETIC ASSOCIATION ATHLETIC GRANT-IN-AID CAP ANTITRUST LITIGATION<br><br>This Document Relates to:<br><br>ALL ACTIONS | MDL Docket No. 14-md-02541-CW |
| MARTIN JENKINS, et al.,<br><br>               Plaintiffs,<br><br>    v.<br><br>NATIONAL COLLEGIATE ATHLETIC ASSOCIATION, et al.,<br><br>               Defendants. | Case No. 14-cv-02758-CW<br><br>**DEFENDANTS' SUR-REPLY MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO PLAINTIFFS' AMENDED JOINT MOTION FOR CLASS CERTIFICATION**<br><br>Date:      October 1, 2015<br>Time:      2:00 p.m.<br>Courtroom:  Courtroom 2, 4th Floor<br>Before:   Hon. Claudia Wilken |

# *Table of Contents*

Table of Authorities ............................................................................................................ ii

Preliminary Statement ......................................................................................................... 1

Argument ............................................................................................................................. 2

I.     CONFLICTS OF INTEREST AMONG PUTATIVE CLASS MEMBERS
PRECLUDE CLASS CERTIFICATION UNDER RULE 23(b)(2) .................................... 2

II.    PLAINTIFFS UNEQUIVOCALLY SEEK TO ENJOIN ALL LIMITS ON
PAYMENTS TO STUDENT-ATHLETES. ...................................................................... 7

III.   PLAINTIFFS HAVE NOT MET THEIR BURDEN OF PROVING THE
ABSENCE OF CONFLICTS NECESSARY FOR PLAINTIFFS TO FAIRLY
AND ADEQUATELY REPRESENT THE INTERESTS OF ABSENT CLASS
MEMBERS. ...................................................................................................................... 8

IV.   THE CONSOLIDATED PLAINTIFFS' MOTION SHOULD BE DENIED AS
DUPLICATIVE AND FOR LACK OF STANDING. ...................................................... 13

Conclusion ........................................................................................................................... 15

## *Table of Authorities*

### **Cases**

*Amchem Prods., Inc. v. Windsor*, 521 U.S. 591 (1997) ....................................................2, 5

*Banks v. NCAA*, 977 F.2d 1081 (7th Cir. 1992).........................................................15

*Berger v. Compaq Computer Corp.*, 257 F.3d 475 (5th Cir. 2001)...................................8

*Brown v. Pro Football, Inc.*, 518 U.S. 231 (1996) ......................................................4

*Brown v. Ticor Title Ins. Co.*, 982 F.2d 386 (9th Cir. 1992) .........................................3

*Caselman v. Pier 1 Imports (U.S.), Inc.*, No. 14-CV-02383-LHK, 2015 WL 106063 (N.D. Cal. Jan. 7, 2015) ..............................................................................14

*Cooper v. Fed. Reserve Bank of Richmond*, 467 U.S. 867 (1984)..................................13

*County of Tuolumne v. Sonora Cmty. Hosp.*, 236 F.3d 1148 (9th Cir. 2001)....................11

*Ellis v. Costco Wholesale Corp.*, 657 F.3d 970 (9th Cir. 2011) ....................................14

*General Tel. Co. v. Falcon*, 457 U.S. 147 (1982)........................................................8

*Haro v. Sebelius*, 747 F.3d 1099 (9th Cir. 2014) ......................................................14

*Hernandez v. County of Monterey*, 70 F. Supp. 3d 963 (N.D. Cal. 2014)........................14

*Hooker v. Simon*, No. 1:06-cv-00389, 2010 WL 3516662 (E.D. Cal. Sept. 7, 2010) .................13

*Lyon v. United States Immigration & Customs Enforcement*, 300 F.R.D. 628 (N.D. Cal. 2014), *order modified on other grounds*, No. C-13-5878 EMC, 2015 WL 4538047 (N.D. Cal. July 27, 2015)....................................................................15

*In re High-Tech Employee Antitrust Litigation*, 985 F. Supp. 2d 1167 (N.D. Cal. 2013)..............4

*In re NCAA Student-Athlete Name & Likeness Licensing Litigation*, No. C 09-1967 CW, 2013 WL 5979327 (N.D. Cal. Nov. 8, 2013) .............................................6

*In re Potash Antitrust Litigation*, 159 F.R.D. 682 (D. Minn. 1995)................................4

*Kamakahi v. American Society for Reproductive Medicine*, 305 F.R.D. 164 (N.D. Cal. 2015)..............................................................................4

*Kuenz v. Goodyear Tire & Rubber Co.*, 104 F.R.D. 474 (E.D. Mo. 1985) ........................4

*Laumann v. NHL*, Nos. 12-CV-1817 (SAS), 12-CV-3704 (SAS), 2015 WL 2330107 (S.D.N.Y. May 14, 2015)...........................................................................5

*Mateo v. V.F. Corp.*, No. C 08-05313 CW, 2009 WL 3561539 (N.D. Cal. Oct. 27, 2009) ...........2

*Mayfield v. Dalton*, 109 F.3d 1423 (9th Cir. 1997) ..................................................................3, 14

*Meiresonne v. Marriott Corp.*, 124 F.R.D. 619 (N.D. Ill. 1989) ......................................................4

*Merenda v. VHS of Michigan, Inc.*, 296 F.R.D. 528 (E.D. Mich. 2013) ...........................................4

*Moreno v. Castlerock Farming & Transp., Inc.*, No. CIV-F-12-0556 AWI JLT, 2013 WL
    1326496 (E.D. Cal. Mar. 29, 2013) ................................................................................13

*Plack v. Cypress Semiconductor*, 864 F. Supp. 957 (N.D. Cal. 1994) ...........................................13

*Powell v. NFL*, No. 4-87-917 (D. Minn. June 20, 1988) ..................................................................4

*Robertson v. NBA*, 389 F. Supp. 867 (S.D.N.Y. 1975).......................................................................4

*Simmons v. City of Kansas City, Kansas*, 129 F.R.D. 178 (D. Kan. 1989) ......................................4

