Steve W. Berman (*Pro Hac Vice*)
Craig R. Spiegel (122000)
Ashley A. Bede (*Pro Hac Vice*)
HAGENS BERMAN SOBOL SHAPIRO LLP
1918 Eighth Avenue, Suite 3300
Seattle, WA 98101
Telephone: (206) 623-7292
Facsimile: (206) 623-0594
steve@hbsslaw.com
craigs@hbsslaw.com
ashleyb@hbsslaw.com

Bruce L. Simon (96241)
Benjamin E. Shiftan (265767)
PEARSON, SIMON & WARSHAW, LLP
44 Montgomery Street, Suite 2450
San Francisco, CA 94104
Telephone: (415) 433-9000
Facsimile: (415) 433-9008
bsimon@pswlaw.com
bshiftan@pswlaw.com

*Plaintiffs' Class Counsel*

[Additional Counsel on Signature Page]

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

OAKLAND DIVISION

| | |
|---|---|
| IN RE: NATIONAL COLLEGIATE ATHLETIC ASSOCIATION ATHLETIC GRANT-IN-AID CAP ANTITRUST LITIGATION<br><br>This Document Relates to:<br><br>ALL ACTIONS EXCEPT<br><br>*Jenkins v. Nat'l Collegiate Athletic Ass'n*<br>Case No. 14-cv-0278-CW | Case No. 4:14-md-2541-CW<br><br>NOTICE OF MOTION AND MOTION FOR FINAL APPROVAL OF CLASS ACTION SETTLEMENT<br><br>DATE:   November 17, 2017<br>TIME:    9:00 a.m.<br>DEPT:    Courtroom 2, 4th Floor<br>JUDGE:  Hon. Claudia Wilken<br><br>COMPLAINT FILED:  March 5, 2014 |

010271.11 985750 V1

**NOTICE OF MOTION AND MOTION**

PLEASE TAKE NOTICE that on November 17, 2017, at 9:00 a.m. or as soon thereafter as the matter may be heard by the Honorable Claudia Wilken of the United States District Court of the Northern District of California, located at 1301 Clay Street, Courtroom 2 – 4th Floor, Oakland, CA 94612, plaintiffs will and hereby do move the Court under Federal Rules of Civil Procedure 23 for an order certifying the proposed settlement classes and granting final approval to the class action settlement with National Collegiate Athletic Association, Pac-12 Conference, The Big Ten Conference, Inc., The Big 12 Conference, Inc., Southeastern Conference, Atlantic Coast Conference, The American Athletic Conference, Conference USA, Mid-American Conference, Mountain West Conference, Sun Belt Conference, and Western Athletic Conference (collectively, "defendants").

This motion is based on this Notice of Motion and Motion for Final Approval of Settlement, the following memorandum of points and authorities, the Settlement Agreement on file with the Court, the pleadings and papers on file in this action, and such other matters as the Court may consider.

# TABLE OF CONTENTS

**Page**

NOTICE OF MOTION AND MOTION ................................................................................................1

I. INTRODUCTION ................................................................................................................5

II. BACKGROUND ..................................................................................................................5

    A. The settlement classes ..............................................................................................6

    B. The settlement consideration ....................................................................................6

    C. Release of claims .....................................................................................................7

    D. Notice is estimated to have reached over ninety percent of class members. ...............7

    E. Plan of distribution. ................................................................................................11

III. ARGUMENT ......................................................................................................................12

    A. The settlement classes should be certified. ............................................................12

    B. Plaintiffs have complied with Rule 23(c) notice requirements. ..............................12

    C. The Settlement Agreement is fair, adequate and reasonable. .................................13

        1. The strength of plaintiffs' case supports final approval. ..............................14

        2. The risk, expense, complexity, and duration of further litigation supports final approval. ................................................................................................15

        3. The risk of maintaining class action status through trial. ............................15

        4. The amount offered in settlement supports final approval. .........................15

        5. The extent of discovery completed and stage of proceedings supports final approval. ................................................................................................16

        6. The experience and views of class counsel support approval. ...................17

        7. The non-presence of a government participant supports final approval. ......18

        8. The reaction of the classes supports final approval. ....................................18

IV. THE PROPOSED PLAN OF ALLOCATION IS FAIR .....................................................18

V. CONCLUSION ...................................................................................................................18

# TABLE OF AUTHORITIES

Page(s)

**Cases**

# TABLE OF AUTHORITIES

Page(s)

**Cases**

*In re Bluetooth Headset Prods. Liab. Litig.*,
 654 F.3d 935 (9th Cir. 2011) .................................................................................................. 14

*In re Cathode Ray Tube (CRT) Antitrust Litig.*,
 2016 U.S. Dist. LEXIS 24951 (N.D. Cal. Jan. 28, 2016) .......................................................... 18

*Hanlon v. Chrysler Corp.*,
 150 F.3d 1011 (9th Cir. 1998) ................................................................................................ 13

*Knight v. Red Door Salons, Inc.*,
 2009 U.S. Dist. LEXIS 11149 (N.D. Cal. Feb. 2, 2009) ..................................................... 16, 17

