UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

OAKLAND DIVISION

| | |
|---|---|
| IN RE: NATIONAL COLLEGIATE ATHLETIC ASSOCIATION ATHLETIC GRANT-IN-AID CAP ANTITRUST LITIGATION<br><br>This Document Relates to:<br><br>ALL ACTIONS EXCEPT<br><br>*Jenkins v. Nat'l Collegiate Athletic Ass'n*<br>Case No. 4:14-cv-02758-CW | No. 4:14-md-2541-CW<br><br>ORDER GRANTING PLAINTIFFS' AND CLASS COUNSEL'S MOTION FOR ATTORNEYS' FEES, EXPENSES AND SERVICE AWARDS<br><br>DATE: November 17, 2017<br>TIME: 9:00 a.m.<br>DEPT: Courtroom 2, 4th Floor<br>JUDGE: Hon. Claudia Wilken<br><br>COMPLAINT FILED: March 5, 2014 |

# I. BACKGROUND

Plaintiffs seek final approval of a settlement that provides for payment of approximately 50% of the classes' single damages claims after fees and expenses are deducted. The settlement agreement is the result of extensive litigation and arm's-length negotiations between the parties. Defendants agree to pay $208,664,445.00, which (after deduction of fees and expenses) will be disbursed to student-athletes who attended Division I schools that plaintiffs' evidence shows would have awarded the full cost of attendance at those schools ("COA"), but for the NCAA bylaw in effect until January 1, 2015, that capped the maximum grant-in-aid ("GIA") at less than COA. The average recovery for a class member who played his or her sport for four years would be approximately $6,000.[1] After final approval of the proposed settlement, each impacted class member with calculated damages will be mailed a check, with no claim form required and no right of any reversion of funds to defendants.

Plaintiffs' counsel, who have litigated numerous antitrust and other matters against the NCAA over the years, believe this is an exceptional result for the proposed class. As this Court knows, antitrust matters against the NCAA involve unique arguments and have had narrow historical success. And the NCAA has been willing to devote significant resources to vigorously defending them, including on appeal. Thus, not only is the monetary size of the settlement a major benefit to the class, the likelihood of near-term payout is also significant.

Finally, the settlement does not release or bar in any way the class claims for prospective injunctive relief from going forward—and plaintiffs will continue to vigorously pursue them.

Plaintiffs and Class Counsel request: (1) an award of attorneys' fees in the amount of $41,732,889, which is exactly 20% of the $208,664,445 million settlement fund; (2) reimbursement of $3,184,274.38 in expenses and costs plaintiffs' counsel have advanced to date on behalf of the class; and (3) service awards of $20,000 each for the four class representatives.

---

[1] Since the settlement was reached, many additional schools began paying or stated an intent to pay COA. Eligible class members from these additional COA-paying schools will also receive payment from the settlement fund. As such, the number of class members eligible to receive payment has grown significantly since the settlement was reached.

**A. The requested fee of twenty percent of the settlement is fair and reasonable (and even below market) under the percentage-of-the-recovery method.**

In the Ninth Circuit, the district court has discretion in a common fund case to choose either the "percentage-of-the-fund" or the "lodestar" method in calculating fees. *In re Online DVD-Rental Antitrust Litig.*, 779 F.3d 934, 949 (9th Cir. 2015). Regardless of what method is chosen as the primary method to calculate attorneys' fees, the Ninth Circuit encourages district courts to conduct "a cross-check using the other method." *Id.* Plaintiffs' counsel request in the amount of $41,732,889, which is 20% of the $208,664,445 million settlement fund. Applying a lodestar cross-check, this would be a 3.66 multiplier from plaintiffs' counsel's lodestar of $11,398,158.30. The Court finds these fees to be fair and reasonable under either method.

When considering a request for attorneys' fees under the percentage-of-recovery method, the Ninth Circuit has "established a 25 percent 'benchmark' in percentage-of-the-fund cases that can be 'adjusted upward or downward to account for any unusual circumstances involved in [the] case.'"[2] The Ninth Circuit has instructed that although the benchmark of 25 percent "is not per se valid, it is a helpful 'starting point.'"[3] Courts consider the following factors to determine whether to apply either an upward or downward adjustment from that benchmark: (1) the results obtained by counsel; (2) the risks and complexity of issues in the case; (3) whether the attorneys' fees were entirely contingent upon success and whether counsel risked time and effort and advanced costs with no guarantee of compensation; (4) whether awards in similar cases justify the requested fee; and (5) whether the class was notified of the requested fees and had an opportunity to inform the Court of any concerns they have with the request.[4] Each of these factors supports the request for fees of 20 percent.

---

[2] *Fischel v. Equitable Life Assur. Soc'y of the United States*, 307 F.3d 997, 1006 (9th Cir. 2002) (citation omitted). *See also In re Bluetooth Headset Prods. Liab. Litig.*, 654 F.3d 935, 942 (9th Cir. 2011) ("we have allowed courts to award attorneys a percentage of the common fund in lieu of the often more time-consuming task of calculating the lodestar").

[3] *In re Online DVD-Rental Antitrust Litig.*, 779 F.3d 934, 955 (9th Cir. 2015) (citation omitted).

[4] *See, e.g.*, *Keller*, 2015 U.S. Dist. LEXIS 114387, at *12-13.

### 1. The 25% benchmark award is presumptively reasonable, reflecting a market based fee.

Plaintiffs' counsel seek fees that are $10.4 million under the 25% benchmark. "While the benchmark is not per se valid," the Ninth Circuit has recognized that requesting "the 25% benchmark award only" shows the reasonableness of a fee request.[5] As a court in this District recognized, "in most common fund cases, the award exceeds the [25%] benchmark."[6] And this Court has referred to the "the many cases in this circuit that have granted fee awards of 30% or more."[7]

Empirical evidence supports the 20% fee request. A study of attorneys' fees, known as the EMG Study,[8] looked at awards in 458 class actions between 2009 and 2013, finding that 21% was the midpoint for fees where the recovery exceeded $100 million. The largest recoveries, over $100 million, had mean and median fee percentages ranging from 16.6% to 25.5%, depending on the year.[9] Twenty-one percent is the mid-point of that range and below the average award of 22.3% for the highest recoveries (above $67.5 million).[10] The report finds that "[o]n average, fees were 27% of gross recovery during the 2009-2013 period, which is higher than the average fee percentage of 23% that we reported in our analyses of the 1993-2008 period."[11] And of the 53 settlements in this District, the mean and median awards were 26% and 25%, respectively, matching the mean and median percentages found more broadly in the 144 settlements surveyed in the Ninth Circuit.[12] Further, of

---

[5] *In re Online DVD-Rental Antitrust Litig.*, 779 F.3d at 955. *See also Keller v. NCAA*, 2015 U.S. Dist. LEXIS 166546, at *28-29 (N.D. Cal. Dec. 10, 2015) ("A fee award of 30 percent is within the usual range of fee awards that Ninth Circuit courts award in common fund cases.") (citations and internal quotation marks omitted).

