UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

OAKLAND DIVISION

| | |
|---|---|
| IN RE: NATIONAL COLLEGIATE ATHLETIC ASSOCIATION ATHLETIC GRANT-IN-AID CAP ANTITRUST LITIGATION | No. 4:14-md-2541-CW<br><br>ORDER GRANTING PLAINTIFFS' MOTION FOR FINAL APPROVAL OF CLASS ACTION SETTLEMENT AND FINAL JUDGMENT AS TO DAMAGES CLAIMS ("ORDER AND FINAL JUDGMENT") |
| This Document Relates to:<br><br>ALL ACTIONS EXCEPT<br><br>*Jenkins v. Nat'l Collegiate Athletic Ass'n*<br>Case No. 4:14-cv-02758-CW | DATE: November 17, 2017<br>TIME: 9:00 a.m.<br>DEPT: Courtroom 2, 4th Floor<br>JUDGE: Hon. Claudia Wilken<br><br>COMPLAINT FILED: March 5, 2014 |

## I. BACKGROUND

Plaintiffs seek final approval of a settlement that provides for payment of approximately 50% of the classes' single damages claims after fees and expenses are deducted. The settlement agreement is the result of extensive litigation and arm's-length negotiations between the parties. Defendants agree to pay $208,664,445.00, which (after deduction of fees and expenses) will be disbursed to student-athletes who attended Division I schools that plaintiffs' evidence shows would have awarded the full cost of attendance at those schools ("COA"), but for the NCAA bylaw in effect until January 1, 2015, that capped the maximum grant-in-aid ("GIA") at less than COA. The average recovery for a class member who played his or her sport for four years would be approximately $6,000.[1] After final approval of the proposed settlement, each impacted class member with calculated damages will be mailed a check, with no claim form required and no right of any reversion of funds to defendants.

Plaintiffs' counsel, who have litigated numerous antitrust and other matters against the NCAA over the years, believe this is an exceptional result for the proposed class. As this Court knows, antitrust matters against the NCAA involve unique arguments and have had narrow historical success. And the NCAA has been willing to devote significant resources to vigorously defending them, including on appeal. Thus, not only is the monetary size of the settlement a major benefit to the class, the likelihood of near-term payout is also significant.

Finally, the settlement does not release or bar in any way the class claims for prospective injunctive relief from going forward—and plaintiffs will continue to vigorously pursue them.

## II. FINAL APPROVAL OF SETTLEMENT

The Court grants the Motion for Final Approval of Settlement and grants final approval to the Settlement Agreement, as amended by the parties' stipulations filed on March 1, 2017 and March 21, 2017. All further references to the Settlement Agreement shall be to the Settlement Agreement as

---

[1] Since the settlement was reached, many additional schools began paying or stated an intent to pay COA. Eligible class members from these additional COA-paying schools will also receive payment from the settlement fund. As such, the number of class members eligible to receive payment has grown significantly since the settlement was reached.

ORDER GRANTING MOT. FOR FINAL APPROVAL OF CLASS
ACTION SETTLEMENT - No: 14 -md-2541-CW - 1 -

amended in the parties' stipulations. The Settlement Agreement is hereby incorporated into this Order and Final Judgment, and all terms used herein shall have the same meanings set forth in the Settlement Agreement.

### III. SETTLEMENT CLASSES

The Settlement[2] resolves claims on behalf of the following Settlement Classes:

> **Division I FBS Football Class**: All current and former NCAA Division I Football Bowl Subdivision ("FBS") football student-athletes who, at any time from March 5, 2010 through the date of Preliminary Approval of this Settlement, received from an NCAA member institution for at least one academic term (such as a semester or quarter) a Full Athletics Grant-In-Aid (defined herein).
>
> **Division I Men's Basketball Class**: All current and former NCAA Division I men's basketball student-athletes who, at any time from March 5, 2010 through the date of Preliminary Approval of this Settlement, received from an NCAA member institution for at least one academic term (such as a semester or quarter) a Full Athletics Grant-In-Aid.
>
> **Division I Women's Basketball Class:** All current and former NCAA Division I women's basketball student-athletes who, at any time from March 5, 2010 through the date of Preliminary Approval of this Settlement, received from an NCAA member institution for at least one academic term (such as a semester or quarter) a Full Athletics Grant-In-Aid.

