Sean Eskovitz (SBN 241877)
WILKINSON WALSH + ESKOVITZ LLP
11726 San Vicente Blvd., Suite 600
Los Angeles, CA 90049
Telephone:  (424) 316-4000
Facsimile:  (202) 847-4005
seskovitz@wilkinsonwalsh.com

Beth A. Wilkinson (*pro hac vice*)
Alexandra M. Walsh (*pro hac vice*)
Brian L. Stekloff (*pro hac vice*)
Rakesh N. Kilaru (*pro hac vice*)
WILKINSON WALSH + ESKOVITZ LLP
2001 M Street NW, 10th Floor
Washington, DC 20036
Telephone:  (202) 847-4000
Facsimile:  (202) 847-4005
bwilkinson@wilkinsonwalsh.com
awalsh@wilkinsonwalsh.com
bstekloff@wilkinsonwalsh.com
rkilaru@wilkinsonwalsh.com

Attorneys for Defendant
NATIONAL COLLEGIATE ATHLETIC
ASSOCIATION

Raoul D. Kennedy (SBN 40892)
SKADDEN, ARPS, SLATE, MEAGHER &
FLOM LLP
525 University Avenue, Suite 1100
Palo Alto, CA 94301
Telephone:  (650) 470-4500
Facsimile:  (650) 470-4570
raoul.kennedy@skadden.com

Jeffrey A. Mishkin (*pro hac vice*)
Karen Hoffman Lent (*pro hac vice*)
SKADDEN, ARPS, SLATE, MEAGHER &
FLOM LLP
Four Times Square
New York, NY  10036
Telephone:  (212) 735-3000
Facsimile:  (212) 735-2000
jeffrey.mishkin@skadden.com
karen.lent@skadden.com

Attorneys for Defendants
NATIONAL COLLEGIATE ATHLETIC
ASSOCIATION and WESTERN ATHLETIC
CONFERENCE

[Additional Counsel Listed on Signature
Page]

# IN THE UNITED STATES DISTRICT COURT

## FOR THE NORTHERN DISTRICT OF CALIFORNIA

### OAKLAND DIVISION

| | |
|---|---|
| IN RE NATIONAL COLLEGIATE ATHLETIC ASSOCIATION ATHLETIC GRANT-IN-AID CAP ANTITRUST LITIGATION<br><br>This Document Relates to:<br><br>ALL ACTIONS | MDL Docket No. 4:14-md-02541-CW<br>Case No. 4:14-cv-02758-CW<br><br>**REPLY IN SUPPORT OF DEFENDANTS' MOTION FOR SUMMARY JUDGMENT, REPLY IN SUPPORT OF DEFENDANTS' MOTIONS TO EXCLUDE EXPERT TESTIMONY, AND OPPOSITION TO PLAINTIFFS' MOTIONS TO EXCLUDE EXPERT TESTIMONY**<br><br>Date:            January 16, 2018<br>Time:            2:30 p.m.<br>Courtroom:    Courtroom 2, 4th Floor<br>Before:          Hon. Claudia Wilken |

1

# **TABLE OF CONTENTS**

2

Page

3

REPLY IN SUPPORT OF DEFENDANTS' MOTION FOR SUMMARY JUDGMENT ...........1

ARGUMENT ........................................................................................................................4

    I.     *O'Bannon* Precludes All of Plaintiffs' Claims........................................................4

           A.     Well-Established Precedential Doctrines Preclude Plaintiffs from
                 Relitigating *O'Bannon*. ................................................................................7

                 1.     *Res Judicata* and Collateral Estoppel Preclude Plaintiffs from
                            Relitigating *O'Bannon*. .......................................................7

                 2.     *Stare Decisis* Also Bars Plaintiffs' Claims. .....................................9

           B.     This Case Does Not Include Material Factual Differences Warranting
                 Departure from *O'Bannon*. ........................................................................14

                 1.     Defendants Do Not Pay Student-Athletes Cash Compensation
                            Untethered to Educational Expenses. ..............................................15

                 2.     Plaintiffs Have No New Evidence Undermining the NCAA's
                            Commitment to Ensuring Student-Athletes Have Academic
                            Opportunities. .................................................................................18

                 3.     Plaintiffs' Recycled Challenges to Academic Integration Fail. ......21

                 4.     Plaintiffs' "New" Survey Evidence Is Irrelevant. ..........................23

                 5.     Plaintiffs' Arguments About Longstanding NCAA Rules
                            Permitting Student-Athletes to Receive Certain Awards,
                            Benefits, and Reimbursements Mischaracterize Those Rules
                            and Their Role in *O'Bannon*. ........................................................24

                 6.     The Small Handful of Rules Changes Since *O'Bannon* Do
                            Not Constitute Materially Changed Circumstances Justifying
                            a Different Result. ..........................................................................27

            C.     Plaintiffs May Not Retry *O'Bannon* Based on Allegedly New
                 Arguments About New Less Restrictive Alternatives. ..............................29

REPLY IN SUPPORT OF DEFENDANTS' MOTIONS TO EXCLUDE EXPERT
TESTIMONY AND OPPOSITION TO PLAINTIFFS' MOTIONS TO EXCLUDE EXPERT
TESTIMONY ....................................................................................................................33

    I.     *Daubert* Compels Exclusion of Several Opinions Offered by Drs. Noll,
           Rascher, and Lazear. ................................................................................34

            A.     Opinions That Contradict *O'Bannon* Are Irrelevant and Should Be
                 Excluded. ....................................................................................................34

i

B.   Opinions That Plaintiffs' Experts Are Not Qualified to Offer Should Be Excluded. ...................................................35

C.   Opinions Based on No Accepted or Recognized Methodology Should Be Excluded. ...................................................36

II.   Plaintiffs' Motion to Exclude Dr. Elzinga's Testimony on Market  Definition Should Be Denied. ...................................................37

A.   Dr. Elzinga's Use of Multi-Sided Platform Analysis Accounts for Several of *O'Bannon*'s Key Holdings. ...................................................37

B.   Dr. Elzinga Used Methodology That Is Well Established in the Literature and Has Been Accepted by Courts, and Thus Is Not Subject to Exclusion Under *Daubert*. ...................................................39

III.   Plaintiffs' Motion to Exclude Dr. Heckman's Testimony Should Be Denied. ...................................................44

A.   Dr. Heckman's Empirical Analysis Is Relevant to Whether Current NCAA Rules Benefit Student-Athletes. ...................................................45

B.   Dr. Heckman's Analysis Is Based on Sound, Well-Accepted Economic Methods. ...................................................48

C.   Dr. Heckman's Rebuttal Report Properly Strengthened His Conclusions With Additional Economic Analysis and Literature. ...................................................52

CONCLUSION ...................................................56

# TABLE OF AUTHORITIES

## CASES

*A & M Records, Inc. v. Napster, Inc.*,
   2000 WL 1170106 (N.D. Cal. Aug. 10, 2000) ..............................................34, 36

*American Booksellers Association, Inc. v. Barnes & Noble, Inc.*,
   135 F. Supp. 2d 1031 (N.D. Cal. 2001) ......................................................36, 37

*Avila v. Willits Environmental Trust*,
   2009 WL 2972513 (N.D. Cal. July 9, 2009) ......................................................54

*Aviva Sports, Inc. v. Fingerhut Direct Marketing, Inc.*,
   829 F. Supp. 2d 802 (D. Minn. 2011) .........................................................41, 55

*Bazemore v. Friday*,
   478 U.S. 385 (1986) ...........................................................................................52

*Braswell v. Shoreline Fire Department*,
   2011 WL 4712124 (W.D. Wash. Oct. 5, 2011) ................................................41

*Brown Shoe Co. v. United States*,
   370 U.S. 294 (1962) ...........................................................................................44

*California Department of Toxic Substances Control v. Interstate Non-Ferrous Corp.*,
   298 F. Supp. 2d 930 (E.D. Cal. 2003) ...............................................................33

*Calence, LLC v. Dimension Data Holdings, PLC*,
   222 F. App'x 563 (9th Cir. 2007) .........................................................................7

*In re Cessna 280 Series Aircraft Products Liability Litigation*,
   2009 WL 1649773 (D. Kan. June 9, 2009) ........................................................55

*In re CitiMortgage, Inc. Home Affordable Modification Program
   ("HAMP") Litigation*,
   2013 WL 8844095 (C.D. Cal. Oct. 7, 2013) ......................................................49

*Cooper v. Federal Reserve Bank of Richmond*,
   467 U.S. 867 (1984) ...........................................................................................33

*Daubert v. Merrell Dow Pharmaceuticals, Inc.*,
   43 F.3d 1311 (9th Cir. 1995) .............................................................................45

*Daubert v. Merrell Dow Pharmaceuticals., Inc.*,
   509 U.S. 579 (1993) .............................................................................34, 35, 45

*Doe v. University of Pacific*,
   467 F. App'x 685 (9th Cir. 2012) ......................................................................20

*Doyle v. Chrysler Group LLC*,
   2015 WL 353993 (C.D. Cal. Jan. 21, 2015) ................................................50, 51

*In re Dual-Deck Video Cassette Recorder Antitrust Litigation*,
 11 F.3d 1460 (9th Cir. 1993) .................................................................9, 11, 12

*EEOC v. General Telephone Co. of Northwest, Inc.*,
 885 F.2d 575 (9th Cir. 1989) ...............................................................................52

*EEOC v. Texas Roadhouse, Inc.*,
 215 F. Supp. 3d 140 (D. Mass. 2016) ..................................................................41

*Ehrler v. Berryhill*,
 2017 WL 1902164 (E.D. Wash. May 9, 2017) ......................................................7

*Flaviano v. California. Department of State Hospitals*,
 2017 WL 385973 (N.D. Cal. Jan. 26, 2017) ........................................................20

*Fonseca v. Food Services of Arizona, Inc.*,
 374 F.3d 840 (9th Cir. 2004) ...............................................................................20

*Gospel Missions of America v. City of Los Angeles*,
 328 F.3d 548 (9th Cir. 2003) ...............................................................................14

*Harkins Amusement Enterprises, Inc. v. General Cinema Corp.*,
 850 F.2d 477 (9th Cir. 1988) ("*Harkins I*") .........................................................11

*Harkins Amusement Enterprises, Inc. v. Harry Nace Co.*,
 890 F.2d 181 (9th Cir. 1989) ("*Harkins II*") ........................................................11

*Hart v. Massanari*,
 266 F.3d 1155 (9th Cir. 2001) ...................................................................9, 14, 27

*In re High-Tech Employee Antitrust Litigation*,
 2014 WL 1351040 (N.D. Cal. Apr. 4, 2014) ..................................................52, 54

*Hotel 71 Mezz Lender LLC v. National Retirement Fund*,
 778 F.3d 593 (7th Cir. 2015) ...............................................................................33

*HTC Corp. v. Technology Properties Ltd.*,
 2013 WL 4782598 (N.D. Cal. Sept. 6, 2013) ......................................................48

*Hyland v. HomeServices of America, Inc.*,
 771 F.3d 310 (6th Cir. 2014) ...............................................................................35

*i4i Ltd. Partnership v. Microsoft Corp.*,
 598 F.3d 831 (Fed. Cir. 2010) .............................................................................49

*Jaasma v. Shell Oil Co.*,
 412 F.3d 501 (3d Cir. 2005) ................................................................................49

*Jerden v. Amstutz*,
 430 F.3d 1231 (9th Cir. 2005) .............................................................................31

*Kamilche Co. v. United States*,
 53 F.3d 1059 (9th Cir. 1995) ...............................................................................30

iv

*King Drug Co. of Florence, Inc. v. Cephalon, Inc.*,
    2015 WL 6750899 (E.D. Pa. Nov. 5, 2015) ..................................................34

*Larez v. City of Los Angeles*,
    946 F.2d 630 (9th Cir. 1991) ....................................................................20

*Lawlor v. National Screen Service Corp.*,
    349 U.S. 322 (1955) ...................................................................................9

*Lawson v. Trowbridge*,
    153 F.3d 368 (7th Cir. 1998) ....................................................................43

*Lexecon Inc. v. Milberg Weiss Bershad Hynes & Lerach*,
    523 U.S. 26 (1998) ...................................................................................32

*Los Angeles Memorial Coliseum Commission v. National Football League*,
    726 F.2d 1381 (9th Cir. 1984) ..................................................................10

*Los Angeles Memorial Coliseum Commission v. National Football League*,
    791 F.2d 1356 (9th Cir. 1986) ..................................................................10

*Miranda v. Selig*,
    860 F.3d 1237 (9th Cir. 2017) .................................................9, 10, 13, 14

*Montana v. United States*,
    440 U.S. 147 (1979) .................................................................................15

*National Basketball Association v. SDC Basketball Club, Inc.*,
    815 F.2d 562 (9th Cir. 1987) ....................................................................10

*Nationwide Mutual Fire Insurance v. Sunbeam Products*,
    2014 WL 3875844 (S.D.N.Y. July 14, 2014) ...........................................43

*In re NCAA Grant-in-Aid Cap Antitrust Litigation*,
    2016 WL 4154855 (N.D. Cal. Aug. 15, 2016) .............................1, 2, 6, 32

*In re NCAA Student-Athlete Name & Likeness Licensing Litigation*,
    37 F. Supp. 3d 1126 (N.D. Cal. 2014) .......................................................5

*Newton v. Thomason*,
    22 F.3d 1455 (9th Cir. 1994) ....................................................................32

*O'Bannon v. NCAA*,
    7 F. Supp. 3d 955 (N.D. Cal. 2014) ................................................. *passim*

*O'Bannon v. NCAA*,
    802 F.3d 1049 (9th Cir. 2015) ......................................................... *passim*

*Oddi v. Ford Motor Co.*,
    234 F.3d 136 (3d Cir. 2000)......................................................................44

*Oltz v. St. Peter's Community Hospital*,
    861 F.2d 1440 (9th Cir. 1988) ..................................................................10

v

**REPLY ISO DEFS.' MOT. FOR SUMMARY JUDGMENT, REPLY ISO DEFS.'**
**MOTIONS TO EXCLUDE, & OPP. TO PLS.' MOTIONS TO EXCLUDE**

**MDL No. 4:14-md-02541-CW**
**Case No. 4:14-cv-02758-CW**

*Oracle America, Inc. v. Google Inc.*,
    2011 WL 5572835 (N.D. Cal. Nov. 15, 2011) .......................................................54

*Oregon Natural Desert Association v. U.S. Forest Service*,
    550 F.3d 778 (9th Cir. 2008) .................................................................14, 27

*In re Phenylpropanolamine (PPA) Products Liability Litigation*,
    460 F.3d 1217 (9th Cir. 2006) ...................................................................32

*Primiano v. Cook*,
    598 F.3d 558 (9th Cir. 2010) .............................................................39, 41, 44

*Ramallo Bros. Printing v. El Día, Inc.*,
    490 F.3d 86 (1st Cir. 2007) .......................................................................9

*Rambus Inc. v. Hynix Semiconductor Inc.*,
    569 F. Supp. 2d 946 (N.D. Cal. 2008) .............................................................30

*State Oil Co. v. Khan*,
    522 U.S. 3 (1997) ...............................................................................13

*Tahoe-Sierra Preservation Council, Inc. v. Tahoe Regional Planning Agency*,
    322 F.3d 1064 (9th Cir. 2003) ...................................................................30

*Taylor v. Sturgell*,
    553 U.S. 880 (2008) ..........................................................................8, 14

*Tesoro Refining & Marketing Co. LLC v. Pacific Gas & Electric Co.*,
    2016 WL 158874 (N.D. Cal. Jan. 14, 2016) .....................................................48, 51

*Times-Picayune Publishing Co. v. United States*,
    345 U.S. 594 (1953) .............................................................................40

*In re Toyota Motor Corp. Hybrid Brake Marketing, Sales Practices & Products Liability Litigation*,
    2012 WL 4904412 (C.D. Cal. Sept. 20, 2012) ......................................................41

*Turtle Island Restoration Network v. U.S. Department of State*,
    673 F.3d 914 (9th Cir. 2012) .....................................................................12

*United States v. American Express Co.*,
    21 F. Supp. 3d 187 (E.D.N.Y. 2014) ...............................................................42

*United States v. American Express Co.*,
    838 F.3d 179 (2d Cir. 2016).............................................................40, 43, 44

*United States v. Blauvelt*,
    680 F. App'x 578 (9th Cir. 2017) ................................................................31

*United States v. Gadson*,
    763 F.3d 1189 (9th Cir. 2014) ...................................................................31

*United States v. Mercy Health Services*,
    107 F.3d 632 (8th Cir. 1997) ....................................................................13

*United States v. Motor Vehicle Manufacturers Association of the United States, Inc.*,
    1982 WL 1934 (C.D. Cal. Oct. 28, 1982) ...........................................................13

*United States v. Ramos-Medina*,
    706 F.3d 932 (9th Cir. 2013) ..............................................................15, 26

*United States v. Santini*,
    656 F.3d 1075 (9th Cir. 2011) ...............................................................35

*United States Telecom Assocation v. Federal Communications Commission*,
    825 F.3d 674 (D.C. Cir. 2016) ...............................................................42

*US Airways, Inc. v. Sabre Holdings Corp.*,
    2017 WL 1064709 (S.D.N.Y. Mar. 21, 2017) ...........................................40, 42

*Van Alfen v. Toyota Motor Sales, U.S.A., Inc.*,
    2012 WL 12930456 (C.D. Cal. Nov. 9, 2012) ...............................................53

*Vident v. Dentsply, International*,
    2008 WL 11336951 (C.D. Cal. June 5, 2008) ...............................................9

*Wendell v. GlaxoSmithKline LLC*,
    858 F.3d 1227 (9th Cir. 2017) ...............................................................35

*Western Oilfields Supply Co. v. Goodwin*,
    461 F. App'x 624 (9th Cir. 2011) ..........................................................31

*Windham v. Circuit City Stores, Inc.*,
    420 F. Supp. 2d 1206 (D. Kan. 2006) ......................................................43

## STATUTES

20 U.S.C. § 1087*ll*..................................................................................15, 16

28 U.S.C. § 1407 .......................................................................................32

## RULES

Fed. R. Civ. P. 26(a)(2)(D)(ii) ......................................................................53

Fed. R. Civ. P. 37(c)(1) ..............................................................................54

Fed. R. Civ. P. 56(a), (g) ...........................................................................33

Fed. R. Civ. P. 56(a) advisory committee's note to 2010 amendment ...........................33

N.D. Cal. Civ. L.R. 56-3 .............................................................................33

## REGULATIONS

34 CFR 668.164(d) ....................................................................................16

1

## <u>OTHER AUTHORITIES</u>

2

3

ABA Section of Antitrust Law, *Market Definition in Antitrust:  Theory and Case Studies*
(2012) ...................................................................................................................40

4

Charles A. Wright et al., 15 *Federal Practice and Procedure* § 3867 (4th ed. 2013) ..................32

5

David S. Evans & Richard Schmalensee, Nat'l Bureau of Econ. Research, *The Antitrust Analysis of Multi-Sided Platform Businesses*, in NBER Working Paper Series (Feb. 2013) ...................................................................................................................39

6

7

Jean-Charles Rochet & Jean Tirole, *Two-Sided Markets:  A Progress Report*, 37 RAND. J. Econ. 645 (2006) ................................................................................................40

8

Patrick S. Buckley et al., "Early Single-Sport Specialization: A Survey of 3090 High School, Collegiate, and Professional Athletes," *Orthopaedic J. of Sports Med.* 3 (2017) ...................................................................................................................50

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**REPLY ISO DEFS.' MOT. FOR SUMMARY JUDGMENT, REPLY ISO DEFS.'
MOTIONS TO EXCLUDE, & OPP. TO PLS.' MOTIONS TO EXCLUDE**

**MDL No. 4:14-md-02541-CW
Case No. 4:14-cv-02758-CW**

1    **REPLY IN SUPPORT OF DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

2    In *O'Bannon v. NCAA*, the Ninth Circuit—like numerous courts before it—recognized that

3    a defining and necessary feature of college sports is that they are played by *students*, not paid

4    professionals.  802 F.3d 1049 (9th Cir. 2015).  The court acknowledged the immense popularity of

5    this American tradition with millions of fans both on and off campus.  And it agreed that student-

6    athletes benefit from playing sports as part of an overall educational experience.  For these reasons,

7    the *O'Bannon* court refused to transform college sports as we know it, and undermine the value

8    this institution provides to students and sports fans alike, by supplanting the rulemaking function

9    of the NCAA and jettisoning its members' longstanding commitment not to permit pay-for-play.

10   Instead, the Ninth Circuit held that the NCAA's financial support rules serve important

11   procompetitive purposes.  *See id.* at 1073, 1076.  It held that the *only* alteration to those rules

12   required by the antitrust laws was permitting schools to offer student-athletes scholarships up to

13   the federally determined cost of attendance.  *Id.* at 1079.  And it held, based on well-established

14   Supreme Court precedent, that *the NCAA* must have "'ample latitude' to superintend college

15   athletics."  *Id.* (quoting *NCAA v. Bd. of Regents*, 468 U.S. 85, 120 (1984)).

16   This case is *O'Bannon* "all over again."  Pls.' Opp. 1.[1]  Plaintiffs' latest filing confirms that

17   they—like the *O'Bannon* plaintiffs—seek to radically alter college sports.  They are not lodging a

18   targeted challenge to specific "rules prohibiting the provision of other 'benefits' and 'in-kind'

19   compensation."[2]  Nor do they seek "an injunction that would say" what particular benefits must be

20   provided if they were successful in that narrower challenge.[3]  Instead, Plaintiffs have made clear

---

21   [1]    "Pls.' Opp." refers to Plaintiffs' Memorandum of Points and Authorities filed on November 7,

22   2017; "Pls.' MSJ" refers to Plaintiffs' Memorandum of Points and Authorities filed in support of
     their motion for summary judgment filed on August 11, 2017; "Pls.' Elzinga Mot." refers to

23   Plaintiffs' motion to exclude proposed testimony of Dr. Kenneth G. Elzinga, filed on August 11,
     2017; and "Defs.' MSJ" refers to Defendants' Memorandum of Points and Authorities filed on

24   September 29, 2017.

25   [2]    *In re NCAA Grant-In-Aid ("GIA") Cap Antitrust Litig.*, 2016 WL 4154855, at *2 (N.D. Cal.
     Aug. 15, 2016).

26   [3]    Decl. of Jeffrey A. Mishkin in Supp. of Reply in Supp. of Defs.' Mot. for Summ. J., Reply in

27   Supp. of Defs.' Mot. to Exclude Expert Testimony, and Opp. to Pls.' Mot. to Exclude Expert
     Testimony ("Mishkin Decl."), Ex. 2 (Aug. 2, 2016 Hr'g Tr.) 28:9-10.

