IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| IN RE: NATIONAL COLLEGIATE ATHLETIC ASSOCIATION ATHLETIC GRANT-IN-AID CAP ANTITRUST LITIGATION | Case Nos. 14-md-02541-CW<br>14-cv-02758-CW |
| THIS DOCUMENT RELATES TO:<br><br>ALL ACTIONS | ORDER GRANTING IN PART AND DENYING IN PART CROSS-MOTIONS FOR SUMMARY JUDGMENT<br><br>(Dkt. Nos. 657, 704, 797, 800) |

In this multidistrict litigation, student-athlete Plaintiffs allege that Defendants National Collegiate Athletic Association (NCAA) and eleven of its member conferences fixed prices for the payments and benefits that the students may receive in return for their elite athletic services.  Now pending are cross-motions for summary judgment.[1]  For the reasons set forth below, the cross-motions for summary judgment are granted in part and denied in part.[2]

BACKGROUND

Plaintiffs are current and former student-athletes in the sports of men's Division I Football Bowl Subdivision (FBS) football and men's and women's Division I basketball.  Defendants are the NCAA and eleven conferences that participated, during the relevant period, in FBS football and in men's and women's

---

[1] The Court will rule by separate order on the pending motions to seal and to exclude proposed expert testimony.

[2] In the exercise of discretion, the Court denies Defendants' Motion for Supplemental Briefing and Plaintiffs' Motion to File Supplemental Evidence for the Summary Judgment Record.  See Civil Local Rule 7-3(d).  The Court does not, at this time, rule on whether Plaintiffs' proposed supplemental evidence will be admissible at trial.

United States District Court<br>Northern District of California

Division I basketball.  Plaintiffs allege that Defendants violated federal antitrust law by conspiring to impose an artificial ceiling on the scholarships and benefits that student-athletes may receive as payment for their athletic services.

I.   O'Bannon v. NCAA

In 2009, a group of college Division I student-athletes brought an antitrust class action against the NCAA to challenge the association's rules preventing men's football and basketball players from being paid, either by their school or by any outside source, for the sale of licenses to use the student-athletes' names, images, and/or likenesses (NIL) in videogames, live game telecasts, and other footage.  O'Bannon v. NCAA, 7 F. Supp. 3d 955, 962-63 (N.D. Cal. 2014).  The rules challenged by the O'Bannon plaintiffs, which furthered the agreement of the NCAA and its members to fix the value of student-athletes' NIL at zero, included the then-applicable maximum limit on financial aid.  Under that limit, student-athletes were prohibited from receiving "financial aid based on athletics ability" that exceeded the value of a full grant-in-aid.  O'Bannon, 7 F. Supp. 3d at 971.  The rules defined "grant-in-aid" as "financial aid that consists of tuition and fees, room and board, and required course-related books."  Id.  Other expenses related to school attendance, such as supplies and transportation, were not included in the grant-in-aid limit, although they were calculated in a school-specific figure called "cost of attendance."  Id.

The Court held a bench trial and ruled that the challenged NCAA rules violated Section 1 of the Sherman Act, 15 U.S.C. § 1. Id. at 963.  The Court found that the evidence presented at trial

United States District Court
Northern District of California

United States District Court
Northern District of California

1   established that FBS football and Division I men's basketball

2   schools compete to recruit the best high school football and

3   men's basketball players in a relevant market for a college

4   education combined with athletics.  7 F. Supp. 3d at 965-68, 986-

5   88.  In exchange for educational and athletic opportunities, the

6   FBS and Division I schools compete "to sell unique bundles of

7   goods and services to elite football and basketball recruits."

8   Id. at 965, 986.  The Court found that this market,

9   alternatively, could be understood as a monopsony, in which the

10  NCAA member schools, acting collectively, are the only buyers of

11  the athletic services and NIL licensing rights of elite student-

12  athletes.  Id. at 973, 993.

13      The Court found that the plaintiffs met their burden to show

14  that the NCAA had fixed the price of the student-athletes' NIL

15  rights, which had significant anticompetitive effects in the

16  relevant market.  Id. at 971-73, 988-93.  On the question of

17  procompetitive justifications of the restraints, the Court found

18  that the NCAA's challenged restrictions on student-athlete

19  compensation played "a limited role in driving consumer demand

20  for FBS football and Division I basketball-related products."

21  Id. at 1001.  The Court also found that the challenged rules

22  "might facilitate the integration of academics and athletics

23  . . . by preventing student-athletes from being cut off from the

24  broader campus community."  Id. at 1003.

25      The O'Bannon plaintiffs proposed three alternatives that

26  they asserted were less restrictive than the NCAA rules that they

27  challenged: (1) raising the grant-in-aid limit to allow schools

28  to award stipends, derived from specified sources of licensing

3

revenue, to student-athletes; (2) allowing schools to deposit a share of licensing revenue into a trust fund for student-athletes which could be paid after the student-athletes graduate or leave school for other reasons; and (3) permitting student-athletes to receive limited compensation for third-party endorsements approved by their schools.  7 F. Supp. 3d at 982.  Each of these proposed less restrictive alternatives related specifically to the use of revenue derived from NIL licensing and endorsements.

This Court found that the first two of these proposed alternatives "would limit the anticompetitive effects of the NCAA's current restraint without impeding the NCAA's efforts to achieve its stated purposes."  Id.; see also id. at 983-84.  The Court rejected the plaintiffs' third proposed alternative.  Id. at 984.  Accordingly, this Court enjoined the NCAA from enforcing any rules that would prohibit its member schools and conferences from offering their FBS football and men's Division I basketball recruits a limited share of the revenues generated from the use of their NIL in addition to a full grant-in-aid, but permitted the NCAA to implement rules capping the amount of compensation that could be paid to student-athletes while they are enrolled in school at the cost of attendance.  Id. at 1007-08.  The Court also prohibited the NCAA from enforcing rules to prevent member schools and conferences from offering to deposit a limited share of NIL licensing revenue in trust for their FBS football and Division I basketball recruits, payable when they leave school or their eligibility expires.  Id. at 1008.

The Ninth Circuit largely affirmed this Court's decision, including the finding that allowing NCAA member schools to award

4

grants-in-aid up to the student-athletes' full cost of attendance would be a substantially less restrictive alternative to the existing compensation rules.  O'Bannon v. NCAA, 802 F.3d 1049, 1079 (9th Cir. 2015).  It held that "the grant-in-aid cap has no relation whatsoever to the procompetitive purposes of the NCAA: by the NCAA's own standards, student-athletes remain amateurs as long as any money paid to them goes to cover legitimate educational expenses."  Id. at 1075.  However, it vacated the judgment and injunction insofar as they required the NCAA to allow its member schools to pay student-athletes limited deferred compensation in a trust account.  Id. at 1079.  The circuit court found that allowing "students to receive NIL cash payments untethered to their education expenses" would not promote the NCAA's procompetitive purposes as effectively as a rule forbidding cash compensation, even if the payment was limited and took the form of a trust fund.  Id. at 1076.

