Steve W. Berman (*Pro hac vice*)
Craig R. Spiegel (SBN 122000)
HAGENS BERMAN SOBOL SHAPIRO LLP
1918 Eighth Avenue, Suite 3300
Seattle, WA 98101
Telephone: (206) 623-7292
Facsimile:  (206) 623-0594
*steve@hbsslaw.com*
*craig@hbsslaw.com*

Bruce L. Simon (SBN 96241)
Benjamin E. Shiftan (SBN 265767)
PEARSON, SIMON & WARSHAW, LLP
44 Montgomery Street, Suite 2450
San Francisco, CA 94104
Telephone:  (415) 433-9000
Facsimile:  (415) 433-9008
*bsimon@pswlaw.com*
*bshiftan@pswlaw.com*

*Class Counsel for Jenkins and Consolidated Action Plaintiffs*

[Additional counsel listed on signature page]

Jeffrey L. Kessler (*Pro hac vice*)
David G. Feher (*Pro hac vice*)
David L. Greenspan (*Pro hac vice*)
Jennifer M. Stewart (*Pro hac vice*)
Joseph A. Litman (*Pro hac vice*)
WINSTON & STRAWN LLP
200 Park Avenue
New York, NY 10166-4193
Telephone: (212) 294-6700
Facsimile: (212) 294-4700
*jkessler@winston.com*
*dfeher@winston.com*
*dgreenspan@winston.com*
*jstewart@winston.com*
*jlitman@winston.com*

Sean D. Meenan (SBN 260466)
Jeanifer E. Parsigian (SBN 289001)
WINSTON & STRAWN LLP
101 California Street
San Francisco, CA 94111
Telephone: (415) 591-1000
Facsimile: (415) 591-1400
*smeenan@winston.com*
*jparsigian@winston.com*

*Class Counsel for Jenkins and Consolidated Action Plaintiffs*

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

OAKLAND DIVISION

| | |
|---|---|
| IN RE: NATIONAL COLLEGIATE ATHLETIC ASSOCIATION ATHLETIC GRANT-IN-AID CAP ANTITRUST LITIGATION | Case No. 4:14-md-02541-CW<br>Case No. 4:14-cv-02758-CW<br><br>**REPLY OF CONSOLIDATED PLAINTIFFS AND *JENKINS* PLAINTIFFS IN SUPPORT OF MOTIONS TO EXCLUDE PROPOSED TESTIMONY OF DR. KENNETH G. ELZINGA AND DR. JAMES J. HECKMAN** |
| This Document Relates to:<br><br>ALL ACTIONS | Date:  January 16, 2018<br>Time:  2:30 p.m.<br>Dept:  Courtroom 2, 4th Floor<br>Judge: Hon. Claudia Wilken<br>Complaint Filed:  March 5, 2014 |

1

**TABLE OF CONTENTS**

**Page**

I.   DR. ELZINGA'S TESTIMONY SHOULD BE EXCLUDED...............................................1

    A.   Dr. Elzinga's proposed multi-sided platform contradicts
         *O'Bannon.* ...............................................................................................2

    B.   Dr. Elzinga does not use any methodology to define his proposed
         relevant market, let alone a methodology that has been accepted by
         courts. ...................................................................................................5

II.  THE COURT SHOULD EXCLUDE THE TESTIMONY OF DR.
     HECKMAN .................................................................................................13

    A.   Defendants do not address the fact that this court already has found
         Dr. Heckman's opinions on these same issues to be irrelevant.................................14

    B.   Dr. Heckman's econometric opinions are not reliable. ...............................................16

         1.   Dr. Heckman's regressions fail to account for the amount
              of athletic scholarship that athletes receive. ...................................17

         2.   Dr. Heckman's stale data is demonstrably unable to show
              benefits ten years later. ...................................................18

         3.   Dr. Heckman is incapable of opining that the surveyed
              individuals even played the sports in question. ...........................19

         4.   Dr. Heckman did not take precautions to exclude club
              sports athletes from the ELS data.................................................20

    C.   Dr. Heckman's new opinions in the reply report were not disclosed
         in his opening report, and therefore should be stricken.............................................21

    D.   Even if the Court were to entertain Dr. Heckman's new opinions in
         his reply report, Defendants do not dispute that they are entirely
         speculative. ...............................................................................................23

III. CONCLUSION ...............................................................................................24

# TABLE OF AUTHORITIES

**Page(s)**

## CASES

*Advanced Telemedia, L.L.C. v. Charter Commc'ns, Inc.*,
  2008 WL 6808442 (N.D. Ga. July 17, 2008) ................................................... 23

*AFMC LLC v. UPS Co.*,
  2014 WL 12515335 (C.D. Cal. Feb. 5, 2014) ..................................................... 9

*Aviva Sports, Inc. v. Fingerhut Direct Mktg., Inc.*,
  829 F. Supp. 2d 802 (D. Minn. 2011) ....................................................... 10, 23

*Bazemore v. Friday*,
  478 U.S. 385 (1986) .................................................................................. 17

*Braswell v. Shoreline Fire Dep't*,
  2011 WL 4712124 (W.D. Wash. Oct. 5, 2011) ................................................ 11

*Daubert v. Merrell Dow Pharm., Inc.*,
  509 U.S. 579 (1993) .................................................................................. 23

*Daubert v. Merrell Dow Pharms., Inc.*,
  43 F.3d 1311 (9th Cir. 1995) ............................................................... *passim*

*EEOC v. Texas Roadhouse, Inc.*,
  215 F. Supp. 3d 140 (D. Mass. 2016) ............................................................. 11

*Gbarabe v. Chevron Corp.*, No. 14-CV-00173-SI,
  2017 WL 956628 (N.D. Cal. Mar. 13, 2017 ..................................................... 24

*Gen. Elec. Co. v. Joiner*,
  522 U.S. 136 (1997) .................................................................................. 19

*In re Graphics Processing Units Antitrust Litig.*,
  253 F.R.D. 478 (N.D. Cal. 2008) ................................................................... 22

*In re High-Tech Empl. Antitrust Litig.*,
  2014 WL 1351040 (N.D. Cal. Apr. 4, 2014) ..................................................... 22

*Lawson v. Trowbridge*,
  153 F.3d 368 (7th Cir. 1998) ........................................................................ 12

*In re Live Concert Antitrust Litig.*,
  863 F. Supp. 2d 966 (C.D. Cal. 2012) ............................................................ 17

*Nationwide Mut. Fire Ins. v. Sunbeam Prods.*,
  2014 WL 3875844 (S.D.N.Y. July 17, 2014) ................................................... 12

*Newcal Indus., Inc. v. Ikon Office Solution*,
   513 F.3d 1038 (9th Cir. 2008) .................................................................. 12

*O'Bannon v. Nat'l Collegiate Athletic Ass'n*,
   7 F. Supp. 3d 955 (N.D. Cal. 2014) ...................................................... *passim*

*Obrey v. Johnson*,
   400 F.3d 691 (9th Cir. 2005) .................................................................. 16

*Pedroza v. PetSmart, Inc.*,
   2013 WL 1490667 (C.D. Cal. Jan. 28, 2013) ......................................... 20

*Primiano v. Cook*,
   598 F.3d 558 (9th Cir. 2010) .................................................................. 11

*In re REMEC Inc. Sec. Litig.*,
   702 F. Supp. 2d 1202 (S.D. Cal. 2010) ................................................. 17

*Tanaka v. Univ. of S. Cal.*,
   252 F.3d 1059 (9th Cir. 2001) .................................................................. 2

*In re Toyota Motor Corp. Hybrid Brake Mktg., Sales Practices & Prods. Liab. Litig.*,
   2012 WL 4904412 (C.D. Cal. Sept. 20, 2012) ....................................... 10

*U.S. Telecomm. Ass'n v. FCC*,
   825 F.3d 674 (D.C. Cir. 2016) .................................................................. 9

*United States v. Am. Express Co.*,
   21 F. Supp. 3d 187 (E.D.N.Y. 2014) ......................................................... 9

*United States v. Am. Express Co.*,
   838 F.3d 179 (2d Cir. 2016) ...................................................................... 7

*United States v. Williams*,
   2017 WL 3498694 (N.D. Cal. Aug. 15, 2017) .......................................... 9

*US Airways, Inc. v. Sabre Holdings Corp.*,
   2017 WL 1064709 (S.D.N.Y. Mar. 21, 2017) ........................................... 8

*Van Alfen v. Toyota Motor Sales, U.S.A., Inc.*,
   2012 WL 12930456 (C.D. Cal. Nov. 9, 2012) ......................................... 22

*Vollrath Co. v. Sammi Corp.*,
   9 F.3d 1455 (9th Cir. 1993) ...................................................................... 9

