# Exhibit 10

Redacted Document

**Highly Confidential – Counsel Only**

# In Re: National Collegiate Athletic Association Athletic Grant-In-Aid Cap Antitrust Litigation

**Expert Report of**

**Kenneth G. Elzinga**

**Robert C. Taylor Professor of Economics**

**University of Virginia**

**Before Judge Claudia Wilken**

**U.S. District Court, Northern District of California, Oakland Division**

**Number 4:14-md-2541-CW**

**March 21, 2017**

EXHIBIT
1500
4/27/17

**Highly Confidential – Counsel Only**

## Table of Contents

I.  Introduction .............................................................................................................................................................. 1

   A. Qualifications ........................................................................................................................................................ 1

   B. Assignment and Summary of Conclusions ............................................................................................... 4

      1.  Assignment .................................................................................................................................................. 4

      2.  Two Competing Hypotheses ................................................................................................................ 5

         a.  Plaintiffs' Erroneous Theory: The NCAA and its Member Institutions are a Monopsonistic Cartel in a Labor Market ........................................................................... 6

         b.  The Challenged NCAA Rules are an Efficiency Enhancing Response to What Would Otherwise Constitute Market Failure ................................................................... 7

      3.  Relevant Market(s) ................................................................................................................................. 8

      4.  Summary of Conclusions ................................................................................................................... 10

   C. Plan of the Report .......................................................................................................................................... 11

II.  The Setting ............................................................................................................................................................... 12

   A. The NCAA ............................................................................................................................................................. 12

      1.  NCAA History ........................................................................................................................................... 13

      2.  The NCAA and Amateurism .............................................................................................................. 19

         a.  The NCAA's Governing and Public Documents ...................................................... 19

         b.  Amateurism and the Student-Athlete ....................................................................... 21

   B. Universities and Amateurism ................................................................................................................... 22

      1.  The NCAA and its member institutions value student-athletes as members of the student body ....................................................................................................................................... 24

      2.  Universities' commitment to educating student-athletes is demonstrated by substantial investments in academic support services. ........................................................................... 24

      3.  The NCAA and its member institutions have demonstrated that academic standards should not be sacrificed to achieve athletic success ............................................................. 25

III.  The Relevant Market: Plaintiffs' One-sided Market versus the Economics of Multi-Sided Markets ......................................................................................................................................................................... 26

   A. Concepts for Market Definition ............................................................................................................... 27

   B. Multi-Sided Markets and Network Externalities ............................................................................. 29

   C. Intercollegiate Athletics as a Multi-Sided Platform ....................................................................... 33

      1.  Colleges and Universities as Multi-Sided Platforms ............................................................. 33

      2.  Intercollegiate Athletic Associations as Multi-Sided Platforms ..................................... 37

      3.  The Need to Regulate Conduct ....................................................................................................... 3B

         a.  Amateurism vs. Professionalism ................................................................................. 3B

         b.  The Regulation of Conduct ............................................................................................. 43

**Highly Confidential – Counsel Only**

|     |    |    |                                                                                                       |     |
|-----|----|----|-------------------------------------------------------------------------------------------------------|-----|
|     | 4. |    | Competition for the Multi-Sided Platform and the Relevant Market ......................................... | 44  |
| D.  |    |    | Plaintiffs' Proposed Relevant Markets .................................................................................................. | 45  |
|     | 1. |    | Plaintiffs' Proposed Relevant Markets are One-Sided ........................................................... | 45  |
|     | 2. |    | Flaws in Plaintiffs' One-Sided Markets .................................................................................. | 46  |
|     |    | a. | Plaintiffs' Proposed Relevant Markets are Too Broad for One-Sided Markets ........... | 46  |
|     |    | b. | Plaintiffs Fail to Analyze the Prices that are Economically Relevant to Their Proposed Relevant Markets........................................................................................... | 46  |
|     |    | c. | Plaintiffs' Proposed Relevant Markets Preclude Analysis of the Relevant Product... | 47  |

IV. Plaintiffs' Theory of a Monopsonistic Cartel is Flawed ................................................................................. 55

A. Monopsony and the NCAA.................................................................................................................... 56

     1. The Economics of Monopsony............................................................................................... 56

     2. Monopsony and a Labor Market for Athletes.................................................................... 58

B. Evaluation of the Plaintiffs' Monopsonistic Labor Market Cartel Theory ...................................... 58

     1. The Conduct of NCAA Schools is Inconsistent with Monopsony.......................................... 59

          a. Eligibility Rules Restrict Supply..................................................................................... 59

          b. Allegedly Extravagant Spending on Facilities and Coaches ...................................... 60

          c. Non-Revenue Sports......................................................................................................... 61

     2. Intercollegiate Athletics Doesn't Fit the Model of Labor-Market-Monopsony-Cartel.......62

          a. The Motivation of the Putative Cartel is not Clear ..................................................... 62

          b. The NCAA would be an Unusual Cartel........................................................................ 63

          c. The COA Cap is not a Wage ............................................................................................ 65

V. The NCAA, Amateurism, and Externalities in Intercollegiate Athletics ................................................... 68

A. Economic Theory of Externalities.......................................................................................................... 69

B. Externalities in Intercollegiate Athletics............................................................................................... 70

     1. Benefits to Student-Athletes .................................................................................................... 71

     2. Benefits to Student-Athletes in Non-Revenue Sports......................................................... 72

     3. Benefits to Other Students........................................................................................................ 73

     4. Benefits to Campus Community .............................................................................................. 73

     5. Amateurism v. Professionalism................................................................................................ 78

     6. Amateurism is a Choice ............................................................................................................. 81

C. Externalities in College and University Decision Making...................................................................... 84

     1. The College's or University's Decision.................................................................................... 85

     2. Externalities, Market Failure, and the Response to it........................................................... B9

     3. Ronald Coase and the NCAA as Collective Action............................................................... 89

**Highly Confidential – Counsel Only**

    D. Protecting Amateurism ........................................................................................................ 92

        1. Student-Athletes and the Rest of the University Community........................................ 92

        2. The Audience for Intercollegiate Athletics outside the University ............................ 94

        3. Amateur Student-Athletes vs. Professional Athletes ................................................ 96

VI. The Group Boycott Allegation .............................................................................................. 9B

VII. Conclusion ........................................................................................................................ 100

Appendix A, Curriculum Vitae of Professor Kenneth G. Elzinga ............................................ A-1

Appendix B, Prior Testimony of Professor Kenneth G. Elzinga ............................................ B-1

Appendix C, Materials Relied Upon ...................................................................................... C-1

Appendix D, Evidence of the Value Placed on Amateurism by NCAA Member Schools ........................ D-1

**Highly Confidential – Counsel Only**

## I.   Introduction

### A.   Qualifications

I am the Robert C. Taylor Professor of Economics at the University of Virginia where I have served on the faculty since 1967. I have received several honors at the University of Virginia including the Thomas Jefferson Award, the highest award the University confers. I also was the original holder of the Cavaliers Distinguished Teaching Professorship, the first endowed chair at the University awarded specifically to honor teaching. Outside the University of Virginia, I have received the Commonwealth of Virginia Outstanding Faculty Award, the Templeton Honor Roll Award for Education in a Free Society, and the Kenan Award for Teaching Economics, among other teaching honors. In 1990, I was selected to be the Thomas Jefferson Fellow at Cambridge University.

Most of my academic career has been devoted to teaching and research in the field of antitrust economics. I have written dozens of scholarly publications, including articles on market definition, market power, and the behavior of cartels. I have served in the Antitrust Division of the Department of Justice as economic advisor to the Assistant Attorney General and have been an economic consultant and testifying expert for both the Federal Trade Commission and the Antitrust Division. On several occasions, I have lectured to federal judges on antitrust economics. I was a special consultant to Judge Lewis A. Kaplan on the Christie's-Sotheby's Auction Houses Antitrust Litigation.

The Supreme Court has cited my work in antitrust economics, and I was the economic expert in three prominent antitrust cases that were decided by the Supreme Court.[1] Two of these cases, *Matsushita* and *Brooke Group*, involved allegations of horizontal conduct on the part of the defendants. The other, *Leegin*, involved vertical relationships between a manufacturer and

---

[1] *Matsushita v. Zenith Radio Corp.*, 475 U.S. 574 (1986); *Brooke Group Ltd. v. Brown & Williamson Tobacco Corp.*, 509 U.S. 209 (1993); and *Leegin Creative Leather Products, Inc., v. PSKS, Inc.*, 551 U.S. 877 (2007).

**Highly Confidential – Counsel Only**

downstream retailers of its products. My publications in antitrust economics have dealt with both horizontal and vertical agreements, as has my consulting experience.

My involvement with intercollegiate athletics at the University of Virginia has been modest. I am the faculty mentor to UVA's wrestling coach and have had varsity athletes at my school from—Olympic medalists to team walk-ons—in my classes. I have never been a faculty representative to the NCAA. In the world of sports, I have been an antitrust consultant to NASCAR and the National Football League.

I began my work on this case by reading and reviewing pleadings, documents, and data that were part of the record. In addition, I reviewed publicly available materials and relevant academic literature about the economics of sports and conducted research specific to the issues in this case. As detailed below, I also had the opportunity to interview several individuals affiliated with various NCAA-member-institutions who informed me about the role and relevance of amateurism in intercollegiate sports.[2]

In particular, two university presidents made themselves available to me for interviews: Greg Fenves of the University of Texas and Nathan Hatch of Wake Forest University. The University of Texas is the flagship public university of Texas and has historically had a major sports program. Wake Forest University is private school with a much smaller enrollment than the University of Texas, but nonetheless competes in a major athletic conference. The presidents of both of these universities are former provosts, Fenves at the University of California Berkeley (public) and Hatch at Notre Dame (private). Hatch also has governance experience with the NCAA.

---

[2] I interviewed Mitch Barnhart, Athletics Director (AD) at the University of Kentucky on 12/19/2016 (hereafter, "Barnhart Interview"); Greg Fenves, President of the University of Texas on 2/3/2017 (hereafter, "Fenves Interview"); Keith Gill, AD at the University of Richmond on 2/8/2017 (hereafter, "Gill Interview"); Nathan Hatch, President of Wake Forest University on 2/15/2017 (hereafter, "Hatch Interview"); and Morgan Burke, currently Vice President and formerly AD at Purdue University on 2/22/2017 (hereafter, "Burke Interview"). Each of these interviews occurred on the respective campuses of these individuals' schools with the exception of President Fenves's, which took place in Dallas.

**Highly Confidential – Counsel Only**

Among athletics directors, I interviewed Mitch Barnhart at the University of Kentucky, Morgan Burke at Purdue University, and Keith Gill at the University of Richmond. The University of Kentucky has a storied reputation in sports, especially in basketball. Purdue University, highly regarded in engineering, developed a strong reputation in athletics under Burke's direction. The University of Richmond, the smallest of the schools I visited, also competes at the Division I level. Like Wake Forest University, the University of Richmond is private. And like Hatch, Gill has served in a governance role in the NCAA. The range of experience of these individuals and the diversity of institutions afforded me the opportunity to further my understanding of intercollegiate athletics. I combined what I learned in these interviews along with the other elements of my research in my economic analysis.

In completing this report, I was given free rein by attorneys for the NCAA and the conferences who are defendants in this matter. I was assisted in my analysis by the Princeton office of Compass Lexecon, an economic consulting firm.[3] No resources of the University of Virginia were used in preparing this report. If new information becomes available to me after this report has been filed that materially alters my opinions or analysis of this case, I would expect to file a supplemental report at a later time if the Court permits.

A copy of my curriculum vitae is attached as Appendix A. Past cases in which I have testified or submitted a report are recorded in Appendix B. Appendix C and the footnotes in this report list the material I relied upon in forming my opinions.

---

[3] I am being compensated for my work on this matter at my customary rate of $1,000 per hour. In addition, I receive payments from Compass Lexecon based on its fees for work in this matter in accordance with our prior arrangements and in return for other services I render the firm.

**Highly Confidential – Counsel Only**

## B.    Assignment and Summary of Conclusions

### 1.    Assignment

Plaintiffs in these matters[4] have challenged the NCAA rule that limits the amount of financial

aid a student-athlete can receive.[5]  Specifically, they allege that "the NCAA and its member

institutions participating in the relevant markets, including the Conference Defendants, have

engaged and continue to engage in a contract, combination, and conspiracy, through the cap on

grants-in-aid, to fix the amount of financial aid and awards available to Class Members and

otherwise unreasonably restrain competition."[6]  Put briefly, Plaintiffs allege that the NCAA is a

---

[4] I refer in the text to matters (plural) because my opinions in this report relate to allegations made in two separate complaints: (i) United States District Court Northern District of California Oakland Division, *In Re: National Collegiate Athletic Association Athletic Grant-In-Aid Cap Antitrust Litigation*, No. 4:14-md-2541-CW, Consolidated Amended Complaint and Demand for Jury Trial Class Action, July 11, 2014, (hereafter, "Consolidated Amended Class Complaint") and (ii) United States District Court Northern District Of California Oakland Division, *In Re: National Collegiate Athletic Association Athletic Grant-In-Aid Cap Antitrust Litigation*, No.s 4:14-md-02541-CW and 4:14-cv-02758-CW, Second Amended Complaint– Class Action Seeking Injunction, This Document Relates To: *Jenkins, et al. v. NCAA, et al.* (hereafter, "Jenkins Complaint"). Even though both complaints make class action allegations, in the remainder of this report, I will refer to the first as the "Consolidated Amended Class Complaint," or "Class Complaint" for short, and I will refer to the second as the "Jenkins Complaint." Similarly, for convenience I will refer to the plaintiffs in the Consolidated Amended Class Complaint as the "Class Plaintiffs," and I will refer to the plaintiffs in the Jenkins Complaint as the "Jenkins Plaintiffs." In referring to both groups collectively, I use the term "Plaintiffs."

[5] Current NCAA rules for Division I limit a student-athlete's financial aid to the cost of attendance ("COA cap"). "A student-athlete shall not be eligible to participate in intercollegiate athletics if he or she receives financial aid that exceeds the value of the cost of attendance as defined in Bylaw 15.02.2. A student-athlete may receive institutional financial aid based on athletic ability (per Bylaw 15.02.4.2) and any other financial aid up to the value of his or her cost of attendance." (*NCAA Division I Manual August 2016-17*, National Collegiate Athletic Association, Indianapolis, IN (hereafter, "2016-17 Manual") Rule 15.1, p. 182). There is an exception for Pell Grant recipients. (2016-17 Manual, Rule 15.1.1, p. 182). In addition, student-athletes may receive student assistant funds, as provided in 2016-17 Manual, Rule 15.01.6.1, p. 179. In prior years, including years covered by the complaint in this case, student-athletes could receive athletics-based financial aid in an amount equal to a Grant in Aid that was limited to tuition and fees, room and board and required books, and could also receive non-athletics aid up to the cost of attendance. "A student-athlete shall not be eligible to participate in intercollegiate athletics if he or she receives financial aid that exceeds the value of the cost of attendance as defined in Bylaw 15.02.2. A student-athlete may receive institutional financial aid based on athletics ability (per Bylaw 15.02.4.1), outside financial aid for which athletics participation is a major criterion (per Bylaw 15.2.6.4) and educational expenses awarded per Bylaw 15.2.6.5 up to the value of a full grant-in-aid, plus any other financial aid unrelated to athletics ability up to the cost of attendance." (*NCAA Division I Manual 2004-05*, National Collegiate Athletic Association, Indianapolis, IN, Rule 15.1, p. 194.)

[6] Consolidated Amended Class Complaint ¶¶513, 523, and 535. In the Jenkins complaint Plaintiffs allege that "The restraints [limits on the amount of the GIA] imposed by Defendants [The NCAA and the five 'Power Conferences'] limiting the remuneration that the Defendants' member institutions may provide to members of the Football Class and members of the Basketball Class constitute an anticompetitive, horizontal agreement

4

**Highly Confidential – Counsel Only**

cartel with monopsony power that caps the financial aid Football Bowl Subdivision ("FBS") Football and Division I Men's and Women's Basketball players can receive.[7]

Plaintiffs also allege that the NCAA's members are engaged in a Group Boycott because the NCAA sanctions that can be imposed on institutions that violate its eligibility rules include refusal to allow those schools to participate in NCAA-sponsored sporting events.[8] Plaintiffs describe this feature of the NCAA's rules as one of "various cartel-policing measures against any school that violates the price-fixing agreement."[9]

I have been asked by counsel for the NCAA and the eleven defendant conferences to assess whether the economic evidence is consistent with Plaintiffs' monopsony-cartel hypothesis or whether the economic evidence is consistent with an efficient market explanation.

## 2.   Two Competing Hypotheses

There are two different views of the economic environment in which student-athletes are recruited and then play for their schools. These conflicting perspectives differ with regard to the proper relevant markets in which the challenged rules should be analyzed; they differ with regard to the economic rationale of the NCAA's rules for financial aid; and they differ with regard to the consequences for economic welfare if these rules were to be changed or abolished. Sorting out

---

among competitors to fix artificially the remuneration for the services of the members of each class." (Jenkins Complaint ¶ 118). The relevant markets that Class Plaintiffs allege are "(1) the NCAA Division I Football Labor Market; (2) the NCAA Division I Men's Basketball Labor Market; and (3) the NCAA Division I Women's Basketball Labor Market." (Consolidated Amended Class Complaint, ¶ 191). The class members alleged in the class complaint are athletes who received grants-in-aid for participation in FBS football, Division I men's basketball or Division I women's basketball from March 5, 2010 to the date of judgment in this matter excluding athletes at Ivy League schools and the military academies. (Consolidated Amended Class Complaint, ¶¶ 497-8). In the Jenkins complaint the class members are FBS football players and Division I men's basketball players who received a full grant-in-aid or a written offer of a full grant in aid from the date of the Jenkins complaint (February 13, 2015) through later of the date of final judgment or the date of resolution of final appeal of the Jenkins matter. (Jenkins Complaint, ¶¶ 24-5).

[7] Consolidated Amended Class Complaint, ¶¶ 1-2, 191, 513, 523, and 535; Jenkins Complaint, ¶¶ 1-2, 5-6, and 118-9.  Women's Division I basketball is the subject of cartel allegations only in the Consolidated Amended Class Complaint, and not in the Jenkins Complaint.

[8] Consolidated Amended Class Complaint, ¶¶ 12, 291-2, 303, and 551; Jenkins Complaint, ¶¶ 118-9.

[9] Consolidated Amended Class Complaint, ¶ 12. See also Jenkins Complaint, ¶¶ 7, 36, and 49.

**Highly Confidential – Counsel Only**

these conflicting perspectives using the tools of economic analysis is what this report offers to

assist the court in its legal analysis of this matter.

### a. Plaintiffs' Erroneous Theory: The NCAA and its Member Institutions are a Monopsonistic Cartel in a Labor Market

Class Plaintiffs state their view of this case in the opening paragraphs of their complaint.

> This case is about Defendants' unlawful restraint of trade in . . . labor markets in college sports. . . . In these labor markets, college athletes work and perform for their schools. In exchange, schools pay the athletes with athletic scholarships (known as "grants-in-aid"). The NCAA and its members have unlawfully agreed that no college will pay an athlete any amount for his or her work that exceeds the value of a grant-in-aid, . . .

> The Defendants have ample power to enforce their restraint. They collectively share "monopsony" power over college athletes. . . . That is the nature of a monopsony. Instead of a free market, a market controlled by a monopsonist is a "take it or leave it" market. The labor markets herein are prime examples of "take it or leave it" markets. [10]

Similarly, Jenkins Plaintiffs describe the case as one in which

> Defendants have jointly agreed and conspired with their member institutions to deny Plaintiffs the ability to provide and/or market their services as football and men's basketball players in top-tier college football and men's basketball markets through a patently unlawful price-fixing and group boycott arrangement.

> The Defendants' agreed-upon rules impose an artificial and unlawful ceiling on the remuneration that players may receive for their services as football and men's basketball players in the multi-billion dollar college sports industry. Under NCAA and Power Conference rules, players may receive only tuition, required institutional fees, room and board, and required course-related books in exchange for their services as college football and men's basketball players. This amount is defined by the NCAA as a "full grant-in-aid" and commonly referred to as an "athletic scholarship."[11]

In short, Plaintiffs allege that student-athletes are employees of the school, that their wage is the

amount of the grant-in-aid ("GIA") awarded to each student-athlete, and that the NCAA and its

members have formed a monopsonistic cartel to suppress the amount of that wage. This portrayal

---

[10] Consolidated Amended Class Complaint, ¶¶ 1-2.

[11] Jenkins Complaint, ¶¶ 5-6.

6

**Highly Confidential - Counsel Only**

of the NCAA as a monopsony-cartel rests on the interpretation of NCAA and conference rule-making

as a collective agreement not to compete. [12]

> The NCAA and the Conference Defendants have *agreed* that Division
> I football and basketball players may only receive payments that the
> NCAA approves. ... The NCAA and Conference Defendants have
> *agreed* to unlawfully cap the value of a grant-in-aid at an amount
> substantially below what a football or basketball player would
> receive for his or her services in a competitive market.[13]

Of course, as a matter of economics, it takes more than the existence of a rule about financial

aid for student-athletes to determine whether or not the NCAA is a labor-market-monopsony-

cartel. It takes evidence and analysis, which this report provides. And, as demonstrated below, the

labor-market-monopsony-cartel hypothesis simply does not withstand economic scrutiny.

### b.   The Challenged NCAA Rules are an Efficiency Enhancing Response to What Would Otherwise Constitute Market Failure

As explained in this report, the correct analysis of the conduct being challenged in this

litigation relies on conventional principles of economic theory applied to the NCAA's financial aid

limits. This analytical approach recognizes that, as an economic activity, intercollegiate athletic

competition has features that, if not dealt with, give rise to market failure. The proper economic

perspective allows one to analyze and understand the tension between:

*   The *collective interest* that colleges and universities share in the benefits of amateurism in

    intercollegiate athletics, and

---

[12] In the Consolidated Amended Class Complaint the defendant conferences are The Pac-12 Conference, The Big Ten Conference, Inc., The Big 12 Conference, Inc., Southeastern Conference, Atlantic Coast Conference, The American Athletic Conference, Conference USA, Mid-American Conference, Mountain West Conference, Sun Belt Conference, and Western Athletic Conference. (Consolidated Amended Class Complaint, ¶¶ 146-82). In the Jenkins Complaint the defendant conferences are The Atlantic Coast Conference, The Big Twelve Conference, The Big Ten Conference, the Pac-12 Conference, and the Southeastern Conference. (Jenkins Complaint, ¶ 22).

[13] Consolidated Amended Class Complaint, ¶ 7, italics added. Similarly, the Jenkins Plaintiffs allege that "The Defendants' *agreed*-upon rules impose an artificial and unlawful ceiling on the remunerations that players may receive for their services as football and men's basketball players." (Jenkins Complaint, ¶ 6, italics added).

**Highly Confidential – Counsel Only**

- The *private interest* each school has in improving the success of its own intercollegiate athletic teams.

These two competing interests, collective versus private, give rise to the potential for market failure in a way that is conventionally taught in economics courses under the heading of "externalities."

"Externality" is the term economists use to describe situations where a transaction between two parties affects the economic well-being of others who are not parties to the transaction. The parties who engage in the activity that causes the externality may fail to account for all the relevant costs and benefits that are a consequence of their economic interaction. This causes the outcome of their transaction to be economically inefficient, which is why such outcomes are referred to as "market failures." In such situations, the market has failed to achieve an economically efficient outcome.

The externality problem here arises in this manner: while the colleges and universities that compete athletically collectively value amateurism, individual universities may be tempted to deviate from amateurism in order to increase their chances of athletic success. The gains they achieve from doing so, however, come at the expense of (a) other colleges and universities whose chances of success are reduced and (b) all colleges and universities through an erosion in the value of a model in which the players are both students and amateurs. The college or university that deviates from amateurism experiences only a fraction of the collective losses, so it fails to take all of them into account, and makes an economically inefficient decision.

### 3. Relevant Market(s)

The difference between the monopsony-cartel and externality hypotheses is closely related to the difference between two distinct ways of looking at the relevant markets in which to analyze the allegations in this case. Plaintiffs' monopsony-cartel approach relies on viewing the relevant markets as labor markets for student-athletes' services in three sports—Division I football, men's basketball, and women's basketball. In such markets, colleges and universities are thought to be

8

**Highly Confidential – Counsel Only**

purchasers of athletes' services for which they pay a "wage." According to this view, the rule limiting financial aid to the Cost of Attendance ("COA") cap is an agreement among purchasers of this particular kind of labor that constrains competition among them. From this perspective, the competition that is purportedly limited is competition among schools for athletes.

The proper analysis takes a wider view of the nature of the relevant market. This perspective recognizes that colleges and universities are platforms in a multi-sided market context. As multi-sided platforms, they provide an array of related goods and services to a variety of constituencies that are linked to one another in that the value each obtains from being a part of the institution depends on the actions and participation in the college or university of the other constituencies. In this context, one cannot reliably analyze competition only from the perspective of one constituency, as Plaintiffs' cartel-monopsony approach proposes to do, because the actions taken with respect to, for example, student-athletes, affect the competitiveness of the college or university as a platform with respect to its other constituencies. The correct approach views the relevant market as a multi-sided one for the educational services of colleges and universities.

The important distinction between these two proposed relevant markets is the difference between defining the relevant market by reference only to one side of a multi-sided platform as opposed to taking into account the other sides. In *O'Bannon*, the market analysis focused solely on one side of this platform: the relationship between Division I schools and football and basketball recruits.[14]

---

[14] *O'Bannon v. National Collegiate Athletic Association*, 7 F.Supp.3d 955, 965 (2014), internal citations omitted. "FBS football and Division I basketball schools compete to recruit the best high school football and basketball players. Specifically, these schools compete to sell unique bundles of goods and services to elite football and basketball recruits. The bundles include scholarships to cover the cost of tuition, fees, room and board, books, certain school supplies, tutoring, and academic support services. They also include access to high-quality coaching, medical treatment, state-of-the-art athletic facilities, and opportunities to compete at the highest level of college sports, often in front of large crowds and television audiences. In exchange for these unique bundles of goods and services, football and basketball recruits must provide their schools with their athletic services and acquiesce in the use of their names, images, and likenesses for commercial and promotional purposes. They also implicitly agree to pay any costs of attending college and participating in intercollegiate

9

**Highly Confidential – Counsel Only**

Plaintiffs' allegations in this matter, however, require an analysis of colleges and

universities as multi-sided platforms. A failure to do so would ignore the relevant competitive

forces that affect other sides of the college education platform and could lead to erroneous

conclusions.

### 4. Summary of Conclusions

Analyzing intercollegiate sports with an understanding of the economic impact of

externalities, rather than through an overly simplistic cartel-monopsony theory, makes what the

Supreme Court has called "economic sense."[15] With an appreciation of the economic effect of

externalities, it becomes evident that the cap on financial aid for student-athletes is an efficient

form of governance to forestall market failure. In this report, I show that:

  i.   Plaintiffs' monopsony model does not fit the facts of the relationship between
       colleges and universities and student-athletes.

  ii.  The relevant market for an economic analysis of the allegations in this case is a
       multi-sided market for higher education (the "college education market").

  iii. The challenged rules on the COA cap correct for a potential market failure caused by
       the externalities that occur when one school does not take into account the effect of
       its actions on the value of amateurism to other schools.

---

athletics that are not covered by their scholarships." *O'Bannon v. National Collegiate Athletic Association*, 7 F.Supp.3d 955, 965-6 (2014), internal citations omitted.

[15] *Matsushita v. Zenith Radio Corp.*, 475 U.S. 574, 587(1986). In *NCAA v. Board of Regents,* the court concluded "Moreover, the NCAA seeks to market a particular brand of football -- college football. The identification of this 'product' with an academic tradition differentiates college football from and makes it more popular than professional sports to which it might otherwise be comparable, such as, for example, minor league baseball. In order to preserve the character and quality of the 'product,' athletes must not be paid, must be required to attend class, and the like. And the integrity of the 'product' cannot be preserved except by mutual agreement; if an institution adopted such restrictions unilaterally, its effectiveness as a competitor on the playing field might soon be destroyed. Thus, the NCAA plays a vital role in enabling college football to preserve its character, and as a result enables a product to be marketed which might otherwise be unavailable. In performing this role, its actions widen consumer choice—not only the choices available to sports fans but also those available to athletes—and hence can be viewed as procompetitive . . . The NCAA plays a critical role in the maintenance of a revered tradition of amateurism in college sports. There can be no question but that it needs ample latitude to play that role, or that the preservation of the student-athlete in higher education adds richness and diversity to intercollegiate athletics and is entirely consistent with the goals of the Sherman Act. But consistent with the Sherman Act, the role of the NCAA must be to preserve a tradition that might otherwise die; rules that restrict output are hardly consistent with this role." (*NCAA v. Board of Regents,* 468 U.S. 85, 101-2 and 120 (1984)).

10

**Highly Confidential - Counsel Only**

## C.    Plan of the Report

This report is organized as follows: Section II describes the factual setting for this case as it relates to the economic analysis. Specifically, the first half of Section II summarizes the history and basic facts about the NCAA and the Conference Defendants, including the NCAA's articulation of its commitment to amateurism. The second half reviews evidence of the value that colleges and universities attach to amateurism in intercollegiate athletics. While cynics may dismiss amateurism as a pretext for exploiting student-athletes, the economic evidence I have reviewed indicates that colleges and universities genuinely value amateur athletics.

Section III, entitled "The Relevant Market: Plaintiffs' One-sided Market versus the Economics of Multi-Sided Markets," addresses Plaintiffs' proposed relevant markets and explains why, from an economic standpoint, they are irrelevant to the issues in this case because they are one-sided, rather than multi-sided. I then describe multi-sided markets and explain how intercollegiate athletics are properly understood in the context of such markets. I explain why ignoring the multi-sided market approach means one would necessarily overlook some of the competitive consequences of decisions made with respect to intercollegiate athletics. Symptomatic of Plaintiffs' inaccurate market definitions are that were they adopted, the NCAA and its member schools would be forced to move into different relevant markets than the ones in which they currently operate and produce different products than they now supply. Market definition ought to take the products involved in a dispute as data and attempt to identify the substitutes that provide competitive discipline for those products. Here Plaintiffs ask that the production of three of the products provided by colleges and universities—namely, amateur intercollegiate athletic competition in football and men's and women's basketball—be abandoned in favor of different products — watered down versions of professional athletic competition in those three sports.

Section IV, entitled "Plaintiffs' Theory of a Monopsonistic Cartel is Flawed," describes Plaintiffs' theory in detail and explains why the NCAA does not fit the economic model of a cartel.

11

**Highly Confidential – Counsel Only**

Section V, "The NCAA, Amateurism, and Externalities in Intercollegiate Athletics," describes how externalities can cause market failure; how the value of amateurism generates positive externalities for intercollegiate athletics and the college/university community; and how economic theory anticipates a solution to externality problems that is consistent with the NCAA's collective decision to cap student-athlete financial aid.

Section VI addresses Plaintiffs' Group Boycott allegations, and Section VII is the conclusion to this report.

Through a combination of economic theory and evidence, Sections III through V demonstrate that Plaintiffs' labor-market-monopsony-cartel hypothesis is in error. The *conduct* of the NCAA is inconsistent with that of a cartel. The so-called "agreement" (the rule limiting the amount of a student-athlete's financial aid) actually is an efficiency-enhancing response to externalities inherent in amateur intercollegiate athletics. Furthermore, the "markets" Plaintiffs put forward are artificially tailored to fit their case and are not consistent with the realities of the multi-sided market for college education of which intercollegiate athletics is a part. Far from being anticompetitive, the COA cap is efficient and consistent with the goals of antitrust.

## II. The Setting

In this section of my report I describe the history of the NCAA and summarize the NCAA's statements—both in its governing documents and in its public statements—regarding its commitment to amateurism. These documents reveal, among other things, that the ideal of amateurism is closely related to the idea of the student-athlete. I then provide a description of colleges' and universities' commitment to amateurism.

### A. The NCAA

The NCAA describes itself as "a member-led organization dedicated to the well-being and lifelong success of college athletes" whose members are "invest[ed] in improving the experiences of

**Highly Confidential – Counsel Only**

student-athletes—on the field, in the classroom, and in life."[16] Member institutions are organized
into three divisions and two subdivisions (Division I with the Football Bowl Subdivision and the
Football Championship Subdivision, Division II, and Division III). The NCAA is governed by over
150 committees, including association-wide committees comprised of representatives from all
three divisions and division-specific committees that focus on issues specific to a particular
division.[17] Examples of association-wide committees include the Committee on Sportsmanship and
Ethical Conduct, the Committee on Competitive Safeguards and Medical Aspects of Sports, and the
Playing Rules Oversight Panel.[18] Division I also has a committee solely devoted to academics,
appropriately titled the Committee on Academics.[19]

### 1. NCAA History

The organization that would eventually become the NCAA was created in 1906 to address
the violent nature of early football that had resulted in frequent injuries and several deaths.[20]
Concerns regarding the sport's injury rate caught the attention of then President Theodore
Roosevelt, who invited college representatives from Harvard, Yale and Princeton to the White
House in October of 1905 to discuss and encourage reform.[21] Later that year, in December 1905
representatives from 62 institutions met to discuss additional reforms, and in March 1906, the
Intercollegiate Athletic Association of the United States (IAAUS) was formed. In 1910 the IAAUS
would change its name to the National Collegiate Athletic Association (NCAA).[22]

---

[16] "What Is The NCAA?" http://www.ncaa.org/about/resources/media-center/ncaa-101/what-ncaa
(accessed 1/3/17) and "Membership," http://www.ncaa.org/about/who-we-are/membership (accessed
1/3/17).

[17] "NCAA committees," http://www.ncaa.org/governance/committees (accessed 2/3/17).

[18] "NCAA committees," http://www.ncaa.org/governance/committees (accessed 2/3/17).

[19] "Division I Committee on Academics,"
http://www.ncaa.org/governance/committees/division-i-committee-academics (accessed 3/18/17).

[20] Joseph N. Crowley, "In the Arena" (hereafter, "Crowley"), pp. 10 and 154.

[21] Crowley, pp. 9-10.

[22] Crowley, p. 10.

13

**Highly Confidential – Counsel Only**

In addition to developing a set of guidelines for intercollegiate football that were designed

to eliminate "unnecessary roughness and brutality,"[23] the IAAUS also adopted rules regarding

eligibility, amateur status, and financial compensation for players.[24]  In the IAAUS' first set of

bylaws, its definition of amateurism appeared as follows:

> No student shall represent a College or University in an
> intercollegiate game or contest who is paid or receives, directly or
> indirectly, any money or financial concession or emolument as past
> or present compensation for, or as prior consideration or
> inducement to play in, or enter any athletic contest, whether the said
> remuneration be received from, or paid by, or at the instance of any
> organization, committee or faculty of such College or University, or
> any individual whatever.[25]

This definition has been updated at times throughout the NCAA's history but its essential features

have remained constant.

In 1916 the NCAA reemphasized this commitment to amateurism with the adoption of a

new rule describing an amateur athlete as "'one who participates in competitive physical sports

only for pleasure, and the physical, mental, moral and social benefits directly derived therefrom.'"[26]

That rule was reaffirmed again in 1922 with the rules describing an amateur as "'one who engages

in sport solely for the physical, mental or social benefits he derives therefrom, and to whom the

sport is nothing more than an avocation.'"[27]

---

[23] *Salt Lake Herald*, "Football Rules Made At Last," April 2, 1906.

[24] *O'Bannon v. National Collegiate Athletic Association*, 7 F.Supp.3d 955, 973-4 (2014) (citing, "Stip. Undisputed Facts").

[25] *O'Bannon v. National Collegiate Athletic Association*, 7 F.Supp.3d 955, 973-4 (2014) (citing, "Stip. Undisputed Facts").

[26] *O'Bannon v. National Collegiate Athletic Association*, 7 F.Supp.3d 955, 974 (2014) (citing, "Stip. Undisputed Facts").

[27] *O'Bannon v. National Collegiate Athletic Association*, 7 F.Supp.3d 955, 974 (2014) (citing, "Stip. Undisputed Facts").

14

**Highly Confidential – Counsel Only**

Between 1906 and 1920, numerous additional sports were included under NCAA supervision[28] and over the next 30 years the organization grew from 170 members in 1919 to over 380 by 1950.[29]

As the popularity of college sports increased, intercollegiate athletics faced growing commercialization and problems regarding financial and non-financial inducements offered to student-athletes.[30] A 1929 Carnegie Foundation for the Advancement of Teaching Report found evidence of numerous NCAA rule violations, especially the subsidization and illegal recruitment of student-athletes.[31] In response, the NCAA imposed additional regulations regarding student-athlete eligibility, recruitment, and financial aid, culminating in the "Sanity Code" of 1948.[32]

The Sanity Code put restrictions on financial aid and recruiting. It prohibited colleges and universities from awarding financial aid based on athletic prowess.[33] While the NCAA had existing legislation governing amateurism,[34] the Sanity Code was its first effort to establish an enforcement mechanism.[35] However, the punishment for violations was so severe — the termination of an individual school's NCAA membership — that the NCAA was unable to enforce the code, as two-thirds of its members were unwilling to vote for the expulsion penalty.[36]

The Sanity Code was repealed in January 1951 and a new code was adopted a year later that had "a more practicable approach to enforcement."[37] Under the new code, the NCAA had a more

---

[28] By 1919, the organization "was directly involved in 11" intercollegiate sports (Crowley, p. 21).

[29] Crowley, p. 21; NCAAGIA000410434-533 at 440.

[30] Crowley, p. 26.

[31] Crowley, pp. 25-6.

[32] Crowley, p. 30.

[33] Crowley, p. 45.

[34] See, p. 14 above.

[35] *Chicago Tribune*, "NCAA Moves to Eoforce 'Sanity Code'," January 9, 1948.

[36] Crowley, p. 31.

[37] Crowley, p. 36.

**Highly Confidential – Counsel Only**

flexible enforcement mechanism whose penalties included probation, suspension, and termination of membership.[38] Five years later, the NCAA established a grant-in-aid system allowing colleges and universities to award students athletic scholarships,[39] up to "commonly accepted educational expenses (*i.e.*, tuition and fees; room and board; required course-related supplies and books, and incidental expenses not in excess of fifteen dollars per month)."[40] The fifteen dollar allowance for "incidental expenses" was sometimes known as "laundry money."[41] In 1975 the NCAA eliminated laundry money from the calculus and capped the grant-in-aid at tuition, fees, books and room and board.[42]

As college athletics grew, the NCAA modified its organization to accommodate a broader range of athletic programs across its member institutions, resulting in variations or differing tiers of competition.[43] In 1973, the NCAA divided its membership into three divisions.[44] Division I schools typically have the largest student bodies and budgets for athletic programs. These schools generally offer fully funded athletic scholarships for many student-athletes.[45] Division I schools are required to offer at least fourteen sports and must satisfy rules ensuring equal access to sports by

---

[38] Crowley, p. 36.

[39] *O'Bannon v. National Collegiate Athletic Association*, 7 F.Supp.3d 955, 974 (2014) (citing, "Stip. Undisputed Facts").

[40] NCAAGIA00328670-775 at 676.

[41] *O'Bannon v. National Collegiate Athletic Association*, 7 F.Supp.3d 955, 974 (2014) (citing, "Stip. Undisputed Facts").

[42] Gordon S. White Jr., "N.C.A.A Cuts Athletes' Aid," *New York Times*, August 15, 1975.

[43] Crowley, p. 42.

[44] Crowley, p. 42.

[45] "NCAA Division I," http://www.ncaa.org/about?division=d1 (accessed 12/27/16). Division I recognizes two categories of sports: head-count and equivalency. All Division I sports have a predetermined number of athletic scholarships, but different sports have different rules on how those scholarships can be distributed. Head-count sports must provide full athletic scholarships to each student-athlete receiving aid, whereas equivalency sports can split the value of a full grant-in-aid between numerous student-athletes (2016-17 Manual, Article 15.5).

16

**Highly Confidential – Counsel Only**

gender.[46] Division II schools usually devote fewer financial resources to their athletic programs. They typically offer "partial-scholarships" for student-athletes.[47] Division III schools comprise the largest NCAA division both in terms of number of schools and number of students competing in a sport.[48] Division III schools do not offer athletic scholarships.[49] In 1978, the football programs in Division I schools were further subdivided into Divisions I-A and I-AA (renamed the Football Bowl Subdivision and the Football Championship Subdivision in 2006) to separate schools that participate in bowl games from the schools in the NCAA-run football championship.[50]

In 1980 "the NCAA had its first co-ed championship," which was followed one year later by the adoption of a female athletic program governance plan.[51] During this time, the NCAA also passed Proposition No. 48, which established an NCAA-wide minimum threshold for both grade point averages ("GPAs") and standardized test scores for the first time.[52]

---

[46] Specifically, the relevant rules say that "A member institution shall sponsor teams in a minimum of: (a) Seven varsity intercollegiate sports, including at least two team sports, based on the minimum requirements of Bylaw 20.9.6.3 and involving all-male teams or mixed teams of males and females, and seven varsity intercollegiate sports (of which a maximum of two emerging sports per Bylaw 20.02.4 may be used), including at least two team sports, based on the minimum requirements of Bylaw 20.9.6.3 and involving all-female teams; or (b) Six varsity intercollegiate sports, including at least two team sports, based on the minimum requirements of Bylaw 20.9.6.3 and involving all-male teams or mixed teams of males and females, and eight varsity intercollegiate sports (of which a maximum of two emerging sports per Bylaw 20.02.4 may be used), including at least two team sports, based on the minimum requirements of Bylaw 20.9.6.3 and involving all-female teams. (See Bylaws 20.9.9.1 and 20.9.10.1 for additional sports sponsorship requirements for member institutions participating in football.)" (2016-17 Manual, Article 20.9.6).

[47] "About NCAA Division II," http://www.ncaa.org/about?division=d2 (accessed 2/3/17).

[48] "NCAA Division III," http://www.ncaa.org/about?division=d3 (accessed 2/3/17).

[49] "The Division III Experience," http://www.ncaa.org/division-iii-experience (accessed 3/14/17).

[50] NCAA, "Football Championship Subdivision Records," 2013.

[51] "The evolution of women's college sports," http://usatoday30.usatoday.com/sports/college/20010927-women-timeline.htm (accessed 12/27/16).

[52] Gary Brown, "NCAA Graduation Rates: A Quarter –Century of Tracking Academic Success," http://www.ncaa.org/about/resources/research/ncaa-graduation-rates-quarter-century-tracking-academic-success (accessed 12/27/16).

17

**Highly Confidential – Counsel Only**

In 1997, the NCAA changed its governance to increase the extent to which the three competitive divisions set policy for themselves.[53] Division I had the most significant change: adopting a representative governance system where the conferences have major decision-making authority.[54]

Division I underwent further organizational change in 2014 that brought "autonomy" to the five larger conferences.[55] Under the new rules, the autonomy conferences can regulate and make certain legislative changes for themselves, without the need of smaller conference approval.[56] One of those changes already has been enacted. In 2015 the autonomy conferences voted to adopt rules allowing athletic scholarships that cover the full cost of attendance, or "COA."[57] In addition, the Division I Board of Directors was expanded to include a "student-athlete, faculty representative, athletics director and female administrator"[58] and a new governing body known as the Council was created,[59] which is "responsible for day-to-day operation of the division" and has "two seats for student-athletes, two for faculty and four for commissioners."

[53] Malcolm Moran, "N.C.A.A. Has to Work Out Details of Its New Structure," *New York Times*, January 12, 1997.

[54] "History of Faculty Involvement in Collegiate Athletics," http://www.ncaa.org/sites/default/files/History+of+Faculty+Involvement_final.pdf (accessed 3/15/17).

[55] Dan Wolken, "NCAA Board approves Division I autonomy proposal," http://www.usatoday.com/story/sports/college/2014/08/07/ncaa-board-of-directors-autonomy-vote-power-five-conferences/13716349/ (accessed 3/19/17).

[56] Amy Wimmer Schwarb, "DI schools outside autonomy group ponder how to work together," http://www.ncaa.org/about/resources/media-center/news/di-schools-outside-autonomy-group-ponder-how-work-together (accessed 3/19/17).

[57] Michelle B. Hosick, "Autonomy schools adopt cost of attendance scholarships," http://www.ncaa.org/about/resources/media-center/autonomy-schools-adopt-cost-attendance-scholarships (accessed 3/14/17).

[58] Michelle B. Hosick, "Board adopts new Division I structure," http://www.ncaa.org/about/resources/media-center/news/board-adopts-new-division-i-structure (accessed 12/27/16).

[59] Michelle B. Hosick, "Board adopts new Division I structure," http://www.ncaa.org/about/resources/media-center/news/board-adopts-new-division-i-structure (accessed 12/27/16).

18

**Highly Confidential – Counsel Only**

Which brings us to the present day. Headquartered in Indianapolis, the NCAA currently has net assets totaling $294 million,[60] oversees more than 80 different intercollegiate championships[61] and in conjunction with its more than 1,100[62] members provides over $2.7 billion in athletic scholarships.[63] As of 2016, there were close to 500,000 student-athletes participating in NCAA championship, non-championship and emerging sports.[64] All of the NCAA's net revenues (except for reserves) are distributed to its member institutions (directly or through redistribution by the conferences) to support the academic and athletic programs of the institutions.[65]

## 2.   The NCAA and Amateurism

### a.   The NCAA's Governing and Public Documents

Reflecting the importance that its member schools attach to amateurism, the NCAA has enshrined the principle in its constitution. Article 1.3 of the NCAA Constitution describes the organization's "Fundamental Policy," and the beginning of the article reads

> 1.3 Fundamental Policy. [*]
>
> 1.3.1 Basic Purpose. [*] The competitive athletics programs of member institutions are designed to be a vital part of the educational system. A basic purpose of this Association is to maintain intercollegiate athletics as an integral part of the educational program and the athlete as an integral part of the student body and,

---

[60] NCAA Financial Statements 2015-16.

[61] "2013-14 NCAA National Championships," http://www.ncaa.com/news/ncaa/article/2014-01-25/2013-14-ncaa-national-champions (accessed 1/3/17).

[62] "What is the NCAA?" http://www.ncaa.org/about/resources/media-center/ncaa-101/what-ncaa (accessed 12/27/16).

[63] "The value of college sports," http://www.ncaa.org/student-athletes/value-college-sports (accessed 12/27/16).

[64] NCAA Sports Sponsorship and Participation Rates Report: Student-Athlete Participation 1981-82 – 2015-16, pp. 79-80.

[65] "Distributions," http://www.ncaa.org/about/resources/finances/distributions (accessed 3/16/17); "The NCAA Budget: Where the Money Goes," http://www.ncaa.org/health-and-safety/sport-science-institute/ncaa-budget-where-money-goes (noting a distribution rate of 96%) (accessed 3/21/17).

19

**Highly Confidential – Counsel Only**

> by so doing, retain a clear line of demarcation between
> intercollegiate athletics and professional sports.[66]

Another provision in the NCAA constitution is "The Principle of Amateurism," which reads:

> 2.9 The Principle of Amateurism. [*]
>
> Student-athletes shall be amateurs in an intercollegiate sport, and
> their participation should be motivated primarily by education and
> by the physical, mental and social benefits to be derived. Student
> participation in intercollegiate athletics is an avocation, and student-
> athletes should be protected from exploitation by professional and
> commercial enterprises.[67]

In addition to these constitutional provisions, the NCAA describes its members' commitment to

amateurism on its public website in similar terms:

> Amateur competition is a bedrock principle of college athletics and
> the NCAA. Maintaining amateurism is crucial to preserving an
> academic environment in which acquiring a quality education is the
> first priority. In the collegiate model of sports, the young men and
> women competing on the field or court are students first, athletes
> second.[68]

All of the Division I schools (which are the particular focus of this case) have adopted a

commitment to amateurism:

### Commitments to the Division I Collegiate Model

> In addition to the purposes and fundamental policy of the National
> Collegiate Athletic Association, as set forth in Constitution 1,
> members of Division I support the following commitments in the
> belief that these commitments assist in defining the nature and
> purposes of the division. These commitments are not binding on
> member institutions, but serve as a guide for the preparation of
> legislation by the division and for planning and implementation of
> programs by institutions and conferences. . . .

---

[66] 2016-17 Manual, Article 1.3.1. The asterisks printed in sections of the NCAA constitution indicate to readers the voting procedures required for amendment of each section. Asterisks indicate that a particular provision is a "Dominant Provision," which is defined as: "Dominant provision—Legislation that is derived from the constitution in the 1988-89 Manual (the Manual format that was employed until the membership approved the revised format at the 1989 Convention). All such legislation is identified by an asterisk (*) and requires a two-thirds majority vote of the total membership (present and voting) for adoption or amendment." (2016-17 Manual, § III).

[67] 2016-17 Manual, Article 2.9.

[68] "Amateurism," http://www.ncaa.org/amateurism (accessed 2/14/17).

20

**Highly Confidential – Counsel Only**

> **The Commitment to Amateurism.** Member institutions shall
> conduct their athletics programs for students who choose to
> participate in intercollegiate athletics as a part of their educational
> experience and in accordance with NCAA bylaws, thus maintaining a
> line of demarcation between student-athletes who participate in the
> Collegiate Model and athletes competing in the professional model.[69]

### b.   Amateurism and the Student-Athlete

The documents cited above reveal a close connection between the idea of amateurism and

the idea of the student-athlete. The NCAA constitution describes a basic purpose of the

organization as being to "maintain intercollegiate athletics as an integral part of the educational

program and the athlete as an integral part of the student body." It calls for a "line of demarcation"

to separate intercollegiate athletics from professionalism. On its public website the organization

describes *amateurism* as "crucial to preserving an *academic* environment." The website further

insists that competitors are "students first, athletes second." The title of the Division I Commitment

to Amateurism is expressed as a commitment that intercollegiate athletics will be "part of the

educational experience," and it repeats the "line of demarcation" language separating

intercollegiate athletics from professional sports.

In short, the NCAA sustains amateurism by ensuring that athletes who compete on behalf of

schools are *bona fide* student-athletes who participate in athletics as part of their education and not

in return for the compensation they could thereby acquire. There is significance to this. At a

certain mechanical level one could imagine four different categories of athletes competing on behalf

of universities: amateur student-athletes, amateur non-student athletes, professional non-student

athletes, and professional student-athletes. The NCAA's governing principles limit competition to

athletes who are students and amateurs, ruling out all but the first possibility.

There is good reason for them to do so. Being a student takes a major commitment of time

and effort, as does being an elite athlete. In an employment relationship, such as the relationship

---

[69] 2016-17 Manual, "Commitments to the Division I Collegiate Model," emphasis in original.

21

**Highly Confidential – Counsel Only**

professional athletes would have with their employers, professional athletes are encouraged and incentivized to place paramount emphasis on their athletic performance. A professional student-athlete would find their incentives skewed against his or her studies. Mark Emmert, President of the NCAA, expressed the idea in his deposition when he said:

> [I]f I'm paying somebody 100,000 a year to play football, the last thing I want them to do is study calculus. I want them to play football.[70]

The economic reality that Mr. Emmert synthesized is that athletics and education compete for the time, attention, and effort of a student-athlete. If the student-athlete were a professional, the professional pressures and economic incentives would work against education. But, of course, education is the purpose of colleges and universities. It's still a challenge in the existing system, as coaches and athletic directors know, but a student-athlete, whose primary purpose for going to school is to get an education, is in a better position to strike the balance between academics and athletics than a professional athlete would be. During my interview with Wake Forest University President Nathan Hatch, he expressed similar concerns, saying that athletes who were paid more money would find it harder to balance athletic and academic demands on their time.[71]

## B.    Universities and Amateurism

Understanding the student-athlete model of amateur athletics in intercollegiate competition reveals the lengths to which colleges and universities that are members of the NCAA go to live up to their commitment to amateurism, which in the context of the student-athlete model means devoting real resources and effort to the education and student-experience of student-athletes.

One sees the appeal to the student-athlete model of amateurism in athletic departments' plans and mission statements. For example, Ohio State University describes its mission as:

---

[70] Deposition of Mark Emmert, 1/12/17 (hereafter, "Emmert Deposition"), p. 97.

[71] Hatch Interview.

22

Highly Confidential – Counsel Only

> We foster a culture that provides the opportunity to develop our
> student-athletes through success in academics and competition to
> achieve excellence in life.[72]

And it describes one of its values as:

> We will educate each student-athlete with quality academic,
> competitive, leadership and social experiences to build a sense of
> responsibility and foster an appreciation for life-long learning.[73]

Similarly the Purdue University Plan 2020, the athletics department's strategic plan, includes the

following goal directed at student-athletes:

> **Student-Athlete Development and Welfare**: We will deliver
> exceptional support services throughout the athletics department to
> all student-athletes to ensure they are mentally and physically
> prepared to absorb the skill development necessary to maximize
> their potential as students, leaders, and athletes.[74]

Similar statements may be found in documents from other schools and conferences.[75]

The NCAA and its member institutions have demonstrated their commitment to including

athletics as a component of the college experience that contributes to the diversity of the campus

community and educational mission of the member schools.  A key element of this commitment is

ensuring that student-athletes are integrated members of the college and university community

who are able to succeed academically and benefit from their educational and extracurricular

experiences.  The fact that the schools expend costly resources for this purpose indicates—in terms

that are particularly credible to an economist—that those schools have a genuine commitment to

the student dimension of student-athletes and that eligibility rules are not just a means of lowering

the cost of producing sporting events.

---

[72] Ohio State Mission Statement.

[73] Ohio State Mission Statement.

[74] PUR-PR-00023-34 at 26.

[75] See for example SEC00310481-2 at 1(University of Kentucky); SB_GIA_137560-731 at 653 (Troy
University); MAC_000967 (Mid-American Conference); MWC_GIA_006380-97 at 84 (Mountain West
Conference); SEC00049539-712 at 551 (Southeast Conference); PAC12GIA_00020473 at slide 4 and
PAC12GIA_00027209-10 at 9 (PAC-12); ACC-GIA044190-324 at 193 (ACC).

**Highly Confidential – Counsel Only**

### 1. The NCAA and its member institutions value student-athletes as members of the student body

Professional athletes are valued primarily for their performance on the field or on the court

whereas amateur student-athletes are valued both because they are full-fledged members of the

student body of their college or university and because of their participation in athletics. The NCAA

and its member institutions recognize the importance of student-athletes being students first, and

that this is incompatible with them being professional athletes. In its "Commitments to the Division

I Collegiate Model," the NCAA states:

> Intercollegiate athletics programs shall be maintained as an
> important component of the educational program, and student-
> athletes shall be an integral part of the student body. Each member
> institution's admission and academic standards for student-athletes
> shall be designed to promote academic progress and graduation and
> shall be consistent with the standards adopted by the institution for
> the student body in general.[76]

Additional evidence on this point is summarized in Appendix D.

### 2. Universities' commitment to educating student-athletes is demonstrated by substantial investments in academic support services.

Colleges and universities invest substantial resources in providing academic support for

student-athletes. In a 2009 NCAA survey of all Division I Athletics Departments, 88% of institutions

reported having a physical space on campus dedicated to academic support for student-athletes,

and 70% of institutions reported having updated that space within the last 5 years.[77] Nearly 10%

of those updates cost $1 million or more.[78] For example, the University of Kentucky ("UK")

established the Center for Academic and Tutorial Services ("CATS") in 1981, which provides

academic support services to student-athletes, including an average of 100 hours of tutoring per

---

[76] 2016-17 Manual, "Commitments to the Division I Collegiate Model."

[77] NCAAGIA03423528-73 at 39. Preliminary version of results was released in September 2009. (NCAA, "Student-Athlete Academic Support Services at Division I Institutions," September 2009).

[78] NCAAGIA03423528-73 at 39.

24

**Highly Confidential – Counsel Only**

day, as well as career and life skills development.[79] UK opened an expanded CATS facility in 1998 at

a cost of $2.4 million with help from a $1 million grant from the Ohio Casualty Insurance Group. As

of December 2000, the center's budget was $1.5 million.[80]

Schools' commitment to their student-athletes does not end when those students no longer

play for the school team, further demonstrating that student-athletes are valued beyond their

athletic ability. In 2014, the ACC submitted its list of initial priorities to the NCAA, which included

"[e]nsuring institutional flexibility to provide educational support for former student-athletes" and

"[e]xamination of career-related insurance options for student-athletes."[81]

Additional evidence of this kind is summarized in Appendix D.

### 3. The NCAA and its member institutions have demonstrated that academic standards should not be sacrificed to achieve athletic success

In 2003, the NCAA launched an academic reform effort to "encourage improved academic

performance and progress toward graduation for all student-athletes."[82] The key elements of the

reform included 1) increasing the number of core courses required for high school graduates to

obtain initial eligibility,[83] 2) requiring student-athletes to make steady term-by-term progress

toward an academic degree, 3) establishing a system of awards and penalties to increase the

---

[79] "Center For Academic and Tutorial Services," http://www.ukathletics.com/news/genrel_121300aaa_html (accessed 2/27/17).

[80] "Center For Academic and Tutorial Services," http://www.ukathletics.com/news/genrel_121300aaa_html (accessed 3/10/17).

[81] ACC-GIA009440-1 at 40.

[82] The National Collegiate Athletic Association, "Division I Academic Reform: Overview (Revised October 2003)" October 9, 2003.

[83] The new initial eligibility rules also removed the requirement that students achieve a minimum score of 17 on the ACT or 820 on the SAT in response to concerns that the standardized test requirements disproportionately disqualified minority athletes from eligibility. (See Mark Asher and Jon DeNunzio, "Student-Athletes Find it Harder to Stay in the Game," *Washington Post,* May 28, 1995 and The National Collegiate Athletic Association, "Division I Academic Reform: Overview (Revised October 2003)" October 9, 2003). While this could have been an opportunity to decrease the organization's academic standards, the NCAA demonstrated its commitment to the educational mission of its member institutions by increasing the coursework requirements for initial eligibility and setting higher standards for academic progress of student-athletes.

25

**Highly Confidential – Counsel Only**

accountability of member institutions for educating student-athletes, and 4) adjusting time demands so that student-athletes are able to meet the new academic standards.[84]

Penalties for failing to meet the standards for academic progress include the loss of scholarships, recruiting limitations, and the loss of eligibility to participate in postseason or preseason competition, including bowl games and NCAA championships.[85] The introduction of higher academic standards has been a meaningful requirement that has posed challenges for several Division I athletics departments. In 2005, the NCAA reported that 7.2 percent of the 5,720 men's and women's Division I sports teams did not achieve the minimum Academic Progress Rate (APR), and approximately 50 percent of all schools had at least one team in danger of losing at least one scholarship for the 2005-2006 academic year.[86]

Additional evidence of this kind also is summarized in Appendix D.

## III.    The Relevant Market: Plaintiffs' One-sided Market versus the Economics of Multi-Sided Markets

In antitrust cases, the delineation of a relevant market can often be central to the outcome of the case. If the boundaries of the relevant market are not properly drawn, any analysis of what is going on in the *faux* market may end up being mistaken and therefore unreliable. Defining the relevant market in an antitrust analysis is essentially an economic exercise the purpose of which is to achieve a public policy goal: the protection and promotion of overall consumer welfare.

The relevant market in this case is a multi-sided market for college education in the United States. Because colleges and universities are complex organizations that serve multiple constituencies that interact with one another in a variety of ways, this conclusion necessarily

---

[84] The National Collegiate Athletic Association, "Division I Academic Reform: Overview (Revised October 2003)" October 9, 2003.

[85] "NCAA Addresses Academic Progress Issues,"
http://www.santaclarabroncos.com/general/2003-04/releases/043004aaa.html (accessed 2/27/17).

[86] Teddy Greenstein, "NCAA puts number on academic reform," *Chicago Tribune*, March 1, 2005.

**Highly Confidential – Counsel Only**

involves taking into account both the complexity of the organizations and the effects acting on those organizations.

In this section of my report I explain the reasons for my conclusion. In sub-section A, I introduce the ideas that are pertinent to defining a relevant market in this context, and the remaining sub-sections take up the details. Sub-section B contains a description of multi-sided markets and competition between multi-sided platforms; sub-section C applies the concepts of multi-sided competition to market definition for purposes of this case; and in sub-section D, I describe why Plaintiffs' proposed relevant market fails to capture the competitive forces relevant to the allegations they have made.

## A.    Concepts for Market Definition

Because it is a community of multiple constituencies, what it means for a university to "compete" with other universities is more complex than it is for a firm that manufactures a physical good like a tennis racket to compete with other tennis racket manufacturers, or a firm that provides a specific service like a beauty salon to compete with other beauty salons. The economic demand to participate in the college or university by each of its many constituencies depends on the participation of other constituencies in the school, so setting competitive prices is a complex matter and cannot be determined without reference to the effect that pricing to one constituency has on other constituencies.

This interdependence is characteristic of what economists call a multi-sided platform. This means that a college or university brings together individuals from multiple constituencies and creates value out of the interaction among those constituencies. In a multi-sided platform, the value to each constituency of platform participation depends on the participation of other constituencies. That mutual dependence means that how the platform is priced to each constituency affects *all* constituencies. For example, a price increase to one side will reduce participation on that side, and that reduced participation will diminish the value of the platform to the other sides of the platform,

27

**Highly Confidential - Counsel Only**

reducing their participation as well. Thus, increasing the price on one side only will result in volume changes on *both* sides of the platform. Multiple constituencies participating in a given platform increase the complexity and importance of these economic interactions to proper market definition.

The essential problem in market definition is to identify the sources of discipline on pricing. In other words, one attempts to answer the question: How will price changes affect the volume of business? Answering that question will determine which price changes are—and are not— profitable, *i.e.*, answering that question will determine if the producer of that product or service has market power of antitrust concern. When a firm takes part in a multi-sided market the effect of price increases on any one side of the market are likely to be felt on any and all sides. Therefore, markets must be defined for multi-sided platforms with respect to all sides of the platform. Because colleges and universities are platforms that serve several mutually dependent constituencies, they are multi-sided platforms, for which relevant markets must be defined in multi-sided terms.

The relevant market here—the multi-sided market for college education—is just such a market. It encompasses the effect of pricing to any one constituency on the volume of participation by all of the college's or university's various constituencies, which includes student-athletes in each of their respective sports, non-athlete students, alumni, coaches and athletic staff, faculty, other staff, the community in which the school is located, and, if they are public institutions, the state.[87]

The proper relevant market differs from those proposed by Plaintiffs, which are labor markets for three different groups of student-athletes.[88] Plaintiffs' proposed market definitions are

---

[87] This list is not necessarily exhaustive. Public fans of the university's athletic teams are also a relevant constituency, as are broadcasters, who in a fashion analogous the description of magazines, operate a two-sided platform, themselves, serving viewers (including public fans of the university's teams) and the broadcaster's advertisers.

[88] Or two, depending on which complaint you read.

28

**Highly Confidential – Counsel Only**

one-sided. They focus exclusively on the terms colleges and universities offer student-athletes for their participation in three particular sports. Since all the other constituencies that are part of a college or university are outside Plaintiffs' relevant markets, any use of Plaintiffs' market definitions would ignore the effect that a change in "pricing" to, say, football players would have on the demand or supply decisions of participants, such as student-athletes in other sports and non-athlete students on other sides of the platform.

To be clear, the key difference between the correct relevant market and the relevant markets proposed by Plaintiffs is more than just the difference between a market for education and markets for labor. It is the difference between a *multi-sided* market for education and *one-sided* markets for labor.

Had Plaintiffs offered *one-sided* relevant markets for the education of football student-athletes, male basketball student-athletes, and female basketball student-athletes, they still would not have avoided the fundamental error in their approach. That error is to focus analytical attention exclusively on the terms under which each type of student-athlete attends the college or university and participates in athletics. The approach is erroneous because it excludes analysis of the effect that pricing and conduct on one side of the multi-sided platform has on the other sides of the multi-sided platform. In short, by proposing one-sided relevant markets, Plaintiffs propose to use an analytical framework that is deficient in that it neglects the competitive discipline on colleges and universities that comes from other sides of the multi-sided platform.

**B.     Multi-Sided Markets and Network Externalities**

Intercollegiate athletic competition is an activity that creates value by networking or bringing together groups of people from different constituencies where the value of the activity for members of one constituency depends on the participation in the activity of members of other constituencies. This kind of interaction has been studied in the economics literature under the

29

**Highly Confidential – Counsel Only**

rubric of "two-sided" or, more generally, "multi-sided" markets.[89] To describe the general principles of two-sided markets, it is helpful to consider an example, magazine publishing.

Magazines serve two distinct constituencies. They have readers and they have advertisers. Typically, a magazine charges members of both groups to "participate" in the platform, *i.e.*, the magazine. Readers pay to purchase or subscribe to the magazine, and advertisers pay to have their advertisements appear in the magazine.

The value of the magazine to the members of each constituency depends, among other things, on the participation of members of the other constituency. That's easiest to see with advertisers. They advertise in a magazine in order to place their marketing messages in front of consumers, who are also readers of the magazine. The more readers the magazine has, the more valuable it is for advertisers to have their messages in the magazine. For readers, the value of the magazine also depends, among other things, on the participation of advertisers. The relationship for readers may be more complex than it is for advertisers. While some advertisements—especially if they are for products the readers of the magazine value—may enhance the value of the magazine to readers, it is possible that too many advertisements, or advertisements for the wrong sort of product, could diminish the value of the magazine to readers.

This relationship will differ from one magazine to another. For example, because I enjoy older cars, I subscribe to a magazine called *Hemmings Motor News.* In addition to articles and photographs of interest to automobile enthusiasts, *Hemmings* contains a substantial advertising section that is of special value to its readers, because it is through these advertisements that one can find and obtain difficult-to-locate automotive parts, such as, for example, a left front fender for a 1951 Hudson Hornet, or to purchase a classic or unusual car itself (such as a 1951 Hudson

---

[89] Jean-Charles Rochet and Jean Tirole, Two-Sided Markets: An Overview, *Working paper, Institut d'Economie Industrielle* (2004); American Bar Association, *Market Definition In Antitrust: Theory And Case Studies* (American Bar Association, 2012), Chapter XI; David S. Evans, The Antitrust Economics of Multi-Sided Platform Markets, *Yale Journal on Regulation* 20, issue 2, article 4 (2003).

30

**Highly Confidential – Counsel Only**

Hornet). On the other hand, a general news magazine like *Time* or *Newsweek* may find it optimal to include fewer advertisements relative to editorial content lest excessive advertising drive readers away.

The situation is depicted in the diagram below. The magazine is the platform that serves both readers and advertisers. The blue lines at the bottom of the figure represent the effects that the participation of the members of each constituency have on the value that members of the other constituency obtain from the platform.

Figure 1, A Magazine as a Two Sided Platform



When a magazine publisher considers the prices it charges on each side of its two-sided market (*i.e.*, to readers and advertisers), it has to consider the effects represented by the blue lines in Figure 1. This makes pricing decisions more complicated for a magazine publisher than for firms in ordinary (one-sided) markets. Suppose the publisher is considering lowering the magazine's subscription price. If the magazine were produced in a one-sided market, the publisher would anticipate that if the price is lowered, the magazine will likely sell more copies. This is the law of demand in action.

Whether or not the price decrease will increase total sales depends on how many more magazines are sold. If the additional volume is large enough, it will make up for the smaller price realized on each copy and the magazine will earn more revenue. The magazine publisher could

**Highly Confidential – Counsel Only**

then compare the amount of that marginal revenue with the extra cost incurred to produce copies of the magazine for additional readers (the marginal cost) and determine whether or not the magazine's profit would be increased by the price cut.

For a magazine publisher operating in a two-sided market, there's an additional consideration. As the subscription price is cut and readership grows, the magazine becomes more attractive to advertisers, whose willingness to pay for space in the magazine increases. Thus, with the cut in the *subscription* price to readers, the magazine stands to make more revenue from *advertisers*. The additional advertising revenue could make a subscription price cut that wasn't profitable on its own (*i.e.*, only with respect to readers) profitable when advertising revenue is taken into account.[90] In order to set optimal (*i.e.*, profit maximizing) prices the magazine publisher has to tease out prices that will lead to the optimal balance between both constituencies—the readers and the advertisers.

This example illustrates a number of essential aspects of two-sided markets. There are two distinct constituencies, and each constituency is influenced not only by its own price but also by the price to the other group, because a group's prices influence its participation—and the participation of members of one group affects the value of the platform for other groups. This is a phenomenon that economists refer to as "network externalities." A network externality is a type of externality that arises when parties care about the participation of other parties in some network.[91] Magazine publishing also illustrates the possibility that pricing can be very asymmetric on a two-sided

---

[90] This is one reason subscription prices for most car magazines are relatively low.

[91] Network externalities arise naturally in two-sided (or multi-sided) markets, but they are not limited to those settings. A common example of network externalities in a setting that is not a two-sided market is the telephone network. The more individuals who have telephone service, the more valuable it is to each individual to get service because the network offers the opportunity to communicate with more people. If none of my friends, family, or business associates had telephone service, the value of the service to me would be significantly reduced.

**Highly Confidential – Counsel Only**

platform. Some publications, for example *Metro NY* in New York[92] and the *C'Ville Weekly*[93] in Charlottesville where I live are distributed for *free* to readers, and these publications only collect revenue from advertisers.

The magazine example also illustrates how the conduct of participants in the platform, if not regulated, could undermine the value of the platform. Most magazines enforce standards of conduct and integrity on their advertisers. Publishers have an incentive to do so because if advertisers took advantage of reader/consumers, the magazine would acquire a bad reputation among readers, leading them to stop purchasing the magazine. A loss of readership harms all advertisers, including those who had not taken advantage of readers.

## C.   Intercollegiate Athletics as a Multi-Sided Platform

I have provided this example of a two-sided market to further assist the Court in understanding the NCAA's COA cap and the appropriate relevant market in which to analyze the cap. I now apply this analytical framework to intercollegiate athletics.

### 1.   Colleges and Universities as Multi-Sided Platforms

A college or university is a multi-sided platform, similar to the example given above, but in the case of colleges and universities, there are multiple constituencies that include at least student-athletes in each of their respective sports, non-athlete students, alumni, coaches and athletic staff, faculty, other staff, the community in which the school is located, and, if it is a public institution, the state.[94]

Student-athletes benefit directly from the participation of faculty and coaches and trainers. They also benefit from the participation of other students and alumni (and other members of the college or university community) who take an interest in their competition and root for them as

---

[92] "Metro is the most-read free daily newspaper in New York," http://www.metro.us/local/metro-is-the-most-read-free-daily-newspaper-in-new-york/tmWmkr—-7eGwFMneRsU2 (accessed 3/15/17).

[93] "News Media," http://www.readthehook.com/media (accessed 3/15/17).

[94] As I indicated earlier, this list is not necessarily exhaustive. See note 87.

33

**Highly Confidential – Counsel Only**

spectators. For student-athletes who value participation in high-stakes competition, this kind of following makes the competition more significant, which provides the motivation for the contestants to stretch the limits of their talent.[95] Student-athletes in different sports benefit from the presence of one another and the opportunity to take advantage of shared facilities.

Students who are not varsity athletes benefit from the competition of varsity student-athletes in at least three ways. Some of them are sports fans and will enjoy watching the games. Others may not follow the games closely but nonetheless benefit from intercollegiate athletic competition that can become the focal point or catalyst for a college or university-wide sense of community, what Wake Forest President Nathan Hatch described as spirit.[96] School spirit is a collective good that members of a college or university can share in common. Finally, the presence of student-athletes in the student-body contributes to the diversity of that community, which is an attribute many colleges and universities, by revealed preference, indicate that they value.[97]

For similar reasons, a school's alumni and other members of the school community, such as faculty and other staff, also can derive benefits from the sense of shared community fostered by intercollegiate athletic competition. Thus, these constituencies benefit from the enrollment of student-athletes and students who do not actually compete in sports.

Coaches and trainers, of course, would have nothing to do in the absence of student-athletes, so they benefit from the participation in the platform by student-athletes. They also benefit from the participation of students who are not athletes, alumni, and others for the same

---

[95] Kalliopi (Popi) Sotiriadou and David Shilbury, "Australian Elite Athlete Development: An Organisational Perspective," *Sport Management Review* 12 (2009): 137–48, p. 146; "Sports Fandom and the NCAA Student-Athlete," http://www.ncaa.org/health-and-safety/sports-fandom-and-ncaa-student-athlete (accessed 3/14/17).

[96] See p. 47 below.

[97] In a letter to the House of Representatives, Myles Brand, then President of the NCAA, explained that "Most colleges and universities offer special admissions opportunities to a variety of students who have not met the academic standards generally applied to the student body. ... Special admission standards are ... applied to admit some students with talents that offset their academic shortcomings; e.g., musicians, artists, dance and drama majors, and athletes." (NCAAGIA02201997-2021 at 2008).

34

**Highly Confidential – Counsel Only**

reason that student-athletes benefit. Coaches and trainers experience the same effect as athletes, namely that an enthusiastic following of intercollegiate sports makes the competition better.

Figure 2 illustrates a University as a multi-sided platform. Figure 2 is analogous to Figure 1 except that in Figure 2 there are several constituencies participating in the platform rather than only two. The blue line connecting the various constituencies represents the flow of externalities among the various groups. The pricing problem faced by a college or university is to determine prices for the participation of these various constituencies (and possibly more) of the multi-sided platform that provides an optimal balance of their participation given the network externalities involved.

Highly Confidential – Counsel Only

Figure 2. A College or University as a Multi-Sided Platform



Legend

| Abbreviation | Description |
|---|---|
| FB | Football Student-Athletes |
| MB | Men's Basketball Student-Athletes |
| WB | Women's Basketball Student-Athletes |
| NR | Non-Revenue (Olympic) Sport Athletes |
| NA | Non-Athlete Students |
| AL | Alumni |
| CA | Coaches and Athletic Staff |
| FA | Fans (Public) |
| OS | Other Staff |
| CO | Community |

As with two-sided markets, this pricing may be highly asymmetric, depending on the relative elasticities of demand or supply of the various participants and the value that other constituencies place upon their participation.

The economics of two-sided markets teaches that one cannot understand competition by focusing on only one "side" of the platform. Any antitrust analysis of the economic exchange between colleges and universities and student-athletes that is conducted without consideration of the exchanges (or what economists call "gains from trade") with all the other constituencies of the college or university is going to be incomplete and potentially unreliable for that reason.

36

Highly Confidential – Counsel Only

### 2.    Intercollegiate Athletic Associations as Multi-Sided Platforms

An intercollegiate athletic association like the NCAA is, itself, a multi-sided platform. The platform is the association of member institutions. The constituencies that participate are the various schools that take part in the competition organized by the association. Each of those member institutions is, as already described, a multi-sided platform with multiple constituencies who become, in effect, constituencies of the athletic association through their respective schools. Each school requires the participation of others in order for there to be intercollegiate sports competition. Each benefits from the participation of the others. Eschewing the central teaching of multi-sided markets, Plaintiffs have sliced out one element of this complex system, the student-athlete in two discrete sports, and one price, the COA cap, and stopped there.

Figure 3 provides an example of an intercollegiate athletic association as a multi-sided platform whose constituencies are, themselves, multi-sided platforms. It portrays eight schools, Universities A, B, C, D, E, F, G, and H that participate in the association. Each university benefits from the participation in the association of the others. Moreover, as just explained, each university is, itself, a multi-sided platform. Figure 3 shows the relationships between the schools at the level of the association. The figure also includes under the node for each university, an abbreviated set of connectors to remind the reader that each of those universities is a multi-sided platform. The goal of the association is to manage the top platform so as to optimize the participation of all the various constituencies in this complex system.

**Highly Confidential – Counsel Only**

Figure 3. An Intercollegiate Athletic Association as a Multi-Sided Platform



### 3.    The Need to Regulate Conduct

Each school's participation contributes value to the association as a whole, but that value depends on how each individual college or university participates.

#### a.    Amateurism vs. Professionalism

In my interviews with university presidents and athletics directors I consistently heard that relaxing the rules that keep schools from "professionalizing" their athletes would have harmful effects on intercollegiate athletics. For example when I asked President Fenves (University of Texas) about the likely consequences of student-athletes receiving wage-like payments driven by market forces, he responded that athletics could not be a part of university life if student-athletes were professional players. He believes that students go to games to watch their fellow students compete and that they would not be as interested in attending if the players were professional.[98] Similarly, Chancellor Rebecca Blank of the University of Wisconsin testified that

> [A] number of our alumni who are fans of our teams, who come to
> games, who follow them, who enjoy watching this, are likely to be
> less interested if they believed the players are there as paid players

---

[98] Fenves Interview.

38

Highly Confidential – Counsel Only

> as opposed to students which they identify with as -- from when they
> were students on campus.[99]

That same view was also noted in a report by the NCAA's Task Force on Commercial Activity

in Division I Intercollegiate Athletics:

> The attraction of intercollegiate athletics that allows the enterprise
> to compete favorably with professional sports for media attention
> and commercial support is not the athletics superiority of the
> collegiate product. Professional athletes are paid for a reason; they
> are better at what they do than amateurs because playing sports is
> the professional's job. The attraction is the near visceral recognition
> that intercollegiate athletics and higher education share common
> values and that the keystone to the relationship is the student-
> athlete who resides in both worlds. That is a value that advertisers
> and corporations are as interested in preserving as is higher
> education.[100]

Similarly, when I asked President Hatch (Wake Forest) about a world in which monies paid

to collegiate football and basketball players were unrestrained, he said that many Presidents and

Chancellors likely wouldn't be willing to participate in such a system.  While acknowledging that

some might, he didn't expect that top universities would be willing to do so, and he didn't expect

that Wake Forest would.[101]  Consistent with this expectation, Chancellor Blank said in a declaration

she submitted in the *O'Bannon* case that

> Based on my experience in higher education and my personal
> observations, any such payment [allowing football and men's
> basketball players to negotiate for a share of broadcast revenue and
> payments for the use of their names, images, and likenesses] would
> be harmful to higher education and, if implemented at Wisconsin,
> would undermine Wisconsin's core academic mission.[102]

---

[99] Deposition of Rebecca Blank, 6/1/16 (hereafter, "Blank Deposition"), p. 124.

[100] MWC_GIA_003597-610 at 602.

[101] Hatch Interview.

[102] Plaintiffs' Deposition Exhibit 35, ¶ 8.

**Highly Confidential – Counsel Only**

Nebraska Chancellor Perlman testified "[t]here's a clear line between intercollegiate athletics and professional athletics," and went on to say, "I think that line is important and allows us, as higher educational institutions, to justify our involvement."[103]

Mark Emmert, the current President of the NCAA, testified that if colleges and universities had to pay student-athletes to play for their school team, some schools would no longer participate in college athletics.[104] One particular example Mr. Emmert was asked about in his deposition was the possibility that a college or university athlete might be given a $500 payment at the close of a "great year." Mr. Emmert's reaction was

> It certainly changes the nature of that relationship. Now, you are paying him cash, or her, depending on the sport, obviously, if it's a women's golfer. You're -- you're -- you're paying that student to play a game. Instead of -- instead of having that be part of their collegiate experience, it's now part of them working on behalf of the university to participate in -- in some act -- specified activity.[105]

Asked if the hypothetical student was a "professional," Mr. Emmert said:

> Yeah, . . . you've moved into a very different relationship; and so, to me, . . . that is the line that you don't want to cross. It is -- it's, for all intents and purposes, irrelevant whether it's 500, 5,000, 50,000.[106]

Larry Scott, the Pac-12's current Commissioner, remembers prominent alumni and other fans of Stanford University telling him that "[t]hey would have trouble imagining Stanford wanting to continue to participate in intercollegiate athletics if there were—if there were professionals competing."[107] He explained that in his experience if people viewed student-athletes as professionals, "it would not only lose appeal to key stakeholders within the community but create

---

[103] Deposition of Harvey Perlman, 5/3/16 (hereafter, "Perlman Deposition"), p. 127.

[104] Emmert Deposition, pp. 70-4.

[105] Emmert Deposition, pp. 55-6.

[106] Emmert Deposition, pp. 57-8.

[107] Deposition of Lawrence G. Scott, 1/12/17 (hereafter, "Scott Deposition"), pp. 85-6.

real divisions and separations as between, quote, student athletes and other student populations on campus, that some schools, including Stanford, might find untenible [sic]."[108]

In June of 2014, The Big-Ten Council of Presidents and Chancellors issued a statement saying, in part,

> We believe that the intercollegiate athletics experience and the educational mission are inextricably linked. Professionalizing specific sports or specific participants will bring about intended as well as likely unintended consequences in undermining the educational foundation of these programs, on Big Ten campuses and others throughout the country.[109]

If college sports lost their amateur status and schools were paying student-athletes unlimited amounts or awarding unlimited "benefits," President Hatch predicted that there would be a significant decline in loyalty to institutions, which would affect television viewership, and that the conferences would cease to exist. Some schools, he posited, would adopt the free market approach, and effectively would become minor league NFL or NBA organizations.[110]

In his deposition, University of Nebraska Chancellor Harvey Perlman echoed this sentiment:

> I believe if we're required to pay athletes for play, turn them into professional or semiprofessional players, I think that will ultimately undermine the reason why higher education is involved in intercollegiate athletics in the first place.
>
> . . .
>
> I think if you're paying them to play athletics, I think it is inconsistent with the idea of what a student athlete is.[111]

During my interview with Mr. Gill (University of Richmond) I read him the foregoing excerpt from Chancellor Perlman's deposition, and asked for his reaction to it. Mr. Gill described it as "perfect." He went on to say that the University of Richmond would get out of intercollegiate sports if it had to pay athletes. He believes that college sports are one part of the institution's educational experience

---

[108] Scott Deposition, p. 86.

[109] Plaintiffs' Deposition Exhibit 37.

[110] Hatch Interview.

[111] Perlman Deposition, pp. 126-7.

**Highly Confidential – Counsel Only**

and undermining that turns the participants into employees, which, he said, would be
catastrophic.[112]

During his deposition, Mr. Scott (Pac-12 Commissioner) was asked if he had seen specific
studies showing that consumer fan interest would be reduced if students were provided money
beyond the cost of attendance. In response, he testified that he had "a general recollection of
studies that seem where fans have made it clear they would have a diminished view of collegiate
athletics if they viewed student athletes as being paid or as employees" and that "anecdotally, [he]
heard that from people . . . including commercial partners."[113] Scott later referred to conversations
with "broadcast partners, sponsors and others, including fans, and other stakeholders" that have
informed his view.[114]

Mr. Michael Aresco, Commissioner of the American Athletic Conference, recalled telling the
Knight Commission that failing to maintain amateurism would reduce intercollegiate athletics'
appeal to television networks.

> I did testify before the Knight Commission when I was at CBS, and I
> said that if the amateur model was not maintained and we became
> like pro sports and I may have mentioned paying players, I don't
> recall, that that would absolutely have an effect on the product we
> were televising and that ultimately, I felt that it would be less
> attractive to the TV networks to televise what would be essentially a
> professional model. I thought there was tremendous value in
> amateurism and how people perceive college sports as an amateur
> venture.[115]

Mr. Aresco's concerns were not limited to television. At another point in his deposition he was

asked what the problems associated with paying student-athletes more than the cost of attendance

would be. He said:

---

[112] Gill Interview.

[113] Scott Deposition, pp. 72-3.

[114] Scott Deposition, p. 83.

[115] Deposition of Michael Aresco, 11/16/16 (hereafter, "Aresco Deposition"), p. 72.

42

Highly Confidential – Counsel Only

> I think there would be enormous problems. I think it would be professionalizing our student athletes. I think this would be pay for play. I think it would be untethered from the collegiate mission. I've always felt strongly that it would disrupt, upset and ultimately jeopardize the collegiate model because I believe that ultimately, you have something unique in college sports because of the amateur aspect. . . . I think it would absolutely change the nature of what we're doing. I think it would have an impact on the interest, you know, fans and everyone else, students have in the sports, and I think it would -- it would ultimately, you know, lead to something that I think would, that many universities would say we're just not, you know, going to do this anymore. It has nothing to do with our educational mission anymore, nothing to do with or what we're all about.[116]

### b.   The Regulation of Conduct

All told, the interviews I conducted and the discovery record in this case both indicate that replacing amateurism with professionalism would be harmful to intercollegiate athletics and its role in the college/university system.  Put another way, if an association or conference did not regulate the conduct of individual member institutions, the individual schools would have an incentive to increase their chances of athletic success by taking actions that undermine amateurism.[117]  To the extent that amateurism is valued by constituencies in the platform (and, as demonstrated above, it is valued by all involved), these actions would diminish the value of the platform, which ultimately would cause reduced participation in the platform, further reducing its value.  Hence, there is a need for collective action that promotes and preserves amateurism.  This means that intercollegiate athletics fits squarely into the pattern I described earlier for multi-sided platforms.  Namely, that conduct with respect to one side of the platform can exert value-diminishing effects on other sides of the platform, creating the need for the management of the platform to regulate such conduct—which is what the COA cap does.

---

[116] Aresco Deposition, pp. 239-40.

[117] See section V.C.1 below.

**Highly Confidential – Counsel Only**

### 4.    Competition for the Multi-Sided Platform and the Relevant Market

The destructive effects of professionalism on the various sides of a college's or university's multi-sided platform bear directly on the appropriate definition of the relevant market. As I explained earlier, a relevant market is supposed to capture the forces that impose competitive discipline on firms in the market. A would-be monopolist of a one-sided market encounters the effect of competitive discipline on its selling prices if it loses too large a volume of sales when it increases the prices of the products it sells. Likewise, a would-be monopsonist in a conventional one-sided market experiences the effect of competitive discipline on its buying prices if it loses too large a volume of supply when it reduces the prices of the products it buys.

In order to properly assess the effects of competitive price discipline, *i.e.*, in order to have a properly defined relevant market, one must take into account all the essential ways in which a firm faces volume losses or gains when it acts. For an organization that operates a multi-sided platform, volume effects can take place through the other sides of the platform—not the one where some action is taken.

The multi-sided approach to defining the relevant market is particularly important here. Suppose a college or university dropped its commitment to the amateurism standard about which Plaintiffs complain. This would exert a negative effect on that college or university through the reactions of its students, fans, alumni, and TV broadcasters. It also would exert a negative effect (an externality) on other colleges and universities[118] through its effect on their students, fans, alumni, and TV broadcasters.[119] These effects, in turn would feed back on the college or university contemplating the original change.

---

[118] See section V below.

[119] As I said earlier, broadcasters can also be viewed as a constituency of the multi-sided platform. See note 87, above.

44

**Highly Confidential – Counsel Only**

Understanding the issues in this case requires an appreciation of all of the effects on the various constituencies of the multi-sided platform. To understand those effects, one needs a properly defined relevant market that encompasses all sides of the multi-sided platform. Thus, as noted above, I have concluded that the relevant market for analyzing this case is a multi-sided market for college education.

### D.    Plaintiffs' Proposed Relevant Markets

Class Plaintiffs claim that there are three distinct relevant markets: "(1) the NCAA Division I Football Labor Market;[120] (2) the NCAA Division I Men's Basketball Labor Market; and (3) the NCAA Division I Women's Basketball Labor Market."[121] There are 129 colleges and universities operating in Plaintiffs' first proposed market, 347 operating in Plaintiffs' second proposed market, and 345 operating in Plaintiffs' third proposed market.[122] The geographic scope of these markets purportedly is the entire country.[123] The Jenkins Plaintiffs claim only two markets—one for FBS football player services and one for Division I men's basketball player services.[124] Like the Class Plaintiffs, the Jenkins Plaintiffs claim that both of these markets are national.[125]

#### 1.    Plaintiffs' Proposed Relevant Markets are One-Sided

Each of Plaintiffs' markets is one-sided. For example, looking at a "labor market" for NCAA Division I Football would confine the analysis of competition to the transactions by which Division I universities acquire football players. Such an approach ignores completely the effects of pricing to football players and their reactions to those prices on the supply or demand decisions of other

---

[120] Class Plaintiffs also allege that the Football Bowl Subdivision of Division I football constitutes "a distinct submarket," and "[Class] Plaintiffs only seek damages and injunctive relief with respect to the Football Bowl Subdivision submarket." (Consolidated Amended Class Complaint, ¶ 193).

[121] Consolidated Amended Class Complaint, ¶191.

[122] "NCAA Sports Sponsorship," http://web1.ncaa.org/onlineDir/exec2/sponsorship (accessed 01/20/17).

[123] Consolidated Amended Class Complaint, ¶¶ 192, 224-5, and 245.

[124] Jenkins Complaint, ¶ 50.

[125] Jenkins Complaint, ¶¶ 57 and 63.

**Highly Confidential – Counsel Only**

university constituencies. It also overlooks the multi-sided nature of the platform. The same is true of the proposed relevant markets for Division I Men's and Women's Basketball labor. As demonstrated below, the one-sided approach to market definition will omit important competitive forces on pricing, and therefore is unreliable as a tool of economic analysis.

### 2. Flaws in Plaintiffs' One-Sided Markets

Even viewed through the one-sided lens that Plaintiffs prefer, their proposed relevant markets have flaws that allow one to conclude that even if the relevant market(s) for this case were one-sided, they would not be the one-sided relevant markets proposed by Plaintiffs.

#### a. Plaintiffs' Proposed Relevant Markets are Too Broad for One-Sided Markets

Plaintiffs contend that football players and basketball players "sell" their services in separate relevant markets, presumably because elite level football players are not supply-side substitutes for elite basketball players. But the distinction between basketball players and football players does not clinch the case for Plaintiffs' proposed relevant markets. It only raises the question of why point guards and centers who play basketball are not in separate markets, since they are neither supply-side nor demand-side substitutes for one another. Similarly, why are quarterbacks and defensive lineman not in separate markets, since quarterbacks and defensive linemen also are neither supply-side nor demand-side substitutes. This means that if one takes for granted that relevant markets are to be one-sided, Plaintiffs have defined their proposed relevant markets too broadly, combining types of labor in the same relevant market that are not substitutable for one another, and so would not provide pricing discipline for one another.

#### b. Plaintiffs Fail to Analyze the Prices that are Economically Relevant to Their Proposed Relevant Markets

As previously observed, a properly defined relevant market should capture all the goods and services that exert competitive discipline on the pricing of the good or service that is of immediate interest. Thus, it goes without saying that a proper understanding of the economically

46

**Highly Confidential – Counsel Only**

relevant price is essential to reliably defining the relevant market. Plaintiffs have failed in that regard as well. The relevant markets proposed by Plaintiffs in this matter are drawn opportunistically. If they were accepted as the markets appropriate for this litigation, and the analysis of the contentions in this case were based on these purported markets, the upshot would be a reduction in consumer welfare.

Plaintiffs interpret the COA cap as the "wage" in the three labor markets they proffer as relevant markets. This misses the mark. Being offered enrollment at a Division I school and receiving a scholarship that covers the cost of attending school provides a student-athlete with more than just the cash value of that financial aid. Enrolling at a Division I school also provides the student-athlete with amenities during his or her time in college and the opportunity to invest in the student-athlete's human capital.[126] Plaintiffs' proposed market definitions make no economic sense because, among other reasons, in their rush to find alleged exploitation, they overlook the most valuable part of a student-athlete's college experience—the student's education. Focusing solely on the COA cap as the "wage" significantly understates what would be the economically relevant price for labor if one took for granted that the appropriate relevant market was a one-sided market.

### c. Plaintiffs' Proposed Relevant Markets Preclude Analysis of the Relevant Product

In antitrust economics, the task of relevant market definition often involves squabbles such as whether disposable diapers are close substitutes for cloth diapers; whether high speed copiers belong in the same relevant product market as slower photocopiers; or whether specialty steel made in Japan is in the same geographic market as specialty steel made in Pittsburgh. Defining the relevant market often is a search for what economist Joan Robinson called "gap[s] in the chain of substitutes."[127] In this litigation, the error in Plaintiffs' proposed relevant markets is very different.

---

[126] James E. Long and Steven B. Caudill, "The Impact of Participation in Intercollegiate Athletics on Income and Graduation," *The Review of Economics and Statistics* 73, issue 3 (1991): 525-31.

[127] Joan Robinson, *The Economics of Imperfect Competition*, 2nd ed. (New York: St. Martin's Press, 1969), p. 5.

**Highly Confidential – Counsel Only**

If Plaintiffs' definition of relevant markets were accepted, the result would be one of *reductio ad absurdum*. Here's why.

Imagine an antitrust case outcome that required Coca-Cola to put sugar in its Diet Coke product; one that required NASCAR to use open-wheel Formula 1 cars in its races; one that required Hardie Plank to make its siding material out of cedar instead of fiber cement; or one that required Tiffany to design and make its jewelry out of Cubic Zirconia instead of precious stones. These scenarios are difficult to imagine because each one involves companies being required to change the very products they make in a way that would make consumers of those products worse off. Consumer welfare would be reduced.

While these examples might be difficult to imagine, conceptually this is what Plaintiffs are attempting to accomplish in their proposed definition of the relevant market: to take the NCAA's product—the carefully crafted brand identity of the defendants—and turn it into something else. Replacing amateur student-athletes with professional athletes would transform one of the products that is part of the portfolio of goods and services that make up the modern American university. As I explain elsewhere in my report, many colleges and universities with active intercollegiate sports teams consider amateur sports to be part of the brand identity of a school, one that offers value to both participants and fans (where the fans are current and former students of the school, faculty and staff, townspeople, and others).

It is symptomatic of a flaw in their definition of the relevant market that Plaintiffs seek to change one of the very products the NCAA schools produce—namely, amateur athletics. Rather than seek to understand the dimensions of competition in which amateur intercollegiate athletics is produced, which is the proper function of market definition, they would simply do away with it.

Defining a relevant market should illuminate the economic issues in an antitrust case, not distort them. Plaintiffs' proposed market definitions and their proposed remedy would reduce the popularity of amateur student-athlete intercollegiate sports (at least football and basketball, the

48

**Highly Confidential – Counsel Only**

two largest sports under the NCAA umbrella).[128] Under Plaintiffs' theory of the case, the
professional athletes who played Division I football and Division I basketball would no longer relate
to other students and faculty in the same way as amateur student-athletes.[129]

This would be a major concern, because both the interviews I conducted and the documents
I reviewed showed that colleges and universities attach value to student-athletes' participation, as
regular students, in campus life. For example, Greg Fenves (the President of the University of
Texas) told me that multiple factors attract students to the University of Texas, including
academics, clubs, the opportunity to network, *and sports*. He described this bundle of activities as
making up the University of Texas brand. Fenves explained that at the University of Texas there is a
campus culture, that having athletics programs that compete at a top level is part of that culture,
and that students experience that culture on campus.[130]

Rebecca Blank described the value of athletic teams to the University of Wisconsin in
similar terms. In her deposition she testified that Wisconsin has 23 varsity teams:

> and for all of those, just as we have band, as we have dance, we have
> a variety of activities that play to skills beyond just those in the
> classroom. The athletic teams benefit the University by providing
> our students with a broader range of experiences, of skills, of

---

[128] Emmert Deposition pp. 110-4; Aresco Deposition, pp. 72 and 238-9;
                                                                  ; AMERICAN_GIA_024727-40 at 32.
See also Barnhart Interview; Fenves Interview; Hatch Interview; MWC_GIA_003597-610 at 602; Blank
Deposition, p. 124-5; Scott Deposition, pp. 73, 82-4, and 86; Plaintiffs' Deposition Exhibit 35, ¶ 17.

[129] Even Ekow Yankah, an ardent critic of the NCAA who identifies himself as a loyal Michigan Wolverines fan,
understands the importance of student-athletes being first and foremost students. "Fans are not only seeking
athletic excellence as such—the biggest and fastest players in descending order. Our connection to the
athletes is deeper. These student athletes walk the same halls, have the same professors, and sweat the same
midterms that we did, however long ago. . . . Paying student athletes erodes that association." While Mr.
Yankah understands the importance of student-athletes being *bona fide* students, I do not believe, as an
economist, that his criticisms of the NCAA are grounded in economic logic, because he fails to address the
benefits the NCAA and its regulations provide. See § V and Appendix D below. (Ekow N. Yankah, "Why
N.C.A.A. Athletes Shouldn't Be Paid," *The New Yorker*, October 14, 2015). See also pp. 21-22, above, and 77-78,
below; Blank Deposition, pp. 97-8, 106-10, and 117; Deposition of Jonathan Alger, 6/23/16, pp. 127-8. In his
interview with me Nathan Hatch indicated that paying athletes more money would make it harder for them to
maintain a balance between athletics and academics. (Hatch Interview).

[130] Fenves Interview.

**Highly Confidential – Counsel Only**

> disciplinary -- you know, teaching disciplines of mind and body
> together.[131]

In her declaration in the *O'Bannon* case, Chancellor Blank testified similarly, saying:

> athletics benefits education at Wisconsin because athletics
> contribute to the building of the Wisconsin community. Students,
> faculty, alumni, and members of the community bond and are
> brought together based on their identification with Wisconsin sports
> teams. This team spirit and community building has positive benefits
> for even our newest students, whose adaptation and assimilation
> into the University is better when they feel part of a spirited
> community.[132]

A statement by Dr. Donna Shalala, who at the time was the President of the University of

Miami and Chair of the Atlantic Coast Conference's Council of Presidents, was similar:

> For our colleges and universities, athletics *contributes to the quality
> of life on campus*, promotes the work of our universities, and helps us
> connect with our alumni.[133]

Nathan Hatch (the President of Wake Forest University) shares this perspective. In our interview,

he explained how multiple interconnected elements go into the relationship between students (and,

ultimately, alumni) and their schools, and that amateur athletics is one of these elements. Hatch

regards intercollegiate sports as a powerful force that contributes to building spirit, passion, and

identity.[134]

My interviews and the record reveal a commitment to student-athletes on the part of

colleges and universities that is expressed in tangible efforts and the use of resources to support

those institutions' educational mission to student-athletes as students. For example, President

Fenves indicated that three years ago his university started a program for sports leadership and

innovation that now is overseen by a graduate of Harvard Law School and the Kennedy School of

Government. Its purpose is to teach student-athletes (and other students) life management skills,

---

[131] Blank Deposition, p. 12.

[132] Plaintiffs' Deposition Exhibit 35, ¶ 12.

[133] ACC-GIA010154-5 at 4, italics added.

[134] Hatch Interview.

50

particularly financial management.[135] While President Fenves believes Texas' program is one of the best,[136] I also read about similar programs and facilities to academically support student-athletes at a wide array of Division I schools.[137]

President Hatch indicated that varsity athletes were among the few students at Wake Forest who enjoyed the benefits of a program that builds character, which he believes is very valuable. He related a conversation he had with a corporate Finance Director who has a preference for hiring former student-athletes because of the discipline and work-ethic to which they are accustomed.[138] An NCAA Division I strategic summit notes that Division I student-athletes "have valuable skills...like leadership, discipline, and the ability to work in teams" that are "highly valued by employers in a range of industries and sectors" and Division I wants to continue "providing support for student-athletes in translating their experience as athletes to prospective employers."[139]

Keith Gill (Athletics Director at the University of Richmond) described his coaches as professionals who work hard to promote the development of their student-athletes. In addition,

---

[135] Fenves Interview.

[136] Fenves Interview.

[137] The list includes, but is not limited to the University of Florida, the University of Kentucky, West Virginia University, Arkansas State University, Georgia Southern University, Georgia State University, The University of Louisiana at Lafayette, The University of Louisiana at Monroe, The University of South Alabama, Texas State University, Troy University, The University of Arkansas at Little Rock, The University of Texas at Arlington, The University of Idaho, New Mexico State University, The University of South Carolina, The University of Alabama, Auburn University, Louisiana State University, The University of Mississippi, The University of Georgia, The University of Arkansas in Fayetteville, The University of Missouri, Mississippi State University, and Vanderbilt University. (Deposition of Bernie Machen, 6/29/16, pp. 201-3; SEC00153035-43 at 40-1; SEC000310481-2 at 1; AMERICAN_GIA_026457-524 at 496; SB_GIA_137006-101 at 026, 030, 034, 038, 042, 046, 050, 054, 058, and 062; SB_GIA_137560-731 at 605 and 629; SEC00128835-40 at 36-7; SEC00152986-90 at 89; SEC00152991-5 at 3-4; SEC00152996-9 at 9; SEC153000-9 at 4-5; SEC00153015-22 at 19-20; SEC00153025-34 at 29; SEC00153044-53 at 50; SEC00153054-7 at 6; SEC00153058-65 at 63; SEC00153066-71 at 68-9).

[138] Hatch Interview. Eugene Smith, the Athletics Director at Ohio State University, testified similarly: "The life lessons you learn through the group dynamics and team participation in gymnastics, tennis and volleyball teams is invaluable; how to manage conflict resolution within a group, how to work with people from all walks of life, all those learning experiences and more are significant beyond your sport." (Deposition of Eugene Smith, 6/8/16, pp. 37-8).

[139] WAC_GIA_027037-111 at 67.

51

Highly Confidential – Counsel Only

Gill described this concern for student-athletes as part of the culture of his university. That is, he and his colleagues are thoughtful about their students' experiences in college, including graduation, balancing other interests, time off, and time to study.[140] Similarly, Rebecca Blank testified that at Wisconsin, "our primary objective with regard to students is their education."[141] And in the same vein, David Brandon, former Athletics Director at the University of Michigan, testified in his deposition that:

> Our coaches are highly incentivized to make sure that the students perform well in the classroom and they're highly penalized if they don't, and I don't think there's a coach at least that I worked with of the 31 coaches at Michigan that ever wanted to put themselves in a situation where they were standing in the way of a kid being successful in the classroom.[142]

One of the 3-5 Year Outcome Goals of the NCAA is that "[s]tudent-athletes will be better-educated and prepared for increased and life-long achievement and success."[143] To achieve that goal, colleges and universities provide their student-athletes with a variety of counselling support, and enrichment opportunities. For example, Arkansas State University supports its student-athletes' participation in travel abroad programs;[144] Ohio State has a similar program called "Buckeyes Go International."[145] Georgia State supported its men's basketball team's travel to Costa Rica to hold clinics and participate in a shoe distribution with "Samaritan's Feet."[146] The Division I Men's Basketball Academic Enhancement Group identified a list of support programs in August of 2008 designed to assist Division I institutions enhance the academic preparation and success of its Division I men's basketball student-athletes. For each program, the targeted student groups or

---

[140] Gill Interview.

[141] Blank Deposition, p. 13.

[142] Deposition of David Brandon, 8/17/16 (hereafter, "Brandon Deposition"), p. 127.

[143] AMERICAN_GIA_056660-722 at 687.

[144] SB_GIA_137402-559 at 424.

[145] OSU-PR-00211-3 at 1.

[146] SB_GIA_137402-559 at 440.

**Highly Confidential – Counsel Only**

responsible personnel are identified along with the program description and instructions.[147]
Moreover, Division I member institutions are required to make "general academic counseling and
tutoring services available to all student-athletes" and "conduct a life skills program on its
campus."[148]

All of this is consistent with the NCAA's "Basic Purpose," which the organization describes
as "to maintain intercollegiate athletics as an integral part of the educational program and the
athlete as an integral part of the student body and, by so doing, retain a clear line of demarcation
between intercollegiate athletics and professional sports."[149]

Paying student-athletes would undermine these goals. As I explain above, paying student-
athletes would skew their incentives to allocate their scarce time and effort away from their studies
and towards athletics.[150] If colleges' and universities' academic support programs for student-
athletes are going to be effective, the student-athletes must be incentivized to do the work they
need to do to succeed academically. Hence, paying student-athletes would undermine the schools'
educational goals for them.

The value of maintaining the "line of demarcation between intercollegiate athletics and
professional sports" is reflected in the attitude of the college and university officials I interviewed.
Mitch Barnhart (Athletics Director at the University of Kentucky) maintained that if intercollegiate
athletes were not amateurs, intercollegiate sports would be viewed very differently. He explained
that the student-athletes, because of their amateur status, are regarded by other students and fans

---

[147] MWC_GIA_004258-71 at 58-69.

[148] 2016-17 Manual, Article 16.3.1.

[149] 2016-17 Manual, Article 1.3.1.

[150] See pp. 21-22, above, and 77-78 below.

53

**Highly Confidential – Counsel Only**

as students who represent their colleges and universities, and that while fans enjoy supporting

student-athletes' educations, they wouldn't want to pay for salaries for them.[151]

An NCAA Task Force on Commercial Activity in Division I Intercollegiate Athletics writes:

> We know from our experiences with media partners and their
> advertisers that it is not only the popularity of college sports that is
> attractive. It is also the values that intercollegiate athletics and
> higher education foster that appeal to marketing and advertising
> interests. Indeed, if there were no constraints on commercial
> activity - if colleges and universities were to barter their values (the
> avocational motivation for athletics participation and the protection
> of the student-athlete from commercial and professional interests)
> for a few dollars more - the appeal would be weakened.[152]

The "Commissioner's Opening Remarks" for the SEC's "2013 Football Media Days" on July

15, 2013 included the following description of how intercollegiate athletics help alumni and fans

connect with universities:

> Intercollegiate athletics also offers an important point of connection
> for university alumni and fans who share in the accomplishments of
> teams and student-athletes, and for the general public, which
> demonstrates the continuing and growing interest in collegiate
> sporting events.[153]

During his 2004 State of the Association Address, Myles Brand (then, President of the

NCAA) described and contrasted the "collegiate model" and the professional model. He described

drifting towards the professional model as dangerous and expressed concern that the "educational

value to student-athletes and the institutional goodwill from alumni and fans" would disappear.

Brand added that the NCAA has to "recommit to academic success as a primary goal of

intercollegiate athletics," "respect the concept that the student-athlete is central to the enterprise,"

and "reconnect athletics programmatically and financially with the rest of the university."[154]

---

[151] Barnhart Interview.

[152] AMERICAN_GIA_024727-40 at 32.

[153] SEC00201135–60 at 43.

[154] NCAAGIA03350287-96 at 93-5.

54

Highly Confidential – Counsel Only

Plaintiffs' case would sever the taproot of the NCAA's purpose: to draw a "clear line" between amateur and professional sports. Because the NCAA draws this line, the organization enhances and protects the economic welfare of all the constituencies (including millions of student and non-student fans) who value the fact that student-athletes are just that: both students and athletes. The COA cap is an integral and essential part of the "product" that NCAA schools produce. If this number is not constrained, the NCAA cannot produce the product that has developed millions of customers (fans) whose welfare would be reduced if football and basketball players became paid employees of their colleges and universities.

## IV.    Plaintiffs' Theory of a Monopsonistic Cartel is Flawed

Notwithstanding the organization's size and complexity, several economists who have written about the NCAA describe it as a cartel whose concerted conduct gives its member "firms" (colleges and universities) monopsony power over the student-athletes who play Division I basketball and football.[155] In some circles, this cartel-monopsony narrative has become the conventional wisdom about the NCAA. Class Plaintiffs implicitly and explicitly rely upon this anticompetitive narrative that they have borrowed from the sports economics literature.[156]

---

[155] Arthur A. Fleisher III, Brian L. Goff, and Robert D. Tollison, *The National Collegiate Athletic Association: A Study in Cartel Behavior* (Chicago: University of Chicago Press, 1992) (hereafter, "Fleisher, Goff and Tollison"), pp. 20-4; Armen A. Alchian and William Allen, *University Economics, 3rd ed.* (Belmont: Wadsworth Publishing Company, 1972), pp. 443-4; Edgar K. Browning and Mark A. Zupan, *Microeconomics Theory & Applications, 7th ed.* (New York: John Wiley & Sons, 2002), pp. 502-3; Gary S. Becker, "College Athletes Should Get Paid What They are Worth," *Business Week*, September 30, 1985, p. 18; Gary S. Becker, "The NCAA: A Cartel in Sheepskin Clothing," *Business Week*, September 14, 1987, p. 24; Lawrence M. Kahn, "Markets: Cartel Behavior and Amateurism in College Sports," *The Journal of Economic Perspectives* 21, no. 1 (2007): 209-26, p. 210; Robert Barro, "The Best Little Monopoly in America," *Business Week*, December 9, 2002, p. 22; Brad W. Humphreys and Jane E. Ruseski, "Monitoring Cartel Behavior and Stability: Evidence from NCAA Football," *Southern Economic Journal* 75, issue 3 (2009): 720-35 (hereafter, "Humphreys and Ruseski"), p. 720; Robert W. Brown, "Measuring cartel rents in the college basketball player recruitment market," *Applied Economics* 26, no. 1 (1994): 27-34 (hereafter, "Brown"), p. 27; Allen R. Sanderson, and John J. Siegfried, "The Case for Paying College Athletes," *Journal of Economic Perspectives* 29, no. 1 (2015): 115-37 (hereafter, "Sanderson and Siegfried"), p. 119.

[156] Consolidated Amended Class Complaint, ¶¶ 2, 12, 23, 303, 315, 319, 340-1, 343, 47B, and 488. The Jenkins plaintiffs implicitly rely on the same narrative, but do not explicitly cite economists in their complaint. Jenkins Complaint, ¶¶ 1, 5-B, 36, and 39.

**Highly Confidential – Counsel Only**

The economic error in the cartel-monopsony model is exposed by an alternative economic narrative, one based on the economic theory of externalities. An externality perspective unpacks the efficiency-rationale behind the COA cap on student-athlete financial aid and explains why such a cap is not anticompetitive.

### A.    Monopsony and the NCAA

#### 1.    The Economics of Monopsony

In economic parlance, a "monopsony" is a market with a single *buyer* who has the ability to set the price it pays for one or more of its inputs. Monopsony is the other side of the coin from a monopoly: a market with a single *seller* who has the ability to set the price it charges for one or more of its outputs. In the textbook version of perfect competition, any individual firm's decision about its price or output does not affect market price and output. Instead, "the market" sets the price, and the individual firms are "price takers" because they "take" the market price as given. When a firm has some ability to affect prices, whether for something it buys or for something it sells, the firm possesses some amount of "market power." For most firms in the U.S. economy, this amount of market power is not of antitrust concern.

Most real-world markets are characterized by what economic theory calls "imperfect competition," where individual firms have a degree of market power but the amount is constrained. On the selling side, a limited degree of monopoly power enables firms to profitably raise prices without losing all their business to rivals. On the buying side, a limited degree of monopsony power enables firms to profitably drive down purchase prices without losing all of their sources of supply. Just as the availability of alternative purchase options for a customer undermines the market power of a prospective monopolist, the availability of alternative selling options for an input supplier undermines the market power of a prospective monopsonist.

56

**Highly Confidential – Counsel Only**

A classic textbook illustration of monopsony is the case of one big factory in a small isolated town.[157] In this example, travel to an alternative source of employment would have been very costly for residents of the town (the source of labor supply) to pursue. Therefore, the "big factory in a small isolated town" represents the sole source of employment and has the ability to determine the number of individuals employed and the wage rate they are paid.

A monopsony employer depresses the wage rate by limiting the number of workers it hires. The result is an inefficient level of employment because there will be some workers who would have been willing to work at the competitive market wage, but not the depressed monopsony wage. In addition to lower wages and employment, a monopsony might cause poorer working conditions because a firm with monopsony power knows that its workers do not have readily available alternative sources of employment.

In a competitive labor market, no single employer has the ability to set the wage rate. Economists would say "the market" determines the wage level; employer-firms in such markets would be "wage takers." Firms in a competitive labor market compete for workers by bidding up the wage rate until the marginal wage cost required to hire another worker matches the additional revenue the firm would earn from that worker. If a firm were to offer a wage below the competitive rate, its workers could seek employment elsewhere.

In the world of antitrust, most cartels involve an agreement among firms in the same market to restrict output and fix the *selling prices* for certain goods or services. Indeed, in antitrust circles, the word "cartel" often is a synonym for "price-fixing." Monopsonistic cartels are less common, but as a matter of economic analysis, they run parallel to a cartel of sellers. The members of a monopsonistic cartel collude in order to lower the purchase price of inputs—or wages in the

---

[157] An example from Paul A. Samuelson's iconic textbook, *Economics, 8th ed.* (New York: McGraw-Hill Book Company, 1970), p. 562. The textbook I assign uses the example of a "'company town' in which a single firm is the only employer." See David C. Colander, *Microeconomics, 10th ed.* (New York: McGraw-Hill, 2016), p. 361.

**Highly Confidential – Counsel Only**

case of labor inputs—below competitive levels. Doing so increases the profits of the cartel participants above what unilateral behavior would have generated.

Economic theory teaches that a monopsonistic cartel would lead to inefficient reductions in the use of factors of production and a resulting decrease in output. The monopsonistic cartel is willing to lose revenue from its reduced output because the cost savings from paying lower wages to its employees are greater than the loss in revenue, so the firms in the cartel are left with higher profits.

### 2.  Monopsony and a Labor Market for Athletes

Several economists have described intercollegiate athletics as a monopsonized labor market. [158] In their economic narrative, there is a labor market for athletes in which colleges and universities are employers, student-athletes are labor inputs, and the amount of financial aid and/or scholarships is the wage. Purportedly, the NCAA and its members act as a monopsonistic cartel whose purpose is to constrain competition among schools for student-athletes by putting a cap on financial aid that limits the "wage" student-athletes may receive. As I mentioned at the outset of this report, Plaintiffs have embraced this economic narrative.

### B.  Evaluation of the Plaintiffs' Monopsonistic Labor Market Cartel Theory

At first glance, it might seem appropriate to put the NCAA and its member schools into a box labeled "labor-market-monopsony-cartel." Doing so is too clever by half -- for two reasons. First, the conduct of the NCAA's member schools is incompatible with a monopsony. Second, the "market" for student-athletes doesn't readily fit the economic model of a cartelized labor market. [159] The economic phenomenon at issue here is one of externalities, not cartels.

---

[158] Humphreys and Ruseski; Brown; Sanderson and Siegfried.

[159] At this point, I have put aside the question of whether it even makes sense to think of a relevant market for student-athletes, which I discussed in Section III.A.

58

Highly Confidential – Counsel Only

### 1.      The Conduct of NCAA Schools is Inconsistent with Monopsony

Plaintiffs' theory—that a labor market for intercollegiate athletes has been monopsonized by NCAA member schools—has testable implications for what should be observed in such a "market" for student-athletes.  But what's observed isn't what would be present in a monopsony-cartel.  Indeed, there are three specific ways in which the facts about the COA cap are not consistent with Plaintiffs' theory.

### a.      Eligibility Rules Restrict Supply

The NCAA rules that limit the amount of financial aid to student-athletes are not the only rules that affect students who compete in Division I sports.  Even before they enter college, high school juniors who would like to be considered for athletic scholarships at NCAA schools must submit information about their background and experience and ask the NCAA to certify them as eligible to play.[160]  The conditions these students must meet involve academic standards and amateur status.[161]  Once certified, enrolled, and playing, student-athletes must meet academic standards set by the NCAA[162] and must continue to adhere to NCAA rules on amateur status.[163]

In the context of Plaintiffs' monopsony-cartel theory, the obvious economic implication of these rules is that they restrict the supply of labor upon which NCAA member schools can draw.  Restrictions in supply reduce the ability of the monopsonist to depress the wage rate while maintaining its labor force.  In other words, supply restrictions have the effect of reducing the profit of a labor-market monopsonist.  In terms of textbook economics, the only employer in a remote town would not want to do anything to reduce the number of people in the town.  More generally, a labor-market monopsonist would not willingly adopt or install measures that would restrict supply.

---

[160] NCAA Eligibility Center, 2016-17 Guide for the College-Bound Student Athlete (hereafter, "2016-17 Student-Athlete Guide"), p. 8.

[161] 2016-17 Student-Athlete Guide, pp. 11-25.

[162] 2016-17 Manual, Article 14.3.

[163] 2016-17 Manual, Articles 12.01.1 and 12.1.2.

**Highly Confidential – Counsel Only**

Yet the NCAA has. The evidence that the NCAA restricts supply through rules and regulations that are distinct from the COA cap is inconsistent with Plaintiffs' labor-market-monopsony-cartel theory.

### b.   Allegedly **Extravagant Spending on Facilities and Coaches**

The NCAA's critics frequently decry the amount of money that member schools spend on coaches' salaries and athletic facilities. Often these criticisms are not merely described as extravagance; they are proffered as evidence of the existence of a cartel. For example, Fleisher, Goff, and Tollison compare growth in coaches' salaries and expenditures on athletic programs with what they call "compensation to athletes" that has "remained essentially the same," and attribute the difference to successful collusion among schools.[164]

In this respect, the critics of the NCAA share with Plaintiffs the uncertainty about what the purpose of the alleged cartel might be.[165] In another passage, Fleisher, Goff, and Tollison write:

> The motivation behind market-restricting collusion by producers is
> easy to see. The rationale is to increase returns per firm relative to
> the situation in which firms freely compete with one another. This
> holds true whether the restrictions are in output or input markets.
> The fact that the NCAA is a nonprofit organization simply changes
> the balance sheet item which is maximized. Instead of "profits" or
> returns to shareholder, it may be implicit subsidies to the university
> general operating expenses, coaches' salaries, office facilities, and so
> on which are maximized.[166]

In other words, Fleisher, Goff, and Tollison don't know who benefits from the alleged cartel.

This perspective is at odds with cartel theory. In economic analysis, the purpose of a cartel is to maximize the profits of the member firms. It would be pointless for firms to incur the cost and risk of setting up and operating a cartel if the net returns received by the cartel were only going to be dissipated in extravagant unproductive facilities or captured by particular groups of employees.

---

[164] Fleisher, Goff, and Tollison, p. 8.

[165] See section IV.B.2.a, The Motivation of the Putative Cartel is not Clear.

[166] Fleisher, Goff, and Tollison, p. 21.

**Highly Confidential – Counsel Only**

Those employees certainly would have a reason for wanting the cartel to operate. But if they're not the ones who actually initiate and operate the cartel, then their pecuniary interest in the operation of the cartel doesn't explain why their employer takes part in it.

Unless one is prepared to argue that football and basketball coaches have so much power over universities that they can compel presidents, chancellors, and trustees (and in the case of public universities, state legislatures) to organize and participate in a cartel that operates on their behalf, the cartel described by the NCAA's critics and Plaintiffs in this case doesn't make what the Court in *Matsushita* called "economic sense."[167]  The purpose of a cartel is to maximize profit, so a cartel would not be enthused to see that profit frittered away.

### c.    Non-Revenue Sports

Plaintiffs never address (much less answer) the following question: if a university-cartel-participant operates on a profit maximizing basis, why would it participate in non-revenue sports at all beyond the minimum required by Title IX?  Without revenue, there can be no profit.

Rebecca Blank, Chancellor of the University of Wisconsin, described her reasons for offering different sports with different commercial potential in the multi-sided platform that is her university as follows:

> I don't view our Athletics Program as a business. It is part of our student educational mission, and we don't run it like a business. I have, right now, only two paying sports. There have been some years when we've had three, and every other sport loses money, and if I were running a business, I would abolish all those sports, except the paying sports, and that's not what I do.
>
> We receive income from a variety of sources. We spread it out across a wide variety of athletic enterprises. Some of them we make money on them, most of we don't [*sic*], and we do that because we think there's a value to those – that type of athletic discipline and training for us as an educational institution.[168]

---

[167] *Matsushita v. Zenith Radio Corp.*, 475 U.S. 574 (1986), 587.

[168] Blank Deposition, pp. 60-1.

**Highly Confidential – Counsel Only**

David Brandon, former Athletics Director at the University of Michigan had a similar explanation for

why his university offered athletic programs that weren't "revenue generating"[169]:

> It's a longstanding tradition of the university and I believe also The
> Big Ten conference to provide broad-based programs and provide
> opportunity. We speak with great pride, our commitment to Title 9
> and making sure that we adhere to the law as it relates to both the
> intent and the spirit of Title 9. We want to offer opportunities.[170]

The fact that schools *do* offer a broad array of non-revenue sports, far more than would be

required by Title IX, [171] and the fact that for Division I status, the NCAA rules *require* them to offer at

least 14 men's and women's sports[172] are at odds with Plaintiffs' theory that the colleges and

universities are operating as a profit maximizing cartel: one master-minded or choreographed by

the NCAA and the conferences.[173]

## 2. Intercollegiate Athletics Doesn't Fit the Model of Labor-Market-Monopsony-Cartel

### a. The Motivation of the Putative Cartel is not Clear

In the economic theory of cartels, it is obvious what the members of the cartel want to

maximize: profits. But if the NCAA and its member schools have organized a cartel, it is not evident

what the cartel is maximizing.[174] In economic theory, firms conventionally maximize profits. But

---

[169] Brandon Deposition, p. 184.

[170] Brandon Deposition, pp. 184-5.

[171] Title IX requires a balancing of opportunities among male and female athletes, but it does not require institutions to sponsor numerous men's sports and women's sports that generate net losses. If profit were the motive, a Division I institution would sponsor men's football (85 scholarships), men's basketball (13 scholarships), and only a few women's sports (98 scholarships) required to comply with the statute. But institutions typically sponsor more than a dozen sports that generate losses. ("Title IX Frequently Asked Questions," http://www.ncaa.org/about/resources/inclusion/title-ix-frequently-asked-questions#title (accessed 3/21/17); 2016-17 Manual, Articles 15.5.6 and 15.5.5).

[172] See note 175.

[173] Consolidated Amended Class Complaint, ¶ 12; Jenkins Complaint ¶ 36.

[174] Nor is it obvious why Plaintiffs have identified the defendants listed in the two complaints. One of the oddities of this case is that the alleged cartel Plaintiffs describe is an agreement among NCAA member schools, of which the NCAA is only the implementing mechanism. Usually in cartel cases, the members of the cartel are the defendants. Here, none of the member schools is a defendant – only the conferences and the NCAA are defendants.

Highly Confidential – Counsel Only

the facts don't support the proposition that the economic profit of intercollegiate athletics is being

maximized—because almost all of the sports that members of the NCAA actively sponsor and

promote generate very little revenue and their profits would be negative. Wrestling, swimming,

field hockey, soccer, volleyball and track and field would be a few examples.[175]  Plaintiffs provide no

indication of what they believe the goal of the alleged cartel might be.  Because the economic

efficiency consequences of the alleged cartel depend on what its members' goals are, this leaves

Plaintiffs' theory of the alleged cartel incomplete and flawed.

### b.    The NCAA would be an Unusual Cartel

If the NCAA were a cartel it would be remarkably large.  There are 347 schools in

Division I;[176] 324 schools in Division II;[177] and 449 schools in Division III.[178]  That would make the

NCAA a cartel with over 1,100 members.  Even a cartel comprising only Division I schools would

have almost 350 members.  Carlton and Perloff, in their textbook description of conditions

favorable to the formation of a cartel, identify low organizational costs as a factor that facilitates

cartel formation and they recognize:

---

[175] A list of NCAA Division I sponsored sports can be found in the 2016-17 Manual, Article 20.9.6.3. Moreover, a Division I school in the NCAA is required to sponsor a minimum number of sports. "A member institution shall sponsor teams in a minimum of: (a) Seven varsity intercollegiate sports, including at least two team sports, based on the minimum requirements of Bylaw 20.9.6.3 and involving all-male teams or mixed teams of males and females, and seven varsity intercollegiate sports (of which a maximum of two emerging sports per Bylaw 20.02.4 may be used), including at least two team sports, based on the minimum requirements of Bylaw 20.9.6.3 and involving all-female teams; or (b) Six varsity intercollegiate sports, including at least two team sports, based on the minimum requirements of Bylaw 20.9.6.3 and involving all-male teams or mixed teams of males and females, and eight varsity intercollegiate sports (of which a maximum of two emerging sports per Bylaw 20.02.4 may be used), including at least two team sports, based on the minimum requirements of Bylaw 20.9.6.3 and involving all-female teams. (See Bylaws 20.9.9.1 and 20.9.10.1 for additional sports sponsorship requirements for member institutions participating in football.)" (2016-17 Manual, Article 20.9.6).

[176] 129 of which play FBS football and basketball, 123 of which play FCS football and basketball, and 95 of which play basketball but not football. "NCAA Sports Sponsorship," http://web1.ncaa.org/onlineDir/exec2/sponsorship (accessed 01/20/17).

[177] 173 of which play football and basketball and 151 of which play basketball but not football. "NCAA Sports Sponsorship," http://web1.ncaa.org/onlineDir/exec2/sponsorship (accessed 01/20/17).

[178] 248 of which play football and basketball, 200 of which play basketball but not football, and 1 of which (the Massachusetts Maritime Academy) plays football but not basketball. "NCAA Sports Sponsorship," http://web1.ncaa.org/onlineDir/exec2/sponsorship (accessed 01/20/17).

**Highly Confidential – Counsel Only**

> Four factors keep the cost low, facilitating the creation of a cartel: *Few firms are involved,* the market is highly concentrated, all firms produce a nearly identical product, and a trade association exists.[179]

The alleged markets for intercollegiate athletes, if they were proper antitrust markets, would have hundreds of participants, be unconcentrated, and the "firms" in the market do not produce or purchase identical products. Of Carlton and Perloff's four factors, therefore, at most only one fits the NCAA and the defendant-conferences, and that is the existence of a trade association (if you consider the NCAA to be a trade association).

A cartel with hundreds of members does not fit easily within the conventional boundaries of the economic theory of cartels. Successful cartels require coordination and monitoring among their members. This becomes more difficult the larger the number of cartel participants. Because the NCAA member schools and the conferences believe that their activities are legal, it is worth noting that Carlton and Perloff's emphasis on the small number of firms in a cartel is not limited to hiding illegal activity. "Even where cartels are legal," they write, "the number of firms is *crucial*."[180]

Not only would Plaintiffs' alleged cartel be unusually large, it also would be unusually long-lived. Economics teaches that a cartel has centripetal and centrifugal forces operating at the same time. That's one reason cartels usually are not long-lasting. Economists who have studied the longevity of cartels maintain that they are inherently fragile institutions that rarely last more than a decade.[181]

---

[179] Dennis W. Carlton and Jeffrey M. Perloff, *Modern Industrial Organization, 4th ed.* (Boston: Pearson Addison Wesley, 2005) (hereafter, "Carlton and Perloff"), p. 134, italics added.

[180] Carlton and Perloff, p. 134, italics added.

[181] For example, Levenstein and Suslow have reviewed and summarized nine empirical analyses of cartel duration and found that most cartels fall into one of two categories: a group that lasts no more than a single year and a longer lasting group, most lasting four to six years, with a diminishing number lasting longer. (Margaret C. Levenstein and Valerie Y. Suslow, "What Determines Cartel Success?" *Journal of Economic Literature* 44 (2006): 43-95 (hereafter, "Levenstein and Suslow"), pp. 51-2). The average length in the studies reviewed in Levenstein and Suslow's paper varied between 3.7 and 10 years. (Levenstein and Suslow Table 1, p. 51.) They concluded that "[s]ome cartels last — on average about five years" and found the median duration to be about six years. Since cartels can (and sometimes do) operate for a time, break down due to cheating, reorganize and resume, analysts have to decide how to "count" such cartels and measure their duration. (See Levenstein and Suslow, pp. 52–7 and the studies cited therein). For another analysis with

64

**Highly Confidential ~ Counsel Only**

In contrast with these findings, the NCAA has been around for sixty years. As I discuss in Section II, the NCAA began in 1910.[182] Moreover, the NCAA has had rules that limit the amount of financial aid student-athletes can receive since 1952.[183] Because these rules constitute the alleged cartel conduct in this case, that means Plaintiffs' alleged cartel has been in existence for over 64 years.

In short, because of its size and longevity, the cartel Plaintiffs allege would be, in a word, unusual. To be sure, neither the size nor longevity of the alleged cartel are sufficient to rule out the possibility of its being a cartel. But, these factors contribute to the overall conclusion that Plaintiffs' alleged cartel theory is implausible, and that, consequently, the cartel model is a poor vehicle for understanding the operations of the NCAA and its effect on economic welfare.

### c. The COA Cap is not a Wage

Plaintiffs define the COA cap as a wage—one that allegedly has been suppressed by a monopsonistic cartel whose members are the NCAA and the defendant conferences. Defining the COA cap as a wage masks the economic logic of the payment. One economist who understands how a COA cap differs from a conventional wage payment is Rebecca Blank, now the Chancellor of the University of Wisconsin. During her deposition she was asked about academic scholarships as a form of "pay."

> Q: Why is Wisconsin, in your view, providing to college football players, let's say, academic scholarships, worth, I would imagine, several tens of thousands of dollars per year, as well as checks for

---

similar conclusions, see also Joseph E. Harrington, Jr. "How Do Cartels Operate?" *Foundations and Trends in Microeconomics* 2, no. 1 (2006): 1-105.

[182] A precursor organization, the Intercollegiate Athletic Association of the United States (IAAUS) began in 1906.

[183] While the NCAA's has had rules on financial aid since 1939, with the adoption of the Declaration of Sound Principles and Practices for Intercollegiate Athletics, 1952 was the first year the NCAA had a workable enforcement mechanism to implement those rules. (See p. 15 above and Frederick W. Luehring, "XIV. The National Collegiate Athletic Association," *Journal of Health and Physical Education* 18, no. 10 (1947): 707-9, 751-3, p. 752.

**Highly Confidential – Counsel Only**

spending money to cover their living expenses? Is that paying them to do something, in your mind?

THE WITNESS [Rebecca Blank]: It is not. Given the demands upon them as an athlete, and their willingness to be here as an athlete and a student, it gives them the ability to make that choice without having to do other things – you know, to work at the local bar or the local restaurant in their spare time, because we all know student athletes have very little spare time once they're fully engaged in studies and they're fully engaged on the field.

. . .

So, you know, we similarly give scholarships to other groups of students. You know, it's a much smaller group, but we have some musicians who we regularly give full scholarships to, for the same reasons, they're not going to have a lot of time outside of their other commitments to raise funds for their college experience.[184]

If one were to apply the economic concept of a wage to the COA cap, it would understate the wage by a significant amount. The reason is that student-athletes are both students *and* athletes. This means the COA cap is contingent upon every student-athlete's admission to a college or university. This, in turn, means the *value* (or remuneration) of playing sports is not simply the nominal amount of the athletic scholarship—but rather is the monetized value of the entire college-experience. The value of the degree itself—what economists would call the value of accumulated *human capital*—also represents economic value that a student-athlete receives.

In the traditional economic rendering of a monopsonized labor market, the exploited worker does not accumulate human capital on the job (*much less a college education and degree*). For most student-athletes who receive a scholarship, the economic value of their education far exceeds the value of their scholarship. As a matter of economic taxonomy, the human capital component distinguishes the COA cap from conventional wage payments. And the distinction is significant.

The rate of return on human capital from a U.S. college or university education is positive and higher than most other investment alternatives. Greenstone and Looney estimated that the

---

[184] Blank Deposition, pp. 102-3.

Highly Confidential – Counsel Only

return on investment for a four-year college degree is 15.2%.[185]  This rate is "more than double the average return over the last 60 years experienced in the stock market (6.8 percent), and more than five times the return to investments in corporate bonds (2.9 percent), gold (2.3 percent), long-term government bonds (2.2 percent), or housing (0.4 percent)."[186]  These results are consistent with a recent study by economists at the Federal Reserve Bank of New York who estimated that the average rate of return for a bachelor's degree has been consistently high, at 14% to 15% during the past decade.[187]

Plaintiffs have put forward the theory that intercollegiate athletics is a labor market monopsonized by NCAA member schools.  By adopting a monopsony narrative with its singular focus on the COA cap, Plaintiffs end up ignoring the human capital component of a college education.  As a result, they fail to comprehend what should be a central aspect of their own theory:

---

[185] Michael Greenstone and Adam Looney, "Where is the Best Place to Invest $102,000 -- in Stocks, Bonds, or a College Degree?" *The Hamilton Project of the Brookings Institution*, June 25, 2011 (hereafter, "Greenstone and Looney").

[186] Greenstone and Looney.

[187] Jaison R. Abel and Richard Deitz, "Do the Benefits of College Still Outweigh the Costs?" *Federal Reserve Bank of New York Current Issues in Economics and Finance* 20, no. 3 (2014): 1- 11, p. 7.  The authors also estimate the rate of return to a bachelor's degree by major in 2012, which ranges from 9% for students who major in Education to 21% for students who major in Engineering.  The impressive rates of return on a college education may be attributed to the boost to earnings that comes with higher education, and the reduced probability of unemployment.  A recent study indicates that the earnings premium for a college degree relative to a high school degree remains very high at about 60%.  The earnings premium increases to 84% when individuals with advanced degrees are included.  (Jonathan James, "The College Wage Premium," *Economic Commentary* (2012)).  Data from the Bureau of Labor Statistics show that in 2015 the unemployment rate of high school graduates was nearly twice the unemployment rate of college graduates (5.4% versus 2.8%).  ("Employment Projections," https://www.bls.gov/emp/ep_chart_001.htm (accessed 2/3/17)).  These rates of return underestimate the full value of a college education because they do not account for differences in non-wage benefits between college graduates and those without a degree (*e.g.*, health insurance, pension benefits, and paid leave).  (See US Department of the Treasury and Department of Education, "The Economics of Higher Education," December, 2012 (hereafter, "US Departments of Treasury and Education"), p. 14 ).  College graduates are more likely to be covered by employer-sponsored health insurance than those without a degree (69% of full-time college graduates versus 55% of high school graduates in 2011).  (Sandy Baum, Jennifer Ma, and Kathleen Payea, "Education Pays 2013: The Benefits of Higher Education for Individuals and Society," *Trends in Education Series*, College Board (2013) (hereafter, "Baum et al."), p. 24).  College graduates also are more likely to be offered pension plans by their employers, 65% of full-time workers with a bachelor's degree were offered pension plans in 2011 versus 52% of full-time workers with only a high-school diploma.  (Baum et al., p. 23).  A bachelor's degree also can serve as a stepping stone to an advanced degree, which can lead to even higher lifetime earnings and more generous employer benefits.  (US Departments of Treasury and Education, p. 14).

**Highly Confidential – Counsel Only**

the actual value of a college education for a student-athlete. This failure to appreciate the full economic value of the student-athlete experience undercuts their allegations that student-athletes are the victims of economic exploitation.[188]

## V.    The NCAA, Amateurism, and Externalities in Intercollegiate Athletics

Having shown that cartel theory does not offer a compelling explanation for the NCAA's COA cap provisions, I turn to economic theory for the explanation of what actually is going on here. The standard economic model of externalities fits the facts. Economics also provides a precedent for Plaintiffs' error in misattributing what is actually an externality problem to a monopsony cartel.

In 1972, Professor Ronald Coase, who would go on to win the Nobel Prize in Economics,[189] attended the 50th anniversary conference of the National Bureau of Economic Research. At that conference, Coase remarked that when economists don't understand some business practice, all too often the conclusion is drawn that the practice is anticompetitive. As Coase put it, "An economist finds something—a business practice of one sort or other—that he does not understand, he looks for a monopoly explanation."[190]

That describes what happened to the NCAA. Some economists observed an economic practice they did not fully understand: funding of student-athletes by colleges and universities that are members of the NCAA. So, they gave this practice what Coase called "a monopoly explanation." This propensity to label something as anticompetitive before it is fully understood was unfortunate

---

[188] Nor is the value of the degree the only contribution that the undergraduate experience makes to the human capital of a student-athlete. Those playing in FBS football or Division I men's or women's basketball experience coaching and competition at an elite level. For student-athletes who go on to play professional sports, these experiences are likely to be valuable components to building their career. For those who do not go on to play professionally, the value of these experiences is still part of the economic payoff of their undergraduate student-athlete experience.

[189] "The Sveriges Riksbank Prize in Economic Sciences in Memory of Alfred Nobel 1991," https://www.nobelprize.org/nobel_prizes/economic-sciences/laureates/1991/ (accessed 12/29/16).

[190] R.H. Coase, "Industrial Organization: A Proposal for Research," Chapter 4 in *Policy Issues and Research Opportunities in Industrial Organization, Fiftieth Anniversary Colloquium III*, Economic Research: Retrospect and Prospect, edited by Victor R. Fuchs (New York: National Bureau of Economic Research, 1972), p. 67. {For chapter sequencing, see Front Matter, http://www.nber.org/chapters/c7614.pdf (accessed 1/30/17)}.

68

Highly Confidential – Counsel Only

for the NCAA and its member schools because this label crowded out the actual economic logic behind the NCAA's amateurism rules, which, as I previewed earlier, involves the economics of externalities.

A.   **Economic Theory of Externalities**

After explaining the gains from trade, and teaching how competitive markets promote consumer welfare, every teacher of economic principles explains the exceptions to the market system's beneficence: what is sometimes called "market failure." Monopoly is one example of market failure. An externality is another.

As described earlier, an externality occurs when a transaction between two parties affects the economic welfare of some third party who is "external" to the transaction. A common classroom example of an externality is when producers of steel sell their output to steel fabricators and, in the process of producing steel, emit pollutants, *e.g.*, smoke, into the air that impose costs on third persons who are not parties to the transaction, *e.g.*, neighboring households that hang laundry out to dry. This would be an example of a *negative* externality, which is "an uncompensated action that harms someone."[191]

A common classroom example of a *positive* externality is when a group of people get flu shots and in the process, they confer benefits on third parties—those who did not get flu shots, because the probability of these individuals getting the flu also is reduced. A positive externality is "an uncompensated action that benefits others."[192]

Millions of transactions every day do not involve externalities. When a consumer buys a cup of coffee, presumably no third-party consumer is affected one way or the other; so, there's no externality. But when economic agents do not shoulder the full cost that their actions inflict on

---

[191] Carlton and Perloff, p. 82.

[192] Carlton and Perloff, p. 82.

**Highly Confidential – Counsel Only**

third parties, an externality occurs. The reason Plaintiffs' analysis goes off track is their failure to realize that the economic concept of externalities applies to intercollegiate sports.

### B.     Externalities in Intercollegiate Athletics

A modern college or university can be thought of as a diverse portfolio of endeavors, from science to music to social clubs to service groups to athletics to career counseling and more. For example, the University of Arizona has 589 student-run organizations, 20 varsity sports[193] and 30 sports clubs.[194] Among 589 student organizations, there are 241 academic clubs, 129 cultural/international clubs, 87 departmental clubs, 35 environmental/sustainability clubs, 58 health clubs, 46 honorary clubs, 165 leadership clubs, 32 political clubs, 167 professional clubs, 49 religious clubs, 10 social Greek letter clubs and 202 special interest clubs. [195] These activities serve the differing needs of students with differing interests and talents. This variety relates to colleges and universities as a multi-sided platform, since schools believe that this diverse array of students is best served by being combined in one institution – sharing classes, dormitories, social life, and in the process sharing ideas, questions, and intellectual growth. It provides a highly disaggregated picture of the many sides of the multi-sided platform that is a college or university.

Division I colleges and universities offer a wide variety of extracurricular activities to increase the value of the college experience for all students. Whether a person associates with the college or university as a student or as staff, and whatever role the person assumes within the institution, this person enjoys externalities conferred by other parts of the institution. If all goes as it should, a Chemistry major and a Chemistry professor confer benefits on other students and faculty members outside the Chemistry lab through the mixing of people with differing interests

---

[193] "Athletics & Recreation," http://www.arizona.edu/topics/athletics-recreation (accessed 1/24/17).
[194] "Club Sports," http://rec.arizona.edu/program/club-sports (accessed 1/24/17).
[195] "Organizations Directory," https://arizona.collegiatelink.net/organizations (accessed 1/24/17).

70

## Highly Confidential – Counsel Only

and backgrounds. Long before the term "network effects" became a buzzword, the modern college or university was a bundle of network externalities.

A college's or university's sports program is part of this portfolio of activities that provides benefits both to student-athletes (who participate in the various sports) and to the larger campus community, which includes students, faculty, and administrators who enjoy being spectators of college sports and/or value being part of a community that includes access to student-athletes in a manner that professional sports does not. Let me expand upon these.

### 1. Benefits to Student-Athletes

Participation in college athletics provides student-athletes with the opportunity to increase their abilities in a particular sport. In addition to developing these skills, student-athletes also acquire skills that benefit them academically, socially, and professionally. Part of this benefit is in the form of accumulating human capital (as described earlier). A survey[196] of student-athletes at 18 NCAA Division 1A[197] schools (what would later be known as the FBS) found that close to 95% of the respondents claimed that their participation in athletics had contributed to their "educational and/or personal development."[198] When asked about specific skills, more than 90% of the student-athletes claimed that playing sports had positively influenced their leadership skills, teamwork,

---

[196] Josephine (Jo) R. Potuto and James O'Hanlon, "National Study of Student Athletes Regarding Their Experiences as College Students," National Collegiate Athletic Association Publications (2006) (hereafter, "Potuto and O'Hanlon").

[197] Potuto and O'Hanlon, p. 1. The authors of the study explain that, "[w]e surveyed exclusively at D1A [Division IA] universities because (1) concentration on a particular NCAA division made more manageable the scope of the project and enhanced the representative character of the sample; (2) D1A institutions, and particularly the revenue sports at these institutions, are the primary focus of claims that student-athletes are exploited and/or are not really students; (3) D1A institutions have more fully funded and structured student-athlete support services with which we could interact in distributing and collecting surveys; and (4) D1A institutions are those that we know best, in terms of on-campus administration and NCAA bylaws and governance." (Potuto and O'Hanlon, p. 2).

[198] Potuto and O'Hanlon, p. 10.

71

**Highly Confidential – Counsel Only**

work ethic, ability to take responsibility for themselves, ability to make decisions, and time management skills—all forms of what economists consider human capital.[199]

Participation in varsity sports also provides some students with an edge in competing for jobs after graduation and advancing their careers. For example, statistics published by Purdue University show that from 2011 to 2015 upwards of 90% of Purdue student-athletes attained employment, pursued continuing education opportunities, or had other confirmed plans upon graduation, at and sometimes well above the general student-body placement rate.[200] Further, there is evidence that participation in college sports is associated with higher incomes, and many employers have stated a preference for hiring student-athletes due to their leadership skills, work ethic, and ability to work collaboratively.[201]

### 2. Benefits to Student-Athletes in Non-Revenue Sports

Student-athletes in non-revenue sports, sometimes called "Olympic Sports," benefit from being in the same athletics department as student-athletes in football and basketball to the extent that facilities can be shared, *e.g.*, locker rooms, weight rooms, trainers' facilities.[202] Economizing on scarce resources by taking advantage of opportunities for joint production is a conventional source of economic efficiency, and in this context a source of positive externalities between different sports.

---

[199] Potuto and O'Hanlon, p. 11.

[200] PUR-PR-00468-72.

[201] Participation in intercollegiate athletics has been shown to increase the income of males ages 28 to 30 by 4%. These findings suggest that college athletics may "enhance development of discipline, confidence, motivation, a competitive spirit, or other subjective traits that encourage success." (James E. Long and Steven B. Caudill, "The Impact of Participation in Intercollegiate Athletics on Income and Graduation," *The Review of Economics and Statistics* 73, issue 3 (1991): 525-31). For these reasons, many employers have stated a preference for hiring student-athletes. (Fred Bastie, "Recruiting Column: Employers Want To Hire College Athletes," *USA Today High School Sports*, October 2, 2015; Stephanie Vozza, "Why Your Next Employee Should Be A Former Student Athlete," *Fast Company*, April 10, 2014; Scott Soshnick, "Wall Street Hires Losers Turned Winners After College Athletics," *Bloomberg*, October 16, 2013; Hatch Interview).

[202] "Facilities Management," http://www.ncaa.org/governance/facilities-management (accessed 1/31/17); Emmert Deposition, p. 41.

**Highly Confidential – Counsel Only**

### 3. Benefits to Other Students

College and university athletic programs also generate on-campus benefits to students who themselves are not varsity athletes. Some of these benefits accrue to students who participate in intramural or club sports. They often enjoy access to facilities that generally are supported by their school's intercollegiate athletic program, such as regulation size fields, courts, and swimming pools, as well as exercise facilities and locker rooms.[203]

Students who are not varsity athletes, and who do not participate in intramural or club sports, may still benefit from being part of a community of students with a diverse range of interests, including sports. For example, the experience of a student whose academic interests are primarily math and computer science and whose extracurricular interests are chess and Habitat for Humanity can be enriched by being part of a diverse campus community that includes student-musicians, student-artists, and student-athletes.[204]

### 4. Benefits to Campus Community

Varsity sports confer benefits on the entire campus community when they generate school spirit and foster a connection to the school itself. Many students, faculty, and administrators with different backgrounds and interests come together at sporting events to support their school and cheer for student-athletes who are part of their school. "Athletic events . . . offer all members of the university the opportunity to wear the same colors, rally behind a common cause, and feel proud of the student-athletes who represent their school. The energy that runs through arenas across the

---

[203] "Facilities Management," http://www.ncaa.org/governance/facilities-management (accessed 1/31/17); Emmert Deposition, p. 41.

[204] The Chancellor of the University of Wisconsin explains: "I don't think the issue for Men's Football Team is any different than any of our athletic teams which we have, I believe, 23 and varsity sports, and for all of those, just as we have band, as we have dance, we have a variety of activities that play to skills beyond just those in the classroom. The athletic teams benefit the University by providing our students with a broader range of experiences, of skills, of disciplinary -- you know, teaching disciplines of mind and body together." (Blank Deposition, p. 12).

73

**Highly Confidential – Counsel Only**

country has the power to both unite and empower."[205] A report by the Carnegie Foundation for the

Advancement of Teaching observed that "athletics has contributed greatly to the spirit of

community on campus . . . powerfully uniting students, faculty and alumni behind a common

passion."[206] The Beach Boys' ode to this phenomenon is their song, "Be true to your school."[207]

There are multiple intangible benefits to fostering a collegial connection among those at a

school. The benefit is difficult to quantify, but it forms part of a school's DNA. The phenomenon can

be called "school spirit." College and universities invest significant resources to cultivate their

institutional DNA. All other things equal, students prefer to enroll and faculty and administrators

prefer to work at a school where these stakeholders feel connected to the institution.[208] A school's

athletic program is one way to promote this allegiance.

Colleges and universities benefit from having an involved and supportive alumni base.

Intercollegiate athletics serve to keep school spirit alive by keeping alumni engaged after they

graduate.[209] In addition to financially supporting the institution, loyal alumni also provide valuable

networking opportunities for current students and graduates. Sporting events provide a focus for

---

[205] Jackie Hyman and Mathew Van Jura, "Elite Collegiate Athletics and the Academy: Criticisms, Benefits, and the Role of Student Affairs," *The Vermont Connection* 30 (2009): 42-52, p. 47.

[206] Carnegie Foundation for the Advancement of Teaching, *Campus Life: In Search of Community*. (Princeton: The Carnegie Foundation for the Advancement of Teaching, 1990), p. 59.

[207] See https://www.youtube.com/watch?v=8V110MrVpRY (accessed 3/21/2017) for a performance.

[208] Vincent Tinto and John Cullen, "Dropout in Higher Education: A Review and Theoretical Synthesis of Recent Research," Office of Planning, Budgeting, and Evaluation of the U.S. Office of Education (1973), p. 64; Patrick O'Keeffe, "A Sense of Belonging: Improving Student Retention", *College Student Journal* 7, no. 4 (2013): 605-13; Laura L. B. Barnes, Menna O. Agago and William T. Coombs, "Effects of Job-Related Stress on Faculty Intention to Leave Academia," *Research in Higher Education* 39, no. 4 (1998): 457-69, pp. 465-7; John C. Smart, "A Causal Model of Faculty Turnover Intentions," *Research in Higher Education* 31, no. 5 (1990): 405-24, pp. 416-7.

[209] Strong athletic programs unify the college community and alumni and significantly increase the level of alumni contribution ("Alumni Giving," https://www.alumnifactor.com/node/5854 (accessed 1/31/17)). Alumni make significant contribution to athletic programs directly every year. For example, at BCS schools, alumni contribution to athletic programs is $4.0 million on average per year and $0.7 million per year at non-BCS schools. (Michael L. Anderson, "The Benefits Of College Athletic Success: An Application Of The Propensity Score Design," *Review of Economics and Statistics* 99, no. 1 (2017): 119-134, p. 120); SEC00201135-60 at 43.

**Highly Confidential – Counsel Only**

continuing alumni connection to a college or university.[210]  A recent fund-raising letter from a

seminary president bemoaned the fact that seminaries have no weekend football games that attract

graduates and other friends of the school back to campus.[211]

Intercollegiate amateur athletic programs also aid in recruiting a college's or university's

entering class of students, by providing increased national exposure and generating student

interest.  Brian Goff reviewed several studies regarding the effects of athletic programs on colleges

and universities and concluded the following:

> - Athletic success, particularly significant improvement, can substantially increase national exposure for universities regardless of their academic reputation.
>
> . . .
>
> - Major achievements in athletics appear to spark additional interest from prospective students, even at schools with highly rated academic programs.
> - Major achievements in athletics may lead to an improved pool of entering students (in terms of aptitude tests) at selective universities.
> - Dropping football can have measurable, negative impacts on enrollments and possibly other indirect variables (*e.g.*, giving), even for universities that do not have top tier programs.[212]

In addressing the question: "Why Do U.S. Colleges Have Sports Programs?" Sandy and

Sloane concluded: "We find that there are substantial gains in student numbers and in student

quality when a given institution raises the level of its sports affiliation."[213]  The economic benefit of

---

[210] Doug J Chung, "The Dynamic Advertising Effect of Collegiate Athletics," *Marketing Science* 32, no. 5 (2013): 679-698 (hereafter, "Chung"), p. 696.

[211] Timothy Brown, the President of Western Theological Seminary wrote a letter to my wife and me this fall which read, in part, "I often think of colleges and universities with basketball and football teams that draw alumni and friends onto their campus to show off. I wish we had something like that . . ." Timothy Brown, Letter dated "November 2016" to Dr. & Mrs. Kenneth G. Elzinga.

[212] Brian Goff, "Effects of University Athletics on the University: A Review and Extension of Empirical Assessment," Chapter 5 in *Economics of College Sport*, edited by John Fizel and Rodney Fort (Westport: Praegar Publishers, 2004): 65-85, p. 82.

[213] Robert Sandy and Peter Sloane, "Why Do U.S. Colleges Have Sports Programs?" Chapter 6 in *Economics of College Sports*, edited by John Fizel and Rodney Fort (Westport: Praegar Publishers, 2004): 87-109, p. 93.

Highly Confidential – Counsel Only

the ability of athletics programs to attract additional donations to the school or additional students (sometimes called the "recruiting effect") is not simply additional tuition dollars. A positive (nontrivial) recruiting effect means an institution's admissions office can be more selective in drawing from the applicant pool which then affects the national rankings of the school.[214]

After summarizing the literature (including his own research) as to why universities have athletic programs, Osborne concluded: "Schools spend resources on athletics because it, along with better education, is what students by and large want."[215]  Economic analysis has a short-hand expression for what Osborne found: economists call this "revealed preference." Individuals and organizations often "reveal" the cost-benefit logic behind their conduct by what they do.

More generally, athletic programs contribute to the overall brand identification of an institution. To be sure, this benefit is hard to measure. But being hard to measure does not negate the economic reality of the benefit. Colleges and universities do not hide the fact that they are conscious of their brand (or reputation) and they devote resources openly and unabashedly to brand management in order to generate interest from prospective students, faculty, and administrators.[216]  In addition, a school's brand can affect private donations and public funding.[217]

---

[214] Chung, pp. 695-6.

[215] Evan Osborne, "Motivating College Athletics," Chapter 4 in *Economics of College Sports*, edited by John Fizel and Rodney Fort (Westport: Praegar Publishers, 2004): 51-62, p. 61.

[216] Kimberly M. Judson, Timothy W. Aurand, Linda Gorchels, and Geoffrey L. Gordon, "Building a University Brand from Within: University Administrators' Perspectives of Internal Branding," *Services Marketing Quarterly* 30, no. 1 (2008): 54-68 (hereafter, "Judson et al."), p. 57. Hannah-Mari Aula, Jane Tienari, and Arild Wæraas, "The University Branding Game: Players, Interests, Politics," *International Studies of Management & Organization* 45, no. 2 (2015): 164-79, pp. 164-5 (citing, Anthony Lowrie, "Branding higher education: Equivalence and difference in developing identity," *Journal of Business Research* 60 (2009): 990-9, p. 994; Susan Whelan and Markus Wohlfeil, "Communicating brands through engagement with 'lived' experiences," *Brand Management* 13, no. 4/5 (2006): 313-29, pp. 317 and 320; T.C. Melewar and Sibel Akel, "The role of corporate identity in the higher education sector: A case study," *Corporate Communications: An International Journal* 10, issue 1 (2005): 41-57, pp. 41-2). As an example, the University of Houston conducted a five-year, $5 million Branding Campaign. ("The UH Image Campaign," http://www.uh.edu/learningleading/results.htm (accessed 1/31/17)).

[217] Judson et al., p. 64.

**Highly Confidential – Counsel Only**

Studies suggest that success in intercollegiate athletics, such as bowl trips and tournament appearances, results in increased donations to universities.[218]

The benefits of intercollegiate athletics are not limited to campus communities. Home games can aid college and university towns by generating revenue for local businesses.[219] Of course their capacity to do so depends on their popularity with alumni and fans generally, and as I have explained above that is related to student-athletes being amateurs. In addition, sporting events can improve town/gown relations[220] by fostering positive relationships between an institution and the community in which it is located, bringing together the campus community and local residents in support of the local team.[221] Many college and university teams also engage in public service activities to benefit their surrounding neighborhoods, such as clothing drives, preparing lunch bags for distribution at homeless shelters, and volunteering time at youth programs.[222]

These benefits to the communities in which they are located, in turn, confer benefits to the colleges and universities themselves, because having poor "town/gown relations" can be costly to a

[218] Robert A. Bade and Jeffrey O. Sundberg, "Fourth Down and Gold to Go? Assessing the Link between Athletics and Alumni Giving," *Social Science Quarterly* 77, no. 4 (1996): 789-803; Irvin B. Tucker, "A reexamination of the effect of big-time football and basketball success on graduation rates and alumni giving rates," *Economics of Education Review* 23 (2004): 655-61. Making much the same point, Rebecca Blank of the University of Wisconsin testified, "[t]he Men's Football Team had very poor performance for a large number of years, and probably now 15, 20 years ago, started improving, and there are probably been some increase in donations to athletics as a result of that." She added: "I don't think there's much evidence of an increase in donations to other parts of the University as a result of that. We've got pre- and post-evidence here, right?" (Blank Deposition, p. 14).

[219] Robert J. Sternberg, "College Athletics: Necessary, Not Just Nice To Have," http://www.nacubo.org/Business_Officer_Magazine/Business_Officer_Plus/Bonus_Material/College_Athletics_Necessary_Not_Just_Nice_to_Have.html (accessed 1/31/17).

[220] "Town/gown" is a term frequently used in university communities to refer to the relationship between universities or colleges and the communities in which they are located.

[221] Robert J. Sternberg, "College Athletics: Necessary, Not Just Nice To Have," http://www.nacubo.org/Business_Officer_Magazine/Business_Officer_Plus/Bonus_Material/College_Athletics_Necessary_Not_Just_Nice_to_Have.html (accessed 1/31/17).

[222] "Playing It Forward", http://www.ncaa.org/about/resources/media-center/feature/playing-it-forward (accessed 2/1/17); "NCAA Partners With Local Universities And Schools On Literacy Program", http://www.ncaa.org/about/resources/media-center/news/ncaa-partners-local-universities-and-schools-literacy-program (accessed 2/1/17).

school.[223] As long as poor relations with the community are costly to an institution and such
relations can be improved by encouraging members of the community to follow and support a
school's athletic teams, the activities of the athletic program confer a benefit on the college or
university.

### 5.   Amateurism v. Professionalism

As I explain elsewhere in this report, American colleges and universities value a particular
variety of intercollegiate athletic competition, namely competition between *bona-fide* student-
athletes, *i.e.* competition between *amateurs*.[224] Many of the benefits generated by intercollegiate
sports would be diminished if amateur student-athletes were replaced by professional athletes.  If
professionalism displaced amateurism, athletes would no longer be perceived as active in the
student culture, including both academic and extracurricular activities.[225]  In his deposition Kevin
Lennon, Vice President of the NCAA for Division I, articulated this concern when he was asked why
he believes that "pay for athletic . . . competition would lead some athletes not to take full advantage
of educational opportunities."[226]

> I think the introduction of pay in anything above, kind of, a cost of
> attendance educational expense would -- would change the
> motivation of some of our students in terms of why they go to
> college, what they're to get out of the college, why they're to
> continue to pursue eligibility only, if, in fact, there's money that's
> associated with that, because the -- the higher ed experience and the
> growth that goes on within in college is to encourage students to
> receive the benefits from all aspects of the college, and providing
> money directly tied that that educational experience, again, I think
> for some, but not all, but clearly for some, may significantly change
> that orientation. And secondly, I think it, again, separates them from
> the rest of the student body as the others are not motivated solely by

---

[223] Some town-gown relations have become so strained that lawsuits have become a common form of
communication between the university and town.  For example, residents of Malibu, California "took
Pepperdine University to court trying to block the university's proposed expansion along the coast."  (William
Cecil, "College vs. Community: The Civil Wars," *New York Times*, April 5, 1992).

[224] See §§ II.A.2, II.B, and Appendix D.

[225] See pp. 21-22, above.

[226] Deposition of Kevin Lennon, 1/25/17 (hereafter "Lennon Deposition"), p. 33.

Highly Confidential – Counsel Only

> money in terms of why they're in college, and it has the potential of
> further dividing their experience; and, again, part of the college
> experience is this issue of integration, is the issue of common
> experience, and introducing this to a unique population of students
> and changing potentially the motivation, I think, can change a
> dynamic that, candidly, has worked very, very well for a lot of young
> people for a long time.[227]

His answer covers two sources of harm.  Student-athletes would change their decisions about allocating their time and effort in response to the financial incentives of monetary payments,[228] and they would be separated from the rest of the student body.  Thus, pay above the cost of attendance would impose a cost upon some students, faculty and administrators in the campus community.[229] Indeed, replacing student-athletes with professional athletes would transform the portfolio of goods and services that make up modern American colleges and universities.

Colleges and universities with active intercollegiate sports teams consider sports to be part of the brand identity of a school, one that offers value to both participants and fans, where the fans include current students and former students of the school.  Much of the appeal of Division I football and basketball is because the student-athletes are just that: students who also are amateur athletes. Division I football and basketball have a significant fan base both inside and outside any particular school.  Part of what draws attention to these events is that the athletes are genuine students who are amateurs, and not athletes who are professionals.[230]

To put the question directly: what makes millions of consumers desire to watch contests of very good (but certainly not the best) football players and basketball players?  It cannot be the superior athleticism of university football and basketball teams because professional basketball

---

[227] Lennon Deposition, pp. 33-4.

[228] See pp. 21-22, above.

[229] WAC_GIA_064593-7 at 3 and SB_GIA_059981-5 at 1; Deposition of Lawrence G. Scott, 1/12/17, p. 86; Blank Deposition, pp. 106-10; Burke Interview.

[230] Richard B. McKenzie, and E. Thomas Sullivan. "Does the NCAA Exploit College Athletes-An Economics and Legal Reinterpretation." *The Antitrust Bulletin.* 32 (1987): 373-399 (hereafter, "McKenzie and Sullivan"), p. 383; SB_GIA_008013-26 at 18; AMERICAN_GIA_061993; Emmert Deposition, pp. 110-14; Scott Deposition, pp. 72-3 and 83-4; Fenves Interview; Lewis 30(b)(6) Deposition, pp. 98-9; MWC_GIA_003597-610 at 602.

**Highly Confidential – Counsel Only**

(the NBA) and professional football (the NFL) offer contests played at a higher level of athletic skill. Therefore, it must be something other than the sports themselves given the relative lack of popularity of minor league sports and non NBA/NFL contests, such as the NBA-D (Development) League and Arena Football.[231] Rather, that "something" is that many consumers value competition among *bona fide* student-athletes, *i.e.*, amateurs.

A focus group study of college sports fans conducted by The Big Ten Conference in 2008 found that college sports fans were attracted to the spirit of amateurism, in contrast to the professionalism of major league sports:[232]

> For these individuals, college sports represented the purest form of the sport - playing for the love of the game, sportsmanship and teamwork. Conversely, pro sports are believed to be more about money and individuals. Many believe for the pro athlete the game has become a job and playing for the love of the game has unfortunately become a distant second. College athletes also seem to develop more personal connections with the university and community. Conversely, in pro sports a player may only play for a team for a few years before being traded. This makes it difficult to develop personal connections with a team or city. College athletes develop loyalties to the university and community that last a lifetime. In fact, many of these loyalties are passed on to their children. The combination of these factors seemed to create a greater sense of connection to college athletics.[233]

---

[231] For example in basketball, 3 million fans attended NBA D-League games in the 2015-16 season compared to the nearly 22 million fans who attended NBA games. ("NBA D-League Sets Single-Season Records During 2015-16 Season," http://dleague.nba.com/news/nba-dleague-records-2015-16-season (accessed 3/15/17); "NBA breaks all-time attendance record for second consecutive season," pr.nba.com/nba-breaks-time-attendance-record-second-consecutive-season (accessed 3/15/17)). In football for the 2015-16 season, close to 600,000 fans attended Arena Football League games compared to the nearly 18 million fans who attended NFL games. ("AFL Arena Football History – Year by Year – 2016," http://www.arenafan.com/history/?page=yearly&histleague=1&fpage=attendance&year=2016 (accessed 3/15/17)); "2016 NFL Attendance Data," http://www.pro-football reference.com/years/2016/attendance.htm (accessed 3/19/17)).

[232] BIGTEN-GIA 124850-94. Although the participants in the study noted the important role conferences play in setting, maintaining and enforcing academic standards for student-athletes, they expressed concern that some conferences were placing athletics above academics and that money had become a central focus. The study summary noted: "The concept of the student athlete is very powerful yet many believe the student athlete is becoming increasingly rare" (BIGTEN-GIA 124850-94 at 53 and 64-65).

[233] BIGTEN-GIA 124850-94 at 60.

Case 4:14-md-02541-CW   Document 809-7   Filed 04/06/18   Page 86 of 171

Highly Confidential - Counsel Only

Two senior university administrators testified to a similar understanding of intercollegiate

competition. Harvey Perlman from the University of Nebraska testified:

> I believe if we're required to pay athletes for play, turn them into
> professional or semiprofessional players, I think that will ultimately
> undermine the reason why higher education is involved in
> intercollegiate athletics in the first place. . . . I think if you're paying
> them to play athletics, I think it is inconsistent with the idea of what
> a student athlete is.[234]

And, Rebecca Blank from the University of Wisconsin testified:

> I think any payment to student athletes would fundamentally change
> the nature of what we are about here in college sports, and, you
> know, we are primarily an education-based institution, and our
> Athletic Programs, as I say, need to put education first, and once you
> start paying, students are not employees. They should not be
> receiving pay for going to school.[235]

In short, American colleges and universities and their constituencies value amateurism in

student-athletics more highly than they value the alternative professional model.

### 6. Amateurism is a Choice

Amateurism is a choice that colleges and universities can make. They can either treat their

student-athletes as amateurs or as professionals. The difference between amateur and professional

athletes is not merely a difference in degree. It is a difference in kind. The words "amateur" and

"professional" are true antonyms, as the dictionary definition of "amateur" makes clear.

> **am.a.teur** . . . 1: one that has a marked fondness, liking, or taste :
> DEVOTEE, ADMIRER (~s of this splendid wine will surely rejoice to
> learn that a limited quantity . . . will be available -*New Yorker*)
> 2a: one that engages in a particular pursuit, study, or science as a
> pastime rather than as a profession (the professional historians . . .
> have again let an ~ make off with a theme of real significance - T.H.
> Williams) b: one that competes in sports or athletics for pleasure
> rather than for financial gain -compare PROFESSIONAL[236]

---

[234] Perlman Deposition, pp. 126-7.

[235] Blank Deposition, pp. 97-8.

[236] Philip Babcock Gove (ed.) and The Merriam-Webster Editorial Staff, *Webster's Third New International Dictionary of the English Language Unabridged* (Springfield: Merriam-Webster Inc., 1986) (hereafter, "Webster's Third"), p. 65.

81

**Highly Confidential – Counsel Only**

Thus, in the context of intercollegiate athletics, an amateur is one who plays the game for the sake of the game "rather than for financial gain."[237] The Court of Appeals in the *O'Bannon* case recognized this understanding of amateurism when it wrote, "to borrow the Supreme Court's analogy, the market for college football is distinct from other sports markets and must be 'differentiate[d]' from professional sports lest it become 'minor league [football],'"[238] and then went on to explain that

> The difference between offering student-athletes education-related
> compensation and offering them cash sums untethered to
> educational expenses is not minor; it is a quantum leap. Once that
> line is crossed, we see no basis for returning to a rule of amateurism
> and no defined stopping point.[239]

The court understood that "not paying student-athletes is *precisely what makes them amateurs.*"[240] This description of an amateur contrasts starkly with that of a professional who does participate "for financial gain."

The qualitative difference between these two types of participation is mirrored in the difference between how student-athletes' scholarships are determined and how professionals' wages are determined. Wages for professionals are determined in the marketplace by the interaction of supply and demand. The demand for labor is a derived demand, based on the demand for whatever good or service the employer is using labor to produce. It's influenced by the costs of other factors of production and the availability and cost of different inputs that could be substituted for labor. The supply of labor is driven by prospective workers' preferences for work versus leisure, the wages they could earn in alternative activities, and the utility or disutility of the work in question. Employers need not concern themselves with prospective workers "needs." That is left for the workers, themselves, who ultimately express the urgency of their preferences in their

---

[237] Webster's Third, p. 65.

[238] *O'Bannon v. National Collegiate Athletic Association*, 802 F.3d 1049, 1076-7 (9th Cir. 2015).

[239] *O'Bannon v. National Collegiate Athletic Association*, 802 F.3d 1049, 1078 (9th Cir. 2015).

[240] *O'Bannon v. National Collegiate Athletic Association*, 802 F.3d 1049, 1076 (9th Cir. 2015), italics in original.

Highly Confidential – Counsel Only

labor supply choices. In the marketplace, professional employees and their employers each seek an outcome as good as the market will bear.

By contrast, scholarship amounts and other support for student-athletes are determined differently. Colleges and universities determine scholarship amounts in order to provide students access to an education, and in the case of student-athletes, an education that includes athletic competition.[241] The process is based on the schools' assessments of what their student-athletes need in order to participate in their education and compete athletically. School and conference officials are concerned that scholarship amounts should cover educational expenses, but not provide financial aid to student-athletes that is not directly related to the cost of attending school.

Along this line, Michael Aresco, Commissioner of the American Athletic Conference testified during his deposition:

> Scholarship enables [student-athletes] to get, you know, a free education. The cost of the attendance enables them to pay various incidentals connected with that education above and beyond the scholarship amount, whereas if you just pay players, you've created, you know, essentially a professional model that really doesn't have anything to do with the educational mission of the institution or the educational needs of those students, . . . I also think it would have a profound impact on how college sports are viewed and might if, you know, ultimately college sports have been valuable to the country, to the fabric of the country, to the communities, to the, you know, the history of, it is wonderful. I think all that might be put in jeopardy down the road.[242]

Mark Lewis, Executive Vice President of Championships and Alliances at the NCAA described in his testimony what determines the amount of scholarship that goes to a student-athlete:

> [W]hat [student-athletes] receive is about going to college and making sure they have the resources to go to college, and that includes more than room, books, board, tuition, et cetera. It includes

---

[241] NCAAGIA02821438-40 at 39; Deposition of Michael Slive, 11/10/16, pp. 191-2; BIG12-GIA_00119153; MWC_GIA_058001-8 at 1.

[242] Aresco Deposition, pp. 241-2.

**Highly Confidential – Counsel Only**

> things that are part of the cost of attendance as that term is used,
> with no relevance to sports at all.[243]

And then, in a later exchange, he went on to describe the consequences of deviating from this

approach:

> Q But are you saying that any amount, no matter how small, above
> the cost of attendance is going to have a significant impact --
> negative impact on consumer demand? . . .
>
> THE WITNESS: Yes, I'm saying if you un-tether the payment to the
> philosophy, any amount would have the impact, because now you're
> characterizing these students as professional athletes. So, yes, that's
> what I'm saying.[244]

In her deposition, Chancellor Rebecca Blank testified that

> I believe most of the presidents and chancellors would have agreed
> to, is that, for those student athletes who receive scholarships, which
> is certainly not all student athletes at all, we should do what we can
> to make sure that their educational experience is what it needs to be,
> and that means that they need to have the financial resources
> available to attend school, to participate in their athletic functions, to
> be successful as students, without facing undue financial stress.[245]

## C.    Externalities in College and University Decision Making

In this section of my report, I apply the economic concept of externality to the schools'

choice described in the previous section—the choice between treating athletes as amateurs or

professionals. The Amateur vs. Professional choice faced by colleges and universities fits within a

standard economic model commonly taught in economic principles courses. This analytical

framework reveals the economic logic behind how the NCAA's practice of capping financial aid to

student-athletes is not anticompetitive but, rather, promotes economic efficiency by avoiding the

phenomenon of market failure that would undercut the established image and success of

intercollegiate athletics.

---

[243] Lewis 30(b)(6) Deposition, pp. 164-5.

[244] Lewis 30(b)(6) Deposition, p. 166.

[245] Blank Deposition, pp. 27-8.

B4

**Highly Confidential – Counsel Only**

### 1.   The College's or University's Decision

The economic logic of externalities in colleges' and universities' amateurism/
professionalism choice can be revealed by considering a simple example. Suppose there are two
universities: the University of Alpha and the University of Beta. Like the real-world colleges and
universities described in the previous section of my report, the Universities of Alpha and Beta value
athletics with amateurism more highly than athletics with professionalism. The decisions we will
study are the choices of each university between two alternatives: amateurism and
professionalism. The universities' preference for amateurism over professionalism means

$$V_A > V_P,$$

where $V_A$ is the average value of athletics to each university with amateurism, and $V_P$ is the average
value of athletics to each university under the condition that one or both chooses professionalism.
Assuming, for the sake of simplicity, that Alpha and Beta experience the costs and benefits of
athletics in the same way, these are the payoffs (the value) experienced by each university if both
choose amateurism ($V_A$) or professionalism ($V_P$) respectively.[246]

If one university chooses professionalism, the average value of athletics programs drops to
$V_P$. Notwithstanding this, one university could still be tempted to consider "going pro" while the
other remained amateur if there are private gains to that university from doing so that come at the
expense of the other university. This will happen if the university that chooses to go pro enjoys a
greater chance of athletic success (*e.g.*, championships) and there are economic gains to a
university that achieves such success. These necessarily come at the expense of the other
university, for whatever increases one university's chances of winning necessarily reduces the
other's. The university that goes pro while its rival remains amateur is able, in effect, to get a

---

[246] When I refer to the "value" to a university, I mean in the broad sense that embraces not only cash receipts
and disbursements but also includes value the institution attaches to less quantifiable goals such as school
spirit, community cohesion, and diversity.

**Highly Confidential – Counsel Only**

transfer of value, call it $T$. So, if the University of Alpha goes pro while the University of Beta remains amateur, the value of athletics to Alpha becomes

$$V_P + T,$$

and the value of athletics to Beta is

$$V_P - T.$$

Alpha will want to go pro if

$$V_P + T > V_A$$

which is the same as

$$T > V_A - V_P.$$

This means going pro is attractive to Alpha if the amount it gains through transferring net benefits from Beta to itself ($T$) is greater than the per school reduction in the value of athletics created by the loss of amateurism.

For Beta, the situation is unambiguously worse if Alpha goes pro and Beta stays amateur. The value that Beta gets from athletics goes from $V_A$ to $V_P - T$. Beta experiences two losses, the reduction in the per-school value of athletics associated with the loss of amateurism,

$$V_A - V_P,$$

and, as if to add insult to injury, the further loss of the transfer, $T$.

Beta's losses are negative externalities. They are costs inflicted on Beta by Alpha's decision to go pro, in other words by Alpha's transactions with its athletes. Beta has no role in those transactions so neither Alpha nor Alpha's athletes take the cost to Beta into account.

The perceptive reader may want to interject at this point, "But, can't Beta do the same thing that Alpha does?" The answer to that question is, "Yes, it can. But it doesn't help." Taking into account the fact that both universities have the same opportunities to choose between amateurism and professionalism, the possible outcomes to this situation are given in the following table.

B6

Highly Confidential – Counsel Only

Table 1

| The Value of Athletics to the Universities of Alpha and Beta | Alpha Amateur | Alpha Professional |
|---|---|---|
| Beta Amateur | Alpha: $V_A$ | Alpha: $V_P + T$ |
|  | Beta: $V_A$ | Beta: $V_P - T$ |
| Beta Professional | Alpha: $V_P - T$ | Alpha: $V_P$ |
|  | Beta: $V_P + T$ | Beta: $V_P$ |

If Alpha expects Beta to choose Amateur, then Alpha's choice is between choosing Amateur and getting $V_A$ or choosing Professional and getting $V_P + T$, which is better as long as $T > V_A - V_P$.[247] If Alpha expects Beta to choose Professional, then Alpha's choice is between choosing Amateur and getting $V_P - T$ or choosing Professional and getting $V_P$, so choosing Professional is the better choice in this case as well.  In other words, no matter what Beta does, Alpha is better off by choosing Professional.

The situation for Beta is exactly the same as it is for Alpha.  So, if both schools follow where their respective private incentives lead, both will choose Professional, and the gains to amateurism will be lost.

The situation depicted in Table 1 is an example of what economists and game theorists call "The Prisoners' Dilemma."[248]  It is routinely taught in economics courses and is the first example of a "game" that most students see when they are introduced to game theory.  It has been used to study the externality problem involving pollution in natural resource and environmental economics in ways that closely parallel its application to amateurism here.  For example, Perman, et al. (2003) apply a "Prisoner's Dilemma game" to study countries' decision on whether or not to abate

---

[247] If this condition is violated, there are two pure strategy equilibria and some form of coordination is still required to achieve the equilibrium with both universities choosing Amateur.

[248] Paul A. Samuelson and William D. Nordhaus, *Economics, 12th ed.* (New York: McGraw-Hill Book Company, 1985), pp. 556-7.

Highly Confidential – Counsel Only

pollution, because of the interdependence between players due to externality from pollution.[249] Their use of the Prisoners' Dilemma provides a simple illustration of situations in which some degree of cooperation is needed to obtain an efficient outcome. They conclude that "cooperation cannot be relied upon to prevail over individual countries acting non-cooperatively in ways which they perceive to be in their own interests," and game theory analysis suggests "[t]he existence of an international political institution with the authority and power to construct, administer and enforce a collective agreement" can be used to achieve effective international cooperation to abate pollution.[250]

To be sure, the example of Alpha and Beta Universities is purposefully heuristic. With only two universities, and with them portrayed as mirror images of one another, much of the richness of the intercollegiate athletics world is missing. However, this simple example is instructive because it contains the essential ingredients of the problem. Maintaining amateurism, which the colleges and universities individually and collectively value, requires coordinated decisions by all of them. Individual colleges or universities may be tempted to deviate from amateurism for the sake of private gains that they can achieve by increasing their chances of athletic success. Those gains, however, come at the expense of other schools whose chances of success are correspondingly reduced and at the expense of all schools who lose the value of amateurism. The individual institution, choosing to go pro, experiences only a fraction of the collective losses that its decision causes, so it fails to take the full amount of such losses into account and makes an inefficient decision.

These concerns are not merely theoretical. The NCAA often is called upon to enforce its amateurism rules to prevent member institutions (or, more typically, their boosters) from engaging

---

[249] Roger Perman, Yue Ma, James McGilvray and Michael Common, *Natural Resource and Environmental Economics, 3rd ed.* (Harlow: Pearson Education, 2003) (hereafter, "Perman et al."), pp. 300-302.

[250] See Perman et al., pp. 300 and 302. In section V.C.3 below I discuss how the NCAA is the mechanism by which that degree of cooperation is attained in this context.

**Highly Confidential – Counsel Only**

in violations that threaten the fundamental foundation of college sports as contests between amateur student-athletes.

### 2.     Externalities, Market Failure, and the Response to it

The achievement of an economically inefficient outcome makes this an example of what economists call market failure. But it is a market failure that could be avoided if the colleges and universities agreed among themselves on a rule (or rules) that enforced amateurism. Paradoxically if not ironically, what Plaintiffs complain about—the COA cap—is actually part of the solution to what otherwise would be a situation of market failure.

### 3.     Ronald Coase and the NCAA as Collective Action

At this juncture, it is appropriate to return to Ronald Coase (and the work that generated his Nobel Prize).[251] Coase would claim that it only makes sense to speak of "market failure" in producing an outcome like mutual professionalism if mutual professionalism is the limit of what the market is capable of generating. But for Coase, the market (or the "pricing system" as he preferred to call it) was capable of more.[252] In a situation like the smoke-emitting factory and a neighboring household with clean laundry to dry, Coase focused on comparing the cost to the factory of curtailing the amount of smoke it produced with the cost to the household of drying its clothes by alternative means. The comparison of these costs becomes the basis of potential bargaining between the two parties.

Coase conjectured that if the law allowed the factory the right to produce smoke, then households would be willing to pay the factory an amount up to the cost of curtailing, revising, or relocating its production. If the cost to the factory owner of curtailing the smoke were smaller than

---

[251] See "The Sveriges Riksbank Prize in Economic Sciences in Memory of Alfred Nobel 1991," https://www.nobelprize.org/nobel_prizes/economic-sciences/laureates/1991/ (accessed11/23/16).

[252] See R. H. Coase, "The Problem of Social Cost," *The Journal of Law & Economics* III, (1960): 1-44 (hereafter, "Coase")

**Highly Confidential – Counsel Only**

the cost to households of another way of drying their clothes, there again was the opportunity for a mutually beneficial agreement.

The same logic could be applied here. Suppose for the moment that Beta was committed to remaining amateur. Alpha would still be tempted to go pro if

$$T > V_A - V_P.$$

The gain that Alpha would realize from doing so is

$$\binom{Alpha's}{Gain} = T - (V_A - V_P).$$

But, Beta's loss is greater

$$\binom{Beta's}{Loss} = (V_A - V_P) + T > T - (V_A - V_P) = \binom{Alpha's}{Gain}.$$

The fact that Beta's loss is greater than Alpha's gain means there is the potential for a deal (or contract) between Alpha and Beta that would make both better off. If Beta were to pay Alpha an amount somewhere between its loss and Alpha's gain in return for a commitment from Alpha not to go pro, then both Beta and Alpha would be better off than they would be if Alpha went pro unilaterally.

This kind of bargaining reflects the basic insight of the Coase Theorem. If a market were to reach a market failure—an inefficient outcome—there are some unexploited gains to efficiency. If the parties can agree on a means of sharing those gains, all can be made better off by moving away from the inefficient outcome towards the efficient outcome. Under conditions that Coase and later scholars worked out, if negotiating and forming such agreements is an inexpensive process (*i.e.,* transaction costs are low) the parties can be expected to achieve a negotiated agreement that moves to the efficient mix of production. As Coase put it:

> It is always possible to modify by transactions on the market the initial legal delimitation of rights. And, of course, if such market transactions are costless, such a rearrangement of rights will always

Highly Confidential – Counsel Only

take place if it would lead to an increase in the value of production.[253]

As the qualifying phrases in the preceding paragraph suggest, the *costs* of arranging alternative mechanisms for dealing with externalities take center stage. Coase called these alternative mechanisms "social arrangements." "[T]he problem is one of choosing the appropriate social arrangement for dealing with the harmful effects. All solutions have costs,"[254] and so the problem becomes one of finding the "social arrangement" that achieves the most efficient outcome possible, taking into account the costs of the arrangement itself. This conclusion came to be called the "Coase Theorem," a theorem that many first-year law students now encounter and must learn in their Property and/or Tort classes, and that economics students learn in their microeconomic theory courses.

Given the externality problem faced by the NCAA and its member institutions, the question became: what "social arrangement" could member institutions devise that would constrain the externalities that would otherwise arise from the effects of schools' actions upon one another as they engaged in intercollegiate athletics? If any single college or university undermines the common good of amateurism by treating its student-athletes as professionals, the effect is felt by other colleges and universities. Yet there are hundreds of colleges and universities involved. Such large numbers meant that bilateral negotiations between schools would be too numerous and too costly. A common institutional setting would have lower bargaining and transaction costs and would have a greater probability of being arranged.

The NCAA fits the profile of a Coasian "social arrangement" able to provide the means of efficiently managing the potential market failure arising from externalities that would undermine amateurism. An association of schools provides a common institutional setting in which those taking part already are knowledgeable and experienced with regard to intercollegiate athletics.

---

[253] Coase, p. 15.

[254] Coase, p. 18.

**Highly Confidential – Counsel Only**

Such a "social arrangement" to resolve an externality problem means that the challenged constraints on scholarship amounts are not the concerted conduct of a monopsony-cartel. Rather, they are the fruits of an efficiency-enhancing process of collective negotiation that enables colleges and universities to set the level of financial aid consistent with amateurism. The COA cap (together with the NCAA's other amateurism rules) is nothing more than a collaborative endeavor of the type anticipated and advocated by Coase in the event of externalities to solve the problem illustrated in the simple example above by the choice of mutual professionalism.

Economic analysis explains how a steel mill that emits pollutants into the air will sell its steel at too low a price—without some form of collective action to internalize the cost of the externality. That's why there's an EPA. The same principles of economics explain why a university will embrace professionalism too readily—without some form of collective action to internalize the cost of the externality. That why there's an NCAA, and that's why there's a COA cap.

**D.    Protecting Amateurism**

The need for a collective mechanism to protect amateurism is reflected in evidence from the record and the interviews I conducted that confirm the costs of undermining amateurism in favor of professionalism.

**1.    Student-Athletes and the Rest of the University Community**

I found evidence that paying athletes as professionals undermines their connection with the rest of the student-body and the college/university community as a whole. When that happens intercollegiate athletics will not play the role I described earlier as a generator of "school-spirit" and contributor to the portfolio of activities and experiences that many colleges and universities want to offer.[255] For example, in his deposition Mark Lewis, Executive Vice President of Championships and Alliances at the NCAA, was asked about the consequences of a hypothetical decision to pay FBS football players and Division I basketball players $5,000 above the cost of

---

[255] See p. 33, above.

92

**Highly Confidential – Counsel Only**

attendance at their respective schools. Mr. Lewis answered, "I do believe it would be dire. It would

fundamentally alter the relationship of the student athlete to their fellow students."[256] Similarly,

when Michael Aresco was asked if paying student-athletes "above cost of attendance," would

"destroy the collegiate model," he answered:

> I've always believed that ultimately, it would, it could and it would if
> the -- if the money was for performance. In other words, if the money
> was being paid for performance so that the student athlete would
> become essentially an employee or professional, I think that would
> lead, I think, to the -- ultimately the destruction of the collegiate
> experience, if we prefer to call it experience in the collegiate model,
> but I do believe that. I always have.[257]

In my interview with Mitch Barnhart, Athletics Director at the University of Kentucky, he

explained that people would look at athletes who were paid according to a market model

differently than they look at student-athletes now.[258]  In my interview with Greg Fenves, President

of the University of Texas, he indicated that he could not understand how professionally paid

athletes could be part of a university's campus-life, and he thought if they were professional their

fellow students would be less interested in watching them play.[259]  Morgan Burke, until recently the

Athletics Director at Purdue University, thought that university athletes who were not amateurs

would be viewed as hired guns.  Keith Gill, Athletics Director at the University of Richmond, was

convinced that student-athletes being amateur athletes was essential to the interest of non-athlete

students and other members of the university community in athletics.  As I indicated earlier, Gill

endorsed the statement that paying students to play football and basketball is "inconsistent with

the idea of what a student-athlete is."[260]

---

[256] Lewis 30(b)(6) Deposition, p. 158.

[257] Aresco Deposition, pp. 107-8.

[258] Barnhart Interview.

[259] Fenves Interview.

[260] Gill Interview and Perlman Deposition, pp. 126-7.  See pp. 39 and 78  above.

93

**Highly Confidential – Counsel Only**

## 2.    The Audience for Intercollegiate Athletics outside the University

Members of the college/university community are not the only constituencies for whom the

record reveals a preference for *bona-fide* non-professional amateur student-athletes. For example,

a document entitled "Final Report of the NCAA Task Force on Commercial Activity in Division I

Intercollegiate Athletics" and dated January 9, 2009 said:

> We know from our experiences with media partners and their
> advertisers that it is not only the popularity of college sports that is
> attractive. It is also the values that intercollegiate athletics and
> higher education foster that appeal to marketing and advertising
> interests. Indeed, if there were no constraints on commercial activity
> - if colleges and universities were to barter their values (*the
> avocational motivation for athletics participation* and the protection
> of the student athlete from commercial and professional interests)
> for a few dollars more - the appeal would be weakened. The
> attraction of intercollegiate athletics that allows the enterprise to
> compete favorably with professional sports for media attention and
> commercial support is not the athletics superiority of the collegiate
> product. Professional athletes are paid for a reason; they are better
> at what they do than amateurs because playing sports is the
> professional's job. The attraction is *the near visceral recognition that
> intercollegiate athletics and higher education share common values
> and that the keystone to the relationship is the student-othlete who
> resides in both worlds.* That is a value that advertisers and
> corporations are as interested in preserving as is higher
> education.[261]

In other words, the NCAA's "media partners and their advertisers," *i.e.,* broadcasters and

advertisers, value intercollegiate athletics in its current form because the athletes who compete on

the field or on the court are genuine student-athletes. Part of the attraction of the NCAA "product"

to commercial broadcasters and advertisers is that the competition is set in the context of higher

education. The genuineness of that feature depends on the student-athletes being *bona fide*

students, a status they would lose in the eyes of their audience if they were paid as professionals.

A similar view is expressed by Michael Aresco in a December 18, 2013 e-mail message to

several people. In the e-mail, Mr. Aresco is responding to an earlier e-mail sent by John Griffen

---

[261] AMERICAN_GIA_024727-40 at 32, italics added.

Highly Confidential – Counsel Only

forwarding a tweet that read "Ex-CBS Sports president: college sports TV ratings could decline 15-

20% if players are paid."[262]  Mr. Aresco's reaction was:

> Who knows regarding percentages, but I agree there would be a
> decline, and maybe a substantial one. I said that to the Knight
> Commission years ago. Despite college sports being big business,
> there is still an important amateur aspect that you never get with the
> NFL or NBA, and *if you take that amateur aspect out of this, people
> just won't care as much*.  The NFL has its place, but we don't need two
> of them.[263]

███████████████████████████████████████████████████████████

██████████████████████████████████████████

████████████████████████████████████████████████████

. . .

████████████████████████████████████████████████████

In my interview with Keith Gill, he confirmed that if student-athletes were no longer

amateurs there would be a dramatic effect on the interest of broadcasters and advertisers in

intercollegiate sports.[265]  Nathan Hatch, President of Wake Forest University, also indicated that he

would expect a significant drop in television viewership if intercollegiate athletics didn't maintain

---

[262] The tweet was from an AL.com journalist named Jon Solomon, who also posted an article on his blog the same day with the same title reporting on the testimony of Neal Pilson in the *O'Bannon* trial. (http://connect.al.com/user/jsolomon/posts-9.html (accessed 3/17/17).  See also "Ex-CBS Sports president: College sports TV ratings could decline 15-20% if players are paid," http://www.al.com/sports/index.ssf/2013/12/ex-cbs_sports_president_colleg.html (accessed 3/17/17)).

[263] AMERICAN_GIA_061993, italics added.

██████████████████████████████████████████

[265] Gill Interview.

Highly Confidential – Counsel Only

amateurism.  He anticipated that the professionalization of athletes in intercollegiate sports could

lead to the collapse of the existing conferences.[266]

### 3.    Amateur Student-Athletes vs. Professional Athletes

██████████████████████████████

████████████████████████████████

████████████████████████████████

███████████████████████████████

████████████████████████████████

███████████████████████████████

████████████████████████████████

███████████████████  Notre Dame's President, the Rev. John

Jenkins told the *New York Times* something similar.  According to a *Times* article:

> He [Rev. Jenkins] believes that the drama and popularity of college
> athletics are rooted in the fact that the student-athletes are
> amateurs. "*If they make mistakes, you know, it's not like they're
> professionals,*" he says. But if a pay-to-play dynamic is applied to
> college sports, he suggests, something is lost.[268]

The difference between amateurism and professionalism is a difference in kind, not merely

a difference in degree.  Consider two excerpts from testimony in this case.  When Mark Lewis was

asked by how much the payment to a student-athlete would have to exceed the cost of attendance

in order to have a harmful effect on demand for intercollegiate athletics, he said:

> I don't think it's about a penny, I think it's about a philosophy, . . . it's
> the philosophy of saying, I think there would be a negative impact on
> consumer demand if you go beyond that college sports is about
> college first and foremost. And so, it's not about a penny more or $1
> more or $10,000 more.[269]

---

[266] Hatch Interview.

████████████████

[268] WAC_GIA_039307-11 at 10, italics added.

[269] Lewis 30(b)(6) Deposition, p. 164.

**Highly Confidential – Counsel Only**

When Michael Aresco was asked a similar question, he gave a similar answer:

> The issue is that, if it's one penny or one dime, it is basically paying
> players, and you've now set a precedent to pay players for what
> they're doing, and I think with the cost of attendance with the
> scholarship, it's different. It is related to their education. Scholarship
> enables them to get, you know, a free education. . . . whereas if you
> just pay players, you've created, you know, essentially a professional
> model that really doesn't have anything to do with the educational
> mission of the institution or the educational needs of those
> students.[270]

Both of these answers have a common element. It is that if student-athletes receive even

very small payments—a penny—that isn't related to their educational expenses, then the payment

is a damaging breach of amateurism. These are the thoughtful answers one would expect from

people who understand that the difference between amateurism and professionalism isn't captured

in some wooden and mechanical way by the number of dollars a student-athlete receives. True

student-athletes are amateurs in the sense that they are not being paid to play. They receive

scholarships to cover the costs of attending school, but these costs determine the amount of their

GIA. Professionals, by contrast, receive funds determined by market forces, the amount of which is

not tied to their living costs.

The NCAA brand and that of its colleges and universities are built on the principle of

amateurism. Applying this principle through the NCAA's rules, including the COA cap, protect the

value of these brands from being undermined by externalities. Understanding the qualitative (as

opposed to quantitative) distinction between amateurism and professionalism allows one to

evaluate various proposals that are sometimes advanced to pay student-athletes "extras," *i.e.*,

additional payments or valuable benefits unrelated to the cost of their education. For example,

during his deposition, Michael Aresco was asked:

> Q. Don't you think that some dollar amount equal and applicable
> across a sport above cost of attendance would entice players, student

---

[270] Aresco Deposition, pp. 241-2.

97

> athletes, to stay in school and potentially graduate versus leaving for the professionals sooner?[271]

He replied:

> Not if it means paying them to -- as professionals to stay because that's antithetical to the mission. There's a contradiction in terms right there. What's important, college athletics by students with an opportunity to compete at a highest -- high level, that relationships built with their coaches, with their fellow students, with their communities, these are all valuable things, but if you actually pay them and use that as an excuse for, you say, well, that will enable them to get a degree. It's a contradiction in turn [sic] because you're basically paying them to be professionals and saying that then the ancillary benefit is somehow that they would stay to get a degree. . . . paying them to be professionals, it doesn't have anything to do with the educational mission.[272]

Aresco rejects the suggested program of payments in excess of the cost of attendance—not because

of the size of the payments—but because they are unrelated to the cost of education. As long as

amateurism produces a greater social surplus than professionalism, payments unrelated to the cost

of attendance will be inefficient.

From this perspective, a variety of schemes to funnel money to student-athletes can be

rejected, all on the same grounds. The test won't be their size. The test will be whether or not the

dollars are connected or disconnected to the cost of the student-athlete's education. Whenever the

student-athlete's scholarship exceeds the total cost of attending a school, the principle of

amateurism has been undercut and the demand for intercollegiate sports will be at risk.

## VI.    The Group Boycott Allegation

In addition to the allegation that the NCAA's COA cap amounts to a price fixing agreement,

Plaintiffs also have alleged that the NCAA and its member institutions are engaged in a group

boycott.[273] This allegation is related to Plaintiffs' price fixing claim in the sense that the *threat* of a

---

[271] Aresco Deposition, p. 242.

[272] Aresco Deposition, pp. 244-5.

[273] Consolidated Amended Class Complaint, ¶¶ 12, 291-2, 303, and 551; Jenkins Complaint, ¶¶ 5, 7, 36, 118-9, and 121.

98

**Highly Confidential – Counsel Only**

group boycott purportedly is used to impose cartel discipline on member institutions. Plaintiffs

describe the relationship between the price fixing and group boycott allegations as follows:

> Through collusive agreement among all Division I members of the
> NCAA, the artificial cap on athletics financial aid is set below the
> amount of the full Cost of Attendance that any student would incur to
> attend the relevant colleges and universities. This agreement is
> enshrined in the Bylaws of the NCAA which serve, in essence, as the
> contract (as in the Sherman Act's prohibition on any contract,
> combination, or conspiracy in restraint of trade) among the
> conspirators, making the agreement explicit, and authorizing various
> cartel-policing measures against any school that violates the price-
> fixing agreement. The NCAA thus arbitrarily restricts athletics
> financial aid to amounts that are less than the athletes would receive
> in a competitive market and then enforces that agreement through
> threat of sanctions ranging from loss of the ability to compete
> (through loss of scholarships) all the way to a full collective boycott
> of all other members known colloquially as "the death penalty."[274]

In other words, Plaintiffs' "group boycott," allegation amounts to a claim that the NCAA

enforces its rules. The NCAA's rules describe when a student-athlete is or is not eligible to play, and

then even the most drastic group boycott allegation amounts to a rule that says a school is eligible

to participate in athletic competition only if it fields teams composed of players who are all eligible.

As a matter of economics, the group boycott allegation doesn't add any new economic issues

beyond those raised by Plaintiffs' central claim that the COA cap is an anticompetitive agreement on

price.

Earlier in this report, I explained that this case presents two competing hypotheses about

the NCAA's financial aid rules. Either the rules are the implementation of a monopsonistic cartel in

a labor market for talented young athletes,[275] or they are an efficient "social arrangement" for

preventing what would otherwise be an externality-induced market failure in a complex multi-

---

[274] Consolidated Amended Class Complaint ¶ 12. Class plaintiffs also allege that individual student-athletes
are also subject to the threat of boycott (Consolidated Amended Class Complaint, ¶ 291). The Jenkins
Complaint also alleges that the boycott is used to enforce the alleged cartel agreement (Jenkins Complaint,
¶¶7, 36, and 118), and Plaintiffs allege that the boycott could be applied to individual student-athletes
(Jenkins Complaint, ¶ 118). In neither complaint do Plaintiffs explain what cartel motivation exists to boycott
individual student-athletes.

[275] See pp. 6-7, above.

## Highly Confidential – Counsel Only

sided market.[276]  In the former case, to say that the NCAA's enforcement rules are anticompetitive would be to say that rules enforcing a cartel are anticompetitive—a proposition that it would be idle to deny.  However, because the NCAA's financial aid rules provide a mechanism for avoiding an inefficient market failure, born of the incentive to free ride on the benefits of amateurism, the rules limiting play to schools that only allow eligible players on their teams is merely implementing the efficient solution, in which case the rules are not anticompetitive, they are procompetitive.  In either event, no new economic issues are raised by the group boycott allegation.

### VII.   Conclusion

As noted above, in an economics classroom, a typical teaching example of a negative externality is a factory that emits smoke that imposes costs on households whose freshly-washed clothing hung out to dry is soiled by soot from the factory's smoke.  And as I explained earlier, effects like these are externalities because the actions of one party, *e.g.,* the smoke-emitting factory, impose a cost on a third party (here the person trying to have clean clothes) that is not mediated by market processes.

As a matter of economic analysis, the problem of inefficient pollution is no different from the problem of inefficient deviation from amateurism in intercollegiate athletics.  Each is an example of an externality (or market failure), *i.e.,* instances in which market-determined allocations are inefficient, and problems of this kind are a staple item in Introductory Economics classes

The absence of a mediating transaction means that for parties producing the externality there is a cost (or in some instances a benefit) they do not take into account, with the result that their cost-benefit analysis of the activity is not aligned with actual costs and benefits, leading them to make inefficient decisions about the activity.  Hence the economic taxonomy of "market failure."

---

[276] See pp. 7-11, above.

**Highly Confidential – Counsel Only**

Years ago, Ronald Coase recognized that internalizing externalities and doing it well would almost always involve collective negotiations between those who buy and/or sell the product—and those third parties who are affected by the transaction between the buyers and sellers of the good or service at issue. That is what the collective action being challenged in this litigation represents.

The NCAA has an incentive to constrain the private interests and incentives of each member institution to "go pro" and, in the process, reduce the historic value-generating features of intercollegiate sports to universities and their constituencies. Had Coase examined intercollegiate sports, no doubt he would have recognized that the NCAA and its member conferences represent a collective endeavor to increase the overall popularity for amateur intercollegiate sports. Just as Coca-Cola is incentivized to maintain the brand name of its soft drink, the NCAA is incentivized to maintain the brand identity of amateurism in intercollegiate sports.

One of the more thoughtful and oft-cited books on intercollegiate athletics is *The Game of Life: College Sports and Educational Values*, by Shulman and Bowen. Schulman is a specialist in higher education who has been associated with the Mellon Foundation; Bowen, an economist, was the President of Princeton University. One conclusion of the Shulman-Bowen collaboration is this:

> The objective, in our view, should be to strengthen the links between athletics and the educational missions of colleges and universities—to reinvigorate an aspect of college life that deserves to be celebrated for its positive contributions, not condemned for its excesses or criticized for its conflicts with educational values.[277]

It is difficult to imagine a course of action more contrary to the Shulman-Bowen objective than what Plaintiffs in this litigation advocate. Allowing Division I athletes in two sports to receive compensation in the manner proposed by Plaintiffs would weaken the links that Shulman and Bowen say should be strengthened.

What Plaintiffs seek would reduce the supply of other opportunities currently available to student-athletes in the form of consumption goods and investment in human capital that form part

---

[277] Shulman and Bowen, p. 309.

**Highly Confidential – Counsel Only**

of the overall student experience, whether that of top-tier student-athletes in football or basketball, or not. In addition, the professionalization that Plaintiffs seek for Division I basketball and football players would reduce the appeal of these contests and lessen consumer welfare. In the face of these effects the inexorable logic of mutual dependency of demand in multi-sided platforms cautions that the diminishing effect of professionalizing intercollegiate sports would not be confined to athletes and sports fans, but its full effects could be felt all across every college and university.

Kenneth D. Elzinga

Kenneth G. Elzinga

March 21, 2017

Date

102

## Appendix A

# KENNETH G. ELZINGA

**Office**  PO Box 400182 (*U.S. Mail*)
McCormick Road
Monroe Hall, Room 237 (*FedEx/UPS*)
Dept. of Economics at UVA
Charlottesville, VA 22904-4182
Phone: (434) 924-6752 (voicemail)
Fax: (434) 982-2317

**Home**  246 Rookwood Drive,
Charlottesville, VA 22903
Phone: (434) 296-1275
Phone: (434) 589-4878 (summer)
**Email**  kenelzinga@yahoo.com
elzinga@virginia.edu
**Website**  kenelzinga.com
**Birthplace**  Coopersville, Michigan

#### Education

B.A. Kalamazoo College, 1963
M.A. Michigan State University, 1966
Ph.D. Michigan State University, 1967
L.H.D. Kalamazoo College, 2000

#### Present Position

Robert C. Taylor Professor of Economics, University of Virginia, 2002-

#### Previous Positions

Visiting Professor of Economics, Pepperdine University, Spring 2008
Vernon F. Taylor Visiting Professor of Economics, Trinity University, Spring 2006
Distinguished Visiting Professor, School of Law, Pepperdine University, Spring 2004
Cavaliers' Distinguished Teaching Professorship, 1992-1997
Thomas Jefferson Fellow, Cambridge University, January-June, 1990
Visiting Professor of Economics, Trinity University, Spring 1984
Fellow in Law & Economics, University of Chicago, Winter-Spring 1974
Professor of Economics, University of Virginia, 1974-
Associate Professor of Economics, 1971-1974
Assistant Professor of Economics, 1967-1971
Special Economic Advisor to the Assistant Attorney General, Antitrust Division, 1970-1971
Assistant Instructor of Economics, Michigan State University, 1965-1966
Research Economist, Senate Antitrust & Monopoly Subcommittee, Summer, 1964

#### Administrative Positions

Coordinate and teach introductory economics course with 1000 students and 20 teaching assistants, 1967 -
Executive Committee, Southern Economic Association, 1985-87; 1991-93
Assistant Dean, College of Arts & Sciences, 1971-1973

#### Editorial Board

*The Journal of Markets and Morality*, 1998-2004
*The Antitrust Bulletin*, 1977-
*Industrial Organization Review*, 1972-79
*The Social Science Quarterly*, 1969-1977

## Academic Awards

Weiching Williams Yen Award, University of Virginia China Fund, 2015
Honorary Professor, Dongbei University of Finance and Economics, 2014
Leonard W. Sandridge Student Partnership Award, University of Virginia, 2014
Mystery Writers of America, Judge to select the Edgar Award Winner, Best Mystery Novel of 2014
The Society of Purple Shadows; The Gordon F. Rainey Jr. Award, University of Virginia, 2013
Society of Economic Educators, 2009
Jefferson Scholars Foundation Faculty Prize, University of Virginia, 2009
Patrick Henry Award, Commonwealth of Virginia, 2001
Distinguished Alumni Award, Michigan State University, 1999
Templeton Honor Roll Award for Education in a Free Society, John Templeton Foundation, 1997
Kenan Enterprise Award for Teaching Economics, William R. Kenan, Jr. Charitable Trust, 1996
Thomas Jefferson Award, University of Virginia, 1992
Phi Eta Sigma Teacher of The Year, 1992
Commonwealth of Virginia Outstanding Faculty Award, 1992
President, Southern Economic Association, 1991
Raven Society Faculty Honor Award, 1983
Distinguished Alumni Award, Kalamazoo College, 1983
Distinguished Professor Award, University of Virginia, 1979
President, Industrial Organization Society, 1979
Phi Beta Kappa Prize for *The Antitrust Penalties* (shared with William Breit), 1977
Inducted to Raven Society, 1977
Phi Beta Kappa Visiting Scholar, 1973-1974
Z Society Outstanding Teaching Award, University of Virginia, 1973
Woodrow Wilson Fellow, 1964
W. G. Howard Prize in Economics, 1963
R. S. Light Scholar, University of Bonn, 1962

## Member

Board of Directors, 100Fold, 2014-
Board of Directors, Initialview, 2013-
Board of Directors, Digital Reasoning, 2003-
University Academy of Teaching, University of Virginia, 2011-
Council of Distinguished Fellows, C.S. Lewis College, 2009-
Wheaton College Center for Economics, Government and Public Policy, Wheaton College, 2008-
Board of Trustees, Hope College, 1983-1990, 2007-2014
Board of Trustees, InterVarsity Christian Fellowship, 1992-2000, 2006-2014, 2016-
Board of Trustees, Advanced Studies in Culture Foundation, 1999-
Committee on Economic Education, American Economic Association, 2005-2010
Faculty, Advanced Course for Federal Judges on Antitrust Economics, Law and Economics Center, 1982, 1983,
    1984, 1986, 1992, 2001, 2002
American Bar Association Special Committee to Study the Federal Trade Commission, 1988-89
Nuclear Regulatory Commission Licensing and Safety Board Panel, 1971-1979
Trial Judge (with M. L. Glaser & M. E. Miller), *In the Matter of Alabama Power Company*, 5 *Nuclear Regulatory
    Commission* 804-962, 1977

**Membership**

American Economic Association
Southern Economic Association
Mystery Writers of America
International Association of Crime Writers
International J. A. Schumpeter Society
Industrial Organization Society
American Bar Association, Associate
Beeronomics Society
American Association of Wine Economists
Society of Economic Educators

**Publications (not including book reviews)**

"Oligopoly, the Sherman Act, and The New Industrial State," 49 Social Science Quarterly 49 (June, 1968).

"Mergers: Their Causes and Cures," 2 Antitrust Law & Economics Review 53 (Fall, 1968).

"The Antimerger Law: Pyrrhic Victories?", 12 Journal of Law & Economics 43 (April, 1969). Cited by Justice Stewart in Ford Motor Co. v. U.S., 405 U.S. 562, 582 (1972).

"Predatory Pricing: The Case of the Gunpowder Trust," 13 Journal of Law & Economics 23 (April, 1970).

"The Beer Industry," in Walter Adams (ed.), The Structure of American Industry 4th ed. (New York: Macmillan, 1971). Cited by Justice Marshall in U.S. v. Falstaff, 410 U.S. 526, 551 (1973).

Economics: A Reader (edited) (New York: Harper & Row, 1972).

"The Demand for Beer," (with Thomas F. Hogarty), 54 Review of Economics & Statistics 195 (May, 1972).

"Attitudes Toward Risk and Antitrust Penalties," (with William Breit) 85 Harvard Law Review 693 (February, 1973).

"The Problem of Geographic Market Delineation in Antimerger Suits," (with Thomas F. Hogarty) 18 Antitrust Bulletin 45 (Spring, 1973).

"The Restructuring of the U.S. Brewing Industry," 1 Industrial Organization Review 101 (1973).

"The Instruments of Antitrust Enforcement," (with William Breit) in J. Dalton and S. Levin (eds.) The Antitrust Dilemma (London & Toronto: Lexington-Heath, 1974).

"Private Actions: The Purposes Sought and the Results Achieved: The Economist's View," (with William Breit) 43 Antitrust Law Journal 9 (1974).

"Product Differentiation and Institutionalism: New Shadows on An Old Terrain," (with William Breit) 8 Journal of Economic Issues 813 (December, 1974).

Economics: A Reader (edited) 2nd ed. (New York: Harper & Row, 1975).

"Antitrust Enforcement, Private Actions and Economic Efficiency: The Uneasy Case for Treble Damages," (with William Breit) 17 Journal of Law & Economics 329 (October, 1974).

"The Beer Industry," in Walter Adams (ed.) The Structure of American Industry 5th ed. (New York: Macmillan, 1977).

"The Economics of Dissolution, Divorcement and Divestiture," in Charles F. Phillips, Jr. (ed.) Competition and Regulation - Some Economic Aspects (Lexington: Washington & Lee University, 1976).

The Antitrust Penalties: A Study in Law and Economics co-author with William Breit (New Haven: Yale University Press, 1976). Cited by Justice Burger in Texas Industries v. Radcliff Materials, 451 U.S. 630, 636 (1981).

"The Goals of Antitrust - Other Than Competition and Efficiency, What Else Counts?," 125 University of Pennsylvania Law Review 1191 (June, 1977).

Economics: A Reader (edited) 3rd. ed. (New York: Harper & Row, 1978).

A-4

"Cartel Problems and Their Persistence," (with David E. Mills) 68 <u>American Economic Review</u> 938 (December, 1978).

<u>Murder At The Margin</u> by Marshall Jevons (pseudonym), co-author with William Breit (Glen Ridge: Thomas Horton and Daughters, 1978). A mystery novel in which the protagonist uses economic analysis to solve the crime.

"The Problem of Geographic Market Delineation Revisited: The Case of Coal," (with Thomas F. Hogarty) 23, <u>Antitrust Bulletin</u> 1 (Spring, 1978).

"The Travel Agent, the IATA Cartel, and Consumer Welfare," 44 <u>Journal of Air Law and Commerce</u> 47 (1978).

"<u>Utah Pie</u> and the Consequences of Robinson-Patman," (with Thomas F. Hogarty) 21 <u>Journal of Law and Economics</u> 427 (October, 1978).

"Ronald H. Coase," biographical entry in 18 <u>International Encyclopedia of the Social Sciences</u> (New York: The Free Press, 1979).

"The Robinson-Patman Act: A New Deal for Small Business," in Gary M. Walton (ed.) <u>Regulatory change in an Atmosphere of Crisis: The Current-day Implications of the Roosevelt Years</u> (New York: Academic Press, 1979).

"The Compass of Competition for Professional Services," in Roger D. Blair and Steven Rubin (eds.) <u>Regulating the Professions</u> (London & Toronto: Lexington-Heath, 1979).

"Ezra Pound and the GNP," (with William Breit) 46 <u>Southern Economic Journal</u> 904 (January, 1980).

"Information For Antitrust and Business Activity: Line-Of-Business Reporting," (with William Breit) in Kenneth W. Clarkson & Timothy J. Muris (eds.) <u>The Federal Trade Commission Since 1970</u> (Cambridge: Cambridge University Press, 1981).

"Mr. Friedman's Strictures on <u>Murder at the Margin</u>," (with William Breit under the name of Marshall Jevons) 36 <u>Public Choice</u> 195 (1981).

"The Beer Industry," in Walter Adams (ed.) <u>The Structure of America Industry</u> 6th ed. (New York: Macmillan, 1982).

"Defining Geographic Market Boundaries," 26 <u>Antitrust Bulletin</u> 739 (Winter, 1981).

<u>The Antitrust Casebook:  Milestones in Economic Regulation</u> co-edited with William Breit (Hinsdale, IL: Dryden Press, 1982).

"Elzinga On Coase," in Henry W. Spiegel and Warren J. Samuels (eds.) <u>Contemporary Economists in Perspective</u> (Greenwich: JAI Press, 1984).

<u>Relevant Markets In Antitrust</u> co-edited with Robert W. Rogowsky. 14 <u>Journal of Reprints for Antitrust Law and Economics</u> (1984).

"New Developments on the Cartel Front," 29 <u>Antitrust Bulletin</u> 3 (Spring, 1984).  Also appeared in slightly revised form as "A Short Story on Cartels," Department of Justice, Antitrust Division, Economic Policy Office, Discussion  Paper EPO 83-13, October, 1983.

"Private Antitrust Enforcement: The New Learning," (with William Breit) 28 <u>Journal of Law & Economics</u> 405 (May, 1985).

"Public Choice and Antitrust: A Comment," 4 Cato Journal 917 (Winter, 1985).

The Fatal Equilibrium by Marshall Jevons (pseudonym), co-author with William Breit (Cambridge: MIT Press, 1985). Paperback version published by Ballantine, 1986. Japanese version published by Nihon-Keizai Shinbun, 1986; French edition, Équilibre fatal (Paris: Economica, 2002); Korean edition, (Seoul: Book and World, 2001); Thai edition published by Nation Books International Co., Ltd., 2004; Chinese edition published by China Machine Press, 2006.

The Morality of the Market: Religious and Economic Implications co-edited with Walter Block and H. Geoffrey Brennan (Vancouver: The Fraser Institute 1985).

"Comment" on Ezra J. Mishan's, "Religion, Culture and Technology," in W. Block, H. Geoffrey Brennan, and Kenneth G. Elzinga (eds.) The Morality of the Market: Religious and Economic Implications (Vancouver: The Fraser Institute, 1985).

"Money-Wise, Pound Was Foolish," The Wall Street Journal, December 31, 1985, p. 8. Published in slightly revised form as "Ezra Pound: The Poet As An Economist," Fall Thoughtlines 17 (1985), both Pound centennial pieces drawn from "Ezra Pound and the GNP," supra.

"The Beer Industry," in Walter Adams (ed.) The Structure of American Industry 7th ed. (New York: Macmillan, 1986).

Antitrust Penalty Reform: An Economic Survey co-author with William Breit (Washington and London: American Enterprise Institute, 1986).

"Technology and Energy Use Before, During and After OPEC: The U.S. Portland Cement Industry," (with Charles A. Capone) 8 The Energy Journal 93 (1987).

"Antitrust Policy and Trade Policy," 56 Antitrust Law Journal 439 (1987).

"The Costs of the Legal System in Private Antitrust Enforcement," (with William C. Wood) in Lawrence J. White (ed.) Private Antitrust Litigation: New Evidence, New Learning (Cambridge: MIT Press, 1988).

"Pricing Achievements In Large Companies," in Arnold A. Heggestad (ed.) Management and Public Policy of Corporations (Gainesville: University of Florida Press, 1988).

"Introduction" to Ronald H. Coase in Ideas, Their Origins, and Their Consequences (Washington, D.C.: American Enterprise Institute, 1988).

"Collusive Predation: The Case of Matsushita v. Zenith" in John E. Kwoka, Jr. and Lawrence J. White (eds.) The Antitrust Revolution (Glenview: Scott, Foresman, 1989), (2nd. ed. New York: Harper Collins, 1994), (3rd. ed. [revised] Oxford University Press, 1999).

"Unmasking Monopoly: Four Types Of Economic Evidence," in Robert J. Larner and James W. Meehan, Jr. (eds.) Economics And Antitrust Policy (Westport, CT: Greenwood Press, 1989).

The Antitrust Casebook: Milestones in Economic Regulation (2nd ed.) co-edited with William Breit (Hinsdale, IL: Dryden Press, 1989).

"The New International Economics Applied: Japanese Televisions and U.S. Consumers," in "Antitrust Law and the Internationalization of Markets," symposium issue, David J. Gerber (ed.) 64 Chicago-Kent Law Review 941 (1988).

"Testing for Predation: Is Recoupment Feasible?" (with David E. Mills) 34 Antitrust Bulletin 869 (Winter

1989). Cited by Justice Kennedy in Brooke Group v. Brown & Williamson, 509 U.S. 209 (1993).

"The Beer Industry," in Walter Adams (ed.) The Structure of American Industry 8th ed. (New York: Macmillan, 1990).

"Commentary: Remarks of Professor Scherer," 29 Washburn Law Journal 264 (1990).

.    "Walter Adams and Chicago," 6 Review of Industrial Organization 117 (1991).

Antitrust, the Market and the State: The Contributions of Walter Adams co-edited with James W. Brock (Armonk, N.Y.: M.E. Sharpe, 1991).

"The Eleven Principles of Economics," 58 Southern Economic Journal B61 (1992).

"Jefferson and Schumpeter: Contrasts and Compatibilities," in Mark Perlman and F.M. Scherer (eds.) Entrepreneurship, Technological Innovation, and Economic Growth: Papers in the Schumpeterian Tradition (Ann Arbor: University of Michigan Press, 1992).

Murder At The Margin by Marshall Jevons (pseudonym), revised and reissued with a Foreword by Herbert Stein and an Afterword by the authors (co-author with William Breit). (Princeton: Princeton University Press, 1993). Spanish edition, Asesinato en al Margen (Madrid: El Libro de Bolsillo,1996); Korean edition (Seoul: Book and World, 2001); French edition, Meurtre À La Marge (Paris: Economica, 2002); Thai edition published by Nation Books International Co., Ltd., 2004; Chinese edition published by China Machine Press, 2006.

"Trumping the Areeda-Turner Test: The Recoupment Standard In Brooke Group," (with David E. Mills) 62 Antitrust Law Journal 559 (1994).

"The Beer Industry," in Walter Adams and James Brock (eds.) The Structure of American Industry 9th ed. (New York: Prentice-Hall, 1994).

"The Relevant Market for Less-Than-Truckload Freight: Deregulation's Consequences," 34 Transportation Journal 29 (1994).

"Monopolies" and "Profit" Entries in D. J. Atkinson and D. H. Field (eds.) New Dictionary of Christian Ethics and Pastoral Theology (Leicester: InterVarsity Press, 1995).

A Deadly Indifference by Marshall Jevons (pseudonym), co-author with William Breit (New York: Carroll & Graf, 1995).

"The Supreme Court's Predation Odyssey: From Fruit Pies to Cigarettes" (with Donald J. Boudreaux and David E. Mills) 4 Supreme Court Economic Review 57 (1995).

"An Assessment of Jacob Neusner's The Economics of the Mishnah," 7 Cultural Dynamics 281 (1995) and "Jacob Neusner and Post-Mishnah Economics" (a response to Neusner's "Defining Scarce Resources: Real Estate or Intellect"), 7 Cultural Dynamics 327 (1995) in "Religious and Cultural Perspectives on Economic Freedom: Christians and the Jewish Tradition," (Walter Block ed.) 7 Cultural Dynamics (Nov. 1995).

The Antitrust Casebook: Milestones in Economic Regulation (3rd ed.) co-edited with William Breit (Fort Worth: Dryden Press, 1996).

"The Yeager Mystique: The Polymath as Teacher, Scholar and Colleague," (with William Breit and Thomas D. Willett) 22 Eastern Economic Journal 215 (1996). Slightly revised as "The Yeager Mystique: a profile of the scholar as teacher and colleague," in Roger Koppl (ed.) Money and Markets: Essays in Honor of

Leland B. Yeager. (New York: Routledge, 2006).

"Innovation and Entry in the U.S. Disposable Diaper Industry," (with David E. Mills) 5 Industrial and Corporate Change 791 (1996).

"Is Predation Rational? Is it Profitable? Comment to Adams, Brock and Obst," (with David E. Mills) 11 Review of Industrial Organization 759 (1996).

"Speculation" Entry in R. E. Freeman and P. H. Werhane (eds.) Dictionary of Business Ethics (Oxford: Blackwell Publishers) 1997.

"Teaching Economics: Inspiration & Perspiration," in Phillip Saunders & William G. Walsted (eds.) Teaching Undergraduate Economics: A Handbook for Instructors (New York: McGraw Hill, 1997).

"The Distribution and Pricing of Prescription Drugs," (with David E. Mills) 4 International Journal of the Economics of Business 287 (1997).

A Deadly Indifference by Marshall Jevons (pseudonym, co-author with William Breit) (Princeton: Princeton University Press, 1998). Paperback version of 1995 book by same title. Korean version published by Book&World, 2001; Japanese version published by Nihon-Keizai-Shinbun; Thai edition published by Nation Books International Co., Ltd.; Chinese edition published by China Machine Press.

"Morality and Antitrust Laws: A Reply to Jeffrey Tucker," 1 The Journal of Markets and Morality 83 (1998).

"Switching Costs in the Wholesale Distribution of Cigarettes," (with David E. Mills) 65 Southern Economic Journal 282 (1998).

"Economics and Religion: An Essay," in James M. Dean and A.M.C. Waterman (eds.) Religion and Economics: Normative Social Theory, (Dordrecht: Kluwer Academic Publishers, 1999).

"Price Wars Triggered by Entry," (with David E. Mills) 17 International Journal of Industrial Organization 179 (1999).

"Walter Adams: In Memoriam," 65 Southern Economic Journal 375 (1999).

"Henry C. Simons," biographical entry in John A. Garraty and Mark C. Carnes (eds.) American National Biography Vol. 20, New York: Oxford University Press, 1999.

"PC Software," (with David E. Mills) 44 The Antitrust Bulletin 739 (1999).

Personal statement of teaching philosophy in J. Jenry Morsman IV, William B. McAllister, Marva A. Barnett (eds.) Reflections on Teaching. Personal Essays on the Scholarship of Teaching. (Charlottesville: Teaching Resource Center of the University of Virginia, 1999).

"Industrial Organization and Human Action," 19 Cato Journal 233 (1999).

"The Beer Industry," in Walter Adams and James Brock (eds.) The Structure of American Industry 10th ed. (Upper Saddle River, New Jersey: Prentice Hall, 2000).

"Independent Service Organizations and Economic Efficiency," (with David. E. Mills) 39 Economic Inquiry 287 ( 2001).

"U.S. v. Microsoft: Remedy or Malady?" (with David. S. Evans and Albert L. Nichols) 9 George Mason Law Review 633 (2001).

A-8

"Predatory Pricing and Strategic Theory," (with David E. Mills) 89 Georgetown Law Journal 2475 (2001). Reprinted in Recent Developments in Monopoly and Competition Policy, George Norman, ed., Elgar Reference Collection, International Library of Critical Writings (2008).

"Fifteen Theses on Classroom Teaching," 68 Southern Economic Journal 249 (2001).

"The Economist as Detective," (with William Breit) 33 Journal of Economic Education 367 (2002).

"Uniform Gasoline Price Regulation: Consequences for Consumer Welfare," (with Michael C. Keeley) 10 International Journal of the Economics of Business (No. 2), 157 (July 2003).

"The Brand Name Prescription Drugs Antitrust Litigation (1999)," (with David E. Mills) in John E. Kwoka, Jr. and Lawrence J. White (eds.), The Antitrust Revolution (4th ed.), Oxford: Oxford University Press (2004).

"Injunctive Relief in Sherman Act Monopolization Cases," (with Robert W. Crandall) 21 Journal of Research in Law and Economics, (Special Issue in Antitrust Law and Economics, John B. Kirkwood, ed.) 277 (2004).

"The Beer Industry," in Walter Adams and James Brock (eds.) The Structure of American Industry 11th ed. (Upper Saddle River, New Jersey: Prentice Hall, 2005).

"The Supreme Court and Beer Mergers: From Pabst/Blatz to the DOJ-FTC Merger Guidelines," (w/ Anthony W. Swisher) 26 Review of Industrial Organization 245 (2005).

"Price Competition and Slotting Allowances," (w/ Peter Bronsteen and David E. Mills) in 50 Antitrust Bulletin 267 (Summer, 2005).

"Walter Adams," The Biographical Dictionary of American Economists, Ross B. Emmett (General Editor) London: Thoennes Continuum. 2006.

"The Belated but Welcome Demise of Dr. Miles:  Why the Court's Decision on Vertical 'Price-Fixing' is Good Law, Good Economics, and Good for Consumers," (w/ Tyler Baker) 4 Competition Law International 4 (2008).

"Predatory Pricing in the Airline Industry: Spirit Airlines v. Northwest Airlines," (2005) (w/ David E. Mills) in John E. Kwoka and Lawrence J. White (eds.), The Antitrust Revolution 5th ed. (Oxford: Oxford University Press, 2008).

"The Economics of Resale Price Maintenance," (w/ David E. Mills) in Wayne D. Collins (ed.), Issues in Competition Law and Policy Vol. II (Chicago: ABA Book Publishing, 2008).

"The Beer Industry," in James Brock (ed.) The Structure of American Industry 12th ed. (Upper Saddle River, New Jersey: Prentice Hall, 2009).  Reissued 2013 by Waveland Press, Inc.. Long Grove, IL.

"Christianity and Hayek," (w/ Matthew R. Givens) 6 Faith & Economics 53 (2009).

"35,000 Principles Students: Some Lessons Learned," (w/ Daniel O. Melaugh) 76 Southern Economic Journal 32 (2009).

Comment on Lawrence J. White, "Economics, Economists, and Antitrust: A Tale of Growing Influence," in John J. Siegfried (ed.), Better Living through Economics, Harvard University Press (2010).

A-9

"*Leegin* and Procompetitive Resale Price Maintenance," (w/ David E. Mills) 55 The Antitrust Bulletin 2. 349 (2010).

"Elzinga-Hogarty Test in Hospital Mergers: the *Evanston Case*," (w/ Anthony W. Swisher) 18 International Journal of the Economics of Business 1, 133 (2011).

"The Lerner Index of Monopoly Power: Origins and Uses," (w/ David E. Mills) 101 The American Economic Review 3, 558 (2011).

"Developments in U.S. Merger Policy: The Beer Industry as Lens," (w/ Anthony W. Swisher) The Economics of Beer (Johan F.M. Swinnen, ed.), New York: Oxford University Press, 2011.

"The U.S. Beer Industry: Concentration, Fragmentation, and a Nexus with Wine," 6 Journal of Wine Economics, 217 (2011).

"The Economics of NASCAR," (w/ Andrew E. Abere and Peter Bronsteen) in Leo H. Kahane and Stephen Shmanske (eds.), The Oxford Handbook of Sports Economics: Vol. I: The Economics of Sports. Oxford: Oxford University Press, 2012.

"The Socratic Method," in Gail Hoyt and Kim Marie McGoldrick (eds.), International Handbook on Teaching and Learning Economics. Cheltenham: Elgar Press, 2012.

"Predatory Pricing in the Airline Industry: *Spirit Airlines v. Northwest Airlines*," (w/ David E. Mills; revised and updated from prior edition) in John E. Kwoka and Lawrence J. White (eds.), The Antitrust Revolution 6th ed. Oxford: Oxford University Press, 2014.

"*Leegin v. PSKS (2007)*: Resale Price Maintenance Wins a Reprieve," (w/ David E. Mills) in John E. Kwoka and Lawrence J. White (eds.), The Antitrust Revolution 6th ed. Oxford: Oxford University Press, 2014.

"F.M. Scherer on Vertical Agreements: Staking out the Middle Ground on Resale Price Maintenance," in Francesco Silva (ed.), 41 Journal of Industrial and Business Economics, 1, 105-119 (2014).

"Predatory Pricing," (w/ David E. Mills) in Roger D. Blair and Daniel Sokol (eds.), Oxford Handbook on International Antitrust Economics. Oxford: Oxford University Press, 2014.

"Antitrust Predation and 'The Antitrust Paradox,'" (w/ David E. Mills), 57 Journal of Law & Economics, 181 (August 2014).

The Mystery of the Invisible Hand by Marshall Jevons (pseudonym). Princeton: Princeton University Press, 2014. Paperback version published by Princeton University Press, 2016. Chinese version published by AND Publishing Ltd., 2016.

"The Beer Industry," in James Brock (ed.) The Structure of American Industry 13th ed. Long Grove, IL: Waveland Press, 2016.

"Craft Beer In The United States: History, Numbers, and Geography," (w/Carol Horton Tremblay and Victor J. Tremblay), 10 Journal of Wine Economics, 242 (2015).

"Alfred Marshall: Why He Matters," Number 67 Faith & Economics, 5 (2016).

"Thirteen Editions of *The Structure of American Industry*: An I.O. Perspective," (w/ F.M. Scherer), 49 Review of Industrial Organization, 515 (2016).

"Craft Beer in the United States: Strategic Connections to Macro and European Brewers," (w/Carol Horton Tremblay and Victor J. Tremblay), (forthcoming in Christian Garavaglia and Johann Swinnen, eds.).

A-10

"Louis Brandeis and Contemporary Antitrust Enforcement," (w/ Micah Webber), Touro Law Review (forthcoming).

"Resale Price Maintenance and the Tenth Anniversary of *Leegin*." Introduction and Editor of Special Issue of the Review of Industrial Organization (2017).

## References

Charles Holt
A Willis Robertson Professor of Political Economy
University of Virginia
Charlottesville, Virginia 22903

Orley C. Ashenfelter
Joseph Douglas Green 1895 Professor of Economics
Princeton University
Princeton, New Jersey 08544

David E. Mills
Professor of Economics
University of Virginia
Charlottesville, Virginia 22903

John J. Siegfried
Professor of Economics
Vanderbilt University
Nashville, Tennessee 37235

Leland B. Yeager
Ludwig von Mises Professor of Economics, Emeritus
Auburn University
Auburn, Alabama 36849

**Appendix B**

March 2017

**<u>Expert Testimony and Sworn Statements: Kenneth G. Elzinga</u>**

These are the antitrust cases in which I have presented deposition or trial testimony or authored a sworn statement since August, 1985.

1. Assam Drug Co. v. Miller Brewing Company (U.S. D.C. for S. Dakota, Southern Div.). Affidavit for Miller Brewing Company dated 8/5/1985.

2. State of New York v. Anheuser-Busch, et al. (U.S. D.C. for E.D. N.Y.)  Deposition testimony given on 6/6/1989 and 7/7/1989.  I was deposed on behalf of the Miller Brewing Company. Expert Affidavit filed on 12/24/1986.

3. Liggett v. Brown & Williamson (U.S. D.C. for M.D. N.C., Durham, Div.), deposed on 10/21/1986, 11/14/1986 and 3/12/1987; court testimony given on 1/22-24/1990.  I testified on behalf of Brown & Williamson.  Affidavit dated 12/30/1986; Answering Affidavit dated 1/28/1987; Reply Affidavit dated 2/16/1987.  This case now known as Brooke Group v. Brown & Williamson.

4. Lifschultz v. Consolidated Freightways, Roadway & Yellow Freight  (U.S. D.C. for S. C., Greenville Div.), deposition testimony given on 3/8-9/1990, 3/12-16/1990.  I was deposed on behalf of the three defendants.  Expert Report dated 8/31/1989.

5. Kimberly Clark v. Procter & Gamble (U.S. D.C. for NE.D. Texas, Dallas Div.), deposition testimony on 5/21-23/1991.  I was deposed on behalf of Procter & Gamble.

6. Infant Formula Antitrust Investigation, MDL-878 (U.S. D.C. for N.D. FL, Tallahassee Div.), deposition testimony on September 21-23, 1992.  I was deposed on behalf of the State of Florida and three grocery chains, Albertsons, American Stores, and Safeway.  Sworn Declaration dated 11/2/1992.

7. Pearl Brewing Co. and Pabst Brewing Co. v. Miller Brewing Company (U.S. D.C. for W.D. of Texas), Expert Report dated 3/20/1993 on behalf of Miller Brewing.

8. R&D Business Systems, et al. v. Xerox Corporation <u>and</u> Gemini Equipment Partners, et al. v. Xerox Corporation (U.S. D.C. for E.D. Texas), deposition testimony given 1/12-13/1994.  I was deposed on behalf of Xerox.

9. Nestle Food Company v. Abbott Laboratories, et al. (U.S. D.C. for C.D. of Cal), deposition testimony on 1/16-17/1994, 12/5/1994, 12/9/1994; court testimony given on 5/18-19/1995.  I testified on behalf of Nestle.

10. Procter & Gamble v. Paragon Trade Brands, (U.S. D.C. for Del.), deposition testimony on 6/22-23/1995.  I testified on behalf of Procter & Gamble.

11. Clorox v. Reckitt & Colman (U.S. D.C. for E.D. of N.Y.). Expert Affidavit dated 8/9/1995; filed on behalf of Reckitt & Colman.

12. Brand Name Prescription Drug Litigation (U.S. D.C. for N.D. IL). Expert Report dated 11/30/1995 filed on behalf of SmithKline Beecham and deposition testimony given on 12/28-29/1995.

13. JCB Mining, Inc. v. Peabody Development Company (C.C. for Monongalia County, WV). Court testimony given on 9/20,23/1996 on behalf of Peabody.

14. Coors Brewing Company v. Miller Brewing Company and Molson Breweries (U.S. D.C. for Col.), Expert Report dated 7/23/1996; filed on behalf of Miller and Molson and deposition testimony on 10/8-9/1996.

15. In re: Independent Service Organizations Antitrust Litigation (U.S. D.C. for Kansas), Expert Reports dated 12/1996 and 1/1997 filed on behalf of Xerox and deposition testimony on 1/14/1997.

16. In re: Industrial Silicon Antitrust Litigation (U.S. D.C. for W.D. of Penn), Expert Reports dated 10/1997 and 3/1998 filed on behalf of GM, Ford, Chrysler, USS and Republic and deposition testimony on 12/8, 10, 12/1997.

17. In re: High Fructose Corn Syrup Antitrust Litigation (U.S. D.C. for C.D. of IL), Expert Report on behalf of defendants dated 3/19/98. Deposition testimony on 10/13, 14, 28/1998 and 3/26/2001. Supplemental Report filed 3/21/2001. Declaration filed on 3/29/2001. Response Report to Professor Frank Wolak dated 3/12/2004.

18. S. McCampbell and C. O'Husky v. Ralphs Grocery Company, The Vons Companies, & Lucky Stores (Superior Court of California, County of San Diego). Deposition testimony on behalf of Ralphs, Vons, and Lucky on 12/9/1998. Court testimony on 8/18-19/1999.

19. Caldera, Inc. v. Microsoft Corporation (U.S. D.C. for C.D. of Utah), Expert Report dated 12/14/1998 filed on behalf of Microsoft and deposition testimony on 1/20/1999 and 3/8/1999. Supplemental Report dated 9/10/1999.

20. Bristol Technology, Inc. v. Microsoft Corporation (U.S. D.C. for CT), Expert Report dated 4/15/1999 filed on behalf of Microsoft. Deposition testimony on 5/17/1999 and 6/10/1999. Court testimony on 6/28-29/1999.

21. Hugh Collins, et al. v. International Dairy Queen, Inc. (U.S. D.C. for M.D. of Georgia), Expert Report dated 12/10/1999 filed on behalf of Dairy Queen. Supplemental Report dated 2/7/2000.

22. Continental Airlines v. United Airlines, et al. (U.S. D.C. for E.D. of Virginia), Expert Report dated 8/25/00 filed on behalf of Continental Airlines. Deposition testimony on 9/6/2000 and 10/4/2000. Rebuttal Report dated 9/22/2000.

23. In re: Auction Houses Antitrust Litigation (Sotheby's and Christie's), Economic Assessment of Proposed Class Settlement (with Denise Martin) dated 1/18/2001; Supplemental Report dated 1/25/2001. Court appointed consultant to Judge Lewis A. Kaplan (S.D. N.Y.).

24. R. J. Reynolds v. Philip Morris; Lorillard v. Philip Morris; Brown & Williamson v. Philip Morris (U.S. D.C.for Middle District of N.C.), Expert Report dated 7/31/2001 filed on behalf of Philip Morris. Deposition testimony on 8/23-24/2001. Court Testimony in PI Hearing, 10/17/2001. Supplemental Report dated 12/13/2001.

25. In re: Cigarette Antitrust Litigation aka Holiday Wholesale Grocery Co v. Philip Morris, et al. (U.S. D.C. for Northern District of GA, Atlanta Division), Expert Report dated 12/19/2001 filed on behalf of Philip Morris. Deposition testimony on 1/31/2002.

26. State of New York et al., v. Microsoft Corporation (U.S. D.C. for D.C.), Expert Report dated 1/25/2002 filed on behalf of Microsoft. Deposition testimony given on 2/20/2002 and 2/25/2002. Written direct testimony submitted on 5/5/2002; court testimony on 5/8-9/2002.

27. Spirit Airlines, Inc. v. Northwest Airlines, Inc. (U.S. D.C. for Eastern Michigan), Expert Report dated April 5, 2002 filed on behalf of Spirit. Rebuttal report dated filed 5/31/2002. Deposition testimony on 6/21/2002. Affidavit dated 8/8/2002.

28. Monsanto Company v. Mitchell Scruggs et al. (U.S. D.C. for N. Mississippi), Expert Report dated April 18, 2002 filed on behalf of Monsanto. Deposition testimony given on 5/22/2002. Declaration filed on 12/3/2003. Supplemental Declaration filed on 1/16/2004.

29. Chemical Products Technologies v. Monsanto Company (U.S. D.C. for the District of South Carolina), Expert Report dated 5/20/2002 filed on behalf of Monsanto.

30. Crest Foods of Edmond, L.L.C. v. Wal-Mart Stores, Inc. (U.S. D.C. for the Western District of Oklahoma), Expert Report dated 11/26/2002 filed on behalf of Wal-Mart. Expert Report dated 12/12/2002 filed on behalf of Wal-Mart. Deposition testimony on 12/16/2002. Declaration filed 1/31/2003. Supplemental Report filed 2/24/2003.

31. Maureen Baker, et al. v. Jewel Food Stores, Inc., et al. (State of Illinois, County of Cook), Expert Report dated 12/9/2002 filed on behalf of Dominick's and Jewel. Deposition testimony on 1/7/2003.

32. Coalition for a Level Playing Field, et al. v. AutoZone, inc. et al. (U.S. D.C. for Eastern District of N.Y.), Expert Report dated 1/20/2003 on behalf of AutoZone; court testimony on 1/27/2003.

33. Smith Wholesale Co., et al. v. Philip Morris (U.S. D.C. for Eastern District of Tennessee), Expert Report dated 7/9/2003 on behalf of Philip Morris; court testimony on 7/15/2003. Deposition on 10/13/2004.

34. PSKS, Inc. and Toni Cochran, L.L.C. v. Leegin, Inc. (U.S. D.C. for Eastern District of Texas, Marshall Division), Expert Report dated 1/12/2004 on behalf of Leegin. Deposition testimony on 2/20/2004.

35. U.S. v. Oracle Corporation (U.S. D.C. for Northern District of California, San Francisco Division), Expert Report dated 4/26/2004 on behalf of the Antitrust Division. Supplemental Report filed 5/3/2004. Rebuttal Report filed 5/18/2004. Second Supplemental Report filed 5/24/2004. Deposition testimony on 5/27-28/2004; court testimony on 6/18/2004.

36. In the matter of Evanston Northwestern Healthcare Corporation, Federal Trade Commission Docket D9315, Expert Report dated 9/21/2004 on behalf of the FTC; court testimony on 2/25/2005.

37. Sandar V. Nilavar v. Mercy Health System-Western Ohio, et al. (U.S. D.C. for Southern District of Ohio), Affidavit filed 7/29/2005.

38. Syngenta Seeds, Inc. v. Monsanto Company (U.S. D.C. for District of Delaware), Expert Report dated 8/21/2006 on behalf of Monsanto. Deposition testimony on 9/27/2006.

39. Lindsay Hall (on behalf of a class) v. Leegin Creative Leather Products, Inc. (18th Judicial District, Sedgwick County, Kansas, Civil Department). Expert Report dated 11/30/2006 on behalf of Leegin. (See 44. below)

40. Kentucky Speedway, LLC v. National Association for Stock Car Auto Racing, Inc. and International Speedway Corporation (U.S. D.C. for Eastern District of Kentucky), Expert Report dated 5/23/2007 on behalf of NASCAR and ISC. Deposition testimony on 6/12-13/2007.

41. In re: Ethylene Propylene Diene Monomer (EPDM) Antitrust Litigation (U.S. D.C. for District of Connecticut). Expert Report dated 7/16/2007 on behalf of DSM. Deposition testimony on 12/19/2007.

42. In re: OSB Antitrust Litigation (U.S. D.C. for Eastern District of Pennsylvania). Expert Report dated 9/24/2007 on behalf of Tolko. Deposition testimony on 11/6/2007.

43. American Express Travel Related Services Inc. v. Visa U.S.A., Inc., et al. (U.S.D.C. for Southern District of New York), Expert Report dated 10/8/2007 on behalf of Visa, MasterCard, and defendant banks. Deposition testimony on 10/30-31/2007.

44. Sue O'Brien (on behalf of a class) v. Leegin Creative Leather Products, Inc. (18th Judicial District, Sedgwick County, Kansas, Civil Department). Expert Report Reply dated 1/22/2008 on behalf of Leegin.

45. In re: Wellbutrin SR Antitrust Litigation; Sheet Metal Workers Local 441 v. GlaxoSmithKline; and Medical Mutual of Ohio v. GlaxoSmithKline (U.S. D.C. for Eastern District of Pennsylvania).  Expert Report dated 7/29/2008 on behalf of GlaxoSmithKline. Supplemental Report dated 10/9/2008.  Deposition testimony on 10/14/2008.

46. Rambus v. Micron Technology, Inc., et al. (Superior Court of the State of California).  Expert Report dated 11/6/2008 on behalf of Rambus.  Supplemental Report dated 12/19/2008. Deposition testimony on 1/12-13/2009.  Declaration dated 1/23/2009.  Deposition testimony on 4/10/2009 and on 8/19/2009.  Court Testimony dated 7/26-27/2011.

47. Marty Ginsburg et al. v. InBev N.V./S.A. and Anheuser-Busch, Inc. (U.S. D.C. for Eastern District of Missouri).  Declaration dated 11/7/2008 on behalf of InBev.

48. In re: Payment Card Interchange Fee and Merchant Discount Antitrust Litigation (U.S. D.C. for Eastern District of New York).  Expert Report dated 12/14/2009 on behalf of Visa and MasterCard.  Deposition testimony on 3/10-11/2010.

49. Sweetwater Valley Farms, et al. v. Dean Foods, et al. (U.S. D.C. for Eastern District of Tennessee, Greenville Division).  Expert Report dated 5/3/2010 on behalf of defendants. Deposition testimony on 6/3-4/2010.

50. Food Lion, LLC, et al., v. Dean Foods Company, et al. (U.S. D.C. for Eastern District of Tennessee, Greenville Division).  Expert Report dated 5/3/2010 on behalf of defendants. Deposition testimony on 6/9-10/2010.

51. In re: Wellbutrin XL Antitrust Litigation (U.S. D.C., E.D. of Pennsylvania).  Expert Report dated 9/16/2011 on behalf of GlaxoSmithKline.  Expert Report dated 12/23/2014 on behalf of GlaxoSmithKline.  Deposition testimony on 1/30/2015.

52. Ross, et al. v. Bank of America, et al. (U.S. D.C. Southern District of New York).  Expert Report dated 9/21/2010 on behalf of defendants Citibank and Discover.  Deposition testimony on 10/13/2010.  Court testimony on 2/7/2013.

53. In re: Urethane Antitrust Litigation, No. 04-MD-1616 JWL, and Seegott Holdings, Inc., et al. v. Bayer AG, et al., No. 05-2265-JWL, and Carpenter Co. et. al v. BASF SE et. al, No. 2:08-cv-05169-KSH-PS, and Woodbridge Foam Corporation et. al. v. BASF SE et. al., No. 2:08-cv-05759-DRD-MAS, and Dash Multi-Corp, Inc. et. al., v. BASF SE et. al., No. 2:09-cv-05588-KSH-PS (U.S. D.C. for Kansas).  Expert Report dated 3/23/2012 on behalf of defendants. Deposition testimony on 5/3-4/2012.  Court testimony on 2/13/2013.  Supplemental Report dated 12/18/2013.  Deposition testimony on 2/27/2014.  Court testimony on 3/28-29/2016 in U.S. D.C., Newark, NJ.

54. IN THE MATTER of certain agreements or arrangements implemented or enforced by Visa Canada Corporation and MasterCard International Incorporated between The Commissioner of Competition (Applicant) and Visa Canada Corp. and MasterCard International Inc. (Respondents) and Toronto-Dominion Bank and Canadian Bankers Association (Intervenors).

Expert Report dated 4/10/2012 on behalf of Respondents. Testimony before the Canadian Competition Tribunal on 6/4/2012.

55. American Needle v. New Orleans Saints, et al. (U.S. D.C. for Northern District of IL, Eastern Division). Expert Report dated 12/14/2012 on behalf of NFL. Deposition testimony on 12/21/2012.

56. In re: Pool Products Distribution Market Antitrust Litigation (U.S. D.C. for Eastern District of Louisiana). Two Expert Reports dated 4/10/2014 on behalf of Hayward Industries, Pentair Water Pool and Spa, and Zodiac Pool Systems. Expert Report dated 6/11/2014 in response to Expert Report of the DPPs. Deposition testimony on 7/3/2014.

57. In re: Cathode Ray Tube Antitrust Litigation (U.S. D.C. for Northern District of California, San Francisco Division). Expert Report dated 4/15/2014 on behalf of opt out plaintiffs (Dell, Office Depot et al). Deposition on 7/17/2014. Reply Expert Report dated 8/5/2014. Rebuttal Report dated 9/29/2014. Deposition testimony on 10/15/2014 and 10/27/2014. In the Matter of Arbitration between Viewsonic Corporation v. Panasonic Corporation, Rebuttal Report dated 10/4/2014.

58. American Media, Inc. et al. v. Anderson News, LLC, and Charles Anderson, Jr. (U.S. D.C. for Southern District of New York). Expert Reports dated 4/16/2014 and 7/16/14 on behalf of Time Inc. Anderson News, LLC, and Lloyd Whitaker v. American Media, Inc. et al. (U.S. D.C. for Southern District of New York). Expert Report dated 5/28/2014 on behalf of Time Inc. and Time/Warner Retail Sales and Marketing, Inc. Deposition testimony on 10/6/2014.

59. Garber, et al. v. Office of the Commissioner of Baseball, et al. (U.S. D.C. for Southern District of New York). Expert Report dated 8/24/2015 on behalf of Comcast and DIRECTV. Deposition testimony on 10/19/2015.

60. Wal-Mart Stores, Inc., et al. v. Texas Alcoholic Beverage Commission, et al. (U.S. D.C. for Western District of Texas Austin Division). Expert Report dated 2/12/2016 on behalf of Wal-Mart. Second Expert Report dated 4/11/2016. Deposition testimony on 4/18/2016. Rebuttal Report dated 1/13/2017. Deposition testimony on 1/27/2017. Fourth Expert Report dated 3/15/2017.

61. In re: Wholesale Grocery Products Antitrust Litigation (U.S.D.C. for District of Minnesota). Expert Report dated 12/7/2016 on behalf of SuperValu and C&S. Deposition testimony on 3/10/2017.

**Highly Confidential – Counsel Only**

## Appendix C

### Materials Relied Upon

#### BATES STAMPED DOCUMENTS

##### American Athletic Conference Bates Stamped Documents

| Beginning Bates | Ending Bates |
|---|---|
| AMERICAN_GIA_019241 | AMERICAN_GIA_019660 |
| AMERICAN_GIA_024727 | AMERICAN_GIA_024740 |
| AMERICAN_GIA_026457 | AMERICAN_GIA_026524 |
| AMERICAN_GIA_056660 | AMERICAN_GIA_056722 |
| AMERICAN_GIA_061993 | AMERICAN_GIA_061993 |

##### Atlantic Coast Conference Bates Stamped Documents

| Beginning Bates | Ending Bates |
|---|---|
| ACC-GIA009440 | ACC-GIA009441 |
| ACC-GIA010154 | ACC-GIA010155 |
| ACC-GIA044190 | ACC-GIA044324 |
| ACC-GIA132931 | ACC-GIA132931 |
| ACC-GIA132932 | ACC-GIA132932 |
| ACC-GIA132939 | ACC-GIA132940 |

##### Big Ten Conference Bates Stamped Documents

| Beginning Bates | Ending Bates |
|---|---|
| BIGTEN-GIA 050514 | BIGTEN-GIA 050515 |
| BIGTEN-GIA 061677 | BIGTEN-GIA 061725 |
| BIGTEN-GIA 063768 | BIGTEN-GIA 063768 |
| BIGTEN-GIA 063777 | BIGTEN-GIA 063777 |
| BIGTEN-GIA 083923 | BIGTEN-GIA 083923 |
| BIGTEN-GIA 083924 | BIGTEN-GIA 083924 |
| BIGTEN-GIA 124850 | BIGTEN-GIA 124894 |
| BIGTEN-GIA 210487 | BIGTEN-GIA 210487 |
| BIGTEN-GIA 210503 | BIGTEN-GIA 210504 |
| BIGTEN-GIA 241584 | BIGTEN-GIA 241600 |
| BIGTEN-GIA251324 | BIGTEN-GIA251348 |

##### Big Twelve Conference Bates Stamped Documents

| Beginning Bates | Ending Bates |
|---|---|
| BIG12-GIA_00047505 | BIG12-GIA_00047577 |
| BIG12-GIA_00053569 | BIG12-GIA_00053640 |
| BIG12-GIA_00092249 | BIG12-GIA_00092313 |
| BIG12-GIA_00119153 | BIG12-GIA_00119153 |
| BIG12-GIA_00216792 | BIG12-GIA_00216792 |

**Highly Confidential – Counsel Only**

## Mid-American Conference Bates Stamped Documents

| *Beginning Bates* | *Ending Bates* |
|---|---|
| MAC_000909 | MAC_001207 |
| MAC_000967 | MAC_000967 |

## Mountain West Conference Bates Stamped Documents

| *Beginning Bates* | *Ending Bates* |
|---|---|
| MWC_GIA_003597 | MWC_GIA_003610 |
| MWC_GIA_004258 | MWC_GIA_004271 |
| MWC_GIA_006380 | MWC_GIA_006397 |
| MWC_GIA_003893 | MWC_GIA_003895 |
| MWC_GIA_058001 | MWC_GIA_058008 |
| MWC_GIA_063792 | MWC_GIA_063796 |
| MWC_GIA_075619 | MWC_GIA_075820 |

## NCAA Bates Stamped Documents

| *Beginning Bates* | *Ending Bates* |
|---|---|
| NCAAGIA000410434 | NCAAGIA000410533 |
| NCAAGIA001928623 | NCAAGIA001928627 |
| NCAAGIA002201997 | NCAAGIA002202021 |
| NCAAGIA002821438 | NCAAGIA002821440 |
| NCAAGIA003350287 | NCAAGIA003350296 |

## Ohio State University Bates Stamped Documents

| *Beginning Bates* | *Ending Bates* |
|---|---|
| OSU-PR-00001 | OSU-PR-00042 |
| OSU-PR-00211 | OSU-PR-00213 |
| OSU-PR-00236 | OSU-PR-00236 |
| OSU-PR-00237 | OSU-PR-00238 |
| OSU-PR-00239 | OSU-PR-00240 |
| OSU-PR-00241 | OSU-PR-00241 |

## Pacific-12 Conference Bates Stamped Documents

| *Beginning Bates* | *Ending Bates* |
|---|---|
| PAC12GIA_00020473 | PAC12GIA_00020473 |
| PAC12GIA_00024126 | PAC12GIA_00024132 |
| PAC12GIA_00027209 | PAC12GIA_00027210 |
| PAC12GIA_00027901 | PAC12GIA_00027902 |

## Purdue University Bates Stamped Documents

| *Beginning Bates* | *Ending Bates* |
|---|---|
| PUR-PR-00023 | PUR-PR-00034 |
| PUR-PR-00048 | PUR-PR-00075 |
| PUR-PR-00076 | PUR-PR-00107 |

**Highly Confidential – Counsel Only**

| | |
|---|---|
| PUR-PR-00108 | PUR-PR-00136 |
| PUR-PR-00137 | PUR-PR-00164 |
| PUR-PR-00210 | PUR-PR-00236 |
| PUR-PR-00281 | PUR-PR-00297 |
| PUR-PR-00468 | PUR-PR-00472 |

**Southeastern Conference Bates Stamped Documents**

| Beginning Bates | Ending Bates |
|---|---|
| SEC00017611 | SEC00017619 |
| SEC00049539 | SEC00049712 |
| SEC00128835 | SEC00128840 |
| SEC00152986 | SEC00152990 |
| SEC00152991 | SEC00152995 |
| SEC00152996 | SEC001S2999 |
| SEC00153000 | SEC00153009 |
| SEC00153015 | SEC00153022 |
| SEC0015302S | SEC00153034 |
| SEC00153035 | SEC00153043 |
| SEC00153044 | SEC00153053 |
| SEC00153054 | SEC00153057 |
| SEC001530S8 | SEC00153065 |
| SEC00153066 | SEC00153071 |
| SEC00193S46 | SEC00193577 |
| SEC00201135 | SEC00201160 |
| SEC00293025 | SEC00293072 |
| SEC00310481 | SEC00310482 |
| SEC00310491 | SEC00310505 |
| SEC00310634 | SEC00310656 |
| SEC00310657 | SEC00310700 |
| SEC00310711 | SEC00310714 |

**Sun Belt Conference Bates Stamped Documents**

| Beginning Bates | Ending Bates |
|---|---|
| SB_GIA_008013 | SB_GIA_008026 |
| SB_GIA_059981 | SB_GIA_059985 |
| SB_GIA_136596 | SB_GIA_136669 |
| SB_GIA_136746 | SB_GIA_136825 |
| SB_GIA_137006 | SB_GIA_137101 |
| SB_GIA_137402 | SB_GIA_137559 |
| SB_GIA_137402 | SB_GIA_137559 |
| SB_GIA_137560 | SB_GIA_137731 |

**Western Athletic Conference Bates Stamped Documents**

| Beginning Bates | Ending Bates |
|---|---|
| WAC_GIA_000730 | WAC_GIA_000888 |
| WAC_GIA_027037 | WAC_GIA_027111 |
| WAC_GIA_038964 | WAC_GIA_038965 |

**Highly Confidential – Counsel Only**

WAC_GIA_039307
WAC_GIA_064593

WAC_GIA_039307
WAC_GIA_064597

#### EXHIBITS

- Plaintiffs' Deposition Exhibit 35
- Plaintiffs' Deposition Exhibit 37

#### DEPOSITIONS

- Deposition of Alger, Jonathan, 06/23/2016
- Deposition of Aresco, Michael L., 11/16/2016
- Deposition of Blank, Rebecca M., 06/01/2016
- Deposition of Brandon, David, 08/17/2016
- Deposition of Emmert, Mark A., 01/12/2017
- Deposition of Lennon, Kevin, 01/25/2017
- Deposition of Lewis, Mark A. (NCAA Rule 30(b)(6)), 01/31/2017
- Deposition of Machen, Bernie, 06/29/2016
- Deposition of Perlman, Harvey, 05/03/2016
- Deposition of Scott, Lawrence G., 01/12/2017
- Deposition of Slive, Michael, 11/10/2016
- Deposition of Smith, Eugene DuBois, 06/08/2016

#### INTERVIEWS

- Interview of Barnhart, Mitch (Athletics Director, University of Kentucky), 12/18/2016
- Interview of Burke, Morgan (*former* Athletics Director, Purdue University), 02/22/2017
- Interview of Fenves, Greg (President, University of Texas), 02/03/2017
- Interview of Gill, Keith (Athletics Director, University of Richmond), 02/08/2017
- Interview of Hatch, Nathan (President, Wake Forest University), 02/15/2017

#### PUBLIC DOCUMENTS

- 2013-14 NCAA National Championships,
  http://www.ncaa.com/news/ncaa/article/2014-01-25/2013-14-ncaa-national-champions
  (accessed 1/3/17)
- 2016 NFL Attendance Data," http://www.pro-football
  reference.com/years/2016/attendance.htm (accessed 3/19/17)
- A Strategic Plan for Spider Student-Athletes, University of Richmond Athletics,
  http://www.richmondspiders.com/ViewArticle.dbml?&DB_OEM_ID=26800&ATCLID=2092
  50146 (accessed 1/11/17)
- Abel, Jaison R. and Richard Deitz, "Do the Benefits of College Still Outweigh the Costs?"
  *Federal Reserve Bank of New York Current Issues in Economics and Finance* 20, no. 3 (2014)
- About NCAA Division II, http://www.ncaa.org/about?division=d2 (accessed 2/3/17)
- Academic Progress Rate Explained: What is the APR and how is it calculated?
  http://www.ncaa.org/aboutresources/research/academic-progress-rate-explained
  (accessed 2/27/17)
- Academic Progress Rate Timeline,
  http://www.ncaa.org/about/resources/research/academicprogress-rate-timeline
  (accessed 2/27/17)
- ACC Academic Consortium (ACCAC), http://www.theacc.com/page/accac (accessed
  3/14/17)

**Highly Confidential – Counsel Only**

- AFL Arena Football History – Year by Year – 2016, http://www.arenafan.com/history/?page=yearly&histleague=1&fpage=attendance&year=2016 (accessed 3/15/17)
- Alchian, Armen A. and William Allen, *University Economics*, *3rd ed.* (Belmont: Wadsworth Publishing Company, 1972)
- Alumni Giving, https://www.alumnifactor.com/node/5854 (accessed 1/31/17)
- Amateurism, http://www.ncaa.org/amateurism (accessed 2/14/17).
- Anderson, Michael L., "The Benefits Of College Athletic Success: An Application Of The Propensity Score Design," *Review of Economics and Statistics* 99, no. 1 (2017)
- Asher, Mark and Jon DeNunzio, "Student-Athletes Find it Harder to Stay in the Game," *Washington Post,* May 28, 1995
- Athletics & Recreation, http://www.arizona.edu/topics/athletics-recreation (accessed 1/24/17)
- Aula, Hannah-Mari, Jane Tienari, and Arild Wæraas, "The University Branding Game: Players, Interests, Politics," *International Studies of Management & Organization* 45, no. 2 (2015)
- Bade, Robert A. and Jeffrey O. Sundberg, "Fourth Down and Gold to Go? Assessing the Link between Athletics and Alumni Giving," *Social Science Quarterly* 77, no. 4 (1996)
- Barnes, Laura L. B., Menna O. Agago and William T. Coombs, "Effects of Job-Related Stress on Faculty Intention to Leave Academia," *Research in Higher Education* 39, no. 4 (1998): 457-69
- Barro, Robert, "The Best Little Monopoly in America," *Business Week*, December 9, 2002
- Bastie, Fred, "Recruiting Column: Employers Want To Hire College Athletes," *USA Today High School Sports*, October 2, 2015
- Baum, Sandy, Jennifer Ma, and Kathleen Payea, "Education Pays 2013, The Benefits of Higher Education for Individuals and Society," *Trends in Education Series,* College Board (2013)
- Beaton, Andrew, "Harvard Wants to Rule the Basketball World," *The Wall Street Journal*, November 11, 2016
- Becker, Gary S., "College Athletes Should Get Paid What They are Worth," *Business Week,* September 30, 1985
- Becker, Gary S., "The NCAA: A Cartel in Sheepskin Clothing," *Business Week,* September 14, 1987
- Belkin, Douglas, "To Boost Male Enrollment, Some Schools Turn to Football," *The Wall Street Journal,* November 14, 2016
- Brown, Gary, "NCAA Graduation Rates: A Quarter –Century of Tracking Academic Success," http://www.ncaa.org/about/resources/research/ncaa-graduation-rates-quarter-century-tracking-academic-success (accessed 12/27/16)
- Brown, Robert W., "Measuring cartel rents in the college basketball player recruitment market," *Applied Economics* 26, no. 1 (1994)
- Browning, Edgar K. and Mark A. Zupan, *Microeconomics Theory & Applications*, *7th ed.* (New York: John Wiley & Sons, 2002)
- Bucks Go Pro Student-Athlete Summer Internship Program, http://www.ohiostatebuckeyes.com/genrel/bucks-go-pro.html (accessed 3/19/17)
- CalSO to be replaced with new weeklong Golden Bear Orientation, http://www.dailycal.org/2016/03/04/calso-replaced-new-weeklong-golden-bear-orientation/ (accessed 2/27/17)
- Carlton, Dennis W. and Jeffrey M. Perloff, *Modern Industrial Organization, 4th ed.* (Boston: Pearson Addison Wesley, 2005)

**Highly Confidential – Counsel Only**

- Carnegie Foundation for the Advancement of Teaching, *Campus Life: In Search of Community*. (Princeton: The Carnegie Foundation for the Advancement of Teaching, 1990)
- Cecil, William, "College vs. Community: The Civil Wars", *New York Times*, http://www.nytimes.com/1992/04/05/education/college-vs-community-the-civil-wars.html?pagewanted=all, April 5, 1992
- Center For Academic and Tutorial Services, http://www.ukathletics.com/news/genrel_121300aaa_html (accessed 2/27/17).
- *Chicago Tribune*, "NCAA Moves to Enforce 'Sanity Code'," January 9, 1948
- Chung, Doug J, "The Dynamic Advertising Effect of Collegiate Athletics," *Marketing Science* 32, no. 5 (2013)
- Club Sports, http://rec.arizona.edu/program/club-sports (accessed 1/24/17)
- Coase, R. H., "The Problem of Social Cost," *The Journal of Law & Economics* III, (1960)
- Coase, R.H., "Industrial Organization: A Proposal for Research," Chapter 4 in Policy Issues and Research Opportunities in Industrial Organization, Fiftieth Anniversary Colloquium III, Economic Research: Retrospect and Prospect, edited by Victor R. Fuchs (New York: National Bureau of Economic Research, 1972)
- Colander, David C., *Microeconomics, 10th ed.* (New York: McGraw-Hill, 2016)
- Conference Awards and Scholarships, https://pac-12.com/content/awards (accessed 3/11/17)
- Conference Awards, http://sunbeltsports.org/sports/2014/1/8/ConferenceAwards.aspx? (accessed 3/11/17)
- Cost of Attendance, https://fafsa.ed.gov/help/costatt.htm (accessed 3/14/17)
- Crowley, Joseph N., "*In the Arena*"
- Davies, Robin, "How To Boost Staff Retention", *People Management* 7, no. 8 (2001)
- Distributions, http://www.ncaa.org/about/resources/finances/distributions (accessed 3/13/17)
- Division I Academic Progress Rate (APR), http://www.ncaa.org/about/resources/research/division-i-academic-progress-rate-apr (accessed 2/27/17)
- Division I Committee on Academics, http://www.ncaa.org/governance/committees/division-i-committee-academics (accessed 3/18/17)
- Division I student-athletes still making gains in APR, http://www.ncaa.org/about/resources/media-center/news/division-i-student-athletes-still-making-gains-apr (accessed 3/14/17)
- Employment Projections, https://www.bls.gov/emp/ep_chart_001.htm (accessed 2/3/17)
- Evans, David S., The Antitrust Economics of Multi-Sided Platform Markets, *Yale Journal on Regulation* 20, issue 2, article 4 (2003)
- Ex-CBS Sports president: College sports TV ratings could decline 15-20% if players are paid," http://www.al.com/sports/index.ssf/2013/12/ex-cbs_sports_president_colleg.html (accessed 3/17/17)
- Facilities Management, http://www.ncaa.org/governance/facilities-management (accessed 1/31/17)
- Fizel, John and Timothy Smaby, "Participation in Collegiate Athletics and Academic Performance," Chapter 10 in *Economics of College Sport*, edited by John Fizel and Rodney Fort. (Westport: Praegar Publishers, 2004)
- Fleisher III, Arthur A., Brian L. Goff, and Robert D. Tollison, *The National Collegiate Athletic Association: A Study in Cartel Behavior.* (Chicago: University of Chicago Press, 1992) (hereafter, "Fleisher, Goff, and Tollison")

**Highly Confidential – Counsel Only**

- Goff, Brian "Effects of University Athletics on the University: A Review and Extension of Empirical Assessment," Chapter 5 in *Economics of College Sport,* edited by John Fizel and Rodney Fort. (Westport: Praeger Publishers, 2004)
- Gove, Philip Babcock (ed.) and The Merriam-Webster Editorial Staff, *Webster's Third New International Dictionary of the English Language Unabridged* (Springfield: Merriam-Webster Inc., 1986)
- Greenstein, Teddy, "NCAA puts number on academic reform," *Chicago Tribune*, March 1, 2005
- Greenstone, Michael and Adam Looney, "Where is the Best Place to Invest $102,000 -- in Stocks, Bonds, or a College Degree?" The Hamilton Project of the Brookings Institution, June 25, 2011
- Harrington, Jr., Joseph E. "How Do Cartels Operate?" *Foundations and Trends in Microeconomics* 2, no. 1 (2006)
- History of Faculty Involvement in Collegiate Athletics, http://www.ncaa.org/sites/default/files/History+of+Faculty+Involvement_final.pdf (accessed 3/15/17)
- Hosick, Michelle B., "Autonomy schools adopt cost of attendance scholarships," http://www.ncaa.org/about/resources/media-center/autonomy-schools-adopt-cost-attendance-scholarshipshttp://www.ncaa.org/about/resources/media-center/autonomy-schools-adopt-cost-attendance-scholarships (accessed 3/14/17)
- Hosick, Michelle B., "Board adopts new Division I structure," http://www.ncaa.org/about/resources/media-center/news/board-adopts-new-division-i-structure (accessed 12/27/16)
- http://connect.al.com/user/jsolomon/posts-9.html (accessed 3/17/17)
- http://www.ohiostatebuckeyes.com/sports/m-footbl/mtt/urban_meyer_789606.html (accessed 3/19/17)
- https://www.youtube.com/watch?v=BV110MrVpRY (accessed 3/21/17)
- Humphreys, Brad R. and Jane E. Ruseski, "Monitoring Cartel Behavior and Stability: Evidence from NCAA Football," *Southern Economic Journal* 75, issue 3 (2009)
- Hyman, Jackie and Mathew Van Jura, "Elite Collegiate Athletics and the Academy: Criticisms, Benefits, and the Role of Student Affairs," *The Vermont Connection* 30 (2009): 42-52
- J. Sternberg, "College Athletics: Necessary, Not Just Nice To Have," http://www.nacubo.org/Business_Officer_Magazine/Business_Officer_Plus/Bonus_Materia l/College_Athletics_Necessary_Not_Just_Nice_to_Have.html (accessed 1/31/17)
- James, Jonathan, "The College Wage Premium," *Economic Commentary*, Federal Reserve Bank of Cleveland, Number 2012-10, August 8, 2012.
- Judson, Kimberly M., Timothy W. Aurand, Linda Gorchels, and Geoffrey L. Gordon, "Building a University Brand from Within: University Administrators' Perspectives of Internal Branding," *Services Marketing Quarterly* 30, no. 1 (2008)
- Kahn, Lawrence M., "Markets: Cartel Behavior and Amateurism in College Sports," *The Journal of Economic Perspectives* 21, no. 1 (2007)
- Keith Richard, ULM basketball survive NCAA APR hell and are thriving, http://www.nola.com/ragincajuns/index.ssf/2015/03/keith_richard_ulm_basketball_s.ht ml (accessed 3/14/17)
- Levenstein, Margaret C. and Valerie Y. Suslow, "What Determines Cartel Success?" *Journal of Economic Literature* 44 (2006)

**Highly Confidential – Counsel Only**

- Long, James E. and Steven B. Caudill, "The Impact of Participation in Intercollegiate Athletics on Income and Graduation," *The Review of Economics and Statistics* 73, issue 3 (1991)
- Lowrie, Anthony, "Branding higher education: Equivalence and difference in developing identity", *Journal of Business Research* 60 (2009): 990-9
- Luehring, Frederick W., "XIV. The National Collegiate Athletic Association," *Journal of Health and Physical Education* 18, no. 10 (1947): 707-9, 751-3
- *Market Definition In Antitrust: Theory And Case Studies*, (American Bar Association, 2012)
- McKenzie, Richard B., and E. Thomas Sullivan, "Does the NCAA Exploit College Athletes-An Economics and Legal Reinterpretation," *The Antitrust Bulletin* 32 (1987)
- Melewar, T.C. and Sibel Akel, "The role of corporate identity in the higher education sector: A case study," *Corporate Communications: An International Journal* 10, issue 1 (2005): 41-57
- Membership, http://www.ncaa.org/about/who-we-are/membershiphttp://www.ncaa.org/about/who-we-are/membership (accessed 1/3/17)
- Mennell, James, "The Service Football Program of World War I: Its Impact on the Popularity of the Game," *Journal of Sport History* 16, no. 3 (1989)
- Metro is the most-read free daily newspaper in New York, http://www.metro.us/local/metro-is-the-most-read-free-daily-newspaper-in-new-york/tmWmkr---7eGwFMneRsU2 (accessed 3/15/17)
- Moran, Malcolm, "N.C.A.A. Has to Work Out Details of Its New Structure," *New York Times*, January 12, 1997
- Mountain West Awards, http://www.themw.com/page/mw_awards (accessed 3/17/17)
- NBA breaks all-time attendance record for second consecutive season, pr.nba.com/nba-breaks-time-attendance-record-second-consecutive-season (accessed 3/15/17)
- NBA D-League Sets Single-Season Records During 2015-16 Season, http://dleague.nba.com/news/nba-dleague-records-2015-16-season (accessed 3/15/17)
- NBA Frequently Asked Questions, http://www.nba.com/news/faq (accessed 3/18/17)
- NCAA Addresses Academic Progress Issues, http://www.santaclarabroncos.com/general/2003-04/releases/043004aaa.html (accessed 2/27/17)
- NCAA After the Game Career Center, http://www.ncaa.org/student-athletes/former-student-athlete/ncaa-after-game-career-center (accessed 3/20/17)
- NCAA committees, http://www.ncaa.org/governance/committees (accessed 2/3/17)
- NCAA Division I, http://www.ncaa.org/about?division=d1 (accessed 12/27/16)
- NCAA Division III, http://www.ncaa.org/about?division=d3 (accessed 2/3/17)
- NCAA Eligibility Center, 2016-17 Guide for the College-Bound Student Athlete
- NCAA Partners With Local Universities And Schools On Literacy Program, http://www.ncaa.org/about/resources/media-center/news/ncaa-partners-local-universities-and-schools-literacy-program (accessed 2/1/17)
- NCAA President Mark Emmert, http://www.ncaa.org/about/who-we-are/office-president/ncaa-president-mark-emmert (accessed 1/3/17)
- NCAA Sports Sponsorship, http://web1.ncaa.org/onlineDir/exec2/sponsorship (accessed 01/20/17)
- News Media, http://www.readthehook.com/media (accessed 3/15/17)
- *New-York Tribune,* "For Reform in Football," December 13, 1905

**Highly Confidential – Counsel Only**

- NFL Sees Small Regular-Season Attendance Decline; Titans, Rams Down Sharply At Home, http://www.sportsbusinessdaily.com/Daily/Issues/2016/01/05/Research-and-Ratings/NFL-gate.aspx (accessed 3/15/17)
- Norris, Edwin M. (ed.) et al., "Football reform: Henry B. Thompson '77 on the Present Evils of the Game," *The Princeton Alumni Weekly* VI, no. 3 (1905)
- O'Keeffe, Patrick, "A Sense of Belonging: Improving Student Retention", *College Student Journal* 7, no.4 (2013)
- Ohio State Athletics Introduces the Wolstein Leadership Academy, http://www.ohiostatebuckeyes.com/genrel/042815aaa.html (accessed 3/19/17)
- Ohio State Department of Athletics, "2014-15 Year in Review," http://grfx.cstv.com/schools/osu/graphics/pdf/1415year-in-review.pdf (accessed 3/16/17)
- Ohio State Records Graduation Success Rate of 87 Percent, http://www.ohiostatebuckeyes.com/genrel/111516aac.html (accessed 3/16/17)
- Ohio State Student-Athletes Post Graduation Success Rate of 89 Percent, http://www.ohiostatebuckeyes.com/genrel/110415aae.html (accessed 3/16/17)
- Ohio State Student-Athletes Post Graduation Success Rate of 89 Percent, http://www.ohiostatebuckeyes.com/genrel/102814aae.html (accessed 3/16/17)
- Organizations Directory, https://arizona.collegiatelink.net/organizations (accessed 1/24/17)
- Osborne, Evan, "Motivating College Athletics," Chapter 4 in *Economics of College Sport*, edited by John Fizel and Rodney Fort. (Westport: Praegar Publishers, 2004)
- Pelnar, Gregory J., *Antitrust Analysis of Sports Leagues* (2007)
- Perman, Roger, Yue Ma, James McGilvray and Michael Common, *Natural Resource and Environmental Economics, 3rd ed.* (Harlow: Pearson Education, 2003)
- Playing It Forward, http://www.ncaa.org/about/resources/media-center/feature/playing-it-forward (accessed 2/1/17)
- Potuto, Josephine (Jo) R. and James O'Hanlon, "National Study of Student Athletes Regarding Their Experiences as College Students," National Collegiate Athletic Association Publications (2006)
- Robinson, Joan, *The Economics of Imperfect Competition, 2nd ed.* (New York: St. Martin's Press, 1969)
- Rochet, Jean-Charles and Jean Tirole, Two-Sided Markets: An Overview, *Working paper, Institut d'Economie Industrielle* (2004)
- *Salt Lake Herald*, "Football Rules Made At Last," April 2, 1906
- Samuel, Michael O. and Crispen Chipunza, "Employee Retention And Turnover: Using Motivational Variables As A Panacea," *African Journal of Business Management* 3, no.8 (2009)
- Samuelson, Paul A. and William D. Nordhaus, *Economics, 12th ed.* (New York: McGraw-Hill Book Company, 1985)
- Samuelson, Paul A., *Economics: An Introductory Analysis, 8th ed.* (New York: McGraw-Hill, 1970)
- Sanderson, Allen R. and John J. Siegfried, "The Case for Paying College Athletes," *Journal of Economic Perspectives* 29, no. 1 (2015)
- Sandy, Robert and Peter Sloane, "Why Do U.S. Colleges Have Sports Programs?" Chapter 6 in *Economics of College Sport*, edited by John Fizel and Rodney Fort. (Westport: Praegar Publishers, 2004)

Highly Confidential – Counsel Only

- Services for Spider Student-Athletes, University of Richmond Athletics, http://www.richmondspiders.com/ViewArticle.dbml?DB_OEM_ID=26800&ATCLID=20925 0482 (accessed 1/9/17)
- Shulman, James L. and William G. Bowen, *The Game of Life*. (Princeton: Princeton University Press, 2001)
- Smart, John C., "A Causal Model of Faculty Turnover Intentions," *Research in Higher Education* 31, no. 5 (1990): 405-24
- Soshnick, Scott, "Wall Street Hires Losers Turned Winners After College Athletics," *Bloomberg*, October 16, 2013
- Sotiriadou, Kalliopi (Popi) and David Shilbury, "Australian Elite Athlete Development: An Organisational Perspective," *Sport Management Review* 12 (2009)
- Sports Fandom and the NCAA Student-Athlete, http://www.ncaa.org/health-and-safety/sports-fandom-and-ncaa-student-athlete (accessed 3/14/17)
- Stephen M. Ross Academic Center, http://www.mgoblue.com/facilities/ross-academic-center.html (accessed 3/19/17)
- The Division III Experience, http://www.ncaa.org/division-iii-experience (accessed 3/14/17)
- The evolution of women's college sports, http://usatoday30.usatoday.com/sports/college/20010927-women-timeline.htm (accessed 12/27/16)
- The NCAA Budget: Where the Money Goes," http://www.ncaa.org/health-and-safety/sport-science-institute/ncaa-budget-where-money-goes (accessed 3/21/17)
- The Sveriges Riksbank Prize in Economic Sciences in Memory of Alfred Nobel 1991, https://www.nobelprize.org/nobel_prizes/economic-sciences/laureates/1991/ (accessed 12/29/16)
- The UH Image Campaign, http://www.uh.edu/learningleading/results.htm
- The value of college sports, http://www.ncaa.org/student-athletes/value-college-sports (accessed 12/27/16)
- Title IX Frequently Asked Questions, http://www.ncaa.org/about/resources/inclusion/title-ix-frequently-asked-questions#title (accessed 3/21/17)
- Tucker, Irvin B., "A reexamination of the effect of big-time football and basketball success on graduation rates and alumni giving rates," *Economics of Education Review* 23 (2004)
- UK Student-Athletes Make GPA Gains, https://uknow.uky.edu/campus-news/uk-student-athletes-make-gpa-gains (accessed 2/26/17)
- University of Idaho Student-Athlete Handbook, http://www.govandals.com/documents/2016/7/13/stu%20ath%20handbook.pdf?id=31 66 (accessed 3/20/17)
- *US Department of the Treasury and Department of Education*, "The Economics of Higher Education," December, 2012
- Vandal Scholar Athlete of the Month, http://www.govandals.com/sports/2016/1/28/vandal_scholar_athlete_of_the_month.aspx (accessed 3/20/17)
- Vozza, Stephanie, "Why Your Next Employee Should Be A Former Student Athlete," *Fast Company*, April 10, 2014
- What Is The NCAA? http://www.ncaa.org/about/resources/media-center/ncaa-101/what-ncaa (accessed 1/3/17)

**Highly Confidential – Counsel Only**

- Whelan, Susan and Markus Wohlfeil, "Communicating brands through engagement with 'lived' experiences," *Brand Management* 13, no. 4/5 (2006): 313-29
- White Jr., Gordon S., "N.C.A.A Cuts Athletes' Aid," *New York Times*, August 15, 1975
- Wolken, Dan, "NCAA Board approves Division I autonomy proposal," http://www.usatoday.com/story/sports/college/2014/08/07/ncaa-board-of-directors-autonomy-vote-power-five-conferences/13716349/ (accessed 3/19/17)
- Yankah, Ekow N., "Why N.C.A.A. Athletes Shouldn't Be Paid," *The New Yorker*, October 14, 2015
- You're Not Going to Disney World, https://www.insidehighered.com/news/2012/06/21/ncaa-bans-teams-postseason-low-apr-scores (accessed 3/15/17)

## OTHER

- Brown, Timothy, Letter dated "November 2016" to Dr. & Mrs. Kenneth G. Elzinga
- NCAA *Division I Manual 2004-05*, National Collegiate Athletic Association, Indianapolis, IN
- NCAA *Division I Manual August 2016-17*, National Collegiate Athletic Association, Indianapolis, IN
- NCAA Financial Statements 2015-16
- NCAA Sports Sponsorship and Participation Rates Report: Student-Athlete Participation 1981-82 – 2015-16
- NCAA, "Football Championship Subdivision Records," 2013
- NCAA, "Student-Athlete Academic Support Services at Division I Institutions," September 2009 "NCAA Survey"
- NCAA, "Student-Athlete Academic Support Services at Division I Institutions-Preliminary Results," September 2009
- Ohio State Mission Statement
- The National Collegiate Athletic Association, "Division I Academic Reform: Overview (Revised October 2003)" October 9, 2003
- Tinto, Vincent and John Cullen, "Dropout in Higher Education: A Review and Theoretical Synthesis of Recent Research," Office of Planning, Budgeting, and Evaluation of the U.S. Office of Education (1973)

## LEGAL FILINGS

- Consolidated Plaintiffs' "Consolidated Amended Complaint" (*In Re: National Collegiate Athletic Association Athletic Grant-In-Aid Cap Antitrust Litigation*, No. 4:14-md-2541-CW (07/11/2014, Wilken, J.) (MDL Dkt. No. 60))
- *Jenkins* Plaintiffs' "Second Amended Complaint – Class Action Seeking Injunction" (*In Re: National Collegiate Athletic Association Athletic Grant-In-Aid Cap Antitrust Litigation*, Nos 4:14-md-02541-CW and 4:14-cv-02758-CW (08/13/2015, Wilken, J.) (MDL Dkt. No. 194)

## LEGAL OPINIONS

- *Brooke Group Ltd. v. Brown & Williamson Tobacco Corp.*, 509 U.S. 209 (1993)
- *Leegin Creative Leather Products, Inc., v. PSKS, Inc.*, 551 U.S. 877 (2007)
- *Matsushita v. Zenith Radio Corp.*, 475 U.S. 574 (1986)
- *NCAA v. Board of Regents*, 468 U.S. 95 (1984)
- *O'Bannon v. National Collegiate Athletic Association*, 802 F.3d 1049 (9th Cir. 2015)
- *O'Bannon v. National Collegiate Athletic Association*, 7 F.Supp.3d 955 (2014)

## Appendix D

### Evidence of the Value Placed on Amateurism by NCAA Member Schools

In this appendix I review additional evidence of the value that NCAA member schools attach to amateurism in their athletic programs. The evidence is organized to parallel the discussion in Section II.B of the report. The following examples are intended to be illustrative, not exhaustive.

### 1. The NCAA and its member institutions value student-athletes as members of the student body

The NCAA and its member institutions recognize the importance of student-athletes being students first. The NCAA and Division I Conferences present various awards to honor the academic success of student-athletes and sponsor scholarships to assist with the expenses of post-graduate education.[278]

- The Big 10 Conference states that its primary purpose is to "regulate intercollegiate athletics as institutional activities, to encourage sound academic practices for student athletics, and to establish harmonious intercollegiate relationships among member institutions."[279]

- The Mountain West Conference states that it is "committed to excellence in intercollegiate athletics, while promoting the academic missions of its member institutions. Progressive in its approach, the MW continues to cultivate opportunities for student-athletes to compete at the highest level, while fostering academic achievement and sportsmanship."[280]

- The Mid-American Conference mission statement states: ". . . the Mid-American Conference is an association of Universities dedicated to maximizing the academic, athletic and personal development of its student-athletes while competing at the NCAA's highest level. Consistent with the educational missions of its members, the MAC is dedicated to the principles of

---

[278] Some scholarships are funded wholly or in part by donors or corporate sponsors.

[279] BIGTEN-GIA 061677-725 at 699.

[280] MWC_GIA_075619-820 at 624-5.

sportsmanship, integrity, and diversity, offering opportunities for leadership development through participation in successful, highly competitive, broad-based programs."[281]

- The 2014-2015 Mid-American Conference Handbook emphasizes the importance of a student-athlete's educational experience and the role of coaches in helping to ensure that student-athletes succeed.[282]

    o "As role models, coaches should provide guidance to student-athletes that will help ensure success both on and off the fields and courts of play."[283]

- A presentation regarding the Southeastern Conference states that the "purpose of the Southeastern Conference is to assist its member institutions in the maintenance of programs of intercollegiate athletics which are compatible with the highest standards of education and competitive sports."[284] A former SEC student-athlete is quoted: "There are life skills learned from competition in a league where you are expected not only to win, but to serve and to study. You can't fake it in the Southeastern Conference."[285]

- The Western Athletic Conference's *Statement of Principles for Intercollegiate Athletics* states: "Student-athletes are first and foremost students at their respective institutions. Thus, they have responsibilities to comply with institutional policies and procedures to pursue academic excellence, and to make satisfactory progress toward degrees in the same manner and to the same extent as have other students."[286]

- The Atlantic Coast Conference (ACC) established the ACC Academic Consortium (ACCAC) to "leverage the athletic associations and identities among the 15 ACC universities in order to

---

[281] MAC_000967.

[282] MAC_000978-9.

[283] MAC_000978-9 at 9.

[284] SEC00293025-72 at 28.

[285] SEC00293025-72 at 32.

[286] WAC_GIA_000730-888 at 734.

**Highly Confidential – Counsel Only**

enrich the educational missions of member universities. The intent is to impact all students, not only student athletes. The strategy is to sponsor activities and programs that cannot be accomplished by any one university, and are best supported by universities-acting-in-concert. By directly supporting academic initiatives, the ACC reinforces its conviction that strong academics and strong athletics go together, and it projects this message to its many stakeholders."[287]

- ○ "The ACC is continuing initiatives aimed at enhancing the academic performance and the leadership skills of its student-athletes. The ACC's Academic Consortium, guided by university provosts, reflects the conference's strong commitment to the centrality of studies. The Council of Presidents has earmarked ACC revenue to fund several academic initiatives."[288]

- The University of Idaho Student-Athlete Handbook states: "Our highest priority is to enhance the educational growth of our young men and women. The primary purpose of the athletic department shall be to provide a successful, quality, competitive intercollegiate athletic experience for University of Idaho students which will enrich their lives, provide the necessary training ground for life growth, enhance the image of the institution and build upon the academic mission of the university."[289]  The Handbook advises student-athletes that their "first responsibility should be to your education."[290]

- The University of Richmond Department of Athletics notes the importance of student-athletes fulfilling their academic responsibilities in its General Policies and Performance Expectations

---

[287] "ACC Academic Consortium (ACCAC)," http://www.theacc.com/page/accac (accessed 3/14/17).

[288] ACC-GIA132939-40 at 40.

[289] University of Idaho Student-Athlete Handbook, http://www.govandals.com/documents/2016/7/13//stu%20ath%20handbook.pdf?id=3166 (accessed 3/20/17), p. 2.

[290] University of Idaho Student-Athlete Handbook, http://www.govandals.com/documents/2016/7/13//stu%20ath%20handbook.pdf?id=3166 (accessed 3/20/17), p. 6.

Highly Confidential – Counsel Only

for Student-Athletes: "University of Richmond student-athletes are expected to represent the University, the Department of Athletics, their teams and themselves in a manner consistent with the vision, mission and values of the University and the Department of Athletics in all their academic, athletic and social endeavors during their tenure with the institution. ... Student-athletes shall demonstrate good sportsmanship, honesty, and integrity at all times and shall not make or assist others in engaging in dishonest acts or statements. Additionally, student-athletes shall not allow their participation in intercollegiate athletics to interfere unnecessarily with their educational responsibilities."

- In "talking points" regarding the 2011 Graduation Success Rate, Walter Harrison, Chair of the NCAA Committee on Academic Performance and President of the University of Hartford stated, "Student-athletes are students first, and we want to see them do better each year."[291]

- Former University of Kentucky basketball Coach Orlando "Tubby" Smith once stated, "When we bring a young man into our program, we expect him to perform in the classroom first and on the hardwood second."[292]

- A draft version of the opening statement to be made by Commissioner Larry Scott at a Pac-12 men's basketball press conference in 2014 addressed the detrimental effect of "one and done" college basketball players on the educational mission of schools.[293] "Another issue affecting college basketball is 'One and Done.' Especially at Pac-12 institutions where excellence is measured both on the court and in the classroom, this is detrimental to the essential academic missions of our institutions. ... our universities expect student-athletes to pursue academic

---

[291] NCAAGIA001928623-7 at 23 and 25-6.

[292] "Center for Academic and Tutorial Services," http://www.ukathletics.com/news/genrel_121300aaa_html (accessed 3/18/17).

[293] PAC12GIA_00024126-32 at 27. NBA draft rules have led to what have been referred to as "one and done" players - players who enroll in college for just one year and play basketball and then declare for the NBA draft. In order to be eligible for the NBA draft, a player must be at least 19 years old and more than one year removed from high school ("NBA Frequently Asked Questions," http://www.nba.com/news/faq (accessed 3/18/17)).

**Highly Confidential – Counsel Only**

rigor, hold them to the same high standards and work to ensure they have all the same opportunities. The vast majorities of our student-athletes are successful and appropriately serve as true models of discipline and hard work across our campuses. . . . if a kid wants to go professional immediately after high school, I am fine with that . . . But if they commit to a Pac-12 university, we want them to commit for a full college education."[294]

- "The NCAA awards 174 postgraduate scholarships each year, 87 for men and 87 for women. The scholarships are awarded to student-athletes who excel academically and athletically and who are in at least their last year of intercollegiate athletics competition. One-time grants of $7,500 each are equally divided among fall, winter and spring sports. During each sports season, a total of 58 postgraduate scholarships are available -- 29 for men and 29 for women."[295] The NCAA also offers the Walter Byers Postgraduate Scholarship and the Jim McKay Scholarship.[296]

  - "The Walter Byers Postgraduate Scholarship Program was established in 1988 in honor of former NCAA Executive Director Walter Byers to recognize and encourage excellence in academic performance by student-athletes. The scholarship is awarded annually to one male and one female in recognition of outstanding undergraduate achievement and potential for success in graduate study and their chosen career field. . . . The annual stipend is $24,000 and is renewable for a second year if the recipient is in good academic standing."[297]

  - "In 2008, the NCAA established the Jim McKay Scholarship Program as a means of recognizing the immense contributions and legacy of pioneer sports journalist Jim

---

[294] PAC12GIA_00024126-32 at 27.

[295] NCAAGIA00410434-533 at 476.

[296] NCAAGIA00410434-533 at 475.

[297] NCAAGIA00410434-533 at 475.

McKay. Under this program, one male and one female student-athlete are annually awarded a $10,000 scholarship in recognition for outstanding academic achievement and potential to make a major contribution in the sports communication industry."[298]

- The Big Ten offers several academic awards for student-athletes.[299]

  o Big Ten Medal of Honor

    "One of the most prestigious conference awards in college athletics, the Big Ten Medal of Honor was first awarded in 1915 to one student-athlete from the graduating class of each university who had 'attained the greatest proficiency in athletics and scholastic work.' It was the first award in intercollegiate athletics to demonstrate support for the educational emphasis placed on athletics and was acclaimed throughout the nation, and in particular by the NCAA 'as one of the significant gestures yet made in college sports.' ... In 2014, the conference will celebrate the 100th anniversary of this prestigious award."[300]

  o Academic All-Big Ten Conference Honors

    The Big Ten awards Academic All-Big Ten Honors to student-athletes based on their sports seasons (fall, winter, spring, or "at-large").[301] "To be eligible for Academic All-Big Ten selection, student-athletes must be letter winners who are in at least their second academic year at their institution and carry a cumulative grade-point average of 3.0 or higher."[302]

  o Big Ten Distinguished Scholar Award

---

[298] NCAAGIA00410434-533 at 475.

[299] BIGTEN-GIA 063768.

[300] BIGTEN-GIA 241584-600 at 586.

[301] BIGTEN-GIA 063777.

[302] BIGTEN-GIA 063777. See also BIGTEN-GIA 210503-4 (May 29, 2013 Conference Press Release announcing Spring and "At-Large" Academic All-Conference Honorees).

D-6

**Highly Confidential – Counsel Only**

"In February 2008, the [Big Ten] Faculty Representatives established a new conference academic recognition. Similar to the Academic All-Big Ten award, student-athletes who are letter winners and in at least their second year in residence at the institution would be eligible for selection if they earned a minimum grade-point average (GPA) of 3.7 or higher for the previous academic year. ... The 3.7 GPA benchmark is designed to include approximately the top 10% of all eligible student athletes."[303]

ᴏ Big Ten Postgraduate Scholarship Award

The Big Ten Postgraduate Scholarship Awards are "annual postgraduate scholarships to be awarded to 24 student-athletes beginning with the current academic year. The conference will award $7,500 scholarships based primarily on academic achievements to one male and one female student-athlete from each of its 12 institutions who plan to continue their education. ... Student-athletes must be in their final season of eligibility, maintain at least a 3.2 grade point average, demonstrate leadership qualities, serve as excellent role models and intend to continue their academic work beyond their baccalaureate degree at a graduate degree program."[304]

- The Big 12 offers several academic awards for student-athletes.[305] A 2015-16 Conference Handbook describes the awards as follows.[306]

  o Conference Medal Awards

---

[303] BIGTEN-GIA 050514-5 at 5. See also BIGTEN-GIA 210487. (July 10, 2013 Conference Press Release announcing 2012-13 Distinguished Scholar Award recipients "who have earned a minimum grade-point average (GPA) of 3.7 or higher for the previous academic year.")

[304] BIGTEN-GIA 083923. See also BIGTEN-GIA 083924; BIGTEN-GIA251324-48 at 27.

[305] BIG12-GIA_00053569-640 at 609-10.

[306] BIG12-GIA_00053569-640 at 609-10.

Highly Confidential – Counsel Only

"Each Member Institution may award Conference Medal Awards annually to the male and female student-athletes who have completed their athletic eligibility and who have made the most outstanding record in athletics and scholarship."[307]

o Dr. Prentice Gautt Postgraduate Scholarship

"A Dr. Prentice Gautt Postgraduate Scholarship in the amount of $10,000 each shall be awarded annually to both a female and male scholar-athlete recommended by each Member Institution and confirmed by the Dr. Prentice Gautt Student-Athlete Welfare Committee."[308]

o Conference Honor Roll Program

"The Conference shall sponsor a Commissioner's Honor Roll, which shall recognize all varsity student-athletes of a given semester who have achieved a 3.000 grade-point average or better for the that [sic] academic semester."[309]

o Dr. Gerald Lage Academic Achievement Award

". . . the Dr. Gerald Lage Academic Achievement Award shall annually recognize student-athletes that meet the following criteria: letter award winner, minimum of one academic year in residence at the institution and 100 hours of earned credit with a cumulative grade-point average of 3.80 or higher."[310]

- The Mountain West Conference offers three academic awards for student-athletes.[311]

    o Scholar-Athlete of the Year Award

    "Established by the Mountain West Joint Council in 1999, the Scholar-Athlete of the Year Award is the highest honor presented to a student-athlete by the league.  The award is

---

[307] BIG12-GIA_00053569-640 at 609-10.

[308] BIG12-GIA_00053569-640 at 610.

[309] BIG12-GIA_00053569-640 at 610.

[310] BIG12-GIA_00053569-640 at 610.

[311] "Mountain West Awards," http://www.themw.com/page/mw_awards (accessed 3/17/17).

## Highly Confidential – Counsel Only

bestowed annually to one male and one female who best exemplify the term 'student-athlete' by achieving excellence in academics, athletics and community involvement. Criteria for the Scholar-Athlete of the Year award requires [sic] that nominees demonstrate leadership and exhibit good character and conduct on and off the playing field. In addition to athletic achievement, candidates must have exhausted their athletic eligibility and maintained a minimum 3.5 grade point average. The winners each receive a post-graduate scholarship."[312]

○ Scholar-Athlete Award

"Presented annually, the Mountain West Scholar-Athlete Award is one of the highest academic honors bestowed by the Conference. To be eligible for selection, student-athletes must have completed at least two academic terms at the member institution, while maintaining a cumulative grade point average of 3.5 or better, and have participated in varsity competition in an MW-sponsored sport."[313]

○ Academic All-Conference Award

"The Mountain West Academic All-Conference Award is presented following the fall and spring semesters. To be eligible for selection, student-athletes must have completed at least one academic term at a member institution while maintaining a cumulative grade point average of 3.0 or better, and are starters or significant contributors on their athletic teams."[314]

• The Pac-12 Conference offers the following academic awards for student-athletes.[315]

---

[312] MWC_GIA_075619-820 at 632.

[313] "Mountain West Awards," http://www.themw.com/page/mw_awards (accessed 3/17/17).

[314] "Mountain West Awards," http://www.themw.com/page/mw_awards (accessed 3/17/17).

[315] "Conference Awards and Scholarships," https://pac-12.com/content/awards (accessed 3/11/17).

**Highly Confidential – Counsel Only**

o   "The Pac-12 Conference established the Pac-12 Scholar-Athlete of the Year Awards in 2007-08 to recognize its outstanding senior student-athletes. A Scholar-Athlete of the Year will be named in each of the Pac-12's 23 sponsored sports. The nomination criteria are: senior (in athletics eligibility) on track to receive a degree; cumulative grade point average of 3.0 or higher; participation in at least 50% of the scheduled contests in the sport; and a minimum of one year in residence at the institution."[316]

o   "In 1999, the Conference created a postgraduate scholarship program to honor outstanding student-athletes from its member institutions who also are outstanding scholars. Each year, the Conference awards 24 scholarships of $9,000 each to student-athletes who have excelled academically and athletically and have completed their intercollegiate athletics eligibility. Each Pac-12 institution selects two student-athlete recipients, one man and one woman, through its institutional selection process."[317]

o   "A Conference Medal is awarded annually to each member institution's outstanding senior male and female student-athlete based on the exhibition of the greatest combination of performance and achievement in scholarship, athletics and leadership. In 2009, the Conference renamed the award the Tom Hansen Conference Medal in honor of Hansen, who retired at the end of June 2009 after serving for 26 years as commissioner of the Conference."[318]

o   "The Woman of the Year Award honors graduating student-athletes who have distinguished themselves throughout their collegiate careers in the areas of academic achievement, athletics excellence, community service and leadership. Winners of the

---

[316] "Conference Awards and Scholarships," https://pac-12.com/content/awards (accessed 3/11/17).
[317] "Conference Awards and Scholarships," https://pac-12.com/content/awards (accessed 3/11/17).
[318] "Conference Awards and Scholarships," https://pac-12.com/content/awards (accessed 3/11/17).

**Highly Confidential – Counsel Only**

Conference Woman of the Year award go on to be nominated for NCAA Woman of the Year."[319]

- The Southeastern Conference awards 28 scholarships each year, including two $15,000 H. Boyd McWhorter Scholar-Athlete of the Year awards and 26 $7,500 SEC Postgraduate Scholarship Awards.[320] "The purpose of these awards is to emphasize, at the institutional and conference levels, the importance of academic as well as athletic achievement by SEC student-athletes. Accordingly, each institution is responsible for selecting the outstanding male and outstanding female student-athlete on its campus. The two student-athletes selected from each campus are considered as their institution's nominees for the H. Boyd McWhorter Scholar-Athlete of the Year awards. The SEC Faculty Athletics Representative Committee selects one male and one female for the H. Boyd McWhorter Scholar-Athlete of the Year. All other nominees are selected SEC Postgraduate Scholarship Award Recipients."[321]

- The Sun Belt Conference offers three academic awards for student-athletes.[322]

  o Conference Medallion

    "Any Sun Belt Conference student-athlete who successfully completes graduation requirements at a member institution shall be awarded a graduation Medallion awarded by the Conference. The Conference Medallion may be worn during graduation ceremonies."[323]

  o Commissioner's All-Academic List

---

[319] "Conference Awards and Scholarships," https://pac-12.com/content/awards (accessed 3/16/17).

[320] SEC00017611-9 at 4.

[321] SEC00017611-9 at 4.

[322] "Conference Awards," http://sunbeltsports.org/sports/2014/1/8/ConferenceAwards.aspx? (accessed 3/11/17).

[323] "Conference Awards," http://sunbeltsports.org/sports/2014/1/8/ConferenceAwards.aspx? (accessed 3/11/17).

**Highly Confidential – Counsel Only**

"The Commissioner's All- Academic List is a compilation of all student-athletes to be honored for academic achievement. Student-athletes must attain a minimum 3.5 grade point average (based on a 4.0 scale) during the current academic year not as a cumulative average."[324]

o   Academic Honor Roll

"The Academic Honor Roll is a compilation of all student-athletes to be honored for academic achievement. Student-athletes must attain a minimum 3.5 grade point average (based on a 4.0 scale) during the current academic year not as a cumulative average."[325]

- The 2015 Sun Belt Conference Media Guide notes that the University of Louisiana at Monroe (ULM) "recently honored the first 66-person class in the 'Maroon and Gold Society', [sic] which is an honors program for ULM student-athletes based on their academic success."[326]

- The Western Athletic Conference grants three different academic awards for student-athletes.[327]

o   Academic All-Conference Award

"Student-athletes who have completed one academic year at the member institution, have a 3.0 or better cumulative grade point average, have participated in at least fifty (50) percent of the team's contests, with the exception of starting baseball and softball pitchers who shall have participated in at least twenty-five (25) percent of the team's

---

[324] "Conference Awards," http://sunbeltsports.org/sports/2014/1/8/ConferenceAwards.aspx? (accessed 3/11/17).

[325] "Conference Awards," http://sunbeltsports.org/sports/2014/1/8/ConferenceAwards.aspx? (accessed 3/11/17).

[326] SB_GIA_137402-559 at 464.

[327] WAC_GIA_000730-888 at 766.

**Highly Confidential – Counsel Only**

contests, and are nominated by the institution's faculty athletics representative after consultation with the head coach, shall be named Academic All-Conference."[328]

o   Scholar-Athlete Award

"Student-athletes who have completed two semesters or three quarters at the certifying institution, have a 3.0 or better cumulative grade point average, or 3.0 grade point average for the past two semesters or three quarters, shall receive the Scholar-Athlete Award."[329]

o   Stan Bates Award (Student-Athlete Award)

"In honor of former Commissioner Stan Bates (1971-80), the Conference office shall circulate annually to each member institution nomination forms for the Stan Bates Award. These nomination forms shall require one-page recommendation letters from the athletics director, the coach, and a faculty member and should comment on each candidate as a student, an athlete and a person. The awards shall signify the most outstanding male and female student-athletes who have a 3.0 cumulative grade point average or better and who are in their final year of eligibility. The awards shall include a \$3,000 postgraduate scholarship with a five-year time limitation from the September following its presentation for acceptance or refusal."[330]

Division I Conferences and universities want student-athletes to embody the educational missions of their schools, and they celebrate student-athletes' academic success and community service. They also take steps to ensure student-athletes are fully integrated members of the campus community and have the opportunity to participate in a variety of activities.

---

[328] WAC_GIA_000730-888 at 766.

[329] WAC_GIA_000730-888 at 766.

[330] WAC_GIA_000730-888 at 766.

**Highly Confidential – Counsel Only**

- An ACC press release dated May 27, 2015 states, "Athletic teams from Atlantic Coast Conference institutions continue to be among the top percentage of those at Division I colleges and universities that meet standards and excel academically, as reflected by Academic Progress Rate (APR)[331] data released by the NCAA on Wednesday. … All 58 ACC football, men's basketball, women's basketball and baseball programs exceeded the required 930 APR average. … 12 women's basketball teams are above the national 973 APR average. 11 men's basketball teams are above the Division I 961 APR average. 12 ACC football teams are above the FBS 960 APR average."[332]

- An ACC press release dated April 20, 2016 states, "Athletic teams from Atlantic Coast Conference institutions continue to be among the top percentage of those at Division I colleges and universities that meet standards and excel academically, as reflected by Academic Progress Rate (APR) data released by the NCAA on Wednesday. … All 58 ACC football, men's basketball, women's basketball and baseball programs exceeded the required 930 APR average. In the sport of football, 12 of the conference's 14 teams achieved an APR higher than the average rate of 964 in the sport. In men's basketball, 14 of the 15 conference teams achieved an APR higher than the average rate of 964 in the sport. In women's basketball, 11 of the conference's 15 teams achieved an APR higher than the average rate of 978 in the sport."[333]

- The Southeastern Conference 2011-12 Review praises both the athletic and academic achievements of its student-athletes, as well as their commitment to community service.[334]

---

[331] "The APR, or Academic Progress Rate, holds institutions accountable for the academic progress of their student-athletes through a team-based metric that accounts for the eligibility and retention of each student-athlete for each academic term." ("Academic Progress Rate Explained: What is the APR and how is it calculated?" http://www.ncaa.org/aboutresources/research/academic-progress-rate-explained (accessed 2/27/17).

[332] ACC-GIA132931.

[333] ACC-GIA132932.

[334] SEC00193546-77 at 48 and 59-66.

**Highly Confidential – Counsel Only**

- ○ "... the SEC had 23 of its student-athletes earn first-team Capital One / CoSIDA Academic All-America status in 2010-11 - more than any other conference."[335]

- ○ "The SEC has had 12 student-athletes awarded NCAA Postgraduate Scholarships from fall and winter sports this season - more than any other conference."[336]

- ○ The review describes the achievements of the male and female student-athletes that were honoured with the H. Boyd McWhorter Scholar-Athlete of the Year Awards and lists the nominees.[337]

- ○ The review describes the achievements of the male and female student-athletes that were honoured with the Brad Davis Community Service Leader of the Year Awards and lists the nominees.[338]

- The 2015 Sun Belt Conference Football Media Guide highlighted community service activities in which student-athletes from several member schools participated.

  - ○ The Appalachian State women's basketball team travelled to Costa Rica where they spent time at Roblealto, a non-profit social service organization.[339]

  - ○ The Georgia State men's basketball team travelled to Costa Rica in August 2014 where they "held clinics for children and took part in a shoe distribution with the Samaritan's Feet Program."[340]

- The University of Idaho Academic Support Services Department developed the "Scholar Athlete of the month" program "in hopes of amplifying student-athlete recognition for all of their effort

---

[335] SEC00193546-77 at 48.

[336] SEC00193546-77 at 48.

[337] SEC00193546-77 at 59-62.

[338] SEC00193546-77 at 63-6.

[339] SB_GIA_137402-559 at 416.

[340] SB_GIA_137402-559 at 440.

throughout each semester."[341] The program recognizes a male and a female student-athlete each month "for their hard work, determination, and persistence towards academic goals."[342]

- The 2010 University of Kentucky Athletics Annual Report states: "Although a student-athlete is not required to participate in the community, it is highly encouraged, a call that hundreds of student-athletes are more than willing to answer. As of publication of this report, UK student-athletes had volunteered 2,037 hours in the community this athletics year, helping out everywhere from local hospitals, to the Hope Lodge, God's Pantry and more."[343]

- The 2010 University of Kentucky Athletics Annual Report noted that "UK football stars Danny Trevathan and Stuart Hines joined Phillips and athletics director Mitch Barnhart on a trip to Africa to introduce the game of American football and serve the people of Ethiopia by forming relationships and offering a week of humanitarian labor."[344]

- The successes of University of Kentucky student-athletes in the classroom and in extracurricular activities are highlighted at meetings of the Board of Directors. Notes from a meeting on December 14, 2015 state that "UK Athletics tied school records for graduation rates announced by the NCAA in November" and "UK's graduation success rate is 81 percent, tying last year's school record and continuing the trend of breaking or tying the mark for earning diplomas every year since the NCAA began charting graduation."[345] The same meeting notes mention that two football players were named "Academic All American" and one of those players was also a member the Allstate AFCA Good Works Team and SEC Community Service

---

[341] "Vandal Scholar Athlete of the Month,"
http://www.govandals.com/sports/2016/1/28/vandal_scholar_athlete_of_the_month.aspx (accessed 3/20/17).

[342] "Vandal Scholar Athlete of the Month,"
http://www.govandals.com/sports/2016/1/28/vandal_scholar_athlete_of_the_month.aspx (accessed 3/20/17).

[343] SEC00310491-505 at 493.

[344] SEC00310491-505 at 497.

[345] SEC00310711-4 at 1 and 3.

Highly Confidential – Counsel Only

Team.[346] A basketball player was named an NABC Good Works Team nominee for his commitment to community service.[347]

- The Ohio State University Department of Athletics publishes an annual "Year in Review" highlighting the academic achievements of student-athletes alongside their athletic achievements.[348] Press releases issued by the university note that the graduation rates among student-athletes at Ohio State exceed the national average for Division I athletic programs and often exceed the graduation rate of the general student-body.[349]

- Purdue publicizes the academic achievements of its student-athletes in the Purdue Athletics Student Services Annual Report.[350] For example, the 2013-2014 report recognized student-athletes who had made the "AD's Honor Roll" by attaining a GPA of at least 3.5 – the list included 15 members of the football team, 2 members of the men's basketball team, and 3 members of the women's basketball team for the fall semester.[351] There were 6 athletes recognized for earning the Durham Brother's Leadership Award, including one football player and one men's basketball player.[352]

- In September 2012, the Colorado State University Athletics Department issued a press release regarding six student-athletes to be honored at the annual Athletics Hall of Fame Banquet,

---

[346] SEC00310711-4 at 4.

[347] SEC00310711-4 at 4.

[348] Ohio State Department of Athletics, "2014-15 Year in Review," http://grfx.cstv.com/schools/osu/graphics/pdf/1415year-in-review.pdf (accessed 3/16/17).

[349] "Ohio State Records Graduation Success Rate of 87 Percent," http://www.ohiostatebuckeyes.com/genrel/111516aac.html (accessed 3/16/17); "Ohio State Student-Athletes Post Graduation Success Rate of 89 Percent," http://www.ohiostatebuckeyes.com/genrel/110415aae.html (accessed 3/16/17); "Ohio State Student-Athletes Post Graduation Success Rate of 89 Percent," http://www.ohiostatebuckeyes.com/genrel/102814aae.html (accessed 3/16/17).

[350] PUR-PR-00048-75 at 49 and 52-57; PUR-PR-00076-107 at 77 and 79-85; PUR-PR-00108-36 at 109-16; PUR-PR-00137-64 at 38 and 41-46.

[351] PUR-PR-00076-107 at 82.

[352] PUR-PR-00076-107 at 86.

including two student-athletes to receive scholar-athlete awards, one of whom was a member of the men's basketball team.[353]

- o "Jesse Carr was selected as the 2012 recipient of the Merrill-Green Award, for his efforts on the hardwood and in the classroom. A key contributor for Colorado State's men's basketball team, Carr played in all 32 games for the Rams in 2011-12, making five starts, and averaging 7.2 points and 3.3 rebounds per game, while dishing out a team-leading 86 assists and shooting better than 43 percent from beyond the arc. Carr also excels in the classroom where he has maintained a 3.722 cumulative grade-point average as a Business Administration major."[354]

- "New Mexico State University's Athletic Department has established a plan in which all student-athletes are expected to complete a 15-hour credit requirement of Community Service...During the 2014-2015 academic year all sports combined completed over 6,000 hours of community service."[355]

- The University of Richmond recognized that it could be challenging for student-athletes to participate in study abroad programs due to their athletic commitments so the Athletic Department collaborated with the Foreign Language Department to create a study abroad opportunity that incorporates an athletic training component.[356] "Athletics and Academics" is a 5-week summer study abroad program in which student-athletes travel to Spain both to take a course and to train for their sports.[357] "This opportunity allows our student-athletes to not only

---

[353] MWC_GIA_063792-6 at 2 and 4.

[354] MWC_GIA_063792-6 at 4.

[355] SB_GIA_137402-559 at 472.

[356] "Services for Spider Student-Athletes, University of Richmond Athletics," http://www.richmondspiders.com/ViewArticle.dbml?DB_OEM_ID=26800&ATCLID=209250482 (accessed 1/9/17).

[357] "Services for Spider Student-Athletes, University of Richmond Athletics," http://www.richmondspiders.com/ViewArticle.dbml?DB_OEM_ID=26800&ATCLID=209250482 (accessed 1/9/17).

maintain their training programs, but experience a life changing opportunity while taking a course that fulfills a graduation requirement."[358]

- The University of Richmond Athletics Department outlines a strategic plan for its student-athletes that highlights the importance of student-athletes being fully integrated members of the campus community.[359]

  - o "Our vision is characterized by . . . [s]tudent-athletes and staff who are engaged in all aspects of University life and the greater Richmond community . . . "[360]

  - o "We believe student-athletes should have the opportunity to be engaged in the life of the University with equal access to all of its academic and cultural programs and opportunities."[361]

- The University of California Berkeley has made efforts to ensure that student-athletes are integrated with the rest of the student community. UC Berkley historically offered a separate orientation program for student-athletes through the Athletic Study Center (ASC) so they did not usually attend the larger orientation program offered to all incoming freshman – dubbed CalSO.[362] In 2015, the university recognized the need to integrate "athletics into campus and vice versa," and incorporated the ASC student-athlete orientation program into CalSO in order

---

[358] "Services for Spider Student-Athletes, University of Richmond Athletics,"
http://www.richmondspiders.com/ViewArticle.dbml?DB_OEM_ID=26800&ATCLID=209250482 (accessed 1/9/17).

[359] "A Strategic Plan for Spider Student-Athletes, University of Richmond Athletics,"
http://www.richmondspiders.com/ViewArticle.dbml?&DB_OEM_ID=26800&ATCLID=209250146 (accessed 1/11/17).

[360] "A Strategic Plan for Spider Student-Athletes, University of Richmond Athletics,"
http://www.richmondspiders.com/ViewArticle.dbml?&DB_OEM_ID=26800&ATCLID=209250146 (accessed 1/11/17).

[361] "A Strategic Plan for Spider Student-Athletes, University of Richmond Athletics,"
http://www.richmondspiders.com/ViewArticle.dbml?&DB_OEM_ID=26800&ATCLID=209250146 (accessed 1/11/17).

[362] WAC_GIA_038964-5 at 4.

D-19

to "further unite student-athletes and nonathletes [sic]."[363] Beginning in 2017, CalSO will be

replaced with the new Golden Bear Orientation, which is a week-long program that will be

mandatory for all incoming freshman and transfer students (previously, participation in

orientation programs had been encouraged but not required).[364] Chrissy Roth-Francis, director

of the school's New Student Services division, stated that "the new program format will allow

the campus to introduce new students to the campus as a whole population."[365]

## 2. Universities' commitment to educating student-athletes is demonstrated by substantial investments in academic support services.

Universities' have demonstrated their commitment to both current and former student-

athletes through investments in various support programs.

- The NCAA returns approximately 60% of its annual revenue to Division I Conferences and

    member institutions.[366] A portion of this amount is distributed through the Academic

    Enhancement Fund to assist with academic-support programs for student-athletes (e.g., tutorial

    services, computers, and other supplies).[367]

- In a 2009 NCAA survey of all Division I Athletics Departments, 88% of institutions reported

    having a physical space on campus dedicated to academic support for student-athletes.[368]

    According to the NCAA survey, schools in the Football Bowl Subdivision employed up to 18 full-

    time professional staff who were dedicated to academic support for student-athletes (the range

[363] WAC_GIA_038964-5 at 4.

[364] "CalSO to be replaced with new weeklong Golden Bear Orientation,"
http://www.dailycal.org/2016/03/04/calso-replaced-new-weeklong-golden-bear-orientation/ (accessed 2/27/17); WAC_GIA_038964-5 at 4.

[365] "CalSO to be replaced with new weeklong Golden Bear Orientation,"
http://www.dailycal.org/2016/03/04/calso-replaced-new-weeklong-golden-bear-orientation/ (accessed 2/27/17).

[366] "Distributions," http://www.ncaa.org/about/resources/finances/distributions (accessed 3/13/17).

[367] "Distributions," http://www.ncaa.org/about/resources/finances/distributions (accessed 3/13/17) and NCAAGIA00410434-533 at 465.

[368] NCAAGIA03423528-73 at 39. (Preliminary version of results was released in September 2009. (NCAA, "Student-Athlete Academic Support Services at Division I Institutions," September 2009.))

**Highly Confidential – Counsel Only**

was 2 to 18 with an average of 7.67 across 105 schools), and schools in the Football Championship Subdivision employed up to 8 full-time staff (the range was 0 to 8 with an average of 2.44 across 90 schools).[369]   Most of the full-time professional staff held advanced degrees, with 74% having Master's degrees and 7% having a Ph.D., Ed.D., or J.D.[370]   These schools also employed full-time IT and administrative staff, as well as part-time employees and interns.[371]

- The 2015 Sun Belt Conference Media Guide notes that "[a]s part of the ULM [University of Louisiana at Monroe] Athletics Academic Improvement Plan, the athletic department recently added new staff, increased tutoring opportunities, improved the administrative technology and expanded the supervised study program. ... UL Monroe also has four athletic academic counselor positions including one coordinator of academic counseling. ... Athletic academic advisors do not advise for coursework; they 'pre-advise.' The athletic academic counselors also perform several functions specific to student-athletes, including individual academic counseling, working with the coaching staffs of assigned teams, tracking continuing eligibility and completing Prospective Student Athlete evaluation."[372]

- A May 2009 document outlines best practices with respect to academic support services for members of the Mountain West Conference.[373]
   - The document states that "[t]he institutions of the Mountain West Conference commit to the education of the student-athlete as a whole. In doing so, the institutions adhere to

---

[369] NCAAGIA03423528-73 at 49.

[370] NCAAGIA03423528-73 at 51.

[371] NCAAGIA03423528-73 at 49.

[372] SB_GIA_137402-559 at 464.

[373] MWC_GIA_03893-5.

Highly Confidential – Counsel Only

the principles of academic integrity, honesty and responsibility in scholarship. This applies to student-athletes and institutional staff members alike."[374]

- o The document describes best practices for four categories: academics, transition (orientation), student-athlete well-being, and life skills.[375]

   - The academics category includes guidelines regarding tutoring, study hall, access to a learning specialist, testing for learning disabilities, computer training and access to a computer lab, academic progress monitoring, missed class time, and degree completion.[376]

   - The transition (orientation) category includes guidelines regarding freshman/transfer orientation sessions, annual orientation for returning students, reviewing academic profiles of prospective student-athletes.[377]

   - The student-athlete well-being category includes guidelines regarding drug and alcohol counseling and education and hazing education.[378]

   - The life skills category includes guidelines regarding career counseling, study skills/time management courses, mentoring, and communicating with faculty about the NCAA and student-athletes issues.[379]

- The Office of Student-Athlete Services at Troy University "assists in maintaining an effective academic center, supervision of computer labs, arranging tutors, monitoring academic success and progress towards degree, assisting with academic advisement/registration, coordination of

---

[374] MWC_GIA_03893-5 at 3.

[375] MWC_GIA_03893-5.

[376] MWC_GIA_03893-5 at 3-4.

[377] MWC_GIA_03893-5 at 4.

[378] MWC_GIA_03893-5 at 4-5.

[379] MWC_GIA_03893-5 at 5.

NCAA and Conference awards and scholarships, and arrangement of academic and lifestyle seminars and workshops (CHAMPS/Life Skills)."[380]

- Arkansas State University has a Student-Athlete Academic Success Center to "assist student-athletes in various aspects of their academic, athletic and personal lives. The center has a very active tutoring program with the goal of providing each student-athlete with the best possible assistance available. ... A total of five academic advisors are also available to student-athletes in order to monitor academic progress."[381]

- Ohio State has created a Student-Athlete Support Services Office ("SASSO"), which administers programs to support student-athletes in a variety of ways.[382] The SASSO seeks to:

    o "Enhance career readiness and provide career resources that prepare student-athletes for professional life after Ohio State."[383]

    o "Promote healthy behaviors and offer programming and resources that enhance a student-athlete's individual well-being and decision-making."[384]

    o Support participation in academic opportunities that enrich a student-athlete's collegiate experience, in and out of the classroom."[385]

    o "Expand student-athletes worldviews, celebrate diversity, and provide an inclusive, supportive environment."[386]

    o "Offer leadership and service experiences and advocate for increased student-athlete involvement on campus and in the community."[387]

---

[380] SB_GIA_137402-559 at 496.

[381] SB_GIA_137402-559 at 424.

[382] OSU-PR-00237-8. See also OSU-PR-00239-40.

[383] OSU-PR-00237-8 at 7.

[384] OSU-PR-00237-8 at 7.

[385] OSU-PR-00237-8 at 8.

[386] OSU-PR-00237-8 at 8.

**Highly Confidential – Counsel Only**

- Ohio State University Athletics introduced the Wolstein Leadership Academy in 2015, which it
  described as a program "designed to equip student-athletes with the knowledge and skills
  necessary to emerge as leaders on and off the playing field."[388]

    o  Associate Director of Athletics T.J. Shelton stated, "With the generous gift from the
       Bertram and Iris Wolstein foundation, our student-athletes will be exposed to Ohio
       State faculty, staff and alumni, along with business leaders from the community . . .
       These educators will teach competencies such as, self-awareness, emotional
       intelligence, effective communication and problem-solving strategies. The Wolstein
       Leadership Academy will give our student-athletes an opportunity to make meaningful
       connections within their team and community."[389]

    o  Participating student-athletes meet once per week during a summer session and
       periodically throughout the academic year, and also participate in a leadership
       retreat.[390]

- The Ohio State Athletics Department funds the Huntington Bucks Go Pro Program, an eight-
  week summer internship program for student-athletes.[391] "Typically, the student-athletes
  spend two mornings a week participating in pre-programmed professional development
  activities. The remainder of their 20-25 weekly hours is spent working in each student-

---

[387] OSU-PR-00237-8 at 8.

[388] "Ohio State Athletics Introduces the Wolstein Leadership Academy,"
http://www.ohiostatebuckeyes.com/genrel/042815aaa.html (accessed 3/19/17). See also OSU-PR-00001-
42 and OSU-PR-00241.

[389] "Ohio State Athletics Introduces the Wolstein Leadership Academy,"
http://www.ohiostatebuckeyes.com/genrel/042815aaa.html (accessed 3/19/17).

[390] "Ohio State Athletics Introduces the Wolstein Leadership Academy,"
http://www.ohiostatebuckeyes.com/genrel/042815aaa.html (accessed 3/19/17).

[391] "Bucks Go Pro Student-Athlete Summer Internship Program,"
http://www.ohiostatebuckeyes.com/genrel/bucks-go-pro.html (accessed 3/19/17).

**Highly Confidential – Counsel Only**

athlete's internship department. The goal is to provide valuable and practical work experiences that they [sic] can be utilized in the student-athlete's future."[392]

- "Buckeyes Go International (BGI) was an initiative started in 2013 in efforts to enhance and improve the number of Ohio State student-athletes travelling abroad. Since 2015, the program has expanded to include service-learning opportunities."[393]

- Ohio State University Football Head Coach Urban Meyer "wants more than just a degree for his students. He wants to also develop outstanding young men prepared to succeed in life, and the efforts he and his staff engage [sic] their student-athletes in to ensure they are prepared for life after football are equally important and impressive."[394] Meyers introduced the "Real Life Wednesdays" program where different guest speakers address the team on Wednesday afternoons in the winter and spring.[395] The purpose of the forum is "to introduce the team to influential individuals who can share insight into succeeding in life after football is over. Speakers typically address the job interview process, finances, starting and building a successful business, parenting and other career endeavours."[396]

- Purdue University provides academic support services to student-athletes through the Drew and Brittany Brees Student-Athlete Academic Center, where student-athletes have access to

---

[392] "Bucks Go Pro Student-Athlete Summer Internship Program,"
http://www.ohiostatebuckeyes.com/genrel/bucks-go-pro.html (accessed 3/19/17).

[393] OSU-PR-00211-3 at 1.

[394] http://www.ohiostatebuckeyes.com/sports/m-footbl/mtt/urban_meyer_789606.html (accessed 3/19/17).

[395] http://www.ohiostatebuckeyes.com/sports/m-footbl/mtt/urban_meyer_789606.html (accessed 3/19/17).

[396] http://www.ohiostatebuckeyes.com/sports/m-footbl/mtt/urban_meyer_789606.html (accessed 3/19/17). See also OSU-PR-00236.

D-25

Highly Confidential – Counsel Only

group tutoring, individual tutoring, and academic mentoring.[397]  Student-athletes also receive leadership training through the John R. Wooden Leadership Institute.[398]

- "The academic component of Georgia Southern's Student-Athlete Services employs 18 tutors, five mentors and six dual role mentors/tutors.  After moving to Cone Hall in 2011, the new space provides 17 study rooms to student-athletes along with 36 computers for use."[399]

- Georgia State has 42 tutors and six academic mentors available to student-athletes and offers three programs/activities to provide student-athletes with the resources necessary to achieve "academic excellence, athletic excellence, personal development, career development, and commitment to service." [400]

    o  Panther Academic Support Services (P.A.S.S.)

        "PASS includes new student-athlete orientation, a learning lab, tutorial assistance, mandatory advisement, and academic monitoring."[401]

    o  Student-Athlete Affairs

        "Student-Athlete Affairs is a comprehensive program that provides educational, personal, community, and career development to enhance the overall quality of our student-athletes university experience."[402]

    o  Panther DEN

        "The Panther DEN holds an academic study area, two computer labs, containing 90 computers for student-athlete use, and nine private study rooms.  Recent renovation was completed on the academic study area and both computer labs."[403]

---

[397] PUR-PR-00281-97 at 82.

[398] PUR-PR-00210-36 at 12 and 23-4.

[399] SB_GIA_137402-599 at 432.

[400] SB_GIA_137402-599 at 440.

[401] SB_GIA_137402-599 at 440.

[402] SB_GIA_137402-599 at 440.

**Highly Confidential – Counsel Only**

- The University of Louisiana at Lafayette has a newly renovated Student-Athlete Academic Success Center that "provides student-athletes and mentors a variety of spaces including: a study hall lounge, two computer labs, twelve small scale tutor rooms, two medium scale tutor rooms, and a classroom that meets the everyday academic needs of student-athletes. The center provides a free tutoring service for all student-athletes . . ."[404]

- South Alabama offers student-athletes academic support services at its 4,500 square foot Athletics Academic Support Services Office that includes "staff offices, four private tutor rooms, study tables and carrels, and a computer lab with 30 computers."[405]

- The Texas State University Athletic Academic Center is open six days a week and "houses a state-of-the-art computer lab, areas for both individual and group study, and offices for the ACC staff. The AAC is led by five full-time professional staff members, four graduate assistant students and university trained tutors. . . . Currently there are 20 tutors that specifically tutor the student-athletes in the ACC."[406]

- The University of Michigan completed construction of the Stephen M. Ross Academic Center in 2006.[407] The three-floor center is 38,000 square feet and "provides individual and group study areas, computer labs, meeting rooms for tutorial work, a large meeting room and assembly areas for group projects, as well as offices for instructional support staff."[408] The center cost $12 million, with $5 million funded by alumnus, Stephen M. Ross, and the remainder funded

---

[403] SB_GIA_137402-559 at 440.

[404] SB_GIA_137402-599 at 456.

[405] SB_GIA_137402-599 at 480.

[406] SB_GIA_137402-599 at 488.

[407] "Stephen M. Ross Academic Center," http://www.mgoblue.com/facilities/ross-academic-center.html (accessed 3/19/17).

[408] "Stephen M. Ross Academic Center," http://www.mgoblue.com/facilities/ross-academic-center.html (accessed 3/19/17).

from "Athletic Department gifts, resources and investment proceeds. In all, about 20 individuals and groups made donations."[409]

- Arkansas State University not only invests in resources to assist its student-athletes in achieving academic success, it also promises 100 percent job placement for all of its student-athletes upon graduation.[410]

- Arkansas State University not only invests in resources to assist its student-athletes in achieving academic success, it also promises 100 percent job placement for all of its student-athletes upon graduation.[411]
  - "Arkansas State student-athletes took part in the first study abroad program offered by any university and their athletics department in the nation in the summer of 2015. The program goes hand-in-hand with the Red Wolves Leadership Academy, designed with the sole purpose to obtain 100 percent job placement for all student-athletes upon graduation."[412]
- Georgia Southern began the Eagles in Transition program in the 2014-2015 academic year. "Eagles in Transition is a student-athlete specific career counseling opportunity that helps student-athletes tailor their resumes, network with alumni and businesspeople in the area, and complete mock interviews."[413]
- Georgia State offers internships for former student-athletes "to assist with professional development."[414]

---

[409] "Stephen M. Ross Academic Center," http://www.mgoblue.com/facilities/ross-academic-center.html (accessed 3/19/17).

[410] SB_GIA_137402-599 at 424.

[411] SB_GIA_137402-599 at 424.

[412] SB_GIA_137402-599 at 424.

[413] SB_GIA_137402-599 at 432.

[414] SB_GIA_137402-599 at 440.

- The "NCAA After the Game Career Center" is designed "to support former student-athletes by helping them gain employment in their chosen profession at all stages of their professional career. . . . the goal of this career center is to promote connections between former NCAA student-athletes of all ages and employers in a wide variety of professions who want to hire them. Former NCAA student-athletes can post their resume, find employment opportunities and get job-seeking advice for free."[415]

## 3. The NCAA and its member institutions have demonstrated that academic standards should not be sacrificed to achieve athletic success

The NCAA has been dedicated to academic reforms designed to improve the academic success of student-athletes, and member institutions have responded with an increased focus on ensuring student-athletes have the resources and support they need to succeed as students.

- In 2003, the NCAA launched an academic reform effort to "encourage improved academic performance and progress toward graduation for all student-athletes."[416]

  - The 2003 reforms introduced the Academic Progress Rate, which is a "team-based metric that accounts for the eligibility and retention of each student-athlete for each academic term."[417] Each student-athlete receiving an athletic scholarship earns one point for being academically eligible and one point for staying enrolled at the school.[418] Points are added up for all student-athletes on the team and divided by the total possible points.[419] The result is then multiplied by 1000 to calculate the APR.[420]

---

[415] "NCAA After the Game Career Center," http://www.ncaa.org/student-athletes/former-student-athlete/ncaa-after-game-career-center (accessed 3/20/17).

[416] The National Collegiate Athletic Association, "NCAA Division I Academic Reform: Overview (Revised October 2003)" October 9, 2003.

[417] "Division I Academic Progress Rate (APR)" http://www.ncaa.org/about/resources/research/division-i-academic-progress-rate-apr (accessed 2/27/17).

[418] "Academic Progress Rate Explained: What is the APR and how is it calculated?" http://www.ncaa.org/aboutresources/research/academic-progress-rate-explained (accessed 2/27/17).

[419] "Academic Progress Rate Explained: What is the APR and how is it calculated?" http://www.ncaa.org/aboutresources/research/academic-progress-rate-explained (accessed 2/27/17).

**Highly Confidential – Counsel Only**

- ▪ Teams were initially required to achieve an APR of 925 in order to avoid penalties.[421]

- ▪ The minimum APR to participate in NCAA Championships has increased in recent years.[422] For the 2012-2013 academic year, the minimum was a 900 four-year average APR or 930 average APR over the most recent two years; in 2014-2015, the minimum was raised to a 930 four-year average APR or 940 average APR over the most recent two years.[423]

- ○ As part of its reform efforts, the NCAA also developed the Graduation Success Rate (GSR) to replace the Federal Graduation Rate (FGR) as a measure of academic progress of student-athletes. The GSR methodology accounts for students that transfer and graduate from a different institution, as well as students who leave an institution when in good academic standing to enroll at another school or pursue other opportunities.

- ○ Teams that fail to meet the NCAA academic standards face penalties intended to direct more time to academic studies. The penalties may include practice restrictions and playing-season reductions. [424]

- Many athletic teams have faced challenges as a result of the NCAA's academic reform initiatives, but, since 2003 there has been steady improvement in the NCAA measures of academic progress of student-athletes.[425]

---

[420] "Academic Progress Rate Explained: What is the APR and how is it calculated?" http://www.ncaa.org/aboutresources/research/academic-progress-rate-explained (accessed 2/27/17).

[421] "Academic Progress Rate Timeline," http://www.ncaa.org/about/resources/research/academicprogress-rate-timeline (accessed 2/27/17).

[422] SB_GIA_136596-669 at 601.

[423] SB_GIA_136596-669 at 601.

[424] "Division I student-athletes still making gains in APR," http://www.ncaa.org/about/resources/media-center/news/division-i-student-athletes-still-making-gains-apr (accessed 3/14/17).

[425] "You're Not Going to Disney World," https://www.insidehighered.com/news/2012/06/21/ncaa-bans-teams-postseason-low-apr-scores (accessed 3/15/17) and "Division I student-athletes still making gains in

**Highly Confidential – Counsel Only**

- ○ In June 2012, it was reported that the NCAA had banned a record 15 teams from post-season play that year (up from 8 teams banned last year) and 35 teams were subject to sanctions, such as scholarship reductions and practice restrictions. However, it was reported that "the average APR for all Division I teams is continuing its steady climb upward; this year it's up three points, to 973. And even though they are responsible for the vast majority of postseason penalties, teams in men's basketball and football, the two sports with the lowest APRs, this year averaged 950 (up five points from last year) and 948 (up two points), respectively."[426]

- ○ "NCAA President Mark Emmert applauded Division I student-athletes for their continued academic achievement and dedication to earning a degree. 'Division I student-athletes learn to balance playing a sport they love with the pursuit of a degree, and we honor their continued success in the classroom. The APR data prove that students can achieve both academically and athletically,' Emmert said. 'Supporting our students as they work toward graduation is a top priority of everyone involved in college athletics.'"[427]

- The Men's Basketball team at the University of Louisiana at Monroe was grappling with NCAA sanctions when Keith Richard became head coach of the team in April 2010.[428] "In his first four seasons, Richard completely rebuilt the program academically. He was unable to carry a full scholarship roster when he took over at the helm due to APR penalties that he inherited. Since then, the NCAA has lifted all sanctions against the program due to its outstanding improvement.

---

APR," http://www.ncaa.org/about/resources/media-center/news/division-i-student-athletes-still-making-gains-apr (accessed 3/14/17).

[426] "You're Not Going to Disney World," https://www.insidehighered.com/news/2012/06/21/ncaa-bans-teams-postseason-low-apr-scores (accessed 3/15/17).

[427] "Division I student-athletes still making gains in APR," http://www.ncaa.org/about/resources/media-center/news/division-i-student-athletes-still-making-gains-apr (accessed 3/14/17).

[428] SB_GIA_136596-669 at 616.

**Highly Confidential - Counsel Only**

Furthermore, the Warhawks won the SBC academic award for the second consecutive year in 2013-14. They once again posted the conference's best cumulative grade-point average to earn the award. ULM also earned back-to-back Team Academic Excellence Awards from the National Association of Basketball Coaches. In 2012-13, ULM was one of only 21 NCAA Division I men's basketball programs to be honored for achieving a team cumulative GPA above 3.0. In 2013-14, the Warhawks were the only team in the Sun Belt Conference to earn the award and the only Division I institution in the state of Louisiana. On the court, ULM showed significant improvement last season as it more-than doubled both its overall and conference win totals from the year before. It was the first time Richard was able to carry a full scholarship roster at ULM and he led the team to a No. 7 seed at the Sun Belt Championships . . ."[429]

- o Head Coach Richard explained, "The first thing we had to do was get our academic house in order . . . And we did that. Sometimes at the expense of winning games. We took no shortcuts. It was all about improving our academic performance. And our APR score started inching up and improving. Then in our fourth year, we finally got all our scholarships back. The NCAA started lessening the penalties a little bit."[430]

- In 2008, the University of Kentucky ("UK") Athletics Department introduced initiatives to improve athletic success alongside initiatives aimed at improving academic success. UK Athletics Director Mitch Barnhart launched his 15 by 15 by 15 initiative in November 2008.[431] The goals of the initiative included becoming a top-15 athletics department and winning a

---

[429] SB_GIA_136746-825 at 771.

[430] "Keith Richard, ULM basketball survive NCAA APR hell and are thriving," http://www.nola.com/ragincajuns/index.ssf/2015/03/keith_richard_ulm_basketball_s.html (accessed 3/14/17).

[431] SEC00310634-56 at 38.

D-32

combined 15 conference and national championships by 2015.[432] At the same time, Mr. Barnhart set a goal for an average GPA of 3.0 across all athletes.[433]

- o  In May 2010, UK reported that its competing scholarship student-athletes averaged a GPA of 3.04 for the spring semester, reaching the goal set by Mr. Barnhart just a few semesters prior and surpassing the 2.95 average for all undergraduate students.[434]  The football players, in particular, contributed substantially to increasing the overall athletic department GPA by raising their own team average from 2.35 in the fall to 2.66 in the spring.[435]

- o  In 2013, UK reported that it ranked number 25 in the Learfield Sports Directors' Cup standings ("one of the most recognizable measures of athletic department success"), which was the first time UK had achieved a top 25 finish during the 20-year history of the Directors' Cup.[436]  In addition, as of 2013, UK had won 11 conference and national titles, with four more wins needed to reach the department's goal of 15 by 2015.[437]  "With all that success in competition, the Wildcats' work in the classroom hasn't suffered. In fact, the opposite is true: 2012-13 was the best academic year in UK Athletics history. UK reached Barnhart's goal of a 3.0 cumulative GPA among scholarship student-athletes in both the fall and spring semesters for the first time,

---

[432] SEC00310634-56 at 3B.

[433] SEC00310634-56 at 3B.

[434] "UK Student-Athletes Make GPA Gains," https://uknow.uky.edu/campus-news/uk-student-athletes-make-gpa-gains (accessed 2/26/17).

[435] "UK Student-Athletes Make GPA Gains," https://uknow.uky.edu/campus-news/uk-student-athletes-make-gpa-gains (accessed 2/26/17).  University of Kentucky Athletics Director Barnhart explained that "Football has a tendency to be able to move the needle because there are such huge numbers in the sport...When you've got 85 guys in a sport, and for those 85 guys to get a 2.66, that is significant. It can move the needle the other way if you don't have a great semester." ("UK Student-Athletes Make GPA Gains, https://uknow.uky.edu/campus-news/uk-student-athletes-make-gpa-gains (accessed 2/26/17)).

[436] SEC00310491-505 at 504.

[437] SEC00310491-505 at 504.

punctuated by a 3.14 spring GPA—the highest of any semester during Barnhart's 11-year tenure."[438]

- o In its 2014 Athletics Annual Report, UK stated: ". . . we have reached our goal of becoming a top-15 athletics department by the year 2015 by finishing 11th in this year's Directors' Cup standings, all while our student-athletes posted a cumulative grade-point average of better than 3.0 for the fourth consecutive semester."[439]

- o In May 2016, UK reported that all 22 UK sports teams had surpassed the NCAA minimum APR (Academic Progress Rate) score,[440] with 20 of the 22 teams surpassing the national average for public universities in their respective sports.[441] Barnhart stated, "Our students, coaches and staff have embraced our commitment to academics as a central part of our mission as a department. ... Our strong team APR scores and the progress our students continue to make toward graduation are proof of that. We will continue to be diligent as we help young people prepare for their journeys through life after UK."[442]

- In its latest strategic plan (through year 2020), the Purdue University Athletics Department described the academic success of its student-athletes during the previous six years (2008-2014). "Student-athletes performed equal to or better than the student body every semester and now have done so for 34 consecutive semesters – or 17 years – dating to 1997-98. Student-athletes have maintained better than a 3.0 cumulative grade-point average for the last 11 semesters, achieving a record 3.04 in the spring of 2014. Our Graduation Success Rate has

---

[438] SEC00310491-505 at 504.

[439] SEC00310657-700 at 661.

[440] "The marks are a four-year composite, covering the 2011-12, 2012-13, 2013-14 and 2014-15 school years, taking a real-time look at a team's academic success by the progress of each student-athlete on scholarship. The APR measures academic eligibility, retention and graduation." (SEC00310481-2 at 1).

[441] SEC00310481-2 at 1.

[442] SEC00310481-2 at 1.

**Highly Confidential – Counsel Only**

climbed to 82 percent, and we expect to hit 84 percent in 2015. Ninety percent of student-athletes completing his/her eligibility at Purdue graduate. Student-athletes who graduated in May of 2013 realized a 90 percent job placement rate (based upon placement within six months of graduation)."[443]

---

[443] PUR-PR-00023–34 at 25.