**EXHIBIT A**

**DIRECT TESTIMONY DECLARATION OF DR. KENNETH G. ELZINGA**

~~**PROVISIONALLY FILED UNDER SEAL**~~

## Declaration of Professor Kenneth G. Elzinga

### I.     Qualifications

1.     I am the Robert C. Taylor Professor of Economics at the University of Virginia where I have served on the faculty since 1967.  Most of my academic career has been devoted to teaching and research in the field of antitrust economics.  I have written dozens of scholarly publications, including articles on market definition, market power, and the behavior of cartels.  I have served in the Antitrust Division of the Department of Justice as economic advisor to the Assistant Attorney General and have been an economic consultant and testifying expert for both the Federal Trade Commission and the Antitrust Division.  On several occasions, I have lectured to federal judges on antitrust economics. I was a special consultant to Judge Lewis A. Kaplan on the Christie's-Sotheby's Auction Houses Antitrust Litigation.

2.     The Supreme Court has cited my work in antitrust economics, and I was the economic expert in three prominent antitrust cases that were decided by the Supreme Court.[1]  Two of these cases, *Matsushita* and *Brooke Group*, involved allegations of horizontal conduct on the part of the defendants.  The other, *Leegin*, involved vertical relationships between a manufacturer and downstream retailers of its products.  My publications in antitrust economics have dealt with both horizontal and vertical agreements, as has my consulting experience.

3.     I have received several honors at the University of Virginia including the Thomas Jefferson Award, the highest award the University confers.  I also was the original holder

---

[1] *Matsushita v. Zenith Radio Corp.*, 475 U.S. 574 (1986) (hereafter, *"Matsushita"*); *Brooke Group Ltd. v. Brown & Williamson Tobacco Corp.*, 509 U.S. 209 (1993); and *Leegin Creative Leather Products, Inc., v. PSKS, Inc.*, 551 U.S. 877 (2007).

of the Cavaliers Distinguished Teaching Professorship, the first endowed chair at the University awarded specifically to honor teaching. Outside the University of Virginia, I have received the Commonwealth of Virginia Outstanding Faculty Award, the Templeton Honor Roll Award for Education in a Free Society, and the Kenan Award for Teaching Economics, among other teaching honors. In 1990, I was selected to be the Thomas Jefferson Fellow at Cambridge University.

4.     I began my work on this case by reading and reviewing pleadings, documents, and data that were part of the record. In addition, I reviewed publicly available materials and relevant academic literature about the economics of sports and conducted research specific to the issues in this case. I also had the opportunity to interview several individuals affiliated with various NCAA member institutions who informed me about the role and relevance of amateurism in intercollegiate sports.[2] The range of experience of these individuals and the diversity of institutions afforded me the opportunity to further my understanding of intercollegiate athletics. I combined what I learned in these interviews along with the other elements of my research in my economic analysis.

5.     In my expert work in this litigation, I was given free rein by attorneys for the NCAA and the conferences who are defendants in this matter. I was assisted in my analysis by the Princeton office of Compass Lexecon, an economic consulting firm.[3]

---

[2] I interviewed Mitch Barnhart, Athletics Director (AD) at the University of Kentucky on 12/19/2016 (hereafter, "Barnhart Interview"); Greg Fenves, President of the University of Texas on 2/3/2017 (hereafter, "Fenves Interview"); Keith Gill, AD at the University of Richmond on 2/8/2017 (hereafter, "Gill Interview"); Nathan Hatch, President of Wake Forest University on 2/15/2017 (hereafter, "Hatch Interview"); and Morgan Burke, currently Vice President and formerly AD at Purdue University on 2/22/2017 (hereafter, "Burke Interview"). Each of these interviews occurred on the respective campuses of these individuals' schools with the exception of President Fenves, which took place in Dallas.

[3] I am being compensated for my work on this matter at my customary rate of $1,100 per hour. In addition, I receive payments from Compass Lexecon based on its fees for work in this matter in accordance with our prior arrangements and in return for other services I render the firm.

II.     **Summary of Opinions**

    A.     **The challenged restrictions are procompetitive.**

        i.    A shared definition of amateurism is essential for the existence of intercollegiate amateur athletics.  In the absence of the NCAA's amateurism rules, individual schools could find it worthwhile to exceed those limits because the *private* benefits from doing so exceed its *private* costs, at least in the short term, but costs would be borne by other schools adhering to those rules resulting in a net loss to the NCAA member schools collectively and to fans who care about amateurism.

        ii.    By preserving the NCAA's shared definition of amateurism, the challenged restrictions preserve the overall demand for college sports by consumers of college athletics (including members of the university community, the general public, and broadcasters and advertisers wishing to reach those constituencies).  There is substantial evidence that amateurism is an important element in the preferences of those who value intercollegiate athletics and neither the recent move to full cost of attendance athletic scholarships nor other evidence offered by Plaintiffs' experts effectively calls that into question.

        iii.    The challenged restrictions promote the integration of academics and athletics. If student-athletes were to receive greater athletically-related compensation, they would be incentivized to spend more time on athletics to the detriment of their own educations and ultimately their schools' academic missions.  NCAA schools demonstrate a serious commitment to student-athletes and Plaintiffs'

contention that the challenged restrictions actually harm academic integration is contradicted by data on student-athletes' academic success.

    iv.    While Plaintiffs claim that any procompetitive benefits that might exist from the challenged restrictions are outweighed by anticompetitive effects, they have failed to provide analysis demonstrating that to be the case. From an economic perspective, the challenged rules are procompetitive.

### B.    Less Restrictive Alternatives

    i.    Plaintiffs have not shown that their purportedly less restrictive alternatives would be as effective in maintaining the procompetitive benefits of the challenged rules without significantly increased cost. Allowing schools to provide unlimited cash payments to student-athletes, as Plaintiffs have proposed, is inherently inconsistent with amateur athletics, and since the procompetitive benefits of the challenged practices arise from amateurism itself, such a regime couldn't be equally effective in providing those benefits.

### III.    <u>Plaintiffs' Experts</u>

6.    The opinions I have just summarized differ substantially from those proffered by the Plaintiffs' economic experts, Professor Daniel A. Rascher and Professor Roger G. Noll. In particular, Professor Rascher and Professor Noll frequently draw dubious conclusions from limited information and they mischaracterize Defendants' contentions.

### A.    Flawed Reasoning

7.    Professor Rascher and Professor Noll both draw strong and dubious conclusions from limited information and sometimes erroneous data, often failing to control for additional relevant factors. A good example of this comes in Professor Rascher's testimony when he concludes that "the challenged rules are not required to maintain or enhance demand,"

because revenues continued to rise after schools moved to full COA athletic scholarships.[4]  As a basis for this conclusion he points to increases in sports revenue between 2015 and 2017 for several conferences and schools.[5]  Professor Rascher assumes that revenue growth reflects demand growth (rather than, for example, escalating payments from previously-agreed-upon media rights agreements), then assumes that demand growth means that any future compensation increases would not affect consumer demand, but he makes no effort to control for other factors that could be influencing either demand or revenue during that time period.  This is a serious omission because he accompanied his description of these changes with a series of charts showing that from 2009-10 to 2014-15, before full COA athletic scholarships were permitted, revenue for men's football, men's basketball, and women's basketball for the power schools was growing steadily.  But so was sports revenue at non-FBS schools for men's and women's basketball.[6]

8.      The importance of Professor Noll's omission of other factors is illustrated by the example of the Ivy League.  Professor Noll, himself, calls attention to the fact that "Ivy League revenues increased in both 2014-15 (the announcement year) and 2015-16 (the implementation year)."[7]  Since the Ivy League schools do not give athletic scholarships, there was no change in the rules governing athletically-related financial aid within the Ivy League.  Nonetheless their revenues rose.  Professor Noll does not analyze whatever forces were at work to cause that increase in Ivy League revenue.  So, he has no basis for

---

[4] In Re: National Collegiate Athletic Association Athletic Grant-In-Aid Cap Antitrust Litigation, Direct Testimony of Dr. Daniel A. Rascher, July 3, 2018 (hereafter, "Rascher Direct Testimony"), ¶ 45.

[5] Rascher Direct Testimony, ¶¶ 45-50.

[6] Rascher Direct Testimony, Exhibit 167(e), 167(f), 167(g).

confidence that those forces were not also exerting an effect on the revenue of other NCAA schools.  Thus, when he reports that the data showed no decline, he cannot know if that was because, as he claims, the rule change itself exerted no effect or if it was because the rule change did exert an effect and that effect was offset by other forces. That unexamined possibility renders his conclusions on this point unreliable.

9.    Professor Noll and Professor Rascher also cite rising graduation rates as evidence that increased benefits are correlated with academic success.[8]  But again, neither examined whether any of a number of other factors might have contributed to that trend.

10.   As I discuss in more detail below, drawing bold conclusions from limited data and making predictions about the future based on those conclusions is a flaw that permeates both of Plaintiffs' experts' opinions.  Professors Rascher and Noll both mistake superficial correlation for causation repeatedly in their arguments.  This undermines the value of their conclusions as a matter of fundamental economics.

**B.    Misrepresentations**

**(i)    Not One Penny**

11.   Professor Noll attributes to me an endorsement of what he calls the NCAA's "Not One Penny" standard.  Professor Noll says, "according to Professor Elzinga, 'if student-athletes receive even very small payments—a penny—that isn't related to their educational expenses, then the payment is a damaging breach of amateurism.'"[9]  The citation to this quotation, which is in footnote 40 reads, "*Elzinga Report*, p. 97."[10]

---

[8] Rascher Direct Testimony, ¶ 150; In Re: National Collegiate Athletic Association Athletic Grant-In-Aid Cap Antitrust Litigation, Direct Testimony of Dr. Roger G. Noll (hereafter, "Noll Direct Testimony"), ¶¶ 144-5.

[9] Noll Direct Testimony, ¶ 50.

[10] Noll Direct Testimony, note 40.

12.     It is true that the words quoted by Professor Noll appear in my report.  They are part of a

discussion of NCAA amateurism standards.  The context in which they appear is below—

the passage selectively quoted by Professor Noll is underlined:

> The difference between amateurism and professionalism is a difference in kind,
> not merely a difference in degree.  Consider two excerpts from testimony in this
> case.  When Mark Lewis was asked by how much the payment to a student-
> athlete would have to exceed the cost of attendance in order to have a harmful
> effect on demand for intercollegiate athletics, he said:
>
>> I don't think it's about a penny, I think it's about a
>> philosophy, . . . it's the philosophy of saying, I think there
>> would be a negative impact on consumer demand if you go
>> beyond that college sports is about college first and
>> foremost.  And so, it's not about a penny more or $1 more
>> or $10,000 more.[269]
>
> When Michael Aresco was asked a similar question, he gave a similar answer:
>
>> The issue is that, if it's one penny or one dime, it is
>> basically paying players, and you've now set a precedent to
>> pay players for what they're doing, and I think with the cost
>> of attendance with the scholarship, it's different.  It is
>> related to their education. Scholarship enables them to get,
>> you know, a free education.  . . . whereas if you just pay
>> players, you've created, you know, essentially a
>> professional model that really doesn't have anything to do
>> with the educational mission of the institution or the
>> educational needs of those students.[270]
>
> Both of these answers have a common element.  It is that <u>if student-athletes
> receive even very small payments—a penny—that isn't related to their
> educational expenses, then the payment is a damaging breach of amateurism.</u>
> These are the thoughtful answers one would expect from people who understand
> that the difference between amateurism and professionalism isn't captured in
> some wooden and mechanical way by the number of dollars a student-athlete
> receives.  True student-athletes are amateurs in the sense that they are not being
> paid to play.  They receive scholarships to cover the costs of attending school, but
> these costs determine the amount of their GIA.  Professionals, by contrast, receive
> funds determined by market forces, the amount of which is not tied to their living
> costs.[11]

---

[11] In Re: National Collegiate Athletic Association Athletic Grant-In-Aid Cap Antitrust Litigation, Expert Report of
Kenneth G. Elzinga, March 21, 2017 (hereafter, "Elzinga Report I"), pp. 96-7 quoting Deposition 30(b)(6) of Mark

13. Neither Mark Lewis nor Michael Aresco is advocating the "Not One Penny" standard that Professor Noll attributes to the NCAA.  The passage from Mr. Lewis begins with "'I don't think it's about a penny, I think it's about a philosophy,'"[12] and ends with "'it's not about a penny more or $1 more or $10,000 more.'"[13]  Similarly, Mr. Aresco focuses not on a specific amount, "'if it's one penny or one dime, it is basically paying players,'"[14] and goes on to draw the distinction between supporting a student-athlete via scholarship and merely paying him to play.  "'Scholarship enables them to get, you know, a free education. . . . whereas if you just pay players, you've created, you know, essentially a professional model …'"[15]

14. Not only are Mr. Aresco and Mr. Lewis *not* advocating the "Not One Penny" standard Professor Noll attributes to them, neither am I.  In the material omitted by Professor Noll, I explained,

> These are the thoughtful answers one would expect from people who understand that *the difference between amateurism and professionalism isn't captured in some wooden and mechanical way by the number of dollars a student-athlete receives.*  True student-athletes are amateurs in the sense that they are not being paid to play.[16]

15. Thus, when Professor Noll says "according to Professor Elzinga, 'if student-athletes receive even very small payments—a penny—that isn't related to their educational

---

A. Lewis, 1/31/17 (hereafter, "Lewis 30(b)(6) Deposition"), p. 164 and Deposition of Michael Aresco, 11/16/16 (hereafter, "Aresco Deposition"), pp. 241-2, underlining added.

[12] Elzinga Report I, p. 96 quoting Lewis 30(b)(6) Deposition, p. 164.

[13] Elzinga Report I, p. 96 quoting Lewis 30(b)(6) Deposition, p. 164.

[14] Elzinga Report I, p. 97 quoting Aresco Deposition, pp. 241-2.

[15] Elzinga Report I, p. 97 quoting Aresco Deposition, pp. 241-2.

[16] Elzinga Report I, p. 97, italics added.

expenses, then the payment is a damaging breach of amateurism,'"[17] he misrepresents my analysis and my opinion, as well as the position of the NCAA and its members.

      **(ii)**     Payments Above COA

16.     Closely related to the "Not One Penny" misrepresentation is the position both Professor Noll and Professor Rascher take that the NCAA's definition of amateurism requires student-athletes never to receive any payments in excess of the COA.  For example, Professor Noll says that defendants rely on "the false premise that NCAA rules guarantee that college athletes receive no compensation for participation in athletics other than for their education-related costs. … [S]ince 2015 many scholarship athletes have received compensation that substantially exceeds COA.  As a result, the defendants' practices since 2015 do not accord with the NCAA's definition of amateurism."[18]

17.     Similarly, Professor Rascher devotes extensive attention to purported measures of demand when student-athletes receive payments in excess of the COA.  According to Professor Rascher, "since the implementation of rules allowing COA, thousands of Class members have received Full COA scholarships and on top of that have also received additional compensation and/or benefits, untethered to educational expenses or even to education more broadly.  Yet consumer demand has not been adversely affected by these pervasive payments."[19]  He goes on to say "Since *O'Bannon*, extensive new evidence shows that the COA line has been crossed, repeatedly, with zero impact on demand.  Thousands of athletes went from having the scholarship portion of their compensation capped at the old GIA to it being capped at COA, once the new COA cap was allowed.

---

[17] Noll Direct Testimony, ¶ 50.

[18] Noll Direct Testimony, ¶ 94.

[19] Rascher Direct Testimony, ¶ 52.

But in addition to these Full COA scholarships, thousands of athletes have also received numerous 'incidental benefit' payments as well as SAF payments, rendering the Full COA line meaningless as a purported essential bulwark against demand-decreasing levels of compensation."[20]

18.  In other words, Professor Rascher proposes to "test" the effect of amateurism on demand by examining how demand varies with whether or not payments received by student-athletes are -- or are not -- in excess of the COA.  Professor Noll proposes a very similar test.  He proposes to test whether or not the 2015 increase in payments to student-athletes affected the popularity of intercollegiate athletics.[21]  However, *O'Bannon* acknowledged that even at the time of that trial, both Pell Grants and SAF payments already resulted in student-athletes receiving financial aid in excess of COA within the NCAA's rules.[22]

19.  Even if Professor Rascher and Professor Noll's methods for testing the effect of the putative amateurism standard against the data on demand were reliable and rigorous, which they are not, the test would still only be meaningful if the amateurism standard were correctly embodied in the test.

20.  The NCAA's amateurism standard, as it is implemented in practice, is more complex than Professor Rascher or Professor Noll acknowledge.  Professor Rascher, particularly, has described the benefits that student-athletes can receive in excess of the COA as

---

[20] Rascher Direct Testimony, ¶ 54.

