Sean Eskovitz (SBN 241877)
WILKINSON WALSH + ESKOVITZ LLP
11726 San Vicente Blvd., Suite 600
Los Angeles, CA 90049
Telephone:  (424) 316-4000
Facsimile:  (202) 847-4005
seskovitz@wilkinsonwalsh.com

Beth A. Wilkinson (*pro hac vice*)
Brant W. Bishop, PC (*pro hac vice*)
Alexandra M. Walsh (*pro hac vice*)
Brian L. Stekloff (*pro hac vice*)
Lori Alvino McGill (*pro hac vice*)
Rakesh N. Kilaru (*pro hac vice*)
WILKINSON WALSH + ESKOVITZ LLP
2001 M Street NW, 10th Floor
Washington, DC 20036
Telephone:  (202) 847-4000
Facsimile:  (202) 847-4005
bwilkinson@wilkinsonwalsh.com
bbishop@wilkinsonwalsh.com
awalsh@wilkinsonwalsh.com
bstekloff@wilkinsonwalsh.com
lalvinomcgill@wilkinsonwalsh.com
rkilaru@wilkinsonwalsh.com

Attorneys for Defendant
NATIONAL COLLEGIATE ATHLETIC
ASSOCIATION

Patrick Hammon (SBN 255047)
SKADDEN, ARPS, SLATE, MEAGHER &
FLOM LLP
525 University Avenue, Suite 1100
Palo Alto, CA 94301
Telephone:  (650) 470-4500
Facsimile:  (650) 470-4570
patrick.hammon@skadden.com

Jeffrey A. Mishkin (*pro hac vice*)
Karen Hoffman Lent (*pro hac vice*)
SKADDEN, ARPS, SLATE, MEAGHER &
FLOM LLP
Four Times Square
New York, NY  10036
Telephone:  (212) 735-3000
Facsimile:  (212) 735-2000
jeffrey.mishkin@skadden.com
karen.lent@skadden.com

Attorneys for Defendants
NATIONAL COLLEGIATE ATHLETIC
ASSOCIATION and WESTERN
ATHLETIC CONFERENCE

[Additional Counsel Listed on Signature
Page]

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF CALIFORNIA
## OAKLAND DIVISION

| | |
|---|---|
| IN RE NATIONAL COLLEGIATE ATHLETIC ASSOCIATION ATHLETIC GRANT-IN-AID CAP ANTITRUST LITIGATION | MDL Docket No. 4:14-md-02541-CW |
| | **DEFENDANTS' OPENING STATEMENT** |
| This Document Relates to: | |
| ALL ACTIONS EXCEPT *Jenkins v. Nat'l Collegiate Athletic Ass'n*, Case No. 14-cv-02758-CW | |

# CONTENTS

I.      Introduction .................................................................................................... 1

II.     Legal Framework ............................................................................................ 6

        A.      The Rule of Reason ............................................................................. 6

        B.      Plaintiffs' Additional Burden To Show That O'Bannon Does Not Govern ........... 9

III.    The NCAA Rules, And Those Plaintiffs Challenge Here ............................... 11

        A.      The "Category 1" Rules Plaintiffs Challenge Embody The Same
                Amateurism Principles Upheld In O'Bannon. ...................................... 12

        B.      Additional Caps On Participation Benefits (Appendix C) Are Improper
                Attempts To Expand The Scope Of Plaintiffs' Challenge. .................... 15

IV.     The Challenged Rules Further The Procompetitive Purpose Of Supporting The Popularity
        Of Amateur College Sports That Is Distinct From Professional Sports. ......... 15

        A.      Fact And Expert Witnesses Can And Will Support The Well-Recognized
                Role Amateurism Rules Play In The Popularity Of The NCAA's Product ........... 17

        B.      Plaintiffs' Evidence (And Argument) Does Not Disprove The Role That
                Amateurism Plays In Fostering Demand For The NCAA's Product. ................. 20

                1.      Defendants Have Not Abandoned Amateurism ........................ 20

                2.      Mr. Poret's Survey Does Not Support Plaintiffs' Argument That
                        Demand Would Be Unaffected By The Changes They Seek .......... 30

V.      The Challenged Rules Help Preserve The Integration Of Athletics And Academics. ...... 33

        A.      NCAA Division I Schools Continue To Treat Students-Athletes As Students. .... 33

        B.      The Challenged Rules Support The NCAA's Efforts To Preserve Student-
                Athletes' Integration Into The Experience As Students. ...................... 38

        C.      Integration Of Athletes Into The Student Experience Is A Valid
                Procompetitive Justification .............................................................. 41

VI.     Plaintiffs Have Not Demonstrated Less Restrictive Alternatives That Equally Serve The
        NCAA's Procompetitive Interests. ................................................................. 42

        A.      "Complete Conference Autonomy" Is Not An Equally Effective Alternative
                That Imposes No Additional Costs. .................................................... 43

        B.      Eliminating All Restrictions On Aid Or Benefits That Can Be "Tethered" To
                Education Or Incidental To Participation Is Not An Equally-Effective, Less
                Restrictive Alternative. .................................................................... 45

      C.     "Net Balancing" Does Not Support A Finding Of Antitrust Violations................48

VII.   Plaintiffs Are Not Entitled To The Injunctions They Seek.................................48

      A.     The Injunctions Plaintiffs Seek Are Not Justified. .................................48

      B.     Plaintiffs' Proposed Injunctions Are Impermissibly Vague. .................................48

VIII.  Conclusion ........................................................................................................50

## I.  Introduction

College football and basketball are part of the fabric of American life.  These sports are wildly popular, enjoyed by millions.  And they have enabled countless athletes to obtain a college education that they would not otherwise have been able to afford—without the crushing debt many non-athletes incur.  For decades, men and women who attend college and play sports have chosen their schools based on their ability to compete in athletics and participate in a student community.  The educational and athletic benefits student-athletes receive pay dividends for their entire lives.

Why do intercollegiate sports exist in the first place?  Because, in pursuing their own educational missions, over eleven hundred schools in the United States agree that "competitive athletics programs . . . [should] be a vital part of the educational system."[1]  So they have formed a member-led association, the National Collegiate Athletic Association, to advance their shared "basic purpose of . . . maintain[ing] intercollegiate athletics as an integral part of the educational program and the athlete as an integral part of the student body, and by so doing, retain a clear line of demarcation between intercollegiate athletics and professional sports."[2]

What makes college sports unique?  They are played by *amateur students*.  Playing Division I Football and Basketball on top of academic work is demanding.  Not every athlete, nor every student who is not an athlete, can or does take advantage of every possible educational benefit offered at their school.  But what sets college sports apart is that the competitors are students and not paid professionals.

That is where the NCAA rules come in.  They establish the ground rules for intercollegiate sports, attempting to assure that competition is done on fair terms that are consistent with the schools' shared commitment—by athletes who are both students and amateurs.  A competition between athletes recruited and paid based on the value of their performance, on one hand, and athletes who

---

[1] NCAA Division I Manual, Art. 1.3.1.  (Because the exhibit numbers are not yet assigned, the evidence previewed in this Opening will be referenced by underlying document, not exhibit number.)

[2] *Id.*  The NCAA's Division I consists of approximately 350 schools that are generally larger than schools in the other divisions, but still share "the commitment to amateurism" to maintain the "line of demarcation between student-athletes who participate in the Collegiate Model and athletes competing in the professional model."  *Id.* at xii (capitalization altered).

1   compete just as part of their student experience and a way to maintain it, would readily degenerate
2   into an uninteresting and potentially dangerous mismatch.

3       Maintaining the integration of amateur athletics and academics has proven to be very
4   popular.  Sports are popular to begin with.  But the attraction of college sports goes further.  Students
5   are attracted to the competition *for* their school *by fellow students* with whom they identify.  Alumni
6   and others with school affiliations or sympathies are attracted by seeing *students* compete for the
7   schools they support.  And even fans with no particular school connection are attracted by the human
8   interest of seeing the *amateur student* competition.  These fans understand that college athletes are
9   not professionals, that while they may receive scholarships and support to attend school, they remain
10  students playing for their schools and the love of the game, not for pay.  In short, among the reasons
11  consumers are attracted to collegiate athletics, one important reason is the purity of the athletic
12  competition relative to professional sports.  That is why, despite the abundance of professional minor
13  leagues such as Minor League Baseball and the NBA G League (formerly NBA Development
14  League) filled with very skilled athletes, none has ever attracted anything close to the popularity of
15  college sports.

16      In preserving this defining feature of amateur student athletics—which is simultaneously so
17  popular with fans and advances member schools' educational missions—NCAA rules provide a
18  reasoned basis for distinguishing amateurs and professionals.  By permitting grants up to the cost of
19  attending school, they seek to allow schools to support students-athletes *as students*, while
20  preventing disguised forms of pay for play.  And recognizing the burdens and expenses associated
21  with sports practice and competition, the rules also allow schools to support and commemorate
22  student-athletes' dedication, while drawing lines so these benefits do not become a form of
23  professional compensation.  Everyone may not agree on how to strike the balance these
24  considerations require.  But the balance struck by NCAA schools in the rules they have agreed on is
25  not simply arbitrary.  It is informed by decades of experience in "superintend[ing] college athletics."[3]

26      In this lawsuit, Plaintiffs attack these rules broad-side, seeking to destroy what makes college
27  sports unique.  Their proposed injunction is unequivocal:  Plaintiffs ask this Court to enjoin any

28
---
[3] *O'Bannon v. Nat'l Collegiate Athletic Ass'n*, 802 F.3d 1049, 1074 (9th Cir. 2015) (quoting *Nat'l Collegiate Athletic Ass'n v. Bd. of Regents of Univ. of Okla.*, 468 U.S. 85, 120 (1984)).

1   NCAA rule that "fixes or limits compensation or benefits" that schools may offer athletes.  They
2   would replace a successful, established product with a fundamentally different one, with staggering
3   and destructive implications.  Some schools could compete for highly-prized athletes by offering
4   millions of dollars in compensation.  Others with fewer financial resources would struggle to offer
5   Division I college sports at the same level, offering a diminished product that would interest
6   consumers less.  And others could withdraw from Division I sports altogether to preserve their
7   conception of the role amateur athletics should play.  Meanwhile, athletes with big money riding on
8   athletic performance would face lower incentives to devote meaningful time to academics.

9   The inevitable results of Plaintiffs' proposed market-based system for players are apparent
10   from looking at the unregulated economic market for college coaches.  The disparate salaries,
11   contracts, and pressures on those coaches reflect the real-world consequences of paying participants
12   for performance—including the insecurity of their positions if job, or team, performance suffers.
13   Subjecting players to the same dynamics would alter the basic distinction between student-athletes
14   and professionals and radically change student-athletes' incentives.

15   Nothing in the antitrust laws requires the decimation of college sports as we know it.  As the
16   Ninth Circuit explained, "not paying student-athletes is *precisely what makes them amateurs*," and
17   "offering them cash sums untethered to educational expenses" would be "a quantum leap."[4]  As a
18   result, the court held:

19   
20   > The Rule of Reason requires that the NCAA permit its schools to provide up to the
> cost of attendance to their student athletes.  *It does not require more*.[5]

21   The same reasoning applies here to foreclose Plaintiffs' claims, as the evidence at trial will show.

22   **Trial Issue #1:  Do The Challenged Rules Implementing Amateurism Contribute To**
23   **Demand For College Sports?**  Yes.  This Court and the Ninth Circuit correctly recognized in
24   *O'Bannon* that amateurism contributes to consumer demand for college sports—and the appeal for
25   student-athletes in the market for a college education—and there is no reason to revisit those
26   findings.  Defendants will present testimony from NCAA, conference, and school officials, as well
27   as economists and a survey expert, that amateurism is the defining feature of college sports.  As

28   ---
[4] *Id.* at 1076, 1078 (emphasis in original).

[5] *Id.* at 1078 (emphasis added).

1  these witnesses will explain, allowing schools to pay student-athletes unlimited sums would

2  fundamentally change the nature of the product in a way that would erode its consumer appeal.

3       In the face of this evidence, Plaintiffs point to the continued demand for college sports since

4  the NCAA made minor changes to its rules in the wake of *O'Bannon*.  But none of those changes

5  crossed the line from amateurism to a "pay-for-play" world.  As a result, the continued popularity

6  says nothing about how consumers would react to a radically different concept of college sports, in

7  which athletes could be paid unlimited amounts for their performance.  And Plaintiffs' survey—

8  which fails to measure the impact on consumer demand of Plaintiffs' proposed less restrictive

9  alternatives or proposed injunctions—does nothing to support Plaintiffs' request for injunctive relief.

10       **Trial Issue #2:  Do The Challenged Rules Contribute To The Integration Of Athletics**

11  **With Academics?**  Yes.  Defendants will present substantial evidence that athletes who are fully

12  integrated into the broader campus community get more out of their college experience, leading to

13  tangible benefits for the rest of their lives.  The NCAA's rules promote this objective by striking a

14  critical balance between the athletic and academic endeavors of student-athletes.  Paying student-

15  athletes substantial sums for their performance would inevitably reduce their incentives to achieve

16  academically and participate in all other aspects of campus life, and drive a wedge between them

17  and other students.  Contrary to Plaintiffs' assertions, this benefit is not merely a "social policy

18  justification."  It is an economic justification.  As this Court expressly recognized in *O'Bannon*,

19  integration makes the unique product that schools are "selling" to student-athletes more valuable,

20  which is precisely the type of economic consideration that qualifies as a procompetitive benefit.

21       **Trial Issue #3:  Have Plaintiffs Put Forward Less Restrictive Alternatives To The**

22  **Challenged Rules That Serve Their Procompetitive Purposes Without Increased Cost?**  No.

23  Plaintiffs cannot even come close to satisfying their burden to demonstrate that their two proposed

24  alternatives are "'virtually as effective' in serving the procompetitive purposes of the NCAA's

25  current rules, and 'without significantly increased cost.'"[6]

26       Plaintiffs' conference autonomy alternative would balkanize college sports, making the

27  product less interesting and thereby reducing the popularity of college sports.  And it would increase

28  ---
[6] *Id.* at 1074 (quoting *County of Tuolumne v. Sonora Cmty. Hosp.*, 236 F.3d 1148, 1159 (9th Cir. 2001)).

1    costs by causing each school to evaluate the conference re-alignment Plaintiffs explicitly

2    contemplate and requiring each of the 32 Division I athletic conferences to build its own substantial

3    infrastructure to impose and enforce rules—tasks that are currently accomplished on a centralized

4    basis by the NCAA.

5        Plaintiffs' second alternative, which would enjoin the NCAA from foreclosing any benefit

6    that was even tangentially related to education or participation, is simply poorly disguised pay for

7    play.  Under Plaintiffs' view, schools would be free to pay athletes unlimited amounts of money just

8    to show up for games or maintain their academic eligibility.  The result would be akin to market-

9    based professional sports, with all of the resulting diminution of consumer demand and integration.

10   And this alternative, too, would increase enforcement costs by engendering numerous disputes as to

11   what precisely is "related to" education or participation.

12       In their second alternative, Plaintiffs quibble with lines that the NCAA has drawn to limit

13   benefits so that they do not become an end-run around the prohibition against pay for play.  It may

14   be debatable where some of those lines should be drawn.  But these line-drawing judgments are the

15   very decisions that are within the NCAA's "'ample latitude' to superintend college athletics."[7]

16       **Remedy**:  Plaintiffs are not entitled to either of their proposed injunctions.  In the first place,

17   for the foregoing reasons, Plaintiffs are not entitled to any injunction because the challenged rules

18   do not violate the antitrust laws.  Separately, Plaintiffs' proposed injunctions are impermissibly

19   vague.  Neither provides guidance on how the Court or the Defendants could apply the standards

20   Plaintiffs propose.  Because Plaintiffs' first injunction gives no indication about how to determine

21   whether a rule is "substantially similar," it fails to "satisfy the exacting requirements of Rule 65(d)."[8]

22   And Plaintiffs' proposed alternative gives no hint about what qualifies as a benefit "tethered" to

23   education, a benefit "incidental to participation," or a benefit "substantially similar in purpose and

24   effect to such benefits."  The two proposed injunctions would only subject the NCAA and its member

25   schools to persistent uncertainty and risk of additional disputes.

26

27   ───────────────

[7] *Id.* (quoting *Bd. of Regents*, 468 U.S. at 120).

28   [8] *Fed. Election Comm'n v. Furgatch*, 869 F.2d 1256, 1263-64 (9th Cir. 1989) (holding injunction again "future similar violations" was impermissibly vague).

