Steve W. Berman (*pro hac vice*)
Craig R. Spiegel (SBN 122000)
HAGENS BERMAN SOBOL SHAPIRO LLP
1918 Eighth Avenue, Suite 3300
Seattle, WA 98101
Telephone: (206) 623-7292
Facsimile: (206) 623-0594
*steveb@hbsslaw.com*
*craigs@hbsslaw.com*

Jeff D. Friedman (SBN 173886)
HAGENS BERMAN SOBOL SHAPIRO LLP
715 Hearst Avenue, Suite 202
Berkeley, CA 94710
Telephone: (510) 725-3000
Facsimile: (510) 725-3001
jefff@hbsslaw.com

Bruce L. Simon (SBN 96241)
Benjamin E. Shiftan (SBN 265767)
PEARSON, SIMON & WARSHAW, LLP
44 Montgomery Street, Suite 2450
San Francisco, CA 94104
Telephone:  (415) 433-9000
Facsimile:   (415) 433-9008
bsimon@pswlaw.com
bshiftan@pswlaw.com

*Class Counsel for Jenkins and Consolidated
Action Plaintiffs*

[Additional counsel listed on signature page]

Jeffrey L. Kessler (*pro hac vice*)
David G. Feher (*pro hac vice*)
David L. Greenspan (*pro hac vice*)
Joseph A. Litman (*pro hac vice*)
WINSTON & STRAWN LLP
200 Park Avenue
New York, NY 10166-4193
Telephone: (212) 294-6700
Facsimile: (212) 294-4700
*jkessler@winston.com*
*dfeher@winston.com*
*dgreenspan@winston.com*
*jlitman@winston.com*

Sean D. Meenan (SBN 260466)
Jeanifer E. Parsigian (SBN 289001)
WINSTON & STRAWN LLP
101 California Street
San Francisco, CA 94111
Telephone: (415) 591-1000
Facsimile: (415) 591-1400
*smeenan@winston.com*
*jparsigian@winston.com*

*Class Counsel for Jenkins and Consolidated
Action Plaintiffs*

## UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

## OAKLAND DIVISION

| | |
|---|---|
| IN RE: NATIONAL COLLEGIATE ATHLETIC ASSOCIATION ATHLETIC GRANT-IN-AID CAP ANTITRUST LITIGATION | Case No. 4:14-md-2541-CW<br>Case No. 4:14-cv-02758-CW |
| | **CORRECTED PLAINTIFFS' OPENING ARGUMENT MODIFIED TO REFLECT FINAL TRIAL EXHIBIT NUMBERS** |
| This Document Relates to:<br><br>ALL ACTIONS | |

I.    **INTRODUCTION**

Colleges and universities ask their Division I ("D-I") basketball and FBS football players to vigorously compete against one another on the basketball court and on the football field.  And the schools compete against one another without limitation to attract top coaches and trainers and administrators, to construct the largest stadia and the most lavish suites, and to secure the most lucrative broadcast and sponsorship and licensing agreements.  In the multi-billion dollar business of D-I basketball and FBS football, competition is stifled only—and entirely—when it comes to compensating athletes for their services.

Following years of litigation, the Court entered summary judgment for Plaintiffs on their initial burden to prove the existence of agreements that inflict significant anticompetitive harm in defined ("relevant") markets.  Just two issues now remain for trial:  First, whether Defendants can meet their burden to prove that the challenged compensation restraints[1] cause procompetitive effects because they are necessary to (i) maintain consumer demand for D-I basketball and FBS football (*i.e.*, Defendants' "amateurism" justification) or (ii) integrate Class Members into their campus or academic communities (*i.e.*, Defendants' "integration" justification).  And, second, if the Court were to find that Defendants have carried their burden to show that the restraints cause a material procompetitive effect, whether Plaintiffs could, in turn, demonstrate that any such procompetitive benefit(s) can be achieved through one or more less-restrictive alternatives.

Plaintiffs will prove at trial that the answer to the first question is "no"—Defendants will fail to come forward with any evidence capable of demonstrating that their claimed justifications are anything more than NCAA mythology—requiring judgment against Defendants on this ground alone.  But even were the Court to proceed to try the existence of less-restrictive alternatives, Plaintiffs would still prevail because the trial evidence will show that there are ample alternatives to achieve any ostensible benefit of amateurism and/or integration without extinguishing *all* competition for Class Members' services on the basis of compensation and benefits.  Most notably, Defendants could permit

---

[1] In Section III, below, Plaintiffs organize the challenged rules and demonstrate why they do not require individual rule-by-rule discussions at trial.

individual conferences—which, as presently constituted, do not possess market power—to set their own rules concerning compensation and benefits, without NCAA-wide agreements or conferences colluding with one another.  This would allow each conference to make its own decisions about the claimed procompetitive need for compensation caps while, at the same time, providing Class Members and the relevant markets with the benefits of competition among the conferences and their members.

*Trial Issue #1*: **Are the Challenged Rules Necessary to Maintain Consumer Demand Because They Enforce the NCAA's Concept of Amateurism?**   No—the trial will show that Defendants cannot meet their burden to prove their amateurism justification.  They will not (in contrast to *O'Bannon*) be able to offer any expert economic testimony purporting to show that the challenged rules regarding amateurism are needed to promote consumer demand.  Nor (in contrast to *O'Bannon*) will Defendants be able to offer any testimony from their only disclosed consumer survey expert that permitting additional forms of compensation to Class Members would adversely impact consumer demand.  Rather, Dr. Isaacson has already testified, and the trial will show, that he did not even *attempt* to examine or predict future consumer demand in the event that additional forms of compensation were permitted.   Similarly (and, again, in contrast to *O'Bannon*), Defendants will not be able to offer testimony from any disclosed media expert that the compensation restrictions foster consumer demand among broadcasters or viewers.  In fact, despite Defendants' professed belief that amateurism is the essential driver of consumer demand, Plaintiffs are aware of no evidence of the NCAA or any conference or any school conducting an empirical study about the relationship between Defendants' amateurism rules and consumer demand.  Defendants' effort to bring in evidence from *O'Bannon* to resuscitate their failure to provide such evidence in this case should be rejected.

Also, this Court has already held to be inadmissible Dr. Elzinga's testimony relating to the competitive impact of the challenged rules, based on his inapplicable and rejected concept of a "multisided platform" market.  And, in the event that any portion of his disclosed testimony is found, on reconsideration, to be germane to the relevant markets found by the Court, and conceded by Defendants during the summary judgment argument in this case, he still will not be able to offer any empirical evidence or analysis with respect to the critical issue of the impact of amateurism on

consumer demand because Dr. Elzinga has already testified that he did not study any data on this issue. Instead, Defendants will parade out their own employees to offer self-serving, lay opinion speculation about how offering even a penny more than a cost-of-attendance ("COA") scholarship would be ruinous to consumer demand. This speculative lay testimony is not only inadmissible, but it also will be indistinguishable from the same kind of dire warnings that Defendants trotted out to oppose COA in prior cases. The subsequent economic facts have proven that these shrill warnings, like those asserted here, were utterly false, and the sky did not fall on consumer demand.

Although it is not Plaintiffs' burden to *disprove* that the amateurism compensation caps are procompetitive, Plaintiffs' evidence will do just that. For starters, the trial record will show that the NCAA has admitted—post *O'Bannon*, via the binding 30(b)(6) testimony of Kevin Lennon—that Defendants already permit Class Members to receive numerous "incidental-to-participation" and Student Assistance Fund ("SAF") benefits that are "not related to the principle of amateurism,"[2] that are *in addition* to full COA, and that have *not adversely affected* consumer demand.[3] Permitting these additional "participation" benefits to be paid to individual Class Members puts total compensation significantly *above* COA for many thousands of Class Members without harming consumer demand. This post-*O'Bannon* development is devastating to Defendants' arbitrary and ever-changing amateurism justification. Indeed, as Mr. Lennon testified, the amount and kind of participation benefits permitted to cross the COA line are based not on any principle of "amateurism," but rather by "what the [NCAA] membership agrees to provide."[4] Plaintiffs' economists—Dr. Rascher and Dr. Noll— will further demonstrate the lack of any procompetitive consumer-demand effect from Defendants' enforcement of their "amateurism" compensation rules by, among other things, showing that broadcast revenue, ticket sales, sponsorships, and other proxies for consumer demand have continued to *increase significantly* at the same time that the value of permitted compensation to Class Members has also increased significantly, rising not just to COA but beyond through scholarships, participation benefits, SAF disbursements, and Pell Grants. Compensation has gone up so much that most Class Members

---

[2] NCAA (Kevin Lennon) Tr. 58:20-59:1.
[3] *Id.* 63:21-64:1.
[4] *Id.* 72:17-25.

already receive substantially more compensation than COA, including compensation that is untethered to education.  Further, Plaintiffs' consumer survey expert—Hal Poret—will show that his survey demonstrates that if schools and conferences were allowed to provide Class Members with various forms of additional compensation and benefits that currently are prohibited, it would not negatively impact viewership or attendance.[5]   In short, the trial will expose amateurism as a mythical procompetitive justification devoid of evidentiary support in the post-*O'Bannon* world—an emperor with no clothes.

*Trial Issue #2*:   **Is Defendants' "Integration" Justification Procompetitive?**   No— Defendants will be unable to meet their burden to prove their "integration" justification.  Although Defendants will argue at trial that Plaintiffs' requested injunction would hinder D-I basketball and FBS football players' integration into college life and pursuit of a college education, they will not even be able to prove, in the first instance, that Class Members are currently well-integrated.  To the contrary, the trial evidence will show that Defendants have taken numerous destructive steps regarding scheduling, team commitments, and the construction of private athlete facilities that harm Class Members' ability to integrate into their schools or to improve their academic work.  The fundamental premise of Defendants' integration defense is a sham.  Equally important, even if Class Members were well-integrated, Defendants will have zero proof at trial that any such integration is the ***result of*** the challenged rules and a national cap on compensation.  Defendants' proffered expert on this point, Dr. James Heckman, does not help them satisfy their burden.  Dr. Heckman's testimony stands for the unremarkable and undisputed proposition that attending college has benefits.  But he did not study what matters:   whether Defendants' compensation caps *cause* integration or academic success.  Without such evidence, Defendants cannot meet their burden of proof on this issue.

Although Defendants' failure of proof is dispositive, Dr. Noll and Dr. Rascher will nonetheless offer affirmative evidence from peer-reviewed literature that the accepted correlation between greater financial resources—such as higher compensation—and academic success in college is a positive one. They also will refute any economic claim that higher compensation would reduce integration because

---

[5] *See* Hal Poret Decl., ECF No. 865-5, ¶ 4.

it would provide an incentive to devote more time to athletic success.  In reality, since the NCAA is free to maintain its academic eligibility and degree progress standards—and has already adopted rules which forbid certain schools from terminating scholarships due to athletic performance—the overall incentive of higher compensation, as Dr. Rascher and Professor Noll will testify, would be to encourage greater efforts to succeed academically.

Moreover, the trial evidence will show that numerous categories of students—from software engineers to actors to coffee-shop baristas—receive substantial income above the COA scholarship cap, all while remaining *bona fide* and successful college students.  There is no evidence that such non-athletes earning income above COA are not well-integrated, and there will be no basis for the Court to find that Class Members would fare any differently if they were permitted to receive greater compensation and benefits for their efforts.

Lastly, the trial will demonstrate that Defendants' integration defense is not a proper procompetitive justification even in theory because it has nothing to do with consumer demand or the economic success of D-I basketball or FBS football.  Instead, as Dr. Rascher and Dr. Noll will testify, the integration defense—even if credited—is not *procompetitive* as a matter of economics.  Despite the ostensibly laudable virtue of integrating Class Members, Defendants' justification is the very type of social policy/non-economic objective that the Supreme Court has unequivocally rejected as a defense for an antitrust violation.

***Trial Issue #3***:  **Could Defendants Achieve Any Procompetitive Benefit(s) Found by the Court in a Significantly Less-Restrictive Way?**  Yes—even if Defendants are able to meet their burden to prove a procompetitive justification for the challenged rules, Plaintiffs will in turn be able to establish one or more less-restrictive alternatives for achieving any such procompetitive benefit(s).  Specifically, Dr. Rascher and Dr. Noll will demonstrate that Defendants' asserted procompetitive justifications could be achieved either through individual conference rulemaking or through less-restrictive NCAA regulations.  As presently constituted, no individual conference has market power, and thus conferences—acting *independently*—could decide whether to adopt compensation restraints that serve any procompetitive justification found by the Court.  At the same time, however, competition

1    for Class Members' services would ensue *between* conferences, thus creating significantly less-

2    restrictive and more-cost-efficient relevant markets that would benefit both Class Members and other

3    market participants.   Plaintiffs will show at trial that this less-restrictive system of individual

4    conference autonomy is consistent with Defendants' structure and history over the past hundred years

5    and could be implemented without Court supervision or the fear of future antitrust attacks (*e.g.*, the

6    Court's "whack-a-mole" concern).

7            Dr. Rascher and Dr. Noll also will show that another less-restrictive alternative, in addition to

8    individual conference rulemaking, would be to limit any NCAA compensation caps to those restricting

9    cash sums untethered to educational expenses—the limited category of compensation that the

10   *O'Bannon* court held to undermine amateurism (albeit based on a very different and now outdated

11   factual record).   Mr. Poret will provide further expert support for this less-restrictive alternative

12   through his survey demonstrating that various forms of education-related benefits—a category of

13   compensation that the *O'Bannon* court held *not* to undermine amateurism or integration—could be

14   offered to Class Members without adversely impacting consumer demand.   And Mr. Lennon's binding

15   30(b)(6) testimony that various participation benefits have already been determined by the NCAA to

16   have nothing to do with amateurism or maintaining consumer demand establishes that Defendants'

17   restrictive caps on such participation benefits can be eliminated without undermining amateurism or

18   integration.

19           In addition, Dr. Rascher will demonstrate that neither category of less-restrictive alternatives—

20   *i.e.*, conference autonomy or NCAA restraints limited to cash sums untethered to educational expenses

21   and not restraining participation benefits—would be significantly more costly (if at all) to implement.

22   For starters, a reduction in Defendants' monopoly profits as a result of increased competition is *not* a

23   cost attributable to implementing any less-restrictive alternative, but rather, the inevitable consequence

24   of eliminating an unreasonable restraint of trade.   As discussed below, under Ninth Circuit precedent,

25   the relevant costs for the Court to consider are only significant additional *implementation* costs that a

26   proffered less-restrictive alternative would entail.   Here, as Dr. Rascher will testify, the additional

27

28

1  implementation costs of either conference autonomy or less-restrictive NCAA rules would be *de*

2  *minimis*.

3      Further, even with respect to the cost of increased compensation and benefits that many

4  conferences and schools would provide if not restrained by the current rules, Plaintiffs' proposed less-

5  restrictive alternatives would not require any particular school or conference to incur any additional

6  costs—if certain schools did not wish to offer increased benefits or compensation because they found

7  them to be too costly or otherwise objectionable, they simply would not do so (*e.g.*, a choice the Ivy

8  League Conference already makes). And, in any event, the economic evidence provided by Dr.

9  Rascher will show that even for schools and conferences that choose to offer greater benefits, their

10 total costs would essentially remain the same, as existing and growing revenues are reallocated more

11 efficiently in a competitive market.

12      Finally, if the Court were to find that Defendants met their burden of proof on procompetitive

13 justification, and that Plaintiffs did not meet their burden on the existence of less-restrictive

14 alternatives, it would then need to weigh any procompetitive effects shown at trial against the

15 anticompetitive effects of the restraints established on summary judgment. In that event, the economic

16 evidence will show that Defendants' rules could not withstand scrutiny under this balancing test

17 either—*zero* compensation competition for Class Members' services in the relevant markets would

18 substantially outweigh any claimed procompetitive benefit.

19      ***Remedy***: Plaintiffs' proposed injunctive relief is narrowly tailored and straight forward.

20 *Requested Injunction*. Plaintiffs propose a traditional antitrust injunction to stop Defendants from

21 colluding to enforce the challenged rules, and any future rules that are substantially similar in purpose

22 and effect, regarding the compensation and benefits that schools may provide Class Members for their

23 athletic services. This injunction would not prevent individual conferences from adopting their own

24 compensation limits—provided that the conferences do not collude with one or another or with the

25 NCAA.

26      *Alternative Injunction*. Should the Court find the Plaintiffs' requested injunction to be too

27 broad, Plaintiffs would propose an alternative injunction whereby the challenged rules would be

28

1   enjoined except to the extent those rules prohibit NCAA members from providing Class Members with

2   cash sums untethered to educational expenses, *i.e.*, the limited category of cash compensation that the

3   *O'Bannon* court held to be subject to NCAA prohibition based on the different record presented in that

4   case.  Even under this alternative injunction, however, the NCAA could not continue to cap the benefits

5   that Lennon identified as participation benefits—which include not only non-cash benefits, like gift

6   suites and health insurance, but also a number of permitted cash sums, *e.g.*, *per diems* and

7   reimbursement of training expenses, certain family travel to games, etc.—because the NCAA concedes

8   that they are unrelated to any amateurism or integration justification.  Under this alternative injunction,

9   individual conferences would still be free to decide for themselves whether to permit their members to

10  provide any new types or amounts of education-related benefits, or greater amounts of other existing

11  participation benefits.

