IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

**United States District Court**
For the Northern District of California

| | |
|---|---|
| IN RE: NATIONAL COLLEGIATE ATHLETIC ASSOCIATION ATHLETIC GRANT-IN-AID CAP ANTITRUST LITIGATION | No. 14-md-02541 CW |
| THIS DOCUMENT RELATES TO: ALL ACTIONS | ORDER REAFFIRMING EXCLUSION OF CERTAIN EXPERT TESTIMONY BY DR. ELZINGA |

Following the Court's rulings on cross-motions for summary judgment and the admissibility of Dr. Elzinga's expert opinions regarding a multi-sided market definition, Defendants assert that the Court's summary adjudication of market definition, as well as the ruling on the admissibility of Dr. Elzinga's opinions on that issue, are erroneous because they are predicated on a misunderstanding of Defendants' position at the summary judgment stage, and because of the recent Supreme Court opinion regarding market definition in the context of two-sided transaction platforms, Ohio v. American Express Co., 138 S. Ct. 2274 (2018) (American Express).  See Docket No. 862 at 7-10.  The parties briefed these issues and argued them at the pretrial conference held on July 19, 2018.

The Court revisits its summary judgment adjudication of market definition and related Daubert ruling as to Dr. Elzinga's

1  proposed multi-sided market definition in light of <u>American</u>

2  <u>Express</u> and reaffirms those decisions.

3  I.   MARKET DEFINITION

4      In its Order Granting in Part and Denying in Part Cross-

5  Motions for Summary Judgment, the Court granted Plaintiffs'

6  summary judgment motion on the issue of market definition based on

7  "the absence of any material factual dispute" with respect to that

8  issue.  Docket No. 804 at 18.  The Court noted that Defendants

9  contend that stare decisis controls the outcome of this case,

10 including the market definition.  <u>Id.</u>  The Court also noted that,

11 at the hearing on the cross-motions for summary judgment,

12 Defendants agreed that all relevant rulings in <u>O'Bannon</u> control in

13 this case, including market definition.  <u>Id.</u>

14     Defendants now argue that their summary judgment briefs were

15 clear that "the applicable market definition is a disputed issue

16 of fact," and that they never agreed, either in their summary

17 judgment briefs, or at the hearing on the cross-motions for

18 summary judgment, "to application of the same relevant market as

19 in <u>O'Bannon</u>."  Docket No. 862 at 8-9.  The record, however, does

20 not support these new contentions.

21     Plaintiffs moved for summary judgment on the issue of market

22 definition.  They pointed to sufficient facts to satisfy their

23 burden of production under Rule 56 to define the relevant market

24 in this case as comprising national markets for Plaintiffs' labor

25 in the form of athletic services in men's and women's Division I

26 basketball and FBS football, wherein each class member

27

28

United States District Court
For the Northern District of California

United States District Court
For the Northern District of California

participates in his or her sport-specific market.[1]  Docket No. 655-4 at 6-7 (citing Daniel A. Rascher Report of March 21, 2017 (Rascher Rep.) at 74, 13-63, 75-100).  In these markets, the class-member recruits sell their athletic services to the members of Division I basketball and FBS football in exchange for grants-in-aid and other benefits and compensation permitted by NCAA rules.  Id.  This market definition is consistent with Plaintiffs' claims against Defendants in this litigation, which are based on the theory that Defendants have monopsony power over the labor markets for Division I basketball and FBS football and exercise that power to cap artificially the compensation to athletes participating in these markets.

In response to Plaintiffs' motion, Defendants did not ask the Court, either in their summary judgment briefs or at the hearing on the parties' cross-motions for summary judgment, to adopt a market definition different from the one that Plaintiffs proposed.

