Sean Eskovitz (SBN 241877)
WILKINSON WALSH + ESKOVITZ LLP
11601 Wilshire Blvd., Suite 600
Los Angeles, CA 90025
Telephone:  (424) 316-4000
Facsimile:  (202) 847-4005
seskovitz@wilkinsonwalsh.com

Beth A. Wilkinson (*pro hac vice*)
Brant W. Bishop, P.C. (*pro hac vice*)
James Rosenthal (*pro hac vice*)
WILKINSON WALSH + ESKOVITZ LLP
2001 M Street NW, 10th Floor
Washington, DC 20036
Telephone:  (202) 847-4000
Facsimile:  (202) 847-4005
bwilkinson@wilkinsonwalsh.com
bbishop@wilkinsonwalsh.com
jrosenthal@wilkinsonwalsh.com

Attorneys for Defendant
NATIONAL COLLEGIATE ATHLETIC
ASSOCIATION

Patrick Hammon (SBN 255047)
SKADDEN, ARPS, SLATE, MEAGHER &
FLOM LLP
525 University Avenue, Suite 1100
Palo Alto, CA 94301
Telephone:  (650) 470-4500
Facsimile:  (650) 470-4570
patrick.hammon@skadden.com

Jeffrey A. Mishkin (*pro hac vice*)
Karen Hoffman Lent (*pro hac vice*)
SKADDEN, ARPS, SLATE, MEAGHER &
FLOM LLP
Four Times Square
New York, NY  10036
Telephone:  (212) 735-3000
Facsimile:  (212) 735-2000
jeffrey.mishkin@skadden.com
karen.lent@skadden.com

Attorneys for Defendants
NATIONAL COLLEGIATE ATHLETIC
ASSOCIATION and WESTERN ATHLETIC
CONFERENCE

[Additional Counsel Listed on Signature
Page]

# IN THE UNITED STATES DISTRICT COURT

# FOR THE NORTHERN DISTRICT OF CALIFORNIA

# OAKLAND DIVISION

| | |
|---|---|
| IN RE NATIONAL COLLEGIATE ATHLETIC ASSOCIATION ATHLETIC GRANT-IN-AID CAP ANTITRUST LITIGATION<br><br><br>This Document Relates to:<br><br>ALL ACTIONS EXCEPT *Jenkins v. Nat'l Collegiate Athletic Ass'n*, Case No. 14-cv-02758-CW | MDL Docket No. 4:14-md-02541-CW<br><br><br>**DEFENDANTS' CLOSING BRIEF**<br><br>Date: December 18, 2018<br>Time: 9:30 a.m.<br>Judge: Hon. Claudia Wilken<br>Courtroom: 6, Second Floor |

# TABLE OF CONTENTS

**Page**

Table of Abbreviations ................................................................................................ iv

Introduction ................................................................................................................. 1

I.     PLAINTIFFS FAILED TO PROVE A NEW ANTITRUST VIOLATION OR MATERIAL FACTUAL CHANGE SINCE *O'BANNON* .......................................... 3

II.    THE EVIDENCE AT TRIAL RECONFIRMED WHAT *O'BANNON* ESTABLISHED: THE CHALLENGED RULES ARE PROCOMPETITIVE ...................... 7

     A.     Plaintiffs' Articulation of the Legal Standard at Step Two Is Incorrect ..................... 8

     B.     The Challenged Rules Promote Consumer Demand for College Sports ................... 10

         1.     Uncontroverted Evidence Demonstrates That Amateurism Is a Defining Characteristic of College Sports That Contributes to Demand ....... 10

         2.     Dr. Isaacson's Survey Further Demonstrates Consumer Demand for Amateur College Sports ............................................................................. 18

     C.     The Challenged Rules Promote the Integration of Academics and Athletics ............ 22

         1.     Division I Members Seek to Ensure that Student-Athletes Are Integrated ...................................................................................... 23

         2.     The Challenged Rules Promote Integration ......................................... 27

         3.     Integration Is a Valid Procompetitive Justification ............................. 32

     D.     The Challenged Rules Promote the Principle of Amateurism ................................. 34

III.    NONE OF PLAINTIFFS' PURPORTED LESS RESTRICTIVE ALTERNATIVES SATISFY THE UNAMBIGUOUS LEGAL REQUIREMENTS ........................................... 38

     A.     Plaintiffs' Experts Did Not Competently Establish What Would Happen If the Requested Relief Were Granted .............................................................. 41

     B.     There Are No Analogous Situations to Plaintiffs' Requested Relief ....................... 43

     C.     The Evidence at Trial Demonstrated That Plaintiffs' Proposals Are Not Viable Alternatives to the NCAA Compensation Rules ......................................... 45

         1.     National Rules Are Essential for Amateur Intercollegiate Athletics ............. 45

         2.     Plaintiffs' Proposed Injunctions Would Reduce Consumer Demand ............ 47

         3.     Integration Would Suffer if the Challenged Rules Were Eliminated ............ 50

         4.     Increased Cost of Conference-Level Rulemaking ............................... 51

     D.     The Existing Autonomy Governance Model Bears No Relationship to Plaintiffs' Requested Relief ............................................................................. 54

     E.     Affording the NCAA Ample Latitude Precludes This Court from Implementing a Numerical Compensation Cap or Tinkering with Individual Benefits ........................................................................................................... 55

IV.    THERE IS NO FOURTH "BALANCING" STEP .................................................. 56

     A.     Ninth Circuit Precedent Does Not Call for a Fourth Balancing Step ....................... 57

     B.     Balancing in This Case Is Not Even Theoretically Possible ................................... 59

     C.     Plaintiffs Left the Court with Nothing to "Balance" ............................................. 60

Conclusion ................................................................................................................. 61

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*Agnew v. NCAA*,
   683 F.3d 328 (7th Cir. 2012) ................................................................3

*Appliances Inc. v. Tyco Health Care Grp. LP*,
   592 F.3d 991 (9th Cir. 2010) .............................................................59

*Aydin Corp. v. Loral Corp.*,
   718 F.2d 897 (9th Cir. 1983) .............................................................59

*Bassett v. NCAA*,
   528 F.3d 426 (6th Cir. 2008) ................................................................3

*Bendix Autolite Corp. v. Midwesco Enterprises, Inc.*,
   486 U.S. 888 (1988) ..........................................................................59

*Bhan v. NME Hospitals, Inc.*,
   929 F.2d 1404 (1991) ..................................................................57, 58

*Cal. Dental Ass'n v. FTC*,
   224 F.3d 942 (9th Cir. 2000) ...............................................................9

*Cleveland v. Groceryworks.com, LLC*,
   200 F. Supp. 3d 924 (N.D. Cal. 2016) ..............................................10

*Continental T.V., Inc. v. GTE Sylvania, Inc.*,
   433 U.S. 36 (1977) ............................................................................43

*Cty. of Tuolumne v. Sonora Cmty. Hosp.*,
   236 F.3d 1148 (9th Cir. 2001) ......................................................57, 58

*Deppe v. NCAA*,
   893 F.3d 498 (7th Cir. 2018) ................................................................3

*Deutscher Tennis Bund v. ATP Tour, Inc.*,
   610 F.3d 820 (3d Cir. 2010) ..............................................................32

*Hahn v. Or. Physicians' Serv.*,
   868 F.2d 1022 (9th Cir. 1988) ...........................................................59

*Hairston v. Pac. 10 Conference*,
   101 F.3d 1315 (9th Cir. 1996) ....................................................9, 57, 58

i

*Hamilton v. State Farm Fire & Cas. Co.*,
 270 F.3d 778 (9th Cir. 2001) ................................................................56

*Hynix Semiconductor Inc. v. Rambus Inc.*,
 2008 WL 504098 (N.D. Cal. Feb. 19, 2008) ...........................................10

*In re Google AdWords Litig.*,
 2012 WL 28068 (N.D. Cal. Jan. 5, 2012) ................................................10

*In the Matter of James Wilson Assocs.*,
 965 F.2d 160 (7th Cir. 1992) ...................................................................10

*Law v. NCAA*,
 134 F.3d 1010 (10th Cir. 1998) ...........................................................3, 40

*Leegin Creative Leather Prods, Inc. v. PSKS, Inc.*,
 551 U.S. 877 (2007) ................................................................................43

*M & H Tire Co., Inc. v. Hoosier Racing Tire Corp.*,
 733 F.2d 973 (1st Cir. 1984) ...................................................................43

*McCormack v. NCAA*,
 845 F.2d 1338 (5th Cir. 1988) .............................................................3, 32

*Milton H. Greene Archives, Inc. v. Julien's Auction House LLC*,
 345 Fed. App'x 244, 247 (9th Cir. 2009) ...............................................10

*NCAA v. Bd. of Regents*,
 468 U.S. 85 (1984) ...................................................................3, 35, 40, 46

*O'Bannon v. NCAA*,
 7 F. Supp. 3d 955 (N.D. Cal. 2014) ................................................ passim

*O'Bannon v. NCAA*,
 802 F.3d 1049 (9th Cir. 2015) ........................................................ passim

*Ohio v. Am. Express Co.*,
 138 S. Ct. 2274 (2018) ..........................................................................7, 56

*Paddack v. Dave Christensen, Inc.*,
 745 F.2d 1254 (9th Cir. 1984) .................................................................10

*Pulaski & Middleman, LLC v. Google, Inc.*,
 802 F.3d 979 (9th Cir. 2015) ...................................................................10

*Race Tires Am., Inc. v. Hoosier Racing Tire Corp.*,
 614 F.3d 57 (3d Cir. 2010)........................................................................40

*Rothery Storage & Van Co. v. Atlas Van Lines, Inc.*,
 792 F.2d 210 (D.C. Cir. 1986) .................................................................59

ii

*Seattle Totems Hockey Club, Inc. v. Nat'l Hockey League*,
    783 F.2d 1347 (9th Cir. 1986) ................................................................59

*Smith v. NCAA*,
    139 F.3d 180 (3d Cir.1998) .......................................................................3

*State of N.Y. by Abrams v. Anheuser-Busch, Inc.*,
    811 F. Supp. 848 (E.D.N.Y. 1993) ..........................................................59

*Tanaka v. Univ. of S. Cal.*,
    252 F.3d 1059 (9th Cir. 2001) ................................................................57

*Toscano v. PGA Tour, Inc.*,
    201 F. Supp. 2d 1106 (E.D. Cal. 2002)................................................9, 57

*Ty Inc. v. Softbelly's Inc.*,
    353 F.3d 528 (7th Cir. 2003) ...................................................................11

*Virgin Atl. Airways Ltd. v. British Airways PLC*,
    257 F.3d 256 (2d Cir. 2001)......................................................................57

STATUTES

20 U.S.C. § 1070a .........................................................................................4

OTHER AUTHORITIES

1 J. Kalinowski, Antitrust Laws and Trade Regulation § 12.02[5] (2d ed. 2017) ...........................58

*Debunking the NCAA's Myth that Amateurism Conforms with Antitrust Law: A Legal and Statistical Analysis*, by Thomas Baker, Marc Edelman, and Nicholas Watanabe.................................................................44

Fed. R. Evid. 701 .........................................................................................10

Herbert A. Hovenkamp, *Antitrust Balancing*, 12 N.Y.U. J.L. & Bus. 369, 383 (2016).................3, 58

P. Areeda & H. Hovenkamp, Fundamentals of Antitrust Law § 15.02 (4th ed. 2017)............40, 58, 59

Roland G. Fryer, Jr., "Financial Incentives and Student Achievement: Evidence from Randomized Trials." ...........................................................29

**TABLE OF ABBREVIATIONS**

| Abbreviation | Reference | Docket |
|---|---|---|
| COA Stip. | Joint Stipulation of Facts and Order Concerning Cost of Attendance | Dkt. No. 1093 |
| Defs.' Op. | Defendants' Opening Statement | Dkt. No. 993 |
| Defs.' MIL Opp. | Defendants' Joint Opposition to Plaintiffs Motions in Limine | Dkt. No. 901 |
| Elzinga Dir. Test | Elzinga Direct Testimony Declaration | Dkt. No. 986-1 |
| Heckman Dir. Test. | Heckman Direct Testimony Declaration | Dkt. No. 986-2 |
| Isaacson Dir. Test. | Isaacson Direct Testimony Declaration | Dkt. No. 986-3 |
| MSJ Order | Order Granting in Part and Denying in Part Cross-Motions for Summary Judgment | Dkt. No. 804 |
| Noll Dir. Test. | Direct Testimony of Dr. Roger G. Noll | Dkt. No. 1021-1 |
| Noll Reb. Test. | Rebuttal Testimony of Dr. Roger G. Noll | Dkt. No. 1021-2 |
| Pls.' Closing | Plaintiffs' Closing Argument | Dkt. No. 1099 |
| Pls.' Op. | Corrected Plaintiffs' Opening Argument Modified to Reflect Final Trial Exhibit Numbers | Dkt. No. 1014 |
| Poret Dir. Test. | Direct Testimony of Hal Poret | Dkt. No. 1044-1 |
| Poret Reb. Test. | Rebuttal Testimony of Hal Poret | Dkt. No. 1044-2 |
| Rascher Dir. Test. | Direct Testimony of Dr. Daniel A. Rascher | Dkt. No. 1020-1 |
| Rascher Reb. Test. | Rebuttal Testimony of Dr. Daniel A. Rascher | Dkt. No. 1020-2 |
| Tr. | Trial transcripts | n/a |
| [witness] Tr. | Plaintiffs' and Defendants' Revised Deposition Designations | Dkt. Nos. 1116-1117 |

**INTRODUCTION**

Defendants have proved once again that the NCAA's limits on financial aid and benefits are procompetitive.  Defendants offered days of testimony from six fact witnesses experienced in college sports, sports broadcasting, and education, about how the challenged rules help preserve consumer demand and contribute to the integration of academics and athletics.  The testimony of these witnesses was corroborated by surveys and studies that they commissioned, testimony from Defendants' economic experts Dr. Kenneth Elzinga and Dr. James Heckman, and a survey conducted by Dr. Bruce Isaacson demonstrating both that amateurism is a significant reason fans like college sports and that those fans are overwhelmingly opposed to Plaintiffs' proposed relief.  By contrast, Plaintiffs offered only expert testimony from two long-time opponents of the NCAA, anecdotal evidence from a handful of student-athletes who attended college before the move to cost of attendance ("COA"), and a survey that did not even purport to test Plaintiffs' proposed relief.

Plaintiffs' case—which began as a challenge to the NCAA's prior GIA cap, based on the assertion that student-athletes were not receiving enough financial support to attend college—has finally emerged as an undisguised effort to "eliminate[e] all NCAA compensation rules."[1]  But because Defendants met their burden at step two of the rule of reason analysis, Plaintiffs need to prove that their proposed less restrictive alternatives would be "virtually as effective" as the challenged rules in preserving consumer demand for amateurism and contributing to academic integration, and "without significantly increased cost."[2]  They have not.

Because of the voluminous evidence that consumers value amateurism, Plaintiffs' proposal that the Court eliminate all limits on financial aid and benefits incidental to participation in athletics could never be as effective in preserving consumer demand as the challenged rules.  Plaintiffs' two alternative injunctions fare no better, as each would still allow unlimited cash payments so long as they were characterized as "education related expenses or benefits," such as a $10,000, or $100,000, or even a higher payment for maintaining the minimum GPA to stay eligible or even for showing up

---

[1] Pls.' Closing at 34.
[2] *O'Bannon v. NCAA*, 802 F.3d 1049, 1074 (9th Cir. 2015) (internal quotation marks omitted).

to class.  And Plaintiffs have offered no evidence at all about how their proposed less restrictive alternatives would promote academic integration.  Their speculation that the conferences would adopt their own limits on financial aid and benefits incidental to athletic participation is not part of the less restrictive alternatives they proposed, and to the extent Plaintiffs are relying on conference-level rulemaking as a less restrictive alternative to meet their burden at step three, such a regime would not be as effective as having national rules and would be significantly more expensive to implement.

Unable to prevail at step three, Plaintiffs are left to argue that the procompetitive justifications Defendants proved again—consumer demand for amateurism, and integration of academics and athletics—are "economically invalid myths."[3]  For this flawed proposition, Plaintiffs largely rely on what they call the "post-*O'Bannon* natural experiment," which consists of purportedly observing no significant change in consumer demand after the NCAA allowed full COA athletic scholarships in compliance with the Ninth Circuit's ruling in *O'Bannon*.[4]  Even if there were valid data concerning consumers' reactions to the move to COA scholarships—and there is not[5]— such data would say nothing about how consumers value amateurism, because as this Court, the Ninth Circuit, and even Plaintiffs' expert agreed, COA scholarships are consistent with the principle of amateurism.[6]  Plaintiffs simply have no basis in the record to dispute the fact that substantial consumer demand exists for amateurism in college sports.

---

[3] Pls.' Closing at 1.

[4] *See, e.g.*, Pls.' Closing at 3.

[5] Plaintiffs' "natural experiment" relies heavily on revenue growth from Defendants' media rights agreements as a proxy for demand.  That revenue growth proves nothing, as Dr. Rascher conceded that aside from "a couple" of those contracts, those media rights agreements were entered into prior to 2015 and had escalating revenue clauses at the time they were executed.  Tr. 31:3-7, 33:7-15.  Dr. Rascher also conceded that there are a number of reasons revenues could be rising in college sports, just as there are a number of reasons attendance could be declining (which it is).  Tr. 26:3-14, 29:11-24.

[6] *See O'Bannon*, 802 F.3d at 1074-75 (finding from record that "raising the grant-in-aid cap to the cost of attendance would have virtually no impact on amateurism"); *O'Bannon v. NCAA*, 7 F. Supp. 3d 955, 1005 (N.D. Cal. 2014) (holding that "the NCAA could permit FBS football and Division I basketball schools to award stipends to student-athletes up to the full cost of attendance, as that term is defined in the NCAA's bylaws, to make up for any shortfall in its grants-in-aid" as a "legitimate less restrictive alternative for achieving" the NCAA's goals of "preserving the popularity of the NCAA's product by promoting its current understanding of amateurism and improving the quality of educational opportunities for student-athletes by integrating academics and athletics"); Tr. 260:10- *(cont.)*

The idea that amateurism is a "myth," moreover, would surely come as a surprise to the Supreme Court and every other court—including this Court and the Ninth Circuit in *O'Bannon*, five other circuits (the Seventh Circuit as recently as this past June), and numerous other district courts—that have held otherwise.[7]  Those holdings confirm what Defendants showed at trial:  that consumers value amateurism and that the challenged rules promote both amateurism and the integration of athletics and academics, as well as the integration of student-athletes into their college communities.[8]  These conclusions are made all the more clear in light of the Ninth Circuit's mandate that "appropriate deference" be given to the Supreme Court's observations about the procompetitive nature of amateurism in college sports.[9]

## I.  PLAINTIFFS FAILED TO PROVE A NEW ANTITRUST VIOLATION OR MATERIAL FACTUAL CHANGE SINCE *O'BANNON*

Consistent with this Court's summary judgment order, Plaintiffs do not dispute that *O'Bannon* dooms their claims unless they have proved "either (1) an actionable new antitrust violation that occurred after *O'Bannon*, or (2) a fundamental, material change in the factual basis for the Ninth Circuit's decision."[10]  Plaintiffs did neither.

Plaintiffs argue in their closing, as they did at trial, that they made the required showing "because since *O'Bannon*, thousands of Class Members have received compensation and benefits above COA without any harm to consumer demand or integration."[11]  Plaintiffs also relatedly suggest (again as they did at trial) that Defendants recently began providing student-athletes with

---

19, 2097:17-2098:6 (Noll) ("An alternative to the GIA Cap is to permit athletic scholarships to be set at the cost of attendance, which is consistent with the principles of amateurism as set forth by the AAU and the other governing bodies in sports, including the NCAA.").

[7] *See, e.g.*, *NCAA v. Bd. of Regents*, 468 U.S. 85, 120 (1984); *Deppe v. NCAA*, 893 F.3d 498, 499 (7th Cir. 2018); *O'Bannon*, 802 F.3d at 1078-79; *Agnew v. NCAA*, 683 F.3d 328, 345 (7th Cir. 2012); *Bassett v. NCAA*, 528 F.3d 426, 433 (6th Cir. 2008); *Smith v. NCAA*, 139 F.3d 180, 187 (3d Cir. 1998), *vacated on other grounds by NCAA v. Smith*, 525 U.S. 459 (1999); *Law v. NCAA*, 134 F.3d 1010, 1018 (10th Cir. 1998); *McCormack v. NCAA*, 845 F.2d 1338, 1354 (5th Cir. 1988); Herbert A. Hovenkamp, *Antitrust Balancing*, 12 N.Y.U. J.L. & Bus. 369, 377 n.27 (2016) (citing five additional district court cases).

[8] *See* Part II, *infra*.

[9] *O'Bannon*, 802 F.3d at 1063.

[10] Pls.' Closing at 38.

[11] *Id.* (emphasis omitted).

1  four new categories of benefits that are inconsistent with amateurism:  COA stipends, Student

2  Assistance Fund ("SAF") payments, incidental benefits, and Pell Grants.[12]  But these claims are

3  flatly contradicted by the evidence at trial.  As Plaintiffs' own expert conceded, student-athletes

4  could receive more than COA prior to *O'Bannon*.[13]  Indeed, both this Court and the Ninth Circuit

5  acknowledged the very same thing in *O'Bannon*.[14]  Plaintiffs' experts also conceded that all four

6  categories of benefits that Plaintiffs suggest in their closing are new or unprecedented in fact existed

7  prior to *O'Bannon*.[15]

8      Moreover, each of those four benefits is fully consistent with amateurism.  The Ninth Circuit

9  explicitly reached that conclusion as to COA and Pell Grants.[16]  And there was extensive evidence at

10  trial demonstrating that neither SAF nor any other benefit incidental to participation function like

11  pay for playing college sports.[17]

---

12  [12] *See* Pls.' Closing at 24-28; Noll Dir. Test. ¶¶ 48-92.  It is not accurate that Defendants or their
   members provide student-athletes with Pell Grants.  As required by federal statute, 20 U.S.C.

13  § 1070a, Pell Grants are awarded by the Department of Education on the basis of financial

14  need.  J1517-0001 ("Awards for each of the Federal Student Aid (FSA) programs are based on some
   form of financial need, beginning with cost of attendance."); J1518-0002 ("Pell Grants are

15  considered to be the first source of aid to the student, and packaging FSA funds begins with Pell
   eligibility.").  Pell Grants are granted to students "within a particular income level," "based on the

16  need of the particular student."  Tr. 694:16-19 (Alston); Tr. 880:1-3 (Blank).

17  [13] *See* Tr. 33:16-34:16 (Rascher).  Since at least 2004, the U.S. Department of Education has
   recognized that student-athletes could receive a "full Pell Grant" even if their financial aid needs had
   "already been met" by an athletic scholarship.  COA Stip. ¶ 11.

18  [14] 7 F. Supp. 3d at 974; *O'Bannon*, 802 F.3d at 1059 (recognizing that "student-athletes are

19  permitted to accept Pell grants even when those grants raise their total financial aid package above
   their cost of attendance").

