IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

IN RE: NATIONAL COLLEGIATE ATHLETIC
ASSOCIATION ATHLETIC GRANT-IN-AID CAP
ANTITRUST LITIGATION

No. 14-md-02541 CW

FINDINGS OF FACT
AND CONCLUSIONS OF
LAW

## INTRODUCTION

Plaintiffs are current and former student-athletes who played men's Division I Football Bowl Subdivision (FBS) football and men's and women's Division I basketball during the relevant period.  Defendants are the National Collegiate Athletic Association (NCAA) and eleven of its conferences[1] that participate in FBS football and Division I basketball.

Plaintiffs challenge the current, interconnected set of NCAA rules that limit the compensation they may receive in exchange for their athletic services.  Plaintiffs contend that these limits on compensation, which are set and enforced by agreement of Defendants, violate federal antitrust law, because Plaintiffs

---

[1] Conference Defendants are: Pac-12 Conference (Pac-12), The Big Ten Conference, Inc. (Big Ten), The Big 12 Conference, Inc. (Big 12), Southeastern Conference (SEC), and The Atlantic Coast Conference (ACC) (collectively, the Power Five Conferences); American Athletic Conference (AAC), Conference USA, Inc., Mid-American Conference (MAC), Mountain West Conference, Sun Belt Conference, and Western Athletic Conference (WAC).

United States District Court
For the Northern District of California

1    would receive greater compensation in exchange for their athletic

2    services in the absence of these artificial limits.

3         Defendants respond that the limits are procompetitive for two

4    reasons.  First, the limits help preserve the demand for college

5    sports because consumers value amateurism as Defendants define it.

6    Second, the rules promote integration of student-athletes into

7    their academic communities, which in turn improves the college

8    education they receive in exchange for their services.

9         The Court resolved certain of the issues relevant to

10   Plaintiffs' claims on summary judgment, and presided over a non-

11   jury trial on the remaining issues.

12        The Court finds and concludes that Defendants agreed to and

13   did restrain trade in the relevant market, affecting interstate

14   commerce, and that the challenged limits on student-athlete

15   compensation produce significant anticompetitive effects.  The

16   Court further finds that the only procompetitive effect that

17   Defendants established, namely preventing unlimited cash payments,

18   unrelated to education, similar to those observed in professional

19   sports, can be achieved through less restrictive means.

20   Specifically, the Court finds that an alternative compensation

21   scheme that would allow limits on the grant-in-aid scholarships at

22   not less than the cost of attendance and limits on compensation

23   and benefits unrelated to education, but that would generally

24   prohibit the NCAA from limiting education-related benefits, would

25   be virtually as effective as the challenged rules in achieving the

26   only procompetitive effect that Defendants have shown here.  The

27   only education-related compensation that the NCAA could limit

28   under this alternative would be academic or graduation awards or

incentives, provided in cash or cash-equivalent.  The limit
imposed by the NCAA could not be less than its current or future
caps on athletics participation awards.

Based on the findings of fact and conclusions of law set
forth below, the Court will enter separately a permanent
injunction barring the restraints that the Court finds to be
overly and unnecessarily restrictive.

FINDINGS OF FACT[2]

I.   Background

The NCAA, then known as the Intercollegiate Athletic
Association (IAA), was founded in 1905 to regulate college
football.  Today, the NCAA and its members collectively issue
rules that govern many aspects of athletic competitions among NCAA
member schools.  Joint Stipulation of Facts (Stip. Facts) ¶ 1,
Docket No. 1098.

The NCAA comprises three Divisions.  Id. ¶ 2.  Of the NCAA's
eleven hundred schools, approximately three hundred and fifty
schools compete in Division I.  Id. ¶ 5.  Division I itself is
divided, for the purposes of football competition, into two
subdivisions, one of which is the FBS.  Id. ¶ 6.  There are
thirty-two conferences in Division I.  Id. ¶ 7.  Conferences may
enact and enforce conference-specific rules, but these must be
consistent with the NCAA's own rules.  Id.

_____

[2] Defendants moved to strike portions of Plaintiffs' closing
brief, Docket No. 1125, on the ground that they improperly rely on
expert testimony to support substantive assertions of fact.  The
Court will resolve this motion by way of a separate order.  The
findings of fact in this order do not rely on evidence that is
inadmissible.

United States District Court
For the Northern District of California

The NCAA rules governing participation in Division I generally are enacted by the Division I Board of Directors. Id. ¶¶ 11, 12. The rules that Plaintiffs challenge here govern a small subset of the conduct that the NCAA regulates.

The NCAA generates approximately one billion dollars in revenues each year. See Defs.' Ex. 0532 (D0532); Pls.' Ex. 0030 (P0030). Its revenues have increased consistently over the years. See P0030. Most of the NCAA's revenues are derived from the Division I men's basketball post-season tournament known as March Madness, and the media and marketing rights relating to it. Trial Transcript (Tr.) (McNeely) at 2134; D0532 at 0006. The total value of the current multi-year media contracts for March Madness, which extend to 2032, is $19.6 billion. See P0045 at 0001-02. Each year, the NCAA distributes about half of its revenues to the conferences. Joint Ex. 0021 (J0021); P0030.

Division I conferences negotiate their own contracts and generate their own revenues from regular-season basketball and regular- and post-season FBS football. See, e.g., Dr. Daniel Rascher Direct Testimony Declaration ¶¶ 169-172, Docket No. 865-3. The FBS conferences have a multi-year media contract with ESPN for the College Football Playoff, the total value of which is $5.64 billion. See P0045 at 0006-07. The five conferences with the largest revenues, known as the Power Five Conferences, each generate hundreds of millions of dollars in revenues per year, in addition to the money that the NCAA distributes to them. See P0031; P0032; P0033; P0036; see also P0037 (showing that SEC made more than $409 million in revenues from television contracts alone in 2017, with its total conference revenues exceeding $650 million

United States District Court
For the Northern District of California

that year).  The revenues of the Power Five have increased over time and are projected to continue to increase.  See P0031; P0032; P0033; P0036; P0037.  Conferences distribute most of their revenues to their member schools.

Among the areas that the NCAA regulates are the compensation and benefits that can be afforded to student-athletes.  The 1906 bylaws of the IAA, as the NCAA was originally known, expressly prohibited student-athletes from receiving any compensation whatsoever, even athletics scholarships, in exchange for their participation in college sports.  In 1956, the NCAA enacted a new set of rules permitting schools to award athletics scholarships, known as "grants-in-aid," to student-athletes.  Stip. Facts ¶ 25, Docket No. 1098.  These rules imposed a limit on the size of the grant-in-aid that schools were permitted to offer.  Id.  The limit precluded student-athletes from receiving any financial aid beyond that needed for commonly accepted educational expenses, which were tuition, fees, room and board, books, and cash for incidental expenses such as laundry.

In 1976, the cash for incidental expenses was disallowed by way of an amendment to the definition of the grant-in-aid that limited the scope of commonly accepted educational expenses to include only "tuition and fees, room and board and required course-related books."  Stip. Facts ¶ 26, Docket No. 1098.  Cash for incidental expenses related to school attendance, such as laundry, supplies, and transportation, was not included in the grant-in-aid limit.  This definition of a grant-in-aid remained in place until August 2015.  See Stip. Facts ¶ 10, Docket No. 1093.

United States District Court
For the Northern District of California

On August 7, 2014, the NCAA adopted a new legislative process for the Power Five, which is referred to as the Autonomy structure.[3]  It allows those five conferences collectively to adopt legislation in specific areas, which include limits on grants-in-aid.  Soon afterward, in January 2015, the Power Five voted to increase the overall limit on grants-in-aid, from the limit then in place, to a higher limit based on the cost of attendance at each school.  See O'Bannon v. Nat'l Collegiate Athletic Ass'n, 802 F.3d 1049, 1054-55 (9th Cir. 2015) (O'Bannon II), cert. denied, 137 S. Ct. 277 (2016).  This became effective on August 1, 2015.  The revised "full grant-in-aid" comprises "tuition and fees, room and board, books and other expenses related to attendance at the institution up to the cost of attendance[.]"  Division I Bylaw 15.02.6; Stip. Facts ¶ 10, Docket No. 1093.  Cost of attendance is calculated by each school in accordance with federal regulations.  J1517 at 0002; Stip. Facts ¶¶ 3-6, Docket No. 1093.  It is generally several thousand dollars higher than the prior grant-in-aid limit because it includes cash for incidental expenses related to the cost of attendance.  See Stip. Facts ¶ 5, Docket No. 1093.

Compensation and benefits in addition to the full grant-in-aid, some related and some unrelated to education, are also allowed and regulated by the NCAA.  These include benefits the NCAA denominates "incidental to athletics participation," as well as money from the NCAA's Student Assistance Fund and Academic

---

[3] See NCAA Constitution, Article 5.3.2.1.2; Stip. Facts ¶ 17, Docket No. 1098.

Enhancement Fund, government grants, and payments from outside
entities.   Other compensation is generally prohibited.

In 2009, a group of Division I male basketball and FBS
football student-athletes brought an antitrust class action
against the NCAA and its licensees to challenge the association's
rules preventing them from being paid by schools or other entities
for the sale of licenses to use their names, images, and/or
likenesses (NIL) in videogames, live game telecasts, and other
footage.[4]   See O'Bannon v. Nat'l Collegiate Athletic Ass'n, 7 F.
Supp. 3d 955, 962-63 (N.D. Cal. 2014) (O'Bannon I), aff'd in part,
vacated in part, 802 F.3d 1049 (9th Cir. 2015).   The rules
challenged by the O'Bannon plaintiffs related to the release, use,
and licensing of NIL.   The then-applicable maximum limit on the
grant-in-aid was discussed and implicated in the relief ordered by
the Court, but the plaintiffs did not specifically challenge it in
O'Bannon I.   Some of the rules challenged in the present case were
challenged in O'Bannon; others were not.

This Court held in O'Bannon I that the NCAA rules challenged
there violated Section 1 of the Sherman Act, 15 U.S.C. § 1.   Id.
at 963.   The Court found that the plaintiffs met their burden to

---

[4] The class in O'Bannon was defined as including "[a]ll
current and former student-athletes residing in the United States
who compete on, or competed on, an NCAA Division I (formerly known
as 'University Division' before 1973) college or university men's
basketball team or on an NCAA Football Bowl Subdivision (formerly
known as Division I-A until 2006) men's football team and whose
images, likenesses and/or names may be, or have been, included or
could have been included (by virtue of their appearance in a team
roster) in game footage or in videogames licensed or sold by
Defendants, their co-conspirators, or their licensees." O'Bannon
II, 802 F.3d at 1055-56.

United States District Court
For the Northern District of California

show that the NCAA had fixed the price of the student-athletes'
NIL rights, which had significant anticompetitive effects in the
relevant market. Id. at 971-73, 988-93. On the question of
procompetitive justifications of the restraints, the Court found
that the NCAA's challenged restrictions on student-athlete
compensation played "a limited role in driving consumer demand for
FBS football and Division I basketball-related products." Id. at
1001. The Court also found that the challenged rules might
facilitate the integration of student-athletes with their academic
communities. Id. at 1003.

The O'Bannon plaintiffs proposed alternatives they asserted
were less restrictive than the NCAA rules they challenged. This
Court found that two of these proposed alternatives, which relied
specifically on the use of revenue derived from NIL licensing,
constituted "less restrictive means of achieving" the challenged
rules' limited procompetitive effects. Id. at 982-84; 1004-07.

Accordingly, this Court issued an injunction barring the NCAA
from enforcing any rules that would prohibit its member schools
and conferences from offering their FBS football and men's
Division I basketball recruits compensation for the use of their
NIL in addition to a full grant-in-aid as then defined. The Court
permitted the NCAA to implement rules capping the amount of
compensation that could be paid to student-athletes while they are
enrolled in school as long as the amount of the cap was not lower
than the cost of attendance for students at that school. Id. at
1007-08. The Court also required the NCAA to allow member schools
to deposit a limited share of NIL licensing revenue in trust for
their student-athletes. Id. at 1008. The Ninth Circuit affirmed

United States District Court
For the Northern District of California

United States District Court
For the Northern District of California

the liability finding and the remedy prohibiting the NCAA from limiting payment of a share of NIL revenues to less than the cost of attendance.  It vacated the remedy allowing a trust fund payment.  O'Bannon II, 802 F.3d at 1074-79.  By the time the O'Bannon injunction went into effect, the NCAA had already increased, through the Autonomy structure, the grant-in-aid limit to the cost-of-attendance amount for all Division I student-athletes, regardless of NIL use or revenue.

Plaintiffs in the present case are student-athletes who played Division I FBS football and men's and women's basketball between March 5, 2014, and the present.[5]  Order Granting Motion for Rule 23(b)(2) Class Certification (Class Cert. Order) at 1, Docket No. 305.  The Court certified three injunctive relief classes in the consolidated action under Federal Rule of Civil Procedure 23(b)(2), each consisting of student-athletes who would be offered or receive a full grant-in-aid during the pendency of this action.[6]  Id. at 4-5, 31.

---

[5] The first of the actions that became a part of this consolidated case, Alston v. NCAA, Case No. 14-cv-01011, was filed on March 5, 2014.  Additional actions were filed in that year and in 2015.  The United States Judicial Panel on Multidistrict Litigation transferred actions filed in other districts to this Court pursuant to 28 U.S.C. § 1407.  Plaintiffs in all of the actions, except Jenkins v. NCAA, Case No. 14-cv-02758, filed a consolidated amended complaint.  Docket No. 60.

[6] The Division I FBS Football Class is defined as "[a]ny and all NCAA Division I Football Bowl Subdivision ('FBS') football players who, at any time from the date of the Complaint through the date of the final judgment, or the date of the resolution of any appeals therefrom, whichever is later, received or will receive a written offer for a full grant-in-aid as defined in NCAA Bylaw 15.02.5, or who received or will receive such a full grant-in-aid."  Class Cert. Order at 5, Docket No. 305.  The Division I Men's Basketball Class and the Division I Women's Basketball Class are defined similarly.  Id.  In the Jenkins action, the Court

United States District Court
For the Northern District of California

II.   Agreement in Restraint of Trade Affecting Interstate Commerce

On summary judgment, the Court found that the existence of an agreement (i.e., a contract, combination, or conspiracy) restraining trade and affecting interstate commerce was undisputed.  Defendants did not contest evidence showing that (1) the compensation limits that Plaintiffs challenge are enacted by agreement of Defendants and other NCAA members through the NCAA's legislative process and are embodied in NCAA rules published in the NCAA Division I Manual; (2) Defendants enforce these rules by requiring all NCAA members to comply with them, and by punishing violations; (3) the challenged rules affect interstate commerce, because they regulate transactions between Plaintiffs and their schools in multiple states nation-wide; and (4) these transactions are commercial because they regulate an essential component of Division I basketball and FBS football.  Order Granting in Part and Denying in Part Cross-Motions for Summary Judgment (Summary Judgment Order) at 15, Docket No. 804.

The Court also found on summary judgment that the challenged NCAA rules restrain trade in that they limit the compensation that student-athletes may receive for their athletic services.  These limits cap athletics-based grants-in-aid at the cost of attendance, but they also allow and fix the prices of numerous and varied additional benefits and compensation on top of a grant-in-

---

certified the men's football and basketball classes; women's basketball class certification was not sought in that case.  Id.

United States District Court
For the Northern District of California

aid that have a monetary value above the cost of attendance.[7]
Some of these rules regulate compensation that relates to
education; others regulate compensation incidental to athletics
participation and unrelated to education, including monetary
awards that reward performance in athletics.  The compensation
limits are artificially set through an exercise of Defendants'
monopsony power, and Plaintiffs would receive more compensation in
exchange for their athletic services in the absence of the
challenged limits.  This Court had made similar findings in
O'Bannon I, which were affirmed on appeal in O'Bannon II.
O'Bannon I, 7 F. Supp. 3d at 971-73; O'Bannon II, 802 F.3d at
1064-69.  Horizontal price-fixing among competitors is usually a
per se violation of antitrust law.  However, because "a certain
degree of cooperation" is necessary to market athletics
competition, the Court applies the Rule of Reason.  See O'Bannon
II, 802 F.3d at 1069 (citation and internal quotation marks
omitted).

III. Rule of Reason: Market Definition

    The Court's first step in applying the Rule of Reason is to
determine the relevant market.  On summary judgment, at the
request of both parties and in the absence of a genuine issue of
material fact, the Court adopted the market definition from the

---

    [7] The rules that Plaintiffs challenge here are listed and
described in Plaintiffs' Opening Statement at 13-15 and Appendices
A-C, Docket No. 868-3.

United States District Court
For the Northern District of California

O'Bannon case.[8]  The relevant market there was that for a college
education combined with athletics, or, alternatively, the market
for the student-athletes' athletic services.  See Summary Judgment
Order at 18, Docket No. 804.  In O'Bannon I, the Court had found
that the plaintiffs' antitrust claims could be analyzed as a
monopoly or, alternatively, as a monopsony.  7 F. Supp. 3d at 991.
Under the theory of monopsony, sometimes referred to as a buyers'
cartel, schools were characterized as buyers and student-athletes
as sellers in a market for recruits' athletic services and
licensing rights.  Id.  The NCAA did not challenge the market
definitions on appeal and the Ninth Circuit adopted them.
O'Bannon II, 802 F.3d at 1070.

    At trial in this case, Plaintiffs based their claims on a
theory of monopsony only.  Dr. Rascher, Plaintiffs' economics
expert, defined the relevant market here as comprising national
markets for Plaintiffs' labor in the form of athletic services in
men's and women's Division I basketball and FBS football, wherein

---

[8] After the Court had entered summary judgment on market
definition, Defendants argued that the Court should have
considered or adopted an alternative market definition that their
economics expert, Dr. Kenneth Elzinga, discussed in his report,
namely a "multi-sided market for college education in the United
States" in which colleges operate as multi-sided platforms that
balance their pricing to numerous constituencies.  Elzinga Report
at 26-28; see also Order Reaffirming Exclusion of Certain Expert
Testimony by Dr. Elzinga at 9, Docket No. 1018.  The Court
rejected this argument on the ground that it was untimely, because
Defendants did not offer any alternative definition of the
relevant market or point to any admissible evidence to raise a
genuine issue of material fact with respect to market definition
during summary judgment proceedings; and on the ground that Dr.
Elzinga's expert opinions about a multi-sided relevant market were
unreliable and inadmissible.  See generally id.

each class member participates in his or her sport-specific market.  See Rascher Report ¶¶ 30-130, 148-85.  In these markets, the class-member recruits sell their athletic services to the schools that participate in Division I basketball and FBS football in exchange for grants-in-aid and other benefits and compensation permitted by NCAA rules.  Dr. Rascher found that Defendants have monopsony power in all of these markets and exercise that power to cap artificially the compensation offered to recruits.  Id. ¶ 37.

