Steve W. Berman (*pro hac vice*)
Craig R. Spiegel (SBN 122000)
Emilee N. Sisco (*pro hac vice*)
HAGENS BERMAN SOBOL SHAPIRO LLP
1918 Eighth Avenue, Suite 3300
Seattle, WA 98101
Telephone: (206) 623-7292
Facsimile:  (206) 623-0594
*steveb@hbsslaw.com*
*craigs@hbsslaw.com*
*emilees@hbsslaw.com*

Jeff D. Friedman (SBN 173886)
HAGENS BERMAN SOBOL SHAPIRO LLP
715 Hearst Avenue, Suite 202
Berkeley, CA 94710
Telephone: (510) 725-3000
Facsimile: (510) 725-3001
*jefff@hbsslaw.com*

Bruce L. Simon (SBN 96241)
Benjamin E. Shiftan (SBN 265767)
PEARSON, SIMON & WARSHAW, LLP
44 Montgomery Street, Suite 2450
San Francisco, CA 94104
Telephone:  (415) 433-9000
Facsimile:  (415) 433-9008
*bsimon@pswlaw.com*
*bshiftan@pswlaw.com*

*Class Counsel for Jenkins and Consolidated
Action Plaintiffs*

[Additional counsel listed on signature page]

Jeffrey L. Kessler (*pro hac vice*)
David G. Feher (*pro hac vice*)
David L. Greenspan (*pro hac vice*)
Joseph A. Litman (*pro hac vice*)
WINSTON & STRAWN LLP
200 Park Avenue
New York, NY 10166-4193
Telephone: (212) 294-6700
Facsimile: (212) 294-4700
*jkessler@winston.com*
*dfeher@winston.com*
*dgreenspan@winston.com*
*jlitman@winston.com*

Sean D. Meenan (SBN 260466)
Jeanifer E. Parsigian (SBN 289001)
WINSTON & STRAWN LLP
101 California Street
San Francisco, CA 94111
Telephone: (415) 591-1000
Facsimile: (415) 591-1400
*smeenan@winston.com*
*jparsigian@winston.com*

*Class Counsel for Jenkins and Consolidated
Action Plaintiffs*

**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

**OAKLAND DIVISION**

| | |
|---|---|
| IN RE: NATIONAL COLLEGIATE ATHLETIC ASSOCIATION ATHLETIC GRANT-IN-AID CAP ANTITRUST LITIGATION | **Case No. 4:14-md-2541-CW**<br><br>**NOTICE OF MOTION AND MOTION FOR ATTORNEYS' FEES, EXPENSES, AND SERVICE AWARDS** |
| This Document Relates to:<br><br>ALL ACTIONS EXCEPT<br>*Jenkins v. Nat'l Collegiate Athletic Ass'n*,<br>Case No. 14-cv-02758-CW | DATE:            April 30, 2019<br>TIME:            2:30 p.m.<br>COURTROOM:  Courtroom 6, 2d Floor |

**NOTICE OF MOTION**

PLEASE TAKE NOTICE that on April 30, 2019, at 2:30 p.m., in the courtroom of the Honorable Claudia Wilken of the United States District Court of the Northern District of California, located at 1301 Clay Street, Courtroom 6, Second Floor, Oakland, CA 94612, Plaintiffs will and hereby do move the Court for an order, pursuant to 15 U.S.C. § 26, Fed. R. Civ. P. 54(d), and Civil Local Rules 54-1 through -5:

1.      Awarding Plaintiffs' counsel $44,917,341.30 in attorneys' fees; and

2.      Approving reimbursement of $1,346,741.69 in expenses and costs incurred by Plaintiffs' counsel; and

3.      Approving service awards totaling $15,000 for each Plaintiff who testified at trial, and $10,000 for each of certain other Plaintiffs who participated in discovery and contributed to achieving this litigation victory by expending substantial time and effort.

This motion is based on this notice of motion, the accompanying memorandum of points and authorities, the declarations in support of the motion, argument by counsel at the hearing before this Court, any papers filed in reply, such oral and documentary evidence as may be presented at the hearing on this motion, and all papers and records on file in this matter.

**STATEMENT OF ISSUES**

1.      Plaintiffs' counsel has dedicated more than 51,000 hours in attorney and professional time to this matter over roughly five years, achieving a historic victory.  Counsel now seek attorneys' fees worth $44,917,341.30, which represents the value of time spent on this case, along with a modest multiplier of 1.5 that is more than justified by the degree of difficulty relative to the risk and investment undertaken by Plaintiffs' counsel and the value of the relief obtained for the Classes.  Should this Court approve the fee request as fair and reasonable under the statutory fee shifting provisions of the Clayton Act, 15 U.S.C. § 26?

2.      Plaintiffs' counsel has advanced $1,346,741.69 in out-of-pocket expenses in this litigation required for the successful prosecution of this case (excluding millions Plaintiffs' counsel spent on expert fees).  Should the Court approve reimbursement of this cost amount as fair and reasonable?

3.      Several Plaintiffs undertook significant risk and responsibilities in order to successfully bring and prosecute this action, investing tremendous time to help prepare the case, sit for depositions, produce documents, and, in the case of three of these Plaintiffs, testify at trial.  Should the Court approve service awards worth $15,000 for each of the Plaintiffs who testified at trial, and $10,000 for certain of the other Plaintiffs who assisted in the prosecution of this MDL?

# TABLE OF CONTENTS

**Page**

I.  INTRODUCTION ................................................................................................. 1

II. WORK UNDERTAKEN BY PLAINTIFFS' COUNSEL ..................................... 2

    A.  Pre-Filing Preparation ................................................................................ 3

    B.  Transfer and Coordination .......................................................................... 4

    C.  Defending Against the Initial Motion to Dismiss ....................................... 4

    D.  Defending Against the Rule 12(c) Motion for Judgment on the Pleadings ................. 4

    E.  Obtaining Injunctive Class Certification and Opposing the Rule 23(f) Petition .......... 5

    F.  Fact Discovery ............................................................................................ 5

    G.  Expert Discovery ........................................................................................ 8

    H.  Summary Judgment .................................................................................... 8

    I.  Pretrial Work ............................................................................................... 9

    J.  Trial and Judgment .................................................................................... 11

III. ARGUMENT ...................................................................................................... 13

    A.  Plaintiffs' Counsel's Hourly Rates Are Reasonable and Aligned with the Market ........ 15

    B.  Plaintiffs' Counsel's Rates Are Particularly Reasonable in Light of the Novelty and Difficulty Presented by This Litigation and High Risk of Non-Recovery ........ 16

    C.  Plaintiffs' Counsel's Total Hours Are Reasonable .................................... 18

    D.  Plaintiffs' Counsel's Costs and Expenses Are Reasonable and Typical ................... 20

    E.  The Risk Inherent to This Litigation and Exceptional Result Warrant the Modest 1.5 Multiplier Plaintiffs Seek .................... 21

    F.  Plaintiffs Who Testified at Trial and Participated Extensively in the Prosecution of the Case Should Receive Service Awards ................... 23

IV. CONCLUSION.................................................................................................... 25

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Alston v. NCAA, et al.*,
4:14-cv-01011-CW (N.D. Cal.) ............................................................................3

*In re AOL Time Warner Shareholder Derivative Litig.*,
2010 WL 363113 (S.D.N.Y. Feb. 1, 2010)........................................................14

*Auto. Prods. PLC v. Tilton Eng'g, Inc.*,
1993 WL 660146 (C.D. Cal. Nov. 18, 1993)....................................................20

*Auto. Prods. PLC v. Tilton Eng'g, Inc.*,
855 F. Supp. 1101 (C.D. Cal. 1994) ...............................................................20

*Azizian v. Federated Dep't Stores, Inc.*,
499 F.3d 950 (9th Cir. 2007) ...........................................................................13

*Bd. of Trustees v. Piedmont Lumber & Mill Co.*,
2016 WL 4446993 (N.D. Cal. Aug. 24, 2016) ................................................21

*Blackwell v. Foley*,
724 F.Supp.2d 1068 (N.D. Cal. 2010) ............................................................21

*In re Bluetooth Headset Prod. Liability Litig.*,
654 F.3d 935 (9th Cir. 2011) ....................................................................14, 21

*Blum v. Stenson*,
465 U.S. 886 (1984)...........................................................................................15

*Campbell v. Nat'l Passenger R.R. Corp.*,
718 F. Supp. 2d 1093 (N.D. Cal. 2010) ...........................................................14

*Costco Wholesale Corp. v. Hoen*,
538 F.3d 1128 (9th Cir. 2008) ...................................................................13, 23

*Davis v. Mason Cty.*,
927 F.2d 1473 (9th Cir. 1991), *cert denied*, 502 U.S. 899 (1991)..................15

*Dehoyos v. Allstate Corp.*,
240 F.R.D. 269 (W.D. Tex. 2007) ....................................................................15

*Doran v. Corte Madera Inn Best Western*,
360 F. Supp. 2d 1057 (N.D. Cal. 2005) ...........................................................14

*Frank Music Corp. v. Metro-Goldwyn-Mayer Inc.*,
886 F.2d 1545 (9th Cir. 1989) .........................................................................14

ii

*Hasbrouck v. Texaco, Inc.*,
  631 F. Supp. 258 (E.D. Wash. 1986), *aff'd in part, rev'd in part,* 879 F.2d 632
  (9th Cir. 1989)..................................................................................................................20

*Jenkins et al. v. NCAA, et al.*,
  3:14-cv-01678-FLW-LHG (D.N.J.)................................................................................3, 6, 24