*Social Servs. Union, Local 535 v. Santa Clara Cnty.*, 609 F.2d 944 (9th Cir. 1979).......................3

*Wal-Mart Stores, Inc. v. Dukes*, 131 S. Ct. 2541 (2011) ..............................................................7, 8

*White v. NFL*, 822 F. Supp. 1389 (D. Minn. 1993), *aff'd*, 41 F.3d 402 (8th Cir. 1994)...................4

*Yarger v. ING Bank*, 285 F.R.D. 308 (D. Del. 2012) .........................................................................4

**Statutes**

Fed. R. Civ. P. 23(a)(4)..................................................................................................................1, 2

Fed. R. Civ. P. 23(b)(2)......................................................................................................................2

### *Preliminary Statement*

In their moving papers, plaintiffs gave short shrift to their burden of proving that there are no conflicts of interest between plaintiffs and absent class members that would disqualify plaintiffs from fairly and adequately protecting the interests of all absent putative class members, as required by Fed. R. Civ. P. 23(a)(4).  Although plaintiffs clearly bear the burden of proof on this issue, they offered no factual evidence or economic analysis whatsoever to establish that they could fairly and adequately protect the interests of absent class members who have benefited from the challenged NCAA rules that were designed to increase the number of student-athletes who receive athletics-based financial aid, and who would be harmed if those rules were enjoined.

In opposition, defendants submitted the expert analysis of Dr. Janusz A. Ordover.  Apply-ing several independent economic principles—including the substitution effect, the economics of superstars, several marginal revenue product ("MRP") studies on student-athletes, and the unre-markable principle that an increase in the cost of an activity causes a decline in the extent to which firms engage in that activity—Dr. Ordover demonstrated that many absent class members would likely lose some or all of their current athletic scholarships if the injunction plaintiffs seek were granted.  (*See* Ordover Rep. ¶ 18.)  The interests of those absent class members who greatly benefit from the longstanding amateur athletics model (and would be injured by its demise) undeniably conflict with the interests of plaintiffs who seek to impose an unconstrained professional model on intercollegiate athletics.  Accordingly, defendants showed that plaintiffs cannot fairly and ade-quately protect the interests of all absent class members, and their motion for class certification should be denied.

In reply, plaintiffs still make no attempt to meet their burden of proving that all putative class members share a common interest in eliminating the challenged NCAA rules that annually provide athletic scholarships to many thousands of student-athletes.  Rather, plaintiffs erroneously argue that conflicts among class members do not matter on a motion for class certification.  (Reply Br. at 1, 7-10.)  They falsely profess that they do not seek a free and open market for student-athletes.  (*Id*. at 4-7.)  And they attack Dr. Ordover's opinion that, in such an unconstrained market, some class members will lose some or all of their current athletic scholarships.  (*Id.* at 11-13.)

Pursuant to this Court's orders dated May 29, 2015 (Dkt. No. 228) and July 21, 2015 (Dkt. No. 236), defendants NCAA and eleven Division I conferences now submit this sur-reply.  As demonstrated below, plaintiffs misstate the law as determined by the Supreme Court and the Ninth Circuit:  conflicts of interest between plaintiffs and absent class members do matter and preclude class certification under Rule 23(b)(2).  Plaintiffs also misstate the nature of the relief they seek: plaintiffs unequivocally seek the elimination of any and all rules that restrict the competitive free-dom of student-athletes and Division I schools to negotiate student-athlete compensation based on each student-athlete's individual value.  Applying the correct law to the relief plaintiffs actually seek, it is clear that plaintiffs have not met their burden of proof on this motion:  plaintiffs have not proven the absence of fundamental conflicts of interest between them and absent class members who would lose some or all of their athletic scholarships in a free market model of professional sports in which student-athletes compete for compensation on the basis of their value to their teams.  Finally, the consolidated amended complaint ("CAC") plaintiffs' motion should be dis-missed as duplicative and for lack of standing to pursue a claim for injunctive relief.

## *Argument*

## I.    CONFLICTS OF INTEREST AMONG PUTATIVE CLASS MEMBERS PRECLUDE CLASS CERTIFICATION UNDER RULE 23(b)(2).

Plaintiffs' assertion that conflicts of interest between the named plaintiffs and absent class members do not preclude certification of a class under Rule 23(b)(2) is wholly inconsistent with the well-established law of the Supreme Court, the Ninth Circuit, and this district.  As defendants previously explained (Opp. Br. at 8-9), Rule 23(a)(4), which applies to certification motions under Rule 23(b)(2), requires plaintiffs to prove that the named plaintiffs will fairly and adequately pro-tect the interests of all absent class members.  The rule is intended "to uncover conflicts of interests between named parties and the class they seek to represent." *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 625 (1997); *see also Mateo v. V.F. Corp.*, No. C 08-05313 CW, 2009 WL 3561539, at \*5 (N.D. Cal. Oct. 27, 2009) (Wilken, J.) (courts must determine whether "the named plaintiffs . . . have any conflicts of interests with other class members" (citation omitted)).

Intra-class conflicts precluding certification under Rule 23(a)(4) arise where the class repre-

sentatives' interests are "antagonistic to those of the class."  *Social Servs. Union, Local 535 v. Santa Clara Cnty.*, 609 F.2d 944, 947 (9th Cir. 1979); *see also Brown v. Ticor Title Ins. Co*., 982 F.2d 386, 390 (9th Cir. 1992) ("Adequate representation . . . 'depends on . . . an absence of antagonism.'" (citation omitted)).  In *Mayfield v. Dalton*, 109 F.3d 1423 (9th Cir. 1997), for instance, the named plaintiffs opposed a program requiring armed services members to provide a specimen of their DNA for future analysis.  The court held that they "could not properly represent a class comprised of all service members who were compelled to participate in the program because there were undoubtedly people among the broad class proposed by [plaintiffs] who did not oppose the [program], and who, in fact, approved of it and wished the policies fully enforced." *Id*. at 1427.  Affirming the lower court's denial of class certification, the Ninth Circuit held that "[b]ecause [plaintiffs'] interests would thus have been antithetical to the interests of such class members, [plaintiffs] could not have adequately represented such class members." *Id*.