*In re Linerboard Antitrust Litig.*,
 2004 U.S. Dist. LEXIS 10532 (E.D. Pa. June 2, 2004) ............................................................. 14

*Linney v. Cellular Alaska P'ship*,
 151 F.3d 1234 (9th Cir. 1998) ................................................................................................ 15

*In re Mego Fin. Corp. Sec. Litig.*,
 213 F.3d 454 (9th Cir. 2000) .................................................................................................. 16

*O'Bannon v. Nat'l Collegiate Athletic Ass'n*,
 802 F.3d 1049 (9th Cir. 2015) ................................................................................................ 14

*Officers for Justice v. Civil Serv. Comm'n*,
 688 F.2d 615 (9th Cir. 1982) .................................................................................................. 14

*In re Omnivision Techs., Inc.*,
 559 F. Supp. 2d 1036 (N.D. Cal. 2007) ............................................................................. 17, 18

*Rodriguez v. West Pub. Co.*,
 563 F.3d 948 (9th Cir. 2009) .................................................................................................. 13

*Sciortino v. PepsiCo, Inc.*,
 2016 U.S. Dist. LEXIS 83937 (N.D. Cal. June 28, 2016) .......................................................... 17

*Staton v. Boeing Co.*,
 327 F.3d 938 (9th Cir. 2003) .................................................................................................. 12

*Sullivan v. DB Invs., Inc.*,
 667 F.3d 273 (3d Cir. 2011) ................................................................................................... 13

*In re Syncor ERISA Litig.*,
 516 F.3d 1095 (9th Cir. 2008) ................................................................................................ 13

*Van Bronkhorst v. Safeco Corp.*,
    529 F.2d 943 (9th Cir. 1976) .................................................................................................. 13

*In re Washington Pub. Power Supply Sys. Sec. Litig.*,
    720 F. Supp. 1379 (D. Ariz. 1989) ......................................................................................... 14

*Zepeda v. PayPal, Inc.*,
    2017 U.S. Dist. LEXIS 43672 (N.D. Cal. Mar. 24, 2017) ..................................................... 17

**Other Authorities**

Federal Rule of Civil Procedure 23 .................................................................................... 1, 10, 12, 13

*Van Bronkhorst v. Safeco Corp.*,
    529 F.2d 943 (9th Cir. 1976) .................................................................................................. 13

*In re Washington Pub. Power Supply Sys. Sec. Litig.*,
    720 F. Supp. 1379 (D. Ariz. 1989) ......................................................................................... 14

*Zepeda v. PayPal, Inc.*,
    2017 U.S. Dist. LEXIS 43672 (N.D. Cal. Mar. 24, 2017) ......................................................... 17

**Other Authorities**

Federal Rule of Civil Procedure 23 .................................................................................... 1, 10, 12, 13

## I. INTRODUCTION

Plaintiffs seek final approval of a settlement that provides for payment of approximately 50% of the classes' single damages claims after fees and expenses are deducted. The agreement is the result of extensive litigation and arm's-length negotiations between the parties. Defendants agree to pay $208,664,445.00, which (after deduction of fees and expenses) will be disbursed to student-athletes who attended Division I schools that plaintiffs' evidence shows would have awarded the full cost of attendance at those schools ("COA"), but for the NCAA bylaw in effect until January 1, 2015, that capped the maximum grant-in-aid ("GIA") at less than COA. The average recovery for a class member who played his or her sport for four years would be approximately $6,000.[1] Once the proposed settlement is approved, each impacted class member with calculated damages will be mailed a check, with no claim form required and no right of any reversion of funds to defendants.

Plaintiffs' counsel, who have litigated numerous antitrust and other matters against the NCAA over the years, believe this is an exceptional result for the proposed class. As this Court knows, antitrust matters against the NCAA involve unique arguments and have had narrow historical success. And the NCAA has been willing to devote significant resources to vigorously defending them, including on appeal. Thus, not only is the size of the monetary settlement a major benefit to the class, the likelihood of near-term payout is also significant.

Finally, the settlement does not release or bar in any way the class claims for prospective injunctive relief from going forward—and plaintiffs will continue to vigorously pursue them.

## II. BACKGROUND

This Court is familiar with plaintiffs' allegations in this case, which plaintiffs do not repeat here. In the motion for attorneys' fees, expense, and incentive awards, plaintiffs included a detailed discussion of the procedural history and their efforts in litigating this case.[2]

---

[1] Since the settlement was reached, many additional schools are now paying or have stated an intent to pay COA. Eligible class members from these additional COA-paying schools will also receive payment from the settlement fund. As such, the number of class members eligible to receive payment has grown significantly since the settlement was reached.

[2] *See* Notice of Motion and Motion for Attorneys' Fees, Expenses and Service Awards, Sept. 6, 2017, ECF No. 688.