[6] *De Mira v. Heartland Empl. Serv.*, 2014 U.S. Dist. LEXIS 33685, at *2 (N.D. Cal. Mar. 13, 2014) (quoting *In re Omnivision Techs.*, 559 F. Supp. 2d 1036, 1047 (N.D. Cal. 2008)).

[7] *Vedachalam v. Tata Consultancy Servs., Ltd.*, 2013 U.S. Dist. LEXIS 100796, at *4 (N.D. Cal. July 18, 2013) (awarding 30% fee). This Court cited *In re Heritage Bond Litig.*, 2005 U.S. Dist. LEXIS 13555, at *18 n.12 (C.D. Cal. June 10, 2005), in which the court noted that more than 200 federal cases awarded fees higher than 30% as of 2005.

[8] Berman Decl., Ex. C (Eisenberg, Miller & Germano, *Attorneys' Fees in Class Actions: 2009-2013*) ("EMG Study") at 8.

[9] *Id.*

[10] *Id.* at 9.

[11] *Id.* at 8.

[12] *Id.* at 11, 12.

the 19 antitrust settlements between 2009 and 2013, with a mean recovery of $501.09 million and a median recovery of $37.3 million, the mean and median fee percentages were 27% and 30%.

### 2. All relevant circumstances confirm a 20% fee award is reasonable.

#### a. A 20% fee is justified by the exceptional results achieved.

"The most important factor is the results achieved for the class." [13] Here, the results are exceptional because counsels' efforts created a $208,664,445 fund for the class (nearly 100% single damages at time of settlement and 66% of single damages currently). Far lesser results (with 20% recovery of damages or less) have justified upward departures from the 25% benchmark.[14] The results achieved are even more substantial when considering the actual recovery amounts. The average recovery for a class member who was eligible to receive payment for four years is approximately $6,000, after accounting for the fees and expenses class counsel requests. Importantly, class counsel also negotiated an allocation and payment method whereby, at the time of disbursement, each non-opt-out class member who is entitled to payment will receive payment directly in the mail, without needing to make any showing or do anything further. Plaintiffs' counsel achieved these exceptional raw-dollar, percentage, and per capita results despite facing off against some of the best, and most well-resourced, defense lawyers in the country.[15]

---

[13] *In re Cathode Ray Tube (CRT) Antitrust Litig.*, 2016 U.S. Dist. LEXIS 102408, at *63 (N.D. Cal. Aug. 3, 2016).

[14] *See, e.g.*, *id.* at *65 (holding that 20% antitrust recovery in a megafund case warranted "a modest increase over the Ninth Circuit benchmark"); *In re Omnivision Techs.*, 559 F. Supp. 2d at 1046 ("a total award of approximately 9% of the possible damages . . . weighs in favor of granting the requested 28% fee"). In *In re Heritage Bond Litig.*, 2005 U.S. Dist. LEXIS 13627, at *28-29 (C.D. Cal. June 10, 2005), the court cited numerous examples, stating that the "the Settlement Fund, as a percentage of recovery, is greater than recoveries obtained in other cases where courts have awarded attorneys' fees of one-third of a common fund. *See, e.g.*, *Medical X-Ray*, 1998 U.S. Dist. LEXIS 14888, 1998 WL 661515, at *7-8 (court increased 25% benchmark to 33.3% where counsel recovered 17% of damages); *Crazy Eddie*, 824 F. Supp. at 326 (court increased 25% benchmark to 33.8% where counsel recovered 10% of damages); *In re General Instr. Sec. Litig.*, 209 F. Supp. 2d 423, 431, 434 (E.D. Pa. 2001) (one-third fee awarded from $48 million settlement fund that was 11% of the plaintiffs' estimated damages); *In re Corel Corp., Inc. Sec. Litig.*, 293 F. Supp. 2d 484, 489-90, 498 (E.D. Pa. 2003) (one-third fee awarded from settlement fund that comprised about 15% of damages); *Cullen*, 197 F.R.D. at 148 (one-third awarded in fees from settlement of class consisting of defrauded vocational students that was 17% of the tuition the class members paid)."

[15] *See De Mira*, 2014 U.S. Dist. LEXIS 33685, at *5-6 (justifying 28% fee award in part because "Defendant was represented by an experienced and well-resourced defense firm. Had Class Counsel failed to vigorously prosecute this case, it is unlikely that this settlement could have been achieved").

### b. A 20% fee is justified by the significant risk borne by plaintiffs' counsel and the complexity of issues in this case.

Plaintiffs' counsel faced real risks in pursuing this case, not the least of which was being initially dismissed on the pleadings as a matter of law based on *O'Bannon*. "The risk that further litigation might result in [p]laintiffs not recovering at all, particularly a case involving complicated legal issues, is a significant factor in the award of fees."[16] And although numerous antitrust cases have been brought over the years against the NCAA, seldom if ever has there been a significant monetary award. An "antitrust class action is arguably the most complex action to prosecute. The legal and factual issues involved are always numerous and uncertain in outcome."[17] And it bears noting that the EMG Study looked at average fee awards based on risk, according to the type of litigation. The average fee award for ***low-medium risk*** antitrust cases between 2009 and 2013 was ***24.91%***. This data looking at the risk dimension in antitrust cases reinforces the reasonableness of counsel's 20% fee request.

Just one example of unique complexity in this case was the challenge in obtaining, digesting, and utilizing the data necessary to model impact and damages in this case. Plaintiffs needed to obtain tens of thousands of records from hundreds of different schools. Each school maintained its own data and frequently had different systems and formats for data. Plaintiffs' counsel not only had to identify and get the right data but also had to work with their experts to understand (for their model and class certification arguments) the various financial aid packages and sources of grants.

Along with the data endeavor, counsel had to analyze and understand eligibility rules and definitions, and apply all of this in the context of an NCAA manual the size of a telephone book. These were all very specific factors unique to college athletics that were necessary to develop a reliable working model to both identify class members and calculate damages, as well as present compelling certification arguments.