"Full Athletics Grant-In-Aid" means either (1) athletically related financial aid for any particular academic term (year, semester, or quarter), in an amount equal to or greater than tuition and fees, room and board, and required course-related books, or (2) athletically related financial aid that was not equal to or greater than tuition and fees, room and board, and required course-related books only because it was reduced by the applicable NCAA member institution by an amount of non-athletically related financial aid received by the student-athlete

The Court has personal jurisdiction over the Plaintiffs and all Settlement Class Members and has subject matter jurisdiction to approve this Settlement and Settlement Agreement.

---

[2] As set forth in the Settlement Agreement, "'Settlement' means the settlement of the Released Claims [defined therein]."

## IV. SETTLEMENT CONSIDERATION

The total settlement amount provides for defendants to pay $208,664,445.00. This amounted to approximately 100% of the settlement classes' single damages claims at the time of settlement, as calculated by plaintiffs' expert economist, Dr. Daniel Rascher, whose econometric model statistically predicts which Division I schools would more likely than not have paid the full COA at the start of the class period, had the GIA cap been at full COA (or above).[3] And the settlement amount equals approximately two-thirds of single damages after including additional class members who attended schools that adopted full COA by June of 2017.

## V. THE SETTLEMENT IS FAIR, REASONABLE AND ADEQUATE

### A. The Settlement Classes meet all requirements of Rule 23.

The Court preliminarily certified the three Settlement Classes for settlement purposes under Rule 23(e). No objection to certification of those Settlement Classes has been filed. The Court hereby certifies those three classes for settlement purposes only.

### B. The parties have complied with Rule 23(c) notice requirements.

Class actions brought under Rule 23(b)(3) must satisfy notice provisions of Rule 23(c)(2), and upon settlement of a class action, the "court must direct notice in a reasonable manner to all class members who would be bound by the proposal." Fed. R. Civ. P. 23(e)(l). Rule 23(c)(2) prescribes the "best notice that is practicable under the circumstances, including individual notice" of particular information. Fed. R. Civ. P. 23(c)(2)(B).

The proposed notice plan was undertaken and carried out pursuant to this Court's preliminary approval order by Gilardi & Co. LLC ("Gilardi").[4] Gilardi caused notice to be sent to 19,973 email addresses and 25,949 postal addresses; approximately 1,689 potential class members had contact information on both lists resulting in direct notice to 44,233 unique class members out of

---

[3] *See* Expert Declaration of Daniel A. Rascher in Support of Motion for Preliminary Approval of Damages Classes, Feb. 3, 2017, ECF No. 560-4.

[4] Declaration of Alan Vasquez Regarding Implementation of Class Notice Plan ("Vasquez Decl."), Oct. 4, 2017, ECF No. 706; andCorrected Declaration of Alan Vasquez Regarding Implementation of Class Notice Plan, Nov. 16, 2017, ECF No. 731 ("Corrected Vasquez Decl.")

approximately 53,748.[5] Of the 19,973 emails, 3,020 bounced back as undeliverable, with 209 of the bounce-backs having a corresponding postal address that was not returned as undeliverable.[6] Of the 25,949 notices sent via postal mail, 3,806 were returned as undeliverable with 5 having a corresponding email address that did not bounce back.[7] Factoring in the returned mail, approximately 39,310 unique class members were reached through direct notice (74% of the classes).[8]

Gilardi established a case-dedicated notice website where class members could obtain more information about the settlement. Both the direct notice and paid media efforts directed individuals to this website.[9] By May 12, 2017, Gilardi established a different website where schools could upload contact information for potential class members and approve the usage of data collected during the *In Re: Nat'l Collegiate Athletic Ass'n Student-Athlete Concussion Litigation*; NCAA letters sent to member schools directed recipients to this website.[10]

To supplement direct notice, Gilardi implemented a comprehensive Internet notice campaign that provided multiple channels for potential class members to be directed to the case website.[11] And Gilardi worked with the parties to create a party-neutral press release with information about the litigation and the proposed settlements.[12] The release issued on April 7, 2017. The full content of the release was posted to 138 websites with a total estimated audience of 80 million.[13] Further, Gilardi worked with class counsel to develop a call script for the purpose of providing basic information about the settlement to class members.[14] Class members were able to call toll-free and receive infor-