28

---

1  that they are pursuing a global injunction against *all* NCAA-level limits on the compensation or

2  benefits that student-athletes may receive.  *See* Pls.' Opp. 4, 6, 55.  That relief is squarely

3  foreclosed by *O'Bannon*'s conclusion that the NCAA's prohibition on pay-for-play, *the heart of*

4  *what Plaintiffs attack in this case*, easily withstands antitrust scrutiny.  "Here we go again," indeed.

5  *Id.* 19.

6       Plaintiffs' efforts to avoid summary judgment in light of *O'Bannon* all fail.  *First*, Plaintiffs

7  pretend *O'Bannon* never happened.  As just one example, they argue that "Defendants' academic

8  integration justification should be rejected as a matter of law because, however ostensibly

9  laudable, it is not an *economic* justification."  *Id.* 44.  That incorrect argument is foreclosed by this

10 Court's and the Ninth Circuit's contrary conclusion that "certain limited restrictions on student-

11 athlete compensation may help to integrate student-athletes into the academic communities of their

12 schools, which may in turn improve the schools' college education product."  *O'Bannon v. NCAA*,

13 7 F. Supp. 3d 955, 980 (N.D. Cal. 2014); *see also O'Bannon*, 802 F.3d at 1073.  Much as Plaintiffs

14 may not like it, "*O'Bannon* is binding."  *In re NCAA GIA Cap Antitrust Litig.*, 2016 WL 4154855,

15 at *2.  Plaintiffs cannot wish it away.

16       *Second*, Plaintiffs erroneously claim that the ordinary rules that govern our legal system—

17 principally, that precedent should be followed—do not apply here, either because this is an

18 antitrust case, Pls.' Opp. 10, or because (according to Plaintiffs) only the "analytical framework for

19 antitrust analysis" carries forward from *O'Bannon*, *id.* 12.  Plaintiffs have all but conceded that *res*

20 *judicata* and collateral estoppel foreclose their claims by failing to offer any meaningful

21 explanation for why those doctrines do not apply.  *Compare id.* 9, *with* Defs.' MSJ 17-20.  And

22 they provide no serious argument for why *stare decisis* does not also bar their claims.  Indeed,

23 Plaintiffs do not cite a single case—antitrust or otherwise, from any jurisdiction—in which a

24 district court ignored binding circuit court precedent addressing identical issues, especially

25 precedent issued just two years earlier.  There is good reason for that:  A functionally identical set

26 of Plaintiffs cannot renew a previously lost challenge under a different case caption in an effort to

27 obtain relief that the courts have already rejected.

28

**REPLY ISO DEFS.' MOT. FOR SUMMARY JUDGMENT, REPLY ISO DEFS.'**          **MDL No. 4:14-md-02541-CW**
**MOTIONS TO EXCLUDE, & OPP. TO PLS.' MOTIONS TO EXCLUDE**               **Case No. 4:14-cv-02758-CW**

1       *Third*, ignoring the record in *O'Bannon*, as well as Defendants' opening brief, Plaintiffs

2   suggest there is "new, undisputed evidence of changed economic and other factual circumstances"

3   that was absent from the *O'Bannon* record.  Pls.' Opp. 13.  But the doctrine of *stare decisis*

4   requires adhering to controlling precedent unless a new case truly presents new, material factual

5   differences.  The implementation of relief ordered by a precedent (here, permitting schools to offer

6   student-athletes financial aid up to the cost of attendance) obviously provides no basis for setting

7   that precedent aside.  And as Defendants have explained, virtually all of the other purportedly

8   "new" evidence and arguments that Plaintiffs raise in this case were part of the record in

9   *O'Bannon*, often in the exact same form.  *See* Defs.' MSJ 7-10, 25-30.  On that record, this Court

10  and the Ninth Circuit largely upheld the NCAA's rules—including the prohibition on pay-for-

11  play—concluding that the rules serve the important procompetitive purposes of protecting

12  amateurism (and thus consumer demand) and integrating student-athletes into their schools'

13  academic communities.  Plaintiffs offer no response to the fact that their arguments were litigated

14  and lost in *O'Bannon*, choosing instead to repeat them, supplemented by little more than

15  inadmissible hearsay plucked from sports media.  Setting aside these categories of old or

16  immaterial evidence leaves only a minuscule handful of new facts—such as the NCAA's decision

17  to permit schools to offer unlimited snacks—that come nowhere close to justifying a departure

18  from *O'Bannon*.

19      *Fourth*, and finally, Plaintiffs' argument that they have at least come forward with new less

20  restrictive alternatives not presented in *O'Bannon*, *see* Pls.' Opp. 54, is simply incorrect.  Plaintiffs

21  principally seek an injunction that would allow "individual schools or conferences [to]

22  independently promulgate their own rules."  *Id.* 4.  Contrary to Plaintiffs' suggestion, this Court

23  considered and rejected that *exact same proposal* in *O'Bannon*.  Nor is that "alternative" less

24  restrictive in any relevant sense—it is a wholesale abandonment of the popular national system

25  *O'Bannon* largely upheld, as well as the NCAA's critical role in administering that system (which

26  is presumably why this argument has already been rejected).  To the extent Plaintiffs set forth any

27  other alternatives, they are irrelevant as a legal matter.  As this Court has recognized, arguments

28  that could have been presented in *O'Bannon*, but were not, provide no basis for undercutting that

3

1   decision: "Even if [*O'Bannon*] wasn't tried as you might have tried it, it was tried and it's the

2   law."[4]

3         This Court has given Plaintiffs several opportunities to present a case that does not run

4   headlong into *O'Bannon*.  They have not done so.  The challenged NCAA and conference rules

5   protect what makes college sports unique, preserve consumer demand, and ensure that student-

6   athletes have an opportunity to succeed in the classroom as well as on the field or court.  The time

7   has come to end Plaintiffs' repeated attacks and allow the NCAA's membership to exercise its

8   "ample latitude" to continue to govern college sports.  *See O'Bannon*, 802 F.3d at 1079.  This

9   Court can and should grant Defendants' motion for summary judgment, and deny the parties'

10  *Daubert* motions as moot.  In the alternative, Defendants' *Daubert* motions should be granted, and

11  Plaintiffs' motions should be denied, for the reasons detailed further below.

12                                    **ARGUMENT**

13  **I.    *O'Bannon* Precludes All of Plaintiffs' Claims.**

14        While *O'Bannon* may have started as a case challenging the NCAA's restriction on

15  student-athletes receiving compensation for the use of their names, images, and likenesses

16  ("NIL"), *see* Pls.' Opp. 7-8, it ultimately addressed and resolved a much broader set of issues.  As

17  this Court recognized at the Rule 12(c) hearing in this case, while *O'Bannon* "was ostensibly

18  pegged to name, image and likeness . . . what it really was was they should be able to offer more

19  money, which is pretty hard for me to distinguish from, as they call it, pay for play."  Mishkin

20  Decl., Ex. 2 (Aug. 2, 2016 Hr'g Tr.) 24:16-20; *see id.* 24:15 ("And my question is, what would be

21  the different evidence?").  Indeed, the plaintiffs in *O'Bannon* did not just present evidence

22  regarding NIL—they also addressed (among many other things) the then-existing grant-in-aid

23  limitation on the financial aid that student-athletes could receive; various other awards, benefits,

24  and expense reimbursements that institutions can provide to student-athletes; and arguments

25  regarding the NCAA's commitment to academics.  Defs.' MSJ 7-14.  The Plaintiffs also offered

---

4   Decl. of Karen Hoffman Lent in Supp. of Defs.' Mot. for Summ. J. ("Lent Decl."), Ex. 9 (Aug. 2, 2016 Hr'g Tr.) 20:20-21.

**REPLY ISO DEFS.' MOT. FOR SUMMARY JUDGMENT, REPLY ISO DEFS.'**              **MDL No. 4:14-md-02541-CW**
**MOTIONS TO EXCLUDE, & OPP. TO PLS.' MOTIONS TO EXCLUDE**                    **Case No. 4:14-cv-02758-CW**

1   testimony regarding the possibility of "each individual conference . . . set[ting] its rules instead of

2   the NCAA."  Mishkin Decl., Ex. 3 (*O'Bannon* Tr.) 445:10-22; *see id.* 446:3-451:5.  The parties

3   spent years litigating those issues.  *See In re NCAA Student-Athlete Name & Likeness Licensing*

4   *Litig.*, 37 F. Supp. 3d 1126, 1134-35 (N.D. Cal. 2014).  They conducted extensive fact and expert

5   discovery and filed comprehensive cross-motions for summary judgment.  They participated in a

6   14-day bench trial in June 2014 that resulted in a 3,395-page transcript of proceedings.  *See* 802

7   F.3d at 1056; 7 F. Supp. 3d at 963.  And this Court and the Ninth Circuit then issued lengthy

8   opinions addressing that record and further arguments made on appeal.

9        Ultimately, the courts rejected much of the *O'Bannon* plaintiffs' attack.  The Ninth Circuit

10   reaffirmed the NCAA's authority to establish rules regarding the compensation and benefits that

11   student-athletes may receive, recognizing that the NCAA must have "'ample latitude' to

12   superintend college athletics."  802 F.3d at 1079 (quoting *Bd. of Regents*, 468 U.S. at 120).  It held

13   that the existing "compensation rules serve the two procompetitive purposes identified by the

14   district court:  integrating academics with athletics, and preserving the popularity of the NCAA's

15   product by promoting its current understanding of amateurism."  *Id.* at 1073 (citation omitted); *see*

16   *also id.* at 1076 (agreeing that amateurism "has procompetitive benefits").  The Ninth Circuit then

17   made clear that "[t]he Rule of Reason requires that the NCAA permit its schools to provide up to

18   the cost of attendance to their student athletes"—which the NCAA began doing even before that

19   decision—but "*does not require more*."  *Id.* at 1079 (emphasis added).  Critically, the court did

20   not, as Plaintiffs suggest, hold that various other forms of increased compensation, such as "non-

21   cash compensation and benefits" or "cash sums tethered to educational benefits," are consistent

22   with amateurism.  Pls.' Opp. 1.  Nor did the court issue an injunction that "would leave the

23   conferences competing with one another for various and sundry things."  Mishkin Decl., Ex. 3

24   (*O'Bannon* Tr.) 3379:5-6.  Instead, the court considered the evidence and arguments that the

25   parties had presented about the system as a whole, required that NCAA members be allowed to

26   offer up to the full cost of attendance *because it is consistent with amateurism*, and left everything

27   else in place.  *See O'Bannon*, 802 F.3d at 1079; *see also infra* at 17-18.  It recognized that ordering

28   anything more would eliminate "*precisely what makes [student-athletes] amateurs*," and that if

1   "that line is crossed," there would be "no basis for returning to a rule of amateurism and no defined

2   stopping point" between college sports and professional "minor league[s]." *O'Bannon*, 802 F.3d

3   at 1076, 1078-79.

4          Plaintiffs' mere assertion that they are presenting different claims and seeking different

5   relief than that sought in *O'Bannon*, Pls.' Opp. 1, does not give them a new bite at the apple.

6   Despite this Court's statements at the Rule 12(c) hearing, *see supra* at 1, Plaintiffs have not

7   pursued claims aimed at specific individual rules not covered by the ruling in *O'Bannon* and

8   explained why those individual rules harm competition.  Plaintiffs' complaint and pleadings may

9   list some nominally different restraints than the filings in *O'Bannon*, but Plaintiffs' challenge is in

10  all material respects the same challenge that *O'Bannon* adjudicated—as evidenced by their

11  reliance on functionally the same record and their pursuit of broad relief that is squarely foreclosed

12  by *O'Bannon*.  *See In re NCAA GIA Cap Antitrust Litig.*, 2016 WL 4154855, at *2 (noting that

13  *O'Bannon* "limits the types of relief Plaintiffs may seek").

14         As explained below, Plaintiffs offer no convincing arguments for why *O'Bannon*'s

15  holdings do not foreclose their claims.  As set forth in Part I.A, Plaintiffs provide virtually no

16  response to Defendants' arguments about *res judicata* or collateral estoppel.  They also provide no

17  caselaw suggesting that a court may disregard controlling and squarely on-point circuit precedent

18  issued just two years earlier.  And as discussed in Parts I.B and I.C, Plaintiffs' arguments about the

19  factual record in this case and the relief they seek change nothing about that straightforward

20  analysis.  Virtually all of Plaintiffs' allegedly new evidence and arguments were either considered

21  and rejected by this Court and/or the Ninth Circuit in *O'Bannon* or could have been raised during

22  those proceedings, meaning that there are no new, material facts justifying a departure from

23  *O'Bannon*'s precedent.

24         In short, despite Plaintiffs' previous representations that they would be pursuing claims

25  materially different from those adjudicated in *O'Bannon*, it is clear from the summary judgment

26  record that they are not doing so.  As a result, Plaintiffs can no longer avoid *O'Bannon* and its

27  preclusive effect on all of their claims.

28

**A.**    **Well-Established Precedential Doctrines Preclude Plaintiffs from Relitigating**
**_O'Bannon_.**

   1.    _Res Judicata_ and Collateral Estoppel Preclude Plaintiffs from Relitigating
   _O'Bannon_.

Plaintiffs' opposition brief barely refers to Defendants' demonstration that Plaintiffs'
claims are precluded under both _res judicata_ and collateral estoppel, effectively conceding that
those doctrines apply.  Pls.' Opp. 9-10 (Plaintiffs' one-paragraph response).[5]  For _res judicata_,
Defendants showed that Plaintiffs' claims are identical to those in _O'Bannon_:  The cases arise out
of the same transactional nucleus of facts, they involve the alleged infringement of the same rights,
and Plaintiffs are not raising any antitrust challenges to the NCAA Bylaws that could not have
been raised in _O'Bannon_.  Defs.' MSJ 18; _see also infra_ Part I.B.  Plaintiffs offer no specific
response to any of these points.

For collateral estoppel, Defendants have shown that the dispositive issues in these cases—
such as the procompetitive justifications for the restraints at issue and the rejection of less
restrictive alternatives that would permit paying student-athletes (including an injunction against
NCAA or conference rules)—were already litigated and decided in _O'Bannon_.  _See_ 802 F.3d at
1079 (holding that the Rule of Reason "does not require more" than permitting schools "to provide
up to the cost of attendance"); _see also id._ at 1073, 1076 (holding that the challenged restraints
have procompetitive benefits); _id._ at 1076 ("[N]ot paying student-athletes is _precisely what makes
them amateurs_."); _id._ at 1078 ("The difference between offering student-athletes education-related
compensation and offering them cash sums untethered to educational expenses is not minor; it is a
quantum leap."); _id._ at 1079 (acknowledging "the Supreme Court's admonition that we must afford

---

[5]    Plaintiffs' attempt to incorporate their Rule 12(c) briefing changes nothing about the merits of
their arguments and also represents a violation of this Court's rules.  Pls.' Opp. 5; _see, e.g._,
_Calence, LLC v. Dimension Data Holdings, PLC_, 222 F. App'x 563, 566 (9th Cir. 2007) (district
court did not abuse its discretion in refusing to consider argument contained in prior briefing that
the plaintiff attempted to incorporate by reference); _Ehrler v. Berryhill_, 2017 WL 1902164, at *6
(E.D. Wash. May 9, 2017) (court was "not obliged to consider" plaintiff's "attempts to incorporate
by reference points and authorities set forth in a previous motion" in ruling on motion for summary
judgment).

1 the NCAA 'ample latitude' to superintend college athletics" (citation omitted)).[6] Here too,

2 Plaintiffs offer no specific response.[7]

3       Finally, Plaintiffs' claim that "[t]he Court rejected these same arguments when it denied

4 Defendants' Rule 12(c) motion" is incorrect. Pls.' Opp. 9. As noted above, the Court left the door

5 open for Plaintiffs to attempt narrow, targeted challenges to specific restrictions not covered by

6 *O'Bannon*. But neither the Court's order on the Rule 12(c) motion nor its statements at the Rule

7 12(c) hearing rejected the application of *res judicata* or collateral estoppel to a broad challenge to

8 the NCAA's ability to set restrictions on the financial support that student-athletes may receive for

9 athletic services. Just the opposite: The Court observed that, under any of the applicable legal

10 doctrines, *O'Bannon* governs and prohibits that kind of challenge:

11      Well, you're sort of getting into the question of whether there's collateral estoppel,

12 is there stare decisis, should we have judgment on the pleadings or something else. And the way I see it is more like we've got some Ninth Circuit authority on a

13 certain point, and does that Ninth Circuit authority, as in any other kind of case, mean that certain questions of law have been decided and we can't say something

14 different now.

15      Even if they were decided in a case that wasn't tried as you might have tried it, it

16 was tried and it's the law. So I don't really care whether it's collateral estoppel or stare decisis or a motion for judgment on the pleadings or a motion for partial

17 summary adjudication of certain legal principles.

18      The fact is, the Ninth Circuit has said that payment above cost of attendance

19 untethered to educational expenses can't be ordered.

20

21 ───────────────

22 [6]   There is no dispute that *O'Bannon* resulted in a final decision on the merits, which is required for both doctrines.

23 [7]   The privity requirement also is satisfied for both doctrines, contrary to Plaintiffs' passing suggestion. Pls.' Opp. 9. As Defendants demonstrated, most of the male athletes here were class

24 members in *O'Bannon*. Defs.' MSJ 18. To the extent there is not a complete identity of parties, both the Plaintiffs and Defendants here were "adequately represented by someone [in *O'Bannon*]

25 with the same interests who [wa]s a party to the suit." *Taylor v. Sturgell*, 553 U.S. 880, 894 (2008) (second alteration in original) (citation omitted); *see also* Defs.' MSJ 18-19 & nn.8-9. Moreover,

26 in awarding prospective injunctive relief, this Court necessarily took special care to protect the interests of future student-athletes. *See Taylor*, 553 U.S. at 900; *see also* Defs.' MSJ 18-19.

27 Plaintiffs offer no response to *Taylor*'s explanation of what privity actually requires.

28

1  Lent Decl., Ex. 9 (Aug. 2, 2016 Hr'g. Tr.) 20:12-21:3.  Plaintiffs' requested injunction eliminating

2  all caps on compensation and benefits established by the NCAA and its members seeks an order

3  for just what this Court and the Ninth Circuit refused to do.[8]  Accordingly, both *res judicata* and

4  collateral estoppel apply in these actions and bar Plaintiffs' claims here.

5          2.    *Stare Decisis* Also Bars Plaintiffs' Claims.

6        As a published opinion by the Ninth Circuit, *O'Bannon* also controls this case as a matter

7  of *stare decisis*.  "If a court must decide an issue governed by a prior opinion that constitutes

8  binding authority, the later court is bound to reach the same result, even if it considers the rule

9  unwise or incorrect.  Binding authority must be followed unless and until overruled by a body

10  competent to do so."  *Hart v. Massanari*, 266 F.3d 1155, 1170 (9th Cir. 2001).  Barely two years

11  ago, in response to a nearly identical challenge, *O'Bannon* held that the only change to the

12  NCAA's rules required by the antitrust laws was increasing the permitted scholarship limit to the

13  cost of attendance.  *See* 802 F.3d at 1079.  This decision is binding precedent governing Plaintiffs'

14  challenge to the same system and their request for an injunction that would go far beyond what the

15  Ninth Circuit ruled was required.

16        As to Plaintiffs' position that *stare decisis* does not apply in antitrust cases because the

17  Rule of Reason analysis *necessarily* differs from case to case, Pls.' Opp. 10-12, the Ninth Circuit

18  rejected effectively the same argument in a published decision this year.  In *Miranda v. Selig*, 860

19

---

20     [8]   Plaintiffs' suggestion that *res judicata* should not ordinarily apply in the antitrust context

21  should also be rejected.  Many courts have applied *res judicata* and collateral estoppel in antitrust
cases so long as the doctrinal requirements are met.  *See, e.g.*, *Ramallo Bros. Printing, Inc. v. El*

22  *Día, Inc.*, 490 F.3d 86, 91-92 (1st Cir. 2007) (applying both); *In re Dual-Deck Video Cassette
Recorder Antitrust Litig.*, 11 F.3d 1460, 1463-64 (9th Cir. 1993) (collateral estoppel); *Vident v.*

23  *Dentsply, Int'l, Inc.*, 2008 WL 11336951, at *11 (C.D. Cal. June 5, 2008) (collateral estoppel).
While the Supreme Court did, in 1955, state that whether two suits involve "essentially the same

24  course of wrongful conduct" is not decisive for *res judicata*, *Lawlor v. Nat'l Screen Serv. Corp.*,
349 U.S. 322, 327 (1955), in that case the conduct "complained of was all *subsequent* to the [prior]

25  judgment," and the plaintiffs alleged "new antitrust violations" that were "not present in the former
action."  *Id.* at 28 (emphasis added) (noting that the prior judgment "cannot be given the effect of

26  extinguishing claims which did not even then exist and which could not possibly have been sued

27  upon in the previous case").  The same is not true here, as Plaintiffs have alleged the same
conspiracy and the same course of conduct adjudicated in *O'Bannon*.  *See infra* Part I.B.

28

1   F.3d 1237, 1242 (9th Cir. 2017), *cert denied*, 2017 WL 4269809 (2017), a party lodging an

2   antitrust challenge urged the Ninth Circuit to ignore binding precedent and *stare decisis*.  Similar

3   to Plaintiffs, that party contended that "the doctrine of *stare decisis* should not be applied and does

4   not apply where, as here, the circumstances that may have once applied to the prior decision no

5   longer apply and/or are no longer reasonable, particularly in the ever evolving field of antitrust

6   jurisprudence."  Appellants' Opening Br., *Miranda v. Selig*, 2016 WL 147650, at *3 (9th Cir. Jan.

7   6, 2016); *Miranda*, 860 F.3d at 1242.  The Ninth Circuit expressly rejected this argument and

8   applied the binding caselaw to reject appellants' claims, holding that appellants—like Plaintiffs

9   here—simply "misapprehend[ed] the doctrine of *stare decisis*."  *Miranda*, 860 F.3d at 1242-43.