II.  This Litigation

     Plaintiffs initiated these actions in 2014 and 2015, attacking the NCAA's cap on their grant-in-aid itself, rather than merely the association's restrictions on sharing NIL revenue.  The United States Judicial Panel on Multidistrict Litigation transferred actions filed in other districts to this Court pursuant to 28 U.S.C. § 1407 for coordinated or consolidated pretrial proceedings.  All but one of the actions were consolidated.  The operative pleading in the consolidated action is Plaintiffs' consolidated amended complaint, filed July 11, 2014.  The consolidated amended complaint has been amended by orders incorporating additional allegations about named

United States District Court
Northern District of California

1    Plaintiffs in subsequently-filed cases (Docket Nos. 86, 184,

2    197).  One case, Jenkins v. NCAA, No. 14-cv-02758, has not been

3    consolidated, but all pending motions were briefed together in

4    the consolidated action and in Jenkins.[3]

5         On December 4, 2015, the Court certified three injunctive

6    relief classes in the consolidated action, under Federal Rule of

7    Civil Procedure 23(b)(2): a Division I FBS Men's Football Class,

8    a Division I Men's Basketball Class, and a Division I Women's

9    Basketball Class, each consisting of student-athletes who

10   received or will receive a written offer for a full grant-in-aid

11   as defined by NCAA Bylaw 15.02.5 during the pendency of this

12   action.  In the Jenkins action, the Court certified the men's

13   football and basketball classes; the women's basketball class was

14   not sought in that case.  As part of the class certification

15   proceedings, all Plaintiffs committed to seek to stay either the

16   consolidated case or the Jenkins case prior to trial of the other

17   in order to avoid duplicative trials on behalf of identical

18   classes and a race to determine which judgment would be binding

19   under principles of res judicata.

20        Defendants and the consolidated Plaintiffs reached a

21

22        [3] The Jenkins Plaintiffs raise one separate issue in a
     footnote to Plaintiffs' opposition to Defendants' cross-motion
23   for summary judgment.  They request that if the Court grants
     Defendants' summary judgment motion in the consolidated action,
24   the Court not apply the ruling to the Jenkins action, but instead
     remand it back to the District of New Jersey, where the decisions
25   of the Ninth Circuit and this Court in O'Bannon would not control
     under the doctrine of stare decisis.  At the hearing on the
26   motion, the Jenkins Plaintiffs clarified that they do not seek
     remand if the Court grants summary judgment only in part.  See
27   Jan. 16, 2018 Tr. at 50.  Because the Court grants summary
     judgment in part and denies it in part, the Jenkins Plaintiffs'
28   request for remand prior to summary judgment is moot.

settlement of all claims for damages, and the Court granted final approval of that settlement and entered a partial judgment under Federal Rule of Civil Procedure 54(b) on December 6, 2017.  The Jenkins Plaintiffs have not sought damages.  Therefore, only claims for injunctive relief remain pending.

LEGAL STANDARD

Summary judgment is properly granted when no genuine and disputed issues of material fact remain, and when, viewing the evidence most favorably to the non-moving party, the movant is clearly entitled to prevail as a matter of law.  Fed. R. Civ. P. 56; Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986); Eisenberg v. Ins. Co. of N. Am., 815 F.2d 1285, 1288-89 (9th Cir. 1987).

The moving party bears the burden of showing that there is no material factual dispute.  Therefore, the court must regard as true the opposing party's evidence, if supported by affidavits or other evidentiary material.  Celotex, 477 U.S. at 324; Eisenberg, 815 F.2d at 1289.  The court must draw all reasonable inferences in favor of the party against whom summary judgment is sought. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986); Intel Corp. v. Hartford Accident & Indem. Co., 952 F.2d 1551, 1558 (9th Cir. 1991).

Material facts which would preclude entry of summary judgment are those which, under applicable substantive law, may affect the outcome of the case.  The substantive law will identify which facts are material.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).

Where the moving party does not bear the burden of proof on

an issue at trial, the moving party may discharge its burden of production by either of two methods:

> The moving party may produce evidence negating an essential element of the nonmoving party's case, or, after suitable discovery, the moving party may show that the nonmoving party does not have enough evidence of an essential element of its claim or defense to carry its ultimate burden of persuasion at trial.

Nissan Fire & Marine Ins. Co., Ltd., v. Fritz Cos., Inc., 210 F.3d 1099, 1106 (9th Cir. 2000).

If the moving party discharges its burden by showing an absence of evidence to support an essential element of a claim or defense, it is not required to produce evidence showing the absence of a material fact on such issues, or to support its motion with evidence negating the non-moving party's claim.  Id.; see also Lujan v. Nat'l Wildlife Fed'n, 497 U.S. 871, 885 (1990); Bhan v. NME Hosps., Inc., 929 F.2d 1404, 1409 (9th Cir. 1991). If the moving party shows an absence of evidence to support the non-moving party's case, the burden then shifts to the non-moving party to produce "specific evidence, through affidavits or admissible discovery material, to show that the dispute exists." Bhan, 929 F.2d at 1409.

If the moving party discharges its burden by negating an essential element of the non-moving party's claim or defense, it must produce affirmative evidence of such negation.  Nissan, 210 F.3d at 1105.  If the moving party produces such evidence, the burden then shifts to the non-moving party to produce specific evidence to show that a dispute of material fact exists. Id.

If the moving party does not meet its initial burden of

production by either method, the non-moving party is under no obligation to offer any evidence in support of its opposition. Id. This is true even though the non-moving party bears the ultimate burden of persuasion at trial. Id. at 1107.

DISCUSSION

I.  Res Judicata and Collateral Estoppel

Defendants argue that all of Plaintiffs' claims are foreclosed under the doctrines of res judicata, or claim preclusion, and collateral estoppel, or issue preclusion, by the decisions of the Ninth Circuit and this Court in O'Bannon. 802 F.3d 1049; 7 F. Supp. 3d 955.  The purpose of these doctrines is to "relieve parties of the cost and vexation of multiple lawsuits, conserve judicial resources, and, by preventing inconsistent decisions, encourage reliance on adjudication." Allen v. McCurry, 449 U.S. 90, 94 (1980).  The burden of proving the elements of either res judicata or collateral estoppel is on the party asserting it.  Kendall v. Visa U.S.A., Inc., 518 F.3d 1042, 1050-51 (9th Cir. 2008) (collateral estoppel); Karim-Panahi v. Los Angeles Police Dep't, 839 F.2d 621, 627 n.4 (9th Cir. 1988) (res judicata).

Res judicata prohibits the re-litigation of any claims that were raised or could have been raised in a prior action.  Tahoe-Sierra Pres. Council v. Tahoe Reg'l Planning Agency, 322 F.3d 1064, 1077-78 (9th Cir. 2003).  Three elements must be present in order for res judicata to apply: (1) an identity of claims; (2) a final judgment on the merits; and (3) the same parties or their privies.  Id. at 1077.