*Windham v. Circuit City Stores, Inc.*,
   420 F. Supp. 2d 1206 (D. Kan. 2006) ..................................................... 12

1

## STATUTES

2

Antitrust Law ABA Section ..................................................................................................... 8

3

## OTHER AUTHORITIES

4

David S. Evans & Richard Schmalensee, *The Industrial Organization of Markets*

5

    *with Two-Sided Platforms* ....................................................................................................... 9

6

Fed. R. Evid. 702 ........................................................................................................... 2, 20, 24

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## I.       DR. ELZINGA'S TESTIMONY SHOULD BE EXCLUDED

Defendants' opposition confirms that Dr. Elzinga does not apply any actual methodology (let alone a testable one) to define a relevant market. Defendants state that Dr. Elzinga's "application of multi-sided platform analysis provides a ***framework*** for explaining features of the college education market that the courts recognized in *O'Bannon*, and that both sides' experts in this case acknowledge."[1] But a framework does not establish and apply a methodology, any more than an architect's drawings, standing alone, provide a shelter for a family. Dr. Elzinga's "framework" never attempts to actually demonstrate the restraint's impact on supply and demand in any market or assess whether any products or services are interchangeable to define the boundaries of any relevant market. Instead, Dr. Elzinga did a "sketch of both, universities as a platform and a conference as a platform," and testified, "I think both are helpful as heuristic devices for thinking about the issues in this case."[2] But using these "heuristic devices" is simply an *ipse dixit* thought exercise – as exemplified by his testimony that "[h]euristically, one might think of [the market] as a conference, one might think of it as all of the NCAA."[3]

And Dr. Elzinga admits that his opinions are only making "conceptual point(s)," instead of applying a peer-reviewed methodology to data. For example, he testified that "[f]or my purposes of analysis, I'm not trying to cabin or limit [the platform] to a particular organization. I'm trying to make a conceptual point that when it comes to analyzing the issues in this case, I find the multi-sided platform a useful analytical lens to use."[4] As shown in Plaintiffs' opening brief and below, such a "conceptual" and "heuristic" "framework" is neither consistent with *O'Bannon* nor based on any accepted expert methodology for defining a relevant market. In short, thinking about "analytical lenses" is not equivalent to reliably applying accepted economic methodologies to the facts and data

---

[1] Reply in Support of Defendants' Motion for Summary Judgment, Reply in Support of Defendants' Motions to Exclude Expert Testimony, and Opposition to Plaintiffs' Motions to Exclude Expert Testimony ("Def. Mem."), Dec. 8, 2017, ECF No. 748, at 37 (emphasis added).

[2] Berman Decl., Ex. 2 (Elzinga dep. tr.), at 280:2-3. "Berman Decl." refers to the Declaration of Steve W. Berman in Support of Motion of Consolidated Plaintiffs and *Jenkins* Plaintiffs to Exclude Proposed Testimony of Dr. Kenneth G. Elzinga (submitted under seal Aug. 11, 2017, ECF No. 654).

[3] *Id*. at 284:4-6.

[4] *Id*. at 284:7-12.

1   in this case. The latter is admissible expert testimony; the former, offered by Dr. Elzinga, must be

2   stricken under Rule 702 and *Daubert*.

3   **A.      Dr. Elzinga's proposed multi-sided platform contradicts *O'Bannon*.**

4           Defendants erroneously contend that Dr. Elzinga's purported multi-sided platform "is

5   consistent with several holdings of *O'Bannon* regarding the college education market. . . ."[5] In

6   *O'Bannon v. NCAA*,[6] this Court defined the relevant market as a college education market in which

7   "FBS football and Division I basketball schools compete to recruit the best high school football and

8   basketball players." In contrast to the boundaries of the market in *O'Bannon*, Dr. Elzinga defines an

9   amorphous "multi-sided market for college education in the United States"[7] that includes (at a

10  minimum) public fans of the university's athletic teams; broadcasters; broadcasters' advertisers;

11  chemistry, economics, and drama departments; the marching band in some universities; and the

12  college's library.[8] Dr. Elzinga offers an observation about a proposed multi-sided market without

13  any testing of the cross-elasticity of demand across any of these constituencies—to actually define

14  the boundaries of a relevant market, as required by hornbook antitrust law. As the Ninth Circuit has

15  explained, an antitrust "product market includes the pool of goods or services that enjoy reasonable

16  interchangeability of use and cross-elasticity of demand."[9]

17          In a failed attempt to show that Dr. Elzinga's use of a "heuristic," "conceptual" multi-sided

18  market for college education is consistent with *O'Bannon*, Defendants mischaracterize this Court's

19  *O'Bannon* decision when they assert that "this Court defined the relevant market as the 'college

20  education market,' which included both '*educational* and athletic opportunities' for student athletes.

21  7 F. Supp. 3d at 986-87 (emphasis added)."[10] In fact, this Court did not define the relevant market as

22  the "college education market." This Court used the phrase "college education market" in order to

23          [5] Def. Mem. at 37.

24          [6] *O'Bannon v. Nat'l Collegiate Athletic Ass'n*, 7 F. Supp. 3d 955, 965 (N.D. Cal. 2014), *rev'd in part on other grounds*, 802 F.3d 1049 (9th Cir. 2015) (alteration in original).

25          [7] Berman Decl., Ex. 1 at 26.

26          [8] *Id*. at 28 n.87; Ex. 2 at 43:1-9 and 46:1-8.

27          [9] *Tanaka v. Univ. of S. Cal*., 252 F.3d 1059, 1063 (9th Cir. 2001) (citation and internal quotation marks omitted).

28          [10] Def. Mem. at 37.

1    distinguish payments to collegiate student-athletes from payments to professional athletes, not to

2    hold or even suggest that an amorphous "college education market" is a relevant market. After

3    further analyzing the *evidence*—not heuristic devices or frameworks—this Court found that "there

4    are no professional football or basketball leagues capable of supplying a substitute for the bundle of

5    goods and services that FBS football and Division I basketball schools provide. ***These schools***

6    ***comprise a relevant college education market*. . . ."[11] Plainly, this Court defined the relevant market

7    as it related to college athletics and the schools for whom the athletes provided their services.

8    Nowhere did the Court define the relevant market to comprise all aspects of the type of multi-sided

9    college education market advocated by Dr. Elzinga, which includes marching bands, the chemistry

10   department, and public fans, among many others. The Court used the phrase "college education

11   market" to limit the market to "the bundle of goods and services that FBS football and Division I

12   basketball schools provide." Indeed, the Court adopted the market as defined by the plaintiffs'

13   experts in *O'Bannon*, and those experts made it clear *with evidence* that the market was defined by

14   the competition for athletes among schools, to the exclusion of schools in other divisions, collegiate

15   athletics associations, or minor and foreign professional sports leagues.[12]

16        And the Ninth Circuit affirmed this Court's finding as to the relevant market. The Ninth

17   Circuit explained that this Court "found that there is a 'college education market' in which FBS

18   football and Division I basketball schools compete to recruit the best high school players by offering

19   them 'unique bundles of goods and services' that include not only scholarships but also coaching,

20   athletic facilities, and the opportunity to face high-quality athletic competition."[13] The Court then

---

[11] *O'Bannon*, 7 F. Supp. 3d at 968 (emphasis added).

[12] As this Court explained, plaintiffs' expert Dr. Roger Noll provided *evidence*, not his *ipse dixit*, to define the market. *See, e.g.*, *O'Bannon*, 7 F. Supp. 3d at 966 ("Plaintiffs' economic expert, Dr. Roger Noll, examined the rates at which elite football and basketball recruits accept athletic scholarships to play FBS football or Division I basketball. He observed that, between 2007 and 2011, more than ninety-eight percent of football recruits classified as four- or five-star recruits (the two highest ratings available) by Rivals.com accepted offers to play FBS football. Trial Tr. 113:2-114:13; Ex. 2529. None of the five-star recruits and only 0.2% of four-star recruits chose to play football at an FCS school and none chose to play at a Division II or III school during that period. Ex. 2529. Among three-star recruits, ninety-two percent of those offered a scholarship from an FBS school accepted one. *Id*. Less than four percent of all three-star recruits accepted an offer to play football at a non-FBS school. *Id*.").

[13] 802 F.3d at 1056.

explained that the NCAA "does not take issue with the way that the district court defined the college education market."[14] And the Ninth Circuit reconfirmed that regardless of whether the school or the athlete is looked at as a buyer or seller of services, the market is for the services exchanged between the school and the athlete—not some other market participants such as fans, faculty members, band members or alumni. The Ninth Circuit explained that "the district court alternatively characterized student-athletes as buyers of educational services from a cartel rather than sellers of labor to a monopsony. This different way of describing the college education market did not alter either the district court's analysis of how the market functioned or its assessment that student-athletes are harmed by the NCAA's compensation rules."[15] The "college education market" found in *O'Bannon* plainly was limited to the bundle of goods and services exchanged by schools with FBS football players and Division I basketball players in competing for their services as athletes, and did not involve any other, multi-sided platform participants in the market.