[21] "Thus, one test of the validity of the hypothesis put forth by the defendants is whether the popularity of college sports was negatively affected by the adoption of the new financial aid system in 2015 that enabled many college athletes to be paid thousands of dollars more than COA." (Noll Direct Testimony, ¶ 111).

[22] *O'Bannon .v. National Collegiate Athletic Association,* 802 F.3d 1049 (9th Cir. 2015) (hereafter, *"O'Bannon II"*) at 1079*; O'Bannon v. National Collegiate Athletic Association*, 7 F.Supp.3d 955 (N.D. Cal. 2014) (hereafter, *"O'Bannon I"*) at 972.

arbitrary or inconsistent and unrelated to amateurism.[23]  Actually, as I explain later, the supposedly arbitrary benefits, the rules governing them, and their enforcement are consistent with conduct to preserve amateurism.[24]  Thus, Professors Rascher and Noll can point to no test of the effect of amateurism, because there is no period during which the NCAA did not have and enforce amateurism standards.

21.  The same observations apply to the law review article described by Professor Noll as the "only … academic study [that] undertakes a statistical test of whether the compensation system that was adopted in 2015 affected the popularity of sports."[25]  As Professor Noll acknowledged, the authors of that study conducted an econometric analysis of the effect of the 2015 increase in payments on the popularity of NCAA intercollegiate athletics.[26] They found no statistically significant relationship.[27]  The econometric results in this paper compare two regimes, both of which comply with the NCAA's amateurism standards.  Therefore, the results aren't relevant to the Rule of Reason analysis, which seeks to learn whether or not the amateurism standard has a procompetitive effect.

   **(iii)**    Professor Noll's Putatively False Premises

22.  Professor Noll attributes to the defendants and the defendants' experts, including me, three premises that he claims are false, namely:

---

[23] In Re: National Collegiate Athletic Association Athletic Grant-In-Aid Antitrust Litigation, Rebuttal Report of Kenneth G. Elzinga, May 16, 2017 (hereafter, "Elzinga Report II"), p. 31 quoting In Re: National Collegiate Athletic Association Athletic Grant-In-Aid Cap Antitrust Litigation, Expert Report of Daniel A. Rascher, March 21, 2017 (hereafter, "Rascher Report"), ¶¶ 12-3, 24-5, 33, 81, 130, 193, 220, 236-241 and Exhibit 39.

[24] See ¶¶ 87-101 below.

[25] Noll Direct Testimony, ¶ 112.

[26] Noll Direct Testimony, ¶ 112.

[27] Thomas A. Baker III, Marc Edelman, and Nicholas M. Watanabe, "Debunking the NCAA's Myth that Amateurism Conforms with Antitrust Law: A Legal and Statistical Analysis," *Tennessee Law Review*, Forthcoming, https://ssrn.com/abstract=3072641 (accessed 7/11/18), pp. 28-9.

- "that the NCAA always has adopted and enforced essentially the same rules and policies with respect to the compensation of college athletes, and recent changes in the rules regarding such compensation, including raising the cap on athletic scholarships to COA, are minor tweaks."

- "that the new rules that were adopted in 2015 adhere to the NCAA's standard for being an amateur, which is that compensation for scholarship athletes is restricted to the costs of attending college and participating in college sports, plus modest prizes for members of teams that do especially well,"

- that "the defendants and their economic experts mischaracterize the relief that the plaintiffs seek and the 'but for' world that is contemplated in my economic analysis of the NCAA's current restrictions on compensation of class members.  Specifically, defendants and their economic experts persistently compare current NCAA rules and policies with a system in which no restrictions exist."[28]

23.    As I explain below (in section IV.A(iv)), the NCAA's definition of amateurism has remained materially consistent over the years, and as explained above (in section III.B(ii)) the rules adopted in 2015 are consistent with the NCAA's definition of amateurism, a conclusion that was recognized by the Ninth Circuit in *O'Bannon*.[29]

24.    With respect to the relief sought by Plaintiffs, both of their proposed forms of injunctive relief would permit unlimited cash payments.[30]  Plaintiffs' experts assume without analysis that schools or conferences might eventually implement new limits, but Plaintiffs' requested relief here would result in a system with no limits.

25.    Even under the "alternative injunction" contemplated by the Plaintiffs, payments that are not "tethered" to education could still be the object of NCAA rules, but those that are "tethered" to education could not be.  So, for example, a practice of paying student-athletes who retain their academic eligibility a bonus for doing so, which is "tethered to education," could not be restricted in its amount.  By definition all student-athletes who

---

[28] Noll Direct Testimony, ¶¶ 12-4.

[29] *O'Bannon II* at 1073.

[30] Rascher Direct Testimony, ¶ 155.

are currently playing, must be eligible.  So, this "tethered" benefit would provide a means whereby unlimited payments could be made to all athletes.  And even some "participation benefits … even if paid in the form of a cash sum untethered to an educational expense," would be permissible in expressly unlimited amounts.  In addition, Plaintiffs' requested relief overlooks the role, described in ¶¶ 91-99 below that restrictions on the *dollar amounts* of incidental benefits play in ensuring that they remain consistent with the NCAA's definition of amateurism.

## IV.   The Challenged Rules Are Procompetitive

### A.     The Need for a Collective Definition of Amateurism

26.     *Amateurism* is fundamental to amateur student-athletics.  It is part of the definition of the activity.  For a university to offer amateur athletics requires a definition of amateurism, and in order to offer intercollegiate amateur student-athletics, a standard definition of what it means for an athlete to be an amateur is essential.  In the realm of Division I intercollegiate athletics, the definition is provided through the NCAA.[31]

27.     The need to define the good or service is not unique to this litigation.  An example, outside intercollegiate sports, of a good that needs to be defined in order for a market to function efficiently is fair trade products.  Fair trade products are goods, usually agricultural or hand-crafted products from developing countries, that are produced, purchased from their makers, and marketed under rules intended to ensure that the prices

---

[31] The NCAA is well positioned for this role because the NCAA's organizational reach spans virtually all of intercollegiate sports. That makes the NCAA better suited to this role than, for example individual conferences whose teams play against teams from other conferences. Were conferences to be given this role, they would be subject to the same externalities that individual schools are subject to. One conference would have an interest in rules that favor its teams at the expense of teams from other conferences, and would not have a reason to take the costs inflicted on those other conferences into account. See note 39, below.

paid to producers are not too low, that working conditions are improving, supply is sustainable, and the business is not, in the view of fair trade advocates, exploitive.[32]  Fair trade goods typically are brought to market in the developed world through the services of certifying organizations (typically non-profit organizations) that publish standards for fair trade goods and certify products that meet those standards.[33]  Having an agreed upon definition of fair trade makes it possible for sellers to provide the kind of goods that consumers value.  The definition helps economic agents solve what economists call an externality problem.  The fact that the designation of fair trade *raises* price would not be seen by me (and I think most antitrust economists) as anticompetitive.

28.   In economics, an "externality" refers to the effect that a transaction between one set of buyers and sellers has on others who were not parties to that transaction.  Externalities can be positive (*i.e.*, a beneficial impact) or negative (*i.e.*, a detrimental impact).

29.   In the case of intercollegiate amateur student-athletics, economic value is created from the positive externalities that take place within universities between student-athletes and members of other constituencies, such as other students, alumni, and other members of the university community, who value amateur student-athletics.  The positive externalities are not confined to people who are formally affiliated with a particular campus.  University athletic teams have their fans among the general public.  To the extent that members of these constituencies value amateurism in student-athletes, the

---

[32]  Fair Trade USA, "Frequently Asked Questions: What is Fair Trade?" http://fairtradeusa.org/what-is-fair-trade/faq (accessed 6/8/17).

[33]  Fair Trade USA describes itself as "the leading third-party certifier of Fair Trade products in the United States." (Fair Trade USA, "About Fair Trade USA," http://fairtradeusa.org/about-fair-trade-usa (accessed 6/5/2017)).

challenged restrictions help make it possible for universities to provide the amateur

athletic competition consumers value by helping solve the externality problem.

### (i)   The Need for Collective Action

30.   The necessity of collective action to establish eligibility rules for athletic competition is

hardly surprising.  The world of sports is one in which competition inherently requires

organizational cooperation.  In any sport, the competitors must concur on the dimensions

and materials that make up the field of play.  The rules of the game have to be specified

and agreed upon.  Schedules for competition have to be determined jointly.  Rules and

procedures for designating champions have to be decided collectively.  And, the would-

be competitors have to agree upon who is eligible to play.

31.   As a general principle, economists recognize that organizing *athletic competition* requires

*economic cooperation.*  For example, Roger Blair and Jessica Hayes write:

> For all the on-field competition, however, there is a lot more
> cooperation than competition off the field.  Some of that
> cooperation is both necessary and beneficial to the fans.  For
> example, cooperation on the rules of play, schedules, playoffs, and
> championships is necessary to the production of what the fan
> consumes – the games.  Cooperation on these dimensions is clearly
> beneficial to the fans. . . . Ordinarily, coordination among
> competitors raises antitrust issues.  Sports leagues, however, are
> granted latitude that other industries would not enjoy because they
> must cooperate off the field to produce competition on the field.[34]

32.   So it is with intercollegiate sports.  Cooperation has economic value because it's essential

to creating the sporting events.  The NCAA is responsible for much, albeit not all, of the

requisite coordinating activity.

---

[34] Roger D. Blair and Jessica S. Haynes, "Baseball's Antitrust Exemption: History and Current Relevance," Chapter 5 in *The Oxford Handbook of Sports Economics Volume 1:  The Economics of Sports*, edited by Leo H. Kahane and Stephen Shmanske (Oxford University Press:  New York, 2012): 81-96 (hereafter, "Blair and Haynes"), pp. 81-2.

### (ii)   Rules, Specificity, and Eligibility

33.   The same prerequisite for specific, agreed-upon rules applies to the NCAA's amateurism

standards, which define (in part) eligibility to play.[35]

34.   In order for the NCAA's rules to enable universities to offer amateur student-athletics

that will be regarded as fair, ambiguity in interpretation needs to be resolved and the rules

need to be perceived as the same for all competitors.  Professors Noll and Rascher

suggest that "amateurism" means a particular dollar amount (or cap).[36]  This is an error

on their part.  The central tenet of amateurism is not a specific dollar amount (as in

$X$ = amateur, but $X + \varepsilon$ = professional).

35.   Rather, the defining feature is that student-athletes not be paid to play their respective

sports.  Put differently, if some schools or conferences adhered to a high standard of

amateurism and others did not, the disparities between teams would likely be viewed as

"not legitimate."  Consequently, consumer interest in contests between those schools

would be diminished, and an economist would expect fewer match-ups between schools

with differing standards.

### (iii)   The Need for Amateurism Rules

#### (a)   Professor Rascher's Purported Paradox

36.   Professor Rascher asserts a theoretical argument that, he contends, allows him to infer

that amateurism would not be damaged or lessened if some student-athletes received

---

[35] It is not too much of a stretch, indeed, to say that the NCAA's amateurism rules define the product the NCAA has on offer – amateur intercollegiate athletics.  Thus, the plaintiffs' request to change the NCAA's amateurism rules is a request to change the very nature of the product the NCAA sells.  I have never encountered an antitrust case in which a defendant was required to change the nature of the product it sold – until here, where the NCAA and the other Defendants would be required to change the product they offer from what they deem to be the definition of amateurism to what the Plaintiffs would define as amateurism.  Conceptually, this is like NASCAR being required to let open-wheel Indy or F1 cars race in NASCAR cup races.

[36] See § III.B(i), above.

compensation and benefits in excess of what is currently allowed under the challenged rules. The argument he makes is that if payments in excess of what is currently allowed were harmful to the schools taking part in amateur student-athletics, then no school would have any incentive to make them, and if that were true, then there would be no need for a rule forbidding them.[37] He has previously referred to claims by NCAA personnel that rules are needed to keep schools from paying above the allowed limits as "paradoxical" and asserts that the paradox can be resolved by assuming that the NCAA officials who described deviations from amateurism as harmful are wrong.[38]

### (b) Externalities and Amateurism

37. Professor Rascher's argument fails as a matter of economic analysis because it fails to account for the distinction between an economic agent's individual incentives and the collective incentives of the group. A negative externality is created when one school chooses to exceed the existing NCAA limits on compensation and associated benefits: the school making such a decision does not incur all the costs of its actions. An individual school, for example the University of Michigan, while weighing the costs and benefits that it will experience, could find it worthwhile to exceed the compensation limits because the *private* benefits from doing so exceed its *private* costs, at least in the short term. But as a consequence of the negative externality, there now are costs borne by other schools with the result that in total the benefits from the University of Michigan's deviation from amateurism imposes a net loss to all schools collectively, notwithstanding that it provides a net short-term benefit to the University of Michigan. In this situation, a

---

[37] Rascher Direct Testimony, ¶ 35.

[38] Rascher Report, ¶¶ 283-5.

rule against such a financial aid package promotes economic efficiency by preventing schools like the University of Michigan from taking action that is economically inefficient by diminishing the value of the product to the entire group.[39]

38.     Achieving the benefits of amateurism requires overcoming the problem with those incentives to deviate that, if left uncorrected, would lead to the failure of the marketplace to achieve economic efficiency, *i.e.,* would lead to what economists call market failure. Thus, the NCAA amateurism rules serve two related purposes. They make possible the positive externalities found within and around universities and intercollegiate amateur student-athletics, and they prevent the negative externalities that could be destructive of amateur student-athletics.[40]

---

[39] The same economic logic would apply if a conference within the NCAA adopted rules that permitted payments beyond the COA. The members of the conference wouldn't incur all the costs of their action, so as a group they would have an incentive to take an inefficient action that was, in the aggregate, harmful to other NCAA conferences. See Rascher Direct Testimony, § 4.1.

[40] Without acknowledging its significance, Professor Rascher recognized this point when he described the NCAA as a "sanctioning body." (Rascher Direct Testimony, ¶ 167). Sanctioning bodies, whether in sports or in any other endeavor, set standards. For example, NASCAR (the National Association of Stock Car Automobile Racing) sets the standard for what constitutes a race car. If one visits the NASCAR "museum" in Charlotte, North Carolina (aka the NASCAR Hall of Champions) one can view a Toyota Camry, half of which is built as though it came off the showroom floor, half of it built to the design of a NASCAR-compliant race car. The design specifications set by NASCAR means an open-wheel F1 car cannot compete in a NASCAR race, nor could the Toyota off the showroom floor. Neither fits the standards. Conceptually, what the NCAA has done is no different: instead of defining the characteristics of an automobile, the NCAA defines the characteristics of an amateur student-athlete. The former necessarily involves the definition of a stock car that all the vehicles in the race must meet; the latter necessarily involves the definition of amateurism that all the student-athletes playing for teams sanctioned by the NCAA are to share. Another way to see the role of the NCAA is to recognize that schools offering amateur student-athletics are in a position much like that of franchisees in a restaurant chain. Each franchisee has an interest in the value of the franchise (the brand), but is also confronted with multiple opportunities to profit privately by not adhering to the brand standards. Understanding the role of the NCAA as a sanctioning body that sets the standard for amateur athletics makes it clear that Professor Rascher was wrong to describe the roles of sanctioning body and league as if they were mutually exclusive. "[T]he NCAA is not a league at all, but rather is a sanctioning body." (Rascher Direct Testimony, ¶ 167). By setting standards in the form of rules of play and rules of amateurism, leagues serve as sanctioning bodies.

### (iv)     The NCAA's Consistent Commitment to Amateurism

39.     Professors Noll and Rascher both criticize the NCAA's definition of amateurism by

alleging inconsistencies over time.  This too is inaccurate.  The essential features or goals

of the NCAA's amateurism definition *have remained consistent.*  When one compares the

language of the NCAA's current definition of amateurism to the definition adopted in

1912, the language is similar:

| 1912 Definition[41] | Current Definition[42] |
|---|---|
| 1. An amateur in athletics is one who enters and takes part in athletic contests purely in obedience to the play impulses or for the satisfaction of purely play motives and for the exercise, training, and social pleasures derived. | Student-athletes shall be amateurs in an intercollegiate sport, and their participation should be motivated primarily by education and by the physical, mental and social benefits to be derived. |
| The natural or primary attitude of mind and motives in play determines amateurism. | Student participation in intercollegiate athletics is an avocation . . . |
| 2. A professional in athletics is one who enters or takes part in any athletic contest from any other motive than the satisfaction of pure play impulses or for the exercise, training, and social pleasures derived, or one who desires and secures from his skill or who accepts from spectators, partisan or other interest, any material or economic advantage or reward. | [S]tudent-athletes should be protected from exploitation by professional and commercial enterprises.  . . . An individual loses amateur status and thus shall not be eligible for intercollegiate competition in a particular sport if the individual: . . . (a) Uses his or her athletics skill (directly or indirectly) for pay in any form in that sport; |

40.     The essential features of both definitions are the same.  First, student-athletes are those

who play the game for the sake of the game, *i.e.,* "for the exercise, training, and social

---

[41] Proceedings of the Seventh Annual Convention of the National Collegiate Athletic Association, December 27, 1912 (hereafter, "1912 Proceedings"), p. 34.