## II. Legal Framework

### A.       The Rule of Reason

The Court has held that the rules at issue here should be analyzed under the rule of reason, which implicates a three-step burden shifting framework.[9]

At the first step, Plaintiffs "have the burden to prove that the challenged restraint has a *substantial* anticompetitive effect that harms consumers in the relevant market."[10] This Court entered summary judgment for Plaintiffs on the definition of the relevant market and whether the challenged rules produce significant anticompetitive effects in that market.[11] At the second step, "the burden shifts to the defendant to show a procompetitive rationale for the restraint."[12]

On the legal standards applicable to this step, Plaintiffs and Defendants part ways. As this Court has already recognized—both in this case and in *O'Bannon*—what defendants must do is "come forward with evidence of the restraints' procompetitive effects."[13] That does not mean, as Plaintiffs suggest, that Defendants must show that the rules (either individually or collectively) are "*necessary*" to create consumer demand for the college sports product.[14] Such a focus suggests a

---

[9] *Ohio v. Am. Express Co.*, 138 S. Ct. 2274, 2284 (2018); *O'Bannon*, 802 F.3d at 1070 ("Like the district court, we follow the three-step framework of the Rule of Reason."). Defendants reserve their challenge to the Court's application of the rule-of-reason analysis here. As the Seventh Circuit recently held, rules "meant to preserve the amateur character of college athletics" are "presumptively procompetitive under *NCAA v. Board of Regents of University of Oklahoma*." *Deppe v. Nat'l Collegiate Athletic Ass'n*, 893 F.3d 498, 499–500 (7th Cir. 2018).

[10] *Am. Express*, 138 S. Ct. at 2284 (emphasis added); *see also* Order Granting in Part & Denying in Part Cross-Mots. for Summ. J. ("MSJ Order"), ECF No. 804 (Mar. 28, 2018) at 15–16, 18–19 (explaining that Plaintiffs must prove that "the challenged restraints produce *significant* anticompetitive effects in the relevant market.") (emphasis added).

[11] Defendants have not conceded, and reserve the right to challenge, the Court's rulings regarding the relevant market and alleged anticompetitive effects. In particular, the Court's market definition fails to recognize the multi-sided nature of the market. *See generally Am. Express*, 138 S. Ct. at 2280–81. Defendants also maintain that the applicability of *O'Bannon* is an all-or-nothing proposition: That is, if the *O'Bannon* market definition controls here, then so must its holdings regarding procompetitive justifications.

[12] *Id.* at 2284.

[13] MSJ Order at 16; *O'Bannon v. Nat'l Collegiate Athletic Ass'n*, 7 F. Supp. 3d 955, 985 (N.D. Cal. 2014) (quoting *Tanaka v. Univ. of S. Cal.*, 252 F.3d 1059, 1063 (9th Cir. 2001)).

[14] Plaintiffs' Opening Argument ("Pls. Op.") at 1–2, 10, 15, 19, 21, 23, 46 (emphasis added).

---

1  defendant must show that, but-for the challenged "restraints," demand would "collapse" or "fall[]

2  off a cliff."[15]  Plaintiffs cite no authority for this extreme view, and it is not the law.

3          Instead, in *O'Bannon*, this Court concluded that amateurism qualified as a procompetitive

4  benefit based on its finding that "restrictions on student-athlete compensation play a *limited role* in

5  driving consumer demand," along with other factors that also attract consumers.[16]  The Ninth Circuit

6  concluded that "there is a concrete procompetitive effect in the NCAA's commitment to amateurism:

7  namely, that the amateur nature of collegiate sports increases their appeal to consumers."[17]  The

8  analysis is no different for integration:  although evidence will show that the challenged rules are

9  important in integrating academics with athletics, Defendants need to demonstrate only that the

10  challenged rules contribute to it, not that they are *necessary*.[18]

11          Defendants will demonstrate that the challenged rules, which operate together as part of an

12  integrated whole, promote procompetitive ends.[19]  The challenged rules provide consumers a distinct

13  product that they enjoy watching; and, by fostering athlete integration into the student body, improve

14  and maintain the quality of the educational experience available to all students.  Just as *deterioration*

15  of the "quality of goods or services" is an anticompetitive effect,[20] maintaining the character and

16  quality of the products enjoyed by consumers (*i.e.*, college sports) and students (*i.e.*, college

17  education) alike reasonably serves to advance consumer interests.  That is so regardless of whether

18  there would still be some residual demand for a fundamentally *different* product if the rules were

19  eliminated or substantially modified, as Plaintiffs request.

20

21  _____

22  [15] *Id.* at 18, 21.

   [16] 7 F. Supp. 3d at 1001 (emphasis added).

23  [17] 802 F.3d at 1072–73.

24  [18] *Id.* (concluding that the NCAA's compensation rules serve this same procompetitive justification

25  based on the district court's determination that those rules "play a limited role in integrating student-
   athletes with their schools' academic communities").

26  [19] Plaintiffs seem to agree that "there is no need for segregated rule-by-rule analysis," that the
   challenged "rules are overlapping," and that they "all collectively rise or fall based upon Defendants'

27  identical amateurism and integration justifications."  Pls. Op. at 12–13.

28  [20] *Tunis Bros. Co. v. Ford Motor Co.*, 952 F.2d 715, 728 (3d Cir. 1991) (internal quotation marks
   omitted).

Once Defendants have provided evidence of procompetitive justifications, the Court turns "to the final inquiry."[21]  Plaintiffs must make a "strong evidentiary showing" that specific "substantially less restrictive alternatives to the NCAA's current rules" *both* are "'virtually as effective' in serving the procompetitive purposes of the NCAA's current rules, and [do so] 'without significantly increased cost.'"[22]  This is a substantial burden.  Plaintiffs must prove, not just argue, that their alternatives would be as effective in serving the procompetitive ends.[23]  And they "must prove," not just argue, "that any alternative will not significantly increase costs to implement."[24]

The burden on Plaintiffs at this stage is substantial for a good reason:  as "the Supreme Court has admonished[, courts] must generally afford the NCAA 'ample latitude' to superintend college athletics."[25]  More generally:  "courts should not use antitrust law to make marginal adjustments to broadly reasonable market restraints."[26]  Thus, the burden on Plaintiffs to demonstrate a less restrictive alternative cannot be turned into a requirement that the challenged rules have to be the *least* restrictive way to serve procompetitive ends.[27]  Plaintiffs' burden of showing a substantially less restrictive alternative does not invite them to replace their judgment for the NCAA's.

---

[21] *O'Bannon*, 802 F.3d at 1074.

[22] *Id.* (quoting *County of Tuolumne*, 236 F.3d at 1159).

[23] *See, e.g.*, *Toscano v. PGA Tour, Inc.*, 201 F. Supp. 2d 1106, 1123 (E.D. Cal. 2002) (rejecting challenge to golf tour's eligibility rules where the plaintiff "speculated" that more golfers "would be better," offered "no evidence as to why this would make the market for professional golf more competitive," and failed "to consider the effects of an expanded field on the Tour's sponsors").

[24] *O'Bannon*, 802 F.3d at 1076 n.19 (noting the absence of "any findings about whether allowing schools to pay students NIL cash compensation will significantly increase costs").

[25] *O'Bannon*, 802 F.3d at 1074 (quoting *Bd. of Regents*, 468 U.S. at 120).

[26] *Id.* at 1075; *see also N. Am. Soccer League, LLC v. U.S. Soccer Fed'n, Inc.*, 883 F.3d 32, 45 (2d Cir. 2018) (rejecting proposal for individual league regulation; "[a]s the Supreme Court said of the NCAA's regulating function"—regulating soccer "would be completely ineffective if there were no rules on which the competitors agreed to create and define the competition to be marketed").

[27] *See O'Bannon*, 802 F.3d at 1075 (relying on *Bruce Drug, Inc. v. Hollister, Inc.*, 688 F.2d 853, 860 (1st Cir. 1982) (noting that defendants are "not required to adopt the least restrictive" alternative); and *Am. Motor Inns, Inc. v. Holiday Inns, Inc.*, 521 F.2d 1230, 1249 (3d Cir. 1975) (denying that "alternative means of achieving the asserted business purpose renders the existing arrangement unlawful if that alternative would be less restrictive of competition no matter how small a degree")); *see also Barry v. Blue Cross of Cal.*, 805 F.2d 866, 873 (9th Cir. 1986) (rejecting proposed alternative because it sought to change "an essential element" of the challenged insurance plan, and thus was "really no alternative at all").

1    Defendants also disagree with Plaintiffs about the role of "balancing" and its relationship to

2    the burden-shifting framework.  Plaintiffs assert that if they fail to prove a less restrictive alternative

3    under the third step of the rule of reason's burden-shifting framework, they can try again in a free-

4    form fourth step, where the Court must "balance the harms and benefits" of the challenged restraints

5    to determine if they are reasonable.[28]   This misconstrues the purpose of the burden-shifting

6    framework and its relationship to "balancing."  That framework is not a precursor to conducting the

7    rule of reason's balancing inquiry, but rather a tool a designed to guide and effectuate it.  As this

8    Court has explained, "[a] restraint violates the rule of reason if the restraint's harm to competition

9    outweighs its procompetitive effects.  *Courts typically rely on a burden-shifting framework to*

10   *conduct this balancing*."[29]   Accordingly, once a court determines that a plaintiff has failed to

11   establish a less restrictive alternative, it has already conducted a balancing analysis establishing the

12   reasonableness of the challenged restraint.  It would be particularly inappropriate to conduct such a

13   separate free-form inquiry here, where binding precedent instructs that Defendants must be afforded

14   "'ample latitude' to superintend college athletics."[30]   Indeed, in *O'Bannon* itself, the Ninth Circuit

15   did not undertake or direct any such fourth balancing step, referring to the less-restrictive-alternative

16   analysis as "the final inquiry."[31]

17       **B.    Plaintiffs' Additional Burden To Show That *O'Bannon* Does Not Govern**

18       To prevail in this case, Plaintiffs must not only satisfy their burden at step three of the rule

19   of reason analysis, but also make a factual showing sufficient to demonstrate that their claims are

20   not precluded.  At the summary-judgment stage, Plaintiffs persuaded the Court that they "raise new

21   _____

[28] Pls. Op. at 11; *see also id.* at 9, 12.

22   [29] *O'Bannon*, 7 F. Supp. 3d at 985 (emphasis added).

23   [30] *O'Bannon*, 802 F.3d at 1074 (quoting *Bd. of Regents*, 468 U.S. at 120).

24   [31] *See* 802 F.3d at 1079.  Consistent with these binding precedents, to the extent that two Ninth
     Circuit cases—*County of Tuolumne v. Sonora Community Hospital*, 236 F.3d at 1160, and *Bhan v.*
25   *NME Hospitals, Inc.*, 929 F.2d 1404, 1413 (9th Cir. 1991)—suggest that an additional fourth
     balancing step may occur after the court has engaged in the three burden-shifting steps, that inquiry
26   would have to be strictly curtailed, and would not be appropriate here.  As the treatise cited by the
     Ninth Circuit as support for conducting a discrete fourth balancing step explains, "most cases will
27   be resolved" by the end of the third stage of the rule-of-reason analysis.  Phillip Areeda & Herbert
     Hovenkamp, *Antitrust Law: An Analysis of Antitrust Principles and their Application* (4th ed. 2017)
28   ¶ 1502 at 399.

1   antitrust challenges to conduct, in a different time period, relating to rules that are not the same as

2   those challenged in *O'Bannon*."[32]   Having made it this far on argument, now they need evidence to

3   prove that is in fact the case.[33]   Plaintiffs must prove either (1) an actionable new antitrust violation

4   that occurred after *O'Bannon*,[34] or (2) a fundamental, material change in the factual basis for the

5   Ninth Circuit's decision that takes this case out from under the *O'Bannon* holding.[35]

6         Plaintiffs want to have it both ways with *O'Bannon*.  They maintain that *O'Bannon* does not

7   control this case and seek to enjoin rules capping compensation and benefits that were specifically

8   upheld in *O'Bannon*.  Yet, they repeatedly criticize Defendants for allegedly providing benefits that

9   are "untethered to education."[36]   For that verbiage to have any legal significance, even under

10  Plaintiffs' theory of the case, *O'Bannon* must control *something*.  Otherwise, whether a particular

11  benefit is "untethered to education" would be irrelevant to the issues in this case.

12        Plaintiffs' "Alternative Injunction" similarly assumes that *O'Bannon* is controlling.  In

13  *O'Bannon*, the Ninth Circuit vacated the portion of the injunction allowing student-athletes to

14  receive "cash payments untethered to their educational expenses," and observed that "[t]he

15  difference between offering student-athletes education-related compensation and offering them cash

16  sums untethered to educational expenses is not minor; it is a quantum leap."[37]   The Ninth Circuit's

17  observation supported its conclusion that permitting cash payments untethered to education would

18  destroy amateurism.  Plaintiffs illogically twist that language to argue that *O'Bannon* requires the

19  NCAA to permit unlimited cash payments that are rewards for any academic achievement, including

20  _____

21  [32] MSJ Order at 15.

    [33] *See generally* Defs.' Mot. *In Limine* No. 11, ECF No. 861 (July 2, 2018) at 2–3.

22  [34] *See, e.g.*, *In re Dual-Deck Video Cassette Recorder Antitrust Litig.*, 11 F.3d 1460, 1463–64 (9th
23  Cir. 1993) (holding that "continuation of commercial activity pursuant to [prior] arrangements held
    not to be an antitrust conspiracy" does not give rise to a new cause of action).

24  [35] *See, e.g.*, *Hart v. Massanari*, 266 F.3d 1155, 1172 (9th Cir. 2001) (binding precedent applies
    unless factual "differences are material to the application of the rule" announced in that case); *Gospel*
25  *Missions of Am. v. City of L.A.*, 328 F.3d 548, 558 (9th Cir. 2003) (res judicata applies to "[a]n action
    that merely alleges new facts in support of a claim that has gone to judgment in a previous);
26  litigation"); *Montana v. United States*, 440 U.S. 147, 159 (1979) (collateral estoppel applies unless
    there were "changes in facts essential to a judgment").

27  [36] Pls. Op. at 4, 22–25, 29.

28  [37] 802 F.3d at 1076, 1078.

1    baseline eligibility.  While that conclusion is demonstrably incorrect, it is the basis for their second

2    proposed less restrictive alternative and describes the scope of their "Alternative Injunction."[38]

3        *O'Bannon* does not, as Plaintiffs imply, require Defendants to demonstrate that every benefit

4    NCAA member schools provide to student-athletes is tethered to educational expenses.  Nor does it

5    remotely suggest that Defendants can only regulate "cash sums untethered to educational expenses,"

6    or require Defendants to prove that each of the challenged rules is designed to achieve that specific

7    goal.  *O'Bannon*, having been litigated and decided, does require that *Plaintiffs* prove they are

8    challenging something other than the NCAA amateurism rules addressed and upheld in that case.

9    **III. The NCAA Rules, And Those Plaintiffs Challenge Here**

10        As reflected in the NCAA Constitution, the "fundamental policy" and "basic purpose" of the

11    NCAA "is to maintain intercollegiate athletics as an integral part of the educational program and the

12    athlete as an integral part of the student body and, by so doing, retain a clear line of demarcation

13    between intercollegiate athletics and professional sports."[39]  The two key considerations at issue in

14    this case—amateurism and the integration of athletes into the broader student experience—spring

15    directly from this foundation.  They are reflected in the guiding principles NCAA schools have

16    adopted, including "The Principle of Student-Athlete Well-Being," "The Principle of Sound

17    Academic Standards" (which states that "student-athletes shall be an integral part of the student

18    body"), and "The Principle of Amateurism."[40]  NCAA member schools strive to maintain the

19    "delicate balance of these principles"[41] and rules "enacted by the Association governing the conduct

20    of intercollegiate athletics [are] . . . designed to advance one or more" of them.[42]

21        Plaintiffs broadly attack the NCAA's amateurism rules.  But they now explain that, of the

22    "previously identified seventy-nine challenged rules," they are in fact challenging only 25 of those

23

---

24 [38] Pls. Op. at 46 (asking the Court to enjoin the challenged rules "except for compensation rules

25 restricting or prohibiting the payment of cash sums untethered to educational expenses") (emphasis removed).

26 [39] NCAA Division I Manual, Art. 1.3, 1.3.1.

27 [40] NCAA Division I Manual, Art. 2.2, 2.5, 2.9.

[41] NCAA Division I Manual, Art. 2.01.