12  Plaintiffs propose that either injunction be stayed for ninety days to permit Defendants and

13  non-defendant (D-I basketball and FBS football) conferences to promulgate any new rules in light of,

14  and consistent with, the Court's ruling.  And, for clarity, the Court could specify that its injunction

15  does not apply to the NCAA continuing to enforce its many rules regarding academic eligibility, third-

16  party payments, transfers, name/image/likeness rights, or other restraints not challenged in this case.

17  ## II.    LEGAL FRAMEWORK FOR TRIAL

18  The governing legal principles for the trial have already been established by prior opinions of

19  the Court.  To establish a Section 1 claim under the Sherman Act, 15 U.S.C. § 1, Plaintiffs must

20  demonstrate (1) a contract, combination, or conspiracy; (2) that the agreement unreasonably restrained

21  trade under either a *per se* rule of illegality or rule-of-reason analysis; and (3) that the restraint affected

22  interstate commerce.[6]  Here, the Court has decided to apply the rule of reason.[7]

23

24

25  ---

26  [6] Order Granting in Part and Denying in Part Cross-Mots. for Summ. J. ("MSJ Order"), ECF No. 804,
    at 15 (citing *Tanaka v. Univ. of S. California*, 252 F.3d 1059, 1062 (9th Cir. 2001)).  All docket
    references are to the MDL docket, Case No. 14-md-02541-CW (NC).

27  [7] Based on *O'Bannon*, the Court has decided to apply the rule of reason in this case (MSJ Order at 15),
    though Plaintiffs believe that the challenged restraints should be found unlawful under a *per se* or

28  quick look analysis, as well, and expressly preserve those issues for appeal.

1   The first step in a rule-of-reason analysis, after proving the existence of a "contract,
2   combination, or conspiracy," is to "define the relevant market within which the challenged restraint[s]
3   may produce significant anticompetitive effects."[8]   The second step is to assess "whether the
4   challenged restraints produce significant anticompetitive effects within the relevant market."[9]   If a
5   plaintiff satisfies these first two elements, the third step is to determine "whether Defendants have
6   come forward with evidence of procompetitive effects of the challenged restraints."[10]  If so, the burden
7   shifts back to plaintiffs to show that any legitimate objectives can be achieved by less-restrictive
8   alternatives.[11]   Finally, if the plaintiffs do not meet their burden on less-restrictive alternatives, "the
9   court must weigh the harms and benefits to determine if the behavior is reasonable on balance."[12]

10   With no genuine or material factual dispute that the challenged agreements inflict grave
11   anticompetitive harm on the relevant markets, the Court entered summary judgment for Plaintiffs on
12   these elements.[13]   The burden at trial now shifts to Defendants to try to prove that the challenged
13   restraints in fact cause one of two procompetitive effects:  (i) maintaining consumer demand through
14   the pursuit of amateurism or (ii) integrating Class Members into academics and campus life.  The Court
15   has already rejected Defendants' other claimed justifications on summary judgment.[14]   If Defendants
16   are unable to meet their burden of proof, "then there [will] be no need for less restrictive alternatives,"[15]
17   and Plaintiffs would be entitled to judgment as a matter of law.[16]

---

[8] MSJ Order at 18.
[9] *Id.*
[10] *Id.* at 19.
[11] *O'Bannon v. Nat'l Collegiate Athletic Ass'n*, 802 F.3d 1049, 1070 (9th Cir. 2015), *cert. denied*, 137 S. Ct. 277 (2016).
[12] *Bhan v. NME Hosps. Inc.*, 929 F.2d 1404, 1413 (9th Cir. 1991).
[13] MSJ Order at 18-19, 34-35.
[14] MSJ Order at 22-25.
[15] May 22, 2018 Hr'g Tr. at 28:17-21.
[16] *In re NCAA Student-Athlete Name & Likeness Litig.*, 37 F. Supp. 3d 1126, 1151 (N.D. Cal. 2014); *Tanaka*, 252 F.3d at 1062; *F.T.C. v. Ind. Fed. of Dents.*, 476 U.S. 447 (1986) (demonstrating anticompetitive effects "are sufficient as a matter of law to establish a [Sherman Act § 1] violation" where defendants failed to prove "some countervailing procompetitive virtue" for the restraint).

9

To discharge their burden, Defendants must prove that the challenged rules are competition-enhancing—*e.g.*, they actually foster consumer demand.  Pretext will not do.[17]  Nor will social, educational, or other non-economic policy objectives, as the Supreme Court has repeatedly instructed.[18]  In fact, in arguing before the Supreme Court in *Board of Regents*,[19] the NCAA not only admitted this legal principle, it conceded that "any educational or amateurism" goals, by themselves, are "not reasons for monopolistic practices":

> As you know, we have not argued that any educational or amateurism goals of the NCAA are a good reason for the NCAA to engage in monopolistic practices, practices that increase the price paid by viewers. . . .  We haven't argued that because as we read this Court's cases, including *Engineers* and others, the goals other than economic are not reasons for monopolistic practices.[20]

Thus, Defendants must show that their amateurism or integration justifications, in fact, are necessary to promote consumer demand in some demonstrable fashion.  As the Tenth Circuit held in *Law v. NCAA*, where the NCAA violated the Sherman Act by capping the salaries of assistant coaches, "cost-cutting by itself is not a valid procompetitive justification."[21]  "If it were, any group of competing buyers could agree on maximum prices," and "the cartel ultimately robs the suppliers"—here, Class Members who offer their athletic services—"of the normal fruits of their enterprises."[22]  Defendants

---

[17] *See e.g.*, *McWane, Inc. v. F.T.C.*, 783 F.3d 814, 840-41 (11th Cir. 2015) ("Having established that the defendant's conduct harmed competition, the burden shifts to the defendant to offer procompetitive justifications for its conduct . . . [s]uch justifications, however, cannot be merely pretextual.") (internal quotation marks omitted); *N.Y. ex rel. Schneiderman v. Actavis PLC*, 787 F.3d 638, 658 (2d Cir. 2015) ("Because we have determined that Defendants' procompetitive justifications are pretextual, we need not weigh them against the anticompetitive harms.").

[18] *FTC v. Superior Court Trial Lawyers Ass'n*, 493 U.S. 411, 424 (1990) (boycott by lawyers in support of greater funds for indigent representation could not be justified by social policy objectives); *Nat'l. Soc'y. of Prof'l Eng'rs v. United States*, 435 U.S. 679, 692 (1978) (rejecting public safety justification for a restraint and holding "the purpose of the [rule of reason] analysis is to form a judgment about the competitive significance of the restraint; it is not to decide whether a policy favoring competition is in the public interest, or in the interest of the members of an industry.").

[19] *NCAA v. Bd. of Regents*, 468 U.S. 85 (1984).

[20] NCAA Oral Arg., *Bd of Regents*, No. 83-271 (Mar. 20, 1984), available at http://www.oyez.org/cases/1980-1989/1983/1983_83_271.

[21] *Law v. NCAA*, 134 F.3d 1010, 1022 (10th Cir. 1998).

[22] *Id.  See also id.* at 1023 ("[M]ere profitability or cost savings have not qualified as a defense under the antitrust laws.").

1    will not be able to meet this heavy burden on the changed facts and new record that has been developed

2    since the decision in *O'Bannon*.

3            Nonetheless, if the Court were to find otherwise, Plaintiffs then would need to establish that

4    any legitimate purpose of the challenged restraints could be accomplished through one or more less-

5    restrictive alternatives.  A viable less-restrictive alternative must be "virtually as effective" in serving

6    any procompetitive purpose of the rules and must not impose "significantly increased cost."[23]

7    "Increased cost" does not refer to the reduction of any monopoly profits, which is not the cost of a

8    less-restrictive alternative, but instead the inevitable consequence of eliminating any illegal restraint

9    of trade.  In *O'Bannon*, for example, the Ninth Circuit found that permitting schools to pay full COA

10   was a less-restrictive alternative, even though any increased payments above the old GIA cap would

11   obviously reduce the monopoly profits that had been attributed to the restraint.  The only cost issue a

12   court should consider under Ninth Circuit law is whether the "implementation" costs of a particular

13   less-restrictive alternative would be "significantly" increased so as to render that less-restrictive

14   alternative not viable.[24]

15           Where "plaintiffs have failed to meet their burden of advancing viable less-restrictive

16   alternatives," a court then (and only then) must "reach the balancing stage."[25]  To conduct this analysis,

17   the Court "must balance the harms and benefits" of the anticompetitive conduct "to determine whether

18

19

---

20   [23] *O'Bannon*, 802 F.3d at 1074 (quoting *Cty. of Tuolumne v. Sonora Cmty. Hosp.*, 236 F.3d 1148, 1159
     (9th Cir. 2001)).  *Cf. Am. Motor Inns, Inc. v. Holiday Inns, Inc.*, 521 F.2d 1230, 1248–49 (3d Cir. 1975)
21   ("In a rule of reason case, the test is not whether the defendant deployed the least restrictive
     alternative.  Rather the issue is whether the restriction actually implemented is 'fairly necessary' in the
22   circumstances of the particular case, or whether the restriction exceed(s) the outer limits of restraint
     reasonably necessary to protect the defendant.") (internal quotations omitted).

23   [24] In *O'Bannon*, the Ninth Circuit noted that "[a]lthough our analysis focuses on whether the alternative
     serves procompetitive purposes, our prior cases make clear that plaintiffs must prove that any
24   alternative will not significantly increase costs *to implement*."  *Id.* at 1076 n.19 (emphasis added)
     (citing *Cty. Of Tuolumne*, 236 F.3d at 1159 (the process required for "a hospital independently
25   evaluating a physician's skill in the operating room [] can be made effective only by the hospital's
     incurring substantial costs.").  And insofar as the Ninth Circuit reversed the NIL stipend portion of the
26   Court's injunction, it was because the Court "clearly erred when it found that allowing students to be
     paid compensation for their NILs is virtually as effective as the NCAA's current amateur-status rule"—
27   not because of anything to do with significantly increased implementation costs.  *O'Bannon*, 802 F.3d
     at 1074.

28   [25] *Cty. of Tuolumne*, 236 F.3d at 1160 (citing 7 Areeda ¶ 1507b, at 397).

1   [it is] reasonable."[26]  As the expert testimony of Drs. Rascher and Noll will establish, even with respect

2   to this last-stage analysis, the economic evidence proves that, on balance, the challenged rules—which

3   completely eliminate price competition for the services of Class Members—are unreasonable restraints

4   of trade.

5   **III.     THE CHALLENGED RESTRAINTS**

6          Plaintiffs challenge Defendants' rules that fix and cap the compensation and benefits that

7   schools may offer to Class Members for their athletic services.  Defendants have repeatedly attempted

8   to confuse this issue, but to the extent there are some challenged rules that overlap with one another in

9   whole or in part, or other challenged rules that broadly extend to subjects beyond player compensation

10  by schools, that is a function of Defendants' byzantine rulebooks.  Antitrust defendants cannot be heard

11  to complain that it is too difficult for them to defend their own behavior because their self-imposed

12  restraints are too voluminous or complicated.

13         Plaintiffs previously identified seventy-nine challenged rules. But there is substantial

14  commonality among these rules so that all of them fall into one of three categories for easy analysis.

15  There are:  (1) twenty-five NCAA rules capping compensation and benefits; (2) fifteen NCAA rules

16  for enforcing the compensation and benefits caps; and (3) thirty-nine conference rules which simply

17  incorporate or rely upon the NCAA rules in Category 1.  So, for starters, Categories 2 and 3[27] of the

18  challenged rules require no separate scrutiny at trial—they serve merely to implement and enforce the

19  compensation limits set forth in Category 1.  Plaintiffs identified these two Categories of rules in their

20  interrogatory responses for the sake of completeness, but seek to enjoin them only to the extent they

21  are a mechanism to enforce the Category 1 compensation caps.

22         Substantively, the trial concerns the core set of compensation caps in Category 1.  Again, there

23  is no need for segregated rule-by-rule analysis.  The compensation-cap rules are overlapping and

24  circular, and all collectively rise or fall based upon Defendants' identical amateurism and integration

25  justifications.  Most fundamentally, Plaintiffs' proposed injunction leaves no ambiguity as to whether

26

27  _____
    [26] *Id.*

28  [27] *See* App'xs. A and B, attached.

and to what extent any one rule could continue to be enforced.  This is clear from reviewing the compensation/benefit rules at issue, each of which should be enjoined to the extent it fixes or limits the compensation or benefits that conferences or individual schools may offer to Class Members for their athletic services.

| Category 1: NCAA Rules That Limit Compensation Beyond Cost of Attendance[28] | |
|---|---|
| **Rule** | **Summary** |
| NCAA Bylaw 12.01.1 | **Eligibility for Intercollegiate Athletics**: "Only an amateur student-athlete is eligible" to participate in athletics. |
| NCAA Bylaw 12.01.4 | **Permissible Grant-in-Aid**: Grant-in-aid "is not considered to be pay or the promise of pay for athletics skill provided it does not exceed the financial aid limitations set by the Association's membership." |
| NCAA Bylaw 12.02.10 | **Pay**: "Pay is the receipt of funds, awards or benefits not permitted by the governing legislation of the Association for participation in athletics." |
| NCAA Bylaw 12.1.2.1 *et seq.* | **Prohibited Forms of Pay**: Prohibited forms of pay include salary, performance-based compensation, and awards of cash or cash equivalents for participation in competition. |
| NCAA Bylaw 12.1.2.2 | **Use of Overall Athletics Skill—Effect on Eligibility**: Participating for pay in competitions that "involves the use overall athletics skill" violates amateur status. |
| NCAA Bylaw 13.2.1 | **Offers and Inducements, General Regulation**: During recruiting, athlete may not receive any financial aid or other benefits other than those expressly permitted by NCAA. |
| NCAA Bylaw 13.2.1.1 | **Specific Prohibitions**: Specifically prohibited financial aid, benefits, and arrangements include gifts of clothing and equipment, loans, cash, tangible items, and expenses for academic services to assist in initial eligibility. |
| NCAA Bylaw 15.01.1.1 | **Financial Aid to Attend Another Institution**: School may not provide financial aid for athlete to attend another school. |
| NCAA Bylaw 15.01.2 | **Improper Financial Aid**: Any athlete who receives financial aid other than that permitted by the Association shall not be eligible for intercollegiate athletics. |
| NCAA Bylaw 15.02.2 | **Cost of Attendance**. "Cost of attendance" "is an amount calculated by an institutional financial aid office, using federal regulations, that includes the total cost of tuition and fees, room and board, books and supplies, transportation, and other expenses related to attendance at the institution." |

---

[28] Ex. 24, 2018-19 NCAA Division I Manual.  At the time Plaintiffs' Opening Argument was filed, the 2017-18 NCAA Division I Manual was operative.  The Trial Exhibit List (ECF No. 992) includes the currently operative 2018-19 NCAA Division I Manual, which made, among other things, minor changes to NCAA Bylaw numbers.  The current NCAA Bylaw numbers are reflected in this document.