_____

[1] Dr. Rascher's definition of these markets is based on similar economic analyses to those performed in O'Bannon, which were not challenged by the NCAA on appeal in that case.  Dr. Rascher's analyses here are predicated on up-to-date data and take into account women's Division I basketball, which was not at issue in O'Bannon.  Rascher Rep. at 74-75.  Dr. Rascher's economic analyses show that the most talented athletes are concentrated in the respective markets for Division I basketball and FBS football; purported alternatives to Division I basketball and FBS football, such as the National Association of Intercollegiate Athletics (NAIA) or National Christian College Athletic Association (NCCAA), have not proved to be viable substitutes; none of the major professional leagues in class members' sports provide competitive options for most college-aged talent; high barriers to entry preclude any viable alternatives emerging for class members' athletic services; and the geographic scope of the markets is nationwide.  Id. at 75-100.  Defendants did not move to exclude Dr. Rascher's opinions regarding market definition under Federal Rule of Evidence 702.  Defendants did not appeal the Court's market definition in O'Bannon and the Ninth Circuit adopted it.

Nor did Defendants point to any facts in their summary judgment briefs to show that a genuine issue of material fact existed with respect to the issue of market definition.

Instead, Defendants' position during summary judgment proceedings was that O'Bannon controls all relevant issues in this litigation, including market definition.  See Docket No. 789, Hr'g Tr. at 7-9 (responding in the affirmative when asked by the Court whether the rulings in O'Bannon "with respect to the agreement, the market, and the anti-competitive effect would apply equally" to the women's basketball class, which includes persons who were not involved in O'Bannon).  At the hearing on the cross-motions for summary judgment, the Court asked the parties whether expert testimony, including Dr. Elzinga's on his multi-sided market theory, was relevant to the determination of the summary judgment motions.  Defendants responded only that Dr. Elzinga's opinions "are relevant if, for example, you allow re-litigation on the issue of pro-competitive justifications." Id. at 74.  Defendants added that "Dr. Elzinga does not redefine the market from the way it was defined in O'Bannon in the sense that O'Bannon defined it to include Division I colleges and universities." Id. at 75 (emphasis added).

To the extent that Defendants mentioned Dr. Elzinga's testimony in their summary judgment briefs, they did so in connection with other issues, and did not cite it as a basis to preclude summary adjudication on market definition.  Specifically, Defendants mentioned Dr. Elzinga's opinions (1) to support their argument that Defendants did not abandon certain of their procompetitive justifications, Docket No. 704, Opp'n to MSJ at 52;

**United States District Court**
For the Northern District of California

and (2) to argue that the portions of Dr. Elzinga's opinions that were based on a multi-sided market theory should not be excluded, in part because they are "<u>consistent</u> with several holdings of <u>O'Bannon</u> regarding the college education market and the procompetitive effects of the challenged restraints within that market" and because they provide a "framework for explaining the features" of the market recognized in <u>O'Bannon</u>.  Docket No. 748, Defs.' Reply at 37 (emphasis added).

The foregoing establishes that Defendants did not point to facts to show the existence of a disputed issue of fact as to market definition.  <u>See</u> <u>Keenan v. Allan</u>, 91 F.3d 1275, 1279 (9th Cir. 1996) (holding that the non-moving party must "identify with reasonable particularity the evidence that precludes summary judgment" and that it is not the duty of the district court "to scour the record in search of a genuine issue of triable fact").  Accordingly, the Court's summary adjudication on the issue of market definition in Plaintiffs' favor was appropriate.

II.  DR. ELZINGA'S OPINIONS REGARDING A MULTI-SIDED MARKET

In a separate order following its rulings on summary judgment, the Court granted Plaintiffs' motion to exclude the expert opinions of Dr. Elzinga regarding the definition of the relevant antitrust market in this litigation as a multi-sided market.  The Court excluded such opinions as irrelevant because they addressed market definition, an issue that was no longer a part of this case in light of the Court's summary adjudication of that issue.  Docket No. 815 at 5.