20  [15] *See* Tr. 33:16-34:16 (Rascher).

   [16] *O'Bannon*, 802 F.3d at 1075 ("A compensation cap set at student-athletes' full cost of attendance

21  is a substantially less restrictive alternative means of accomplishing the NCAA's legitimate
   procompetitive purposes."); *id.* at 1078 n.24 (observing that Pell Grants are "intended for education-

22  related expenses" and "available to athletes and nonathletes alike").

23  [17] *See, e.g.*, J0024-0247 (NCAA Bylaw 16.11.1.8) (Student Assistance Fund. "A student-athlete may
   receive money from the NCAA Student Assistance Fund. Member institutions and conferences shall

24  not use money received from the fund to finance salaries and benefits . . . ."); *see also id.* at 0211-12
   (NCAA Bylaw 15.01.6.1) (Student Assistance Fund. "Member institutions and conferences shall not

25  use money received from the fund to finance salaries and benefits . . . ."); J0021-0014 (2018
   Division I Revenue Distribution Plan) ("As a guiding principle, the SAF shall be used to assist

26  student-athletes in meeting financial needs that arise in conjunction with participation in
   intercollegiate athletics, enrollment in an academic curriculum or to recognize academic

27  achievement as determined by conference offices."); *id.* at 0016 (graph showing categories of SAF
   uses, nearly three-quarters relating to educational, health, or safety expenses); Tr. 1275:12-22,

28  1276:25-1277:8, 1303:20-1304:3, 1308:7-1309:12, 1322:14-20, 1624:25-1627:1 (Lennon) (benefits
   are provided in a way consistent with the principle of amateurism, including through caps on
   *(cont.)*

4

Plaintiffs' claim therefore boils down to the assertion that Defendants violated the antitrust laws by implementing *the very relief ordered by O'Bannon*, and not eliminating these other categories of benefits.  This Court rejected that theory at summary judgment, holding that Defendants cannot be liable for changes "required and approved by the Court."[18]  In *O'Bannon*, moreover, both the Ninth Circuit and this Court expressly contemplated that student-athletes could receive benefits in excess of COA and never suggested that any of the existing categories of benefits that Plaintiffs highlight in their closing is inconsistent with amateurism.[19]  In fact, the Ninth Circuit was clear that "[t]he Rule of Reason requires that the NCAA *permit* its schools to provide up to the cost of attendance to their student athletes"—not that the NCAA must *prohibit* schools from providing educational expenses or benefits incidental to participation in addition to cost of attendance, while still prohibiting pay-for-play.[20]

Plaintiffs are also wrong to suggest that several minor changes to the NCAA rules since 2015 warrant disregarding *O'Bannon*, especially in light of "the Supreme Court's admonition that [courts] must afford the NCAA 'ample latitude' to superintend college athletics."[21]  In their closing (at 39), Plaintiffs contend that there have been ten "significant amendments to the NCAA's bylaws" since the *O'Bannon* record closed.  But the evidence at trial establishes that these alleged "amendments" do not represent material changes.  Plaintiffs, for example, note that NCAA bylaws now permit "sports federation payments to international athletes"—but this change merely brought treatment of international athletes in line with American athletes, who could already receive these payments before *O'Bannon*.[22]  Similarly, Plaintiffs note that class members can now borrow against their earnings to buy loss-of-value insurance—but such insurance was available to class members prior to *O'Bannon* through the Student Assistance Fund and student-athletes could previously borrow

---

benefits to prevent them from becoming "a form of pay"); *see also* Part II.D, *infra*.
[18] MSJ Order at 20.
[19] 802 F.3d at 1059, n.24; 7 F. Supp. 3d at 972 n.5.
[20] 802 F.3d at 1079 (emphasis added).
[21] *Id.* (quoting *Bd. of Regents*, 468 U.S. at 120).
[22] D0680-0010.

1  against future earnings for other forms of disability insurance.[23]   And many of the other changes

2  Plaintiffs claim (at 39) are "significant amendments" represent exceedingly minor tweaks to the

3  rules, such as the fact that institutions may now cover "certain meal and lodging expenses" for the

4  families of FBS football recruits (while in the past such expenses could be covered only for

5  basketball recruits) and student-athletes hosting a recruit now can receive a daily stipend of $75 (as

6  opposed to the previous limit of $40 per day).  Such changes do not constitute "a fundamental,

7  material change in the factual basis for the Ninth Circuit's decision."[24]

8        That is particularly true given Plaintiffs' concession at trial that all of these purported

9  amendments represent "expansions" of benefits, not "restrictions."[25]  In effect, Plaintiffs are asking

10  this Court to conclude that Defendants have committed a new antitrust violation since *O'Bannon* by

11  *loosening* their allegedly anticompetitive rules through minor adjustments.  This Court should reject

12  this novel and baseless theory.[26]  Aside from perversely suggesting that relaxing rules causes new

13  antitrust violations to arise where they did not exist before, Plaintiffs' position would invite this

14  Court or other courts to hold a trial any time minor rule changes are adopted.  As even Plaintiffs

15  themselves recognize (at 43), this is not the law; "antitrust jurisprudence counsels against courts

16
17  [23] Hostetter Tr. 237:17-21; *see also id.* 74:14-75:11; J0025-0048 (2013-2014 NCAA Manual in place during O'Bannon trial) (NCAA Bylaw 12.1.2.4.4) ("An individual may borrow against his or her future earnings potential . . . for the purpose of purchasing insurance (with no cash surrender value)

18  against a disabling injury or illness that would prevent the individual from pursuing a chosen career . . . .").

19  [24] Pls.' Closing at 38.

20  [25] Tr. 187:4-8.

21  [26] This Court also should reject any claim that NCAA interpretations and waivers of its rules issued since July 2014 justify setting aside *O'Bannon*, as Plaintiffs put virtually no evidence in the record to

22  show how waivers or interpretations warrant revisiting the Ninth Circuit's decision.  While Plaintiffs suggest that there have been many waivers and interpretations since 2014, Pls.' Closing at 40, they provide only anecdotal evidence of changes, and they made no attempt at trial to establish how many

23  have occurred since *O'Bannon*, which rules have been affected, or how these rules were allegedly changed—much less how such a change would warrant a departure from *O'Bannon*.  In any event,

24  by their very nature of *waiving* application of NCAA rules, none of the waivers could reflect a new *restraint* on how universities conduct their affairs.  Indeed, Plaintiffs identify only a pair of related

25  changes that post-date *O'Bannon*: a single interpretation—the NCAA's travel pilot program which allows reimbursement of expenses for a small group of family members to attend the College

26  Football Playoff—and a single waiver—which similarly allows the NCAA to reimburse expenses for family members to attend the Final Four.  And while Plaintiffs cite the NCAA's Waivers Checklist,

27  the Checklist actually demonstrates that the previously approved waivers were first "approved with an immediate effective date by the NCAA Division I Legislative Council during its *April 2009*

28  meeting." P0148-0001 (emphasis added).

DEFS.' CLOSING BRIEF                                                      MDL No. 4:14-md-02541-CW

acting as *de facto* regulatory bodies."  So long as the challenged restraints are consistent with their procompetitive justification, arguments that the defendants could have drawn the line in some other place are precisely what the Ninth Circuit warned against in directing that courts are not "free to micromanage organizational rules" and "should not use antitrust law to make marginal adjustments to broadly reasonable market restraints."[27]

## II.  THE EVIDENCE AT TRIAL RECONFIRMED WHAT *O'BANNON* ESTABLISHED: THE CHALLENGED RULES ARE PROCOMPETITIVE

As in *O'Bannon*, this case is governed by the three-step rule of reason framework.[28]  With the Court having resolved the first step in Plaintiffs' favor at summary judgment, the burden shifts to Defendants to show a procompetitive rationale for the challenged restraint.[29]  As detailed below, Defendants, as they did in *O'Bannon*, have proven the existence of two procompetitive benefits. Substantial evidence demonstrated that the challenged rules preserve consumer demand because amateurism is a key part of demand for college sports.  The challenged rules also foster the integration of athletics and academics, thereby improving and maintaining the quality of the educational experience available to all students, including to student-athletes, as well as contributing to consumer demand.

The Court thus turns to the third step—what the Ninth Circuit in *O'Bannon* called "the final inquiry"[30]—where Plaintiffs must make a "strong evidentiary showing" that specific "substantially less restrictive alternatives to the NCAA's current rules" are "'virtually as effective' in serving the procompetitive purposes of the NCAA's current rules, and 'without significantly increased cost.'"[31]

---

[27] *O'Bannon*, 802 F.3d at 1075.

[28] "To determine whether a restraint violates the rule of reason, . . . a three-step, burden-shifting framework applies.  Under this framework, the plaintiff has the initial burden to prove that the challenged restraint has a substantial anticompetitive effect that harms consumers in the relevant market.  If the plaintiff carries its burden, then the burden shifts to the defendant to show a procompetitive rationale for the restraint.  If the defendant makes this showing, then the burden shifts back to the plaintiff to demonstrate that the procompetitive efficiencies could be reasonably achieved through less anticompetitive means."  *Ohio v. Am. Express Co.*, 138 S. Ct. 2274, 2284 (2018) (citations omitted); *see also O'Bannon*, 7 F. Supp. 3d at 985 (quoting *Tanaka v. Univ. of S. Cal.*, 252 F.3d 1059, 1063 (9th Cir. 2001)).

[29] MSJ Order at 16, 18-19.  *See generally Am. Express*, 138 S. Ct. at 2284.

[30] *O'Bannon*, 802 F.3d at 1074.

[31] *Id.* (quoting *Cty. of Tuolumne v. Sonora Cmty. Hosp.*, 236 F.3d 1148, 1159 (9th Cir. 2001)).

1   As discussed in Part III below, Plaintiffs have failed to prove any less restrictive alternative meeting

2   that test.

3                    **A.  Plaintiffs' Articulation of the Legal Standard at Step Two Is Incorrect**

4          Perhaps recognizing that Defendants have easily met their burden to prove procompetitive

5   justifications at step two under the correct legal standard, Plaintiffs have repeatedly—and

6   incorrectly—urged that Defendants bear the burden to show that the rules are "*necessary*" to create

7   consumer demand for the college sports product, such that, but for the challenged restraints, demand

8   would "collapse" or "fall[] off a cliff."[32]   Likewise, Plaintiffs argue that Defendants must prove that

9   the challenged restraints, by themselves, "*cause* 'integration.'"[33]   Not so.  The test is a rule of

10  *reason*, not the strict rule of necessity and causation Plaintiffs make it out to be.  In reality, under

11  controlling law Defendants need to prove only "that the NCAA's 'current understanding of

12  amateurism' plays *some role* in preserving 'the popularity of the NCAA's product,'" the "particular

13  brand" of amateur sports that is intercollegiate athletics,[34] or that the challenged rules improve the

14  quality of college education by *promoting* the integration of academics and athletics.[35]

15         Plaintiffs also argue that it is Defendants' burden at step two to prove that additional forms of

16  compensation or conference-level rulemaking "would, in fact, negatively impact consumer

17  demand."[36]   In so doing, they attempt to shift onto Defendants what is *their* burden at step three to

18  prove the existence of equally effective but less restrictive alternatives, asserting essentially that

19  Defendants have to prove the nonexistence of less restrictive alternatives to survive step two.  The

20

21  ─────────────────────────────
    [32] Pls.' Op. at 1-2, 10, 15, 18-19, 21, 23, 46 (emphasis added); *see also* Pls.' Closing at 2 (stating that
    Defendants have a "substantial burden" to prove that "the challenged restraints preserve consumer
22  demand").
    [33] Pls.' Closing at 2, 18.
23  [34] *O'Bannon*, 802 F.3d at 1059 (emphasis added) (quoting *O'Bannon*, 7 F. Supp. 3d at 1005); *id.* at
    1079 (quoting *Bd. of Regents*, 468 U.S. at 101-02).
24  [35] *O'Bannon*, 802 F.3d at 1059, 1081; *see also O'Bannon*, 7 F. Supp. 3d at 1004-05.  By way of
    example, in *O'Bannon*, this Court concluded that the challenged rules had a procompetitive effect
25  based on its finding that "restrictions on student-athlete compensation play a *limited role* in driving
    consumer demand," along with other factors that also attract consumers.  *Id.* at 1001 (emphasis
26  added).
    [36] Pls.' Closing at 11-12; *see also id.* at 9 (arguing that Dr. Bruce Isaacson's testimony does not help
27  Defendants meet their step two burden because "consumer *opposition* to a compensation change
    does not equate to a respondent reducing consumption if the change were implemented").
28

**DEFS.' CLOSING BRIEF**                                                    **MDL No. 4:14-md-02541-CW**

Ninth Circuit has expressly rejected such a reallocation of burden: "The correct inquiry under the Rule of Reason [at step two] is: What procompetitive benefits are served by the NCAA's existing [challenged rule]?"[37] "It is only in the third step, where the burden is on the plaintiffs, when the court could consider whether alternative rules provide a procompetitive benefit. And even then, the courts' analysis is cabined to considering whether the alternative serves the same procompetitive interests identified in second step."[38]

Plaintiffs also wrongly claim "that Defendants offered no *economic* evidence to meet their burden to prove the challenged compensation restraints preserve consumer demand for D-I basketball and FBS football,"[39] conflating *economic* evidence with *econometric* analysis. Plaintiffs cite no authority requiring the latter in order for a defendant to meet its burden at step two, and indeed there was no econometric evidence offered in *O'Bannon* on the subject of consumer demand.[40] Defendants offered extensive economic evidence—from economists, a survey expert, conference commissioners with significant experience in broadcasting college sports, and university

---

[37] *O'Bannon*, 802 F.3d at 1073 n.17.

[38] *Id.*; *see also id.* at 1079 n.25 ("[W]e do not decide, and the NCAA need not prove, whether paying student athletes $5,000 payments [above cost of attendance] will necessarily *reduce* consumer demand. The proper inquiry in the Rule of Reason's third step is whether the plaintiffs have shown these payments will *not reduce* consumer demand (relative to the existing rules)." (emphasis in original)).

[39] Pls.' Closing at 6 (emphasis added).

[40] *See also Cal. Dental Ass'n v. FTC*, 224 F.3d 942, 949 & n.5, 956 (9th Cir. 2000) (affirming procompetitive justifications for restrictions on dental advertisements based solely on testimony from dentists about harm that would result if restrictions were lifted). Two other cases within the Ninth Circuit likewise concluded that sports organizational rules were procompetitive with no mention of econometric analysis. *See Hairston v. Pac. 10 Conference*, 101 F.3d 1315, 1319 (9th Cir. 1996) (citing only *Board of Regents* for the proposition that the challenged rules are procompetitive); *Toscano v. PGA Tour, Inc.*, 201 F. Supp. 2d 1106, 1123 (E.D. Cal. 2002) (citing *Board of Regents* and a single paragraph from the defendant's statement of undisputed facts).

To the extent *O'Bannon* does not preclude Plaintiffs' case, Defendants do not need to prove *both* of the procompetitive justifications from *O'Bannon* to prevail or limit the scope of any injunctive relief. The Ninth Circuit's rejection of the $5,000 stipend was based solely on the procompetitive justification of preserving consumer demand. *See* 802 F.3d at 1076 ("The question is where the alternative of allowing students to be paid NIL compensation unrelated to their education expenses, is virtually as effective in preserving amateurism as *not* allowing compensation. We cannot agree that a rule permitting schools to pay students pure cash compensation and a rule forbidding them from paying NIL compensation are both *equally* effective in promoting amateurism and preserving consumer demand." (internal quotation marks and citations omitted; emphases in original)).

---

9

officials—about the procompetitive nature of the NCAA's amateurism rules, both in preserving consumer demand for college sports and in fostering academic integration.[41]

### B.  The Challenged Rules Promote Consumer Demand for College Sports

#### 1.  *Uncontroverted Evidence Demonstrates That Amateurism Is a Defining Characteristic of College Sports That Contributes to Demand*

The uncontroverted evidence elicited at trial more than demonstrates "that the NCAA's 'current understanding of amateurism' plays *some role* in preserving 'the popularity of the NCAA's product.'"[42]  Indeed, not even Dr. Daniel Rascher would testify that "amateurism has nothing to do with consumer demand."[43]  To the contrary, Dr. Rascher testified, "[b]ased on [his] understanding of economics [and] antitrust," that it is "true" that "there is a level of disenchantment with paying athletes that would lead to a reduction in demand" for college sports, and that this relationship between consumer demand and pay-for-play "would be sufficient to meet the Prong 2 requirement of a procompetitive justification . . . ."[44]  Plaintiffs' survey expert, Mr. Hal Poret, would not opine that *any* amount of compensation could be offered without decreasing consumer demand.[45]

At least six fact witnesses—from different schools, conferences, and the NCAA—testified from *personal experience* that consumers value amateurism.[46]  Contrary to Plaintiffs' assertions that this testimony is "entirely speculative" or amounted to nothing more than "unsupported belief,"[47] these witnesses' testimony was properly "based upon particularized knowledge obtained by virtue of

---

[41] Plaintiffs also improperly rely on the testimony of their economic expert witnesses, Drs. Rascher and Noll, to support substantive assertions of fact.  The law is clear that, while an expert may rely on hearsay or other inadmissible evidence to explain the basis for his opinion, that evidence itself is not admissible for its truth simply because the expert relied on it.  *Paddack v. Dave Christensen, Inc.*, 745 F.2d 1254, 1261-62 (9th Cir. 1984); *In the Matter of James Wilson Assocs.*, 965 F.2d 160, 172-73 (7th Cir. 1992).  Accordingly, even though it may have been unobjectionable for Drs. Rascher and Noll to recite supposed historical facts as the basis for their opinions, what Plaintiffs now try to do—rely on those recitations as the evidentiary basis for the historical facts—is not allowed.

[42] *O'Bannon*, 802 F.3d at 1059 (emphasis added) (quoting *O'Bannon*, 7 F. Supp. 3d at 1005).

[43] Tr. 58:11-13, 59:3-23.

[44] Tr. 66:9-15.

[45] Tr. 1693:1-20.

[46] While Plaintiffs denigrate this testimony as "repetitive," Pls.' Closing at 13, the consistent testimony from multiple witnesses involved in college sports at various levels only demonstrates the truth of such testimony.

[47] *See* Pls.' Closing at 5, 13.

10

the witness's position in the business."[48]  In particular, "experienced businessmen [and

businesswomen] know a great deal about what consumers think; that is personal knowledge . . . ."[49]

As detailed below, each of the six witnesses testified that his or her understanding of consumer

demand was developed through frequent and substantial interactions with constituencies of college

sports, and often supported by formal consumer studies.[50]  Plaintiffs attack these witnesses,

including non-party witnesses, as having a "pecuniary or philosophical interest in the *status quo*."[51]

It is not clear what having a "philosophical interest in the *status quo*" means, apart from Plaintiffs

agreeing that these witnesses sincerely believe in the current model of amateurism based on personal

experience.  Nor is it credible to assert that whatever financial stake certain witnesses might have

(the scope of which is highly speculative anyway) would lead them to alter their testimony.

> a.  American Athletic Conference Commissioner Mike Aresco

Commissioner Aresco explained that, even before he was an NCAA conference

commissioner, he recognized—through decades of experience negotiating deals for ESPN and CBS

to broadcast college sports to consumers[52] —that "amateurism or not paying college athletes . . .

does contribute to consumer demand"[53] and that many fans would not follow college sports as

closely if student-athletes were paid.[54]  This is not merely a personal opinion; broadcasters—

---

[48] In re Google AdWords Litig., 2012 WL 28068, at *4 (N.D. Cal. Jan. 5, 2012), rev'd on other grounds sub nom. Pulaski & Middleman, LLC v. Google, Inc., 802 F.3d 979 (9th Cir. 2015); see also Milton H. Greene Archives, Inc. v. Julien's Auction House LLC, 345 Fed. App'x 244, 247 (9th Cir. 2009); Cleveland v. Groceryworks.com, LLC, 200 F. Supp. 3d 924, 949 (N.D. Cal. 2016); Hynix Semiconductor Inc. v. Rambus Inc., 2008 WL 504098, at *4 (N.D. Cal. Feb. 19, 2008); Fed. R. Evid. 701 advisory committee's note to 2000 amendment.

[49] *Ty Inc. v. Softbelly's Inc.*, 353 F.3d 528, 534 (7th Cir. 2003).

[50] As the voluminous cases cited by Defendants in the prior briefing on this topic make clear, a witness does not lack personal knowledge of her or his business simply because that knowledge is derived from conversations had on the job.  *See* Defs.' MIL Opp. at 5-7 (collecting cases).

[51] Pls.' Closing at 1.

[52] Tr. 1003:17-1004:22, 1036:21-26, 1037:1-8, 1044:9-12.

[53] Tr. 1036:1-20.