Dr. Rascher's definition of these markets is based on economic analyses similar to those performed in the O'Bannon case. His analyses here are predicated on updated data and take into account women's Division I basketball, which was not at issue in O'Bannon.  Id. ¶¶ 148-53.  Dr. Rascher's economic analyses show that the most talented athletes are concentrated in the respective markets for Division I basketball and FBS football; possible alternatives, such as the National Association of Intercollegiate Athletics (NAIA) or the National Christian College Athletic Association (NCCAA), have not proved to be viable substitutes; none of the major professional sports leagues in class members' sports provide competitive options for most college-aged talent; high barriers to entry into the market preclude any viable alternatives emerging for class members' athletic services; and the geographic scope of the markets is nationwide.  Id. ¶¶ 154-85. In sum, class members cannot obtain the same combination of a college education, high-level television exposure, and opportunities to enter professional sports other than from Division I schools.

//

IV.   Rule of Reason: Anticompetitive Effects

On summary judgment, the Court found that the challenged restraints produce significant anticompetitive effects in the relevant market.  The absence of a genuine dispute with respect to the existence of an agreement among Defendants that is intended to, and does, limit student-athlete compensation in the relevant market, is in and of itself sufficient to find that this agreement has a strong potential for significant anticompetitive effects. Plaintiffs offered evidence of significant anticompetitive effects, however, which Defendants did not meaningfully dispute. The Court had also found significant anticompetitive effects with respect to the rules challenged in O'Bannon I, which the Ninth Circuit affirmed in O'Bannon II.  O'Bannon I, 7 F. Supp. at 973, 993; O'Bannon II, 802 F.3d at 1057-58, 1070-72.

The economic analyses of Plaintiffs' experts established that the challenged rules have the effect of artificially compressing and capping student-athlete compensation and reducing competition for student-athlete recruits by limiting the compensation offered in exchange for their athletic services.  The compensation that student-athletes receive under the challenged rules does not correlate meaningfully with the value of their athletic services, based on indicators of their talent.[9]  This is consistent with the absence of rigorous competition among schools with respect to student-athlete compensation.  In a market free of the challenged restraints, competition among schools would increase in terms of

---

[9] Dr. Edward Lazear, Plaintiffs' economics expert on summary judgment, relied on ratings of talent based on a system for rating athletes by 247sports.com.  Lazear Report ¶ 29.

the compensation they would offer to recruits, and student-athlete compensation would be higher as a result.  Student-athletes would receive offers that would more closely match the value of their athletic services.  See Lazear Report ¶¶ 11-50.

Plaintiffs' experts' analyses also show that Defendants are able to artificially compress and limit student-athlete compensation as described above because they possess monopsony power in the relevant market.  See Rascher Report ¶¶ 30-130, 148-85; id. ¶ 37 ("Defendants and their co-conspirators have monopsony power in all three markets – that is, they have the power to collectively depress input prices without fear of loss of revenue in excess of the immediate cost savings").  Because of the absence of viable alternatives to Division I basketball and FBS football, and because of reduced competition among conferences due to the challenged compensation limits, the market for recruits in these sports is highly or perfectly concentrated under the current NCAA compensation limits.  By contrast, if each conference were free to set its own compensation limits in competition with other conferences, the market concentration would decrease from highly or perfectly concentrated, to "moderately concentrated" for FBS football and "unconcentrated" for Division I basketball.  Rascher Report ¶¶ 155-57.

This evidence shows that student-athletes are harmed by the challenged compensation limits, because these rules deprive them of compensation they would receive in the absence of the restraints.

At trial, Plaintiffs offered additional proof of the anticompetitive effects of the NCAA's limits on compensation.  It

15

shows that changes had been made, starting in August 2014, to the amounts and types of permissible student-athlete compensation. The changes were caused, in part, by the desire of the Power Five, those conferences with the highest revenues in Division I, to divert some of their relatively significant resources away from expenditures that only indirectly benefit student-athletes (such as expenditures on opulent athletic facilities and multi-million dollar coaches' salaries) and toward student-athlete compensation. See, e.g., P0056 at 0001-02; Rascher Direct Testimony Declaration ¶ 212. Dr. Harvey Perlman, chancellor of the University of Nebraska, agreed with the statement that, "[i]n short, we recruit by shifting funds from regulated benefits for student athletes to unregulated frills[.]" Perlman Deposition Transcript (Dep. Tr.) at 60-61.

In a presentation in 2013, the presidents and chancellors of the Power Five had asked the Division I Board of Directors for autonomy in a variety of subject areas, for the following reasons: (1) the recognition of criticisms and accusations "of exploiting student athletes for our own financial gain"; (2) the desire to avoid "unintended consequences" if "ill-advised reforms are imposed" as a result of these criticisms; (3) a wish to move away from efforts to "create 'a level playing field,'" because "[t]oo often, our efforts to improve the lives of student athletes have been deflected because of cost implications that are manageable by our institutions but not by institutions with less resources"; and (4) a sense that efforts to "'level the playing field'" led the Power Five to "spend these resources in almost any way we want EXCEPT to improve support for student athletes." P0056 at 0001-

United States District Court
For the Northern District of California

United States District Court
For the Northern District of California

02. This is evidence that these conferences were prevented from making the increases in student-athlete compensation that they would have made absent the anticompetitive effects of the challenged restraints.

After the new Autonomy structure became effective on August 7, 2014, in January 2015, the Power Five voted to increase the overall limit on grant-in-aid athletics scholarships from the limit in place at the time of the O'Bannon I trial to the higher, cost-of-attendance limit, effective on August 1, 2015.[10] The Power Five also created new forms of permissible compensation for student-athletes, and expanded the scope of previously permissible benefits or compensation. These changes permitted student-athletes to borrow against their future professional earnings to purchase loss-of-value insurance (Division I Bylaw 12.1.2.4.4);

---

[10] This Court issued its O'Bannon I injunction on August 8, 2014, to take effect on August 1, 2015. Case No. 09-cv-3329, Docket Nos. 292, 298. On July 31, 2015, the Ninth Circuit stayed the injunction. Case No. 09-cv-3329, Docket No. 418. On September 30, 2015, while the injunction was stayed, the Ninth Circuit issued its opinion affirming in part this Court's decision; the judgment became effective on December 28, 2015, when the Ninth Circuit issued its mandate. See O'Bannon II, 802 F.3d at 1079; Case No. 09-cv-3329, Docket Nos. 437, 463. Thus, the Autonomy structure change to the full grant-in-aid limit became effective before the injunctive relief ordered by this Court in O'Bannon I ever went into effect. The Autonomy structure change differs from the relief ordered in O'Bannon; it permits grants-in-aid up to the cost of attendance for any Division I athlete (in any sport) and is not limited to compensation for the use or licensing of NIL. By contrast, the relief ordered in O'Bannon I, in relevant part, prohibited the NCAA from precluding its members from compensating Division I men's basketball and FBS football student-athletes for the licensing or use of their NIL, at an amount lower than the cost of attendance. Compare Division I Bylaw 15.02.6 "Full Grant-in-Aid" with Case No. 09-cv-3329, Docket No. 292 (injunction).

United States District Court
For the Northern District of California

expanded reimbursement or payment of travel expenses for certain family members to attend certain events (Division I Bylaw 16.6.1.1); provided unlimited food (Division I Bylaw 16.5.2.5); and required schools to pay for medical care for athletics-related injuries for at least two years after graduation (Division I Bylaw 16.4.1).

Although the Power Five's Autonomy legislative enactments have resulted in greater compensation for student-athletes, such compensation is still capped by overarching NCAA limits that prevent the Power Five and all NCAA members from expanding compensation beyond a point determined by the NCAA through its traditional rulemaking process.[11]

In light of the foregoing, the Court finds that Defendants, through the NCAA, have monopsony power to restrain student-athlete compensation in any way and at any time they wish, without any meaningful risk of diminishing their market dominance. This is because the NCAA's Division I essentially is the relevant market for elite college football and basketball. And, because elite student-athletes lack any viable alternatives to Division I, they are forced to accept, to the extent they want to attend college and play sports at an elite level after high school, whatever compensation is offered to them by Division I schools, regardless of whether any such compensation is an accurate reflection of the

---

[11] See, e.g., Trial Tr. (Lennon) at 1618 (the Power Five's ability to modify athletics financial aid caps is limited by NCAA Bylaw 15.01.6); id. at 1620 (the Power Five's ability to award expenses and benefits is limited by NCAA Bylaw 12.1.2.1.4); id. at 1629 (the NCAA Board of Directors has the authority to override Autonomy legislation).

competitive value of their athletic services.  Moreover, the
compensation that class members receive under the challenged rules
is not commensurate with the value that they create for Division I
basketball and FBS football; this value is reflected in the
extraordinary revenues that Defendants derive from these sports.

The challenged rules thus have severe anticompetitive effects
and student-athlete are harmed as a result of the challenged
rules, because the rules deprive them of compensation that they
would otherwise receive for their athletic services.

V.    Rule of Reason: Asserted Justifications for the Challenged
      Restraints[12]

A.    Consumer Demand for Amateurism

Defendants argue that the challenged compensation limits are
procompetitive because "amateurism is a key part of demand for
college sports" and "consumers value amateurism."  Defs.' Closing
Brief at 7, 10, Docket No. 1128.  The corollary is that if
consumers did not believe that student-athletes were amateurs,
they would watch fewer games and revenues would decrease as a
result.  Defendants rely on the notion that it is the "principle"
of amateurism that drives consumer demand, and that the challenged
restraints are procompetitive because they "implement" or

_____

[12] Two additional pro-competitive justifications had been
offered previously: increased output and competitive balance.
These were rejected by the Court on summary judgment.  They also
were rejected in O'Bannon I and the NCAA did not address them on
appeal, so the rejection was accepted in O'Bannon II.  See Summary
Judgment Order at 23 n.7, Docket No. 804; see also O'Bannon II,
802 F.3d at 1072.  Some testimony offered by Defendants at this
trial seemed aimed at resurrecting these justifications.  The
Court will not consider these arguments again.

"effectuate" that principle. Id. at 37. They did not offer evidence to establish that the challenged compensation rules, in and of themselves, have any direct connection to consumer demand.

Defendants nowhere define the nature of the amateurism they claim consumers insist upon. Defendants offer no stand-alone definition of amateurism either in the NCAA rules or in argument. The "Principle of Amateurism," as described in the current version of the NCAA's constitution, uses the word "amateurs" to describe the amateurism principle, and is thus circular. It does not mention compensation or payment. The constitution says, "Student-athletes shall be amateurs in an intercollegiate sport, and their participation should be motivated primarily by education and by the physical, mental and social benefits to be derived. Student participation in intercollegiate athletics is an avocation, and student-athletes should be protected from exploitation by professional and commercial enterprises." NCAA Constitution Article 2.9. No connection between the "Principle of Amateurism" and the challenged compensation limits is evident. Mike Slive, who served as commissioner of the SEC, one of the Power Five, from 2002 to 2015, testified that amateurism is "just a concept that I don't even know what it means. I really don't." Slive Dep. Tr. at 23, 45. He repeated, "You know, the term amateur I've never been clear on what is meant either by in your question or otherwise, what is really meant by amateurism[.]" Id. at 43.

The definition of amateurism that Defendants point to is one that cannot be found in the Division I manual. Defendants and their witnesses often describe amateurism by reference to what they say it is not: namely, amateurism is not "pay for play."

United States District Court
For the Northern District of California

United States District Court
For the Northern District of California

1   See, e.g., Defs.' Closing Brief at 36 n.214, Docket No. 1128

2   ("Amateurism is, by definition, 'not paying' the participants.");

3   Trial Tr. (Lennon) at 1275-77 (justifying challenged compensation

4   limits on the ground that they prevent "pay for play").

5   Defendants do not explain the origin or meaning of the term "pay

6   for play."  The NCAA constitution and the Division I Bylaws do not

7   define, or even mention, "pay for play."

8       The concept of "pay" is addressed only in certain bylaws that

9   govern student-athlete compensation and eligibility.  In these

10  bylaws, "pay" is defined only indirectly; it is defined by listing

11  a variety of forms of compensation that could be considered pay,

12  and indicating that each form of compensation constitutes

13  prohibited "pay," unless it falls within one of many exceptions or

14  is otherwise permitted by the NCAA.  Thus, whether any form of

15  compensation constitutes "pay" in violation of NCAA rules cannot

16  be determined except by studying all of the relevant bylaws and

17  all of their exceptions and cross-references.  Erik Price, the Pac

18  12's Rule 30(b)(6) witness, testified, "Well, I think the NCAA,

19  the way Bylaw 12 is written is a series of things that you cannot

20  do, and by then still remain an amateur.  It doesn't exactly have

21  a beautiful definition of [amateurism]."  Pac 12 Rule 30(b)(6)

22  witness (Erik Price) Dep. Tr. at 60; see Division I Bylaw 12.1.2

23  (listing items that would cause a student-athlete to lose "amateur

24  status" and eligibility for intercollegiate competition); Division

25  I Bylaw 12.1.2(a) (prohibiting a student-athlete from using his or

26  her athletic skills "for pay in any form" in his or her sport);

27  but see Division I Bylaw 12.1.2.4 ("Exceptions to Amateurism

28  Rule").

United States District Court
For the Northern District of California

"Pay" under NCAA rules does not necessarily track the plain meaning of the word, whereby something of monetary value is provided in exchange for something else.  Indeed, a review of the bylaws shows that many forms of payment, often in unrestricted cash, from schools and other sources, are allowed by the NCAA as "not pay," and thus as not inconsistent with amateurism.  Much of this permissible compensation appears on its face to be akin to "pay" under the plain meaning of the word.  In some instances it is provided to student-athletes in exchange for their athletic performance, making it similar to what a reasonable person could consider to be "pay for play."

As noted, the NCAA allows grants-in-aid up to the cost of attendance, which are intended to pay for the student-athletes' education-related expenses.  It also allows monetary awards it describes as "incidental to athletics participation" on top of a grant-in-aid, which reward participation or achievement in athletics, such as qualifying for a bowl game in FBS football. See Division I Bylaw 16.1.4.1 and Figures 16-1, 16-2, 16-3; Trial Tr. (Lennon) at 1275.  These performance awards, which are not related to education and can be provided on top of a full cost-of-attendance grant-in-aid, are allowed at several hundred dollars for each award, but the rules permit student-athletes to qualify for multiple of these awards, meaning that they could receive several thousand dollars in cash-equivalent compensation if they perform well enough in their sport.  See Rascher Direct Testimony Declaration ¶¶ 72, 205; Dr. Kenneth Elzinga Direct Testimony Declaration ¶¶ 95-96, Docket No. 883-1 (a student-athlete on a team that won a national championship could receive $5,600 total

United States District Court
For the Northern District of California

in athletics participation awards when combined); Hostetter Dep. Tr. at 207.  These awards can be provided to student-athletes in the form of Visa gift cards that can be used like cash.[13]  See Hostetter Dep. Tr. at 224-27.  Robert Bowlsby, the Big 12 Conference's Rule 30(b)(6) witness, explained that "these things [gift cards] were all previously geared towards being mementos of the . . . games" and "it's . . . taken . . . another turn, and the gift cards are representative of that."  Big 12 Conference Rule 30(b)(6) witness (Robert Bowlsby) Dep. Tr. at 160.  On their face, athletics participation awards seem to violate other Division I bylaws, including those that prohibit cash or cash-equivalent payment or compensation that incentivizes athletic performance (Division I Bylaws 12.1.2.1.4.1 and 12.1.2.1.5); nevertheless, these awards do not constitute a prohibited form of payment or compensation only because the NCAA has chosen to permit them.

Without affecting their status as amateurs, Division I student-athletes can also receive money from their schools, from monies provided by the NCAA each year through the conferences, by

_____

[13] At the time of O'Bannon I, student-athletes could receive performance awards in the form of store-specific gift cards but can now receive these awards in the form of Visa gift cards.  See Hostetter Dep. Tr. at 224-27.  Performance awards also can be provided in the form of "gift suites," which involve allowing student-athletes access to a location where they can select from a variety of gifts.  See Elzinga Direct Testimony Declaration ¶ 95.  Gifts available through gift suites include prepaid debit cards from stores such as Best Buy, iPad minis, speakers, watches, and headphones.  See, e.g., James Dep. Tr. at 168 (received a watch and a $452 Best Buy gift card at gift suite, which he used to buy his mother a television); Jemerigbe Dep. Tr. at 206 (received iPad mini, iTunes gift card, headphones, and speaker through gift suites).

United States District Court
For the Northern District of California

way of the Student Assistance Fund (SAF) and the Academic Enhancement Fund (AEF), on top of a full cost-of-attendance grant-in-aid.[14]  In 2018, the NCAA made available for distribution more than $84 million in SAF money, and more than $48 million in AEF money.  This money is disbursed by schools to assist student-athletes in meeting financial needs, improve their welfare or academic support, or recognize academic achievement.[15]  Division I

---

[14] Division I Bylaw 16.11.1.8 ("A student-athlete may receive money from the NCAA Student Assistance Fund."); Division I Bylaw 15.01.6.1 ("The receipt of money from the NCAA Student Assistance Fund for student-athletes is not included in determining the permissible amount of financial aid that a member institution may award to a student-athlete.").

[15] The Division I Bylaws address only the uses of SAF monies that are impermissible.  Neither schools nor conferences report to the NCAA detailed information (i.e., by student-athlete or by expense) to show how SAF funds were allocated; conferences report to the NCAA only amounts and types of uses of SAF monies in the aggregate.  Trial Tr. (Lennon) at 1634-35.  SAF monies have been used for expenses related to education, including postgraduate scholarships; fees for internship programs; international student fees, taxes, and insurance; school supplies and electronics (such as laptops, cameras, tablets); graduate school application fees; graduate school exam fees; tutoring; and academic achievement or graduation awards.  J0002 at 0010; J0020 at 0001; P0043 at 0001; J0019 at 0001.  SAF monies also have been used for benefits that are not related to education, such as loss-of-value insurance premiums, Trial Tr. (Lennon) at 1340; medical expenses; professional program testing; career assessments; travel expenses for both the student-athlete and family members; clothing; magazine subscriptions; and grocery reimbursement.  J0002 at 0010; J0020 at 0001.  AEF monies have been used for education-related benefits, such as academic achievement or graduation awards; summer school; fifth- or sixth-year aid; tutoring; academic support services; international student fees and taxes; professional program testing; and supplies (expendable or educational).  J0021 at 0004-05.  They have also been used for benefits that are not related to education, such as insurance premiums; medical, dental, or vision expenses (not covered by another insurance program); clothing; travel; and capital improvements/equipment.  Id.; Stip. Facts ¶ 15, Docket No. 1094.

United States District Court
For the Northern District of California

Revenue Distribution Plan, J0021 at 0004, 0014.  It can be provided in cash or as a benefit, and it is not limited to education-related expenses.  The schools are not constrained in the amount of these funds they can disburse to an individual student-athlete; they are limited only in the aggregate by the amount that the NCAA distributes through these funds each year. Since 2015, SAF disbursements to individual student-athletes has reached to the tens of thousands of dollars above a full cost-of-attendance grant-in-aid,[16] and in some cases, $50,000 for premiums for loss-of-value insurance against the loss of future professional earnings, Trial Tr. (Lennon) at 1340.