*Jenkins v. Duke University*,
  Case No. 16-00052-UA-JEP (M.D.N.C., case filed 2016) ...........................................8

*Jenkins v. University of Notre Dame*,
  Case No. 16-cv-10228 (N.D. Ill., case filed 2016) .......................................................8

*Jordan v. Multnomah County*,
  815 F.2d 1258 (9th Cir. 1987) .....................................................................................14

*Kelly v. Wengler*,
  822 F.3d 1085 (9th Cir. 2016) .....................................................................................14

*Kim v. Space Pencil, Inc.*,
  2012 WL 5948951 (N.D. Cal. Nov. 28, 2012) .............................................................14

*Martin Jenkins, et al. v. National Collegiate Athletic Association, et al.*,
  C.A. No. 15-80219 (9th Cir.).........................................................................................5

*Morales v. City of San Rafael*,
  96 F.3d 359 (9th Cir. 1996) .........................................................................................14

*Moreno v. San Francisco Bay Area Rapid Transit District*,
  2019 WL 343472 (N.D. Cal. Jan. 28, 2019) ...............................................................24

*O'Bannon v. Nat'l Collegiate Athletic Ass'n*,
  739 Fed. App'x 890 (9th Cir. 2018) ...................................................................... *passim*

*O'Bannon v. NCAA*,
  802 F.3d 1049 (9th Cir. 2015) .....................................................................................17

*Pennsylvania v. Delaware Valley Citizens' Council for Clean Air*,
  478 U.S. 546 (1986)......................................................................................................14

*Rodriguez v. West Publ'g Corp.*,
  563 F.3d 948 (9th Cir. 2009) .......................................................................................23

*St. Louis Police Ret. Sys. v. Severson*,
  2014 WL 3945655 (N.D. Cal. Aug. 11, 2014) .............................................................14

*State of Ariz. v. Maricopa Cty. Med. Soc.*,
  578 F. Supp. 1262 (D. Ariz. 1984) ...............................................................................14

*Theme Promotions, Inc. v. News Am. Mktg. FSI, Inc*,
   731 F. Supp. 2d 937 (N.D. Cal. 2010) ...................................................................................13

*Trs. of the Constr. Indus. & Laborers Health & Welfare Trust v. Redland Ins. Co.*,
   460 F.3d 1253 (9th Cir. 2006) ...........................................................................................21

*Twin City Sportservice, Inc. v. Charles O. Finley & Co., Inc.*,
   676 F.2d 1291 (9th Cir. 1982) ...........................................................................................13

*U.S. Football League v. Nat'l Football League*,
   887 F.2d 408 (2d Cir. 1989)...............................................................................................20

*Vietnam Veterans of America v. Central Intelligence Agency*,
   2018 WL 4827397 (N.D. Cal. Oct. 4, 2018) (Wilken, J.)................................................24

*Weiss v. York Hosp.*,
   628 F. Supp. 1392 (M.D. Pa. 1986) ..................................................................................14

**Statutes**

15 U.S.C. §§ 12-27, 29 U.S.C. §§ 52-53 ................................................................... *passim*

28 U.S.C. § 1821 ................................................................................................................21

**Other Authorities**

Fed. R. Civ. P. 12(c) ............................................................................................................4

Fed. R. Civ. P. 23(b)(2)........................................................................................................5

Fed. R. Civ. P. 23(b)(3)....................................................................................................1, 2

Fed. R. Civ. P. 23(f) ......................................................................................................5, 17

Civil Local Rule 54.......................................................................................................13, 21

# I. INTRODUCTION

Following a ten-day bench trial, this Court became the first to rule that Defendants' restraints on the compensation that college athletes in the certified Classes may receive for their athletic services violate the antitrust laws. This issue has plagued college players in these sports without legal resolution for decades. The Court entered a permanent injunction invalidating the challenged NCAA rules to the extent that they limit the amount and type of education-related benefits and academic achievement awards that Class Members may receive. In so doing, this Court provided relief that offers Division I ("D-I") basketball and FBS football players a future where they will have the opportunity to be eligible to receive tens of thousands of dollars more in education-related benefits and awards each year than had been possible under Defendants' unlawful restraints. Indeed, Plaintiffs' expert economist Daniel Rascher has opined that the new education-related benefits that may now become available could, conservatively, be worth as much as $100,000 for individual Class Members over a four-year period, and as much as $235 million annually to the three Classes as a whole.[1]

Plaintiffs' counsel now seek to recover the reasonable fees and costs they poured into achieving this historic outcome on behalf of the injunctive classes.[2] Over five years, Plaintiffs invested $29,944,894.20 in attorneys' fees and advanced $1,346,741.69 in compensable costs to which they are now entitled under the Clayton Act's fee-shifting framework. As set out more fully below and in the accompanying declarations, Plaintiffs' fees are reasonable in light of the substantial defense resources (involving more than a dozen of the top law firms in the world) that they had to overcome, the difficulty and novelty of the many issues presented by this case, the enormous amount of factual discovery and expert work that was required to prosecute the claims, and the substantial economic value of the injunctive relief delivered to the Plaintiff Classes. To benchmark the reasonableness of these fees, Plaintiffs note that the successful injunctive-relief classes in *O'Bannon* were awarded

---

[1] Plaintiffs concurrently submit the expert declaration of Rascher estimating the likely economic value of the Court's permanent injunction to the three Classes. *See* Declaration of Daniel A. Rascher on Economic Value of Ordered Injunctive Relief, attached as Exhibit C to the Declaration of Jeffrey L. Kessler in Support of Motion for Attorneys' Fees and Expenses.

[2] Plaintiffs' counsel do not seek the recovery of any fees in conjunction with their work on behalf of the Rule 23(b)(3) damages classes, as such fees were previously awarded to the involved counsel out of the damages settlement.

$40,794,245.89 in lodestar fees[3]—roughly one-third more than what the injunctive-relief Classes incurred here.  In *O'Bannon*, however, the injunction was limited to the issues of NIL restraints, and thus did much less to bridge the "great disparity" between Class Members and Defendants that the Court addressed in this case after five years of hard-fought litigation.

Because of the significant risks and investments involved, as well as the substantial economic value of the injunctive relief obtained in this historic litigation, Plaintiffs also seek a modest lodestar multiplier of 1.5.  Such an enhancement is warranted to award the Classes' reasonable attorneys' fees given the purposes of the Clayton Act's fee-shifting provision, which is to encourage plaintiffs and their counsel to prosecute antitrust claims that cause serious anticompetitive harms, even when the costs of pursing such an action can be very large and come with a high risk of no recovery at all.  The risk here includes Plaintiffs' counsel's willingness to expend millions of dollars to retain the best experts for the Classes despite the fact that such fees are not taxable costs under the Clayton Act.  Applying the requested multiplier here would increase the fee award to $44,917,341.30—roughly what was sought in *O'Bannon*—for an outcome that will deliver much greater economic value for the Classes.  Allowing for a modest fee multiplier in such circumstances would help enforce the Clayton Act's policy to encourage private parties to invest in and successfully prosecute antitrust violations that benefit the public interest.

Finally, Plaintiffs seek reasonable incentive awards between $10,000 and $15,000 for Plaintiffs who contributed to achieving this litigation victory by expending substantial time and effort, and who also took on substantial risk to make this result possible for the benefit of the Classes. Furthermore, because these Plaintiffs are no long college athletes, the substantial economic value of the Court's injunction will not benefit them directly.

## II.    WORK UNDERTAKEN BY PLAINTIFFS' COUNSEL

The Court's judgment in Plaintiffs' favor[4] represents the culmination of more than 51,000 hours of work undertaken by Plaintiffs' counsel over five years of hard-fought litigation.[5]  The long

---

[3] *O'Bannon v. Nat'l Collegiate Athletic Ass'n*, 739 Fed. App'x 890, 892 (9th Cir. 2018).

[4] ECF No. 1164, Judgment in a Civil Case (entered on Mar. 12, 2019).

[5] To reiterate, no fees or costs are sought for Class Counsel's prosecution of the Rule 23(b)(3) damages case and settlement.

path to this outcome began with the formulation of the complaints, JPML coordination, and fighting off a motion to dismiss; it then proceeded through a heavily contested class certification process, followed by a motion for judgment on the pleadings; there was a two-year discovery period that involved the production and review of more than six million pages of documents, more than sixty fact depositions, reports and depositions involving eight different experts; then cross motions for summary judgment, *Daubert* motions, and ultimately a ten-day trial.  During this five-year period, Defendants were represented by more than a dozen of the best law firms in the world, and they aggressively litigated every issue on behalf of their clients.  Meeting the demands necessary to overcome this massive defense, Plaintiffs' counsel was required to invest extensive resources to secure a historic victory.

### A.    Pre-Filing Preparation

Plaintiffs' counsel filed complaints in this action in March 2014, but the work required to initiate the case began earlier.  To prepare this case before filing, counsel:

- Researched the commercial landscape surrounding D-I basketball and FBS football, along with the relationships between the NCAA, Conference Defendants, member schools, and their business partners;

- Analyzed legal theories and prospective remedies;

- Consulted with experts to discuss various issues that would be presented in the case, including relevant markets and less restrictive alternatives;

- Gathered public information and statements from Defendants and their member schools;

- Interviewed college athletes and prospective lead plaintiffs; and

- Conferred with advocacy groups and other college-sports stakeholders to seek their advice on the litigation.[6]

Only after completing this extensive preparation and due diligence did Plaintiffs file their complaints.[7]

---

[6] Kessler Decl. ¶ 5; Simon Decl. ¶ 8; Berman Decl. ¶ 9; Pritzker Decl. ¶ 12.