Here, the challenged NCAA rules are designed both (i) to preserve the amateur student-athlete collegiate model and (ii) to encourage colleges and universities to spread their athletics-based financial aid among a large number of student-athletes, rather than concentrate their spending on the recruitment of a handful of superstar players.  These rules ensure that more student-athletes are able to afford a college education and to participate in Football Bowl Subdivision ("FBS") football, Division I men's and women's basketball, and a broad array of non-revenue sports programs.  To prevail in their challenge, plaintiffs must demonstrate that any anticompetitive effects of those rules outweigh the procompetitive justifications for them.  The proposed representative plaintiffs (and other superstar members of the putative class) share an interest in eliminating those rules so that colleges and universities may concentrate their scholarship spending on the recruitment of superstar players.  But other putative class members share a contrary, conflicting interest in maintaining the rules to promote the procompetitive effects of ensuring that more student-athletes receive athletic scholarships covering most or all of their educational expenses.

Plaintiffs' facile assertion that this Court should ignore the interests of those student-athletes who "benefit from a defendant's illegal conduct" (Reply Br. at 10) assumes away the very issue in dispute:  whether, under a rule of reason analysis, the challenged NCAA rules are actually

illegal. Plaintiffs, of course, hope to establish that the rules' anticompetitive effects outweigh their procompetitive justifications, but other putative class members have an equally strong interest in demonstrating that the procompetitive effects of the rules outweigh any anticompetitive effects. The interests of the proposed representative plaintiffs in trying to establish that the challenged NCAA rules are unlawful are wholly antithetical to the interests of those absent class members whose scholarships are being placed at risk and who therefore share an interest in establishing that the challenged NCAA rules are lawful. Plaintiffs and their counsel argue that the NCAA rules are unreasonable, anticompetitive, and illegal; as a matter of law, they cannot advocate for or protect the interests of putative class members whose scholarships are jeopardized by this lawsuit and who would contend that the rules are reasonable, procompetitive and legal. It would raise serious due process implications to permit class representatives to advocate for relief that, if granted, would cause economic harm to some class members.

The cases on which plaintiffs rely do not hold that a court may ignore conflicts among putative class members when deciding a motion for injunctive class certification. Gender- or race-based discrimination decisions, like *Simmons v. City of Kansas City, Kansas*, 129 F.R.D. 178 (D. Kan. 1989), *Meiresonne v. Marriott Corp.*, 124 F.R.D. 619 (N.D. Ill. 1989), and *Kuenz v. Goodyear Tire & Rubber Co.*, 104 F.R.D. 474 (E.D. Mo. 1985), contain no suggestion whatsoever that any putative class members might be harmed by the end of the challenged discrimination or that any conflict existed among putative class members. Other decisions, like *Yarger v. ING Bank*, 285 F.R.D. 308 (D. Del. 2012), hold only that there is no requirement that every putative class member be injured by the challenged conduct. Still others, like *Kamakahi v. American Society for Reproductive Medicine*, 305 F.R.D. 164 (N.D. Cal. 2015), and *Robertson v. NBA*, 389 F. Supp. 867 (S.D.N.Y. 1975), hold not that conflicts among class members are irrelevant, but simply that the claimed conflict in those cases was too speculative. And some cases, like *In re High-Tech Employee Antitrust Litigation*, 985 F. Supp. 2d 1167 (N.D. Cal. 2013), *Merenda v. VHS of Michigan, Inc.*, 296 F.R.D. 528 (E.D. Mich. 2013), and *In re Potash Antitrust Litigation*, 159 F.R.D. 682 (D. Minn. 1995), involve Rule 23(b)(3) damages classes where, unlike here, absent class members with contrary views of the lawsuit and relief sought could opt out of the class.

Plaintiffs' reliance on *White v. NFL*, 822 F. Supp. 1389 (D. Minn. 1993), *aff'd*, 41 F.3d 402 (8th Cir. 1994), *Brown v. Pro Football, Inc.*, 518 U.S. 231 (1996), and *Powell v. NFL*, No. 4-87-917 (D. Minn. June 20, 1988), for the proposition that "numerous injunctive classes of athletes have been certified in antitrust actions like this one without regard to the possibility that competition might not benefit all class members equally" (Reply Br. at 7-8), is misplaced. None of those cases dealt with the class certification issues before this Court, and none concerned conflicts of interest among proposed class representatives and class members in a contested class. *White* was a settlement class case involving a labor union, in which the district court and the Eighth Circuit erroneously held that certification of a settlement class reduced the requirement for determining the adequacy of class representation. That rationale in *White* was expressly rejected by the Supreme Court in *Amchem*, 521 U.S. at 618, 627. *Brown* and *Powell* were both litigated as labor union cases, and concerned the application of the non-statutory labor exemption to the antitrust laws and the Norris-LaGuardia Act. Neither case considered the kinds of conflicts of interests between putative class members at issue here.

Even *Laumann v. NHL*, No. 12-CV-1817 (SAS), 2015 WL 2330107 (S.D.N.Y. May 14, 2015), the case that comes closest to supporting plaintiffs' position, is distinguishable. In *Laumann*, the district court's express basis for declining to follow the numerous "antitrust cases where courts have embraced a winners and losers argument against class certification" was the court's conclusion that all of the proposed class members in *Laumann* had suffered the same antitrust injury. *Id.* at *10-11 ("What all of [the contrary cases] have in common—and what sets them apart from this case—is the presence of class members who, in the actual world, suffered no injury. In every case cited by defendants, the upshot of the court's analysis is that as a result of the disputed conduct, some class members either (1) saw no effect or (2) received a benefit without any downside. Thus, some class members—because they were not injured—did not belong in the case. . . . The same is not true in this case."). Moreover, to the extent any other portion of *Laumann* can be read to suggest that intra-class conflicts are not a basis for denying certification under Rule 23(b)(2), it is contrary to the controlling Supreme Court and Ninth Circuit law cited above.