A.     **The settlement classes**

The Court preliminary certified the following Settlement Classes:[3]

> **Division I FBS Football Class**: All current and former NCAA Division I Football Bowl Subdivision ("FBS") football student-athletes who, at any time from March 5, 2010 through the date of Preliminary Approval of this Settlement, received from an NCAA member institution for at least one academic term (such as a semester or quarter) a Full Athletics Grant-In-Aid (defined herein).
>
> **Division I Men's Basketball Class**: All current and former NCAA Division I men's basketball student-athletes who, at any time from March 5, 2010 through the date of Preliminary Approval of this Settlement, received from an NCAA member institution for at least one academic term (such as a semester or quarter) a Full Athletics Grant-In-Aid.
>
> **Division I Women's Basketball Class:** All current and former NCAA Division I women's basketball student-athletes who, at any time from March 5, 2010 through the date of Preliminary Approval of this Settlement, received from an NCAA member institution for at least one academic term (such as a semester or quarter) a Full Athletics Grant-In-Aid.

B.     **The settlement consideration**

The total settlement amount provides for defendants to pay $208,664,445.00. This amounted to approximately 100% of the settlement classes' single damages claims at the time of settlement, as calculated by plaintiffs' expert economist, Dr. Daniel Rascher, whose econometric model statistically predicts which Division I schools would more likely than not have paid the full COA at the start of the class period, had the GIA cap been at full COA (or above).[4] And the settlement amount equals approximately two-thirds of single damages after including additional class members who attended schools that adopted full COA by June of 2017.

---

[3] Amended Order Granting Plaintiffs' Unopposed Motion for Preliminary Approval of Class Action Settlement, Mar. 29, 2017, ECF No. 615 ("Amended Order"), at ¶ 3. The Court defined "Full Athletics Grant-In-Aid" to mean "either (1) athletically related financial aid for any particular academic term (year, semester, or quarter), in an amount equal to or greater than tuition and fees, room and board, and required course-related books, or (2) athletically related financial aid that was not equal to or greater than tuition and fees, room and board, and required course-related books only because it was reduced by the applicable NCAA member institution by an amount of nonathletically related financial aid received by the student-athlete." *Id*.

[4] *See* Expert Declaration of Daniel A. Rascher in Support of Motion for Preliminary Approval of Damages Classes, Feb. 3, 2017, ECF No. 560-4.

**C.     Release of claims**

Once the Settlement Agreement is final and effective, the named plaintiffs and settlement class members who have not opted out will release all federal and state law claims for damages against defendants arising out of or relating in any way to any act or omission of the defendants or their member institutions that is alleged or could have been alleged in this litigation. The released claims do not include claims solely for prospective injunctive relief. Indeed, the injunctive class claims in this litigation are still pending and not part of the proposed Settlement Agreement.

**D.     Notice is estimated to have reached over ninety percent of class members.**

The proposed notice plan was carried out by the notice administrator, Gilardi & Co. LLC ("Gilardi"), pursuant to the Amended Order.[5] At a website developed and maintained by Gilardi, NCAA member institutions securely uploaded student-athlete data and/or provided written notice of their consent to use information from the NCAA Concussion Settlement.[6] If potential class members identified from that data had both an associated email address and USPS address, Gilardi disseminated notice to *both* addresses.[7] On or before August 21, 2017, Gilardi caused notice to be sent to 19,973 email addresses and 25,949 postal addresses; approximately 1,689 potential class members had contact information on both lists resulting in direct notice to 44,233 unique class members.[8]

Of the 19,973 emails, 3,020 bounced back as undeliverable, with 209 of the bounce-backs having a corresponding postal address that was not returned as undeliverable.[9] Of the 25,949 notices sent via postal mail, 3,806 were returned as undeliverable with 5 having a corresponding email address that did not bounce back.[10] Factoring in the returned mail, approximately 39,310 unique class members were reached through direct notice (89% of the classes).[11]

---

[5] *See* Declaration of Alan Vasquez Regarding Implementation of Class Notice Plan ("Vasquez Decl." or "Vasquez Declaration"), submitted herewith, at ¶ 1.

[6] *Id.* at ¶¶ 11-12.

[7] *Id.* at ¶ 13.

[8] *Id.*

[9] *Id.* at ¶ 14.

[10] *Id.*

[11] *Id.*

1    By April 7, 2017, Gilardi established a case-dedicated notice website where class members could obtain more information about the settlement. Both the direct notice and paid media efforts directed individuals to this website.[12] By May 12, 2017, Gilardi established a different website where schools could upload contact information for potential class members and approve the usage of data collected during the *In Re: Nat'l Collegiate Athletic Ass'n Student-Athlete Concussion Litigation*; NCAA letters sent to member schools directed recipients to this website.[13]

To supplement direct notice, Gilardi implemented a comprehensive Internet notice campaign that provided multiple channels for potential class members to be directed to the case website.[14] The Internet, and more specifically social media, is part of the fabric of sport these days as athletes, schools, and coaches all utilize the various platforms to share and discuss important issues.[15] In fact, data from a student athlete study done by Fieldhouse Media in 2016 showed that 97% of student athletes have a Facebook account and approximately 84% have a twitter account.[16] It is not likely that usage has decreased and if anything has increased; given the nature of the class being made up of current and former student athletes with a preference for consuming online media, Gilardi believes using online advertising to supplement a direct notice program was the most effective approach to implement.[17]

Internet efforts for this case generated over 10 million impressions directed to likely athletes and sports fans, and the impressions generated 56,105 clicks through to the case website.[18] A report

---

[12] *Id.* at ¶ 15. The website is www.grantinaidsettlement.com. *Id.*

[13] *Id.* at ¶ 16. The website is https://kccsecure.com/NAHUpload. *Id.*

[14] *Id.* at ¶ 17.