---

[16] *In re Omnivision Techs.*, 559 F. Supp. 2d at 1046-47; *accord In re Pac. Enters. Sec. Litig.*, 47 F.3d 373, 379 (9th Cir. 1995) (holding fees justified "because of the complexity of the issues and the risks").

[17] *In re Optical Disk Drive Prods. Antitrust Litig.*, 2016 U.S. Dist. LEXIS 175515, at *45 (N.D. Cal. Dec. 19, 2016) (internal citation, quotation marks, and ellipses omitted).

### c. A 20% fee is justified by the contingent nature of the representation and the efforts and costs expended by plaintiffs' counsel.

The 20% fee request is also reasonable in light of the contingent nature of class counsel's representation; they would only get paid if the classes recovered and only out of the class recovery at that. "Courts have long recognized that the public interest is served by rewarding attorneys who assume representation on a contingent basis with an *enhanced fee* to compensate them for the risk that they might be paid nothing at all for their work."[18] "This mirrors the established practice in the private legal market of rewarding attorneys for taking the risk of nonpayment by paying them *a premium* over their normal hourly rates for winning contingency cases."[19] And "[c]ontingent fees that may *far exceed* the market value of the services if rendered on a non-contingent basis are accepted in the legal profession as a legitimate way of assuring competent representation for plaintiffs who could not afford to pay on an hourly basis regardless whether they win or lose."[20]

In short, contingent fees are good for clients and the public alike. In exchange for increased predictability, decreased bean counting, and unlimited protection against downside risks—including the risk of a zero dollar recovery—a client agrees to pay its attorneys an enhanced fee if and only if the client recovers. And because contingent fees are almost always determined as a percentage of the client's recovery, such fees are necessarily aligned with and proportional to the results achieved for that client—in short, the client only pays for what it gets.[21] Lest contingent fees disappear altogether, the law must recognize both sides of the bargain—namely, a significant upside fee for successful contingent representations. If it instead becomes that lawyers must not only bear all of the downside risk but must also do so only for the prospect of being paid what they would have been paid by the hour, the law will discourage sophisticated counsel from pursuing risky representations on behalf of

---

[18] *Ching v. Siemens Indus.*, 2014 U.S. Dist. LEXIS 89002, at *25 (N.D. Cal. June 27, 2014) (emphasis added).

[19] *Vizcaino II*, 290 F.3d at 1051 (emphasis added).

[20] *In re Washington Pub. Power Supply Sys. Sec. Litig.*, 19 F.3d 1291, 1299 (9th Cir. 1994) (emphasis added).

[21] *See* John C. Coffee, Jr., *The Regulation of Entrepreneurial Litigation: Balancing Fairness and Efficiency in the Large Class Action*, 54 U. Chi. L. Rev. 877, 887 (1987) ("[E]ven uninformed clients can align their attorney's interests with their own by compensating them through a percentage-of-recovery fee formula.").

non-wealthy clients.[22]

Here, counsel for the classes have spent more than three years investigating and litigating this case, without receiving any compensation to do so. Such burdens are significant, even for law firms of the stature of plaintiffs' counsel. For instance, the fact that no money was coming in did not relieve class counsel from having to pay the salaries of the associates and staff working on this case, or from having to cover non-reimbursable overhead expenses like rent. Class counsel floated these expenses while assuming the risk that there might never be ***any*** repayment.[23] They also advanced over $3,184,274.38 in expenses, interest-free, prosecuting this action, including all expert fees and expenses, which are a substantial but necessary burden in any antitrust action. "This substantial outlay, when there is a risk that none of it will be recovered, further supports the award of the requested fees."[24] So a 20% award would reasonably compensate plaintiffs' counsel for carrying the financial burdens of this risky case.[25]

### d. A 20% fee accords with fee awards in analogous cases.

An award of 20% of the common fund is consistent with, and within the range of, fee awards out of common funds of comparable size—which is not surprising since the benchmark is 25%. Of course, because "the percentage may be adjusted to account for any unusual circumstances,"[26] it is possible to cite many examples of percentage-of-the-fund awards falling on either side of that benchmark. But "[p]ercentage awards of between 20% and 30% are common"[27] and "in most common

---

[22] *See Vizcaino II*, 290 F.3d at 1051 ("In common fund cases, 'attorneys whose compensation depends on their winning the case must make up in compensation in the cases they win for the lack of compensation in the cases they lose.'" (citation omitted)).

[23] *See Torrisi v. Tucson Elec. Power Co.*, 8 F.3d 1370, 1376-77 (9th Cir. 1993) ("Class counsel, however, have the case on a contingency. Moreover, it is a double contingency; first, they must prevail on the class claims, and then they must find some way to collect what they win.").

[24] *In re Omnivision Techs.*, 559 F. Supp. 2d at 1047.

[25] *See Torrisi*, 8 F.3d at 1377 ("The 25% contingent fee rewarded class counsel not only for the hours they had in the case to the date of the settlement, but for carrying the financial burden of the case, effectively prosecuting it and, by reason of their expert handling of the case, achieving a just settlement for the class.").

[26] *Williams v. MGM-Pathe Commc'ns Co.*, 129 F.3d 1026, 1027 (9th Cir. 1997).

[27] *De Mira*, 2014 U.S. Dist. LEXIS 33685, at *3.

fund cases, the award exceeds th[e] benchmark."[28]

In fact, of the three common funds of nearly equivalent size cited by the Ninth Circuit in *Vizcaino II*,[29] **all three cases awarded fees at or above the 25 percent benchmark**, and ***two of the three awards*** resulted in multipliers exceeding the 3.66 multiplier requested here:

| Case | Fund | Fee (%) | Fee ($) | Multiplier |
|---|---|---|---|---|
| *In re Rite Aid Corp. Secs. Litig.*, 146 F. Supp. 2d 706 (E.D. Pa. 2001) | $193M | 25.0% | $48M | 4.5-8.5 |
| *In re Lease Oil Antitrust Litig.*, 186 F.R.D. 403 (S.D. Tex. 1999) | $190M | 25.0% | $47M | 1.4 |
| *In re Merry-Go-Round Enters.*, 244 B.R. 327 (Bankr. D. Md. 2000) | $185M | 40.0% | $71M | 19.6 |

Indeed, "federal district courts across the country have, in the class action settlement context, routinely awarded class counsel fees in excess of the 25% 'benchmark,' even in so-called 'mega-fund' cases."[30]

While *Vizcaino II* alone demonstrates that both the requested fee and resultant multiplier is

---

[28] *Id.* at *2 (alteration in original) (citation and internal quotation marks omitted).

[29] 290 F.3d at 1052 (upholding 28% fee on $97 million settlement fund).