---

[5] *Id*. at ¶ 13 and Corrected Vasquez Decl. at ¶ 3.
[6] Vasquez Decl. at ¶ 14.
[7] *Id.*
[8] Corrected Vasquez Decl. at 10.
[9] Vasquez Decl. at ¶ 15. The website is www.grantinaidsettlement.com. *Id.*
[10] *Id*. at ¶ 16. The website is https://kccsecure.com/NAHUpload. *Id.*
[11] *Id*. at ¶¶ 17-26.
[12] *Id*. at ¶ 26.
[13] *Id.*
[14] *Id*. at ¶ 27.

mation through an automated menu system, and as of October 4, 2017, Gilardi had logged 1,864 calls.[15]

The notice plan, as implemented, comports with the requirements of due process and Rule 23. The notice plan provided for a robust direct notice program, supplemented by an array of effective internet advertising efforts. As implemented, the notice plan exceeded this standard of reach through direct notice alone, using reach calculation methodology consistent with other national class action notice programs. Gilardi believes that notice reached 74% of class members directly and approximately 90% when the supplemental notice is taken into account.[16] Those percentages exceed the constitutional requirement for notice, particularly with 74% receiving direct notice.

The Court previously found that the notice itself informed class members of the nature of the action, the terms of the proposed settlements, the effect of the action and the release of claims, as well as class members' right to exclude themselves from the action and their right to object to the proposed settlements (ECF No. 615). The Court finds that plaintiffs have complied with all of the notice requirements of Rule 23(c) and have provided constitutionally-sufficient notice to the class members.

## C. The settlement is fair, adequate, and reasonable.

The "decision to approve or reject a settlement is committed to the sound discretion of the trial judge," who "is exposed to the litigants and their strategies, positions, and proof."[17] But the "court's intrusion upon what is otherwise a private consensual agreement negotiated between the parties to a lawsuit must be limited to the extent necessary to reach a reasoned judgment that the agreement is not the product of fraud or overreaching by, or collusion between, the negotiating parties, and that the settlement, taken as a whole, is fair, reasonable, and adequate to all concerned."[18]

---

[15] *Id.*

[16] *Id.* at ¶ 31; Corrected Vasquez Decl. at ¶ 11-12.

[17] *Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1026 (9th Cir. 1998).

[18] *Rodriguez v. West Pub. Co.*, 563 F.3d 948, 965 (9th Cir. 2009) (citation and internal quotation marks omitted).

In the Ninth Circuit, "voluntary conciliation and settlement are the preferred means of dispute resolution," which is "especially true in complex class action litigation."[19] There "is an overriding public interest in settling and quieting litigation," which is "particularly true in class action suits."[20] A "presumption in favor of voluntary settlement agreements" exists, and "this presumption is especially strong in class actions and other complex cases . . . because they promote the amicable resolution of disputes and lighten the increasing load of litigation faced by the federal courts."[21]

In determining whether a settlement agreement is fair, adequate, and reasonable, the Court must weigh some or all of the following factors: (1) the strength of the plaintiffs' case; (2) the risk, expense, complexity, and likely duration of further litigation; (3) the risk of maintaining class action status throughout the trial; (4) the amount offered in settlement; (5) the extent of discovery completed and the stage of the proceedings; (6) the experience and views of counsel; (7) the presence of a governmental participant; and (8) the reaction of class members to the proposed settlement.[22] All of these factors support approval of the Settlement Agreement.

### 1. The strength of plaintiffs' case supports final approval.

In assessing the strength of plaintiffs' case, the Court should not reach "any ultimate conclusions regarding the contested issues of fact and law that underlie the merits of this litigation."[23] Instead, the Court is to "evaluate objectively the strengths and weaknesses inherent in the litigation and the impact of those considerations on the parties' decisions to reach these agreements."[24] The Court's assessment of the likelihood of success is "nothing more than 'an amalgam of delicate balancing, gross approximations and rough justice.'"[25] Plaintiffs believe the classes' claims are meritor-

---

[19] *In re Syncor ERISA Litig.*, 516 F.3d 1095, 1101 (9th Cir. 2008) (internal quotation marks and citation omitted).

[20] *Van Bronkhorst v. Safeco Corp.*, 529 F.2d 943, 950 (9th Cir. 1976).

[21] *Sullivan v. DB Invs., Inc.,* 667 F.3d 273, 311 (3d Cir. 2011) (internal citation and quotation marks omitted; ellipsis in original).

[22] *In re Bluetooth Headset Prods. Liab. Litig.*, 654 F.3d 935, 946 (9th Cir. 2011).