10         Plaintiffs have failed to identify a single case allowing a successive antitrust challenge to

11   the same challenged restraints and conduct at issue in a prior case (in the sports context, or

12   otherwise).  For example, Plaintiffs quote *Oltz v. St. Peter's Community Hospital*, 861 F.2d 1440,

13   1449 (9th Cir. 1988), for the unremarkable proposition that the "analysis" under the Rule of

14   Reason "will differ from case to case."  Pls.' Opp. 11.  But the Ninth Circuit made that statement

15   in rejecting an argument that ruling against a particular restraint implemented by one hospital

16   necessarily bound all other hospitals—some of which had been permitted to implement the

17   restraint.  *Oltz*, 861 F.2d at 1449.  Similarly, in *National Basketball Association v. SDC Basketball

18   Club, Inc.*, 815 F.2d 562 (9th Cir. 1987), the Ninth Circuit held that earlier cases (*Raiders I* and

19   *Raiders II*)[9] addressing an *NFL* franchise relocation rule did not preclude a subsequent challenge to

20   an *NBA* relocation rule, where the NBA's assertions about the purpose and effect of its restraint

21   and the relevant market "create[d] an entirely different factual setting."  *Id.* at 568.  "[T]he antitrust

22   issue" in *SDC*, the court held, was "vastly different than that in the *Raiders* cases."  *Id.*; *see also id.*

23   at 567 ("*Raiders II* confirmed that the jury's liability verdict affirmed in *Raiders I* 'held Rule 4.3

24   [the franchise movement rule] invalid only as it was applied to the Raiders' proposed move,'" but

25   did not hold "that a franchise movement rule, in and of itself, was invalid under the antitrust laws."

26

27   [9]   *Los Angeles Mem'l Coliseum Comm'n v. Nat'l Football League*, 726 F.2d 1381 (9th Cir. 1984)
     ("*Raiders I*"); 791 F.2d 1356 (9th Cir. 1986) ("*Raiders II*").

28

1    (alteration in original)).  Here, by contrast, Plaintiffs seek to set aside the *same* restraints, as

2    applied to the *same* parties, that were upheld in a prior decision.

3            Plaintiffs likewise mischaracterize *Harkins Amusement Enterprises, Inc. v. Harry Nace*

4    *Co.*, 890 F.2d 181 (9th Cir. 1989) ("*Harkins II*"), as holding that plaintiffs may repeatedly bring

5    new antitrust challenges to ongoing conduct.  Pls.' Opp. 12.  There is no such rule.  In *Harkins II*, a

6    second lawsuit "allege[d] *new* antitrust conduct" and new "conspiracies *after* the date" of the

7    original suit.  890 F.2d at 183 (first emphasis added).  The court permitted those challenges to

8    proceed, but held that the plaintiffs were barred by *res judicata* and collateral estoppel from

9    challenging conduct that occurred prior to the filing of the complaint in the first action.  *Id.* at 182.

10   The court also left "no doubt" that the Ninth Circuit's legal pronouncements in *Harkins*

11   *Amusement Enterprises, Inc. v. General Cinema Corp.*, 850 F.2d 477 (9th Cir. 1988) ("*Harkins*

12   *I*"), were "the law of this circuit."  *Harkins II*, 890 F.2d at 182; *see also id.* at 183 (holding that the

13   Ninth Circuit's earlier determination "that plaintiff's claim of shared monopoly had no basis in

14   law" barred the plaintiff from making a shared monopoly claim in the later action).

15           The Ninth Circuit clarified this point in *In re Dual-Deck Video Cassette Recorder Antitrust*

16   *Litigation*, 11 F.3d at 1464, holding that "continuation of commercial activity pursuant to [prior]

17   arrangements held not to be an antitrust conspiracy" does not give rise to a new cause of action.  In

18   *Dual-Deck*, the Ninth Circuit explained that *Harkins II* did not give plaintiffs *carte blanche* to

19   repeatedly challenge the same alleged antitrust violations.  *See id.*  In that case, the plaintiff, a

20   manufacturer of dual-deck VCRs, alleged "that its competitors conspired to prevent introduction of

21   dual-deck VCRs to the United States by agreeing that they would refuse to manufacture such

22   VCRs or deal with manufacturers or sellers of dual-deck VCRs," and that its competitors

23   "conspired to monopolize the market for consumer electronics products in general."  *Id.* at 1462.

24   Following a jury verdict in favor of the defendants covering the time period through April 1988,

25   the plaintiff filed a complaint alleging, *inter alia*, "the same antitrust violations as were advanced

26   in the first, unsuccessful lawsuit, but for the 1987-1990 time period."  *Id.*  While the Ninth Circuit

27   agreed with the plaintiff that "'new antitrust violations may be alleged after the date covered by

28   decision or settlement of antitrust claims covering an earlier period,'" *id.* at 1463 (quoting *Harkins*

1  *II*, 890 F.2d at 183), it held that collateral estoppel still barred the plaintiff's claims because they

2  alleged "no new acts," *id.* at 1464.

> 3   The theory of this case is that defendants formed a conspiracy before
> 1987 to engage in conduct violative of the Sherman Antitrust Act, and
> 4   engaged in such conduct subsequent to the time period covered by the
> 1987 lawsuit.  Nothing new is alleged—no new conspiracy, no new kinds
> 5   of monopolization, no new acts. Distinct conduct is alleged only in the
> limited sense that every day is a new day, so doing the same thing today
> 6   as yesterday is distinct from what was done yesterday.

7  *Id.*  The Ninth Circuit analogized serial antitrust challenges over the same procompetitive restraint

8  to serial products liability cases arising out of the same non-defective product:  "It is as though an

9  earlier jury had rejected a claim that a defendant had unlawfully manufactured a product and was

10  damaging plaintiff by selling it, and a later lawsuit claimed that the manufacturer had continued to

11  sell the same product.  Though distinct, the conduct is not new in a way which would vitiate the

12  prior determination that it is lawful."  *Id.*

13   As discussed in Part I.B, Plaintiffs have not asserted any claim based on distinct conduct

14  that was not encompassed in the Ninth Circuit's determination in *O'Bannon* that the NCAA's

15  current caps on compensation and benefits are lawful.  "[R]ules that impose *caps* (not floors) on

16  *compensation/benefits*," which Plaintiffs describe as "[t]he subject matter of Plaintiffs' antitrust

17  challenge," Pls.' Opp. 7, are not a post-*O'Bannon* development giving rise to new antitrust claims.

18  A "cap" is precisely what was litigated in *O'Bannon*.  And the NCAA's adherence to the

19  injunctive relief ordered in that case certainly does not present a basis to challenge that very same

20  cap once again.  Because in this case there is "no new conspiracy, no new kinds of

21  monopolization, [and] no new acts," Plaintiffs do not have a new cause of action.  *Dual-Deck*, 11

22  F.3d at 1464.  As in *Dual-Deck*, "[d]istinct conduct is alleged only in the limited sense that . . .

23  doing the same thing today as yesterday is distinct from what was done yesterday."  *Id.* (applying

24  collateral estoppel); *see also Turtle Island Restoration Network v. U.S. Dep't of State*, 673 F.3d

25  914, 918-19 (9th Cir. 2012) (quoting the same language and applying claim preclusion; "bringing a

26  new general challenge to the [State Department's] certification process based on next year's

27

28

1   certification decisions, and every year from now on . . . [is] exactly the kind of piecemeal litigation

2   *res judicata* aims to prevent" (emphasis added)).[10]

3        Finally, Plaintiffs' suggestion that "factual changes in the relevant markets warrant a new

4   antitrust analysis and possibly a new and different antitrust outcome" in a new case challenging the

5   same restraints, Pls.' Opp. 11, has no support—illustrated by the fact that Plaintiffs could find

6   nothing better than out-of-context quotes from two obviously irrelevant cases, one from out of

7   circuit and the other an unpublished district court decision from 35 years ago.  The first case,

8   *United States v. Mercy Health Services*, 107 F.3d 632 (8th Cir. 1997), addressed whether the

9   voluntary abandonment of an allegedly illegal merger rendered the case moot.  In concluding the

10  case was moot, the court merely noted that affirming the district court's decision would not give

11  the parties "an eternal license to merge regardless of circumstances."  *Id.* at 637.  The second case,

12  *United States v. Motor Vehicle Manufacturers Association of the United States, Inc.*, 1982 WL

13  1934 (C.D. Cal. Oct. 28, 1982), addressed the propriety of modifying a consent decree entered

14  thirteen years earlier, and as part of that inquiry evaluated "whether there has been such a change

15  in circumstances as would justify the approval of the proposed modification in order that the

16  judgment might serve the public interest in the future."  *Id.* at *4.  Neither case allowed the

17  relitigation of the same issues that were the subject of a prior judgment, much less a judgment

18  entered just two years earlier.[11]

19

20  [10]   These cases likewise necessitate rejection of Plaintiffs' argument that "prior antitrust cases"
     provide only "the analytical framework for antitrust analysis," Pls.' Opp. 12.  But even if only the
21   "framework" from *O'Bannon* carried forward, that would not help Plaintiffs—that "framework"
     established that "courts should not use antitrust law to make marginal adjustments to broadly
22   reasonably market restraints."  802 F.3d at 1075.  Restraints that were just reaffirmed by the Ninth
23   Circuit, based on much the same evidence, fit that description.

24  [11]   The Supreme Court's recognition that it can revisit its own prior substantive antitrust rulings
     does not support Plaintiffs' contention that this Court can revisit *O'Bannon*.  *See State Oil Co. v.*
25   *Khan*, 522 U.S. 3, 20 (1997) ("The Court of Appeals was correct in applying that principle despite
     disagreement with [another case], for it is this Court's prerogative alone to overrule one of its
26   precedents."); *see also Miranda*, 860 F.3d at 1243 ("Courts of Appeal must adhere to the
     controlling decisions of the Supreme Court.  Further, under the law-of-the-circuit rule, we are
27   bound by decisions of prior panels' [sic] unless an en banc decision, Supreme Court decision, or
     subsequent legislation undermines those decisions." (alterations in original) (citations omitted)).
28

*(cont'd)*

**REPLY ISO DEFS.' MOT. FOR SUMMARY JUDGMENT, REPLY ISO DEFS.'**          **MDL No. 4:14-md-02541-CW**
**MOTIONS TO EXCLUDE, & OPP. TO PLS.' MOTIONS TO EXCLUDE**               **Case No. 4:14-cv-02758-CW**

1    In short, Plaintiffs have offered no case suggesting that *stare decisis* does not apply here.

2    And it could hardly be otherwise:  Allowing Plaintiffs (functionally identical classes of plaintiffs

3    as in *O'Bannon*) to ignore binding legal precedent and repeatedly challenge the same restraints

4    with substantially similar arguments would invite perpetual litigation regarding the NCAA's or

5    any other organization's rules.  Such a result would be inconsistent with the whole point of *stare*

6    *decisis*.  *E.g.*, *Taylor*, 553 U.S. at 903 ("[S]*tare decisis* will allow courts swiftly to dispose of

7    repetitive suits brought in the same circuit."); *Miranda*, 860 F.3d at 1243 (*stare decisis* "promotes

8    the evenhanded, predictable, and consistent development of legal principles, fosters reliance on

9    judicial decisions, and contributes to the actual and perceived integrity of the judicial process"

10   (citation omitted)).  In this case, it would also be contrary to a specific legal holding in *O'Bannon*,

11   as it would permit plaintiffs to continue to attempt to alter the NCAA's rules until a point at which

12   "the NCAA will have surrendered its amateurism principles entirely and transitioned from its

13   'particular brand of football' to minor league status."  802 F.3d at 1079 (quoting *Bd. of Regents*,

14   468 U.S. at 101).

15       **B.    This Case Does Not Include Material Factual Differences Warranting**
             **Departure from *O'Bannon*.**

16

17   Plaintiffs alternatively attempt to evade *O'Bannon* by erroneously claiming that the record

18   in this case "includes many undisputed facts that did not even exist when the *O'Bannon* record

19   closed in August 2014."  Pls.' Opp. 1.  But the law is clear that new facts would not justify

20   departing from *O'Bannon* unless the factual "differences are material to the application of the rule"

21   announced in that case.  *Hart*, 266 F.3d at 1172.  Where "there are neither new factual

22   circumstances nor a new legal landscape, *stare decisis* is an appropriate basis for [a] decision."

23   *Ore. Natural Desert Ass'n v. U.S. Forest Serv.*, 550 F.3d 778, 786 (9th Cir. 2008); *see also Gospel*

24   *Missions of Am. v. City of L.A.*, 328 F.3d 548, 558 (9th Cir. 2003) (*res judicata* applies to "[a]n

25   action that merely alleges new facts in support of a claim that has gone to judgment in a previous

26   _____

*(cont'd from previous page)*

27   Plaintiffs cannot escape the impact of *O'Bannon* by arguing before this Court that it was wrongly

28   decided.

1   litigation" (citation omitted)); *Montana v. United States*, 440 U.S. 147, 159 (1979) (collateral

2   estoppel applies unless there were "changes in facts essential to a judgment").

3          Comparing the record here and in *O'Bannon* demonstrates that there are no new, material

4   facts justifying a different outcome in this case.  Nearly all of Plaintiffs' evidence and arguments

5   were presented to, and considered by, the courts that decided *O'Bannon*—thereby foreclosing

6   reliance on those points in support of a different decision here.  As the Ninth Circuit has made

7   clear, courts cannot "disregard the decision of another panel of our court simply because . . . the

8   arguments have been characterized differently or more persuasively by a new litigant."  *United*

9   *States v. Ramos-Medina*, 706 F.3d 932, 939 (9th Cir. 2013).  To the extent Plaintiffs have

10  identified any new evidence that was not considered by one of the courts in *O'Bannon*, it does not

11  come close to being sufficiently material to justify discarding recent and well-established Ninth

12  Circuit precedent.  *O'Bannon* is the law, and it precludes Plaintiffs' claims.

13              1.    Defendants Do Not Pay Student-Athletes Cash Compensation Untethered to
14                    Educational Expenses.

15         Plaintiffs' initial contention that cost of attendance ("COA") stipends are cash payments

16  untethered to educational expenses, Pls.' Opp. 23, is a virtually unchanged rehash of an argument

17  already refuted in Defendants' opening brief.  Plaintiffs concede, as they must, that cost of

18  attendance stipends facially "represent legitimate costs to attend school."  *Id.* (quotations omitted);

19  *see O'Bannon*, 802 F.3d at 1075.  That concession alone rebuts their claim that COA stipends are

20  untethered to educational expenses.  Pls.' Opp. 23.  As Defendants have explained, those stipends

21  are calculated by reference to a federal statute that measures the expenses associated with college

22  attendance.  *See O'Bannon*, 802 F.3d at 1054 & n.3; 20 U.S.C. § 1087*ll*; *see also* Lent Decl., Ex. 1

23  (NCAA Bylaws) § 15.02.2.  Any variance in COA merely ensures that students attending different

24  schools in different parts of the country receive scholarships sufficient to cover the specified

25  expenses for attending those schools.  *See, e.g.*, Lent Decl., Ex. 2 (Federal Student Aid Handbook,

26  Vol. 3, Ch. 2).  These stipends are precisely the relief that the courts granted in *O'Bannon* in order

27  to cover the "'legitimate costs' to attend school."  802 F.3d at 1075 (quoting NCAA president

28  Mark Emmert).

1   Plaintiffs' observation that the COA stipend can, in practice, be used by individual student-

2   athletes to pay for non-educational expenses changes nothing.  Colleges and universities have

3   reasonably determined the typical cost of attending their schools in accordance with federal law,

4   and many consider it easier to pay COA stipends to their students than to handle reimbursements

5   for every purchase that falls within the amount of COA (which range from a computer to

6   transportation to other personal expenses).  *See* 20 U.S.C. § 1087*ll*.  Schools use the same manner

7   of distribution to non-athlete students where their federal financial aid is also tied to COA.  *See*

8   34 C.F.R. 668.164(d) ("Direct payments").  The relevant point is not that aid is provided in cash

9   rather than in expense reimbursements, but that aid is provided to cover the expected cost of

10  attendance, and is distributed to student-athletes *in the same way* aid is distributed to other students

11  who receive financial aid from the school.  Indeed, under the NCAA Bylaws, aid must be provided

12  using the same "cost-of-attendance policies and procedures," in the same amounts, and in the same

13  fashion as to "students in general."  Lent Decl., Ex. 1 (NCAA Bylaws) § 15.02.2.1; *see id.*

14  §§ 15.2.2, 15.01.6; Lent Decl., Ex. 5 (COA Q & A).  Providing a COA stipend to a student-athlete

15  no more constitutes a payment untethered to educational expenses than does a payment for COA

16  expenses to a student on an academic or need-based scholarship.

17  The way this change was implemented undermines another of Plaintiffs' arguments—that

18  the changes in the NCAA's governance structure to allow schools in the Autonomy Five

19  conferences to pass their own legislation on certain subject matters constitutes a relevant post-

20  *O'Bannon* development.  Pls.' Opp. 54-55. The Ninth Circuit specifically took note of the

21  autonomy rules in *O'Bannon*, explaining that the "member schools of the five largest athletic

22  conferences in the country" had voted in January 2015 to increase their scholarship caps to full

23  cost of attendance.  802 F.3d at 1055.  The court also cited a *New York Times* article explaining

24  that the conferences were "acting for the first time under autonomy they were granted by the

25  N.C.A.A. last August."  *Id.* (citing Marc Tracy, *Top Conferences to Allow Aid for Athletes' Full*

26  *Bills*, N.Y. Times, Jan. 18, 2015, at SP8).

27  References to the NCAA's Student Assistance Fund as new evidence of cash untethered to

28  educational expenses, Pls.' Opp. 24, fare no better, for the simple reason that they are not new.  As

16

1  Defendants have explained, *see* Defs.' MSJ 8-9, 28-30, the *O'Bannon* plaintiffs likewise presented

2  evidence about the Student Assistance Fund and its permissible uses. *See, e.g.*, Lent Decl., Ex. 15

3  (*O'Bannon* Tr.) 2146:6-2149:4 (testimony regarding potential uses of the fund, including for

4  "special insurance polic[ies]"); *id.* 1231:3-20 (use of Student Assistance Fund to reimburse

5  "transportation to go home for an interview or a funeral"). The *O'Bannon* plaintiffs' experts also

6  discussed the Student Assistance Fund in their reports. *See, e.g.*, Expert Report of Ellen

7  Staurowsky (*O'Bannon* Dist. Ct. Dkt., Case No. 4:09-cv-01967-CW, ECF No. 898-20) (Sept. 25,

8  2013) at 49-50 (noting size of the fund and that it may be used for emergency travel, clothing, and

9  other miscellaneous expenses). And this Court expressly acknowledged that evidence, noting that

10  "special financial need[s]," such as "needed clothing, needed supplies, a computer, or other

11  academic needs" could be reimbursed out of the Student Assistance Fund, and that such aid might

12  exceed "the cost of attendance." 7 F. Supp. 3d at 972 n.5. Repackaging these arguments as now

13  being about cash payments untethered to educational expenses does not turn them from old to

14  new.[12]

15  Finally, and more broadly, Plaintiffs' suggestion that the implementation of the relief

16  ordered by *O'Bannon* justifies setting that decision aside is as wrong as it sounds. The central

17  holding of *O'Bannon* was that permitting student-athletes to receive scholarships up to the cost of

18  attendance would be "virtually as effective" as the pre-existing system in protecting amateurism,

19  and thus consumer demand. *See* 802 F.3d at 1074-75. That ruling was itself based on the premise

20  that cost of attendance covers the "'legitimate costs' to attend school," *id.* at 1075, and thus does

21  *not* constitute cash untethered to educational expenses. If consumer demand has not decreased

22

23

24  ─────────────────────────

[12]  Further, as Defendants explained in their opening brief, the Student Assistance Fund is not a

25  way to funnel cash to student-athletes for athletic performance. It is designed to facilitate student-
athletes' efforts to meet the often demanding requirements of participation in Division I sports

26  while satisfying the academic demands of college—as evidenced by the fact that many uses of the
Fund represent situations that can warrant an emergency grant under an institution's need-based

27  financial aid policies. Defs.' MSJ 32.

28

1    after the change, that is consistent with *O'Bannon*'s conclusion—not a basis for providing further

2    relief that the Ninth Circuit considered and expressly rejected.[13]

3                    2.      **Plaintiffs Have No New Evidence Undermining the NCAA's Commitment to Ensuring Student-Athletes Have Academic Opportunities.**

4

5        Plaintiffs' baseless arguments that "Defendants prioritize maximizing revenue" over the

6    academic welfare of student-athletes, Pls.' Opp. 40, were considered and rejected in *O'Bannon*.

7    As Defendants have previously explained, Defs.' MSJ 34-35, the plaintiffs in *O'Bannon* called an

8    expert witness, Ellen Staurowsky, who—using the same exact words as Plaintiffs—testified for

9    over fifty transcript pages about the six reasons why "football and men's basketball players are not

10   students first and athletes second, but the other way around." Mishkin Decl., Ex. 3 (*O'Bannon* Tr.)

11   1175:12-1228:9. Plaintiffs' counsel in *O'Bannon* also asked each of the named plaintiffs who

12   testified whether he considered himself a student first or an athlete first. *See* 7 F. Supp. 3d at 980-

13   81 (quoting testimony of Ed O'Bannon that "he felt like 'an athlete masquerading as a student'"

14   during college); Mishkin Decl., Ex. 3 (*O'Bannon* Tr.) 560:5-8 (testimony from Tyrone Prothro that

15   "I definitely didn't, you know, think of myself as a student first 'cause . . . the amount of time that

16   we put in, it felt backwards, felt like we were an athlete first and a student second"); Lent Decl.,

17   Ex. 15 (*O'Bannon* Tr.) 1073:1-4 (testimony from Chase Garnham that "I would say I was an

18   athlete first, student second"). The *O'Bannon* plaintiffs also argued the point in their trial brief:

19   "[T]he NCAA cannot demonstrate that Division I men's basketball and football players are

20

---

[13]   Plaintiffs' passing suggestion that the NCAA could provide other, additional forms of education-related compensation, Pls.' Opp. 26, ignores two critical holdings of *O'Bannon*: (1) the antitrust laws require schools to permit student-athletes to receive "up to the cost of attendance," but no more, 802 F.3d at 1079, and (2) the NCAA has "'ample latitude' to superintend college athletics"—including where key lines should be drawn regarding compensation—and should not be second-guessed in its efforts to establish "broadly reasonable market restraints," *id.* at 1074-75 (citation omitted). Eliminating the restriction on such compensation would enable payment of all manner of thinly-disguised cash compensation for participation in athletics, and an easy end-run of *O'Bannon*'s central prohibition on pay-for-play. Defs.' MSJ 27-28. It also bears noting that Plaintiffs are not asserting a claim that any rule barring a particular benefit violates the antitrust laws, choosing instead to pursue a duplicative global challenge to the rules barring pay-for-play. *See* Pls.' Opp. 8 (request for "even broader relief" than in *O'Bannon*); *id.* 4 ("[T]he Classes do *not* seek to require any specific benefits or compensation . . . .").

1  'students first, athletes second.'"  Antitrust Plaintiffs' Trial Brief, *O'Bannon v. NCAA*, 2014 WL

2  11513014 (N.D. Cal. June 3, 2014).