Collateral estoppel "prevents a party from relitigating an

United States District Court
Northern District of California

issue decided in a previous action if four requirements are met:
'(1) there was a full and fair opportunity to litigate the issue
in the previous action; (2) the issue was actually litigated in
that action; (3) the issue was lost as a result of a final
judgment in that action; and (4) the person against whom
collateral estoppel is asserted in the present action was a party
or in privity with a party in the previous action.'" Kendall,
518 F.3d at 1050 (quoting United States Internal Revenue Serv. v.
Palmer, 207 F.3d 566, 568 (9th Cir. 2000)).

The application of either res judicata or collateral
estoppel here would require that any Plaintiff not present in
O'Bannon have been in privity with the parties in that case.  Two
primary categories of Plaintiffs here were not part of the
O'Bannon class: male student-athletes who were recruited after
O'Bannon and female student-athletes.[4]

Defendants contend that privity nonetheless exists here
because, in O'Bannon, the interests of nonparty student-athletes
were represented adequately by the plaintiffs there with the same
interests and the Court took special care to protect the
interests of future student-athletes.  In "certain limited
circumstances, a nonparty may be bound by a judgment because she
was adequately represented by someone with the same interests who
was a party to the suit.  Representative suits with preclusive
effect on nonparties include properly conducted class actions."

[4] The parties have not briefed whether there are any class
members in this case who were not class members in O'Bannon
because their NIL have not been, and will not be, included in
game footage or in videogames after the conclusion of the
athlete's participation in intercollegiate athletics.  See
O'Bannon, 7 F. Supp. 3d at 965 (quoting class definition).

10

Taylor v. Sturgell, 553 U.S. 880, 894 (2008) (internal

alteration, citation and quotation marks omitted).  The Supreme

Court held,

> A party's representation of a nonparty is "adequate"
> for preclusion purposes only if, at a minimum: (1) The
> interests of the nonparty and her representative are
> aligned, and (2) either the party understood herself to
> be acting in a representative capacity or the original
> court took care to protect the interests of the
> nonparty.  In addition, adequate representation
> sometimes requires (3) notice of the original suit to
> the persons alleged to have been represented.

Taylor, 553 U.S. at 900 (citations omitted).  The Supreme Court

further explained that, in the federal class action context, the

limitations on nonparty representation "are implemented by the

procedural safeguards contained in Federal Rule of Civil

Procedure 23."  Id. at 900-01.  In other words, the definition of

the O'Bannon class under Rule 23 limits the persons who are

subject to the preclusive effect of the judgment.  Under Taylor,

then, the effect of res judicata does not extend to individuals

who were not part of the O'Bannon class.  Furthermore, Defendants

cannot satisfy the Taylor factors for individuals who were not

class members in that case.  The Court and the parties in

O'Bannon focused their analysis on the claims of class members,

the named plaintiffs represented only class members, and only

class members were on notice that they were represented.

None of the current Plaintiffs' claims are precluded for an

additional reason, regardless of whether those Plaintiffs were

O'Bannon class members.  The general rule is that "'the

continuation of conduct under attack in a prior antitrust suit'"

gives rise to a new action.  Harkins Amusement Enters., Inc. v.

Harry Nace Co., 890 F.2d 181, 183 (9th Cir. 1989) (quoting

2 P. Areeda & D. Turner, <u>Antitrust Laws</u> § 323c (1978)) ("Failure to gain relief for one period of time does not mean that the plaintiffs will necessarily fail for a different period of time."); <u>see also</u> <u>Frank v. United Airlines, Inc.</u>, 216 F.3d 845, 851 (9th Cir. 2000) ("A claim arising after the date of an earlier judgment is not barred, even if it arises out of a continuing course of conduct that provided the basis for the earlier claim.").  Only where no distinct conduct is alleged can res judicata be applied to bar claims arising from a different time period.  <u>See</u> <u>In re Dual-Deck Video Cassette Recorder Antitrust Litig.</u>, 11 F.3d 1460, 1464 (9th Cir. 1993) (applying res judicata where nothing new was "alleged--no new conspiracy, no new kinds of monopolization, no new acts").

The Court must consider the "conduct of parties since the first judgment" and other factual matters in the new cause of action.  <u>Harkins</u>, 890 F.2d at 183 (quoting <u>California v. Chevron Corp.</u>, 872 F.2d 1410, 1415 (9th Cir. 1989)).  It is not enough that "both suits involved essentially the same course of wrongful conduct" or that injunctive relief was sought in the first action, especially "in view of the public interest in vigilant enforcement of the antitrust laws through the instrumentality of the private treble-damage action."  <u>Lawlor v. Nat'l Screen Serv. Corp.</u>, 349 U.S. 322, 327, 329 (1955) (internal quotation marks omitted).

The NCAA Bylaws were changed after, and in part because of, <u>O'Bannon</u>, and now permit student-athletes to receive financial aid, based on athletics ability, up to their cost of attendance, or more than that in the case of a Pell grant.  <u>See</u> Pls. Ex. 15

United States District Court
Northern District of California

at 182 (Bylaws 15.1, 15.1.1).  In this case, Plaintiffs do not challenge the bar on distributing NIL licensing revenue to student-athletes or the former grant-in-aid limitation.  Rather, the challenged restraints are the current, interconnected set of NCAA rules that generally limit financial aid to the cost of attendance yet also fix the prices of numerous and varied exceptions--additional benefits that have a financial value above the cost of attendance.  <u>See</u> Pls. Opp. to Defs. MSJ, App'x A (Challenged Rules and Operative Language).

Some of these rules regulate payment for additional benefits that do appear to be tethered to education, such as the rule limiting the availability of academic tutoring.  <u>See</u> Defs. Ex. 1 at 102 (Bylaw 13.2.1.1(k), prohibiting tutoring to assist in initial eligibility, transfer eligibility, or waiver requests). The rules also restrict schools' ability to reimburse student-athletes for computers, science equipment, musical instruments and other items not currently included in the cost of attendance calculation but nonetheless related to the pursuit of various academic studies.  <u>See</u> NCAA (Kevin C. Lennon) Depo. at 212:11-19. Plaintiffs also challenge various additional restrictions on benefits related to educational expenses, such as providing guaranteed post-eligibility scholarships.  <u>Id.</u> at 195:5-199:17. Currently, schools may provide guaranteed post-eligibility scholarships for undergraduate or graduate study and tutoring costs only at their own institution, but not at other institutions.  <u>Id.</u>

Defendants also allow, but fix the amount of, benefits that a school may provide that are incidental to athletic

13

participation, such as travel expenses and prizes.  See id. at

58:20-59:16 ("There are items that schools can provide outside of

educational expenses, which, again, are tethered to cost of

attendance, that I would kind of capture as incidental to

participation.").  Some of the additional benefits limited by the

rules at issue in this case were provided to student-athletes at

the time of the O'Bannon trial, but neither this Court nor the

Court of Appeals addressed them in that case and their scope has

expanded since that time.  For example, student-athletes could

previously receive meals incidental to participation in

athletics, see O'Bannon Ex. 2340-233 (then-applicable Bylaws),

but may now receive unlimited meals and snacks, see Pls. Ex. 15

at 183 (Bylaw 15.2.2.1.6 regarding meals incidental to

participation); Mishkin Reply Decl. Ex. 1 at 207 (Bylaw

16.5.2(d), (e) regarding meals and snacks).  Witnesses in

O'Bannon testified that the Student Assistance Fund (SAF)[5] could

then be used to purchase a "special insurance policy" or

"catastrophic injury insurance," O'Bannon Tr. 2147:14-23,

2152:7-17, but student-athletes now may borrow against future

earnings to purchase loss-of-value insurance, Pls. Ex. 15 at 58

(Bylaw 12.1.2.4.4).  Student-athletes now may receive athletic

performance bonuses from international organizations related to

Olympic participation.  See Pls. Ex. 15 at 57 (Bylaw

12.1.2.1.5.2, adopted January 17, 2015 and effective August 1,

---

[5] The SAF is a fund that the NCAA provides to member schools
to distribute to student-athletes for a variety of uses, some of
which are in addition to full cost-of-attendance financial aid.
See NCAA (Lennon) Depo. at 152:19-153:19; Pls. Ex. 24 at
NCAAGIA03316052 (reporting on SAF uses).