And contrary to Defendants' assertion, the discussion of procompetitive effects in *O'Bannon* does not turn Dr. Elzinga's unsupported and amorphous multi-sided platform into a reliable and admissible market definition. Defendants point to statements in *O'Bannon* that "'the amateur nature of collegiate sports increases their appeal to consumers'"[16] and that "the challenged restraints also had the procompetitive benefit of integrating academics and athletics."[17] But neither of those findings remotely suggests that the relevant market includes every conceivable "side" of a multi-sided "college education" platform; and Dr. Elzinga never applies a methodology to any market transactions between student-athletes and anyone other than the schools to support this "analytical lens."

Similarly, Defendants abandon any pretense of applying well-established antitrust rules for defining a relevant market by asserting that Dr. Elzinga's heuristic device "enables consideration of how the price at which universities and student-athletes transact affects the interactions on yet

---

[14] *Id.* at 1070.

[15] *Id.* at 1071 n.14.

[16] Def. Mem. at 37-38 (quoting 802 F.3d at 1073).

[17] *Id.* at 38.

another side of the platform, between student-athletes and the non-university participants of the

campus community—which this Court embraced when it recognized the procompetitive justification

of integration of athletics and academics."[18] Defendants ignore the fact that while there are ***market***

***transactions*** between schools and student-athletes, Dr. Elzinga does not identify even a single

market transaction between "student-athletes and the non-university participants of the campus

community."[19] And even for those market transactions that may exist between student-athletes and

the marching band or the chemistry department or alumni, all of which are "sides" of his multi-sided

market the Court is left to guess what relationship these transactions have to the restraints in this case

and their impact on supply and demand. Dr. Elzinga does not analyze the boundaries of his market or

identify which purported competitors are competing with each other, and does not even study what

would happen to the marching band or a chemistry professor's salary at a college if a student athlete

received compensation above the cost of attendance? He does not examine any data, does not employ

any methodology; and certainly does not follow the market definition found by this Court in

*O'Bannon*.

**B.      Dr. Elzinga does not use any methodology to define his proposed relevant market, let alone a methodology that has been accepted by courts.**

Defendants do not dispute the fact that, as Dr. Elzinga testified at his deposition, no other

economist that has examined college sports has ever applied his proposed multi-platform market

definition. To the contrary, all of his peers, and all of the peer literature, have applied traditional

market definition principles to define relevant college player markets in which the NCAA members

have been viewed as a cartel.[20] Dr. Elzinga himself taught these basic economic principles in his

economics course in college.[21]

To try to justify Dr. Elzinga's radical departure from all other economists who have defined

relevant markets for college sports, Defendants erroneously argue that Plaintiffs attack Dr. Elzinga's

---

[18] *Id.* at 38.

[19] *Id.*

[20] *See* Berman Decl., Ex. 1 at 55 n.155; Ex. 2 at 16-21.

[21] *Id.*, Ex. 2 at 36:12-18.

application of a methodology, not the methodology itself.[22] Defendants assert that "multi-sided platform analysis is … a well-established methodology in both economic literature and antitrust jurisprudence."[23] But this ignores the fact that multi-platform analysis has never been applied to college sports by any court. And his opinion about the existence or non-existence of a multi-sided platform is not a methodology *at all* – it is an *ipse dixit* thought experiment that does not analyze any data and does not employ any methodology to define the boundaries of the proposed market. And just as an expert's opinion that the relevant market is a particular type of single-sided market must be based on a reliable methodology to be admissible, so must an expert opinion that the relevant market is a particular type of a two- or multi-sided market.

Dr. Elzinga applies no methodology whatsoever to support his multi-sided market opinions. He does not test any economic relationships between the purported sides of the platforms, such as price, output, or quality. Nor does he consider which market participants compete with each other, whether any products or services are interchangeable, whether there is any cross-elasticity of demand, or any other peer-reviewed accepted economic methodology for defining a relevant market in an antitrust case.

As Plaintiffs showed in their motion, every court that has addressed whether an economic platform constitutes a relevant product market in an antitrust case has applied the well-accepted methodology of determining interchangeability between products or services in assessing the relevant market, **and** has held that platform analysis only can apply where the platform includes intermediate transactions between two sides of an economic transaction.[24] For example, In *United States v. American Express Co*., the Second Circuit explained that economists "define a two-sided market as one in which a 'platform can affect the volume of transactions by charging more to one side of the market and reducing the price paid by the other side by an equal amount; in other words,

---

[22] Def. Mem. at 39-44.

[23] *Id*. at 39.

[24] Notice of Motion and Motion of Consolidated Plaintiffs and *Jenkins* Plaintiffs to Exclude Proposed Testimony of Dr. Kenneth G. Elzinga ("Elzinga Mot.") submitted under seal Aug. 11, 2017, ECF No. 654, at 14-16.

the price structure matters, and platforms must design it so as to bring both sides on board.'"[25] Defendants cite *American Express* but ignore the fact that Dr. Elzinga does not provide even a single instance of, for example, student-athletes and a marching band entering into any transaction that brings both sides on board. And he does not even try to show how his purported multi-sided platform "can affect the volume of transactions by charging more to one side of the market and reducing the price paid by the other side by an equal amount."[26] Indeed, he does not examine any price or other economic data on any side of the multi-side platform he proposes to include in his market definition.

Instead, Defendants erroneously claim that *American Express* supports their argument because "[c]ardholders are not interchangeable with merchants any more than consumers are reasonable substitutes for Division I athletes. Considering them together is important not because they are substitutes, but because they are complements who benefit from their mutual interaction with the university platform, giving rise to network externalities."[27] That argument completely distorts the actual market analysis employed in *American Express*. Cardholders and merchants enter into transactions that are intermediated by American Express, leading the Second Circuit to conclude that a two-sided market exists. But after such a market is defined, the trial court must still assess whether the services offered by that market are interchangeable with other services to define the contours of the relevant market in which to examine competitive effects.[28] Further, the *American Express* court made it clear that to assess contours of the market, it was necessary to consider whether the prices charged on one side of the platform impact the price (or supply and demand) on the other side of the platform.[29] Here by contrast, Dr. Elzinga does not identify a relevant market in

---

[25] *United States v. Am. Express Co.*, 838 F.3d 179, 185 n.3 (2d Cir. 2016), *cert. granted sub nom. Ohio v. Am. Express Co.*, No. 16-1454, 2017 WL 2444673 (Oct. 16, 2017) (quoting Jean-Charles Rochet & Jean Tirole, *Two-Sided Markets: A Progress Report*, 37 Rand J. Econ. 645, 664–65 (2006)).

[26] *Id.*

[27] Def. Mem. at 43.

[28] As the Second Circuit explained, the district court "should have considered the extent to which even a low level of merchant attrition might cause some cardholders to switch to alternative forms of payment." *Am. Express*, 838 F.3d at 200.

[29] *See, e.g.*, *id.* ("[T]he price charged to merchants necessarily affects cardholder demand, which in turn has a feedback effect on merchant demand (and thus influences the price charged to merchants).").

1   which the university intermediates transactions; nor does he analyze the supply and demand

2   relationship between different sides of his proposed platform to determine which participants offer

3   interchangeable services that impact each other's prices. Absent such an analysis, Dr. Elzinga has no

4   basis to offer an admissible opinion on any relevant market in this case, including his multi-sided

5   platform market. Indeed, Defendants fail to cite a single authority for their novel proposition that a

6   relevant market can comprise "complements who benefit from their mutual interaction with the

7   university platform, giving rise to network externalities,"[30] whatever that may mean.

8          Defendants' argument similarly is unsupported by their citation to *US Airways, Inc. v. Sabre*

9   *Holdings Corp.*, in which the court stated, "Simply put, '[a] two-sided platform provides goods or

10  services to two distinct groups of customers who need each other in some way and who rely on the

11  platform to intermediate transactions between them.' ABA Section of Antitrust Law, *Market*

12  *Definition in Antitrust: Theory and Case Studies*, 439–40 (2012)."[31] The court in *US* Airways found

13  that global distribution systems "are two-sided platforms. They provide an avenue for airlines selling

14  tickets and travel agents purchasing tickets to do business with each other." *Id*. But the court then

15  explained that the "relevant market for purposes of antitrust analysis may not be two-sided even

16  though the defendant operates a two-sided platform." *Id*. The court then held that "a reasonable jury

17  could conclude that changing the price on one side of the platform (increasing or decreasing the

18  booking fee paid by the airlines) does not change demand on the travel agent side."[32] The court thus

19  considered traditional measures of supply-and-demand interchangeability in defining the relevant

20  market.