[42] 2016-17 Manual, Articles 2.9, 12.1.2.

pleasures,"[43] or for the "education and . . . physical, mental and social benefits."[44] Second, student-athletes do not play for "any material or economic advantage or reward,"[45] or "for pay in any form."[46]  That is, they do not play for pay.  These two strands are not separate; they are complementary.  The opposite of playing for pay is to play for the sake of the game and *vice versa*.  Both definitions refer to the attitude or state of mind of the student-athlete.  The earlier definition says "[t]he natural or primary attitude of mind and motives in play determines amateurism,"[47] and the latter says "[s]tudent participation in intercollegiate athletics is an avocation."[48]

41.   Notwithstanding the similarity of the NCAA's language on amateurism, Professor Noll focused his attention on changes over time in the NCAA rules governing payments to student-athletes,[49] and on payments that he argued are not directly related to the cost of education.[50]

---

[43] 1912 Proceedings, p. 34.

[44] 2016-17 Manual, Article 2.9.

[45] 1912 Proceedings, p. 34.

[46] 2016-17 Manual, Article 12.1.2.

[47] 1912 Proceedings, p. 34.

[48] 2016-17 Manual, Article 2.9.

[49] According to Professor Noll athletic scholarships were not allowed in the earliest days of the NCAA (In Re: National Collegiate Athletic Association Athletic Grant-In-Aid Cap Antitrust Litigation, Declaration of Roger G. Noll, May 16, 2017 (hereafter, "Noll Declaration, pp. 8-9); then in 1948 financial aid based on need and given on the same terms as aid to non-athletes was permitted (Noll Declaration, p. 12); in 1957 financial aid conditional on participation in sport was allowed (Noll Declaration, p. 13); in the 1960s limits were set on a student-athletes university earnings and using one's "fame or reputation" to earn income was forbidden (Noll Declaration, p. 13); in 1976 "laundry money" and certain course supplies were removed from the allowable GIA (Noll Declaration, p. 14); and in 2014 the amount of the GIA was allowed to increase to the full COA (Noll Declaration, p. 14).

[50] The examples of payments not directly related to the cost of education to which Professor Noll refers are: student-athletes who receive some of their financial aid in cash and can, therefore, spend it however they choose (Noll Declaration, pp. 17, 19-21), financial aid amounts that vary with the cost of living, which may not be perfectly correlated with the cost of education (Noll Declaration, pp. 18-21), schools' determinations of their official COA amounts that may reflect competitive pressures (Noll Declaration, pp. 21-2), Student Assistance Funds (SAF) that may be used for non-educational purposes, such as compassionate gifts during times of family crisis or for loss of value insurance (Noll Declaration, pp. 22-3), and some student-athletes who receive various awards or gifts such as

42.   Both Professor Rascher and Professor Noll emphasize that prior to the introduction of enforceable, nationwide limits on compensation in the 1950s, there was no uniform rule governing support to student-athletes -- and intercollegiate athletics thrived.[51]

43.   What neither Professor Noll nor Professor Rascher provides is a basis for understanding the meaning of that historical period whose ending (1956) was *sixty-two years ago*.

44.   The lessons that may be drawn from that history depend on the extent to which the current environment corresponds to the environment (or environments, since the period in question covers considerable time and change) at the time.  For example, in order to make economic sense out of this history, Professors Noll and Rascher should have evaluated whether the underlying, relevant economic considerations of today were the same in a world with no color television, cable television, high-definition television, internet, or social media.  Did the advent of these changes affect the incentives or opportunities of students?  Did the advent of these changes affect the incentives or opportunities of universities?  How did any of these changes affect demand for intercollegiate athletics?  They should have evaluated whether, in their market for student-athlete labor, the dramatic expansion in collegiate athletic opportunities for women and minorities might be relevant.  The fact that neither Professor Noll nor

---

Olympic medal bonuses or gifts, and awards for members of successful teams, such as national champions or bowl game participants (Noll Declaration, pp. 23-5).

[51] "The significance of this history of the NCAA is that the NCAA did not enforce restrictions on the compensation of college athletes for the first fifty years of its existence.  Yet during this period, college football and basketball as organized by the same colleges that now are members of Division I became immensely popular."  (Noll Direct Testimony, ¶ 36).  "The first key point is that college sports developed and thrived for fifty-plus years prior to the adoption of any nationally enforced 'amateurism' rules.  Aside from major league baseball (the 'national pastime'), during this period of time (when no national cap on compensation was enforced), college football was the most popular sport in America.  Indeed, it was only after the 1956 adoption of the GIA cap that the NFL and NBA surpassed college football and basketball in terms of consumer demand."  (Rascher Direct Testimony, ¶ 93).

Professor Rascher address these or any other questions about the how the economic considerations from the earlier time periods differ from today and might impact the validity of any comparisons between the periods means that there is no reliable way of evaluating the economic meaning of the history they describe.

45.    Professor Noll concluded that "Since 1957 the NCAA's compensation rules have been untethered to any coherent or consistent definition of amateurism."[52]

46.    This criticism is misplaced and comes from applying a wooden and mechanical definition of amateur eligibility.  One of the changes to which Professor Noll called attention was the advent in 1957 of athletic scholarships.[53]  Up until then, a student whose scholarship depended on athletics was ineligible to play.  Professor Noll refers to this change as one of the pieces of evidence that the NCAA does not have a consistent definition of amateurism.[54]  Because such payments were once disallowed, he insists they must always be forbidden if the NCAA is to be true to amateurism.

47.    But Professor Noll is mistaken in this regard.  Whatever attitudes might have been before 1957, sports fans today would not regard a student-athlete as a *professional* merely for receiving an athletic scholarship.  For the NCAA to allow athletic scholarships is not an abandonment of principle.

48.    It is, of course, pivotal to the Plaintiffs' theory of this case that the NCAA *not* be motivated by the principle of amateurism.  Only in the absence of a commitment to amateurism can the Plaintiffs allege that the NCAA schools suppress payments to athletes because the Defendants want to enjoy the profits of operating a monopsonistic cartel.

---

[52] Noll Declaration, p. 16.

[53] See Noll Declaration, p. 13.

[54] Noll Declaration, pp. 8-16.

But if a monopsonistic cartel were in operation, the current rules of the NCAA would make no "economic sense."[55]

49.     If the NCAA member schools were trying simply to use market power to suppress payments to student-athletes, rather than trying to protect amateur student-athletics, all they would need to do is set the allowable amount of the GIA just large enough to ensure that they can "hire" as many student-athletes as they need, and then simply ban all other payments.  There would be no need to spend the time, effort, and resources needed to convene rules committees to review, debate, and approve new eligibility rules.  With fewer (and simpler) rules to enforce, the NCAA schools also would be able to save on enforcement costs.  But that is not the world we observe.

**B.     Consumer Demand**

50.     The value of amateurism is reflected in the popularity of intercollegiate amateur student-athletics that packs stadia with football fans on Saturdays in the fall and fills gymnasiums and exhibition centers with basketball fans in the winter leading up to the annual March Madness Tournaments, and all with larger audiences watching on television.  Nor is the economic value confined to the sporting events themselves.  Constituencies within universities value having a robust amateur intercollegiate athletics program, which the challenged restrictions make possible.  Intercollegiate athletics enrich the experience of student-athletes and other students, build school spirit, attract applicants to attend universities, and help universities maintain relationships with alumni.

51.     Professors Rascher and Noll both criticize me for not *proving*, as a matter of economic analysis, that there is a positive correlation between amateurism (as defined by the

---

[55] *Matsushita* at 587.

challenged conduct) and the value consumers place on intercollegiate sports, *i.e.,* demand.  While I have not performed an econometric measurement of the extent to which consumers of intercollegiate sports will be disappointed (*i.e.*, incur a reduction in consumer welfare) if football and basketball become "more professional," my research on this matter has uncovered evidence of this effect.

52.    In addition to what I learned from the record and my interviews with university presidents and athletic directors, the comparison between demand for Division I football and basketball and the demand for minor league football and basketball is instructive.  First, there is an intrinsic comparability between minor league professional sports – especially the top rung of minor league sports and Division I intercollegiate athletics.  In the hierarchy of athletic excellence, the minor leagues and intercollegiate athletics stand in a similar position.  The pinnacle of the pyramid is the major league professional version of the game: the NFL and the NBA.  Intercollegiate sports and minor league sports represent two different ways for talented up and coming athletes to make their way to the "big leagues."  These are the settings in which the next best athletes, the future stars, play.

53.    Demand for intercollegiate athletics is quite different from demand for minor league professional athletics.  In football and basketball that difference is the difference between filling large stadia, big television audiences that give rise to lucrative television contracts, and millions of devoted fans on the one hand and small stadia, modest television audiences, and comparatively smaller and less enthusiastic fan base.

54.     My research in this case shows that one of the variables that gives rise to these demand differences is that the minor league players are professionals, and the student-athletes who play intercollegiate athletics are amateurs.

55.     Professors Noll and Rascher contend that I have not proved any connection between amateurism and the demand for intercollegiate sports because part of my evidence is based on interviews – which they claim should not be a basis of economic analysis. There is value in interviewing university presidents and directors of athletic programs (as I did) for their views.  I find it strange that professors consider meeting with experienced university officials who are in the trenches to be an inappropriate research methodology or think that the people I interviewed are either ignorant of what would happen if the challenged conduct were to change or so biased that they would dissemble in their interviews with me.  My analysis in this matter involved much more than my interviews. But I make no apologies for making this part of my research.[56]

### (i)    Amateurism and the University Community

56.     Wake Forest University President Nathan Hatch told me that multiple interconnected elements go into the relationship between students (and, ultimately, alumni) and their schools, and that amateur athletics is one of these elements.  President Hatch regards intercollegiate sports as a powerful force that contributes to building spirit, passion, and identity.[57]

---

[56] Nor am I alone in including parties to the litigation in my research. See Noll Direct Testimony, ¶ 166 for Professor Noll's use of an interview with Josh Rosen, a UCLA quarterback and a member of the class in this case.  The interview was conducted by *Bleacher Report.com*.  (Matt Hayes, "Josh Rosen Q&A: UCLA QB on Injuries, NCAA and Post-NFL Goal to 'Own the World,'" http://bleacherreport.com/articles/2722587-josh-rosen-qa-ucla-qb-on-injuries-ncaa-and-post-nfl-goal-to-own-the-world (accessed 7/10/18)).

[57] Hatch Interview.

57.   Rebecca Blank, Chancellor of the University of Wisconsin, provided comparable
testimony in her declaration in the *O'Bannon* case:

> [A]thletics benefits education at Wisconsin because athletics
> contribute to the building of the Wisconsin community.  Students,
> faculty, alumni, and members of the community bond and are
> brought together based on their identification with Wisconsin
> sports teams.  This team spirit and community building has
> positive benefits for even our newest students, whose adaptation
> and assimilation into the University is better when they feel part of
> a spirited community.[58]

58.   Chancellor Blank testified in her deposition that many Wisconsin alumni who attend
games would be less interested in watching if "the players are there as paid players as
opposed to students which they identify with as -- from when they were students on
campus."[59]

59.   In my interviews, school officials consistently told me that paying student-athletes would
weaken the relationship between student-athletes and the rest of the university
community.  University of Kentucky Athletic Director Mitchell Barnhart explained that
"if intercollegiate athletes were not amateurs, intercollegiate sports would be viewed very
differently."[60]  He elaborated that "student-athletes, because of their amateur status, are
regarded by other students and fans as students who represent their colleges and
universities, and that while fans enjoy supporting student-athletes' educations, they
wouldn't want to pay for salaries for them."[61]  Former Purdue Athletic Director Morgan
Burke thought that "university athletes who were not amateurs would be viewed as hired

---

[58] Plaintiffs' Deposition Exhibit 35, ¶ 12.

[59] Deposition of Rebecca Blank, 6/1/16 (hereafter, "Blank Deposition"), p. 124.

[60] Elzinga Report I, p. 53 (citing, Barnhart Interview).  See also Elzinga Report I, p. 93.

[61] Elzinga Report I, pp. 53-4 (citing, Barnhart Interview).

guns."[62]  University of Richmond Athletic Director Keith Gill believed that "student-athletes being amateur athletes was essential to the interest of non-athlete students and other members of the university community in athletics."[63]

60.     I have found similar evidence in public sources and in the record corroborating the views of the university officials I interviewed.  Ekow Yankah, a critic of the NCAA, explained that "Fans are not only seeking athletic excellence as such—the biggest and fastest players in descending order.  Our connection to the athletes is deeper.  These student athletes walk the same halls, have the same professors, and sweat the same midterms . . . Paying student athletes erodes that association."[64]

61.     University and NCAA officials held the same view.  Chancellor Blank testified that paying student-athletes

> subverts the whole point of being a student and what it means to be a student athlete . . . I think any payment to student athletes would fundamentally change the nature of what we are about here in college sports . . . we are primarily an education-based institution, and our Athletic Programs . . . need to put education first, and once you start paying, students are not employees.  They should not be receiving pay for going to school.[65]

62.     President Jonathan Alger of James Madison University testified similarly in his deposition:

> I think at that point -- at that point it sounds to me like you're talking about treating individuals as professional athletes and pay to play, not as students, and I think that would undermine the amateur model, I think it would undermine our educational mission, I think it would create a lot of resentment among other students who presumably would not have access to the same sort

---

[62] Elzinga Report I, p. 93 (citing, Burke Interview).

[63] Elzinga Report I, p. 93 (citing, Gill Interview).

[64] Ekow N. Yankah, "Why N.C.A.A. Athletes Shouldn't Be Paid," *The New Yorker,* October 14, 2015.

[65] Blank Deposition, pp. 97-8.

> of resource, many of whom have significant financial need.  I think
> it would raise all sorts of questions with people who support the
> university, whether it's as a public institution, the slate legislature
> or whether it's individuals who donate to the institution and want
> to make sure that we're focused on our educational mission.  I
> think it would create all kinds of concerns.[66]

63.     Former Michigan Athletic Director Dave Brandon also said that if student-athletes got

additional payments, it would affect their relationship with other students.[67]

**(ii)     Amateurism and Broadcasting**

64.     In his interview, President Hatch also told me that if student-athletes became

professionalized "there would be a significant decline in loyalty to institutions, which

would affect television viewership, and that the conferences would cease to exist."[68]  In

addition, he posited that some schools "would adopt the free market approach, and

effectively would become minor league NFL or NBA organizations."[69]  Former

Chancellor Harvey Perlman (University of Nebraska) also expressed the view that if

student-athletes were paid, it would "turn them into professional or semiprofessional

players."[70]  Chancellor Blank predicted that under a pay-for-play regime, "a number of

our fans would . . . become much less committed than they had been before."[71]  AAC

Commissioner and former college sports broadcast executive Mike Aresco also testified

that if the amateur model was not maintained, college athletics would be less attractive to

the TV networks to televise.[72]

---

[66] Deposition of Jonathan Alger, 6/23/16, pp. 127-8.

[67] Deposition of David Brandon, 8/17/16 (hereafter, "Brandon Deposition"), pp. 190-1.

[68] Elzinga Report I, p. 41 (citing, Hatch Interview).

[69] Elzinga Report I, p. 41 (citing, Hatch Interview).

[70] Deposition of Harvey Perlman, 5/3/16, p. 126.

[71] Blank Deposition, p. 125.

[72] Aresco Deposition, p. 72.