28 [42] *Id.*

---

rules "capping compensation and benefits" (what Plaintiffs call "Category 1" rules).[43]  According to Plaintiffs, the remaining 54 rules were identified "for the sake of completeness" but "require no separate scrutiny" because "they serve merely to implement and enforce the compensation limits set forth in Category 1," and thus Plaintiffs "seek to enjoin them only to the extent they are a mechanism to enforce the Category 1 compensation caps."  *Id.*[44]

At the same time, however, Plaintiffs have expanded the target in another respect.  They now "also seek to enjoin NCAA caps on permitted types of participation benefits" identified in the seventeen rules or sets of rules they list in Appendix C—most of which are now identified as the intended subject of their challenge and proposed injunction for the first time.[45]

### A.  The "Category 1" Rules Plaintiffs Challenge Embody The Same Amateurism Principles Upheld In *O'Bannon*.

All but three of the supposed "compensation caps in Category 1" that Plaintiffs challenge are drawn from NCAA Bylaws 12 (Amateurism & Athletics Eligibility), 13 (Recruiting), 15 (Financial Aid), and 16 (Awards & Benefits).  These bylaws establish the core requirement that students not be paid for their athletic performance, while permitting schools to provide for their costs of attendance as well as benefits incidental to their athletic participation.  They are the basis for the Ninth Circuit's conclusion that, while the Rule of Reason requires the NCAA to permit its member institutions to offer financial aid up to the cost of attendance, "*it does not require more.*"[46]

***Bylaw 12.***  The rules in Bylaw 12 (Amateurism & Athletics Eligibility) articulate the NCAA commitment to amateurism, prohibiting student-athletes from being paid and establishing standards for what does and does not constitute pay so the rules can be uniformly and equitably enforced.  As shown in Exhibit A (NCAA Rules Challenged by Plaintiffs Existing in Identical Form in *O'Bannon* Record), the only challenged Bylaw 12 rules that have changed since *O'Bannon* are Bylaws

---

[43] Pls. Op. at 12.

[44] As a result of this concession, Defendants agree that the remaining 54 rules—Category 2 and Category 3 rules—are not the focus of this trial because they do not create the anticompetitive effects about which Plaintiffs complain and, accordingly, cannot properly be the basis for finding antitrust liability or the subject of an injunction.

[45] *See* Exhibit D, Plaintiffs' Appendix C Rules Not Previously Identified As Challenged Rules.

[46] *O'Bannon*, 802 F.3d at 1079 (emphasis added).

12.1.2.1.4.1.3 and 12.1.2.1.5.2.[47]   But neither rule establishes any restriction on compensation or benefits, much less a new one.  To the contrary, these rules were enacted to *permit* non-U.S. athletes to receive certain expenses, awards, benefits, or payments from his or her country's Olympic governing body related to Olympic participation or performance, just as previously existing rules (Bylaws 12.1.2.1.4.1.2 and 12.1.2.1.5.1) permitted it for U.S. student-athletes—as was specifically discussed in *O'Bannon*.[48]  These two rules therefore do not create any anticompetitive effect; they merely equalized the treatment of similarly-situated U.S. and international student-athletes.[49]  Even if the Bylaw 12 rules in Category 1 could be said to have any anticompetitive effect, that would be the same effect that was found in *O'Bannon* to be justified by procompetitive considerations under the rule-of-reason analysis.  *O'Bannon* thus requires a finding that these rules are reasonable.

**Bylaw 13.**  Bylaw 13 (Recruiting) governs schools' efforts to recruit student-athletes, regulating the expenses they can provide during recruiting trips, for example.  Bylaw 13 thus ensures potential student-athletes do not have to pay out of pocket to visit schools they are considering, while curbing excessive perks that could cross the line into payment.  The Category 1 rules drawn from Bylaw 13 are identical to the rules at issue in *O'Bannon*.[50]

**Bylaw 15.**  Bylaw 15 (Financial Aid) establishes rules for colleges providing financial aid to student-athletes to attend their school.  They do so by permitting financial aid up to the cost of attendance, which "is an amount calculated by an institutional financial aid office, using federal regulations" and "policies and procedures that are used for students in general."[51]  The only challenged rules from Bylaw 15 that have changed since *O'Bannon* are Bylaws 15.02.5 and 15.1.2.[52] These changes are fully consistent with *O'Bannon*'s holding, and resulted in NCAA rules permitting

---

[47] A parenthetical was added to Bylaw 12.1.2.1.4.3, but Plaintiffs do not specifically challenge it.

[48] *See* Trial Tr. 2544:17–19.

[49] They are also largely irrelevant.  Football is not an Olympic sport, and Plaintiffs have identified only *one* recipient of payments for Olympic basketball.  *See* Direct Testimony of Dr. Daniel Rascher (ECF No. 865, Ex. 1) ¶ 126.

[50] *See* Exhibit A (Bylaws 13.2.1 and 13.2.1.1).

[51] NCAA Division I Manual, Bylaws 15.02.2, 15.02.2.1.

[52] A sentence about the process for administering financial aid to military veterans under federal statute was deleted from Bylaw 15.2.5(e), but Plaintiffs do not specifically challenge this change.

full cost-of-attendance grants.  Accordingly, these revisions to Bylaw 15 cannot be construed to violate the antitrust laws (or to justify a new finding that the NCAA rules are anticompetitive) for two reasons:  (1) they did not give rise to any new anticompetitive effect, but instead *relaxed* previous restrictions on how much aid could be given; and (2) they conform financial aid caps to what *O'Bannon* held was required and permitted.[53]

**Bylaw 16.**  Bylaw 16 (Awards & Benefits) permits colleges to absorb student-athlete expenses associated with playing college sports and to provide awards commemorating their dedication and competition.  Recognizing that rules prohibiting pay for play could be evaded if colleges provided excessive non-monetary benefits, Bylaw 16 establishes limits on permissible benefits and creates concrete, enforceable standards.  The Category 1 rules drawn from Bylaw 16 have not changed in any respect since *O'Bannon* was decided.[54]  They plainly do not represent a material change from the principles that *O'Bannon* upheld.

**Article 5 (Legislative Process).**  Finally, Plaintiffs inexplicably include provisions from Article 5 of the NCAA Constitution in Category 1.  On their face, these provisions are not "rules capping compensation and benefits."[55]  Article 5 merely establishes the general process requirements for legislation governing intercollegiate athletics to be adopted by the NCAA membership.[56]  The particular bylaws that Plaintiffs include in Category 1 impose no substantive restriction on compensation or benefits.  They permit five Division I conferences—the ACC, Big Ten, Big 12, Pac-12, and SEC—to advance legislation related to pre-enrollment expenses and support, athletically related financial aid, and awards, benefits, and expenses for student-athletes without going through the more extensive NCAA legislative process.[57]  Unsurprisingly, therefore, there is

---

[53] As the Court has already ruled, any change made to the NCAA's rules to effect the ruling in *O'Bannon* "does not distinguish the present case from *O'Bannon* because it was the very issue adjudicated in that case."  MSJ Order at 20.

[54] *See* Exhibit A (Bylaws 16.02.2–16.11.2.1).

[55] Pls. Op. at 12.

[56] *See generally* NCAA Division I Manual, Bylaw 5.01.1.

[57] *See* NCAA Division I Manual, Bylaws 5.3.2.1.2(e)-(g).

1    no finding in the Court's summary judgment order or elsewhere that these autonomy provisions give

2    rise to any anticompetitive effects at all.  Nor could any such finding be supported.

### B.    Additional Caps On Participation Benefits (Appendix C) Are Improper Attempts To Expand The Scope Of Plaintiffs' Challenge.

5          In addition to rules in Categories 1-3, Plaintiffs now also seek to expand the scope of their

6    case and enjoin the caps reflected in rules defining several participation benefits, as identified in

7    Appendix C.  Most of the rules listed in Appendix C were never previously identified as challenged

8    rules Plaintiffs intended to enjoin.[58]  Most of these Appendix C rules were not disclosed during

9    discovery as "challenged" rules.  Nor were they "list[ed in Appendix A among] the specific rules

10   that Plaintiffs seek to enjoin, insofar as they restrict schools or conferences from providing greater

11   benefits to Class Members"—when Plaintiffs insist they were altogether clear about what they were

12   challenging and seeking to enjoin.[59]  The Court should not permit Plaintiffs to expand the scope of

13   their challenge at this late stage.  These rules were not even at issue at the summary judgment stage,

14   so the Court has naturally never found that they have any substantial anticompetitive effects.

### IV. The Challenged Rules Further The Procompetitive Purpose Of Supporting The Popularity Of Amateur College Sports That Is Distinct From Professional Sports.

16          Defendants may justify their restrictions by showing a connection between amateurism and

17   existing interest in watching or attending college sports.  That college sports differentiates itself from

18   professional sports by avoiding the pay-for-play model is well recognized—indeed, it is a central

19   feature of the "revered tradition" of college sports.[60]  The NCAA's Constitution makes this explicit.[61]

20          Consistent with that general principle, this Court and the Ninth Circuit in *O'Bannon* have

21   previously held that "the amateur nature of collegiate sports increases their appeal to consumers."[62]

22   Other courts have found this point obvious.  For example, the Seventh Circuit recently held that rules

---

[58] *See* Exhibit D, Plaintiffs' Appendix C Rules Not Previously Identified As Challenged Rules.

[59] Pls.' Mot. for Summ. J. at 4 n.2.  Plaintiffs also never sought to correct the Court when it referred, during the most recent Case Management Conference, to that list as being the "subset of 80 rules." May 22, 2018 Hearing Tr. 30:11–18.

[60] *Bd. of Regents*, 468 U.S. at 120.

[61] Division 1 Manual, Art. 1.3.1 ("A basic purpose of this Association is to . . . retain a clear line of demarcation between intercollegiate athletics and professional sports.").

[62] *O'Bannon*, 802 F.3d at 1073.

1  preserving the amateur character of college sports—one of its principal distinguishing features—are

2  presumptively valid, procompetitive exercises of the NCAA's "ample latitude" in maintaining "a

3  revered tradition of amateurism in college sports."[63]

4      The rules Plaintiffs challenge here represent the NCAA member schools' rational articulation

5  of a common standard of amateurism, distinguishing collegiate from professional sports.  Taken

6  together, these rules all set forth restrictions on the payments or benefits that student-athletes may

7  receive, so that they are not subjected to the dynamics of pay for play typical of professional sports.

8  The evidence at trial will demonstrate that amateurism is a defining feature of the collegiate sports

9  product that has achieved such popularity, and Defendants are entitled to "ample latitude" to conduct

10  the necessary line-drawing, as informed by their substantial expertise.[64]

11      Plaintiffs largely seek to disprove or obscure this connection by suggesting that any aid or

12  benefits in excess of the cost of attendance is inconsistent with amateurism, and by attacking the

13  Defendants for making rule changes.[65]  But a "clear line of demarcation between intercollegiate

14  athletics and professional sports,"[66] does not require a hard cutoff at the cost of attendance (as

15  important as that concept may be) or preclude marginal adjustments to the existing rules, consistent

16  with amateurism, to address particular circumstances or equitable considerations.   It is perfectly

17  consistent with the collegiate model for a school to defray its athletes' expected cost of being

18  students at that college, to support them in their athletic activity (including expenses associated with

19  that activity), and to permit incidental awards commemorating their competition.

20

21  _____

22  [63] *Deppe*, 893 F.3d at 499–501 (quoting *Bd. of Regents*, 468 U.S. at 120); *see also, e.g.*, *Banks v. Nat'l Collegiate Athletic Ass'n*, 977 F.2d 1081, 1089–90 (7th Cir. 1992) (holding NCAA draft-entry

23  or agent-hiring rule presumptively procompetitive); *McCormack v. Nat'l Collegiate Athletic Ass'n,* 845 F.2d 1338, 1343–45 (5th Cir. 1988) (holding as presumptively procompetitive a rule

24  allowing the suspension of a college football program for illicitly compensating players beyond scholarships); *Smith v. Nat'l Collegiate Athletic Ass'n*, 139 F.3d 180, 186 (3d Cir. 1998) (holding as

25  presumptively procompetitive a bylaw making student-athletes ineligible to compete at a graduate school different from their undergraduate institution), *vacated on other grounds by Nat'l Collegiate*

26  *Athletic Ass'n v. Smith*, 525 U.S. 459 (1999).

27  [64] *O'Bannon*, 802 F.3d at 1074 (quoting *Bd. of Regents*, 468 U.S. at 120).

   [65] Pls. Op. at 15.

28  [66] *See* NCAA Division I Manual, Art. 1.3.1.

1
2

**A.      Fact And Expert Witnesses Can And Will Support The Well-Recognized Role Amateurism Rules Play In The Popularity Of The NCAA's Product.**

3      First, the very evidence Plaintiffs say that they will offer supports the nexus between

4  amateurism and consumer demand.  After all, Plaintiffs insist the Defendants have used amateurism

5  rules to *restrain* the market from professionalizing college athletes.  At the same time, however,

6  Plaintiffs note that "proxies for consumer demand have continued to *increase significantly*."[67]  But

7  robust, rising popular demand for college sports coexists with widespread awareness that the athletes

8  remain amateurs.   Existing demand thus represents objective evidence of the procompetitive

9  function NCAA rules play in differentiating college athletes by avoiding pay for play.[68]

10      In marked contrast to Plaintiffs, Defendants will present testimony from witnesses with

11  decades of experience in college sports, higher education, and broadcasting, many of whom were

12  also Division I student-athletes.  Based on their own observations and experience, they will testify

13  about amateurism and the extent to which differentiation from professional sports supports demand

14  for intercollegiate sports; how NCAA rules help integrate student-athletes into school communities;

15  and the negative consequences—to conferences, schools, student-athletes, and college sports as a

16  whole—that would result from Plaintiffs' proposed alternatives to the current rules.[69]

17      Further, Defendants will present research that highlights the role of amateurism in promoting

18  consumer demand.  Plaintiffs erroneously claim that Defendants have no such research,[70] ignoring

19  reports that, for example, found that "[m]ost of the general population (71%) thinks that college

20  athletes already receive enough benefits and should not be paid" and that "overall all audiences

21  _____

[67] Pls. Op. at 3 (emphasis in original).

22
23 [68] *See Am. Express Co.*, 138 S. Ct. at 2288–91 (challenged restraint was not anticompetitive where Amex's business model "has increased the quality and quantity of credit-card transactions," which "grew dramatically from 2008 to 2013, increasing 30%").

24 [69] *See, e.g.*, NCAA 30(b)(6) Tr. (Lewis) 27:21–28:11 (noting broadcaster concern about potential
25  changes to amateurism model); *see also* MacLeod Tr. 153:15–16, 153:18–20, 153:23–154:14 (noting that their broadcast contracts require compliance with NCAA rules and the time and day
26  parameters Conference USA puts on scheduling of games); Barnhart Tr. 34:11–15, 34:17–20, 45:22–46:8 (explaining his view that the Kentucky fan base values the current model, which is
27  consistent with the mission of the University, and that going beyond the cost of attendance would affect the popularity of college sports).

28 [70] Pls. Op. at 17.

1   prefer student athletes to remain amateurs."[71]  Defendants will also introduce *external* research that

2   they have considered, including a Washington Post-ABC News Poll finding that, "[a]t 64 percent,"

3   opposition to paying salaries beyond scholarships is "nearly twice as high as support, with 47 percent

4   strongly against the idea."[72]  Plaintiffs, for their part, have not identified any evidentiary basis for

5   the notion that consumer preferences have changed since this Court first found, just a few years ago,

6   that amateurism promotes consumer demand for college sports.

7         Defendants' economic experts will further corroborate the observations of the fact witnesses.

8   Dr. Kenneth Elzinga[73] will explain that an agreed-upon national definition of amateurism helps

9   preserve demand for college sports.  He will explain how some schools' deviations from such a

10  standard for short term gains would negatively impact remaining schools that adhere to amateurism,

11  and hurt the value of college sports in the long term.  And he will explain how Plaintiffs' proposed

12  alternatives—both of which would permit schools to provide unlimited cash to student-athletes—

13  would not be as effective as the challenged rules in preserving the popularity of college sports.[74]

14        Dr. James Heckman will testify that eliminating NCAA rules capping payments to student-

15  athletes is a radical change in the framework of college sports.  He will testify that removing

16  compensation caps likely would cause college constituencies to re-evaluate the consequences of the

17  new equilibrium and the available choices.  Further, he will explain that Plaintiffs' unsupported

---

18  [71] Pac-12 Reputation & Key Issue Benchmark Study (PAC12GIA_00220281) at -83, -89 (Jan.

19  2014); *see also* Exploratory Qualitative Research on Consumer Perceptions of Major College
    Conferences (BIGTEN-GIA 124850) at -53 (June 2008) (Big Ten-commissioned market research

20  concluding that "[t]he appeal of college athletics is driven by purity of the game and the passion of
    the athletes (e.g., playing for the love of the sport, teamwork and don't play for pay.)"); Sports

21  Property Comparison (NCAAGIA00791115) at -52 (Apr. 2010) (NCAA-commissioned research

22  showing that sports fans are more than twice as likely to believe student-athletes "play for the love
    of the sport" than professional athletes).

23  [72] *See* March 23, 2014 Email from Erik Christianson to Dan Gavitt, *et al.*, (NCAAGIA02824852);

24  *see also* March 2014 HBO Real Sports/Marist Poll (PAC12GIA_00008636) at -37, -43 (reporting
    that 68% of college sports fans opposed paying student-athletes and that 27% of college sports fans

25  responded that they would enjoy watching college sports less if student-athletes were paid).