13

| NCAA Bylaw 15.02.2.1 | **Calculation of Cost of Attendance**: An institution must calculate the cost of attendance for athletes in accordance with the COA policies used for students in general. |
| --- | --- |
| NCAA Bylaw 15.02.6 | **Full Grant-in-Aid**: "A full grant-in-aid is financial aid that consists of tuition and fees, room and board, books and other expenses related to attendance at the institution up to the cost of attendance . . . ." |
| NCAA Bylaw 15.1 | **Maximum Limit on Financial Aid**: Athlete "shall not be eligible to participate in intercollegiate athletics if he or she receives financial aid that exceeds" COA. |
| NCAA Bylaw 15.1.2 | **Types of Aid Included in Limit**: List of financial awards considered when calculating maximum financial aid. |
| NCAA Bylaw 15.1.3 | **Reduction When Excess Aid Is Awarded**: If an athlete's "financial aid from the sources listed in Bylaw 15.1.2, which includes institutional financial aid, will exceed [COA] for the balance of the academic year, the institution shall reduce institutional" aid so as not to exceed COA. |
| NCAA Bylaw 15.2.4 | **Other Expenses Related to Attendance**: "An institution may provide a student-athlete financial aid that covers other expenses related to attendance in combination with other permissible elements of financial aid (per Bylaw 15.2) up to the cost of attendance . . . ." |
| NCAA Bylaw 15.2.5 *et seq.* | **Government Grants**: "Government grants for educational purposes shall be included when determining the permissible amount of the cost of attendance for a student athlete, except for those listed in Bylaw 15.2.5.1." |
| NCAA Bylaw 16.02.2 | **Excessive Expense**: "Excessive expense is one not specifically authorized" by NCAA. |
| NCAA Bylaw 16.02.3 | **Extra Benefit**: "An extra benefit is any special arrangement by an institutional employee or representative of the institution's athletics interests to provide a student-athlete or the student-athlete family member or friend a benefit not expressly authorized by NCAA legislation." |
| NCAA Bylaw 16.02.5 | **Pay**: "Pay is the receipt of funds, awards or benefits not permitted by the governing legislation of the Association for participation in athletics." |
| NCAA Bylaw 16.1.4 *et seq.* | **Types of Awards, Awarding Agencies, Maximum Value and Numbers of Awards**: Athletics awards given to athletes "shall be limited to those approved or administered by the member institution, its conference or an approved agency . . . and shall be limited in value and number. . . ." |
| NCAA Bylaw 16.11.2.1 | **Nonpermissible, General Rule**: Athlete shall not receive any extra benefit. |
| NCAA Bylaw 5.3.2.1.2(e) | **Pre-enrollment Expenses and Support**: ACC, Big Ten, Big 12, Pac-12, SEC "are granted autonomy . . . to permit the use of resources to advance" "legitimate educational or athletics-related needs of" athletes and for changes that "will otherwise enhance athlete well-being." <br><br> An included area of autonomy is "expenses and support provided in the recruiting process and the transition to college enrollment, including assistance to families to visit |

14

| | campus, medical expenses and academic support during the summer prior to enrollment, and transportation to enroll." |
|---|---|
| NCAA Bylaw 5.3.2.1.2(f) | **Financial Aid**: Another area of autonomy includes an athlete's "individual limit on athletically related financial aid, terms and conditions of awarding institutional financial aid, and the eligibility of former student-athletes to receive undergraduate financial aid." |
| NCAA Bylaw 5.3.2.1.2(g) | **Awards, Benefits and Expenses**: Another area of autonomy includes "awards, benefits and expenses for enrolled student-athletes and their families and friends." |

Further, because Plaintiffs also seek to enjoin NCAA caps on permitted types of participation benefits, we list in Appendix C the participation benefits that were identified by the NCAA's corporate designee as unrelated to principles of amateurism or integration and are capped arbitrarily based on the majority whim of the NCAA membership. All such compensation caps serve only to unreasonably restrain trade and should be enjoined.

## IV. DEFENDANTS WILL NOT BE ABLE TO CARRY THEIR BURDEN TO PROVE THAT THE CHALLENGED RESTRAINTS IMPOSED IN THE NAME OF AMATEURISM ACTUALLY PROMOTE CONSUMER DEMAND

Defendants will not meet their burden to prove that the NCAA's nationwide rules capping compensation and benefits available to college athletes are necessary to maintain or enhance consumer demand for D-I basketball and FBS football. Defendants' malleable, ill-defined, and ever-evolving "amateurism" justification will be exposed as bereft of any actual proof, with this post-*O'Bannon* record demonstrating that the challenged rules have no causal effect on whether consumers choose to follow, watch, attend, or otherwise engage with D-I college basketball and FBS football.

### A. Defendants Will Offer No Admissible, Probative, or Credible Evidence That Their Amateurism Compensation Caps Are Required to Maintain Consumer Demand

Defendants' putative, affirmative evidence that their challenged rules are needed to maintain consumer demand will not come close to meeting their burden of proof on this critical issue. To support this proposition, Defendants will try to offer into evidence: (1) *anecdotal lay opinions* and *conjecture* from Defendants' employees that limiting benefits to student athletes is needed to maintain consumer demand; and (2) an *inapt survey* that did not even test the central question at issue—whether there is any causal relationship between the challenged restraints and consumer demand. And despite

15

1    the fact that Defendants' burden is to show that their amateurism restraints cause an improvement in

2    *economic* welfare, conspicuously absent from their evidentiary showing at trial will be any disclosed,

3    reliable, and admissible expert *economic* testimony capable of proving amateurism's claimed

4    procompetitive effect in the relevant markets.  Simply put, Defendants' proof on this issue will not

5    come close to satisfying their burden—zero, plus zero, times zero, still equals zero.

> ###     1.    Defendants' Self-Serving, Anecdotal, and Largely Inadmissible Lay Opinion Testimony Cannot Satisfy Their Burden to Prove Amateurism's Procompetitive Effects

8              Defendants' only proffered economic expert on the purported procompetitive effects of their

9    amateurism compensation restraints is Dr. Elzinga.  But the Court excluded Dr. Elzinga's testimony

10   based on his rejected "multisided platform" market definition——an unsupported departure from all

11   prior economic studies of the relevant markets for analyzing NCAA restraints on athletes' services

12   that even defense counsel abandoned during summary judgment argument.[29]  And, even if the Court

13   were to reconsider and admit any portion of his excluded opinions, Dr. Elzinga still could not help

14   carry Defendants' burden of proof for the simple reason that he did not study any economic data on

15   any relationship between the challenged compensation restraints and consumer demand.  Instead, Dr.

16   Elzinga solely relied on the unsupported lay opinions of Defendant-designated school officials (who

17   are themselves invested in protecting the cartel), and his economic theories based upon his rejected

18   multisided market opinion.  He did not, for example, so much as look at any data on ticket sales,

19   television revenues, sponsorship revenues, or other economic indicia of consumer demand.[30]  In

20   contrast to the record in *O'Bannon*, where the NCAA at least offered experts who claimed to have

21   conducted analyses of economic evidence supporting the position that compensation caps are

22   procompetitive, no such expert analysis of the new economic facts since *O'Bannon* has even been

23   proffered by Defendants in this case.  This is why the Court also found that Dr. Elzinga merely assumed

---

[29] *See* Order on Mots. to Exclude Proposed Expert Testimony ("*Daubert* Order"), ECF No. 815, at 1; MSJ Order at 18 n.6.

[30] Kenneth Elzinga Tr. 29:14-30:18.

1   certain procompetitive benefits which are irrelevant to the issues to be tried and would not assist the

2   Court.[31]

3        Instead, Defendants seek to rely upon the *ipse dixit* statements of a few cherry-picked college

4   administrators.  But self-interested, anecdotal lay opinion evidence from NCAA, conference, and

5   college employees about the supposed virtues of amateurism have little, if any, probative value for

6   showing that the challenged restraints actually have any positive effect on consumer demand.  For

7   starters, this unreliable lay opinion testimony is inadmissible and should be excluded from evidence.[32]

8   But even if it were admitted, what is required to carry Defendants' burden is economic proof, not lay

9   speculation—especially when that speculation will be based on the false factual premise that NCAA

10  rules currently maintain consumer demand by banning all compensation and benefits above COA.  As

11  Plaintiffs will show, the reality is that, post *O'Bannon*, the NCAA has been permitting Class Members

12  to receive many thousands of dollars in excess of COA without any decline in demand.[33]  And *no* lay

13  witness put forward by Defendants will have a factual basis to assess the challenged rules' effect on

14  consumer demand.

15       Nor will the rank conjecture of Defendants' lay witnesses be credible.  If amateurism were

16  essential to the maintenance of consumer demand, one would expect all of the conferences and schools

17  to have studied the issue in the ordinary course of their businesses.  Yet, despite Class counsel asking

18  NCAA, conference, and college executives time and time again at their depositions, no Defendant

19  witness identified any kind of study—of consumer demand, market testing, or otherwise—that

20  Defendants had conducted into whether their compensation caps have any positive relationship to

21  consumer demand for the sports at issue.[34]  And, in contrast to the record in *O'Bannon*, the NCAA will

22

23  ───────────────
    [31] *Daubert* Order at 6-7.

24  [32] Plaintiffs have filed a motion *in limine* (ECF No. 863) to preclude Defendants from offering,
    eliciting, or referencing speculative, lay witness opinion testimony which is prohibited under Rule 701
25  of the Federal Rules of Evidence.  Specifically, Defendants may not seek to support their
    procompetitive justifications by offering such speculative lay opinions about the potential impact on
26  consumer demand for D-I basketball and FBS football if Defendants' compensation restraints were
    enjoined.

27  [33] *See, e.g.*, Roger Noll Decl., ECF No. 865-4, ¶¶ 53-56, 69-92.

    [34] *See e.g.*, Big 12 (Bob Bowlsby) Tr. 85:7-17 ("Q. I'm asking a little bit of a different question, which
28  is:  Does the Big 12 promote the fact that its players 'don't get paid'? . . .  A. No, not specifically.  Q.

                                        17

1   not even offer any testimony from a broadcasting expert in support of its amateurism defense. Instead,

2   the record will build upon uninformed testimony like that of NCAA President Mark Emmert, who

3   admitted that he was unaware of specific studies that could demonstrate any negative impact on the

4   viewing audience for college sports if student athletes were provided with certain levels or types of

5   additional compensation.[35]

6       The credibility of defense witnesses' testimony that the NCAA's amateurism compensation

7   restraints exist to promote consumer demand will also be refuted by the history of the rules. As Dr.

8   Noll and Dr. Rascher will testify, the genesis of these compensation restraints was *not* an economic

9   objective to foster consumer demand. On the contrary, "[s]ince 1957 . . . the NCAA's compensation

10  rules have not been tethered to any coherent or consistent definition of amateurism," but rather have

11  just been an ever-changing succession of cartel rules that have sought to suppress competition in

12  compensation to the athletes whose efforts produce the very large, and ever-increasing, revenues in D-

13  I basketball and FBS football.[36]

14      In short, the familiar and self-serving testimony of Defendants' "fact" witnesses with personal,

15  professional, and financial stakes[37] in maintaining the *status quo* will simply echo past, demonstrably

16  inaccurate predictions by the same or similar witnesses that permitting increased compensation to D-I

17  basketball players and FBS football players—even up to COA—would lead to a collapse in consumer

18  demand.[38] There will not be any credible economic expert or lay testimony introduced by the NCAA

19  to meet their burden on this issue.

20

21  Okay. Has the Big 12 ever conducted any type of study or analysis of amateurism as a driver of
22  revenue? A. No."); MAC (Jon Steinbrecher) Tr. 14:1-4 ("Q. Does the MAC have any tangible
    evidence that consumers place a premium on the amateur nature of MAC sports? A. I have no
23  knowledge of that."); *id.* Tr. 45:8-11; C-USA (Judy MacLeod) Tr. 126:21-127:7 ("Q. Does the
    conference specifically promote the concept of amateurism? . . . A. I don't believe so, no."); *id.* Tr.
24  129:19-130:2. None of Defendants' experts could identify any such study, either. *E.g.*, Elzinga Tr.
    251:4-13; Isaacson Tr. 235:19-236:10.
25  [35] Mark Emmert Tr. 118:9-119:23.
26  [36] Noll Decl. ¶ 46; *id.* ¶¶ 26-56.
27  [37] For example, Defendants have indicated that they intend to call witnesses like Pac-12 Commissioner
    Larry Scott, who earns *more than $4 million per year* from the existing system. Ex. 137, Noll Decl.
    Ex. 168(c), FBS Conference Revenues.
28  [38] Noll Decl. ¶¶ 105-09; Daniel Rascher Decl., ECF No. 865-3, ¶¶ 112-114.

1

2

**2.      Defendants' Survey Evidence Cannot Satisfy Their Burden to Prove Amateurism's Procompetitive Effects**

Defendants' *only* other evidence in ostensible support of their amateurism defense is from their survey expert—Dr. Isaacson.  But unlike the survey evidence offered by Defendants in *O'Bannon*, the Isaacson study here does not even claim to test for any future impact on consumer demand if greater compensation to Class Members were permitted.  To the contrary, Dr. Isaacson made a conscious choice to duck the central issues in this case:  whether conferences or schools offering additional compensation and benefits to Class Members would adversely impact future viewership or attendance for D-I basketball or FBS football.  He admits he did not ask a single survey respondent if he or she would stop watching college sports, or watch less, or watch more, if players were provided additional compensation and benefits.  His explanation?  Dr. Isaacson will opine that surveys cannot reliably predict such future behavior so he did not bother to try.[39]  But this is the exact opposite of what the NCAA attempted to do in *O'Bannon*.

There, to try to support the NCAA's position that the then-existing rules banning name, image, and likeness compensation were necessary to maintain consumer demand, the NCAA offered a survey that endeavored *to predict consumer behavior* in the event those rules were changed to permit greater benefits.[40]  Here, by contrast, Dr. Isaacson took the opposite position of the NCAA's prior survey expert and disavowed "attempt[ing] to measure future behaviors" in the event schools were able to provide new benefits for Class Members.[41]  As a result, Defendants in this case have zero consumer survey evidence to even attempt to carry their burden to show that the challenged compensation restraints drive consumer demand for their product.

As Defendants acknowledged in opposing summary judgment, "[i]nstead of asking college sports fans to predict their own future behavior and attempting to quantify the difference, Dr. Isaacson surveyed respondents about their current preferences."[42]  But this Court has previously found that such

---

[39] *See* Isaacson Tr. 50:9-16, 51:3-53:1.

[40] Pls.' Mot. for Summ. J., ECF No. 655-3 at 12 (citing evidence submitted).  The NCAA survey from *O'Bannon* is inadmissible in this case pursuant to F.R.E. 801, 802, and 402 and F.R.C.P. 26, 37.  *See* Plaintiffs' Motions in *Limine*, ECF No. 863, at 13-18.

[41] Isaacson Rep. ¶ 11.

[42] Defs.' Mot. for Summ. J., ECF No. 704, at 40-41.

19

a limited inquiry about whether consumers "favor" or "oppose" changes to NCAA compensation restraints is inherently flawed in the antitrust context because it does not test the challenged rules' impact on consumer demand:

> The NCAA relies heavily on the fact that sixty-nine percent of respondents to Dr. Dennis's survey expressed opposition to paying student-athletes while only twenty-eight percent favored paying them. Trial Tr. 2604:21-2605:2; Ex. 4045 at 19. *These responses, however, are not relevant to the specific issues raised here and say little about how consumers would actually behave if the NCAA's restrictions on student-athlete compensation were lifted.*[43]

Indeed, a consumer of a basketball game might favor or oppose the team calling a certain play, or wearing a certain color uniform, or changing the team's name, but that does not mean that such support or opposition will translate into a change in consumer demand, be it buying more or fewer tickets, watching more or fewer games, or anything else.[44]

Further, even if the Isaacson study had any probative value (it does not), its results would not help Defendants meet their burden. To begin with, according to the Isaacson survey, the top "reasons why [respondents] watch or attend" D-I basketball and FBS football are because respondents like when certain colleges win or lose and can watch or attend games with friends or family—not because of anything to do with the severe limits on compensation paid to athletes, or with amateurism.[45]

Only a minority—31.7%—of the Isaacson survey respondents selected (as a multiple-choice answer) that one of numerous reasons why they watch or attend college sports is "the fact that college players are amateurs and/or are not paid."[46] Putting aside that there is no way to know what a respondent meant by selecting that he or she likes that "college players are amateurs *and/or* are not paid"[47]—that choice was on average only 1 out of 4.4 different reasons selected by this minority of

---

[43] *O'Bannon*, 7 F. Supp. 3d at 975 (emphasis added).
[44] *See* Poret Decl. ¶ 8.
[45] *See* Isaacson Rep. ¶152, Table 7.
[46] *Id*. ¶ 151 (emphasis added).
[47] The separation of "amateur" and "not paid" by a conjunction including "or" strongly suggests that "amateur" and "not paid" are not synonymous. This formulation of the choice makes it impossible to know whether any respondents who selected this choice did so because they like it that college players are "amateurs" in the sense that they are college students (as many consumers would likely understand the term in the colloquial sense, as opposed to how the NCAA defines "amateurism" in its rule books), or because they like it that college players "are not paid." *See* Poret Decl. ¶ 145-146. Indeed, as both Dr. Rascher and Dr. Noll will testify, it is the identity of Class Members as students—not their

1    respondents for watching college sports.[48]  And Dr. Isaacson will concede at trial that he did nothing

2    to test the relative importance of "amateurs and/or not paid" against the three-plus *additional* reasons

3    (on average) that this minority of respondents selected.[49]  This is significant because, among other

4    things, *even according to Isaacson's survey*:  (i) more respondents care about their teams' success on

5    the field and watching with friends and family than anything to do with amateurism; (ii) less than one-

6    third of respondents indicated that they care to any degree about whether "college players are amateurs

7    and/or not paid" (whatever that means); (iii) 62% of respondents *favored* one or more new

8    compensation scenarios for Class Members; and (iv) 77% did *not oppose* all of the new compensation

9    scenarios that were identified.[50]  In sum, the survey conducted by Dr. Isaacson, like the rest of

10   Defendants' affirmative evidence, cannot meet Defendants' burden to show that the challenged

11   restraints are necessary to maintain consumer demand for the three sports at issue. Because Defendants

12   will not come forward with evidence to satisfy their burden, judgment in Plaintiffs' favor on this issue

13   will be warranted before even considering the substantial evidence that Plaintiffs will present to

14   affirmatively demonstrate that the challenged restraints do not have any procompetitive effect on

15   consumer demand.