After the Court excluded Dr. Elzinga's opinions regarding a multi-sided market definition, the Supreme Court issued its decision in American Express, which addresses market definition in the context of two-sided transaction platforms.  Defendants argue that "the American Express decision validates key aspects of Dr. Elzinga's opinions that this Court excluded and squarely calls into question whether the Court erred in declining to even consider at trial Dr. Elzinga's arguments on the relevant market and anticompetitive effects."  Docket No. 862 at 7-10.  Defendants add that "even if the Court were correct in its view that Defendants previously waived reliance on a multi-sided market analysis, the Supreme Court's clarification of the law in American Express makes it appropriate for Defendants to advance that theory at trial."  Id. at 9.  At the pretrial conference held on July 19, 2018, the Court invited both sides to argue the relevance, or lack thereof, of American Express to the Court's prior rulings.

After considering the parties' submissions and argument, the Court concludes that American Express has no effect on its rulings on market definition or the exclusion of Dr. Elzinga's opinions on the issue.

In American Express, the question before the Supreme Court was whether the plaintiffs in that case carried their initial burden to prove that American Express' anti-steering provisions in its contracts with merchants, which prevented merchants from encouraging cardholders to use non-American Express credit cards at the point of sale and which resulted in higher merchant fees, have anticompetitive effects under Section 1 of the Sherman Act. 138 S. Ct. at 2283.

United States District Court
For the Northern District of California

     The Supreme Court explained that a credit-card company brings
two types of market participants together in what is called a two-
sided transaction platform, which offers different services to two
different groups "who both depend on the platform to intermediate
between them."  Id. at 2280.  Each credit-card company operates a
network that "provides separate but interrelated services to both
cardholders and merchants," consisting of credit on the cardholder
side, and a means to receive a fast and guaranteed payment on the
merchant side.  Id.  Two-sided transaction platforms "facilitate a
single, simultaneous transaction between participants," such that
when a credit-card network sells one transaction's worth of card-
acceptance services to a merchant, it also "must" sell one
transaction's worth of credit-payment services to a cardholder.
Id. at 2286.  Because of this directly proportional and
simultaneous consumption on both sides, two-sided transaction
platforms are "better understood as suppl[ying] only one product –
transactions."  Id. (internal quotation marks and citation
omitted).

     The Supreme Court held that, to determine whether the anti-
steering provisions at issue have anticompetitive effects under
Section 1, they should be assessed under the rule of reason
because they are vertical restraints, namely restraints imposed by
agreement between firms at different levels of distribution.  Id.
at 2284.  The Supreme Court further held that defining the
relevant market is necessary to determine the existence of any
anticompetitive effects.  Id. at 2284-85.  The district court had
defined the relevant market as including only the merchant side of
the credit-card two-sided transaction platforms that compete in

the credit-card market, but the Second Circuit reversed, holding that the credit-card market is a single market that should include both the merchant side and the cardholder side of the credit-card two-sided transaction platforms.  Id. at 2283.

The Supreme Court affirmed the Second Circuit and held that "[i]n two-sided transaction markets, only one market should be defined," and it defined the relevant market there as "the two-sided market for credit-card transactions as a whole."  Id. at 2287.  The Supreme Court held that "courts must include both sides of the platform – merchants and cardholders — when defining the credit-card market" for two reasons.  Id. at 2286.

First, credit-card two-sided transaction platforms exhibit "pronounced" indirect network effects[2] and interconnected pricing and demand.  Id.  As a result of the presence and degree of these economic relationships, credit-card two-sided transaction platforms cannot raise prices on one side without risking a feedback loop of declining demand; consequently, the credit-card network that intermediates must find the "balance of pricing" that encourages the greatest number of matches between cardholders and merchants based on "differences in the two sides' demand elasticity[.]"  Id. at 2286-87.  Striking the "optimal balance" of the prices charged on each side "is essential" for two-sided transaction platforms to "maximize the value of their services and to compete with their rivals."  Id. at 2281; see also id. at 2286

_____

[2] Indirect network effects "exist where the value of the platform to one group depends on how many members of another group participate."  138 S. Ct. at 2280.

**United States District Court**
For the Northern District of California

("[C]redit cards determine their market share by measuring the volume of transactions they have sold.").