[54] Tr. 1067:11-1068:2.  Commissioner Aresco negotiated dozens, up to a hundred, college sports broadcasting contracts during his decades at ESPN and CBS.  Tr. 1000:8-14.  He worked at ESPN from 1984 to 1996, during which time college sports were fundamental to the development of the nascent network.  Tr. 984:17-985:2, 987:8-988:11.  While at ESPN, Aresco was responsible for making the television rights deals necessary to broadcast sporting events, with a focus on college football and basketball.  Tr. 985:11-986:13.  He was later promoted to Director of College Sports at ESPN, overseeing all college sports programming and deals at the network.  Tr. 988:12-24.  In 1996, *(cont.)*

1  including Aresco throughout his career—base their business decisions to *purchase* college sports

2  events on that understanding.[55]  They recognize that college sports represent a "purer form of

3  competition involving amateur student athletes [that] resonate[s] with the public."[56]  And while still

4  working at CBS, Aresco publicly shared these views, including in testimony before the Knight

5  Commission.[57]

6         Since Mr. Aresco became a conference commissioner, his understanding that amateurism

7  supports consumer demand has only been reinforced.  Among other things, his view has been

8  confirmed by a survey he received of consumers' attitudes toward college sports, which showed that

9  71% of the public does not believe players should be paid.[58]

10                         **b.  Pac-12 Commissioner Larry Scott**

11         Another conference commissioner, Larry Scott, likewise testified that "the very large

12  majority of consumers value amateurism, think student athletes get a lot of support under the current

13  system, and would not like to see them be paid or be professional."[59]  That understanding comes

14  from myriad conversations directly with alumni, boosters, and fans generally.  Those consumers

15  have made clear to Commissioner Scott that "amateurism promotes consumer demand for college

16  sports"[60]; indeed, some said "they would not attend football and basketball games or watch them on

17  TV if there were professional athletes playing."[61]  Like Aresco and his colleagues at CBS, Scott

18  recognizes that, in college sports, consumers see "there's a different kind of a purity about the

19  purpose and why the athletes are participating that is an important point of difference."[62]

20

---

21  Aresco left ESPN to go to CBS, where he worked until 2012.  Tr. 995:22-25, 1005:24-1006:2.
22  While at CBS, Aresco handled college sports programing, including negotiating TV contracts with
   conferences and the NCAA.  Tr. 996:1-4, 996:21-997:21.
23  [55] Tr. 1004:1-6, 1004:15-21, 1028:20-25, 1033:24-1034:8, 1035:5-11, 1036:1-20.
   [56] Tr. 1004:10-22 (Aresco).
24  [57] Tr. 1034:10-1035:4.
   [58] Tr. 1037:1-8, 1044:9-12.
25  [59] Tr. 1153:2-6; *see also* Tr. 1152:19-1153:14 (Scott) (It is "clear . . . that the vast majority of
26  consumers think amateurism is a very important component of college sports.").
   [60] Tr. 1167:6-10, 1172:6-17.
27  [61] Tr. 1243:20-22.
   [62] Tr. 1094:22-1095:7.
28

Commissioner Scott's understanding about the appeal of amateurism is supported by studies he commissioned or received.[63]  In 2014, for example, he had the Pac-12 survey one thousand consumers about their perceptions of the conference and of amateurism, to help develop policies and marketing approaches.[64]  Nearly three-fourths of respondents, 71%, opposed paying student-athletes and agreed they "should remain amateurs," with only 29% saying that student-athletes "should be allowed to earn money" playing college sports.[65]  Opposition to pay-for-play ranged from 60% (among the biggest fans) to 74% (among other fans).[66]  But every demographic group evaluated, whether by geography or intensity of interest, showed greater opposition to paying student-athletes than support.[67]

Not surprisingly, then, Commissioner Scott's understanding about the relationship between amateurism and consumer demand is not merely a personal opinion, but one of the business principles involved in his oversight of the Pac-12 Conference and the broadcasting of games, both on the conference's own Pac-12 Networks and through contracts with broadcast partners.[68]  For example, consistent with Aresco's experience with CBS and ESPN, Scott explained that the Pac-12's third-party broadcast partners, ESPN and Fox, have discussed the appeal of amateurism in the context of contract negotiations, after deals closed, and during regular meetings with the Pac-12.[69]  Likewise, Scott explained that amateurism appeals not only to broadcasters, but to sponsors too—many of whom "are very focused on Pac-12 athletics being a part of higher education and the fact that the student athletes are students and they're amateurs and they're . . . participating . . . as part of

---

[63] Tr. 1149:14-23, 1151:21-23, 1152:19-1153:14.  One such study was provided to Commissioner Scott by Big Ten Commissioner Jim Delany.  *See* Tr. 1147:10-1149:23; D0683.  This was an abbreviated version of the same study about which Ohio State AD Gene Smith testified, D0239, described in detail *infra* at 15.

[64] Tr. 1153:22-1155:1; D0541-0002.  As Mr. Scott explained, the survey was not designed to reach any particular result.  Tr. 1165:1-1166:2.

[65] D0541-0009.

[66] D0541-0009.  So-called "Big Fans" were slightly more likely to watch college sports on television than so-called "Somewhat Fans" (70% vs. 63%) and marginally more likely to attend games live (14% vs. 13%).  D0541-0013.

[67] D0541-0009; *see also id.* at 0003 (reporting that "all audiences prefer student athletes to remain amateurs").

[68] Tr. 1090:24-1092:7.

[69] Tr. 1167:11-1168:16.

13

1   an overall educational journey that they're on," and want the academic aspect of college sports to be

2   reflected in their sponsorship.[70]

3                       c.   Former NCAA Executive Vice President for Championships Mark Lewis

4          Mark Lewis testified to similar experience with consumer interest in amateurism.  Based on

5   communications he has had with ticket buyers and other consumers as well as broadcast and media

6   partners, Lewis explained that the college sports "fans who create that consumer demand would feel

7   differently if college sports looked like professional sports."[71]  In fact, whereas "plenty" of fans have

8   expressed their desire to Lewis that student-athletes not be provided more than a scholarship and that

9   college sports not become a minor professional league, none has ever expressed a desire to pay

10  student-athletes.[72]  Maintaining a distinction between college sports and professional sports, in other

11  words, is important to maintaining consumer demand.  Lewis also testified that if college sports were

12  professionalized, demand would fall because they would become a sort of minor professional league

13  but would never be able to compete with the "apex" professional sports leagues, like the NFL and

14  the NBA.[73]  The professionals who play those sports are simply better players on the whole than

15  those playing college sports.  And if fans want to watch, for example, professional football, most

16  will choose to watch the more talented players in the NFL.[74]  By contrast, consumers are drawn to

17  college sports because the athletes are not playing for money, but "for the joy of competition . . . ."[75]

18                      d.   The Ohio State University Athletic Director Gene Smith

19         In addition to witnesses at the NCAA and conference level, several non-party witnesses

20  testified about consumer demand for amateurism in college sports.  For example, current Ohio State

21  AD, Gene Smith, testified that amateurism is "basic and core to what [college sports are] all about,"

22  namely, creating a sports product that is centered in academic education and personal development,

23  _____

24  [70] Tr. 1129:16-1131:4, 1132:15-19.

    [71] Lewis 30(b)(6) Tr. 64:17-65:12.

25  [72] Lewis 30(b)(6) Tr. 65:20-66:7.

26  [73] Lewis 30(b)(6) Tr. 46:5-9, 97:15-98:12, 98:24-99:5, 99:19-25; *see also* Berst Tr. 71:6-16 ("[A]s
    soon as you have a system that's pay for play, you have the developmental league in basketball
    which isn't very successful . . . .").

27  [74] Lewis 30(b)(6) Tr. 101:3-14.

28  [75] Lewis 30(b)(6) Tr. 98:13-18.

1  which is "significantly different than the pro environment."[76]  Based on his interactions with

2  collegiate donors and fans of college football and basketball, he testified that a "super majority are

3  opposed to pay-for-play."[77]  Likewise, Smith's experience with athletic sponsors echoes

4  Commissioner Scott's:  many want to align themselves with the values particularly held by college

5  sports fans, such as education and personal growth, and if universities paid student-athletes, some

6  would stop sponsoring college sports.[78]

7      In addition to his direct conversations with fans and sponsors, Smith testified that his views

8  were confirmed by a consumer-demand study The Big Ten Conference commissioned to inform

9  conference leaders about the fan base for college sports.[79]  The participants in that study "indicated a

10  clear preference for college over pro sports."[80]  That preference "is driven by the purity of the game

11  and the passion of the athletes," as demonstrated by their "playing for the love of the sport" and not

12  "play[ing] for pay."[81]  The Big Ten study further provided a detailed comparison of the "Perceptions

13  of College vs. Pro Sports":[82]

---

21  [76] Tr. 1394:20-1395:9.  Aside from being Ohio State's current athletic director, Mr. Smith is a former student-athlete, a first generation college student, former college football coach, and previously served as athletic director at three other NCAA Division I schools.  Tr. 1377:10-21, 1379:13-15, 1382:8-24, 1383:13-24, 1384:13-16, 1385:12-15, 1387:9-13.

23  [77] Tr. 1406:24-1408:14.

24  [78] Tr. 1420:22-1422:1 (Smith).

25  [79] Tr. 1412:15-1413:23, 1418:4-20, 1419:18-22, 1416:24-1417:3.  The study consisted of six focus groups conducted in three major markets across the country, specifically chosen because they were representative of multiple major conferences.  D0239-0003.  Only fans who regularly attended or watched college sports participated in the focus groups.  *Id.*

27  [80] *Id.* at 0004.

[81] *Id.*

28  [82] *Id.* at 0011.

DEFS.' CLOSING BRIEF                                        MDL No. 4:14-md-02541-CW

| College Sports | Professional Sports |
|---|---|
| • "For these individuals, college sports represented the purest form of the sport - playing for the love of the game, sportsmanship and teamwork."<br><br>• "College athletes also seem to develop more personal connections with the university and community."<br><br>• "College athletes develop loyalties to the university and community that last a lifetime. In fact, many of these loyalties are passed on to their children." | • "[P]ro sports are believed to be more about money and individuals."<br><br>• "Many believe for the pro athlete the game has become a job and playing for the love of the game has unfortunately become a distant second."<br><br>• "[I]n pro sports a player may only play for a team for a few years before being traded. This makes it difficult to develop personal connections with a team or city." |

These contrasting perceptions highlight not only the importance of amateurism in distinguishing college sports from professional sports, but also that "a connection between the fan and the student" is *promoted* by the non-professional character of the student-athlete's participation in college sports.[83]  As Smith explained, while collegiate athletes are less polished than professionals, college sports fans enjoy that they are playing not for money but as part of their education and personal development.  By contrast, in professional sports the fans are attracted because of the polished nature of the game and the environment, as well as the superior skill of the athletes.[84]  Smith testified that paying student-athletes would change the nature of that relationship; fans would "feel differently about the game and feel differently about the student athletes that they come to see."[85]  The connection to student-athletes is particularly important for current and former students, and school faculty and staff, which represent a significant percentage of college sports fans.[86]

---

[83] Tr. 1419:23-1420:12 (Smith); *see also* D0239-0011 (fans have a "greater sense of connection to college athletics" in part because student-athletes "seem to develop more personal connections with the university and community").

[84] Tr. 1393:15-1394:11.

[85] Tr. 1408:15-1410:13.

[86] At Ohio State, for example, roughly 102,000 people can attend a football game.  Nearly half of those in attendance at any given football game are *current* students (30,000, or 29%) and university faculty and staff (15,000, or 15%), and that is not even counting *former* Ohio State students.  Tr. 1396:20-25, 1411:9-13, 1453:10-12 (Smith).

e. <u>University of Wisconsin at Madison Chancellor Rebecca Blank and Wake Forest University President Nathan Hatch</u>

The top officers of two other universities—Chancellor Rebecca Blank and President Nathan Hatch (who formerly served as the Provost of the University of Notre Dame)—similarly explained how the consumer appeal of college sports is intertwined with the educational mission of the schools that sponsor them.  Chancellor Blank testified that if student-athletes were paid to play, *i.e.*, given more than their educational expenses and benefits incidental to participation, it would negatively affect consumer demand.[87]  In almost none of her conversations with alumni or community members has anyone expressed support for paying student-athletes.[88]  Dr. Hatch similarly testified that "amateurism contributes to the demand for college athletics" and "is critical to the kind of model" universities espouse.[89]  Alumni and other donors contribute to universities for many reasons, but one reason is an "attachment" to the "amateur model of athletics."[90]

Chancellor Blank also echoed Mr. Smith in explaining that a "sense of connection" between fans and student-athletes is fostered if the former identify with the latter "as representatives of their school, as students like [the fans] were" and that these connections foster consumer demand.[91]  Dr. Hatch likewise agreed that part of the appeal of collegiate sports is that student-athletes are "students like others who go through similar paths" and are "not being paid to play."[92]  Paying student-athletes would disrupt the relationships between them and the campus community because faculty and non-athlete students expect all student-athletes to be non-professional students.[93]

Chancellor Blank noted as well that students in particular "love seeing their fellow students out there playing,"[94] and have a "sense of connection with them as a fellow student."[95]  Alumni similarly watch college sports and "see[] themselves at a younger age," which gives them a

---

[87] Tr. 954:8-25.
[88] Tr. 864:12-16.
[89] Tr. 1978:25-1979:8, 1991:5-1993:13.
[90] Tr. 1987:13-1989:16 (Hatch).
[91] Tr. 869:18-870:2, 947:8:16.
[92] Tr. 1991:24-1992:4.
[93] Tr. 2001:3-12 (Hatch).
[94] Tr. 868:23-869:6.
[95] Tr. 949:9-950:6.

17

"particular pride" in college sports.[96]  If college athletes were paid to play, "the identification of

students with this as part of the team, as one of them, would be less," as would both "the support of

. . . alumni for the students" and "support of the leadership at [the] university, given [the] core

mission . . . is an educational mission . . . ."[97]

> 2.   *Dr. Isaacson's Survey Further Demonstrates Consumer Demand for Amateur College Sports*

Dr. Bruce Isaacson's survey "provid[es] valid and reliable evidence confirming that

amateurism is an important reason for the popularity of college sports" and "that amateurism is

important in consumers' decisions to watch or attend college sports . . . ."[98]  As Dr. Isaacson

explained, two aspects of that survey, in particular, support the conclusion "that there is a

relationship between amateurism and consumer demand":  first, the responses to his question asking

respondents why they watch or attend college sports, and the second, responses to his questions

about the so-called unlimited-payments scenario, where (as the name suggests) there would be no

limits on the payments that could be made to student-athletes.[99]

---

[96] Tr. 869:7-870:2 (Blank).

[97] Tr. 954:8-25 (Blank); *see also* Tr. 1454:2-15 (Smith).  Plaintiffs criticize Defendants for proffering lay opinions from only "a handful of witnesses cherry picked by Defendants."  Pls.' Closing at 14.  This argument is completely unfounded.  This Court has already recognized, "based on the sheer scope of this case, that the presentation of live testimony necessarily would have to be limited and streamlined."  Dkt. 1119 at 3.  That is because the "universe of potential witnesses in this action is extraordinary.  Division I has 351 member schools, each with a president and staff in several relevant departments; and thirty-two conferences, each with a commissioner and staff."  *Id.* at 3-4.  "Because the universe of potential witnesses in this case runs to the thousands, it would not have been possible for either side to present live testimony by every witness with knowledge or opinions on the subject."  *Id.* at 13.  Defendants, therefore, called witnesses from a cross-section of conferences and universities that was, as the Court described it, "representative" of the institutions not present at trial.  *Id.*

[98] Isaacson Dir. Test. ¶¶ 24, 26, 160; *see also id.* ¶ 13 ("The results . . . demonstrate that: (i) amateurism is an important reason why consumers watch college Division I football and basketball; (ii) a substantial portion of college sports fans oppose providing to student-athletes additional compensation and benefits, beyond the cost of attendance, tested in [the] survey; and (iii) a majority of consumers oppose providing student-athletes with unlimited payments . . . .").

[99] Tr. 1947:21-25.  Dr. Isaacson's survey is the only survey in evidence that measured consumers' *current* views on amateurism, as opposed to what might happen in a but-for world where some NCAA rules were eliminated.  Plaintiffs' expert, Hal Poret, repeatedly made clear that the purpose of his survey was to examine hypothetical changes to the NCAA rules that would provide "additional forms of compensation or benefits that are not currently permitted by the challenged NCAA rules" and to "measure[] the potential *impact on consumer viewership/attendance*" of those hypothetical changes.  Poret Dir. Test. ¶ 6 (emphasis in original); *see also, e.g., id.* ¶¶ 2, 18, 22, 25, 134; Tr. 1773:3-11 ("The assignment was to determine whether there are some forms of compensation or *(cont.)*

---

**DEFS.' CLOSING BRIEF**                                                    **MDL No. 4:14-md-02541-CW**

a. <u>Consumers Watch and Attend College Sports Because They Are Played by Amateurs</u>

Not only do the NCAA's amateurism rules promote demand for college sports, a significant percentage of consumers expressly recognize the athletes' amateur status as a reason why they watch or attend.  Dr. Isaacson asked consumers:  "Which of the following, if any, are reasons why you watch or attend [college sports] games," giving them 14 substantive possible answers, including "another reason not listed above."[100]  "Almost one-third (31.7%) of the respondents in [the] survey answered that they watch or attend college sports because they 'like the fact that college players are amateurs and/or are not paid.'  This was the third-most-commonly selected reason."[101]

These data are unrefuted—and certainly not addressed by the survey of Plaintiffs' expert, Mr. Poret.  While he asked consumers "Which of the following, if any, are reasons why you watch" college sports, Mr. Poret did not offer respondents the option of selecting the amateur or unpaid status of athletes, despite the fact that it is the central issue in this case.[102]

With no evidence of their own on the question, Plaintiffs strain to dismiss the data Dr. Isaacson gathered, arguing that his phrase "amateurs and/or are not paid" "made it impossible to determine whether respondents choosing this response did so merely because they liked the fact that

---

benefits that go beyond what is currently permitted that could be offered without having there be a negative impact on consumer demand for the college sports at issue.").

Mr. Poret's opinions likewise address only what he believes *might* happen in a but-for world where "additional forms of compensation/benefits . . . could be offered . . . ."  Poret Dir. Test. ¶ 57; *see also, e.g.*, *id.* ¶¶ 59, 129; Tr. 1790:14-20 (describing his "bottom line conclusion" as "there are some scenarios in which conferences or colleges could offer additional compensation without having a negative impact on consumer demand").  Mr. Poret did not asses existing consumer demand under the current NCAA rules.

[100] Tr. 1965:23-1966:4; Isaacson Dir. Test. ¶ 132.

[101] Isaacson Dir. Test. ¶ 24; *see also* Tr. 1903:19-23, 1904:14-19 (Isaacson) (amateurism's ranking as third most important among college sports fans demonstrates its value, relative to the other reasons for watching/attending included in Dr. Isaacson's survey question).

[102] Poret Dir. Test. ¶¶ 78, 79; Tr. 1661:18-1662:13; Isaacson Dir. Test. ¶¶ 86, 88.  As Dr. Isaacson explained, this question plays no role in Mr. Poret's opinions in this case.  Its only purpose appears to be to "'prime[]' respondents to give answers more favorable to Plaintiffs when responding to the subsequent scenarios . . . because the omission of amateurism from the list of possible reasons why respondents watch college sports would have encouraged respondents to think about and focus on reasons why they are fans of college sports *other than* amateurism."  *Id.* ¶ 89; *see also id.* ¶ 90 ("Mr. Poret's . . . disregard of amateurism early in his survey may have artificially depressed consumers' opposition to the later scenarios as well as their predictions that the scenarios would cause them to watch or attend the sports less often.").

1  the athletes are students without regard to whether they are also 'paid . . . .'"[103]  This effort to create

2  an artificial distance between the word "amateur" and its definition ("not paid") and to suppose that

3  respondents would not have given the commonplace word "amateur" its ordinary meaning—the one

4  Dr. Isaacson provided and the one the Ninth Circuit used in *O'Bannon*—namely, "not paid"[104]—has

5  no basis.  Unsurprisingly, Plaintiffs have provided *no* evidence (or logic) to support this highly

6  counterintuitive supposition.  And Dr. Isaacson's survey results demonstrate that respondents

7  understood the common definition of amateurism to apply since 85% of respondents who testified

8  that they watch college sports because they are played by amateurs also opposed the Unlimited

9  Payments scenario.[105]  Because "amateur" is functionally synonymous with "not paid," it does not

10  matter whether a respondent selected the response based on one term or the other.[106]

11  Plaintiffs also try to dismiss these data on the ground that respondents who indicated they

12  watch college sports because they are played by amateurs also indicated there were other reasons for

13  their viewership.[107]  But, in *O'Bannon*, the Ninth Circuit already rejected that view as a matter of

14  common sense and law; even if the "district court was not persuaded that amateurism is the *primary*

15  driver of consumer demand for college sports," it was enough that "the NCAA's 'current

16  understanding of amateurism' plays *some role* in preserving 'the popularity of the NCAA's

17  product.'"[108]  Dr. Isaacson's survey evidence unquestionably shows at least that much.

18        b.  Consumers Oppose Unlimited Payments to Student-Athletes

19  Consumers' negative responses to Dr. Isaacson's questions about the Unlimited Payments

20  scenario likewise show that many consumers are attracted to amateurism in college sports.[109]  That

21

---

22  [103] Pls.' Closing at 10; *see also* Poret Dir. Test. ¶ 146; Poret Reb. Test. ¶ 6 n.5.

23  [104] Isaacson Dir. Test. ¶ 155; *see also O'Bannon*, 802 F.3d at 1076 ("not paying student-athletes is *precisely what makes them amateurs*" (emphasis in original)).

24  [105] Tr. 1967:16-23 (Isaacson).

   [106] Isaacson Dir. Test. ¶ 156.

25  [107] Pls.' Closing at 10-11.

26  [108] 802 F.3d at 1059 (second emphasis added); *see also O'Bannon*, 7 F. Supp. 3d at 977 (finding that "the NCAA's restrictions on student-athlete compensation are not the driving force behind consumer

27  demand for FBS football and Division I basketball-related products" and that "consumers are interested in college sports for other reasons"); Isaacson Dir. Test. ¶ 157; Tr. 1966:5-15 (Isaacson).

28  [109] Tr. 1967:5-9 (Isaacson).

1   scenario asked whether respondents were in favor of or opposed to changing NCAA rules such that

2   "a college could pay a student-athlete any amount it wanted to, without any limit, for playing college

3   sports."[110]  "In total, the gross percentages of respondents opposed to and in favor of the [Unlimited

4   Payments] scenario were 68.5% and 19.8%, respectively.  After accounting for the survey control,

5   59.7% of respondents were opposed, compared with 0.1% in favor."[111]  These data are unrefuted, as

6   Mr. Poret did not test the possibility of uncapped compensation or payments in a free and open

7   market, even though Plaintiffs seek an injunction that would eliminate all of the NCAA's caps on

8   student-athlete compensation.[112]

9        Dr. Isaacson testified that these results support his opinion on the importance of amateurism

10  to college sports for two independent reasons.[113]  First, Dr. Isaacson tested this scenario because it

11  "specifically tests whether amateurism is related to consumer demand,"[114] since the possibility of

12  unlimited payments is, as Dr. Isaacson described, "the polar opposite of amateurism."[115]  Survey

13  respondents expressed "very high rates of opposition to that particular scenario,"[116] which

14  demonstrates consumers' support for the principle of amateurism.  These results—showing roughly

15  70% of respondents opposing a scenario where there were no rules limiting what a college could pay

16  student-athletes—reinforced testimony by Commissioners Scott and Aresco, whose views on

17  amateurism had been shaped by additional survey data likewise demonstrating around 70%

18  opposition to paying student-athletes.[117]  Based on his extensive experience in marketing, Dr.

19

20  [110] Isaacson Dir. Test. ¶ 126.

    [111] Isaacson Dir. Test. ¶ 25.

21  [112] Tr. 1693:11-15, 1696:8-19, 1766:20-1767:21 (Poret); Isaacson Dir. Test. ¶ 124; Requested
    Injunction (Pls.' Op., App'x C ¶ 1) ("Defendant National Collegiate Athletic Association . . . [is]
22  hereby permanently restrained and enjoined from maintaining . . . any . . . rule . . . that fixes or limits
    compensation or benefits available from schools or conferences to Division I women's and men's
23  basketball and FBS football athletes in consideration for their athletic services.").

24  [113] Tr. 1967:5-12.

    [114] Tr. 1913:14-16 (Isaacson).

25  [115] Tr. 1915:2-5, 1915:18-24.

    [116] Tr. 1967: 12-15 (Isaacson).

26  [117] Tr. 1167:6-10, 1172:6-17 (Scott) (Pac-12 survey consistent with his views on amateurism);
    D0541-0009 (Pac-12 Survey) ("Most of the general population (71%) thinks that college athletes
27  already receive enough benefits and should not be paid."); Tr. 1044:9-12 (Aresco) ("I have seen a
    study that showed that 71 percent . . . of the public does not believe players should be paid.").