Schools can also make thirty-dollar per diem payments to student-athletes for un-itemized incidental expenses while they are travelling for certain events.  Division I Bylaw 16.8.1.1. Schools can pay travel expenses for certain family members to attend certain events.  Division I Bylaw 16.6.1.  In January 2015, without changing any bylaws, the NCAA began to pay up to $3,000 for family members of student-athletes who reach the Final Four but do not advance to the basketball championships, and up to $4,000 to attend the basketball championships.  See P0148.  Also in January 2015, the College Football Playoff committee began to

[16] See P0104 (showing SAF payments above the cost of attendance (COA) provided to in-state students at Ohio State University, with the highest above-COA payment being $14,740); P0105 (showing SAF payments above COA provided to out-of-state students at Ohio State University, with the highest above-COA payment being $49,015); P0106 (showing SAF payments above COA at nineteen schools, with the highest above-COA payment being $61,000); Rascher Direct Testimony Declaration ¶¶ 75, 78-81; Trial Tr. (Lennon) at 1338-40; Trial Tr. (Rascher) at 111.

pay up to $3,000 for each competing athlete's family members to travel to that event.  Id.

Cost-of-attendance grants-in-aid themselves provide cash for expenses, as well as providing tuition, room, board, and books at no cost to the student-athlete.  Any athletics aid in excess of the fixed expenses of tuition, room, board and books is provided to the student-athlete in the form of a cash stipend.  The cash stipend can total several thousand dollars for some students. Defendants do not monitor how student-athletes spend their stipend.  NCAA Rule 30(b)(6) witness (Kevin Lennon) Dep. Tr. at 35, 37; Hostetter Dep. Tr. at 85-86.  Schools may provide full cost-of-attendance grants-in-aid to student-athletes who have already received federal Pell grants, which also are calculated to cover the cost of attendance.  Any athletics aid in excess of tuition, room, board, and books, therefore, pays student-athletes a second time for the same cost-of-attendance expenses that the Pell grant is intended to cover.[17]

Each school may award two post-eligibility graduate school scholarships per year of $10,000 each that can be used at any institution (Senior Scholar Awards).  Division I Bylaw 16.1.4.1.1.

---

[17] Division I Bylaw 15.1.1.  Pell grants are awarded by the government based on financial need measured by the difference between a student's ability to pay and the cost of attendance. The maximum amount of a Pell grant is $6,000.  Noll Direct Testimony Declaration ¶¶ 78-79.  When a student-athlete receives athletics aid permitted by the NCAA in addition to a Pell grant, the athletics aid may exceed the student's need as determined by federal regulations.  See J1518 at 0001-02.  This is an exception to the general practice that requires schools to adjust non-federal aid awards to ensure that the total aid does not exceed a student's financial need.  Id.

United States District Court
For the Northern District of California

This is an exception to the NCAA's prohibition on post-eligibility financial aid to attend graduate school at a different institution.   Defendants have not provided any cogent explanation for why the NCAA generally prohibits financial aid for graduate school at another institution, or for why the Senior Scholar Awards are limited in quantity and amount.   The record suggests that these limitations are arbitrary.   For example, when asked whether increasing the current limit on Senior Scholar Awards from two students per school to five students per school would render the awards inconsistent with amateurism, the NCAA's Rule 30(b)(6) witness, Kevin Lennon, provided no meaningful response other than to justify the current limit on the basis that the membership decided that limiting the awards to two students per school constituted a "reasonable cap."   Trial Tr. (Lennon) at 1551-53. Lennon agreed that if the membership wanted to increase the awards "from two to three . . . they'd certainly be permitted to raise that[.]"   Lennon Rule 30(b)(6) Dep. Tr. at 179.

In addition to the payments in excess of cost of attendance allowed from schools to student-athletes described above, the NCAA has allowed, and in recent years increased, payments that student-athletes may receive from outside entities without being found ineligible to play.   For example, since 2015, international student-athletes have been allowed to receive unlimited payment from their national Olympic governing body in exchange for their performance at certain international competitions.   And student-athletes continue to receive unlimited funds from the U.S. Olympic Committee for their performance in the Olympics; this also is not "pay."   NCAA Rule 30(b)(6) witness (Mark Lewis) Dep. Tr. at 50-51

(a swimmer received $115,000 for participating in the Olympics, permissible under NCAA rules).

A given student-athlete is permitted to receive, in combination, all of the foregoing compensation and benefits for which he or she qualifies, on top of a full cost-of-attendance grant-in-aid, regardless of what the total amount of such compensation may turn out to be. Yet this compensation, some of which is unrelated to education and some of which is provided in cash or a cash-equivalent, is not considered to be "pay" and student-athletes who receive it remain amateurs.

These payments and benefits are, without a doubt, justifiable and well-deserved. They are relevant to the analysis of Defendants' consumer-demand procompetitive justification for two reasons. First, the rules that permit, limit, or forbid student-athlete compensation and benefits do not follow any coherent definition of amateurism, including Defendants' proffered definition of no "pay for play," or even "pay." The only common thread underlying all forms and amounts of currently permissible compensation is that the NCAA has decided to allow it.

Second, whatever understanding consumers have of amateurism, they enjoy watching sports played by student-athletes who receive compensation and benefits such as these, because this compensation has been paid and increased while college athletics has become and remains exceedingly popular and revenue-producing. This belies Defendants' position that the challenged current restrictions on student-athlete compensation are necessary to preserve consumer demand. Indeed, as discussed in more detail below, increases in compensation since 2015 have not reduced consumer demand,

suggesting that all of the current limits on student-athlete
compensation are not necessary to preserve consumer demand.

Defendants' only economics expert on the issue of consumer
demand, Dr. Elzinga, failed to show that the challenged
compensation limits are necessary to preserve consumer demand.
First, Dr. Elzinga's opinions on consumer demand are unreliable.
He did not study any standard measures of consumer demand, such as
revenues, ticket sales, or ratings. See Trial Tr. (Noll) at 285-
287. The "narrative" evidence that formed the primary basis of
his demand analysis was not representative. Trial Tr. (Elzinga)
at 477-78, 445-47 (acknowledging that his economic analysis did
not include interviews of fans, coaches, student-athletes,
broadcasters, or conference commissioners). Instead, he
interviewed people connected with the NCAA and its schools, who
were chosen for him by defense counsel. Id. at 446-47.

Second, Dr. Elzinga's analysis of consumer demand is not
relevant because he failed to study the effect of changes to
student-athlete compensation on consumer demand. Dr. Elzinga
explained his failure to study this issue by opining that "no test
of the effect of amateurism" is possible "because there is no
period during which the NCAA did not have and enforce amateurism
standards." See Elzinga Direct Testimony Declaration ¶ 20. Dr.
Elzinga also posits that studying the effects on consumer demand
of changes to compensation would be unnecessary in any event
because the principle of amateurism has been "materially
consistent over the years." Id. ¶ 23. He explains that "[t]he
central tenet of amateurism is not a specific dollar amount (as in
$X = amateur, but $X +ε = professional\)," rather, it is whether

United States District Court
For the Northern District of California

student-athletes are "being paid to play."  Id. ¶¶ 14, 34-35; see
also id. ¶ 14 ("[T]he difference between amateurism and
professionalism isn't captured in some wooden and mechanical way
by the number of dollars a student-athlete receives.  True
student-athletes are amateurs in the sense that they are not being
paid to play.") (emphasis omitted).

The record directly undercuts the premises of Dr. Elzinga's
analysis.  Dr. Elzinga's assertion that there is "no period"
during which the NCAA did not "have and enforce amateurism
standards" is contradicted by undisputed facts, which show that
"NCAA did not have any rule-making or enforcement authority over
its members until the 1950s."  Stip. Facts ¶ 23, Docket No. 1098.
And, as discussed above in the Background section, the NCAA's
implementation of amateurism has changed materially on multiple
occasions throughout its history.[18]  Further, Dr. Elzinga's
contention that amateurism does not depend on a specific dollar
amount is contradicted by the NCAA.  The NCAA's Rule 30(b)(6)
witness, Kevin Lennon, testified that specific dollar limits on
student-athlete compensation incidental to athletics
participation, such as performance awards, are set precisely for
the purpose of distinguishing between permissible compensation and
"pay for play."  Trial Tr. (Lennon) at 1275.  In other words, the

---

[18] In addition to the changes described in the Background
section above, the fact that the NCAA currently permits student-
athletes to receive the other forms of compensation discussed in
this section in addition to a full grant-in-aid scholarship, such
as compensation "incidental to athletics participation, including
performance awards, also distinguishes today's concept of the
amateur student-athlete from that in effect in earlier years.

United States District Court
For the Northern District of California

amounts are set for the purpose of distinguishing between amateurism and non-amateurism.  Dollar amounts (and changes to such amounts), therefore, cannot be said to be irrelevant to the analysis of this procompetitive justification.  As described above, such amounts can reach the hundreds and thousands of dollars.

For these reasons, the Court is not convinced by Dr. Elzinga's testimony.

The only economic analysis in the record that specifically speaks to the effects of compensation amounts on consumer demand is that by Dr. Rascher.  Dr. Rascher analyzed two natural experiments to determine whether increases in student-athlete compensation would have an impact on consumer demand.  He concluded that increased student-athlete compensation does not negatively affect consumer demand for Division I basketball and FBS football.  The Court finds Dr. Rascher's analysis and opinions to be reliable and persuasive.

The first natural experiment involved comparing consumer demand before and after the increase to the grant-in-aid limit to the cost of attendance, which was voted on in January 2015 and implemented in August 2015.  As explained earlier, this change to the grant-in-aid limit, on its own, resulted in a significant increase in permissible compensation per student-athlete, because it allowed grants-in-aid to provide cash for expenses that previously could not be covered, such as supplies and transportation.  Rascher Direct Testimony Declaration ¶¶ 52, 54; Noll Direct Testimony Declaration ¶ 12.  Some schools adjusted their cost-of-attendance calculations so that the value of a full

cost-of-attendance grant-in-aid would be greater.  See, e.g.,
Trial Tr. (Lennon) at 1365 ("some" schools' financial aid offices
"revisited their calculation[s]" regarding the cost of attendance
after the increase of the grant-in-aid limit to cost of
attendance).  Moreover, because the NCAA rule that permits schools
to award full grants-in-aid to student-athletes in addition to a
Pell grant was not adjusted after the change to the grant-in-aid
limit in 2015, the amount of cash provided above the cost of
attendance increased even more for student-athletes who are
awarded both a Pell grant and a full grant-in-aid scholarship.
See Noll Direct Testimony Declaration ¶¶ 78-79.

Dr. Rascher's conclusions are also supported by the fact that
the NCAA has increased its SAF and AEF distributions since 2015.
See P0039 at 0001; D0695 at 0001.  As noted, a student-athlete can
receive unlimited money through the school, from the NCAA's SAF
and AEF, on top of a full cost-of-attendance grant-in-aid.  Since
2015, SAF cash to individual students has reached to the tens of
thousands of dollars above a full cost-of-attendance grant-in-aid.
See P0104; P0105; P0106; Rascher Direct Testimony Declaration ¶¶
75, 78-81.  The schools are not constrained in terms of the amount
of these funds they can disburse to an individual student-athlete.
Stip. Facts ¶¶ 3-12, Docket No. 1094.

Thus, Dr. Rascher found that total permissible student-
athlete compensation has increased since August 2015, resulting in
thousands of class members receiving significant benefits and
compensation on top of full cost-of-attendance grants-in-aid since
O'Bannon I was decided.  Rascher Direct Testimony Declaration ¶

United States District Court
For the Northern District of California

52.[19]  This has had no negative impact on consumer demand; to the contrary, Dr. Rascher found that NCAA, conference, and school revenues from Division I basketball and FBS football have increased since 2015.  Rascher Direct Testimony Declaration ¶¶ 45, 47, 52, 54-55; P0139, P0030, P0032-P0039; P0048, P0049; P0137. The revenues of the schools in the Power Five alone for basketball and FBS football increased from a very large amount in 2014-2015 disclosed under seal, to an even larger amount in 2015-16. Rascher Direct Testimony Declaration ¶ 47; see also P0045; J0017 at 0012-13 (showing that generated revenues have increased since 2014 for schools in the Power Five and other schools not in the Power Five).  Revenues are one of the best economic measures of consumer demand.  Rascher Direct Testimony Declaration ¶ 51.

Dr. Rascher acknowledged that some of the media revenues he examined are derived from multi-year contracts that were executed before 2015 and have escalating clauses (i.e., the payments under the contracts will increase each year for their duration without the need to renegotiate).  Trial Tr. (Rascher) at 32. Nonetheless, some of the most valuable and longest-term contracts were executed after 2015.[20]  This supports the finding that

_____

[19] Again, this is not intended to suggest that student-athletes should not receive these payments, but that the increases in compensation described above have not negatively affected consumer demand.

[20] For example, in 2016, the NCAA extended its agreement with CBS/Turner for the March Madness tournament; the previous contract was to run through 2024.  The 2016 extension increased substantially the average annual fees owed to the NCAA relative to the prior iteration of the contract.  D0532 at 0023; Rascher Direct ¶ 47; P0045 at 0001-02.  The total value of the 2016 extension, which covers eight years, from 2024 to 2032, is $8.8

United States District Court
For the Northern District of California

consumer demand was not negatively affected after more student-athlete compensation became permissible in 2015.  Dr. Rascher also testified that multi-year contracts that were executed before 2015 show that the increase in student-athlete compensation in 2015 did not negatively impact consumer demand given that these contracts were not renegotiated after the compensation change in 2015.[21] Trial Tr. (Rascher) at 32.

The second natural experiment is based on the University of Nebraska Post-Eligibility Opportunities (PEO) program, which was

---

billion.  P0045 at 0002.  The prior iteration, which covers fourteen years, from 2010 to 2024, is valued at $10.8 billion. P0045 at 0001.  Additionally, the 2016 extension is through 2032; witnesses who have experience negotiating media contracts in the context of college sports have described this as a major extension on the ground that contracts of greater potential value to broadcasters are typically executed for a longer timeframe.  See Trial Tr. (Aresco) at 1009 (characterizing the 2016 extension as a "major extension"); id. at 998 (in the context of media contracts in college sports, "[t]he more attractive the product, the longer [the networks would] want to go" with the length of a contract).

[21] Some defense witnesses speculated that networks or sponsors could choose to renegotiate broadcast rights fees under provisions for "changed circumstances" if they believed that Division I basketball and FBS football changed from amateur to professional. See, e.g., NCAA Rule 30(b)(6) witness (Mark Lewis) Dep. Tr. at 247.  This testimony, however, is not supported.  Defendants have not pointed to any instance in which networks or sponsors have chosen to renegotiate licensing rights fees as a result of changes in student-athlete compensation or otherwise, and the record shows no renegotiations or fees adjustments after the grant-in-aid limit was increased to cost of attendance on August 1, 2015.  See, e.g., Big 12 Rule 30(b)(6) witness (Robert Bowlsby) Dep. Tr. at 121, 125-28.  No evidence was presented that student-athlete compensation or amateurism have even been discussed with media partners in this context, suggesting that these issues are not of concern to media partners and that renegotiation based on these issues is unlikely.  See, e.g., Conference USA Rule 30(b)(6) witness (Judy McLeod) Dep. Tr. 149-50; Big 12 Rule 30(b)(6) witness (Robert Bowlsby) Dep. Tr. 125-28.

created after the O'Bannon I trial and allows post-eligibility aid from the university, on top of a grant-in-aid, of up to $7,500 for education-related endeavors, including graduate school, as well as study abroad, or an internship. Perlman Dep. Tr. 127-28. This natural experiment shows two things. First, at least one school has the desire to offer post-eligibility benefits such as these provided on top of a grant-in-aid. Second, there is no evidence that the creation of this program has reduced consumer demand for Nebraska sports or Division I basketball or FBS football in general. The evidence is to the contrary: Nebraska's chancellor testified that this program is consistent with amateurism because it advances "the kinds of activities that higher education are involved with" and that Nebraska's "Athletic Director talks about it at every opportunity, public and private[.]" Perlman Dep. Tr. at 127-28; see also Trial Tr. (Rascher) 19-20; Rascher Direct Testimony Declaration ¶¶ 206-07; Trial Tr. (Elzinga) at 434-37.

Dr. Rascher's analysis and opinions, therefore, support a finding that, because the described increases to student-athlete compensation did not lead to a decrease in consumer demand, similar future increases in compensation would not reduce demand.

Some defense witnesses corroborated Dr. Rascher's conclusions. See, e.g., NCAA Rule 30(b)(6) witness (Mark Lewis) Dep. Tr. at 112 (negotiated media contracts for NCAA, testified that increase of grant-in-aid limit to cost of attendance did not affect consumer demand for FBS football and Division I basketball); Big 12 Rule 30(b)(6) witness (Robert Bowlsby) Dep. Tr. at 67-68 (he is not aware of "any impact on revenue" based on

"greater meals and snacks," and "with respect to Big 12 members' ability to provide cost of attendance scholarships").

Defendants try to show that consumer demand is dependent on maintaining current restrictions on student-athlete compensation by presenting the opinions of a survey expert, Dr. Bruce Isaacson, who concluded that "amateurism" is an "important" factor in consumers' decision to watch or attend college sports, and is an "important reason for the popularity of college sports." Dr. Bruce Isaacson Direct Testimony Declaration ¶¶ 24, 26, 160, 13, Docket No. 883-3. Dr. Isaacson surveyed 1,086 consumers of college football and basketball, id. ¶¶ 111, 114, on-line to determine the reasons why they watch college sports. One of the reasons that respondents could select was that student-athletes are "amateurs and/or not paid." He also asked whether consumers would favor or oppose certain compensation scenarios.

Dr. Isaacson's survey results and the inferences he draws from them do not establish or reliably indicate that a relationship exists between the challenged compensation limits and consumer demand for Division I basketball and FBS football.

First, the Court is not persuaded that the selection by some respondents of the "amateurs and/or not paid" option as a reason for viewing college sports sheds any light on the question of whether the challenged compensation limits, or increases in them, would cause those respondents to view fewer college sports events. Dr. Isaacson did not define "amateurs" or "not paid" in his survey, or determine what either of those terms meant to respondents. Trial Tr. (Isaacson) at 1907-09. Worse, the use of the phrase "amateurs and/or not paid" renders the responses

United States District Court
For the Northern District of California

hopelessly ambiguous.  (emphasis added).  The phrase includes the response "amateurs or not paid," implying that a respondent could believe that an athlete could be an amateur though not unpaid. Dr. Isaacson "intend[ed] [the terms] to be synonymous" but admits that he provided no indication to respondents in his survey that they were so intended.  Id. at 1908-09.