[7] ECF No. 1, Complaint, *Alston v. NCAA*, 4:14-cv-01011-CW (N.D. Cal.); ECF No. 1, Complaint, *Jenkins v. NCAA*, 3:14-cv-01678-FLW-LHG (D.N.J.).

### B.   Transfer and Coordination

Plaintiffs' two original complaints and several tagalong actions were transferred to this Court for coordination by the United States Judicial Panel on Multidistrict Litigation ("JPML") in June 2014.[8] Prior to the JPML Order, the parties briefed several transfer issues, including whether the cases were suitable for coordination, and which court would be an appropriate transferee forum.[9]

### C.   Defending Against the Initial Motion to Dismiss

Following the JPML Order transferring and coordinating Plaintiffs' cases before this Court, Defendants filed a motion to dismiss the complaints, arguing that Plaintiffs, "[i]n light of this Court's ruling in *O'Bannon*, . . . [could not] show that they [were] entitled to the relief they [sought,]" and that earlier decisions established that ". . . rules prohibiting the payment of wages or salaries to student-athletes for participation in their chosen sport, are lawful under the antitrust laws."[10]  In response, Plaintiffs filed briefs and presented arguments that demonstrated that their claims were very different from those in *O'Bannon*,[11] and that the restraints at issue were neither procompetitive as a matter of law nor immune from antitrust scrutiny.[12]  The Court denied Defendants' motion.[13]

### D.   Defending Against the Rule 12(c) Motion for Judgment on the Pleadings

Defendants reprised their *O'Bannon* argument in a Motion for Judgment on the Pleadings, asserting that Plaintiffs' claims in this case were identical to those in *O'Bannon* and that both *stare decisis* and collateral estoppel barred the requested injunctive relief.[14]  The Court again rejected these defenses[15] after Plaintiffs briefed and argued the issues.[16]

---

[8] *See* ECF No. 1, JPML Transfer Order ("JPML Order").

[9] *See, e.g.*, *id.* at 1 ("Several groups of defendants also oppose centralization. . . . Alternatively, the defendants propose the Southern District of Indiana as the transferee forum.")

[10] ECF No. 89, Notice of Mot. and Mem. of P. & A. ISO Mot. to Dismiss the Compls., at 6, 11.

[11] The distinction between Plaintiffs' claims and those litigated in *O'Bannon* was one that Defendants continually insisted on litigating over the ensuing course of this case, despite repeated rulings by this Court rejecting their arguments.  *See, e.g.*, *infra* §§ II.D, II.E.

[12] *See* ECF No. 94, Pls.' Opp'n. to Mot. to Dismiss with Prejudice; ECF No. 98, Pls.' Opp'n. to Defs.' Mot. to Dismiss.

[13] ECF No. 131, Order Denying Mot. to Dismiss.

[14] ECF No. 373, Defs.' Mot. for J. on the Pleadings and Mem. of P. & A. in Supp. Thereof.

[15] ECF No. 459, Order Denying Mot. for J. on the Pleadings.

[16] ECF No. 396, Pls.' Mem. of P. & A. in Opp'n to Defs.' Mot. for J. on the Pleadings.

### E. Obtaining Injunctive Class Certification and Opposing the Rule 23(f) Petition

Plaintiffs' counsel was required to put considerable effort into certifying the injunctive-relief classes pursuant to Fed. R. Civ. P. 23(b)(2). Plaintiffs not only filed briefs to support class certification, but also submitted two additional briefs to address Defendants' arguments that *O'Bannon* precluded the relief sought in this matter.[17] In addition, Plaintiffs concluded it was necessary to depose the expert retained by Defendants to oppose class certification, to submit three rebuttal expert reports in support of class certification, and to defend the depositions of Plaintiffs' experts. All Plaintiffs' counsel collaborated to ensure coordination and efficiency. The Court certified the injunctive-relief Classes on December 4, 2015.[18]

Despite the extensive briefing and expert discovery that informed the Court's class-certification decision, Defendants sought interlocutory relief from the Ninth Circuit Court of Appeals to appeal the certification ruling pursuant to Fed. R. Civ. P. 23(f).[19] Defendants contended that intra-class conflicts precluded certification, and (once again) argued that *O'Bannon* made the injunctive relief sought by the classes unavailable.[20] Plaintiffs filed a response opposing the petition,[21] and the Ninth Circuit denied Defendants' request,[22] allowing this matter to proceed as a certified class action.

### F. Fact Discovery

Fact discovery in this case lasted more than two years and was gargantuan in breadth given the twelve Defendants, the scope of the claims, the need for significant third-party discovery, and the very complicated factual issues that had to be addressed. Plaintiffs' counsel's work included:

- **Document Production**: Plaintiffs' counsel propounded multiple document requests on Defendants and third parties that yielded more than *680,000 total documents* spanning

---

[17] *See* ECF No. 291, Pls.' Joint Br. Re Coordination and Impact of Ninth Circuit Ruling; ECF No. 302, Pls.' Joint Reply Re Coordination and Impact of Ninth Circuit Ruling.

[18] ECF No. 305, Order Granting Mot. for Rule 23(b)(2) Class Certification.

[19] *See Jenkins v. Nat'l Collegiate Athletic Ass'n*, C.A. No. 15-80219 (9th Cir.).

[20] ECF Nos. 1-3, Defs.-Pets.' Pet. for Permission to Appeal from Order Granting Class Certification, *Jenkins v. Nat'l Collegiate Athletic Ass'n*, C.A. No. 15-80219 (9th Cir.).

[21] ECF No. 7, Pls.-Resps.' Opp'n to Defs.-Pets.' Pet. for Permission to Appeal from Order Granting Class Certification, *Jenkins v. Nat'l Collegiate Athletic Ass'n* , C.A. No. 15-80219 (9th Cir.)

[22] ECF No. 12, Order.

more than *6 million pages*.[23]  Reviewing this material was a tremendous undertaking that required careful coordination among Plaintiffs' counsel and lasted through the close of discovery.[24]  Likewise, Plaintiffs' counsel also had to work with Plaintiffs to gather information and documents responsive to Defendants' document requests.[25]  Throughout the discovery period, Plaintiffs' counsel met and conferred extensively with Defendants and third parties to negotiate details regarding document production protocols, including the form of specific search terms, the names of custodians, and even which phrases and sentences could be redacted in produced documents pursuant to the protective order that was negotiated by the parties and ordered by the Court.[26]

- **Interrogatories**: The parties exchanged several rounds of interrogatories that were instrumental in narrowing the issues in the case, such as Plaintiffs' request for Defendants to identify their claimed procompetitive justifications—an issue that became central to part of the Court's summary judgment ruling and thus shaped the scope of the  trial.[27]  Another example is provided by Plaintiffs' contention interrogatory responses that identified the specific NCAA rules being challenged and the forms of injunctive relief being sought.[28]  Further, in reviewing Defendants' responses to Plaintiffs' interrogatory requests, Plaintiffs' Counsel was required to analyze thousands of pages of documents.  For instance, Defendant Southeastern Conference, alone, responded to just three of Plaintiffs' interrogatory requests in its Second Set of Interrogatories to all Defendants by listing 1,060 Bates-numbered documents, which Plaintiffs' counsel took the necessary time to analyze.[29]  But this exercise was multiplied across all Defendants, and is illustrative of the scope and

---

[23] Kessler Decl. ¶ 9; Simon Decl. ¶ 27; Berman Decl. ¶ 15.

[24] Kessler Decl. ¶¶ 9-11.

[25] *Id.* ¶ 7.

[26] *Id.*

[27] ECF No. 804, Order Granting in Part and Denying in Part Cross-Mots. for Summ. J ("MSJ Order"), at 19-25.

[28] *See* Sept. 19, 2016 Consolidated Amended Complaint Plaintiffs' Responses to Defendant NCAA's Second Set of Interrogatories at 4-12; Feb. 7, 2017 Consolidated Amended Complaint Plaintiffs' Amended Responses to NCAA's Second Set of Interrogatories at 1-2.

[29] Defendant Southeastern Conference's Second Amended and Supplemental Responses and Objections to Consolidated & *Jenkins* Plaintiffs' Second Set of Interrogatories to all Defendants.

scale of the work that Plaintiffs' counsel was required to undertake to succeed.

- **Party and Non-Party Fact Depositions**:  Plaintiffs took more than sixty fact depositions and defended nine more in this case.[30]  The deponents questioned by Plaintiffs' counsel included NCAA President Mark Emmert; the various commissioners of the Conference Defendants, including Pac-12 President Larry Scott and American Athletic President Mike Aresco; university presidents, such as Wake Forest University's Nathan Hatch; university athletic directors, such as Ohio State University's Eugene Smith; and stakeholders and experts in college sports, such as ESPN college-basketball analyst Jay Bilas.[31]  Included among this tally were the 30(b)(6) depositions of each Defendant, which also involved an extensive meet and confer process involving multiple rounds of negotiations.  The NCAA at one point also refused to agree that Plaintiffs could ask the NCAA's 30(b)(6) about the factual bases for the NCAA's proffered procompetitive justifications.  As a result, Plaintiffs were required to bring this dispute to Judge Cousins, who granted the motion.[32]

- **Financial Documents and Contracts**: Among the most relevant documents produced in the case were Defendants' and third-parties' financial documents and contracts, including conference and NCAA financial statements and television broadcast agreements.  Though the parties ultimately negotiated the production of these documents,[33] Defendants and third-parties fought aggressively to limit or defeat Plaintiffs' requests for this information. On multiple occasions, Defendants' production refusals required the parties to litigate a resolution before Judge Cousins.[34]  Likewise, Plaintiffs were forced to litigate with multiple subpoenaed third-parties that would not produce relevant documents absent judicial mandate.  Plaintiffs thus found it necessary to file motions to compel production from  certain of the Defendants, from their network television partners, and from the

---

[30] Kessler Decl. ¶ 13.