Plaintiffs' argument that the substitution effect—one of the economic principles that Dr.

Ordover used to demonstrate the conflicts of interests between putative class members—has not been recognized as a basis for finding conflicts of interest sufficient to deny injunctive class certification (Reply Br. at 7-9) is equally unavailing. That the courts did not discuss the substitution effect in the cases on which plaintiffs rely does not, of course, render it an impermissible basis on which to ascertain the presence of conflicts between plaintiffs and absent putative class members in this case. And as plaintiffs acknowledge, in *In re NCAA Student-Athlete Name & Likeness Licensing Litigation*, No. C 09-1967 CW, 2013 WL 5979327 (N.D. Cal. Nov. 8, 2013) ("*O'Bannon*"), this Court recognized that the substitution effect would cause conflicts among student-athletes who would be forced to compete with one another for compensation if the rules were modified to permit institutions to compete to pay group licensing fees to student-athletes. *Id.* at *8-9. Indeed, the Court in *O'Bannon* declined to certify a Rule 23(b)(3) damages class because the substitution effect created conflicts of interest among putative damages class members; while the Court certified a Rule 23(b)(2) injunctive class, it did so only after concluding that intra-class conflicts did not exist for the unique reason (not present here) that the group license sought in *O'Bannon* would not cause class members to compete against one another for compensation. *Id.* at *5 ("Plaintiffs' model propose[d] that damages be allocated equally among the members of every football and basketball team" according to a "group licensing" scheme, notwithstanding that, in a free market, "some putative class members—such as star athletes—would command a higher price for their name, image, and likeness rights than others.").

O'Bannon's group-licensing construct distinguishes it from the instant case, and that distinction is "important because it renders irrelevant any differences in the value of each class member's individual publicity rights." *Id.* at *6. The injunction that plaintiffs seek in this case is markedly different from the injunction sought in *O'Bannon*. (*See* Opp. Br. at 6-7.) As Dr. Ordover has established, the requested injunction here will cause student-athletes to compete against one another for compensation and, depending on the differences in the value of each class member's individual talent and skill, some putative class members will be harmed by the elimination of the challenged rules. (Ordover Rep. ¶¶ 18, 50, 60-62, 71-73.)

Finally, plaintiffs' contention that denying class certification where there are conflicts be-

tween the named plaintiffs and absent members of the putative class would impair the efficacy of class action lawsuits (Reply Br. at 1) is irrelevant. To be sure, Rule 23 is a useful procedural tool in the private enforcement of the antitrust laws. But it is nevertheless "an exception to the usual rule that litigation is conducted by and on behalf of the individual named parties only," *Wal-Mart Stores, Inc. v. Dukes*, 131 S. Ct. 2541, 2550 (2011) (citation omitted), and cannot be used to bind absent parties whose interests conflict with the named parties seeking to certify the class. Especially on motions to certify injunctive class actions under Rule 23(b)(2), where absent class members are not afforded notice or an opportunity to opt out of the class, a court must be scrupulous in determining that there are no conflicts of interests between the named plaintiffs and absent putative class members.

## II. PLAINTIFFS UNEQUIVOCALLY SEEK TO ENJOIN ALL LIMITS ON PAYMENTS TO STUDENT-ATHLETES.

Although they try to obscure the nature of the injunctive relief they seek, plaintiffs and their experts do not dispute that plaintiffs seek an injunction prohibiting any rules that would set an upper limit, or cap, on the level of compensation that may be paid to student-athletes in FBS football, Division I men's basketball, and Division I women's basketball. (*See*, *e.g.*, *Jenkins* Second Am. Compl. ¶ 38; CAC ¶¶ 1, 297; Noll Dep. at 30; Rascher Dep. at 34; Lazear Dep. at 74-75, 84-85.) Plaintiffs plainly seek to replace the present amateur, financial aid-based college model with a professional model in which individual student-athletes would be compensated based on the value of their contributions to their teams.

The replacement of the scholarship-based model of amateur college sports with a free market-based model of professional sports would naturally pit student-athletes against one another as they compete to be compensated based on their free market value. Plaintiffs attempt to avoid the inevitably resulting conflicts of interest among putative class members by asserting that defendants could choose to retain or adopt—or this Court could impose—other rules in the post-injunction world that would establish an artificial floor on the level of student-athlete compensation. Plaintiffs argue, for example, that current NCAA or conference rules designed to promote the scholarship-based model of amateur college sports—rules, for instance, that set minimum scholarship

1  amounts, establish minimum numbers of scholarship recipients, or prohibit individual schools from

2  unilaterally reducing or revoking existing scholarships—could be retained in a free market-based

3  world of professional college sports.  (Reply Br. at 4-5.)  Plaintiffs' experts also suggest that de-

4  fendants or the Court could relax the limit on the number of full GIA scholarships each school is

5  permitted to award (Rascher Dep. at 125-29), or require that all student-athletes be paid the same

6  amount (*id*. at 112, 144-51), or mandate that all student-athletes receive scholarships equal to cost

7  of attendance before any student-athlete receives compensation above that level (*id*. at 137-44).

8  But plaintiffs have not sought an injunction compelling such rules (*id*. at 35-36), and they proffer

9  no factual evidence or economic theory even to suggest that such rules would exist in a free mar-

10  ket-based model of professional sports or why, in such a free market model, defendants would vol-

11  untarily restrain their ability independently to determine the minimum number of paid student-

12  athletes they will recruit or the minimum compensation they will pay those student-athletes.