[15] *Id.* (citing https://www.forbes.com/sites/markjburns/2014/07/25/how-twitter-is-part-of-the-fabric-of-sports-in-2014/#46d4a92c2af4).

[16] *Id.* (citing http://www.fieldhousemedia.net/social-media-use-of-student-athletes-2016-survey-results/).

[17] *Id.*

[18] *Id.* at ¶ 18. Specifically, the Internet portion of the Notice campaign included: (i) sponsored Links (search) advertising through Google AdWords; (ii) text link and banner advertising through Google Display Network; (iii) targeted banner advertising through Collective, a well-known national provider of programmatic banner advertising; (iv) Facebook text link and banner advertising; (v) Twitter Promoted Tweet campaign; and (vi) outreach through Twitter using organic tweets targeted to accounts identified as relevant to the case issue. *Id.* at ¶ 19.

detailing the statistics by media vehicle for the internet portion of the notice campaign is attached as Exhibit 2 to the Vasquez Declaration.[19]

By April 7, 2017, Gilardi placed advertising through Google's search engine platform and display network.[20] The search efforts reached individuals who were searching for the website, while the display network ads reached individuals while on sites related to sports in general. As of September 29, 2017, the search and display efforts have generated 358,549 impressions with 4,784 clicks through to the case website for a click through rate ("CTR") of 1.33%, which in Gilardi's experience is well above average for this type of advertising.

By May 18, 2017, Gilardi worked with its banner advertising vendor Collective to develop the creative banner advertisements and launch the banner campaign.[21] As of September 29, 2017, the campaign had served 8,244,667 impressions with 18,410 clicks through to the case website. To ensure a minimum number of unique individuals was reached, Gilardi frequency-capped impressions to a limit of 3 times per Internet Protocol ("IP") address. Based on the 8,244,667 impressions generated, an estimated 2.7 million unique individuals had the opportunity to see the ads and click to view more information about the settlement.

Gilardi developed banner and text link ads to be targeted toward appropriate pages and individuals on Facebook.[22] More specifically, Gilardi leveraged twitter handles for many of the colleges at issue in the litigation and keywords and interest-targeting related to sports and likely athletes. As of September 29, 2017, the campaign had served 1,469,402 impressions with 5,424 clicks through to the case website.

Gilardi maintains a database of social media accounts and is in possession of a list that would be appropriate for the class members who played the sports at issue in the Settlement.[23] These handles and hashtags were used for the purpose of targeting the promoted tweet campaign impressions to

---

[19] *Id.* at ¶ 18.

[20] *Id.* at ¶ 20. All statements in this paragraph are based on ¶ 20.

[21] *Id.* at ¶ 22. All statements in this paragraph are based on ¶ 22.

[22] *Id.* at ¶ 23. All statements in this paragraph are based on ¶ 23.

[23] *Id.* at ¶ 24. All statements in this paragraph are based on ¶ 24.

individuals likely to be members of the class. As of September 29, 2017, the campaign has served 660,250 impressions with 27,487 clicks through to the case website.

In addition to paid promoted tweets, Gilardi staff issued tweets with a link to the case website from Gilardi's Twitter account periodically throughout the notice period.[24] Tweets included hashtags related to the colleges with potential athlete class members and were disseminated at various times throughout the day. As of September 29, 2017, 300 tweets have been issued from Gilardi. A list of the tweets issued is included in the report attached as Exhibit 2 to the Vasquez Declaration.

Gilardi worked with the parties to create a party-neutral press release with information about the litigation and the proposed settlements.[25] The release issued on April 7, 2017. The full content of the release was posted to 138 websites with a total estimated audience of 80 million. A copy of the Visibility Report from PR Newswire documenting the results of the press release is attached as Exhibit 3 to the Vasquez Declaration.

Gilardi worked with class counsel to develop a call script for the purpose of providing basic information about the settlement to class members.[26] Class members were able to call toll-free and receive information through an automated menu system. To date, Gilardi has logged 1,864 calls.