[30] *Allapattah Servs. v. Exxon Corp.*, 454 F. Supp. 2d 1185, 1210 (S.D. Fla. 2006) (31.33% fee on $1.075 billion settlement fund); *accord In re Urethane Antitrust Litig.*, 2016 U.S. Dist. LEXIS 99839, at *82 (D. Kan. July 29, 2016) (awarding 33.33% fee on $835 million settlement, noting that "Counsel's expert has identified 34 megafund cases with settlements of at least $100 million in which the court awarded fees of 30 percent or higher"). *See also, e.g.*, *In re Optical Disk Drive Prods. Antitrust Litig.*, 2016 U.S. Dist. LEXIS 175515, at *6 (awarding 25% fee on $124.5 million settlement fund); *In re Cathode Ray Tube (CRT) Antitrust Litig.*, 2016 U.S. Dist. LEXIS 102408, at *55-56 (27.5% fee on $576.75 million settlement fund); *In re Polyurethane Foam Antitrust Litig.*, 2015 U.S. Dist. LEXIS 23482 (N.D. Ohio Feb. 26, 2015) (awarding 30% fee on $147.8 million settlement fund); *In re Neurontin Mktg. & Sales Practices Litig.*, 58 F. Supp. 3d 167, 170 (D. Mass. 2014) (28% fee on $325 million settlement fund); *In re TFT-LCD (Flat Panel) Antitrust Litig.*, 2013 U.S. Dist. LEXIS 49885, at *72 (N.D. Cal. Apr. 1, 2013) (28.6% fee on $571 million settlement fund); *In re Checking Account Overdraft Litig.*, 830 F. Supp. 2d 1330, 1366 (S.D. Fla. 2011) (33.3% fee on $510 million settlement fund); *In re Comverse Tech., Inc.*, 2010 U.S. Dist. LEXIS 63342 (E.D.N.Y. June 23, 2010) (25% fee on $225 million settlement fund); *In re Rite Aid Corp. Secs. Litig.*, 362 F. Supp. 2d 587, 589 (E.D. Pa. 2005) (25% fee on $126 million settlement fund, resulting in multiplier of 6.96); *In re Linerboard Antitrust Litig.*, 2004 U.S. Dist. LEXIS 10532 (E.D. Pa. June 2, 2004) (30% fee on $202.5 million settlement fund); *In re Buspirone Antitrust Litig.*, 2003 U.S. Dist. LEXIS 26538 (S.D.N.Y. Apr. 11, 2003) (33.3% fee of a $220 million dollar fund); *In re Vitamins Antitrust Litig.*, 2001 U.S. Dist. LEXIS 25067 (D.D.C. July 13, 2001) (34.6% fee on $365 million settlement fund); *In re Ikon Office Sols.*, 194 F.R.D. 166, 170 (E.D. Pa. 2000) (30% fee on $111 million settlement fund); *In re Brand Name Prescription Drugs Antitrust Litig.*, 2000 U.S. Dist. LEXIS 1734 (N.D. Ill. Feb. 9, 2000) (25% fee on $696 million settlement fund); *In re Sumitomo Copper Litig.*, 74 F. Supp. 2d 393, 395 (S.D.N.Y. 1999) (27.5% fee on $116 million settlement fund).

well within the reasonable range, additional market information further shows that a 20% award is reasonable and within the range of fee awards from analogous cases. As discussed above, the EMG Study reports that the highest decile of recoveries in the study, above $67.5 million, averaged a 22.3% fee award.[31] The largest recoveries in the study, above $100 million, had mean and median fee percentages that ranged from 16.6% to 25.5%, depending on the year.[32] Across all settlements in the study, "[o]n average, fees were 27% of gross recovery during the 2009-2013 period, which is higher than the average fee percentage of 23% that we reported in our analyses of the 1993-2008 period."[33] And of the 53 settlements in the Northern District of California, the mean and median percentages awarded were 26% and 25% respectively, and of the 144 settlements in the Ninth Circuit, the mean and median percentages awarded were also 26% and 25% respectively.[34] The study further reports that 19 antitrust settlements between 2009-2013 had a mean recovery of $501.09 million and a median recovery of $37.3 million, with mean and median percentages awarded of 27% and 30% respectively.[35] In addition, the study reports that "the fee-to-recovery ratio tends to be lower in cases with very large recoveries."[36] Conversely, the study at the same time reports that "higher multipliers are associated with higher recoveries."[37] Here, again, the fact that the average award in mega-fund cases across all subject matters and all locales in 2011 was greater than the 20% fee requested here confirms, like *Vizcaino II* does, that a 20% fee on a recovery of this size is reasonable and well inside the range of fee awards in comparable common fund cases.

e. **A 20% fee does not award windfall profits to counsel even if the settlement were deemed a megafund.**

In reiterating that any fee award must be reasonable, the Ninth Circuit has remarked that "for example, where awarding 25% of a 'megafund' would yield windfall profits for class counsel in light

---

[31] See EMG Study at 9-10.
[32] *See id.* at 8.
[33] *Id.*
[34] *Id.* at 11, 12.
[35] *Id.* at 13; *see also In re Auto. Refinishing Paint Antitrust Litig.*, 2008 U.S. Dist. LEXIS 569, at *16 (E.D. Pa. Jan. 3, 2008) ("We have previously noted that is not unusual in antitrust class actions for the attorneys to receive awards for fees in the 30% range.").
[36] EMG Study at 8.
[37] *Id.* at 27.

of the hours spent on the case, courts should adjust the bench-mark percentage or employ the lodestar method instead."[38] As an initial matter, counsel do not seek the benchmark 25% fee, notwithstanding the cases and studies cited in the previous section that would support such a request. And the 20% fee is reasonable. This is not a mass tort or fraud case in which mere disclosure of a government investigation all but guarantees the creation of a megafund, notwithstanding what counsel does or does not do; instead, this case went from zero recovery to megafund *solely* because of counsel's efforts and expenditures of expert fees and other expenses.[39] Relatedly, the size of the common fund obtained in this case is not "merely a factor of the size of the class."[40] A megafund was created in this case despite the size of the classes, not because of it. And above-benchmark fees frequently are awarded where megafunds must be shared by hundreds of thousands, if not millions, of class members.[41] Here, there are approximately 53,748 class members.

So while applying the so-called "increase-decrease" principle may be appropriate in certain cases,[42] it is tenuous here, where the size of the fund is not merely a factor of the size of the classes

---

[38] *In re Bluetooth Headset Prods. Liab. Litig.*, 654 F.3d at 942 (citation omitted).