[23] *Officers for Justice v. Civil Serv. Comm'n*, 688 F.2d 615 at 625 (9th Cir. 1982).

[24] *In re Washington Pub. Power Supply Sys. Sec. Litig.*, 720 F. Supp. 1379, 1388 (D. Ariz. 1989).

[25] *Officers for Justice*, 688 F.2d at 625 (internal citations omitted).

ious claims but realize there are risks generally in litigation and specifically with respect to the Ninth Circuit's ruling in *O'Bannon v. Nat'l Collegiate Athletic Ass'n*,[26] which defendants vigorously advocate could present some limitation to the case. This factor supports final approval.

### 2. The risk, expense, complexity, and duration of further litigation supports final approval.

"'An antitrust class action is arguably the most complex action to prosecute. . . . The legal and factual issues involved are always numerous and uncertain in outcome.'"[27] The classes are not certified (other than provisionally for settlement purposes only), and significant obstacles to victory remain on the merits even if the classes were certified. The Settlement Agreement brings significant relief to the classes despite this ongoing risk. This factor also supports final approval of the Settlement Agreement.

### 3. The risk of maintaining class action status through trial.

The second factor, the risk of maintaining class action status through trial, also supports final approval of the settlements here. Defendants vigorously opposed plaintiffs' motion for certification of damages classes.[28] If the Settlement Agreement were not approved, plaintiffs would need to renew their motion for class certification of the damages classes. If the motion were denied, the putative class members would recover nothing. Once again, this factor supports final approval of the Settlement Agreement.

### 4. The amount offered in settlement supports final approval.

The "very essence of a settlement is compromise, a yielding of absolutes and an abandoning of highest hopes."[29] Guided by Dr. Rascher's damages probit regression model, class counsel negotiated a settlement of $208,664,445. The probit model predicted which schools would have adopted

---

[26] 802 F.3d 1049 (9th Cir. 2015).

[27] *In re Linerboard Antitrust Litig.*, MDL No. 1261, 2004 U.S. Dist. LEXIS 10532, at *34 (E.D. Pa. June 2, 2004) (internal quotation marks and citations omitted).

[28] *See* Defendants' Memorandum of Points and Authorities in Opposition to Consolidated Plaintiffs' Motion for Certification of Damages Classes, dated Aug. 26, 2016 (filed under seal) (and supporting papers).

[29] *Linney v. Cellular Alaska P'ship*, 151 F.3d 1234, 1242 (9th Cir. 1998) (internal quotation marks omitted).

full cost of attendance in 2009-2010 had the NCAA's rules prohibiting such payments not been adopted, and damages were estimated therefrom.[30] For eligible class members attending schools that the probit model predicted would have paid COA, estimated damages are approximately $210 million to $220 million.[31] Since the settlement was reached, many additional schools are now paying or have stated an intent to pay COA. Class members from these additional COA-paying schools will also receive payment from the settlement fund.[32] The average recovery for class members who played a sport for four years and are entitled to an award is approximately $6,000 (net of requested fees and expenses). This factor strongly weighs in favor of granting final approval.

### 5. The extent of discovery completed and stage of proceedings supports final approval.

The extent of the discovery conducted and the stage of the litigation are both indicators of counsel's familiarity with the case and of their having sufficient information to make an informed decision.[33] "A settlement following sufficient discovery and genuine arms-length negotiation is presumed fair."[34] The parties here conducted extensive discovery, thoroughly testing the claims and defenses available in this case. As explained in plaintiffs' motion for attorneys' fees, expenses, and

---

[30] *See* Expert Declaration of Daniel A. Rascher in Support of Motion for Preliminary Approval of Damages Classes, Feb. 3, 2017, ECF No. 560-4.

[31] *Id.*

[32] The number of class members eligible to receive payment has grown significantly since the settlement was reached. The settlement agreement benefitted class members by including a clause allowing for even more class members to become eligible to receive settlement payments after the parties reached an agreement in principle in December 2016 and executed their settlement agreement on February 3, 2017, if their school provided or indicated by or before June 1, 2017 an intent to start providing any portion of the gap between the athletic GIA allowed prior to August 1, 2015 and full COA to at least one Class Member at their school. *See* ECF No. 560-1 at Exhibit A to the Settlement Agreement, para. B.2. As Dr. Rascher opined at class certification, the market was still unwinding from the longstanding GIA cap and had yet to reach "equilibrium." After the parties reached settlement, dozens of schools adopted or declared their intent to adopt COA. So, many more student-athlete class members have become eligible to get paid from the settlement fund after the parties agreed to settlement and the Court granted preliminary approval. Counting all of the many additional class members who will now receive payment, the settlement fund now represents approximately 66% of total single damages—a tremendous result in comparison to most large antitrust settlements.