3       The *O'Bannon* plaintiffs also supported these arguments with much the same evidence that

4  Plaintiffs bring forward here.  For example, Plaintiffs highlight the time student-athletes spend on

5  sports, Pls.' Opp. 40, but the *O'Bannon* plaintiffs took the same tact.  *See* 7 F. Supp. 3d at 981

6  (citing testimony of Ellen Staurowsky regarding "the time demands of [student-athletes'] athletic

7  obligations"); Mishkin Decl., Ex. 3 (*O'Bannon* Tr.) 16:5-7; 546:18-549:25; 1034:7-10 (testimony

8  of plaintiffs that they spent a great deal of time on athletic activities).  Plaintiffs likewise

9  emphasize the "travel and schedule demands" on student-athletes, Pls.' Opp. 40, which the

10  *O'Bannon* plaintiffs also emphasized.  *See* Mishkin Decl., Ex. 3 (*O'Bannon* Tr.) 1192:12-20

11  (testimony of Ellen Staurowsky that "a game at night that might be later, and then, you know, you

12  don't get home until four in the morning, and then you're going to have to go to classes the next

13  day or whatever"); *id.* 18:19-19:21, 558:3-5, 1039:20-1040:5 (testimony from plaintiffs regarding

14  travel obligations).  Just like Plaintiffs here, Pls.' Opp. 40-42, the *O'Bannon* plaintiffs presented

15  testimony that schools allegedly were delegating the power to schedule games to broadcasters.[14]

16  *See* Mishkin Decl., Ex. 3 (*O'Bannon* Tr.) 1136:2-4 ("Q.  Has TV had any impact on when games

17  are scheduled during the week?  A. Yes.").  In fact, the plaintiffs in *O'Bannon* even supported this

18  claim with one of the *same* contracts that Plaintiffs now use to support their identical claim that

19  broadcasters have imposed "new travel and schedule demands."  *Compare* Pls.' MSJ App. C

20  (listing 2010 agreement between CBS, Turner and NCAA), *with* Mishkin Decl., Ex. 3 (*O'Bannon*

21  Tr.) 646:4-18 (admitting 2010 agreement between CBS, Turner and NCAA into evidence).  And as

22  here, the *O'Bannon* plaintiffs attempted to establish that universities put money ahead of student-

---

14  Expert Report of Ellen Staurowsky (*O'Bannon* Dist. Ct. Dkt., Case No. 4:09-cv-01967-CW,
ECF No. 898-20) at 30-31 (quoting the following passage from "a strategic planning document"
created by Duke University:  "We no longer determine at what time we will play our games,
because they are scheduled by TV executives.  This is particularly troubling for basketball, which
may be required to play weeknight games away from home at 9:00 p.m.  The potential impact on
academic work is obvious, as students are required to board a flight at 2:00 a.m., arriving back at
their dorms at 4:00 or 5:00 a.m., and then are expected to go to class, study, and otherwise act as if
it were a normal school-day.").

**REPLY ISO DEFS.' MOT. FOR SUMMARY JUDGMENT, REPLY ISO DEFS.'**          **MDL No. 4:14-md-02541-CW**
**MOTIONS TO EXCLUDE, & OPP. TO PLS.' MOTIONS TO EXCLUDE**          **Case No. 4:14-cv-02758-CW**

1   athletes.  *Compare* Pls.' Opp. 41 (quotes from NCAA President Mark Emmert regarding a recent

2   poll), *with* Mishkin Decl., Ex. 3 (*O'Bannon* Tr.) 1881:8-14 (testimony from Emmert about the risk

3   of overcommercializaton and responding to critique of "financial[] exploit[ation]"), *and*

4   *O'Bannon*, 7 F. Supp. 3d at 984 (citing that testimony, but noting that the fact "that the NCAA has

5   not always succeeded in protecting student-athletes from commercial exploitation . . . does not

6   justify expanding opportunities for commercial exploitation of student-athletes in the future").

7          Defendants of course dispute these claims because they ignore the many rules and forms of

8   support the NCAA and its members have put in place to ensure student-athletes have the

9   opportunity to succeed in the classroom—not to mention denigrate student-athletes' impressive

10  accomplishments.  *See* Defs.' MSJ 34-38.  But for present purposes, the key point is that these

11  arguments were considered by the courts in *O'Bannon*—even if not expressly mentioned in the

12  decision, Pls.' Opp. 39—which is enough to render them irrelevant here.  *See Ramos-Medina*, 706

13  F.3d at 939.  If *stare decisis* applies when a new litigant "presents a *different* argument than did the

14  [litigants] in [prior cases]," *id.* at 938 (emphasis added), it surely applies when a litigant presents

15  the *same* arguments as before.

16         To the extent Plaintiffs even purport to offer evidence that post-dates *O'Bannon*, much of it

17  takes the form of inadmissible, multi-leveled hearsay pulled from the sports press, which was

18  never produced in this action or otherwise authenticated.  *See, e.g.*, *Flaviano v. Cal. Dep't of State*

19  *Hosps.*, 2017 WL 385973, at *8 (N.D. Cal. Jan. 26, 2017) ("If a newspaper or police report

20  reported that a party opponent had admitted the light was red, it would still be hearsay."); *Larez v.*

21  *City of L.A.*, 946 F.2d 630, 642 (9th Cir. 1991) (holding trial court erred in admitting statements

22  published in newspapers).[15]  And the remaining anecdote Plaintiffs highlight—the allegations of

23  academic misconduct at the University of North Carolina ("UNC")—likewise provides no basis

24  _____

25  [15]   While otherwise inadmissible evidence may be "admissible for summary judgment purposes"
    if the facts "could be presented in an admissible form at trial," *Fonseca v. Food Servs. of Az., Inc.*,
26  374 F.3d 840, 846 (9th Cir. 2004) (citation omitted), Plaintiffs have proffered no plausible
    explanation for how the articles or quotes contained in those articles—most made by non-parties to
27  the litigation without any authority to speak on behalf of any defendant—could be admitted at trial.
    *See Doe v. Univ. of Pac.*, 467 F. App'x 685, 689 (9th Cir. 2012).

28

20

1   for setting *O'Bannon* aside, because it too was raised by the *O'Bannon* plaintiffs.[16]   The *O'Bannon*

2   plaintiffs submitted a declaration from Mary Willingham, whose claims initiated the UNC

3   investigation, in support of their motion for summary judgment.  Decl. of Mary C. Willingham in

4   Supp. of Antitrust Pls.' Combined Position to NCAA's Mot. for Summ. J. and Reply In Supp. of

5   Mot. for Summ. J. (*O'Bannon* Dist. Ct. Dkt., Case No. 4:09-cv-01967-CW, ECF No. 957-7) (Jan.

6   10, 2014).  One of their experts, Dr. Ellen Staurowsky, testified that UNC had engaged in

7   "academic frauds."  Mishkin Decl., Ex. 3 (*O'Bannon* Tr.) 1345:18-24; *see also* Expert Report of

8   Ellen Staurowsky (*O'Bannon* Dist. Ct. Dkt., Case No. 4:09-cv-01967-CW, ECF No. 898-20) at 42

9   ("An internal investigation by the university uncovered numerous academic improprieties,

10   including unauthorized grade changes, forged faculty signatures on grade roles, and courses

11   conducted with limited or no class time.").  And a witness called by the NCAA in the *O'Bannon*

12   trial, Neal Pilson, addressed the alleged "scandals that have taken place at North Carolina" in

13   explaining that it did not change the public's perception of college sports as "significantly different

14   from professional sports."  Mishkin Decl., Ex. 3 (*O'Bannon* Tr.) 773:4-18.  There is accordingly

15   nothing new here that warrants rejection of *O'Bannon*.

16              3.    Plaintiffs' Recycled Challenges to Academic Integration Fail.

17          Plaintiffs offer no basis for disregarding this Court's determination in *O'Bannon* that the

18   challenged rules "help to integrate student-athletes into the academic communities of their schools,

19   which may in turn improve the schools' college education product."  7 F. Supp. 3d at 980.  They

20   first attempt to minimize that determination, arguing that "social ideals" are "not an *economic*

21   justification," and that the Ninth Circuit "hardly considered the issue."  Pls.' Opp. 44.  That is

22   _____

23   [16]   Plaintiffs also mischaracterize what the NCAA did.  Quoting a press release summarizing the
     NCAA committee's report (rather than the report itself), Plaintiffs misleadingly suggest that the
24   NCAA found that there was widespread academic fraud at UNC and simply chose to ignore it.
     Pls.' Opp. 42-43.  In truth, the NCAA levied sanctions against UNC for some of the alleged
25   violations and concluded that, for others, there was a "lack of identifiable examples of fraudulent
     activity in . . . the record" to support sanctions.  Mishkin Decl., Ex. 9 (UNC at Chapel Hill Public
26   Infractions Decision, Oct. 13, 2017) at 15-16; *see also id.* 19 ("It is not clear on the face of the
     record that the conduct supported impermissible academic assistance."); *id.* 20 ("The record,
27   however, does not establish specific, intentional or systemic efforts tied to athletics motives.").

28

1   triply flawed:  This Court ruled that integration *is* a valid procompetitive justification under the

2   antitrust laws, *see* 7 F. Supp. 3d at 1005; the Ninth Circuit expressly agreed that "the NCAA's

3   compensation rules serve the . . . procompetitive purpose[ of] . . . integrating academics with

4   athletics," 802 F.3d at 1073; and those rulings are binding precedent entitled to respect.

5        Plaintiffs' assertion that there is new evidence on this score fares no better.  Drawing on

6   this Court's observation "that paying student-athletes large sums of money would potentially

7   'create a wedge' between student-athletes and others on campus," *O'Bannon*, 7 F. Supp. 3d at 980

8   (citation omitted), Plaintiffs suggest that a "wedge" already exists between student-athletes and

9   other students on campus.  Pls.' Opp. 45.  But here too, the evidence they proffer, *see id.*, was

10   already put forth in *O'Bannon*—including evidence regarding locker rooms, Mishkin Decl., Ex. 3

11   (*O'Bannon* Tr.) 2362:4-13, 2516:7-18; student-athlete-only academic services, *id.* 60:11-14,

12   1000:21-1001:2, 1597:6-17; and specialized dormitories and cafeterias, *id.* 1375:24-1376:9,

13   1378:20-1379:12.  Indeed, one of Plaintiffs' experts in *O'Bannon* submitted a report focusing on

14   this evidence, including pictures of student-athlete facilities.  *See generally* Expert Report of Ellen

15   Staurowsky (*O'Bannon* Dist. Ct. Dkt., Case No. 4:09-cv-01967-CW, ECF No. 898-20).

16        Another argument that was considered, and rejected, in *O'Bannon* is that paying student-

17   athletes would not impair integration because "colleges do nothing to limit" other students from

18   earning money while in school.  Pls.' Opp. 47.  For example, Plaintiffs here point out that non-

19   athlete students can receive compensation for "working for college publications," *id.*, which is an

20   observation that Dr. Noll made in *O'Bannon*.  *See* Mishkin Decl., Ex. 3 (*O'Bannon* Tr.) 520:12-

21   521:11.  Plaintiffs likewise note that students at Stanford have received university funding for their

22   businesses, Pls.' Opp. 47—a point echoed in the *O'Bannon* transcript as well.  *See* Mishkin Decl.,

23   Ex. 3 (*O'Bannon* Tr.) 521:1-11 (testimony of Dr. Noll that students can form technology

24   companies or sell computer programs developed in school); *id.* 2543:6-2544:11 (testimony of

25   Bernard Muir, Athletic Director at Stanford University, that computer science students have made

26   money for developing programs).  Faced with this evidence, this Court and the Ninth Circuit held

27

28

1 that academic integration is a procompetitive justification.  Recycled arguments about that same

2 evidence here provide no basis for a different result.[17]

3        4.      Plaintiffs' "New" Survey Evidence Is Irrelevant.

4        The relationship between the NCAA's existing rules and consumer demand also was

5 addressed and resolved in *O'Bannon*.  Concluding that "the amateur nature of collegiate sports

6 increases their appeal to consumers," *O'Bannon*, 802 F.3d at 1073, the Ninth Circuit ordered the

7 NCAA to permit student-athletes to receive financial aid up to the cost of attendance, but rejected

8 more drastic relief, *see id.* at 1075-79.  More drastic changes, the court held, would transition

9 college sports "from its 'particular brand of football' to minor league status," *id.* at 1079, and

10 "vitiate the[] amateur status" that makes them so popular, *id.* at 1077.  As explained above,

11 *O'Bannon* forecloses Plaintiffs' attempt to proffer allegedly new evidence about consumer demand

12 as a basis to retry the same factual issue.  It also forecloses Plaintiffs from seeking a different type

13 of injunctive relief that *O'Bannon* rejected.

14        Moreover, the survey of Plaintiffs' proffered expert, Hal Poret, does not constitute a new

15 material fact because it does not support Plaintiffs' claim for injunctive relief.  Pls.' Opp. 15.  The

16 assertion that Mr. Poret's survey "provides further post-*O'Bannon* evidence that consumer demand

17 would not be adversely impacted" by a ruling in Plaintiffs' favor, *id.*, ignores the survey that

18 Mr. Poret actually ran.  Plaintiffs have made clear that the relief they seek is *not* an injunction

19

---

20 [17]   Plaintiffs inaccurately assert that there is no new evidence that paying athletes more would undermine integration.  Pls.' Opp. 48.  Dr. Heckman testified about precisely that point, noting that

21 paying student-athletes would encourage them to focus their attention and effort on athletics at the expense of academics.  Defs.' MSJ 47.  Critically, Plaintiffs' own expert, Dr. Lazear, *agreed*,

22 noting on multiple occasions that paying student athletes would increase "their incentive to play hard and stay on the [team]."  *See* Lent Decl., Ex. 32 (Aug. 17, 2017 Dep. of Edward P. Lazear

23 ("Lazear Dep.")) 223:24-228:17; *id.* 224:11-14 ("When people are compensated on the basis of their effort, and when those wages are allowed to increase with effort, then we tend to see more

24 effort being provided.").  Plaintiffs attempt to minimize this testimony by suggesting that "more 'effort' towards athletics is neither synonymous with more *time* toward athletics or less time and

25 *effort* towards academics," Pls.' Opp. 43, but that is inconsistent with Dr. Lazear's own testimony

26 that "[i]t's . . . likely that some individuals would, and, possibly, given individual[s] might supply more hours, more effort, at that wage as well."  Lent Decl., Ex. 32 (Lazear Dep.) 82:16-21.

27 Plaintiffs' argument also makes no sense in light of their assertions, just pages before, that student-athletes are pressed for time as it is.  Pls.' Opp. 40.

28

23

**REPLY ISO DEFS.' MOT. FOR SUMMARY JUDGMENT, REPLY ISO DEFS.'**
**MOTIONS TO EXCLUDE, & OPP. TO PLS.' MOTIONS TO EXCLUDE**

**MDL No. 4:14-md-02541-CW**
**Case No. 4:14-cv-02758-CW**

1  "requir[ing] any specific benefits or compensation," but an "injunction to enjoin enforcement" of

2  all rules affecting the benefits and compensation that student-athletes may receive.  *Id.* 4.  Yet Mr.

3  Poret's survey provides *no evidence of how consumer demand would be affected by that kind of*

4  *injunction*, because he did not test that alternative to the current regime.  During Mr. Poret's

5  deposition, Defendants specifically asked him whether he tested the effects on consumer demand if

6  the Court were to issue an order "permitting the conference defendants to compete amongst each

7  other as to the financial aid, awards, non-cash benefits and monetary remuneration that conference

8  defendants choose to offer."  Lent Decl., Ex. 45 (July 20, 2017 Dep. of Hal Poret ("Poret Dep."))

9  141:12-142:7.  His response: "You're correct[] that I didn't ask something worded like that."  *Id.*

10  142:8-9.  Mr. Poret also admitted that he did not test consumer response to an unlimited, pay-for-

11  play world.  *Id.* 106:1-12.[18]  Mr. Poret's survey thus provides no basis for concluding that a ruling

12  for Plaintiffs would not undermine consumer demand.

13       Ultimately, Plaintiffs' survey evidence provides no basis for departing from what

14  *O'Bannon* already established:  Amateurism enhances the popularity of college sports, and the

15  relief that the Ninth Circuit already ordered is all the antitrust laws require.

16       5.   <u>Plaintiffs' Arguments About Longstanding NCAA Rules Permitting
          Student-Athletes to Receive Certain Awards, Benefits, and Reimbursements</u>

17       <u>Mischaracterize Those Rules and Their Role in *O'Bannon*</u>.

18       Another supposedly post-*O'Bannon* development Plaintiffs highlight is not a post-

19  *O'Bannon* development at all.  Plaintiffs renew their suggestion that the NCAA's rules "*now*[]

20  permit members, at their individual discretion, to offer athletes substantial specified benefits"

21  above the "illusory COA limit."  Pls.' Opp. 19.  But the rules regarding awards, benefits, and

22  _____

23  [18]   Further, as Defendants explained in their opening brief, Defs.' MSJ 41-42, and as Plaintiffs do
     not contest, Mr. Poret did not even attempt to determine how consumers would react if student-

24  athletes could receive several additional benefits as a result of a ruling for Plaintiffs.  Plaintiffs
     seek to enjoin over eighty different rules, which collectively restrict many different forms of

25  benefits that student-athletes do or could theoretically receive.  Mr. Poret's survey, however,
     analyzed consumer reaction to only eight potential benefits, and in isolation.  Lent Decl., Ex. 45

26  (Poret Dep.) 102:13-104:19.  Thus, Plaintiffs' claim that his survey shows "no negative impact on
     consumer demand if such additional benefits to class members above COA were permitted," Pls.'

27  Opp. 15, is a misstatement of Mr. Poret's own analysis.

28

**REPLY ISO DEFS.' MOT. FOR SUMMARY JUDGMENT, REPLY ISO DEFS.'**
**MOTIONS TO EXCLUDE, & OPP. TO PLS.' MOTIONS TO EXCLUDE**

**MDL No. 4:14-md-02541-CW**
**Case No. 4:14-cv-02758-CW**

1   reimbursements—and the items student-athletes can receive under those rules—are not new.  They

2   were part of the system that *O'Bannon* considered, and the plaintiffs in *O'Bannon* made many of

3   the same arguments about these benefits that Plaintiffs now repeat.  So here too, Plaintiffs' "new

4   evidence" claims fail.

5          As the Ninth Circuit recognized, the grant-in-aid limit is a measure of the direct "financial

6   aid" colleges and universities can provide to student-athletes to fund their academic education.

7   *O'Bannon*, 802 F.3d at 1054; *see id.* (noting that the grant-in-aid limit affects the "financial aid,"

8   in the form of "scholarships," that student-athletes can receive).  But the NCAA has long permitted

9   student-athletes to also receive certain non-cash awards, benefits, and expense reimbursements

10  related to their participation in athletics, recognizing that athletics are also part of a student-

11  athlete's educational experience, that student-athletes should be able to participate in competition

12  without having to bear the built-in costs, and that they should be allowed to receive certain awards

13  recognizing athletic success.  *See* Defs.' MSJ 9 (collecting authorities).  These awards, benefits,

14  and expense reimbursements are governed by a different portion of the NCAA's rulebook than the

15  financial aid limits, *see* Mishkin Decl., Ex. 1 (NCAA Bylaws) § 16, but they are consistent with

16  the same underlying principles that motivate all the NCAA's rules—including "maintaining a line

17  of demarcation between student-athletes who participate in the Collegiate Model and athletes

18  competing in the professional model," and protecting student-athlete "well-being."  Lent Decl., Ex.

19  1 (NCAA Bylaws) § 1.3.1.

20         These rules did not spring into place in the last two years.  Instead, they were part of the

21  system and the record that the courts considered in *O'Bannon*.  Like Plaintiffs here, the plaintiffs

22  in *O'Bannon* highlighted these awards, benefits, and expense reimbursements in an effort to show

23  that the NCAA's "concept of amateurism is unfixed, malleable, and self-serving."  *O'Bannon*

24  Appellee Br. (9th Cir., Case No. 14-16601, ECF No. 43-1) (Jan. 21, 2015) at 4; *see* Pls.' Opp. 19

25  (similar).  To provide just a few examples:

26      • Plaintiffs highlight the awards that student-athletes can receive in connection with
          postseason competition.  Pls.' Opp. 21.  So did the plaintiffs in *O'Bannon*.  *See* Expert
27        Report of Ellen Staurowsky (*O'Bannon* Dist. Ct. Dkt., Case No. 4:09-cv-01967-CW,
          ECF No. 898-20) at 51; Lent Decl., Ex. 15 (*O'Bannon* Tr.) 908:16-909:14; *O'Bannon*
28        Appellee Br. (9th Cir., Case No. 14-16601, ECF No. 43-1) at 19.

                                                       25

- Plaintiffs raise transportation and lodging for family members to attend championship events.  Pls.' Opp. 21.  So too in *O'Bannon*.  *See* Expert Report on Liability of Roger G. Noll (*O'Bannon* Dist. Ct. Dkt., Case No. 4:09-cv-01967-CW, ECF No. 898-15) (Sept. 25, 2013) at Ex. 1A; *O'Bannon* Appellee Br. (9th Cir., Case No. 14-16601, ECF No. 43-1) at 7.

- Plaintiffs identify special insurance policies that student-athletes can receive.  Pls.' Opp. 21.  These policies were discussed in *O'Bannon* too.  Lent Decl., Ex. 15 (*O'Bannon* Tr.) 2147:14-23.

- Plaintiffs mention reimbursements for costs associated with national championships and other high-level competition.  Pls.' Opp. 21.  The same was true in *O'Bannon*.  *See* Expert Report on Liability of Roger G. Noll (*O'Bannon* Dist. Ct. Dkt., Case No. 4:09-cv 01967-CW, ECF No. 898-15) at Ex. 1A.

Confronted with these arguments, however, the Ninth Circuit did not suggest that the NCAA should stop providing these benefits.  Nor did it impose a "COA cap" on *all* financial aid, awards, benefits, and reimbursements student-athletes may receive, Pls.' Opp. 20.  Instead, the court held that the *only* change to the status quo that was required by the antitrust laws was lifting the educational financial aid limit from the previous amount up to the cost of attendance.  *O'Bannon*, 802 F.3d at 1079.  For that reason, the shift to COA does not give "'old' benefits . . . new and different economic relevance," by "push[ing] a college athlete's total compensation package above . . . the COA cap," Pls.' Opp. 14—the shift simply added the personal, travel and similar expenses included in the federal definition of cost of attendance to what student-athletes were already eligible to receive.[19]

Plaintiffs' remaining argument—that the testimony of Kevin Lennon somehow changes the meaning of these awards and benefits—does not undermine this straightforward reasoning.  The law is clear that a new characterization of previously presented evidence provides no basis for diluting the effect of *stare decisis*.  *See Ramos-Medina*, 706 F.3d at 938.  And in any event, Plaintiffs' characterization of Lennon's testimony is wrong.  Plaintiffs repeat the same set of

---

[19]   Other benefits raised by Plaintiffs have not changed since *O'Bannon*, such as transportation and lodging for spouses and children (NCAA Bylaw 18.7.5, last revised in 2011), and per diems for away-game travel (NCAA Bylaw 31.7.2.1.2, last revised in 1998).  Mishkin Decl., Ex. 1 (NCAA Bylaws) §§ 18.7.5, 31.7.2.1.2.  Arguments that could have been, but were not, raised in *O'Bannon* provide no basis for setting its binding precedent aside.  *See* Lent Decl., Ex. 9 (Aug. 2, 2016 Hr'g Tr.) 20:20-21.