United States District Court
Northern District of California

2015).  There has been an increase in permissible reimbursement for family travel expenses, which permits schools to pay limited expenses of a student-athlete's spouse and children to attend games, although still not those of parents or siblings.  Eugene DuBuis Smith Depo. at 51:24-57:18; see also NCAA (Lennon) Depo. at 71:7-73:2, 186:1-16 (discussing Bylaw 16.6.1.1); Mishkin Reply Decl. Ex. 1 at 303 (Bylaw 18.7.5).

Because Plaintiffs raise new antitrust challenges to conduct, in a different time period, relating to rules that are not the same as those challenged in O'Bannon, res judicata and collateral estoppel do not preclude the claims even of those Plaintiffs who were O'Bannon class members.

II.  Section 1 of the Sherman Act

The Court next turns to the remaining issues in the parties' cross-motions.  Plaintiffs move for summary judgment of their claims under Section 1 of the Sherman Act.  15 U.S.C. § 1.  In order to establish a Section 1 claim, Plaintiffs must demonstrate: "(1) that there was a contract, combination, or conspiracy; (2) that the agreement unreasonably restrained trade under either a per se rule of illegality or a rule of reason analysis; and (3) that the restraint affected interstate commerce."  Tanaka v. Univ. of S. California, 252 F.3d 1059, 1062 (9th Cir. 2001) (internal quotation marks omitted).  The existence of a contract, combination or conspiracy that affects interstate commerce is undisputed in this case.  NCAA regulations are subject to antitrust scrutiny under the Sherman Act and must be tested using a rule-of-reason analysis.  O'Bannon, 802 F.3d at 1079.  Under that analysis, Plaintiffs bear the initial burden of

United States District Court
Northern District of California

15

showing that the challenged restraints produce significant anticompetitive effects within a relevant market.  If Plaintiffs meet this burden, Defendants must come forward with evidence of the restraints' procompetitive effects.  Plaintiffs must then show that any legitimate objectives can be achieved in a substantially less restrictive manner.  Tanaka, 252 F.3d at 1063.

Plaintiffs contend that the undisputed evidence supports their claim that the challenged restraints cause anticompetitive effects in the relevant market, and that Defendants cannot meet their burden to prove that the restraints have procompetitive benefits.  They request that the Court grant summary judgment on this basis, obviating the need to reach the question of whether there are any less restrictive alternatives to any legitimate objectives.  Plaintiffs do not seek summary judgment on the existence of less restrictive alternatives.

Defendants cross-move for summary judgment on the basis that the decisions of this Court and the Ninth Circuit in O'Bannon bar all of Plaintiffs' claims, under the doctrine of stare decisis. "If a court must decide an issue governed by a prior opinion that constitutes binding authority, the later court is bound to reach the same result, even if it considers the rule unwise or incorrect.  Binding authority must be followed unless and until overruled by a body competent to do so." Hart v. Massanari, 266 F.3d 1155, 1170 (9th Cir. 2001).  Stare decisis applies when "there are neither new factual circumstances nor a new legal landscape." Ore. Natural Desert Ass'n v. U.S. Forest Serv., 550 F.3d 778, 786 (9th Cir. 2008).  A court is required to reach the same legal consequence from the same "detailed set of facts."

United States District Court
Northern District of California

In re Osborne, 76 F.3d 306, 309 (9th Cir. 1996).  "Insofar as there may be factual differences between the current case and the earlier one, the court must determine whether those differences are material to the application of the rule or allow the precedent to be distinguished on a principled basis."  Hart, 266 F.3d at 1172; see also Miranda v. Selig, 860 F.3d 1237, 1242 (9th Cir. 2017) (stare decisis required where circumstances of new case are not "separate and distinct in a meaningful way for the purposes of the Sherman Act").  The doctrine encompasses issues actually decided in a prior case even if those issues were not, in a technical sense, necessary, but only if they were germane to the eventual resolution of the case and expressly resolved after reasoned consideration.  Alcoa, Inc. v. Bonneville Power Admin., 698 F.3d 774, 804 n.4 (9th Cir. 2012); Barapind v. Enomoto, 400 F.3d 744, 751 (9th Cir. 2005) (en banc).

In the area of antitrust law, however, another interest competes with the doctrine of stare decisis.  That is an interest "in recognizing and adapting to changed circumstances and the lessons of accumulated experience."  State Oil Co. v. Khan, 522 U.S. 3, 20 (1997).  Rule-of-reason analysis "evolves with new circumstances and new wisdom."  Id. at 21 (quoting Bus. Elecs. Corp. v. Sharp Elecs. Corp., 485 U.S. 717, 731-32 (1988)).  "The rule of reason requires an evaluation of each challenged restraint in light of the special circumstances involved.  That the analysis will differ from case to case is the essence of the rule."  Oltz v. St. Peter's Cmty. Hosp., 861 F.2d 1440, 1449 (9th Cir. 1988) (citation omitted).

A.    Anticompetitive Effects in the Relevant Market

1.    Market Definition

In a rule-of-reason analysis, the Court must first define the relevant market within which the challenged restraint may produce significant anticompetitive effects.  Both sides here request that the Court adopt the market definition applied in O'Bannon, which was not challenged in the appeal of that case. 802 F.3d at 1070.  Plaintiffs argue that the evidence supports the same education or labor market for student-athletes in FBS football and Division I basketball.  Defendants contend that stare decisis controls the outcome of this case, including the market definition.[6]  Defendants also agreed at the January 21, 2018 hearing that the market definition, as well as other rulings in O'Bannon, would apply equally to the women's basketball Plaintiffs in this action.  Tr. at 7-8.

In the absence of any material factual dispute, the Court will grant both parties' summary judgment motions on the issue of market definition and adopt the market definition from O'Bannon, the market for a college education combined with athletics or alternatively the market for the student-athletes' athletic services.

2.    The Challenged Restraints and Significant
Anticompetitive Effects

The next element of the rule-of-reason analysis is whether the challenged restraints produce significant anticompetitive

---

[6] Defendants' expert Dr. Kenneth G. Elzinga posits that the market should be viewed more broadly as a multi-sided one for the educational services of colleges and universities, but Defendants, having taken the position that O'Bannon is controlling, do not rely on this theory.