21         Here by contrast, Dr. Elzinga does not consider any of the relevant economic evidence or

22  factors to define his proposed multi-sided market. He does not identify any transactions that schools

23  intermediate and does not analyze or even consider whether changing the price on one side of the

24  platform would change the demand on the other side *for transactions between those two sides.*

25

26      [30] Def. Mem. at 43.

27      [31] *US Airways, Inc. v. Sabre Holdings Corp.*, No. 11 Civ. 2725, 2017 WL 1064709, at *8
    (S.D.N.Y. Mar. 21, 2017).

28      [32] *Id*. at *10

1   Having failed to consider any of the relevant economic evidence or factors, he cannot offer reliable

2   opinions on the contours of any proposed multi-sided market. In similar circumstances, the Ninth

3   Circuit rejected a market definition because "[t]here was no detailed examination of market data or

4   any analysis of cost, comparable usage, or comparative features of other competing products."[33]

5          And Defendants mischaracterize Plaintiffs' argument when they incorrectly assert that the

6   opinions cited by Plaintiffs "do not support Plaintiffs' claim that constituencies must transact **_directly_**

7   with one another to mutually benefit."[34] Plaintiffs do not claim that the constituencies of a multi-

8   sided platform "must transact **_directly_** with one another" but instead that in order for a two-sided

9   platform to exist, the schools must act as intermediaries for transactions. As Defendants concede, the

10  district court in *American Express* explained that American Express sells its "services to both

11  merchants and cardmembers in order to allow these groups of customers to interact with each

12  other."[35] And in the other case cited by Defendants, *U.S. Telecomm. Ass'n v. FCC*, Judge Williams

13  simply explained that a two-sided market is "a business aiming to 'facilitate interactions between

14  members of . . . two distinct customer groups,' David S. Evans & Richard Schmalensee, *The*

15  *Industrial Organization of Markets with Two-Sided Platforms*, 3 Competition Policy International

16  151, 152 (2007)."[36] Dr. Elzinga never even considers or discusses whether such intermediate

17  transactions exist and between which multi-platform participants. He thus cannot offer a reliable

18  opinion that any relevant multi-platform market exists

19

20          [33] *Vollrath Co. v. Sammi Corp.*, 9 F.3d 1455, 1462 (9th Cir. 1993). *See also See United States v.*
    *Williams*, No. 14-cr-00764, 2017 WL 3498694, at *13 (N.D. Cal. Aug. 15, 2017) ("I am not

21  excluding the reports from SERI because they contain conclusions that are wrong.... I am excluding
    SERI's opinions because they are not based on sound methodology."); *AFMC LLC v. UPS Co.*, No.

22  CV 10-5830, 2014 WL 12515335, at *7 (C.D. Cal. Feb. 5, 2014) ("Brotman does not apply any of
    the accepted methodologies for defining a relevant market.... The vagueness of Brotman's

23  methodology is particularly troublesome in the antitrust arena where economic models and analysis
    are required.") (excluding opinions under *Daubert*).

24          [34] Def. Mem. at 42 (emphasis added).

25          [35] *United States v. Am. Express Co.*, 21 F. Supp. 3d 187, 191 (E.D.N.Y. 2014).

26          [36] *U.S. Telecom. Ass'n v. FCC,* 825 F.3d 674, 754 (D.C. Cir. 2016). Tellingly, Defendants
    favorably cite another article by Evans & Schmalensee, which explains that "[m]ulti-sided platforms

27  create value by bringing two or more different types of economic agents together and facilitating
    interactions between them that make all agents better off." David S. Evans & Richard Schmalensee,
    Nat'l Bureau of Econ. Research, *The Antitrust Analysis of Multi-Sided Platform Businesses*, in

28  NBER Working Paper Series, at 2 (Feb. 2013).

Even on his own terms, Dr. Elzinga fails to perform any analysis to support his definition of a multi-sided platform for college education. His proposed market "encompasses the effect of pricing to any one constituency on the volume of participation by all of the college's or university's various constituencies, which includes student-athletes in each of their respective sports, non-athlete students, alumni, coaches and athletic staff, faculty, other staff, the community in which the school is located, and, if they are public institutions, the state."[37] But he does not even attempt to analyze the "effect of pricing" for student-athletes on the "volume of participation" by any of the other "various constituencies." He does not study any price data at all.

Instead, Dr. Elzinga bases his opinion solely on his own thought experiment, with a few citations to self-serving quotations provided by a non-random group of interviewees who he admits were selected by Defendants' counsel and may have been prepped to provide him with biased views. As he testified, "Q. . . . [W]ith respect to those economic issues [of this case], you don't know whether you ended up interviewing a biased, pre-selected sample, if you will, designed to give you answers all pointing in one direction, you just have no way of knowing, right? [A.] No way I can know that, no sir."[38] That is not a foundation for admissible expert testimony. As the Ninth Circuit has explained, "The court's "task [under *Daubert*] is to analyze not what the experts say, but what basis they have for saying it."[39] It is not enough for Dr. Elzinga to opine that the relevant market is a multi-sided platform; instead, he must provide a reliable methodology for that opinion and apply that methodology to the economic evidence of supply and demand in this case. Having eschewed any such analysis or methodology, Dr. Elzinga offers no admissible opinions as to the relevant market.[40]

---

[37] Berman Decl., Ex. 1 at 28.

[38] *Id*., Ex. 2 at 97:21-98:5 (objection omitted).

[39] *Daubert v. Merrell Dow Pharms., Inc*., 43 F.3d 1311, 1316 (9th Cir. 1995).

[40] Cases cited by Defendants in support of their argument that *Daubert* focuses on methodology, not application of a methodology, are inapposite, because the experts in those cases applied well-established methodologies. *See Aviva Sports, Inc. v. Fingerhut Direct Mktg., Inc*., 829 F. Supp. 2d 802, 829 (D. Minn. 2011) ("Photogrammetry is an accepted technique generally used for deriving measurements from photographs, and is heavily published and widely used in other areas. Anthropometry has also been tested and reviewed, and is widely used. Krauss applied these well-known techniques to a unique scenario."); *In re Toyota Motor Corp. Hybrid Brake Mktg., Sales Practices & Prods. Liab. Litig*., No. MDL 10-02172, 2012 WL 4904412, at *4 (C.D. Cal. Sept. 20, 2012) ("Dr. Williams' proposed methods of analysis, *i.e.* hedonic regression, contingent valuation,

Nor can Defendants buttress Dr. Elzinga's inadmissible testimony by asserting that "as Dr. Rascher acknowledged, a peer-reviewed article on which he previously relied in litigation against the NCAA found that 'the multisided market framework offers a promising framework for analyzing sports business and adds insights to the several problems of sports markets that traditional analysis cannot fully solve.'"[41] In referencing this article, Defendants ignore the fact that this very source states that a "'market is two-sided if the platform can affect the volume of transactions by charging more to one side of the market and reducing the price paid by the other side by an equal amount; in other words, the price structure matters, and platforms must design it so as to bring both sides on board.'"[42] To reiterate, Dr. Elzinga does no such analysis to support his market opinions here and does not define *any* such multi-sided transactions.[43]

Even more off point is Defendants' assertion that "*Daubert* does not require an expert's testimony to be empirical rather than descriptive."[44] No court has ever suggested, let alone held, that merely describing a proposed market suffices to define a relevant market in an antitrust case. To the contrary, as noted above, courts have specifically held that the "'outer boundaries of a product market are determined by the reasonable interchangeability of use or the cross-elasticity of demand

---

and discrete choice, are generally accepted, have been tested, and are part of peer-reviewed studies."); *Braswell v. Shoreline Fire Dep't*, No. C 08-924, 2011 WL 4712124, at *3 (W.D. Wash. Oct. 5, 2011) ("Mr. Halverson's experience imbues him with specialized knowledge regarding the process for hiring firefighters in the fire district in which he served. He is qualified to render an opinion on the likelihood that Mr. Braswell would be hired in one of the districts in which he has hiring experience."); *Primiano v. Cook*, 598 F.3d 558, 566 (9th Cir. 2010) ("comparison of what happened with Ms. Primiano's artificial elbow with what surgeons who use artificial elbows ordinarily see, against a background of peer-reviewed literature, is the ordinary methodology of evidence based medicine"); *EEOC v. Texas Roadhouse, Inc*., 215 F. Supp. 3d 140, 162 (D. Mass. 2016) ("The duration dependence theory, however, is not new. . . . Although application of this theory to the hiring context may be new …, neither duration dependence as a theory nor the Cox proportional hazard model as a method is novel.") (internal citations omitted).