65.   In my interview with Mr. Gill, he told me that commercial broadcasters and advertisers indicated that intercollegiate athletics would be less attractive if players were not amateurs.  He understood that "if student-athletes were no longer amateurs there would be a dramatic effect on the interest of broadcasters and advertisers in intercollegiate sports."[73]  Mark Lewis of the NCAA similarly testified in his deposition that NCAA media partners "expressed concern that if college basketball turns into professional basketball, that it would not be the same tournament that it is today" and that "[t]here were conversations with some of our corporate partners that they would no longer be sponsors of the NCAA if the athletes were paid."[74]  In response to a tweet by Jon Solomon that stated "Ex-CBS Sports president: College sports TV ratings could decline 15-20% if players are paid," Commissioner Aresco, formerly the head of CBS collegiate sports broadcasting (whose job included purchasing broadcast rights to collegiate games for CBS) wrote in an email:

> Who knows regarding percentages, but I agree there would be a decline, and maybe a substantial one.  I said that to the Knight Commission years ago.  Despite college sports being big business, there is still an important amateur aspect that you never get with the NFL or NBA, and if you take that amateur aspect out of this, people just won't care as much.  The NFL has its place, but we don't need two of them.[75]

66.   Commissioner Aresco testified similarly at his deposition.

> I did testify before the Knight Commission when I was at CBS, and I said that if the amateur model was not maintained and we became like pro sports . . . that that would absolutely have an effect

---

[73] Elzinga Report I, p. 95 (citing, Gill Interview).

[74] Lewis Deposition, pp. 28-9.

[75] AMERICAN_GIA_061993.  Indeed, history supports Mr. Aresco's opinion that "we don't need two of them;" the USFL and other would-be-competitors to the NFL have all failed to replicate its success.  Leigh Steinberg, "New XFL Could Succeed Where Other NFL Challenges Haven't," *Forbes*, Jan 25, 2018, https://www.forbes.com/sites/leighsteinberg/2018/01/25/new-xfl-could-succeed/#32482aa7679d (accessed 7/11/18).

> on the product we were televising and that ultimately, I felt that it
> would be less attractive to the TV networks to televise what would
> be essentially a professional model.[76]

67.     A similar point is made in The Final Report of the NCAA Task Force on Commercial

Activity in Division I Intercollegiate Athletics:

> We know from our experiences with media partners and their
> advertisers that it is not only the popularity of college sports that is
> attractive.  It is also the values that intercollegiate athletics and
> higher education foster that appeal to marketing and advertising
> interests.  Indeed, if there were no constraints on commercial
> activity – if colleges and universities were to barter their values
> (the avocational motivation for athletics participation and the
> protection of the student-athlete from commercial and professional
> interests) for a few dollars more – the appeal would be weakened.
> The attraction of intercollegiate athletics that allows the enterprise
> to compete favorably with professional sports for media attention
> and commercial support is not the athletics superiority of the
> collegiate product.  Professional athletes are paid for a reason; they
> are better at what they do than amateurs because playing sports is
> the professional's job.  The attraction is the near visceral
> recognition that intercollegiate athletics and higher education share
> common values and that the keystone to the relationship is the
> student-athlete who resides in both worlds.  That is a value that
> advertisers and corporations are as interested in preserving as is
> higher education.[77]

68.     These reactions are consistent with the responses of Dr. Isaacson's survey respondents.

In the Isaacson Survey,[78] more respondents disapproved than approved of the four

scenarios for paying student-athletes amounts greater than current amateurism rules

permit.[79]

---

[76] Aresco Deposition, p. 72.

[77] AMERICAN_GIA_024727-40 at 32.

[78] See In Re: National Collegiate Athletic Association Athletic Grant-In-Aid Antitrust Litigation, Reply Report of Kenneth G. Elzinga, June 21, 2017, § III.B.

[79] In Re: National Collegiate Athletic Association Athletic Grant-In-Aid Cap Antitrust Litigation, Rebuttal Report of Dr. Bruce Isaacson, May 16, 2017 (hereafter, "Isaacson Rebuttal"), Table 6.  Referring to results after accounting for control scenario.

### (iii)   Response to Plaintiffs' Experts on Consumer Demand

69.   Professor Rascher and Professor Noll argue that raising the existing limits on compensation and benefits would not reduce consumer demand.  In part, they make this argument based on history—both recent history, referring to the increase in the athletics-based financial aid cap from the old GIA to the full cost of attendance ("COA"), and earlier history, arguing that football and basketball already were flourishing before any "cap" (at all) was imposed.[80]  Their implication is that intercollegiate sports like football and basketball could flourish without a cap.  Absent a cap, in their view, there would be no reduction in consumer demand.

### (a)   Natural Experiments and History

70.   A central theme of Professor Rascher's testimony is the "natural experiment" that occurred when Division I schools adopted full cost of attendance as the cap on the allowable amount of athletically-related financial aid to student-athletes—and, he claims, there was no adverse economic consequence.[81]  He contends that revenues and television viewership increased, and draws from this the conclusion that schools could (and now do) pay their student-athletes above COA without adverse economic consequences.[82]  He claims this shows that further increases in the amount of financial aid *above* the COA would produce outcomes similar to those observed when the allowable amount of the Grant in Aid was increased up to the COA.[83]

---

[80] Rascher Report, ¶¶ 208, 211; Noll Direct Testimony, ¶ 16.

[81] See Rascher Report, ¶¶ 21, 75, 257, 260.

[82] Rascher Direct Testimony, ¶¶ 51-2.

[83] Rascher Report, ¶¶ 113-4, 124-5.

71.     But, there is good reason not to make such a claim.[84]  The economic importance of the

COA is directly connected to the meaning of amateurism in intercollegiate sports.  To be

an amateur is to be one who is not paid for playing.[85]  Once a student-athlete's cost of

attendance and the amounts incidental to his or her participation in college athletics have

been covered, to receive additional amounts in return for athletic performance is to be

paid, *i.e.,* to cease to be an amateur and to become a professional.  That's a fundamental

change to the product when the contests being marketed are *amateur sports,* not

professional sports.  There is nothing in Professor Rascher's framework of analysis that

enables him to forecast the result of abandoning limits on compensation by referring to an

earlier change that preserved the NCAA's agreed-upon definition of amateurism.

72.      Exceeding the reasonable costs of education and benefits incidental to athletic

participation is a qualitative difference, and not just a difference of degree.  Once the rule

that payments cannot exceed that which is consistent with amateurism is relaxed, or

eliminated (as Plaintiffs propose), the schools will no longer be able to offer amateur-

athletics to the public and members of their communities.  Even schools that don't

---

[84] When we turn to examples of the "Natural Experiment" analysis, we see that the analysis often involves the kind of over-reaching I described earlier.

For example, Professor Rascher attributes to the NCAA that "the 2015 men's basketball championship – the first championship held after COA was approved – attracted a record number of 28.3 million television viewers on average, the highest in more than a decade." (Rascher Direct Testimony, ¶ 51).  This conclusion rests on a factual error.  Student-athletes did not begin actually receiving COA until the 2015-16 academic year. (Michelle B. Hosick, "Autonomy schools adopt cost of attendance scholarships," January 18, 2015,) http://www.ncaa.org/about/resources/media-center/autonomy-schools-adopt-cost-attendance-scholarships (accessed 3/14/17). )  In 2016, which really was the first year student-athletes received the COA, albeit for an unrelated reason – namely that the game was moved to cable from free, over-the-air broadcast television, viewership dropped significantly. (Rick Kisell, "Ratings: NCAA Men's Basketball Title Game Tumbles in First Year on Cable," Variety, April 5, 2016, https://variety.com/2016/tv/news/ncaa-mens-basketball-title-game-ratings-tumble-on-cable-1201745947 (accessed 7/9/18)).  Nonetheless, this example illustrates how failure to take account of other factors influencing the difference between one year and another leads to inaccurate conclusions, and why proper economic analytical methods are required to be applied.

[85]*O'Bannon II* at 1076.

increase their payments to student-athletes will no longer be able to describe athletic contests as "amateur," because for the contest to be amateur competition, all of the participants must be amateurs.

73.     The significance of this agreed-upon definition of amateurism may be appreciated by considering some of the details of the NCAA's rules that governed allowable financial aid *before* the shift to COA athletic scholarships was made.  At that time, the allowable GIA was not a ceiling on the amount of financial aid a student-athlete could receive.  It was merely the ceiling on the amount of financial aid a student-athlete could receive *for his or her athletic participation*.  A student-athlete could receive additional financial aid that was based on need or academic merit, but that additional aid could not bring the total amount of aid to more than the COA (with an exception made for Pell Grant recipients).[86] Through the combination of Pell Grants, academic scholarships, and SAF, student-athletes could already receive COA scholarships.  In other words, except for ensuring that student-athletes weren't forced to effectively "give up" any Pell Grant funds, before the allowable Grant in Aid amount was increased to the COA, the NCAA's rules recognized the COA's relationship to amateurism by capping non-athletically-related aid at COA.

74.     Professor Rascher's analysis actually "proves" a point found in my first report.  Professor Rascher recounts the conduct of a group of schools that included Elon University, James

---

[86] "A student-athlete shall not be eligible to participate in intercollegiate athletics if he or she receives financial aid that exceeds the value of the cost of attendance as defined in Bylaw 15.02.2. A student-athlete may receive institutional financial aid based on athletics ability (per Bylaw 15.02.4.1), outside financial aid for which athletics participation is a major criterion (per Bylaw 15.2.6.4) and educational expenses awarded per Bylaw 15.2.6.5 up to the value of a full Grant-In-Aid, plus any other financial aid unrelated to athletics ability up to the cost of attendance." *(NCAA Division I Manual 2004-05,* National Collegiate Athletic Association, Indianapolis, IN, Article 15.1). Additionally, if a student-athlete obtained a Pell Grant, the amount of aid the student-athlete could receive was increased further to allow the student-athlete to enjoy the full benefit of the Pell Grant. ("A student-athlete who receives a Pell Grant may receive financial aid equivalent to the limitation set forth in Bylaw 15.1 or the value of a full Grant-In-Aid plus the Pell Grant, whichever is greater." *(NCAA Division I Manual 2004-05,* National Collegiate Athletic Association, Indianapolis, IN, Rule 15.1.1)).

Madison University, the University of Delaware, and the University of New Hampshire, all of whom opposed the COA provision.[87]  However, once it was passed, three of the schools adopted the COA within one season.[88]  Professor Rascher cites their decisions to move to a COA level as evidence of the anticompetitive market power of the Defendants.[89]

75.    Actually, the conduct of these three schools is precisely what my externality model of university conduct would predict: on a Division I-wide basis, it is mutually advantageous to restrict compensation and benefits to an optimal level.  But in the absence of amateurism rules, if one economic agent (*i.e.*, one school) raises the payment to its teams, this imposes pressure on the other schools to increase payments.  Doing so does not, as Professor Rascher contends, result in an increase in "quantity, quality, or diversity of output."[90]  To the contrary, as schools deviate from amateurism, the overall value of college athletics to fans who care about amateurism decreases.

76.    When Professor Noll tells the story of Johnny Manziel, the Texas A&M quarterback who was investigated for improperly participating in a scheme to sell his autograph, Professor Noll acknowledges that "the NCAA concluded that the evidence was insufficient to prove that Manziel received an improper benefit for his autographs."[91]  Mr. Manziel was

---

[87] Rascher Report, ¶¶ 90-5.

[88] Rascher Report, ¶ 92.

[89] Rascher Report, § 4.2.2.1.

[90] See Elzinga Report I, p. 87.

[91] Noll Direct Testimony, ¶ 128.

nonetheless "required to sit out the first half of his team's first game in 2013 as

punishment for violating the NCAA's rules by being involved in selling his autograph."[92]

77.     Professor Noll's first error is to assume that fans' attitudes toward a player who was

punished because of allegations that he received improper benefits from a third party

indicate what fans' attitudes would be if the games were changed so that schools could

make unlimited cash payments to their student-athletes.

78.     Professor Noll also makes much of the fact that the television audience for the second

half of A&M's first game (Mr. Manziel having sat out the first half) was larger than the

first half, and the audience for his second game was "the highest of any college football

game on CBS in 23 years, up by 200 percent over the opening SEC game on CBS."[93]  In

concluding that those ratings are evidence that consumers are indifferent about

amateurism, Professor Noll ignores that the apparent ratings spike could have been

caused by any of a number of other factors, including both the publicity generated by Mr.

Manziel's suspension and the possibility that some viewers tuned in to root against Mr.

Manziel.  Professor Noll recognizes that this evidence is inadequate for any conclusion,

because he ends his discussion of this episode by saying "if the negative externality

exists, it must be sufficiently small that *other factors affecting the popularity of SEC

football* overwhelm the effect of Manziel's rules violation."[94]

79.     In his discussion of Mr. Manziel and elsewhere, Professor Noll cites revenue growth as

evidence that periodic NCAA sanctions for compensation rule violations "have not

undermined the popularity of college sports," and unjustifiably concludes that "[t]he most

---

[92] Noll Direct Testimony, ¶ 128.

[93] Noll Direct Testimony, ¶ 129.

[94] Noll Direct Testimony, ¶ 130.

plausible inference to draw from these data is that the negative effect on demand of violating the NCAA's compensation rules either does not exist or, if it does, is economically unimportant."[95]

80.     Even if rising revenues did establish that punishing rules violators has not undermined the popularity of college sports, that would not support a conclusion that fans of college sports do not care about amateurism.  The fact that the NCAA conducted those investigations demonstrates to the public that the NCAA does take amateurism seriously, and is willing to mete out punishment when violations call for it.  That's the sort of information that should be more likely to encourage the public about NCAA enforcement, rather than discourage it.  Fans are unlikely to anticipate that 100% of participants in intercollegiate sports will fully comply with all amateurism rules 100% of the time.  The question Professor Rascher should be asking is whether, over time, consumer interest in college sports would have been eroded if the rules had not been enforced.

81.     Aside from the NCAA, itself, the most prominent historical examples to which Professor Rascher refers are major league baseball (MLB) and the Olympics.  As with his use of NCAA rules changes, he draws conclusions that are simply not supported by his own evidence.

82.     With respect to MLB, Professor Rascher refers both to what he calls "the amateur era (prior to the 1870s)" and the period in the mid-1970s when baseball ended the reserve clause in its contracts with players.[96]  Comparing the situation in which baseball found

---

[95] Noll Direct Testimony, ¶ 132.

[96] Rascher Direct Testimony, ¶ 116.

itself in the 1970s at the end of reserve clause era and the current situation facing the NCAA, Professor Rascher takes the position that, aside from language, "the two situations are … essentially identical."[97]  That's an extraordinary proposition because it means that Professor Rascher regards the fact that MLB is a *professional* sports league while intercollegiate sports are not, the fact that MLB has an antitrust exemption,[98] and the fact that MLB explicitly practiced revenue sharing[99] as irrelevant.  Professor Rascher also drew a parallel between 1870s baseball and twenty-first century intercollegiate athletics.[100]  As with the discussion of the history of the NCAA, the suggestion that (in this example) the passage of nearly 150 years is insufficient to create meaningfully different economic circumstances is implausible.

83.     Professor Rascher also attempts to draw a parallel to the Olympics, which he regards as essentially professionalized now.  The gist of his argument is that people involved with the Olympics predicted that dropping amateurism would be the death of the Olympics yet such a dire outcome never occurred.[101]  According to Professor Rascher

> [F]rom an economic perspective, the question is whether there exists economic evidence that the Olympics' strict enforcement of amateurism was necessary for the commercial success – consumer demand – of the Olympics.  The empirical record shows it was not. Despite the movement's insistence that "amateurism" was the primary driver of consumer demand, the empirical evidence shows that consumers loved (and still love) many things about the Olympics.[102]

---

[97] Rascher Direct Testimony, ¶ 116.

[98] Blair and Haynes, pp. 82-3.

[99] Andy Dolich, "MLB revenue sharing a problem for A's, Raiders," February 29, 2016, https://www.nbcsports.com/bayarea/athletics/mlb-revenue-sharing-problem-raiders (accessed 7/9/16).

[100] Rascher Direct Testimony, ¶ 118.

[101] Rascher Direct Testimony, ¶¶ 124-5.

[102] Rascher Direct Testimony, ¶ 125.

84.     There are at least two reasons why an economist should be unwilling to infer from this experience that if the Olympians' predictions of diminished demand after abandoning amateurism were wrong, then the NCAA's also must be wrong.  For one thing, it is not at all clear that the basis for Olympians fighting to retain amateurism necessarily was the effect of amateurism on demand or that Olympic leadership's opposition to the abandonment of amateurism was based on concerns about consumers' preferences or the potential impact on revenues.  For example, Professor Rascher refers to "the famous statement by the Olympic leadership from 1960 that if the Olympics abandoned amateurism, and were to 'water down the rules now, the Games will be destroyed within eight years.'"[103]  Professor Rascher doesn't provide a citation in his declaration, but the quotation can be found in a *Sports Illustrated* article from 1960 that featured Avery Brundage, then President of the Olympic Committee.[104]  The article reports that Mr. Brundage wrote to the author that amateurism "is a thing of the spirit."[105]  The author went on to recount the eight-year quotation, made by an anonymous supporter of Brundage

> The issue could scarcely be more clearly drawn.  The amateur ideal of sportsmanship, fair play and the pursuit of excellence for its own sake is both a noble and a sound one.  Whether this ideal depends for its existence on the amateur rules … is quite another question.
>
> Brundage and his supporters believe with religious fervor that it does.  "If we water down the rules now," one of his staunchest

---

[103] Rascher Direct Testimony, ¶ 120.