26  [73] Plaintiffs seek to foreclose Dr. Elzinga from testifying altogether based on this Court's market
    definition ruling.  But Dr. Elzinga's proffered testimony is clearly independent of his view that the

27  market is multi-sided.  Rather, this testimony depends on Dr. Elzinga's understanding of the appeal
    of college sports and the drivers of consumer demand, which are unaffected by this Court's rulings.

28  [74] *See* Direct Testimony of Dr. Kenneth Elzinga (ECF No. 883, Ex. A) ¶¶ 159, 170.

---

1    assertions do not provide a basis from which to conclude that a change in a key element of the

2    collegiate model would only lead to only small changes in the new equilibrium.[75]

3          Dr. Bruce Isaacson will explain that his survey provides valid and reliable evidence that

4    amateurism is an important reason for the popularity of college sports.[76]  Almost one-third (31.7%)

5    of the respondents in his survey answered that they watch or attend college sports because they "like

6    the fact that college players are amateurs and/or are not paid."  This was the third-most-commonly

7    selected reason for watching or attending college sports.  Those results provide significant evidence

8    of a substantial risk to the demand for college sports if current restrictions on compensation and

9    benefits were eliminated entirely or replaced with Plaintiffs' proposed alternatives.

10          Dr. Isaacson's survey also showed broad consumer opposition to providing student-athletes

11   with additional compensation beyond the cost of attendance, and moreover that more respondents

12   opposed than supported the scenarios he tested, after properly accounting for the survey control.

13
     - **Unlimited Payments**:  In total, the gross percentages of respondents opposed to
14     and in favor of the scenario were 68.5% and 19.8%, respectively. After accounting
       for the survey control, 59.7% opposed, compared with 0.1% in favor.

15
     - **Graduation Incentive Payment**:  In total, the gross percentages of respondents
       opposed to and in favor of the scenario were 46.4% and 35.6%, respectively.
16     After accounting for the control, 37.6% opposed, compared to 15.9% in favor.

17
     - **Academic incentive payment**:  In total, the gross percentages of respondents
18     opposed to and in favor of the scenario were 45.0% and 39.2%, respectively.
       After accounting for the control, 36.2% opposed, compared to 19.5% in favor.

19
     - **Off-Season Expenses**:  In total, the gross percentages of respondents opposed to
20     and in favor of the scenario were 35.8% and 44.1%, respectively. After
       accounting for the control, 27.0% opposed, compared to 24.4% in favor.

21   Dr. Isaacson's survey thus provides substantial evidence that amateurism is an important reason for

22   the popularity of college sports, consistent with the Ninth Circuit's recognition in *O'Bannon*.[77]

23

24

25   [75] *See* Direct Testimony of Dr. James Heckman (ECF No. 883, Ex. B) ¶¶ 12–14

26   [76] Dr. Isaacson's survey asked viewers of Division I football and men's and women's basketball
     about (1) their reactions to various scenarios that involve student-athletes receiving additional
27   benefits or compensation beyond the cost of attendance and (2) the reasons why they watch college
     sports.

28   [77] *O'Bannon*, 802 F.3d at 1079 ("amateurism principles" define the "particular brand" of college
     sports as distinct from "minor league" sports).

**B.**   **Plaintiffs' Evidence (And Argument) Does Not Disprove The Role That Amateurism Plays In Fostering Demand For The NCAA's Product.**

Plaintiffs' evidence will not overcome the substantial evidence just discussed, certainly not enough to justify departing from *O'Bannon*'s findings that amateurism has procompetitive benefits.

**1.**   **Defendants Have Not Abandoned Amateurism.**

Plaintiffs' principal argument, offered by both of their economic experts, is that, after *O'Bannon,* Defendants have abandoned any commitment to amateurism and college sports have only grown in popularity.  Their position is based on two severe logical errors:  (1) that the move to cost-of-attendance athletic scholarships in 2015, while continuing to provide other benefits, constitutes a departure from amateurism, and (2) that rising revenues since then demonstrate that college sports fans do not care about amateurism because demand "continues to thrive."[78]  From these meritless premises, Plaintiffs argue that removing all restrictions on paying student-athletes would similarly have no impact on demand.  That argument is deeply flawed, and relies on a superficial, contrived definition of amateurism concocted by Plaintiffs.

Defendants agree that college sports "continue[] to thrive."  They are very popular and generate substantial revenues.  But that does not mean that they generate more revenue than they cost for all schools and all sports—women's basketball, in particular, almost everywhere generates less revenue than it costs, while men's basketball and football are nearly as likely to generate less revenue than costs, even in Division I-FBS.[79] And, more importantly, *those sports are still played by amateurs.*[80]

---

[78] Pls. Op. at 27–29 (capitalization altered).

[79] 2004-2012: NCAA Division I Intercollegiate Athletics Programs Report (NCAAGIA02198277) at 305.  In addition, Plaintiffs' reliance on increased media rights agreements is misleading, because many of those agreements are long-term and the increasing rates were negotiated prior to *O'Bannon* and are, in fact, predicated on an assumption that amateurism will continue.

[80] Plaintiffs' expert Dr. Rascher similarly argues that fan reaction to changes in compensation rules in the Olympics (where athletes from certain Eastern Bloc nations had already been de facto professionals) and Major League Baseball (which went professional in the *1870s*) is evidence that permitting schools to provide unlimited cash to student-athletes would not affect the popularity of college sports.  Rascher Direct ¶¶ 115–127.  The Ninth Circuit explicitly rejected this same argument from Dr. Rascher in *O'Bannon*.  *See* 802 F.3d at 1077 (footnote omitted) ("[P]rofessional baseball and the Olympics are not fit analogues to college sports.  The Olympics have not been nearly as transformed by the introduction of professionalism as college sports would be.").

---

1    Putting that aside, in arguing that Defendants have abandoned amateurism, Plaintiffs create

2  their own definition of the term and then insist that by permitting financial aid up to the cost of

3  attendance consistent with the Ninth Circuit's decision in *O'Bannon*, Defendants somehow forfeited

4  their right to protect their view of what it means to be a student-athlete.  With an almost maniacal

5  focus on the cost-of-attendance concept, Plaintiffs point to the fact since 2015 many student-athletes

6  have received financial aid and benefits that, in combination, exceed the cost of attendance.  But that

7  is not a change, as both this Court's and the Ninth Circuit's decision in *O'Bannon* recognized:  under

8  NCAA rules, student-athletes were allowed prior to *O'Bannon* to receive specified grants and

9  benefits in addition to the cost of attendance.  That is because amateurism is perfectly consistent

10 with schools both defraying athletes' expected cost of being students at that school (the cost of

11 attendance, as calculated by each school according to federal regulations that apply to students

12 generally), *and* supporting their athletic activity by providing facilities and covering expenses

13 associated with it, as well as incidental awards commemorating participation in competition.

14    With that in mind, as explained below, none of the benefits Plaintiffs identify crosses the line

15 of paying students to play like professionals.  As a result, Plaintiffs' observations about the current

16 popularity of college football and men's basketball (they never say a word about women's basketball

17 in particular, which is unfortunately not nearly as popular among consumers) imply nothing about

18 what would happen in the alternative universe they seek, in which schools would have no limits on

19 what they could pay athletes to play sports.

20               **a.    Cost-of-attendance stipend payments.**

21    Plaintiffs' first line of attack is on the cost-of-attendance principle itself.  They say their

22 experts will testify that permitted cost-of-attendance stipends are just an *estimated average*, and that

23 students are not monitored or restricted in using these amounts for specific educational expenses,

24 rather than video games.[81]  But this attack is misguided. The cost of attendance is an amount that

25 each school calculates under federal regulation to estimate what it costs an individual student to

26 attend.  While it includes "tuition and fees," "an allowance for books, supplies, transportation," and

27 an allowance "for room and board costs incurred by the student," it also includes an allowance for

28

---

[81] *See* Pls. Op. at 23.

1    "miscellaneous personal expenses."[82]   And if *O'Bannon* means anything in this case, it surely

2    resolved whether full cost-of-attendance scholarships are consistent with amateurism.[83]

3           Preserving a distinction between amateur sports and professional sports does not depend on

4    cost-of-attendance figures perfectly matching each student-athlete's actual educational expenses.[84]

5    In using cost-of-attendance figures to define permissible financial aid packages for student-athletes,

6    the NCAA and member schools thus treat athletes the same as other students.[85]

7                           **b.      Pell Grants.**

8           Plaintiffs' discussion of Pell Grants similarly criticizes NCAA schools' administration of a

9    federal financial aid program intended to benefit "students who display exceptional financial

10   need."[86]  Devoting a full page to the topic, Plaintiffs lament that "following *O'Bannon*," Pell Grants

11   bring some students' total financial aid package above the cost of attendance.[87]  This, according to

12   Plaintiffs, shows that "the imaginary Maginot line drawn at COA as some kind of defining barrier

13   protecting consumer demand for the sports at issue has not existed since at least 2015."[88]

14          This is not a phenomenon that arose "following *O'Bannon*." As this Court recognized in

15   *O'Bannon*, the NCAA Bylaws were amended "in 2004" to allow "student-athletes who receive

16   federal Pell Grants to receive total assistance . . . in excess of the cost of attendance."[89]

---

17   [82] 20 U.S.C. § 1087*ll*.

18   [83] *See O'Bannon*, 802 F.3d at 1075 (recognizing that aid given to student-athletes under the cost-of-
19   attendance rules "cover[s] their legitimate costs to attend school" (internal quotation marks omitted)).

20   [84] Plaintiffs point to Alec James's testimony that he spent some of his monthly rent stipend on things other than rent. Pls. Op. at 23.  This is a recycled argument from *O'Bannon*, where Plaintiffs' expert
21   Dr. Rascher testified that student-athletes who live off-campus sometimes spend their off-campus
22   living stipends on things other than rent.  *O'Bannon* Tr. 908:9–15.  That was not inconsistent with amateurism then, and it is not now.

23   [85] *See* NCAA Division I Manual, Bylaws 15.02.1–15.02.2; Cost of Attendance Q&A, NCAA.com
24   (Sept. 3, 2015), https://www.ncaa.com/news/ncaa/article/2015-09-03/cost-attendance-qa.

     [86] Federal Pell Grants, Fed. Student Aid, https://studentaid.ed.gov/sa/types/grants-scholarships/pell;
25   *see* 20 U.S.C. § 1070a.

26   [87] Pls. Op. at 26–27.

     [88] *Id.* at 27.

27   [89] 7 F. Supp. 3d at 974; *see also O'Bannon*, 802 F.3d at 1059 (recognizing that "student-athletes are
     permitted to accept Pell grants even when those grants raise their total financial aid package above
28   their cost of attendance").

---

1    Moreover, the availability of Pell Grants and the fact that they are not required to count

2 against financial-aid limits does not violate the NCAA's commitment to amateurism of student-

3 athletes.  NCAA Bylaw 15.1.1—which has made clear since 2004 that Pell Grants do not have to

4 count against permissible financial aid limits—merely means that colleges are not perversely

5 required to reduce their own financial aid packages to the student-athletes who are identified under

6 federal regulations to have the highest need.  This does not turn Pell Grants into a pay-for-play

7 mechanism for individually valuing athletes' performance.  Not surprisingly, therefore, Rule 15.1.1

8 did not preclude this Court or the Ninth Circuit in *O'Bannon* from recognizing amateurism's

9 procompetitive effect.  And it should not do so today.[90]

10               c.       **Benefits incidental to participation.**

11    The availability of non-educational benefits incidental to participation in sports is likewise

12 neither new since *O'Bannon* nor inconsistent with amateurism—if they are prevented from

13 becoming a mechanism to disguise pay-for-play compensation typical of professionals.  Defendants'

14 witnesses will explain how these incidental benefits are designed to relieve the burdens and expenses

15 associated with the very activity of athletic competition.  This does not amount to treating student-

16 athletes as professionals who are paid to play based on the value of their athletic performance.

17    Contrary to Plaintiffs' characterizations, Mr. Kevin Lennon and others will explain at trial

18 what the NCAA Bylaws themselves make clear:  the restrictions on permissible benefits assure that

19 they do not become a pay-for-play mechanism.  There is a big amateur-related difference, for

20 example, between allowing colleges to pay for athletes' athletic apparel, equipment, and supplies,

21 on the one hand,[91] and eliminating all restrictions to permit "participation benefits" like $100,000

22

23 [90] While Plaintiffs criticize Defendants and NCAA schools for allowing the neediest student-athletes
    to receive Pell Grants in excess of the cost of attendance, their expert Dr. Rascher simultaneously
24 criticizes schools that reduce financial aid for Pell Grant recipients so the total aid does not exceed
    the cost of attendance.   Rascher Direct ¶ 99 (alleging that a Division I school "effectively
25 confiscates" Pell Grants).  This is yet another example of Plaintiffs criticizing Defendants for *not*
    providing benefits to student-athletes, but using the benefits Defendants *are* providing to argue that
26 Defendants have abandoned amateurism.  If, as with the cost of attendance, Defendants are required
    to allow additional benefits as a result of this litigation, then surely another class of Plaintiffs will
27 point to those as evidence that Defendants have abandoned their principles.
28 [91] *See* NCAA Division I Manual, Bylaw 12.02.2(c).

1    per season of participation.  While performing such an end-run around principles of amateurism is

2    what the Plaintiffs urge,[92] that is not what the NCAA benefits rules do.

3           Suggesting that amateurism is a sham, Plaintiffs rattle off several things they call benefits

4    incidental to participation, without analyzing each or the rules that address them.[93]  But actually

5    looking at the rules related to each of these—as we do below and Defendants' witnesses will do at

6    trial—shows that they are rationally crafted to draw a line between recognized traditions of

7    amateurism, on the one hand, and indifference to the costs and burdens of athletic competition, on

8    the other.  Neither common sense nor the antitrust laws require that amateurism can be sustained

9    only through callous indifference to these realities.  So the fact that "consumer demand has not

10   missed a beat despite all of this compensation"[94] does nothing to undermine the NCAA's

11   procompetitive justification for regulating these benefits or otherwise prohibit pay for play.

12                        **i.        Apparel, Entry Fees, And Facility Use**

13          Plaintiffs tout the fact that, in addition to full cost-of-attendance scholarships, athletes may

14   receive "non-education-related benefits" like apparel, entry fees and athletic facility use.[95]  In other

15   words, Plaintiffs are criticizing Defendants for providing things like uniforms and practice jerseys,

16   entry fees for participating in intercollegiate competitions, and use of the schools' athletic facilities.

17   They spend no attention on why Bylaws 12.02.2 and 12.02.2.1 permit them—because (and to the

18   extent that) they are part of an athlete's "actual and necessary expenses."[96]  Similarly, fees for

19   conditioning activities are permitted as "actual and necessary expenses" under Bylaw 16.8.1.3

20   because they are necessary aspects of a student-athlete's practice and competition.  Other "actual

21   and necessary" expenses include "equipment," "coaching and instruction," and "transportation" to

22   and from games.[97]  Under Plaintiffs' logic, a student-athlete receiving a full cost-of-attendance

23

---

24   [92] Pls. Op. at App'x D (Proposed Injunction) ¶ 1, App'x E (Proposed Alternative Injunction) ¶ 1.

25   [93] *See* Pls. Op. at 23–24 (listing "apparel, transportation and lodging for families to attend contests,
     entry fees and facility use, fees for conditioning activities, gift suites, bowl payments . . . and athletic
26   awards").

     [94] *Id.* at 23.

27   [95] *See id.* at 3.

28   [96] *See* NCAA Division I Manual, Bylaw 12.02.2(c) (apparel), (h) (facility usage), (i) (entry fees).

     [97] *See Id.* at Bylaw 12.02.2(c)–(d), (f).

1  scholarship would no longer be an amateur if he or she were provided with a helmet, coaching, or a

2  bus ride for games.  Treating these expense provisions as if they exposed a hypocritical sham is

3  patently wrong.  The NCAA rules permit schools to cover these expenses because they would

4  otherwise burden the athletes precisely because they compete and prepare to compete, not because

5  things like apparel and entry fees are a way to individually pay athletes for performance.

6              ii.      **Transportation And Lodging For Families To Attend Contests**

7              Contrary to Plaintiffs' suggestion, NCAA rules generally *do not* permit schools to pay for a

8  student-athlete's family to travel to competitions.  Permitting unregulated payments of this sort

9  would create incentives for colleges to pay student-athletes by providing their families with

10 extravagant travel and lodging—essentially paid vacations.  Absent limitations in the rules, that

11 would vitiate the principles of amateurism.  Narrow exceptions exist for limited and specified family

12 members—student-athletes' spouse and children—to attend limited and enumerated events—

13 football bowl games and one round of the NCAA basketball championship, as relevant here.[98]

14 Defendants' witnesses will testify that, while these limited exceptions do not pose a substantial

15 danger of becoming disguised forms of pay for play, broader allowances might lead to abuse and be

16 used as recruiting incentives inconsistent with the principle of amateurism.  Members have therefore

17 decided that the exceptions should be narrowly drawn.