16          **B.**      **Plaintiffs' Evidence Demonstrates That the Challenged Restraints Are Not Required to Maintain Consumer Demand**

17

18          It is not Plaintiffs' burden to disprove Defendants' claim that their nationwide compensation

19   caps promote consumer demand for D-I basketball and FBS football.  But Plaintiffs' evidence will in

20   fact demonstrate that full COA is not some immutable line beyond which consumer demand falls off

21   a cliff.

22

23                 compensation level—that actually defines their sports and differentiates them from a minor league of

24   professionals with no connection to school.  *See, e.g.*, Noll Decl. ¶ 91 ("The distinguishing characteristic of college athletes is not that they are amateurs . . . but that they are full-time college

25   students who play for their schools."); Rascher Decl. ¶¶ 93-106 (showing that college sports with

26   student-athletes thrived prior to any national NCAA compensation rules and have always accommodated some forms of variation in athletic compensation models).

27   [48] *See* Poret Decl. ¶ 148 n.26.

     [49] Isaacson Tr. 222:1-224:22.

28   [50] *See* Isaacson Rep. ¶ 150; Poret Decl. ¶¶ 142, 148.

*First*, Plaintiffs will show that, since *O'Bannon*, Class Members already are receiving substantial payments that can rise many thousands of dollars above full COA per athlete and are untethered to education (including *compensation contingent on athletic success*). This compensation comes from a combination of a full COA scholarship and incidental-to-participation benefits, SAF and Athletic Enhancement Fund ("AEF") payments, and Pell Grants. Despite their rhetoric to the contrary, Defendants' voluntary shattering of their purported COA compensation ceiling—and the undisputed economic evidence Plaintiffs will produce—will show that demand for these sports, as reflected in revenues, has continued to grow in leaps and bounds. Indeed, even the NCAA's 30(b)(6) witnesses were forced to admit that the provision of these significant additional benefits in excess of COA has not hurt consumer demand or damaged the amateur "collegiate model" that Defendants advocate.[51]

*Second*, the evidence produced by Plaintiffs will show that Defendants prohibit numerous types of education-related benefits that could be used to further academic achievements and experiences, and that permitting such benefits would not adversely impact consumer demand in any way. Indeed, as described above, Plaintiffs will produce a survey of future consumer demand conducted by Mr. Poret that will show that there are many additional benefits that could be permitted for Class Members without adversely impacting either viewership of, or attendance at, D-I basketball or FBS football.

*Third*, the economic evidence produced by Plaintiffs will show that the nationwide compensation caps actually *reduce consumer demand* relative to the "but for" world where conference autonomy reigns and individual conferences are permitted to set their own rules for compensating Class Members, taking all relevant economic considerations into account.

### 1. Defendants Already Permit Compensation and Benefits Substantially in Excess of Full COA and Untethered to Education

The trial evidence will show that, since *O'Bannon* and the jump to full COA scholarships in 2015, at least **three thousand college athletes** in the Power Five conferences, in addition to **one thousand** athletes outside of the Power Five conferences, have received substantial benefits **exceeding** the full cost of attendance.[52] The compensation that Class Members receive above COA consists of,

---

[51] NCAA (Mark Lewis) Tr. 79:1-21; NCAA (Lennon) 63:21-64:1.
[52] Rascher Decl. ¶ 55; *see also* Noll Decl. ¶¶ 54-56.

among other things, benefits unrelated to education and benefits for their athletic services and success. Plaintiffs will first describe the evidence of the myriad forms of compensation already available to Class Members since *O'Bannon* in excess of COA, and next describe the evidence showing that consumer demand has not missed a beat despite all of this compensation exceeding COA and untethered to education.   This natural, post-*O'Bannon* experiment is a complete repudiation of Defendants' assertions that their nationwide compensation caps are necessary to preserve consumer demand.

> **a. *Unrestricted COA stipend payments.*** As Dr. Rascher and Dr. Noll will testify, because the amount of the permitted COA stipend at each school is an estimated average expenditure (ranging between approximately three and seven thousand dollars per student),[53] the uses of the COA stipends vary enormously among students and often are used by athletes for expenditures that are unrelated to being either a student or an athlete.  Class Members use such funds, for example, to send money home to family, buy video games, and for other purposes unrelated to education or athletic expenses.  Defendants do not regulate in any shape or form how Class Members use their COA stipends,[54] and frequently the amount of the stipend exceeds the actual expenses which a particular Class Member incurs to attend his or her school.[55]  Plaintiff Alec James, for example, testified that the stipend he received for rent was $700 (monthly) greater than his actual rent, so he put some of the difference into savings and spent the remainder as he chose.[56]

> **b. *Incidental to participation benefits.*** The undisputed evidence will further show that, in addition to a full COA scholarship, Class Members already receive significant amounts of non-education-related benefits for participating in D-I basketball and FBS football, including things like apparel, transportation and lodging for families to attend contests, entry fees and facility use, fees

---

[53] *See, e.g.*, Noll. Decl. ¶ 67-68.

[54] NCAA (Lennon) Tr. 37:2-38:24 ("Q. It is correct that the students can use the money in any way they desire to, correct? A. Yes, that's correct.  Q. So, for example, [if a student used] part of the stipend to cover the $100 fee his younger brother needed to play football at high school. That's a perfectly permissible thing for a student to do, correct? . . . A. The NCAA does not dictate how a student uses any money it may receive within its cost of attendance.").

[55] Noll Decl. ¶¶ 48-68.

[56] Alec James Tr. 115:4-116:3, 119:4-120:17.

23

for conditioning activities, gift suites, bowl payments (watches, televisions, microwaves, hundreds of dollars in gift cards for electronics, etc.), and athletic awards.[57]  These benefits can add up to thousands of dollars per athlete, and are provided in addition to a full COA scholarship.  Critically, the NCAA's designated corporate representative under Rule 30(b)(6)—Lennon—has already given binding testimony as part of the trial record that such "incidental to participation benefits" are not tethered to education and are "not related to the principle of amateurism."[58]

Importantly, the Court will further hear from Mr. Lennon that many of these benefits, such as bowl or tournament gifts, are given based on *athletic achievement*.  That is, athletes and teams that perform better than others on the field, and not in the classroom, will receive these benefits.  Yet, there will be no evidence that these bonuses based on athletic performance that are substantially in excess of COA adversely impact consumer demand for these sports.  For example, thousands of participants in football bowl games are allowed to receive compensation in the form "gift suite" prizes.  As of 2016-17, an FBS football player was able to receive $5,620 in goods or prepaid cash-cards, based on his and his school's athletic success.[59]  Awards available through gift suites can include luxury watches, microwaves, refrigerators, headphones, mountain bikes, and prepaid debit cards from vendors

---

[57] *See, e.g.*, *id.* 168:5-20 ("Q. . . Then Bowl issue category, did you receive each of these things? A. Yes. . . . Q. And the Best Buy gift card was for $452?  A. Yes.  Q. What did you use that for?  A. I bought my mother a TV.").

[58] NCAA (Lennon) Tr. 72:6-73:2 (The NCAA permits certain benefits that are "incidental to participation, and our membership, at any point in time, can agree to change" rules to permit certain benefits "without violating the principle of amateurism . . . *[I]t's related to incidental benefits to participation, and in that category, yes, it's subject to what the membership agrees to provide. This is not related to the principle of amateurism*.") (emphases added); *see also*, *id.* 59:12-16 ("There are items that schools can provide outside of educational expenses, which, again, are tethered to cost of attendance, that I would kind of capture as incidental to participation."); *id.* 74:22-75:5 ("Q. But you agree with me, there are other reasonable expenses which the school could apply under this category that would be incidental to participation that could be allowed? A. Yes. Q. That's why the category was created? A. Yes."); *id.* 93:4-10 ("If the—the benefit provided is permitted within the legislation as either related to educational expenses or . . . incidental to participation, then it would not be considered pay, and it would be permitted. . . ."); *id.* 287:6-19 ("Q. Actually, as you testified a lot today, the membership is also comfortable in allowing expenses made that are incidental to competition—A. Yes. Q. –that are not tethered to educational expenses? A. That is correct. There is a category of things that is incidental to participation that they have carved out and said, yes, there are benefits there that—Q. So there are two areas that the membership is comfortable with? A. That's correct, those two buckets, yes.").

[59] Rascher Decl. ¶¶ 55, 68-72.

24

of consumer products including Best Buy.[60]  Mr. James will testify about one such card he received

worth more than $400[61]—a cash sum untethered to any educational expense.  Moreover, such

incidental-to-participation benefits, on top of COA, include the possibility of thousands of dollars for

professional lost earnings insurance and the possibility of thousands of dollars in payments from sports

federations for Olympic or other national-team success—all without any adverse impact on consumer

demand.[62]

                **c. *SAF and AEF payments.***  Another example of substantial compensation

untethered to education that has been permitted in combination with full COA since *O'Bannon* are

SAF payments, which is money the NCAA distributes from its March Madness (and NIT) basketball

contracts.[63]  In addition to the SAF, the NCAA also distributes funds to D-I schools for the AEF, with

payments of $48 million in 2017-18, compared to $26 million in 2013-14.[64]  Spending from these

programs is available only to college athletes, and so receiving a grant from these programs is

conditioned on athletic participation.

       Cash distributions from the SAF are not capped per athlete, but instead are capped per school,

and student athletes can choose how they spend the SAF money they receive.  The evidence will show

these SAF funds are used to pay for such varied items as groceries, clothes, gas, toys, parking tickets,

and prepaid gift cards to major retailers.  For example, Dr. Rascher will testify about specific examples

of SAF fund payments, including:  (1) a star quarterback receiving $58,914 to purchase professional

loss-of-income insurance; (2) $2,565 for an athlete to travel home after his house burned down; (3)

$1,900 for an athlete's dentist bill; and (4) payments made on behalf of various athletes for "vehicle

repair," "parking tickets," "electric bill," "court fees,"  and "new tires."[65]  The University of Maryland

used SAF money to buy an iPad for all of its athletes, while the University of Minnesota used SAF

funds to pay for the travel of a football player to attend his aunt's funeral, to buy a new dress for a

---

[60] *Id.*

[61] James Tr. 168:5-20.

[62] *See, e.g.*, Noll Decl. ¶¶ 73, 76, 88; Rascher Decl. ¶¶ 46, 53, 59, 62.

[63] Rascher Decl. ¶ 58.

[64] Noll Decl. ¶ 71.

[65] Rascher Decl. ¶¶ 59-60, 77, 82.

1    women's basketball player to wear when she was selected in the WNBA draft, and, more generally, to

2    make grants to 375 athletes that averaged over $1,000 each.[66]

3                    **d. *Pell Grants.*** Finally, in addition to all of the above payments and benefits

4    that are paid in combination with, and in excess of, COA since 2015, low-income Class Members can

5    qualify for and receive additional aid from the federal government—most significantly, Pell Grants.[67]

6    Significantly, following *O'Bannon*, Defendants have permitted athletes to receive both full COA and

7    the full value of any Pell Grant, so that the total received is thousands of dollars in excess of COA.

8    The proportion of Class Members who receive both a COA scholarship and a Pell Grant is not publicly

9    available for all of the conferences and schools in D-I, but the information that is available shows that

10   this proportion is substantial and, in some cases, is half or more of the students who play football or

11   basketball at FBS schools.[68]

12              For example, a financial report to the NCAA by Ohio State University that became public

13   shows that 47 percent of Ohio State football players received Pell Grants in 2016-17, accounting for

14   nearly half of all Pell Grants to male athletes at the school, and that 64 percent of these athletes also

15   received a full COA athletic scholarship.[69]  Nearly one-fourth of Ohio State's men's basketball team

16   and more than half of its women's basketball team received Pell Grants.[70]  The many students who are

17   receiving Pell Grants *and* full COA are thus being paid twice for some of the same expenditures—a

18   significant post-*O'Bannon* change in total compensation for individual Class Members.[71]

19              All told, and as the trial evidence will show, many Class Members already receive thousands

20   of dollars in compensation and benefits in excess of COA and unrelated to education or educational

21

22   _____
     [66] Noll Decl. ¶ 72.

23   [67] *Id.* ¶¶ 78-85.

     [68] *Id.*

24   [69] Noll Decl. ¶ 83.

25   [70] *Id.*

     [71] *See* James Tr. 131:18-132:10 ("Q. I think you said you've been able to save some of that room and
26   board money that you get?  A. Yes.  How much have you been saving? . . . A. . . . when I first got my
     Pell Grant, I put almost all of it in the savings account.  From each check, I usually try to put away like
27   just $100.  Q. And then with the $100 put away, the rest is sufficient to cover rent?  A. Yeah.  I pay
     rent—the first thing I pay is rent.  Q. and then what other expenses do you have?  A. Credit card, food.
28   I usually try to send some home to my family.").

expenses.  In short, the imaginary Maginot line drawn at COA as some kind of defining barrier protecting consumer demand for the sports at issue has not existed since at least 2015.

> **2.    Despite the Availability of Non-Educational Benefits Substantially in Excess of Full COA, Consumer Demand Continues to Thrive**

According to Defendants, the payment of even a penny more than full COA would destroy consumer demand for these sports.[72]  But the truth is that many thousands of dollars—not pennies— have been paid to Class Members in excess of COA since 2015 and demand has not just been maintained, it has substantially grown.  To begin with, the trial evidence will show that Defendants freely admit that there has been no adverse impact on consumer demand as a result of payments to Class Members in excess of COA.[73]  This 30(b)(6) testimony is binding.  Indeed, numerous witnesses from Defendants and their members have given testimony to the effect that "there has been no decrease [in consumer demand] as a result of the [change to] cost of attendance."[74]  Because the undisputed facts show that when this change to COA was made, thousands of dollars in additional benefits were also permitted, these admissions are fatal to Defendants' case.

Further, even Dr. Isaacson, Defendants' flawed survey expert, has opined that upon learning that schools may offer COA scholarships, "a fan . . . may view this new information as making them ***more likely*** to watch or attend" because schools treating their athletes well may engender goodwill with consumers.[75]  The same rationale, of course, would apply to the many benefits and payments in excess of COA.

But even without Defendants' admissions, the economic evidence that consumer demand continues to thrive—notwithstanding the steady increase in compensation for Class Members above-COA—is one-sided and unequivocal.  For example, the evidence will show that the Big 12 Conference's revenues have increased by over $100,000,000 after COA was allowed.[76]  The American

---

[72] *See* Noll Decl. ¶ 50 (quoting Emmert).

[73] NCAA (Lewis) Tr. 112:2-16 (admitting that COA change has not harmed consumer demand).

[74] *Id.* 180:19-21; *see also* Big 12 (Bowlsby) Tr. 68:9-13 (same); Eugene Smith Tr. 129:17-131:19 (Ohio State University has set records in fan interest since COA change).

[75] Isaacson Rep. ¶ 56 (emphasis added); *see also* Isaacson Tr. 239:23-241:18.

[76] Rascher Decl. ¶ 47; *see also* Ex. 32, FRE 1006 Summary of Big 12 Form 990s for FYs 2012-2016.

27

Athletic Conference, Big Ten Conference, Mid-American Athletic Conference, Mountain West Conference, Pac-12 Conference, Southeastern Conference, Sun Belt Conference the Western Athletic Conference, and the NCAA also have each experienced enormous increases in revenue since the implementation of COA and thousands of dollars of additional benefits provided to Class Members.[77]

For example, in 2015-16, the first year when schools could provide COA scholarships along with incidental-to-participation benefits, SAF and AEF benefits, and Pell Grants on top, the schools in the Power Five conferences generated $4.3 billion through their men's and women's basketball programs and FBS football programs, as compared to $4 billion in 2014-15.[78]  In 2016, the NCAA extended its media rights agreement with CBS and Turner for an additional eight years to last through 2032, which pays the NCAA an average annual rights fee of ▇▇▇▇▇▇—an increase of over ▇▇▇▇▇▇ per year.[79]  Likewise, conferences like the Big Ten will receive more than ▇▇▇▇▇▇ from a new television agreement with the Big Ten Network that runs from 2015 through 2032, while the ACC will receive more than ▇▇▇▇▇▇ from ESPN between 2016 and 2036.[80]

Other evidence will also show that individual schools have experienced major revenue increases while offering COA and thousands of dollars in additional compensation to Class Members. For example, Auburn University, an SEC school, announced a $15 million surplus of revenue over costs in the 2015-16 athletics season, while Arizona State, a Pac-12 school, reported an increase of over $10 million in athletic revenue in fiscal year 2016.[81]  In 2015, after schools began offering their athletes COA plus thousands of dollars in additional benefits, Nike reached a multi-year contract worth $250 million in cash and apparel with Ohio State and another $125 million with Michigan in the following year.[82]  And UCLA and Under Armour entered into a deal worth $280 million over 15 years

---

[77] Rascher Decl. ¶ 47; *see also* Ex. 137, FBS Conference Revenues.
[78] Rascher Decl. ¶ 47.
[79] *See* Ex. 45, FRE 1006 Summary of Defendants' Media Agreements.
[80] *Id.*
[81] Rascher Decl. ¶ 44.
[82] *Id.* ¶ 50.