Second, "competition cannot be accurately assessed by looking at only one side of the platform in isolation," because only other credit-card two-sided transaction platforms that have "both cardholders and merchants willing to use [their] network" can compete with American Express in the credit-card transaction market.  Id. at 2287.

Dr. Elzinga opines that the "relevant market in this case is a multi-sided market for college education in the United States" in which colleges operate as multi-sided platforms that balance their pricing to numerous constituencies.[3]  Kenneth G. Elzinga Report of March 21, 2017 (Elzinga Rep.) at 26-28.  Dr. Elzinga opines that this multi-sided market encompasses a relationship between the "pricing to any one constituency on the volume of participation" by the college's various constituencies.  Id. at 27-28.  Dr. Elzinga, however, does not identify what product the universities offer to each of their constituencies, or how any product is "priced" to each constituency; he does not explain what he means by or how he determines "participation" and "volume"; he does not describe what "value" he is referring to or indicate how that can be measured.  Dr. Elzinga also does not identify or describe the relevant economic interactions between the members of

---

[3] Dr. Elzinga states in his report that the various constituencies in his multi-sided platform include "student-athletes in each of their respective sports, non-athlete students, alumni, coaches and athletic staff, faculty, other staff, the community in which the school is located, and, if they are public institutions, the state."  Elzinga Rep. at 28.  Dr. Elzinga notes that this list is "not necessarily exhaustive."  Id.

the numerous constituencies and the platform, or identify the
timing or relationship of any such interactions to other
interactions within the claimed platform.

   The multi-sided relevant market proposed by Dr. Elzinga is
not analogous to the relevant market that the Supreme Court
recognized as two-sided in American Express.  In this litigation,
the market participants and their interactions are nothing like
what the Supreme Court observed in the context of credit-card
transactions in American Express.  There is no simultaneous
interaction or proportional consumption through a platform by
different market participants of what essentially constitutes
"only one product."  Additionally, the restraints at issue in this
litigation are horizontal agreements among competitors to limit
student-athlete compensation, which is alleged to constrain
competition among the universities; by contrast, the restraint
analyzed in American Express was a vertical agreement between a
single credit card company, American Express, and the merchants
who participate in that credit card company's network, which
American Express claimed allowed it to better compete with other
credit card companies.  In light of these material and obvious
differences, it is clear that American Express does not require
altering the Court's rulings as to market definition or the
admissibility of Dr. Elzinga's opinions on that issue.

   But even assuming that American Express would permit the
relevant market here to be defined as multi-sided although the
relevant interactions are not transactional or simultaneous and
the restraints at issue are not vertical, the Court's rulings on
market definition and the admissibility of Dr. Elzinga's opinions

on that topic would remain unchanged, because any opinions by Dr. Elzinga as to a multi-sided market definition are unreliable and thus inadmissible under Daubert v. Merrell Dow Pharms., Inc., 509 U.S. 579 (1993), and Federal Rule of Evidence 702.  As such, Dr. Elzinga's opinions regarding a multi-sided market definition could not have precluded the entry of summary judgment as to market definition even if Defendants had pointed to such opinions for that purpose during the summary judgment proceedings, which they did not.

To support his conclusion that the relevant market in this litigation is multi-sided, Dr. Elzinga refers frequently in his report to economic variables such as pricing, demand, supply, participation, "value," "network externalities," "competitive discipline," and others.  He states that relationships exist between the various sides of his multi-sided platform with respect to these variables.  But Dr. Elzinga does not perform any economic analysis to support his assertions with respect to these variables and purported relationships.[4]  Indeed, he does not examine any economic data at all to quantify, test, evaluate, or confirm any of the economic relationships upon which his proposed multi-sided relevant market is predicated.  The lack of any such analysis is confounding given that Dr. Elzinga states in his report that this

---

[4] The only "price" discussed by Dr. Elzinga is the cap on student-athlete compensation, which is set by the NCAA by agreement; it is not set individually by each university multi-sided platform through "balancing" in an effort to better compete with other university multi-sided platforms.  As discussed above, this distinguishes Dr. Elzinga's proposed multi-sided market from the two-sided relevant market recognized in American Express in the context of two-sided transaction platforms.

analysis is necessary.  Elzinga Rep. at 11 ("Market definition ought to take the products involved in a dispute as data and attempt to identify the substitutes that provide competitive discipline for those products.").