28

1  Isaacson opined that "you wouldn't want to change a product, in fact, a product that's your only

2  product, when . . . more than half of your consumers oppose that change."[118]

3      Second, Dr. Isaacson testified that there was "very good correspondence" between responses

4  to the Unlimited Payments scenario and the question asking why respondents watch or attend college

5  sports.  A large majority of respondents who testified that they watch college sports because they are

6  played by amateurs (85%) also opposed the Unlimited Payments scenario.[119]  This correspondence

7  demonstrates that the two measures both support the same concept—the relationship between

8  amateurism and consumer demand.[120]  Together, they show that college sports fans both watch

9  college sports because student-athletes are not paid *and* oppose unlimited pay-for-play at levels that

10  both survey experts in this case agree demonstrate a significant result.[121]

11      **C.  The Challenged Rules Promote the Integration of Academics and Athletics**

12      The evidence at trial also demonstrates that the challenged restraints promote integration, a

13  second and independent procompetitive justification that was recognized by this Court and the Ninth

14  Circuit in *O'Bannon* and should again be recognized here.  Despite Plaintiffs' assertion to the

15  contrary, this Court recognized in *O'Bannon* and the Ninth Circuit affirmed that integrating student-

16  athletes into their academic communities is a legitimate procompetitive objective because it

17  "improve[s] the schools' college education product."[122]  Moreover, like amateurism, academic

18  integration itself plays a role in preserving consumer demand for college sports.

19      Although Defendants need not prove that student-athletes are perfectly integrated, the record

20  demonstrates that the challenged restraints promote integration in at least two ways.  First, not

21  paying student-athletes incentivizes student-athletes to retain a focus on academics.  Second, paying

22

23  ────────────────

[118] Tr. 1964:18-21.

24  [119] Tr. 1967:16-23 (Isaacson).

[120] Tr. 1968:11-18 (Isaacson).

25  [121] Tr. 1967:5-23, 1968:19-25 (Isaacson) (fact that "over a quarter of the population of Division I

26  sports fan[] respondents in [the] survey said that they watch because of amateurism and opposed the
   Unlimited Payment scenario" is "evidence of the relationship between amateurism and consumer

27  demand"); Tr. 1716:8-1717:11 (Poret) (responses of less than 10% are insignificant, but responses of
   15% or more are typically sufficient to demonstrate a significant result).

28  [122] *O'Bannon*, 7 F. Supp. 3d at 980; *O'Bannon*, 802 F.3d at 1072.

1  student-athletes would further distinguish them from their peers and create a wedge between student-

2  athletes and the broader school community and also among different student-athletes.

3          1.    *Division I Members Seek to Ensure that Student-Athletes Are Integrated*

4         The core missions of universities undeniably are educational, and universities are achieving

5  their educational missions with respect to student-athletes under the existing collegiate model.[123]  As

6  Chancellor Blank testified, the basic missions of the university are education and research, and

7  everything the university does must fit into one of those missions.[124]  Athletics are a central part of

8  the university's educational mission, not a business intended to increase profits.[125]  Intercollegiate

9  athletics are key to student-athlete development, teaching student-athletes valuable lessons in

10  teamwork, leadership, discipline, grit, and how to cope with success and failure.[126]  Indeed, the

11  evidence at trial demonstrated that many student-athletes recognize the importance of academics in

12  their overall university experience, selecting schools based on academic reputation and putting

13  academics before athletics.[127]

---

14  [123] *See* Heckman Dir. Test. ¶ 66.  Despite Plaintiffs' insinuation that there is some "business of D-I

15  basketball and FBS football" separate from universities' overall educational mission, Pls. Op. at 1, college sports are "a key part of [their] educational enterprise."  Tr. 1982:1-11 (Hatch).  Universities

16  sponsor athletics (often at great economic loss) because they provide "an opportunity for students who otherwise might not go to a quality university" and because "the educational experience itself"

17  that comes from participation in athletics is "important."  Tr. 1982:12-1983:22 (Hatch).  Even Dr. Noll agreed that "universities don't have college sports to make money in and of itself, they have it

18  to attract student-athletes" and "to please important constituencies, primarily students."  Tr. 275:10-13, 276:5-20; *see also* Tr. 278:18-22 (Noll) ("The business of colleges is to attract students and . . .

19  research grants.  And so doing things that attract students is part of the business model.").
[124] Tr. 874:10-13.

20  [125] Tr. 874:14-17 (Blank); Tr. 1392:21-1393:20 (Smith); *see also* Tr. 1390:16-1391:25 (Smith) (explaining that Ohio State sponsors 36 sports because the university believes in the educational

21  experience of intercollegiate athletics); Tr. 1982:5-11 (Hatch) (Wake Forest participates in 16 varsity sports, not to generate income, but because intercollegiate athletics "is a key part of [the

22  university's] educational enterprise" and is "critical to [the university's] educational mission.").  Dr. Noll's testimony likewise reveals that the "vast majority [of colleges and universities] sponsor teams

23  with no expectation of generating revenue," and that most Division I athletic programs lose money.  Tr. 275:14-276:4, 278:3-13.  Instead, "[u]niversities have comprehensive varsity athletic

24  programs largely because students want to be athletes" and "want to have the academic experience and the athletic experience."  Tr. 277:13-20 (Noll).

25  [126] Tr. 1983:11-22 (Hatch).  For example, Plaintiff Justine Hartman testified that she learned a lot

26  from her experience as a student-athlete, including principles of teamwork, how to bounce back from a loss, and leadership skills, which will help her in the future. Tr. 825:24-827:3; *see also* Tr.

27  1392:14-17 (Smith) ("Your experience and the group dynamics of athletics provides you with some intangible characteristic growth that other students don't have.").

28  [127] Tr. 263:7-265:9 (Noll).  For example, Plaintiff Shawne Alston testified that West Virginia *(cont.)*

DEFS.' CLOSING BRIEF                                           MDL No. 4:14-md-02541-CW

1    Consistent with their educational missions, Division I universities take significant steps to

2    ensure that student-athletes are integrated into the broader university communities.[128]  For example,

3    Chancellor Blank testified that student-athletes at the University of Wisconsin-Madison have more

4    than 90 different majors, do not live in athlete-only dorms, participate in the same freshmen

5    orientation as their non-athlete peers, and attend classes with non-athletes.[129]  Similarly, student-

6    athletes at Ohio State are not clustered in certain majors, are required to live on campus for two

7    years like all other students, do not live in separate student-athlete-only dorms, and eat in the same

8    dining halls as non-athlete students.[130]  Likewise, student-athletes at Notre Dame and Wake Forest

9    live in the same dorms and eat in the same dining halls, attend the same classes, and otherwise

10    engage in the same campus communities as non-athlete students.[131]

11    Results from the NCAA's Growth Opportunities, Aspirations and Learning of Students in

12    college (GOALS) studies confirm that that schools' integration efforts produce positive results.[132]

13    Among other results, a recent such study shows that (i) 69 to 81% of Division I student-athletes

14    confirmed that they have a sense of belonging on campus; (ii) 93% of respondents stated their

15    college athletic experiences had a positive or very positive impact on their "personal responsibility"

16    skills; and (iii) 69% of student-athletes in the relevant sports reported that some of their closest

17    friends were not their teammates.[133]

18

19    University's criminal justice program was "one of the biggest things" he considered in choosing a
school, Tr. 669:24-670:4, and Plaintiff Martin Jenkins testified that he was interested in the right

20    balance of academics and athletics, and the quality of education was important to him, Tr. 770:11-
771:6.  Plaintiff Justine Hartman also explained that she was looking for a school that was good at

21    athletics and academics.  Tr. 795:21-24; *see also* Jemerigbe Tr. 58:24-59:8 (describing the
opportunity to get "a really good education" as one of two equal criteria); Kindler Tr. 40:13-20,

22    52:7-53:21 (listing the courses of study and campus traditions as central to his decision-making
process).

23    [128] *See, e.g.*, Alger Tr. 111:11-113:8.
[129] Tr. 887:4-25, 888:22-889:13.

24    [130] Tr. 1398:12-1399:7, 1451:16-18 (Smith).  In addition, a member of Ohio State's football team
recently created a student organization to develop stronger relationships between African American

25    student-athletes and African American non-athlete students.  Tr. 1397:13-1398:11 (Smith).
[131] Tr. 1997:8-22 (Hatch).

26    [132] P0059-0011; Tr. 946:5-8 (Blank).  Whether student-athletes have a sense of belonging at their

27    colleges is one way to look at integration.  Tr. 945:24-946:4 (Blank).
[133] P0059-0011, 0013, 0048; Tr. 1818:17-1819:2, 1819:11-1820:17 (Petr).  Results from the NCAA

28    Study of College Outcomes and Recent Experiences (SCORE) similarly confirm that the vast
*(cont.)*

24

Division I schools also fulfill their core educational missions by supporting student-athletes academically, providing a variety of resources designed to help student-athletes succeed in their demanding academic environments. The collegiate model helps schools achieve their educational missions and encourages universities to invest in academic opportunities for student-athletes, which in turn benefits student-athletes.[134] For example, Plaintiff Martin Jenkins testified that he was provided academic support and attended over 430 tutoring sessions for free, which helped him succeed academically.[135] Plaintiff John Bohannon described some of the resources his schools employed to push for student-athlete academic achievement, including mandatory study hall, tutoring appointments, and weekly meetings with an academic advisor.[136] Student-athletes at Ohio State similarly are provided significant academic support, including academic advice, tutors, and learning specialists.[137] And as Ms. Hartman explained in a promotional video for the women's basketball team at the University of California at Berkeley, student-athletes "are set up to not fail."[138]

Trends in graduation rates demonstrate universities' success in helping student-athletes graduate and obtain degrees under the collegiate model.[139] As of 2017, the federal graduation rate

---

majority of former student-athletes are satisfied with their collegiate experiences. For example, 82% of respondents indicated that they were satisfied or completely satisfied with their overall experiences, 68% with their athletic experiences, 69% with their academic experiences, and 77% with their social experiences. Tr. 1828:15-24 (Petr).

[134] Heckman Dir. Test. ¶ 66.

[135] Tr. 777:7-15, 781:6-782:4.

[136] Bohannon Tr. 71:6-74:5.

[137] Tr. 1388:8-1389:10, 1438:14-1440:8 (Smith). Ohio State spends approximately $250,000 on tutors for student-athletes each year. Tr. 1438:25-1439:1 (Smith). It also provides significant support to help student-athletes get jobs after college, including career-development programs, internship programs, and study abroad programs. Tr. 1454:19-1455:16 (Smith) ("[W]e really try our best to work with them individually and have an individual plan to help them identify what they want to do and get them ready for that."). Of the 221 graduating student-athletes at Ohio State last spring, 76% had jobs by the time of graduation and that figure has since risen to 84%. Tr. 1455:23-1456:4 (Smith). The university also has a degree-completion program whereby athletes who leave before graduating to play sports professionally can come back afterwards to complete their degrees. Tr. 1456:5-12 (Smith).

[138] D0802-0004; *see also id.* ("As far as like, you know, getting in homework and stuff like that, I mean we have this great tutor so, like, that helps. Like my tutor is really like, on top of me consistently. So it's pretty easy, honestly.").

[139] *See* J0018 (Trends in GSR and Federal Graduation Rates at DI Institutions).

1   was higher for men's basketball and women's basketball student-athletes than their comparable non-

2   athlete cohorts.[140]  In fact, between 1991 and 2017, the federal graduation rate for student-athletes

3   increased 16%, including increases across all subgroups for football and men's and women's

4   basketball.[141]  These trends are consistent with the expert analysis of Dr. Heckman, whose empirical

5   work on the human capital benefits of amateur athletics demonstrates that "student-athletes have

6   received substantial academic and labor-market benefits under the Collegiate Model."[142]

7           Despite all this, Plaintiffs downplay the integration justification by claiming "Defendants

8   cannot even prove that D-I basketball and FBS football players are currently well-integrated,"

9   followed by a litany of anecdotes about the tensions and trade-offs that exist for student-athletes.[143]

10  But such complaints that athletes are not "well-integrated," while incorrect to begin with, also miss

11  the point.  The issue is not whether schools have achieved an ideal level of student-athletes'

12  integration, but whether the challenged rules are rationally crafted to help strike appropriate balances

13  so existing tensions and trade-offs do not unreasonably undermine academics.  Integrating student-

14  athletes into the student body does not mean that these tensions and trade-offs disappear, any more

15  than integration means that all students (athletes or not) will have the same college experience.  To

16  the contrary, the tensions and trade-offs that Plaintiffs bemoan underscore the reason there is a need

17  for the NCAA to establish rules promoting integration.  And these rules are economically

18  procompetitive if they improve the quality of collegiate offerings by helping to integrate athletics

19  into the broader student experience, reducing tensions or fragmentation that might otherwise exist or

20  be worse.

21

22

---

23  [140] J0018-0040; Tr. 1811:16-25 (Petr); *see also* Heckman Dir. Test. ¶ 52 ("Intercollegiate varsity
    athletes are as likely or more likely to earn at least a Bachelor's degree relative to comparable non-

24  athletes.").

    [141] J0018-0043; Tr. 1813:8-18 (Petr).

25  [142] Heckman Dir. Test. ¶ 26; *see also id.* ¶ 11 ("The current Collegiate Model contributes to the
    balance of incentives for students to spend time both on athletics and academics.  Specifically, . . .

26  there are substantial benefits to participation in high school athletics and college athletics and to
    participation in NCAA Division I basketball and FBS football in particular. For members of

27  disadvantaged groups in particular, this is of key importance.") (internal citations omitted).

    [143] Pls.' Closing at 18 (capitalization altered).

28

**DEFS.' CLOSING BRIEF**                                                          **MDL No. 4:14-md-02541-CW**

Plaintiffs also focus on student-athletes' demanding schedules.  But even putting aside that Plaintiffs ignore the important life lessons student-athletes learn about how to balance and manage busy schedules and competing demands, the NCAA, conferences, and individual schools have taken steps to ensure that student-athletes have sufficient time to devote to academics and life outside the classroom.[144]  Defendants do not "sell out their putative integration goals by surrendering control over scheduling games to broadcasters," as Plaintiffs suggest.[145]  Rather, many conferences, such as the Pac-12 and SEC, have scheduling parameters designed to minimize the impact of playing games on student-athletes' academic schedules.[146]  And there are new bylaws addressing time demands, including one prohibiting official athletics-related activity during an eight-hour period every night.[147]  Further, as Commissioner Scott explained, "the majority of student athletes do not want to spend less time on athletics."[148]

### 2.   *The Challenged Rules Promote Integration*

The evidence at trial demonstrates that the challenged rules promote the integration between academics and athletics in at least two ways:[149]  (1) they incentivize student-athletes to not focus

---

[144] *See, e.g.*, Tr. 888:1-18 (Blank); Henry 30(b)(6) Tr. 48:5-50:19 (discussing Mountain West Conference policies to ensure that the schedule is "not impacting negatively student athlete missed class time").

[145] Pls.' Closing at 19.

[146] *See, e.g.*, Lindberg 30(b)(6) Tr. 23:1-16, 27:5-12, 27:19-23, 29:2-8; D0696 at 0003-0007; *see also* MacLeod 30(b)(6) Tr. 154:3-14 ("When we get to windows for broadcasts, we've put some time parameters on there so they don't start too late or too early.  Days of play have been discussed in football.  Our members have chosen not to play midweek games other than Thursday, Friday, and the traditional Saturday.").

[147] Tr. 1229:12-24; J0024-0262 (NCAA Bylaw 17.1.7.10.6.1); *see also id.* at 0260 (NCAA Bylaws governing required days off); Emmert Tr. 209:15-210:17, 212:8-214:9, 215:2-22 (describing proposals to reduce time demands).

[148] Tr. 1225:2-6 (Scott).  Commissioner Scott explained that Pac-12 student-athletes "view themselves as elite academically as well as athletically.  They want the best of all worlds.  That's why they attend our schools."  Tr. 1225:6-8.  It is "not unusual" for students who are very passionate about what they do to spend a significant amount of time on their craft, whether it's engineering students who are conducting research or musicians and dancers who want to get to the next level or reach their peak.  Tr. 1225:20-25 (Scott).  And "if anyone is spending 50 hours on their sport, a significant portion of those hours are voluntary, they are choosing to do it."  Tr. 1227:11-15 (Scott).

[149] As explained above, Defendants need not prove that the challenged restraints, alone, *cause* integration, as Plaintiffs claim.  *O'Bannon*, 802 F.3d at 1081; *see also O'Bannon*, 7 F. Supp. 3d at 1004-05.

1  exclusively on athletics, but to also focus on academics, and (2) they decrease the wedge that would

2  otherwise exist between student-athletes and the rest of the student body and among student-athletes.

3                              a.    The Rules Incentivize Student-Athletes to Focus on Academics

4          Under the current collegiate model, a balance of incentives is struck to encourage student-

5  athletes to succeed both academically and athletically.[150]  This is because amateurism "fosters

6  incentives to study as well as participate in athletics, and experience the social and emotional

7  benefits of college life with classmates," which in turn improves the college-education product

8  universities offer student-athletes.[151]  As Plaintiff Nigel Hayes explained in his mock

9  commencement speech, he grew "intellectually and spiritually" while in college and that "[o]ne of

10 the best things about Wisconsin is that you've got thousands of students from different backgrounds

11 and they all want to debate ideas."[152]  Mr. Hayes thanked all of his "classmates, teammates, coaches,

12 professors and friends for being part of a community that [he] will always be grateful for."[153]

13         Plaintiffs' proposed removal of the NCAA's financial-aid rules would be a "radical change"

14 that would likely lead to "substantial changes" in student-athlete incentives.[154]  Paying student-

15 athletes would "change[] the nature of the student/teacher relationship," and would "change[] the

16 whole goal" of that balance under the existing rules.[155]  Dr. Heckman explained that if substantial

17 sums of money hinged on student-athletes' athletic performance, they would inevitably be

18 incentivized to devote more time to athletics.[156]

19

20 [150] Heckman Dir. Test. ¶ 13; *see also id.* ¶ 63 ("My empirical work provides evidence that incentives for student-athletes to succeed both academically and athletically are in place and effective under the Collegiate Model.").

21 [151] Heckman Dir. Test. ¶ 26; s*ee also, e.g., id.* ¶¶ 65-71.

22 [152] D0719-0007 ("I remember more than a few times when I found myself walking behind groups of students walking around campus just to listen in on their political conversations.").  Mr. Hayes

23 knows that the University of Wisconsin "made [him] a better student, athlete and person."  D0719-0011.

24 [153] D0719-0011.

[154] Heckman Dir. Test. ¶ 12.

25 [155] Tr. 624:1-8 (Heckman).

26 [156] Heckman Dir. Test. ¶¶ 11-13, 67-68, 89, 92-94; *see also* Tr. 505:21-506:17 (Elzinga) (Pay-for-

27 play can lead to perverse incentives "because the student-athlete may move into other types of academic endeavors that are rewarded basically because the grades are easy, as opposed to majoring in economics at Stanford, which is a substantive major").  *See also* Tr. 1469:25-1470:4 (Smith)

28 ("the pay-for-play model . . . would have a significant impact on our ability to ensure that the *(cont.)*

1   This would be the case even if student-athletes were paid for obtaining a certain GPA or

2   progressing toward a degree.[157]  Plaintiffs contend that "[i]f Defendants were truly concerned that

3   above-COA payments would cause athletes to focus less on academics, then they could tie such

4   compensation to grades and/or graduation."[158]  One fallacy of this suggestion is that it equates

5   "grades" with "education," whereas "in academia one is trying to gain knowledge, not just

6   grades."[159]  As Dr. Heckman testified, pay for GPA or progress toward a degree may have a negative

7   impact on learning:  "It's one of the internal rules of incentive models, that you will try to achieve

8   that objective at lowest cost, which might be taking easier courses, courses that don't have the same

9   content as the other kinds of courses."[160]

10   To support his expert opinion that "forming the incentive is a delicate task,"[161] Dr. Heckman

11   cited to an article co-authored by Roland Fryer.[162]  Contrary to Dr. Noll's assertions, this article

12   supports Dr. Heckman's opinions, and Dr. Heckman did not make "broad generalizations about [the

13   authors'] results."[163]  Rather, Dr. Heckman cited the article as an example of the "large academic

14   literature in the economics of education that shows that paying for grades and incentivizing students

15   has had either a zero or negative effect, especially for low-ability students."[164]  Dr. Elzinga also

16   testified regarding this economic principle, explaining that pay for GPA could establish perverse

17   incentives so that a student would decide to take a less desirable curriculum because the payment for

18   GPA in a different major would be beneficial financially to the student, but might not enhance the

19   academic quality of the education.[165]

---

20   behavior of our student athletes maintains their focus on their academics.").

21   [157] Tr. 1469:18-1470:4 (Smith).

     [158] Pls.' Closing at 23.

22   [159] Tr. 624:1-8 (Heckman).

23   [160] Tr. 618:2-619:5.  Chancellor Blank testified that she has not heard of any school paying students
     for GPAs or graduation bonuses and worries that this would incentivize students not to take difficult

24   courses.  Tr. 895:15-896:15.  Such payments would "send[] a very negative message to those
     students who need a little more support and mentoring to catch up that first year."  *Id.*

25   [161] Tr. 619:4-5.

     [162] Roland G. Fryer, Jr., "Financial Incentives and Student Achievement: Evidence from

26   Randomized Trials."  *The Quarterly Journal of Economics* 126.4 (2011): 1755-1798.

     [163] Tr. 2067:15-17 (Noll).

27   [164] Tr. 618:10-13.

28   [165] Tr. 494:11-495:10.  Dr. Noll admits that "there are a lot of papers that find there is no effective
     *(cont.)*

29

1    And the NCAA cannot offset this negative change in incentives by simply limiting the

2   number of hours student-athletes are permitted to spend on athletics.  The NCAA's limitations on

3   student-athlete time demands are only a small part of the interconnected set of rules, including the

4   amateurism rules and academic eligibility requirements, which combined make up the collegiate

5   model.  As Dr. Heckman testified, those limitations alone would not "guarantee [student-athletes]

6   are going to spend that time studying."[166]  This is especially true if there were "a substantial change

7   in the Collegiate Model," which would "rebalance the incentives" of student-athletes and other

8   stakeholders, motivating student-athletes, in particular, "to substitute effort toward athletics in place

9   of academics."[167]  As Commissioner Scott testified, even under the current amateur model of college

10  sports, "student athletes want to participate" in their sport beyond the practices and workouts

11  mandated by their coaches and do so through a variety of voluntary activities.[168]  If student-athletes

12  already choose to dedicate time beyond NCAA limits improving their athletic performance, new

13  limits would be even less effective if student-athletes were paid based on their athletic performances.