Even so, Dr. Isaacson's conclusion that "amateurism" is an "important" factor in consumers' decision to watch or attend college sports is an overstatement, because only 31.7% selected the "amateur and/or not paid" option as a reason why they watch or attend college sports, meaning that the great majority of respondents, 68.3%, gave other reasons.  Isaacson Direct Testimony Declaration ¶¶ 153, 24, 26; Trial Tr. (Isaacson) at 1903-04.  More respondents selected the options "I like it when certain colleges win or lose" and "my friends or family watch games, or attend games in person" than the "amateurs and/or not paid" option (which was the third most common selection).  This suggests that these more-frequently selected reasons are more "important" factors for viewing college sports than "amateurism and/or not paid." Moreover, the respondents who selected the "amateurs and/or not paid" option selected an average of more than four other reasons they watch college sports.  Trial Tr. (Isaacson) at 1902.

Second, Dr. Isaacson did not show that opposition or support for the hypothetical compensation scenarios he asked about would serve as a reliable indicator of how consumers would actually behave if the scenarios were implemented.  Trial Tr. (Isaacson) at 1893; Dr. Hal Poret Direct Testimony Declaration ¶ 28.  Dr. Isaacson tested four compensation scenarios: (1) academic

37

United States District Court
For the Northern District of California

incentive payment; (2) graduation incentive payment; (3) off-season expenses; and (4) unlimited payments.  Isaacson Direct Testimony Declaration ¶ 126.  He also tested a fifth "control" scenario that was not related to compensation.  Id. ¶ 130.  Dr. Isaacson's survey did not ask whether respondents would view fewer or more Division I basketball and FBS football events if additional compensation were provided to student-athletes.  Dr. Isaacson acknowledged that measuring consumer preferences is "not the same thing" as measuring future consumer behavior, and that he did not do any work to measure any relationship between the two.[22] See Trial Tr. (Isaacson) at 1894-96; see also id. (testified at his deposition that his "survey does not attempt to measure future behavior"); see also Poret Direct Testimony Declaration ¶ 28 and Poret Rebuttal Testimony ¶¶ 2-3 (opposition to a scenario does not translate to a change in behavior if the scenario were implemented).[23]

By contrast, Plaintiffs' survey expert, Dr. Hal Poret, did attempt to measure the potential impact on future consumer behavior of providing additional compensation.[24]  He conducted a

---

[22] The NCAA offered in O'Bannon a survey by Dr. J. Michael Dennis that did ask respondents about their future behaviors. This survey suffered from other defects.  See O'Bannon I, 7 F. Supp. 3d at 975-76; O'Bannon II, 802 F.3d at 1059.

[23] Moreover, Dr. Isaacson acknowledged that he was "not providing an opinion on whether or not opposition to a particular benefit relates to amateurism.  I'm going to leave that to you and the NCAA and the conferences."  See Trial Tr. (Isaacson) at 1912.

[24] The Court finds that Dr. Poret's survey results and the conclusions he draws therefrom regarding future consumption of Division I basketball and FBS football are based on a methodology that is sufficiently reliable.  Dr. Poret showed that his use of

survey of 2,696 people who watch or attend college basketball or football to assess the extent to which certain scenarios involving increased compensation, if permitted by conferences and schools, would cause them to watch or attend these sports events more or less often.  Poret Direct Testimony Declaration ¶¶ 4, 17 and n.2, 18.  Unlike Dr. Isaacson, Dr. Poret specifically asked respondents to indicate whether scenarios whereby compensation provided by conferences or schools would include some compensation that is not currently permitted or is currently limited would affect their viewership or attendance and, if so, to indicate the extent.  Id. ¶¶ 44-47.  Dr. Poret tested scenarios involving (1) a healthcare fund; (2) an academic incentive payment of up to $10,000 per school year; (3) a one-time graduation incentive payment of up to $10,000; (4) a post-eligibility undergraduate scholarship; (5) a work-study payment; (6) off-season expenses; (7) a graduate school scholarship for the cost of attendance; and (8) a post-eligibility study abroad scholarship.  Poret Direct Testimony Declaration ¶ 24.  Dr. Poret concluded, based on the survey responses, that viewership and attendance would not be negatively impacted if the scenarios he tested were implemented individually.  Id. ¶ 59; Trial Tr. (Poret) at 1792, 1795.  Dr. Poret's survey, therefore, supports the finding that the current limits on student-athlete compensation, to the extent they relate to the scenarios that he tested, are not necessary to preserve consumer demand.

---

controls and other aspects of his survey's design allowed him to assess reliably the potential impact on future consumer behavior of implementing the scenarios he tested.  Poret Rebuttal Testimony ¶¶ 12-26; Trial Tr. (Poret) at 1713-16; 1725-26; 1729; 1781-82; 1784.

United States District Court
For the Northern District of California

Defendants presented no evidence that NCAA bylaws limiting compensation are enacted based on any analysis of consumer demand.[25]   Limits on student-athlete compensation and benefits are set through "a deliberative process" of NCAA members, Trial Tr. (Lennon) at 1309, and are based on the "delicate balancing that the membership . . . engage[s] in," Trial Tr. (Lennon) at 1552. That deliberative process and delicate balancing do not appear to include considering any possible effects on consumer demand. Indeed, Lennon, who has worked for the NCAA for more than thirty years, testified that he does not recall any instance in which any study on consumer demand was considered by the NCAA membership when making rules about compensation.  Trial Tr. (Lennon) at 1550-51.  Lennon did not offer much insight as to what the NCAA membership does consider when it decides where to set a compensation cap, and the explanations that he did provide suggest that the caps are set arbitrarily.

Defendants also rely on the testimony of lay witnesses to try to establish a connection between the compensation limits and consumer demand.  These lay witnesses presented their own personal opinions and those of unidentified other people with whom they

[25] Some witnesses referred to studies conducted by third parties at the request and for the use of conferences.  See Trial Tr. (Scott) at 1167, 1153-57; D0541 (third-party study commissioned by the Pac-12, dated January 2014); Trial Tr. (Scott) 1149-53, 1172; D0683 (third-party study commissioned by the Big Ten, dated September 21, 2009); Trial Tr. (Smith) at 1412-18; D0239 (third-party study commissioned by the Big Ten, dated June 3, 2008).  There is no evidence that these or any other studies were considered by the NCAA when enacting any bylaws limiting compensation.  These studies were admitted for a limited purpose and not for the truth of the matter asserted therein because their contents constitute hearsay within hearsay.

have spoken.  This testimony posits that consumers oppose
increasing compensation to student-athletes and support what the
witnesses described as amateurism.  The witnesses imply that these
consumers would watch fewer games if they did not believe that
student-athletes were amateurs.  But there is no way to know what
that concept means to the consumers these witnesses reported on.

Some lay defense witnesses testified that, absent the
challenged NCAA limits in their current form, conferences would
set limits, or not, based upon different values and resources, and
that could diminish the consumer appeal of national tournaments or
rivalries or lead to conference realignment.  See, e.g., Trial Tr.
(Scott) at 1141-1143.  But, at present, there is wide variation
among conferences and their members in Division I in terms of the
compensation they permit their student-athletes to receive within
the current NCAA limits.[26]  Further, resources, budgets, revenues,
and performance among schools and conferences that continue to
play each other in Division I already vary significantly, and the
disparities that exist are longstanding.[27]  There is no evidence

[26] For example, the Ivy League does not offer any athletics-
based scholarships.  Military academies offer no athletics
scholarships but pay their students as salaried employees.  Some
conferences, like the Big 12, require their members to offer
athletics scholarships up to the maximum allowed by the NCAA.
Some schools in other conferences cap athletics-related
compensation at the cost of attendance (in other words, these
schools do not permit students to, for example, receive a full
cost-of-attendance grant-in-aid on top of a Pell grant).  Rascher
Direct Testimony Declaration ¶¶ 41, 96; Big 12 Handbook J0005 at
0017.

[27] See e.g., Trial Tr. (Aresco) at 1054-55 (disparities in
revenue and branding opportunities currently exist between
conferences, and schools with fewer resources still play schools
with greater resources); Bowlsby Dep. Tr. at 38-39 (agreeing that

United States District Court
For the Northern District of California

United States District Court
For the Northern District of California

that this lack of uniformity detracted from the popularity of national tournaments or rivalries.  Rascher Direct Testimony Declaration ¶¶ 97-98.  The variety in compensation models and resources across schools and conferences may, in fact, promote the popularity of national tournaments.  See Trial Tr. (Elzinga) at 546 (agreeing that a "david/goliath story" is appealing to consumers in the national NCAA men's basketball tournament, March Madness, because it provides "differentiation" due to the schools' varying economic models and strengths); id. at 483.[28]  Moreover, this testimony is further undermined by the fact that other rules that assist in promoting equity among conferences, such as the limits on total scholarships, are not being challenged in this litigation and would not be modified through any of the proposed alternatives.[29]

Further, even if modifications to the NCAA's current compensation scheme resulted in some conferences realigning their

the concept of "competitive equity is largely a mirage" because "in reality, there hadn't been much balance in the past"); Slive Dep. Tr. at 39 ("the effort to ensure a level playing field was an unattainable concept").

[28] See also Lynn Holzman Dep. Tr. 129-30 (NCAA Vice President for Women's Basketball, testifying that under current NCAA rules for March Madness, "institutions with different resources, institutions that provide athletic scholarships and some that don't end up being matched up and play against one another.  So if there's an institution that permissibly is providing a benefit or something to student-athletes, under the current construct of the championship, an institution that does not provide the same thing, in my opinion, would be okay for them to play one another").

[29] See Trial Tr. (Aresco) at 1025-26 (the "larger schools" cannot "take 200 of the best student athletes" because "there are scholarship limits, 85 per school.  And that was imposed in 1992. And it was to enhance the competition in college football").

membership because of differences in values, the argument that this would harm college sports as a product is unconvincing. Changes in conference membership have happened frequently in the last two decades. See Trial Tr. (Elzinga) at 485-87 (it is a "well-established fact" that "dozens and dozens of teams have" changed conferences over the years and conference changes "have increased in the past two decades"); Stip. Facts ¶ 10, Docket No. 1098.

The record does not support a finding that media or other commercial agreements would be renegotiated or terminated if conferences realigned. Some of the conference media agreements in the record contain clauses that permit the networks to renegotiate fees or terminate the agreement in the event that certain schools leave the conference. There is no evidence that any agreement was renegotiated or terminated in the past as a result of realignment. Instead, when the Big East experienced a significant realignment and ultimately became the AAC in July 2013, ESPN did not terminate its contract with the Big East/AAC; in fact, the existence of this contract was described as one of the reasons why the Big East/AAC was able to "recover" from the realignment. Trial Tr. (Aresco) at 1023, 1048; J1509 at 0003-05.

Defense lay witnesses also testified that consumer demand for Division I basketball and FBS football is driven by consumers' perception that student-athletes are, in fact, students. See, e.g., Bowlsby Dep. Tr. at 12-13 ("This really isn't about amateurs or not amateurs. This is . . . about the concept of student athlete."); NCAA Rule 30(b)(6) witness (Mark Lewis) Dep. Tr. at 166 (he would draw the line to limit pay in the context of

43

consumer demand as follows: "the line is if it's now not about . . . going to school, but now it's about paying somebody to play a sport"); Trial Tr. (Blank) at 954, 869 (fans of college sports "love seeing their fellow students out there playing"); Trial Tr. (Blank) at 949-50 (viewership of college sports is based on student-athletes being "students at the university"); Trial Tr. (Smith) at 1411-12 (same); Trial Tr. (Smith) at 1394-95, 1407-08 (the "collegiate fan is more aligned to the educational experience that college sports provide"). Michael Aresco, the commissioner of the AAC who previously worked for CBS and ESPN, noted that the programming of televised college sports focuses on "the college experience," which includes the campus, academics, and community service. See Trial Tr. (Aresco) at 1032. This testimony does not establish that the challenged rules have a connection to consumer demand, however, because student-athletes would continue to be students in the absence of the challenged rules. Fellow students, alumni, and neighbors of the schools would continue to identify with them.

The Court does credit the importance to consumer demand of maintaining a distinction between college sports and professional sports. In addition to the fact that college sports are played by students actually attending the college, student-athletes are not paid the very large salaries that characterize the professional sports leagues that many student-athletes aspire to, the National Basketball Association and the National Football League.

Some lay witnesses, particularly those who have professional experience with third-party networks such as CBS or ESPN, testified that the value of media rights contracts has a

United States District Court
For the Northern District of California

relationship to the popularity of college sports as being distinguishable from professional sports.  Trial Tr. (Aresco) at 1004, 1032-35; see also NCAA Rule 30(b)(6) witness (Mark Lewis) Dep. Tr. at 65-66 ("the people that are our fans who create that consumer demand would feel differently if college sports looked like professional sports"); id. at 99 ("if the college game looks to be professional sports, less people will watch it" and "there won't be the same demand" and "revenue will decline").

The Court credits this testimony and finds that some of the challenged compensation limits may have some effect in preserving consumer demand to the extent that they serve to support the distinction between college sports and professional sports.  That distinction cannot be based on student-athletes not receiving any compensation and benefits on top of a grant-in-aid; this is because student-athletes currently can receive thousands or tens of thousands of dollars in such compensation, related and unrelated to education, while remaining NCAA amateurs. Accordingly, it follows that the distinction between college and professional sports arises because student-athletes do not receive unlimited payments unrelated to education, akin to salaries seen in professional sports leagues.

Rules that prevent unlimited payments such as those observed in professional sports leagues, therefore, are procompetitive when compared to having no such restrictions.  Such rules include those challenged that are necessary to limit compensation and benefits unrelated to education.  The same is true with respect to the challenged limit on grants-in-aid; because the difference between the fixed costs of tuition, room, board, and books and the cost of

United States District Court
For the Northern District of California

attendance is paid to student-athletes in cash, removing the limit
on the grant-in-aid could result in unlimited cash payments.

However, rules that limit or prohibit non-cash education-
related benefits do not serve to foster consumer demand by
maintaining a distinction between college and professional sports.
The value of such benefits, like a scholarship for post-
eligibility graduate school tuition, is inherently limited to its
actual value, and could not be confused with a professional
athlete's salary. Further, the relationship of the benefits to
education would serve to emphasize that the recipients are
students, and not professional athletes. A subset of these
education-related rules, namely those that limit cash or cash-
equivalent benefits, such as academic or graduation awards or
incentives, have a procompetitive effect to the extent that they
prevent unlimited cash payments similar to those observed in
professional sports. As will be discussed in more detail below in
the section on less restrictive alternatives, the current
challenged rules that limit education-related benefits and
compensation are more restrictive than necessary to accomplish
this procompetitive effect.

B.   Integration

Defendants' second remaining procompetitive justification is
that the challenged limits promote the integration of student-
athletes with their academic communities, which improves the
college education student-athletes receive.[30] Within this rubric,

---

[30] In this context, Defendants also argue that academic
integration itself plays a role in preserving consumer demand for
college sports. This is merely a restatement of the argument that
the challenged limits preserve consumer demand because consumers

United States District Court
For the Northern District of California

Defendants present evidence that student-athletes benefit from receiving a college education, that the challenged limits help to incentivize academics and that the limits help integrate student-athletes into their academic communities where otherwise a "wedge" might be created.

Defendants have not shown that the challenged rules have an effect on improving or promoting integration. While the evidence shows that student-athletes benefit from receiving a college education, it does not support the notion that any such benefits arise out of, or are caused by, the challenged compensation limits.

Defendants rely on the expert testimony of Dr. James Heckman to support the proposition that student-athletes benefit from their college education. Plaintiffs quarrel with Dr. Heckman's methodology,[31] but accepting his opinion that student-athletes benefit from attending college, this opinion says nothing about whether the challenged compensation rules cause the benefits that he observed. Indeed, Dr. Heckman conceded as much at trial. See Trial Tr. (Heckman) at 564-66. Dr. Heckman also conceded that additional compensation could improve outcomes for student-athletes, which contradicts the notion that the challenged compensation limits have a positive effect on student-athlete

value amateurism. Indeed, the evidence that Defendants offer to support both of these arguments overlaps. The Court considers this argument to be part of the consumer demand justification.

[31] Dr. Heckman's analysis was based on data whose temporal scope did not capture the class period in this litigation, and did not include any information about whether the student-athletes actually received an athletics scholarship (and if so, the amount of such scholarship) or any of the other types of compensation that are at issue in this case.

47

outcomes.  Trial Tr. (Heckman) at 597 (if a student-athlete received "another $10,000" then the "student is clearly better off.  No question about it").

Defendants also proffer lay witness testimony on the benefits of college education.  None of this shows a connection between the challenged compensation limits and the benefits of the education.  Some student-athletes testified that they gained skills and learning opportunities, but they did not attribute these benefits to the caps on their grant-in-aid athletic scholarships.  See, e.g., Trial Tr. (Hartman) at 825-27.

Dr. Heckman's opinion that student-athletes would be incentivized to spend time on athletics to the detriment of academics if they received additional compensation is undermined by evidence suggesting that additional compensation can have a positive impact on academic achievement.  See, e.g., NCAA Research: Trends in Graduation Success Rates and Federal Graduation Rates at NCAA Division I Institutions (Nov. 2017), J0018 at 0026-29; see also Trial Tr. (Petr) 1884-85 (showing that graduation rates for student-athletes in Division I basketball and FBS football have increased since 2015, when permissible athletics-related compensation increased).

Defendants point to policies that assist with student-athletes' involvement in academics and other aspects of university life, but these policies are not related to the challenged compensation limits.  See, e.g., Trial Tr. (Blank) at 887-89 (student-athletes at Wisconsin are not limited in their selection of major or to athlete-only dorms, and are permitted to miss only a certain number of classes in a season); Trial Tr. (Smith) at

48

United States District Court
For the Northern District of California

1398-99 (Ohio State requires student-athletes to live on campus
for two years); Trial Tr. (Hatch) at 1997 (same at Notre Dame);
Division I Bylaw 17.1 (governing required time off); Emmert Dep.
Tr. at 209-15 (proposals to reduce athletics time demands).

Defendants next contend that the challenged rules help
prevent a "wedge" between student-athletes and other students that
could result if student-athletes received compensation that was
not available to ordinary students. Defendants again rely on Dr.
Heckman, who opined that academic achievement incentives would
isolate student-athletes "from the rest of the student body" and
affect the "camaraderie in these various institutions." Trial Tr.
(Heckman) at 631-33. Defendants also point to testimony, by
university administrators and former student-athletes, that
additional compensation for student-athletes would create tensions
and resentment between student-athletes and non-athletes, as well
as among student-athletes to the extent that any additional
compensation is not provided equally. See, e.g., Trial Tr.
(Hatch) at 2000-01; Trial Tr. (Smith) at 1409-10; Jemerigbe Dep.
Tr. at 294-95.