[31] *Id.*; Simon Decl. ¶¶ 8, 24; Berman Decl. ¶ 6.

[32] *See* ECF No. 273, Order Granting Pls.' Mot. to Compel Deposition on Rule 30(b)(6) "Topic 10."

[33] *See, e.g.*, Kessler Decl. ¶ 8 (Plaintiffs negotiated production agreement with Pac-12 and several other Defendants).

[34] *See, e.g.*, *id.* ¶ 12.

University of Notre Dame and Duke University (which required motion practice in Illinois and North Carolina, in addition to this District).[35]

### G.  Expert Discovery

The parties retained eight different testifying experts (Rascher, Noll, Lazear, and Poret for the Plaintiffs; Elzinga, Heckman, Ordover, and Isaacson for the Defendants), who produced extensive expert reports relating to either class certification, merits issues, or both.  In total, the parties' experts drafted eighteen expert reports, covering 2,850 pages; testified at eleven depositions; and submitted nine expert direct declarations and replies for trial, totaling 1,533 pages.  In addition, six experts provided live trial testimony, and all of this required substantial efforts by Plaintiffs' counsel to both defend Plaintiffs' experts and cross-examine Defendants' experts.

### H.  Summary Judgment

Upon the close of discovery, Plaintiffs and Defendants cross-moved for summary judgment. As noted above,[36] Plaintiffs reviewed the voluminous discovery record that was developed over more than two years and presented extensive briefs and arguments both in support of their motion for summary judgment and in opposition to the summary judgment motions of Defendants.  There was also extensive briefing and argument on various *Daubert* motions.[37]  Plaintiffs defeated Defendants' summary judgment motion in its entirety, and also defeated Defendants' *Daubert* motions except in minor respects.[38]  By contrast, the Court granted Plaintiffs' motion for summary judgment in significant part, holding that there was no genuine issue of material fact that Defendants' challenged rules constituted agreements that produced significant anticompetitive effects in the relevant market; that Defendants had failed to adequately present evidence to raise a genuine issue of material fact in support of all but two of their putative procompetitive justifications; and that the focus of trial would

---

[35] See ECF No. 311, Joint Statement re Motion to Compel Financial Records; *Jenkins v. Duke University*, Case No. 16-00052-UA-JEP (M.D.N.C., case filed 2016); *Jenkins v. University of Notre Dame*, Case No. 16-cv-10228 (N.D. Ill., case filed 2016).

[36] *Supra* § II.F.

[37] *See* ECF Nos. 704, 807, 809-52.

[38] *See* ECF No. 804, MSJ Order; ECF No. 815, Order on Mots. to Exclude Proposed Expert Testimony ("*Daubert* Order").

be on whether "amateurism" and "integration" had any procompetitive effect.[39]   The Court also granted Plaintiffs' *Daubert* motion to strike a significant portion of Elzinga's proffered testimony.[40]

## I.  Pretrial Work

In the months preceding trial, Plaintiffs' counsel undertook the monumental task of preparing all facets of Plaintiffs' case for trial.  The pretrial process was intensified by an expedited schedule set to accommodate defense counsel after lead lawyers for the NCAA and Conference Defendants represented that incurable conflicts necessitated that any trial held in 2018—which was necessary to provide relief to Class Members from ongoing harm—begin as soon as practicable rather than in December as the Court initially ordered.[41]   The wide range of complex pretrial tasks that thus had to be concluded in just a few months included:

- **Deposition Designations:**  Over the course of several months, Plaintiffs' counsel reviewed all deposition transcripts and identified testimony that it wished to designate for trial. Plaintiffs' counsel also reviewed Defendants' deposition designations, identified counter-designations to the designations made by Defendants, and identified objections to Defendants' designations.  As part of this process, Plaintiffs' counsel prepared for and participated in an extensive meet-and-confer process with Defendants to discuss objections and narrow the issues.[42]   Ultimately, thirty-seven witnesses' testimony was submitted to the Court by deposition.

- **Motions in *Limine*:**  Plaintiffs' counsel filed an omnibus brief containing four motions in *limine*, submitted oppositions to Defendants' four motions in *limine*, and ultimately argued in support for its positions before Judge Wilken at the pretrial conference.[43]

- **Trial Exhibit Lists:**  Plaintiffs' counsel spent significant time identifying the most pertinent documents to include on its exhibit list for trial and negotiating about

---

[39] MSJ Order at 18-19, 22-25, 34-35.

[40] *See* ECF No. 815, *Daubert* Order.

[41] *See* ECF No. 818, Joint Case Management Statement at 4-6.

[42] Kessler Decl. ¶ 16; Simon Decl. ¶¶ 31-37; Berman Decl. ¶ 15.

[43] *See* ECF No. 883, Plaintiffs' Motions *in Limine*; ECF No. 901, Plaintiffs' Opposition to Defendants' Motions *in Limine*.

admissibility.  Defendants' counsel sent multiple drafts of its exhibit list: first sending a draft of 1,024 exhibits; then supplementing their initial draft to reach 1,067 exhibits; later submitting a revised exhibit list with 446 exhibits following the pretrial conference; then exchanging an exhibit list of 548 exhibits; later adding to the exhibit list for a total of 565 exhibits; and finally submitting 622 exhibits for trial.  Plaintiffs filed only 285 exhibits based on the extensive pre-trial work it conducted to identify the most relevant evidence for efficiently presenting their case to the Court at trial.  And as part of revising the final trial exhibit list, Plaintiffs' counsel worked with Defendants' counsel to submit a joint exhibit list of 45 exhibits.  In order to properly prepare for trial, as well as to participate in the meet-and-confer process to address objections, Plaintiffs' counsel was required to devote many hours reviewing Defendants' very large proposed exhibit lists even though most of those exhibits would never be offered at trial.[44]

- **Opening Statements:**  In accordance with the pretrial order requiring the parties to submit their respective opening statements in writing, Plaintiffs spent significant time drafting a forty-seven-page opening statement brief.[45]

- **Expert Direct Testimony:**  Also in accordance with the Court's Pretrial Order, Plaintiffs' counsel assisted in preparing and filing the direct testimony of Plaintiffs' three experts, Poret, Noll, and Rascher.[46]

- **Witness Preparation:**  Throughout the months preceding the ten-day trial, Plaintiffs' counsel worked diligently to prepare for direct questioning of Plaintiffs' fact witnesses, redirect examination of their three expert witnesses, cross-examination of the thirteen individuals listed on Defendants' fact witness list, and cross-examination of Defendants' three expert witnesses.[47]

---

[44] Kessler Decl. ¶ 16; Simon Decl. ¶¶ 27-30; Berman Decl. ¶ 15.

[45] ECF No. 1014, Corrected Pls.' Opening Argument Modified to Reflect Final Trial Exhibit Numbers.

[46] ECF No. 1017, Direct Testimony of Dr. Daniel A. Rascher; ECF No. 1020-1, ECF No. 1020-2, Corrected Direct and Rebuttal Testimony of Dr. Roger G. Noll to Reflect Final Trial Exhibit Numbers; ECF No. 1044, Corrected Direct and Rebuttal Testimony of Hal Poret to Reflect Final Trial Exhibit Numbers.

[47] Kessler Decl. ¶ 16; Simon Decl. ¶¶ 41-46; Berman Decl. ¶ 18; Pritzker Decl. ¶¶ 12, 22.

- **Other Miscellaneous Tasks and Motion Practice**:  There were a substantial number of additional tasks Plaintiffs' counsel undertook in preparation for trial, including moving to compel—and taking—court-ordered depositions of four of Defendants' intended live witnesses who were not previously disclosed, opposing Defendants' motion for a continuance, opposing Defendants' post-trial submission of a witness proffer, and submitting motions regarding the scope and parameters of the trial.[48]

## J.   Trial and Judgment

Plaintiffs ultimately prevailed in this case following a ten-day bench trial.  Preparation and prosecution of the case at trial was round-the-clock and intense, as is to be expected in a complicated antitrust litigation, and particularly in one where Plaintiffs' counsel was presented with an aggressive defense by more than a dozen top law firms, many with multiple or even significant numbers of attorneys attending trial each day at counsel table and in the gallery.  Plaintiffs estimate that, on average, roughly two dozen defense attorneys attended trial on a daily basis.  Plaintiffs' counsel relied on a much smaller trial team to promote efficiency and effective presentation, with around twelve lawyers attending trial depending on the day.[49]  The trial included nine expert direct declarations and cross-examinations, thirty-seven submitted sets of deposition designations, eighteen live witnesses, and 952 exhibits contained on the lists submitted for trial (with 133 admitted into evidence).[50]

Following the trial, closing statements were submitted by each side.  Plaintiffs' statements totaled sixty pages in two different submissions.[51]  Defendants filed both a closing statement and a motion to strike, which Plaintiffs responded to.[52]  At the final hearing convened by the Court, Plaintiffs addressed numerous issues, including questions about the scope of relief, legal arguments raised in Defendants' closing brief, and Defendants' motion to strike.

On March 8, 2019, the Court issued its trial judgment, and Plaintiffs achieved a historic and

---

[48] *See, e.g.*, ECF Nos. 813; 841; 971; 1008.

[49] *See, e.g.*, Kessler Decl. ¶ 16; Simon Decl. ¶ 50; Pritzker Decl. ¶ 12.

[50] *See, generally*, ECF Nos. 1038-1041, 1060-1063, 1066, 1067.