13  **III.  PLAINTIFFS HAVE NOT MET THEIR BURDEN OF PROVING THE ABSENCE**
    **OF CONFLICTS NECESSARY FOR PLAINTIFFS TO FAIRLY AND**
14  **ADEQUATELY REPRESENT THE INTERESTS OF ABSENT CLASS MEMBERS.**

15  The law is clear that plaintiffs—not defendants—bear the burden of proving that they will

16  fairly and adequately protect the interests of absent class members who have benefited from the

17  challenged rules and whose scholarships would be put at risk if those rules were enjoined.  *See*

18  *Wal-Mart Stores*, 131 S. Ct. at 2551; *see also Berger v. Compaq Computer Corp.*, 257 F.3d 475,

19  481 (5th Cir. 2001) ("Adequacy [of representation under Rule 23(a)] is for the plaintiffs to demon-

20  strate; it is not up to defendants to disprove.").  And plaintiffs cannot satisfy that burden with con-

21  clusory assertions; they must proffer affirmative evidence showing that all putative class members

22  share the same interest in striking down the challenged NCAA rules.  The Supreme Court has re-

23  peatedly held that the district court must "probe behind the pleadings before coming to rest on the

24  certification question" and must determine, "after a rigorous analysis, that the prerequisites of Rule

25  23(a) have been satisfied."  *Wal-Mart Stores*, 131 S. Ct. at 2551 (quoting *General Tel. Co. v. Fal-*

26  *con*, 457 U.S. 147, 160-61 (1982)).

27  Plaintiffs have failed to meet that burden of proof.  They have proffered no evidence what-

28  soever to support an affirmative showing that they can fairly and adequately protect the interests of

absent class members whose scholarships plaintiffs jeopardize by the injunction they seek. In light of that failure and Dr. Ordover's demonstration that the putative classes are fraught with conflicts between the superstar players and less accomplished players, this Court cannot grant plaintiffs' motion for class certification.

Plaintiffs' experts conceded in their depositions that they have made no attempt to determine what would likely happen to absent class members if the injunction that plaintiffs seek were granted. (*See*, *e.g.*, Noll Dep. at 28; Rascher Dep. at 31, 35, 45; Lazear Dep. at 95-96, 125-26.) Professor Noll testified, for example, that he "was not asked to opine about what the—the world would look like if the injunction were granted." (Noll Dep. at 28.) Professor Rascher testified that "an economist seeking to model and then rigorously analyze the impact of [a requested] injunction and any purported class conflict must consider potential alternative rules related to compensation that end the alleged anticompetitive restraints," but admitted that he has not been asked to conduct such an analysis, and has not done so. (Rascher Dep. at 44-45.) And Professor Lazear explained that, "in order to give a reliable prediction of what would happen in a but-for world, you have to spell out specifically what that but-for world looks like," but he has not done so, and has "no opinion on the post-injunction world and how that might play out." (Lazear Dep. at 95-96, 126.) Consequently, plaintiffs' experts admitted that they have done no analysis to determine whether there are conflicts among putative class members. (Rascher Dep. at 16-17; Lazear Dep. at 99-100.)

In short, plaintiffs have failed to conduct any analysis whatsoever, let alone the kind of rigorous analysis necessary to ensure that the representative plaintiffs will fairly and adequately protect the interests of absent class members. Rather, plaintiffs and their experts muse about several possible additional rules that might be adopted to prevent student-athletes from losing some or all of their current athletics-based financial aid in the post-injunction world where the amount of one's compensation depends on one's free market value to the team. Mischaracterizing these rules as "less restrictive alternatives," plaintiffs and their experts speculate that schools might collectively retain or adopt rules that require conferences (rather than individual schools) to pay student-athletes, set minimum scholarship amounts, establish minimum numbers of scholarship recipients, prohibit individual schools from reducing or revoking existing scholarships, require all student ath-

letes to be paid the same amount, require all student-athletes to receive athletics-based financial aid in an amount equal to their cost of attendance before any student-athlete could be paid more than the cost of attendance, or establish a team (rather than a student-athlete) compensation cap. (*See*, *e.g.*, Rascher Rep. ¶ 32; Rascher Dep. at 106-75.)

But plaintiffs' experts readily admit that they have not analyzed whether these or any other collectively enacted rules would likely exist in the professional free market that plaintiffs' request-ed injunction seeks to impose, or whether, if those rules did exist, they would themselves create conflicts among putative class members. Professor Lazear could offer no opinion about what rules would likely exist if plaintiffs prevail in this case: "that's beyond my pay grade," he explained, "That's not something that I feel I'm in a position to answer." (Lazear Dep. at 96.) When asked what rules would likely emerge in a post-injunction world, Professor Rascher candidly conceded, "I just don't know" (Rascher Dep. at 168; *see also id.* at 47, 84, 96, 108-10), admitting that he has done no analysis of the effects of the alternative rules about which he theorizes. (*Id.* at 77; *see also id.* at 51, 98-103, 115-16, 125-26, 137, 142-43.) And Professor Noll testified that he has not ana-lyzed any alternatives to the scholarship rules that plaintiffs challenge. (Noll Dep. at 29-30.)

Importantly, the rules about which plaintiffs and their experts speculate are no less restric-tive of competition than the rules that plaintiffs do challenge. Like the challenged rules setting a scholarship cap, collectively adopted rules that set scholarship floors, prohibit individual schools from reducing or revoking existing scholarships, or require schools to award all students the same scholarship amount, restrain the competitive freedom of each individual school unilaterally to de-termine the amount of athletics-based financial aid it will offer to any particular student-athlete. (Ordover Reply Rep. ¶ 14.) Plaintiffs offer no reason in fact or economic theory why, in a free market-driven professional model of college sports, NCAA member schools would voluntarily agree to constrain their competitive independence to determine the lower limits of their scholarship awards. As Dr. Ordover observes, particularly where the elimination of the scholarship cap would likely increase both the amount of funds paid to student-athletes and the financial pressure on Divi-sion I athletics departments, where college football rosters include many more players than profes-sional rosters do, and where many student-athletes are willing and able to play college football or

basketball as walk-ons, individual schools are unlikely voluntarily to agree to forego the ability to award partial scholarships and to reduce or eliminate existing scholarships. (*Id*. ¶ 15.)