Gilardi's responsibilities also included processing any requests for exclusion or objections from class members.[27] The deadline for exclusions and objections was September 20, 2017.[28] As of October 3, 2017, Gilardi had not received any requests for exclusion and had received only one objection.[29]

It is Gilardi's opinion that the notice plan, as implemented, comports with the requirements of due process and Fed. R. Civ. P. 23.[30] The notice plan provided for a robust direct notice program,

---

[24] *Id.* at ¶ 25. All statements in this paragraph are based on ¶ 25.
[25] *Id.* at ¶ 26. All statements in this paragraph are based on ¶ 26.
[26] *Id.* at ¶ 27. All statements in this paragraph are based on ¶ 27.
[27] *Id.* at ¶¶ 28-29.
[28] Amended Order at ¶ 23.
[29] Vasquez Decl., at ¶¶ 28-29.
[30] *Id.* at ¶ 30.

supplemented by an array of effective internet advertising efforts.[31] Gilardi believes that notice reached 89% of class members directly and over 90% when the supplemental notice is taken into account.[32]

### E. Plan of distribution.

Within thirty days of the Court's entry of the Preliminary Approval Order, defendants wired 50% of the settlement funds ($104,332.202.50) into an escrow account. Within thirty days of the Court's entry of an order granting final approval of the settlement, defendants will wire or cause to be wired the remaining 50% of the settlement funds into the same account.

The parties submitted a distribution plan,[33] which the Court preliminarily approved.[34] Eligible class members will receive their distribution with no claim form required. For class members who attended schools that provide, have provided, or have indicated by or before June 1, 2017 an intent to start providing any portion of the gap between the GIA allowed prior to August 1, 2015 and full COA to at least one class member at that school, the class member will receive a distribution proportional to the difference between the GIA they received and the full COA for each academic term (the "gap"). In other words, there will be a pro-rata distribution for every dollar in the gap between what each student-athlete received and that student-athlete's specific COA. The gap will be measured net of any offset for nonathletically related aid received by the student-athlete above his or her GIA, but not net of any SAF/SAOF distributions, Pell Grants, or "Exempted Government Grants" identified in NCAA Division I Bylaw 15.2.5.1. When the data is available (and it is for most class members), the gap calculation will be based on each class member's individual records.

If there are sufficient unclaimed funds, they will be distributed proportionally to class members who received funds in the first round. Alternatively, if there are insufficient funds to feasibly redistribute to all class members, then any funds unclaimed by class members would be redistributed within schools in proportionate shares to other locatable class members at the same school, based on

---

[31] *Id.*

[32] *Id.* at ¶ 31.

[33] Second Joint Stipulation Amending Settlement Agreement, Mar. 21, 2017, ECF No. 612-1.

[34] Amended Order, at ¶ 6.

unclaimed monies for each school. If there are insufficient funds to economically redistribute in that manner, any unclaimed amounts will escheat to the state of the relevant class member's most recent known address. In any event, no class member will receive a distribution from the fund for any year that exceeds his or her calculated gap for that year. If the additional distribution from unclaimed funds would cause a class member to receive a distribution in excess of his or her calculated gap for a given year, the excess amount will escheat to the state of the class member's most recent known address.

### III. ARGUMENT

Three steps must be satisfied for final approval of the Settlement Agreement. *First*, the Court must certify the settlement classes. *Second*, the Court must find that the classes received adequate notice under Federal Rule of Civil Procedure 23(c)(2)(B). *Third*, the Court must decide whether the Settlement Agreement is "fair, reasonable, and adequate."[35] These requirements are all met.

**A.    The settlement classes should be certified.**

In the order granting preliminary approval, this Court provisionally certified three settlement classes under Rule 23(b)(3).[36] The same analyses apply here, so the three classes should be certified for settlement purposes under Rule 23(e), for the reasons set forth in plaintiffs' class certification motion[37] and in plaintiffs' motion for preliminary approval of the Settlement Agreement.[38]

**B.    Plaintiffs have complied with Rule 23(c) notice requirements.**

A class action certified under Rule 23(b)(3) must satisfy the Rule 23(c)(2) notice provisions, and upon settlement, the "court must direct notice in a reasonable manner to all class members who

---

[35] *See* Fed. R. Civ. P. 23(e)(2); *Staton v. Boeing Co.*, 327 F.3d 938, 959 (9th Cir. 2003) (discussing Rule 23(e)(2) standard).

[36] Amended Order at ¶ 3.

[37] *See* Consolidated Plaintiffs' Notice of Motion and Motion for Certification Of Damages Classes, dated Feb. 16, 2016 (filed under seal, ECF Nos. 348-49, 352) (and supporting evidence); Consolidated Plaintiffs' Reply Memorandum in Support of Motion for Certification Of Damages Classes (Oct. 7, 2016, ECF No. 509-2).

[38] Notice of Motion and Plaintiffs' Unopposed Motion for Preliminary Approval of Class Action Settlement (Feb. 3, 2017, ECF No. 560).

would be bound by the proposal."[39] Rule 23(c)(2) requires the "best notice that is practicable under the circumstances, including individual notice" of particular information.[40]

This Court approved the proposed class notice and notice program.[41] As described in Section II(D), above, the notice administrator appointed by the Court (Gilardi) implemented that program. Over **ninety percent** of the class members received notice,[42] which far exceeds the constitutional requirement for notice. The notice itself informed class members of the nature of the action, the terms of the proposed settlements, the effect of the action and the release of claims, as well as class members' right to exclude themselves from the action and their right to object to the proposed settlements. This notice complies with all of the requirements of Rule 23.