[39] *Accord, e.g.*, *In re Linerboard Antitrust Litig.*, 2004 U.S. Dist. LEXIS 10532, at *51 ("the highly favorable settlement was attributable to the petitioners' skill and it is inappropriate to penalize them for their success"); *In re Vitamins Antitrust Litig.*, 2001 U.S. Dist. LEXIS 25067, at *68 ("This Court agrees that it is not fair to penalize counsel for obtaining fine results for their clients.").

[40] *In re Bluetooth Headset Prods. Liab. Litig.*, 654 F.3d at 943.

[41] *See In re Optical Disk Drive Prods. Antitrust Litig.*, 2016 U.S. Dist. LEXIS 175515, at *36 ($124.5 million settlement for "millions of class members"); *In re Cathode Ray Tube (CRT) Antitrust Litig.*, 2016 U.S. Dist. LEXIS 102408, at *1 ($576.75 million settlement for millions of class members); *In re Polyurethane Foam Antitrust Litig.*, 2015 U.S. Dist. LEXIS 23482, at *8 ($147.8 million settlement for "more than 48,000" class members); *In re TFT-LCD (Flat Panel) Antitrust Litig.*, 2013 U.S. Dist. LEXIS 49885, at *58 ($571 million settlement fund for "235,808 claimants"); *In re Checking Account Overdraft Litig.*, 830 F. Supp. 2d at 1366 ($510 million settlement for "approximately 13 million" class members); *In re Comverse Tech., Inc.*, 2010 U.S. Dist. LEXIS 63342, at *5 ($225 million settlement fund for "more than 204,000 potential class members"); *In re Linerboard Antitrust Litig.*, 2004 U.S. Dist. LEXIS 10532, at *18 ($202.5 million settlement for "approximately 80,000 companies"); *In re Ikon Office Sols.*, 194 F.R.D. at 170 ($111 million settlement for more than 200,000 class members); *but see In re Vitamins Antitrust Litig.*, 2001 U.S. Dist. LEXIS 25067 ($365 million settlement fund for 4,000 class members).

[42] Many courts are not so sure. As Judge Katz put it in oft-quoted language: "The court will not reduce the requested award simply for the sake of doing so when every other factor ordinarily considered weighs in favor of approving class counsel's request of thirty percent. . . . It is difficult to discern any consistent principle in reducing large awards other than an inchoate feeling that it is simply inappropriate to award attorneys' fees above some unspecified dollar amount, even if all of the other factors ordinarily considered relevant in determining the percentage would support a higher percentage. Such an approach also fails to appreciate the immense risks undertaken by attorneys in

but is instead directly related to the efforts of plaintiffs' counsel, who achieved exceptional, megafund results for a relatively discrete set of class members. In so doing, they obtained incidental benefits for the public, expended huge amounts of time and money, and faced considerable risks of non-recovery (and thus non-payment) in pursuing this complex antitrust case against well-financed, top-notch counsel. The 20% fee request is below the market contingency rate, below the Ninth Circuit benchmark rate, and below rates awarded in other megafund cases, and results in a multiplier within the range of multipliers that the Ninth Circuit has deemed reasonable. The 20% fee request is eminently reasonable and justified based on all the circumstances of this case. To nonetheless apply the increase-decrease principle and reduce an otherwise reasonable fee simply because this is a "megafund" case would be unreasonable.

**B.    Using lodestar as a cross-check further supports the requested fees.**

As the Ninth Circuit has explained, "a crosscheck using the lodestar method can confirm that a percentage of recovery amount does not award counsel an exorbitant hourly rate."[43] Here, counsel for plaintiffs have invested $11,398,158.30 in attorneys' and para-professionals' time in this case, and request a 3.66 multiplier, which is well within the range of multipliers awarded in similar cases.

A court may give an upwards adjustment to a lodestar (through a positive multiplier) to reflect "reasonableness" factors, including: (1) the amount involved and the results obtained, (2) the time and labor required, (3) the novelty and difficulty of the questions involved, (4) the skill requisite to perform the legal service properly, (5) the preclusion of other employment by the attorney due to acceptance of the case, (6) the customary fee, (7) the experience, reputation, and ability of the attorneys, and (8) awards in similar cases.[44] These are referred to as *Kerr* "reasonableness" factors after

---

prosecuting complex cases in which there is a great risk of no recovery." *In re Ikon Office Sols.*, 194 F.R.D. at 196-97 (citations omitted).

[43] *In re Online DVD-Rental Antitrust Litig.*, 779 F.3d at 949 (internal quotation marks and citation omitted).

[44] *Id.* at 941-42. The Supreme Court has since called into question the relevance of two of the original *Kerr* factors: the contingent nature of the fee and the "desirability" of the case. *See Resurrection Bay Conserv. All. v. City of Seward*, 640 F.3d 1087, 1095 n.5 (9th Cir. 2011). Other factors such as "time limitations imposed by the client or the circumstances" and "the nature and length of the professional relationship with the client" do not readily apply here.

the Ninth Circuit's opinion in *Kerr v. Screen Extras Guild, Inc.*[45] "Foremost among these considerations, however, is the benefit obtained for the class."[46]

### 1. Plaintiffs' counsel achieved an exceptional result for the classes.

The first factor, the amount involved and the results for the classes, strongly supports the 20% fee request and the 3.66 multiplier. At the time of settlement, the parties agreed to a fund equaling nearly 100% of single damages according to Dr. Rascher's model.[47] And after settlement, as more class members became eligible to receive payment from the $208 million fund (because their schools agreed to start paying COA), the recovery for all of those eligible class members now stands at 66% of their single damages.[48] If the Court grants class counsel's fee and expense request, class members will receive approximately 50% of their damages, a result almost never achieved in large, complex antitrust cases.[49]

### 2. Plaintiffs' counsel expended significant resources on behalf of the classes.

Plaintiffs' counsel collectively devoted $11,398,158.30 in attorneys' and para-professionals' time in litigating this matter. They have also spent $3,184,274.38 in expenses in this litigation. This commitment of time, personnel, and money to the classes supports the requested award.