[33] *See, e.g.*, *In re Mego Fin. Corp. Sec. Litig.*, 213 F.3d 454, 459 (9th Cir. 2000).

[34] *See Knight v. Red Door Salons, Inc.*, No. 08-01520, 2009 U.S. Dist. LEXIS 11149, at *10 (N.D. Cal. Feb. 2, 2009).

incentive awards,[35] plaintiffs for three years responded to defendants' interrogatories and requests for production of documents, by working with plaintiffs to acquire information requested by defendants and by drafting the discovery responses. Discovery responses included, for example, a 45-page set of responses to defendants' contention interrogatories directed at critical issues in the case (e.g., less restrictive alternatives).[36]

Plaintiffs' counsel have also propounded extensive document requests on defendants and third parties. These requests yielded significant document productions of more than 550,000 documents and more than 2.8 million pages of documents.[37] And plaintiffs received productions from various NCAA member institutions throughout the litigation.[38] Reviewing these massive document productions was a major effort; lead counsel coordinated a complex and thorough review process with eleven attorneys, spanning two-and-a-half years and amounting to about 5,000 attorney hours.[39] And plaintiffs issued subpoenas to 337 NCAA member institutions in order to obtain critical NCAA member scholarship data. This effort cannot be understated, given the importance of detailed school and player-specific data required for plaintiffs' econometric damages model.[40] And plaintiffs took more than 50 depositions, including numerous high-profile figures in the world of college sports.[41]

The extent of discovery strongly favors final approval of the Settlement Agreement.

---

[35] *See* Notice of Motion and Motion for Attorneys' Fees, Expenses, and Service Awards, Sept. 6, 2017, ECF No. 688, at 4-6.

[36] *Id*. at 4.

[37] *Id*.

[38] *Id*.

[39] *Id.*

[40] *Id.*

[41] *Id*. at 5. The deponents included but were not limited to Mark Emmert (President of the NCAA); Mary Willingham (the whistleblower who helped reveal an academic fraud scandal at the University of North Carolina at Chapel Hill); Mike Slive (former Commissioner of the Southeastern Conference); John Swofford (Atlantic Coast Conference Commissioner); Michael Aresco (American Athletic Conference Commissioner); Harvey Perlman (former Chancellor of the University of Nebraska); Jim Delany (Big Ten Conference Commissioner); Karl Benson (Sun Belt Conference Commissioner); and Larry Scott (Pac-12 Conference Commissioner). *Id.*

### 6. The experience and views of class counsel support approval.

"The recommendations of plaintiffs' counsel should be given a presumption of reasonableness."[42] Here, plaintiffs' counsel—antitrust lawyers with many years of experience—support the settlement. This factor again weighs in support of final approval.

### 7. The non-presence of a government participant supports final approval.

"No governmental entity participated in this matter; this factor, therefore, is irrelevant to the Court's analysis."[43]

### 8. The reaction of the classes supports final approval.

Plaintiffs have received only one objection, which focuses on the requested attorneys' fees. Plaintiffs believe that the objection is unfounded and addressed it in the memorandum they filed with the Court on November 3, 2017, under the Amended Order. In addition, not a single class member has opted out of the case.[44]

## D. The plan of allocation is fair.

Approval of a plan to allocate settlement funds to class members is governed by the same standard that applies to approval of settlement terms—the distribution plan must be "fair, reasonable and adequate."[45] A plan of allocation that reimburses class members based on the type and extent of their injuries is generally reasonable.[46] Pro-rata distribution plans (similar to what is provided for

---

[42] *See In re Omnivision Techs., Inc.*, 559 F. Supp. 2d 1036, 1043 (N.D. Cal. 2007) (citation and internal quotation marks omitted).

[43] *Zepeda v. PayPal, Inc.*, No. C 10-2500, 2017 U.S. Dist. LEXIS 43672, at *48 (N.D. Cal. Mar. 24, 2017). *Accord*, *Sciortino v. PepsiCo, Inc*., No. 14-cv-00478, 2016 U.S. Dist. LEXIS 83937, at *20 (N.D. Cal. June 28, 2016) ("Because there is no government participant in this case, this factor is inapplicable.").