26

1  carefully selected quotes as before, but provide no response to the fact that Lennon made clear that

2  changes to the rules affecting awards, benefits, and expenses must "operat[e] within the other

3  bylaws, *like the principle of amateurism*," Lent Decl., Ex. 34 (Lennon 30(b)(6) Dep.) 174:24-25

4  (emphasis added).  They likewise offer no response at all to other evidence—including the

5  synopsis of rules prepared by Brad Hostetter, the ACC's Executive Associate Commissioner and

6  Chief of Internal Affairs—confirming that the rules governing awards, benefits, and expenses are

7  designed to "prevent abuses of the concept of amateurism."   Lent Decl., Ex. 13 (Hostetter

8  Synopsis) at 5.

9         In short, the record in this case does not support Plaintiffs' rhetoric.  The awards, benefits,

10  and expenses that student-athletes may receive are not new evidence absent from "the record in

11  *O'Bannon*."  Pls.' Opp. 19.  These arguments were presented to the court in *O'Bannon*, and the

12  court rejected them.  There is no legal basis for a different result here.

13         6.    The Small Handful of Rules Changes Since *O'Bannon* Do Not

14  Constitute Materially Changed Circumstances Justifying a
Different Result.

15         After all of Plaintiffs' purported evidence relating to issues actually considered in

16  *O'Bannon* is set aside, what is left is a small handful of minor, post-*O'Bannon* refinements to

17  various NCAA rules.  This evidence is not particularly novel, nor is it the type of "material"

18  evidence that could even arguably justify departing from *O'Bannon*.  *See Hart*, 266 F.3d at 1172;

19  *Ore. Natural Desert Ass'n*, 550 F.3d at 785.

20         One of the post-*O'Bannon* developments that Plaintiffs highlight—the change to the rule

21  regarding meals—underscores that the differences from the prior record are minor indeed.

22  Plaintiffs do not dispute that prior to 2014, NCAA Bylaw 16.5.2(d) outlined specific instances in

23  which student-athletes could receive "meals incidental to participation" tied to practices or games.

24  *See* Pls.' Opp. 14, App. B-2.  The recent revision to the rule merely eliminates limits on such

25  meals.  Mishkin Decl., Ex. 1 (NCAA Bylaws) § 16.5.2(d).  Permitting student-athletes to eat extra

26  meals, or take snacks back to their dorms from the cafeteria, does not constitute the kind of

27  materially changed circumstance that would have led "the *O'Bannon* court [to] reach[] a different

28  conclusion."  Pls.' Opp. 16.

27

**REPLY ISO DEFS.' MOT. FOR SUMMARY JUDGMENT, REPLY ISO DEFS.'**
**MOTIONS TO EXCLUDE, & OPP. TO PLS.' MOTIONS TO EXCLUDE**
          **MDL No. 4:14-md-02541-CW**
          **Case No. 4:14-cv-02758-CW**

1        Evidence regarding the scope of disability insurance that students can procure likewise

2  represents a difference in degree, rather than kind.  Todd Petr testified during *O'Bannon* that the

3  Student Assistance Fund could be used to purchase "a special insurance policy," Lent Decl., Ex. 15

4  (*O'Bannon* Tr.) 2147:14-23, or "catastrophic injury insurance," Mishkin Decl., Ex. 3 (*O'Bannon*

5  Tr.) 2152:7-17.  As they previously allowed for total disability insurance, the rules now permit

6  student-athletes to borrow against future earnings, or seek reimbursement from the Student

7  Assistance Fund, to pay for loss-of-value insurance.  Pls.' Opp., App. B-3; Lent Decl., Ex. 1

8  (NCAA Bylaws) § 12.1.2.4.4.  The Ninth Circuit was aware of this development when it

9  considered *O'Bannon*.  802 F.3d at 1055 (citing Tracy, *supra* at 16).  And as Defendants explained

10  in their opening brief, this expanded form of disability insurance furthers amateurism by further

11  encouraging the small number of student-athletes with strong professional prospects to remain in

12  school and receive the educational and other benefits of intercollegiate athletics.  *See* Defs.' MSJ

13  32.  The fact that some students choose to take out these policies to continue participating in

14  amateur athletics, Pls.' Opp. 25, is in no way inconsistent with, and could not justify ignoring, the

15  binding effect of *O'Bannon*.

16        Finally, the fact that student-athletes from all countries may now receive Olympic success

17  bonuses from their national Olympic organizations, just as American student-athletes could at the

18  time of *O'Bannon*, is of little consequence.  Plaintiffs provide no example of a *class member*

19  receiving any such benefit.  *Cf.* Pls.' Opp. 25 (example of swimmer).  And the Court has already

20  heard and considered testimony about student-athletes receiving money relating to the Olympics,

21  albeit in a different form.  Mishkin Decl., Ex. 3 (*O'Bannon* Tr.) 2545:19–2546:10 (testimony about

22  student-athletes being permitted to sell medals).  Plaintiffs omit this detail, perhaps because there

23  is no substantial difference between that evidence and evidence that qualified student-athletes may

24  now receive payments from foreign Olympic committees for non-collegiate Olympic competition.

25  Pls.' Opp., App. B-3; Mishkin Decl., Ex. 1 (NCAA Bylaws) § 12.1.2.1.5.2.  Also, as *O'Bannon*

26  recognized, allowing student-athletes "to accept award money from outside athletic events

27  implicates amateurism differently than allowing schools to pay [student-athletes] directly" for

28  participation in collegiate athletics.  802 F.3d at 1077 n.21.

28

1    Plaintiffs are thus correct that "college athletes are receiving more benefits," Pls.' Opp. 21,

2    but that is a result of the ordinary functioning of the NCAA's legislative process that was

3    implicitly, but necessarily, upheld in *O'Bannon*.  These minor changes fall well within the "ample

4    latitude" that the Ninth Circuit held the NCAA must have in rule-setting.  *See O'Bannon*, 802 F.3d

5    at 1079.  As the court made clear, "courts should not use antitrust law to make marginal

6    adjustments to broadly reasonable market restraints."  *Id.* at 1075.  Courts should be still more

7    reluctant to make major adjustments to recently approved restraints on the basis of such a thin

8    record of purportedly new evidence.  Indeed, if this meager handful of incremental changes were

9    enough to justify departing from precedent, it is hard to imagine when *stare decisis* would apply.

10   **C.     Plaintiffs May Not Retry *O'Bannon* Based on Allegedly New Arguments About
         New Less Restrictive Alternatives.**

11

12   Plaintiffs' attempts to stave off summary judgment by citing "factual disputes" regarding

13   allegedly less restrictive alternatives is just another failed effort to avoid *O'Bannon*'s preclusive

14   effect.  First, the primary less restrictive alternative Plaintiffs propose here—an injunction

15   allowing "individual schools or conferences [to] independently promulgate their own rules," Pls.'

16   Opp. 4—*was considered and rejected in O'Bannon*.  During trial, Roger Noll testified that one

17   alternative to the then-existing system was "competition among the conferences where the

18   conference makes the rules."  Mishkin Decl., Ex. 3 (*O'Bannon* Tr.) 445:15-16.  He then explained

19   at some length how this system could work.  *Id.* at 445:17-451:5 ("So that is the mechanism—

20   there are conference rules that are set through market competition between conferences.").  And

21   during the closing colloquy, this Court listed "allow[ing] the conferences to make their own rules"

22   as a potential less restrictive alternative, *id.* at 3379:2, and heard argument from the plaintiffs about

23   that concept, *id.* at 3382:15-3383:2.  Yet neither this Court nor the Ninth Circuit actually ordered

24   that relief.  Plaintiffs provide no justification for revisiting that determination—in fact, they do not

25   so much as acknowledge this part of the *O'Bannon* record.  And because this request for relief is

26   clearly precluded, Defendants thus had no obligation to make any showing with respect to this

27   proposed "alternative."  Pls.' Opp. 53-54.

28

**REPLY ISO DEFS.' MOT. FOR SUMMARY JUDGMENT, REPLY ISO DEFS.'          MDL No. 4:14-md-02541-CW
MOTIONS TO EXCLUDE, & OPP. TO PLS.' MOTIONS TO EXCLUDE                  Case No. 4:14-cv-02758-CW**

1    Second, Plaintiffs cannot evade *O'Bannon* merely by claiming that they are challenging

2    different restraints in this case, *see* Pls.' Opp. 13-16.  As noted above, Plaintiffs have not

3    substantiated that claim by alleging or proving the elements of a Rule of Reason case as to any

4    distinct NCAA rule or set of rules.  Instead, they have brought forward largely the same evidence

5    and arguments from *O'Bannon* in support of a request for relief that this Court and the Ninth

6    Circuit rejected.  Precedent would be meaningless if a party could seek relief irreconcilable with a

7    binding circuit court decision just by applying nominally different labels to the scope of its

8    challenge.  *Tahoe-Sierra Pres. Council, Inc. v. Tahoe Reg'l Planning Agency*, 322 F.3d 1064, 1082

9    (9th Cir. 2003).

10    Third, Plaintiffs' passing mentions of other potential less restrictive alternatives likewise

11    provide no basis for disregarding *O'Bannon*.  Arguments about different less restrictive

12    alternatives to the same system of rules considered and largely upheld in *O'Bannon* are just that—

13    arguments.  And Plaintiffs cannot defeat *stare decisis*, *res judicata*, or collateral estoppel with

14    arguments about less restrictive alternatives (largely undeveloped, abstract, and theoretical

15    "alternatives" to boot) that could have been raised in *O'Bannon* but were not.  *See, e.g.*, *Rambus*

16    *Inc. v. Hynix Semiconductor Inc.*, 569 F. Supp. 2d 946, 972 (N.D. Cal. 2008) ("*Stare decisis* would

17    be largely meaningless if a lower court could change an appellate court's interpretation of the law

18    based only on a new argument."); *Tahoe-Sierra Pres. Council, Inc.*, 322 F.3d at 1078-79 (under

19    *res judicata*, a party cannot reopen a judgment if the arguments or evidence it seeks to present

20    "could have been brought" earlier); *Kamilche Co. v. United States*, 53 F.3d 1059, 1063 (9th Cir.

21    1995) ("[O]nce an *issue* is raised and determined, it is the entire *issue* that is precluded, not just the

22    particular arguments raised in support of it in the first case." (citation omitted)).

23    Further, in addition to being precluded under these doctrines, each of these cursorily

24    discussed less restrictive alternatives is also foreclosed by *O'Bannon*'s specific rulings.  Plaintiffs'

25    suggestion that Defendants could permit "*all* payments that are tethered to educational expenses,"

26    Pls.' Opp. 55, cannot be squared with *O'Bannon*'s holding that limiting payments to the

27    "'legitimate costs' to attend school" is consistent with the antitrust laws.  802 F.3d at 1075-76.

28    Claiming that Defendants should "allow additional compensation and benefits incidental to sports

30

1    participation," Pls.' Opp. 55 (citation omitted), ignores that the move to COA was the only

2    required alteration to "the NCAA's current rules."  *See* 802 F.3d at 1075-76, 1079.  And Plaintiffs'

3    suggestion that the Court should simply "enjoin enforcement" of the challenged rules and allow

4    the NCAA to "promulgate less restrictive rules, guided by the Court's application of the rule of

5    reason," Pls.' Opp. 4, expressly invites the "whack-a-mole" problem that has concerned this Court.

6    Mishkin Decl., Ex. 2 (Aug. 2, 2016 Hr'g Tr.) 28:2-5.  Plaintiffs—or some other similar class—

7    would surely "sue" again if Defendants "tr[ied] something else," *id.* 28:6-8, which Plaintiffs all but

8    admit in requesting that this Court preside over a sixty-day supervisory period after issuing its

9    ruling.  Pls.' Opp. 4.[20]

10       A "less restrictive alternative" must be an "alternative" to something else, namely a validly

11   challenged restraint on trade.  In opposing Defendants' Motion for Summary Judgment, however,

12   Plaintiffs identified no such challenges, and have done little more than present already-considered

13   evidence and arguments in support of their broad challenge to the NCAA's restrictions on paying

14   athletes—a challenge that is foreclosed by *O'Bannon*.

15                                       *        *        *

16       At the Rule 12(c) hearing, Plaintiffs were given an invitation to proceed with targeted

17   claims that might not be precluded by *O'Bannon*.  And Plaintiffs suggested they would come

18   _____

19   [20]   Plaintiffs also have not come close to making the "strong evidentiary showing" that these
     alternatives would "be 'virtually as effective' in serving the procompetitive purposes of the

20   NCAA's current rules, and 'without significantly increased cost.'"  *O'Bannon*, 802 F.3d at 1074
     (citation omitted).  As noted above, Plaintiffs' survey expert did not test how consumers would

21   react to any of these suggested alternatives.  *Supra* at 23-24 & n.18.  And evidence that several
     conferences now exercise "autonomy" over certain areas of rulemaking was already considered in

22   support of *O'Bannon*'s order of relief inconsistent with all of these alternatives.  *Supra* at 16.

23       Further, Ninth Circuit precedent forecloses Plaintiffs' efforts to dismiss, as improper lay
     opinions, the testimony of experienced administrators regarding the havoc these alternatives would

24   wreak.  Lay witnesses may testify to opinions based on their experience, and various witnesses
     have relied on that experience to point out the problems with Plaintiffs' suggested remedies.  *See,*

25   *e.g.*, *United States v. Gadson*, 763 F.3d 1189, 1208 (9th Cir. 2014), *cert denied* 135 S. Ct. 2350
     (2015); *Jerden v. Amstutz*, 430 F.3d 1231, 1239 (9th Cir. 2005) ("Lay witnesses can permissibly

26   base opinion testimony upon their experience . . . ."); *see also United States v. Blauvelt*, 680 F.
     App'x 578, 581 (9th Cir. 2017); *Western Oilfields Supply Co. v. Goodwin*, 461 F. App'x 624, 626

27   (9th Cir. 2011).

28

31

1  forward with claims aimed at current rules limiting specific benefits that, according to Plaintiffs,

2  were not encompassed within the Ninth Circuit's decision in *O'Bannon*.  That is not what

3  Plaintiffs have done.  While they attempt to disguise their challenge to the entirety of the NCAA's

4  caps on compensation and benefits, they ultimately acknowledge, as they must, that they are

5  seeking to enjoin all of those existing limits.  *See, e.g.*, Pls.' MSJ 4; Pls.' Opp. 4.  And requiring

6  the NCAA to permit unlimited compensation and benefits is unambiguously foreclosed by

7  *O'Bannon*.  802 F.3d at 1076-79; *see also In re NCAA GIA Cap Antitrust Litig.*, 2016 WL

8  4154855, at \*2 (recognizing that *O'Bannon* "limits the types of relief Plaintiffs may seek").

9  Allowing this challenge to continue would not just be inconsistent with precedent—it would also

10  further "open the floodgates to new lawsuits demanding all manner of incremental changes in the

11  NCAA's and other organizations' rules," 802 F.3d at 1075—not just as they currently stand, but in

12  whatever form they may take in the future.

13        Indeed, *Jenkins* Plaintiffs request just such an outcome in asking the Court to remand their

14  case to the District of New Jersey in the event "that *O'Bannon* requires summary judgment for

15  Defendants" so that they can continue to pursue their claims.  Pls.' Opp. 8 n.3.  That suggestion is

16  nonsensical.  The MDL panel consolidated these cases, including *Jenkins*, for *all* pretrial

17  proceedings, including summary judgment.  *See* 28 U.S.C. § 1407; *In re Phenylpropanolamine*

18  *(PPA) Prods. Liab. Litig.*, 460 F.3d 1217, 1230-31 (9th Cir. 2006) (transferee judge has "authority

19  to decide all pretrial motions, including dispositive motions such as . . . motions for summary

20  judgment").  If this Court determines that summary judgment is warranted, then there will be

21  nothing left to remand, because "[Section] 1407(a) limit[s] the [MDL] Panel's remand obligation

22  to cases *not 'previously terminated'* during the pretrial period."  *Lexecon Inc. v. Milberg Weiss*

23  *Bershad Hynes & Lerach*, 523 U.S. 26, 37 (1998) (emphasis added).  And Ninth Circuit precedent

24  makes clear that there is no merit to the *Jenkins* Plaintiffs' implicit suggestion that *O'Bannon* does

25  not apply to their claims here.  *Newton v. Thomason*, 22 F.3d 1455, 1460 (9th Cir. 1994) ("We

26  therefore hold that, when reviewing federal claims [transferred under either § 1404 or § 1407], a

27  transferee court in this circuit is bound only by our circuit's precedent."); Charles A. Wright et al.,

28

1  15 *Federal Practice and Procedure* § 3867 (4th ed. 2013) ("[T]he transferee court applies its own

2  interpretation of federal law.").[21]

3        Enough is enough. *O'Bannon* requires judgment in favor of Defendants on all of Plaintiffs'

4  claims in these actions and Defendants' Motion for Summary Judgment should be granted in its

5  entirety.[22]

6  **REPLY IN SUPPORT OF DEFENDANTS' MOTIONS TO EXCLUDE EXPERT**
   **TESTIMONY AND OPPOSITION TO PLAINTIFFS' MOTIONS TO EXCLUDE EXPERT**
7  **TESTIMONY**

8

9        The Court needs to reach the merits of the parties' *Daubert* challenges only if it denies

10 Defendants' Motion for Summary Judgment. Defendants have moved to exclude certain opinions

11 offered by Plaintiffs' experts, but those challenges matter only if this case somehow survives

12 notwithstanding *O'Bannon*. Likewise, while Plaintiffs have moved to exclude certain testimony of

13 Dr. Elzinga and Dr. Heckman, the legal deficiencies of Plaintiffs' claims in no way turn on any

---

14 [21]   Moreover, even if *Jenkins* were somehow remanded to the District of New Jersey, the *Jenkins*
15 Plaintiffs (all of whom are also CAC class members) would still be bound by *O'Bannon* as well as
   any final judgment from this Court because of *res judicata* and collateral estoppel. *E.g.*, *Cooper v.*
16 *Fed. Reserve Bank of Richmond*, 467 U.S. 867, 874 (1984).

17 [22]   Even if Plaintiffs could be viewed as having demonstrated to the Court that they have
   established the existence of any single claim not precluded by *O'Bannon*—and they have not—
18 only that single claim, not the entire duplicative action, could proceed to trial. Fed. R. Civ. P.
   56(a), (g) (stating that if complete judgment cannot be granted, the court may grant summary
19 judgment on any issues it decides in movant's favor, stating the reasons for granting or denying
   any other parts of the motion, and "stating any material fact – including an item of damages or
20 other relief – that is not genuinely in dispute and treating the fact as established in the case").
   "Among other advantages," the Court's statement of reasons for its decision "can facilitate an
21 appeal or subsequent trial-court proceedings," and "identification of central issues may help the
   parties to focus further proceedings." Fed. R. Civ. P. 56(a) advisory committee's note to 2010
22 amendment. As other courts have recognized, "partial summary judgment can serve a useful
   brush-clearing function even if it does not obviate the need for a trial." *Hotel 71 Mezz Lender*
23 *LLC v. Nat'l Ret. Fund*, 778 F.3d 593, 606 (7th Cir. 2015); *see also Cal. Dep't of Toxic Substances*
   *Control v. Interstate Non-Ferrous Corp.*, 298 F. Supp. 2d 930, 939 (E.D. Cal. 2003) (noting that
24 the purpose of the predecessor to Rule 56(g) "is to salvage some results from the judicial effort
   involved in evaluating a summary judgment motion and to frame narrow triable issues if the court
25 finds that the order would be helpful with the progress of litigation"). To the extent the Court
   grants partial summary judgment in favor of Defendants, pursuant to Local Rule 56-3, Defendants
26 respectfully request that the Court specify that those statements in its order "constitute issues
   deemed established for purposes of the trial of the case."
27

28

**REPLY ISO DEFS.' MOT. FOR SUMMARY JUDGMENT, REPLY ISO DEFS.'**                    **MDL No. 4:14-md-02541-CW**
**MOTIONS TO EXCLUDE, & OPP. TO PLS.' MOTIONS TO EXCLUDE**                          **Case No. 4:14-cv-02758-CW**

1    opinion offered by those experts.  The Court should therefore deny the *Daubert* motions as moot

2    after granting summary judgment to Defendants.  Otherwise, the Court should grant Defendants'

3    *Daubert* motions and deny the motions filed by Plaintiffs.

4    **I.    *Daubert* Compels Exclusion of Several Opinions Offered by Drs. Noll, Rascher, and**
     **Lazear.**

5
6          **A.    Opinions That Contradict *O'Bannon* Are Irrelevant and Should Be Excluded.**

7          Defendants' opening brief demonstrated that various opinions proffered by Plaintiffs'

8    economics experts—Drs. Rascher, Noll, and Lazear—are contrary to the Ninth Circuit's decision

9    in *O'Bannon* and thus are inadmissible under Federal Rule of Evidence 702 and *Daubert v.*

10   *Merrell Dow Pharmaceuticals., Inc.*, 509 U.S. 579 (1993).  Defs.' MSJ 53-56.  Opinions that

11   address (and in fact contradict) already-resolved issues do not "fit" the facts of the case and

12   provide no assistance to the trier of fact.  Accordingly, they should be excluded as irrelevant.  *King*

13   *Drug Co. of Florence, Inc. v. Cephalon, Inc.*, 2015 WL 6750899, at *9 (E.D. Pa. Nov. 5, 2015);

14   *A & M Records, Inc. v. Napster, Inc.*, 2000 WL 1170106, at *10 (N.D. Cal. Aug. 10, 2000).