United States District Court
Northern District of California

effects within the relevant market.  Plaintiffs have produced undisputed evidence that greater compensation and benefits would be offered in the recruitment of student-athletes absent the challenged rules, meeting their burden for summary adjudication on this question.  Defendants' position is that O'Bannon is binding on this point under the doctrine of stare decisis.  See 802 F.3d at 1070-72; 7 F. Supp. 3d at 971-73, 988-93.  They have not meaningfully disputed Plaintiffs' showing that the challenged restraints produce significant anticompetitive effects within the relevant market.  Because Plaintiffs have met their burden and Defendants have not created a factual dispute, the Court will grant the parties' cross-motions for summary adjudication of this element and find that the challenged restraints produce significant anticompetitive effects in the relevant market.

B.    Procompetitive Benefits of the Restraints

The next factor is whether Defendants have come forward with evidence of procompetitive effects of the challenged restraints. Defendants claim that O'Bannon established as a matter of law that the NCAA's rules serve the procompetitive purposes of "integrating academics with athletics, and 'preserving the popularity of the NCAA's product by promoting its current understanding of amateurism.'"  802 F.3d at 1073 (quoting 7 F. Supp. 3d at 1005).  They further argue that the record in this case contains ample evidence of these procompetitive justifications as well as of other possible procompetitive justifications not found in O'Bannon.  Plaintiffs respond that O'Bannon does not require the Court to uphold Defendants' procompetitive justifications in this case because Plaintiffs

United States District Court
Northern District of California

United States District Court
Northern District of California

1  have developed a record of factual circumstances that have

2  changed after the close of the record in O'Bannon.

3      Plaintiffs first point to the change caused by O'Bannon:

4  student-athletes now may receive scholarships above the former

5  grant-in-aid limit, up to the cost of attendance.  This change,

6  however, does not distinguish the present case from O'Bannon

7  because it was the very issue adjudicated in that case.  The

8  change that was made was required and approved by the Court.

9  802 F.3d at 1075-76.

10     Next, Plaintiffs identify the NCAA rule changes discussed

11 above, which have generally increased but continue to fix various

12 benefits related to athletic participation that a member school

13 may provide for its student-athletes or permit them to receive

14 from outside sources.  See Section I above.  They also identify

15 new concessions by Defendants that benefits and gifts that are

16 related to athletic participation but are above the cost of

17 attendance are connected neither to education nor to their

18 understanding of amateurism.  See, e.g., Big 12 (Robert A.

19 Bowlsby, II) Depo. at 162:10-14 (not sure how valuable gifts

20 could be tethered to education); Michael Slive Depo. at 218:4-10

21 (gift card "not really" connected to educational experience);

22 NCAA (Lennon) Depo. at  119:20-122:22, 287:6-19 (gifts not

23 related to amateurism).  Plaintiffs contend that because

24 Defendants permit student-athletes to be paid money that does not

25 go "to cover legitimate educational expenses," they are not

26 amateurs.  O'Bannon, 802 F.3d at 1075.  Plaintiffs also identify

27 a number of expenses that they contend are tethered to education

28 but are still disallowed.  See Pls. MSJ, App'x B (citing NCAA

(Lennon) Depo. at 195:5-215:14); see also Section I above.

While the restraints challenged in this case overlap with those in O'Bannon, the specific rules at issue are not the same. Challenges to the NCAA's rules must be assessed on a case-by-case basis under the rule of reason, and O'Bannon's holding that there were procompetitive justifications for the rules challenged in that case would not necessarily require the Court to find that different rules, challenged in this case, also have the same procompetitive effects. 802 F.3d at 1063 (citing NCAA v. Bd. of Regents of the Univ. of Okla., 468 U.S. 85 (1984)) ("we are not bound by Board of Regents to conclude that every NCAA rule that somehow relates to amateurism is automatically valid").  The Court rejects Defendants' contention that merely because all of the then-existing NCAA Bylaws were part of the record in O'Bannon, the Court necessarily adjudicated in Defendants' favor all possible challenges to any of those rules.  The reasoning of O'Bannon will be very relevant in assessing whether the rules in this case have procompetitive effects.  However, like the NIL rules in O'Bannon, the validity of the specific rules challenged in this case "must be proved, not presumed."  Id. at 1064.

Plaintiffs further contend that Defendants have failed to provide material evidence that their current rules create procompetitive effects.  Therefore, Plaintiffs argue, the Court should enter summary judgment against Defendants without balancing the competitive effects of the restraints or reaching the question of less restrictive alternatives.  However, Defendants have presented sufficient evidence in support of the two procompetitive effects found in O'Bannon to create a factual

United States District Court
Northern District of California

issue for trial.  This includes a survey of consumer preferences,
which led Defendants' expert Dr. Bruce Isaacson to conclude that
fans are drawn to college football and basketball in part due to
their perception of amateurism.  See Isaacson Depo. at 48:4-17;
Isaacson Rep. ¶¶ 151 & Table 7, 155.  Plaintiffs identify various
defects in Defendants' survey evidence, including the fact that
it reflects consumers' stated preferences rather than how
consumers would actually behave if the NCAA's restrictions on
student-athlete compensation were modified or lifted.  However,
the weight of Dr. Isaacson's testimony is a question for trial
rather than summary judgment.

Defendants also present evidence that paying student-
athletes would detract from the integration of academics and
athletics in the campus community.  For example, Professor James
T. Heckman testified that paying student-athletes would likely
lead them to dedicate even more effort and possibly more time to
their sports, potentially diverting them "away from actually
being students and towards just being athletes."  Heckman Depo.
at 315:5-316:18.

Accordingly, the Court will deny the parties' cross-motions
for summary adjudication of the question of whether the
challenged NCAA rules serve Defendants' asserted procompetitive
purposes of integrating academics with athletics and preserving
the popularity of the NCAA's product by promoting its current
understanding of amateurism.  See 802 F.3d at 1073 (quoting 7 F.
Supp. 3d at 1005).

Plaintiffs also move for summary judgment that Defendants
have abandoned seven additional procompetitive justifications

that they identified in response to an interrogatory.  See Defs.

Ex. 8 (NCAA Amended Responses to Pls. Second Set of

Interrogatories) at 9-14.  Plaintiffs contend that Defendants

developed no record to support any of them.

Defendants first respond to this argument by contending that

Plaintiffs' summary judgment motion inadequately demonstrates an

absence of evidence on these procompetitive justifications, and

should be denied due to Plaintiffs' failure to meet their burden

as the moving party.  However, "the Celotex 'showing' can be made

by 'pointing out through argument'" the "'absence of evidence to

support plaintiff's claim.'"  Devereaux v. Abbey, 263 F.3d 1070,

1076 (9th Cir. 2001) (quoting Fairbank v. Wunderman Cato Johnson,

212 F.3d 528, 532 (9th Cir. 2000)).  Although not lengthy,

Plaintiffs' argument that Defendants have not developed evidence

to support additional procompetitive justifications, identified

in their interrogatory responses, is sufficient to shift the

burden to Defendants to produce "specific evidence, through

affidavits or admissible discovery material, to show that the

dispute exists."  Bhan, 929 F.2d at 1409.  For six of their

asserted procompetitive justifications, Defendants have not

attempted to meet this burden at all, only quoting their

interrogatory response identifying those justifications in a

footnote but producing no evidence to support them.[7]  See Defs.