[41] Def Mem. at 40 (quoting Mishkin Decl., Ex. 7 (Rascher Dep.)); 55:24-58:14; Mishkin Decl., Ex. 8 (Rascher Dep. Ex. 6 (Oliver Budzinski & Janina Satzer, 'Sports Business and Multisided Markets: Towards a New Analytical Framework?,' 1 Sport, Business & Management 124 (2011)).

[42] *See* Mishkin Decl., Ex. 8, Budzinski & Satzer at 125-26 (quoting Rochet and Tirole (2006)).

[43] The article cited by Defendants focuses solely on the interaction of sports enterprises and their customers, not on a purported multi-sided college education market. *Id.* at 127 ("In order to apply the multisided framework to sports business, the platform supplier and its distinct customer groups must be identified.").

[44] Def. Mem. at 43.

1  between the product itself and substitutes for it.'"[45] The cases concerning non-empirical expert

2  opinions cited by Defendants do not involve market definition or even antitrust claims. Two involve

3  the cause of a fire and the other how police officers are trained to approach people holding knives.[46]

4  Defendants cannot cite a single antitrust case in which descriptive thought experiments by an expert,

5  like Dr. Elzinga offers here, were found to be a reliable basis for defining a relevant market.

6        Finally, Defendants incorrectly seek to narrow the scope of Plaintiffs' *Daubert* challenge to

7  Dr. Elzinga's testimony. Defendants first erroneously assert that "Dr. Elzinga's distinct conclusion

8  that the NCAA's amateurism rules are procompetitive does not turn on the adoption of his multi-

9  sided market."[47] But in fact, Dr. Elzinga's opinion that the rules are procompetitive rests ***entirely*** on

10  his adoption of his purported multi-sided market. He only uses the word procompetitive in his report

11  twice. First, it's in a long quotation to another source in a footnote in his report.[48] And later he states,

12  "Either the rules are the implementation of a monopsonistic cartel in a labor market for talented

13  young athletes, or they are an efficient 'social arrangement' for preventing what would otherwise be

14  an externality-induced market failure in a complex multi-sided market. . . . [T]he rules limiting play

15  to schools that only allow eligible players on their teams is merely implementing the efficient

16  solution, in which case the rules are not anticompetitive, they are procompetitive."[49] In other words,

17  he rests his opinion that the NCAA compensation rules are procompetitive solely on his proposed

18  definition of an "efficient" but "complex multi-sided market." Once this Court finds that his relevant

---

[45] *Newcal Indus., Inc. v. Ikon Office Solution*, 513 F.3d 1038, 1045 (9th Cir. 2008) (quoting *Brown Shoe v. United States*, 370 U.S. 294, 324 (1962)).

[46] *See Lawson v. Trowbridge*, 153 F.3d 368, 375 (7th Cir. 1998) ("[The police officers'] testimony was not scientific—either in a hard or soft (social science) way—and it was entirely descriptive rather than based on empirical study of any sort…. What made [the police officers] experts in the district court's eyes was that [they] had specialized knowledge concerning police training, specifically, how police officers such as Howland are trained to approach knives in varying contexts."); *Nationwide Mut. Fire Ins. v. Sunbeam Prods.*, No. 12 Civ. 6594, 2014 WL 3875844, at *3 (S.D.N.Y. July 17, 2014) (admitting expert testimony of "a licensed and certified fire investigator who conducted an investigation into the origin and cause of the fire"); *Windham v. Circuit City Stores, Inc.*, 420 F. Supp. 2d 1206, 1211 (D. Kan. 2006) ("Martin's testimony shows that he did eliminate alternative causes of the fire and this has been recognized as a legitimate method of establishing causation.").

[47] Def. Mem. at 44 n.25.

[48] Berman Decl., Ex. 1 at 10 n.15.

[49] *Id.* at 99-100 (footnotes excluded.)

1    market opinions must be excluded, his assertions of procompetitive effects based on that relevant

2    market definitions must be excluded as well. Dr. Elzinga offers no analyses independent of his

3    multi-sided platform market to support his opinions of procompetitive effect.

4            Further, Defendants incorrectly claim that "Dr. Elzinga's rejection of Plaintiffs' monopsony-

5    cartel hypothesis is also logically separate from his opinion on multi-sided markets."[50] In fact, his

6    rejection of Plaintiffs' monopsony-cartel model once again rests on his opinion that a "complex

7    multi-sided market" exists. Once that relevant market opinion is excluded, the rest of Dr. Elzinga's

8    opinions about pro- and anticompetitive effects collapse for the lack of any independent economic

9    analysis or support.

10   **II.      THE COURT SHOULD EXCLUDE THE TESTIMONY OF DR. HECKMAN**

11           Defendants fail to explain away the fatal flaws in Dr. Heckman's proposed expert testimony.

12   As explained in detail in Plaintiffs' prior brief,[51] this Court already found Dr. Heckman's

13   econometric opinions on these issues to be irrelevant in *O'Bannon*. Rather than addressing this head-

14   on, Defendants bury their head in the sand, never once even acknowledging that Dr. Heckman

15   testified in *O'Bannon*. Instead, Defendants cobble together a few pages to try to breathe reliability

16   into Dr. Heckman's data and regressions. This effort fails though, as Dr. Heckman himself has

17   admitted fundamental problems with his analyses that render them unreliable.

18           Defendants similarly fall well short in arguing that the out-of-left-field new theories in Dr.

19   Heckman's reply report are just an "elaboration" on the points he raised in his opening report. Even a

20   cursory comparison of the two reports shows this is false. All of these new opinions and materials

21   should be excluded as beyond the proper scope of an expert reply report. Nonetheless, even if the

22   Court were to entertain these new opinions, Defendants and Dr. Heckman have confirmed why the

23   _____

     [50] Def. Mem. at 44 n.25.

24   [51] Pl. Opp. at 65-66. "Pl. Opp." refers to Plaintiffs' Memorandum in Opposition to Defendants'
     Motion for Summary Judgment; Reply Memorandum in Support of Plaintiffs' Motion for Summary
25   Judgment; Memorandum in Opposition to Defendants' Motion for Exclusion of Expert Testimony;
     and Memorandum in Support of Motion to Exclude Proposed Testimony of James Heckman, Nov. 7,
26   2017, ECF No. 713-3. "Pl. MSJ" refers to Plaintiffs' Notice of Motion and Motion for Summary
     Judgment; Memorandum of Points and Authorities in Support Thereof, Aug. 11, 2017, ECF No. 657.
27   "Def. MSJ" refers to Defendants' Notice of Motion for and Motion for Summary Judgment and for
     Exclusion of Expert Testimony, and Opposition to Plaintiffs' Motion for Summary Judgment;
28   Memorandum of Points and Authorities in Support Thereof, Sept. 29, 2017, ECF No. 704.

1   Court must strike these new and purely speculative theories.

2   **A.    Defendants do not address the fact that this court already has found Dr. Heckman's opinions on these same issues to be irrelevant.**

3   Dr. Heckman testified over two days during the *O'Bannon* trial. When the Court issued its

4   decision, the Court stated the following:

5

6   > [T]he NCAA relies on evidence showing that student-athletes receive both
7   > short-term and long-term benefits from being student-athletes. One of its
8   > experts, Dr. James Heckman, testified that participation in intercollegiate
9   > athletics leads to better academic and labor market outcomes for many
10  > student-athletes as compared to other members of their socioeconomic
11  > groups. . . . *However, none of this data nor any of Dr. Heckman's
12  > observations suggests that student-athletes benefit specifically from the
13  > restrictions on student-athlete compensation that are challenged in this
14  > case.*
15
16  > . . .
17
18  > *[T]he restraints on student-athlete compensation challenged in this
19  > case generally <u>do not</u> serve to enhance academic outcomes for
20  > student-athletes.*[52]

Now, over three years later, Dr. Heckman admits that he is offering a "similar statement" of his

opinions in *O'Bannon*, and that he still is not expressing any opinions on how the compensation

restrictions challenged here *cause* or *provide* any benefits to student-athletes.[53]

Ignoring the fact that the Court has already found Dr. Heckman's same opinions to be

irrelevant to an antitrust review of Defendants' compensation restraints, Defendants offer up a few

weak arguments in response. First, Defendants claim that Dr. Heckman's opinions rebut a purported

claim by Plaintiffs that college has no benefits.[54] Plaintiffs have said it before on numerous

occasions,[55] but will say it again: Plaintiffs *do not* dispute that college has benefits.  However,

nothing in Dr. Heckman's regressions or opinions suggests that Defendants' compensation restraints

---

[52] *O'Bannon*, 7 F.Supp.3d at 979-81 (emphasis added).

[53] *See* Pl. Opp., Ex. 116 (Heckman dep. tr.) at 109:19; Pl. Opp. 65-66.

[54] Def. Mem. at 45.