[104] Charles W. Thayer, "A Question of the Soul," *Sports Illustrated*, August 15, 1960, pp. 72-84 (hereafter, "Thayer").

[105] Thayer, p. 74.

backers told me, "the Games will be destroyed within eight years."[106]

85. The magazine article does not include a reference to the relationship between the Olympic leadership's commitment to amateurism and consumer demand. Nor does a CNN article quoted by Professor Rascher from 2012 reporting that fans did not seem to mind the end of Olympic amateurism.[107] If the early Olympic leaders were not basing their prediction of the consequences of abandoning amateurism on expectations of consumer demand, then their experience is no guide to how one should evaluate the accuracy of NCAA predictions that abandoning amateurism would hurt demand for intercollegiate athletics. Even if Mr. Brundage and his colleagues had been basing their predictions on how they expected demand to react to a reduction in amateurism, it still wouldn't be appropriate to base a prediction for the NCAA in 2018 on the professionalization of the Olympics. If the Olympians made poor predictions in 1960, that doesn't mean that the NCAA is making poor predictions in 2018. If some economists predict a recession is 2019 and no recession occurs that year, that will not mean that in the future all forecasts of recession are wrong.

86. In any event before putting too much analytic emphasis on Mr. Brundage and his colleagues it still wouldn't be appropriate to base a prediction for the NCAA in 2018 on the experience of the Olympics without first confirming that the economic fundamentals--demand, supply, and incentives-- were similar. Professors Rascher and Noll have not demonstrated through any form of economically valid analysis that the Olympics provide

---

[106] Thayer, p. 75.

[107] Bob Greene, "What Changed the Olympics Forever," *CNN*, July 23, 2012, http://www.cnn.com/2012/07/22/opinion/greene-olympics-amateurs/index.html (accessed 7/9/18).

any basis for predicting the impact material changes to the NCAA collegiate model will have.

### (b)   NCAA limits on benefits are not arbitrary

87.   Professor Rascher argues that reimbursement of student-athletes for actual and necessary expenses incurred in connection with their participation in their sport, together with the existence of benefits and awards incidental to participation, demonstrates that the NCAA is mistaken to assert that limiting financial aid to the COA is necessary for intercollegiate sports to survive.[108]

88.   Specifically, Professor Rascher identifies rules governing the provision of "apparel, equipment and supplies, transportation and lodging for family to attend championship contests, entry fees and facility use, expenses in connection with national championship events, the Olympics and national team tryouts, fees for conditioning activities, participation awards such as 'gift suites,' and loss of professional value insurance," as "not based on principles of amateurism."[109]

89.   Professor Rascher argues that the NCAA's rules on incidental benefits are arbitrary or inconsistent and, therefore, must be unrelated to amateurism.[110]  The situation he describes is contrary to his position that the NCAA is a cost-containment cartel, and he overlooks the complexity of the economic purposes served by the rules and the way in which the rule-making process operates to protect amateurism.

90.   The NCAA and its member institutions must decide how to handle an array of complexities that include reimbursements for expenses associated with athletic events

---

[108] Rascher Report, ¶¶ 220-3.

[109] Rascher Direct Testimony, ¶ 46.

[110] Rascher Direct Testimony, § 2.1.

and various benefits that properly can be allocated to student-athletes in connection with their participation in athletics and special contests within the definition of amateurism. Additionally, in some cases, the NCAA must decide how to handle the handful of student-athletes who participate in the Olympics.

91.    Each of these activities could have a role in intercollegiate athletics.  The NCAA's Constitution identifies principles to guide the organization that include "the principle of student-athlete well-being, the principle of amateurism, and the principle that student-athletes should be fully integrated into the student body."[111]  The activities that Professor Rascher singles out can contribute to student-athletes' well-being, which is one of the organization's principles.  But, under the wrong circumstances any of these activities could become a threat to amateurism, which is another basic principle.  The NCAA Constitution recognizes that "'[i]n some instances, a delicate balance of these principles is necessary to help achieve the objectives of the Association.'"[112]

92.    Most of the time achieving that balance is straightforward.  For example, providing uniforms to student-athletes without charge raises no threat to amateurism even though it is clearly not within the definition of the cost of attendance.  No one (including Professor Rascher) would argue that amateurism requires student-athletes to buy their own uniforms.  Accordingly, NCAA rules provide that where the expenses of participating in competition are concerned, "actual and necessary expenses may be provided only if such expenses are for competition on a team or in a specific event or for practice that is

---

[111] Brad Hostetter, "Synopsis of NCAA Amateurism and Incidental Benefits Rules, Prepared for Dr. Kenneth G. Elzinga and Dr. Bruce Isaacson, May 12, 2017 (hereafter, "Synopsis"), p. 2. (See also 2016-17 Manual, Articles 2.2, 2.5, and 2.9).

[112] Synopsis, p. 2 (citing 2016-17 Manual, Article 2.01).

directly related to such competition.  The value of such expenses must be commensurate with the fair market value of similar goods and services in the locality in which the expenses are provided and must not be excessive in nature."[113]  In other words, expense reimbursements are allowed, but they are constrained to ensure that they do not become a means of making payments to student-athletes that would indirectly add to their income, making the reimbursement more like pay-for-play.[114]  Because reasonable people can disagree about whether various specific benefits violate the general principle of amateurism, the NCAA adopts specific rules to provide guidance and facilitate enforcement.

93.    One of the programs that Professor Rascher had mentioned in his earlier report provided free food to student-athletes.[115]  He continues to characterize the food provided to student-athletes as "extravagant."[116]  Assisting student-athletes with their nutritional needs certainly serves their welfare.  As long as the program does not become a means to funnel income to them in return for playing (which would alter the substance of the transaction), it doesn't threaten amateurism.  The NCAA's rules governing food allow schools to provide meal plans and food specifically related to competition.  Additionally,

---

[113] Synopsis, pp. 3-4 (citing 2016-17 Manual, Article 12.02.2.1).

[114] Kevin Lennon stated in his declaration that the membership's goal in making rules "includes . . . ensuring that student-athletes are not required to pay 'out-of-pocket' just to participate in college sports," but added that "benefits, however, always must comport with the NCAA's constitutional principle of amateurism and limits are adopted, when necessary, to protect against the potential for abuse that would harm or subvert the amateur model."  (In Re: National Collegiate Athletic Association Athletic Grant-In-Aid Cap Antitrust Litigation, Declaration of Kevin Charles Lennon, 5/16/17 (hereafter, "Lennon Declaration"), ¶ 8).

[115] Rascher Report, ¶¶ 80-2.

[116] Rascher Direct Testimony, ¶ 222.

schools can provide food "incidental to participation [in athletics] (so long as that food is not provided as a replacement for traditional board plan meals)."[117]

94.   Similarly, the rules also allow schools to use Student-Athlete Assistance Fund (SAF) money to provide "loss of value" insurance for student-athletes who qualify for it.[118] Loss-of-value insurance, which indemnifies a student-athlete against the risk of loss from an injury incurred while playing intercollegiate sports, is economically the same as other expenses a student-athlete incurs while playing intercollegiate sports, such as the cost of travel to away games or the cost of equipment.  Here the cost in question is a risk related cost, but it is a cost nonetheless.

95.   Another one of the programs Professor Rascher mentioned was "gift suites,"[119] which are a means of distributing awards to student-athletes on highly successful teams.  Professor Rascher emphasized the large value (approximately $5,600) that a member of a very successful team (such as a team that won a national championship) could theoretically obtain in this fashion.[120]  Awards or prizes of that magnitude, however, are the exception – and not the one that proves the rule.  And despite Professor Rascher's repeated references to the maximum allowable dollar values of these awards, they are not awards of cash (as would be allowed if Plaintiffs obtained their requested relief in this case).[121]

96.   The 2016-17 NCAA Manual provides tables that describe the permissible awards to athletes for participation, for National and Conference Championships, and for Special

---

[117] Synopsis, p. 11 (citing 2016-17 Manual, Article 16.5.2(d)-(e)).

[118] Synopsis, p. 12.

[119] Rascher Direct Testimony, ¶¶ 46, 71, 205.

[120] See for example, Rascher Direct Testimony, ¶¶ 71-2, 74, 205.

[121] Synopsis, p. 10 (citing 2016-17 Manual, Article 16.1.1.2).

Achievement Awards, *e.g.,* MVP awards or "Athlete of the Year."[122]  The allowable

awards in these categories are typically between $200 and $500 dollars.  The largest

single award is for "Athlete of the Year" and is $1,500.[123]  The only way to receive an

award total as large as that described by Professor Rascher would be to combine multiple

awards at different levels resulting in a National Championship.

97.     The rules governing awards are intended to "balance the preservation of the longstanding

        tradition in sport of bestowing gifts and awards for participation and commitment against

        the potential for abuse if there were no limits on the amounts of gifts or awards."[124]  The

        gifts are meant to provide "mementos" that student-athletes will "treasure ... to

        commemorate their experience and achievement."[125]  Cash awards are not allowed, lest

        they become a means of pay-for-play.[126]

98.     Professor Rascher also identifies training expenses and prize money received by

        participants in the Olympic games from their respective countries' Olympic

        Committees.[127]  The NCAA permits student-athletes to receive this money from nations'

        Olympic committees "[i]n recognition of the training costs incurred by National team

        athletes, the unique nature of the Olympics (including that it provides an opportunity

        available only once every four years to represent one's country at the pinnacle of

        international competition), the patriotic attributes of representing one's country, and the

---

[122] 2016-17 Manual, Figures 16-1, 16-2, and 16-3.

[123] 2016-17 Manual, Figures 16-1, 16-2, and 16-3.

[124] Synopsis, p. 10 (citing 2016-17 Manual, Articles 12.1.2.4 and 16.1); see also Lennon Declaration, ¶ 10.

[125] Synopsis, p. 10.

[126] Synopsis, p. 10 (citing 2016-17 Manual, Article 16.1.1.2).

[127] Rascher Direct Testimony, ¶¶ 46, 53, 126, 145.

non-revenue nature of most Olympic sports."[128]  These amounts are not payments in
return for participating in collegiate athletics.

99.     There is a discernible pattern to all these examples.  Each of these activities contributes in
some way to the welfare of student-athletes (satisfying one of the NCAA's principles),
but the activities are only allowed with limits.  The purpose of the limits is to keep the
various benefits from becoming so significant that they become like wages for
participating in college athletics.  The same thing may be said for other benefits that
NCAA rules permit student-athletes to receive: they can receive tickets to sporting
events, but they cannot resell them;[129] they can be paid to work at a school sponsored
football or basketball camp, but only at the going wage for the area;[130] they can receive
health insurance or free health care, including insurance or care that covers future
expenses from injuries sustained during play, but they cannot receive any cash value from
a health savings account set up by the school;[131] they can receive cell phones or travel
expenses, but only if those costs are included in the school's cost of attendance for all
students;[132] their family members can receive transportation to national semi-final and
championship games, but there are caps on the amount of allowable expenses, and this
can only be used once a year;[133] and tennis players are permitted to receive prize and
expense money for the period before they enter college to defray the "exorbitant

---

[128] Synopsis, p. 11 (citing 2016-17 Manual, Articles 12.1.2.1.3.2.1, 12.1.2.1.4.1.2-12.1.2.1.4.1.3, 12.1.2.1.5.1-
12.1.2.1.5.2, 12.1.2.4.7); see also Lennon Declaration, ¶ 17.

[129] Synopsis, p. 6 (citing 2016-17 Manual, Article 16.2.2.1).

[130] Synopsis, p. 6 (citing 2016-17 Manual, Articles 12.4.1, 12.4.3 and 13.12.2.1).

[131] Synopsis, pp. 6-7 (citing 2016-17 Manual, Article 16.4).

[132] Synopsis, p. 7 (citing 2016-17 Manual, Article 15.02.5).

[133] Synopsis, p. 8 (citing 2016-17 Manual, Articles 12.1.2.1.4.4 and 16.6.1.1).

individual competition costs" they often incur as junior tennis players, but only up to $10,000.[134]

100.    To Professor Rascher, this pattern is arbitrary and inconsistent.  On that basis he argues that the NCAA's rules are not grounded in amateurism.[135]  But, Professor Rascher's objection to these rules also misses the point.  If there were a cost-containment cartel, as Professor Rascher alleges, then the cartel would not be arbitrary or inconsistent.  It would be purposeful.  If the NCAA and its member institutions were operating a cartel, the best thing for them to do simply would be to ban all of these benefits.  That would be in its economic self-interest because it would enhance the profitability of the alleged cartel.

101.    The fact that the NCAA permits these benefits, but has rules governing them, reflects the NCAA's commitment to amateurism.  If all of these benefits were inconsistent with amateurism, the NCAA could ban them altogether.  If they were free from the potential for abuse to circumvent amateurism, the NCAA could adopt simple rules allowing them.  But the NCAA has done neither.  Instead, the NCAA shoulders the costs of monitoring and maintaining a compliance system in support of rules that allow these practices, but only within proscribed limits.  The challenged rules and their enforcement are consistent with conduct to preserve amateurism and also would be observed in the absence of a cartel.[136]

---

[134] Synopsis, p. 11 (citing 2016-17 Manual, Article 12.1.2.4.2.1).

[135] Rascher Direct Testimony, § 2.1.

[136] "In sum, the membership's primary objective in permitting benefits incidental to student-athletes' participation in intercollegiate athletics is to maximize student-athlete well-being and the overall educational experience, which is inclusive of athletics participation.  In considering and adopting rules regarding these benefits, however, the membership balances this primary objective with the overarching value of amateurism."  (Lennon Declaration, ¶ 13).

### (c)      Professor Rascher Misrepresents Kevin Lennon's testimony

102.   One witness Professor Rascher quotes frequently is Kevin Lennon (NCAA), who, according to Professor Rascher, conceded that limits on incidental benefits are arbitrary and unconnected to amateurism.[137]  According to Professor Rascher, Mr. Lennon's testimony supports Professor Rascher's argument that the determinations of the amount and type of benefits "incidental to participation" that are permitted or prohibited "are not based on principles of amateurism, have been permitted to be paid in addition to Full COA, and are solely determined to be capped by the majority whims of the NCAA membership."[138]

103.   But Mr. Lennon makes clear in his declaration attached as Exhibit A to my rebuttal report, "Professor Rascher mischaracterizes [his] testimony to reach the erroneous conclusion that NCAA bylaws governing benefits incidental to student-athletes' participation in amateur intercollegiate athletics are adopted without regard to amateurism, arbitrarily and solely for the purposes of cost control.  That is entirely incorrect."[139]  According to Mr. Lennon, whether any particular benefit is consistent with amateurism "is inherent in every Division I rule that addresses these topics, regardless of whether the benefit is related to educational expenses or is incidental to athletics participation."[140]  Incidental benefits "always must comport with the NCAA's constitutional principle of amateurism and limits are adopted, when necessary, to protect

---

[137] Rascher Direct Testimony, ¶¶ 46, 88, 195, 199, 209-10.

[138] Rascher Direct Testimony, ¶ 46.

[139] Lennon Declaration, ¶ 5.

[140] Lennon Declaration, ¶ 7.

against the potential for abuse that would harm or subvert the amateur model."[141]  Mr. Lennon observes that he testified to this point in his deposition.[142]

104.    Professor Rascher contends that "Kevin Lennon testified that any form of payment related to sports participation was acceptable (even when not tethered specifically to education), whether within COA or not, as long as the NCAA members agreed on it representing a *reasonable expense of sport participation.*"[143]

105.    There is a meaningful distinction between an agreement among members regarding what expenses constitute *"a reasonable expense of sport participation"* and an agreement among members to arbitrarily limit payments to student-athletes.  Mr. Lennon testified to the former, not the latter.

106.    When responding to questions at his deposition regarding various types of benefits considered "incidental to participation," Mr. Lennon explained that members can refer to the NCAA Legislative Services Database (LSDBI) for additional guidance regarding which expenses may be approved:[144]

> Q:    And then there's a category called: Other reasonable expenses, okay?  Okay.  Who defines what are other reasonable expenses that the school can pay?  Is that defined by the school to – as to what's reasonable, or is that defined by the NCAA?
>
> A:    Typically, if an institution had a question as to whether something was a – permissible under these expenses, they would

---

[141] Lennon Declaration, ¶ 8.

[142] Lennon Declaration, ¶ 8.