18              iii.     **Athletic Awards**

19             Athletic awards—which include what Plaintiffs call "gift suites" and "bowl payments"—are

20 entirely consistent with traditions of amateurism, particularly given the way the rules circumscribe

21 their number and value.  Witnesses will explain that Bylaw 16.1.4 permits awards if they are limited

22 in value and number as the rules describe, and do not take the form of cash (which Bylaw 16.1.1.2

23 proscribes).   Typically, these awards for participation in a season, post-season event, or

24 championship contest or bowl game are restricted to one per event from each school and agency

25 managing the event, and to a few hundred dollars each.[99]  Championship awards are similarly limited

26

27 [98] *See* NCAA Division I Manual, Bylaw 16.6.1.1 (permitting actual and necessary costs for student-athlete's spouse and children to attend bowl game or one round of any NCAA championship).

28 [99] *See generally id.* at Figure 16-1.

1   to a few hundred dollars each and to being awarded by the college and the conference.[100]

2   Defendants' witnesses will explain that the award limits are set to be consistent with the cost of

3   mementos historically bestowed for sports awards, such as rings, watches and letterman jackets, and

4   increases in the limits have been made over the years to adjust for inflation.  In recognition of the

5   evolving tastes and diversity of student-athletes, awards have shifted toward providing a broader

6   array of mementos, sometimes available for choice through gift suites, to recognize that not every

7   student-athlete will treasure the same kind of item to commemorate their experience and

8   achievement.

9       So these are methods of commemorating student-athletes' participation in the competition

10  with awards of relatively modest value, rather than mechanisms for paying players based on market

11  dynamics.[101]   This is confirmed by the fact that each member of a team receives the same

12  participation award as other student-athletes in their class year, regardless of his or her individual

13  talent or value to the team.[102]   The unsurprising fact that teams performing well enough to reach

14  more post-season games will receive more of these incidental awards—and therefore a greater

15  accumulation of relatively modest values—than teams that make no post-season appearance does

16  not mean that the NCAA has abandoned traditions of amateurism since *O'Bannon*.

17              **iv.        Loss-of-Value Insurance.**

18      Plaintiffs also reference "the possibility of thousands of dollars for professional lost earnings

19  insurance" being available to athletes under Bylaw 12.1.2.4.4 or through the Student Assistance

20  Fund.[103]   Plaintiffs exaggerate the novelty of what this bylaw allows in claiming that it is part of a

21  "natural, post-*O'Bannon* experiment."[104]   Before *O'Bannon*, Bylaw 12.1.2.4.4 already permitted

22

---

23  [100] *Id.* at Figure 16-2.

24  [101] *See* Lambert Tr. at 102:4–103:1; Decl. of Brad Hostetter in Supp. of Defs.' Mot. for Summ. J. ("Hostetter Synopsis") at 13.

25  [102] *See, e.g.*, Henry Tr. at 89:10–91:12.

26  [103] Pls. Op. at 25.  To be clear, while Plaintiffs group this issue with various "benefits incidental to participation," technically, the allowance for securing loss-of-value insurance falls under Bylaw 12,

27  which describes transactions that do or do not constitute forbidden pay—not "benefits incidental to participation."  Bylaw 12.1.2.4.4 permits student-athletes to borrow against future earnings to secure

28  particular kinds of insurance.

[104] Pls. Op. at 23, 25.

1    student-athletes to borrow from respected third-party financial institutions (without third-party

2    sports agent involvement) to buy insurance against a disabling injury that ends a potential

3    professional career.  The minor subsequent change merely permits student-athletes to buy insurance

4    against injuries incurred during college play that *reduce* professional earnings.  This bylaw,

5    including the marginal post-*O'Bannon* modification, does not contradict principles of amateurism,

6    but is a humane recognition that a small fraction of student-athletes want to and can arrange

7    insurance related to their possible future careers as professional athletes.

8                           **v.        Benefits Limitations And Amateurism**

9          Plaintiffs' contentions that the NCAA's benefits rules have nothing to do with amateurism

10   are based largely on their mischaracterization of the testimony of Mr. Lennon.  According to

11   Plaintiffs, Mr. Lennon has "given binding testimony . . . that such 'incidental to participation

12   benefits' are not tethered to education and are 'not related to the principle of amateurism.'"[105]

13   Plaintiffs suggest that Mr. Lennon has effectively conceded the case because a "tether" to education

14   is supposedly necessary to preserve amateurism.  But, as noted above, Mr. Lennon and other

15   witnesses will explain that while financial aid benefits are tailored to estimated costs of education

16   so *those* financial aid payments do not become a form of professional compensation, benefits

17   incidental to participation are designed for a different purpose—to support athletes in, and ameliorate

18   the burdens associated with, their participation in athletics—and are limited in amount in order to

19   avoid their use to pay student-athletes in violation of the principle of amateurism.

20         Similarly, Plaintiffs mischaracterize Mr. Lennon's testimony in suggesting that NCAA rules

21   permitting incidental benefits have no bearing on the interests of amateurism.  The fact that, as Mr.

22   Lennon testified, the NCAA membership may sometimes change the rules to permit certain benefits

23   incidental to athletic participation "without violating the principle of amateurism" is unremarkable

24   since these rules address the burdens and expenses of competing in athletics, without permitting

25   athletes to be paid based on market valuation of their play.  Whether some of Mr. Lennon's

26   statements may have been imprecise or inartful is immaterial.  Antitrust liability does not turn on

27   semantics, and his testimony cannot fairly be twisted to mean there is no connection between NCAA

28

---

[105] *Id.* at 24.

1   rules on benefits and its commitment to amateurism.  Indeed, Mr. Lennon himself testified that the

2   rules limiting incidental benefits serve to keep them consistent with amateurism.[106]

### d.     SAF And AEF Payments.

4        Plaintiffs claim that "another example of substantial compensation untethered to education

5   that has been permitted in combination with full COA since *O'Bannon*" are SAF and AEF

6   payments[107]—but, as discussed above, these benefits are neither new "since *O'Bannon*" nor

7   inconsistent with amateurism.  As Defendants' witnesses will explain, the SAF and AEF both existed

8   before *O'Bannon* and have not been materially changed since then.  Indeed, the plaintiffs in

9   *O'Bannon* presented testimony about the SAF and its permissible uses, and the Court expressly

10  acknowledged it, noting that "special financial need[s]," such as "clothing, needed supplies, a

11  computer, or other academic needs" could be reimbursed out of the Student Assistance Fund, and

12  that such aid might exceed "the cost of attendance."[108]  This Court was also presented with similar

13  testimony about the AEF during *O'Bannon*.[109]

14       Moreover, Defendants' witnesses will explain how Plaintiffs are wrong to suggest that the

15  benefits distributed from these funds are somehow inconsistent with amateurism because they are

16  "untethered to education."  As noted above, the lynchpin of amateurism is not a "tether" to education.

17  But, in any event, as its name implies, the purpose of the *Academic* Enhancement Fund—which will

18  provide over $48 million in benefits in 2018—is to provide "enhancement of *academic*-support

19  programs for Division I student-athletes."[110]  These funds are not a veiled form of pay for play;  they

20

---

21  [106] *See* Lennon Tr. 63:17–22 ("There comes a point in time when, by continuing to provide incidental
22  expense[s], you really are crossing over into a--a principle of amateurism or that the benefits simply
    are not appropriate.").

23  [107] Pls. Op. at 25.

24  [108] 7 F. Supp. 3d at 972 n.5 (citing testimony of Todd Petr).

25  [109] *See, e.g.*, *O'Bannon* Tr. 2149:23-2150:15 (Todd Petr testifying that the NCAA distributed $25
    million to member schools via the "Academic Enhancement Fund," which is "meant for those
26  institutions to enhance the academic support of student athletes"—for example" by "bringing in a
    learning specialist or buying more computers or other needed infrastructure for their academic
27  support center").

28  [110] 2018 NCAA Distribution Plan (emphasis added) (listing possible uses of the fund),
    http://www.ncaa.org/sites/default/files/2018DIFIN_DivisionI_RevenueDistributionPlan_
    20180508.pdf.

---

1   are used for a range of *academic* expenditures, including salaries for academic counselors, study

2   labs, tutors, and other measures to enhance academic success.

3       Similarly, the SAF is not a way to divert extra cash to student-athletes for athletic

4   performance.  Rather, witnesses will testify that it provides a safety valve for student-athlete

5   expenses that may fall within gaps in other NCAA rules.  For example, it is used for academic

6   supplies, clothing, emergency travel, and other miscellaneous and individualized expenses that may

7   arise but are not covered by a student-athlete's scholarship.  As a result, the SAF humanely helps

8   defray unexpected costs of student-athletes attending school—often far from their home—as

9   evidenced by the fact that many uses of the SAF represent situations that can warrant an emergency

10  grant under a school's need-based financial aid policies.

### e.  Olympic Gold And National Governing Body Performance Awards.

13      Plaintiffs have also argued that part of the "post-*O'Bannon* experiment" of "incidental-to-

14  participation benefits, on top of COA" has been "the possibility of thousands of dollars in payments

15  from sports federations for Olympic and other national-team success."[111]  Unlike most other items

16  identified by Plaintiffs, the eligibility rules relating to participation in the Olympics do not involve

17  any funds or benefits that the NCAA, its member schools, or its event sponsors provide.  As

18  *O'Bannon* expressly recognized, allowing payments from third-parties for outside athletic events

19  "implicates amateurism differently than allowing schools to pay [student-athletes] directly," as

20  Plaintiffs propose.[112]  Also, Plaintiffs in this litigation are not challenging NCAA rules regarding

21  "third-party payments to college athletes,"[113] and to date Plaintiffs have identified only one class

22  member who has ever received any such payments from any country.[114]

23      Importantly, moreover, contrary to the impression Plaintiffs try to create, exempting Olympic

24  program awards from what is considered prohibited pay is not a "post-*O'Bannon*" development that

---

[111] Pls. Op. at 23, 25.

[112] 802 F.3d at 1077 n.21.  Indeed, to be clear, while Plaintiffs group Olympic or national-team awards with "benefits incidental to participation," technically these are treated under the Bylaw 12 definition of what qualifies as prohibited professional "pay."

[113] *See* Pls. Op. at App'x D (Proposed Injunction) ¶ 5, App'x E (Proposed Alternative Injunction) ¶ 6.

[114] *See* Rascher Direct ¶ 126.

1  betrays amateurism.  Since 2001—long before *O'Bannon*—funds administered by the U.S. Olympic

2  Committee were recognized as not constituting prohibited pay under Bylaws 12.1.2.1.4.1.2 and

3  12.1.2.1.5.1.  The only change since *O'Bannon* is that Bylaws 12.1.2.1.4.1.3 and 12.1.2.1.5.2 were

4  added to give international athletes equivalent treatment for any funds received from their countries'

5  national Olympic governing body.  This equalization of treatment for U.S. and international student-

6  athletes attending NCAA schools is neither remarkable nor contrary to traditions of amateurism.

7  Finally, witnesses will explain that the grants at issue here are generally used to defray

8  significant expenses individuals incurred in training for and participating in the Olympics.  NCAA

9  membership has determined that this limited exception would not threaten the amateur collegiate

10  model in light of these costs, the unique nature of the Olympics, patriotic attributes of representing

11  one's home country, the non-revenue nature of most Olympic sports, and the fact that very few

12  student-athletes compete (let alone medal) in the Olympics.

13

### 2. Mr. Poret's Survey Does Not Support Plaintiffs' Argument That Demand Would Be Unaffected By The Changes They Seek

14

15  Just as Plaintiffs' evidence does not disprove the NCAA's commitment to amateurism, their

16  survey evidence does not show that truly abandoning amateurism (as Plaintiffs urge) poses no risk

17  to consumer demand for college sports.  Relying on Mr. Hal Poret, Plaintiffs argue that college-

    sports consumers are indifferent to amateurism—and would be unaffected if student-athletes
18
    suddenly operated in an unlimited pay-for-play regime.  But Mr. Poret's testimony does not
19
    withstand the faintest scrutiny, and he indisputably did not test the relief Plaintiffs seek here.
20
    First, as Dr. Isaacson will explain, Mr. Poret's novel methodology is neither established nor
21
22  scientifically supportable and thus does not provide valid or reliable data.  Mr. Poret directly asked

23  consumers to predict their future behavior—a method he previously described as "inherently

    unreliable."[115]  And Mr. Poret himself explained in *O'Bannon* that directly undermines his opinion
24
    here:  "In the context of an issue such as viewership of NCAA sports, consumers' future behavior
25
26  cannot be reliably determined by directly asking them whether they would be less likely to watch

27  ─────────────────

    [115] Expert Report of Hal Poret (Mar. 21, 2017) at 10.  Plaintiffs say a similar survey asking people
28  to predict their future behavior was used in *O'Bannon*.  But the Court did not rely on that survey for
    its conclusions.

1  sports if student-athletes are paid."[116]  There is no support for Mr. Poret's claim that his "control"

2  questions remedied that problem.

3  　　　Mr. Poret misapprehends what a control is, and what it can do.  While a valid control can

4  correct for noise—like respondent error or inattentiveness—it cannot be used to reliably predict

5  future behavior based on direct survey questioning.  Reliably measuring future behavior, Dr.

6  Isaacson will explain, would require comparable historical events along with robust historical data

7  (not merely anecdotes) showing the relationship between consumer preferences and behavior in

8  connection with those events.  In this case, this evidence does not exist because, given the NCAA's

9  commitment to amateurism, it understandably has never made or tested fundamental abandonment

10 of the amateur model like Plaintiffs seek here.[117]

11 　　　Beyond these fundamental problems with the designs of Mr. Poret's survey, Mr. Poret's

12 survey simply does not address what is at issue in this case.  As Dr. Isaacson will testify, Mr. Poret's

13 survey has no reliable application to real-world consumers because of the improper assumptions and

14 biases that pervade his survey design.  Most notably, his survey required respondents to make a

15 critical assumption when answering questions about every single one of his scenarios:  that the

16 proposed benefits and compensation under consideration would be "paid for from the revenue

17 generated by the athlete's team."[118]  As Defendants' evidence will show at trial, such an assumption

18 bears little resemblance to reality.  Money is finite, even for the wealthiest academic departments.

19 And, at most schools, athletics programs already cost more than the revenue they generate.  Even

20 the most competitive schools (Division I schools with FBS football programs) have been nearly as

21 ─────────────────

22 [116] Decl. of Hal Poret (*O'Bannon* Dist. Ct. Dkt., Case No. 4:09-cv-01967-CW, ECF No. 957-6) (Jan. 8, 2014) ¶ 20.

23 [117] Direct Testimony of Dr. Bruce Isaacson (ECF No. 902, Ex. C) ¶¶ 34–43.  Mr. Poret's controls
24 are also fundamentally flawed, so they do not act as controls at all.  A properly designed control
    enables the study to isolate the elements it is testing by resembling the test as closely as reasonably
25 possible except with respect to the elements of interest.  *Id.* ¶¶ 46–47.  A proper control in this case,
    therefore, should have been a scenario with little or no effect on attitudes or demand.  But Mr. Poret's
26 "control" scenarios merely presented other forms of compensation and benefits for student-athletes
    that may reasonably impact consumer attitudes and demand.  *Id.* ¶¶ 52–53.  As Mr. Poret's own data
27 show, they clearly *did* matter to respondents, often more than Mr. Poret's tested scenarios.  *Id.* ¶¶
    62–65.

28 [118] *Id.* ¶¶ 77–79.

1   likely to have football and men's basketball program expenses that exceed generated revenues, while

2   all or virtually all women's basketball programs have historically had expenses greater than

3   generated revenue.[119]  Member schools thus rely heavily on funds the NCAA distributes every year,

4   much of it in the form of restricted funds, earmarked specifically to improve student welfare and

5   education outcomes (and therefore not eligible to be used for coaches' salaries, for example).[120]  As

6   such, Mr. Poret has evaluated only a fictional scenario that is irrelevant to the actual marketplace

7   that would exist if student-athletes could be paid unlimited compensation and other benefits.