1  in 2016, which at the time was the richest deal ever entered into between a school and its equipment

2  and apparel partner.[83]

3        In sum, the trial record will powerfully show that D-I basketball and FBS football revenues

4  continue to climb to dizzying altitudes—with no signs of adverse impact on consumer demand as Class

5  Members' compensation went from receiving GIA-capped scholarships, to full COA scholarships, to

6  compensation totaling many thousands of dollars in excess of COA per athlete and untethered to

7  education or educational expenses.

8        **3.    Defendants Continue to Prohibit Various Education-Related Compensation and Other Student Welfare Benefits That Could Be Provided without Harm to Consumer Demand**

10        The evidence will further show that, despite all of the *non*-education-related compensation

11  Defendants permit, they nevertheless continue to prohibit numerous categories of education-related

12  compensation and benefits that could be used to further educational achievements and experiences

13  without any adverse impact on consumer demand.  There is simply no plausible justification for

14  Defendants barring these additional kinds of education-related benefits.  Nor is there any justification

15  for Defendants' prohibition of myriad other types of benefits that would enhance the welfare of Class

16  Members as students—such as additional health care benefits for athletes who expose themselves to

17  the threat of serious injuries with lifetime consequences.

18        Specifically, Plaintiffs will offer the *only* consumer survey evidence at trial that actually

19  measures whether conferences or colleges allowing D-I basketball or FBS football players to receive

20  increased compensation and benefits would cause consumers to watch or attend these college sports

21  less often.[84]  Mr. Poret presented 3,000 respondents—1,000 fans of, respectively, D-I women's and

22  men's basketball and FBS football—with the following eight tests scenarios of potential new forms of

23  compensation and benefits for Class Members:[85]

---

[83] *Id.*
[84] *See generally* Poret Decl.
[85] *Id.* ¶¶ 17, 21, 24.

- *Test Scenario 1—Healthcare Fund*:  Conferences or colleges would have the option to create a healthcare fund for players to be used for the sole purpose of paying for future medical costs that might arise as a result of injuries incurred from playing men's college basketball, including concussions.

- *Test Scenario 2—Academic Incentive Payment*:  Conferences or colleges would have the option to provide an incentive payment of up to $10,000 for each school year in which the athlete completes at least 1/5th of the units required to earn a degree and also has a GPA at or above what is required for NCAA eligibility.  The payment would be made in installments.

- *Test Scenario 3—Graduation Incentive Payment*:  Conferences or colleges would have the option to provide a one-time incentive of up to $10,000 for an athlete who earns an undergraduate degree.  This incentive would be available for athletes who earn their degree after their eligibility expires.

- *Test Scenario 4—Post-Eligibility Undergrad Scholarship*:  Conferences or colleges would have the option to provide scholarships that athletes could use at any academic institution, to finish their education after their athletic eligibility expires.  Former players could use these scholarships to complete their undergraduate degree at their current school or at another university, *e.g.*, a university closer to their home or family, or to get training at an accredited technical or vocational institution.

- *Test Scenario 5—Work Study Payment*:  Conferences or colleges would have the option to provide athletes who would have otherwise met the financial-need requirements for their college's work-study program the average amount that other students on the school's work-study program receive.  This payment would replace work study income unavailable to the athlete because of [his/her] commitment to the team.

- *Test Scenario 9—Off-Season Expenses*:  Conferences or colleges would have the option to provide meals, housing and other living expenses for pre-season, breaks and vacations.

- *Test Scenario 10—Grad School Costs*:  Conferences or colleges would have the option to provide scholarships that athletes could use for the cost of attendance for graduate school before or after their athletic eligibility expires.

- *Test Scenario 11—Post-Eligibility Study Abroad*:  Conferences or colleges would have the option to provide scholarships that athletes could use for study abroad programs after their athletic eligibility expires.

In testing these compensation scenarios, Mr. Poret's survey had the same objective as the NCAA survey in the *O'Bannon* case—*i.e.*, to measure how consumer demand would respond to increased compensation or benefits—but he corrected the NCAA's survey design flaws in *O'Bannon* with proper screening questions, procedures, and controls.[86]   The results of his survey enabled Mr. Poret to conclude with a high degree of scientific certainty that there are numerous scenarios in which D-I basketball or FBS football players could be offered additional forms of compensation or benefits by conferences or schools that would have no negative impact on consumer viewership/attendance.[87] Specifically, Mr. Poret found that:

(1)     The baseline rate of answering that consumers would watch or attend college football or basketball less often in various scenarios in which additional forms of compensation or benefits were offered was very low, with most of the results in the range of 2% to 5%;

(2)     These rates of consumers answering that they would watch or attend less often were typically lower than the rates of answering that they would watch or attend more often. This reinforces my conclusion that "less often" results are negligible and indicates that, if anything, permitting these additional forms of compensation or benefits would tend to have a net positive impact on consumers watching or attending FBS college football and Division I basketball; and

(3)     When accounting for the results of controls implemented to ensure the reliability of the data, the net results support my opinion of virtually zero negative impact on consumer viewership/attendance for almost all of the scenarios.[88]

Mr. Poret will further testify that his conclusions are not strictly limited to the specific compensation/benefit scenarios articulated in his survey.[89]   More broadly, his survey shows that numerous forms of compensation/benefits of the type he tested—especially those that related to increased education benefits or improved health care—would not have a negative impact on consumer demand.[90]

---

[86] *See id.* ¶¶ 19-20, 22-54.

[87] *See id.* ¶¶ 59, 131.

[88] *See id.* ¶ 4; *see also* Ex. 141, Net Results from Poret's Survey.

[89] *See* Poret Decl. ¶ 26.

[90] *See* Ex. 141, Net Results from Poret's Survey.  It is common for survey research to be used to draw conclusions and inform decisions with respect to scenarios that are not exactly what were articulated in the survey but which are similar.

1

2

### 4.   Defendants' Compensation Restraints Not Only Do Not Maintain Consumer Demand, They Likely *Reduce It*

3

Lastly, Dr. Rascher will testify that not only do Defendants' restraints not enhance demand,

4

they likely diminish it.  As he will show, D-I basketball and FBS football offer differentiated products

5

to their consumers.  For example, the different conferences are generally organized with different

6

considerations as to their respective geography, school resources, and school size.  They accordingly

7

contract individually (*i.e.*, conference-by-conference) for television agreements,[91] promulgate their

8

own respective rules that regulate matters big and small,[92] create their own schedules, and have their

9

own intellectual property licenses.  Fans frequently adhere to some school loyalties as well as intra-

10

conference rivalries.  The "Big Game" (UC Berkeley versus Stanford) draws different viewers, for

11

example, than Florida versus Florida State, or Auburn versus Georgia, or Michigan versus Michigan

12

State.  There are even more fundamental economic differences between the conferences with respect

13

to the big revenue-generating sports at issue:  no one would confuse the Ivy League, which does not

14

permit athletic scholarships at all, with the SEC, whose members offer full COA along with thousands

15

of dollars in additional benefits.   Dr. Rascher will show that having a uniform national cap on

16

compensation for Class Members fails to optimize consumer demand for the different conferences and

17

their members, and it inhibits conferences from appealing to different consumers based on differing

tastes.[93]

18

As such, even if the Court were to conclude that there was a material procompetitive demand

19

benefit for limiting compensation to Class Members (there is not), that benefit would vary significantly

20

for different conferences, and it would maximize consumer demand to allow each individual

21

conference to decide upon its own need for any compensation restraints.

22

When all of this trial evidence is considered together, the Court will be able to reach only one

23

conclusion:  the post-*O'Bannon* record in this case does not establish any procompetitive impact on

24

25

---

26

[91] *See* Ex. 45.

27

[92] *Compare, e.g.*, Ex. 6, 2016-17 Big Ten Conference Handbook, BIGTEN-GIA 252731, *with* Ex. 9, 2017-18 Mountain West Conference Handbook.

28

[93] Rascher Decl. ¶¶ 174-83.

consumer demand by the challenged restraints in service of Defendants' ever-changing and factually unsupported concept of "amateurism."

**V.    TRIAL ISSUE #2: DEFENDANTS CANNOT MEET THEIR BURDEN TO ESTABLISH THAT THE NATIONAL SCHOLARSHIP CAP *CAUSES* THE "INTEGRATION" OF CLASS MEMBERS INTO COLLEGE LIFE**

   **A.    Defendants Cannot Even Prove That D-I Basketball and FBS Football Players Are Currently Well-Integrated**

      **1.    Because of Their Extensive Athletic Obligations, D-I Basketball and FBS Football Players Have Far Less Integrated College Experiences Than Their Peers, Which Impedes—Rather Than Supports—Academic Success**

It is not surprising that 79% of people who took a recent NCAA poll said "big universities put money ahead of student athletes."[94]  NCAA employees themselves do not dispute this.  To the contrary, they admit that in D-I, "education (meaning academic) experience" is "laughable" because of "[the] distance that separates (especially 'big time') athletics from academia."[95]

The evidence at trial will show that Class Members are required to spend significantly more time on athletics than academics—the very opposite of Defendants' integration defense.[96]  As Plaintiff Shawne Alston (former West Virginia University running back) will testify, "[w]hen you're at those major universities, everything revolves around football"; "they're not going to let you skip football practice" just because "you['ve] got a homework assignment to do."[97]  Similarly, Plaintiff Justine Hartman will recount how her freshman year, even basketball practice—let alone games—routinely caused her to miss class:

> [W]e were let out ten minutes before class started, and I wasn't able to get there

---

[94] Ex 76, Oct. 30, 2017 Knight Comm'n Public Session #1: A Conversation with Mark Emmert Tr. 10:2-8; *id.* 10:9-11 ("Now, I can't think of anything right now 79 percent of Americans agree to, but they agreed to that.").
[95] NCAA National Office Culture and Strategic Plan and Priorities Survey, May 17, 2010 NCAAGIA00515346-557 at NCAAGIA00515479 and NCAAGIA00515482.
[96] Ex. 59, Jan. 2016 NCAA Convention Presentation "Results from the 2015 GOALS Study of the Student-Athlete Experience" at NCAAGIA02739658.
[97] Shawne Alston Tr. 194:19-195:8.

33

1

2

> in time.  So I just was, like, what's the point?  It's an hour class. I get there with 20 minutes left, no food in my system because we only have ten minutes to shower.[98]

3       Class Members and named *Jenkins* plaintiffs Nigel Hayes and Martin Jenkins will provide additional

4       testimony about the academic sacrifices athletes make to support Defendants' big-time D-I basketball

5       and FBS football businesses.  Indeed, 51% of women's D-I basketball players, 50% of FBS football

6       players, and 34% of men's D-I basketball players report that athletics prevented them from taking

7       classes they wanted.[99]

8              The trial evidence will further demonstrate that this "athletes first, students second" reality[100]

9       is exacerbated by the television contracts that govern D-I basketball and FBS football.  To collectively

10      generate billions of dollars in revenues, Defendants surrender control over scheduling games to

11      broadcasters and, in the process, sacrifice Class Members' academic lives and time on campus.[101]

12      Defendants admit that their "stated beliefs [about promoting integration] and [their] actions are too

13      often inconsistent with one another" due to television and revenue-driven conditions like "[late] 9:48

14      tip-off[s]" on school nights, "three days of competition in a row,"[102] and a host of other concessions

15      that place TV broadcasters' needs ahead of athletes'.[103]  They likewise admit that "you can't play

16      college football on Tuesday nights"—which at least one Defendant, the Mid-American Conference,

17      does—"and say you care about education."[104]  Even games on Thursday nights—which many

18      Defendants agree to at the behest of television networks[105]—significantly interfere with academics.[106]

19

20      [98] Justine Hartman Tr. 255:7-12; *see also id.* 89:5-7 (". . . [W]e basically are told, without it being said, that basketball is more important than school.").

21      [99] Ex. 59 at NCAAGIA02739644.

22      [100] An NCAA-commissioned survey found that "[t]he majority of student-athletes report that they view

23      themselves more as athletes than as students." 2008 Convention Presentation "The Student-Athlete Perspective of the College Experience: Findings from the NCAA GOALS and SCORE Studies" NCAAGIA01380324-76 at NCAAGIA01380336.  This finding was corroborated in 2015, when an

24      NCAA follow-up survey revealed that men's basketball and FBS football players spent on average more time during their playing seasons on athletics than academics.  Ex. 59 at NCAAGIA02739656.

25      [101] Ex. 45.

        [102] Bowlsby Tr. 36:3-18.

26      [103] Ex. 45.

27      [104] Big 12 (Bowlsby) Tr. 106:3-107:13.

        [105] Ex. 45.

28      [106] Big 12 (Bowlsby) Tr. 106:3-107:13.

1    Defendants and their member schools' decisions to put demands of sports before everything

2    else negatively impact Class Members' integration into academic and campus life in a variety of ways.

3    The trial will show, for example, that Class Members do not have access to the full slate of classes that

4    regular students enjoy;[107] are steered toward certain classes that are an "easy A" and taught by

5    professors that "seem[] to like athletes";[108] are forced to miss an inordinate amount of lectures (for that

6    subset of classes that the athlete is even able to take);[109] do not have the opportunity to pursue study

7    abroad programs or internships that interest them;[110] live with only each other for the most part;[111] and

8    suffer from sleep deprivation due to their time demands.[112]

9    In response, Defendants will undoubtedly trot out a variety of school and Defendant employees

10   who will claim that their priority is the education and integration of Class Members.  But real-world

11   facts speak louder than self-serving litigation testimony about "priorities" and "intentions," and the

12   facts show that Defendants are primarily guided by financial considerations and the desire to win, with

13   Class Members given the clear message that the demands of their teams come before academics.  One

14

15   [107] A typical Class Member schedule "is so demanding [that athletes] can only have a certain time for classes."  Martin Jenkins Tr. 174:7-10; *see also* Ex. 59 at NCAAGIA02739644 (significant number of

16   Class Members report missing classes they wanted due to athletic obligations).  As a May 2016 Pac-12 Report on Student-Athlete Time concluded: "It is not uncommon for student-athletes to . . . change

17   their majors . . . either because they cannot schedule the classes and other requirements they need, or they cannot keep up with their academic demands due to their sport's time demands."  Ex. 14, May

18   2016 Pac-12 Report on Student-Athlete Time Demands at 16; *see also* Ex. 59 at NCAAGIA02739645 (roughly a third of Class Members prevented from major of choice due to athletics participation).

19   [108] Hartman Tr. 170:22-23.  The May 2016 Pac-12 Report on Student-Athlete Time admitted that "[m]any student-athletes struggle to schedule all the classes they need so as not to conflict with practice

20   time." Ex. 14 at 16; *see also* James Tr. 245:2-246:1 (University of Wisconsin had rule that football players could not have class past 2:30 to accommodate football practice).

21   [109] *See* Ex. 14 at 16 ("Student-athletes in most sports are [] missing significant class time due to travel and competition."); *see also* MAC (Steinbrecher) Tr. 161:8-25 (Tuesday and Wednesday football

22   games require athletes to miss class); Pac-12 (Duane Lindberg) Tr. 38:4-39:13 (Pac-12 does not regulate how long athletes are away from campus).

23   [110] *See* John Swofford Tr. 72:4-6 (confirming that an CAA survey stated that college athletes "would

24   like to have more opportunities to take advantage of internships and study abroad."); Big 12 (Bowlsby) Tr. 110:2-19 (confirming that college athletes would like more opportunities to participate in study

25   abroad and internships); Ex. 14 at 16 ("[S]tudent-athletes find it very difficult to . . . participate in required internships [and] study abroad.").

26   [111] *E.g.*, James Tr. 241:20-242:11 (James has "[n]ever had a roommate . . . at school that is not a football player").

27   [112] *See* Ex. 14 at 6 ("The number-one thing time demands keep them from doing is getting adequate sleep . . . ."); MAC (Steinbrecher) Tr. 162:17-163:19 (Tuesday and Wednesday night football games

28   require athletes to return to campus around 2 a.m. or later during school week).

35

1    example on point is the recent academic fraud scandal at the University of North Carolina ("UNC").