Dr. Elzinga states in his report that his opinions are based on his interviews with a handful of university administrators. Dr. Elzinga does not discuss in his report, and Defendants have not explained in their briefs, why it would be proper for Dr. Elzinga to rely solely on interviews or noneconomic data to support his opinions about market definition, particularly where economic data is available and has been employed by other experts in this litigation.  Further, Dr. Elzinga admitted at his deposition that his interviewees were selected by attorneys and that he did not know the methods that these attorneys used in selecting the administrators that he interviewed; Plaintiffs represent that he is referring to Defendants' attorneys, which Defendants do not seem to dispute.  Elzinga Dep. Tr. 97-98.  Dr. Elzinga also testified that he would have no way to know whether the interviews are representative of what other university administrators would say.  Id.  He also admitted that he did not ask questions about revenue during these interviews, and that he did not review the financial statements of any Division I member. Id. at 29, 33.

The lack of economic analysis is particularly problematic in light of the undefined number of sides (i.e., constituencies) in Dr. Elzinga's proposed multi-sided market; the number of sides or constituencies apparently is so large that Dr. Elzinga does not even claim to provide an exhaustive list in his report.

United States District Court
For the Northern District of California

United States District Court
For the Northern District of California

Nothing in American Express supports the notion that a relevant market can be defined to include more than one side without performing any economic analysis.  To the contrary, the law review articles cited in American Express indicate that the presence and degree of the economic relationships discussed in that case present "an empirical issue."  See, e.g., David S. Evans & Michael Noel, Defining Antitrust Markets When Firms Operate Two-Sided Platforms, 2005 Colum. Bus. L. Rev. 667, 671 (2005) (Evans & Noel).

For these reasons, the Court cannot admit Dr. Elzinga's opinion that the relevant market in this case is multi-sided. Daubert v. Merrell Dow Pharmaceuticals, Inc., 43 F.3d 1311, 1319 (9th Cir. 1995) (noting that the trial court's gatekeeping function requires more than simply "taking the expert's word for it"); Fed. R. Evid. 702 advisory committee's note (2000) ("The trial judge in all cases of proffered expert testimony must find that it is properly grounded, well-reasoned, and not speculative before it can be admitted.").  Dr. Elzinga's opinion assumes, without any economic analysis as support, that the type and degree of the economic relationships observed in the context of two-sided transaction platforms in American Express exist here, where he does not describe any platform analogous to a two-sided transaction platform.  The gap between Dr. Elzinga's opinions on market definition and the legal or economic support for them is too large.  Gen. Elec. Co. v. Joiner, 522 U.S. 136, 146 (1997) ("[N]othing in either Daubert or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to existing data only by the ipse dixit of the expert.

A court may conclude that there is simply too great an analytical gap between the data and the opinion proffered."); <u>Vollrath Co. v. Sammi Corp.</u>, 9 F.3d 1455, 1462 (9th Cir. 1993) (rejecting market definition where "[t]here was no detailed examination of market data or analysis of cost, comparable usage, or comparative features of other competing products").

III. CONCLUSION

Dr. Elzinga's opinions regarding a multi-sided market definition are excluded as irrelevant in light of the Court's summary adjudication of market definition, and as unreliable, under Federal Rule of Evidence 702 and <u>Daubert</u>.  The Court does not address in this Order the admissibility of any other opinions of Dr. Elzinga that arguably are dependent upon the excluded multi-sided market definition theory.  The Court will address objections to any such opinions at trial on a case-by-case basis.

IT IS SO ORDERED.

Dated: September 3, 2018

_____
CLAUDIA WILKEN
United States District Judge