14                      b.   The Challenged Rules Prevent the Creation of a Wedge

15    As in *O'Bannon*, Defendants also proved that "by prohibiting student-athletes from being

16  paid large sums of money not available to ordinary students, the rules prevent the creation of a social

17  'wedge' between student-athletes and the rest of the student body."[169]  Dr. Heckman, for example,

18  testified that payment only to student-athletes "creates a special class of people and creates a special

19  incentive.  It separates them, creates a wedge . . . ."[170]  Further, "payments would change the nature

---

20  incentives."  Further, the fact that Dr. Noll is unaware of "any economic evidence that the use by
21  various conferences or schools of scholarships based on GPA level, for example, have had any
    negative effect on academic performance by athletes," Tr. 2069:8-19, does not mean that *payment*
22  for obtaining a certain GPA or progressing toward a degree would not have a negative effect.  As Dr.
    Elzinga explained with respect to the Duncan Clark Hyde Award at the University of Virginia, such
23  an award "is simply an award that is given to one student.  It is not a department wide or university
    wide reward system in which students are given funds that would be a positive function of their
24  GPA."  Tr. 506:18-508:16.

25  [166] Tr. 617:13-618:1.

    [167] Heckman Dir. Test. ¶¶ 63-64.

26  [168] Tr. 1227:3-11.  When asked about student-athletes who reported spending fifty hours a week on
    their sport, Commissioner Scott testified, "I can assure you if anyone is spending 50 hours on their
27  sport, a significant portion of those hours are voluntary, they are choosing to do it."  Tr. 1227:11-13.
    [169] 802 F.3d at 1060 (quoting *O'Bannon*, 7 F. Supp. 3d at 980, 1003).

28  [170] Tr. 632:23-633:3; *see also* Tr. 657:11-658:3.

**DEFS.' CLOSING BRIEF**                                               **MDL No. 4:14-md-02541-CW**

1  of the relationship . . . of those students to the university compared to other students."[171]  So even a

2  "pure graduation incentive" would "more or less isolat[e] those students from the rest of the student

3  body."[172]

4      Plaintiffs recognize that there is already a divide between student-athletes and their non-

5  athlete peers.[173]  Some students already have the impression that student-athletes enjoy a preferential

6  status because of the financial aid and benefits they receive, which can foster resentment.[174]  But the

7  rules on amateurism moderate the divide relative to what it would be in a world of unconstrained

8  pay-for-play.  As President Hatch explained, paying student-athletes would create a "divorce"

9  between walk-ons and scholarship teammates, would create problems with non-athlete students, and

10 would cause faculty to protest and be highly skeptical of student-athletes being paid above the cost

11 of attendance.[175]  Ohio State AD Gene Smith likewise testified that paying only student-athletes on

12 certain teams or paying student-athletes different amounts on the same team would create a wedge

13 between these student-athletes.[176]  And, given Plaintiffs' concession that a "safe harbor" injunction

14 ordering a specific dollar amount for all student-athletes would be inappropriate,[177] student-athletes

15 would almost surely receive different amounts.  Plaintiff Afure Jemerigbe testified that she

16

---

17 [171] Tr. 632:3-13 (Heckman).

[172] Tr. 632:13-15 (Heckman).

18
19 [173] *See, e.g.*, Pls.' Closing at 21; Tr. 828:24-829:6 (Hartman) (recognizing that there is a divide between student-athletes and non-athlete students because non-athletes "think that student-athletes have it easier").

20 [174] *See, e.g.*, Stephens Tr. 138:23-140:12; Tr. 828:19-829:6 (Hartman).  In a mock commencement
21 speech submitted to theplayerstribune.com, Plaintiff Nigel Hayes explained that student-athletes "*are* sometimes misunderstood" and don't "just get free A's without going to class and taking any
22 tests."  D0719-0004 (emphasis in original).  Plaintiff Alec James likewise testified that other students' beliefs about what student-athletes receive—such as the mistaken belief that he received a moped from his school—affect perceptions of student-athletes. James Tr. 294:22-295:17.

23 [175] Tr. 2000:13-2001:22; *see also id.* (explaining that he believes student-athletes are already generally considered privileged on campus, and that paying them more would be "divisive within the
24 university"); *see also* Alger Tr. 127:15-128:6 ("I think it would create a lot of resentment among other students who presumably would not have access to the same sort of resource, many of whom
25 have significant financial need."); Tr. 1454:2-15 (Smith) (testifying he expects that the relationship between student-athletes and faculty members would change if student-athletes were paid, with
26 "many . . . faculty members . . . no longer com[ing] to our contests or be[ing] supportive of the model.").

27 [176] Tr. 1409:20-1410:6.

28 [177] Pls.' Closing at 43.

**DEFS.' CLOSING BRIEF**                                    **MDL No. 4:14-md-02541-CW**

1  "wouldn't be too happy" if football players were to receive more in financial aid than women's

2  basketball players and that it would bother her if another member of her basketball team received

3  more in aid than she did.[178]  Shawne Alston also confirmed that he does not know how schools

4  would "differentiate who gets what"; as he previously told the *New York Times*, "[f]rom player to

5  player and school to school, it's touchy."[179]

6          3.    *Integration Is a Valid Procompetitive Justification*

7  In their closing brief, Plaintiffs' entire argument that integration is not a legally cognizable

8  procompetitive justification consists of a two-word parenthetical—"(it's not)."[180]  This argument, in

9  addition to being unconvincing, is contrary to controlling law.  Multiple courts, including this Court

10  and the Ninth Circuit in *O'Bannon*, have recognized that integration "improve[s] the schools'

11  college education product"[181] and thus is a legitimate procompetitive justification.

12  At trial, Defendants demonstrated that academic integration is an economically

13  procompetitive benefit because it increases the quality of the college education product.

14  Student-athletes benefit from the education that provides the primary value of their

15  scholarships.  Dr. Heckman's direct testimony confirms that there are "substantial benefits to

16  participation . . . in NCAA Division I basketball and FBS football," and "[t]he current Collegiate

17  Model contributes to the balance of incentives for students to spend time both on athletics and

18  academics."[182]  Plaintiffs ignore the fact that the collegiate model itself "results in beneficial

19  educational and economic outcomes for student-athletes."[183]  As Dr. Heckman explained, "[s]tudent-

---

20  [178] Jemerigbe Tr. 294:3-11, 295:5-9.

21  [179] Tr. 722:4-723:1.

22  [180] Pls.' Closing at 24.

23  [181] *O'Bannon*, 7 F. Supp. 3d at 908; *see also O'Bannon*, 802 F.3d at 1059-60; *McCormack*, 845 F.2d at 1344-45.  As the Fifth Circuit explained in *McCormack*, "[t]he NCAA markets college football as

24  a product distinct from professional football. . . .  The goal of the NCAA is to integrate athletics with academics.  Its requirements reasonably further that goal."  845 F.2d at 1344-45 (footnote omitted); *see also Deutscher Tennis Bund v. ATP Tour, Inc.*, 610 F.3d 820, 833 (3d Cir. 2010) (athletics "rules

25  and regulations can be procompetitive where they enhance the 'character and quality of the "product"'" (quoting *Bd. of Regents*, 468 U.S. at 112)).

26  [182] Heckman Dir. Test. ¶ 11.  Underpinning Dr. Heckman's analysis was his empirical evaluation, which analyzed the effects of participation in athletics at different life stages and assessed the effects

27  of athletics participation both incrementally and sequentially.  *Id.* ¶ 4.

28  [183] Heckman Dir. Test. ¶ 66.

athletes receive substantial short-term and long-term human capital benefits, which substantially exceed the direct financial support of athletic scholarships . . . ."[184]  These "include, among other things, the benefits of training, mentoring, classroom education, exposure to diverse communities, publicity, developing self-discipline, leadership and teamwork skills, time management skills, networks, and an identity with the school."[185]

In earning their degrees while playing intercollegiate athletics, student-athletes are provided the means to get an education they can later fall back on and that otherwise may not have been available or as financially feasible.[186]  Indeed, Plaintiff Justine Hartman testified that she does not know that she would have gone to college without an athletic scholarship and accepts that she had the privilege to attend Berkeley because she showed herself to be superior at basketball.[187]  And Ohio State AD Gene Smith received an athletic scholarship to play football at Notre Dame where he obtained a degree in business administration.[188]  He was the first member of his family to attend college, and prior to receiving scholarship offers, he had no intention of going to college.[189]

---

[184] Heckman Dir. Test. ¶ 11; *see also id.* ¶¶ 31-32.

[185] Heckman Dir. Test. ¶ 11.  Plaintiffs instead focus on Dr. Heckman's statement that an individual student would be "better off" if he or she received additional compensation.  Pls.' Closing at 22.  But this ignores the fact that there "could be large systematic adjustments if everybody gets [additional payments]" and that even a "small change and the costs to the university system, and so forth, would probably have small reverberations through the system."  Tr. 595:24-596:3, 597:2-6 (Heckman).

[186] Tr. 686:18-688:7 (Alston); *see also* Heckman Dir. Test. ¶ 69 ("[T]he economics literature strongly supports the notion that many students, including student-athletes, would not have attended college in the first place without some means of assistance.  These student-athletes would not receive any of the lifetime benefits from a college education without the benefit of the athletic scholarship."); Jemerigbe Tr. 243:13-244:2 (explaining that she does not think that she would have gotten into Berkeley without athletics and that getting into Berkeley was a unique opportunity that she might not otherwise have had).

[187] Tr. 821:12-23.  Ms. Hartman's scholarship was even extended after her athletic eligibility expired.  Tr. 829:24-830:7.

[188] Tr. 1377:20-21, 1379:25-1380:1.

[189] Tr. 1377:21-1378:4, 1378:24-1379:15.  Mr. Smith testified that he initially struggled with academics at Notre Dame but ultimately became a successful student.  Tr. 1380:10-21.  He acknowledged that both athletics and academics were significant time commitments at Notre Dame, but he believes that the opportunity to attend Notre Dame and play football was beneficial in that he was exposed to a diverse group of students and learned valuable skills such as time management and overcoming adversity.  Tr. 1381:7-1382:3.  Mr. Smith does not believe that he would have been as successful as he is today if he had not been a student-athlete.  Tr. 1382:4-7.

1    In addition, the integration of academics and athletics is procompetitive because like

2  amateurism, it promotes consumer demand for college athletics.  Chancellor Blank, President Hatch,

3  and Ohio State AD Gene Smith explained in detail how student-athletes being *bona fide* students,

4  integrated within the university community, contributes to the popularity of college sports with non-

5  athlete students, alumni, faculty, and university staff.[190]  Blank testified that "the largest applause

6  line" she gets when speaking with donors and the Wisconsin community about student-athletes is

7  when she talks "about the off-field academic performance of our students, our alumni are very proud

8  of that."[191]  When asked about whether members of the university community discuss "what they

9  like about college athletics and why they watch or attend college athletics," Blank explained that she

10  "frequently" hears students talk about knowing student-athletes from class "and hav[ing] that

11  connection with them as a fellow student.[192]  Similarly, with alumni and community members,

12  "there's a strong connection to the athletes as students at the university."[193]  Smith explained that for

13  the "significant number" of faculty holding season tickets, "student athletes are -- are students in

14  their classes," and that "the faculty member looks at the student athlete from the view of being a

15  student at The Ohio State University.  They don't just look at them as a football player."[194]

16    **D.  The Challenged Rules Promote the Principle of Amateurism**

17    For the reasons described above, the NCAA's basic tenet of not paying student-athletes adds

18  to consumer demand for college sports and facilitates the academic success and integration of

19  student-athletes into the campus community.  This tenet is embodied in the NCAA's Constitution,

20  which sets out "The Principle of Amateurism"[195] and a "basic purpose" of "retain[ing] a clear line of

---

21  [190] *See supra*, 14-17.

22  [191] Tr.862:24-863:9; *see also* Tr. 863:16-24 (Blank) (testifying that the community around Wisconsin is "just as likely to ask about are we treating our athletes right in terms of their academic

23  performance" as athletic performance).

     [192] Tr. 949:20-950:6.

24  [193] Tr. 950:7-12 (Blank).

     [194] Tr. 1411:16-1412:4; *see also, e.g.*, Tr. 868:23-869:21 (Blank).

25  [195] J0024-0016 (NCAA Const. art. 2.9) ("Student-athletes shall be amateurs in an intercollegiate

26  sport, and their participation should be motivated primarily by education and by the physical, mental and social benefits to be derived.  Student participation in intercollegiate athletics is an avocation,

27  and student-athletes should be protected from exploitation by professional and commercial enterprises.").  Several witnesses paraphrased this general principle, but all were consistent with its

28  core tenet.  *See, e.g.*, Tr. 1122:5-15 (Scott); Tr. 1342:20-25 (Lennon); Elzinga Dir. Test. ¶ 71.

1   demarcation between intercollegiate athletics and professional sports."[196]  In furtherance of these

2   constitutional values, the NCAA also enacts detailed bylaws, which "govern[] the conduct of the

3   intercollegiate athletics programs of its member institutions" in a manner that advances this and

4   other fundamental principles of the NCAA.[197]  Plaintiffs challenge a subset of these bylaws,

5   specifically those "that fix and cap the compensation and benefits that schools may offer to Class

6   Members for their athletic services."[198]  These are thus the core rules promoting the principle of

7   amateurism, and as such they "define the product the NCAA has on offer – amateur intercollegiate

8   athletics,"[199] and facilitate academic integration.[200]

9       While "the principle of amateurism overlays all of the bylaws,"[201] the NCAA must often

10  "delicate[ly] balance" that principle (codified in NCAA Const. art. 2.9), against other fundamental

11  principles, such as "The Principle of Institutional Control and Responsibility" (NCAA Const. art.

12  2.1), "The Principle of Student-Athlete Well-Being" (NCAA Const. art. 2.2), "The Principle of

13  Sound Academic Standards" (NCAA Const. art. 2.5), and "The Principle Governing Financial Aid"

14  (NCAA Const. art. 2.13).[202]  Balancing these fundamental principles is a critical part of how "[t]he

15  NCAA plays a critical role in the maintenance of a revered tradition of amateurism in college

16  sports."[203]  The Supreme Court has observed that "[t]here can be no question but that [the NCAA]

17  needs ample latitude to play that role,"[204] and the Ninth Circuit in *O'Bannon* held that this

18

---

19  [196] J0024-0013 (NCAA Const. art. 1.3.1).

20  [197] J0024-0041 (NCAA Const. art. 5.01.1); *see also* Tr. 1283:24-1284:4 (Lennon) (the NCAA's
    bylaws "must comport with what's in the [NCAA] Constitution, our overarching principles"); Tr.
21  1462:23-1463:14 (G. Smith) (the NCAA enacts rules that "tie . . . to certain principles to . . . make
    sure that we stay true to what we're all about," such as "the amateur model," "academics," and
22  "helping young people develop competitively and socially").  The Principle of Amateurism in one in
    a series of "Principles for Conduct of Intercollegiate Athletics" established by the NCAA
23  Constitution.  J0024-0015-17 (NCAA Const. art. 2) (Principles of Conduct of Intercollegiate
    Athletics).

24  [198] Pls.' Op. at 12.

    [199] Elzinga Dir. Test. at 16 n.35; *see supra* Part II.B.1.
25
    [200] *See supra* Part II.C.

26  [201] Tr. 1575:20-21 (Lennon).

    [202] J0024-0015 (NCAA Const. art. 2.01).
27
    [203] *Bd. of Regents*, 468 U.S. at 120.

28  [204] *Id.*

35

1   "admonish[ment]" from the Supreme Court requires courts to "generally afford the NCAA 'ample

2   latitude' to superintend college athletics."[205]

3   　　　The judiciary may not, therefore, micromanage college sports from afar, tinkering with a rule

4   here or a rule there.  "In an intertwined and complex system such as collegiate athletics, one cannot

5   assume that a change to one factor will not affect any other factor."[206]  As Dr. Heckman testified, the

6   current collegiate model exists in an equilibrium, and substantial changes to a key component in that

7   model (such as the prohibition on payments to student-athletes) could have dramatic systemic

8   effects, harming both the academic and economic success of student-athletes and the product of

9   college sports itself.[207]

10   　　　Most relevant in this case, many NCAA bylaws are designed to balance student-athletes'

11   well-being against the possibility that providing excessive benefits could function as a form of

12   payment for playing sports.[208]  Focusing on only half of this balancing process, Plaintiffs make much

13   ado about NCAA Vice President for Division I Governance Kevin Lennon's testimony that the

14   provision of certain benefits incidental to participation is not related to preserving amateurism.[209]  To

15   be sure, Lennon agreed that "the reason incidental benefits are provided to student athletes is not

16   based on the -- the reason behind amateurism," but rather "to support our student athletes' well-

17   being."[210]  But, as Lennon consistently testified, the provision of such benefits must be done in a

18   way "consistent with the principle of amateurism," which may require capping the benefit to prevent

19   it from becoming "a form of pay."[211]  So, to use commemorative awards as an example, the NCAA

20   allows student-athletes to receive limited awards "for the purpose of commemorating participation,"

---

21   [205] 802 F.3d at 1074 (citing *Law v. NCAA*, 134 F.3d 1010, 1022 (10th Cir. 1998) ("[C]ourts should
22   afford the NCAA plenty of room under the antitrust laws to preserve the amateur character of
     intercollegiate athletics.")).

23   [206] Heckman Dir. Test. ¶ 73.

24   [207] Heckman Dir. Test. ¶¶ 74-78.

25   [208] Tr. 1358:18-1359:2 (Lennon) ("[T]he Division I Council of the NCAA . . . decides whether the
     benefits that are provided are advancing the student's well-being without it ever morphing into pay.
26   And that's why there's caps and that's why these are all deemed to be very reasonable expenses and
     to provide a student athlete to support their well-being, that's the Council's motivation.").

27   [209] *See* Pls.' Closing at 1-2, 16.

28   [210] Tr. 1303:20-1304:3.

     [211] Tr. 1275:12-22, 1276:25-1277:8, 1303:20-1304:3, 1308:7-1309:12, 1322:14-20, 1624:25-1627:1.

1   but it imposes caps on those awards to "preserv[e] the value of amateurism."[212]  Without these caps,

2   "there certainly could come a point where the -- the award that is provided would morph into pay-

3   for-play and so there are limitations that are necessary."[213]  As much as Plaintiffs may try to

4   obfuscate this simple principle by selectively quoting Lennon, the unrefuted evidence is that the

5   purpose of the NCAA's limits on compensation or benefits to student-athletes is to promote

6   amateurism.[214]

7         Plaintiffs misleadingly argue that the NCAA's "ever-changing definition of amateurism is

8   arbitrary . . . ."[215]  The most that Plaintiffs can actually show is that specific, individual bylaws

9   enacted in furtherance of the NCAA's amateurism principle have been revised over time.  It is

10  undoubtedly true that there have been adjustments made over time to the educational expenses and

11  the types of benefits incidental to participation permitted under the NCAA's rules.  But these

12  technical bylaws implement the principle of amateurism; they are not the principle itself.  "The

13  fundamental principle is that this is not about student athletes playing a game to get paid, it is not

14  about pay-for-play, it's about . . . young men and women playing these games while they are

15  students at their universities."[216]

16        This is why Plaintiffs miss the mark when they rhetorically ask whether amateurism would

17  be adversely affected if some marginal extra benefit were permitted.[217]  As Dr. Elzinga testified,

18  "The central tenet of amateurism is not a specific dollar amount (as in $X$ = amateur, but $X + \varepsilon$ =

19  professional).  Rather, the defining feature is that student-athletes not be paid to play their respective

20  sports."[218]  This is the same approach the Ninth Circuit took in defining amateurism in *O'Bannon*,

21

22  [212] Tr. 1624:25-1627:1 (Lennon).
    [213] Tr. 1626:22-1627:1 (Lennon).

23  [214] This conclusion is almost tautological.  Amateurism is, by definition, "not paying" the
    participants.  *O'Bannon*, 802 F.3d at 1076.  Thus, the rules setting limits on the benefits student-
24  athletes may receive are part of the "amateurism rules."

    [215] Pls.' Closing at 14 (capitalization omitted).
25  [216] Tr. 1621:24-1622:9 (Lennon); *cf. O'Bannon*, 802 F.3d at 1076 ("[T]he district court probably
    underestimated the NCAA's commitment to amateurism.").
26  [217] *See, e.g.*, Tr. 408:7-409:2 (asking about "a penny" or "a dollar" more), Tr. 422:23-424:1 (asking
27  about paying for parking tickets); Lewis 30(b)(6) Tr. 158:23-159:3 (asking about "one penny more
    than cost of attendance").
28  [218] Elzinga Dir. Test. ¶¶ 34-35; *see also id.* ¶ 14 ("[T]he difference between amateurism and
    *(cont.)*

**DEFS.' CLOSING BRIEF**                                    **MDL No. 4:14-md-02541-CW**

1    holding that "not paying student-athletes is *precisely what makes them amateurs*."[219]  And it is this

2    principle that the challenged restraints promote by "fix[ing] and cap[ping] the compensation and

3    benefits that schools may offer to Class Members for their athletic services."[220]  Because the

4    NCAA's principle of amateurism is procompetitive in promoting consumer demand and fostering

5    academic integration, the challenged restraints that effectuate that principle are also procompetitive.

6    **III.  NONE OF PLAINTIFFS' PURPORTED LESS RESTRICTIVE ALTERNATIVES
          SATISFY THE UNAMBIGUOUS LEGAL REQUIREMENTS**

7

8        In closing, Plaintiffs write, "all that Plaintiffs' less-restrictive alternatives require is

     *eliminating all NCAA compensation rules*"[221]—finally exposing without a hint of doubt that the
9
     remedy Plaintiffs seek is the elimination of amateurism in collegiate sports.  As this Court has already
10
     recognized, if Defendants have met their burden at step two by demonstrating that the challenged rules
11
     contribute to the procompetitive justifications of amateurism and integration, the NCAA must be
12
     permitted to impose compensation limits on its member schools.[222]  Plaintiffs cannot meet their burden
13
     at step three of the rule of reason analysis because each of their three proposed alternatives would
14
     permit unlimited pay-for-play.  And, although it is not Defendants' burden to disprove Plaintiffs'
15
     proposed less restrictive alternatives, the evidence plainly shows that those alternatives would destroy
16
     the identified procompetitive benefits and would come with increased costs.[223]
17
         (1) *The Requested Injunction.*  Plaintiffs' first proposal would prohibit the NCAA from
18
     adopting or enforcing *any* rules that limit compensation available to student-athletes and allow pay-for-
19

20   _____
     professionalism isn't captured in some wooden and mechanical way by the number of dollars a
21   student-athlete receives.  True student-athletes are amateurs in the sense that they are not being paid
     to play." (emphasis omitted)).
22   [219] *O'Bannon*, 802 F.3d at 1076 (emphasis in original)).
     [220] Pls.' Op. at 12.
23   [221] Pls.' Closing at 34 (emphasis added).
     [222] MSJ Order at 34:6-13 ("To be clear, if Defendants prevail in demonstrating the same
24   procompetitive justifications that the Court found in *O'Bannon*, the NCAA will still be able to
     prohibit its member schools from paying their student-athletes cash sums unrelated to educational
25   expenses or athletic participation.  *O'Bannon*, 802 F.3d at 1078-79.  Under such circumstances, the
     Court will not consider any proposed less restrictive alternative by which Plaintiffs seek payment
26   untethered to one of these two categories.").
     [223] *See, e.g.*, *O'Bannon*, 802 F.3d at 1074 ("[T]o be viable under the Rule of Reason," "an alternative
27   must be virtually as effective in serving the procompetitive purposes of the NCAA's current rules,
     and without significant increased cost." (quotation marks omitted)).
28

**DEFS.' CLOSING BRIEF**                                                    **MDL No. 4:14-md-02541-CW**

play in every conceivable form.[224]  As should be obvious, an alternative that calls for the complete elimination of amateurism rules cannot be "virtually as effective" as those rules at protecting amateurism and its role in promoting both consumer demand and academic integration.[225]  The challenged rules help promote consumer demand, integrate academics and athletics for student-athletes, increase integration of student-athletes into the broader school community, and prevent greater tension between student-athletes and non-athlete students and faculty over perceived student-athlete privileges.[226]  Yet the Requested Injunction contemplates no limitation that might possibly serve these interests and protect from the inevitable:  a world in which student-athletes are financially motivated to increase their emphasis on athletics over academics and some campus communities are divided by the university's decision to pay certain student-athletes, and only those student-athletes.