This testimony is outweighed by the fact that income
disparities inevitably exist as a result of family background or
wealth derived from other sources. See e.g. Trial Tr. (Blank) at
920-21 (Wisconsin students come from different socioeconomic
backgrounds). Moreover, levels of student-athlete compensation
vary already. The amount of a cost-of-attendance grant-in-aid is
calculated by each school with the discretion to adjust it on an
individual-student basis. J1517 at 0002; Stip. Facts ¶¶ 3-6,
Docket No. 1093; NCAA Rule 30(b)(6) witness (Mark Lewis) Dep. Tr.

at 164.   Another reason why compensation can vary among student-athletes is that the NCAA permits them to receive their grant-in-aid on top of federal Pell grants, which the government awards to some but not all student-athletes.  Also variable is the payment of SAF and AEF benefits, which are not limited on an individual-student basis, and the awards incidental to athletics participation, including performance awards paid in Visa gift cards.  Athletes who perform well in the Olympics can receive unlimited compensation for their performance; such compensation has reached six figures.  NCAA Rule 30(b)(6) witness (Mark Lewis) Dep. Tr. at 50-51.  And athletes in certain sports, such as tennis, can receive up to $10,000 in prize money per year prior to enrolling in college and still compete as amateurs.  See Division I Bylaw 12.1.2.4.2.1.  At least for some, these disparities are not problematic.  See, e.g., Trial Tr. (Jenkins) at 735-736 (he did not resent a football teammate who received more than a million dollars from a baseball professional league as a recruitment bonus).

In O'Bannon I, the Court found that the challenged limits may help integrate student-athletes with their academic communities by preventing a wedge, which may improve their college education.  See 7 F. Supp. 3d at 980-81.  The Ninth Circuit affirmed that finding, although it noted that on appeal the NCAA focused its argument regarding procompetitive justifications entirely on the amateurism justification.  O'Bannon II, 802 F.3d at 1072.  Nonetheless, support for the Court's finding with respect to integration in O'Bannon I was weak, and it is weaker now.  Evidence was presented at this trial that did not exist at the

United States District Court
For the Northern District of California

United States District Court
For the Northern District of California

time of the O'Bannon trial showing that the challenged rules are not necessary to prevent a wedge between student-athletes and other students. This is the natural experiment resulting from the increase to the cost of attendance for grants-in-aid. As discussed above, since 2015, student-athletes have been allowed to receive thousands of dollars in increased compensation and benefits from full cost-of-attendance grants-in-aid and other payments. Rascher Direct Testimony Declaration ¶¶ 52, 54, 75, 78-81; Noll Direct Testimony Declaration ¶ 12; P0104; P0105; P0106. Yet, there is no evidence that, since 2015, student-athletes have experienced more separation. The NCAA's Rule 30(b)(6) witness, Kevin Lennon, has acknowledged that there is no evidence that the recent increase in student-athlete compensation has created a wedge. Trial Tr. (Lennon) at 1355-58 (agreeing that there is no evidence that increased compensation that student-athletes have received because of the increase of the grant-in-aid limit to cost of attendance and because of benefits that became permissible or expanded recently, such as premiums for loss-of-value insurance against loss of future professional wages, unlimited food, and travel expenses for family members for certain events, has created a wedge).

In fact, the challenged limits may serve to increase separation among students, not decrease or prevent it. According to Dr. Perlman, the University of Nebraska chancellor, the challenged compensation limits result in schools spending their recruitment resources on "unregulated frills" in facilities that benefit student-athletes exclusively, which promotes separation. See, e.g., Perlman Dep. Tr. at 60-61; see also Bilas Dep. Tr. at

105-06 (Kentucky's "opulent" facility for basketball players "functions to segregate them from the normal student population"); Emmert Dep. Tr. at 24-29 (expenditures on training facilities, stadiums, and student-athlete living quarters are not limited by NCAA). Limits on compensation may constrain student-athletes' financial ability to engage in social activities with other students. See, e.g., Trial Tr. (Alston) at 680 (additional compensation would have permitted him to "mingle" more with non-athletes). Accordingly, the evidence here does not support the notion that the challenged rules promote integration by preventing a wedge.

Finally, Defendants proffer Dr. Heckman's opinion that a "substantial change" to what he terms the "Collegiate Model" would alter the incentives of "participants/stakeholders in the college sports world," and would result in a "new equilibrium." Heckman Direct Testimony Declaration ¶ 14. This opinion does not appear to be related to the integration theory. Further, Dr. Heckman did not conduct any empirical, econometric, or quantitative analysis to distinguish "substantial" changes from those that are not; when asked at trial to describe exactly what would qualify as a "large" or "substantial" change, he referred to dollar amounts that "have been put out in the literature" or that others had mentioned during trial, but he declined to adopt any such numbers as what he believes, based on his own work, is "large" or "substantial." Trial Tr. (Heckman) at 607-11.

Because Defendants have not met their burden to show that the challenged limits are procompetitive due to an effect on promoting integration, by preventing a wedge or otherwise, the Court finds

1  that Defendants have not shown that the challenged rules are
2  justified based on this theory.
3  VI.  Rule of Reason: Alternatives to the Challenged Restraints
4       The Court finds that the current rules, read together, are
5  more restrictive than necessary to prevent demand-reducing
6  unlimited compensation indistinguishable from that observed in
7  professional sports.  Plaintiffs propose three alternatives to the
8  challenged restraints as less restrictive.
9       First, they propose an alternative that would prohibit the
10 NCAA from placing any limits on compensation or benefits, whether
11 or not related to education, given in exchange for athletic
12 services.  This would permit individual conferences to set limits
13 on such compensation or benefits.
14      Second, they propose an alternative that would allow the NCAA
15 to continue limiting the compensation or benefits given in
16 exchange for athletic services except for (1) benefits that are
17 related to education, and (2) the seventeen benefits incidental to
18 athletics participation that the NCAA currently allows and caps.
19 These are listed in Plaintiffs' Opening Statement, Appendix C,
20 Docket No. 868-3.  While these could no longer be capped by the
21 NCAA, limits on these two types of compensation and benefits could
22 nonetheless be maintained or set by individual conferences.
23      Third, Plaintiffs propose an alternative that would allow the
24 NCAA to continue to limit the compensation or benefits given in
25 exchange for athletic services, but would not allow NCAA limits on
26 compensation and benefits related to education.  Again, limits on
27 education-related benefits could be set by individual conferences.
28

United States District Court
For the Northern District of California

For all of the proposed alternatives, any permissible limits could be enforced by the NCAA, the conferences, or the schools. Schools, of course, could continue to set their own limits on their offers.

A.  First and Second Proposed Alternatives

The Court finds that Plaintiffs' first proposed alternative, which would eliminate all NCAA limits on compensation, would not be as effective as the current rules in preserving consumer demand for Division I basketball and FBS football; that alternative leaves open the possibility that at least some conferences would allow their schools to offer student-athletes unlimited cash payments that are unrelated to education. Such payments could be akin to those observed in professional sports leagues. Payments of that nature could diminish the popularity of college sports as a product distinct from professional sports. The Court notes that Plaintiffs' survey expert Dr. Poret did not test a proposed scenario of cash compensation greater than $10,000 in value.

Plaintiffs and their experts strenuously argue and opine, perhaps correctly, that if this alternative were adopted, conference officials, as rational economic actors, would not act contrary to their members' aggregate economic interests, and would not choose to pay amounts of cash compensation unrelated to education that would be demand-reducing for Division I sports. Whether by survey or trial and error, these actors would eventually discover the level of cash compensation to student-athletes that would encourage competition for recruits but would not reduce the demand for their product. Be that as it may, the inevitable trial-and-error phase could result in miscalculations

by one or more conferences as to levels of cash pay that would not
reduce demand for the product, and this could produce unintended
consequences.

It is to be hoped that gradual change will be instructive.
If it were persuaded to do so, the NCAA could conduct market
research and allow gradual increases in cash compensation to
student-athletes to determine an amount that would not be demand-
reducing.

Plaintiffs' second proposed alternative likewise would not be
as effective in achieving the procompetitive effect of the
challenged rules to the extent that it would remove the NCAA caps
on athletics participation awards and other compensation and
benefits that are unrelated to education.  It would prohibit NCAA
caps on cash or cash-equivalent awards or incentives.  Without
such limits, conferences could suddenly decide to allow the award
of any sum of cash to some or all student-athletes.  This could
lead to unlimited cash payments and the same effect as the first
alternative.

B.   Third Proposed Alternative as Modified: Prohibiting
     Limits on Most Education-Related Payments

The Court finds that a less restrictive alternative to the
current set of challenged NCAA limits would be to (1) allow the
NCAA to continue to limit grants-in-aid at not less than the cost
of attendance; (2) allow the association to continue to limit
compensation and benefits unrelated to education; (3) enjoin NCAA
limits on most compensation and benefits that are related to
education, but allow it to limit education-related academic or
graduation awards and incentives, as long as the limits are not

lower than its limits on athletic performance awards now or in the future.  This is Plaintiffs' third proposed alternative, as modified by the Court.  It would be less restrictive than the current compensation rules, allowing for additional compensation and benefits related to education.  It would therefore be less harmful to competition in the relevant market, but would not provide a vehicle for unlimited cash payments, unrelated to education.

The types of education-related benefits that could not be capped by the NCAA would include those that it currently prohibits or limits in some fashion.  These include computers, science equipment, musical instruments and other items not currently included in the cost of attendance calculation but nonetheless related to the pursuit of various academic studies.  Also included would be post-eligibility scholarships to complete undergraduate or graduate degrees at any school; scholarships to attend vocational school; expenses for pre- and post-eligibility tutoring; expenses related to studying abroad that are not covered by the cost of attendance; and paid post-eligibility internships. See Trial Tr. (Lennon) at 1559-1565, 1571-72; NCAA Rule 30(b)(6) witness (Kevin Lennon) Dep. Tr. 195-213; Division I Bylaw 13.2.1.1(k).  There may be other education-related benefits that the NCAA, in an exercise of its good faith judgment, would allow. Payment for these benefits would be limited to their actual value and could be provided in kind.  For that reason, they would not be a vehicle for potentially unlimited cash payments.

A subset of education-related benefits, namely, cash academic or graduation awards and incentives, if not capped by the NCAA,

United States District Court
For the Northern District of California

could potentially be unlimited and allow for payments indistinguishable from those received in professional sports. Accordingly, limits on these awards or incentives may have the procompetitive effect of preventing professional-style unlimited cash payments.  This alternative would allow the NCAA to place a limit on such awards, as long as the limit is not less than the maximum amount of compensation that an individual student-athlete could receive in an academic school year in participation, championship, or special achievement awards (combined) under Division I Bylaw, Article 16, and listed in Figures 16-1, 16-2, and 16-3 of the Division I Manual, J0024 at 0249-50.  (These figures list the current caps.)  If the NCAA increased the current athletics participation awards limit just described, any limits on academic or graduation awards and incentives must be increased so that they are never less than the new athletics participation awards limit.  Allowing the NCAA to cap education-related awards and incentives at the athletics participation awards limit, which is an amount that has been shown not to decrease consumer demand and not to be inconsistent with the NCAA's understanding of amateurism, would enable the NCAA to prevent unlimited cash, demand-reducing payments.  On the other hand, the NCAA could decide to set higher limits, or no limits at all, for academic or graduation awards and incentives.

Individual conferences could vote to set or maintain limits on education-related benefits that the NCAA will not be allowed to cap.  Conferences could also set limits on academic and graduation awards and incentives.  This would not have an anticompetitive effect because no individual conference dominates nearly the

United States District Court
For the Northern District of California

1  entire market, like the NCAA does.  Rascher Direct Testimony

2  Declaration ¶¶ 160-61.  Market concentration would be reduced in

3  the absence of NCAA caps limiting education-related compensation

4  and benefits described above.  Thus, the third alternative would

5  be less restrictive than maintaining the current NCAA compensation

6  scheme.  Id. ¶¶ 162, 175.

7  　　　NCAA's latitude to superintend college sports would not be

8  greatly impacted.  This alternative would affect only a small

9  fraction of the NCAA's rulemaking jurisdiction, namely rules that

10  limit education-related compensation and benefits.

11  　　　The third alternative as modified would be virtually as

12  effective as the current rules in achieving the effect on the

13  preservation of consumer demand for Division I basketball and FBS

14  football that the Court found here, and its implementation would

15  not require significant increased costs.

16  　　　　　1.　　Virtually as Effective

17  　　　As discussed above, according to Defendants' own witnesses,

18  consumer demand for Division I basketball and FBS football is

19  driven largely by consumers' perception that student-athletes are,

20  in fact, students.  Providing additional, even uncapped,

21  education-related compensation and benefits to student-athletes

22  would not affect student-athletes' status as students.  These

23  benefits are, by definition, related to education and thus would

24  be consistent with the values propounded by the NCAA.  The

25  Principle of Amateurism in its constitution, quoted above, holds

26  that amateur student-athletes should be motivated primarily by

27  education.  Education-related compensation and benefits would

28  enhance the student-athletes' connection to academics.  See, e.g.,

United States District Court
For the Northern District of California

Perlman Dep. Tr. at 126-27 ("I think if you're paying them to play athletics, I think it is inconsistent with the idea of what a student athlete is.  I don't think it's inconsistent to provide them with benefits that relate to the educational enterprise"); MAC Rule 30(b)(6) witness (Jon Steinbrecher) Dep. Tr. at 189 (compensation above cost of attendance is not problematic because "the key point" is "linking what we're doing to the pursuit of the educational opportunities of the individual involved"); Renfro Dep. Tr. at 84 ("I personally don't see the offer of a post graduate grant in aid as something that violates the concept of amateurism[.]"); Bowlsby Dep. Tr. at 13-14 (an inducement to stay in school an extra year or to graduate "is worthy of consideration").

Other evidence shows that providing additional education-related compensation would not negatively impact consumer demand. See, e.g., NCAA Rule 30(b)(6) witness (Mark Lewis) Dep. Tr. at 269-70 (changes to the NCAA rules regarding compensation and benefits that have occurred in the last five years have not had "any adverse impact on consumer demand" because "they're all tied to education").  Prohibitions or limitations on such benefits have not been shown to be necessary to preserve the distinction between college and professional sports in that the benefits are inherently limited in value and nature and can be provided in kind, not cash; accordingly, they could not be confused with professional-style unlimited cash payments.  The natural experiments, discussed above, show that recent increases in student-athlete compensation, related and even unrelated to education, have not decreased consumer demand for Division I

United States District Court
For the Northern District of California

basketball or FBS football.  Dr. Hal Poret's survey also supports
this finding.  One of the scenarios he tested was offering
scholarships to complete an undergraduate or graduate degree at
any institution, which he found would not negatively impact
consumer demand.  Poret Direct Testimony Declaration ¶¶ 17, 19-24,
26, 59, 131.  Dr. Isaacson's survey does not speak to the possible
effects of implementing this alternative, because he did not test
any analogous scenarios.

The academic and graduation awards and incentives that would
be allowed with a cap in the same amount as current caps on
athletic performance awards likewise will be virtually as
effective as the current compensation scheme.  The amount will not
be demand-reducing because it will be in the same amount that is
allowed for athletic performance awards, which are deemed to be
consistent with amateurism and the preservation of the distinction
between college and professional sports.  And because they are
education-related, they will further the perception of the
student-athletes as students.

Thus, this alternative set of rules will be as effective as
the current set of challenged rules in preserving consumer demand.
It will also allow the NCAA to maintain the distinction between
college student-athletes playing for educational benefits and
professional athletes playing for large cash salaries unrelated to
education.  The education-related amounts that could be expended
under this alternative would be either inherently limited by the
actual value of the benefit, or limited by the NCAA at a level
that has been shown not to be demand-reducing or inconsistent with
amateurism.  The NCAA will be permitted to continue to cap grants-

United States District Court
For the Northern District of California

in-aid at not less than the cost of attendance.  The association
will remain free to bar or limit compensation and benefits that
are unrelated to education, including cash or cash-equivalent
awards for athletic performance.  Conferences individually will be
free to limit any benefits that the NCAA could not.

## 2.   No Significant Increased Costs

The Court finds that the implementation of this third
alternative as modified would not result in significant increased
costs.  To the contrary, because this alternative would result in
the elimination of NCAA caps on most education-related benefits,
it would eliminate the need to expend resources on compliance and
enforcement in connection with such caps.  The NCAA engages in
rule-making, interpretation, investigations, and enforcement of
its rules.[32]  It could employ its systems and resources to the
extent it chooses to limit cash or cash-equivalent academic or
graduation awards and incentives.

Individual conferences would not be required to enact their
own rules to limit any education-related benefits that the NCAA
would not be able to cap.  Even so, the Court finds no evidence

---

[32] Starting in August 2019, as a result of the findings and
recommendations of the Commission on College Basketball chaired by
Dr. Condoleezza Rice, see P0060, the NCAA will add a body composed
of "both external investigators with no school or conference
affiliations and select NCAA enforcement staff" to adjudicate
independently cases involving potential violations of NCAA rules
that are deemed "complex."  Stip. Facts ¶ 9, Docket No. 1098
(internal quotation marks omitted).  Examples of complex cases
include alleged violations of core NCAA values such as
prioritizing academics and the well-being of college athletes.
Id.  The perceived need for this new enforcement mechanism is
unrelated to the changes mandated here, but this mechanism could
certainly be used to police them.

United States District Court
For the Northern District of California

that the costs that could be incurred to do so, if any, would be
significant.  Conferences are required to be "legislative
bod[ies]," Division I Constitution Article 3.3.1.1, and thus, they
already can and do enact their own rules.  The scope of the
benefits that could not be capped by the NCAA under this
alternative would be those related to education, which is a small
fraction of the conduct that the NCAA currently regulates and
enforces.  Any new rulemaking activities by the conferences would
be correspondingly limited.

Conferences are also required by the NCAA to have compliance
programs and are involved in ensuring compliance with both NCAA
and conference rules by their members.  The changes contemplated
here would not add to their enforcement burden.  Conferences also
may require their members to enforce both conference and NCAA
rules.  See, e.g., The Big 10 Handbook at J0006 at 0013 (providing
that it "shall be the responsibility of each member university" to
"adhere to and enforce all Conference Rules and Agreements, and
the NCAA Constitution, Bylaws and Regulations and their respective
interpretations").  Thus, schools currently engage in compliance
efforts, including investigations, and enforcement of NCAA and
conference rules relating to student-athlete compensation and
eligibility.[33]  Schools also currently interpret NCAA rules.  P0146

---

[33]  The NCAA requires all of its members to comply with and
enforce its rules.  See, e.g., Division I Constitution Article
1.3.2 (requiring member institutions to "apply and enforce" NCAA
legislation about eligibility, financial aid, and recruiting,
among other matters); Division I Constitution Article 2.1
(requiring member schools to maintain "institutional control").

at 0002.  Implementing this alternative will impose little or no additional burden on the schools.