[51] ECF No. 1129, Pls.' Closing Argument Reply; ECF No. 1155-1, Pls.' Closing Argument.

[52] ECF Nos. 1125, Defs.' Motion to Strike; ECF No. 1128, Defs.' Closing Argument; ECF No. 1130, Pls.' Opp'n to Defs.' Motion to Strike.

substantial judgment.  Among other things, the Court ruled:  "Restricting non-cash education-related benefits and academic awards that can be provided on top of a grant-in-aid has not been proven to be necessary to preserving consumer demand for Division I basketball and FBS football as a product distinct from professional sports."[53]  The Court held that Defendants' agreement to restrain trade creates "a great disparity between the extraordinary revenue that Defendants garner from Division I basketball and FBS football, and the modest benefits that class members receive in exchange for their participation in these sports relative to the value their athletic services and the contributions they make."[54]  The Court entered a permanent injunction against the challenged NCAA restraints to the extent that they limited education-related benefits or cash academic-achievement awards up to the amounts that the NCAA permitted for all athletic participation awards.[55]  Not only did the Court conclude that the evidence of new facts developed since 2015 demonstrated that "current limits on student-athlete compensation [were] not necessary to preserve consumer demand,"[56] it also found that "support for the Court's finding with respect to integration in *O'Bannon I* was weak, and it is weaker now," and concluded that there was insufficient support at trial for Defendants' claim that "the challenged rules [were] justified based on [the integration] theory."[57]

At the trial, Plaintiffs proposed three alternative injunctions.  While the first preferred form of injunction by the Plaintiffs was not granted, the injunction that the Court imposed was a modification of one of the other two.[58]  As set forth in the accompanying expert declaration of Rascher, the economic value of the relief provided by this injunction to the three Classes is substantial, with the potential for an individual to receive tens of thousands of dollars in new education-related benefits each year, and for the Classes, as a whole, to receive more than $200 million in new benefits yearly.[59]

Rascher's conservative estimate is that an individual Class Member could receive in the future more than $15,000 annually in new cash incentives for academic achievement ($60,000 over four

---

[53] ECF No. 1162, Findings of Fact and Conclusions of Law at 104.
[54] *Id.*
[55] ECF No. 1163, Permanent Injunction.
[56] ECF No. 1162, Findings of Fact and Conclusions of Law at 29.
[57] *Id.* at 52.
[58] *See* ECF No. 1163, Permanent Injunction; ECF No. 1162, at 55-64.
[59] Rascher Decl. ¶¶ 3, 63.

years), and thousands more in additional education-related benefits that could be worth $100,000 or more over four years.[60]  Depending on individual and school choices, some Class Members might even receive benefits worth $200,000 if, for example, they pursue medical school or other graduate school on full scholarship.[61]  On a Class-wide basis, Rascher estimates that the economic value of the injunction for the three Classes could range between $187 million and $235 million per year.[62]

### III.   ARGUMENT

The Clayton Antitrust Act, 15 U.S.C. § 26, provides that "[a]ny person, *firm*, corporation, or association shall be entitled to sue for and have injunctive relief, in any court of the United States having jurisdiction over the parties, against threatened loss or damage by a violation of the antitrust laws, including sections 13, 14, 18, and 19 of this title . . . .  In any action under this section in which the plaintiff substantially prevails, the court shall award the cost of suit, including a reasonable attorney's fee, to such plaintiff."  The policy behind this fee-shifting provision is to incentivize plaintiffs and their counsel to undertake the enormous expense and effort required to prosecute antitrust violations that harm the public, as well as to deter others from violating the antitrust laws.[63]

Local Civil Rules 54-1 through -5 also inform the Court in considering a motion for attorneys' fees and a bill of costs from a prevailing party following a judgment.  As the Ninth Circuit has explained, a determination of what should be part of an award of reasonable fees and costs includes "every item of service which, at the time rendered, would have been undertaken by a reasonable and prudent lawyer to advance or protect his client's interest . . . ."[64]

An award of attorney's fees and costs is mandatory under 15 U.S.C. § 26.  As noted above, this requirement of the Clayton Act is designed to incentivize private enforcement of the antitrust laws and

---

[60] *Id.* ¶¶ 3, 65.

[61] *Id.* ¶ 64.

[62] *Id.* ¶¶ 3, 63.

[63] *Costco Wholesale Corp.*, 538 F.3d 1128, 1136-37 (9th Cir. 2008) ("Congress made fee awards mandatory under § 26 to encourage private parties to bring and maintain meritorious antitrust injunction cases.  Mandatory awards were seen as necessary to protect the injunction-seeking plaintiff's financial incentive to file suit because antitrust cases are normally very expensive to bring and maintain and claims for injunctive relief by nature provide no prospect of money damages." (citations and internal quotation marks omitted)).

[64] *Twin City Sportservice, Inc. v. Charles O. Finley & Co., Inc.*, 676 F.2d 1291, 1313 (9th Cir. 1982); *Theme Promotions, Inc. v. News Am. Mktg. FSI, Inc*, 731 F. Supp. 2d 937, 941-42 (N.D. Cal. 2010).

deter anticompetitive behavior.[65]   Courts in the Ninth Circuit typically examine the "lodestar" in determining the reasonableness of an attorney's fees request.[66]   Under the lodestar method, reasonable attorneys' fees are calculated using the number of hours reasonably spent on litigation multiplied by a market-based hourly rate.[67]   "In setting a reasonable attorney's fee, the district court should make specific findings of the rate and hours it has determined to be reasonable."[68]   There is a "strong presumption" that the lodestar is a reasonable fee.[69]

A court may, however, revise a fee award upward or downward from the lodestar based upon consideration of additional factors that bear on the reasonableness of the award and are not subsumed into the lodestar analysis.[70]   Factors courts may consider include (1) the quality of representation, (2) the benefit obtained for the class, (3) the complexity and novelty of the issues presented, and (4) the risk of nonpayment.[71]   Courts have held that exceptional circumstances may justify a positive multiplier where the attorneys invested substantial resources in a case for an extended period of time, despite a considerable risk of not prevailing or recovering fees or costs, and ultimately achieved superior results for the plaintiffs.[72]

---

[65] *See Costco Wholesale Corp.*, 538 F.3d at 1136-37 ("fee shifting under § 26 is mandatory"); *see generally Azizian v. Federated Dep't Stores, Inc.*, 499 F.3d 950, 959-60 (9th Cir. 2007).

[66] *Jordan v. Multnomah County,* 815 F.2d 1258, 1262 (9th Cir. 1987).

[67] *Morales v. City of San Rafael,* 96 F.3d 359, 363 (9th Cir. 1996); *see, e.g., Jordan,* 815 F.2d at 1262; *Doran v. Corte Madera Inn Best Western,* 360 F. Supp. 2d 1057, 1060 (N.D. Cal. 2005).

[68] *Frank Music Corp. v. Metro-Goldwyn-Mayer Inc.,* 886 F.2d 1545, 1557 (9th Cir. 1989).

[69] *Jordan,* 815 F.2d at 1262; *Pennsylvania v. Delaware Valley Citizens' Council for Clean Air*, 478 U.S. 546, 565 (1986), *supplemented*, 483 U.S. 711 (1987).

[70] *Morales*, 96 F.3d at 363-65; *see also Kelly v. Wengler*, 822 F.3d 1085, 1102 (9th Cir. 2016) (affirming multiplier and holding that courts may enhance fee award from lodestar in exceptional circumstances where the "lodestar figure does not adequately represent counsel's superior performance and commitment of resources" (internal quotation marks omitted)); *In re Bluetooth Headset Prod. Liability Litig.*, 654 F.3d 935, 941-42 (9th Cir. 2011).

[71] *Bluetooth*, 654 F.3d at 942 ("benefit obtained for the class" is "[f]oremost" among considerations).

[72] *See, e.g., State of Ariz. v. Maricopa Cty. Med. Soc.*, 578 F. Supp. 1262, 1279 (D. Ariz. 1984) (awarding multiplier of 1.4 in antitrust injunction proceeding under § 16 of Clayton Act); *Weiss v. York Hosp.*, 628 F. Supp. 1392, 1415 (M.D. Pa. 1986) (increasing lodestar by 100% to compensate counsel for successfully prosecuting Clayton Act claim that carried significant risk of non-recovery); *St. Louis Police Ret. Sys. v. Severson*, 2014 WL 3945655, at *5-6 (N.D. Cal. Aug. 11, 2014) (awarding 1.5 multiplier where plaintiffs' counsel devoted significant resources in obtaining injunctive relief and "excellent results"); *Kim v. Space Pencil, Inc.*, 2012 WL 5948951 (N.D. Cal. Nov. 28, 2012) (awarding 1.18 multiplier where plaintiffs achieved settlement granting significant injunctive relief); *Campbell v. Nat'l Passenger R.R. Corp.*, 718 F. Supp. 2d 1093, 1103 (N.D. Cal. 2010) (exceptional circumstances that justify upward adjustment of lodestar include where "attorneys faced exceptional risks of not prevailing or not recovering any fees" (Wilken, J.)); *see also, e.g., In re AOL Time Warner*

---

A.     **Plaintiffs' Counsel's Hourly Rates Are Reasonable and Aligned with the Market**

Attorneys' fees should be "in line with those prevailing in the community for similar services by lawyers of reasonably comparable skill, experience and reputation.  A rate determined in this way is normally deemed to be reasonable, and is referred to—for convenience—as the prevailing market rate."[73]  "Generally, the relevant community is one in which the district court sits."[74]