In addition to rules setting minimum scholarship levels, plaintiffs suggest that a less restrictive alternative to the challenged rules would permit each conference to set scholarship caps for the schools within that conference. (*See*, *e.g.*, Rascher Dep. at 48-55.) Such a suggestion is not a less restrictive alternative to the challenged NCAA scholarship cap rules because it does not promote and further the same procompetitive objectives of the challenged rules, including the production of athletic competitions between conferences culminating in a national championship. *See County of Tuolumne v. Sonora Cmty. Hosp.*, 236 F.3d 1148, 1159 (9th Cir. 2001) (to qualify as a less restrictive alternative, an alternative rule must promote and further the same procompetitive objective as the challenged rule).

Professor Rascher opined that competition among schools within each conference would be enhanced if all schools within the conference were required to adhere to "a common wage scheme." (Rascher Dep. at 54-56.) Requiring all schools within a conference to comply with a common wage scheme, Professor Rascher explained, would "help with competitive balance within the conference" and allow schools to compete more effectively in recruitment. (*Id.* at 55.) But equally importantly, Professor Rascher readily acknowledged the importance of competition among schools from different conferences leading to a national championship. (*Id.* at 58.) "[A] demand-enhancing aspect of college sports is that many teams play each other, even outside of their conference." (*Id.* at 59.) A national championship in college football or basketball has value, according to Professor Rascher, because "[p]eople like a playoff system that really determines a champion. It's just how we like to—to consume sports . . . . It's that simple." (*Id.* at 86.) "[I]f all of a sudden just the conferences played amongst themselves and that was it[,] I think that would be not demand enhancing." (*Id.* at 62.)

Professor Rascher's testimony demonstrates precisely the procompetitive rationale for the challenged rules setting common national limits on athletic-based financial aid within Division I. The challenged rules that establish a common scholarship cap for all schools within Division I serve the procompetitive goal of producing an inter-conference competition culminating in a na-

tional champion, which Professor Rascher testified is "demand enhancing." (*Id.*) By contrast, plaintiffs' proposed intra-conference rules do not promote and further the production of an inter-conference competition leading to a national champion. In fact, they hinder that goal by balkanizing the scholarship rules among the conferences and thus are not less restrictive alternatives to the challenged NCAA scholarship rules. And as Professor Rascher readily conceded, to the extent that plaintiffs' suggested alternative rules might lessen the demand for the NCAA's product of national college athletic competitions, those alternative rules would harm members of the putative class. (*Id.* at 63-65.)

Finally, Professor Lazear testified that, under the current scholarship-based amateur college sports model, schools have demonstrated a "revealed preference" to award full grant-in-aid ("GIA") scholarships to their student-athletes, and would continue to do so in the professional free market that plaintiffs seek. (Lazear Dep. at 238.) But, as Dr. Ordover explains, the "revealed preference" of schools to award full GIA scholarships in the actual world under NCAA rules designed to limit the amount of financial aid that any single student-athlete may receive and to encourage schools to spread their scholarship awards among many student-athletes, is wholly irrelevant to the schools' likely behavior in a professional free market world in which schools are encouraged by competition to concentrate their scholarship spending to recruit superstar players. (Ordover Reply Rep. ¶¶ 19-24.) If competition to recruit superstar players with increased compensation became the rule, then the current rosters of eighty-five full GIA FBS football scholarships, thirteen Division I men's basketball scholarships, and fifteen Division I women's basketball scholarships are unlikely to continue to reflect the schools' "revealed preference." (*Id.*)

In sum, plaintiffs have utterly failed to meet their burden of proving on this motion that there are no fundamental conflicts of interest between student-athletes who want the Court to strike down the challenged scholarship rules and student-athletes who have benefited from those rules and who would seek to uphold them as procompetitive and lawful. Rather, as Dr. Ordover has shown, if this Court were to enjoin enforcement of the challenged rules, schools would likely compete (possibly "without any economic discipline" (Reply Br. at 6)) to pay superstar players increasingly greater compensation and, in the process, reduce or eliminate current athletic scholarships to

less talented athletes.  (Ordover Rep. ¶¶ 18, 50, 60-62, 71-73, 92.)  As Dr. Ordover opined, the move that plaintiffs seek from a scholarship-based model of amateur college sports, in which thousands of student-athletes receive a free education while participating in amateur college athletics, to a free market-based model of professional sports, in which student-athletes would be compensated on the basis of their market value to their teams, would likely lead to a but-for world in which superstar players would receive substantially more compensation than their current financial aid and less accomplished players would receive less compensation than their current financial aid.  (*Id.*)

## IV. THE CONSOLIDATED PLAINTIFFS' MOTION SHOULD BE DENIED AS DUPLICATIVE AND FOR LACK OF STANDING.

Despite filing a joint motion for class certification, the CAC and *Jenkins* plaintiffs each seek to certify pursuant to Rule 23(b)(2) their own FBS football and Division I men's basketball classes, which overlap almost perfectly in scope.  Plaintiffs' attempt to certify—not one, but two—duplicative classes is inherently improper.  *See Plack v. Cypress Semiconductor*, 864 F. Supp. 957, 959 (N.D. Cal. 1994) ("the filing of a successive, identical class action qualifies as abusive").  It is black letter law that there can be only one final judgment binding all class members, *Cooper v. Fed. Reserve Bank of Richmond*, 467 U.S. 867, 874 (1984), and *res judicata* will preclude absent class members "from seeking other or further injunctive relief."  *Brown v. Ticor Title Ins. Co.*, 982 F.2d at 392; *see also Hooker v. Simon*, No. 1:06-cv-00389, 2010 WL 3516662, at *3 (E.D. Cal. Sept. 7, 2010).  To avoid the inefficiency that would result from two identical class actions racing to final judgment, courts are empowered to dismiss, stay, or enjoin a duplicative action, or to consolidate both actions.  *Moreno v. Castlerock Farming & Transp., Inc.*, No. CIV-F-12-0556 AWI JLT, 2013 WL 1326496, at *1 (E.D. Cal. Mar. 29, 2013).  Plaintiffs have offered no authority, and we have found none, which suggests that a putative class action plaintiff has a right to proceed with a separate, but duplicative class on a parallel track to trial.