### C.     The Settlement Agreement is fair, adequate and reasonable.

The "decision to approve or reject a settlement is committed to the sound discretion of the trial judge," who "is exposed to the litigants and their strategies, positions, and proof."[43] But the "court's intrusion upon what is otherwise a private consensual agreement negotiated between the parties to a lawsuit must be limited to the extent necessary to reach a reasoned judgment that the agreement is not the product of fraud or overreaching by, or collusion between, the negotiating parties, and that the settlement, taken as a whole, is fair, reasonable, and adequate to all concerned."[44]

In the Ninth Circuit, "voluntary conciliation and settlement are the preferred means of dispute resolution," which is "especially true in complex class action litigation."[45] There "is an overriding public interest in settling and quieting litigation," which is "particularly true in class action suits."[46] A "presumption in favor of voluntary settlement agreements" exists, and "this presumption is

---

[39] Fed. R. Civ. P. 23(e)(l).

[40] Fed. R. Civ. P. 23(c)(2)(B) (enumerating notice requirements for classes certified under Rule 23(b)(3)).

[41] Amended Order at ¶ 4.

[42] Vasquez Decl., ¶ 31.

[43] *Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1026 (9th Cir. 1998).

[44] *Rodriguez v. West Pub. Co.*, 563 F.3d 948, 965 (9th Cir. 2009) (citation and internal quotation marks omitted).

[45] *In re Syncor ERISA Litig.*, 516 F.3d 1095, 1101 (9th Cir. 2008) (internal quotation marks and citation omitted).

[46] *Van Bronkhorst v. Safeco Corp.*, 529 F.2d 943, 950 (9th Cir. 1976).

especially strong in class actions and other complex cases . . . because they promote the amicable resolution of disputes and lighten the increasing load of litigation faced by the federal courts."[47]

In determining whether a settlement agreement is fair, adequate, and reasonable, the Court must weigh some or all of the following factors: (1) the strength of the plaintiffs' case; (2) the risk, expense, complexity, and likely duration of further litigation; (3) the risk of maintaining class action status throughout the trial; (4) the amount offered in settlement; (5) the extent of discovery completed and the stage of the proceedings; (6) the experience and views of counsel; (7) the presence of a governmental participant; and (8) the reaction of class members to the proposed settlement.[48] All of these factors support approval of the Settlement Agreement.

### 1. The strength of plaintiffs' case supports final approval.

In assessing the strength of plaintiffs' case, the Court should not reach "any ultimate conclusions regarding the contested issues of fact and law that underlie the merits of this litigation."[49] Instead, the Court is to "evaluate objectively the strengths and weaknesses inherent in the litigation and the impact of those considerations on the parties' decisions to reach these agreements."[50] The Court's assessment of the likelihood of success is "nothing more than 'an amalgam of delicate balancing, gross approximations and rough justice.'"[51] Plaintiffs believe the classes' claims are meritorious claims but realize there are risks generally in litigation and specifically with respect to the Ninth Circuit's ruling in *O'Bannon v. Nat'l Collegiate Athletic Ass'n*,[52] which defendants vigorously advocate could present some limitation to the case. This factor supports final approval.

---

[47] *Sullivan v. DB Invs., Inc.,* 667 F.3d 273, 311 (3d Cir. 2011) (internal citation and quotation marks omitted; ellipsis in original).

[48] *In re Bluetooth Headset Prods. Liab. Litig.*, 654 F.3d 935, 946 (9th Cir. 2011).

[49] *Officers for Justice v. Civil Serv. Comm'n*, 688 F.2d 615 at 625 (9th Cir. 1982).

[50] *In re Washington Pub. Power Supply Sys. Sec. Litig.*, 720 F. Supp. 1379, 1388 (D. Ariz. 1989).

[51] *Officers for Justice*, 688 F.2d at 625 (internal citations omitted).

[52] 802 F.3d 1049 (9th Cir. 2015).

### 2. The risk, expense, complexity, and duration of further litigation supports final approval.

"'An antitrust class action is arguably the most complex action to prosecute. . . . The legal and factual issues involved are always numerous and uncertain in outcome.'"[53] The classes are not certified (other than provisionally for settlement purposes only), and significant obstacles to victory remain on the merits even if the classes were certified. The Settlement Agreement brings significant relief to the classes despite this ongoing risk. This factor also supports final approval of the Settlement Agreement.

### 3. The risk of maintaining class action status through trial.

The second factor, the risk of maintaining class action status through trial, also supports final approval of the settlements here. Defendants vigorously opposed plaintiffs' motion for certification of damages classes.[54] If the Settlement Agreement were not approved, plaintiffs would need to renew their motion for class certification of the damages classes. If the motion were denied, the putative class members would recover nothing. Once again, this factor supports final approval of the Settlement Agreement.

### 4. The amount offered in settlement supports final approval.

"[T]he very essence of a settlement is compromise, a yielding of absolutes and an abandoning of highest hopes."[55] Nonetheless, guided by Dr. Rascher's damages probit regression model, class counsel negotiated a settlement of $208,664,445. The probit model predicted which schools would have adopted full cost of attendance in 2009-2010 had the NCAA's rules prohibiting such payments not been adopted, and damages were estimated therefrom.[56] For eligible class members attending schools that the probit model predicted would have paid COA, estimated damages are approximately

---

[53] *In re Linerboard Antitrust Litig.*, MDL No. 1261, 2004 U.S. Dist. LEXIS 10532, at *34 (E.D. Pa. June 2, 2004) (internal quotation marks and citations omitted).