### 3. This case presented difficult questions, requiring extraordinary skill by plaintiffs' counsel.

The third and fourth *Kerr* factors—the difficulty of the questions presented by the litigation and the skill required to perform the legal services properly—both support the requested award. Plaintiffs' counsel first had to overcome defendants' argument that *O'Bannon* precluded their claim, and then had to present the motion for certification of damage classes so as to overcome this Court's

---

[45] 526 F.2d 67, 70 (9th Cir. 1975).
[46] *In re Bluetooth Headset Prods. Liab. Litig.*, 654 F.3d at 942.
[47] *See* ECF No. 560-4.
[48] This smaller percentage recovery is a function of math—as the number of class members eligible to recover damages from the $209 million goes up, the average *pro rata* recovery goes down. There are few reported cases with sixty-six percent settlement recovery in large antitrust cases.
[49] *See, e.g.*, *In re Cathode Ray Tube (CRT) Antitrust Litig.*, 2016 U.S. Dist. LEXIS 102408, at *65 (holding that 20% antitrust recovery in a megafund case warranted "a modest increase over the Ninth Circuit benchmark"); *In re Omnivision Techs.*, 559 F. Supp. 2d at 1046 ("a total award of approximately 9% of the possible damages . . . weighs in favor of granting the requested 28% fee").

order in *O'Bannon* declining to certify a damages class. And plaintiffs' counsel confronted the difficulties in establishing which schools would have provided COA (and which would not have) in the *but-for* world. In working with an economist to provide a workable, reliable economic model to support these arguments, counsel had to identify, acquire, and understand vast amounts of data, not only to ensure the workability of a reliable antitrust impact and damages model, but also to show the Court an administratively feasible method to identify class members and calculate damages specific to each school and student. And of course, plaintiffs faced the risk of proving liability before even getting a damages award. Counsel performed extensive work in discovery building the liability case to establish that defendants violated the antitrust laws by capping the GIA.

Defendants vigorously opposed plaintiffs at every turn, including on class certification and the merits (with such opposition continuing in the injunctive relief case). Settlement was not reached until class certification had been fully briefed. These issues have required advocacy and skill beyond routine litigation, especially in light of the strength of counsel hired by the multiple defendants in this action.

### 4. The market rate of antitrust lawyers with the experience of plaintiffs' counsel supports the request.

The hourly rates of plaintiffs' counsel are in line with market rates in this District. The most senior HB attorney on the case, Steve Berman, bills at an hourly rate of $950. Other partners at HB have hourly rates ranging between $578 and $760. Associates at HB billed at hourly rates ranging from $295 to $630.[50] The most senior PSW attorneys on the case—Clifford Pearson and Bruce Simon—billed at hourly rates between $835 and $1,035 over the course of this matter. Another PSW partner billed at between $715 and $870 per hour, while PSW "of counsel" lawyers billed at between $450 and $900 per hour. And PSW associates billed at hourly rates ranging from $350 to $635. Staff and law clerks at PSW billed at hourly rates ranging from between $175 to $225.[51] The two partners at Pritzker Levine who worked on this matter—Elizabeth Pritzker and Jonathan Levine—have an

---

[50] *See* Berman Decl., Ex. A (setting forth HB hourly rates).
[51] *See* Simon Decl., Ex. B (setting forth PSW hourly rates).

hourly rate of $695 each. The associates and "of counsel" attorney who worked on this matter for Pritzker Levine have hourly rates ranging from $495 to $625.[52]

All of these rates are well within the range of $200 to $1,080 charged by attorneys in California in 2015, as shown by a reputable survey of billing rates.[53]

### 5. Plaintiffs' counsel by-passed other cases due to their commitment to this case.

Plaintiffs' counsel have dedicated a core team of individuals to the litigation of this action. The consequence of dedicating a team of experienced antitrust attorneys has meant that many of these professionals could not work on other cases. The choice of plaintiffs' counsel to commit a significant number of attorneys almost exclusively to this litigation, forgoing other cases and other projects, further supports the request for fees.

### 6. The requested fee is reasonable when compared to fees in similar litigation.

The sixth and eighth *Kerr* factors—the customary fee and awards in similar cases—both support the fee request. A 3.66 multiplier for a fee award of 20% is reasonable in light of awards in other cases. In *Vizcaino II*, the Ninth Circuit affirmed a fee award based on a 3.65 multiplier.[54] This is nearly the exact multiplier counsel ask for here. And in another case, the Ninth Circuit affirmed a 6.85 multiplier, holding that it "falls well within the range of multipliers that courts have allowed."[55] Similarly here, a 3.66 multiplier is reasonable, particularly given the difficult nature of this litigation and the fact that the fund equals approximately 66% of class members' damages.

The requested 3.66 multiplier is well within the range of awards in other cases. In *In re Linerboard Antitrust Litigation*,[56] the district court explained that "during 2001-2003, the average multi-

---

[52] *See* Pritzker Decl., Ex. 2 (setting forth Pritzker Levine hourly rates).

[53] Berman Decl., Ex. D (2015 NLJ Billing Survey). *See also* Pritzker Decl. ¶ 23.

[54] 290 F.3d at 1050-51; *id*. at 1052-54 (noting district court cases in the Ninth Circuit approving multipliers as high as 6.2, and citing only 3 of 24 decisions with approved multipliers below 1.4).

[55] *Steiner v. Am. Broad. Co.*, 248 F. App'x 780, 783 (9th Cir. 2007). *See also Buccellato v. AT&T Operations, Inc.*, 2011 U.S. Dist. LEXIS 85699, at *4 (N.D. Cal. June 30, 2011) ("The resulting multiplier of 4.3 is reasonable in light of the time and labor required, the difficulty of the issues involved, the requisite legal skill and experience necessary, the excellent and quick results obtained for the Class, the contingent nature of the fee and risk of no payment, and the range of fees that are customary.").

[56] 2004 U.S. Dist. LEXIS 10532, at *50 (E.D. Pa. June 2, 2004) (citing Stuart J. Logan, et al., *Attorney Fee Awards in Common Fund Class Actions*, 24 Class Action Reports 167 (2003)).

plier approved in common fund class actions was 4.35 and during 30 year period from 1973-2003, [the] average multiplier approved in common fund class actions was 3.89." So the 3.66 multiplier requested by plaintiffs' counsel in this matter is below the midrange of multipliers awarded in other cases—and almost none of these other cases, if any, approach the success of the results here. Indeed, multipliers of 4.0 and above are frequently applied in granting fee awards from common funds.[57]

### 7. The reputation, ability, and efficiency of plaintiffs' counsel supports the requested fee.

The three firms requesting attorneys' fees in this matter are among the most well-respected class action litigation firms in the country, as this Court has witnessed in numerous cases.[58] And the efficiency with which plaintiffs' counsel achieved such exceptional results is laudable because it benefits the classes. For example, by working efficiently and keeping a tight hold on the lodestar rein, class counsel is less inclined to seek a benchmark award of 25 percent (or more), resulting in