[44] Vasquez Decl., ¶ 28.

[45] *In re Cathode Ray Tube (CRT) Antitrust Litig.*, No. 3:07-cv-5944, 2016 U.S. Dist. LEXIS 24951, at *216 (N.D. Cal. Jan. 28, 2016); *In re Omnivision Tech.*, 559 F. Supp. 2d at 1045 (N.D. Cal. 2008).

[46] *Cathode Ray*, 2016 U.S. Dist. LEXIS, at *229 (citing *In re Citric Acid Antitrust Litig*., 145 F. Supp. 2d 1152, 1154 (N.D. Cal. 2001)).

here) have been approved in many antitrust cases in this district.[47]

The Court finds that the Settlement Agreement's Distribution Plan is fair, reasonable, and adequate. The Distribution Plan provides monetary recovery in some form, on a pro rata basis based on the gap between the athletic GIA allowed prior to August 1, 2015 and full COA at each school that provided or indicated by or before June 1, 2017 an intent to start providing any portion of that gap to at least one Class Member at their school. The Court also notes that there is no reversion of the Net Settlement Fund, maximizing the amount of payments to Settlement Class Members. Accordingly, with the changes noted above, the Plan of Allocation is approved.

## VI. RELEASE OF CLAIMS

As of the Settlement Agreement's Effective Date, the Releasors[48] will release the Releasees[49] from any and all past, present and future claims, demands, rights, actions, suits, or causes of action, for monetary damages of any kind (including but not limited to actual damages, statutory damages, and exemplary or punitive damages), whether class, individual or otherwise in nature, known or unknown, foreseen or unforeseen, suspected or unsuspected, asserted or unasserted, contingent or non-contingent, under the laws of any jurisdiction, which Releasors or any of them, whether directly, representatively, derivatively, or in any other capacity, ever had, now have or hereafter can, shall or may have, arising out of or relating in any way to any of the legal, factual, or other allegations made in Plaintiffs' Actions,[50] or any legal theories that could have been raised on the allegations in

---

[47] *Id.* ("Indeed, in this District, a 'pro-rata [plan] for allocation has been used in many antitrust cases.'") (quoting *In re TFT-LCD (Flat Panel) Antitrust Litig.*, No. 07-md-1827, 2011 U.S. Dist. LEXIS 154288, at *9 (N.D. Cal. Dec. 27, 2011).

[48] As set forth in the Settlement Agreement, "'Releasors' means the Plaintiffs and each and every Class Member, on their own behalf and on behalf of their respective families, their former, present or future agents and legal representatives, and the predecessors, successors, heirs, executors, administrators and assigns of each of the foregoing."

[49] As set forth in the Settlement Agreement, "'Releasees' means the NCAA, each of the Conference Defendants, and each of their respective member institutions (past and present), subsidiary, parent, related, and affiliated Persons, and each of their respective former, present and future officers, directors, employees, managers, members, partners, agents, servants, shareholders (in their capacity as shareholders), attorneys and legal representatives, and the predecessors, successors, heirs, executors, administrators and assigns of each of the foregoing."

[50] As set forth in the Settlement Agreement "'Actions' means *In Re: National Collegiate Athletic Association Athletic Grant-In-Aid Cap Antitrust Litigation*, Case No. 4:14-MD-02541-CW, and each

Plaintiffs' Actions. The Released Claims do not include claims solely for prospective injunctive relief and certain other claims expressly excluded from the release as set forth in the Settlement Agreement. Indeed, the injunctive class claims in this litigation are still pending and not part of the Settlement Agreement.

As of the Effective Date, (1) the Releasees shall be discharged and released from all Released Claims; (2) the Releasors shall be permanently barred and enjoined from instituting or prosecuting any of the Released Claims; and (3) the Settlement Agreement and this Final Approval Order and Judgment shall be binding on and have *res judicata* and preclusive effect in all pending and future lawsuits or other proceedings encompassed by the Released Claims maintained by or on behalf of the Releasors, as well as their agents, heirs, executors or administrators, successors, insurers and assigns.

### VII. DISMISSAL OF CLAIMS FOR DAMAGES

Plaintiffs' claims for damages are DISMISSED WITH PREJUDICE, and except as provided for in this Order, without costs. Pursuant to Federal Rule of Civil Procedure 54(b), the Court determines that there is no just reason for delay and directs that this Judgment as to the claims for damages shall be final and entered forthwith.