15         Plaintiffs make no effort to reconcile their experts' opinions regarding *O'Bannon* with that

16   case's holding.  Nor do they offer any caselaw suggesting that experts can offer opinions that

17   contradict binding precedent—especially where, as here, several of those experts offered similar

18   testimony in the earlier case that addressed and rejected the same positions.  Instead, Plaintiffs urge

19   only the familiar, and flawed, response that *O'Bannon* does not control because they have

20   presented the Court with a new record.  *See* Pls.' Opp. 56 & n.38 (attempting to distinguish *King*

21   *Drug Co.* on this ground).  But as in *King Drug Co.*, the facts have not changed in this case.  *See*

22   *supra* at 14-27.

23         Plaintiffs' attempt to distinguish *A & M Records* on the ground that the experts in this case

24   have not offered legal testimony, Pls.' Opp. 56 n.38, fails as well.  As Plaintiffs concede, *see id.*,

25   the court in that case held that non-lawyers may not offer expert testimony about the content of the

26   law.  Opinions that amateurism and the integration of academics and athletics are not valid

27   procompetitive justifications for the NCAA's financial support rules under the antitrust laws are

28   not economic opinions; they are legal opinions that go to the heart of the Ninth Circuit's

                                           34

1   conclusions in *O'Bannon*.  They accordingly have no place in this case.  *A & M Records*, 2000 WL

2   1170106, at *10; *see infra* at 35-36.

3          Finally, Plaintiffs' reliance on *Wendell v. GlaxoSmithKline LLC*, 858 F.3d 1227 (9th Cir.

4   2017), *petition for cert. docketed sub nom.*, *Teva Pharm. USA, Inc. v. Wendell*, No. 17-747 (U.S.

5   Nov. 20, 2017), changes nothing, because that decision analyzed only the *reliability* of the experts'

6   opinions.  *Id.* at 1232.  The *relevance* of those opinions had been conceded.  *Id.*  Here, by contrast,

7   the challenged opinions are not *relevant* because they contradict governing law, regardless of

8   whether those opinions were reached through a purportedly reliable methodology.  *See Daubert*,

9   509 U.S. at 591 (evaluation of whether the opinion "fits" the facts of the case and is helpful to the

10  factfinder is an evaluation of the opinion's relevance, not its reliability).

11          **B.**       **Opinions That Plaintiffs' Experts Are Not Qualified to Offer Should Be**
            **Excluded.**
12

13          As Defendants have shown, Drs. Lazear and Noll are not qualified experts in the federal

14  laws and regulations that govern intercollegiate sports.  Defs.' MSJ 56-57.  Their opinions about

15  the meaning of those laws and regulations are outside the scope of their specialized skill or

16  knowledge, and therefore are unreliable and inadmissible.  *Id.*; *see also United States v. Santini*,

17  656 F.3d 1075, 1078-79 (9th Cir. 2011) (*per curiam*).

18          Here, too, Plaintiffs respond not to Defendants' arguments, but to a straw man.  Pls.' Opp.

19  at 57-60.  They argue that Drs. Lazear and Noll are expert economists and can apply their

20  economics expertise to college sports.  *Id.*  But the opinions that Defendants challenge as

21  unreliable are not Dr. Lazear's and Dr. Noll's *economic* opinions—they are their *legal* opinions

22  about the meaning of federal antitrust laws and federal financial aid regulations, and how those

23  interpretations apply to the issues now before the court.  Those opinions do not draw on

24  Dr. Lazear's or Dr. Noll's training in economics, and those witnesses lack any specialized skill or

25  expertise in these areas.  Their opinions on these subjects should therefore be excluded as

26  unreliable.  *See, e.g.*, *Hyland v. HomeServices of Am., Inc.*, 771 F.3d 310, 322 (6th Cir. 2014)

27  (affirming district court's exclusion of expert economic testimony "as to his ultimate opinion that a

28  conspiracy likely existed among the defendants during the class period" because it "embrace[d] a

35

1  legal conclusion which depends on anti-trust doctrine in which [the expert] is not qualified to offer

2  an opinion" (citation omitted)); *A & M Records*, 2000 WL 1170106, at *10 ("Lay persons may not

3  offer expert testimony about the content of the law.") (collecting cases).

4  **C.**   **Opinions Based on No Accepted or Recognized Methodology Should Be**
   **Excluded.**

5

6  Finally, Plaintiffs offer no convincing response to Defendants' argument that opinions of

7  Drs. Rascher and Lazear regarding an alleged underutilization of labor and an overuse of capital in

8  the college education market, and alleged inflated spending on coaches, administrators, and

9  facilities, are not supported by any economic, econometric or other analysis.  Defs.' MSJ 58; *see*

10 *Am. Booksellers Ass'n, Inc. v. Barnes & Noble, Inc.*, 135 F. Supp. 2d 1031, 1041-42 (N.D. Cal.

11 2001).  Plaintiffs all but concede that Dr. Lazear has done no analysis to support his statement that

12 the challenged rules have caused an underutilization of labor and an overuse of capital, or that the

13 use of labor would increase (and the use of capital would decline) if the challenged financial aid

14 caps were eliminated.  Pls.' Opp. 61.  This concession is compelled by the circumstances, as

15 Dr. Lazear admitted the point during his deposition.  Lent Decl., Ex. 32 (Lazear Dep.) 196:10-13

16 (answering "I have not" when asked if he has "engaged in any empirical analysis to establish that

17 there has been a possible overuse of capital").  Plaintiffs offer only a stray deposition excerpt in

18 which Dr. Lazear testified that he looked at "data associated with this market."  Pls.' Opp. 61.

19 That vague and conclusory assertion cannot overcome Dr. Lazear's contrary admission, nor does it

20 establish a reliable methodology underlying his conclusions sufficient to overcome *Daubert*.

21 Similarly, while Plaintiffs cite various portions of Dr. Rascher's reports in this case, *id.* 61

22 n.42, none of the citations reveals a methodology for Dr. Rascher's conclusions about inflated

23 expenditures on other aspects of student-athletes' athletic experience.  They instead reflect

24 Dr. Rascher's reliance on his own arbitrary conclusions that coaches make more than a competitive

25 salary in the marketplace in which they compete, and that universities' investments in athletics

26 facilities are extraordinary when compared with, for instance, their investments in other

27 institutional facilities.  Dr. Rascher himself admitted as much regarding the latter under oath.  Lent

28 Decl., Ex. 47 (July 26, 2017 Dep. of Daniel A. Rascher ("Rascher Dep.")) 228:21-24 ("I don't know

1   what the dollar amounts are compared to the athletic facilities.").  These unsupported *ipse dixit*

2   opinions should be excluded.  *See, e.g., Am. Booksellers Ass'n, Inc.*, 135 F. Supp. 2d at 1041

3   ("[N]othing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit

4   opinion evidence that is connected to existing data only by the *ipse dixit* of the expert." (citation

5   omitted)).

6   **II.    Plaintiffs' Motion to Exclude Dr. Elzinga's Testimony on Market**
        **Definition Should Be Denied.**
7

8          Plaintiffs' motion to exclude Dr. Elzinga's testimony relating to market definition ignores

9   what Dr. Elzinga actually did and what *Daubert* challenges are supposed to preclude.  Plaintiffs

10  challenge only one aspect of Dr. Elzinga's conclusions—his use of multi-sided platform analysis

11  in assessing the college education market that this Court and the Ninth Circuit defined in

12  *O'Bannon*.  But Dr. Elzinga's analysis is consistent with several holdings of *O'Bannon* regarding

13  the college education market and the procompetitive effects of the challenged restraints within that

14  market.  And contrary to Plaintiffs' suggestion, Dr. Elzinga's methodology is well-established in

15  the economics literature, is consistent with prior precedent from this and other courts, and was

16  reliably applied to the facts of this case.  Plaintiffs' limited *Daubert* challenge should be rejected.

17       **A.    Dr. Elzinga's Use of Multi-Sided Platform Analysis Accounts for**
                **Several of *O'Bannon*'s Key Holdings.**
18

19         Dr. Elzinga's application of multi-sided platform analysis provides a framework for

20  explaining features of the college education market that the courts recognized in *O'Bannon*, and

21  that both sides' experts in this case acknowledge.  In *O'Bannon*, this Court defined the relevant

22  market as the "college education market," which included both "*educational* and athletic

23  opportunities" for student-athletes.  7 F. Supp. 3d at 986-87 (emphasis added).  The Ninth Circuit

24  accepted that definition, agreeing that the market includes "'unique bundles of goods and services'

25  that include not only scholarships but also coaching, athletic facilities, and the opportunity to face

26  high-quality athletic competition."  802 F.3d at 1056 (quoting 7 F. Supp. 3d at 965-66).  Both

27  courts then concluded that the challenged restraints were procompetitive within the college

28  education market because "the amateur nature of collegiate sports increases their appeal to

37

1  consumers." *Id.* at 1073; *see* 7 F. Supp. 3d at 1005.  Likewise, both courts concluded that the

2  challenged restraints also had the procompetitive benefit of integrating academics and athletics, *see*

3  802 F.3d at 1073; 7 F. Supp. 3d at 1003, implicitly recognizing "that, in economic terms, the

4  product that the universities and colleges 'sell' to their student-athletes, has an academic as well as

5  an athletic component," *see* Lent Decl., Ex. 12 (May 16, 2017 Rebuttal Report of Kenneth G.

6  Elzinga ("May 16 Elzinga Rep.")) at 12, and that student-athletes' interactions with their non-

7  athlete peers are a relevant component of their experience.  *See* 802 F.3d at 1059-60, 1073; *see*

8  *also* 7 F. Supp. 3d at 1003 ("[l]imited restrictions on student-athlete compensation may help

9  schools" prevent "student-athletes from being cut off from the broader campus community").

10  *O'Bannon* thus considered how the challenged restraints affect consumers and non-student

11  athletes—constituents other than the student-athletes and universities that make up Plaintiffs'

12  proposed markets.  *See* Pls.' MSJ 18.

13       Dr. Elzinga's analysis adopted a model of the college education market using a multi-sided

14  platform analysis that accounts for and explains this Court's and the Ninth Circuit's analyses in

15  *O'Bannon*, because it considers how demand on one "side" of the platform (such as consumer

16  demand for amateur athletics) depends in part on the nature of the transaction between university

17  and recruit, which takes place on another side of the platform.  Decl. of Jeffrey L. Kessler in Supp.

18  of Pls.' Mot. for Summ. J. ("Kessler Decl."), Ex. 10 (Mar. 21, 2017 Expert Report of Kenneth G.

19  Elzinga ("Mar. 21 Elzinga Rep.")) at 9, 33-36.  *Cf. O'Bannon*, 802 F.3d at 1073-74.  That analysis

20  similarly enables consideration of how the price at which universities and student-athletes transact

21  affects the interactions on yet another side of the platform, between student-athletes and the non-

22  university participants of the campus community—which this Court embraced when it recognized

23  the procompetitive justification of integration of athletics and academics.  *See O'Bannon*, 7 F.

24  Supp. 3d at 1003 (challenged rules "facilitate the integration of academics and athletics . . . by

25  preventing student-athletes from being cut off from the broader campus community").  Consistent

26  with Dr. Elzinga's analysis, one of Plaintiffs' experts agrees that there are several external factors

27  that influence the exchange between student-athlete and university.  At his deposition, Dr. Lazear

28  testified that, among other "direct parts" of the market, "alums, . . . viewers, . . . [and] other

38

1    students" are some of the many "components that feed into the demand" for student-athletes.

2    Mishkin Decl., Ex. 6 (Lazear Dep.) 218:4-21.[23]

3         Dr. Elzinga's methodology thus relies on and accounts for features of the college education

4    market that were accepted in *O'Bannon*.  And as explained below, Plaintiffs' challenges to the use

5    of that methodology are meritless.

6         **B.    Dr. Elzinga Used Methodology That Is Well Established in the Literature and**
              **Has Been Accepted by Courts, and Thus Is Not Subject to Exclusion Under**
7             ***Daubert*.**

8         The focus of *Daubert* is the soundness of the *methodology* an expert uses.  *See, e.g.*,

9    *Primiano v. Cook*, 598 F.3d 558, 564 (9th Cir. 2010) ("'[T]he test under *Daubert* is … the

10   soundness of [an expert's] methodology.'" (first alteration in original) (quoting *Daubert v. Merrell*

11   *Dow Pharm., Inc.*, 43 F.3d 1311, 1318 (9th Cir. 1995))).  And multi-sided platform analysis is

12   neither "radical" nor "created solely for this litigation," Pls.' Elzinga Mot. 2-3—it is a well-

13   established methodology in both economic literature and antitrust jurisprudence.

14        There can be little question that multi-sided market analysis is well-accepted within the

15   field of economics.  The model has been used by leading economists for more than a decade, and

16   is itself a response to the failures of conventional firm analysis as applied to certain businesses.

17   *See, e.g.*, David S. Evans & Richard Schmalensee, Nat'l Bureau of Econ. Research, *The Antitrust*

18   *Analysis of Multi-Sided Platform Businesses*, in NBER Working Paper Series, at 2-3 (Feb. 2013)

19   (surveying extensive economic literature and noting that "there is a broad class of businesses that

20   act as catalysts for creating value for two or more groups of customers and have economic features

21   not well explained by the standard economics of the firm"); *id.* at 4 ("[M]any results derived from

22   

23   [23]  The material difference between Plaintiffs and Defendants on this point is whether these
     groups that have an interrelationship with student-athletes operate within the same market (as Dr.
24   Elzinga concluded) or within a distinct "higher-level" market, which then gets incorporated into
     the demand curve in a narrow labor market.  Mishkin Decl., Ex. 6 (Lazear Dep.) 218:4-219:9.  As
25   Dr. Elzinga explains, Plaintiffs' one-sided market approach with only two participants—student-
     athletes and universities—excludes relevant constituencies and promotes an overly simplistic and
26   unrealistic market that is difficult to reconcile with the Rule of Reason analysis first embraced by
     this Court and later affirmed by the Ninth Circuit in *O'Bannon*.  *See, e.g.*, Lent Decl., Ex. 12 (May
27   16 Elzinga Rep.) at 13-14.

28   

39

1  models of one-sided businesses generally do not apply to multi-sided platforms that serve different

2  interdependent customer groups."); *id.* at 2 n.2 (noting that multi-sided platform analysis draws on

3  "several strands of economic analysis" dating back to the 1700s); ABA Section of Antitrust Law,

4  *Market Definition in Antitrust:  Theory and Case Studies* 441-42 (2012); Jean-Charles Rochet &

5  Jean Tirole, *Two-Sided Markets:  A Progress Report*, 37 RAND. J. Econ. 645, 645-46 (2006)

6  (describing the "burgeoning literature on two-sided markets").  Moreover, as Dr. Rascher

7  acknowledged, a peer-reviewed article on which he previously relied in litigation against the

8  NCAA found that "the multisided market framework offers a promising framework for analyzing

9  sports business and adds insights to the several problems of sports markets that traditional analysis

10  cannot fully solve."  Mishkin Decl., Ex. 7 (Rascher Dep.) 55:24-58:14; Mishkin Decl., Ex. 8

11  (Rascher Dep. Ex. 6 (Oliver Budzinski & Janina Satzer, "Sports Business and Multisided Markets:

12  Towards a New Analytical Framework?," 1 *Sport, Business & Management* 124 (2011))).

13          The model has also been used in, and recognized by, the courts.  As one court observed,

14  while "[t]he vocabulary of two-sidedness is new, . . . courts have long addressed claims and

15  developed case law involving businesses now recognized as two-sided platforms by closely

16  examining the competitive realities of the market."  *US Airways, Inc. v. Sabre Holdings Corp.*,

17  2017 WL 1064709, at *8 (S.D.N.Y. Mar. 21, 2017) (citing, as an example, *Times-Picayune Publ'g

18  Co. v. United States*, 345 U.S. 594, 610 (1953), which recognized that "every newspaper is a dual

19  trader in [the] separate though interdependent markets" of advertisers and readers).  Other judicial

20  decisions employ the multi-sided platform model to describe product markets composed of

21  complementary goods or services.  In *United States v. American Express Co.*, 838 F.3d 179 (2d

22  Cir. 2016), *cert. granted sub nom. Ohio v. Am. Express Co.*, No. 16-1454, 2017 WL 2444673 (Oct.

23  16, 2017), for instance, the Second Circuit employed a "two-sided market" model to assess the

24  competitive effects of American Express's merchant acceptance rules in the credit card services

25  market.  Expressly adopting multi-sided analysis, the Second Circuit held that it was important to

26  consider the effects of the challenged restraint on "both cardholders and merchants, who comprise

27  distinct yet equally important and interdependent sets of consumers sitting on either side of the

28  payment-card platform."  *Id.* at 204-05.  It also reversed a district court decision that failed to

1   consider the effect of American Express's merchant acceptance rules on cardholder demand,

2   because the two are connected:   "[T]he price charged to merchants necessarily affects cardholder

3   demand, which in turn has a feedback effect on merchant demand (and thus influences the price

4   charged to merchants)."   *Id.* at 200; *see id.* at 198 (separating merchants and cardholders into two

5   different markets "allows legitimate competitive activities in the market . . . to be penalized no

6   matter how output-expanding such activities may be").

7          Plaintiffs' challenge erroneously conflates methodology with application—the

8   *methodology* Dr. Elzinga used is well-accepted and considered reliable by countless economists

9   and the courts, even if *application* of the methodology to college athletics may be novel.

10  Plaintiffs' claim that Dr. Elzinga is a "maverick" adopting a non-peer reviewed theory thus lacks

11  merit, because *Daubert* does not require an expert's particular assessment to merely repeat existing

12  literature.   As numerous cases establish, there is no basis to challenge the application of a well-

13  established methodology to new circumstances.   "The novel application of accepted, published,

14  reviewed, and tested techniques to a new set of facts does not make the analysis unreliable."   *Aviva

15  Sports, Inc. v. Fingerhut Direct Mktg., Inc.*, 829 F. Supp. 2d 802, 829 (D. Minn. 2011); *see also In

16  re Toyota Motor Corp. Hybrid Brake Mktg., Sales Practices & Prods. Liab. Litig.*, 2012 WL

17  4904412, at *5 (C.D. Cal. Sept. 20, 2012) (use of a "methodology that has been the subject of a

18  substantial amount of published literature" is not unreliable simply because it has been applied "to

19  a new set of facts").   On the contrary, using one's particular experience in a field "to identify

20  patterns . . . and then apply[ ] those patterns to new fact scenarios to predict the likelihood of a

21  particular outcome" is precisely what courts often expect from expert witnesses.   *Braswell v.

22  Shoreline Fire Dep't*, 2011 WL 4712124, at *3 (W.D. Wash. Oct. 5, 2011); *see also Primiano*,

23  598 F.3d at 565-66; *EEOC v. Texas Roadhouse, Inc.*, 215 F. Supp. 3d 140, 162 (D. Mass. 2016).

24  In short, nothing about Dr. Elzinga's approach warrants the skepticism that Plaintiffs advocate.

25         Plaintiffs' remaining challenges to Dr. Elzinga's methodology fail as well.   Citing *US

26  Airways*, Plaintiffs initially claim that "a two-sided [or multi-sided] platform exists for antitrust

27  purposes *only* if the platform intermediates *transactions* between two groups of customers."   Pls.'

28  Elzinga Mot. 14 (emphasis added).   But this argument relies on two cherry-picked sentences from

**REPLY ISO DEFS.' MOT. FOR SUMMARY JUDGMENT, REPLY ISO DEFS.'**
**MOTIONS TO EXCLUDE, & OPP. TO PLS.' MOTIONS TO EXCLUDE**

**MDL No. 4:14-md-02541-CW**
**Case No. 4:14-cv-02758-CW**

1   that case's background discussion of multi-sided platforms.  Plaintiffs neglect to mention that the

2   court went on to explain, relying on *American Express*, that *interdependency* is the key

3   consideration:  "The relevant holding of *Amex* for purposes of this case is that, where the two sides

4   of a platform are interdependent, excluding one side from the relevant market would be improper."

5   *US Airways*, 2017 WL 1064709, at *11.  That analysis applies here too, given *O'Bannon*'s

6   recognition that consumer demand for college sports and integration of student-athletes in the

7   university community are relevant to analyzing the challenged restrictions.  *See* 802 F.3d at 1073-

8   74, 1076; *see also supra* at 37-39.  The *US Airways* court also explained that "[w]hether the two

9   sides of a platform are interdependent such that the relevant market is two-sided is a factual, not a

10  legal, issue," and that the "factual determination of the relevant market should not be lightly

11  disturbed," 2017 WL 1064709, at *11, further suggesting that Plaintiffs' challenge to Dr. Elzinga's

12  approach is not appropriate for a *Daubert* challenge.

13         Plaintiffs' claim that other courts have "similarly limited two-sided markets to situations in

14  which the platform intermediates transactions between customers," Pls.' Elzinga Mot. 14 & n.51,

15  is also unsupported.  The opinions Plaintiffs cite (which include a dissent) are entirely consistent

16  with Dr. Elzinga's opinion that universities, like other multi-sided platforms, bring together

17  constituencies from different sides of the platform for their mutual benefit, and those opinions do

18  not support Plaintiffs' claim that constituencies must transact directly with one another to mutually

19  benefit.  *See U.S. Telecom Ass'n v. FCC*, 825 F.3d 674, 754 (D.C. Cir. 2016) (Williams, J.,

20  dissenting) (quoting academic literature for the proposition that two-sided markets "facilitate

21  interactions between members of . . . two distinct customer groups" (alteration in original) (citation

22  omitted)); *United States v. Am. Express Co.*, 21 F. Supp. 3d 187, 191 (E.D.N.Y. 2014) (observing

23  that American Express sells its "services to both merchants and cardmembers in order to allow

24  these groups of customers to interact with each other").

25         Plaintiffs also misunderstand the relevant economic considerations in criticizing Dr.

26  Elzinga for not analyzing whether different university constituencies (like alumni and student-

27  athletes) are interchangeable.  *E.g.*, Pls.' Elzinga Mot. 9 ("Dr. Elzinga's . . . approach does nothing

28  to examine whether the myriad college constituencies provide reasonable substitutes for the

1    services of class members in the labor markets."); *id.* at 13 ("It is simply not possible for Dr.

2    Elzinga to offer any admissible opinion about a purported platform market without doing any

3    analysis of interchangeability or price.").  While Plaintiffs are correct that in *American Express*,

4    the Second Circuit suggested that the relevant market generally should be defined "as all products

5    reasonably interchangeable by consumers for the same purposes," it went on to hold that "[t]he

6    District Court erred in excluding the market for cardholders from its relevant market definition."

7    838 F.3d at 197-98 (internal quotation marks omitted).  Cardholders are not interchangeable with

8    merchants any more than consumers are reasonable substitutes for Division I athletes.  Considering

9    them together is important not because they are substitutes, but because they are complements who

10   benefit from their mutual interaction with the university platform, giving rise to network

11   externalities.[24]

12       Nor is it valid to criticize Dr. Elzinga for not conducting "quantitative" or "empirical"

13   testing, Pls.' Elzinga Mot. 7-10, 18-19.  *Daubert* does not require an expert's testimony to be

14   empirical rather than descriptive.  *See, e.g.*, *Lawson v. Trowbridge*, 153 F.3d 368, 375 (7th Cir.