_____

[7] Except to the extent that they are included in the
interrogatory response, Defendants do not request that the Court
reconsider the procompetitive justifications of increased output
and competitive balance rejected in O'Bannon.  See 7 F. Supp. 3d
at 978-79, 981-82.  The O'Bannon defendants did not substantively
defend the rejected procompetitive justifications on appeal,
802 F.3d at 1072, and Defendants here do not proffer any evidence
to support them.

United States District Court
Northern District of California

1  Opp. to Pls. MSJ at 50 n.27.  Accordingly, the Court will grant

2  summary judgment on these six procompetitive justifications.

3      Defendants do attempt to meet their burden on one

4  procompetitive justification, specifically, their contention

5  that:

6      The challenged rules serve the procompetitive goals of
       expanding output in the college education market and
7      improving the quality of the collegiate experience for
       student-athletes, other students, and alumni by
8      maintaining the unique heritage and traditions of
       college athletics and preserving amateurism as a
9      foundational principle, thereby distinguishing amateur
       college athletics from professional sports, allowing
10     the former to exist as a distinct form of athletic
       rivalry and as an essential component of a
11     comprehensive college education.

12  Defs. Ex. 8 (NCAA Amended Responses to Pls. Second Set of

13  Interrogatories) at 11.  This proffered justification does not

14  coincide with the justification relating to expanding output that

15  the Court rejected in O'Bannon.  In that case, the defendants

16  argued that the NCAA's rules enable it to increase the number of

17  opportunities available for participation in FBS football and

18  Division I basketball, increasing the number of games that can be

19  played.  7 F. Supp. 3d at 981.  Rather, this purportedly new

20  justification seems largely to overlap with Defendants' two

21  remaining O'Bannon justifications of integrating academics with

22  athletics ("improving the quality of the collegiate experience

23  for student-athletes") and preserving the popularity of college

24  sports ("distinguishing amateur college athletics from

25  professional sports").  Defs. Ex. 8 (NCAA Amended Responses to

26  Pls. Second Set of Interrogatories) at 11.

27      In advancing this purportedly new and separate

28  procompetitive justification, Defendants rely solely on the

24

testimony of two expert witnesses, their expert Dr. Elzinga and
Plaintiffs' expert Dr. Edward P. Lazear.  Dr. Elzinga's report
focuses on issues relating to the relevant market.  Elzinga Rep.
at 4-10.  In that context, he explains his theory that, because
the relevant market is properly viewed as a multi-sided market
for higher education, colleges must price participation in
activities, including athletics, to provide an "optimal balance"
for different constituents.  Id. at 35; see also id. at 9, 27-29,
32-33.  Defendants contend that this view is supported by Dr.
Lazear's testimony that the demand in the relevant college
education market is derived from "some higher-level market, which
might include alums, it might include viewers, it might include
other students," who are direct participants in the market.
Lazear Depo. at 217:19-218:24.  Assuming the admissibility of
these experts' testimony, taking it as true and drawing all
reasonable inferences in favor of Defendants, however, it does
not constitute evidence of a new or different procompetitive
justification.  Dr. Elzinga did not purport to opine on the
impact of the challenged restraints on output or examine data
that might support any such opinion.  Elzinga Depo. at 29:14-
30:18.  Defendants' attempt to characterize Dr. Elzinga's
opinions as supporting a procompetitive justification he did not
directly consider is insufficient to raise a genuine issue of
material fact, and the Court will grant summary judgment on this
proposed procompetitive justification as well.

    C.   Less Restrictive Alternatives

    The final step in the rule-of-reason analysis is whether
Plaintiffs can "make a strong evidentiary showing" that any

legitimate objectives can be achieved in a substantially less restrictive manner. O'Bannon, 802 F.3d at 1074. Plaintiffs do not move for summary judgment on this issue, but seek to prove at trial their contention that the NCAA's rules are "patently and inexplicably stricter than is necessary to accomplish" the NCAA's procompetitive objectives. O'Bannon, 802 F.3d at 1075. Defendants, on the other hand, move for summary judgment that all less restrictive alternatives proposed in this case are foreclosed by O'Bannon. The Court finds that because Plaintiffs challenge different rules and propose different alternatives from those considered in O'Bannon, the Court is not precluded from considering this factor.

To be viable, an alternative "must be 'virtually as effective' in serving the procompetitive purposes of the NCAA's current rules, and 'without significantly increased cost.'" Id. at 1074 (quoting Cnty. Of Tuolumne v. Sonora Cmty. Hosp., 236 F.3d 1148, 1159 (9th Cir. 2001)). In addition, any less restrictive alternatives "should either be based on actual experience in analogous situations elsewhere or else be fairly obvious." Phillip E. Areeda & Herbert Hovenkamp, Antitrust Law ¶ 1913b (3d ed. 2006). In considering Plaintiffs' showing, the Court will afford the NCAA "ample latitude" to superintend college athletics. O'Bannon, 802 F.3d at 1074 (quoting Bd. of Regents, 468 U.S. at 120). The Court will not "use antitrust law to make marginal adjustments to broadly reasonable market restraints." Id. at 1075.

As discussed, Plaintiffs in this case do not challenge restrictions on distribution of licensing revenue derived from

26

United States District Court
Northern District of California

1  NILs, as was the case in O'Bannon.  Rather, they challenge NCAA

2  rules relating to the benefits that schools may offer student-

3  athletes to compete for their recruitment.  The less restrictive

4  alternatives that they propose in this case are different from

5  those reviewed in O'Bannon.  As the Ninth Circuit explained, to

6  "say that the NCAA's amateurism rules are procompetitive, as

7  Board of Regents did, is not to say that they are automatically

8  lawful; a restraint that serves a procompetitive purpose can

9  still be invalid under the Rule of Reason if a substantially less

10 restrictive rule would further the same objectives equally well."

11 O'Bannon, 802 F.3d at 1063-64 (citing Bd. of Regents, 468 U.S. at

12 101 n.23); see also id. at 1063 ("we are not bound by Board of

13 Regents to conclude that every NCAA rule that somehow relates to

14 amateurism is automatically valid").

15     The first less restrictive alternative that Plaintiffs

16 propose is allowing the Division I conferences, rather than the

17 NCAA, to set the rules regulating education and athletic

18 participation expenses that the member institutions may provide.