[55] *See, e.g.*, Pl. Opp. at 48-49 (noting "the unremarkable proposition that attending college is generally beneficial"); Berman Decl., Ex. 3 (Roger Noll Rebuttal Report) at 55-56 ("[E]conomists have reached a broad consensus that higher education contributes substantially to lifetime earnings . . . .) (footnote omitted).

1    are in any way responsible for these benefits—a point this Court has already recognized.[56]

2         Defendants also suggest that Dr. Heckman's opinions are relevant because his analysis helps

3    explain what "**could** be lost if Plaintiffs prevail."[57] But again, Dr. Heckman does not offer any

4    evidence that class members would perform worse academically if they were to receive more

5    compensation.  To the contrary, Dr. Heckman repeatedly emphasized the "positive relationship"

6    between a college student's financial resources and chance for educational success.[58]

7         Defendants claim that Plaintiffs' expert, Dr. Lazear, agreed with their position that college

8    athletes would focus less on their academics if they were to be better compensated.[59] Not so. Dr.

9    Lazear testified that: "When people are compensated on the basis of their effort, and when those

10   wages are allowed to increase with effort, then we tend to see more effort being provided."[60] But

11   more "effort" toward athletics is neither synonymous with more *time* towards athletics nor less time

12   and *effort* towards academics (both of which Defendants could regulate without challenge in this

13   case). In fact, Defendants' own expert, Dr. Ordover, agrees:  "[M]aking money [would] not

14   preclud[e]" students from attending class.[61]

15        Moreover, if schools or individual conferences independently decided that class members

16   should only receive significant above-COA benefits if they showed progress towards a degree and

17   kept a minimum GPA, then surely these athletes would not have "'an incentive to focus their

18   attention on athletics'" to the detriment of their schoolwork.[62] There are countless such academic

19   incentive payments that Defendants could implement as less restrictive alternatives to the status quo.

20   Ironically, it is under the current system of challenged NCAA restraints—where only class members

21

22        [56] *O'Bannon*, 7 F.Supp.3d at 979-981.

23        [57] Def. Mem. at 46 (emphasis added).

24        [58] Pl. Opp., Ex. 116 at 142:7; *see also id.* at 140:14-141:4 (recognizing that "credit constraints
     matter" and that the literature shows a college student's financial resources have a positive effect on
     the student's propensity to graduate); 144:3-5 ("[O]nce you control for endogeneity, more resources
25   would lead to more attendance in school.").

26        [59] Def. Mem. at 46.

27        [60] Def. MSJ, Ex. 32 (Lazear dep. tr.) at 224:11-14.

     [61] Pl. MSJ, Ex. 70 (Ordover dep. tr.) at 328:1-4.

28        [62] Def. Mem. at 46 (citation omitted).

on the best teams receive above-COA "bowl gifts" and prizes for postseason play—that such athletes are indisputably incentivized to focus on athletic success.[63]

In a final plea for the relevance of Dr. Heckman's regressions, Defendants state that "[t]he results [claimed life benefits for athletes] ***transpired under*** a system of interlocking rules designed to enhance the academic and athletic well-being of students."[64] But results "transpiring" under a system is not the same as the system "causing" the results. This is a logical fallacy that Defendants and Dr. Heckman continue to perpetuate.[65]

Dr. Heckman's econometric opinions purportedly showing that attendance at college has benefits—but not addressing at all whether permitting additional compensation would negatively impact those benefits—are just as irrelevant now as they were when he offered them in *O'Bannon*.[66] They should be excluded.

**B.      Dr. Heckman's econometric opinions are not reliable.**

A theme that runs throughout Defendants' opposition is their admission that the data upon which Dr. Heckman relies is imprecise.[67] Boiled down, Defendants' claim is essentially that, despite their acknowledged flaws, the data and regressions should be considered "good enough."

Defendants are wrong. Dr. Heckman's data and regressions suffer from "serious methodological flaws" that destroy their reliability and require exclusion.[68]

---

[63] *See* Pl. MSJ, Ex. 14, *Sports Business Journal, All about that bass: Beats by Dre leads roster of tournament gifts*, dated March 9, 2015 ("All told, a player on a team that runs the table this spring and wins basketball championships for the regular season, the school's postseason conference tournament and the NCAA tournament could secure a total gift haul valued at up to $3,780."); Pl. MSJ. at 9 (discussing "'gift suite' participation awards, such as televisions, iPods, and designer watches and sunglasses.").

[64] Def. Mem. at 47 (brackets added) (emphasis added).

[65] Def. Mem. at 47 (citing deposition testimony from Dr. Heckman in which he conflates correlation and causation: "We're talking about causality in the sense that the actions of the students at the school and the existence of these schools are providing benefits for these students in those schools.").

[66] Defendants' rehashing of Dr. Heckman's regressions (Def. Mem. at 45-46) does not make them relevant.  Nor does it wipe away the fatal errors in these regressions. *See* Section II(B) below; *see also* Pl. Opp. at 67-71.

[67] *See, e.g.*, Def. Mem. at 49 ("[M]ore recent data 'might have resulted in a 'better' or more 'accurate' estimate in the absolute sense' . . . .") (citation omitted).

[68] *Obrey v. Johnson*, 400 F.3d 691, 696 (9th Cir. 2005).

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**1.       Dr. Heckman's regressions fail to account for the amount of athletic scholarship that athletes receive.**

Plaintiffs demonstrated that Dr. Heckman's regressions are "unable to pinpoint that any purported benefit of participating in college athletics actually was the result of participating in sports versus the result of the scholarship money that the athlete received."[69] Defendants now argue that this criticism was unfounded because—in their minds—there is no "methodological reason why [a scholarship variable] should have been tested."[70]

This response is baffling. Dr. Heckman himself recognized the "methodological reason" behind controlling for scholarship money when performing the regressions. In his opening report, under the "***Methodology***" section, Dr. Heckman stated that in order to "examine and isolate the role of participating in high school and intercollegiate athletics," a reliable econometric analysis must control for "individual and family background characteristics," such as family income.[71]

Completely ignoring his own observations about the importance of controlling for income, Dr. Heckman did not control for any scholarship money that the surveyed college athlete may have received while in college.[72] Not accounting for income, which Dr. Heckman acknowledged to be a critical variable, is a fatal flaw in Dr. Heckman's regressions.[73]

By failing to control for scholarship money, Dr. Heckman is left unable to reliably opine that any purported lifetime benefit of playing college sports actually was due to playing those sports as opposed to the multiple tens of thousands of dollars in benefits that the scholarship athlete received,

---

[69] Pl. Opp. at 67.

[70] Def. Mem. at 52 (brackets added).

[71] Def. MSJ, Ex. 10 (Dr. Heckman Opening Report) at 18 (emphasis added); *id.* at 19 ("[F]ailing to control for the income level of the student's family when examining the effect of athletics on the likelihood of college graduation would erroneously lead one to attribute the effects of family income on the likelihood of graduating to the effect of participation in college athletics on graduating.").

[72] *See* Pl. Opp., Ex. 116 at 117:9-12, 142:19-20.

[73] *Bazemore v. Friday*, 478 U.S. 385, 400 (1986) (noting that regression analysis must "'account[] for the major factors'") (citation omitted); *see also In re REMEC Inc. Sec. Litig.*, 702 F. Supp. 2d 1202, 1273 (S.D. Cal. 2010) ("[W]here significant variables that are quantifiable are omitted from a regression analysis, the study may become so incomplete that it is inadmissible as irrelevant and unreliable."); *In re Live Concert Antitrust Litig.*, 863 F. Supp. 2d 966, 973-976 (C.D. Cal. 2012) (noting that "[t]he importance of accounting for the relevant 'major variables' has been recognized as particularly important in the context of antitrust litigation" and excluding an expert's opinions for allegedly failing to do so).

which one would expect to yield lifetime benefits. Similarly, because of this error, Dr. Heckman is unable to reliably opine that class members would not receive *even greater lifetime benefits* if they were to enjoy even greater compensation while playing college sports.

### 2. Dr. Heckman's stale data is demonstrably unable to show benefits ten years later.

Defendants assert that "Plaintiffs object that the NELS and ELS data sets are too old because they do not involve any class members."[74] While true,[75] that is not Plaintiffs' primary basis for objecting to the use of this data. Rather, Plaintiffs' predominant objection is that Dr. Heckman's own regressions have *proven* that this data is not reliable to establish benefits to class members one decade later.

For every instance in which there was a statistically significant result in NELS (data compiled in the mid-1990s) for Division I basketball or FBS football players, that result lost its statistical significance by the time the ELS data was acquired (the mid-to-late 2000s).[76] As explained in Plaintiffs' opening brief—and completely unrebutted by Defendants in their opposition—this result demonstrates that whatever was causing the results Dr. Heckman identified in the 1990s, it was likely *not* the NCAA's old GIA cap, which was identical under both data sets.