[143] Rasher Report, ¶ 340, italics added (citing Deposition 30(b)(6) of Kevin Lennon, 1/24/17 (hereafter, "Lennon 30(b)(6) Deposition"), pp. 72-3, 92, 287).

[144] Lennon explains, "we would also have a database, that's not a manual necessarily, that would provide interpretations or additional guidance regarding this bylaw that schools would need to look to as well. . . . I believe it's called the LSDBI, the Legislative Services Database, which would be where interpretations are – are placed.  As questions come in for the membership regarding the application of these rules, the database itself would be where those interpretations would be housed.  And so, if you were looking for responding to a question you had on campus, as an example, you would also resort to the database."  (Lennon 30(b)(6) Deposition, pp. 19-20).

ask the NCAA or their conference for a determination of that, and those are the type of things that would be found in the database that we talked about.

. . .

Q:     And – and they would probably do that because they would risk, would they not, if they provided an expense, which the NCAA later said was unreasonable to provide under this category, the school could risk some type of NCAA sanction, correct?

A:     Yeah, they – they would want to make sure that what they're doing is permissible.

Q:     Okay.  But you agree with me, there are other reasonable expenses which the school could apply under this category that would be incidental to participation that could be allowed?

A:     Yes.[145]

107.   By my reading, Mr. Lennon's testimony supports the proposition that member institutions are not *arbitrarily* determining which benefits and expenses are permissible. To the contrary, NCAA member schools consider these benefits and expenses, attempting to determine which expenses are *"reasonable expense[s] of sport participation."*  In the process they can seek guidance from the NCAA, and they can query the LSDBI.  The NCAA and its member institutions invest resources to maintain and query the LSDBI database.  It makes no economic sense to shoulder the costs of such activity if they did not believe it was worthwhile doing so.  In other words, Defendants invest resources to ensure that benefits incidental to participation comply with the intent of the NCAA rules to advance the principle of amateurism.

108.   Consistent with that conclusion, Mr. Lennon explains in his declaration that:

> Some proposals for potential benefits to student-athletes may pose little threat to the principle of amateurism and thus the membership accords institutional discretion in such cases.  In other instances, however, the proposed benefit may pose a greater risk to amateurism as a potential device for pay-for-play, requiring the

---

[145] Lennon 30(b)(6) Deposition, pp. 73-5.

membership to adopt limits to minimize that risk.  In either case the decision is the result of the considered judgment of the membership acting in the collective interests of all student-athletes, and is not arbitrary as Professor Rascher asserts.[146]

### (d)   Non-NCAA Sports

109.   Finally, Professor Rascher makes reference to sports -- like cycling, figure skating, sailing, and e-sports[147] which are sanctioned by bodies other than the NCAA[148] -- that he asserts allow students enrolled at NCAA schools to be paid-for-play in those sports.  But the sports Professor Rascher cites have relatively small audiences at the college level and a very modest presence on campus.  Any mix of professionalism and student life in the

---

[146] Lennon Declaration, ¶ 14.

[147] Professor Rascher describes growth in interest in esports (*i.e.,* competitive play of electronic games) generally and on campuses. (Rascher Direct Testimony, ¶¶ 128-9).  Esports is now organized outside the NCAA, and according to Professor Rascher, "A diversity of approaches to compensation for esports is emerging among individual schools and conferences just as a diversity of approaches would likely develop in Division I basketball and FBS football if the current compensation restraints are eliminated." ( Rascher Direct Testimony, ¶ 129).  Other than that they are both forms of competition taking place at universities, Professor Rascher does nothing to establish that esports are a good model for Division I football or basketball.  He does not identify any program where student-esport competitors received more than the COA.  What is more, when Professor Rascher refers to UC Irvine as a school that "has offered full esports scholarships," (Rascher Direct Testimony, ¶ 129). he misstates the facts.  While he cites no source for this claim in his declaration, he made the same claim in his opening report, ("[T]he University of California, Irvine offers full esports scholarships." (Rascher Report, ¶ 268) citing Paul Szoldra "This California university will pay half your college tuition just for playing video games," *Business Insider,* September 19, 2016, http://www.businessinsider.com/uci-scholarship-for-video-games-2016-9/#the-esports-arena-is-located-in-ucis-student-center-where-you-can-also-find-the-food-court-and-conference-rooms-among-other-things-1 (accessed 7/9/18) notwithstanding that the *title* of the article he cited to is "This California university will pay *half* your college tuition just for playing video games." (Paul Szoldra "This California university will pay half your college tuition just for playing video games," *Business Insider,* September 19, 2016, http://www.businessinsider.com/uci-scholarship-for-video-games-2016-9/#the-esports-arena-is-located-in-ucis-student-center-where-you-can-also-find-the-food-court-and-conference-rooms-among-other-things-1." (accessed 7/9/18), italics added.)  As the title suggests, the article says "UCI is bringing in five students on the new scholarship, four of whom weren't even looking to attend. It covers about *half* of in-state tuition."(Paul Szoldra "This California university will pay half your college tuition just for playing video games," *Business Insider,* September 19, 2016, http://www.businessinsider.com/uci-scholarship-for-video-games-2016-9/#the-esports-arena-is-located-in-ucis-student-center-where-you-can-also-find-the-food-court-and-conference-rooms-among-other-things-1 (accessed 7/9/18), italics added).

[148] Collegiate cycling is governed by USA Cycling ("Collegiate," http://www.usacycling.org/Programs/collegiate/ (accessed 5/8/17)); Collegiate ice skating is governed by US Figure Skating ("About Us," http://www.usfsa.org/story?id=58998 (accessed 5/8/17)); Collegiate sailing is governed by the Inter-Collegiate Sailing Association ("Overview," http://www.collegesailing.org/about/overview (accessed 5/8/17)); Collegiate E-Sports is governed by the National Association of Collegiate eSports ("What is NACE?" https://nacesports.org/about/ (accessed 5/8/17)).

context of those sports is not evidence that Division I football and basketball would have the same appeal to consumers and members of the university community or would supply the same "front door" to universities if there were no cap on student-athlete remuneration in these sports.

### C.     **Academic Integration**

110.   Plaintiffs' theory of the case fails to acknowledge that, in economic terms, the product that universities and colleges "sell" to their student-athletes has an academic as well as an athletic component.   *O'Bannon*, however, acknowledged and reflected an understanding of the dual nature of the student-athlete's educational experience when it recognized that promoting the integration of athletics and academics involved a legitimate procompetitive purpose.[149]

111.   Neither Professor Rascher nor Professor Noll appears to dispute that student-athletes benefit academically from attending NCAA Division I universities.   Nor could they – the record is replete with evidence on this point.

112.   For example, former Purdue Athletic Director Morgan Burke expressed the view that "there is intrinsic value to this model [intercollegiate amateur athletics] in America."[150] This view lines up with remarks former SEC Commissioner Mike Slive made at the 2006 SEC Awards Dinner, when he explained that universities have intercollegiate athletics

> because we believe in the intrinsic educational values taught by
> intercollegiate athletics such as sportsmanship, sacrifice,
> teamwork, how to deal with failure and success, learning what
> dedication and commitment requires, and learning how to
> persevere.   We do it because we believe deeply in 'the enterprise
> of intercollegiate athletics' as a vehicle for instilling these values in

---

[149] *O'Bannon II* at 1073 .

[150] Elzinga Report II, p. 12 (citing, Burke Interview).

our student-athletes, values that go hand in hand with academic achievement.[151]

113.  In his interview with me, Mr. Burke went on to explain "You have a kid who is driven to succeed in athletics and academics.  There is synergy to that that makes them 'change makers.'"[152]  This "drive to succeed" academically and athletically also has been recognized by the NCAA and its Division I conferences with each giving out numerous awards linked to academic and athletic achievement.[153]

114.  During his interview, University of Richmond Athletic Director Keith Gill stressed that the University of Richmond's recruiting effort "emphasizes the quality of education and that he tells families of prospective student-athletes, 'at the end of the day, your son or daughter will be a better person when they leave here.'"[154]  The positive effect of athletic participation that Mr. Gill described is well documented.[155]

115.  Mr. Gill described his university as a place where "concern for student-athletes [is] part of the culture" and where "coaches [are] professionals who work hard to promote the development of their student-athletes."[156]  He stated that "his colleagues are thoughtful about their students' experience in college, including graduation, balancing other interests, time off, and time to study."[157]  Chancellor Blank provided similar testimony

---

[151] SEC00201632-47 at 46.

[152] Elzinga Report II, p. 12 (citing, Burke Interview).

[153] See Elzinga Report I, Appendix D.1 for examples.

[154] Elzinga Report II, p. 12 (citing, Gill Interview).

[155] See Elzinga Report III, note 116.

[156] Elzinga Report I, pp. 51-2 (citing, Gill Interview).

[157] Elzinga Report I, p. 52 (citing, Gill Interview).

regarding the University of Wisconsin, explaining "our primary objective with regard to students is their education."[158]  The same point is made by David Brandon who testified:

> Our coaches are highly incentivized to make sure that the students perform well in the classroom and they're highly penalized if they don't, and I don't think there's a coach at least that I worked with of the 31 coaches at Michigan that ever wanted to put themselves in a situation where they were standing in the way of a kid being successful in the classroom.[159]

116.    In an interview that Mark Emmert, former President of the University of Washington, gave to the *Seattle Times* a week after he assumed the Presidency of the NCAA, he was asked what he hoped his legacy at the NCAA would be.  His answer was "I'd hope that we have created a culture across intercollegiate athletics where the focus is on the whole well-being of the student-athletes[,] making sure academic success is embedded in the culture, and making sure they have a high-quality experience."[160]

117.    The commitment to a well-rounded college experience that these interviews describe also can be seen in the services and programs universities provide student-athletes.[161]  Some examples include assisting "student-athletes in identifying summer employment opportunities [and] career placement,"[162] academic support centers and programs,[163] and policies that limit the amount of class time a student-athlete can miss due to competition.[164]

---

[158] Blank Deposition, p. 13.

[159] Brandon Deposition, p. 127.

[160] NCAAGIA02309058-9.

[161] See Elzinga Report I, Appendix D.2.

[162] BIGTEN-GIA 101764-6 at 4.

[163] SEC00153058-65 at 63; MWC_GIA_004258-71.

[164] SEC00310456.

118.   Plaintiffs dispute whether there is any relationship between student-athletes' educational experiences and the challenged restraints.  Their position runs contrary to basic economics of incentives as well as the relevant record evidence.

119.   If student-athletes were paid by the university as professionals, the relationship between the student-athlete and the university would be very different.  As professional athletes, students would have an incentive to focus more of their time and talent on their sport because they are getting paid to do.  The parallel to the corporate world is obvious. In many businesses incentive programs, bonuses and commissions are used to focus the attention of employees on the types of activities that employers want to emphasize.  What is common in the business world would become common in intercollegiate sports.  As student-athletes responded to enhanced economic incentives, they would focus their attention less on the array of academic, social, and cultural opportunities available to them as students, and more on athletics.  Put differently, increasing compensation for athletic performance would incentivize student-athletes at the margin to allocate more time and effort on athletics.

120.   The university officials with whom I spoke understood the incentives that would come into play.  Wake Forest University President Nathan Hatch told me that "athletes who were paid more money would find it harder to balance athletic and academic demands on their time."[165]  In his deposition, Mark Emmert, President of the NCAA, expressed a similar concern, stating that: "[I]f I'm paying somebody 100,000 a year to play football, the last thing I want them to do is study calculus.  I want them to play football."[166]  Mr.

---

[165] Elzinga Report I, p. 22 (citing, Hatch Interview).

[166] Deposition of Mark Emmert, 1/12/17 (hereafter, "Emmert Deposition"), p. 97.

Emmert's statement similarly reflects the situation that student-athletes would face when choosing to allocate their time between athletics and academics if they were "paid" more.

121. In his interview with me, Mr. Gill expressed his opinion that "college sports are one part of the institution's educational experience and undermining that turns the participants into employees," which he described as "catastrophic."[167]  Mr. Emmert similarly said in a Question and Answer session that: "it's really inappropriate to consider [college football players] employees.  They're not employees, they're students.  We need to recognize we have high academic aspirations and expectations of them."[168]  In his deposition, American Athletic Conference Commissioner, Michael Aresco testified:

> I've always believed that ultimately, it would, it could and it would if the -- if the money was for performance.  In other words, if the money was being paid for performance so that the student athlete would become essentially an employee or professional, I think that would lead, I think, to the -- ultimately the destruction of the collegiate experience, if we prefer to call it experience in the collegiate model, but I do believe that.  I always have.[169]

122. Professor Rascher not only contends that the challenged restrictions are unrelated to academic integration, in his original report he asserted that the challenged rules actually *reduce* the prospect of student-athletes integrating successfully with other students and ultimately graduating.  Professor Rascher had claimed the cap on financial aid means student-athletes, especially those from disadvantaged backgrounds, will go through school in comparative poverty and that their poverty will impede their ability to integrate into the life of the university.[170]  While his declaration "excludes direct reference to the

---

[167] Elzinga Report I, pp. 41-2 (citing, Gill Interview).

[168] NCAAGIA002309058-9 at 9.

[169] Aresco Deposition, pp. 107-8.

[170] For example, Professor Rascher writes, "research on educational outcomes suggest that the restraints at issue actively discouraged such integration, by isolating the poorest athletes during weekend outings, dinners at

flaws in Dr. Heckman's work," and generally leaves the task of rebutting Dr. Heckman's conclusions about the positive educational outcomes for student-athletes to Professor Noll,[171]  Professor Rascher continues to suggest that the challenged rules have an adverse effect on academic integration while emphasizing the relative luxury in which he claims student-athletes live on campus.[172]

123.   If Professor Rascher were correct in his assessment that the challenged rules, together with actions like the purported specialized athlete dormitories, conspire to impede the academic integration of student-athletes, and if he also were correct that the resulting diminished integration interfered with the ability of student-athletes to finish their degrees, then the data on degree completion ought to show that student-athletes are less likely to complete their degrees than other similarly situated students.  Professor James Heckman finds that student-athletes are as likely if not more likely than comparable non-athlete students to complete their degrees.[173]

124.   Professor Heckman conducted an empirical analysis of the effect of athletic participation on a student-athlete's likelihood of completing a Bachelor's degree and submitted an expert report containing his findings.[174]  Professor Heckman's results indicate that student-athletes are as likely or more likely than comparable non-athlete students to

---

restaurants off campus, etc." (Rascher Report, ¶ 320) and "The connection between lower income students and lack of integration driven, *inter alia*, by their lack of income is likely to have a disproportionate impact on class members because the three sports at issue have a high concentration of lower income as well as first-generation college students, an indicator of having come from a lower socio-economic status, as well as a characteristic highly connected to poor academic performance." (Rascher Report, ¶ 325, italics in original).

[171] Rascher Direct Testimony, ¶ 132.

[172] Rascher Direct Testimony, ¶¶ 138-41.

[173] See Elzinga Report II, p. 49 and In Re: National Collegiate Athletic Association Grant-In-Aid Cap Antitrust Litigation, Expert Report of Professor James J. Heckman, March 21, 2017 (hereafter, "Heckman Report"), ¶ 53.

[174] Heckman Report.

complete their degrees,[175] which is evidence contravening the hypothesis that student-athletes are held back from graduating by an inability to integrate.  The Heckman findings indicate that the limits on compensation and associated benefits and the actions of member schools are *not* harming the ability of student-athletes to integrate and succeed academically.

### D.     Spending on Coaches and Facilities

125.  Professor Rascher claims that because that because schools cannot pay student-athletes, "schools over-invest in less efficient competitive substitutes, particularly excessive facilities spending, and super-competitive coaching and administrator salaries."[176]  In his view, "[t]he amounts of inefficient spending on coaching and athletic directors and facilities is extraordinary," and that "the super-competitive profits" he contends are created by the challenged rules "are likely to be competed and/or frittered away."[177]  Professor Rascher's analysis is mistaken for this reason.  It would make no economic sense to create a cartel, only to see the fruits of the cartel dissipated in this fashion.[178]  If indirect competition is "inefficient" relative to direct competition via money offers for services, that would mean it is either a costlier form of recruitment than direct money offers, or it is less effective.  That means members of a monopsony cartel who "artificially re-allocate the surplus to less efficient means of achieving indirectly what the compensation cap restrains from happening directly,"[179] are economically irrational.  It

---

[175] Heckman Report, ¶ 53.

[176] Rascher Direct Testimony, ¶ 213.

[177] Rascher Direct Testimony, ¶ 217.

[178] Elzinga Report I, § IV.B.1.b.