8          Moreover, to the extent they are intended to demonstrate that Plaintiffs' less restrictive

9   alternatives would be virtually as effective as the challenged rules, the scenarios Mr. Poret tested do

10  not match Plaintiffs' proposals, undermining the relevance of Mr. Poret's survey to these claims.[121]

11  Mr. Poret did not test what would happen if there were no practical limits on compensation

12  whatsoever, if conferences were permitted to set their own limits, or if only cash payments

13  untethered to educational expenses were barred.  Nor did Mr. Poret make any attempt to measure

14  consumers' responses if multiple compensation or benefit scenarios were implemented, a deficiency

15  that is all the more important and undermining in light of the evidence from Dr. Isaacson's survey

16  that amateurism in college sports *is* important to consumers and that a substantial percentage of

17  consumers oppose benefits that would dilute that principle.[122]  Mr. Poret's new claim that he can

18  opine, to a "high degree of scientific certainty,"[123] about whether consumer demand would be

19  affected if scenarios he never tested were implemented is both unsupported and contrary to his prior

20  testimony in this case.  As the Court recognized in *O'Bannon*, consumer surveys that ask respondents

21  [119] *See, e.g.*, Revenues & Expenses: NCAA Division I Intercollegiate Athletics Programs Report
22  (NCAAGIA02198277) at -28 (Apr. 2013); *see also* Southeastern Conference, Financial Statements:
    August 31, 2015 and 2014 (SEC00310403) at 43 (Oct. 8, 2015) (expenses greater than revenues for
23  2015 SEC Women's Basketball Tournament).

24  [120] *See, e.g.*, 2018 NCAA Distribution Plan (describing permissible uses of distributions); Where
    Does The Money Go?, NCAA.org (Ex. 143 to McNeely Dep.) (Oct. 12, 2016);  *see also* ACC
25  30(b)(6) Tr. (Swofford) 78:16–79:14 (explaining that Grants-in-Aid Fund is disbursed to
    conferences to improve student-athlete welfare); Alger Tr. 34:15–19, 117:23–119:12 (describing
26  heavy subsidization of James Madison University sports, none of which "pay[] their own way").

27  [121] *See* Isaacson Direct ¶ 20.

    [122] *See id.* ¶¶ 80–85.

28  [123] Direct Testimony of Hal Poret (ECF No. 865, Ex. 3) ¶¶ 59, 131.

1    about scenarios that are materially different from what is under consideration cannot provide

2    credible evidence about the scenarios that are actually at issue.[124]

3    **V.  The Challenged Rules Help Preserve The Integration Of Athletics And Academics.**

4         **A.    NCAA Division I Schools Continue To Treat Students-Athletes As
                    Students.**

5
6         The very reason each NCAA member school exists is to educate students.  There may be

7    some variations in their institutional missions.   But they are all committed to creating and

8    maintaining educational communities that integrate many and varied activities—including

9    athletics—into a broader student experience.[125]  Facilitating student-athletes' academic progress and

10   integrating them into the student body improves the quality of the product that schools provide,

11   including to those athletes—and it is therefore a procompetitive justification.[126]

12        The value of a collegiate experience in which academics are integrated with athletics has

13   been established by Dr. James Heckman, a Nobel Laureate.  As Dr. Heckman shows, student-athletes

14   are more likely than non-athletes to graduate high school and go to college.  They are also as likely

15   or more likely to get a college degree.[127]   The benefits of an education in which academics and

16   athletics are integrated, moreover, continue long after obtaining a degree.  Dr. Heckman's analysis

17   shows that, in addition to gaining invaluable life skills and experiences, male Division I basketball

18   and FBS football student-athletes earn more after college than they would have if they did not

19   participate in intercollegiate athletics.[128]   As Dr. Heckman concludes, using regression analyses to

20   determine the importance of different variables, these results are the causal result of participation in

21   college sports under the collegiate model Plaintiffs challenge.[129]

---

22   [124] 7 F. Supp. 3d at 976.

23   [125] *See, e.g.*, Steinbrecher Tr. 45:12–17 ("We link participation in athletics to their pursuit of
      education, and it brings value to that education, not only to those kids, but to everyone within the
      enterprise, that it brings value to the institution as a whole."); Blank Tr. 97:8–98:7 (testifying that
24   paying students athletes "subverts the whole point of being a student and what it means to be a
25   student athlete," and that "any payment to student athletes would fundamentally change the nature
      of what we are about here in college sports," that is, "put[ting] education first").

26   [126] *O'Bannon*, 7 F. Supp. 3d at 1002–03.

27   [127] Heckman Direct ¶¶ 52-60.

28   [128] *Id.* ¶ 61.

     [129] *Id.* ¶¶ 34, 52.

---

1    Plaintiffs downplay the integration justification by claiming "Defendants cannot even prove

2  that D-I basketball and FBS football players are currently well-integrated," followed by a litany of

3  anecdotes about the tensions and trade-offs that exist for student-athletes.[130]  But such complaints

4  that athletes are not "well-integrated," while incorrect to begin with, also miss the point.  The issue

5  is not whether schools have achieved an ideal level of student-athletes' integration—whatever that

6  would mean—but whether the NCAA rules are rationally crafted to help strike appropriate balances

7  so existing tensions and trade-offs do not unreasonably undermine academics.  Integrating student-

8  athletes into the student body does not mean that these tensions and trade-offs disappear, any more

9  than integration means that all students (athletes or not) will have the same college experience.  To

10 the contrary, the tensions and trade-offs that Plaintiffs bemoan underscore the *reason* there is a need

11 for the NCAA to establish rules promoting integration.  These rules are economically procompetitive

12 if they improve the quality of collegiate offerings by *helping to integrate* athletics into the broader

13 student experience, reducing tensions or fragmentation that might otherwise exist.

14    Despite Plaintiffs' efforts to ignore it, NCAA and school administrators have invested

15 significant resources in seeking to promote integration by striking appropriate balances between

16 students' athletic efforts and their participation in the broader academic community.  Article 14, for

17 example, embodies such efforts.  Those rules, among other things, establish national *academic*

18 eligibility standards—and conferences and schools may impose even higher standards than the

19 NCAA's rules.[131]  NCAA rules further require student-athletes to be enrolled, full-time students, and

20 remain in good academic standing.[132]  And to remain eligible to participate in athletics, student-

21 athletes must make a defined amount of progress toward the requirements for a degree.[133]  Other

22 bylaws impose limits on athletically-related activities,[134] and the amount of class-time student-

23

---

24 [130] Pls. Op. at 33–37 (capitalization altered).

25 [131] NCAA Division I Manual, Bylaws 14.01–14.9; *see also, e.g.*, 2014-2015 Southeastern Conf.
   Bylaws (SEC00038552), Bylaw 14.1 *et seq.* (providing, for example, that student-athletes may not
   use more than six semester or nine quarter hours of nontraditional courses from another institution
26 in any twelve-month period to fulfill the minimum satisfactory-progress requirements).

27 [132] *See* NCAA Division I Manual, Bylaw 14.01.2, 14.2.1, 14.2.2.

   [133] *See, e.g., id.* at Bylaw 14.4.1, 14.4.3.

28 [134] *See id.* at Bylaw 17.1.7.1, 17.1.7.3,

1   athletes can miss due to athletics participation or media activities.[135]  These requirements themselves

2   show a commitment to integration of student-athletes into the student experience.

3       Beyond that, the NCAA and its member schools and conferences have programs that aim to

4   encourage and support athletes in their academic endeavors.[136]  Ironically, Plaintiffs complain about

5   one of these programs, the Academic Enhancement Fund, cynically suggesting that it represents a

6   betrayal of amateurism principles for the NCAA to spend over $48 million (expected in 2018) to

7   provide "enhancement of academic-support programs for Division I student-athletes."[137]   As

8   discussed above, trial witnesses will explain how these programs actually represent the NCAA and

9   member schools' commitment to integrating student-athletes in academic programs.

10      Plaintiffs also ignore entirely the efforts undertaken by the NCAA, the conferences, and

11  schools to study the academic progress and on-campus experiences of student-athletes, with the

12  objective of improving both.  For example, the NCAA and its members expend significant resources

13  tracking the academic progress and graduation rates of student-athletes.   The NCAA has also

14  surveyed tens of thousands of student-athletes as part of its Growth, Opportunities, Aspirations and

15  Learning of Students in college (GOALS) studies on issues related to their academic and social

16  experiences.[138]   And it has surveyed thousands of former student-athletes as part of its Study of

17  College Outcomes and Recent Experiences (SCORE) on similar issues, as well as post-college

18  success.[139]  The conferences similarly solicit input from student-athletes on these issues.[140]

19      Where exactly to draw the lines based on all this information can be debated.  Indeed, NCAA,

20  conference, and school officials—many of whom are lifelong educators—debate that all the time.

21  They spend time and money on these questions because academic integration is at the heart of their

22

---

23  [135] *See id.* at Bylaw 3.2.4.13 (athletics participation); *id.* at Bylaw 12.5.3 (media activities).

24  [136] *See, e.g.*, SEC H. Boyd McWhorter Postgraduate Scholarship Checklist (SEC00017611).

25  [137] 2018 NCAA Distribution Plan, http://www.ncaa.org/sites/ default/files/2018DIFIN_DivisionI_
    RevenueDistributionPlan_20180508.pdf  (listing possible uses of the fund).

26  [138] Results from the 2015 GOALS Study of the Student-Athlete Experience, NCAA Convention
    (NCAAGIA02739639) (Jan. 2016).

27  [139] Examining the Student-Athlete Experience Through the NCAA GOALS and SCORE Studies,
    NCAA Convention (NCAAGIA02197924) (Jan. 13, 2011).

28  [140] *See e.g.*, Pac-12 Report on Student-Athlete Time Demands (Pls. Dep. Ex. 1115).

---

educational endeavors.  The whole point of the debate is to decide how to balance the inevitable trade-offs of time and effort between athletics and other student activities.  The NCAA and its member institutions are entitled to "ample latitude" in how they choose to strike that balance to promote academic integration.[141]

Despite the sacrifices that participating in intercollegiate athletics requires, the academic results student-athletes achieve—as a result of these institutional efforts and student-athletes' own hard work and discipline—are impressive.  For the class of 2017, the federal graduation rate for Division I student-athletes exceeded the rate for all students.[142]  This academic edge was especially pronounced for African-Americans; the graduation rate for African-American male student-athletes was 15 percentage points higher than the rate for African-American males in the overall study body while the graduation rate for African-American female student-athletes was 18 percentage points higher than the rate for African-American females in the overall student body.[143]  Overall graduation rates have also improved over time.  Between 1991 and 2017, the graduation rates for the sports directly at issue in this case increased significantly—men's basketball by 10 percentage points, FBS football by 16 percentage points, and women's basketball by 6 percentage points.[144]  And as will be explained at trial, NCAA survey data demonstrates that student-athletes are just as academically engaged as non-student-athletes.[145]

Similarly, data collected in the SCORE study also show that student-athletes identify themselves as both athletes and students and are satisfied in roughly equal measures with their

---

[141] *Bd. of Regents*, 468 U.S. at 120.

[142] *See* Trends in Graduation Success Rates and Federal Graduation Rates at NCAA Division I Institutions), NCAA Research at 40 (Nov. 2017), https://www.ncaa.org/sites/default/files/2017D1RES_Grad_Rate_Trends_FINAL_20171108.pdf.).

[143] *Id.*

[144] *Id.* at 43.

[145] *See, e.g.*, Gallup-Purdue Index Report, Understanding Life Outcomes of Former NCAA Student-Athletes) (NCAAGIA03446939) at 48 (May 3, 2016) (finding student-athletes are just as likely as non-student-athletes to recall having a professor who made them excited about learning or to have a mentor who encouraged to pursue their goals and dreams).

athletic and academic experiences[146]   And the GOALS studies similarly show student-athletes are integrated in the broader student body:   around 70 to 80 percent of Division I student-athletes reported having a "sense of belonging" at their school, with 69 to 73 percent of Division I basketball players and FBS football players reporting that some of their closest college friends were outside of their team.[147]   Again, the critical point here is not to claim that academics and athletics are never in tension, but that the issue of athlete integration is one that NCAA schools care about and promote.[148]

In light of these efforts to integrate student-athletes, it is not surprising that student-athletes (including Plaintiffs in this very case) have extolled the importance of academics, including to the broader community; have excelled academically; and have enjoyed social integration with other students.   Plaintiff John Bohannon, for example, described some of the resources his schools employed to push for student-athlete academic achievement.[149]   Plaintiff Nicholas Kindler was a model student, graduating *magna cum laude* from West Virginia University in just three years and completing a master's degree while playing football.[150]   He expressly attributes his academic success to the "relationships that [he] built with [his] professors and some of the other students."[151]   And he became an academic tutor himself, helping integrate other student-athletes.[152]   Similarly, at the time of his deposition, Plaintiff Nigel Hayes had just made the Dean's List at the University of Wisconsin, where he played basketball.[153]   And Plaintiff Afure Jemerigbe, who played basketball while earning her degree at the University of California at Berkeley, testified about the many friends she made on

---

[146] *See* Examining the Student-Athlete Experience Through the NCAA GOALS and SCORE Studies, NCAA Convention (NCAAGIA02197924) at 33–34 (Jan. 13, 2011).

[147] *See* Results from the 2015 GOALS Study of the Student-Athlete Experience, NCAA Convention (NCAAGIA02739639) at 49, 51 (Jan. 2016).

[148] The importance of integrating student-athletes, and the conferences' commitment to that integration effort, are illustrated in materials such as the Big 12's "Champions for Life" videos. *See* Big 12 Champions for Life (Defs. Mot. for Summ. J. Ex. 78).

[149] *See, e.g.*, Bohannon Tr. 71:6–74:5 (mandatory study hall; tutoring appointments; weekly meetings with an academic advisor).

[150] Kindler Tr. 102:15–103:9, 106:21–107:6.

[151] *Id.* at 90:11–18.

[152] *See id.* at 9:22–10:7.

[153] Hayes Tr. 176:25–177:5.

---

campus who were not student-athletes.[154]  These same Plaintiffs also testified that traditional aspects of the college experience other than athletics—such as academics and campus life—were important to them in choosing schools.[155]   Other student-athletes have become advocates to broader communities about the importance of academic skills.[156]

It is not hard to imagine why student-athletes care about a real academic experience, like other students.  However optimistic they may be about professional prospects, relatively few succeed at the professional level.  And professional athletes' careers can be short.[157]

While no two students' experience will be identical—and not all students will see the same success, regardless of whether they are athletes—the fact of the matter is that the integration of student-athletes into the academic community and student body is both a goal the NCAA member schools pursue and a reality that student-athletes can achieve.[158]

**B.    The Challenged Rules Support The NCAA's Efforts To Preserve Student-Athletes' Integration Into The Experience As Students.**

Again, taken together, the challenged rules allow schools to provide cost-of-attendance financial aid packages and support for athletic participation, while prohibiting payments of additional sums simply for athletic performance.   In assessing whether these rules promote integration, the question is simple:  Would an athlete who is paid vast sums for playing sports be less likely to be a full member of the broader academic community?  The answer is obviously "yes."

[154] Jemerigbe Tr. 245:19–246:13.

[155] *See, e.g.*, Hayes Tr. at 43:6–20 (ranking "academic opportunities" as among most important factors); Jemerigbe Tr. 58:24–59:8 (describing the opportunity to get "a really good education" as one of two equal criteria); Kindler Tr. 40:13–20, 52:7–53:21 (listing the courses of study and campus traditions as central to his decision-making process).

[156] *See, e.g.*, SEC promotional video (SEC00292747) (featuring Univ. of Georgia football player, Malcolm Mitchell); SEC promotional video (SEC00292749) (featuring Univ. of Kentucky football player Melvin Lewis).  Alabama's Barrett Jones won the Outland Award for the outstanding lineman in college football, graduated with a 4.0 in Business Administration and Accounting, and won the SEC's McWhorter Award recognizing achievement.  *See* SEC promotional video (SEC 00292755).

[157] *See, e.g.*, Kindler Tr. 4:20-2:10–24 ("The percentage of high school players that . . . had the opportunity to play collegiate football is extremely small.  And then the percentage of collegiate players . . . to get the opportunity to play professional football is even less."); James Tr. 65:21– 66:4 (explaining that he was "more focused on life after sports" when picking a school because playing sports does not "last . . . forever").

[158] *See, e.g.*, SEC H. Boyd McWhorter Scholar-Athlete of the Year Nominees (SEC00199224).

1     To support that obvious conclusion, Defendants will present evidence from NCAA,

2  conference, and school officials, as well as from Dr. Heckman, that pay for play would dramatically

3  change incentives for student-athletes.  In addition to his testimony about the substantial educational

4  benefits student-athletes currently receive under the existing collegiate model, Dr. Heckman will

5  explain how student-athletes would be deprived of those benefits if that model were abandoned as

6  Plaintiffs request.  Dr. Heckman will explain that with substantial sums of money hinging on their

7  athletic performance, student-athletes would inevitably be incentivized to devote more of their time

8  to sports, at the expense of their studies and other enriching aspects of college life.[159]  School officials

9  will similarly testify that sports enhance the university's core academic mission by building

10 community on campus.  They will explain that allowing pay for play would disrupt those benefits

11 by altering the incentives for student-athletes and reducing the number of students to whom the

12 university would be able to offer educational opportunities through athletics-related scholarships.