2    The UNC scandal involved athletes being given access to "paper classes"—classes where athletes (1)

3    were assigned little or no work, (2) did not have to complete much, if any, work to pass, and (3) were

4    steered by athletic department advisors seeking to ensure athlete eligibility.[113]   In response, the NCAA

5    decided not to punish UNC at all, and most relevant here, the NCAA disavowed any responsibility to

6    ensure that athletes are "academically integrated," stating instead that "the NCAA **did not assume a**

7    **duty** to ensure the quality of the education student-athletes received at member institutions."[114]

8                    2.      **The Unique Living and Eating Arrangements Offered to D-I Basketball**
                             **and FBS Football Players Further Impede, Rather than Promote,**
9                            **Integration**

10           While "typical" college students share a modest dorm room with a roommate, eat their meals

11   in dining halls open to all, and lift weights in the campus gym, most D-I basketball and FSB football

12   players live an entirely different existence that impedes their integration into campus life.  They live

13   in dorm areas designed specifically for athletes, eat at separate times in athlete-segregated dining halls,

14   and work out in segregated athletic facilities.[115]   These amenities are designed to optimize recruiting

15   and competitive success—not integration.

16           Indeed, the trial evidence will show that rather than encouraging Class Members to integrate

17   into campus life, NCAA member institutions actually promote the fact that their housing and athletic

18   facilities prevent Class Members from interacting with people outside the athletic program. Some

19   examples include:

20
21           •      A Clemson University athletic department spokesman explained that Clemson's
                    football complex, which is exclusively for football players, "'[**will**] **be their home on**
22                  **campus**, when they're not in class.'"[116]

23

24

25   [113] Noll Decl. ¶ 168.
     [114] NCAA Mem. ISO Def.'s Mot. to Dismiss, ECF No. 21, at 15, *McCants v. NCAA, et al.*, No. 1:15-
26   CV-176 (M.D.N.C. Mar. 30, 2015).
     [115] *See generally* Rascher Decl. ¶¶ 136-40 (listing examples of amenities offered exclusively to athletes
27   that serve to segregate them from campus life).
     [116] *Id.* ¶ 138 (emphasis added).
28
                                                        36

- The University of Alabama's 2013 football team facility renovation were specifically designed so that "'It's all on one level and ***essentially gives the team no reason—except for classes—to leave the premises***.'"[117]

- Similarly, the University of Tennessee's $45 million Anderson Training Center was designed so that "'***UT players never have to leave the facility***.'"[118]

Academic literature also supports the point that Class Members are *not* well-integrated due, in part, to their segregated living conditions. As Dr. Rascher will testify at trial, these "segregated athlete villages" cause lasting harm to college athletes by "limit[ing] the amount of interaction a student-athlete can have with nonathletes," thereby "reducing the chances of developing important relationships outside of the team family."[119]

It is a perverse twist that these segregated facilities—which exist only as an inefficient diversion of financial resources away from providing additional compensation forbidden to Class Members by Defendants' rules—contribute to the lack of integration for Class Members.[120]

### B. Even if Class Members Were Well-Integrated, There Is No Credible Evidence That the Challenged Restraints Cause That Integration

Putting aside the reality that Class Members are not well-integrated, and that Defendants have repeatedly taken actions to harm, rather than promote, integration, Defendants' integration defense also fails for an even more fundamental reason: there is no evidence that the challenged compensation caps have any positive connection to integration. Despite their burden of proof on this issue, Defendants have utterly failed to produce any probative support for their integration defense.[121]

Defendants' only expert witness on the topic of integration—Dr. Heckman—cannot provide any evidence to support any causal link. Dr. Heckman will offer opinions on the graduation rates and

---

[117] *Id.* (emphasis added).

[118] *Id.* (emphasis added).

[119] *Id.* ¶ 141.

[120] *Id.* ¶ 140.

[121] The evidence will show that Defendants themselves do not even believe that restricting compensation is necessary in order for an athlete to be "well-integrated" on campus. For example, an NCAA task force comprised of university presidents and chancellors defined the key elements of academic integration without once mentioning capped compensation. Ex. 476, The Value of Integration (NCAAGIA00089673) at 674-675 (noting that "[t]he collegiate model of athletics . . . relies on three fundamental beliefs[,]" none of which has anything to do with restricting compensation provided by member schools).

37

post-college earnings of college athletes.  But, just like in *O'Bannon*,[122] Dr. Heckman cannot provide any evidence to demonstrate that these purported educational benefits were caused or aided by restraining the compensation or benefits of Class Members.[123]  Dr. Heckman's analyses did not test for the impact of compensation and benefits on academic success.  Indeed, he did not even control for the level of any scholarship money that the surveyed college athletes may have received while in college[124]—and thus, for example, he does not know who in his data set was a walk-on, who received a partial scholarship, and who received a full scholarship or other benefits from the schools.[125]  This omission is critical because, without these data, Dr. Heckman is unable to offer any opinion on whether the amount of compensation or other benefits that athletes received from attending school (or was denied by the restraints at issue) had any impact on their academic performance or integration.[126]

Similarly, because he does not know the scholarship amount each athlete was receiving, Dr. Heckman cannot offer any opinion on whether D-I basketball and FBS football players would receive more or less *lifetime benefits* if they were permitted to be better compensated while playing college sports.[127]  Although it is not Plaintiffs' burden to prove that integration is *not* procompetitive, Plaintiffs will nonetheless present the *only* relevant economic evidence on this point—the testimony of Dr. Noll that well-established and peer-reviewed academic literature shows that greater financial resources lead to improved educational outcomes.[128]

---

[122] *O'Bannon*, 7 F. Supp. 3d 955, 980 (N.D. Cal. 2014) ("[N]one of this data nor any of Dr. Heckman's observations suggests that student-athletes benefit specifically from the restrictions on student-athlete compensation that are challenged in this case.").

[123] Noll Decl. ¶ 147-48.

[124] Heckman Tr. 117:9-12, 142:19-20.

[125] *See generally* Pls.' Reply Mem. ISO Mot for Summ. J. (ECF No. 713) at 67 and, Pls.' Reply Mem. ISO Mot. to Exclude (ECF No. 749), at 17-18.

[126] *Id.*

[127] *See generally* Pls.' Reply Mem. ISO Mot for Summ. J. at 67-68 and Pls.' Reply Mem. ISO Mot. to Exclude at 17-18.

[128] Noll Decl. ¶¶ 142-44.  Dr. Heckman testified at deposition that he himself agrees with this unsurprising conclusion.  *See also* Heckman Tr. 140:14-141:4 (recognizing that "credit constraints matter" and that the literature shows a college student's financial resources have a positive effect on the student's propensity to graduate); *id.* 144:3-5 ("[O]nce you control for endogeneity, more resources would lead to more attendance in school.").

1    The economic evidence at trial will further demonstrate that when Defendants changed their

2    rules to permit Class Members to receive a combination of full COA scholarships and additional SAF,

3    AEF, incidental-to-participation benefits, and Pell Grants in the summer of 2015, there was no adverse

4    impact on integration.  As NCAA 30(b)(6) witness Kevin Lennon testified, "there has not been a

5    separation from . . . other students" since cost of attendance became permissible.[129]  Or, as MAC

6    Commissioner Jon Steinbrecher testified, "I see no linkage between the two [the passing of the COA

7    rule and the integration of college athletes]."[130]

8    While Defendants may call school or Defendant employees as witnesses who will attempt to

9    predict negative consequences for integration if Class Member receive additional compensation and

10   benefits in excess of COA, that natural experiment has already taken place.  Defendants will come

11   forward with no evidence that this above-COA compensation has had any impact—much less a

12   negative impact—on integration.  Nor will there be any factual support for the theory advanced by

13   Defendants that increased compensation would incentivize Class Members to abandon their studies.

14   Instead, as Dr. Noll and Dr. Rascher will testify, because the NCAA will be free to continue to

15   impose existing academic eligibility rules, or even strengthen them, increased compensation would

16   have the net effect of providing a greater incentive for Class Members to work to maintain their

17   academics so that they may continue to receive their increased compensation and benefits as

18   academically eligible participants in their sports.  Indeed, the five autonomy conferences already

19   prohibit their schools from canceling athletic scholarships due to athletic performance.[131]  As such, the

20   only ways a Class Member  can lose his or her athletic scholarship at an autonomy conference  is to

21   perform poorly academically or commit a personal conduct violation—and Plaintiffs do not challenge

22

23

24

25   [129] NCAA (Lennon) Tr. 316:4-15.

26   [130] MAC (Steinbrecher) Tr. 180:4-7; *see also* Swofford Tr. 67:25 (noting that the move to COA
     "certainly" did not have a negative effect on the integration of college athletes); Benson Tr. 72:1-5 ("I
27   don't see how . . . allowing full cost of attendance to a student athlete has changed the landscape on
     our campuses.").

28   [131] Noll Decl. ¶ 140.

1  these rules.[132]  Thus, as the value of their compensation rises, Class Members would have an even

2  greater incentive to *increase* the time that they dedicate to academics.[133]

3     In sum, the evidence at trial will confirm the prior testimony of Dr. Janusz Ordover, who has

4  served as an expert for the NCAA in at least three cases (including this one), that even if a Class

5  Member were to make a million dollars, this would not "preclud[e] the fact that the student can actually

6  attend my industrial organization course at NYU."[134]  This conclusion will be further supported by the

7  undisputed facts that there are numerous categories of non-athlete students who have succeeded in

8  college despite also receiving large amounts of compensation for their services while attending school,

9  including actors, musicians, reporters, software engineers, entrepreneurs, and many others.

10 Defendants will not be able to meet their burden of proving why athletes, alone, are the one category

11 of students who cannot be integrated into academic and campus life without having their compensation

12 capped by Defendants.[135]

13     **C.     Even if Defendants Could Prove That Class Members Are Well-Integrated, and
              That This Is *Because of* Defendants' Compensation Caps, the Trial Evidence Will
14            Show That Integration Is Still Not a Valid Procompetitive Justification for a
              Restraint of Trade**

15     As discussed in § II (*supra*), antitrust law does not permit a restraint to be justified by a social

16 policy justification.  Defendants must instead prove a procompetitive effect.  This governing legal

17 standard, by itself, dooms Defendants' integration justification, because the trial evidence will show

18 that the goal of integration—however laudable—does not further consumer demand, output, or any

19 other procompetitive effect.   Indeed, as the NCAA conceded thirty-plus years ago before the

20 Supreme Court:  "we have not argued that any educational or amateurism goals of the NCAA are a

21 good reason for the NCAA to engage in monopolistic practices. . . . because as we read this Court's

---

[132] Noll Decl. ¶ 140.

[133] Noll Decl. ¶¶137-45.

[134] Rascher Decl. ¶ 149.

[135] *Id.* ¶ 148 (citing literature for proposition that "almost half" of traditional college students are employed either part- or full-time); *see also* Blank Tr. 77:23-78:22 (University of Wisconsin chancellor confirming that she has never heard of integration problems for students employed by university while enrolled); Smith Tr. 153:22-157:13 (Ohio State University athletic director confirming that he has never heard of integration problems for students employed by university while enrolled, students who get paid for their talents while enrolled, or students who come from wealthier backgrounds than their peers).

40

1   cases, including *Engineers* and others, the goals other than economic are not reasons for monopolistic

2   practices."[136]

3        As Dr. Rascher will testify, for a restraint to be deemed economically procompetitive, it must

4   have a causal connection to an actual improvement in economic welfare—*i.e.*, the restraint must

5   increase quantity (consumer demand) or quality of output, variety, choice, or, at the very least,

6   minimize anticompetitive wealth transfers.[137]   Defendants, however, will not be able to produce any

7   evidence that integration of Class Members has such an economic effect.  Although the integration of

8   college athletes into campus life may be a positive social policy goal, it is not a legally valid

9   procompetitive justification for the challenged compensation restraints based on the evidentiary record

10  in this case.

11  **VI.   IF NECESSARY, PLAINTIFFS WILL PROVE THE EXISTENCE OF LESS-RESTRICTIVE ALTERNATIVES**

12       Even if Defendants could carry their burden to prove that the challenged restraints cause some

13  procompetitive effect, Plaintiffs will demonstrate that there are less-restrictive ways to do so.  Two

14  such alternatives, in particular, would be virtually—if not actually—as effective in achieving any such

15  procompetitive benefit(s) without significant implementation costs.  Both of these less-restrictive

16  alternatives would yield more competitive and efficient markets for Class Members' services, neither

17  would require any material added costs in terms of implementation and enforcement, and to the extent

18  that individual conferences or schools were to choose to increase compensation or benefits for Class

19  Members, the economic evidence will show that existing and growing revenues could be reallocated

20  so that Defendants' overall costs need not increase.

21

22       **A.   Less-Restrictive Alternative 1:  Complete Conference Autonomy with Respect to Compensation/Benefit Restraints**

23       One viable less-restrictive alternative to the challenged rules would be complete conference

24  autonomy.  Under this alternative, Defendants would be required to move the locus of decision-making

25

26

27  ───────────────
    [136] NCAA Oral Arg., *Bd of Regents*, No. 83-271 (Mar. 20, 1984), available at
    http://www.oyez.org/cases/1980-1989/1983/1983_83_271.

28  [137] *See, e.g.*, Rascher Decl. ¶¶ 4, 25-29.

1    concerning restrictions on compensation and benefits for Class Members away from the national

2    NCAA cartel—comprised, in D-I, of hundreds of diversely-situated horizontal competitors—to the

3    individual D-I and FBS conferences.  The conferences would make their own decisions about whether

4    and to what extent to continue to impose compensation restrictions.  Because no conference currently

5    possesses market power, each would be free, under the rule of reason, to decide for itself how best to

6    compensate Class Members for the valuable athletic services they provide.  Mr. Poret's consumer

7    survey will demonstrate compelling evidence that conferences could permit a wide range of additional

8    compensation and benefits not currently permitted without adversely impacting consumer demand.[138]

9    Nonetheless, if conferences have a genuine belief that amateurism or integration are procompetitive,

10   they would be free to enact rules accordingly.

11        Further, as Drs. Rascher and Noll will testify, the complete conference autonomy alternative

12   would unleash competition *between* the conferences for Class Members' services while at the same

13   time permitting schools *within* an individual conference to adopt rules to preserve any procompetitive

14   benefit the Court finds in amateurism and/or integration.[139]   Any given conference could thereafter

15   decide to enact new compensation restrictions, eliminate all such restrictions, or adopt a middle

16   ground.  And, because the trial evidence will demonstrate that individual conferences already enact

17   and enforce different compensation rules—*e.g.*, the Ivy League does not permit any athletic

18   scholarships, other conferences permit "grant-in aid" scholarships, and still others provide for full

19   COA plus Pell Grants and additional SAF, AEF, and participation benefits—there will be virtually no

20   increase in implementation costs to effectuate this less-restrictive alternative.[140]

21        In addition, because the less-restrictive alternative of complete conference autonomy would

22   not *require* conferences to allow any additional benefits—much less *require* individual schools to

23   provide any such newly permitted benefits—it would not compel *any* increase in costs at any particular

24   institution.  Rather, the only additional compensation costs incurred would be those that individual

25   conferences *chose* to permit, and that individual schools in turn *chose* to provide.  And the economic

[138] Poret Decl. at ¶¶ 4-5, 59, 131.
[139] *See, e.g.*, Noll Decl. ¶¶ 184-206; Rascher Decl ¶¶ 174-80.
[140] Rascher Decl ¶ 244.

42

1    evidence will show that to the extent competition results in a reduction of monopoly profits, this is not

2    the implementation cost of any less-restrictive alternative.  It would instead be the expected and natural

3    consequence of eliminating the unreasonable restraint of trade.  Moreover, Dr. Rascher will introduce

4    evidence that there is ample and ever-growing revenue that affords schools the ability to efficiently

5    reallocate funding away from coaches, trainers, administrators, stadia and dormitories, and towards

6    the Class Members who generate Defendants' enormous revenues and are the subject of Defendants'

7    unlawful restraints.[141]

8

9    **B.    Less-Restrictive Alternative 2:  Striking Down the Challenged Rules Except to the Extent That Such Rules Prohibit Cash Sums Untethered to Educational Expenses (Other Than Participation Benefits)**

10

11        As another less-restrictive alternative to the challenged rules, Plaintiffs' experts will

12   demonstrate that Defendants could repeal the NCAA's existing compensation caps except to the extent

13   that such caps ban cash sums untethered to educational expenses. This less-restrictive alternative would

14   be based upon the ruling in *O'Bannon* that distinguished between "education-related compensation"

15   and "cash sums untethered to educational expenses" and thus has no conceivable risk of running afoul

16   of any claimed amateurism or integration principle.[142]  The NCAA could not, under this less-restrictive

17   alternative, continue to cap either education-related compensation or the amount of already permitted

18   participation benefits—some of which (such as *per diems* and reimbursement of family travel or

19   training expenses) may be paid as cash sums untethered to educational expenses.  There is no basis for

20   the NCAA to continue to cap such participation benefits in the face of the NCAA's binding admissions

21   that the provision and amount of such benefits are not related to any principle of amateurism.[143]

22        Moreover, the Poret survey specifically tested for the potential impact of conferences or schools

23   providing various forms of education-related benefits to Class Members that are currently banned—

24   from academic and graduation incentive payments, to post-eligibility graduate school costs, to study

25   abroad—and found that there would be no adverse impact on consumer demand were such additional

26   ─────────────────

27   [141] Rascher Decl. ¶¶ 211-244 .
     [142] *O'Bannon*, 802 F. 3d at 1078.