Perhaps recognizing this, Plaintiffs speculate that, in the absence of a single national set of compensation rules, the conferences may create new compensation rules on a conference-by-conference basis.  But Plaintiffs neither seek nor propose any new infrastructure whereby the conferences would fill that void.  Indeed, Plaintiffs claim (at 34) that the Requested Injunction is cost-free because it would *not* require the conferences to develop their own amateurism rules; rather, it would be their choice to do so, or not.  While Plaintiffs have dubbed this "conference autonomy," they admit that this is "a traditional antitrust injunction" that would simply preclude Defendants from agreeing to abide by the restraints without implementing any substitute in its place.[227]  And to the extent Plaintiffs depend on the adoption by conferences of their own rules in an attempt to meet their burden to establish the existence of a less restrictive alternative, they are stuck with the

---

[224] *See* Pls.' Op. at 41-42, 44-45 & App'x C; *see also* Pls.' Closing at 34.

[225] *See O'Bannon*, 802 F.3d at 1076 ("Having found that amateurism is integral to the NCAA's market, the district court cannot plausibly conclude that being a poorly-paid professional collegiate athlete is 'virtually as effective' for that market as being as amateur.").

[226] This is the second time the NCAA has made this demonstration at trial.  *See O'Bannon*, 802 F.3d at 1059-60 (the procompetitive justification of integration was met by evidence that compensation restrictions help "prevent the creation of a social 'wedge' between student-athletes and the rest of the student body").

[227] Pls.' Op. at 7.

1    significant additional costs that conference-level rulemaking would impose—thus rendering the

2    proffered less restrictive alternative legally ineffective.[228]

3         (2) *The Alternative Injunction*.  Plaintiffs' second option is nearly identical to the first and

4    would also permit unlimited cash compensation.  Like the first, it calls for a full prohibition on

5    NCAA compensation rules, except the NCAA could prohibit payment of purely "cash sums"

6    untethered to what Plaintiffs call "education related expenses or benefits."[229]  While that language

7    seems like a nod to *O'Bannon*, it plainly goes farther and would allow "cash sums untethered to

8    *educational expenses*," in direct contravention of *O'Bannon*.[230]  Plaintiffs' vague expansion of the

9    reference to "educational expenses" would erode what it means to be an amateur and pervert the

10   holding of *O'Bannon* which related to the cost of attending college by allowing pay for anything

11   ostensibly "related" to education, including, for example, attending class, doing homework,

12   completing a course, maintaining a minimum grade point average, or graduating.  No matter how

13   such payments are characterized, by going only to student-athletes they are functionally no different

14   than pay-for-play, as NCAA student-athletes must already meet academic eligibility requirements.

15        (3) *The Modified Alternative Injunction*.  For the first time in their closing, Plaintiffs raise (at

16   43) "one additional possibility," which would modify the Alternative Injunction to permit the NCAA

17   to cap benefits incidental to participation in athletics.  Other than that carve-out, which could be

18   circumvented by characterizing a benefit as education-related rather than incidental to participation,

19   the Modified Alternative Injunction is defective for the same reasons as the Alternative Injunction.

20   Indeed, Plaintiffs do not actually endorse this Modified Alternative Injunction, arguing (at 43)

21   instead without any factual support that the NCAA should be precluded from capping benefits

22   incidental to participation because they are "based on anticompetitive cost-control considerations,

23   not any consideration of Defendants' ostensible procompetitive justifications."

24

25   [228] *See* Part III.C.4, *infra*.

26   [229] Pls.' Op. at 7-8, 43-44, 46 & App'x D; Pls.' Closing at 33, 42.

27   [230] *O'Bannon*, 802 F.3d at 1078 (differentiating between "educational-related compensation" (*i.e.*, financial aid) and what was contemplated by the district court's order allowing $5,000 trust fund payments—"cash sums untethered to educational expenses").

28

1    Notably, Plaintiffs have not proposed an alternative injunction specifically ordering any of

2    the various additional benefits that they discussed at trial, and rightfully so.  This Court is not

3    authorized under the antitrust laws simply to tinker with the compensation rules already in place and

4    instead must comport with the Supreme Court's caution that the NCAA "needs ample latitude" to

5    maintain and preserve the unique traditions of amateurism and higher education in intercollegiate

6    sports.[231]  "'Metering' small deviations is not an appropriate antitrust function any more than is the

7    defense that a price fix is lawful if the fixed price is 'reasonable.'"[232]

8        ### A. Plaintiffs' Experts Did Not Competently Establish What Would Happen If the Requested Relief Were Granted

9        Not one of Plaintiffs' four experts (one of whom was withdrawn before trial) put forth an

10   analysis that informs what would result from Plaintiffs' proposals.  Drs. Rascher and Noll, freely

11   admit that they have not attempted to predict what would happen if any of Plaintiffs' proposed

12   injunctions were implemented.[233]  Indeed, Rascher informed the Court that the process of figuring

13   out what conference rules might develop in place of the national rules in Plaintiffs' but-for world

14   could take *eight or nine years*.[234]  Nor did Mr. Poret even purport to test the potential impact on

15   consumer demand if the challenged rules were eliminated, or what would happen if conferences

16   implemented varying compensation rules.[235]  Rather, Poret tested whether fans predicted they would

17

---

18   [231] *Bd. of Regents*, 468 U.S. at 120; *see also O'Bannon*, 802 F.3d at 1074 ("[T]he Supreme Court has admonished that we must generally afford the NCAA 'ample latitude' to superintend college

19   athletics."); *Law*, 134 F.3d at 1022 n.14 (remarking that "courts should afford the NCAA plenty of room under the antitrust laws to preserve the amateur character of intercollegiate athletics"); *Race

20   Tires Am., Inc. v. Hoosier Racing Tire Corp.*, 614 F.3d 57, 83 (3d Cir. 2010) (noting that, generally, "sports-related organizations should have the right to determine for themselves the set of rules that

21   they believe best advance their respective sport").

22   [232] Areeda at ¶ 1505; *see also id.* ("If members of a joint venture are found to be unlawfully fixing prices at $10, lowering the price to $8 or some other number is not the type of less restrictive alternative contemplated by antitrust law.").

23   [233] Tr. 69:7-21 (Rascher); Tr. 254:14-18 (Noll).  At most, Dr. Rascher testified that he did not expect

24   conferences would implement rules permitting "unfettered competition," if allowed.  Tr. 103:9-17 (Rascher).  However, he did not opine as to what benefits would be offered in the but-for world, and

25   he freely admitted that he had not interviewed any university officials or conducted any empirical analysis as a basis for his opinions.  Tr. 68:12-13, 69:7-21.

26   [234] Tr. 106:4-14.

27   [235] *See* Tr. 61:2-9 (Rascher) ("[Poret] does not test an unlimited payment"); Tr. 1693:1-20, (Poret) (agreeing that his survey did not test whether there exists an amount of student-athlete compensation

28   that could be provided without affecting consumer demand or if so, where that line would be); *see also* Isaacson Dir. Test. ¶ 20 ("Mr. Poret did not test what would happen if there were no limits on *(cont.)*

1    continue to watch intercollegiate sports in the future if student-athletes were to receive certain

2    individual additional benefits.[236]  Indeed, Poret did not even study—and therefore was unable to

3    offer opinions about—what would happen if more than one of his tested compensation scenarios

4    were implemented simultaneously.[237]

5            Moreover, as discussed in Part II.B.2, *supra*, Mr. Poret's survey indisputably did not test the

6    extent to which respondents were fans of college sports because the athletes were amateurs and not

7    professionals.  And as Defendants' expert Dr. Isaacson testified extensively, Mr. Poret's

8    methodology was flawed in significant ways.  Importantly, Poret's survey asked respondents to

9    predict what action they would take in future hypothetical scenarios, which is "not a valid question

10   in this context" and is "completely different than the approach that's typically used to predict

11   consumer behavior by marketers and by social scientists."[238]  While Poret claimed at trial that he

12   relied on "what [he] considered to be standard accepted procedures," he was not able cite a single

13   academic article to support his view that his methodology was appropriate and has not written any

14   peer-reviewed articles about the survey methodology he employed.[239]  He also admitted that it is

15   well accepted that the "artificial nature of a survey environment often causes very significant

16   percentages of respondents to give answers that do not reflect real world conditions or behavior at

17   all" and that "people are notoriously bad at predicting their future behavior in surveys."[240]

18

---

19   compensation whatsoever, if conferences were permitted to set their own limits, or if only cash
     payments untethered to educational expenses were barred.").

20   [236] Poret Dir. Test. ¶ 24 (listing scenarios).

21   [237] Tr. 1657:18-1658:16.  Moreover, Plaintiffs' assertion (at 30) that Mr. Poret's testing of eight
     specific scenarios somehow supports conclusions regarding other untested benefits "of the type he

22   tested" were implemented should be rejected.  Mr. Poret's direct testimony is devoid of any support
     for such conjecture, and Plaintiffs presented no evidence at trial that would inform how one might

23   credibly make such an extrapolation.

     [238] Tr. 1948:10-1949:1, 1957:7-20 (Isaacson); *see also* Isaacson Dir. Test. ¶¶ 15 *et seq.*; Tr. 1954:12-

24   18 (Isaacson).  As Dr. Isaacson explained, the proper methodology is to ask respondents for their
     preferences and use those responses as an indicator for future behavior.  Tr. 1948:16-1949:7.

25   [239] Tr. 1670:23-1671:6, 1671:20-23.  Mr. Poret does not have a relevant doctoral degree; he has a
     law degree.  Tr. 1655:13-20.  He started his career as an attorney, before transitioning into work as

26   an expert witness working on legal cases.  Tr. 1671:7-19 (Poret).  In contrast, Dr. Isaacson has two
     relevant degrees (from Harvard):  a master's of business administration and doctor of business

27   administration in marketing and marketing research.  Tr. 1954:25-1956:3 (Isaacson) (qualifications).
     [240] Tr. 1725:16-23 (Poret).

28

1    Each of Mr. Poret's scenarios also required respondents to make the assumption that "the

2    benefits described would be paid for from the revenue generated by the athlete's team."[241]  But for

3    nearly half of FBS football teams,[242] 80% of Division I men's basketball teams,[243] and each and

4    every Division I women's basketball team,[244] this assumption is baseless.  Those teams do not

5    generate sufficient revenue to pay existing expenses, so there is no surplus of team revenue available

6    to pay for these new benefits.  Thus, for each scenario he tested, "Mr. Poret has evaluated only a

7    fictional scenario that is irrelevant to the actual marketplace that would exist if the additional forms

8    of compensation and benefits were provided to student-athletes."[245]

9    Plaintiffs have offered no evidence whatsoever that the particular scenarios Mr. Poret

10   included in his survey in any way correlate with what would occur in the but-for world if the Court

11   issued any of Plaintiffs' proposed injunctions.  Poret testified that he did no analysis to determine

12   what scenarios to test—he simply tested the scenarios Plaintiffs' counsel gave him without assessing

13   whether they had any connection to the injunctive relief proposed.[246]  In fact, Poret expresses no

14   opinion as to whether the benefits contemplated by the scenarios bear any resemblance to any likely

15   but-for world if the Court issued any of Plaintiffs' proposed injunctions.[247]

16   **B.  There Are No Analogous Situations to Plaintiffs' Requested Relief**

17

18

---

19   [241] Poret Dir. Test. ¶ 38.

20   [242] In the most recently reported data, 46% of FBS football teams failed to generate sufficient revenue to cover their expenses.  *See* J0017-0022 (NCAA Revenue & Expenses Report, Sept. 2017).

21   [243] According to the most recent data, only 47% of men's basketball teams at Football Bowl Subdivision universities, 2% of men's basketball teams at Football Championship Subdivision

22   universities, and 5% of men's basketball teams at universities without football programs reported revenue exceeding their expenses.  *See* J0017-0022 (NCAA Revenue & Expenses Report, Sept.

23   2017) (FBS chart), 0076 (FCS chart), 0094 (no-football chart).  In total, 278 of the 347 men's basketball teams in Division I *do not* generate sufficient revenue to cover their own expenses.  *Id.*

24   [244] Not a single one of the 345 women's basketball teams in Division I generates sufficient revenue to cover its own expenses, according to the most recent data.  *See* J0017-0022 (NCAA Revenue &

25   Expenses Report, Sept. 2017) (FBS chart), 0076 (FCS chart), 0094 (no-football chart).

     [245] Isaacson Dir. Test. ¶¶ 19, 76-78.

26   [246] Tr. 1656:12-22.

27   [247] *See* Isaacson Dir. Test. ¶ 20.  Mr. Poret also admitted that, with respect to the academic and graduation incentive payments, he made no effort to see whether universities already allow such

28   payments to their students at large.  Tr. 1752:2-21 (Poret).

"[A]ny less restrictive alternatives 'should either be based on actual experience in analogous situations elsewhere or else be fairly obvious.'"[248]  Plaintiffs have no real world analogue to establish what would result in the but-for-world, in the event their requested injunction were granted.[249]  The trial record is devoid of evidence concerning the "college athletic system during the first half of the 20th Century, when each conference had its own compensation rules."[250]  Plaintiffs have presented no admissible evidence regarding the conference rules in place at the time, much less how, if at all, they would meet the procompetitive justifications of amateurism and integration as they exist in modern times.  And *O'Bannon* already resolved that "professional baseball and the Olympics are not fit analogues to college sports."[251]

Plaintiffs' reliance on what they call the "natural experiment" of Defendants' permitting athletically-related financial aid up to the full cost of attendance also proves nothing.  Plaintiffs' argument rests on an analysis set to be published in a forthcoming law review article titled, *Debunking the NCAA's Myth that Amateurism Conforms with Antitrust Law: A Legal and Statistical Analysis*, by Thomas Baker, Marc Edelman, and Nicholas Watanabe.[252]  However, as Defendants demonstrated, that study is not reliable evidence to support imposition of the proposed less restrictive alternatives in this case because (1) at most, it tests the impact on consumer demand of the redefinition of "grant-in-aid" to cost of attendance, and does not study what would happen if the NCAA limits on compensation were eliminated;[253] (2) Plaintiffs' own expert Dr. Noll admitted the findings concerning the relationship between the move to COA and consumer demand were *not*

---

[248] MSJ Order at 26:17-20; *see also M & H Tire Co., Inc. v. Hoosier Racing Tire Corp.*, 733 F.2d 973, 987 (1st Cir. 1984) (rejecting alternatives that "are more hypothetical than practical").

[249] Indeed, basic economics tells us to expect "market imperfections such as the so-called 'free rider' effect" that can arise in the absence of restrictions.  *See, e.g.*, *Continental T.V., Inc. v. GTE Sylvania, Inc.*, 433 U.S. 36, 55 (1977); s*ee also Leegin Creative Leather Prods, Inc. v. PSKS, Inc.*, 551 U.S. 877, 890-91 (2007).

[250] MSJ Order at 28:3-5.

[251] 802 F.3d at 1077; *see also id.* ("The Olympics have not been nearly as transformed by the introduction of professionalism as college sports would be.").

[252] Tr. 359: 24-360:12 (Noll); *see also* Noll Dir. Test. at 47 n.109.

[253] Tr. 2094:20-2095:17 (Noll).

1  *causal*;[254] (3) the study is not a peer-reviewed analysis;[255] and (4) it is not methodologically

2  sound.[256]

3         Plaintiffs' focus on the University of Nebraska PEO program as an example of stipends for

4  student-athletes above COA, without repercussions to consumer demand or integration, likewise

5  fails to provide meaningful support for Plaintiffs' proposed less restrictive alternatives.  Unlike the

6  unlimited compensation of student-athletes for athletic performance that Plaintiffs seek by

7  eliminating the rules, Nebraska's PEO program is consistent with principles of amateurism.  As Mr.

8  Lennon explained, the program constitutes institutional aid for further education at the same

9  institution—either in a graduate school setting, cultural education through a study abroad program

10  while still enrolled at the university, or in the form of vocational education through an internship.[257]

11  Moreover, the Nebraska PEO program is particularly inapposite here because Plaintiffs are not

12  asking this Court to permit each student-athlete to receive the same set amount of compensation.  Far

13  from it.  Plaintiffs explicitly urge this Court *not* to adopt such an approach and instead to eliminate

14  all caps on player compensation and benefits so that universities and conferences may award

15  student-athletes differing amounts and, in some cases, well above $7,500.[258]

16      **C. The Evidence at Trial Demonstrated That Plaintiffs' Proposals Are Not Viable Alternatives to the NCAA Compensation Rules**

17

18         Though it is plainly not Defendants' burden to disprove the viability of Plaintiffs' less

19  restrictive alternatives, Defendants' uncontradicted evidence establishes that the elimination of

20  uniform, national compensation limits and enforcement would devalue intercollegiate athletics,

21  undermine integration of student-athletes and significantly increase system costs, even if conferences

22  were to independently develop, implement, and enforce limits of their own.

23      1.    *National Rules Are Essential for Amateur Intercollegiate Athletics*

---

24  [254] Tr. 361:9-21, 2099:5-10 (Noll).

25  [255] Tr. 2090:16-21 (Noll).

26  [256] Tr. 636:10-17, 637:6-639:17 (Heckman).  In addition, one of the authors, Marc Edelman, is a former colleague of Plaintiffs' counsel, Jeffrey Kessler, a fact Plaintiffs apparently did not disclose to Dr. Noll.  Tr. 2094:10-15 (Kessler); Tr. 2093:14-23 (Noll).

27  [257] Tr. 1638:11-1640:13 (Lennon).

28  [258] *See* Pls.' Closing at 43.

1    While Plaintiffs assert that if schools, conferences, the NCAA, fans, networks and sponsors

2    all value amateurism, then there should be no need for national amateurism rules, Plaintiffs have not

3    met their burden of showing that eliminating national rules would be "virtually as effective as *not*

4    allowing compensation."[259]  The subset of NCAA bylaws governing amateurism "define[s] the

5    product the NCAA has on offer – amateur intercollegiate athletics."[260]  While the NCAA's Principle

6    of Amateurism[261] sets out the basic tenet of not paying student-athletes, how to apply that tenet in

7    myriad contexts is not always self-evident and is not necessarily self-executing.  As Dr. Elzinga

8    explained, "[b]ecause reasonable people can disagree about whether various specific benefits violate

9    the general principle of amateurism, the NCAA adopts specific rules to provide guidance and

10   facilitate enforcement." [262]

11   Absent uniform rules enacting a common understanding of what it means for a student-

12   athlete to be an amateur, an individual school or conference—acting rationally—could allow

13   excessive pay to student-athletes, benefitting itself while spreading the costs of such a decision

14   across the whole of college sports.  This creates a negative externality, because the school or

15   conference "making such a decision does not incur all the costs of its actions."[263]  The uniform

16   amateurism standard established by the NCAA's bylaws "help[s] make it possible for universities to

17   provide the amateur athletic competition consumers value by helping solve the externality

18   problem."[264]  The individual bylaws governing financial aid available to student-athletes therefore

19

20   [259] *O'Bannon*, 802 F.3d at 1076 (emphasis in original; internal quotation marks omitted).

     [260] Elzinga Dir. Test. at 16 n.35.

21   [261] The NCAA Constitution sets out a series of "Principles for Conduct of Intercollegiate Athletics",

22   one of which is "The Principle of Amateurism."  J0024-0015, 0016 (NCAA Const. art. 2, art. 2.9);
     *see also* J0024-0013 (NCAA Const. art. 1.3.1) ("A basic purpose of [the NCAA] is to maintain

23   intercollegiate athletics as an integral part of the educational program and the athlete as an integral
     part of the student body and, by so doing, *retain a clear line of demarcation between intercollegiate*

24   *athletics and professional sports*." (emphasis added)).  That principle states:  "Student-athletes shall
     be amateurs in an intercollegiate sport, and their participation should be motivated primarily by

25   education and by the physical, mental and social benefits to be derived.  Student participation in
     intercollegiate athletics is an avocation, and student-athletes should be protected from exploitation

26   by professional and commercial enterprises."  J0024-0016 (NCAA Const. art. 2.9).

     [262] *See* Elzinga Dir. Test. ¶ 92.

27   [263] Elzinga Dir. Test. ¶ 37, 18 n.39.

     [264] Elzinga Dir. Test. ¶ 29.

28

1  "promote[] economic efficiency by preventing schools . . . from taking action that is economically

2  inefficient by diminishing the value of the product to the entire group."[265]  As the Supreme Court has

3  explained, "the integrity of the 'product' [amateur intercollegiate athletics] cannot be preserved

4  except by mutual agreement; if an institution adopted such restrictions unilaterally, its effectiveness

5  as a competitor on the playing field might soon be destroyed."[266]

6        Plaintiffs' experts contend that conference-level rules would be as effective as national rules

7  because a conference, like any business, "will act rationally" and "will not shoot itself in the foot by

8  allowing compensation that will hurt consumer demand or integration."[267]  But this prediction is

9  contrary to fundamental economic principles, untested, and unproven by Plaintiffs' witnesses.

10  While a self-interested conference may not "shoot *itself* in the foot," by definition such a conference

11  will not take into the account the interests of other conferences when setting its own compensation

12  rules.  When Dr. Rascher states that "[s]chools and conferences will only choose to adopt those rules

13  regarding compensation that are consistent with their demand assessments and objectives,"[268] he

14  fails to recognize that some schools or conferences might make choices to increase demand for their

15  own programs, counting on the fact that the decrease in overall demand for college sports will be

16  borne principally by other schools or conferences.

17        2.    *Plaintiffs' Proposed Injunctions Would Reduce Consumer Demand*

18        In order for the independent NCAA member institutions to offer amateur intercollegiate

19  athletics (*i.e.*, competitions between different colleges)—which, as the evidence detailed above

20  demonstrates, drives consumer demand—"a standard definition of what it means for an athlete to be

21  an amateur is essential."[269]  As Dr. Elzinga explained, "In order for the NCAA's rules to enable

22  universities to offer amateur student-athletics that will be regarded as fair, ambiguity in

23  interpretation needs to be resolved and the rules need to be perceived as the same for all

24  ―――――――――――――――

25  [265] Elzinga Dir. Test. ¶¶ 37-38.
    [266] *Bd. of Regents*, 468 U.S. at 102.
26  [267] Pls.' Closing at 31.
    [268] Rascher Reb. Test. ¶ 57.
27
28  [269] Elzinga Dir. Test. ¶ 26.