Some defense witnesses testified that eliminating all of the challenged NCAA limits would result in new costs to the conferences and schools.  See, e.g., Trial Tr. (Scott) 1180; Trial Tr. (Smith) at 1520-23.  The Court finds that this testimony lacks specificity or support and thus is speculative.  Other evidence also outweighs or undermines it.[34]  Additionally, this testimony hypothesized the removal of all NCAA compensation limits, which diminishes its relevance in the context of implementing the third alternative as modified, whereby only a subset of the challenged rules will be affected.[35]

Finally, to the extent that new enforcement costs at the conference or school levels are incurred, the NCAA could shift to its members some of the resources it now spends on enforcement, so there would be no net new costs.  Trial Tr. (Scott) at 1240 (suggesting that any new costs at the conference and school levels could be offset by such distributions).  In sum, the Court finds

---

[34] For example, Larry Scott testified that in the absence of NCAA compensation limits, there would be "significant additional infrastructure and expense" at the Pac-12 relating to "rule development."  Trial Tr. (Scott) at 1136-37.  But other evidence shows that the Pac-12 already has a system in place for passing and amending bylaws relating to student-athlete financial aid and otherwise.  See Pac-12 Handbook, J0010 at 0008, 0014, 0015, 0017-18.

[35] Defendants contend in their opening statement that adopting any of Plaintiffs' proposed alternatives would result in conference realignment, which would entail increased costs.  As discussed above, conference realignment is common and the evidence does not support a finding that adopting the third alternative would result in conference realignment.

United States District Court
For the Northern District of California

that any new costs of implementing this alternative would not rise to the level of "significant."

The Court notes that it asked Defendants several times, during the closing argument hearing held on December 18, 2018, and previously, to propose, based on their superior knowledge of the NCAA and its members and their functions, adjustments to the challenged rules or to Plaintiffs' proposed less restrictive alternatives that would be more workable from their perspective. They offered none.

CONCLUSIONS OF LAW

I.   Legal Standard under Section 1 of the Sherman Act

Section 1 of the Sherman Act makes it unlawful to form a "contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States[.]"  15 U.S.C. § 1.  "To establish a claim under Section 1 of the Sherman Act, Plaintiffs must show 1) that there was a contract, combination, or conspiracy; 2) that the agreement unreasonably restrained trade under either a per se rule of illegality or a rule of reason analysis; and 3) that the restraint affected interstate commerce."  Cnty. of Tuolumne v. Sonora Cmty. Hosp., 236 F.3d 1148, 1155 (9th Cir. 2001) (citation and internal quotation marks omitted).

Here, Plaintiffs challenge the NCAA rules that generally (1) cap at the cost of attendance grants-in-aid they may receive for their athletic services, and (2) limit the additional compensation and benefits that they can receive in addition to a grant-in-aid athletic scholarship, which have a monetary value above the cost of attendance.  Plaintiffs contend that Defendants enact these

64

limits by exercising their monopsony power by way of price-fixing agreements that are made and enforced through the NCAA's bylaws. Plaintiffs contend that they would receive more compensation in exchange for their athletic services in the absence of these limits.

As discussed in the findings of fact above, on summary judgment the Court found no genuine dispute of material fact as to the existence of an agreement among Defendants in restraint of trade that affects interstate commerce, which satisfies the first and third elements of a Section 1 claim. Specifically, Defendants did not meaningfully dispute evidence showing that (1) the compensation limits that Plaintiffs challenge are enacted by agreement of Defendants through the NCAA's legislative process and are embodied in NCAA rules published in the NCAA Division I Manual; (2) Defendants enforce these rules by requiring all NCAA members to comply with them, and by punishing violations; (3) these rules affect interstate commerce, because they regulate transactions between Plaintiffs and their schools with respect to Plaintiffs' athletic services in multiple states nation-wide; and (4) these transactions are commercial because they regulate an essential component of Division I basketball and FBS football. Summary Judgment Order at 15, Docket No. 804; see also O'Bannon II, 802 F.3d at 1065-66 (holding that the NCAA's compensation rules are restraints of trade that regulate "commercial transaction[s]").

As to the remaining element of a Section 1 claim, which requires a showing that the challenged restraints are unreasonable under either the per se rule or the Rule of Reason, the Court held

United States District Court
For the Northern District of California

on summary judgment that the NCAA's regulations "must be tested under a rule-of-reason analysis" as opposed to under the per se rule.  Summary Judgment Order at 15, Docket No. 804; see also O'Bannon II, 802 F.3d at 1053 (holding that "the NCAA's amateurism rules . . . must be analyzed under the Rule of Reason").

Horizontal price-fixing agreements, those among competitors, like the challenged rules in this case, "are ordinarily condemned as a matter of law under an 'illegal per se' approach because the probability that these practices are anticompetitive is so high . . . .  In such circumstances a restraint is presumed unreasonable without inquiry into the particular market context in which it is found."  Nat'l Collegiate Athletic Ass'n v. Bd. of Regents of Univ. of Okla., 468 U.S. 85, 100 (1984) (Board of Regents) (citation omitted).  But where, as here, a "certain degree of cooperation" is necessary to market college sports, the Rule of Reason is appropriate.  O'Bannon II, 802 F.3d at 1069 (quoting Board of Regents, 468 U.S. at 117) (internal quotation marks omitted).

II.   Issue or Claim Preclusion

As a threshold matter, Defendants argue that Plaintiffs have not shown that this case is not precluded by the Ninth Circuit's ruling in O'Bannon II.  The Court denied Defendants' motion for summary judgment that this action is barred by O'Bannon II under

the doctrines of res judicata[36] and collateral estoppel.[37]  See
Summary Judgment Order at 9-15, Docket No. 804.  Defendants invite
the Court to revisit these issues, arguing that Plaintiffs must,
but have failed to, show that a new antitrust violation occurred
since O'Bannon I or that there has been any material change in the
factual basis for O'Bannon II.

     It is not Plaintiffs' burden to show that this action is not
precluded; instead, the burden of proving preclusion is on
Defendants.  See Karim-Panahi v. Los Angeles Police Dep't, 839
F.2d 621, 627 n.4 (9th Cir. 1988) (res judicata); Kendall v. Visa
U.S.A., Inc., 518 F.3d 1042, 1050-51 (9th Cir. 2008) (collateral
estoppel).  Defendants failed to satisfy this burden on summary
judgment, and they have offered nothing new to warrant altering
the Court's summary judgment holding on this issue.

     In its Summary Judgment Order, the Court found that material
differences between this action and the O'Bannon case prevent a

United States District Court
For the Northern District of California

---

[36] Res judicata prohibits the re-litigation of any claims that
were raised or could have been raised in a prior action.  Tahoe-
Sierra Pres. Council, Inc. v. Tahoe Reg'l Planning Agency, 322
F.3d 1064, 1077-78 (9th Cir. 2003).  Three elements must be
present for res judicata to apply: (1) an identity of claims; (2)
a final judgment on the merits; and (3) the same parties or their
privies.  Id. at 1077.

[37] Collateral estoppel "prevents a party from relitigating an
issue decided in a previous action if four requirements are met:
'(1) there was a full and fair opportunity to litigate the issue
in the previous action; (2) the issue was actually litigated in
that action; (3) the issue was lost as a result of a final
judgment in that action; and (4) the person against whom
collateral estoppel is asserted in the present action was a party
or in privity with a party in the previous action.'"  Kendall v.
Visa U.S.A., Inc., 518 F.3d 1042, 1050 (9th Cir. 2008) (citation
omitted).

finding that this action is precluded by that case.  These include
(1) that class members in the two actions are not in complete
privity; and (2) that the conduct and rules challenged, the rights
implicated, and the evidence presented and available were not the
same in both actions.[38]

   The class in O'Bannon did not include, as does one of the
classes here, female student-athletes.  The class in O'Bannon was
not limited to student-athletes in receipt of an offer for a full
grant-in-aid athletic scholarship; it included male Division I
basketball and FBS football student-athletes whose NIL were used
or could have been used in game footage or videogames licensed or
sold by the NCAA and its licensees, regardless of whether they
received any scholarship money.  O'Bannon II, 802 F.3d at 1055-56.
By contrast, the classes in this case include student-athletes who
were offered or received a full grant-in-aid athletic scholarship.
No use of their NIL was necessary; therefore, these classes are
not limited to student-athletes whose NIL were used or licensed.
Additionally, the classes in this case are limited to student-
athletes who received an offer for a full grant-in-aid from March
5, 2014, to the date of final judgment in this action; few of the
male class members in this case would have been O'Bannon class

   [38] See Costantini v. Trans World Airlines, 681 F.2d 1199,
1201-02 (9th Cir. 1982) (citation omitted) (holding that a single
cause of action for the purpose of applying res judicata exists in
successive lawsuits, if, among other things, both actions "involve
infringement of the same right," and "substantially the same
evidence" was presented in both actions); Cent. Delta Water Agency
v. United States, 306 F.3d 938, 953 (9th Cir. 2002) (holding that
collateral estoppel cannot be applied where the facts of the prior
action are merely "similar" to the ones in the second case)
(citation and internal quotation marks omitted).

United States District Court
For the Northern District of California

members because most would have been recruited after the O'Bannon I trial, which ended in August 2014.

The crux of the O'Bannon case was the right to student-athletes' NIL. The plaintiffs sought relief as a result of price-fixing conduct by the NCAA and its licensing partners that prevented them from benefiting financially, through compensation from their schools or from outside sources, from the use and licensing of their NIL. The class members in O'Bannon were required to release the rights to their NIL, the use and licensing of which had monetary value, to the NCAA as a condition of eligibility to play in Division I basketball and FBS football; this was the case regardless of whether they received a grant-in-aid. The rules challenged in O'Bannon related to NIL rights and their commercialization by the NCAA and its licensees, to the exclusion of student-athletes.[39] See O'Bannon II, 802 F.3d at 1055 ("The gravamen of O'Bannon's complaint was that the NCAA's amateurism rules, insofar as they prevented student-athletes from being compensated for the use of their NIL, were an illegal restraint of trade under Section 1 of the Sherman Act, 15 U.S.C. § 1."); id. at 1072 (concluding that "the NCAA's compensation rules fix the price of one component (NIL rights) of the bundle that schools provide to recruits"). The plaintiffs in O'Bannon did not challenge the limit on a full grant-in-aid athletic scholarship, although the limit was implicated in the less restrictive

---

[39] See O'Bannon I, Case No. 09-cv-3329, Pls.' Trial Brief at 4, Docket No. 172 (listing challenged rules); Case No. 09-cv-1967, Third Am. Consolidated Complaint ¶ 359, Docket No. 832 (same).

United States District Court
For the Northern District of California

alternative that the plaintiffs proposed and that this Court adopted.

In this case, by contrast, Plaintiffs seek relief from price-fixing conduct by the NCAA, Conference Defendants, and other NCAA members that prevents them from receiving compensation and benefits from their schools in excess of certain limits in exchange for their athletic services. The conduct at issue here is not connected to NIL rights. The rules challenged in this case, in addition to the limit on a grant-in-aid, include those that limit other compensation and benefits that student-athletes can receive on top of a full cost-of-attendance grant-in-aid. See Pls.' Opening Statement at 13-15 and Appendices A-C, Docket No. 868-3, for a list of the challenged rules. They include those that limit compensation and benefits related to education, such as scholarships for undergraduate or graduate study at other institutions. They also include rules that limit compensation and benefits incidental to athletics participation but are unrelated to education, such as performance awards and travel expenses for student-athletes' family members. These rules were not challenged in O'Bannon. Accordingly, neither these rules nor the compensation and benefits that can be provided pursuant to them were comprehensively addressed in that case.

Some of the rules challenged in this case did not exist or have materially changed since the O'Bannon trial, those relating to reimbursement for travel expenses for family members, student-athletes borrowing against their future earnings to purchase loss-of-value insurance, and payments to international student-athletes from their home countries.

*United States District Court*
*For the Northern District of California*

United States District Court
For the Northern District of California

While some NCAA rules were challenged in both cases, these are core rules that address eligibility and compensation in general terms.[40]  This overlap is a consequence of the interconnected nature of NCAA bylaws, and does not indicate that the two actions overlap in terms of the specific and distinct conduct being challenged, or the rights affected.  The fact that the limit on the grant-in-aid is addressed in both cases also does not preclude this action.  The NCAA changed this limit before the Court's injunction in O'Bannon went into effect, and the NCAA's changed rule differs from the less restrictive alternative that the Court found in O'Bannon I with respect to the student-athletes who would receive the relief and the source and type of the compensation that would cover the difference between the prior grant-in-aid limit and the cost of attendance.

Moreover, since O'Bannon, there have been material increases in permissible compensation above the cost of attendance that is not related to education.  These increases are relevant to the question of whether restrictions on student-athlete compensation are necessary to preserve consumer demand for college sports as distinct from professional sports.  These include the payment by schools from SAF monies of $50,000 premiums for loss-of-value insurance against the loss of future professional earnings in case

---

[40] For example, challenged rules that are common to both cases include Division I Bylaw 13.2.1 (prohibiting benefits and financial aid not permitted by the NCAA); Division I Bylaw 16.02.5 (prohibiting funds, awards, or benefits not permitted by the NCAA); and Division I Bylaw 12.1.2.1 (listing prohibited forms of "pay").  These rules must be read in conjunction with rules that address compensation and benefits in more specific terms and in more specific contexts.

United States District Court
For the Northern District of California

of injury in college.  In January 2015, the NCAA began to pay up
to $3,000 for family members of student-athletes to attend the
Final Four games and up to $4,000 to attend basketball
championships; the College Football Playoff committee began to pay
up to $3,000 for each competing athlete's family members to travel
to that event.  Student-athletes previously could receive
performance awards in the form of store-specific gift cards but
can now receive these awards, in capped amounts, in the form of
Visa gift cards that can be used anywhere that accepts Visa.
Schools can now provide unlimited food to student-athletes.

Defendants note that some of the forms of compensation and
benefits addressed in this case, such as Pell grants, benefits
from the SAF, and store-specific gift cards, were mentioned or can
be found in the record in O'Bannon.  This fact is not sufficient
to support Defendants' claim preclusion argument.

Because student-athlete compensation has expanded since
O'Bannon, Defendants also argue that no new actionable conduct or
material change in the factual basis of O'Bannon has occurred
since O'Bannon I to justify a conclusion that this action is not
precluded.  This argument misses the point.  It is the fact that
the prices of student-athlete compensation are fixed, as opposed
to the amount at which these prices are fixed, that renders the
agreements at issue anticompetitive.  See O'Bannon II, 802 F.3d at
1071 ("It is no excuse that the prices fixed are themselves
reasonable.") (quoting Catalano, Inc. v. Target Sales, Inc., 446
U.S. 643, 647 (1980)) (internal quotation marks omitted).
Defendants do not dispute that the challenged rules embody
agreements among competitors that fix the prices of student-

United States District Court
For the Northern District of California

athlete compensation.  Accordingly, the Court cannot dismiss Defendants' "anticompetitive price-fixing agreement as benign," see id., simply because they contend that the fixed prices are more reasonable than they used to be.  See Associated Press v. United States, 326 U.S. 1, 16 n.15 (1945) ("[T]he Sherman Act cannot be evaded by good motives.") (citation and internal quotation marks omitted).

The material factual differences discussed above defeat Defendants' preclusion arguments and warrant examining the conduct challenged in this case under the Rule of Reason.  See Oltz v. St. Peter's Cmty. Hosp., 861 F.2d 1440, 1449 (9th Cir. 1988) ("The rule of reason requires an evaluation of each challenged restraint in light of the special circumstances involved.  That the analysis will differ from case to case is the essence of the rule.") (citation omitted).  Whether the challenged price-fixing conduct here is justified by a procompetitive effect must be proved, and not presumed.  See O'Bannon II, 802 F.3d at 1063–64.

In sum, because Plaintiffs raise new antitrust challenges to conduct affecting a different class, in a different time period, relating to rules and forms of compensation that are not the same as those challenged in O'Bannon, the claims in this case are not precluded by O'Bannon II.

III. The Rule of Reason

The Rule of Reason is intended for the analysis of "agreements whose competitive effect can only be evaluated by analyzing the facts peculiar to the business, the history of the restraint, and the reasons why it was imposed." Nat'l Soc. of Prof'l Eng's v. United States, 435 U.S. 679, 692 (1978).  "[T]he

United States District Court
For the Northern District of California

purpose of the analysis is to form a judgment about the competitive significance of the restraint; it is not to decide whether a policy favoring competition is in the public interest, or in the interest of the members of an industry." Id.; see also Cont'l T. V., Inc. v. GTE Sylvania Inc., 433 U.S. 36, 49 (1977) ("Under this rule, the factfinder weighs all of the circumstances of a case in deciding whether a restrictive practice should be prohibited as imposing an unreasonable restraint on competition.").

Several Ninth Circuit opinions have articulated burden-shifting schemes to apply the Rule of Reason. "Under the rule of reason burden-shifting scheme, plaintiffs first must 'delineate a relevant market and show that the defendant plays enough of a role in that market to impair competition significantly.'" Cnty. of Tuolumne, 236 F.3d at 1150 (citation omitted). Second, if the plaintiffs make that showing, the burden then shifts to the defendants to offer evidence that a legitimate procompetitive effect is produced by the challenged behavior. Id. Third, if the defendants do so, the burden then shifts back to the plaintiffs to demonstrate that there are less restrictive alternatives to the challenged conduct. Id. Finally, if the plaintiffs fail "to meet their burden of advancing viable less restrictive alternatives," the court then will "reach the balancing stage," wherein the court "must balance the harms and benefits" of the challenged conduct to determine whether it is "reasonable." Id. at 1160 (citing Phillip E. Areeda and Herbert Hovenkamp, Antitrust Law: An Analysis of Antitrust Principles and Their Application ¶ 1507b).

//

IV.   Rule of Reason: Market Definition

Plaintiffs first must show that the challenged conduct has significant anticompetitive effects in the relevant market. "Proof that defendant's activities had an impact upon competition in the relevant market is 'an absolutely essential element of the rule of reason case.'" Supermarket of Homes, Inc. v. San Fernando Valley Bd. of Realtors, 786 F.2d 1400, 1405 (9th Cir. 1986) (citation omitted).   The term "relevant market" in this context "encompasses notions of geography as well as product use, quality, and description.   The geographic market extends to the area of effective competition . . . where buyers can turn for alternative sources of supply.   The product market includes the pool of goods or services that enjoy reasonable interchangeability of use and cross-elasticity of demand." Tanaka v. Univ. of S. Cal., 252 F.3d 1059, 1063 (9th Cir. 2001) (citation and internal quotation marks omitted).

As discussed in the findings of fact, Plaintiffs produced sufficient evidence on summary judgment to establish the existence of a relevant market comprising national markets for Plaintiffs' labor in the form of athletic services in men's and women's Division I basketball and FBS football, wherein each class member participates in his or her sport-specific market.   In these markets, the class members sell their athletic services to the schools that participate in Division I basketball and FBS football in exchange for grants-in-aid and other compensation and benefits permitted by NCAA rules on top of grants-in-aid.   Because of the absence of any viable substitutes for Division I basketball and FBS football, Defendants hold monopsony power in all of these

markets and exercise that power to cap artificially the
compensation offered to recruits.  This is reflected in the high
degree of concentration found in the relevant market.  Class
members cannot obtain the same combination of a college education,
high-level television exposure, and opportunities to enter
professional sports other than from Division I schools.  See
O'Bannon I, 7 F. Supp. 3d at 965-68, 991-93 (finding relevant
market wherein Division I basketball and FBS football schools
compete to recruit elite football and basketball players);
O'Bannon II, 802 F.3d at 1056-57, 1070 (affirming relevant market
found in O'Bannon I on the ground that the NCAA did not "take
issue with the way that the district court defined" the relevant
market).