The hourly rates submitted by Plaintiffs' counsel in this application are consistent with the rates charged by comparable law firms expert in antitrust law engaged in similar litigation nationwide and in this District—including by the more than dozen law firms who represented the various Defendants in this matter.    Tables of the attorneys,  paralegals, and legal assistants who have worked on this matter for Plaintiffs, as well as their historical hourly rates, are found in the attached declarations.[75] These hourly rates range from $1,515 for partners with more than forty years' experience in antitrust litigation and sports law to $350 for the most junior associate and $85 dollars for document-review attorneys who were utilized to maximize efficiency.    Paralegal rates are likewise within a reasonable range reflecting seniority and experience.  These historical rates are reasonable because they are the standard rates charged by Plaintiffs' counsel for other complex antitrust litigation in this District and similar to those charged by comparable firms.[76]  Indeed, upon information and belief, these rates are comparable to the rates that Defendants have paid for their own counsel in defending this litigation in this District.   As reflected in the attached declarations, the historical rates included in this submission reflect the standard hourly rates of each of the co-counsel law firms involved in the prosecution of the litigation after taking into account market rates.[77]

Plaintiffs' counsel obtained a decisive, landmark victory for the injunctive Classes after five

---

*Shareholder Derivative Litig.*, 2010 WL 363113, at *23 (S.D.N.Y. Feb. 1, 2010) (approving fees with a 1.6 multiplier where plaintiffs' counsel took outsized risk to eschew damages fund and earned "somewhat unusual result of extensive future corporate reforms without a recovery of money damages"); *Dehoyos v. Allstate Corp.*, 240 F.R.D. 269, 326-34 (W.D. Tex. 2007) (awarding fees with 1.68 multiplier where attorneys produced groundbreaking injunctive settlement).

[73] *Blum v. Stenson*, 465 U.S. 886, 895 n.11 (1984).

[74] *Davis v. Mason Cty.,* 927 F.2d 1473, 1488 (9th Cir. 1991), *cert denied*, 502 U.S. 899 (1991).

[75] *See* Kessler Decl. ¶ 19; Simon Decl. Ex. B; Berman Decl. Ex. B; Pritzker Decl. Ex. A.

[76] *See* Kessler Decl. ¶ 22; Simon Decl. ¶ 53; Pritzker Decl. ¶ 13.

[77] *See* Kessler Decl. ¶ 22; Simon Decl. Ex. C; Berman Decl. ¶ 21; Pritzker Decl. ¶ 13.

years of hard-fought litigation.  Plaintiffs defeated a motion to dismiss; defeated a motion for judgment on the pleadings; prevailed at class certification; obtained partial summary judgment and defeated Defendants' motion for summary judgment; prevailed in *Daubert* motions; and won a ten-day bench trial.  The resulting injunction will have very considerable economic benefits for the Classes, and is likely to provide almost two-hundred million dollars or more in additional benefits for the three Classes as a whole *each* year.[78]  As noted above, individual Class Members may each now be eligible for more than $15,000 annually in new, cash academic-achievement awards, as well as numerous additional education-related benefits, for a total package of new benefits that Rascher estimates could reach more than $100,000 for an individual Class Member over four years.[79]  The total value of a Class Member's new education-related benefits will vary depending on his or her choices, and the choices of individual schools and conferences, but Rascher estimates that on a Class-wide basis, newly available benefits will likely approach or exceed $200,000 million per year, when one adds roughly $60,000 in cash achievement incentives permissible over four years with the value provided to Class Members through graduate-school scholarships, computers, scientific instruments, paid internships, study abroad, tutoring, and other education-related benefits that schools may now choose to provide.[80]

Further, the Court's injunction provides relief to the three Classes for antitrust violations that have been in place for many decades.  It is only because Plaintiffs' counsel determined to invest and put at risk the significant resources required to take on the NCAA and Conference Defendants in five years of litigation that this favorable outcome for the Classes and the public could be achieved.

**B.   Plaintiffs' Counsel's Rates Are Particularly Reasonable in Light of the Novelty and Difficulty Presented by This Litigation and High Risk of Non-Recovery**

Other considerations demonstrate that Plaintiffs' counsel's historical hourly rates are reasonable as a basis for calculating the fee award lodestar.  As this Court knows well, this five-year-long litigation presented a number of novel and complex issues—both substantively and procedurally.  A brief summary of the case illustrates its complexity:

- Plaintiffs faced twelve Defendants—and each Defendant had its own legal counsel from

---

[78] Rascher Decl. ¶ 3.

[79] *See, e.g.*, *id.* ¶¶ 3, 59, 65.

[80] *Id.* ¶ 63.

among the top law firms in the country.  The number of opposing legal representatives in this litigation grew when dozens of non-party NCAA-member schools received document subpoenas.  Further, legal counsel for at least three television broadcast networks intervened during discovery to assert the confidentiality of the networks' media agreements with the NCAA and Conference Defendants.

- The JPML decided that six separate actions filed in different parts of the country should be coordinated for pretrial proceedings before this Court.

- Plaintiffs conducted sixty-five fact depositions of current and former NCAA executives, conference commissioners, university administrators, coaches, and other witnesses, including twenty-five 30(b)(6) depositions.  Plaintiffs also defended or participated in nine depositions taken by Defendants.  And Plaintiffs took four depositions of Defendants' experts and defended against seven depositions of Plaintiffs' experts.

- Defendants produced 6,000,075 pages of documentary evidence (674,096 documents); non-party NCAA-member schools produced 39,758 pages (6,626 documents).  Plaintiffs' counsel reviewed these many hundreds of thousands of produced documents and also produced documents from Plaintiffs.

- Class certification of the injunctive class spanned thirteen months, eight briefs, five expert reports, four expert depositions, a full class-certification hearing, and a Rule 23(f) briefing.

- Not only did Plaintiffs successfully overcome Defendants' motion to dismiss, Plaintiffs also successfully opposed Defendants' motion for judgment on the pleadings following the Ninth Circuit's decision in *O'Bannon v. NCAA,* 802 F.3d 1049 (9th Cir. 2015).

- Summary judgment proceedings spanned seven months, four briefs, and thirteen expert reports, plus seven expert depositions, and *Daubert* motions.

- The bench trial lasted ten days, and included nine expert direct trial testimony declarations, thirty-seven witnesses submitted by deposition designations, eighteen live witnesses, and 952 exhibits prepared for trial—of which 133 were admitted into evidence.

- Court hearings, depositions, and interviews required frequent travel across the country.

Apart from the complex issues in this litigation, the attached declarations demonstrate the

special skills and experiences of Plaintiffs' counsel in antitrust law, sports law, and class actions. The combined skills of Class Counsel Hagens Berman Sobol Shapiro LLP, Pearson Simon & Warshaw LLP, and Winston & Strawn LLP were critical in earning victory for the three certified classes.[81]

Finally, Plaintiffs' counsel achieved a very significant result for the injunctive Classes, estimated to be worth almost $200 million or more each year in new education-related benefits, despite a substantial risk of non-recovery. As outlined above, Plaintiffs had to overcome a strong defense effort by some of the top antitrust and trial lawyers in the country, and resolve numerous complex legal and factual issues in their favor to get past motions to dismiss and for judgment on the pleadings, class certification, summary judgment, and trial. Plaintiffs were also willing to invest millions of dollars in non-recoverable costs to retain eminently qualified experts for the benefit of the Classes. The trial result is groundbreaking, as no litigation previously had directly—and successfully— challenged Defendants' limits on the compensation available to college athletes in exchange for their playing services. As previously noted, the Court's decision recognized that "Defendants' agreement to restrain trade" created "a great disparity between the extraordinary revenue that Defendants garner from D-I basketball and FBS football, and the modest benefits that class members receive in exchange for their participation in these sports relative to the value their athletic services and the contributions they make."[82] The resulting injunction entered by the Court will allow Class Members the opportunity to earn education-related benefits unlimited by the NCAA, as well as new cash incentives for academic achievement that could be worth more than $15,000 annually, and "may provide some of the compensation student-athletes would have received absent Defendants' agreement to restrain trade."[83] This is a landmark result by any standard.

### C.   Plaintiffs' Counsel's Total Hours Are Reasonable

The large number of hours logged by Plaintiffs' counsel are reasonable given the enormous volume of work required to prove the claims asserted, to develop a full trial record that informed the Court of the many changes that have taken place in the relevant college sports since 2015, and to

---

[81] Important work also was provided by Pritzker Levine LLP, which assisted the prosecution effort as Additional Class Counsel. The firm hereby submits a declaration for its fees and costs, as well.
[82] ECF No. 1162, Findings of Fact and Conclusions of Law at 104.
[83] *Id.*

successfully rebut Defendants' procompetitive justifications. As noted,[84] Plaintiffs were required to engage in five years of intense litigation—contested at every turn—to achieve this victory, and they did so in the face of strong opposition from Defendants, which required extensive motion practice before Judge Cousins and this Court. Given the numerous motions that had to be briefed and argued, the more than 6 million pages of documents that had to be reviewed, the almost one hundred fact and expert depositions that had to be taken or defended, the eight experts and thirteen expert reports in the case, and all of the other procedural and evidentiary challenges, Plaintiffs submit that the hours incurred by their counsel was both required and reasonable.[85]

Plaintiffs do not fault Defendants' litigation choices, but Defendants should not be heard to challenge the reasonableness of Plaintiffs' fees when Defendants' own strategic choices caused much of the work that Plaintiffs engaged in to prevail in this action. For example, the Motion for Judgment on the Pleadings recycled arguments that the Court had already rejected in connection with the Motion to Dismiss, and then some of these very same arguments were recycled again in Defendants' Motion for Summary Judgment, and then again during pre- and post-trial briefing. In each case, Plaintiffs had to re-litigate these issues about the purported preclusive impact of *O'Bannon.* As another illustration, Plaintiff had to seek intervention from Judge Cousins to obtain financial statements, media agreements, and to compel an NCAA 30(b)(6) witness to answer routine questions about the factual bases for its proffered procompetitive justifications. Defendants took aggressive positions in discovery and understandably made this a hard-fought case, but it had the effect of increasing costs.[86]

Nonetheless, Plaintiffs performed their work as efficiently as possible. Plaintiffs do not question or criticize Defendants' staffing on a case of this scale and importance, but the juxtaposition does serve to underscore the efficiency of Plaintiffs' approach to the same work. These disparities were exemplified at trial, where the total number of attorneys present for Defendants was exponentially larger than the number of counsel appearing for Plaintiffs. Similarly, while Defendants regularly had large teams of attorneys appear to defend a deposition, Plaintiffs regularly deployed only

---

[84] *See supra* § II.