The CAC plaintiffs also lack standing to pursue their injunctive relief claims because all of the named CAC plaintiffs either withdrew as injunctive class representatives or no longer remain eligible to participate in college athletics.  (Opp. Br. at 19-20.)  Plaintiffs do not suggest that the CAC plaintiffs who withdrew as injunctive class representatives have standing, but rely on the "in-

herently transitory" doctrine to assert that Justine Hartman and John Bohannon, neither of whom remains eligible to play college sports, continue to have standing to pursue injunctive relief, despite the fact that they will not benefit from any such injunctive relief. (Reply Br. at 14-15.)

There can be no doubt that, having exhausted their eligibility to participate in college athletics, Ms. Hartman and Mr. Bohannon no longer have a personal stake in their claims for injunctive relief, and those individual claims for an injunction are moot. *Mayfield*, 109 F.3d at 1425-26; *see also Caselman v. Pier 1 Imports (U.S.), Inc.*, No. 14-CV-02383-LHK, 2015 WL 106063, at *3 (N.D. Cal. Jan. 7, 2015). On this ground alone, the individual injunctive relief claims of Ms. Hartman and Mr. Bohannon should be dismissed. *Mayfield*, 109 F.3d at 1427; *Caselman*, 2015 WL 106063, at *5. And where the putative class representatives' claims are dismissed as moot prior to class certification, the entire class action should likewise be dismissed as moot. *See, e.g.*, *Ellis v. Costco Wholesale Corp.*, 657 F.3d 970, 986 (9th Cir. 2011) (holding former Costco employees did not have standing and were not adequate representatives to pursue injunctive relief).

Plaintiffs' reliance on the "inherently transitory" doctrine to preserve the CAC class claims is misplaced. An exception to the doctrine of mootness, the "inherently transitory" doctrine involves claims that are "so inherently transitory that the trial court will not have . . . enough time to rule on a motion for class certification before the proposed representative's individual interest expires." *Haro v. Sebelius*, 747 F.3d 1099, 1110 (9th Cir. 2014) (citation omitted). In *Haro*, the plaintiff sought injunctive relief against the Department of Health and Human Services for a practice of requiring an up-front payment in anticipation of reimbursement from Medicare, and the plaintiff was reimbursed approximately one month after she filed her lawsuit. The Ninth Circuit held that, even though the named plaintiff's "individual interest in injunctive relief expired" prior to class certification, the putative class claims were not moot because the district court "could not have been expected to rule on a motion for class certification" during the thirty-day period between the filing of the plaintiff's lawsuit and her reimbursement from Medicare. *Id.*

As a general matter, the "inherently transitory" exception has been applied where the practice against which injunctive relief is sought is inherently short-lived and thus necessarily resolved before a motion for class certification can be decided. *See, e.g.*, *Hernandez v. County of Monterey*,

70 F. Supp. 3d 963, 974-75 (N.D. Cal. 2014) (prisoners' claims were inherently transitory where "[t]he average term in the jail ranges from 30-40 days" and "[t]he vast majority of the jail's population are pretrial detainees with completely unpredictable, but generally brief, lengths of stay," coupled with "the plodding speed of legal action"); *Lyon v. United States Immigration & Customs Enforcement*, 300 F.R.D. 628, 639 (N.D. Cal. 2014) (class claims inherently transitory where "the length of [pretrial] detention cannot be ascertained at the outset and may be ended before class certification by various circumstances. It is not certain that any given individual, named as a plaintiff, would stay in detention long enough for a district judge to certify the class, and the constant existence of a class of persons suffering the alleged deprivation is certain."), *order modified on other grounds*, No. C-13-5878 EMC, 2015 WL 4538047 (N.D. Cal. July 27, 2015).

It is the inherently short period of a claimed violation, or the uncertainty as to whether the alleged violation will continue long enough for the court to rule on a motion for class certification, that is the touchstone for the "inherently transitory" exception. Where, however, the duration of the alleged violation is not uncertain, and the plaintiff could have filed his complaint with sufficient time for the court to resolve a motion for class certification, the "inherently transitory" exception does not apply. *See, e.g.*, *Banks v. NCAA*, 977 F.2d 1081, 1086 (7th Cir. 1992) (where plaintiff's claim would be mooted in 120 days and plaintiff waited 112 days before filing his complaint, the "inherently transitory" exception did not apply when, eight days after the filing of the complaint, plaintiff's claim became moot).

Here, plaintiffs in the putative class have as many as five years of college athletics eligibility, and putative representatives with eligibility could easily have filed their complaint with sufficient time for a court to rule on a motion for class certification before their eligibility expired and their claims for injunctive relief became moot. The "inherently transitory" exception to the doctrine of mootness simply does not apply in such circumstances.

### *Conclusion*

For the foregoing reasons, as well as for the reasons set forth in defendants' opposition brief, plaintiffs' motion for class certification should be denied.

DATED: September 8, 2015

**SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP**


By: _____/s/ Jeffrey A. Mishkin_____
Jeffrey A. Mishkin (*pro hac vice*)
Karen Hoffman Lent (*pro hac vice*)

Attorneys for Defendants
NATIONAL COLLEGIATE ATHLETIC ASSOCIATION
and WESTERN ATHLETIC CONFERENCE

**PROSKAUER ROSE LLP**                    **MAYER BROWN LLP**


By: _____/s/ Scott P. Cooper_____    By: _____/s/ Britt M. Miller_____
      Scott P. Cooper (SBN 96905)       Andrew S. Rosenman (SBN 253764)
      Jennifer L. Jones (SBN 284624)      Britt M. Miller (*pro hace vice*)
      Jacquelyn N. Ferry (SBN 287798)    71 South Wacker Drive
      2049 Century Park East, Suite 3200    Chicago, IL 60606
      Los Angeles, CA 90067      Telephone: (312) 782-0600
      Telephone: (310) 557-2900     Facsimile: (312) 701-7711
      Facsimile: (310) 557-2193      arosenman@mayerbrown.com
      scooper@proskauer.com       bmiller@mayerbrown.com
      jljones@proskauer.com
      jferry@proskauer.com       Richard J. Favretto (*pro hac vice*)
                        1999 K Street, N.W.
      Attorneys for Defendant      Washington, DC  20006
      PAC-12 CONFERENCE       Telephone:  (202) 263-3000
                        Facsimile:  (202) 263-3300
                        rfavretto@mayerbrown.com