[54] *See* Defendants' Memorandum of Points and Authorities in Opposition to Consolidated Plaintiffs' Motion for Certification of Damages Classes, dated Aug. 26, 2016 (filed under seal) (and supporting papers).

[55] *Linney v. Cellular Alaska P'ship*, 151 F.3d 1234, 1242 (9th Cir. 1998) (internal quotation marks omitted).

[56] *See* Expert Declaration of Daniel A. Rascher in Support of Motion for Preliminary Approval of Damages Classes, Feb. 3, 2017, ECF No. 560-4

$210 million to $220 million.[57] Since the settlement was reached, many additional schools are now paying or have stated an intent to pay COA. Class members from these additional COA-paying schools will also receive payment from the settlement fund.[58] The average recovery for class members who played a sport for four years and are entitled to an award is approximately $6,000 (net of requseted fees and expenses). This factor strongly weighs in favor of granting final approval.

### 5. The extent of discovery completed and stage of proceedings supports final approval.

The extent of the discovery conducted and the stage of the litigation are both indicators of counsel's familiarity with the case and of their having sufficient information to make an informed decision.[59] "A settlement following sufficient discovery and genuine arms-length negotiation is presumed fair."[60] The parties here conducted extensive discovery, thoroughly testing the claims and defenses available in this case. As explained in plaintiffs' motion for attorneys' fees, expenses, and incentive awards,[61] plaintiffs for three years responded to defendants' interrogatories and requests for production of documents, by working with plaintiffs to acquire information requested by defendants and by drafting the discovery responses. Discovery responses included, for example, a 45-page set of

---

[57] *Id.*

[58] The number of class members eligible to receive payment has grown significantly since the settlement was reached. The settlement agreement benefitted class members by including a clause allowing for even more class members to become eligible to receive settlement payments after the parties reached an agreement in principle in December 2016 and executed their settlement agreement on February 3, 2017, if their school adopted or stated an intent to adopt COA any time up to June 1, 2017. *See* ECF No. 560-1 at Exhibit A to the Settlement Agreement, para. B.2. As Dr. Rascher opined at class certification, the market was still unwinding from the longstanding GIA cap and had yet to reach "equilibrium." After the parties reached settlement, dozens of schools adopted or declared their intent to adopt COA. So, many more student-athlete class members have become eligible to get paid from the settlement fund after the parties agreed to settlement and the Court granted preliminary approval. Counting all of the many additional class members who will now receive payment, the settlement fund now represents approximately 66% of total single damages—a tremendous result in comparison to most large antitrust settlements.

[59] *See, e.g.*, *In re Mego Fin. Corp. Sec. Litig.*, 213 F.3d 454, 459 (9th Cir. 2000).

[60] *See Knight v. Red Door Salons, Inc.*, No. 08-01520, 2009 U.S. Dist. LEXIS 11149, at *10 (N.D. Cal. Feb. 2, 2009).

[61] *See* Notice of Motion and Motion for Attorneys' Fees, Expenses, and Service Awards, Sept. 6, 2017, ECF No. 688, at 4-6.

responses to defendants' contention interrogatories directed at critical issues in the case (e.g., less restrictive alternatives).[62]

Plaintiffs' counsel have also propounded extensive document requests on defendants and third parties. These requests yielded significant document productions of more than 550,000 documents and more than 2.8 *million* pages of documents.[63] And plaintiffs received productions from various NCAA member institutions throughout the litigation.[64] Reviewing these massive document productions was a major effort; lead counsel coordinated a complex and thorough review process with eleven attorneys, spanning two-and-a-half years and amounting to about 5,000 attorney hours.[65] And plaintiffs issued subpoenas to 337 NCAA member institutions in order to obtain critical NCAA member scholarship data. This effort cannot be understated, given the importance of detailed school and player-specific data required for plaintiffs' econometric damages model.[66] And plaintiffs took more than 50 depositions, including numerous high-profile figures in the world of college sports.[67]

The extent of discovery strongly favors final approval of the Settlement Agreement.

### 6. The experience and views of class counsel support approval.

"The recommendations of plaintiffs' counsel should be given a presumption of reasonableness."[68] Here, plaintiffs' counsel—antitrust lawyers with many years of experience—support the settlement. This factor again weighs in support of final approval.

---

[62] *Id*. at 4.
[63] *Id*.
[64] *Id*.
[65] *Id*.
[66] *Id*.
[67] *Id*. at 5. The deponents included but were not limited to Mark Emmert (President of the NCAA); Mary Willingham (the whistleblower who helped reveal an academic fraud scandal at the University of North Carolina at Chapel Hill); Mike Slive (former Commissioner of the Southeastern Conference); John Swofford (Atlantic Coast Conference Commissioner); Michael Aresco (American Athletic Conference Commissioner); Harvey Perlman (former Chancellor of the University of Nebraska); Jim Delany (Big Ten Conference Commissioner); Karl Benson (Sun Belt Conference Commissioner); and Larry Scott (Pac-12 Conference Commissioner). *Id*.