---

[57] *See, e.g.*, *In re Credit Default Swaps Antitrust Litig.*, 2016 U.S. Dist. LEXIS 54587, at *54 (S.D.N.Y. Apr. 25, 2016) (lodestar multiplier "of just over 6"); *Gutierrez v. Wells Fargo Bank, N.A.*, 2015 U.S. Dist. LEXIS 67298, at *25 (N.D. Cal. May 21, 2015) (awarding $18.5 million in fees, noting that "this order allows a multiplier of 5.5 mainly on account of the fine results achieved on behalf of the class, the risk of non-payment they accepted, the superior quality of their efforts, and the delay in payment"); *In re Payment Card Interchange Fee and Merch. Disc. Antitrust Litig.*, 991 F. Supp. 2d 437, 448 (E.D.N.Y. 2014) (multiplier of "about 3.41"); *Athale v. Sinotech Energy Ltd.*, 2013 U.S. Dist. LEXIS 199696 (S.D.N.Y. Sept. 4, 2013) (20% fee award with 5.65 multiplier); *Beckman v. KeyBank, N.A.*, 293 F.R.D. 467, 481 (S.D.N.Y. 2013) ("Courts regularly award lodestar multipliers of up to eight times the lodestar, and in some cases, even higher multipliers"); *In re Enron Corp. Secs., Derivative & ERISA Litig.*, 586 F. Supp. 2d 732, 741 (S.D. Tex. 2008) (multiplier of 5.2); *In re WorldCom, Inc. Sec. Litig.*, 388 F. Supp. 2d 319 (S.D.N.Y. 2005) (4.0 multiplier); *In re Xcel Energy, Inc.*, 364 F. Supp. 2d 980, 998-99 (D. Minn. 2005) (25% fee with 4.7 multiplier); *In re Rite Aid Corp. Secs. Litig.*, 362 F. Supp. 2d at 587 (25% fee with 6.96 multiplier); *In re AremisSoft Corp. Sec. Litig.*, 210 F.R.D. 109, 134-35 (D.N.J. 2002) (28% fee with 4.3 multiplier); *Maley v. Del Global Techs. Corp.*, 186 F. Supp. 2d 358, 371 (S.D.N.Y. 2002) (33.3% fee, resulting in "modest multiplier of 4.65"); *In re NASDAQ Market-Makers Antitrust Litig.*, 187 F.R.D. 465, 489 (S.D.N.Y. 1998) ("The percentage fee award in this case represents a multiplier of approximately 3.97 times Class Counsel's lodestar of $36,191,751. A multiplier of 3.97 is not unreasonable in this type of case."); *Roberts v. Texaco, Inc.*, 979 F. Supp. 185, 198 (S.D.N.Y. 1997) (5.5 multiplier); *Weiss v. Mercedes-Benz of N. Am.*, 899 F. Supp. 1297 (D.N.J. 1995) (9.3 multiplier), *aff'd*, 66 F.3d 314 (3d Cir. 1995); *Rabin v. Concord Assets Grp., Inc.*, 1991 U.S. Dist. LEXIS 18273, at *4 (S.D.N.Y. Dec. 19, 1991) (awarding 4.4 multiplier and explaining that "multipliers of between 3 and 4.5 have been common") (internal quotation marks and citation omitted).

[58] *See* firm resumes at Berman Decl., Ex. E; Simon Decl., Ex. A; Pritzker Decl., Ex. 1.

more money to class members. So class counsel's efficiency should be considered favorably in evaluating the reasonableness of the fee request.[59]

Plaintiffs' counsel have focused on the most efficient path to results, not devoting resources to "nice to have" belt-and-suspender litigation.[60] These actions reduced their lodestar, resulting in a higher multiplier when cross-checking counsel's percentage-of-the-fund award. But that's a good thing.[61] Strategic and efficient lawyering not only encourages "the just, speedy, and inexpensive determination of every action and proceeding"[62] but also directly correlates with obtaining superb results. Meet and confers with fewer lawyers tend to be more productive; oral arguments tend to go better when the person who wrote the motion also argues the motion; and depositions are more effective when the person taking the deposition drafted the questions for the deposition.

Although modification of a fee award based on a lodestar cross-check may serve some utility in cases at the fringes, routine recourse to it threatens to swallow the benefits that the percentage-of-the-fund method provides, for "if a court sometimes employs a lodestar cross-check, then self-interested entrepreneurial lawyers will conduct their affairs accordingly."[63] In sum, in order to maximize the class recovery, promote optimal deterrence, incentivize efficient, speedy, and inexpensive dispute resolution, and conserve judicial resources, this Court awards attorneys' fees in

---

[59] *See Vizcaino II*, 290 F.3d at 1050 n.5 ("The lodestar method is merely a cross-check on the reasonableness of a percentage figure, and it is widely recognized that the lodestar method creates incentives for counsel to expend more hours than may be necessary on litigating a case so as to recover a reasonable fee.").

[60] *See* Berman Decl. ¶ 10; Simon Decl. ¶ 17 n.2.

[61] *See In re Xcel Energy, Inc.*, 364 F. Supp. 2d at 996 ("But for the cooperation and efficiency of counsel, the lodestar of plaintiffs' counsel would have been substantially more and would have required this court to devote significant judicial resources to its management of the case. Instead, counsel moved the case along expeditiously, and the court determines that the time and labor spent to be reasonable and fully supportive of the 25% attorney fee.").

[62] Fed. R. Civ. P. 1.

[63] Myriam Gilles & Gary B. Friedman, *Exploding the Class Action Agency Costs Myth: The Social Utility of Entrepreneurial Lawyers*, 155 U. Pa. L. Rev. 103, 145-46 (2006). *See also* Sandra R. McCandless et al., Tort Trial & Ins. Practice Section of the Am. Bar Ass'n, *Report on Contingent Fees in Class Action Litigation*, 25 Rev. Litig. 459, 471 (2006) ("The lodestar cross-check reintroduces the problems of the lodestar method. If the attorneys in the previous example know that their fee, when calculated as a percentage, will be 'crosschecked' by the lodestar, they have every financial incentive to put as many hours into the file as possible. They may do unnecessary work or delay settlement to make sure that the multiplier needed to get to their percentage fee does not appear to be out of line.").

1  an amount of 20% of the fund recovered for the classes.