### VIII. NO EVIDENTIARY EFFECT; EFFECT OF TERMINATION

The Court determines that the Settlement Agreement and the Settlement provided for therein and any proceedings taken pursuant thereto are not and should not in any event be offered or received as evidence of a presumption, concession, acknowledgment or an admission of liability or of any wrongdoing by Defendants or any Releasees or of the suitability of these or similar claims to class treatment in active litigation and trial; provided, however, that reference may be made to the Settlement Agreement and the Settlement provided for therein in such proceedings as may be necessary to effectuate the Settlement Agreement.

The Court orders that if the Settlement Agreement is terminated pursuant to its terms, or the Effective Date for any reason does not occur, the certification of the Classes shall be automatically

---

of the cases brought on behalf of Plaintiffs previously consolidated and/or included as part of MDL Docket No. 2541 (excluding *Jenkins v. Nat'l Collegiate Athletic Ass'n*, Case No. 4:14-cv-02758-CW (the "*Jenkins* Action")).

vacated and shall not constitute evidence or any determination that the requirements for certification of a class for trial or other litigation purposes in these Actions or any other action are satisfied; in such circumstances, Defendants reserve all rights to challenge certification of any class or subclass for trial or other litigation purposes in the Actions or in any other action on all available grounds as if no class had been certified in these Actions for purposes of the Settlement, and the Actions shall revert nunc pro tunc to the procedural status quo as of the date and time immediately before the execution of the Settlement Agreement, in accordance with the Settlement Agreement.

## IX. CONTINUING JURISDICTION

Without affecting the finality of this Judgment, the Court reserves continuing and exclusive jurisdiction over the Settlement, including all future proceedings concerning the administration, consummation and enforcement of the Settlement Agreement.

IT IS SO ORDERED.

DATED: December 6, 2017

HONORABLE CLAUDIA WILKEN
UNITED STATES DISTRICT JUDGE

Submitted on December 6, 2017, by:

HAGENS BERMAN SOBOL SHAPIRO LLP

By      */s/ Steve W. Berman*
         Steve W. Berman
Steven W. Berman (*Pro Hac Vice*)
Craig R. Spiegel (122000)
Ashley A. Bede (Pro Hac Vice)
1918 Eighth Avenue, Suite 3300
Seattle, WA 98101
Telephone: (206) 623-7292
Facsimile: (206) 623-0594
steve@hbsslaw.com
craigs@hbsslaw.com
ashleyb@hbsslaw.com

Jeff D. Friedman (173886)
HAGENS BERMAN SOBOL SHAPIRO LLP
715 Hearst Avenue, Suite 202
ORDER GRANTING MOT. FOR FINAL APPROVAL OF CLASS
ACTION SETTLEMENT - No: 14 -md-2541-CW     - 13 -

| | |
|---|---|
| 1 | Berkeley, CA 94710<br>Telephone: (510) 725-3000 |
| 2 | Facsimile: (510) 725-3001<br>jefff@hbsslaw.com |
| 3 | |
| 4 | PEARSON, SIMON & WARSHAW, LLP |
| 5 | By     */s/ Bruce L. Simon*<br>       Bruce L. Simon |
| 6 | Bruce L. Simon (96241)<br>Benjamin E. Shiftan (265767) |
| 7 | 44 Montgomery Street, Suite 2450<br>San Francisco, CA 94104 |
| 8 | Telephone: (415) 433-9000<br>Facsimile: (415) 433-9008 |
| 9 | bsimon@pswlaw.com<br>bshiftan@pswlaw.com |
| 10 | *Plaintiffs' Co-Lead Class Counsel* |
| 11 | Elizabeth C. Pritzker (146267)<br>Jonathan K. Levine (220289) |
| 12 | Shiho Yamamoto (264741)<br>Anne C. Maness (303438) |
| 13 | PRITZKER LEVINE LLP<br>180 Grand Avenue, Suite 1390 |
| 14 | Oakland, CA 94612<br>Telephone: (415) 692-0770 |
| 15 | Facsimile: (415) 366-6110<br>ecp@pritzkerlevine.com |
| 16 | jkl@pritzkerlevine.com<br>sy@pritzkerlevine.com |
| 17 | acm@pritzkerlevine.com |
| 18 | *Additional Class Counsel* |