15   1998) (approving expert testimony that was "entirely descriptive rather than based on empirical

16   study of any sort"); *Nationwide Mut. Fire Ins. v. Sunbeam Prods.*, 2014 WL 3875844, at *3

17   (S.D.N.Y. July 17, 2014) ("[T]esting is not an absolute requirement.  Indeed, courts routinely

18   admit the testimony of experts, even when their theories or conclusions have not been tested, if

19   they are otherwise based on reliable scientific methods.") (collecting cases); *Windham v. Circuit

20   *City Stores, Inc.*, 420 F. Supp. 2d 1206, 1212 (D. Kan. 2006) ("Where an expert otherwise reliably

21   uses scientific methods to reach a conclusion, lack of independent testing may 'go to the weight,

22   not the admissibility' of the testimony." (citation omitted)).  Nor does the *Daubert* standard require

23   Dr. Elzinga's methodology to be complicated to be of use to the Court.  *See Oddi v. Ford Motor*

24   _____

25   [24]   While Plaintiffs argue that "Dr. Elzinga does not even consider, let alone try to establish with
     empirical evidence, which competitors are substitutes for each other with respect to the
     compensation paid to college athletes in the classes," Pls.' Elzinga Mot. 16, Dr. Elzinga's analysis

26   demonstrates that universities (as platforms) compete with other universities (as platforms) in the
     college education market.  Plaintiffs cannot credibly claim that the NCAA Division I member

27   schools are not "substitutes" in this context.

28

43

**REPLY ISO DEFS.' MOT. FOR SUMMARY JUDGMENT, REPLY ISO DEFS.'**
**MOTIONS TO EXCLUDE, & OPP. TO PLS.' MOTIONS TO EXCLUDE**

**MDL No. 4:14-md-02541-CW**
**Case No. 4:14-cv-02758-CW**

1  *Co.*, 234 F.3d 136, 160 (3d Cir. 2000) ("[*Daubert*] does not require the most elaborate or

2  sophisticated tests or studies that can be imagined by opposing counsel.").  Rather, as explained

3  above, the key question is "the soundness of [Dr. Elzinga's] methodology."  *Primiano*, 598 F.3d at

4  564.  In this case, Dr. Elzinga used a well-established and reliable methodology to reach the

5  conclusion that applying multi-sided platform analysis to the college education market is more

6  economically sound than modeling the NCAA as a monopsonistic labor market cartel.

7        "Congress prescribed a pragmatic, factual approach to the definition of the relevant market

8  and not a formal, legalistic one."  *Brown Shoe Co. v. United States*, 370 U.S. 294, 336 (1962).  As

9  the Second Circuit explained in *American Express*, "[t]he basic principle is that the relevant market

10 definition must encompass the realities of competition."  838 F.3d at 197 (citation omitted).  Dr.

11 Elzinga's market analysis does precisely that, by providing a framework to analyze the effects of

12 the challenged restrictions on complementary university constituencies, in a manner consistent

13 with *O'Bannon*.  Plaintiffs' *Daubert* challenge accordingly should be denied.[25]

14 **III.    Plaintiffs' Motion to Exclude Dr. Heckman's Testimony Should Be Denied.**

15       Dr. Heckman's analysis is both relevant and reliable and thus admissible under Federal

16 Rule of Evidence 702 and *Daubert*.  Dr. Heckman's testimony is relevant because, despite

17 _____

18 [25]   It is also important to note that Plaintiffs expressly confine their attack to Dr. Elzinga's
conclusions "regarding the definition of the relevant antitrust market in this matter and whether
19 Defendants possess market power within that market."  Pls.' Elzinga Mot. 1.  Dr. Elzinga's distinct
conclusion that the NCAA's amateurism rules are procompetitive does not turn on the adoption of
20 his multi-sided market.  *See* Kessler Decl., Ex. 10 (Mar. 21 Elzinga Rep.) at 7-8.  As Dr. Elzinga
explained, "because the NCAA's financial aid rules provide a mechanism for avoiding an
21 inefficient market failure, born of the incentive to free ride on the benefits of amateurism, the rules
limiting play to schools that only allow eligible players on their teams is merely implementing the
22 efficient solution, in which case the rules are not anticompetitive, *they are procompetitive*."  *Id.* at
23 100 (emphasis added).

24  Dr. Elzinga's rejection of Plaintiffs' monopsony-cartel hypothesis is also logically separate
from his opinion on multi-sided markets.  Contrary to Plaintiffs' claims, he concluded that "the
25 conduct of the NCAA's member schools is incompatible with a monopsony," and that "the
'market' for student-athletes doesn't readily fit the economic model of a cartelized labor market."
26 *Id.* at 58; *see also* Mishkin Decl., Ex. 4 (June 21, 2017 Reply Report of Kenneth G. Elzinga ("June
21 Elzinga Rep.")) at 30 ("I rejected Plaintiffs' theory because the conduct of the alleged cartel
27 members is not consistent with that of a monopsonistic cartel.").  Plaintiffs' motion has nothing to
28 say about these conclusions.

1  suggesting otherwise, Pls.' Opp. 62-63, Plaintiffs *do* contest that "college has benefits" for student-

2  athletes.  *See, e.g.*, Pls.' MSJ 3; Pls.' Opp. 39.  Dr. Heckman rebuts that argument with statistically

3  significant findings.  Further, testimony from both sides' experts establishes that eliminating the

4  "compensation restraints" challenged here, Pls.' Opp. 65, would shift student-athletes' incentives

5  toward athletics and away from academics.  Dr. Heckman's testimony thus helps explain part of

6  what could be lost if Plaintiffs prevail.

7       Plaintiffs' challenges to reliability are equally groundless.  Dr. Heckman, a Nobel Prize-

8  winning economist, rigorously analyzed the best available Department of Education data regarding

9  educational outcomes using established and accepted methodology.  Plaintiffs' complaints about

10  those data ignore that *Daubert* does not require experts to analyze perfect or contemporaneous

11  data.  Plaintiffs' remaining methodology arguments are meritless and in any event go to weight

12  rather than admissibility.  And while Plaintiffs claim that Dr. Heckman's rebuttal report contains

13  opinions not present in his initial report, *id.* 71-73, those opinions properly respond to Dr. Noll's

14  criticisms and did not prejudice Plaintiffs, who deposed Dr. Heckman after his rebuttal report was

15  served.

16       **A.    Dr. Heckman's Empirical Analysis Is Relevant to Whether Current NCAA
                   Rules Benefit Student-Athletes.**

17

18       Expert testimony is relevant under *Daubert* and Federal Rule of Evidence 702 if it "will

19  assist the trier of fact to understand or determine a fact in issue."  *Daubert*, 509 U.S. at 591-92.

20  Expert testimony need only "logically advance[] a material aspect of the proposing party's case" to

21  be admissible.  *Daubert*, 43 F.3d at 1315.

22       Dr. Heckman's analysis is relevant for multiple reasons.  While Plaintiffs say they agree

23  that "college has benefits," Pls.' Opp. 62-63, they also continue to dispute that *student-athletes*

24  share in these benefits, arguing (wrongly) that Defendants subordinate student-athletes' academic

25  well-being for financial gain.  *See id.* at 3, 39-44 (claiming that "Defendants prioritize maximizing

26  revenue over enforcing their purported 'academics first' principle"); *see also* Pls.' MSJ 3, 14-16,

27  25 (same); Consol. Am. Compl. ¶ 467 (same).  Further, while Plaintiffs assert that they are not

28  challenging any rules establishing academic standards or requirements, Pls.' Opp. 7, testimony

45

1 from both sides' experts confirms that those standards and requirements are intertwined with the

2 financial support rules directly at issue here.  Plaintiffs' own expert, Dr. Lazear, acknowledged that

3 student-athletes' relative focus on academics would likely change if they could be paid for athletic

4 performance:  "When people are compensated on the basis of their effort, and when those wages

5 are allowed to increase with effort, then we tend to see more effort being provided."  Lent Decl.,

6 Ex. 32 (Lazear Dep.) 224:11-14; *see also id.* at 223:24-228:17 (if student-athletes were paid more,

7 "their incentive to play hard and stay on the team . . . would be greater"); 82:12-21, 83:17-84:3,

8 90:18-25 (similar).  Other experts testified to the same effect.  *See* Lent Decl., Ex. 12 (May 16

9 Elzinga Rep.) at 52 (opining that if students were paid for their athletic participation, "students

10 would have an incentive to focus their attention on athletics because that would become what they

11 get paid to do"); Lent Decl., Ex. 27 (Aug. 18, 2017 Dep. of James J. Heckman ("Heckman Dep."))

12 315:5-316:18 ("People respond to incentives," and if student-athletes were paid for performing

13 their sport, it would divert their efforts "away from actually being students towards just being

14 athletes.").

15      Dr. Heckman's analysis addresses Plaintiffs' contentions by using economic principles and

16 rigorous econometric analysis to highlight the broader set of benefits that student-athletes,

17 including college basketball and football players, receive under the NCAA's rules structure and

18 that could be lost if Plaintiffs prevail.  Dr. Heckman looked at *real* students and the *real* benefits

19 they have derived from college athletics.  He found that participation in sports helps students—

20 especially students from at-risk racial, economic, or familial cohorts—go to college.[26]  He also

21 found that college athletics help those students succeed both in college and in their careers.  Lent

---

22 [26]   For example, one analysis showed that men's basketball and football players are 10.3

23 percentage points more likely to attend a college, and women's basketball players are 9.8
percentage points more likely to do so, compared to their non-athlete peers.  Lent Decl., Ex. 10

24 (Mar. 21, 2017 Expert Report of Prof. James J. Heckman ("Mar. 21 Heckman Rep.")) at ¶¶ 50-52.
Athletics' impact on college attendance rates is especially important when the high school student

25 lives below the poverty line, comes from a single-parent household, or is African-American.  *Id.* ¶
52.  In one analysis, men's football and basketball players who meet one of these three criteria are

26 statistically significantly more likely to attend college than their non-athlete peers.  *Id.* ¶ 52, Table

27 3.  Women's basketball players from a single-parent household are statistically significantly more
likely to attend college.  *Id.*

28

1    Decl., Ex. 10 (Mar. 21 Heckman Rep.) at ¶¶ 53-58.  For example, contrary to Plaintiffs' assertions,

2    student-athletes are as likely or more likely than non-athlete students to obtain at least a bachelor's

3    degree or higher.  *Compare id.* ¶ 13, *with* Consol. Am. Compl. ¶ 467 ("their graduation rates

4    frequently are abysmal").  Men's basketball and football players at Division I or FBS schools are

5    at least as likely to earn a bachelor's degree as their non-athlete peers.  Lent Decl., Ex. 10 (Mar. 21

6    Heckman Rep.) at Table 6.  And Division I women's basketball players were 14.4 percentage

7    points more likely to earn a bachelor's degree than their non-athlete peers in one analysis.  *Id.*

8    Further, contrary to Plaintiffs' suggestion that student-athletes are "spoon-fed a curriculum of

9    athlete-friendly classes" and do not meaningfully benefit from college, Consol. Am. Compl. ¶ 467,

10   Dr. Heckman's analysis shows that student-athletes earn the same or higher wages in their mid-

11   twenties compared to non-athlete students.  Lent Decl., Ex. 10 (Mar. 21 Heckman Rep.) at Table 7.

12   To these individuals, including participants in the class sports, the impact of college athletics on

13   their lives is hardly "divorced from reality" or "fanciful," as Plaintiffs repeatedly claim.  Pls.' Opp.

14   43.

15          Importantly, these results were all obtained in a system where student-athletes were not

16   eligible to be paid to play college sports.  The results instead transpired under a system of

17   interlocking rules designed to enhance the academic and athletic well-being of students.  *See*

18   Mishkin Decl., Ex. 5 (Heckman Dep.) 28:13-17 ("We're talking about causality in the sense that

19   the actions of the students at the school and the existence of these schools are providing benefits

20   for these students in those schools.").  There is no question that being a student-athlete is

21   challenging, and requires balancing multiple and substantial time commitments.  That is one

22   reason the academic accomplishments by student-athletes that Dr. Heckman has identified are

23   worthy of praise.  But as both sides' experts acknowledge, changing the financial support rules

24   could disrupt these lifelong benefits.  Evidence addressing these points is plainly relevant to this

25   case.

26

27

28

| REPLY ISO DEFS.' MOT. FOR SUMMARY JUDGMENT, REPLY ISO DEFS.' | MDL No. 4:14-md-02541-CW |
| MOTIONS TO EXCLUDE, & OPP. TO PLS.' MOTIONS TO EXCLUDE | Case No. 4:14-cv-02758-CW |

1       **B.**     **Dr. Heckman's Analysis Is Based on Sound, Well-Accepted Economic**
2              **Methods.**

3              Dr. Heckman also applied well-accepted economic methods to arrive at his conclusions.

4       Expert analysis is admissible where it is "of a type reasonably relied upon by experts in the

5       particular field in forming opinions or inferences upon the subject." *HTC Corp. v. Tech. Props.*

6       *Ltd.*, 2013 WL 4782598, at *1 (N.D. Cal. Sept. 6, 2013).  By contrast, expert evidence should be

7       excluded as unreliable only if it "'suffer[s] from serious methodological flaws.'" *Tesoro*

8       *Refining & Mktg. Co. v. PG&E*, 2016 WL 158874, at *3 (N.D. Cal. Jan. 14, 2016) (alteration in

9       original) (quoting *Obrey v. Johnson*, 400 F.3d 691, 696 (9th Cir. 2005)).  *Daubert*'s reliability

10      prong grants the Court "'broad latitude not only in determining whether an expert's testimony is

11      reliable, but also in deciding how to determine the testimony's reliability.'"  *See id.* (quoting *Ellis*

12      *v. Costco Wholesale Corp.*, 657 F.3d 970, 982 (9th Cir. 2011)).

13             Dr. Heckman won the Nobel Prize in economics for exactly the kind of economic analysis

14      he undertook in this case:  applying rigorous econometric methods to analyze underlying data to

15      reliably answer questions about a particular group of people.  Plaintiffs attempt to criticize that

16      methodology now, but their own expert, Dr. Roger Noll, agrees that Dr. Heckman's statistical

17      methodology is sound.  Dr. Noll may have set forth minor criticisms of Dr. Heckman's

18      methodology in a footnote to his report.  Kessler Decl., Ex. 9 (May 16, 2017 Declaration of Roger

19      G. Noll ("Noll Decl.")) at 55 n.110.  But, even so, Dr. Noll conceded:  "I have no substantial

20      disagreement with the statistical results in the *Heckman Report*."  *Id.* at 55.  On the contrary, Dr.

21      Noll agrees that Dr. Heckman's results are indicative of the "broad consensus" reached by

22      economists "that higher education contributes substantially to lifetime earnings and that

23      participation in intercollegiate athletics does not reduce graduation rates or post-college earnings."

24      *Id.* at 55-56 (footnote omitted).

25             Most of Plaintiffs' criticisms of Dr. Heckman's analysis are unfounded because they are

26      just criticisms of the direct applicability of the data that he analyzed.  "The question under *Daubert*

27      is not whether an expert's report relies on and analyzes perfect data—if that were the inquiry, there

28      would be no data-based expert testimony in federal court—but rather whether an expert's report is

48

1   sufficiently reliable to warrant consideration."  *In re CitiMortgage, Inc. Home Affordable*

2   *Modification Program ("HAMP") Litig.*, 2013 WL 8844095, at *2 (C.D. Cal. Oct. 7, 2013).  The

3   data sets that Dr. Heckman used here, the National Education Longitudinal Study of 1988

4   ("NELS") and the Education Longitudinal Survey of 2002 ("ELS"), are nationally representative

5   surveys of young Americans conducted by the U.S. Department of Education.  Drawing upon his

6   experience, Dr. Heckman determined that these data (which are often cited in economic journals)

7   were robust, reliable, and more than adequate to form the basis for his conclusions.  That is all that

8   is required.  *See Jaasma v. Shell Oil Co.*, 412 F.3d 501, 514 (3d Cir. 2005) ("[T]he question is

9   'whether an expert's data is of a type reasonably relied on by experts in the field . . . [and] whether

10  there are good grounds to rely on this data to draw the conclusion reached by the expert.'"

11  (citations omitted)).  To be sure, NELS and ELS were not created for this litigation, nor was Dr.

12  Heckman involved in designing either survey.  But that too provides no basis for excluding his

13  analysis under *Daubert*.  *See id.* ("We do not require an expert to base his or her opinions on

14  independent data collection or field research.").  And of course, Plaintiffs do not identify a better

15  set of data that they contend he should have used—or any case law supporting the theory that it is

16  better to rely, as their experts routinely do, on inadmissible anecdotes and media soundbites rather

17  than conduct a thorough analysis of the best available (even if slightly imperfect) data.

18          Plaintiffs' more specific objections fail as well.  First, Plaintiffs object that the NELS and

19  ELS data sets are too old because they do not involve any class members.  Pls.' Opp. 69-71.  While

20  more recent data "might have resulted in a 'better' or more 'accurate' estimate in the absolute

21  sense," the Court's focus under *Daubert* should be on methodology, not "the correctness of facts

22  underlying an expert's testimony."  *i4i Ltd. P'ship v. Microsoft Corp.*, 598 F.3d 831, 856 (Fed. Cir.

23  2010), *aff'd*, 564 U.S. 91 (2011).  Relying on his expertise, Dr. Heckman concluded that NELS

24  and ELS were sound datasets for analysis, because they follow two different large cohorts of

25  students from their early teen years through their mid-twenties, providing ten years of data per

26  cohort to analyze, or a "full lifecycle."  *See* Mishkin Decl., Ex. 5 (Heckman Dep.) 30:14-31:4.

27  Further, Plaintiffs' challenge ignores "the presumption in any empirical study, based on historical

28  data that's used in a current setting, . . . that the findings are relevant in the current situation."  *Id.*

119:8-18.  The fact that NELS and ELS do not capture the three years since *O'Bannon* was

decided does not negate the ability of those surveys to provide helpful information about the

benefits of the NCAA's rules.  *Doyle v. Chrysler Grp. LLC*, 2015 WL 353993, at *6 (C.D. Cal.

Jan. 21, 2015) ("To be admissible, the record relied upon by an expert need not be perfect, nor

must it comport with the opposing party's understanding of what parts of the record are

appropriate; rather, Rule 702(b) requires only that an expert opinion be 'based on sufficient facts

or data.'" (citation omitted)).  In any event, Plaintiffs do not dispute that the NELS and ELS data

sets are "the only data in town."  Mishkin Decl., Ex. 5 (Heckman Dep.) 108:7-10.  More recent or

class-specific longitudinal data analysis would not be possible for certain outcomes analyzed by

Dr. Heckman—like earning a bachelor's degree or wages—since members of the injunctive class

are still in college.  Pls.' Opp. 70 n.53.

       Second, Plaintiffs incorrectly object that the data upon which Dr. Heckman relied

inadequately identified the particular sport that a student-athlete played in college.  *Id.* at 68-69.

Contrary to Plaintiffs' suggestion, Dr. Heckman acknowledged that neither NELS nor ELS directly

questioned whether a student-athlete played intercollegiate football or basketball.  Lent Decl., Ex.

10 (Mar. 21 Heckman Rep.) at ¶ 35.  Dr. Heckman therefore instituted rigorous checks to make

sure his analysis and conclusions were valid.  For example, Dr. Heckman hypothesized that

students who played those two sports in their sophomore year of high school and became varsity

collegiate athletes carried those sports over to college, consistent with literature suggesting single-

sport specialization generally begins before that point.[27]  He made this hypothesis clear in his

report, *id.*; tested it against a subsample of students for internal consistency, *see* Mishkin Decl., Ex.

5 (Heckman Dep.) 73:6-74:5;[28] and was deposed extensively about it, *id.* 82:3-84:16.  Plaintiffs'

---

[27]   *See* Patrick S. Buckley et al., "Early Single-Sport Specialization: A Survey of 3090 High
School, Collegiate, and Professional Athletes," *Orthopaedic J. of Sports Med.* 3 (2017) (college
student-athletes who quit other sports to focus on a single sport began specializing in that
particular sport, on average, when they were 14.8 years old).

[28]   *See also* Lent Decl., Ex. 11 (June 21, 2017 Rebuttal Report of Prof. James J. Heckman ("June
21 Heckman Rep.")) at ¶ 61 ("I further investigated the robustness of the results in the *Heckman
Report* using an alternative specification. . . . The results are similar qualitatively and
quantitatively, providing further support to the findings and conclusions in the *Heckman Report*.").

1    challenge to this hypothesis goes to the weight of Dr. Heckman's testimony,[29] not its admissibility.

2    *See Doyle*, 2015 WL 353993, at *6.

3         Third, Plaintiffs suggest, contrary to the record, that the group of college student-athletes

4    whom Dr. Heckman analyzed includes club or non-varsity athletes alongside athletes who played

5    class sports at the varsity level.  Pls.' Opp. 68-69.  But the relevant ELS question asks respondents

6    whether they participated in "intramural or nonvarsity sports" immediately before asking whether

7    they participated in "varsity or intercollegiate sports."  Mishkin Decl., Ex. 11 (Facsimile of the

8    Question Stems of Second Follow-up Instrument) at 10 (listing questions asked of ELS

9    participants).  The survey's structure and wording suggest that those participating solely in club

10   sports would have indicated that they participated in "intramural or nonvarsity sports," not "varsity

11   or intercollegiate sports."  *Id.*[30]  And Dr. Heckman limited his analysis to individuals who

12   confirmed participation in "varsity or intercollegiate sports."  Lent Decl., Ex. 10 (Mar. 21

13   Heckman Rep.) App. C , at 8.  Plaintiffs may contend (albeit wrongly) that Dr. Heckman's tests for

14   internal consistency and interpretation of the survey data are not entirely persuasive.  But their

15   disagreement is with the weight Dr. Heckman's analysis should be given, not its admissibility, and

16   provides no basis for excluding Dr. Heckman's testimony.  *See Tesoro Refining*, 2016 WL 158874,

17   at *3 ("[Reliability and relevance] does not, however, 'require a court to admit or exclude evidence

18   based on its persuasiveness.'" (citations omitted)).

19

20

_____

21   [29]   Notably, Plaintiffs do not proffer any evidence suggesting that Dr. Heckman's data about the
     ratio of college student-athletes playing football or basketball as compared to other sports is

22   inaccurate.  To the contrary, data tracking the actual participation rates in these and other sports at
     Division I schools corroborate Dr. Heckman's conclusions.  *See* Mishkin Decl., Ex. 10 (Student-

23   Athlete Participation 1981-82 – 2015-16, NCAA Sports Sponsorship and Participation Rates
     Report) at 61–62 (2006-2007 women's and men's participation data by sport).