19 Plaintiffs argue that this alternative would be substantially

20 less restrictive because it would allow conferences to compete to

21 implement rules that attract student-athletes while still

22 maintaining the popularity of college sports and balancing the

23 integration of academics and athletics.  They contend that none

24 of the conferences has market power and, thus, their rule-making

25 would not be subject to an antitrust challenge.[8]

26

27      [8] Defendants argue that Plaintiffs' proposed less restrictive
    alternative of conference autonomy is inconsistent with
28  Plaintiffs' challenge to conference-specific rules.  See Pls.
    MSJ, App'x A (listing challenged rules).  However, Plaintiffs

27

United States District Court
Northern District of California

1    Plaintiffs contend that their proposed conference-autonomy

2   system is based on actual experience in a closely analogous

3   context.  It could "operate like the college athletic system

4   during the first half of the 20th Century, when each conference

5   had its own compensation rules."  Roger Noll Rep. at 30.  To

6   support their argument that such autonomy is viable as a less

7   restrictive alternative to NCAA regulations, Plaintiffs have

8   identified new NCAA Bylaws, adopted on August 7, 2014 (after the

9   O'Bannon trial), that grant the Power Five Conferences autonomy

10   to adopt or amend rules on a variety of topics.  See Defs. Ex. 1

11   at 27-28 (Bylaw 5.3.2.1).  The Bylaws now grant autonomy to the

12   Power Five Conferences to legislate, for example, regarding "a

13   student-athlete's individual limit on athletically related

14   financial aid, terms and conditions of awarding institutional

15   financial aid, and the eligibility of former student-athletes to

16   receive undergraduate financial aid"; pre-enrollment expenses and

17   support; student-athletes securing loans to purchase loss-of-

18   value and disability insurance; and awards, benefits and expenses

19   for student-athletes and their family and friends.  Id.; see also

20   Daniel A. Rascher Rep. at 12-13 & n.21, 172-182 (discussing

21   proposed less restrictive alternatives).  The existence of these

22   exceptions for the Power Five Conferences constitutes evidence

23   sufficient to raise a factual question that allowing relevant

24   areas of autonomy for all Division I conferences would be a less

25   restrictive alternative to current NCAA rules.

26

27   _____

28   challenge only the portions of the conference rules that require
compliance with challenged NCAA rules.  See Pls. Reply, App'x A
(listing challenged language of each rule).

United States District Court
Northern District of California

1    Defendants argue that this proposal was considered and

2    rejected in O'Bannon.  The record in O'Bannon, however, does not

3    support their contention.  One of the plaintiffs' expert

4    witnesses, Dr. Noll, testified briefly in O'Bannon about the

5    alternative of allowing the individual conferences to set the

6    rules.  O'Bannon Tr. at 445:11-451:5.  In closing argument, there

7    was discussion of whether an injunction should allow conference-

8    level decision-making on the topics of the challenged NCAA

9    restraints.  Id. at 3382:19-3383:2.  Ultimately, however, the

10   plaintiffs proposed to the Court only the three less restrictive

11   alternatives, listed above, that were addressed in the Court's

12   August 8, 2014 Findings of Fact and Conclusions of Law.  See

13   O'Bannon Plaintiffs' Opening Post-Trial Brief at 25 (No. 09-cv-

14   03329-CW, Dkt. No. 275); O'Bannon Plaintiffs' Post-Trial Reply

15   Brief at 14-15 (No. 09-cv-03329-CW, Dkt. No. 281).  The O'Bannon

16   plaintiffs proposed language for an injunction, asking the Court

17   to enjoin the member institutions and conferences along with the

18   NCAA.  O'Bannon Plaintiffs' Proposed Order Granting Injunctive

19   Relief (No. 09-cv-03329-CW, Dkt. No. 193-1); O'Bannon Plaintiffs'

20   Alternative Proposed Form of Injunction (No. 09-cv-03329-CW, Dkt.

21   No. 252).  The permanent injunction entered by the Court enjoined

22   the NCAA's member schools and conferences as well as the NCAA

23   itself.  O'Bannon Permanent Injunction (No. 09-cv-03329-CW, Dkt.

24   No. 292).  In O'Bannon, this Court did not rule on the less

25   restrictive alternative of conference autonomy.  No rule of law

26   established in that case, or any other, precludes the Court from

27   considering conference autonomy as a less restrictive alternative

28   in this case.  "A hypothetical that is unnecessary in any sense

United States District Court
Northern District of California

1  to the resolution of the case, and is determined only tentatively

2  . . . does not make precedential law." Alcoa, 698 F.3d at 804

3  n.4; see also Osborne, 76 F.3d at 309 ("the doctrine of stare

4  decisis concerns the holdings of previous cases, not the

5  rationales"). A hypothetical that is not determined at all, such

6  as the question of conference autonomy in O'Bannon, is not

7  binding under the doctrine of stare decisis.

8       Plaintiffs propose a second less restrictive alternative,

9  requesting that the Court enjoin all national rules that prohibit

10 or limit any payments or non-cash benefits that are tethered to

11 educational expenses, or any payments or benefits that are

12 incidental to athletic participation. See Rascher Rep. at 173-

13 177. Their position is that because Defendants already permit

14 some payments and benefits in these two categories above the cost

15 of attendance, it would be virtually as effective in serving the

16 NCAA's procompetitive purposes to require the NCAA to allow all

17 benefits in either category. Plaintiffs contend that this

18 alternative could be applied with or without conference autonomy

19 because abolishing the NCAA restraints would be a less

20 restrictive alternative to the current system regardless of

21 whether conference rules were permitted as a replacement.

22      In support of this contention, Plaintiffs first identify

23 evidence that Defendants already allow schools to offer some

24 benefits above the cost of attendance that are related to

25 athletic participation but not tethered to education. See, e.g.,

26 Noll Rep. at 17-18 (discussing categories of benefits); NCAA

27 (Lennon) Depo. at 58:20-59:16 (same). For example, schools can

28 pay the expenses for an athlete's spouse and children to attend a

playoff game, because such expenses are incidental to athletic
participation, but not the expenses of parents, grandparents, or
siblings.  NCAA (Lennon) Depo. at 186:1-16; see also id. at
86:17-87:13 (schools may reimburse students' national
championship, Olympic trials and national team tryout costs).

Plaintiffs contend that Defendants have conceded that the
payment of currently-allowed benefits above the cost of
attendance but tethered to education or incidental to athletic
participation does not undermine their procompetitive purposes.
The NCAA's Rule 30(b)(6) witness Kevin C. Lennon testified
extensively on this topic.  Id. at 63:21-64:1 (expenses
incidental to athletic participation can be paid for athletes
without offending collegiate model); 71:23-73:2 (NCAA
membership's decision to pay expenses incidental to athletic
participation does not violate principle of amateurism); 85:5-23
(per diem during trips does not violate principle of amateurism);
93:4-10 ("If the--the benefit provided is permitted within the
legislation as either related to educational expenses or--or
incidental to participation, then it would be not considered pay,
and it would be permitted to be received."); 186:1-16 (schools'
payment of costs for athlete's spouse and children to attend
playoff game does not implicate principle of amateurism); 287:6-
19 (NCAA membership is comfortable with "two buckets" of
expenses, those tethered to education and those incidental to
athletics participation).  Plaintiffs also cite the conclusion of
their survey expert Hal Poret that there would be no negative
impact on consumer demand for college football and basketball if
various forms of additional benefits were provided to student-

31

United States District Court
Northern District of California

1 athletes.  Poret Rep. at 19-21.