Given that data from the mid-1990s could not show that student-athletes received similar benefits in the mid- to late-2000s, this same data cannot reliably support an opinion that the benefits that class members receive in 2017 have anything to do with the challenged restraints. Defendants try to circumvent this fatal flaw by citing Dr. Heckman's deposition testimony that there is a "presumption in any empirical study, based on historical data that's used in a current setting . . . that the findings are relevant in the current situation."[77] Regardless of whether such a presumption even

---

[74] Def. Mem. at 49.

[75] Defendants insist that Dr. Heckman could not have used "class-specific" data to analyze earning bachelor's degrees or wages because "members of the injunctive class are still in college." Def. Mem. 50. But, that is not true. The injunctive class includes those who played as FBS football/Division I basketball players since March 5, 2014 (*see* Pl. Opp. at 70 n. 53), *including* those who have since graduated and started earning income.

[76] *See* Def. MSJ, Ex. 10 at Table 6 and Table 7.

[77] Def. Mem. at 49 (citation omitted.)

exists,[78] historical data that is ***demonstrably inaccurate*** in showing a relationship to future benefits cannot reliably be used to opine on the existence of such a relationship.[79]

### 3.   Dr. Heckman is incapable of opining that the surveyed individuals even played the sports in question.

As explained in detail in Plaintiffs' moving papers,[80] Dr. Heckman failed to ensure that the data sets he studied were limited to Division I basketball or FBS football players. Defendants insist that this is not a problem because "Dr. Heckman [] instituted rigorous checks to make sure his analysis and conclusions were valid."[81] But Dr. Heckman did no such thing in monitoring the population of his data sets.  For example, he took ***zero*** precautions to exclude those former junior varsity high school basketball or football players who opted to play some other sport in college (*e.g.*, tennis, swimming, lacrosse, etc…).[82]

Dr. Heckman claims that the regressions he ran in his reply report using an alternative definition of a "College Varsity Basketball/Football Athlete"[83] reflect "internal consistency" with the results from his original report.[84] This is wrong.  Dr. Heckman's own back-up data[85] shows that there is nothing "consistent" about the number of individuals in the data sets under the Heckman I and

---

[78] Dr. Heckman did not cite any scholarly literature when he made this statement at his deposition.

[79] *See Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997) ("A court may conclude that there is simply too great an analytical gap between the data and the opinion proffered.").

[80] Pl. Opp. at 68-69.

[81] Def. Mem. at 50.

[82] Citing one solitary article, Defendants claim that Dr. Heckman's hypothesis was "consistent with literature" on "single-sport specialization." Def. Mem. at 50. But Dr. Heckman did not confine his opinions in his opening report to only "single-sport specialists" in basketball or football. On the contrary, Dr. Heckman's regressions included high school students who, in addition to playing football and/or basketball, played other sports. *See* Def. MSJ Ex. 10 at App'x C at 5,7, 8.

[83] The definition in Dr. Heckman's opening report is referred to as "the Heckman I Definition," whereas the alternative specification set forth in the reply report is referred to as "the Heckman II Definition."

[84] Def. Mem. at 50.

[85] *See* NELS:88 Survey Item Evaluation Report, National Center for Education Statistics (1997); Educational Longitudinal Study of 2002 Base Year Field Test Report, National Center for Education Statistics (2003); Heckman I STATA programs: "0_Generate_ELS.do", "0_Generate_NELS.do"; Heckman II STATA programs: "0_Generate_ELS.do", "0_Generate_NELS.do".

Heckman II definitions:[86]

**NELS (1988-2000)**

|  | Men | | Women | |
|---|---|---|---|---|
|  | Heckman I Definition | Heckman II Definition | Heckman I Definition | Heckman II Definition |
| **DIV I BB/FB** | 90 | 20 | 30 | <10 |
| **FBS BB/FB** | 40 | 10 | 10 | <10 |

**ELS (2002-2012)**

|  | Men | | Women | |
|---|---|---|---|---|
|  | Heckman I Definition | Heckman II Definition | Heckman I | Heckman II Definition |
| **DIV I BB/FB** | 100 | 20 | 40 | 10 |
| **FBS BB/FB** | 50 | 10 | 20 | 10 |

These tables illustrate how imprecise Dr. Heckman was in crafting his definition of a "College Varsity Basketball/Football Athlete" in his opening report. Moreover, the minuscule number of athletes in the data sets under the Heckman II definition underscores that any "expert analysis" based upon that definition is not going to be a reliable or representative basis for offering any opinions about the classes as a whole.[87]

### 4. Dr. Heckman did not take precautions to exclude club sports athletes from the ELS data.

Defendants claim that paperwork distributed in the ELS survey indicates that club athletes were not included in the ELS data that Dr. Heckman analyzed.[88] To support this assertion, Defendants point to a part of the 2006 survey that asked both (1) whether the individual participated in "intramural or nonvarsity sports," and (2) whether the individual participated in "varsity or intercollegiate sports."[89]

---

[86] In order to comply with the United States Department of Education license agreement, the numbers are rounded to the nearest 10 (and numbers that round to zero are reflected as "<10").

[87] *See* Fed. R. Evid. 702 (b) (expert testimony must be "based on sufficient facts or data"); *Pedroza v. PetSmart, Inc.*, No. ED CV 11-298-GHK, 2013 WL 1490667, at *3 (C.D. Cal. Jan. 28, 2013) (expert must "explain" why "selection" of data "would be representative.").

[88] Def. Mem. at 51.

[89] Def. Mem., Ex. 11 (Facsimile of the Question Stems of Second Follow-up Instrument) at 10.

1    Defendants then insist that they can read the minds of the college students who participated in

2    the survey over a decade ago and argue that "those participating solely in club sports **would have**

3    **indicated** that they participated in 'intramural or nonvarsity sports,' not 'varsity or intercollegiate

4    sports.'"[90] Defendants, however, have no support for this entirely speculative assumption.

5    Moreover, Dr. Heckman's analysis of the ELS data included those who confirmed participation in

6    "varsity **or intercollegiate athletics**"[91] and Dr. Heckman himself testified that this could include club

7    sports athletes.[92]

8    **C.    Dr. Heckman's new opinions in the reply report were not disclosed in his opening
         report, and therefore should be stricken.**

9

10   Defendants do not deny that the only opinions offered in Dr. Heckman's opening report

11   pertain to the effect that athletic participation has on graduating from high school, attending college,

12   graduating from college, and earning wages. Because these opinions are not relevant to the case, Dr.

13   Noll was able to summarily explain and opine in his rebuttal report that Dr. Heckman "[did] not offer

14   any valid economic arguments or evidence that the conduct in this litigation," *i.e.*, implementing and

     enforcing the challenged restraints, is anything other than an antitrust violation.[93]

15   Defendants concede that Dr. Heckman used his reply report to "set forth 'economic

16   arguments or evidence' explaining why the conduct at issue is not 'a collusive price-fixing

17   agreement among horizontal competitors.'"[94] In particular, Dr. Heckman offered brand new theories

18   and opinions in his reply report on: (1) whether the university labor market is a monopsony; and (2)

19   the equilibrium effects that would result from Plaintiffs' proposed rule changes.[95] Defendants try to

20   justify the sudden appearance of these completely new opinions in an ostensible expert "reply" report

21   by miscasting them as just a "'significant elaboration'" on the points Dr. Heckman raised in his

22

23

24   [90] Def. Mem. at 51 (emphasis added).

25   [91] Def. MSJ, Ex. 10 at App'x C at 8 (emphasis added)

26   [92] *See* Pl. Opp., Ex. 116 at 83:21- 84:2 (confirming, "[c]ould be, yes").

     [93] Berman Decl., Ex. 3 (Roger Noll Rebuttal Report) at 2.

27   [94] Def. Mem. at 53 (citation omitted).

28   [95] *See generally* Def. MSJ, Ex. 11 (Dr. Heckman Reply Report) at 6-28.

opening report. [96] This is not close to accurate.

Dr. Heckman's out-of-left-field opinions about monopsony markets and equilibrium effects are entirely new—not a mere "elaboration" of any opinion or analysis Dr. Heckman disclosed in his opening report. Even a cursory comparison between the two reports confirms this. Dr. Heckman himself could not dispute this at his deposition, where he was unable to point to a single paragraph of his opening report that addressed his newly revealed economic opinions and theories on monopsony power and equilibrium effects.[97] Notably, Defendants do not even try to explain away this deposition testimony.