[179] Rascher Direct Testimony, ¶ 24.

would be an odd cartel to agree on precluding one form of competition only to allow another form that is costlier or less effective.  A profit-maximizing cartel would earn more net revenue by agreeing to preclude *both* forms of competition.

126.    Professor Rascher makes reference to the "Bowen Revenue Theory," according to which a university raises as much revenue as possible in order to have resources to spend on enhancing its reputation.[180]  But in the context of the Bowen hypothesis, a university would not tolerate the kind of gratuitous expenditures that Professor Rascher suggests are the results of the alleged cartel.  If a cartel produced a surplus, under the Bowen Theory of institutional behavior, any university with access to such a surplus would have an incentive to allocate those funds to the area where its marginal effect on the university's reputation would be the greatest.  The surplus would go only to coaches' salaries and lavish athletic facilities if those two kinds of expenditure were, at the margin, the most efficient way of enhancing the university's reputation.  If coaches' salaries and athletic facilities are inefficient uses of resources, then schools that are raising revenue in order to enhance their reputations, as the Bowen Revenue Theory describes them, would have better use for any surplus a cartel brings in.

127.    Professor Rascher's designation of certain expenses as "extraordinary" is itself arbitrary.  He compares the level and rise in coaches' salaries to other metrics without any analysis as to whether those are appropriate metrics for comparison.  For example, he compares college football coaches' salaries with NFL football coaches' salaries as a percentage of

---

[180] Frans van Vught, "Mission Diversity and Reputation in Higher Education," *Higher Education Policy* 21 (2008):151-174, p. 169.

revenue and total payroll.[181]  He compares growth in college football coaches' salaries with inflation and with the "list price," as he calls it, of athletic scholarships.[182]

128.  In view of the fact that college football and basketball coaches sometimes move to the NFL or NBA and vice versa, and in view of the level of professional league coaches' salaries, such as Sean Payton, coach of the NFL's New Orleans Saints with an estimated salary of $8.5 million[183] and Rick Carlisle, coach of the NBA's Dallas Mavericks with an estimated salary of $7 million,[184] there is no reason to believe that the select college salaries he identifies are anything other than the market-clearing level for elite coaches. Professor Rascher has provided no analysis demonstrating that college coaching salaries exceed the market-clearing level.  His finding that college coaches' salaries are a larger percentage of revenue or team payrolls and his findings that college coaches' salaries grew faster than inflation or scholarship support are all consistent with the proposition that college coaches' salaries are at market clearing levels.  Professor Rascher's findings on these points are fully consistent with that and with the proposition that most intercollegiate football teams earn less revenue than NFL teams do and have smaller payrolls.  Here, Professor Rascher found an explanation that suits his narrative, and ignored the possibility that other factors may be causing the phenomenon he observed.[185]

---

[181] Rascher Direct Testimony, ¶¶ 261-2 and Exhibit 167(m)(m).

[182] Rascher Direct Testimony, ¶ 263 and Exhibits 167(n)(n), 167(o)(o).

[183] Mike Triplett, "Sean Payton agrees to 5-year extension with Saints," http://www.espn.com/nfl/story/_/id/15048671/sean-payton-agreed-five-year-extension-new-orleans-saints (accessed 4/28/17).

[184] Marc Stein, "Mavericks, Rick Carlisle reach agreement on new 5-year deal," http://www.espn.com/nba/story/_/id/14061738/dallas-mavericks-rick-carlisle-reach-agreement-new-five-year-deal (accessed 4/27/17).

[185] Rascher Direct Testimony, ¶¶ 221, 261-66.

## V.   **Plaintiffs Have Not Demonstrated Their Alternatives Would be as Effective as the Challenged Rules Without Significantly Increased Cost**

129.   In the third stage of the Rule of Reason the analysis assumes that procompetitive benefits have been identified at the second stage and the question is raised, if alternatives to the challenged conduct can be identified that are less restrictive but equally effective in providing the procompetitive benefits from the second stage -- without increasing costs in the marketplace.

130.   Plaintiffs suggest two different categories of alternatives to the challenged rules.  The first suggestion is that rules governing compensation be made at the conference level - essentially taking the NCAA out of the loop.[186]  Under this approach, schools in the ACC might adopt financial aid and associated benefits rules different than schools in the Big Ten.

131.    The second category consists of a number of schemes by which unlimited money could be paid to athletes.  Professor Rascher describes some examples of what he speculates schools might do in this world as "tethered" to either "educational expenses"[187] or "an educational outcome,"[188] and others as "related to athletic participation."[189]  Examples of the benefits "tethered to education" include scholarships for student-athletes that could be used at any institution and scholarships awarded to student-athletes for graduate school or study abroad.[190]  Examples of benefits tethered to "an educational outcome" include annual cash payments to student-athletes who graduate and cash bonuses for students

---

[186] Rascher Direct Testimony, § 4.1.

[187] Rascher Direct Testimony, ¶ 200, 202.

[188] Rascher Direct Testimony, ¶ 202.

[189] Rascher Direct Testimony, ¶ 207.

[190] Rascher Direct Testimony, ¶ 200.

who live in dorms, which Professor Rascher admits would not be limited to any dollar amount.[191]   Professor Rascher openly refers to these proposals as "'pay-for-stay' and 'pay-for-grades' bonus systems," and contends they would "increase the college-ness of college sports."[192]

132.   What  Professor Rascher characterizes as "direct expenses related to athletic participation" appears to refer to payments to student-athletes for "living expenses" while not in school.[193] These participation-related expenses are part of Plaintiffs' "Alternative Injunction," which would allow unlimited versions of "the existing participation benefits identified by Mr. Lennon—even if paid in the form of a cash sum untethered to an educational expense."[194]

133.   It is important to bear in mind that despite Plaintiffs' experts' efforts to characterize Plaintiffs' requested relief as minor, Plaintiffs are requesting relief that would permit unlimited cash compensation.  Under the first category, while schools and conferences would not be prohibited from setting their own compensation rules, it is pure speculation as to what would actually happen if Plaintiffs get their requested relief.  Individual schools could offer unlimited cash compensation, and schools within conferences could similarly agree to permit member schools to allow unlimited cash compensation.  As to the second category, reflected in Plaintiffs' "Alternative Injunction," schools could provide unlimited sums of cash so long as they were purportedly tethered to education or incidental to athletic participation.

---

[191] Rascher Direct Testimony, ¶¶ 202, 204.

[192] Rascher Direct Testimony, ¶ 205.

[193] Rascher Direct Testimony, ¶¶ 206-7.

[194] Plaintiffs' Opening Argument, p. 46.

134.    In evaluating Plaintiffs' proposed less restrictive alternatives, one has to ask whether a system permitting unlimited compensation is as effective as the NCAA's agreed-upon amateurism rules with respect to the procompetitive justifications for those rules.  Plainly that cannot be the case.

### A.    Conference-Level Rulemaking

135.    Professors Rascher and Noll proposes a world in which many NCAA rules (including some eligibility rules) would stay in place,[195] but where conferences make their own rules about amateurism.[196]

136.    The striking component of this proposal is that it would make the locus of rule-making different from -- and lower than -- the locus of athletic competition.  As it stands now, the most conspicuous activities in NCAA Division I FBS football and NCAA Division I college basketball are their national championships: the NCAA's "March Madness" basketball tournaments and the College Football Playoff (CFP) national championship, which is organized by the FBS conferences with competition occurring under NCAA rules.  Additionally, there are traditional rivalries between schools -- often schools in the same state that cross conference lines, such as Georgia (SEC) vs. Georgia Tech (ACC), Clemson (ACC) vs. South Carolina (SEC), and Florida (SEC) vs. Florida State (ACC).  All of these events are played under NCAA rules.  The major basketball tournaments are NCAA events, and while the national football championship is organized by the CFP, the

---

[195] Noll Direct Testimony, ¶ 182.

[196] Rascher Direct Testimony, § 4.1; Noll Direct Testimony, ¶¶ 184-206.

schools have agreed to be bound by the NCAA rules.[197]  In short, the schools in the cross-conference rivalries are all NCAA members, bound by the NCAA's rules.

137.  In essence, Professors Rascher and Noll propose breaking up a successful nationwide product, into a number of regional products.  Under their conception, teams of any particular conference may or may not continue to play against teams in other conferences in the future.  And they assert without any analytical basis that this change will have no economic effect.  This would be akin to splitting up the National Football League's conferences, as was the case prior to the 1966 merger of the NFL and AFL.  That more conferences would be "competing" does not, as Professor Rascher contends, mean that "the industry as a whole would be far better off."[198]  Because the procompetitive benefit of the NCAA's amateurism standard (presumed at the third stage of the Rule of Reason) is to collectively manage the valuable product attribute of amateurism, Professors Rascher and Noll cannot assume that their proposed conference level decision making regime is more or even equally procompetitive merely because there are more decision makers.  There is no basis for Professor Rascher's suggestion that breaking up one successful league, into smaller leagues with potentially significantly different characteristics that might prevent effective interleague competition in the future, is on balance procompetitive.

---

[197] The NCAA legislates rules concerning the CFP, and nothing in the CFP agreements changes NCAA rules of eligibility or competition (2016-17 Manual, Article 5). See also, 2017-18 NCAA Postseason Bowl Handbook, pp. 1, 18.

[198] Rascher Direct Testimony, ¶ 248.

138.    The exercise that Professor Rascher undertook to calculate HHI indices for the status-quo and for the proposed conference-level-decision-making regime[199] reflect this flaw in reasoning.  The meaning of the calculations and tables produced by Professor Rascher concerning the HHI serve only to demonstrate that if you regard the NCAA as a single competitor in the relevant market, then the relevant market looks more concentrated than it does if you regard each conference as a separate entity.  That's not helpful to understanding the procompetitive effect of the challenged practices because that analysis begs the question of the challenged practices' procompetitive effects – essentially assuming them away.

(i)    **Unwarranted Assumptions**

139.    Professors Rascher and Noll assume that it would be possible to change one part of the system, *i.e.,* to move the authority to set eligibility rules from the NCAA to individual conferences, without causing further changes throughout the system.  In other words, they assume that after moving the authority for setting eligibility rules downstream to the conferences, the conferences and the member schools would continue to operate as they did before.  Professors Rascher and Noll also assume that conferences will continue competing against one another and organizing inter-conference contests in the same fashion after the change is made.

140.    If Professors Rascher and Noll actually believe that having conferences set eligibility rules separately is a less restrictive alternative, one that achieves the same procompetitive benefits as the challenged rules, they should analyze the alternative structure they propose.  They have not done that.  Instead, without analyzing the consequences of the

---

[199] Rascher Direct Testimony, ¶¶ 161-2 and Exhibit 167(s).

change, they implicitly assume that decentralization of eligibility rule-making authority will have no effect on the rest of the intercollegiate sports system, which will continue to function as it does under the *status quo.* Their reliance on *ceteris paribus* means they overlook externality problems.

141. Professors Rascher and Noll assume that in a world in which conferences set eligibility rules separately, one can ignore the potential that separate rule-making creates for the conferences to impose negative externalities on one another. This in turn requires assuming that with the new payment structures that could be forthcoming under that system, student-athletes would continue to have the same interactions with other members of their universities. This means assuming that the other constituencies in their universities will continue to have the same degree of interest in athletic contests, *i.e.,* market demand will not decline. This means assuming that broadcasters will continue to have the same interest in carrying games. This means assuming that alumni will continue to be attracted to their respective *alma maters* to the same degree even if the athletes are professionalized and contests become pay-for-play. Apart from Mr. Poret's survey, Professors Rascher and Noll offer no evidence or analysis in support of any of these propositions, and I understand Mr. Poret's conclusions are contradicted by Dr. Isaacson's report.[200]

142. If rule-making authority moved to the conference level and the conferences adopted substantively different eligibility rules, the schools and conferences that decided to adhere more strictly to the standards of amateurism would face a choice between

---

[200] Isaacson Rebuttal, ¶¶ 144-52, 154-7 and Tables 5-7.

continuing to play with schools that had embraced professionalism or seek to form new organizations composed of like-minded institutions.

143.    If all the schools and conferences remained in the NCAA together, the schools and conferences that retained a commitment to amateurism would find themselves continuing to compete athletically with schools that had embraced professionalism.  The schools and conferences that retained amateurism rules would become the victims of the negative externalities I described earlier.  Their athletic programs would lose value because of the effect of their more professionally-oriented peers.  As the professionally-oriented exercised their advantage, confidence in the fairness of athletic contests would decline. Even the schools that elected to adopt a professional approach would experience the ill effects of the new equilibrium: as the game became more dominated by such schools, the interest of those associated with the amateur-oriented schools in rivalries and championships would likely be diminished, which would reduce the value of those rivalries and championships to members of the professionally-oriented schools.

144.    For example, imagine that the Pac-12 decided to allow professional level payments beyond the COA and the SEC followed suit, but the Big Ten, Big 12, and ACC retained amateurism, and all of the conferences remained within the NCAA.  The conferences that did not exceed COA would incur the negative effects (externalities) that would be a consequence of playing against teams from conferences with a weaker commitment to amateurism.  This would create pressure for conferences that recognized the value of enforcing amateurism to pull out of competition with conferences that did not and that adopted lax rules.  Within conferences schools that recognized the value of enforcing

amateurism would likewise have an incentive to pull out of conferences dominated by schools that did not.

145. During his deposition, Nathan Hatch, President of Wake Forest University and one of my interview subjects, anticipated this outcome when he testified in response to a question about just such a scenario, a regime in which conferences were free to make their own eligibility rules. President Hatch testified that

> Well, for one thing, I think you don't – you no longer have the NCAA. I think the potential would be to fracture conferences, and so I think the sort of – the – the financial infrastructure would be threatened. And I think getting back to where we began, I think the kind of loyalty of our fans to what we're about would be in question.[201]

146. Asked why he expected the proposal to "fracture conferences," he added

> Because presumably the NCAA hasn't changed its rules, and thus, there would be a set of schools that would be leaving the NCAA. And so for things like the basketball tournament, it would have to be completely – completely recast. So you might have two or three basketball tournaments, so whatever.[202]

147. President Hatch had previously told me that many presidents and chancellors likely would not be willing to participate in a system where there were unrestrained payments to collegiate football and basketball players.[203] While he acknowledged that some might, he "didn't expect that top universities would be willing to do so, and he didn't expect that Wake Forest would."[204]

148. Various NCAA, conference and school officials have similarly expressed reluctance to participate in a pay-for-play system. Lawrence Scott, Commissioner of the Pac-12,

---

[201] Deposition of Nathan O. Hatch, 5/11/17 (hereafter, "Hatch Deposition"), p. 57.

[202] Hatch Deposition, p. 57.

[203] Elzinga Report I, p. 39 (citing, Hatch Interview).

[204] Elzinga Report I, p. 39 (citing, Hatch Interview).

testified in his deposition that he recalled conversations with the then President of Stanford University, prominent alumni, and other fans who expressed "[t]hey would have trouble imagining Stanford wanting to continue to participate in intercollegiate athletics if there were . . . professionals competing."[205]  The President of Notre Dame, Rev. John Jenkins, also indicated that Notre Dame would leave elite college football if pay-for-play occurred and would: "explore the creation of a conference with like-minded universities."[206]  In his deposition, Mark Emmert testified that he believed that some schools would no longer participate in college athletics if universities had to pay student-athletes to play for their school team.[207]

149.   Professor Rascher makes much of what he describes as five categories of schools currently differentiated by their policies towards aid to student athletes.  According to Professor Rascher, the military academies pay their students as salaried employees;[208] some schools provide the full COA plus other benefits (*i.e.,* SAF, incidental benefits, and retention of Pell grants); some offer only the COA (a practice which Professor Rascher characterizes as Pell Grant confiscation); some retained the pre-2015 GIA cap; and some (the Ivy League) offer no athletic aid at all.[209]  Yet Professor Rascher argues that schools

---

[205] Scott Deposition, pp. 85-6.

[206] WAC_GIA_039307-11 at 7.

[207] Emmert Deposition, pp. 70-1.

[208] Professor Rascher's treatment of the military academies, whose students earn a salary because they are serving in the military while they are students, is illustrative of the wooden and mechanical approach that he takes to questions of amateurism.  He offers the example of the academies' games with universities and colleges as a demonstration that undercutting amateurism won't affect demand for intercollegiate athletics.  (Rascher Direct Testimony, ¶ 98).  For this observation to be *apropos*, Professor Rascher would have to believe that cadets' and midshipmen's salaries make them professional *athletes*, or at least he would have to believe that fans will think so.  Surely fans of intercollegiate athletics recognize that students at the academies are being paid for their service to the military – not for athletics.