13     In addition, paying a few student-athletes substantial money would further distinguish them

14 from their peers, creating a wedge between student-athletes and the broader school community.[160]

15 As in *O'Bannon*—where the Court credited "testimony of university administrators, who asserted

16 that paying student-athletes large sums of money would potentially 'create a wedge' between

17 student-athletes and others on campus"—Defendants' trial witnesses will establish this risk to

18 integration.  So too will the testimony of named plaintiffs, who testified during their depositions that

19 some students already have the impression that student-athletes are spoiled by the financial aid and

20 benefits they received from their schools or are otherwise treated differently, which can foster

21 resentment.[161]  Alec James, for example, testified that other students' beliefs about what student-

22 athletes receive from their schools—such as the mistaken belief that he had been given a moped—

23 affect perceptions of student-athletes.[162]

24     Moreover, paying student-athletes could create a wedge between student-athletes

25 themselves, including between members of the same team.  Even the named Plaintiffs testified about

26

27 [159] Heckman Direct ¶¶ 11–13, 67–68, 89, 92–94.

   [160] *See* Blank Tr. 107:6–108:1.

28 [161] *See, e.g.*, Stephens Tr. 138:23–140:12.

   [162] James Tr. 294:-22–295:17.

1    the negativity that paying different amounts to different student-athletes would provoke.   Ms.

2    Jemerigbe, for example, testified that she "wouldn't be too happy" if football players were to receive

3    more in financial aid than women's basketball players and that it would bother her if another member

4    of her basketball team received more in aid than she did.[163]

5          None of Plaintiffs' attempts to decouple the challenged rules from the benefit of integration

6    has any merit.[164]   Plaintiffs speculate that paid athletes would somehow spend more time on

7    academics to ensure they would continue to get paid.[165]   This is laughable.   At most, a rational athlete

8    who is highly compensated for athletic performance would face incentives to do the *minimum*

9    necessary to maintain his or her academic eligibility.   Beyond that minimum, as Dr. Heckman

10   explains,[166] that athlete would face the economic trade-off of time spent on academics or other

11   college activities versus time spent on the source of the money:   sports.

12         Unsurprisingly, Plaintiffs' own expert, Dr. Lazear, agreed with this unremarkable

13   proposition.   As he put it:   "When people are compensated on the basis of their effort, and when

14   those wages are allowed to increase with effort, then we tend to see more effort being provided."[167]

15   Failing to acknowledge these admissions, Plaintiffs improperly rely on testimony from a former

16   NCCA expert, Dr. Ordover, that a paid student-athlete could still attend his class.[168]   But that is a

17   red herring; the question is not whether it is theoretically possible for an athlete to take any particular

18   class, but whether payment would reduce their incentives to participate fully in all aspects of campus

19   life.

20         Plaintiffs invent a supposed "natural experiment," contending that the increased benefits

21   since *O'Bannon* have not hurt integration, so paying athletes potentially millions of dollars should

22   not hurt integration either.[169]   This is the same flawed argument that Plaintiffs use in asserting that

---

[163] Jemerigbe Tr. 294:3–11, 295:5–9.

[164] *See* Pls. Op. at 37–40.

[165] *Id*. at 39.

[166] Heckman Direct ¶¶ 67–68, 89, 92–94.

[167] Lazear Tr. 24:1-224:11–14; *see also id.* at 227:7–17 (if student-athletes were paid more, "their incentive to play hard and stay on the team . . . would be greater").

[168] Pls. Op. at 40.

[169] *Id.* at 39.

1  there is no link between amateurism and consumer demand.[170]  Again, the "increased" benefits—

2  many of which existed at the time of *O'Bannon*—have merely raised financial aid to correspond to

3  the cost of attendance and permitted additional benefits that are incidental to athletic participation.

4  Plaintiffs' "natural experiment" has not occurred; athletes are still not paid based on market

5  dynamics determining the economic value of their play.  As a result, the post *O'Bannon* experience

6  says nothing about what would happen under Plaintiffs' proposed injunction.

7  Finally, Plaintiffs raise another red herring, complaining that Dr. Heckman's statistical

8  analyses of graduation rates and post-college earnings do not have a "causal link" to the challenged

9  rules.[171]  Plaintiffs misunderstand the point of Dr. Heckman's testimony.  Dr. Heckman demonstrates

10  that the full college experience under the existing collegiate system is valuable—*i.e.*, it leads to

11  benefits later in life[172]—and paying student-athletes would change their incentives to participate in

12  that experience, which would disrupt the beneficial outcomes of the existing system.[173]  That

13  evidence is more than sufficient to establish that the rules prohibiting pay for play promote

14  integration, and Plaintiffs' experts have done no legitimate analysis to the contrary.[174]

15  **C.   Integration Of Athletes Into The Student Experience Is A Valid**
16  **Procompetitive Justification.**

17  In a final effort to avoid the challenged rules' clear integration benefits, Plaintiffs contend

18  that integration cannot even qualify as a procompetitive benefit.  According to Plaintiffs, integration

19  is only a "social policy goal" without any "causal connection to an actual improvement in economic

20  welfare."[175]  Not so.  As both the Ninth Circuit and this Court correctly recognized in *O'Bannon*,

21  integration is a valid procompetitive benefit.[176]

22  Plaintiffs themselves concede that restraints are economically procompetitive if they

23

24  ─────────────────────
   [170] *See* IV. B. 1., *supra* at 20.

25  [171] Pls. Op. at 37–38.

   [172] *See* Heckman Direct ¶¶ 26–61.

26  [173] *Id.* ¶¶ 62–78.

27  [174] *Id.* ¶¶ 79–101.

   [175] Pls. Op. at 41.

28  [176] *O'Bannon*, 802 F.3d at 1059–60, 1072; *O'Bannon*, 7 F. Supp. 3d at 979–81.

1    "increase" the "quality" of the product.[177]  That is precisely what integration accomplishes.  This

2    Court recognized as much in *O'Bannon*, concluding that "integrat[ing] student-athletes into the

3    academic communities of their schools . . . may in turn *improve the schools' college education*

4    *product*."[178]  The Ninth Circuit affirmed this ruling.

5         Dr. Heckman won a Nobel prize for studying the economic benefits of social policies.  He

6    will explain why the *social* benefits of improving students' education does not deprive the education

7    product of its *economic* benefits to student-athletes or their schools.  Instead, as he and other

8    witnesses will explain, the college-education product that schools offer student-athletes is more

9    valuable if the student-athletes are integrated into the broader academic community.[179]

10        Besides preserving balanced economic incentives for student-athletes, the integration of

11   academics and athletics is also economically procompetitive because that integration itself promotes

12   demand for both academics and athletics.  Many student-athletes pursue a college degree, or learn

13   that college is even an option for them, only because of the benefits available under the current

14   collegiate model.  And the incentives for broadcasters, students, alumni, and other fans to attend or

15   watch college sports would diminish if student-athletes were not viewed as legitimate students and

16   part of the same campus community.

17
18   ### VI. Plaintiffs Have Not Demonstrated Less Restrictive Alternatives That Equally Serve The NCAA's Procompetitive Interests.

19        Because the challenged rules advance procompetitive ends, Plaintiffs' burden under the rule-

20   of-reason analysis requires them to specify less restrictive alternatives that are "'virtually as

21   effective' in serving the procompetitive purposes of the NCAA's current rules, and 'without

22   significantly increased cost.'"[180]  It is not enough that NCAA member institutions could adopt

23   different rules, or that proposed alternatives *might* work.  Plaintiffs must *demonstrate* that specific

24   proposed alternatives would be as effective and administratively easy as the rules they challenge.[181]

---

25   [177] Pls. Op. at 41.

26   [178] *O'Bannon*, 7 F. Supp. 3d at 980.

27   [179] *See* Heckman Direct ¶¶ 65–71.

     [180] *O'Bannon*, 802 F.3d at 1074.

28   [181] *Id.*

1    Plaintiffs identify just two alternatives:  (1) eliminating national rules in favor of strictly

2   conference-enacted rules with regard to any limitations on payments or benefits, which Plaintiffs

3   call "Complete Conference Autonomy"; and (2) a convoluted alternative proposal of "striking down

4   the challenged rules except to the extent that such rules prohibit cash sums untethered to educational

5   expenses (other than participation benefits)."[182]   In substance, this alternative proposal would

6   prohibit any restrictions (at either the NCAA or conference level) on payments or benefits that could

7   be characterized as either "tethered" to education or incidental to participation in athletics.  In effect,

8   both alternatives would allow unlimited cash compensation to student-athletes in return for their

9   athletic participation—in other words, permit unlimited pay for play.  The fact that Plaintiffs spend

10   a scant three pages discussing these alternatives, with next to no description of any evidentiary

11   support, portends their inevitable failure to carry their burden.

12       A.    **"Complete Conference Autonomy" Is Not An Equally Effective Alternative That Imposes No Additional Costs.**

13

14       "Complete Conference Autonomy" explicitly proposes to balkanize the current national

15   framework for Division I college basketball and FBS football using conference-specific rules.

16       The notion that this would pose no threat to the popularity of collegiate sports—*i.e.*, that it

17   would be equally effective in advancing the procompetitive purposes of amateurism—is a fanciful

18   one that Plaintiffs cannot support with evidence.  Indeed, as a matter of common sense, eliminating

19   a common national framework based on shared definitions of amateurism would destroy the uniform

20   eligibility requirements that define college athletics and threaten consumer demand for collegiate

21   sports, not only because of the loss of the central appeal of amateur athletics, but also because of the

22   loss of a cohesive national framework that amateurism provides.[183]   Plaintiffs offer no proof that

23   such a balkanized version of college sports would be at least as desirable to consumers as the national

24   product, which currently offers both regional rivalries and a national stage in which highly valued

25   inter-conference rivalries and post-season bowl games and tournaments play out.

26

27   _____

    [182] Pls. Op. at 41, 43 (capitalization altered).

28   [183] *See* Barnhart Tr. 27:21–28:5, 28:7–28:18, 28:20–29:23, 30:1–30:13, 30:16–31:1 (explaining importance of an "overarching framework that [conferences and schools] all are working under").

1    Plaintiffs clearly contemplate Complete Conference Autonomy would result in
2  fragmentation of the current national market,[184] incentivizing some conferences or schools to
3  gravitate toward attracting the best athletic talent with unrestricted levels of compensation, while
4  other colleges move in an entirely different direction to keep restrictions or evaluate withdrawing
5  from competing at the Division I or FBS level altogether.  Defendants' fact and expert witnesses
6  will testify that this balkanization of college sports would disrupt popular and traditional rivalries to
7  the detriment of student-athletes and fans.  Schools with robust and successful athletic programs and
8  schools with more modest programs would both suffer because a common sphere of competitiveness
9  supports the consumer demand for sports in which both compete.  Indeed, if, as Plaintiffs suggest,
10 the model for what could widely result from their proposal is the Ivy League[185]—in which football
11 and basketball games have negligible consumer appeal, and scholarships are not available for
12 athletics at all—they have essentially conceded that it would not advance consumers' or student-
13 athletes' interests nearly as well as the current regime.

14    Eliminating the common standard in favor of conference rule-making also will harm the
15 integration of academics and athletics.  Defendants' economic experts will testify that eliminating
16 the nationally accepted definition of amateurism that currently binds all Division I schools inevitably
17 will result in some schools resorting to forms of pay for play.  That will necessarily disrupt, at those
18 schools and other schools that feel compelled to follow suit, the current balance carefully struck by
19 the NCAA and its members between incentives to pursue academics and athletics.  Though it is their
20 burden to do so, Plaintiffs say nothing about how the consequences of "Complete Conference
21 Autonomy" could affect integration.  They simply assert that "if conferences have a genuine belief
22 that . . . integration [is] procompetitive, they would be free to enact rules accordingly."[186]   In
23 presenting no factual evidence or expert analysis about what would happen or how, Plaintiffs have
24 entirely punted on their burden.

25

---

26 [184] *See* Pls. Op. at 45 (contemplating "different schools [would] align[] themselves in conferences
27 with like-minded institutions").
   [185] *See* Pls. Op. at 42.
28 [186] *Id.*

1      Finally, a shift to exclusively conference-level rules on benefits would certainly impose

2 significant administrative costs.  In the first place, as Plaintiffs explicitly contemplate, "Complete

3 Conference Autonomy" is likely to fundamentally restructure how conferences are aligned[187]—

4 which would itself entail costs for schools to sort out where they belong in the new alignment.

5 Beyond that, new and duplicative administrative structures at the conference level would have to be

6 created.  Under the current system, the NCAA provides a centralized set of rules and infrastructure

7 for enforcing them; conferences are not set up for this role.  Plaintiffs' proposed injunction would

8 thus require each of the 32 Division I athletic conferences to develop its own separate infrastructure

9 to create and enforce rules related to student-athlete compensation or benefits.  This would not be

10 free, but would increase costs dramatically.  Plaintiffs' claim that "Complete Conference Autonomy"

11 would not *require* conferences to allow any additional benefits"[188] completely misses the point:

12 increasing implementation costs is guaranteed by the mere fact that Plaintiffs' proposed alternative

13 would forbid the economies of scale associated with the central administration of a common set of

14 rules.

15      **B.      Eliminating All Restrictions On Aid Or Benefits That Can Be "Tethered"
             To Education Or Incidental To Participation Is Not An Equally-
16           Effective, Less Restrictive Alternative.**

17      Plaintiffs will similarly be unable to carry their burden of establishing that their second less

18 restrictive alternative is virtually as effective as the current NCAA framework without significantly

19 increasing costs.  Essentially, Plaintiffs ask this Court to enjoin any restriction on any benefit for

20 which someone could contrive a possible link to education or participation in athletics.

21      One fundamental problem with this alternative is that such unlimited benefits could be

22 readily used as an end-run around the prohibition against pay for play that is at the heart of

23 amateurism.[189]  Plaintiffs' illustrations of the types of benefits they envision make this clear.

24

25

---

26 [187] *See* Pls. Op. at 45 (contemplating "different schools [would] align[] themselves in conferences
27 with like-minded institutions").

[188] Pls. Op. at 42 (emphasis in original).

28 [189] *See* Hostetter Synopsis at 5.

1    For example, Plaintiffs suggest that athletes could be given "academic achievement

2    incentives."[190]   And, under the terms of their proposed injunction, they could likewise be given

3    "Participation Awards" without any restriction in number or value.[191]  Such payments would simply

4    operate as unlimited cash compensation to student-athletes in return for their participation in athletes.

5    Under Plaintiffs' proposed injunction, the NCAA could do nothing to stop a school from offering a

6    prized recruit $100,000 just for maintaining academic eligibility and an additional $100,000

7    "Participation Award" for each game.  In Plaintiffs' eyes, the first incentive would be "related" to

8    education because it depends on a baseline level of academic achievement that all student-athletes

9    must meet, and the second incentive would be "incidental to participation."  Unlike stipends for the

10   cost of attendance—which *O'Bannon* said must be permitted, but not exceeded—the true nature of

11   the incentives Plaintiffs urge would be obvious to everyone:  the school would be offering the athlete

12   hundreds of thousands of dollars to play sports.  This would be the end of amateurism.

13   As a result, this alternative cannot possibly be equally effective in serving the interests of

14   promoting amateurism.  If, as the Ninth Circuit said in *O'Bannon*, "not paying student-athletes is

15   *precisely what makes them amateurs*,"[192] then it follows with great force that altogether eliminating

16   compensation and benefit caps cannot be equally effective in promoting amateurism.

17   And, with regard to integration, what is true of the Plaintiffs' first proposed alternative is

18   equally true of the second:  Plaintiffs say virtually nothing about how these kinds of unlimited

19   benefits could help maintain student-athlete integration in the general student body.  As noted above,

20   the true nature of unlimited special benefits for student-athletes would be obvious to everyone and

21   would not have the natural effect of fostering a sense of solidarity and community between athletes

22   and other students.  Plaintiffs' weak and unspecified assertion that schools could offer compensation

23   and benefits that "would further educational and integration objectives,"[193] provides no assurance at

24   all about how potentially unlimited pay would avoid disrupting carefully balanced incentives

25

26

27   [190] Pls. Op. at 44.

[191] *See* [Proposed] Order Granting Alternative Injunction ¶¶ 1, 3, Attachment 1.

28   [192] *O'Bannon*, 802 F.3d at 1076 (emphasis in original).

[193] Pls. Op. at 43.

1    between academics and education or minimize "wedges" between student-athletes and other

2    students and the campus community as a whole.

3        Plaintiffs' second alternative would also create inefficiencies and greatly increase

4    administrative costs.  There is nothing self-defining about what might be "tethered to educational

5    expenses" or "education-related" as Plaintiffs use those terms.  Indeed, the fact that Plaintiffs assert

6    with apparent seriousness that they consider cash payments for maintaining academic eligibility to

7    be education-related is proof that opinions are sure to vary widely about what would, and would not,

8    be permitted under their proposed alternative.  Under Plaintiffs' proposal, Defendants would have

9    to devote significant additional resources to determining whether specific benefits are linked to

10   education as Plaintiffs subjectively see it, and therefore permissible under paragraph 2 of Plaintiffs'

11   alternative injunction, possibly resulting in a larger and more complex set of rules than the ones

12   Plaintiffs challenge now.  Given human ingenuity and the incentives associated with competition,

13   the permutations of these types of purportedly "educational" payments are perhaps inexhaustible.