28   [143] NCAA (Lennon) Tr. 58:20-59:1.

benefits permitted.[144]  More broadly, the Poret survey and the testimony of Drs. Rascher and Noll will demonstrate that there are many new forms of compensation and benefits that schools could offer to Class Members that would further educational and integration objectives, such as lifetime health insurance or academic achievement incentives, without hurting viewership or attendance for D-I basketball or FBS football.[145]

This less-restrictive alternative would be virtually—if not equally—effective in achieving any procompetitive benefits found by the Court without significantly increasing Defendants' implementation costs for the same reasons described above with respect to the complete conference autonomy alternative.

### C.    Net Balancing of Any Pro- and Anticompetitive Effects

In the event that the Court were to conclude that Plaintiffs have not meet their burden to prove a less-restrictive alternative, Plaintiffs would still prevail at trial because the net balance of any pro- and anticompetitive effects tilts decisively toward finding that the challenged rules are unreasonable restraints of trade.  This conclusion follows from the Court's summary judgment decision that the challenged rules cause substantial anticompetitive effects in the relevant markets by completely eliminating competition for Class Members in terms of compensation and benefits.  Weighing this complete suppression of price competition for Class Members' services against whatever negligible procompetitive effects the Court might find will compel the judicial determination that, on balance, the compensation caps are unreasonable.

## VII.    REMEDY

### A.    Requested Injunction

Plaintiffs propose a traditional antitrust injunction[146] that would prevent Defendants from colluding to enforce the challenged rules, along with any future rules that are substantially similar in purpose and effect, regarding the compensation and benefits that schools may provide to Class Members for their athletic services.  This injunction would not prevent individual conferences that

---

[144] Poret Decl. ¶¶ 18, 22-24.
[145] Poret Decl. ¶¶ 4-5, 59, 131; Noll Decl. ¶¶ 9, 139-48; Rascher Decl. ¶¶ 67-91.
[146] *See* App'x. C, attached.

1    lack market power from adopting their own rules to limit compensation—so long as the conferences

2    did not collude with one another or with the NCAA.

3          This injunction would completely remedy Defendants' antitrust violation and free the market

4    from the adverse effects of the unlawful restraints.  *See Ford Motor Co. v. United States*, 405 U.S. 562,

5    577–78 (1972) ("Antitrust relief should unfetter a market from anticompetitive conduct and pry open

6    to competition a market that has been closed by defendants illegal restraints") (internal citation and

7    quotation omitted); *Pac. Coast Agr. Exp. Ass'n v. Sunkist Growers, Inc.*, 526 F.2d 1196, 1208 (9th Cir.

8    1975) (recognizing that "a private antitrust decree may and should be broad enough to restore

9    competition in the relevant market"); *cf. United States v. Apple Inc.*, 992 F. Supp. 2d 263, 280

10   (S.D.N.Y. 2014), *aff'd*, 787 F.3d 131 (2d Cir. 2015) ("Because the relief in an antitrust case must be

11   effective to redress the violations and to restore competition, the District Court is clothed with large

12   discretion to fit the decree to the special needs of the individual case.") (internal citations and quotation

13   marks omitted).

14         Moreover, the injunction would be easy for Defendants to comply with and has the additional

15   benefit of eliminating the threat of future antitrust litigation challenging new rules that might be

16   adopted by the individual conferences (*i.e.*, no "whack-a-mole").  The reason is that conferences

17   without market power do not face a material antitrust risk under the rule of reason.  *See Lucas v.*

18   *Citizens Commc'ns Co.*, 409 F. Supp. 2d 1206, 1220 (D. Haw. 2005), *aff'd*, 244 F. App'x 774 (9th Cir.

19   2007) ("under the Rule of Reason, Plaintiff must prove that the Defendants have market power in the

20   relevant market"); *L.A.P.D. Inc. v. General Elec. Corp.*, 132 F.3d 402, 405 (7th Cir. 1997) ("proof of

21   market power is essential; without it, any case under the Rule of Reason collapses").

22         The requested injunction would also eliminate Defendants' objections to judicial "micro-

23   management" of college athletics because conferences would decide for themselves whether and to

24   what extent to restrict their members from offering compensation and benefits to Class Members.  The

25   economic evidence indicates that the likely outcome would be a diversity of conference rules and

26   competition as different schools aligned themselves in conferences with like-minded institutions.  This

27   would be consistent with the existing conference framework in which there are already significant

28

                                          45

differences in compensation rules, and a return to an earlier period of conference autonomy during which, as Drs. Rascher and Noll will testify, demand for the sports at issue thrived.[147]

## B.   Alternative Injunction

In the alternative, if the Court finds that the requested injunction is too broad, Plaintiffs propose a more narrow injunction[148] that would enjoin the NCAA and the conferences from acting in concert to enforce the challenged rules, and any future rules that are substantially similar in purpose and effect, *except for* compensation rules restricting or prohibiting the payment of cash sums untethered to educational expenses.  In addition, this alternative injunction would bar the NCAA from continuing to cap the existing participation benefits identified by Mr. Lennon—even if paid in the form of a cash sum untethered to an educational expense—because the NCAA has admitted that this category of benefits is unrelated to any ostensible procompetitive justification.[149]

The alternative injunction would also be easy to comply with because the line between "cash sums untethered to educational expense" and "education-related compensation" has already been delineated by the Ninth Circuit in *O'Bannon*, and the permitted participation benefits have been expressly identified by NCAA 30(b)(6) witness Lennon and in specific NCAA rules.  *See* App'x C.

Finally, Plaintiffs propose that either injunction, once granted, should be stayed for ninety days to permit Defendants and non-defendant conferences to promulgate any new rules in light of, and consistent with, the Court's ruling.

## VIII.   CONCLUSION

In contrast to the record in *O'Bannon*, the record in this case will not permit Defendants to meet their burden to prove that the challenged restraints cause or are necessary to achieve any procompetitive benefit.  Instead, the facts will establish that Defendants have voluntarily abandoned their purported barriers holding back compensation in excess of COA and incurred no adverse impact on consumer demand or integration as a result, destroying the very premise of their defenses.  This

---

[147] Noll Decl. ¶¶ 30-36; Rascher Decl. ¶¶ 92-106.

[148] *See* App'x. D, attached.

[149] *See* NCAA (Lennon) testimony that these benefits are unrelated to the principle of amateurism (*supra* n.58) and that they have not led to any additional separation between Class Members and other students (*supra* n.129).

1   factual record—and, if needed, the clear existence of viable less-restrictive alternatives—will compel

2   a trial judgment in Plaintiffs' favor and entry of the requested injunction based upon the Court's

3   findings of fact and conclusions of law.

4

5   DATED: July 6, 2018                          Respectfully submitted,

6   HAGENS BERMAN SOBOL SHAPIRO LLP              WINSTON & STRAWN LLP

7   By    /s/ Steve W. Berman                    By    /s/ Jeffrey L. Kessler
8        STEVE W. BERMAN (*pro hac vice*)             JEFFREY L. KESSLER (*pro hac vice*)

9   Craig R. Spiegel (SBN 122000)                David G. Feher (*pro hac vice*)
    1918 Eighth Avenue, Suite 3300               David L. Greenspan (*pro hac vice*)
10  Seattle, WA 98101                            Joseph A. Litman (*pro hac vice*)
    Telephone: (206) 623-7292                    200 Park Avenue
11  Facsimile: (206) 623-0594                    New York, NY 10166-4193
    steveb@hbsslaw.com                           Telephone: (212) 294-6700
12  craigs@hbsslaw.com                           Facsimile: (212) 294-4700
                                                 jkessler@winston.com
13  Jeff D. Friedman (SBN 173886)                dfeher@winston.com
    HAGENS BERMAN SOBOL SHAPIRO LLP              dgreenspan@winston.com
14  715 Hearst Avenue, Suite 202                 jlitman@winston.com
    Berkeley, CA 94710
15  Telephone: (510) 725-3000                    Sean D. Meenan (SBN 260466)
    Facsimile: (510) 725-3001                    Jeanifer E. Parsigian (SBN 289001)
16  jefff@hbsslaw.com                            WINSTON & STRAWN LLP
                                                 101 California Street
17  PEARSON, SIMON & WARSHAW, LLP                San Francisco, CA 94111
                                                 Telephone: (415) 591-1000
18  By    /s/ Bruce L. Simon                     Facsimile: (415) 591-1400
         BRUCE L. SIMON (SBN 96241)              smeenan@winston.com
19                                               jparsigian@winston.com
    Benjamin E. Shiftan (SBN 265767)
20  44 Montgomery Street, Suite 2450             *Class Counsel for Jenkins and Consolidated*
    San Francisco, CA 94104                      *Action Plaintiffs*
21  Telephone:  (415) 433-9000
    Facsimile:  (415) 433-9008
22  bsimon@pswlaw.com
    bshiftan@pswlaw.com
23
    *Class Counsel for Jenkins and Consolidated*
24  *Action Plaintiffs*

25  By   /s/ Elizabeth C. Pritzker
         Elizabeth C. Pritzker (SBN 146267)
26       Jonathan K. Levine (SBN 220289)
         Bethany L. Caracuzzo (SBN 190687)
27       Shiho Yamamoto (SBN 264741)
         PRITZKER LEVINE LLP
28       180 Grand Avenue, Suite 1390

47

Oakland, California 94612
Telephone: (415) 692-0772
Facsimile: (415) 366-6110

*Additional Class Counsel*

1  **ATTESTATION PURSUANT TO CIVIL LOCAL RULE 5-1(i)(3)**

2     Pursuant to Civil Local Rule 5-1(i)(3), the filer of this document attests that concurrence in the

3  filing of this document has been obtained from the signatories above.

5     /s/ *Jeffrey L. Kessler*
          Jeffrey L. Kessler

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1

## APPENDIX A: NCAA ENFORCEMENT RULES (CATEGORY 2)

| Category 2: NCAA Enforcement Rules[1] | |
|---|---|
| **Rule** | **Summary** |
| NCAA Bylaw 12.1.2 | **Amateur Status**: Athlete loses amateur status and eligibility if, *inter alia*, he or she uses athletics skill for pay in his or her sport. |
| NCAA Bylaw 3.1.2.4 | **Eligibility Requirements for Student-Athletes**: Eligibility premised upon compliance with compensation limits. |
| NCAA Bylaw 3.2.1.2 | **Compliance with Association Rules**: "The institution shall administer its athletics programs in accordance with" NCAA constitution, bylaws and other legislation. |
| NCAA Bylaw 3.2.4.10 | **Discipline of Members**: Forbids member schools from competing against institutions that do not comply with compensation limits. |
| NCAA Bylaw 3.2.5 *et seq.* | **Loss of Active Membership**: Provides for punishment of institution that does not comply with compensation limits. |
| NCAA Bylaw 3.2.6 *et seq.* | **Discipline of Active Members**: Provides for punishment of institution that does not comply with compensation limits. |
| NCAA Bylaw 3.3.5 *et seq.* | **Loss of Member—Conference Status**: Provides for punishment of conference whose members do not comply with compensation limits. |
| NCAA Bylaw 3.3.6 *et seq.* | **Discipline of Member Conferences**: Provides for punishment of conferences that do not comply with compensation limits. |
| NCAA Bylaw 19.01.2 | **Accountability**: Provides for punishment of institution or individual that does not comply with compensation limits. |
| NCAA Bylaw 19.01.4 | **Penalty Structure**: Provides for punishment of institution or individual that does not comply with compensation limits. |
| NCAA Bylaw 19.3.6 *et seq.* | **Authority and Duties of Committee**: Enumerates disciplinary power of committee charged with punishing an institution or individual that does not comply with compensation limits. |
| NCAA Constitution Art. 1.3.2 | **Obligations of Member Institutions**: "Legislation governing the conduct of intercollegiate athletics programs of member institutions shall apply to basic athletics issues such as admissions, financial aid, eligibility and recruiting. Member institutions shall be obligated to apply and enforce this legislation, and the infractions process of the Association shall be applied to an institution when it fails to fulfill this obligation." |
| NCAA Constitution Art. 2.8.3 | **Penalty for Noncompliance**: "An institution found to have violated [NCAA] rules shall be subject to" disciplinary action as determined by the NCAA. |

[1] Ex. 24.

| NCAA Constitution Art. 3.2.4.1 | **Conditions and Obligations of Membership**: NCAA members "agree to administer their athletics programs in accordance with" NCAA rules. |
| NCAA Constitution Art. 5.01.1 | **Basis of Legislation**: All NCAA legislation governing conduct of members' athletics programs "shall be adopted by the membership. . . ." |

2

**APPENDIX B: CONFERENCE RULES INCORPORATING NCAA RULES (CATEGORY 3)**

| Category 3: Conference Rules Incorporating NCAA Rules | |
|---|---|
| **Rule** | **Summary** |
| **American Athletic Conference (AAC)**[1] | |
| AAC Policy Manual at 42 | **Minimum Qualifying Standards Policy**: Member programs shall comply with "NCAA policies and procedures." |
| AAC Policy Manual at 44-46 | **Student Assistance Fund Guidelines**: SAF distributions shall be administered "in accordance with NCAA policies." |
| **Atlantic Coast Conference (ACC)**[2] | |
| ACC Constitution Art. II | **General Purpose**: Conference aims to "promote amateurism" and "foster compliance" with NCAA rules. |
| ACC Bylaw Art. II | **NCAA Regulations**: Members "bound by NCAA rules and regulations," unless ACC rules are more restrictive. |
| **Big Ten Conference (Big Ten)**[3] | |
| Big Ten Bylaw 6.01.1 *et seq.* | **Institutional Responsibility for Compliance**: Each member must adhere to and enforce NCAA rules. |
| Big Ten Bylaw 14.01.3 | **Compliance with NCAA and Conference Legislation**: NCAA rules govern athlete eligibility; all varsity sports subject to NCAA and conference legislation. |
| **Big 12 Conference (Big 12)**[4] | |
| Big 12 Bylaw 1.3.2 | **Adherence to NCAA Rules**: Members "shall be fully committed to compliance" with NCAA rules. |
| Big 12 Bylaw 1.3.3.1 | **Minimum Amount**: Athletically related financial aid shall be "based on the maximum amount permitted by NCAA Bylaws." |
| Big 12 Bylaw 6.1 | **Eligibility Rules**: Athletes "must comply with" NCAA minimums to be eligible for sports. |
| Big 12 Bylaw 6.5.3 | **Financial Aid Reports**: Each institution shall comply with NCAA financial aid legislation. |
| Big 12 Bylaw 6.6.(a) | **Recruiting Code of Ethics**: Any individual engaged in recruiting shall comply with NCAA rules. |
| **Conference USA (C-USA)**[5] | |
| C-USA Bylaw 3.05(a) | **Member Covenants**: Members "covenant[] and agree[]" to administer athletics "in accordance with NCAA" rules. |

[1] Ex. 2, 2017-18 American Athletic Conference Policy Manual.
[2] Ex. 3, 2015-16 ACC Manual.
[3] Ex. 6, 2016-17 Big Ten Conference Handbook, BIGTEN-GIA 252731.
[4] Ex. 5, 2017-18 Big 12 Conference Handbook.
[5] Ex. 7, 2017-18 Conference USA Membership Handbook.