47

1  competitors."[270]  If different schools or conferences adhered to different standards of amateurism,

2  either through different compensation rules or different approaches to what constitute "education

3  related expenses or benefits," it would delegitimize competition between those teams and ultimately

4  reduce consumer demand for such competition.[271]

5          Numerous defense witnesses testified that, if allowed, some NCAA member institutions

6  inevitably would allow significantly more compensation for student-athletes and that this outcome

7  would reduce the value of college athletics overall.  Commissioner Larry Scott testified that

8  differential pay systems among the conferences "would create consumer confusion" concerning the

9  intercollegiate sports product.[272]  That confusion among fans, broadcasters and sponsors would lead

10  to a diminution in the value of college sports.  Specifically, because conference-level rulemaking

11  would result in "different conferences having . . . potentially vastly different rules on . . .

12  compensation" which would "make it much harder and murkier for fans to understand what is

13  college sports, what is the motivation, why are student athletes participating" and "for the entities

14  that invest in college sports, notably TV broadcasters, sponsors, to understand the values that they're

15  associating with and communicate that to the public."[273]  As Commissioner Scott explained, the

16  "fragmentation" that would occur if conferences could set different compensation rules would

17  devalue the product itself:

18              [I]n my experience, and I've been involved in pro[fessional] sports and
             collegiate sports, you know, having a clear set of values and having clarity
19           about the structure of a sport is essential to maximizing value.  You know, you
             don't see any other successful -- big successful sports leagues with
20           significantly different rules across that league.  It just doesn't happen.[274]

21          This testimony was bolstered by that of Commissioner Michael Aresco, and by the expert

22  analysis of Dr. Kenneth Elzinga.  Commissioner Aresco, a former college sports broadcasting

23  executive at ESPN and CBS, echoed the importance, for broadcasters and fans, of product

24

25  [270] Elzinga Dir. Test. ¶ 34.
   [271] Elzinga Dir. Test. ¶ 35.
26  [272] Tr. 1140:14-1141:12.
   [273] Tr. 1141:18-1142:2 (Scott).
27
   [274] Tr. 1142:8-14.
28

48

1   differentiation between college sports and professional sports.[275]   And Dr. Elzinga explained that

2   certain conferences inevitably would act in their own self-interest and offer student-athletes more

3   benefits in an effort to obtain better players and raise consumer demand.[276]   And while consumer

4   demand for that particular conference might be positively impacted, he noted there would be

5   negative impact upon others, with the overall result of degrading the national product, particularly

6   for the significant number of fans who value amateurism.[277]

7       Numerous witnesses also testified that a move to pay-for-play would harm national

8   championships and disrupt traditional rivalries in football and basketball.[278]   With respect to March

9   Madness in particular, there was significant evidence that the value of that tournament, the principal

10  source of revenues for the NCAA and many conferences, would be damaged if pay-for-play were

11  allowed.   Commissioner Scott testified that a system of conference-level rulemaking "would

12  significantly increase the gap between the so-called haves and have nots," negatively impacting the

13  competitive playing field of the tournament and undermining a "key attribute" of popularity—the

14  "Cinderella stories" where schools with fewer resources have the chance to advance in the

15  tournament.[279]   Gene Smith agreed that eliminating caps on benefits as Plaintiffs propose would

16  negatively impact the NCAA tournament, citing precisely the same concern that the preexisting

17  "disparity in the haves and the have-nots . . . would be widened significantly . . . ."[280]   As a result,

18  the "reality is the tournament would change.   It would be less schools.   Would it exist?   Of course it

19  would.   But it would certainly diminish and would certainly have an impact on a number of different

20  schools having an opportunity to participate."[281]

21

22

---

23  [275] Tr. 1003:17-1004:22.

     [276] Tr. 457:9-19.

24   [277] Tr. 445:19-22, 457-459.

25  [278] See Tr. 1143:3-24 (Scott) ("I do worry about the effect on rivalries, the traditions, the history" if
     conferences set different compensation rules); Tr. 1513:23-15 (Smith) (if traditional rivals Michigan

26   and Ohio chose to engage in differential compensation systems "it would end the series.").

     [279] Tr. 1145:4-1146:6.

27   [280] Tr. 1460:13-22, 1461:6-14.

28   [281] Tr. 1461:19-23 (Smith).

1    Consistent with this fact-witness testimony, Dr. Elzinga opined that enjoining the challenged

2  rules could lead to a "balkanization" of the tournament, with different tournaments for different

3  levels of pay.[282]  At a minimum, the overall value of the tournament would be reduced because it

4  would transform into one where pros who are paid to play would be competing against athletes who

5  are not.[283]  The notion that some schools might stop participating altogether under these

6  circumstances was supported by Chancellor Blank, who testified that a pay-for-play model could

7  "take [Wisconsin] out of the sort of national competitions that we've been in," including

8  "absolutely" March Madness.[284]

9                    3.    *Integration Would Suffer if the Challenged Rules Were Eliminated*

10    Plaintiffs also failed to demonstrate how their proposed injunctions would promote the

11  procompetitive goal of integration, let alone how they would do so as well as the challenged rules.

12  Plaintiffs' trial strategy was to attempt to undermine Defendants' evidence that the challenged rules

13  promote integration by demonstrating that integration is not negatively impacted by currently

14  *permissible* benefits, such as the receipt of participation awards, Olympic Gold grants, the Nebraska

15  PEO program or professional league signing bonuses in one sport while maintaining eligibility in

16  another (while also arguing that student-athletes are not currently integrated).[285]  But these examples

17  shed no light on the effect that allowing systematic, uncapped institutional pay for participation in

18  intercollegiate athletics would have across Division I.  And the professional educators that testified,

19  Chancellor Blank, President Hatch, and Nobel laureate Dr. James Heckman, unequivocally rebuffed

20  the notion of paying student-athletes as inconsistent with the university's educational mission.[286]

21  These educators and others who testified also flatly rejected the wisdom of implementing a first-of-

22  its-kind educational experiment in which student-athletes (and only student-athletes) are paid for

23  ---

[282] Tr. 525:18-526:14.

24  [283] *Id.*

[284] Tr. 893:3-9.

25  [285] *See, e.g.*, Tr. 1638:13-1640:13 (Lennon) (explaining the legality of the Nebraska PEO program);
Tr. 735-36 (Jenkins).

26  [286] Tr. 886:18-887:3 (Blank) (noting the importance of student-athletes having the same experiences

27  as the broader student body), Tr. 890:11-14, 23-25; Tr. 2008:7-14 (Hatch); Tr. 631:4-632:15
(Heckman) (academic progress incentives would "change the nature of the relationship, I think, of

28  those students to the university compared to other students" and be "isolating").

1    grades or graduating.[287]  Even Dr. Noll had to admit that the academic literature at best suggests the

2    impact of financial incentives on student achievement is zero and is *negative* for low ability

3    students.[288]

4                 4.     *Increased Cost of Conference-Level Rulemaking*

5         The evidence at trial also demonstrated that conference level rulemaking, if it were to occur,

6    would be much more expensive than the existing rules and would lead to a fracturing of the existing

7    32 Division I football and basketball conferences.  As Commissioner Scott testified, if "there were

8    no national NCAA rules with respect to compensation and benefits, but rather individual conferences

9    had to create their own rules in that regard," "there would be significant additional infrastructure and

10    expense that [the conferences] would all have to bring to rule development, to discussing, deciding,

11    creating the rules."[289]  In addition, Commissioner Scott testified that the conferences each would

12    have to incur significant expense to recreate the NCAA enforcement structure already in place:

13            Because when you set the rules, that also comes with enforcing them as well.
14            And there's a very, very significant head count in Indianapolis that handles
             investigations, enforcement, adjudication, that certainly the Pac-12 would
15            have to recreate to a certain extent. And that would – that would be
             significant. And then each of the other conferences no doubt would -- would
16            have to do the same.[290]

---

17    [287] Tr. 895:20-896:15 (Blank) (explaining that she would "worry about the incentive effects that
18    you'd be creating" including the "negative message" it would send to students who need more help
      and mentoring the first year and also "reducing the incentive to take the hard courses"); Tr. 1999:13-
19    24 (Hatch) (Wake Forest "would never consider" paying its students money for achieving certain
      grades "because it's not the right motivation."); Tr. 618:2-619:5 (Heckman) (academic literature has
20    said the effect of academic incentives is zero and might even be negative; "one of the internal rules
      of incentive models, [is] that you will try to achieve that objective at lowest cost, which might be
21    taking easier courses . . . ."); *see also* Tr. 494:11-495:10 (Elzinga) (pay for grades could establish a
      "perverse incentives so that a student would decide to take a less desirable curriculum because the
22    payment for the grade point average in a different major would be beneficial financially to the
      student but might not . . . enhance the academic quality of the education."), 505:21-506:17; Tr.
23    1469:18-1470:9 (Smith) (student athlete incentives for reaching a certain grade point would be
      inappropriate and harmful and "would have a significant impact on our ability to ensure that the
      behavior of our student athletes maintains their focus on their academics").
24    [288] Tr. 2115:3-17 (Noll) (agreeing that Dr. Fryer, a tenured professor at Harvard, concluded "I
25    estimate that the impact of financial incentives on student achievement is statistically zero in each
      city."); 2115:21-2118:1 (Noll) (agreeing that another academic study published in the *Journal of the*
26    *European Economic Association* "casts doubt" on there being a positive relationship between
      financial incentives and achievement and finds that "low ability students achieve less" when
      assigned financial rewards).
27    [289] Tr. 1135:25-1136:15.
      [290] Tr. 1136:20-1137:1.
28

The Pac-12 is not the only conference with no enforcement structure in place. Commissioner Aresco similarly testified that the American Athletic Conference does not have an enforcement staff, but only a compliance staff that simply assists schools in an advisory role.[291] If the conference had to create and enforce its own rules, that would be "a whole new dimension" which would require the conference to hire additional personnel to perform enforcement and conduct investigations in place of the NCAA.[292] Other conference witnesses also testified during their depositions, about the differences in enforcement infrastructure between the NCAA and the conferences.[293]

Plaintiffs cannot reply that any increased costs for conference or schools would be offset by savings at the NCAA, because the NCAA's enforcement infrastructure could not be eliminated. As explicitly acknowledged in Plaintiffs' proposed injunctions, even if all NCAA compensation rules were eliminated, significant numbers of NCAA "rules regarding academic eligibility, third-party payments to college athletes, transfers, name, image, and likeness rights, or other NCAA regulations not challenged in this case"[294] would still remain to be enforced through the national body's investigative and infractions processes. Aside from Dr. Rascher's unsupported conjecture, Plaintiffs proffer no trial evidence for their bare assertions (at 4, 34-35) that elimination of the current centralized enforcement system with its economies of scale would somehow translate into savings at the conference level. And Plaintiffs' suggestion (at 4, 34-35) that the conferences could simply "leav[e] in place the current NCAA enforcement apparatus" or avail themselves of the new NCAA apparatus contemplated by the Rice Commission is nonsensical, since the contemplated injunction would *prohibit* the NCAA from having any role in enforcing compensation rules.[295]

---

[291] Tr. 1037:24-1038:4.

[292] Tr. 1038:11-1039:2 (Aresco).

[293] *See, e.g.*, Hostetter Tr. 18:4-11; Price 30(b)(6) Tr. 6:20-7:2.

[294] Requested Injunction, Pls.' Op., App'x C.

[295] *See* Pls. Op., App'x C & D (proposing that the NCAA and any person "in active concert or participation with them" be "permanently restrained and enjoined from . . . enforcing or attempting to enforce, now or in the future" compensation rules for Division I basketball and football athletes). Plaintiffs' suggestion that the conferences could rely on NCAA infrastructure is also a tacit admission that the current conference infrastructure is not sufficient to support the kind of enforcement apparatus that would be needed if the national compensation system were decentralized.

1      In addition to the inevitable administrative costs[296] to develop new rules and an infrastructure

2 to enforce them and investigate infractions, and the costs associated with providing pay and/or

3 additional benefits to student-athletes,[297] there would be additional monetary costs triggered by the

4 disruption to the conference system through realignment.[298]  If major conferences were to have

5 different compensation rules, those differing schemes would be "a major driver of schools deciding

6 to leave our conference or – or join our conference based on . . . different sets of values."[299]

7      Dr. Nathan Hatch testified that he expected a similar "shakeout"—meaning a division among

8 conference members—in his school's conference, the Atlantic Coast Conference, if the NCAA's

9 compensation and benefits rules were enjoined.[300]  While Dr. Hatch testified that Wake Forest would

10 not go to a pay-for-play system, he noted the "deep sense" that other schools would and the reason it

11 is not publicly stated by school presidents is that the issue is "deeply divisive" within institutions.[301]

12 But whether some schools would pay more than cost of attendance if the rules allowed it is not in

13 dispute—Dr. Rascher agrees that some would offer pay to participate in athletics.[302]

---

14 [296] Plaintiffs misleadingly argue (at 33) that Defendants have conceded that "administrative
15 implementation costs" are the only relevant costs for this inquiry.  Not true.  At the page cited,
Defendants simply explained the significant administrative costs that would ensue.  Defs.' Op. at 45.
16 [297] *Cf. O'Bannon*, 802 F.3d at 1075 (rejecting an "increase[d] costs" defense because "the NCAA
already permits schools to fund student-athletes' full cost of attendance"); *see also id.* at 1076 n.19
17 (noting the lack of "findings about whether allowing schools to pay students NIL cash compensation
18 will significantly increase costs to the NCAA and its member schools").
[298] *See* Tr. 1141:15-16 (Scott) (noting "it might actually disrupt the conference makeup").  The
19 disruptive effect of conference realignment was explained by Michael Aresco, former Commissioner
of the Big East Conference, who testified that conference "was torn apart by conference
20 realignment" when seven schools left the conference leading to "disarray" and questions about
whether the conference could continue.  Tr. 1014:1-20.
21 [299] Tr. 1143:12-21 (Scott).
[300] Tr. 2015:10-24, 2016:16-18.
22 [301] Tr. 2008:7-14, 2016:25-2017:7.  The issue of whether schools would go to pay-for-play or change
their athletic program is so contentious that University of Wisconsin Chancellor Rebecca Blank was
23 compelled to issue a public statement following her testimony that a pay-for-play system would
cause her school to fundamentally reconsider its student-athlete program, potentially causing it to
24 exit the kinds of national programs they currently compete in, including March Madness.  Tr.
892:15-893:9 (Blank); Dkts. 1054, 1056.
25 [302] Tr. 113:15-20.  Numerous fact witnesses testified that it is generally accepted, and they
personally expected, that agreed some schools would pay more than cost of attendance if allowed.
26 *See, e.g.*, Tr. 1461:14-18 (Smith) ("[T]here would be those who choose to - - compensate student
athletes at a higher level.  And there'll be those who choose not to.  There'll be those who may
27 choose to do something different relative to athletics."); Tr. 972:3-6 (Blank) (testifying it was "quite
possible" that some schools in The Big Ten would decide to pay student-athletes if NCAA rules
28 *(cont.)*

1      At the opposite end of the spectrum, these changes might also trigger certain schools or

2  conferences to leave the NCAA or Division I.  For example, the Commissioner of the America East

3  testified that schools in her conference do not have the budget to pay cost of attendance, much less

4  above cost of attendance scholarships, and "would strongly reconsider their position in the

5  NCAA . . . ."[303]

### D.  The Existing Autonomy Governance Model Bears No Relationship to Plaintiffs' Requested Relief

6

7      This Court should reject the proposition that the current autonomy structure establishes a

8  precedent for Plaintiffs' proposal to eradicate amateurism.  As shown by undisputed testimony

9  elicited by both sides, the current autonomy structure grants to the ACC, The Big Ten, Big 12, SEC

10  and Pac-12 the ability to *collectively* adopt certain legislation within limited areas subject to

11  overriding NCAA rules—including, of particular relevance here, the commitment to amateurism,

12  which means these conferences may not simply decide they will abandon all restrictions on student-

13  athlete compensation.[304]  The core purpose behind the autonomy rules was to provide limited

14  legislative leeway to those five conferences in specific areas while remaining within the "big tent"—

15  *i.e.*, the national rulemaking body that is the NCAA—and without "having to replicate, duplicate" or

16  "conflict" with that larger "ecosystem of college sports."[305]  The range of permissible rulemaking

17  within autonomy was "very limited" and the same rules the five conferences enact for adoption may

18  be adopted by other schools.[306]  Plaintiffs' proposed injunctions bear no similarity to the NCAA

19  autonomy rules—they would allow unlimited compensation and prohibit precisely the kind of

20  collective rulemaking process the NCAA's structure requires for the five "autonomy" conferences to

21

---

22  allowed it); Tr. 2016:25-2017:7 (Hatch) (noting that there is a "deep sense" that schools would pay more than cost of attendance if permitted); Tr. 1142:16-22 (Scott) (testifying that it "has been discussed for some time" that if there were "no rules around compensation . . . some schools in some parts of the country might start paying players").

23

24  [303] Tr. 2059:24-2061:2 (Huchthausen).

25  [304] Tr. 1132:20-1133:5 (Scott); Tr. 1264:17-1265:3 (Lennon); Berst Tr. 246:15-247:3; Emmert Tr. 178:5-179:1.  For example, the five conferences' election to redefine "grant-in-aid" to cost of attendance is now at the maximum allowable financial aid permitted under NCAA rules, which cannot be changed by the five conferences.  Tr. 1618:14-22 (Lennon).

26

27  [305] Tr. 1133:14-1134:16 (Scott).  *See also* Tr. 1265:8-17 (Lennon).

28  [306] Tr. 1135:11-17 (Scott).

adopt rules within the existing commitment to amateurism.[307]  Plaintiffs do not satisfy the required "strong evidentiary showing that [their] alternatives are viable here" by applying the "autonomy" label to their requested relief.[308]

### E.  Affording the NCAA Ample Latitude Precludes This Court from Implementing a Numerical Compensation Cap or Tinkering with Individual Benefits

The fact that Plaintiffs have failed to prove that any of their three proposed less restrictive alternatives are viable should end the analysis.  However, for the sake of completeness, Defendants will address various potential additional benefits Plaintiffs argued during trial that Defendants could make available to student-athletes (although none of those proposed benefits are embodied in any proposed less restrictive alternative or other form of relief that Plaintiffs propose).  As the Ninth Circuit advised in *O'Bannon*, the third step in the rule of reason analysis is not an invitation for courts "to make marginal adjustments to broadly reasonable market restraints" or "to micromanage organizational rules."[309]  Rather, a court should only replace a restraint with a less restrictive alternative where the "restraint is *patently and inexplicably* stricter than is necessary to accomplish all of its procompetitive objectives . . . ."[310]  Ordering individual additional benefits that Plaintiffs discussed during trial would clearly be mere marginal adjustments to reasonable market restraints, and contrary to the ample latitude the NCAA is afforded.

*Numerical Compensation Cap*.  Plaintiffs concede (at 43) that it would be error for the Court to enter an injunction that supplants existing NCAA rules with a higher compensation cap at a specific dollar amount.  Despite repeated inquiry, not one of Plaintiffs' experts could tell the Court that there is some injunction, or some "magic number," that the Court could grant as relief that would maintain the procompetitive benefits of the challenged rules.  Dr. Rascher provided no numeric value that the market could bear, but rather opined that conferences and schools would conduct market research to attempt to determine a number, and it could take them nearly a decade to

---

[307] *See* Requested Injunction and Proposed Injunction, Pls.' Op., App'x C & D.
[308] *O'Bannon*, 802 F.3d at 1074.
[309] *Id*. at 1075.
[310] Id.

1   determine what the right number might be.[311]   Further, in response to questioning from the Court,

2   Dr. Noll made plain that there is no "safe number" that one could "safely say definitely wouldn't

3   cause any decrease in demand."[312]

4        *Individual Benefits*.   Although not proposed by Plaintiffs as less restrictive alternatives,

5   certain of Mr. Poret's test scenarios purported to test the sustainability of consumer demand if

6   various benefits were individually offered.   An injunction restraining the NCAA from prohibiting

7   any or all of these individual benefits patently would tinker with the association's rules.   Moreover,

8   setting aside the substantial deficiencies in Mr. Poret's survey, the survey would *at most* provide

9   support for providing only one individual tested benefit, as he did not even test what would happen if

10  any combination of his scenarios were offered together.[313]   As discussed, *supra* (at 28-29, 44-45),

11  the weight of the evidence also demonstrates that certain benefits, such as financial incentives for

12  academic benchmarks, are neither effective nor consistent with the goals of higher education, while

13  other benefits, such as post-graduation benefits for students who have exhausted eligibility, are

14  already allowed (so long as they are provided at the same institution).

15  **IV. THERE IS NO FOURTH "BALANCING" STEP**

16       Plaintiffs' failure to prove the availability of a less restrictive alternative should end the

17  Court's inquiry, as there is no fourth "balancing" step.   This Court recognized in *O'Bannon* that

18  "[c]ourts typically rely" on the three-step "burden-shifting framework" to determine whether a

19  restraint's harm to competition outweighs its procompetitive effects.[314]   Plaintiffs agreed as recently

20  as May 15, 2018, that analyzing less restrictive alternatives was "[t]he final step in the rule-of-reason

---

21  [311] Tr. 104:10-106:18.

22  [312] Tr. 387:16-388:7 (". . . I don't actually know -- I don't actually have an opinion about the
    existence of some pay.  I don't know what it would be . . . .  So saying there is a magic number that
23  should apply to all players, this is probably not true.  The evidence – there's no empirical evidence
    for the existence of such a magic number.").  Dr. Heckman's testimony concerning the Sanderson &
24  Siegfried article does not establish that a $200,000 compensation limit would be appropriate to
    maintain the observed procompetitive justifications.  It was not Dr. Heckman's testimony, and the
25  Sanderson & Siegfried article does not stand for the proposition, that only once payments at or above
    $200,000 are allowed would there be a diminution in the observed procompetitive justifications.  Dr.
26  Noll agrees that the Sanderson & Siegfried analysis does not support such a view.  Tr. 2071:14-
    2072:15.

27  [313] Tr. 1657:18-1658:16 (Poret).

28  [314] 7 F. Supp. 3d at 985 (explicitly referring to step three as the final step).

analysis."[315]  Plaintiffs' late request for a fourth "balancing" step in the event they lose at step three

defies both the Ninth Circuit's statement in *O'Bannon* that the "final inquiry" in the rule of reason

analysis is "whether there are reasonable alternatives to the NCAA's current compensation

restrictions,[316] and its statement (again in *O'Bannon*) that where the NCAA's "regulations truly

serve procompetitive purposes, *courts should not hesitate to uphold them*."[317]  And the request also

runs counter to the Supreme Court's recent decision in *Ohio v. American Express Co.*, in which the

Court unanimously agreed that the rule of reason inquiry consists of a "*three-step*, burden-shifting

framework."[318]  Moreover, even if the Court were to find that balancing may theoretically be

appropriate, balancing does not make sense in this context and Plaintiffs have not provided the Court

with anything to balance.