     During summary judgment proceedings, Defendants did not
request that the Court adopt an alternative market definition, or
point to any admissible evidence to create a genuine issue of
material of fact with respect to market definition.  Although
Defendants argued later that this Court should have considered or
adopted a multi-sided market definition, the Court rejected these
arguments on the ground that they were untimely, and on the ground
that the only evidence to support the belated multi-sided market
definition was inadmissible in any event.  See generally Order
Reaffirming Exclusion of Certain Expert Testimony by Dr. Elzinga,
Docket No. 1018.

V.   Rule of Reason: Anticompetitive Effects

     The requisite showing of significant anticompetitive effects
calls for evidence that "the activity is the type that restrains
trade and that the restraint is likely to be of significant

magnitude." Bhan v. NME Hosps., Inc., 929 F.2d 1404, 1413 (9th Cir. 1991). This can be done by showing that "the defendant plays enough of a role" in the relevant market "to impair competition significantly," or by showing that the challenged restraint "has actually produced significant anti-competitive effects," such as by restricting output or fixing a price. Id.; Board of Regents, 468 U.S. at 109 ("[W]hen there is an agreement not to compete in terms of price or output, 'no elaborate industry analysis is required to demonstrate the anticompetitive character of such an agreement.'") (citation omitted).

Because Defendants have near complete dominance of, and exercise monopsony power in, the relevant market, and because it is undisputed that the challenged restraints suppress competition and fix the price of student-athletes' services, the Court has found that the anticompetitive effects of the challenged rules are severe. On summary judgment, the Court found no genuine issue of material fact that the challenged rules cause significant anticompetitive effects in the relevant market. Plaintiffs produced sufficient evidence on summary judgment and at trial to show that the challenged rules amount to overt horizontal price-fixing among competitors, because they essentially eliminate price competition as to one key aspect of the recruitment of student-athletes in Division I basketball and FBS football, namely the price of the services of student-athletes. See Board of Regents, 468 U.S. at 100 (noting that horizontal price-fixing agreements have a "high" probability of resulting in anticompetitive effects and are "ordinarily condemned as a matter of law" under an illegal per se approach).

1    This evidence also established that the challenged rules harm

2    class members, because the rules deprive them of compensation they

3    would receive in the absence of the restraints.  See O'Bannon II,

4    802 F.3d at 1071 (holding that NCAA compensation rules have

5    anticompetitive effects because they "extinguish" one form of

6    competition among schools seeking to land recruits and deprive

7    student-athletes of compensation they would receive absent the

8    rules) (citation and internal quotation marks omitted).

9    VI.   Rule of Reason: Asserted Justifications for the Challenged
           Restraints
10

11   Because Plaintiffs have established that the challenged rules

12   restrain competition and have severe anticompetitive effects, the

13   burden shifts to Defendants to show that the challenged price-

14   fixing conduct "brings about some procompetitive effect in order

15   to justify it under the antitrust laws."  O'Bannon II, 802 F.3d at

16   1073 (emphasis omitted).

17   The only two asserted procompetitive justifications for the

18   challenged rules that survived summary judgment[41] are (1) that the

19   challenged rules promote amateurism, which in turn enhances

20   consumer demand for Division I basketball and FBS football; and

21   (2) that the challenged rules promote integration of student-

22   athletes with their academic communities, which in turn improves

23

24   _____
     [41] The Court will not consider arguments relating to
25   procompetitive justifications that it rejected on summary
     judgment.  See Summary Judgment Order at 23 n.7, Docket No. 804;
26   see also O'Bannon II 802 F.3d at 1072 (affirming the district
     court's rejection of competitive balance and increased output
27   procompetitive justifications because the NCAA "offered no
     meaningful argument that those findings were clearly erroneous").
28

United States District Court
For the Northern District of California

the quality of the college education that student-athletes receive for their athletic services.

A.   Consumer Demand for Amateurism

Defendants first contend that the challenged rules are procompetitive because they promote the principle of amateurism, which enhances consumer demand.  Defendants argue that consumers value amateurism, and that consumer demand for Division I basketball and FBS football would deteriorate if student-athletes received more compensation.  To support their contentions, Defendants rely on the expert opinions of Dr. Elzinga and Dr. Isaacson, and lay testimony by various NCAA, conference, and school administrators regarding the preferences of viewers of college sports.

As a threshold matter, it is important to recognize that the challenged limits on compensation cannot be deemed procompetitive simply because they promote or are consistent with amateurism.  To be procompetitive, the challenged rules must have some procompetitive effect on the relevant market.

Although their theory is that the challenged rules promote amateurism, Defendants did not offer an affirmative definition of amateurism.  While Defendants place great emphasis on the Principle of Amateurism, which is described in the Division I constitution, the principle does not mention or address compensation; nor does it prohibit or even discourage compensation.  Accordingly, no link appears between this principle and the challenged compensation limits.

Defendants argue that amateurism can be defined based on what it is not, namely, amateurism is not "pay for play."  But the

concept of "pay for play" does not help define amateurism because this term itself is undefined.

Defendants have not pointed to any NCAA bylaws that define amateurism, pay for play, or pay.  In the bylaws, "pay" is defined only indirectly, by way of a list of forms of compensation that the NCAA permits and does not permit.  A reading of these bylaws discloses no principled, articulable difference between amateurism and not amateurism, or "pay for play" and not "pay for play."  The only thing that can be inferred is that compensation constitutes "pay for play" or "pay" if the NCAA has decided to forbid it, and compensation is not "pay for play" or "pay" if the NCAA has decided to permit it.

The NCAA permits grants-in-aid up to the cost of attendance. In addition, student-athletes can receive cash or cash-equivalent compensation that exceeds the cost of attendance by thousands of dollars.  The NCAA permits schools and conferences to pay student-athletes awards for their performance in their sport, which can be paid in cash-equivalent Visa cards; student-athletes who reach high levels of competition can receive up to $5,600 in such awards in a school year.  Because these awards are directly correlated with athletic performance, they appear, on their face, to be "pay for play," and thus, inconsistent with amateurism as Defendants and their witnesses describe that term.  Yet, they are allowed. Also permissible are SAF payments in the thousands of dollars for varying purposes, including for $50,000 premiums for loss-of-value insurance against future loss of professional wages.

The NCAA permits schools to provide per diem payments to student-athletes for un-itemized expenses.  It also permits

United States District Court
For the Northern District of California

schools to pay for family members' travel expenses to attend
certain events; separately, the NCAA and the College Football
Playoff committee have paid thousands of dollars for family
members to travel to the Final Four, as well as the basketball and
FBS championships.  The NCAA allows outside organizations to
provide payments to certain student-athletes for their
performance; in the case of student-athletes who do well in the
Olympics or in international competitions, the payments that can
be provided under current NCAA rules are unlimited.

Some of the compensation and benefits above the cost of
attendance that the NCAA currently permits are related to
education.  For example, the NCAA permits schools to provide
student-athletes with funding for post-eligibility graduate school
at any institution, although this is capped at $10,000 per
student, two students per school, per year.  These are the Senior
Scholar Awards.  It also permits schools to pay, with SAF funds,
for education-related items and expenses, such as laptops and pre-
eligibility tutoring, that are not covered by the cost of
attendance.

An individual student-athlete could receive all of the
aforementioned forms of compensation, in combination, without
losing his or her status as an amateur or eligibility to play in
Division I sports.  When combined, this compensation can total
thousands and even tens of thousands of dollars above a full cost-
of-attendance grant-in-aid.  Again, the Court does not mean to
imply that these payments should not be made.  The point is that
student-athletes' receipt of this compensation in excess of the
cost of attendance, some of which is related to education and some

1  of which is not, has not led to a reduction in consumer demand for

2  college sports as a distinct product, which continues apace.

3      Defendants' only economics expert on consumer demand, Dr.

4  Elzinga, did not even attempt to examine whether a relationship

5  exists between compensation and consumer demand.  He opines that

6  this analysis is not possible because amateurism has always

7  existed and the NCAA has always enforced it; he also opines that

8  any such analysis would be unnecessary in any event because

9  amateurism is not about whether student-athletes receive specific

10  dollar amounts in compensation, but is instead about whether they

11  are paid to play, which is a concept that he does not define.  Dr.

12  Elzinga's opinions and assumptions are contrary to the record,

13  which shows that the NCAA has not always enforced amateurism

14  rules; that amateurism, and amounts of permissible student-athlete

15  compensation, have changed materially over time; and that the

16  amounts of compensation that student-athletes receive are very

17  relevant to the determination of whether a student-athlete is an

18  NCAA amateur or not, because the NCAA's limits on certain forms of

19  compensation are set based on specific dollar amounts for that

20  very purpose.  Accordingly, the Court found Dr. Elzinga's opinions

21  to be unconvincing.

22      Defendants attempted to establish a connection between

23  student-athlete compensation and consumer demand by way of the

24  opinions of their survey expert, Dr. Isaacson.  His opinions,

25  however, do not establish or suggest that a relationship exists

26  between the challenged rules and consumer demand.

27      The only economic analysis in the record that addresses the

28  impact of changes to student-athlete compensation on consumer

demand, that of Dr. Rascher, shows that recent increases in student-athlete compensation, related and unrelated to education, have not decreased consumer demand. Dr. Rascher concluded, in fact, that revenues, which are an indicator of demand, at the NCAA, conference, and school levels have increased since 2015, when class members' permissible compensation increased significantly as a result of the change to the grant-in-aid limit that year and the expansion or creation of other benefits that schools can provide on top of a full grant-in-aid. Accordingly, Dr. Rascher's findings suggest that additional increases in compensation would not reduce consumer demand.

Dr. Rascher's conclusions are corroborated by other evidence, including the opinions of Plaintiffs' survey expert, Dr. Poret, and some testimony from defense witnesses.

Dr. Poret specifically tested whether providing certain forms of additional compensation to student-athletes would affect future viewership or attendance of basketball and football. He concluded that viewership and attendance would not be negatively impacted if the scenarios he tested were implemented individually.

If limits on student-athlete compensation were necessary to maintain consumer demand, one would expect to see increases in compensation leading to decreases in consumer demand. The evidence described above shows that actual increases in compensation have not decreased demand, and it suggests that future increases in compensation likewise would not do so.

The challenged compensation limits do not appear to be set by the NCAA based on considerations of consumer demand. The NCAA's Rule 30(b)(6) witness, Kevin Lennon, testified that he does not

recall any instance in his more than thirty years with the organization in which a study on consumer demand was considered by the NCAA membership when making rules about compensation.

Defendants rely on lay witness testimony to try to establish a connection between the challenged compensation rules and consumer demand. Most of this testimony is predicated on personal opinion and conversations with unidentified fans of college sports with whom witnesses have spoken. Some of these witnesses testified that the challenged rules prevent conferences from setting different rules on student-athlete compensation based on their different values and resources; these witnesses posited that changing the challenged rules could negatively impact the consumer appeal of national tournaments and rivalries, or could result in conference realignment, all of which could negatively affect consumer demand for college sports. But this testimony is unsupported by the weight of the evidence, which shows that significant variance already exists among conferences in terms of student-athlete compensation schemes, resources, and performance, and that conference realignment has been frequent. None of this has negatively affected consumer demand or revenues.

Some witnesses testified that consumers enjoy college sports because of the difference between college sports and professional sports. Much of this difference is based on the fact that student-athletes are students playing for their school. But this does not in itself establish any connection between consumer demand and the challenged rules. Indeed, student-athletes would remain students even if their compensation were not limited by the challenged rules. See O'Bannon II, 802 F.3d at 1073 (concluding

United States District Court
For the Northern District of California

United States District Court
For the Northern District of California

that the opportunity to earn a higher education "would still be available to student-athletes if they were paid some compensation in addition to their athletic scholarships.  Nothing in the plaintiffs' prayer for compensation would make student-athletes something other than students and thereby impair their ability to become student-athletes").

Other distinctions between college and professional sports are the amounts and types of compensation players receive.  The distinction, currently, cannot be based on student-athletes receiving no compensation or benefits above the cost of attendance and professionals receiving large cash salaries, sometimes in the millions of dollars.  This is because student-athletes already receive moderate amounts in compensation and benefits on top of a grant-in-aid without affecting the distinction between college and professional sports.  Instead, the Court found that a distinction between college and professional sports arises from the fact that student-athletes do not receive unlimited cash payments, especially those unrelated to education, like those seen in professional sports leagues.

Accordingly, the Court found that, when compared with having no limits on compensation, some of the challenged compensation rules may have an effect on preserving consumer demand for college sports as distinct from professional sports to the extent that they prevent unlimited cash payments unrelated to education such as those seen in professional sports leagues.  As will be discussed in more detail in the next section, however, not all of the challenged rules in their current form are necessary to achieve this procompetitive effect, and there is a less

85

United States District Court
For the Northern District of California

restrictive alternative to the set of current challenged compensation restrictions.

The challenged compensation limits can be divided into three categories: (1) the limit on the grant-in-aid at not less than the cost of attendance; (2) compensation and benefits unrelated to education paid on top of a grant-in-aid; (3) compensation and benefits related to education provided on top of a grant-in-aid.

The Court found that the challenged limits in the first and second categories are procompetitive relative to having no limits, to the extent that they help maintain consumer demand for college sports as a distinct product by preventing unlimited cash payments unrelated to education.

As for the limits in the third category, only some have been have been shown to be procompetitive, namely limits on academic or graduation awards and incentives that are provided in cash or cash-equivalents.  These could become a vehicle for unlimited payments.  The Court found that limits or prohibitions on most other benefits related to education that can be provided on top of a grant-in-aid, such as those that limit tutoring, graduate school tuition, and paid internships, have not been shown to have an effect on enhancing consumer demand for college sports as a distinct product, because these limits are not necessary to prevent unlimited cash compensation unrelated to education. Educational benefits limited or prohibited by these rules are distinct from professional-level compensation because they have a connection to education, are paid to students, their value is inherently limited to their actual cost, and they can be provided in kind, not in cash.  Defendants have offered no cogent

explanation for why limits or prohibitions on these education-related benefits are necessary to preserve consumer demand. Some evidence instead suggests that the challenged limits on education-related compensation are arbitrary.[42]   Accordingly, because no procompetitive justification for limiting these education-related benefits has been shown, limits on these benefits cannot be included in a less restrictive alternative.

B.   Integration

Defendants contend that the challenged rules have a procompetitive effect because they promote the integration of student-athletes into their academic communities. Defendants posit that this integration improves the college education that student-athletes receive for their athletic services.

For this proffered justification to be viable, Defendants would have to establish (1) that the challenged rules promote integration, and (2) that integration has a procompetitive effect in the relevant market. As detailed in the findings of fact, Defendants did not meet their burden to show that the challenged rules have an effect on promoting integration. That alone defeats integration as a procompetitive justification.

---

[42] For example, when asked whether increasing the current limit on Senior Scholar Awards from two students per school to five students per school would render the awards inconsistent with amateurism, the NCAA's Rule 30(b)(6) witness, Kevin Lennon, provided no meaningful response other than to justify the current limit on the basis that the membership decided that limiting the awards to two students per school constituted a reasonable cap. Trial Tr. (Lennon) at 1551-53.   It could be raised from two to three.   Lennon Rule 30(b)(6) Dep. Tr. at 179.

United States District Court
For the Northern District of California

United States District Court
For the Northern District of California

The evidence shows that student-athletes benefit in various ways from the college education they receive, but Defendants have not shown that such benefits arise out of the challenged compensation limits.  Most of the benefits that student-athletes can gain from attending college are caused, instead, by the education itself and by other rules and policies, such as those relating to academic eligibility requirements, tutoring, academic support, living conditions, and the scheduling of athletic practice and events.  None of these rules and policies, which appear to be the driving force behind the integration that Defendants describe, are challenged here.  Accordingly, student-athletes would still enjoy the benefits caused by the latter rules and policies even if the challenged compensation limits were changed.

Defendants' expert, Dr. Heckman, conceded that additional compensation could improve outcomes for student-athletes, belying the notion that the challenged compensation limits, as they currently stand, are necessary to achieve positive student-athlete outcomes.  Additionally, other evidence shows that student-athlete achievement, as measured by graduation rates, has increased since 2015, when permissible athletics-related compensation increased.  This also suggests that the challenged compensation limits are not necessary to improve student-athlete academic outcomes.  This evidence also undermines Dr. Heckman's opinion that student-athletes would be incentivized to spend time on athletics to the detriment of academics if they received additional compensation.

United States District Court
For the Northern District of California

Defendants also rely on testimony positing that additional compensation for student-athletes would create a "wedge" between student-athletes and non-athletes, and even among student-athletes if any additional compensation provided were not distributed equally.  The NCAA advanced the same theory in O'Bannon I.  See 7 F. Supp. 3d at 980-81.  There, this Court found that certain limited restrictions on student-athlete compensation "may help" prevent a wedge between student-athletes and others on campus, see id. at 980, and the Ninth Circuit affirmed that finding, although it noted that, on appeal, the NCAA focused all of its arguments regarding a procompetitive justification on its amateurism theory.  O'Bannon II, 802 F.3d at 1059-60, 1072.

Here, the evidence that Defendants cite in support of their "wedge" theory is even weaker than that presented in O'Bannon I, and it also is directly contradicted by evidence that was not available at the time of O'Bannon I.  This shows that student-athlete compensation increased since 2015 and this greater compensation, which can reach thousands or tens of thousands of dollars above a full cost-of-attendance grant-in-aid, has not resulted in increased separation between student-athletes and other students.  This evidence distinguishes the factual record here regarding the "wedge" theory from the record in O'Bannon I, and it justifies a different conclusion with respect to the "wedge" theory and integration as a procompetitive justification. Divisions among students exist and are inevitable as a result of factors that are unrelated to the challenged rules.  Further, the challenged rules may create or exacerbate a wedge because they

result in some schools spending money that would otherwise go to student-athlete compensation on frills, like extravagant, athletes-only facilities.

Because Defendants failed to show that the challenged rules have an effect on promoting integration, Defendants' integration justification fails.

VII. Rule of Reason: Alternatives to the Challenged Restraints

Defendants have sufficiently shown a procompetitive effect of some aspects of the challenged compensation scheme.[43]  These are the cost-of-attendance limit on the grant-in-aid, the limits on compensation and benefits unrelated to education, and the limits on cash or cash-equivalent education-related awards and incentives for academic achievement or graduation.  The procompetitive effect of these caps is preventing unlimited, professional-level cash payments, unrelated to education, that could blur the distinction between college sports and professional sports and thereby negatively affect consumer demand for Division I basketball and FBS football.  Defendants, however, have not shown a procompetitive justification for caps on education-related benefits that are inherently limited by their actual cost and that can be provided in kind, not in cash, such as rules that limit scholarships for graduate school.