[85] Kessler Decl. ¶¶ 9-14; Simon Decl. ¶ 62; Pritzker Decl. ¶¶ 7-12.

[86] To be clear, Plaintiffs do not second-guess Defendants' litigation strategy or tactics. Plaintiffs simply note that they had the effect of increasing Plaintiffs' costs of litigation.

one or two attorneys to take or defend a deposition.[87]   For instance, nine attorneys appeared for Defendants at the deposition of Plaintiffs' expert Hal Poret, while only two attorneys appeared for Plaintiffs.[88]   Six attorneys appeared for Defendants at the deposition of Brad Hostetter, while two attorneys appeared for Plaintiffs.[89]   Five attorneys appeared for Defendants at the Big 12 Conference 30(b)(6) deposition of Commissioner Robert Bowlsby, while only two attorneys appeared for Plaintiffs.[90]   This pattern was pervasive throughout the discovery process.

Moreover, despite the fact that a substantial amount of the work performed in conjunction with the damages claims also related to, and bore significant fruit for the purposes of class certification, summary judgment, and trial proceedings related to the injunctive claims, Plaintiffs' counsel does *not* seek to recover here any portion of the fees and costs that were already awarded from the damages settlement.   Instead, Plaintiffs have calculated, and requested herein, only the fees and expenses attributable to work done specifically for the injunctive portion of the case.

Finally, Plaintiffs note that their requested lodestar reflects less than the total value of time required to litigate this case.   Rather, the fees sought have already been discounted in an effort to be conservative and eliminate the need for any further reduction due to any possible inefficiencies.[91]

### D.   Plaintiffs' Counsel's Costs and Expenses Are Reasonable and Typical

Under the Clayton Act, Plaintiffs' reasonable costs and out-of-pocket litigation expenses are also mandated for recovery from Defendants.   15 U.S.C. § 26 requires the Court to "award the cost of suit" to an injured Plaintiff, who "substantially prevailed" for injunctive relief under Section 16 of the Clayton Act.   Ninth Circuit courts consistently award successful private antitrust litigants their reasonable expenditures for prosecuting the case, whether characterized as costs or expenses.[92]   This

---

[87] *See, e.g.*, Simon Decl. ¶ 51.

[88] Hal Poret Dep. at 2, 4 (July 20, 2017).

[89] Brad Hostetter Dep. at 2-4 (Aug. 22, 2018).

[90] Big 12 Conference 30(b)(6) Dep. (Robert Bowlsby) at 2-3 (Dec. 15, 2016).

[91] *See, e.g.*, Kessler Decl. ¶ 20.

[92] *See Auto. Prods. PLC v. Tilton Eng'g, Inc.*, 855 F. Supp. 1101, 1106-08 (C.D. Cal. 1994); *Auto. Prods. PLC v. Tilton Eng'g, Inc.*, 1993 WL 660146, at *2 (C.D. Cal. Nov. 18, 1993); *Hasbrouck v. Texaco, Inc.*, 631 F. Supp. 258, 268-69 (E.D. Wash. 1986), *aff'd in part, rev'd in part*, 879 F.2d 632 (9th Cir. 1989).

1 approach is consistent with decisions from other circuits.[93]

2     Expenditures are "reasonable" for purposes of the Clayton Act where they are of the type

3 normally billed to clients in an antitrust litigation.  As numerous courts have acknowledged, and as

4 the attached declarations attest, fee-paying antitrust clients typically bear the costs for computerized

5 legal research, attorney travel, photocopying, and printing, among other charges.[94]  The $1,346,741.69

6 in costs and expenses Plaintiffs seek are therefore reasonable and compensable.

7     Plaintiffs' taxable costs—included with the larger costs compensable under the Clayton Act—

8 are also appropriate to be awarded in this case.  Civil Local Rule 54-3 provides the standards for taxing

9 costs in any litigation, detailing the costs of fees for filing and service of process, reporters' transcripts,

10 depositions, witness expenses, and costs of bonds and security as all being taxable.  Separately,

11 Plaintiffs' Counsel will submit accounting records and invoices verifying certain of these cost items,

12 joined with Plaintiffs' Bill of Costs.  These taxable costs are included in the costs and expenses

13 recoverable under the Clayton Act fee-shifting statute.

14     Finally, Plaintiffs note that they do not seek to recover their $4,290,879.10 in total expert costs.

15 Despite the fact that Class Counsel understood that such costs would not be taxable, counsel

16 nonetheless invested in the world's preeminent sports and labor economists, and an acclaimed

17 consumer-survey expert, for the benefit of the Classes.  Needless to say, awarding "attendance fees"—

18 $40 per day—for the enormous work performed by Plaintiffs' experts in a complex antitrust case

19 provides no meaningful recovery for this substantial investment in expert testimony.[95]  But Plaintiffs'

20 counsel was willing to take this risk, and make this investment.

21     **E.**    **The Risk Inherent to This Litigation and Exceptional Result Warrant the**
        **Modest 1.5 Multiplier Plaintiffs Seek**

22

23 [93] *U.S. Football League v. Nat'l Football League*, 887 F.2d 408, 416-17 (2d Cir. 1989).

24 [94] *Trs. of the Constr. Indus. & Laborers Health & Welfare Trust v. Redland Ins. Co.*, 460 F.3d 1253, 1259 (9th Cir. 2006); *Bd. of Trustees v. Piedmont Lumber & Mill Co.*, 2016 WL 4446993, at *3 (N.D.

25 Cal. Aug. 24, 2016); *Blackwell v. Foley*, 724 F.Supp.2d 1068, 1080 (N.D. Cal. 2010).

[95] 482 U.S. 437, 445 (1987).  28 U.S.C. § 1821(a)(1) states, "Except as otherwise provided by law, a

26 witness in attendance at any court of the United States, or before a United States Magistrate Judge, or before any person authorized to take his deposition pursuant to any rule or order of a court of the

27 United States, shall be paid the fees and allowances provided by this section.  28 U.S.C. § 1821 (b) provides, in pertinent part, "A witness shall be paid an attendance fee of $40 per day for each day's

28 attendance."

The circumstances in this case support enhancing Plaintiffs' fee award by a 1.5 multiplier of their lodestar. The "reasonableness" factors identified by the Ninth Circuit in *In re Bluetooth Headset Products Liability Litigation*[96]—including (1) the quality of representation, (2) the benefit obtained for the class, (3) the complexity and novelty of the issues presented, and (4) the risk of nonpayment— all support enhancing Plaintiffs' award. Despite facing a high risk of non-payment, along with complex and novel issues of antitrust, sports, and procedural law, Plaintiffs' counsel achieved a historic result for the Classes that will benefit thousands of college athletes well into the future. Ninth Circuit courts will award multipliers for exceptional circumstances like these where Plaintiffs' counsel: (a) made substantial outlays of resources during a protracted litigation; (b) even though there was a high risk of not prevailing at all, or not recovering the costs or fees expended; and (c) ultimately achieved exceptional results for plaintiffs.[97] All is true here.

This is the first case that successfully and directly challenged Defendants' national limits on compensation available to college athletes in exchange for their playing services. The Court held that Defendants' compensation limits caused substantial anticompetitive harm, and recognized that Defendants have earned extraordinary revenue from D-I basketball and FBS football, while Plaintiffs receive modest benefits in exchange for their services "relative to the value of their athletic services and the contributions they make."[98] That is a monumental holding. The historic injunction entered by this Court will provide substantial benefits to thousands of Class Members for years to come. And the result was risky and required tremendous resources. For example, Plaintiffs repeatedly had to defeat Defendants' arguments that Plaintiffs' claims, or portions thereof, were foreclosed by the Ninth Circuit's decision in *O'Bannon*. Plaintiffs overcame such arguments made in Defendants' motion for judgment on the pleadings, at summary judgment, and in post-trial briefing—an indication both of the resources this litigation required and the novel, complex issues it presented throughout.

Groundbreaking and complex antitrust litigation always requires expensive expert testimony in order to prevail. It was particularly so in this litigation, where the Court extensively relied on the

---

[96] *In re Bluetooth Headset Prod. Liab. Litig.*, 654 F.3d 935, 942 (9th Cir. 2011).

[97] *See supra* nn.70-72.

[98] ECF No. 1162, Findings of Fact and Conclusions of Law, at 104.

expert testimony of Rascher, Noll, Lazear, and Poret at various times from class certification through summary judgment to trial.  Indeed, the testimony of Rascher, Noll, and Poret was each cited numerous times by the Court in its trial decision and the testimony of Lazear was relied upon in both the court's summary judgment and class certification rulings.[99]  The millions of dollars Plaintiffs' counsel invested in this testimony was thus essential to success, even though such fees are not taxable costs.