                        Attorneys for Defendant
                    THE BIG TEN CONFERENCE, INC.

| | |
|---|---|
| **POLSINELLI PC** | **ROBINSON BRADSHAW & HINSON** |

By: _____/s/ Leane K. Capps_____

Leane K. Capps (*pro hac vice*)
Saint Ann Court
2501 N. Harwood Street, Suite 1900
Dallas, TX 75201
Telephone: (214) 397-0030
lcapps@polsinelli.com

Amy D. Fitts (*pro hac vice*)
120 W. 12th Street
Kansas City, MO 64105
Telephone: (816) 218-1255
afitts@polsinelli.com

Wesley D. Hurst (SBN 127564)
2049 Century Park East, Suite 2300
Los Angeles, CA 90067
Telephone: (310) 556-1801
whurst@polsinelli.com

Attorneys for Defendants
THE BIG 12 CONFERENCE, INC. and
CONFERENCE USA, INC.

By: _____/s/ Robert W. Fuller_____

Robert W. Fuller, III (*pro hac vice*)
Nathan C. Chase Jr. (SBN 247526)
Mark W. Merritt (*pro hac vice*)
Lawrence C. Moore, III (*pro hac vice*)
Amanda R. Pickens (*pro hac vice*)
101 N. Tryon St., Suite 1900
Charlotte, NC 28246
Telephone: (704) 377-2536
Facsimile: (704) 378-4000
nchase@rbh.com
rfuller@rbh.com
mmerritt@rbh.com
lmoore@rbh.com
apickens@rbh.com

Mark J. Seifert (SBN 217054)
Robert R. Moore (SBN 113818)
ALLEN MATKINS LECK GAMBLE MAL-
LORY & NATSIS LLP
Three Embarcadero Center, 12th Floor
San Francisco, CA 94111
Telephone: (415) 837-1515
Facsimile: (415) 837-1516
mseifert@allenmatkins.com
rmoore@allenmatkins.com

Attorneys for Defendant
SOUTHEASTERN CONFERENCE

**SMITH MOORE LEATHERWOOD LLP**     **COVINGTON & BURLING LLP**

By: _____/s/ D. Erik Albright_____     By: _____/s/ Benjamin C. Block_____
D. Erik Albright (*pro hac vice*)     Benjamin C. Block (*pro hac vice*)
Gregory G. Holland (*pro hac vice*)     One CityCenter
300 North Greene Street, Suite 1400     850 Tenth Street, N.W.
Greensboro, NC 27401     Washington, DC 20001-4956
Telephone: (336) 378-5368     Telephone: (202) 662-5205
Facsimile: (336) 433-7402     Facsimile: (202) 778-5205
erik.albright@smithmoorelaw.com     bblock@cov.com
greg.holland@smithmoorelaw.com

Jonathan P. Heyl (*pro hac vice*)     Rebecca A. Jacobs (SBN 294430)
101 N. Tryon Street, Suite 1300     One Front Street
Charlotte, NC 28246     San Francisco, CA 94111-5356
Telephone: (704) 384-2625     Telephone: (415) 591-6000
Facsimile: (704) 384-2909     Facsimile: (415) 591-6091
jon.heyl@smithmoorelaw.com     rjacobs@cov.com

Charles LaGrange Coleman, III (SBN 65496)     Attorneys for Defendant
HOLLAND & KNIGHT LLP     AMERICAN ATHLETIC CONFERENCE
50 California Street, Suite 2800
San Francisco, CA 94111-4624
Telephone: (415) 743-6900
Facsimile: (415) 743-6910
ccoleman@hklaw.com

Attorneys for Defendant
THE ATLANTIC COAST CONFERENCE

**WALTER HAVERFIELD LLP**

**BRYAN CAVE LLP**

By: _____/s/ R. Todd Hunt_____
R. Todd Hunt (*pro hac vice*)
The Tower at Erieview
1301 E. 9th Street, Suite 3500
Cleveland, OH 44114-1821
Telephone: (216) 928-2935
Facsimile: (216) 916-2372
rthunt@walterhav.com

Attorneys for Defendant
MID-AMERICAN CONFERENCE

By: _____/s/ Adam Brezine_____
Adam Brezine (SBN 220852)
560 Mission Street, 25th Floor
San Francisco, CA 94105
Telephone: (415) 674-3400
Facsimile: (415) 675-3434
adam.brezine@bryancave.com

Richard Young (*pro hac vice*)
Brent Rychener (*pro hac vice*)
90 South Cascade Avenue, Suite 1300
Colorado Springs, CO 80903
Telephone: (719) 473-3800
Facsimile: (719) 633-1518
richard.young@bryancave.com
brent.rychener@bryancave.com

Attorneys for Defendant
MOUNTAIN WEST CONFERENCE

**JONES WALKER LLP**

By: _____/s/ Mark A. Cunningham_____
Mark A. Cunningham (*pro hac vice*)
201 St. Charles Avenue
New Orleans, LA 70170-5100
Telephone: (504) 582-8536
Facsimile: (504) 589-8536
mcunningham@joneswalker.com

Attorneys for Defendant
SUN BELT CONFERENCE

**FILER'S ATTESTATION**

I, Jeffrey A. Mishkin, am the ECF user whose identification and password are being used to file DEFENDANTS' SUR-REPLY MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO PLAINTIFFS' AMENDED JOINT MOTION FOR CLASS CERTIFICATION. In compliance with Local Rule 5-1(i)(3), I hereby attest that all signatories hereto concur in this filing.

/s/ Jeffrey A. Mishkin

**CERTIFICATE OF SERVICE**

I hereby certify that on September 8, 2015, I electronically filed the foregoing document using the CM/ECF system which will send notification of such filing to the e-mail addresses registered in the CM/ECF system, as denoted on the Electronic Mail Notice List.

/s/ Jeffrey A. Mishkin