[68] *See In re Omnivision Techs., Inc.*, 559 F. Supp. 2d 1036, 1043 (N.D. Cal. 2007) (citation and internal quotation marks omitted).

**7.     The non-presence of a government participant supports final approval.**

"No governmental entity participated in this matter; this factor, therefore, is irrelevant to the Court's analysis."[69]

**8.     The reaction of the classes supports final approval.**

Plaintiffs have received only one objection, which focuses on the requested attorneys' fees. Plaintiffs believe that the objection is unfounded and will address it in the memorandum they will file with the Court on November 3, 2017, under the Amended Order. In addition, **not a single class member** has opted out of the case.[70]

## IV.     THE PROPOSED PLAN OF ALLOCATION IS FAIR

Approval of a plan to allocate settlement funds to class members is governed by the same standard that applies to approval of settlement terms—the distribution plan must be "fair, reasonable and adequate."[71] A plan of allocation that reimburses class members based on the type and extent of their injuries is generally reasonable.[72] Pro-rata distribution plans (similar to what is proposed here) have been approved in many antitrust cases in this district.[73]

## V.     CONCLUSION

Based on the foregoing and on plaintiffs' forthcoming November 3 response to the sole objection filed in this matter, plaintiffs respectfully request that this Court certify the settlement classes and give final approval to the Settlement Agreement.

---

[69] *Zepeda v. PayPal, Inc.*, No. C 10-2500, 2017 U.S. Dist. LEXIS 43672, at *48 (N.D. Cal. Mar. 24, 2017). *Accord*, *Sciortino v. PepsiCo, Inc.*, No. 14-cv-00478, 2016 U.S. Dist. LEXIS 83937, at *20 (N.D. Cal. June 28, 2016) ("Because there is no government participant in this case, this factor is inapplicable.").

[70] Vasquez Decl., ¶ 28.

[71] *In re Cathode Ray Tube (CRT) Antitrust Litig.*, No. 3:07-cv-5944, 2016 U.S. Dist. LEXIS 24951, at *216 (N.D. Cal. Jan. 28, 2016); *In re Omnivision Tech.*, 559 F. Supp. 2d at 1045 (N.D. Cal. 2008).

[72] *Cathode Ray*, 2016 U.S. Dist. LEXIS, at *229 (citing *In re Citric Acid Antitrust Litig.*, 145 F. Supp. 2d 1152, 1154 (N.D. Cal. 2001)).

[73] *Id.* ("Indeed, in this District, a 'pro-rata [plan] for allocation has been used in many antitrust cases.'") (quoting *In re TFT-LCD (Flat Panel) Antitrust Litig.*, No. 07-md-1827, 2011 U.S. Dist. LEXIS 154288, at *9 (N.D. Cal. Dec. 27, 2011).

| | | |
|---|---|---|
| 1 | DATED:  October 4, 2017 | HAGENS BERMAN SOBOL SHAPIRO LLP |
| 2 | | By    */s/ Steve W. Berman* |
| | | Steve W. Berman |
| 3 | | Steven W. Berman (*Pro Hac Vice*) |
| | | Craig R. Spiegel (122000) |
| 4 | | Ashley A. Bede (*Pro Hac Vice*) |
| | | 1918 Eighth Avenue, Suite 3300 |
| 5 | | Seattle, WA 98101 |
| | | Telephone: (206) 623-7292 |
| 6 | | Facsimile: (206) 623-0594 |
| | | steve@hbsslaw.com |
| 7 | | craigs@hbsslaw.com |
| | | ashleyb@hbsslaw.com |

Jeff D. Friedman (173886)
HAGENS BERMAN SOBOL SHAPIRO LLP
715 Hearst Avenue, Suite 202
Berkeley, CA 94710
Telephone: (510) 725-3000
Facsimile:  (510) 725-3001
jefff@hbsslaw.com

PEARSON, SIMON & WARSHAW, LLP

By    */s/ Bruce L. Simon*
Bruce L. Simon
Bruce L. Simon (96241)
Benjamin E. Shiftan (265767)
44 Montgomery Street, Suite 2450
San Francisco, CA 94104
Telephone: (415) 433-9000
Facsimile: (415) 433-9008
bsimon@pswlaw.com
bshiftan@pswlaw.com

*Plaintiffs' Class Counsel*

Elizabeth C. Pritzker (146267)
Jonathan K. Levine (220289)
Shiho Yamamoto (264741)
Anne C. Maness (303438)
PRITZKER LEVINE LLP
180 Grand Avenue, Suite 1390
Oakland, CA 94612
Telephone: (415) 692-0770
Facsimile: (415) 366-6110
ecp@pritzkerlevine.com
jkl@pritzkerlevine.com
sy@pritzkerlevine.com
acm@pritzkerlevine.com

*Additional Class Counsel*