**C.   Class counsel's expenses are reasonable and were necessarily incurred.**

Class counsel seek reimbursement of $3,184,274.38 in expenses necessarily incurred in the prosecution of this action. All expenses that are typically billed by attorneys to paying clients in the marketplace are compensable.[64] With this motion, plaintiffs provide an accounting of the expenses incurred by class counsel.[65] The primary expense in this case is for experts. Several additional categories account for the remainder, including filing fees, travel expenses, costs of court and deposition transcripts, and computer research expenses. All of these costs were necessarily and reasonably incurred to achieve this $208 million dollar recovery, and they reflect market rates for the various categories of expenses incurred. And plaintiffs' counsel advanced these necessary expenses, interest-free, without assurance that they would even be recouped. The request of plaintiffs' counsel for reimbursement of expenses is reasonable.[66]

**D.   A service award of $20,000 is granted to each of the four class representatives.**

Plaintiffs request that the Court approve service awards in the amount of $20,000 each for the four class representatives, to be deducted from the settlement funds. Service awards for class representatives are provided to encourage them to undertake the responsibilities and risks of representing the classes and to recognize the time and effort spent in the case. Incentive awards "compensate class representatives for work done on behalf of the class, to make up for financial or reputational risk undertaken in bringing the action, and, sometimes, to recognize their willingness to act as a private attorney general."[67] Here, the class representatives spent a significant amount of time assisting in the

---

[64] *Harris v. Marhoefer*, 24 F.3d 16, 19 (9th Cir. 1994).

[65] *See* Berman Decl., Ex. B; Simon Decl., Ex. C; Pritzker Decl., Ex. 3.

[66] *See Vedachalam*, 2013 U.S. Dist. LEXIS 100796, at *9-10 ("Plaintiffs' Counsel have incurred unreimbursed costs prosecuting this case on behalf of the Class . . . . Plaintiffs' Counsel put forward these out-of-pocket costs without assurance that they would be repaid. These litigation expenses were necessary to secure the resolution of this litigation.").

[67] *Rodriguez v. West Publ'g Corp.*, 563 F.3d 948, 958-59 (9th Cir. 2009); *see also Just Film, Inc. v. Merch. Servs., Inc.*, 2013 U.S. Dist. LEXIS 186623, at *4-5 (N.D. Cal. Dec. 11, 2013) (explaining that incentive awards "may be made to class representatives based on '(1) the risk to the class representative in commencing suit, both financial and otherwise; (2) the notoriety and personal difficulty encountered by the class representative; (3) the amount of time and effort spent by the class

litigation of this case, in preparing for and having their depositions taken, in searching for and producing documents that spanned many years, and in conferring with counsel throughout the litigation.[68] Awards of $20,000 each are consistent with service awards in other cases.[69]

**E.     The sole objection is overruled.**

The sole objection, filed by Darrin Duncan, is overruled. For the reasons set forth above, the attorneys' fees and service awards sought by plaintiffs and their counsel are reasonable. In addition, there is no merit to Mr. Duncan's request that the Court order that the claims administrator distribute class funds until each class member would receive less than $3.00.  Mr. Duncan provides no legal or factual basis for that request.

IT IS SO ORDERED.

DATED:  December 6, 2017

HONORABLE CLAUDIA WILKEN
UNITED STATES DISTRICT JUDGE

Submitted on November 20, 2017, by:

HAGENS BERMAN SOBOL SHAPIRO LLP

By    */s/ Steve W. Berman*
         Steve W. Berman

---

representative; (4) the duration of the litigation and; (5) the personal benefit (of lack thereof) enjoyed by the class representative as a result of the litigation.'" (citation omitted)).

[68] *See* Berman Decl. ¶¶ 22-25; Simon Decl. ¶¶ 47-48; Pritzker Decl. ¶¶ 26-30.

[69] *See Dandan Pan v. Qualcomm Inc.*, 2017 U.S. Dist. LEXIS 120150, at *42 (S.D. Cal. July 31, 2017) ("[A] $50,000.000-per-Class-Representative award is reasonable. In particular, there is no doubt that in the present case the Class Representatives have helped secure substantial relief for the class . . . ."); *Syed v. M-I, L.L.C.*, 2017 U.S. Dist. LEXIS 118064, at *26-27 (E.D. Cal. July 27, 2017) (awarding $15,000 and $20,000 to two class representatives); *In re High-Tech Empl. Antitrust Litig.*, 2015 U.S. Dist. LEXIS 118052, at *62 (N.D. Cal. Sept. 2, 2015) (authorizing $80,000 and $120,000 service awards in case with $415 million settlement fund, in addition to $20,000 award to each for prior settlement); *Godshall v. Franklin Mint Co.*, 2004 U.S. Dist. LEXIS 23976, at *21 (E.D. Pa. Dec. 1, 2004) (granting incentive award of $20,000 to each plaintiff); *In re Linerboard Antitrust Litig.*, 2004 U.S. Dist. LEXISIS 10532, at *56-58 (awarding $ 25,000 for each of five class representatives and collecting cases in which awards of $24,000 or more were authorized); *Van Vranken v. Atl. Richfield Co.*, 901 F. Supp. 294, 299 (N.D. Cal. 1995) (authorizing $50,000 incentive award in case with settlement fund of $76,723,213.26).

Steven W. Berman (*Pro Hac Vice*)
Craig R. Spiegel (122000)
Ashley A. Bede (Pro Hac Vice)
1918 Eighth Avenue, Suite 3300
Seattle, WA 98101
Telephone: (206) 623-7292
Facsimile: (206) 623-0594
steve@hbsslaw.com
craigs@hbsslaw.com
ashleyb@hbsslaw.com

Jeff D. Friedman (173886)
HAGENS BERMAN SOBOL SHAPIRO LLP
715 Hearst Avenue, Suite 202
Berkeley, CA 94710
Telephone: (510) 725-3000
Facsimile: (510) 725-3001
jefff@hbsslaw.com

PEARSON, SIMON & WARSHAW, LLP

By  */s/ Bruce L. Simon*
       Bruce L. Simon
Bruce L. Simon (96241)
Benjamin E. Shiftan (265767)
44 Montgomery Street, Suite 2450
San Francisco, CA 94104
Telephone: (415) 433-9000
Facsimile: (415) 433-9008
bsimon@pswlaw.com
bshiftan@pswlaw.com

*Plaintiffs' Co-Lead Class Counsel*

Elizabeth C. Pritzker (146267)
Jonathan K. Levine (220289)
Shiho Yamamoto (264741)
Anne C. Maness (303438)
PRITZKER LEVINE LLP
180 Grand Avenue, Suite 1390
Oakland, CA 94612
Telephone: (415) 692-0770
Facsimile: (415) 366-6110
ecp@pritzkerlevine.com
jkl@pritzkerlevine.com
sy@pritzkerlevine.com
acm@pritzkerlevine.com

*Additional Class Counsel*