24
     [30]   Respondents in the NELS survey were also provided choices to indicate participation in

25   intramural or non-varsity sports as opposed to varsity sports.  *See* Mishkin Decl., Ex. 12 (National
     Education Longitudinal Study Third Follow-Up) at 29 (listing questions asked of NELS

26   participants, including whether they participated in "Varsity intercollegiate athletics," "Other
     intercollegiate athletics," or "Intramural athletics"); *see also* Lent Decl., Ex. 10 (Mar. 21 Heckman

27   Rep.) at ¶ 31 & n.26.

28

**REPLY ISO DEFS.' MOT. FOR SUMMARY JUDGMENT, REPLY ISO DEFS.'**                    **MDL No. 4:14-md-02541-CW**
**MOTIONS TO EXCLUDE, & OPP. TO PLS.' MOTIONS TO EXCLUDE**                          **Case No. 4:14-cv-02758-CW**

1      Plaintiffs' remaining criticism of Dr. Heckman's methodology also goes to weight, not

2 admissibility.  Plaintiffs claim that Dr. Heckman's regressions are "unable to pinpoint that any

3 purported benefit of participating in college athletics actually was the result of participating in

4 sports versus the result of the scholarship money that the athlete received." Pls.' Opp. 67.  But the

5 Supreme Court has made clear that "failure to include variables will affect the analysis'

6 probativeness, not its admissibility." *Bazemore v. Friday*, 478 U.S. 385, 400 (1986); *see also In re*

7 *High-Tech Emp. Antitrust Litig.*, 2014 WL 1351040, at *20 (N.D. Cal. Apr. 4, 2014) (argument

8 that "model fails to include variables" is "a prototypical concern that goes to weight, not

9 admissibility").  Further, Plaintiffs' challenge here is particularly weak because they offer no

10 statistical support for inclusion of this variable, or any methodological reason why it should have

11 been tested in an additional regression analysis.  *EEOC v. Gen. Tel. Co. of Nw., Inc.*, 885 F.2d 575,

12 580 (9th Cir. 1989) ("[W]hen statistical evidence is challenged on methodological grounds, the

13 burden should be on the challenger to present evidence that the statistics are defective and how that

14 flaw biases the results." (citing D. Baldur & J.Cole, *Statistical Proof of Discrimination*, vii (1987

15 Supp.))).

16      Further, Plaintiffs' attack on the "missing" scholarship variable—which their experts have

17 never expressed—is premised on a distinction without meaning.  The scholarships received by the

18 student-athletes being studied are inextricably tied to attending college as a student-athlete.  *See*

19 Lent Decl., Ex. 1 (NCAA Bylaws) § 14.01.2.  Academic eligibility, financial aid, academics, and

20 playing sports are linked for student-athletes, and Dr. Heckman properly analyzed the academic

21 and social benefits of this interrelated student-athlete experience.  *See, e.g.*, Lent Decl., Ex. 10

22 (Mar. 21 Heckman Rep.) at ¶ 16 (academic programs), ¶ 17 (exercise, physical care, and

23 teamwork), ¶ 22 (college attendance and preparation), ¶ 28 (studying, cooperation, and teamwork),

24 ¶ 64 (path to college through scholarship).

25    **C.**    **Dr. Heckman's Rebuttal Report Properly Strengthened His Conclusions With
Additional Economic Analysis and Literature.**

26

27      Plaintiffs' claim that they have been "sandbagged" by Dr. Heckman's allegedly new

28 opinions in his rebuttal report is contrary to the record.  Pls.' Opp. 71.  Defendants served Dr.

52

REPLY ISO DEFS.' MOT. FOR SUMMARY JUDGMENT, REPLY ISO DEFS.'
MOTIONS TO EXCLUDE, & OPP. TO PLS.' MOTIONS TO EXCLUDE
MDL No. 4:14-md-02541-CW
Case No. 4:14-cv-02758-CW

1 Heckman's initial report on March 21, 2017, laying out the conclusions summarized above.

2 Plaintiffs then served Dr. Noll's response on May 16, 2017, in which he described his assignment

3 as reviewing the reports of Dr. Elzinga and Dr. Heckman "to determine whether these reports

4 contain valid economic analysis that supports the conclusion that the defendants did not engage in

5 anticompetitive conduct that has no reasonable business justification." Kessler Decl., Ex. 9 (Noll

6 Decl.) at 1-2. Dr. Noll's "primary conclusion" is that Drs. Heckman and Elzinga "do not offer *any*

7 *valid economic arguments or evidence* that the conduct in this litigation . . . is anything other than

8 a collusive price-fixing agreement among horizontal competitors that causes anticompetitive injury

9 in the relevant markets . . . and that this collusive agreement has no reasonable business

10 justification." *Id.* at 2 (emphasis added).

11       Dr. Heckman's rebuttal report was served on June 21, 2017, pursuant to the applicable

12 scheduling order and Federal Rule of Civil Procedure 26(a)(2)(D)(ii), and it did precisely what that

13 rule allows. That rule gave Dr. Heckman the opportunity to file a report that "is intended solely to

14 contradict or rebut evidence on the same subject matter identified by another party." Fed. R. Civ.

15 P. 26(a)(2)(D)(ii); *see also Van Alfen v. Toyota Motor Sales, U.S.A., Inc.*, 2012 WL 12930456, at

16 *2 (C.D. Cal. Nov. 9, 2012) ("[T]he function of rebuttal testimony is to explain, repel, counteract

17 or disprove evidence of the adverse party." (citations omitted)).[31] In his rebuttal report, Dr.

18 Heckman set forth "economic arguments or evidence" explaining why the conduct at issue is not

19 "a collusive price-fixing agreement among horizontal competitors," in direct response to Dr. Noll's

20 criticisms and analysis. *See* Kessler Decl., Ex. 9 (Noll Decl.) at 2. Dr. Heckman criticized Dr.

21 Noll's simplistic reduction of collegiate athletics to a spot labor market—a short-term, wage-based

22 labor market only appropriate when human assets are fungible. Lent Decl., Ex. 11 (June 21

23 Heckman Rep.) at ¶ 16. Dr. Heckman observed the absence of any theoretical or empirical support

24

25 [31] Plaintiffs inexplicably cite *Van Alfen* in support of their argument that Dr. Heckman's report is not proper rebuttal. Pls.' Opp. 71. But in that case, the court denied a motion to strike seven

26 rebuttal reports, finding that all seven challenged reports were within the scope of proper expert rebuttal testimony. *Van Alfen*, 2012 WL 12930456, at *12. In so doing, the court recognized that

27 "an expert may need to include significant elaboration in a rebuttal report to challenge the asserts [sic] of the opponent's expert reports," *id.* at *2, which is what Dr. Heckman did here.

28

1   for Dr. Noll's analysis, in contrast to Dr. Heckman's own analysis, which is well-supported by

2   economic literature and empirical analysis. *See, e.g.*, *id.* ¶¶ 39-40.  And Dr. Heckman used

3   economic reasoning to explain why Dr. Noll's monopsony theory is wrong. *See, e.g.*, *id.*  All these

4   observations were directly responsive to Dr. Noll's criticisms.

5        Almost two months to the day after Dr. Heckman filed his rebuttal report, Plaintiffs

6   deposed Dr. Heckman on August 18, 2017.  Dr. Heckman's rebuttal report was an exhibit to that

7   deposition, and Plaintiffs questioned him at length about the conclusions in his rebuttal report.  *See*

8   *generally* Mishkin Decl., Ex. 5 (Heckman Dep.) 172-238.  Plaintiffs cannot legitimately claim that

9   they suffered any prejudice, or that they were otherwise "sandbagged," by Dr. Heckman's rebuttal

10  report, as they had ample time to prepare to question Dr. Heckman about this report and an

11  opportunity to do so.  *See* Fed. R. Civ. P. 37(c)(1).

12       Plaintiffs provide no authority suggesting otherwise.  One of the cases that Plaintiffs cite

13  involved a situation where a party attempted to offer new causation opinions after the close of

14  discovery.  *Avila v. Willits Envtl. Tr.*, 2009 WL 2972513, at *1 (N.D. Cal. July 9, 2009).  The court

15  granted a motion to strike the opinions rather than reopening discovery.  *Id.*  Here, by contrast,

16  Plaintiffs questioned Dr. Heckman about the opinions in his rebuttal report before expert discovery

17  ended.  This case likewise does not involve an expert who "save[d his] best points for reply," so

18  that he would "have the last word," filing the reply report at the near-close of discovery.  *See In re*

19  *High-Tech Emp. Antitrust Litig.*, 2014 WL 1351040, at *12.  Nor does this case involve a situation

20  where a party attempted to offer "a reply submission attacking the opposition reports served by the

21  other side" from an expert "who did not serve any opening report."  *See Oracle Am., Inc. v. Google*

22  *Inc.*, 2011 WL 5572835, at *2 (N.D. Cal. Nov. 15, 2011).

23       Finally, Plaintiffs misrepresent Dr. Heckman's testimony in claiming that he offered "two

24  new 'opinions' in the reply report [that] are nothing more than unsupported speculation."  Pls.'

25  Opp. 73.  Those portions of Dr. Heckman's rebuttal report are *criticisms* of Dr. Noll's opinions,

26  not *new opinions* by Dr. Heckman.  For example, Plaintiffs claim that "Dr. Heckman suggested

27  that he is not convinced that 'the "price" paid to student-athletes is lower than the "price" that

28  would be observed under the Plaintiffs' proposed rule changes.'"  *Id.* (quoting Lent Decl., Ex. 11

1   (June 21 Heckman Rep.) at 17).  But the passage Plaintiffs selectively quote is actually a criticism

2   of *Dr. Noll* for missing "important simplifying assumptions" in an article cited in his report that

3   "make[] his critique inapplicable to the situation at hand."  Lent Decl., Ex. 11 (June 21 Heckman

4   Rep.) at ¶ 29.  Likewise, Dr. Heckman's reference to the matching process between students and

5   universities, Pls.' Opp. 75, was part of a larger criticism of "Dr. Noll's overly simplistic view of

6   the university-student relationship as an employer/employee relationship for athletic labor"—as

7   compared to Dr. Heckman's more robust analysis, in his initial report, of "empirical evidence"

8   regarding the "multidimensional nature of the relationship between students and universities."

9   Lent Decl., Ex. 11 (June 21 Heckman Rep.) at ¶ 6.[32]

10          Because the challenged portions of the rebuttal report simply represented a critique of

11   Dr. Noll's speculative opinions, it is irrelevant that Dr. Heckman did not reach definitive

12   conclusions as to what changes would occur if Plaintiffs prevail, *see* Pls.' Opp. 75-77.  "Contrary

13   to plaintiffs' suggestion, a rebuttal expert who critiques another expert's theories or conclusions

14   need not offer his own independent theories or conclusions (though of course his testimony may be

15   more persuasive if he does so)."  *In re Cessna 280 Series Aircraft Prods. Liab. Litig.*, 2009 WL

16   1649773, at *1 (D. Kan. June 9, 2009); *see also Aviva Sports, Inc.*, 829 F. Supp. 2d at 834-35

17   (collecting cases).  But it is important to note that while Plaintiffs offered *no* model or empirical

18   estimates of what their counterfactual world would look like, Dr. Heckman's regression results at

19   least provide a baseline for determining what might be lost as a result of Plaintiffs' proposed

20   changes in the regulations.  And his work is grounded in economic theory, the relevant literature,

21   sound econometric methodology, and a rigorous empirical analysis of rich data.  Plaintiffs'

22   challenges to these findings (yet again) are meritless, but ultimately go to weight and not

23   admissibility, and Plaintiffs may raise them during cross-examination if they think there is value in

24

25   _____

26   [32]   Plaintiffs disingenuously suggest that Dr. Heckman has no knowledge of minor league sports,
     Pls.' Opp. 74, only by ignoring his testimony about following the Triple-A Denver Bears while he

27   was in high school, and the movement of players between the Chicago Cubs and the Iowa Oaks (a
     Cubs minor league affiliate).  Mishkin Decl., Ex. 5 (Heckman Dep.) 296:14-298:8

28

1  doing so.  These arguments provide no basis for exclusion under *Daubert*.  Dr. Heckman's rebuttal

2  report, like his original report, is relevant and reliable and should be admitted.

3  **<u>CONCLUSION</u>**

4     Because Plaintiffs seek relief that cannot be squared with *O'Bannon*, and provide no basis

5  for ignoring that recent and binding precedent, Defendants' motion for summary judgment should

6  be granted in its entirety, and Plaintiffs' motion for summary judgment should be denied.  If the

7  Court grants Defendants' motion for summary judgment, then the parties' *Daubert* motions should

8  be denied as moot.  Otherwise, the Court should also exclude the identified portions of Plaintiffs'

9  proffered expert testimony and deny Plaintiffs' challenges to the testimony of Drs. Elzinga and

10  Heckman.

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Dated:  December 8, 2017

**WILKINSON WALSH + ESKOVITZ LLP**

By:  _____/s/ Beth A. Wilkinson_____
    Beth A. Wilkinson (*pro hac vice*)
    Alexandra M. Walsh (*pro hac vice*)
    Brian L. Stekloff (*pro hac vice*)
    Rakesh N. Kilaru (*pro hac vice*)
    2001 M Street NW, 10th Floor
    Washington, DC 20036
    Telephone:  (202) 847-4000
    Facsimile:  (202) 847-4005
    bwilkinson@wilkinsonwalsh.com
    awalsh@wilkinsonwalsh.com
    bstekloff@wilkinsonwalsh.com
    rkilaru@wilkinsonwalsh.com

    Sean Eskovitz (SBN 241877)
    11726 San Vicente Blvd., Suite 600
    Los Angeles, CA 90049
    Telephone:  (424) 316-4000
    Facsimile:  (202) 847-4005
    seskovitz@wilkinsonwalsh.com

    Attorneys for Defendant
    NATIONAL COLLEGIATE ATHLETIC
    ASSOCIATION

Respectfully submitted,

**SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP**

By:  _____/s/ Jeffrey A. Mishkin_____
    Jeffrey A. Mishkin (*pro hac vice*)
    Karen Hoffman Lent (*pro hac vice*)
    Four Times Square
    New York, NY  10036
    Telephone:  (212) 735-3000
    Facsimile:  (212) 735-2000
    jeffrey.mishkin@skadden.com
    karen.lent@skadden.com

    Raoul D. Kennedy (SBN 40892)
    525 University Avenue, Suite 1100
    Palo Alto, CA 94301
    Telephone:  (650) 470-4500
    Facsimile:  (650) 470-4570
    raoul.kennedy@skadden.com

    Attorneys for Defendants
    NATIONAL COLLEGIATE ATHLETIC
    ASSOCIATION and WESTERN
    ATHLETIC CONFERENCE

**PROSKAUER ROSE LLP**

By:  _____/s/ Scott P. Cooper_____
    Scott P. Cooper (SBN 96905)
    Kyle A. Casazza (SBN 254061)
    Jennifer L. Jones (SBN 284624)
    Shawn S. Ledingham, Jr. (SBN 275268)
    Jacquelyn N. Ferry (SBN 287798)
    2049 Century Park East, Suite 3200
    Los Angeles, CA 90067
    Telephone:  (310) 557-2900
    Facsimile:  (310) 557-2193
    scooper@proskauer.com
    kcasazza@proskauer.com
    jljones@proskauer.com
    sledingham@proskauer.com
    jferry@proskauer.com

    Attorneys for Defendant
    PAC-12 CONFERENCE

**MAYER BROWN LLP**

By:  _____/s/ Britt M. Miller_____
    Andrew S. Rosenman (SBN 253764)
    Britt M. Miller (*pro hac vice*)
    71 South Wacker Drive
    Chicago, IL 60606
    Telephone:  (312) 782-0600
    Facsimile:  (312) 701-7711
    arosenman@mayerbrown.com
    bmiller@mayerbrown.com

    Richard J. Favretto (*pro hac vice*)
    1999 K Street, N.W.
    Washington, DC  20006
    Telephone:  (202) 263-3000
    Facsimile:  (202) 263-3300
    rfavretto@mayerbrown.com

    Attorneys for Defendant
    THE BIG TEN CONFERENCE, INC.

1  POLSINELLI PC                                    ROBINSON BRADSHAW & HINSON

2
   By:    /s/ Leane K. Capps              By:    /s/ Robert W. Fuller
3         Leane K. Capps (*pro hac vice*)        Robert W. Fuller, III (*pro hac vice*)
          Caitlin J. Morgan (*pro hac vice*)     Nathan C. Chase Jr. (SBN 247526)
4         2950 N. Harwood Street                 Lawrence C. Moore, III (*pro hac vice*)
          Suite 2100                             Pearlynn G. Houck (*pro hac vice*)
5         Dallas, TX 75201                       Amanda R. Pickens (*pro hac vice*)
          Telephone:  (214) 397-0030             101 N. Tryon St., Suite 1900
6         lcapps@polsinelli.com                  Charlotte, NC 28246
          cmorgan@polsinelli.com                 Telephone:  (704) 377-2536
7                                                Facsimile:  (704) 378-4000
          Amy D. Fitts (*pro hac vice*)          rfuller@rbh.com
8         Mit Winter (SBN 238515)                nchase@rbh.com
          120 W. 12th Street                     lmoore@rbh.com
9         Kansas City, MO 64105                  phouck@rbh.com
          Telephone: (816) 218-1255              apickens@rbh.com
10        afitts@polsinelli.com
          mwinter@polsinelli.com                 Mark J. Seifert (SBN 217054)
11                                               Seifert Law Firm
          Wesley D. Hurst (SBN 127564)           425 Market Street, Suite 2200
12        2049 Century Park East, Suite 2300     San Francisco, CA 94105
          Los Angeles, CA 90067                  Telephone:  (415) 999-0901
13        Telephone: (310) 556-1801              Facsimile:  (415) 901-1123
          whurst@polsinelli.com                  mseifert@seifertfirm.com
14
          Attorneys for Defendants               Attorneys for Defendant
15        THE BIG 12 CONFERENCE, INC. and        SOUTHEASTERN CONFERENCE
          CONFERENCE USA, INC.
16

17

18

19

20

21

22

23

24

25

26

27

28

1

**SMITH MOORE LEATHERWOOD LLP**          **COVINGTON & BURLING LLP**

2

3

By:      /s/ D. Erik Albright                    By:      /s/ Benjamin C. Block
　　　D. Erik Albright (*pro hac vice*)          　　Benjamin C. Block (*pro hac vice*)
　　　Gregory G. Holland (*pro hac vice*)          　　　One CityCenter

4

　　300 North Greene Street, Suite 1400          　　850 Tenth Street, N.W.
　　　Greensboro, NC 27401                    　　Washington, DC 20001-4956

5

　　Telephone:  (336) 378-5368                    　　Telephone:  (202) 662-5205
　　Facsimile:  (336) 433-7402                    　　Facsimile:  (202) 778-5205

6

　erik.albright@smithmoorelaw.com               　　　　bblock@cov.com
　greg.holland@smithmoorelaw.com

7

　　　　　　　　　　　　　　　　　Rebecca A. Jacobs (SBN 294430)
　　Jonathan P. Heyl (*pro hac vice*)               　　　One Front Street

8

　　101 N. Tryon Street, Suite 1300                San Francisco, CA 94111-5356
　　　Charlotte, NC 28246                       　　Telephone:  (415) 591-6000

9

　　Telephone:  (704) 384-2625                    　　Facsimile:  (415) 591-6091
　　Facsimile:  (704) 384-2909                    　　　　rjacobs@cov.com

10

　jon.heyl@smithmoorelaw.com

11

Charles LaGrange Coleman, III (SBN 65496)          Attorneys for Defendant
　　　HOLLAND & KNIGHT LLP                AMERICAN ATHLETIC CONFERENCE

12

　　50 California Street, Suite 2800
　　San Francisco, CA 94111-4624

13

　　Telephone:  (415) 743-6900
　　Facsimile:  (415) 743-6910

14

　　　ccoleman@hklaw.com

15

　　Attorneys for Defendant

16

THE ATLANTIC COAST CONFERENCE

**WALTER HAVERFIELD LLP**               **BRYAN CAVE LLP**

17

18

By:      /s/ R. Todd Hunt                       By:      /s/ Meryl Macklin
　　　R. Todd Hunt (*pro hac vice*)               　　Meryl Macklin (SBN 115053)

19

Benjamin G. Chojnacki (*pro hac vice*)          　560 Mission Street, 25th Floor
　　　The Tower at Erieview                     　　San Francisco, CA 94105

20

　1301 E. 9th Street, Suite 3500                  　　Telephone:  (415) 268-1981
　　Cleveland, OH 44114-1821                    　　Facsimile:  (415) 430-4381

21

　　Telephone:  (216) 928-2935                    　meryl.macklin@bryancave.com
　　Facsimile:  (216) 916-2372

22

　　rthunt@walterhav.com                    　　Richard Young (*pro hac vice*)
　bchojnacki@walterhav.com                    　Brent Rychener (*pro hac vice*)

23

　　　　　　　　　　　　　　　　90 South Cascade Avenue, Suite 1300

24

　　Attorneys for Defendant                    　　Colorado Springs, CO 80903
MID-AMERICAN CONFERENCE                    　　Telephone:  (719) 473-3800
　　　　　　　　　　　　　　　　　Facsimile:  (719) 633-1518

25

　　　　　　　　　　　　　　　richard.young@bryancave.com
　　　　　　　　　　　　　　　brent.rychener@bryancave.com

26

27

　　　　　　　　　　　　　　　　Attorneys for Defendant
　　　　　　　　　　　　　　　MOUNTAIN WEST CONFERENCE

28

**JONES WALKER LLP**

By: _____/s/ Mark A. Cunningham_____
        Mark A. Cunningham (*pro hac vice*)
        201 St. Charles Avenue
        New Orleans, LA 70170-5100
        Telephone:  (504) 582-8536
        Facsimile:  (504) 589-8536
        mcunningham@joneswalker.com

        Attorneys for Defendant
        SUN BELT CONFERENCE

## **FILER'S ATTESTATION**

I, Jeffrey A. Mishkin, am the ECF user whose identification and password are being used to file the Reply in Support of Defendants' Motion for Summary Judgment, Reply in Support of Defendants' Motions to Exclude Expert Testimony, and Opposition to Plaintiffs' Motions to Exclude Expert Testimony.  In compliance with Local Rule 5-1(i)(3), I hereby attest that all signatories hereto concur in this filing.

        /s/ Jeffrey A. Mishkin_____