2       Defendants respond that Plaintiffs' suggestion cannot be

3 squared with O'Bannon's holding that limiting payments to

4 Plaintiffs' legitimate costs to attend school is consistent with

5 antitrust law.  See 802 F.3d at 1075 ("student-athletes remain

6 amateurs as long as any money paid to them goes to cover

7 legitimate educational expenses.").  In O'Bannon, the Ninth

8 Circuit concluded, "The Rule of Reason requires that the NCAA

9 permit its schools to provide up to the cost of attendance to

10 their student-athletes.  It does not require more."  802 F.3d at

11 1079.  Defendants' position is that this means that stare decisis

12 limits the less restrictive alternatives that the Court may

13 consider in this case to the relief that was provided in

14 O'Bannon.  They argue that Plaintiffs' proposed less restrictive

15 alternatives are no more than new arguments in support of the

16 same challenge already adjudicated in O'Bannon.  Relying on a

17 district court case, they argue that stare decisis "would be

18 largely meaningless if a lower court could change an appellate

19 court's interpretation of the law based only on a new argument."

20 Rambus Inc. v. Hynix Semiconductor Inc., 569 F. Supp. 2d 946, 972

21 (N.D. Cal. 2008).

22       In Rambus, however, the district court held that the

23 doctrine of stare decisis bound it to follow the Federal

24 Circuit's previous construction of the same term at issue,

25 "integrated circuit device."  Id. at 963, 972 (citing Rambus Inc.

26 v. Infineon Techs. AG, 318 F.3d 1081, 1089-95 (Fed. Cir. 2003).

27 The question for the court to decide was the same; only the

28 arguments in support of the issue had changed.  Here, in

United States District Court
Northern District of California

contrast, the Court is presented with the new and unresolved issue of whether Plaintiffs have identified different less restrictive alternatives to all of the NCAA's rules that prohibit schools from competing to recruit student-athletes with offers of cash or various benefits tethered to educational expenses or incidental to athletic participation, including rules that have changed after O'Bannon.

As the Ninth Circuit explained in O'Bannon, "NCAA regulations are subject to antitrust scrutiny and must be tested in the crucible of the Rule of Reason." Id. at 1079. A ruling on less restrictive alternatives to certain NCAA rules in one case does not bar consideration of different less restrictive alternatives to a different, if overlapping, set of rules challenged in a different case. The Supreme Court suggested in Board of Regents that the NCAA's purpose of marketing "a particular band of football--college football" could be a procompetitive justification for rules designed to preserve the "character and quality" of this product, including compensation limitations. 468 U.S. at 101-02. This did not mean, however, that the rules challenged in O'Bannon were exempt from antitrust scrutiny, because "a restraint that serves a procompetitive purpose can still be invalid under the Rule of Reason if a substantially less restrictive rule would further the same objectives equally well." O'Bannon, 802 F.3d at 1063-64; see also Nat'l Basketball Ass'n v. SDC Basketball Club, Inc., 815 F.2d 562, 564, 567-68 (9th Cir. 1987) (prior decisions on similar franchise relocation rule in football context did not bar fact-specific rule-of-reason analysis in subsequent challenge in

United States District Court
Northern District of California

basketball context).  Likewise, here, the NCAA's revised rules and Plaintiffs' proposed less restrictive alternatives to those rules are "separate and distinct in a meaningful way for the purposes of the Sherman Act" from those presented in O'Bannon. Miranda, 860 F.3d at 1242.

To be clear, if Defendants prevail in demonstrating the same procompetitive justifications that the Court found in O'Bannon, the NCAA will still be able to prohibit its member schools from paying their student-athletes cash sums unrelated to educational expenses or athletic participation.  O'Bannon, 802 F.3d at 1078-79.  Under such circumstances, the Court will not consider any proposed less restrictive alternative by which Plaintiffs seek payment untethered to one of these two categories.

Plaintiffs have proffered evidence supporting two possible less restrictive alternatives not previously presented for decision or ruled upon, raising a genuine issue of material fact as to whether they can meet their evidentiary burden to show that such alternatives would be virtually as effective as the challenged restraints in advancing Defendants' procompetitive objectives.  They do not seek summary judgment in their favor on this factor.  Defendants have failed to show that these proposed less restrictive alternatives are foreclosed by O'Bannon. Accordingly, the Court will deny summary judgment on the question of less restrictive alternatives.

CONCLUSION

For the reasons set forth above, Plaintiffs' motion for summary judgment (Docket No. 657 in Case No. 14-md-02541 and Docket No. 301 in Case No. 14-cv-02758) is GRANTED IN PART AND

1  DENIED IN PART.  Defendants' cross-motion for summary judgment

2  (Docket No. 704 in Case No. 14-md-02541 and Docket No. 327 in

3  Case No. 14-cv-02758) is GRANTED IN PART AND DENIED IN PART.

4       1.   The Court holds that neither res judicata nor

5  collateral estoppel bars Plaintiffs' claims, and denies

6  Defendants' summary judgment motion on this point.

7       2.   The Court grants both parties' summary judgment motions

8  to find that Plaintiffs have met their initial burden of showing

9  that Defendants' challenged restraints are agreements that

10  produce significant anticompetitive effects, affecting interstate

11  commerce, within the same relevant market as that in O'Bannon.

12       3.   The Court denies Defendants' summary judgment motion,

13  under the doctrine of stare decisis, to hold that the same two

14  procompetitive benefits of Defendants' restraints found in

15  O'Bannon apply in this case as a matter of law.  The Court denies

16  Plaintiffs' motion for summary adjudication that the

17  procompetitive justifications found in O'Bannon do not apply, but

18  grants Plaintiffs' motion for summary judgment regarding

19  Defendants' other proffered procompetitive justifications.

20       4.   The Court denies Defendants' motion for summary

21  judgment that O'Bannon precludes consideration of the two less

22  restrictive alternatives that Plaintiffs propose in this case.

23       The Court DENIES Defendants' Motion for Supplemental

24  Briefing (Docket No. 797) and Plaintiffs' Motion to File

25  Supplemental Evidence for the Summary Judgment Record (Docket No.

26  800).  The Court does not rule on whether Plaintiffs' proposed

27  supplemental evidence will be admissible at trial.

28       A final pretrial conference will be held at 2:30 p.m. on

United States District Court
Northern District of California

Tuesday, November 13, 2018 and a bench trial of no longer than ten days will commence at 8:30 a.m. on Monday, December 3, 2018. The parties shall comply with the Court's standing order for pretrial preparation.  Direct expert testimony shall be presented in writing, with cross-examination and re-direct to take place in Court.  The parties shall limit percipient witness testimony to that which is essential, attempt to reach stipulations regarding potentially cumulative evidence and focus their cases only on the issues remaining for trial.

IT IS SO ORDERED.

Dated: March 28, 2018

CLAUDIA WILKEN
United States District Judge

United States District Court
Northern District of California