Instead, Defendants absurdly suggest that Plaintiffs were not prejudiced by Dr. Heckman's new opinions because Plaintiffs' counsel "had ample time to prepare to question Dr. Heckman about this report and an opportunity do so" at deposition.[98] But this does not change the fact that Dr. Heckman violated his disclosure obligations nor that Plaintiffs' **rebuttal** expert—Dr. Noll—did not have any opportunity to **rebut** Dr. Heckman's new opinions, thereby significantly prejudicing Plaintiffs.[99]

Although Dr. Heckman could have used his reply report to elaborate upon or defend opinions that he offered in his opening report, he improperly used his reply report to assume an entirely new testifying role for Defendants. This is impermissible expert sandbagging.[100] The Court should thus

---

[96] Def. Mem. at 53 n.31 (citing *Van Alfen v. Toyota Motor Sales, U.S.A., Inc.*, No. 810ML02151JVSFMOX, 2012 WL 12930456, at *2 (C.D. Cal. Nov. 9, 2012)(citation omitted). Defendants suggest that it was "inexplicabl[e]" for Plaintiffs to cite *Van Alfen*. It is unclear why they think so. *Van Alfen* criticized the exact gamesmanship that Dr. Heckman employed in this case: "[A] supplemental expert report that states additional opinions . . . is beyond the scope of proper supplementation and subject to exclusion . . . ." *Id.* at *2 (citing *Plumley v. Mockett*, 836 F. Supp. 2d 1053, 1062 (C.D. Cal. 2010)).

[97] *See* Pl. Opp. at 72.

[98] Def. Mem. at 54.

[99] *E.g.*, *In re High-Tech Empl. Antitrust Litig.*, No. 11-CV-02509-LHK, 2014 WL 1351040, at *12 (N.D. Cal. Apr. 4, 2014) ("Dr. Stiroh had no chance to rebut Dr. Leamer's theory because expert discovery has closed. 'This immunity, combined with the element of surprise, would be unfair.'") (citing *Oracle Am., Inc. v. Google Inc.*, No. C 10-03561 WHA, 2011 WL 5572835, at *3 (N.D. Cal. Nov. 15, 2011)).

[100] *See In re Graphics Processing Units Antitrust Litig.*, 253 F.R.D. 478, 501 (N.D. Cal. 2008) ("Slipping these new arguments into a rebuttal report was a clear-cut form of sandbagging and was simply unfair.").

exclude Dr. Heckman's belated opinions on (1) whether the university labor market is a monopsony, and (2) the alleged equilibrium effects of Plaintiffs' proposed rule changes.

**D.     Even if the Court were to entertain Dr. Heckman's new opinions in his reply report, Defendants do not dispute that they are entirely speculative.**

Defendants tellingly do not dispute Plaintiffs' showing[101] that Dr. Heckman's new theories in his reply report are pure speculation which must be excluded. Instead, Defendants engage in semantical gymnastics, arguing that the new theories in his reply report are "*criticisms* of Dr. Noll's opinions, not *new opinions* by Dr. Heckman."[102] Defendants are wrong. As explained above, the out-of-the-blue theories in Dr. Heckman's reply report are categorically "new," and Defendants themselves admit that they are "opinions" (not mere "criticisms").[103]

More importantly, however, even if Dr. Heckman's new theories in his reply report were grounded in a criticism of Dr. Noll's opinions, Dr. Heckman—as an expert witness seeking to testify in a federal courtroom—still must do more than rely upon pure speculation to formulate and offer his contrary opinions.[104]

Yet, as explained in detail in Plaintiffs' prior brief,[105] Dr. Heckman relies on only pure conjecture to support the brand new opinions about monopsony markets and equilibrium benefits

---

[101] *See* Pl. Opp. at 73-78.

[102] Def. Mem. at 54 (emphasis in original).

[103] Def. Mem. at 45 (referencing "those opinions" in the reply report) and 54 (referencing "the opinions in his rebuttal report").

[104] *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 589–90 (1993) ("The subject of an expert's testimony must be 'scientific . . . knowledge.' . . . [T]he word 'knowledge' connotes more than subjective belief or unsupported speculation."); *see also Advanced Telemedia, L.L.C. v. Charter Commc'ns, Inc.*, No. CIV.A. 1:05-CV-2662, 2008 WL 6808442, at *1 (N.D. Ga. July 17, 2008) (precluding a rebuttal expert from testifying because the "testimony is too speculative and unreliable"). Defendants' two authorities on this point do not speak to the contrary. *In re Cessna 208 Series Aircraft Prod. Liab. Litig.* does not even address the issue of an expert witness who critiques an opposing expert by speculating. No. 05-MD-1721-KHV, 2009 WL 1649773, at *1 (D. Kan. June 9, 2009). And *Aviva Sports.* actually supports Plaintiffs' position  that, even with respect to an expert witness who criticizes another expert's analysis, the witness's opinions still must not be "unduly speculative." 829 F. Supp. 2d at 835 (finding that the rebuttal expert—unlike Dr. Heckman here—did not offer "purely speculative" opinions).

[105] Pl. Opp. at 73-78.

presented in his reply report.[106] Defendants do not dispute this.  Instead, they admit that Dr.

Heckman was speculating about "what ***might*** be lost as a result of Plaintiffs' proposed changes in the

regulations."[107]  Such far-flung speculation—without any analysis of record facts or data—about

what "might" (or might not) happen simply does not constitute a proper foundation for admissible

expert opinions.[108]

## III.   CONCLUSION

The opinions of Dr. Elzinga regarding the definition of the relevant antitrust market in this

matter, and his opinion that Defendants lacked market power within that market must be excluded

under Rule 702 and *Daubert*, because they are contrary to accepted economic principles, fundamen-

tally flawed, contrary to governing law, and unreliable. Similarly, Dr. Heckman's opinions must be

excluded.  The opinions in his opening report are neither relevant nor reliable, and the new opinions

in his reply report are nothing but impermissible speculation.


DATED: December 22, 2017                             Respectfully submitted,


HAGENS BERMAN SOBOL SHAPIRO LLP          WINSTON & STRAWN LLP

By ____/s/ Steve W. Berman_____          By ____/s/ Jeffrey L. Kessler_____
       STEVE W. BERMAN (*pro hac vice*)                 JEFFREY L. KESSLER (*pro hac vice*)

Craig R. Spiegel (SBN 122000)                          David G. Feher (*pro hac vice*)
1918 Eighth Avenue, Suite 3300                       David L. Greenspan (*pro hac vice*)
Seattle, WA 98101                                            Jennifer M. Stewart (*pro hac vice*)
Telephone: (206) 623-7292                             Joseph A. Litman (*pro hac vice*)
Facsimile:  (206) 623-0594                             200 Park Avenue
*steve@hbsslaw.com*                                     New York, NY 10166-4193
*craigs@hbsslaw.com*                                    Telephone: (212) 294-6700
                                                                   Facsimile: (212) 294-4700
Jeff D. Friedman (SBN 173886)                        *jkessler@winston.com*
HAGENS BERMAN SOBOL SHAPIRO LLP          *dfeher@winston.com*
715 Hearst Avenue, Suite 202                          *dgreenspan@winston.com*

---

[106] Defendants assert that "Plaintiffs disingenuously suggest that Dr. Heckman has no knowledge of minor league sports." Defs Mem. at 55 n.32.  It is unclear what Defendants find "disingenuous" about this.  Dr. Heckman himself admitted, "I'm not claiming that I know anything about the specifics of minor leagues." Pl. Opp. Ex. 116 at 297:18-19.

[107] Def. Mem. at 55 (emphasis added).

[108] *See Gbarabe v. Chevron Corp.*, No. 14-CV-00173-SI, 2017 WL 956628, at *17 (N.D. Cal. Mar. 13, 2017) (excluding an expert's causation opinion as "speculative and inadmissible" when the expert, at deposition, could muster only "'maybe it did, maybe it didn't'" regarding whether a rig explosion caused pollution).

Berkeley, CA 94710
Telephone: (510) 725-3000
Facsimile: (510) 725-3001
*jefff@hbsslaw.com*

PEARSON, SIMON & WARSHAW, LLP

By ___*/s/ Bruce L. Simon*___
      BRUCE L. SIMON (SBN 96241)

Benjamin E. Shiftan (SBN 265767)
44 Montgomery Street, Suite 2450
San Francisco, CA 94104
Telephone:  (415) 433-9000
Facsimile:  (415) 433-9008
*bsimon@pswlaw.com*
*bshiftan@pswlaw.com*

*Class Counsel for Jenkins and Consolidated
Action Plaintiffs*

*jstewart@winston.com*
*jlitman@winston.com*

Sean D. Meenan (SBN 260466)
Jeanifer E. Parsigian (SBN 289001)
WINSTON & STRAWN LLP
101 California Street
San Francisco, CA 94111
Telephone: (415) 591-1000
Facsimile: (415) 591-1400
*smeenan@winston.com*
*jparsigian@winston.com*

*Class Counsel for Jenkins and Consolidated
Action Plaintiffs*