[209] Rascher Direct Testimony, ¶ 96 and Exhibit 167(o).

in these different categories regularly play against one another "without harm to consumer demand."[210]  He concludes that the evidence of these games (among schools with different aid policies) "supports the conclusion that the current compensation caps are not necessary to maintain or enhance consumer demand."[211]

150.   In the same vein, Professor Noll cites the Ivy League's membership in Division I, despite having different compensation rules as other conferences, is evidence that college athletics would remain commercially successful if there were conference-level compensation rules.[212]

151.   As a matter of logic these conclusions cannot be correct.  All of these schools with their varying aid policies are *within* the NCAA's rules for amateurism.  None of these contests sheds any light on what would happen if there were no enforceable, nationwide amateurism rules.

152.   An additional unwarranted assumption made by Professor Rascher is that administration of the rules at the conference level would be cheaper than NCAA level administration. According to Professor Rascher "the system of national rules creates an inefficient and duplicative extra layer of bureaucracy.  As it is now, each conference and each school has employees engaged in compliance.  Layered on top is the NCAA, which has multiple people employed in compliance as well.  If there were no national cap rules, and thus no need for employees to enforce those national cap rules, the cost of compliance would tend to decrease."[213]  This is backwards.  If the administrative functions of superintending

---

[210] Rascher Direct Testimony, ¶ 97.

[211] Rascher Direct Testimony, ¶ 103.

[212] Noll Direct Testimony, ¶ 187.

[213] Rascher Direct Testimony, ¶ 187.

amateurism moved to the conferences, then each conference would have to carry out tasks formerly undertaken by the NCAA. The result will be duplication of effort that increases costs – not reduces them. It is unlikely that the administration of amateurism rules is subject to significant diseconomies of scale, and that these diseconomies of scale render centralized administration more expensive.

### (ii) Balkanization

153.  The way schools that value amateurism could protect themselves from the negative consequences described above is to join or form new or different organizations that remain committed to amateurism, and to limit their athletic competition to schools in the new organization that share their commitment to amateurism. Schools in conferences that did not want to exceed the COA and retained amateurism would be in a different organization than the organization housing the professionalism enthusiasts.

154.  The likely result would be a "balkanization" of college athletics and a reorganization of conferences. The balkanization would come about as conferences reached different conclusions about how much professionalism to tolerate and, in order to protect themselves from negative externalities, schools in conferences that gave more protection to amateurism would be less willing (or even unwilling) to play schools from conferences that did not. The likely reorganization would come about because current conference membership might not correlate with the strength of attachment to amateurism among schools' constituencies. So, one would expect to see schools moving among conferences as certain conferences established themselves as more or less protective of amateurism.

155. From an economic perspective, this new equilibrium would be less efficient than the status quo. For one thing, the transition period in which schools sorted themselves into a new conference alignment would be costly.

156. Second, in the balkanized new regime of intercollegiate athletics, there would be fewer opportunities for athletes to play and for fans to watch genuinely amateur athletics. This would be the case if some conferences within the NCAA offer additional compensation because some schools, with strong commitments to amateurism, would no longer want to be in a network with schools that have "gone pro" and would reduce their athletic program funding, potentially changing to a club sport model or something resembling Division III status. One can see an example of this in the case of the Ivy League. There are very few football games between Harvard and Auburn.[214] The range of schools that any given team would compete against would be more limited because inter-conference competition would be less common and costlier to arrange.

157. It follows that the value of national championships like the March Madness tournaments and the national football championship would be diminished. With the existing Division I conferences separating by their degree of tolerance for professionalism, the pool of schools that can feed into a season-ending national championship contest like March Madness or the national football championship would be more limited. The organizers of a national championship contest would have to decide which of the various amateurism rules they want to set for the season-ending championships. In the event that schools

---

[214] More generally, Ivy League football teams have played FBS teams only 26 times. When Yale beat Army in the 2014-15 season, "no Ivy League team had played against an FBS opponent in 18 years." Of the 26 games that have taken place, 21 of them involved either Army or Navy. Dartmouth Sports, "Football Schedules Complete Through 2020, Army on Tap in 2022," http://www.dartmouthsports.com/ViewArticle.dbml? ATCLID=210327887 (accessed 6/21/17).

with different rules wanted to participate in the same championship framework, some schools would be at a competitive disadvantage because the rules of their conference are stricter.

158. The result could be multiple non-overlapping championships as relatively strict conferences come together to organize one championship, while relatively permissive conferences organize a separate championship.  Divided championships would be less interesting to fans and less valuable to advertisers.

159. In sum, Plaintiffs' less restrictive alternatives would not be as effective as the challenged restraints in preserving consumer demand or integrating academics and athletics, nor would they come without significantly increased costs of implementation.

### B.    Allowing Any Benefits "Tethered to Education" or "Incidental to Participation"

160. The principal observation I would make about Professor Rascher's suggestions for alternatives that purportedly are less restrictive with respect to level is that they are just that -- a list of suggestions, unconnected to any detailed analysis -- other than a reference to Mr. Poret's survey results.[215]

161. In order to show that there are less restrictive alternatives to the challenged rules *that provide the same procompetitive benefits as the challenged rules with no significant added costs,* Professor Rascher would have to do more than make suggestions.  At a minimum, he would have to analyze how introducing each of the suggested alternatives would affect the response of universities on the supply side and consumers on the demand side.  Then, he would have to compare the economic consequences of that

---

[215] Rascher Direct Testimony, ¶¶ 200, 204, 207.

hypothetical regime with the status quo, in order to determine if the proposed alternative achieved the same procompetitive benefit as the challenged rules; and then he would have to analyze the added costs attributable to those alternatives.  In performing this analysis Professor Rascher would have to maintain the assumption of the third prong of the Rule of Reason (that the challenged practices have procompetitive benefits) and he would have to demonstrate that his proposed alternatives could achieve the same benefits, and that they could do so without increasing cost.  No easy task.

162.    Professor Rascher's testimony includes no such analysis.  Instead, he relies heavily on passages from the deposition testimony of two NCAA witnesses, Kevin Lennon and David Berst, for the proposition that his suggested alternatives with respect to the level of the cap are consistent with the NCAA's principle of amateurism.[216]  I previously explained that Professor Rascher unfairly mischaracterizes Mr. Lennon's testimony.  Rather than engage in a competing exegesis of the Lennon and Berst testimony, however, another way to assess Professor Rascher on the subject of less restrictive alternatives is by economic logic.  The absence of any analysis of the competitive effects or economic consequences of his proposed alternative restrictions amounts to the adoption of an unwarranted assumption that if any one of these measures were put into effect-- or some combination -- the specific payments they allow could be made without bringing about change in any other part of the system.

163.    However, Professor Rascher does not claim to know whether the adoption of one or more of these alternatives would result in a new equilibrium with fewer athletic scholarships, with less generous athletic scholarships, with fewer teams, fewer sports, or fewer games.

---

[216] See Rascher Direct Testimony, ¶¶ 205, 209-10.

He does not claim to know whether television contracts would be more or less remunerative.  He does not claim to know whether student-athletes would maintain the same degree of integration with their classmates or that alumni would maintain the same affinity for their schools and their teams in an environment where schools bid against one another for athletes via these and similar alternatives.  He does not claim to know any of these because he has conducted no analysis of any of them.  In effect, Professor Rascher assumes that aside from the incremental payments he proposes, every other feature of the current equilibrium will remain unchanged.

164.    This particular assumption by Professor Rascher – that of *ceteris paribus* (all things remaining equal) -- is peculiar and unwarranted.  Economics is a discipline that prides itself on recognizing that incremental changes can be consequential and that what happens "at the margin" is important.[217]  Because a change in one element of a system might be felt throughout the system, a large part of an economist's work consists of analyzing those effects.

165.    In place of the analysis I've described, Professor Rascher relies heavily on the results of Mr. Poret's survey.[218]  But I know of no reason to be confident that the survey respondents' "predictions" of the "but for" environment are more reliable than the contrary assessments offered by university presidents and athletic directors who arguably have a comparative advantage over survey respondents and are better positioned to consider the system-wide consequences of variations in student-athlete remuneration.

---

[217] The front page of Alfred Marshall's iconic *Principles of Economics* has the Latin expression *"Natura non facit saltum,"* loosely translated "nature does not make leaps."  (Alfred Marshall, *Principles of Economics, 1st ed.* (London: Macmillan and Co., 1890), Front Matter).

[218] Rascher Direct Testimony, ¶¶ 200, 204, 207.

166. I understand that a survey overseen by Defendants' expert Bruce Isaacson was designed to avoid flaws identified in the Poret survey and obtain a more reliable measure of attitudes about providing additional compensation and other benefits to student-athletes. I understand the results from this survey more closely conform to what I learned during my interviews and other materials I reviewed regarding the importance of amateurism to college sports. Over two-thirds of the survey respondents were opposed to pay-for-play, and pluralities were opposed to academic incentive payments and graduation incentive payments (which, as I explain below, are disguised versions of pay-for-play).[219] Further, over 30 percent of the respondents affirmatively identified amateurism as one of the reasons they watch college football or basketball.[220] In fact, amateurism was the third most frequent reason respondents identified for watching these sports, out of the thirteen reasons included in the survey.[221] While my analysis in this report does not depend on these survey results, they suggest that Professor Rascher placed too much weight on Mr. Poret's survey.

167. If a full-blown analysis of Professor Rascher's proposed "less restrictive alternatives" were to be conducted, there is good reason to believe that it would fail to provide the same procompetitive effects as the challenged rules, because most of the alternatives Professor Rascher enumerates are (as economic analysis would recognize) thinly veiled versions of straightforward pay-for-play. For example, he cites post-athletic-eligibility scholarships for student-athletes to attend school at another institution.[222] While schools

---

[219] Isaacson Rebuttal, Table 5.

[220] Isaacson Rebuttal, Table 7.

[221] Isaacson Rebuttal, Table 7.

[222] Rascher Direct Testimony, ¶ 200.

currently are permitted "to provide financial aid for the completion of an undergraduate degree or postgraduate degree [including study-abroad programs] at the institution at which the student-athlete participated in college athletics consistent with the fundamental relationship between a scholarship student-athlete and his or her institution," paying the costs of education at another institution "is considered to be beyond that fundamental relationship and a potential form of pay for play, and therefore is not permitted."[223]

168.  Another possibility that Professor Rascher proposes are payments to student-athletes conditional upon making progress towards their degree.  He suggests paying a one-time incentive of up to $10,000 to student-athletes who complete their degree or paying student-athletes an unspecified amount "for academic progress combined with some minimum level of GPA.[224]  Another proposed alternative is to pay student-athletes the bonus for living in the dorms.[225]  Making payments over and above the amount of their COA to student-athletes, but not other students, amounts to paying them to play sports.

169.  Professor Noll proposes that the NCAA allow "a bonus of $100 for each tenth of a point over the eligibility floor."[226]  But there is no more principled reason for a $100 cash bonus than there would be for a $1,000 cash bonus, or a $100,000 cash bonus, each of which could be provided under this less restrictive alternative.

170.  The deal that Professor Rascher is proposing that universities strike with student-athletes in his "but for" world are payments beyond the COA and expenses of participation in return for playing football, basketball, or some other sport.  Such a deal is inconsistent

---

[223] Synopsis, p. 9.

[224] Rascher Direct Testimony, ¶¶ 204, 206.

[225] Rascher Direct Testimony, ¶ 204.

[226] Noll Direct Testimony, ¶210 and note 191.

with amateurism and would not be as effective as the challenged rules with respect to the procompetitive justifications at issue in this case.  Professor Rascher fails to recognize that his proposed less restrictive alternatives fail to provide the same procompetitive benefits as the challenged practices because he hasn't taken the nature of the third stage analysis seriously by building in a meaningful assumption about the procompetitive benefits from the second stage.

**VI.**   **Responses to New Arguments**

171.   In their declarations Professors Rascher and Noll have introduced certain new arguments that were not in their reports.  I respond to some of those arguments in this section.

**A.**   **Integration and Amateurism**

172.   Professor Noll argues at one point that the effect of above-amateur-level payments is not an externality *with respect to integration* that is felt on one campus when such payments are made on another campus.[227]  That may be true.  That is, violating amateurism on one campus might not exert an effect on *integration* on another campus, but that objection overlooks the main point.  When a school undermines amateurism and affects demand for athletic contests, that exerts a negative externality on the other schools, and that is what amateurism standards are intended to prevent.

**B.**   **Graduation Rates**

173.   When it comes to the relationship between graduation rates and the size of student-athlete payments, Professor Rascher first criticizes the methodology underlying NCAA data on this point, and then nonetheless refers to the data as evidence that graduation rates rise with greater cash payments, without making any effort to control for other relevant

---

[227] Noll Direct Testimony, ¶ 174.

factors.[228]  Professor Noll also addresses the issue, cavalierly dismissing the question in one sentence. "[D]efendants' arguments are inconsistent with the fact that after the substantial increase in compensation of athletes in 2015, the academic performance of college athletes in Division I, including football and basketball players, improved, belying the claim that increasing compensation for athletic participation would cause athletes to switch time and effort from academics to athletics."[229]

### C.      Compensation and Integrations

174.   Professor Noll suggests a different reason why the NCAA's amateurism standards might restrain integration.  He suggests that if compensation is contingent on remaining academically eligible, then larger compensation would imply a greater incentive to remain eligible, and hence greater academic work on the part of the student. Compensation caps, he maintains, limit that incentive.[230]  As described by Professor Noll, that incentive applies only to remaining eligible.  For student-athletes whose academic ability goes beyond being marginally eligible, the incentive effect will be correspondingly smaller.  Moreover, academic success is not the only aspect of integration.  The more student-athletes receive financial incentives targeted at their academic success, the more non-athlete students are likely to see themselves as being treated differently -- in that they are not financially rewarded for their academic success. Such differences in treatment and the resentments that can follow from them are likely to interfere with integration.

---

[228] Rascher Direct Testimony, ¶ 150.

[229] Noll Direct Testimony, ¶ 18.

[230] Noll Direct Testimony, ¶ 140.

175.  Contrast this situation with that of celebrity or entrepreneur students such as Evan
      Spiegel, Mark Zuckerberg, Natalie Portman, or Emma Watson, all of whom Professor
      Rascher refers to as students for whom "there is no evidence that [they had] any trouble
      integrating into campus life or achieving academic success.[231]  These wealthy students
      did not receive their high incomes from the universities they attended.  They earned them
      outside the university.  Thus, there was less potential for integration-inhibiting
      resentment.

      ### D.    The Economists' Survey

176.  Professor Rascher also offers a survey among certain economists as evidence that the
      effect of the NCAA's s Amateurism standards must be anticompetitive.  The survey
      asked members of a survey group to agree or disagree with the statement,

> NCAA Division I schools coordinate compensation for men's
> basketball and football players (precluding actual pay and limiting
> non-monetary benefits), providing rents to member schools (which
> may be shared with others) at the expense of those players.[232]

177.  As Professor Rascher noted, all the economists on the panel who expressed an opinion
      (and 80% of them did) either agreed or agreed strongly with the statement.[233]  It would be
      idle to deny that's a lot of agreement among an academic tribe that often disagrees.  So,
      what did all these economists agree to?  Not much.  All the statement asks them to agree
      or disagree with is the proposition that the NCAA's rules have an effect, *i.e.,* reduce
      payments to student athletes relative to what they would be without the rules, and that the
      schools gather the savings from that effect and distribute it somehow.  Notably, the

---

[231] Rascher Direct Testimony, ¶ 147.

[232] "The NCAA," *IGM Forum*, April 2, 2018, http://www.igmchicago.org/surveys/the-ncaa (accessed 7/8/18) (hereafter, "IGM Survey").

[233] IGM Survey.

respondents were not asked whether or not the resulting outcome is efficient. Also, the use of the term "rent" in the question does not carry with it the inevitable conclusion of inefficiency.  Viewed with this understanding, this survey does not answer the questions relevant to the Rule of Reason analysis.

**VII.**   **Conclusion**

178.   At the outset of my testimony and in my prior expert reports in this case, I expressed my opinions that the challenged rules are procompetitive.  Specifically, they serve the same two procompetitive justifications identified in *O'Bannon*: they preserve demand for intercollegiate athletics, and contribute to the integration of academics and athletics.  Plaintiffs' proposed less restrictive alternatives, conference-level compensation rules and the relief contemplated in their "Alternative Injunction," would not be as effective as the challenged rules, nor could they be implemented without significantly increased cost.  Nothing in the direct testimony of Professors Rascher and Noll has changed these opinions of mine.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct to the best of my belief.

Executed in Charlottesville, VA on July 11, 2018.

_____
Kenneth G. Elzinga, Ph.D.