14   Administering the restriction Plaintiffs propose would therefore be administratively costly.

15   Maintaining any semblance of a genuine "tether" to education, in fact, would invariably drag the

16   courts into resolving disputes about which payments are actually educational—further increasing

17   costs and denying the NCAA its "'ample latitude' to superintend college athletics."[194]

18       The danger of individual and judicial insertion into decisions that are properly within this

19   "ample latitude" is demonstrated already in Plaintiffs' quibbles over the specific limitations the

20   NCAA has currently placed on benefits.  For example, Plaintiffs already seem to object that the

21   NCAA allows schools to pay for certain family members to travel to championship games, but not

22   other family members or other games.[195]  It is not difficult to imagine that enjoining restrictions on

23   benefits that are "educational" or expenses that are reasonable and "incidental to participation"

24   would proliferate such line-drawing disputes.  Reasonable minds could certainly disagree about

25   precisely where the NCAA and member schools should draw the lines.  But that is the point of the

26   NCAA's "ample latitude."  The NCAA is best situated by experience and expertise to draw these

27

28   [194] *Bd. of Regents*, 468 U.S. at 120; *see also O'Bannon*, 802 F.3d at 1079.
     [195] *See* Pls. Op. at App'x C (citing NCAA Bylaw 16.6.1.1).

1  types of lines in their attempt to preserve a common commitment to amateurism and integration,

2  without fear of antitrust scrutiny on each individual judgment call.

3  **C.   "Net Balancing" Does Not Support A Finding Of Antitrust Violations.**

4  For the reasons discussed above, there is no merit to Plaintiffs' attempt to open up a free-

5  form balancing inquiry and enjoin the challenged restrictions even if it finds that Plaintiffs have not

6  carried their burden on the less-restrictive-alternative analysis.[196]   Again, Plaintiffs have not cited a

7  single case where a plaintiff failed to meet its burden under the burden-shifting framework but the

8  restraint was still found to be unreasonable after a subsequent balancing inquiry.  Nor have they

9  explained the factual basis for their assertion why such balancing would result such a finding in this

10  case or how one would weigh consumer demand or academic integration in such an inquiry.

11  **VII.   Plaintiffs Are Not Entitled To The Injunctions They Seek.**

12  **A.   The Injunctions Plaintiffs Seek Are Not Justified.**

13  Plaintiffs are not entitled to an injunction because, as discussed above, they have not

14  demonstrated that the challenged rules violate the Rule of Reason.  As the Ninth Circuit summarized

15  in *O'Bannon*, "[t]he Rule of Reason requires that the NCAA permit its schools to provide up to the

16  cost of attendance to their student athletes.  *It does not require more*."[197]   This Court subsequently

17  recognized that the Ninth Circuit's decision precludes this Court from enjoining the NCAA from

18  adopting and enforcing rules that restrict "cash compensation untethered to educational expenses."[198]

19  Plaintiffs' proposed injunction would do precisely that and, for that reason, should be rejected.

20  **B.   Plaintiffs' Proposed Injunctions Are Impermissibly Vague.**

21  In addition, Plaintiffs' proposed injunctions lack the specificity and "reasonable detail"

22  required by Federal Rule of Civil Procedure 65(d).[199]   Plaintiffs' first injunction—their "traditional

23

24  ---

[196] *See id.* at 11, 44.

25  [197] *O'Bannon*, 802 F.3d at 1079 (emphasis added).

26  [198] Order Denying Motion for Judgment on the Pleadings, ECF No. 459 (Aug. 5, 2016), at 5.

27  [199] *See* Fed. R. Civ. P. 65(d); *see also Schmidt v. Lessard*, 414 U.S. 473, 476 (1974) ("[T]he specificity provisions of Rule 65(d) are no mere technical requirements.  The Rule was designed to prevent uncertainty and confusion on the part of those faced with injunctive orders, and to avoid the

28  possible founding of a contempt citation on a decree too vague to be understood.").

antitrust injunction"[200]—is not traditional at all.  It seeks to prohibit Defendants from "colluding to enforce the challenged rules,"[201] essentially requiring Defendants to "obey the law."  Such injunctions fail to comply with the requirement that the injunction state its terms specifically and describe in detail the act or acts restrained.[202]

Plaintiffs' first alternative injunction further seeks to enjoin Defendants from "colluding to enforce . . . any future rules that are substantially similar in purpose and effect,"[203] but it does not give Defendants notice as to which future rules may or may not be considered "substantially similar."[204]  Because Plaintiffs' first alternative injunction gives no indication as to how a court might determine whether a rule is "substantially similar," it fails to "satisfy the exacting requirements of Rule 65(d)."[205]

Plaintiffs' second alternative injunction is also impermissibly vague.  The injunction fails to define what it means for compensation to be "tethered to educational related expenses or benefits" and only purports to describe some, but not all, of the benefits Plaintiffs define as "incidental to participation."[206]  But beyond the specifically-named examples, no one reading this injunction can tell what it means for a term to be "incidental to participation."[207]  And, similar to Plaintiffs' first alternative injunction, precisely what, in the future, will constitute compensation "tethered to

---

[200] Pls. Op. at 7.

[201] *Id.*

[202] *See Cuviello v. City of Oakland*, No. C-06-5517 MHP (EMC), 2009 WL 734676, at *3 (N.D. Cal. Mar. 19, 2009) (holding that injunctions allowing "only lawful arrests of Plaintiffs" and another prohibiting "interfering with Plaintiffs' free speech rights" were unenforceable).

[203] Pls. Op. at 7.

[204] *See Fed. Election Comm'n v. Furgatch*, 869 F.2d 1256, 1263 (9th Cir. 1989) (holding injunction again "future similar violations" was impermissibly vague).

[205] *See id.* at 1264; *see also Correct Craft IP Holdings, LLC v. Trick Towers, LLC*, No. 6:13-CV-1052-ORL-31, 2013 WL 6086455, at *5 (M.D. Fla. Nov. 19, 2013) (collecting cases and rejecting catch-all injunction for "any substantially similar towers that infringe"; "Injunctions barring illegal acts 'similar' to those proven in the case are strong candidates for reversal on appeal.").

[206] *See* Pls. Op. at App'x E & Attachment 1.

[207] *See Columbia Pictures Indus., Inc. v. Fung*, 710 F.3d 1020, 1048 (9th Cir. 2013) ("Rule 65(d), overall, prefers certainty to flexibility."); *see also Del Webb Communities, Inc. v. Partington*, 652 F.3d 1145, 1150 (9th Cir. 2011) ("Even with these examples, the general prohibition against using 'illegal, unlicensed and false practices' is too vague to be enforceable.").

1    educational related expenses or benefits," a "benefit incidental to participation," or a rule that is

2    "substantially similar in purpose and effect" are all subject to debate, as Division I conferences and

3    schools seek to improve the quality of the college experience for student-athletes while maintaining

4    the amateur model of intercollegiate athletics.  Such a vague injunction cannot be enforced.[208]

5    **VIII.    Conclusion**

6           In sum, the essence of college sports is that it is played by student-athletes who are amateurs.

7    Plaintiffs' efforts to reshape college sports into a fundamentally different product—threatening both

8    consumer demand for sports and the quality of the education offered to student-athletes—has no

9    foundation in the antitrust laws and should be rejected.

---

[208] *Del Webb Communities, Inc.*, 652 F.3d at 1149–50 ("The examples of prohibited past conduct do not sufficiently define what additional future conduct will be covered.").

Dated: July 17, 2018                          Respectfully submitted,


By: /s/ Beth A. Wilkinson                  By: /s/ Jeffrey A. Mishkin
    Beth A. Wilkinson (*pro hac vice*)            Jeffrey A. Mishkin (*pro hac vice*)
    Alexandra M Walsh (*pro hac vice*)            Karen Hoffman Lent (*pro hac vice*)
    Brian L. Stekloff (*pro hac vice*)            SKADDEN ARPS SLATE MEAGHER
    Rakesh N. Kilaru (*pro hac vice*)            & FLOM LLP
    WILKINSON WALSH + ESKOVITZ LLP                Four Times Square
    2001 M Street NW, 10th Floor                  New York, NY 10036
    Washington, DC 20036                          Telephone: (212) 735-3000
    Telephone: (202) 847-4000                     Facsimile (212) 735-2000
    Facsimile: (202) 847-4005                     *jeffrey.mishkin@skadden.com*
    *bwilkinson@wilkinsonwalsh.com*               *karen.lent@skadden.com*
    *awalsh@wilkinsonwalsh.com*
    *bstekloff@wilkinsonwalsh.com*                Patrick Hammon (SBN 255047)
    *rkilaru@wilkinsonwalsh.com*                  SKADDEN ARPS SLATE MEAGHER
                                                  & FLOM LLP
    Sean Eskovitz (SBN 241877)                    525 University Avenue, Suite 1100
    WILKINSON WALSH + ESKOVITZ LLP                Palo Alto, California 94301
    11726 San Vicente Blvd., Suite 600            Telephone: (650) 470-4500
    Los Angeles, CA 90049                         Facsimile: (650) 470-4570
    Telephone: (424) 316-4000                     *raoul.kennedy@skadden.com*
    Facsimile: (202) 847-4005
    *seskovitz@wilkinsonwalsh.com*                  Attorneys for Defendant
                                                  NATIONAL COLLEGIATE
                                                  ATHLETIC ASSOCIATION
    Attorneys for Defendant
    NATIONAL COLLEGIATE ATHLETIC
    ASSOCIATION

**PROSKAUER ROSE LLP**

By:    /s/ Bart H. Williams
      Bart H. Williams (SBN 134009)
      Scott P. Cooper (SBN 96905)
      Kyle A. Casazza (SBN 254061)
      Jennifer L. Jones (SBN 284624)
      Shawn S. Ledingham, Jr. (SBN 275268)
      Jacquelyn N. Crawley (SBN 287798)
      2049 Century Park East, Suite 3200
      Los Angeles, CA 90067
      Telephone:  (310) 557-2900
      Facsimile:  (310) 557-2193
      *bwilliams@proskauer.com*
      *scooper@proskauer.com*
      *kcasazza@proskauer.com*
      *jljones@proskauer.com*
      *sledingham@proskauer.com*
      *jcrawley@proskauer.com*

      Attorneys for Defendant
      PAC-12 CONFERENCE

**MAYER BROWN LLP**

By:        /s/ Britt M. Miller
      Andrew S. Rosenman (SBN 253764)
      Britt M. Miller (pro hac vice)
      71 South Wacker Drive
      Chicago, IL 60606
      Telephone:  (312) 782-0600
      Facsimile:  (312) 701-7711
      *arosenman@mayerbrown.com*
      *bmiller@mayerbrown.com*

      Richard J. Favretto (pro hac vice)
      1999 K Street, N.W.
      Washington, DC  20006
      Telephone:  (202) 263-3000
      Facsimile:  (202) 263-3300
      *rfavretto@mayerbrown.com*

      Attorneys for Defendant
      THE BIG TEN CONFERENCE, INC.

POLSINELLI PC

ROBINSON BRADSHAW & HINSON

By: _____ /s/ Leane K. Capps
    Leane K. Capps (pro hac vice)
    Caitlin J. Morgan (pro hac vice)
    2950 N. Harwood Street
    Suite 2100
    Dallas, TX 75201
    Telephone: (214) 397-0030
    *lcapps@polsinelli.com*
    *cmorgan@polsinelli.com*

    Amy D. Fitts (pro hac vice)
    Mit Winter (SBN 238515)
    120 W. 12th Street
    Kansas City, MO 64105
    Telephone: (816) 218-1255
    *afitts@polsinelli.com*
    *mwinter@polsinelli.com*

    Wesley D. Hurst (SBN 127564)
    2049 Century Park East, Suite 2300
    Los Angeles, CA 90067
    Telephone: (310) 556-1801
    *whurst@polsinelli.com*

Attorneys for Defendants
THE BIG 12 CONFERENCE, INC. and
CONFERENCE USA, INC.

By: _____ /s/ Robert W. Fuller
    Robert W. Fuller, III (pro hac vice)
    Nathan C. Chase Jr. (SBN 247526)
    Lawrence C. Moore, III (pro hac vice)
    Pearlynn G. Houck (pro hac vice)
    Amanda R. Pickens (pro hac vice)
    101 N. Tryon St., Suite 1900
    Charlotte, NC 28246
    Telephone: (704) 377-2536
    Facsimile: (704) 378-4000
    *rfuller@rbh.com*
    *nchase@rbh.com*
    *lmoore@rbh.com*
    *phouck@rbh.com*
    *apickens@rbh.com*

    Mark J. Seifert (SBN 217054)
    Seifert Law Firm
    425 Market Street, Suite 2200
    San Francisco, CA 94105
    Telephone: (415) 999-0901
    Facsimile: (415) 901-1123
    *mseifert@seifertfirm.com*

Attorneys for Defendant
SOUTHEASTERN CONFERENCE

**SMITH MOORE LEATHERWOOD LLP**   **COVINGTON & BURLING LLP**

By: _____/s/ D. Erik Albright
    D. Erik Albright (pro hac vice)
    Gregory G. Holland (pro hac vice)
    300 North Greene Street, Suite 1400
    Greensboro, NC 27401
    Telephone:  (336) 378-5368
    Facsimile:  (336) 433-7402
    *erik.albright@smithmoorelaw.com*
    *greg.holland@smithmoorelaw.com*

    Jonathan P. Heyl (pro hac vice)
    101 N. Tryon Street, Suite 1300
    Charlotte, NC 28246
    Telephone:  (704) 384-2625
    Facsimile:  (704) 384-2909
    *jon.heyl@smithmoorelaw.com*

    Charles LaGrange Coleman, III (SBN 65496)
    HOLLAND & KNIGHT LLP
    50 California Street, Suite 2800
    San Francisco, CA 94111-4624
    Telephone:  (415) 743-6900
    Facsimile:  (415) 743-6910
    *ccoleman@hklaw.com*

    Attorneys for Defendant
    THE ATLANTIC COAST
    CONFERENCE

By: _____/s/ Benjamin C. Block
    Benjamin C. Block (pro hac vice)
    One CityCenter
    850 Tenth Street, N.W.
    Washington, DC 20001-4956
    Telephone:  (202) 662-5205
    Facsimile:  (202) 778-5205
    *bblock@cov.com*

    Rebecca A. Jacobs (SBN 294430)
    One Front Street
    San Francisco, CA 94111-5356
    Telephone:  (415) 591-6000
    Facsimile:  (415) 591-6091
    *rjacobs@cov.com*

    Attorneys for Defendant
    AMERICAN ATHLETIC CONFERENCE

**WALTER HAVERFIELD LLP**

By: _____ /s/ R. Todd Hunt
     R. Todd Hunt (pro hac vice)
     Benjamin G. Chojnacki (pro hac vice)
     The Tower at Erieview
     1301 E. 9th Street, Suite 3500
     Cleveland, OH 44114-1821
     Telephone:  (216) 928-2935
     Facsimile:  (216) 916-2372
     *rthunt@walterhav.com*
     *bchojnacki@walterhav.com*

     Attorneys for Defendant
     MID-AMERICAN CONFERENCE

**JONES WALKER LLP**

By: _____ /s/ Mark A. Cunningham
     Mark A. Cunningham (pro hac vice)
     201 St. Charles Avenue
     New Orleans, LA 70170-5100
     Telephone:  (504) 582-8536
     Facsimile:  (504) 589-8536
     *mcunningham@joneswalker.com*

     Attorneys for Defendant
     SUN BELT CONFERENCE

**BRYAN CAVE LLP**

By: _____ /s/ Meryl Macklin
     Meryl Macklin (SBN 115053)
     560 Mission Street, 25th Floor
     San Francisco, CA 94105
     Telephone:  (415) 268-1981
     Facsimile:  (415) 430-4381
     *meryl.macklin@bryancave.com*

     Richard Young (pro hac vice)
     Brent Rychener (pro hac vice)
     90 South Cascade Avenue, Suite 1300
     Colorado Springs, CO 80903
     Telephone:  (719) 473-3800
     Facsimile:  (719) 633-1518
     *richard.young@bryancave.com*
     *brent.rychener@bryancave.com*

     Attorneys for Defendant
     MOUNTAIN WEST CONFERENCE

1

**FILER'S ATTESTATION**

2

I, Karen Hoffman Lent, am the ECF user whose identification and password are being used

3

to file the Defendants' Opening Statement.  In compliance with Local Rule 5-1(i)(3), I hereby attest

4

that all signatories hereto concur in this filing.

5

6

7

<u>    /s/ Karen Hoffman Lent    </u>

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28