1

CORRECTED PLAINTIFFS' OPENING ARGUMENT MODIFIED TO REFLECT FINAL TRIAL EXHIBIT NUMBERS, APPENDIX B
CASE NO. 4:14-MD-02541-CW

| | |
|---|---|
| **Mid-American Conference (MAC)[6]** | |
| MAC Constitution Art. II(B) | **Purpose**: Members "ascribe to" "compliance with and vigilant enforcement" of NCAA rules. |
| MAC Bylaw 3.03 | **Recruitment of Prospective Student-Athletes**: Coaches, staff "shall observe and promote" NCAA rules. |
| MAC Bylaw 5.01 | **Mid-American Conference Eligibility**: Eligibility "shall be determined by the requirements set forth in the NCAA Manual . . . ." |
| MAC Bylaw 5.05 | **NCAA 14.01.3 – Compliance with Other NCAA and Conference Legislation**: Athlete shall comply with all NCAA rules. |
| MAC Bylaws App'x at 284-85 | **NCAA Student Assistance Fund Administrative Procedures**: May not use SAF money to pay stipends. |
| **Mountain West Conference (MWC)[7]** | |
| MWC Rule 3.2 | **Eligibility for Regular Season Competition and NCAA Championships**: Unless conference rules more restrictive, financial aid and recruiting are governed by NCAA rules. |
| MWC Rule 5.1 | **Institutional Responsibility**: Each school "shall enforce eligibility rules and regulations of the NCAA . . . ." |
| MWC Bylaw 1.01(c) | **Compliance with Rules**: All members "agree to abide by and fully comply" with NCAA rules. |
| **Pac-12 Conference (Pac-12)[8]** | |
| Pac-12 Bylaw 4.2 | **Application of NCAA Legislation**: All members bound by NCAA rules unless conference rules more demanding. |
| Pac-12 Exec. Reg. 2-1 | **Recruiting**: NCAA rules shall govern recruiting. |
| Pac-12 Exec. Reg. 3-1 | **NCAA Rules**: NCAA rules govern financial aid unless conference modifies them. |
| Pac-12 Exec. Reg. 4-1 | **NCAA Rules**: NCAA rules govern athlete eligibility unless conference modifies them. |
| **Southeastern Conference (SEC)[9]** | |
| SEC Constitution Art. 5.01.1 | **Governance**: Conference governed by its own rules and those of the NCAA. |
| SEC Bylaws Art. 14.01.1 | **Compliance with Other NCAA and Conference Legislation**: Athletes must comply with NCAA rules. |
| SEC Bylaws Art. 15.01.1 | **Institutional Financial Aid Permitted**: Financial aid "must be awarded in accordance with all" NCAA rules. |
| **Sun Belt Conference (Sun Belt)[10]** | |

---

[6] Ex. 8, 2017-18 Mid-American Conference Composite Handbook, MAC_015569.

[7] Ex. 9, 2017-18 Mountain West Handbook.

[8] Ex. 10, 2017-18 Pac-12 Conference Handbook.

[9] Ex. 11, 2017-18 SEC Constitution and Bylaws.

[10] Ex. 12, Sun Belt Conference Constitution & Bylaws (Revised 08/16/2017).

2

| Sun Belt Constitution Art. 1.3(b) | **Purpose**: Conference aims to provide positive experience to athletes by adhering to NCAA rules. |
|---|---|
| Sun Belt Bylaw 7.12 | **Student-Athlete Opportunity Fund**: SAF funds administered in accordance with NCAA rules. |
| Sun Belt Bylaw 9.1 | **Individual Eligibility**: Athletes must meet NCAA eligibility standards. |
| Sun Belt Bylaw 9.1.2 | **Improper Benefits**: Athlete may not accept benefits beyond those allowed by conference (and NCAA as result). |

**Western Athletic Conference (WAC)**[11]

| WAC Code Book at 4 | **Statement of Principles for Intercollegiate Athletics**: Athletics personnel expected to comply with NCAA rules. |
|---|---|
| WAC Code Book § 1, Art. 3(4) | **Application of NCAA Legislation**: Members "bound by NCAA rules and regulations unless Conference rules are more demanding." |
| WAC Code Book § 2, Art. 8(6) | **NCAA Student Assistance Fund**: SAF money to be distributed according to NCAA rules. |
| WAC Code Book § 2, Art. 9(1)(a) | **Eligibility for Regular Season Competition, Post-Season Competition and NCAA Championships**: Eligibility rules are those promulgated by NCAA unless the conference establishes additional requirements. |
| WAC Code Book § 2, Art. 9(2) | **Financial Aid**: Conference rules are consistent with NCAA rules governing financial aid. |
| WAC Code Book § 2, Art. 9(3) | **Recruiting**: Conference rules are consistent with NCAA rules governing recruiting. |
| WAC Code Book § 3, Art. 2(1) | **Institutional Responsibility**: Members are responsible for enforcing NCAA rules. |
| WAC Code Book § 3, Art. 2(4) | **Violations**: Member violates compliance procedures when it fails to ensure compliance with NCAA rules. |

[11] Ex. 13, 2017-18 Western Athletic Conference Code Book.

**APPENDIX C: NCAA RULES REGULATING BENEFITS INCIDENTAL TO PARTICIPATION**

| NCAA Rules Regulating Benefits Incidental to Participation | | |
|---|---|---|
| **Benefit** | **Rule[1]** | **NCAA (Lennon) Tr.** |
| Apparel, equipment and supplies | NCAA Bylaw 12.02.2(c) | 60:3-64:1 |
| Health/medical insurance | NCAA Bylaw 12.02.2(e) | 66:1-68:12 |
| Transportation | NCAA Bylaw 12.02.2(f) | 68:13-69:11; 71:7-73:2 |
| Facility usage and entry fees | NCAA Bylaw 12.02.2(h)-(i) | 73:4-7 |
| Other reasonable expenses | NCAA Bylaw 12.02.2(j) | 73:22-75:8 |
| Unitemized incidental expenses in excess of $30 per day during travel and practice for NCAA championship or bowl game | NCAA Bylaw 16.8.1.1 | 83:14-85:23 |
| Actual and necessary expenses in connection with established regional and national championship events; Olympic Games (and other international competitions); national team tryouts | NCAA Bylaw 16.8.1.2(a)-(c) | 86:17-87:13 |
| Fees related to conditioning activities | NCAA Bylaw 16.8.1.3 | 88:6-24 |
| Actual and necessary expenses in connection with competitions prior to enrollment | NCAA Bylaw 12.1.2.1.4.3.1 | 109:17-110:4 |
| Prize money up to $10,000 per year for tennis competitions, and up to actual and necessary expenses for other competitions, prior to enrollment | NCAA Bylaws 12.1.2.4.1, 12.1.2.4.2 | 110:5-116:5 |
| Participation Awards | NCAA Bylaws 16.1.4.1, 16.1.4.1.2; Figures 16-1, 16-2, 16-3 | 119:18-122:22 |
| Senior Scholar Athlete Award to two graduating seniors of a tangible item valued up to $175 and a post graduate scholarship up to $10,000 | NCAA Bylaw 16.1.4.1.1 | 177:22-180:22 |
| Olympic and national governing body performance awards | NCAA Bylaws 12.1.2.1.4.1.2, 12.1.2.1.4.1.3 | 48:8-51:24 |
| Educational expenses paid for by national governing bodies | NCAA Bylaws 12.1.2.1.3.2.1, 12.1.2.1.3.2.2, 15.2.6.4 | 102:25-106:12 |
| Borrowing against future earnings only for the purchase of loss-of-value insurance | NCAA Bylaw 12.1.2.4.4 | 127:4-131:22 |
| Expenses for spouses/children to attend post-season Bowl game or NCAA Championship | NCAA Bylaw 16.6.1.1 | 185:23-186:16 |

---

[1] Ex. 24.

1

| Expenses for parents/guardians of participants in athletics competition | NCAA Bylaw 12.1.2.1.4.4 | 116:6-117:25 |
|---|---|---|

2

1

**APPENDIX D: PROPOSED INJUNCTION**

2

**UNITED STATES DISTRICT COURT**

3

**NORTHERN DISTRICT OF CALIFORNIA**

4

**OAKLAND DIVISION**

5
6
7

| | |
|---|---|
| IN RE: NATIONAL COLLEGIATE ATHLETIC ASSOCIATION ATHLETIC GRANT-IN-AID CAP ANTITRUST LITIGATION | Case No. 4:14-md-02541-CW (CW) Case No. 4:14-cv-02758-CW (CW) **[PROPOSED] ORDER GRANTING INJUNCTION** |

8
9
10

THIS DOCUMENT RELATES TO:

ALL ACTIONS

11

12          The Court, having duly considered the evidence presented at the bench trial in this matter and

13   consistent with its findings of fact and conclusions of law hereby orders as follows:

14          1.   Defendant National Collegiate Athletic Association ("NCAA"), and its officers, agents,

15               servants, employees, and any person in active concert or participation with them who

16               receive actual notice of this order by personal service or otherwise, are hereby

17               permanently restrained and enjoined from maintaining, adopting, executing or

18               attempting to execute, enacting, agreeing to, or enforcing or attempting to enforce, now

19               or in the future, any constitutional provision, bylaw, rule, regulation, interpretation,

20               policy, membership condition, or eligibility form that fixes or limits compensation or

21               benefits available from schools or conferences to Division I women's and men's

22               basketball and FBS football athletes in consideration for their athletic services.

23          2.   Defendants, and their officers, agents, servants, employees, and any person in active

24               concert or participation with them, who receive actual notice of this order by personal

25               service or otherwise, are hereby permanently restrained and enjoined from agreeing,

26               directly or indirectly, with each other or any other collegiate athletic conference to fix

27               or limit the compensation or benefits available from schools or conferences to Division

28

1

CORRECTED PLAINTFFS' OPENING ARGUMENT MODIFIED TO REFLECT FINAL TRIAL EXHIBIT NUMBERS, APPENDIX D
CASE NO. 4:14-MD-02541-CW

I women's and men's basketball and FBS football athletes in consideration for their athletic services.

3. Defendants and their officers, agents, servants, employees, attorneys, and any person in active concert or participation with them, who receive actual notice of this order by personal service or otherwise, are hereby permanently restrained and enjoined from violating or continuing to violate Section 1 of the Sherman Act (15 U.S.C. § 1) by agreeing to fix or limit the compensation or benefits available from schools or conferences to Division I women's and men's basketball and FBS football athletes in consideration for their athletic services..

4. Nothing herein contained shall be construed as prohibiting an individual conference or individual school from independently establishing rules that limit compensation or benefits available from members of a particular conference or that individual school to Division I women's and men's basketball and FBS football athletes in consideration for their athletic services.

5. Nothing herein contained shall be construed to prohibit the NCAA from continuing to enforce its rules regarding academic eligibility, third-party payments to college athletes, transfers, name, image, and likeness rights, or other NCAA regulations not challenged in this case.

6. This Order shall go into effect in ninety (90) days from its date of issuance.

7. Any party may seek modification of this Order, at any time, by written motion and for good cause based on changed circumstances or otherwise.

8. This Court shall retain jurisdiction to enforce this Order.  In the event that any part of this Order is violated by the parties named herein or other persons, Plaintiffs may, by motion with notice to the attorneys for the Defendants, apply for sanctions or other relief that may be appropriate.

**IT IS SO ORDERED**

2

CORRECTED PLAINTIFFS' OPENING ARGUMENT MODIFIED TO REFLECT FINAL TRIAL EXHIBIT NUMBERS, APPENDIX D
CASE NO. 4:14-MD-02541-CW

1

## APPENDIX E: PROPOSED ALTERNATIVE INJUNCTION

2

3

### UNITED STATES DISTRICT COURT

### NORTHERN DISTRICT OF CALIFORNIA

4

### OAKLAND DIVISION

5

| | |
|---|---|
| IN RE: NATIONAL COLLEGIATE ATHLETIC ASSOCIATION ATHLETIC GRANT-IN-AID CAP ANTITRUST LITIGATION | Case No. 4:14-md-02541-CW (CW) Case No. 4:14-cv-02758-CW (CW) **[PROPOSED] ORDER GRANTING ALTERNATIVE INJUNCTION** |
| THIS DOCUMENT RELATES TO: ALL ACTIONS | |

6

7

8

9

10

11

12      The Court, having duly considered the evidence presented at the bench trial in this matter and

13  consistent with its findings of fact and conclusions of law hereby orders as follows:

14      1.  Defendant National Collegiate Athletic Association, its officers, agents, servants,

15          employees, and any person in active concert or participation with them who receive

16          actual notice of this order by personal service or otherwise, are hereby permanently

17          restrained and enjoined from maintaining, adopting, executing or attempting to execute,

18          enacting, agreeing to, or enforcing or attempting to enforce, now or in the future, any

19          constitutional provision, bylaw, rule, regulation, interpretation, policy, membership

20          condition, or eligibility form that fixes or limits compensation or benefits, including,

21          without limitation, the benefits set forth in Attachment 1 hereto that have been

22          identified by the NCAA as incidental to participation benefits, that may be made

23          available from conferences or schools to Division I women's and men's basketball and

24          FBS football athletes in consideration for their athletic services.

25      2.  Notwithstanding Paragraph 1, the NCAA may maintain, adopt, and enforce rules

26          banning or restricting the provision by conference or schools of cash compensation to

27          Division I women's and men's basketball and FBS football players in consideration for

28

1

CORRECTED PLAINTFFS' OPENING ARGUMENT MODIFIED TO REFLECT FINAL TRIAL EXHIBIT NUMBERS, APPENDIX E
CASE NO. 4:14-MD-02541-CW

their athletic services that is not tethered to education related expenses or benefits, so long as such cash compensation is not one of the incidental to participation benefits set forth in Attachment 1.

3. Defendants, and their officers, agents, servants, employees, and any person in active concert or participation with them, who receive actual notice of this order by personal service or otherwise, are hereby permanently restrained and enjoined from agreeing, directly or indirectly, with each other or any other collegiate athletic conference to fix or limit the compensation or benefits, other than cash compensation that is not tethered to education related expenses or benefits, so long as such cash compensation is not one of the incidental to participation benefit set forth in Attachment 1 hereto, that may be made available by conferences or schools to Division I women's and men's basketball and FBS football athletes in consideration for their athletic services.

4. Defendants and their officers, agents, servants, employees, attorneys, and any person in active concert or participation with them, who receive actual notice of this order by personal service or otherwise, are hereby permanently restrained and enjoined from violating or continuing to violate Section 1 of the Sherman Act (15 U.S.C. § 1) through the conduct enjoined in Paragraphs 1 through 3 above.

5. Nothing herein contained shall be construed as prohibiting an individual conference or individual school from independently establishing rules that limit compensation or benefits available from members of a particular conference or that individual school to Division I women's and men's basketball and FBS football athletes in consideration for their athletic services.

6. Nothing herein contained shall be construed to prohibit the NCAA from continuing to enforce rules regarding academic eligibility, third-party payments to college athletes, transfers, name, image, and likeness rights, or other regulations not challenged in this case.

7. This Order shall go into effect in ninety (90) days from its date of issuance.

8.  Any party may seek modification of this Order, at any time, by written motion and for good cause based on changed circumstances or otherwise.

9.  This Court shall retain jurisdiction to enforce this Order.  In the event that any part of this Order is violated by the parties named herein or other persons, Plaintiffs may, by motion with notice to the attorneys for the Defendants, apply for sanctions or other relief that may be appropriate.

**IT IS SO ORDERED.**

## **ATTACHMENT 1**

| Incidental to Participation Benefits Identified by NCAA 30(b)(6) Witness Lennon | |
|---|---|
| **Benefit** | **Rule** |
| Apparel, equipment and supplies | NCAA Bylaw 12.02.2(c) |
| Health/medical insurance | NCAA Bylaw 12.02.2(e) |
| Transportation | NCAA Bylaw 12.02.2(f) |
| Facility usage and entry fees | NCAA Bylaw 12.02.2(h)-(i) |
| Other reasonable expenses | NCAA Bylaw 12.02.2(j) |
| Unitemized incidental expenses in excess of $30 per day | NCAA Bylaw 16.8.1.1 |
| Actual and necessary expenses in connection with established regional and national championship events; Olympic Games (and other international competitions); national team tryouts | NCAA Bylaw 16.8.1.2 (a)-(c) |
| Fees related to conditioning activities | NCAA Bylaw 16.8.1.3 |
| Actual and necessary expenses in connection with competitions prior to enrollment | NCAA Bylaw 12.1.2.1.4.3.1 |
| Prize money up to $10,000 per year, prior to enrollment, in sports other than tennis | NCAA Bylaws 12.1.2.4.1, 12.1.2.4.2 |
| Participation Awards | NCAA Bylaws 16.1.4.1, 16.1.4.1.2; Figures 16-1, 16-2, 16-3 |
| Senior Scholar Athlete Award to two graduating seniors of a tangible item valued up to $175 and a post graduate scholarship up to $10,000 | NCAA Bylaw 16.1.4.1.1 |
| Olympic and national governing body performance awards | NCAA Bylaws 12.1.2.1.4.1.2, 12.1.2.1.4.1.3 |
| Educational expenses paid for by national governing bodies | NCAA Bylaws 12.1.2.1.3.2.1, 12.1.2.1.3.2.2, 15.2.6.4 |
| Borrowing against future earnings only for the purchase of loss-of-value insurance | NCAA Bylaw 12.1.2.4.4 |
| Expenses for spouses/children to attend post-season Bowl game or NCAA Championship | NCAA Bylaw 16.6.1.1 |

3

| Expenses for parents/guardians of participants in athletics competition | NCAA Bylaw 12.1.2.1.4.4 |
|---|---|

4