### A.  Ninth Circuit Precedent Does Not Call for a Fourth Balancing Step

Although *O'Bannon* is dispositive on the absence of a fourth "balancing" step in this context,

other Ninth Circuit case law addressing antitrust challenges to NCAA and conference rules also

compel this result.  For the three-step burden-shifting framework in *O'Bannon*, both this Court and

the Ninth Circuit cited *Tanaka v. University of Southern California*.[319]  *Tanaka*, which involved a

challenge to the then-Pac-10's restrictions on transfers, made no mention of a fourth "balancing"

---

[315] Dkt. 818 at 10 (internal quotation marks omitted; alteration in original).  This Court also agreed that the three-step approach applies when it ruled on the parties' motions for summary judgment.  MSJ Order at 25-26 ("The final step in the rule-of-reason analysis is whether Plaintiffs can 'make a strong evidentiary showing' that any legitimate objectives can be achieved in a substantially less restrictive manner." (quoting *O'Bannon*, 802 F.3d at 1074)).  Indeed, Plaintiffs avoided summary judgment by arguing that *O'Bannon* merely "suppl[ies] the method of antitrust analysis for scrutinizing the challenged restraints in the relevant markets here."  Dkt. 714-01.  Having prevailed with that approach, Plaintiffs are judicially estopped from taking a different tack now.  *See, e.g.*, *Hamilton v. State Farm Fire & Cas. Co.*, 270 F.3d 778, 782 (9th Cir. 2001) (explaining that judicial estoppel "precludes a party from gaining an advantage by asserting one position, and then later seeking an advantage by taking a clearly inconsistent position").

[316] 802 F.3d at 1074.

[317] *Id.* at 1079 (emphasis added).

[318] 138 S. Ct. at 2284 (emphasis added); *id.* at 2290 (Breyer, J., dissenting) ("I agree with the majority and the parties that this case is properly evaluated under the three-step 'rule of reason' that governs many antitrust lawsuits.").  Plaintiffs correctly note that only the *American Express* dissent suggested that courts could conduct a separate balancing inquiry in lieu of evaluating less restrictive alternatives.  *See* Pls.' Op. at 36.  The majority opinion was clear that at step three "the burden shifts back to the plaintiff to demonstrate that the procompetitive efficiencies could be reasonably achieved through less restrictive means."  *Am. Express*, 138 S. Ct. at 2284.

[319] 252 F.3d at 1063.

step.[320] And *Hairston v. Pacific 10 Conference*, the case upon which *Tanaka* relied, leaves no doubt that there is no fourth "balancing" step in this case. It involved a Sherman Act challenge to penalties for violations of the NCAA's amateurism rules.[321] The Ninth Circuit granted summary judgment for the then-Pac-10 and NCAA because the plaintiffs failed to meet their burden at step three.[322] A fourth "balancing" step is irreconcilable with *Hairston*.[323] And for good reason: the three-step inquiry *itself* strikes the appropriate balance, encompassing the factors that the Ninth Circuit and other courts have found dispositive and dictating how to consider them in relation to each other.

The two cases Plaintiffs cite—neither of which involved the NCAA or any conference or school—are unpersuasive. Both cases solely relied on the treatise "Fundamentals of Antitrust Law" for the suggestion that there is such a fourth step.[324] In both cases, moreover, the suggestion of a fourth step was dicta because the court resolved the case at an earlier step. Specifically, *Bhan v. NME Hospitals, Inc.*, offers no guidance as to how balancing would work because the plaintiff failed at step one—there was no anticompetitive harm.[325] And in *County of Tuolumne v. Sonora Community Hospital*, the court ultimately concluded that a hospital's privileging criteria were procompetitive because (1) the plaintiffs failed at step three, and (2) numerous other cases had concluded that hospital privileging criteria were procompetitive.[326] To the extent *County of Tuolumne* offers any guidance here, it suggests that unless Plaintiffs offer an alternative that is

---

[320] *See id.* (citing *Hairston*, 101 F.3d at 1319).

[321] 101 F.3d at 1317.

[322] *Id.* at 1319.

[323] *Id. Accord Virgin Atl. Airways Ltd. v. British Airways PLC*, 257 F.3d 256, 265 (2d Cir. 2001) ("Virgin's failure to address [step three] leaves intact the evidence that British Airways' incentive agreements are good for competition."); *Toscano*, 201 F. Supp. 2d at 1123 ("[E]ven if Toscano had demonstrated that the [Senior PGA Tour's] eligibility rules had a significant anticompetitive effect, he would still lose under the rule of reason because he both fails to rebut the fact that there are procompetitive justifications for the rules and to show that the procompetitive objectives could be achieved in a less anticompetitive manner.").

[324] *See Cty. of Tuolumne*, 236 F.3d at 1160; *Bhan v. NME Hospitals, Inc.*, 929 F.2d 1404, 1413 (1991).

[325] *See* 929 F.3d at 1413.

[326] 236 F.3d at 1160.

1    "'virtually as effective' in serving the procompetitive purposes of the NCAA's current rules, and

2    'without significantly increased cost,'" the Court should leave the NCAA's rules intact.[327]

3                     **B.  Balancing in This Case Is Not Even Theoretically Possible**

4            Even the authors of "Fundamentals of Antitrust Law" recognized that any balancing would

5    be inherently difficult and that "[i]n the vast majority of rule of reason cases, even complex ones

6    such as *O'Bannon*, real balancing is not necessary."[328]  In *O'Bannon*, the Ninth Circuit "did not

7    balance, but rather applied a purely binary distinction between amateur and professional play."[329]

8    Balancing would require both quantifying and comparing the anticompetitive effects and

9    procompetitive benefits of a challenged restraint, which is not possible in this context.[330]  Even if

10   Plaintiffs had made an effort to quantify the anticompetitive effects of the challenged rules,

11   comparing such a figure to consumer demand for amateur athletics or academic integration would be

12   "like judging whether a particular line is longer than a particular rock is heavy."[331]

13           Not surprisingly, Defendants are not aware of a single case in which a court has purported to

14   apply a fourth "balancing" step after a plaintiff failed at step three, and concluded that a restraint was

15

16   [327] *O'Bannon*, 802 F.3d at 1079 (quoting *Cty. of Tuolumne*, 236 F.3d at 1159, and citing multiple cases recognizing the NCAA's role in superintending amateur college sports).  While necessarily

17   rejecting the existence of a fourth step in both *O'Bannon* and *Hairston*, the Ninth Circuit repeatedly acknowledged *Bhan* and *County of Tuolumne*—they were not simply overlooked.  *See O'Bannon*,

18   802 F.3d at 1074 (citing *Cty. of Tuolumne*, 236 F.3d at 1159); *id.* at 1076 & n.19 (same); *Hairston*, 101 F.3d at 1318 (citing *Bhan*, 929 F.2d at 1410); *id.* at 1319 (citing *Bhan*, 929 F.2d at 1413)).

19   Plaintiffs' reliance on *Bhan* and *County of Tuolumne* should therefore not compel a different result.
     [328] *See* Herbert A. Hovenkamp, *Antitrust Balancing*, 12 N.Y.U. J.L. & Bus. 369, 383 (2016).

20   [329] *Id.* at 377 & n.27 (noting that "the line between 'amateur' and 'professional' athletics was a well-established benchmark that courts had repeatedly approved," and that *Board of Regents* "emphasized

21   the historic role of the NCAA in promoting amateurism in intercollegiate athletics").

22   [330] *See id.* at 384 (cautioning that "[i]n the rare event that balancing is necessary, courts should be aware that unless they have specific, quantifiable amounts to attach to competitive threats and

23   offsetting gains, they are in hazardous territory"); *see also* 1 J. Kalinowski, Antitrust Laws and Trade Regulation § 12.02[5] (2d ed. 2017) ("How a court is to implement this balancing is not clear,

24   perhaps because of difficulties in measuring the competitive effects."); P. Areeda & H. Hovenkamp, Fundamentals of Antitrust Law § 15.02 (4th ed. 2017) (Areeda & Hovenkamp) ("[T]he tribunal must

25   *somehow* weigh the harm against the benefit." (emphasis added)).  Areeda & Hovenkamp explain the difficulties in more detail:  "As a matter of theory, balancing is not even conceptually possible

26   without a unit of measurement.  That is, purely ordinal methods of balancing work only when the value on one side is zero.  When both sides seem weight, however, we must have a way of

27   netting them out."  Areeda & Hovenkamp § 15.07[d].
     [331] *Bendix Autolite Corp. v. Midwesco Enterprises, Inc.*, 486 U.S. 888, 897 (1988) (concurring

28   opinion).

59

1   unreasonable.  Areeda and Hovenkamp observe that "[o]utside of the merger context, no court to our

2   knowledge has ever even attempted to put an actual number, such as dollars of economic loss or gain

3   on either the anticompetitive effects of a restraint or the justifications offered against it."[332]  Indeed,

4   in a Sherman Act case involving a product improvement, the Ninth Circuit has explicitly rejected the

5   notion of trying to weigh procompetitive benefits against anticompetitive effects.[333]

6   ### C.  Plaintiffs Left the Court with Nothing to "Balance"

7   Were the Court to proceed to a fourth step, Plaintiffs would have the burden to demonstrate

8   that the challenged rules are, on balance, unreasonable.[334]  The treatise section that Plaintiffs cite on

9   balancing would further require that "[w]hen balancing must be performed, the consumer welfare

10  principle insists upon a measurable unit, which is either price or output."[335]  Other than arguing that

11  the challenged rules have zero procompetitive benefits, Plaintiffs made no effort at trial to assign

12  measurable units to the alleged anticompetitive effects, to measure them, or to explain how to weigh

13  those effects against the procompetitive benefits.

14  With respect to anticompetitive effects, Plaintiffs point only to the Court's finding at

15  summary judgment that "greater compensation and benefits would be offered in the recruitment of

16  student-athletes absent the challenged rules."[336]  Assuming purely for the sake of argument that such

17  a calculation would be relevant for these purposes, Plaintiffs offered no evidence as to how much

---

18  [332] *See also* Areeda & Hovenkamp § 15.07[d].

19  [333] *Appliances Inc. v. Tyco Health Care Grp. LP*, 592 F.3d 991, 1000 (9th Cir. 2010) ("To weigh the benefits of an improved product design against the resulting injuries to competitors is not just

20  unwise, it is unadministrable.").  Other courts have similarly questioned whether it is even possible to measure procompetitive benefits against anticompetitive effects.  *See Rothery Storage & Van Co.*

21  *v. Atlas Van Lines, Inc.*, 792 F.2d 210, 229 n.11 (D.C. Cir. 1986) ("[T]hough it is sometimes said that, in the case of restraints like these, it is necessary to weigh procompetitive effects against

22  anticompetitive effects, we do not think that a useable formula if it implies an ability to quantify the two effects and compare the values found."); *State of N.Y. by Abrams v. Anheuser-Busch, Inc.*, 811

23  F. Supp. 848, 872 (E.D.N.Y. 1993) ("[T]he weighing required by the rule of reason is extremely awkward to apply.  Competitive effects are not susceptible to any kind of numerical valuation,

24  making the Court's task a daunting one.").

25  [334] *Aydin Corp. v. Loral Corp.*, 718 F.2d 897, 901 (9th Cir. 1983) (stating it is well settled that "[t]he plaintiff in an antitrust action judged under the rule of reason bears the burden of proving

    unreasonableness"); *Hahn v. Or. Physicians' Serv.*, 868 F.2d 1022, 1026 (9th Cir. 1988); *Seattle*

26  *Totems Hockey Club, Inc. v. Nat'l Hockey League*, 783 F.2d 1347, 1350 (9th Cir. 1986); *accord* Areeda & Hovenkamp ¶ 1502.

27  [335] Areeda & Hovenkamp § 15.07[d] (cited in Plaintiffs' Closing at 37).

28  [336] MSJ Order at 19; Pls.' Closing at 74.

1   more student-athletes would receive in the absence of the challenged rules.[337]   In fact, Plaintiffs

2   suggested at trial that payments to student-athletes would be insignificant, and that conference-level

3   compensation rules would not be much different than the NCAA rules currently in place.[338]

4   Plaintiffs also fail to explain by what measure the procompetitive effects "would at most be tiny,"[339]

5   or how one would weigh those effects against any anticompetitive harm.

6                                    **CONCLUSION**

7           For the foregoing reasons, Defendants have met their burden at step two, and Plaintiffs have

8   failed to meet their burden at step three.  Accordingly, judgment must be entered for Defendants.

9

10

11

12

13

14

15

16

17

18

19

---

20   [337] *See, e.g.*, Tr. 75:18-76:11 (Dr. Rascher testifying that he could not quantify what portion of
     coaches' salaries would go to student-athletes in Plaintiffs' but-for world).  Plaintiffs have never
21   proven the quantum of anticompetitive effect caused by the restraints in question.  Therefore, any
     weight given to the procompetitive justifications must necessarily outweigh that unproven effect.
22   [338] Dr. Rascher testified that he would be "shocked if the conferences just started allowing unfettered
     competition for the athletes."  Tr. 104:10-24.  The largest payment tested by Mr. Poret was $10,000,
23   Poret Dir. Test. ¶ 24, and Dr. Rascher characterized that amount as "generous."  Rascher Dir. Test.
     ¶ 197; *see also* Tr. 147:4-12 (Rascher) ("can't imagine a school would go and offer a million
24   dollars").  When asked by the Court whether there was "any amount of money that the economic
     evidence would show could be offered to student-athletes that would negatively [a]ffect the demand
25   for college sports," Dr. Noll responded that "you could—*as long as it's not just a few thousand
     dollars more*."  Tr. 387:3-15 (emphasis added).  Dr. Noll suggested that if conferences set their own
26   compensation limits, they would adopt identical rules to those in place now.  Noll Dir. Test. ¶ 185
     Plaintiffs' counsel suggested the same in their cross-examination of Dr. Elzinga.  Tr. 440:11-441:21.
27   [339] Pls.' Closing at 37.

28

**DEFS.' CLOSING BRIEF**                                           **MDL No. 4:14-md-02541-CW**

Dated:  November 9, 2018

Respectfully submitted,

**WILKINSON WALSH + ESKOVITZ LLP**

**SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP**

By:  /s/ Beth A. Wilkinson
  Beth A. Wilkinson (*pro hac vice*)
  Brant W. Bishop, P.C.(*pro hac vice*)
  James Rosenthal (*pro hac vice*)
  2001 M Street NW, 10th Floor
  Washington, DC 20036
  Telephone:  (202) 847-4000
  Facsimile:  (202) 847-4005
  bwilkinson@wilkinsonwalsh.com
  bbishop@wilkinsonwalsh.com
  jrosenthal@wilkinsonwalsh.com

  Sean Eskovitz (SBN 241877)
  11601 Wilshire Blvd., Suite 600
  Los Angeles, CA 90025
  Telephone:  (424) 316-4000
  Facsimile:  (202) 847-4005
  seskovitz@wilkinsonwalsh.com

  Attorneys for Defendant
  NATIONAL COLLEGIATE ATHLETIC
  ASSOCIATION

By:  /s/ Jeffrey A. Mishkin
  Jeffrey A. Mishkin (*pro hac vice*)
  Karen Hoffman Lent (*pro hac vice*)
  Four Times Square
  New York, NY  10036
  Telephone:  (212) 735-3000
  Facsimile:  (212) 735-2000
  jeffrey.mishkin@skadden.com
  karen.lent@skadden.com

  Patrick Hammon (SBN 255047)
  525 University Avenue, Suite 1100
  Palo Alto, CA 94301
  Telephone:  (650) 470-4500
  Facsimile:  (650) 470-4570
  patrick.hammon@skadden.com

  Attorneys for Defendants
  NATIONAL COLLEGIATE ATHLETIC
  ASSOCIATION and WESTERN
  ATHLETIC CONFERENCE

1   **PROSKAUER ROSE LLP**                **MAYER BROWN LLP**

2   By: _____/s/ Bart H. Williams_____   By: _____/s/ Britt M. Miller_____

3           Bart H. Williams (SBN 134009)        Andrew S. Rosenman (SBN 253764)
            Scott P. Cooper (SBN 96905)          Britt M. Miller (*pro hac vice*)
4           Kyle A. Casazza (SBN 254061)         71 South Wacker Drive
            Jennifer L. Jones (SBN 284624)       Chicago, IL 60606
5           Shawn S. Ledingham, Jr. (SBN 275268)  Telephone:  (312) 782-0600
            Jacquelyn N. Crawley (SBN 287798)    Facsimile:  (312) 701-7711
6           2029 Century Park East, Suite 2400   arosenman@mayerbrown.com
            Los Angeles, CA 90067                bmiller@mayerbrown.com
7           Telephone:  (310) 557-2900
8           Facsimile:  (310) 557-2193          Richard J. Favretto (*pro hac vice*)
            bwilliams@proskauer.com              1999 K Street, N.W.
9           scooper@proskauer.com                Washington, DC  20006
            kcasazza@proskauer.com               Telephone:  (202) 263-3000
10          jljones@proskauer.com                Facsimile:  (202) 263-3300
            sledingham@proskauer.com             rfavretto@mayerbrown.com
11          jcrawley@proskauer.com

12                                               Attorneys for Defendant
            Attorneys for Defendant              THE BIG TEN CONFERENCE, INC.
13          PAC-12 CONFERENCE

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**POLSINELLI PC**

By:      /s/ Leane K. Capps
     Leane K. Capps (*pro hac vice*)
     Caitlin J. Morgan (*pro hac vice*)
     2950 N. Harwood Street
     Suite 2100
     Dallas, TX 75201
     Telephone:  (214) 397-0030
     lcapps@polsinelli.com
     cmorgan@polsinelli.com

     Amy D. Fitts (*pro hac vice*)
     Mit Winter (SBN 238515)
     120 W. 12th Street
     Kansas City, MO 64105
     Telephone:  (816) 218-1255
     afitts@polsinelli.com
     mwinter@polsinelli.com

     Wesley D. Hurst (SBN 127564)
     2049 Century Park East, Suite 2300
     Los Angeles, CA 90067
     Telephone:  (310) 556-1801
     whurst@polsinelli.com

     Attorneys for Defendants
     THE BIG 12 CONFERENCE, INC. and
     CONFERENCE USA, INC.

**ROBINSON BRADSHAW & HINSON**

By:      /s/ Robert W. Fuller
     Robert W. Fuller, III (*pro hac vice*)
     Nathan C. Chase Jr. (SBN 247526)
     Lawrence C. Moore, III (*pro hac vice*)
     Pearlynn G. Houck (*pro hac vice*)
     Amanda R. Pickens (*pro hac vice*)
     101 N. Tryon St., Suite 1900
     Charlotte, NC 28246
     Telephone:  (704) 377-2536
     Facsimile:  (704) 378-4000
     rfuller@rbh.com
     nchase@rbh.com
     lmoore@rbh.com
     phouck@rbh.com
     apickens@rbh.com

     Mark J. Seifert (SBN 217054)
     Seifert Law Firm
     425 Market Street, Suite 2200
     San Francisco, CA 94105
     Telephone:  (415) 999-0901
     Facsimile:  (415) 901-1123
     mseifert@seifertfirm.com

     Attorneys for Defendant
     SOUTHEASTERN CONFERENCE

1

**FOX ROTHSCHILD LLP**

2
By: _____/s/ D. Erik Albright_____

3
D. Erik Albright (*pro hac vice*)
Gregory G. Holland (*pro hac vice*)

4
300 North Greene Street, Suite 1400
Greensboro, NC 27401

5
Telephone:  (336) 378-5368
Facsimile:  (336) 378-5400

6
EAlbright@foxrothschild.com
GHolland@foxrothschild.com

7

8
Jonathan P. Heyl (*pro hac vice*)
101 N. Tryon Street, Suite 1300

9
Charlotte, NC 28246
Telephone:  (704) 384-2625

10
Facsimile:  (704) 384-2800
JHeyl@foxrothschild.com

11

12
Charles LaGrange Coleman, III (SBN 65496)
HOLLAND & KNIGHT LLP

13
50 California Street, Suite 2800
San Francisco, CA 94111-4624

14
Telephone:  (415) 743-6900
Facsimile:  (415) 743-6910

15
ccoleman@hklaw.com

16

17
Attorneys for Defendant
THE ATLANTIC COAST CONFERENCE

18

**COVINGTON & BURLING LLP**

By: _____/s/ Benjamin C. Block_____
Benjamin C. Block (*pro hac vice*)
One CityCenter
850 Tenth Street, N.W.
Washington, DC 20001-4956
Telephone:  (202) 662-5205
Facsimile:  (202) 778-5205
bblock@cov.com

Rebecca A. Jacobs (SBN 294430)
One Front Street
San Francisco, CA 94111-5356
Telephone:  (415) 591-6000
Facsimile:  (415) 591-6091
rjacobs@cov.com

Attorneys for Defendant
AMERICAN ATHLETIC CONFERENCE

19

20

21

22

23

24

25

26

27

28

**WALTER  HAVERFIELD LLP**

By: _____/s/ R. Todd Hunt_____
R. Todd Hunt (*pro hac vice*)
Benjamin G. Chojnacki (*pro hac vice*)
The Tower at Erieview
1301 E. 9th Street, Suite 3500
Cleveland, OH 44114-1821
Telephone:  (216) 928-2935
Facsimile:  (216) 916-2372
rthunt@walterhav.com
bchojnacki@walterhav.com

Attorneys for Defendant
MID-AMERICAN CONFERENCE

**BRYAN CAVE LLP**

By: _____/s/ Meryl Macklin_____
Meryl Macklin (SBN 115053)
560 Mission Street, 25th Floor
San Francisco, CA 94105
Telephone:  (415) 268-1981
Facsimile:  (415) 430-4381
meryl.macklin@bryancave.com

Richard Young (*pro hac vice*)
Brent Rychener (*pro hac vice*)
90 South Cascade Avenue, Suite 1300
Colorado Springs, CO 80903
Telephone:  (719) 473-3800
Facsimile:  (719) 633-1518
richard.young@bryancave.com
brent.rychener@bryancave.com

Attorneys for Defendant
MOUNTAIN WEST CONFERENCE

**JONES WALKER LLP**

By: _____/s/ Mark A. Cunningham_____
Mark A. Cunningham (*pro hac vice*)
201 St. Charles Avenue
New Orleans, LA 70170-5100
Telephone:  (504) 582-8536
Facsimile:  (504) 589-8536
mcunningham@joneswalker.com

Attorneys for Defendant
SUN BELT CONFERENCE

## FILER'S ATTESTATION

I, Karen Hoffman Lent, am the ECF user whose identification and password are being used to file Defendants' Closing Brief.  In compliance with Local Rule 5-1(i)(3), I hereby attest that all signatories hereto concur in this filing.

_____/s/ Karen Lent_____