The burden shifts to Plaintiffs to show that there are substantially less restrictive alternative rules that would

---

[43] Because Defendants have not shown that the challenged rules can be justified on the ground that they promote integration, the Court does not consider whether any proffered less restrictive alternatives would promote integration.

United States District Court
For the Northern District of California

achieve the same procompetitive effect as the challenged set of rules.

Where a restraint "is patently and inexplicably stricter than is necessary to accomplish" demonstrated procompetitive objectives, "an antitrust court can and should invalidate it and order it replaced with a less restrictive alternative." O'Bannon II, 802 F.3d at 1075 (emphasis omitted).  To be viable, a less restrictive alternative must be "virtually as effective" in serving the established procompetitive effect of the challenged restraints, and its implementation must be achieved "without significantly increased cost."  See id. at 1074, 1076 n.19 (citation and internal quotation marks omitted).  In the context of NCAA rules limiting student-athlete compensation, a court must afford the NCAA "ample latitude" to superintend college athletics, and may not "use antitrust law to make marginal adjustments to broadly reasonable market restraints."  Id. at 1074-75 (citation and internal quotation marks omitted).

As discussed in the findings of fact, there is a less restrictive alternative to the set of challenged rules that meets these requirements.  Under these alternative rules, the NCAA can continue to cap the grant-in-aid at not less than the cost of attendance.  The NCAA can also continue to limit compensation and benefits, paid in addition to the cost of attendance, that are unrelated to education.  The association can continue to limit academic or graduation awards or incentives, provided in cash or cash-equivalent on top of a grant-in-aid, as long as the limit is

not less than the athletics participation awards limit.[44] A lower cap is not necessary to preserve consumer demand because athletics participation awards, at the current caps, have not been demand-reducing.  In fact, the NCAA considers these amounts consistent with amateurism.  While the NCAA could reduce the athletics participation awards limit in the future, it may not reduce academic or graduation awards or incentives to amounts lower than the current athletics participation awards limit.  The NCAA may increase athletics participation awards in the future, but it must increase any limits on academic or graduation awards and incentives so that such limits are never lower than the limit on athletics participation awards.

Defendants have not shown a procompetitive effect for NCAA rules that restrict inherently limited, non-cash, education-related benefits provided on top of a grant-in-aid.  Accordingly, such limits are not included in the less restrictive alternative rules.  The types of inherently limited education-related benefits that are uncapped as part of this alternative include those that currently are prohibited or limited in some fashion by the NCAA. These are listed in the findings of fact.

As discussed in the findings of fact, this alternative would be virtually as effective as the challenged set of rules in

---

[44] As discussed in the findings of fact, the athletics participation awards limit is the maximum amount of compensation that an individual student-athlete could receive in an academic school year in participation, championship, or special achievement awards (combined) under Division I Bylaw, Article 16, and listed in Figures 16-1, 16-2, and 16-3 of the 2018-2019 Division I Manual, J0024.

United States District Court
For the Northern District of California

preserving the same contribution to consumer demand for Division I
basketball and FBS football, as a product distinct from
professional sports, that the current NCAA compensation scheme
achieves.  This is because this alternative expands education-
related compensation and benefits only, and it does so in a way
that would not result in unlimited cash payments, untethered to
education, similar to those observed in professional sports.

This alternative also would not require significant new costs
to implement, because it eliminates NCAA caps on education-related
benefits.  This will eliminate the need to expend resources on
compliance and enforcement in connection with such caps.  To the
extent that the NCAA, conferences, or schools choose to regulate
compensation in any way that is permissible under this
alternative, they could employ existing rule-making,
interpretation, and enforcement structures to do so.  The NCAA
could assist conferences and schools in that undertaking, by
reallocating the resources it uses to enforce or interpret the
NCAA caps that this alternative eliminates, or otherwise.

The alternative adopted here is consistent with the teachings
of O'Bannon II.  As noted above, in that case, the Ninth Circuit
affirmed this Court's conclusion that the NCAA's compensation
limits relating to the use or licensing of NIL violated the
Sherman Act, and affirmed its order that the NCAA could not cap
compensation for student-athletes' NIL at an amount lower than the
cost of attendance.  The circuit court reasoned that (1) the
evidence in that case did not "suggest[] that consumers of college
sports would become less interested in those sports" if this
compensation were provided because it "would be going to cover

93

United States District Court
For the Northern District of California

1  [student-athletes'] 'legitimate costs' to attend school;" and (2)

2  the additional compensation "would have virtually no impact on

3  amateurism" as the NCAA defined the concept in that case.

4  O'Bannon II, 802 F.3d at 1074-75.  "By the NCAA's own standards,

5  student-athletes remain amateurs as long as any money paid to them

6  goes to cover legitimate educational expenses."  Id. at 1075.  The

7  circuit court, however, vacated this Court's order that the NCAA

8  could not limit the schools' compensation in trust to student-

9  athletes for their NIL at an amount lower than $5,000 per year.

10 The majority found that this Court erred in allowing student-

11 athletes to be paid cash untethered to their education expenses,

12 even if such payment was deferred, because that alternative would

13 not be "virtually as effective as the NCAA's current amateur-

14 status rule."  Id. at 1074.

15     The non-cash education-related benefits allowed here, like

16 the compensation approved by the court of appeal in O'Bannon II,

17 will go to cover legitimate education-related costs.  As in

18 O'Bannon II, there is no evidence here suggesting that uncapping

19 non-cash education-related benefits would negatively affect

20 consumers' interest in Division I basketball and FBS football.

21 According to defense witnesses, consumer demand for Division I

22 basketball and FBS football as distinct from professional sports

23 is driven by consumers' perception that student-athletes are

24 students.  See Board of Regents, 468 U.S. at 101-02 (noting that

25 "[t]he identification of this 'product' [college football] with an

26 academic tradition differentiates [it]" from professional sports).

27 Additional education-related benefits, if anything, would serve to

28 enhance student-athletes' connection to academics.  The natural

United States District Court
For the Northern District of California

experiments discussed in the findings of fact, as well as the
testimony of Plaintiffs' survey expert, Dr. Poret, and some
testimony by defense witnesses, also show that increasing
education-related compensation and benefits would not reduce
consumer demand for Division I basketball or FBS football.
Defendants and their witnesses agree that the types and amounts of
compensation that the NCAA currently permits schools to provide to
student-athletes on top of a grant-in-aid are consistent with what
they describe as amateurism.  Some of this currently permissible
compensation on top of a grant-in-aid, which can reach thousands
and even tens of thousands of dollars above the cost of
attendance, is related to education, and some is not.  It follows
that allowing limited non-cash education-related benefits on top
of a grant-in-aid is not inconsistent with what Defendants
describe as amateurism.

Nor is there evidence here that allowing limited academic
awards would negatively affect consumers' interest in Division I
basketball or FBS football.  The NCAA will be permitted to limit
academic and graduation awards and incentives that are provided in
cash or a cash-equivalent to a level that the record shows is not
demand-reducing or inconsistent with NCAA amateurism, namely the
level at which athletics participation awards, which are provided
in cash-equivalents, are capped by the NCAA.  The NCAA also will
be permitted to continue to limit grants-in-aid at not less than
the cost of attendance and limit compensation and benefits
unrelated to education.

Defendants rely heavily on the following language from
O'Bannon II: "The Rule of Reason requires that the NCAA permit its

schools to provide up to the cost of attendance to their student athletes.  It does not require more."  Id. at 1079.  But this language from O'Bannon II cannot be read to preemptively bar any Rule of Reason challenge to any NCAA rule that restricts or prohibits student-athlete compensation.  Such a broad reading would be inconsistent with the circuit court's statement elsewhere in the opinion that, under the Rule of Reason, the validity of each rule "must be proved, not presumed."  Id. at 1064.

Further, this statement was made in the context of the majority's disapproval of allowing deferred cash payments above the cost of attendance and "untethered to educational expenses." Id. at 1078.  Based on the evidence in that case, the majority held that paying student-athletes any amount of cash above the cost of attendance, if unrelated to education, would "vitiate their amateur status," id. at 1077, whereas including additional compensation in a grant-in-aid up to the cost of attendance would not.

New evidence presented in this case shows that payments above the cost of attendance do not vitiate student-athletes' NCAA amateur status, even when such payments are made in cash-equivalents, are unrelated to education, and can amount to thousands and even tens of thousands of dollars.  The NCAA permits student-athletes to receive, above the cost of attendance, cash-equivalent payments for their athletic performance directly from their schools and conferences, the cumulative value of which could reach $5,600 in an academic school year.  This evidence was not before the Ninth Circuit in O'Bannon II.  Moreover, the NCAA also currently permits a variety of other payments above the cost of

United States District Court
For the Northern District of California

United States District Court
For the Northern District of California

attendance that have no tether to education, such as payments of $50,000 premiums for loss-of-value insurance against loss of future professional wages, thousands of dollars of SAF and AEF monies that can be used in a wide variety of ways, and thousands of dollars of travel expenses for family members.  Defense witnesses have testified that these payments are not inconsistent with amateurism.  The economic analyses discussed above show that consumer demand has not been negatively affected.

The concern described in O'Bannon II that, if the line of paying cash, non-education-related compensation were crossed, there would be "no defined stopping point," id. at 1078-79, is inapplicable here.  The alternative being adopted would remove NCAA caps on education-related benefits only.  These benefits are inherently limited to their actual value, such as graduate school tuition.  Cash or cash-equivalent academic and graduation awards and incentives would be limited to the NCAA-approved amounts of athletics participation awards.  Thus, the alternative rules being adopted here do have a stopping point, and that stopping point falls within amateurism as Defendants described it in this case.

Under these less restrictive rules, the NCAA would retain the right to define these education-related benefits and to regulate how schools provide them to student-athletes.  For example, the NCAA could require schools to pay the cost of such benefits directly to the educational institution or provider from which the student-athletes will obtain the benefits.  In the case of education-related supplies, such as computers and science equipment, the NCAA could require schools to pay for these items

directly or to reimburse student-athletes for these expenses if
adequate proof of purchase is shown.

The adoption of this alternative set of rules also would not
significantly impact the NCAA's ability to superintend college
sports, because only a small fraction of the conduct that the NCAA
regulates would be affected.  The NCAA will otherwise remain free
to manage college sports as it wishes.

These alternative rules are less restrictive than the current
compensation rules, and therefore less harmful to competition in
the relevant market.  They will result in increased competition
among NCAA members and increased education-related compensation
for student-athletes.

VIII.   Balancing

As discussed above, the Court has found and concluded that
Plaintiffs have shown a less restrictive alternative to the
challenged rules.  Accordingly, the Court can impose its remedy
without weighing the anticompetitive effects of the challenged
restraints against their procompetitive benefits as a final
balancing consideration.

Several Ninth Circuit cases describe the balancing inquiry as
being necessary as a final consideration only if the court finds
no viable less restrictive alternative.  For example, in County of
Tuolumne, the Ninth Circuit explained that where "plaintiffs have
failed to meet their burden of advancing viable less restrictive
alternatives," a court then "reach[es] the balancing stage," where
it "must balance the harms and benefits of the [challenged
restraints] to determine whether they are reasonable."  236 F.3d
at 1160 (citing Areeda ¶ 1507b at 397).  Similarly, in Bhan, the

circuit court described the Rule-of-Reason inquiry as involving four steps, and noted that, after the third step in which a plaintiff must "try to show that any legitimate objectives can be achieved in a substantially less restrictive manner," "[f]inally, the court must weigh the harms and benefits to determine if the behavior is reasonable on balance." 929 F.2d at 1413 (citing Areeda ¶ 1502 at 371-72).

An argument can be made that balancing should be done at an earlier stage, and in the Ninth Circuit, the Rule of Reason inquiry has been described in varying ways. In Tanaka, the circuit court described it as involving three steps but also noted that a "restraint violates the rule of reason if the restraint's harm to competition outweighs its procompetitive effects." 252 F.3d at 1063. In Paladin Assocs., Inc. v. Mont. Power Co., the circuit court described the Rule of Reason inquiry as "determin[ing] whether the anticompetitive aspects of the challenged practice outweigh its procompetitive effects," without mentioning any burden-shifting steps. 328 F.3d 1145, 1156 (9th Cir. 2003). In Am. Ad Mgmt., Inc. v. GTE Corp., the court ruled, "The fact finder must balance the restraint and any justifications or pro-competitive effects of the restraint in order to determine whether the restraint is unreasonable." 92 F.3d 781, 791 (9th Cir. 1996) (citation, internal quotation marks, and emphasis omitted).

Some Supreme Court cases have described the Rule of Reason inquiry without mentioning a burden-shifting framework at all. See, e.g., Leegin Creative Leather Prods., Inc. v. PSKS, Inc., 551 U.S. 877, 885 (2007) (under the rule of reason, "the factfinder

weighs all of the circumstances of a case in deciding whether a restrictive practice should be prohibited as imposing an unreasonable restraint on competition") (citation and internal quotation marks omitted).

Thus, Supreme Court and Ninth Circuit cases have used various formulations of the Rule of Reason: three steps followed by balancing, four steps including balancing, balancing at the second step, or eschewing a burden-shifting test with defined steps altogether.  None of these cases has endorsed or required the use of any particular formulation over any other.

The Court is not persuaded by Defendants' contention that the mention of a three-step test by the Supreme Court in Ohio v. American Express Co., 138 S. Ct. 2274, 2284 (2018) (analyzing challenged restraints under the Rule of Reason using "a three-step, burden-shifting framework") and by the Ninth Circuit in O'Bannon II, 802 F.3d at 1060 (referring to the "third and final" step), means that the Rule of Reason analysis can end without balancing if a viable less restrictive alternative is not shown. Neither the Supreme Court nor the Ninth Circuit has so held.  In O'Bannon II, the Ninth Circuit found a less restrictive alternative was viable; accordingly, balancing as a final consideration was not necessary in that case.  See 802 F.3d at 1070.  The Supreme Court's rule-of-reason analysis in American Express did not reach the balancing stage either, because the plaintiffs had not satisfied their burden to show that the conduct at issue had anticompetitive effects.

As can be observed in many citations above, the Supreme Court and the Ninth Circuit frequently rely on the treatises and other

United States District Court
For the Northern District of California

writings of Phillip E. Areeda and Herbert Hovenkamp in cases involving the Sherman Act.  See, e.g., American Express, 138 S. Ct. at 2284 (citing Areeda & Hovenkamp).  These scholars have noted that a three-step burden-shifting framework and balancing "are hardly the same thing" because "the sequence of evidentiary steps, with its shifting burdens, is an attempt to avoid general balancing."  See Areeda & Hovenkamp ¶ 1507d.  Their view is that balancing is appropriate as a final consideration where no viable less restrictive alternative has been established.  See id. ("A better way to view balancing is as a last resort when the defendant has offered a procompetitive explanation for a prima facie anticompetitive restraint, but no less restrictive alternative has been shown . . . . The court must then determine whether the anticompetitive effects made in the prima facie case are sufficiently offset by the proffered defense.").

If no balancing were required at any point in the analysis, an egregious restraint with a minor procompetitive effect would have to be allowed to continue, merely because a qualifying less restrictive alternative was not shown.  In this case, however, the Court has found a viable less restrictive alternative and will enter its injunction accordingly.

IX.  Summary of Liability Determinations

For the reasons set forth above, the Court finds and concludes that the challenged rules, in their current form, unreasonably restrain trade in violation of Section 1 of the Sherman Act.  The challenged rules constitute horizontal price-fixing agreements enacted and enforced with monopsony power.  This essentially eliminates price competition as to one key aspect of

the recruitment of student-athletes in Division I basketball and
FBS football, namely the labor that goes into these sports.  As
such, the challenged rules harm student-athletes by depriving them
of compensation they otherwise would receive for their athletic
services.

Defendants failed to show that the challenged rules have an
effect on promoting integration of student-athletes and their
academic communities.  While Defendants have shown that limiting
student-athlete compensation has some effect in preserving
consumer demand for Division I basketball and FBS football as
compared with no limit, Plaintiffs have shown that not all of the
challenged rules are necessary to achieve this effect and that a
less restrictive alternative set of rules would be virtually as
effective as the set of challenged rules, without requiring
significant costs to implement.  The less restrictive alternative
would remove limitations on most education-related benefits
provided on top of a grant-in-aid, while allowing the NCAA to
limit cash or cash-equivalent awards or incentives for academic
achievement or graduation to the same extent it limits athletics
awards.  Limits on compensation and benefits that are not related
to education and a limit on the grant-in-aid at not less than the
cost of attendance would remain.

X.    Remedy

The Sherman Act grants the power to district courts to
"prevent and restrain violations" of Section 1.  15 U.S.C. § 4.
In accordance with the viable less restrictive alternative
discussed above, the NCAA may continue to limit the grant-in-aid
at not less than the cost of attendance, and to limit compensation

and benefits that are unrelated to education provided on top of a grant-in-aid.  The NCAA may also limit academic or graduation awards or incentives, provided in cash or cash-equivalent, as long as the limit imposed by the NCAA is not less than the athletics participation awards limit.

Current NCAA limits on other education-related benefits that can be provided on top of a grant-in-aid are invalidated.  The NCAA may not limit these benefits in the future.

Each conference will continue to be able to limit any compensation or benefits, including the education-related benefits that the NCAA will not be permitted to cap, as long as it does so independently from other conferences.  Schools will remain free to set limits on their own offers to student-athletes.

The NCAA will retain the right to define, in an exercise of discretion and good faith, education-related benefits and to regulate how schools provide them to student-athletes.  The NCAA may also assist conferences and schools in enforcing any conference rules limiting educational benefits.

The Court will herewith issue an injunction, which will take effect in ninety days but will be stayed pending the issuance of a mandate if a notice of appeal is timely filed.  The Court will retain jurisdiction over the enforcement and amendment of the injunction.

//

United States District Court
For the Northern District of California

United States District Court
For the Northern District of California

CONCLUSION

There is a great disparity between the extraordinary revenue that Defendants garner from Division I basketball and FBS football, and the modest benefits that class members receive in exchange for their participation in these sports relative to the value of their athletic services and the contributions they make. Class members contribute their elite talent and time, they limit their educational options, and they risk their long-term health to create enormous financial value for Defendants.

Restricting non-cash education-related benefits and academic awards that can be provided on top of a grant-in-aid has not been proven to be necessary to preserving consumer demand for Division I basketball and FBS football as a product distinct from professional sports. Allowing each conference and its member schools to provide additional education-related benefits without NCAA caps and prohibitions, as well as academic awards, will help ameliorate their anticompetitive effects and may provide some of the compensation student-athletes would have received absent Defendants' agreement to restrain trade.

The clerk shall enter judgment in favor of the Plaintiff class. Plaintiffs shall recover their costs from Defendants. The parties shall not file any post-trial motions based on arguments that have already been made.

IT IS SO ORDERED.

Dated: March 8, 2019

_____
Claudia Wilken
United States District Judge