For all of these reasons, Plaintiffs respectfully submit that awarding a modest 1.5 multiplier would adequately compensate counsel for the tremendous financial investment and risk undertaken in a very difficult case, and in which extremely valuable injunctive relief will have the potential to provide hundreds of millions of dollars in new education-related benefits each year to the Classes for countless years to come.  Awarding the requested multiplier will also further the purposes of the Clayton Act to encourage antitrust plaintiffs facing great expense to pursue ground-breaking litigation of this kind that benefits the public interest.[100]

**F.     Plaintiffs Who Testified at Trial and Participated Extensively in the Prosecution of the Case Should Receive Service Awards**

Finally, Plaintiffs request that the Court approve service awards in the amount of $15,000 for each Plaintiff who testified at trial and $10,000 for Plaintiffs who sat for depositions and participated extensively; all of these Plaintiffs also were subject to written discovery and otherwise contributed to Plaintiffs' prosecution of this case.  Service awards for class representatives are awarded as a means of providing an incentive to those who incur the risks and responsibilities of representing and supporting litigation classes.[101]  Service awards "compensate class representatives for work done on behalf of the class, to make up for financial or reputational risk undertaken in bringing the action, and,

---

[99] *See e.g.,* ECF No. 1162, Findings of Fact and Conclusions of Law, at 16 (citing Rascher Direct Testimony Declaration), at 26 n.17 (citing Noll Direct Testimony Declaration), at 38 (citing both Noll Direct and Rebuttal Testimony Declarations).

[100] *See Costco Wholesale Corp. v. Hoen*, 538 F.3d 1128, 1136-37 (9th Cir. 2008) ("Congress made fee awards mandatory under § 26 to encourage private parties to bring and maintain meritorious antitrust injunction cases.  Mandatory awards were seen as necessary to protect the injunction-seeking plaintiff's financial incentive to file suit because antitrust cases are normally very expensive to bring and maintain and claims for injunctive relief by nature provide no prospect of money damages.") (citations and internal quotation marks omitted).

[101] *Rodriguez v. West Publ'g Corp.*, 563 F.3d 948, 958-59 (9th Cir. 2009).

sometimes, to recognize their willingness to act as a private attorney general."[102]  When determining whether an incentive award is reasonable, courts generally consider: (1) the risk to a class representative in commencing suit; (2) the notoriety and personal difficulties encountered by a class representative; (3) the amount of time and effort spent by the class representative; (4) the duration of the litigation; and (5) the personal benefit (or lack thereof) enjoyed by the class representative as a result of the litigation.[103]

The $15,000 sought for each of the three Plaintiffs who testified at trial (after having already submitted to depositions and written discovery) is reasonable in light of the factors this Court must consider, just as is the $10,000 award for Plaintiffs who were not called to testify at trial but were also subjected to depositions and written discovery and helped to prosecute the case.[104]

*First*, each Plaintiff took considerable risk when bringing this suit or the coordinated *Jenkins* case.  At the time work on these cases commenced, Plaintiffs who represented the Classes were college athletes subject to the authority—and possible discipline—of coaches and universities directly implicated by the litigation.  The Court witnessed at trial the extent to which university presidents and athletic administrators will go to maintain the gulf between their economic power and that of the athletes they purport to protect.[105]

*Second*, it was courageous for these athletes to attract attention through their involvement in these lawsuits, as they invited legal and public scrutiny that could have unintended, harmful

---

[102] *Id.*

[103] *Moreno v. San Francisco Bay Area Rapid Transit District*, 2019 WL 343472, at *6-7 (N.D. Cal. Jan. 28, 2019) (citations omitted).

[104] *See, e.g.*, *Vietnam Veterans of America v. Central Intelligence Agency*, 2018 WL 4827397, at *1-2 (N.D. Cal. Oct. 4, 2018) (awarding service awards of $20,000 a piece to class representatives who had played leading role in successful injunctive-relief case) (Wilken, J.).

[105] Trial Tr. (Smith) 1469:25-1470:18 ("Q: And would it hurt the holistic mission of Ohio State University if the rules were changed such that Ohio State was allowed to offer student athletes incentives for reaching a certain grade point? . . . A: In my view, that particular example would move us into the pay-for-play model, and I think it would have a significant impact on our ability to ensure that the behavior of our student athletes maintains their focus on their academics.  Q: So you think it would be inappropriate and it would be harmful if we said to a student athlete, 'We'll pay you extra 500 bucks if you can get a 3.5 as opposed to a 3.0'?  A: Yeah, I think it would be.  Q: You, yourself, at one point got compensated, right, if student athletes received a certain grade point?  A: I'm not in school.  Q: Can you answer the question?  A: Yes.  Q: You have a compensation program . . . where you get more money?  A: Uh-huh.").

consequences.  At trial, the Court also witnessed this sort of risk, through the questioning Justine Hartman faced, when defense counsel attempted to undermine her credibility and embarrass her by highlighting purported shortcomings in her academic and attendance records while a student.[106]

*Third and fourth*, all of the individuals for whom Plaintiffs seek service awards invested significant time in these cases over the course of five hard-fought years: they produced personal records; they prepared and sat for depositions where they were questioned about their academic habits, financial circumstances, and other intimate details;[107] and they provided ideas and insights for case strategy.  In the case of Plaintiffs who were called to testify at trial, they volunteered to do so before the general public, media that covered the case day by day, and many officials and representatives from the college-sports community of which they had been notable members.[108]  They also had to give up their personal time to travel to this District for trial, prepare to testify, and subject themselves to public cross-examination.

*Fifth*, Alston, Hartman, and Jenkins, as well Nigel Hayes and Alec James, have stepped up to contribute to a historic victory for the Classes going forward, from which they, personally, will not benefit.  The Court's injunction will improve the lives of tens of thousands of Class Members prospectively, but that value comes too late to directly benefit these individuals, each of whom has completed his or her time as a college student with playing eligibility.  The requested service awards are appropriate to reward these brave individuals who stood up so that future generations would not be subject to the same unlawful restraints that they faced during their time as college athletes.

### IV.    CONCLUSION

For all the foregoing reasons, the Court should grant Plaintiff's motion for attorney's fees and costs as set forth in their declarations.

---

[106] Trial Tr. (Hartman) 813:2-816:9.

[107] Shawne Alston Dep. (May 12, 2016); Justine Hartman Dep. (April 6, 2015); Martin Jenkins Dep. (Mar. 10, 2015).

[108] Trial Tr. (Alston) 662:10-730:20; Trial Tr. (Hartman) 793:2-831:15; Trial Tr. (Jenkins) 731:4-792:21.

Dated:  March 26, 2019

HAGENS BERMAN SOBOL SHAPIRO LLP

By _____/s/ Steve W. Berman_____
STEVE W. BERMAN (*pro hac vice*)

Craig R. Spiegel (SBN 122000)
Emilee N. Sisco (*pro hac vice*)
1918 Eighth Avenue, Suite 3300
Seattle, WA 98101
Telephone: (206) 623-7292
Facsimile:  (206) 623-0594
*steveb@hbsslaw.com*
*craigs@hbsslaw.com*
*emilees@hbsslaw.com*

Jeff D. Friedman (SBN 173886)
HAGENS BERMAN SOBOL SHAPIRO LLP
715 Hearst Avenue, Suite 202
Berkeley, CA 94710
Telephone: (510) 725-3000
Facsimile: (510) 725-3001
*jefff@hbsslaw.com*

PEARSON, SIMON & WARSHAW, LLP

By _____/s/ Bruce L. Simon_____
BRUCE L. SIMON (SBN 96241)
Benjamin E. Shiftan (SBN 265767)
44 Montgomery Street, Suite 2450
San Francisco, CA 94104
Telephone:  (415) 433-9000
Facsimile:  (415) 433-9008
*bsimon@pswlaw.com*
*bshiftan@pswlaw.com*

*Class Counsel for Jenkins and Consolidated
Action Plaintiffs*

Respectfully submitted,

WINSTON & STRAWN LLP

By _____/s/ Jeffrey L. Kessler_____
JEFFREY L. KESSLER (*pro hac vice*)

David G. Feher (*pro hac vice*)
David L. Greenspan (*pro hac vice*)
Joseph A. Litman (*pro hac vice*)
200 Park Avenue
New York, NY 10166-4193
Telephone: (212) 294-6700
Facsimile: (212) 294-4700
*jkessler@winston.com*
*dfeher@winston.com*
*dgreenspan@winston.com*
*jlitman@winston.com*

Sean D. Meenan (SBN 260466)
Jeanifer E. Parsigian (SBN 289001)
WINSTON & STRAWN LLP
101 California Street
San Francisco, CA 94111
Telephone: (415) 591-1000
Facsimile: (415) 591-1400
*smeenan@winston.com*
*jparsigian@winston.com*

*Class Counsel for Jenkins and Consolidated
Action Plaintiffs*

26

By   */s/ Elizabeth C. Pritzker*
     Elizabeth C. Pritzker (SBN 146267)
     Jonathan K. Levine (SBN 220289)
     Bethany L. Caracuzzo (SBN 190687)
     PRITZKER LEVINE LLP
     180 Grand Avenue, Suite 1390
     Oakland, California 94612
     Telephone: (415) 692-0772
     Facsimile: (415) 366-6110

*Additional Class Counsel*

**ATTESTATION PURSUANT TO CIVIL LOCAL RULE 5-1(i)(3)**

Pursuant to Civil Local Rule 5-1(i)(3), the filer of this document attests that concurrence in the filing of this document has been obtained from the signatories above.

*/s/ Jeffrey L. Kessler*
Jeffrey L. Kessler