Steve W. Berman (*pro hac vice*)
Craig R. Spiegel (SBN 122000)
HAGENS BERMAN SOBOL SHAPIRO LLP
1918 Eighth Avenue, Suite 3300
Seattle, WA 98101
Telephone: (206) 623-7292
Facsimile: (206) 623-0594
*steveb@hbsslaw.com*
*craigs@hbsslaw.com*

Jeff D. Friedman (SBN 173886)
HAGENS BERMAN SOBOL SHAPIRO LLP
715 Hearst Avenue, Suite 202
Berkeley, CA 94710
Telephone: (510) 725-3000
Facsimile: (510) 725-3001
jefff@hbsslaw.com

Bruce L. Simon (SBN 96241)
Benjamin E. Shiftan (SBN 265767)
PEARSON, SIMON & WARSHAW, LLP
44 Montgomery Street, Suite 2450
San Francisco, CA 94104
Telephone:  (415) 433-9000
Facsimile:   (415) 433-9008
*bsimon@pswlaw.com*
*bshiftan@pswlaw.com*

*Class Counsel for Jenkins and Consolidated
Action Plaintiffs*

[Additional counsel listed on signature page]

Jeffrey L. Kessler (*pro hac vice*)
David G. Feher (*pro hac vice*)
David L. Greenspan (*pro hac vice*)
Joseph A. Litman (*pro hac vice*)
WINSTON & STRAWN LLP
200 Park Avenue
New York, NY 10166-4193
Telephone: (212) 294-6700
Facsimile: (212) 294-4700
*jkessler@winston.com*
*dfeher@winston.com*
*dgreenspan@winston.com*
*jlitman@winston.com*

Sean D. Meenan (SBN 260466)
Jeanifer E. Parsigian (SBN 289001)
WINSTON & STRAWN LLP
101 California Street
San Francisco, CA 94111
Telephone: (415) 591-1000
Facsimile: (415) 591-1400
*smeenan@winston.com*
*jparsigian@winston.com*

*Class Counsel for Jenkins and Consolidated
Action Plaintiffs*

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA
### OAKLAND DIVISION

| | |
|---|---|
| IN RE: NATIONAL COLLEGIATE ATHLETIC ASSOCIATION ATHLETIC GRANT-IN-AID CAP ANTITRUST LITIGATION<br><br><br>THIS DOCUMENT RELATES TO: ALL ACTIONS EXCEPT *Jenkins v. Nat'l Collegiate Athletic Ass'n*, Case No. 14-cv-02758-CW | Case No. 4:14-MD-02541-CW<br><br>**DECLARATION OF JEFFREY L. KESSLER IN SUPPORT OF MOTION FOR ATTORNEYS' FEES, EXPENSES, AND SERVICE AWARDS**<br><br>DATE:          April 30, 2019<br>TIME:           2:30 p.m.<br>COURTROOM:  Courtroom 6, 2d Floor |

I, Jeffrey L. Kessler, declare as follows:

1. I am an attorney licensed before all the courts of the State of New York and am co-executive chairman of Winston & Strawn LLP. I am also a partner in Winston & Strawn's New York office, co-chair of the Antitrust practice group, and co-chair of the Sports Law practice group. I am co-lead Class Counsel for the Consolidated Action Plaintiffs in this action. Based on personal knowledge or discussions with counsel at my firm about the matters stated herein, I could competently testify to the same if called upon to do so.

2. This Declaration is made in support of Plaintiffs' Motion for Attorneys' Fees and Costs ("Fee Motion"), and pursuant to Civil Local Rule 54.

3. As detailed more fully below, Winston & Strawn attorneys were intensively involved in all aspects of this litigation regarding the injunctive relief claims. Winston attorneys took or shared the lead on many hearings and motions, at trial, and during years of pretrial litigation, including: drafting briefs and filings; organizing and completing document review; drafting discovery requests and responses; corresponding with defense counsel; setting agendas and guiding negotiations for meet-and-confer discussions that governed document production, depositions, scheduling, and all other manner of discovery disputes; taking and defending depositions; working with experts; preparing witnesses, exhibits, and other content for trial; arguing summary judgment motions, arguing the motion to dismiss and motion for judgment on the pleadings; arguing other motions before the Court, and preparation of this case for trial and the trial itself.

4. The very significant role played by Winston & Strawn for the injunctive-relief claims is reflected in part by Winston's much larger share of Plaintiffs' counsel's fees and expenses with respect to the prosecution of the injunctive-relief claims. Winston did not act as Class Counsel for the damages claims, which were separately resolved, and for which our co-counsel firms served as Class Counsel. Winston did not apply for or receive any fee award with respect to the damages class claims, as Winston's efforts have been solely and exclusively devoted to the injunctive-relief claims and Classes from the outset of this MDL. This is another significant reason for Winston's much larger share of Plaintiffs' counsel's fees and expenses.

### I.     Summary of Work Performed

5.      Winston & Strawn initially represented just the *Jenkins* plaintiffs who filed a complaint on March 17, 2014.  All of the work that Winston performed in that initial filing, however, was of benefit to, and fully utilized in, prosecuting the injunctive relief claims in this action.  That work included the Winston team investing time and resources into researching the commercial landscape surrounding Division I basketball and FBS football, and the relationships between the NCAA, Conference Defendants, member schools, and their business partners.  It also involved working with experts to develop the claims, legal theory, and relief sought by the injunctive classes, and coordinating with various stakeholders.  Even before any JPML transfer, Winston worked with co-counsel in this action to develop the injunctive-relief claims against the NCAA and coordinate the work of the three firms.

6.      Following JPML transfer for coordination before this Court, Winston was named co-lead counsel for all Plaintiff Classes as to injunctive relief, along with Hagens Berman Sobol Shapiro LLP and Pearson Simon & Warshaw LLP.  The three firms worked together closely to avoid duplication of effort and to prosecute this case as efficiently as possible, notwithstanding the enormous scope of this case.[1]  Because the other two firms were also serving as Class Counsel to pursue damages claims, Winston often took on a disproportionate share of the work relating to the injunctive classes.

7.      During discovery, Winston prepared and acted to enforce requests for production and interrogatories, as well as gathering documents from Plaintiffs and preparing Plaintiffs' responses to Defendants' requests.  Likewise, Winston led most of the meet-and-confer negotiations held with Defendants.  For example, while negotiating the scope of Defendants' document production, Winston attorneys initiated communications about numerous subjects, drafted agendas for calls and meetings, and exchanged letters with defense counsel.  Winston attorneys also devised and cross-checked lists of search terms and custodians, testing terms with the assistance of litigation support staff to confirm that the negotiations would yield the requested documents in an efficient manner.  Winston tested specific search terms, phrases, and Boolean search formulations to confirm that discovery would meet

---

[1] A fourth firm, Pritzker Levine LLP, also provided support.

2

Kessler Decl. ISO Mot. for Attorneys' Fees, Expenses, and Service Awards – Case No. 4:14-MD-02541-CW

Plaintiffs' needs, and negotiated which phrases and sentences could be redacted in produced documents pursuant to governing protective orders.

8.     The same was true for many other elements of the discovery process, including negotiations about the number and breadth of depositions, and the scope of financial documents and broadcast and sponsorship contracts to be produced.  It was Winston, for instance, that led the parties' efforts to negotiate terms that would govern production of various Defendant financial documents and media agreements.[2]  Throughout, Winston invested tremendous time and necessary resources to push all of this discovery forward.

9.     In response to Plaintiffs' document requests, Defendants produced nearly 680,000 documents that spanned more than 6 million pages, some of which proved to be an important foundation of the Court's factual findings in favor of the injunctive Classes at trial.  Defendants' responses to Plaintiffs' interrogatory requests were also massive, requiring Winston to analyze thousands of pages of documents.  To provide just one illustration, Defendant Southeastern Conference ("SEC")—just one of twelve Defendants—responded to three of Plaintiffs' interrogatory requests in its Second Set of Interrogatories to all Defendants by listing 1,060 Bates-numbered documents as purported support for the SEC's proffered procompetitive justifications.  Winston attorneys took the time needed to investigate this ostensible evidence, an effort that was then multiplied given the number of Defendants.

10.    Further, Winston served and enforced document subpoenas served on numerous third parties, including Duke University, Florida State University, Ohio State University, Stanford University, University of Kansas, University of Kentucky, University of Michigan, University of Notre Dame, University of Oregon, and the University of Texas.  Additionally, Winston met and conferred extensively with Defendants' media partners, including CBS, FOX, and ESPN, regarding the disclosure of Defendants' media contracts, and argued the successful motion to compel when the networks resisted the full production of the requested documents.  These third-parties produced more

---

[2] *See, e.g.*, ECF No. 473 (Notice of Agreement between Plaintiffs and Pac-12 Conference concerning production of financial documents and contracts); *see also* ECF Nos. 457, 467, 471.

than 6,500 additional documents that spanned nearly 40,000 pages. Again, those documents provided important support for the Court's factual findings in favor of Plaintiffs. Winston attorneys had to file motions to compel in the Northern District of Illinois (against the University of Notre Dame) and in the Middle District of North Carolina (against Duke University) to ultimately receive productions from these schools.

11.     Reviewing such voluminous document productions and analyzing which documents were supportive of Plaintiffs' case was a major undertaking. Winston devised a multi-step review protocol to efficiently identify the most useful documents. To limit cost, the firm relied heavily upon in-firm "review" attorneys who specialize in e-discovery and bill at substantially lower hourly rates than what is commonly charged in the marketplace for these services. When necessary for the proper administration of the case, Winston associate attorneys were also involved, and Winston coordinated with co-counsel on document review issues to avoid duplication of effort. In total, the tremendous volume of documents produced by Defendants and third parties meant that Winston attorneys spent roughly 6,000 hours working until the close of discovery, identifying the best evidence for use at depositions and trial, as well as in pre-trial motions and for devising the case strategy.

12.     Notwithstanding the hundreds of phone calls and email exchanges that were necessary to navigate this massive production process, Defendants and third-party subpoena recipients often resisted the production of relevant documents, and on many occasions up through trial, judicial intervention was necessary to resolve a discovery dispute. Winston was instrumental in briefing and, in many instances, arguing these matters, including disputes about production of documents,[3] scope of depositions,[4] and admissibility of evidence.[5]

13.     Plaintiffs collectively deposed more than sixty fact witnesses and defended close to eighteen depositions. Winston attorneys acted as the "first-chair" examining or defending attorney in thirty-two of these depositions. The depositions for which Winston assumed primary responsibility included numerous witnesses with critical knowledge about the conduct at issue, and whose testimony

---

[3] *See, e.g.*, ECF No. 564, Joint Statement re Pac-12 Conference eSports Documents.
[4] *See, e.g.*, ECF No. 504, Joint Statement re NCAA 30(b)(6) Deposition Topic 10.
[5] *See, e.g.*, ECF No. 1050, Joint Submission re Plaintiffs' Exhibit 139.

provided important evidence in support of Plaintiffs' claims that was repeatedly cited by the Court in rendering its decision.  These witnesses included NCAA Vice President Kevin Lennon; NCAA Director of Research Todd Petr; NCAA 30(b)(6) designee Mark Lewis; Big 12 Conference Commissioner Robert Bowlsby; Atlantic Coast Conference Associate Commissioner Brad Hostetter; Ohio State University Athletic Director Eugene Smith; ESPN basketball analyst Jay Bilas; Mid-American Conference Commissioner Jon Steinbrecher; Conference USA Commissioner Judith MacLeod; University of Texas President Gregory Fenves; NCAA Executive Vice President of Regulatory Affairs Oliver Luck; and University of North Carolina men's basketball coach Roy Williams.  Winston also first-chaired the examining or defending of six out of eight testifying experts in this matter.  Specifically, Winston deposed Defendants' economists, Dr. Janusz Ordover and Dr. Kenneth Elzinga, and Defendants' survey expert, Dr. Bruce Isaacson, and defended Plaintiffs' economists Dr. Roger Noll and Dr. Edward Lazear and consumer survey expert Hal Poret.  The evidence obtained in those depositions resulted in additional crucial evidence cited by the Court in its trial decision.  Winston staffed these depositions leanly to help limit costs, and it was routine for Defendants' lawyers to far outnumber Plaintiffs' total lawyers, both in person and on the phone.  For example, Plaintiffs sent two attorneys to defend the deposition of Plaintiffs' expert Hal Poret while nine attorneys appeared for Defendants.  Six attorneys appeared for Defendants at the deposition of Brad Hostetter, while two attorneys appeared for Plaintiffs.  And five attorneys appeared for Defendants at the Big 12 Conference 30(b)(6) deposition of Commissioner Robert Bowlsby, though Plaintiffs sent only two.

14.     Winston & Strawn also played a leading role in the vast majority of written submissions to the Court on behalf of Plaintiffs, both before and after Winston was appointed co-lead Class Counsel in all of the cases with respect to injunctive relief.  Winston attorneys were central to the briefing for Defendants' dismissal motion; the injunctive class certification motion and 23(f) opposition; Defendants' motion for judgment on the pleadings; the cross-motions for summary judgment and Daubert motions; the pre-trial opening statement briefs; the post-trial closing briefs; discovery disputes about document production, depositions, financial documents, subpoenas, and contracts; and overall scheduling and case management.  Accordingly, Winston attorneys contributed the majority of

Plaintiffs' time and effort to legal research, discussion of briefing strategy, editing drafts, and supervising the manifold elements that go into various filings for a complicated antitrust class action like this one.

15.     Winston attorneys also worked closely with the experts throughout the case, retaining, along with co-counsel, the necessary experts needed to pursue this type of high stakes antitrust litigation.   Working most closely with three out of the four testifying plaintiffs' experts—Dr. Roger Noll, Dr. Edward Lazear, and Mr. Hal Poret—Winston & Strawn assisted plaintiffs' experts in identifying and gathering the relevant materials for expert analysis.  The firm also assisted these experts as they drafted their reports and testimony, formulated their analyses, and sought additional information as the case developed.  In coordination with Winston's efforts, Drs. Noll and Lazear wrote reports that helped the Court certify Plaintiffs' Rule 23(b) injunctive-relief classes; Dr. Noll wrote reports that helped to demonstrate the failings of Dr. Elzinga's and Dr. Heckman's merits reports and trial testimony; and Dr. Noll and Mr. Poret offered trial testimony that was cited as persuasive by the Court in its final judgment.  Winston also assisted in the drafting of the expert report of Dr. Daniel Rascher, Plaintiffs' other principal economist on liability, and helping to prepare him for trial.  In total, across the case, eight experts were retained; they produced eighteen reports spanning 2,850 pages; there were eleven expert depositions; there were nine expert declarations and replies submitted for trial, totaling 1,533 pages; and six experts provided live trial testimony.

16.     Preparing for trial was a tremendous undertaking and Winston played a critical role in this process for the injunctive classes.  The schedule was abbreviated to accommodate defense counsel, and the Court ordered the parties to submit written opening statements and direct expert testimony in advance, in addition to deposition designations, witness lists, exhibit lists, and motions in *limine*. Winston & Strawn worked extensively on all of these complicated pretrial tasks, including:

- Coordinating Plaintiffs' effort to identify trial exhibits for Plaintiffs' exhibit list (which totaled 285, many of them summary charts of longer documents) and to review for objections to the more than 1,000 exhibits initially proposed by Defendants.  Indeed, Defendants sent multiple drafts of their exhibit list:  the first draft listed 1,024 exhibits; a supplement to this draft grew to 1,067 exhibits; later, Defendants' revised their exhibit

list to contain 446 exhibits following the pretrial conference, but then exchanged an updated exhibit list with 548 exhibits; their list again grew to 565 exhibits before trial; and they finally submitted 622 exhibits for trial.  Plaintiffs filed 285 exhibits based on the extensive pre-trial work it conducted to identify the most relevant evidence for trial. And as part of revising the final trial exhibit list, Plaintiffs' counsel worked with Defendants' counsel to submit a joint exhibit list of 45 exhibits.  Working through so many documents identified by Defendants—even though most of them ultimately were not offered at trial—required many, many hours.

- Contributing centrally to writing Plaintiffs' forty-seven-page opening statement brief.

- Leading the efforts to assisting Dr. Noll and Mr. Poret in preparing their trial declarations and live trial testimony, and working with co-counsel to provide the same assistance to Dr. Rascher.

- Preparing Plaintiffs' fact and expert witnesses for direct, redirect, and cross-examination testimony; preparing with co-counsel to cross-examine the thirteen individuals listed on Defendants' fact witness list; and preparing with co-counsel to cross-examine Defendants' three expert witnesses.

- Working with co-counsel to review all deposition transcripts for designation, testimony for counter designation, and objections.  Winston also participated in a lengthy meet-and-confer process to address objections raised by all parties with respect to deposition designations and documents on the exhibit lists.

- Drafting several of Plaintiffs' motions *in limine* and several portions of the omnibus opposition to Defendants' *limine* motions.

- Coordinating a lean trial team to promote efficiency and effective presentation.

17.     As a result of all of the effort Winston attorneys made alongside co-counsel, Plaintiffs achieved a historic victory.  The Court entered a landmark permanent injunction that will help ameliorate the "great disparity between the extraordinary revenue Defendants garner" and "the modest benefits that Class Members" may receive for their athletic services, including lifting all NCAA restraints on education-related benefits, and substantial alleviation of the NCAA's restraints on cash

7

incentives for academic achievement.  The Court did so after finding that the evidence Plaintiffs marshalled and presented at trial, much of which was marshalled and presented by Winston attorneys, demonstrated that Defendants' "amateurism" defense was largely unsupportable, and that Defendants' post-2015 actions—as established at trial—showed that consumer demand for the three sports at issue had not been harmed, and would not be harmed, by increased education-related benefits and other increased compensation paid to Plaintiffs.  Indeed, based on the factual record presented at trial by Winston attorneys and others, the Court wrote an opinion with more than sixty pages of factual findings in support of its verdict against Defendants.  The extensive efforts of Winston lawyers substantially contributed to this result.

## II.    Winston & Strawn Attorney's Fees

18.    From the inception of this MDL through trial, including the costs of preparing this Fee Motion,[6] Winston & Strawn lawyers, paralegals, and support staff have invested 41,152.05 hours over a period of approximately five years of litigation.  The value of that time, using the historic hourly billing rates of the firm at the time the services were rendered, is $24,304,239.70.  The rates used to calculate these figures are the usual and customary hourly rates charged for each attorney or staff member's services at Winston at the applicable period of time.

19.    Enclosed below is a list of Winston & Strawn attorneys and staff who worked on the case, along with their applicable historical rates and total hours worked for each year of the case.

| 2014 | | | | |
|------|------|------|------|------|
| **Timekeeper** | **Role** | **Historical Rate** | **Total Hours** | **Total Lodestar (Hours x Rate)** |
| Dale, Adam | Associate | 425 | 131.25 | $55,781.25 |
| Feher, David | Partner | 960 | 321 | $308,160 |
| Furman, Rebecca | Associate | 425 | 176.71 | $75,101.75 |
| Greenspan, David | Partner | 875 | 274.65 | $240,318.75 |
| Hyppolite, Georgino | Associate | 425 | 131.85 | $56,036.25 |

[6] The Ninth Circuit recognizes that "[i]n statutory fee cases, federal courts, including our own, have uniformly held that time spent in establishing the entitlement to and amount of the fee is compensable." *Camacho v. Bridgeport Fin., Inc.*, 523 F.3d 973, 981 (9th Cir. 2008) (quoting *In re Nucorp Energy, Inc.*, 764 F.2d 655, 659-660 (9th Cir. 1985)).  "This is so because it would be inconsistent to dilute a fees award by refusing to compensate attorneys for the time they reasonably spent in establishing their rightful claim to the fee." *Id.*; *see also Kinney v. Int'l Bhd. of Elec. Workers*, 939 F.2d 690, 695 (9th Cir. 1991).

| Kessler, Jeffrey | Partner | 1,180 | 109.8 | $129,564 |
|---|---|---|---|---|
| Kyritsopoulos, Corinne | Senior Paralegal | 250 | 57.1 | $14,275 |
| Litman, Joseph | Associate | 490 | 423.5 | $207,515 |
| Meenan, Sean | Associate | 605 | 196.6 | $118,943 |
| Nevius, Timothy | Associate | 605 | 957.2 | $579,106 |
| Niss, Matthew | Paralegal | 160 | 109.65 | $17,544 |
| Sarafa, Derek | Partner | 750 | 172.7 | $129,525 |
| **2014 TOTAL** | | | **3,062.01** | **$1,931,870** |

| 2015 | | | | |
|---|---|---|---|---|
| **Timekeeper** | **Role** | **Historical Rate** | **Total Hours** | **Total Lodestar (Hours x Rate)** |
| Blomstrom, Christine | Review Attorney | 85 | 351.25 | $29,856.25 |
| Carter, Andrew | Review Attorney | 95 | 411.75 | $39,116.25 |
| Choate, Ann | Litigation Support Manager | 250 | 86.9 | $21,725 |
| Dale, Adam | Associate | 450 | 45.35 | $20,407.5 |
| Feher, David | Partner | 1,000 | 627.8 | $627,800 |
| Furman, Rebecca | Associate | 480 | 76 | $36,480 |
| Gordon, Benjamin | Associate | 450 | 75.3 | $33,885 |
| Greenspan, David | Partner | 910 | 259.55 | $236,190.5 |
| Heebner, Lindsay | Review Attorney | 145 | 395.75 | $57,383.75 |
| Honness, David | Review Attorney | 85 | 452.5 | $38,462.5 |
| Horan, Deborah | Review Attorney | 85 | 905.25 | $76,946.25 |
| Howell, John | Review Attorney | 85 | 719.5 | $61,157.5 |
| Hyppolite, Georgino | Associate | 450 | 117.67 | $52,951.5 |
| Johnson, Steffen | Partner | 820 | 28.6 | $23,452 |
| Kessler, Jeffrey | Partner | 1,225 | 172.1 | $210,822.5 |
| Kyritsopoulos, Corinne | Senior Paralegal | 265 | 140.6 | $37,259 |
| Litman, Joseph | Associate | 555 | 997.2 | $553,446 |
| Meenan, Sean | Associate | 680 | 314.9 | $214,132 |
| Nevius, Timothy | Associate | 680 | 1,396.2 | $949,416 |
| Niss, Matthew | Paralegal | 170 | 229.55 | $39,023.5 |
| Ogunsunlade, Olayinka | Review Attorney | 85 | 1,032.25 | $87,741.25 |
| Oshin, Jill | Review Attorney | 85 | 22.75 | $1,933.75 |
| Oyler, Caitlin | Review Attorney | 105 | 250.5 | $26,302.5 |
| Parsigian, Jeanifer | Associate | 515 | 484.3 | $249,414.5 |
| Pfeiffer, David | Paralegal | 90 | 19.25 | $1,732.5 |
| Sarafa, Derek | Partner | 820 | 204.1 | $164,902 |
| **2015 TOTAL** | | | **9,816.87** | **$3,891,939.5** |

| 2016 | | | | |
|---|---|---|---|---|
| **Timekeeper** | **Role** | **Historical Rate** | **Total Hours** | **Total Lodestar (Hours x Rate)** |
| Choate, Ann | Litigation Support Manager | 250 | 123.4 | $30,850 |
| Cottingham, Thomas | Partner | 965 | 23.3 | $22,484.5 |
| Dale, Adam | Associate | 470 | 896.1 | $421,167 |
| Dow, Nicole | Paralegal | 170 | 165.4 | $28,118 |
| Feher, David | Partner | 1,055 | 692.75 | $730,851.25 |
| Gordon, Benjamin | Associate | 470 | 455.55 | $214,108.5 |
| Greenspan, David | Partner | 960 | 690.95 | $663,312 |
| Hyppolite, Georgino | Associate | 470 | 1,447.42 | $680,287.4 |
| Kessler, Jeffrey | Partner | 1,290 | 139 | $179,310 |
| Kyritsopoulos, Corinne | Senior Paralegal | 280 | 290.7 | $81,396 |
| Litman, Joseph | Associate | 615 | 2,175.22 | $1,337,760.3 |
| Meenan, Sean | Associate | 715 | 335.95 | $240,204.25 |
| Mendenhall, Samuel | Partner | 885 | 28 | $24,780 |
| Nevius, Timothy | Associate | 715 | 222.6 | $159,159 |
| Niss, Matthew | Paralegal | 180 | 504 | $90,720 |
| Parsigian, Jeanifer | Associate | 575 | 499 | $286,925 |
| Stewart, Jennifer | Associate | 715 | 387.65 | $277,169.75 |
| **2016 TOTAL** | | | **9,076.99** | **$5,468,602.95** |

| 2017 | | | | |
|---|---|---|---|---|
| **Timekeeper** | **Role** | **Historical Rate** | **Total Hours** | **Total Lodestar (Hours x Rate)** |
| Dale, Adam | Associate | 520 | 555.9 | $289,068 |
| Dow, Nicole | Paralegal | 180 | 264.4 | $47,592 |
| Feher, David | Partner | 1,120 | 442.25 | $495,320 |
| Gordon, Benjamin | Associate | 495 | 1,039.69 | $514,646.55 |
| Greenspan, David | Partner | 990 | 750.15 | $742,648.5 |
| Hyppolite, Georgino | Associate | 520 | 955.54 | $496,880.8 |
| Kessler, Jeffrey | Partner | 1,365 | 251.5 | $343,297.5 |
| Kyritsopoulos, Corinne | Senior Paralegal | 295 | 305.6 | $90,152 |
| Lawrenz, Kendall | Paralegal | 165 | 107.35 | $17,712.75 |
| Litman, Joseph | Associate | 690 | 1,848.8 | $1,275,672 |
| Meenan, Sean | Associate | 760 | 236.9 | $180,044 |
| Niss, Matthew | Paralegal | 190 | 148.75 | $28,262.5 |
| Parsigian, Jeanifer | Associate | 645 | 165.5 | $106,747.5 |
| Stewart, Jennifer | Associate | 760 | 276.33 | $210,010.8 |
| **2017 TOTAL** | | | **7,348.66** | **$4,838,054.90** |

| 2018 | | | | |
|------|------|------|------|------|
| Timekeeper | Role | Historical Rate | Total Hours | Total Lodestar (Hours x Rate) |
| Bibko, Lori | Review Attorney | 85 | 58.7 | $4,989.5 |
| Choate, Ann | Litigation Support Manager | 275 | 43.5 | $11,962.5 |
| Dale, Adam | Associate | 585 | 966.49 | $565,396.65 |
| Dow, Nicole | Paralegal | 185 | 572.85 | $105,977.25 |
| Edwards, Renee | Review Attorney | 85 | 56.75 | $4,823.75 |
| Feher, David | Partner | 1,185 | 386.75 | $458,298.75 |
| Gadsden, Nikkole | Paralegal | 340 | 255.6 | $86,904 |
| Glass, Trina | Review Attorney | 85 | 47.75 | $4,058.75 |
| Gordon, Benjamin | Associate | 545 | 1,323.63 | $721,378.35 |
| Greenspan, David | Partner | 1,050 | 1,122.8 | $1,178,940 |
| Hou, Michelle | Review Attorney | 85 | 27 | $2,295 |
| Hyppolite, Georgino | Associate | 585 | 1,229.96 | $719,526.6 |
| Johnson, Paula | Review Attorney | 85 | 56.5 | $4,802.5 |
| Jordan, Tonja | Review Attorney | 85 | 50 | $4,250 |
| Kanayeva, Nataliya | Review Attorney | 85 | 48 | $4,080 |
| Kessler, Jeffrey | Partner | 1,445 | 611.2 | $883,184 |
| Kyritsopoulos, Corinne | Senior Paralegal | 300 | 736.75 | $221,025 |
| Lawrenz, Kendall | Paralegal | 170 | 83 | $14,110 |
| Litman, Joseph | Associate | 765 | 1,934.30 | $1,479,739.5 |
| Meenan, Sean | Partner | 820 | 907.35 | $744,027 |
| Montague, Todd | Paralegal | 340 | 41.2 | $14,008 |
| Nuga, Temiloluwa | Review Attorney | 85 | 47 | $3,995 |
| Parsigian, Jeanifer | Associate | 720 | 889.9 | $640,728 |
| **2018 TOTAL** | | | **11,496.98** | **$7,878,500.10** |

| 2019 | | | | |
|------|------|------|------|------|
| Timekeeper | Role | Historical Rate | Total Hours | Total Lodestar (Hours x Rate) |
| Feher, David | Partner | 1,245 | 17 | $21,165 |
| Gordon, Benjamin | Associate | 615 | 117.12 | $72,028.8 |
| Greenspan, David | Partner | 1,105 | 43.35 | $47,901.75 |
| Hyppolite, Georgino | Associate | 660 | 63.37 | $41,824.2 |
| Johnson, Steffen | Partner | 1,025 | 23 | $23,575 |
| Kessler, Jeffrey | Partner | 1,515 | 25 | $37,875 |
| Litman, Joseph | Associate | 825 | 61.7 | $50,902.5 |
| **2019 TOTAL** | | | **350.54** | **$295,272.25** |

20.     Copies of contemporaneously made individual attorney and staff time records, which would require a significant investment of resources to review and redact for attorney-client privileged

communications and attorney work product, are available at the Court's request. All of the time submitted was recorded contemporaneously in accordance with the firm's billing system.

21.     The $24,304,239.7 in fees that Winston & Strawn seeks is roughly $900,000 less than the total amount billed for this case by Winston personnel during the past five years.  Winston has excluded from its application fees from certain timekeepers that worked only limited hours, or only for short periods of time, for the sake of being conservative and making sure that any possible inefficiencies are eliminated.

22.     Winston & Strawn's hourly rates are adjusted annually to comport with the legal marketplace for comparable firms.  Winston monitors prevailing market rates in the regions where it works, including the Northern District of California, taking into account attorneys of comparable skill, experience, and qualification.  The firm maintains a number of internal metrics to benchmark its rates relative to those charged by competitor firms, a number of which represented Defendants in this matter. The rates reflected in this petition were also the standard billing rates these timekeepers offered for their services for other matters which they worked on throughout the United States, including in the Northern District of California.

23.     Attached hereto as Exhibit A are select biographies of Winston attorneys that provide additional background about the primary team that litigated this matter.  A few points are worth noting. The primary team of lawyers on this case are all experienced antitrust and sports lawyers.  Indeed, Winston has one of the leading antitrust practices and sports law practices in the country, and I am the co-chair of those practices.  Members of the Winston litigation team for this case have been involved in many of the most important sports antitrust cases of the last three decades or more and are considered among the most prominent practitioners in this field.

24.     Attached hereto as Exhibit B are materials about Winston & Strawn and its antitrust and sports law practices that provide additional information about the firm's well-recognized expertise and capabilities with respect to antitrust litigations in the world of sports.

25.     Attached hereto as Exhibit C is the Declaration of Daniel A. Rascher on Economic Value of Ordered Injunctive Relief, which provides detail about the larger expected economic value to the three Classes of the Court's landmark ruling.

26.     As previously noted, Winston did not participate in the damages portion of this case and thus has not received any prior fee award by the Court.  All of Winston's work has been devoted to the coordinated prosecution and proceedings on behalf of the injunctive relief classes, and Winston made this substantial investment in the litigation despite the uncertainty of the ultimate result, and thus a potential non-recovery of Winston's fees and expenses.

### III.     Winston & Strawn Costs

27.     During the pendency of this case, Winston & Strawn advanced a range of expenses necessary for the prosecution of this matter totaling $1,124,511.20.  As explained below, this does *not* include over $2 million in expert fees paid by Winston.  The costs for which we seek reimbursement are the types of costs that would be paid by a Winston antitrust or sports litigation client that hires the firm by the hour, including expenses in various categories compensable under the Clayton Act: computerized legal research, data storage, attorney travel, photocopying, service costs, mail, court costs, etc.

28.     Enclosed below is a list summarizing these necessary litigation costs:

| Category | Cost |
|---|---|
| Travel (Airfare, Hotels, Long-Distance Travel) | $224,482.48 |
| Telecommunication Services | $1,684.45 |
| Copying Costs | $220,976.41 |
| Computerized Legal Research and ECF/PACER | $72,318.97 |
| Meals | $27,584.88 |
| Document Services (Online Hosting, etc.) | $417,046.41 |
| Service of Process and Messenger/Courier | $18,977.70 |
| Professional Services | $9,957.50 |
| Shipping and Mailing | $5,004.5 |
| Court Reporting Costs | $105,808.36 |
| Local Transportation | $15,911.30 |
| Court Costs | $3,943 |
| Miscellaneous | $815.24 |
| **Total** | **$1,124,511.20** |

29.     Copies of invoices and contemporaneously made records evidencing these costs are available at the Court's request.

30.     As noted, Winston has not included among its costs the $2,235,436.48 in fees and charges incurred by expert witnesses, even though experts were essential in devising and proving

Plaintiffs' claims for both class certification and injunctive relief.  Winston expended these millions of dollars in expert fees for the benefit of the Classes, knowing that such fees are not taxable costs under the Clayton Act, because it would not have been possible to successfully prosecute these claims on behalf of the Classes without this expert testimony.  Because of the significant risks involved in prosecuting this case, as well as the substantial economic value of the injunctive relief obtained in this historic litigation, the conservative lodestar multiplier requested by Plaintiffs would help enforce the Clayton Act policy to encourage private parties to invest in and successfully prosecute antitrust violations even when a very substantial risk and investment of time and resources, including large expert fees, is required.

I declare that the foregoing is true and correct.  Executed this 26th day of March, 2019, at New York, New York.

By  _/s/ Jeffrey L. Kessler_____
        Jeffrey L. Kessler (*pro hac vice*)
        WINSTON & STRAWN LLP
        200 Park Avenue
        New York, NY 10166-4193
        Telephone: (212) 294-6700
        Facsimile: (212) 294-4700
        *jkessler@winston.com*
        *Class Counsel for Jenkins and Consolidated*
        *Action Plaintiffs*

# EXHIBIT A





## Jeffrey L. Kessler

Partner, New York
Co-Executive Chairman & Co-Chair, Antitrust/Competition & Sports Law
Practices
+1 212-294-4698
jkessler@winston.com

**Co-Executive Chairman of Winston & Strawn, Jeffrey is one of the world's leading antitrust, sports law, and trial lawyers. He has been lead counsel in some of the most complex antitrust, sports law, and intellectual property law cases in the country, including major jury trials, and has represented a number of U.S. and international companies in criminal and civil investigations in the antitrust, sports law, trade, and FCPA areas.**

| | |
|---|---|
| **Services** | Antitrust / Competition, Intellectual Property, Antitrust Litigation, Complex Commercial Litigation, Trade Secrets, Litigation, Sports Litigation, White Collar, Regulatory Defense & Investigations, Class Actions, Merger Reviews / Challenges, Government Investigations, Patent Litigation, Global Cartel Defense, Compliance & Counseling, Asia Competition & Regulatory Advice, Latin America Antitrust/Competition |
| **Sectors** | Retail & Consumer Products, Sports, Litigation & Arbitration |
| **Admissions** | New York |
| **Court Admissions** | USCA - D.C. Circuit, Southern District of New York, USCA - 1st Circuit, USCA – 2nd Circuit, USCA - 3rd Circuit, USCA - 5th Circuit, USCA – 7th Circuit, USCA - 8th Circuit, USCA - 9th Circuit, USCA – 11th Circuit, U.S. Court of International Trade, U.S. Supreme Court, USCA - Federal Circuit, New York Court of Appeals |
| **Education** | Columbia University, JD, 1977 Columbia University, BA, 1975 |

Jeffrey L. Kessler focuses his practice on all aspects of antitrust/competition, sports law, intellectual property (IP), complex litigation, and government criminal and civil investigations. He has been lead counsel in some of the most complex antitrust, sports law, and intellectual property law cases in the country, including major jury trials, and has represented a number of U.S. and international companies in criminal and civil investigations in the antitrust, trade, and Foreign Corrupt Practices Act (FCPA) areas. He successfully defended Matsushita and JVC against claims of a worldwide conspiracy in the landmark U.S. Supreme Court case *Zenith v. Matsushita* and is regarded as a leading commentator on international antitrust law. He has also been the lead counsel in numerous IP cases involving frontier issues of IP law and lead counsel in numerous government criminal and civil investigations.

© 2019 Winston & Strawn LLP

Jeffrey is also one of the most prominent lawyers in the country regularly engaged in high-profile sports litigation. He has litigated some of the most famous sports-antitrust cases in history, including *McNeil v. the NFL*, the landmark antitrust jury trial which led to the establishment of free agency in the National Football League (NFL), and *Brady v. NFL*, which led to the end of the 2011 NFL lockout. Some of Jeffrey's clients in the sports law area have included the NFL Players Association (NFLPA), the National Basketball Players Association, the Arena Football League (AFL) Players Association, the National Hockey League Players Association, the Major League Baseball Players Association, the National Invitation Tournament (NIT), CAA Sports, Wasserman Media Group, SCP Worldwide, MVP Sports, the Women's National Soccer Team, the NFL Coaches Association, Players, Inc., the Women's Tennis Benefit Association, Excel Sports, and Adidas. Jeffrey has also represented various classes of NBA, NFL, AFL, and MLS players, the North American Soccer League, the United States Football League, and the Cities of San Diego and Oakland, as well as Alameda County, in various sports law disputes. Jeffrey negotiated the current free agency/salary cap systems in the NFL and NBA, and successfully represented Latrell Sprewell in his controversial suspension arbitration. In the area of NFL discipline, he successfully represented Ray Rice, Tom Brady, and the "Bountygate" players. He also represented pro bono Oscar Pistorius, the double amputee athlete, in his successful arbitration to obtain the right to compete against able-bodied athletes around the world.

## Experience

*Some of the experience represented below may have been handled at a previous firm.*

- *Zenith, et al. v. Matsushita Electric Industrial Co., Ltd., et al.* – Successfully defended Matsushita in a landmark antitrust conspiracy case in which new summary judgment standards were established by the United States Supreme Court

- *McNeil, et al. v. NFL, et al.* – Won jury verdict for NFL players striking down free agency restrictions under the antitrust laws. This victory led to the Reggie White class action, in which the free agency/salary cap system in the NFL was negotiated.

- *Thales Avionics, Inc. v. Matsushita Avionics Systems Corp.* – Won summary judgment for Matsushita against monopolization charges in the avionics industry

- *Panasonic Corporation of North America* class action defense – Represented Panasonic in its defense of various nationwide consumer class actions in New Jersey and California courts.

- *NFL Discipline Cases* – Successfully represented Tom Brady, Ray Rice, the "Bountygate" players and others in litigation challenging NFL discipline

- *JVC Americas Corporation* class action defense – Represented JVC in national consumer class action defense

- *MDL proceedings* – Represents Panasonic, Sanyo, NTN, Uralkalli, Nippon Seiki, and other major companies in complex MDL class actions

- *Axcess Global, et al. v. Matsushita Electric Industrial Co., Ltd.* – Successfully defended Matsushita in nine-week jury trial involving claims of breach of contract and fraud in which the plaintiffs sought $750 million and the jury awarded a complete defense verdict

- *NBA Player Class Actions* – Successfully represented various classes of NBA players in different antitrust actions leading to the current free agency/salary cap system in the NBA and the end of the 2011 NBA lockout

- *DVD Copy Control Association v. Bunner, et al.* – Successfully obtained preliminary injunction for DVD Copy Control Association in landmark case challenging theft and distribution of DVD trade secrets over the Internet

- *Brady v. NFL* – Successfully represented a class of NFL players in an antitrust action which led to the end of the 2011 NFL lockout

- *Players Inc. v. Gridiron* and *Athletes First* – Successfully prosecuted two frontier IP litigations challenging the group use of NFL player images on websites

- *J.F. Feesers v. Serv-A-Portion, et al.* – Successfully represented plaintiff in major Robinson-Patman Act litigation

- *City of Oakland and Alameda County, et al. v. Oakland Raiders* – Obtained summary judgment on behalf of City of Oakland and Alameda County requiring Raiders to honor the team's stadium lease and remain in Oakland

- *Minolta and Matsushita State Attorneys General Antitrust Litigation* – Successfully settled separate multi-state antitrust actions alleging resale price maintenance

- *Samsung v. Panasonic, et al.* – Represented Panasonic and the SD-3C patent pool against antitrust claims challenging industry standard setting

- *Sprewell v. NBA* – Successfully represented Latrell Sprewell and the NBA Players Association in arbitration overturning controversial suspension and guaranteed contract termination

- *Rowe, et al. v. Creative Artists Agency, et al.* – Obtained summary judgment for CAA in defense of alleged conspiracy case

- *Metropolitan Intercollegiate Basketball Association v. NCAA* – Successfully represented the National Invitation Tournament (NIT) in antitrust litigation and jury trial against the NCAA

- *Telesat Cable vision, Inc. v. The Nashville Network, et al.* – Successfully defended the Nashville Network and Westinghouse Broadcasting against antitrust claims by cable company

- *Jenkins v. NCAA et al.* – Represented class of college football and basketball players in antitrust litigation to strike down anticompetitive NCAA rules

- *NBA and NFL arbitrations* – Represented the players associations in numerous arbitrations involving player free agency rights, circumvention claims, collusion claims, and salary caps

- *North American Soccer League, et al. v. NFL* – Successfully represented original North American Soccer League in an antitrust case striking down NFL ownership rules

- *Matsushita Electronics Corporation v. Loral Corporation, et al.* – Successfully represented Matsushita in obtaining summary judgment to establish a license defense against patent infringement claims

- *Guidry, et al. v. AFL, et al.* – Successfully represented class of AFL players in antitrust case which established free agency in the AFL

- *Belichick v. NFL, et al.* – Represented NFL Head Coach Bill Belichick in litigation over changing teams

- *Matsushita v. Mediatek* – Lead Counsel for Matsushita in major patent litigation

- *Hygrade Milk and Cream Co., et al. v. DiGiorgio, et al.* – Successfully defended company in Robinson-Patman Act litigation

- *City of Oakland, et al. v. Oakland A's* – Successfully represented the city in franchise valuation arbitration with the Oakland A's baseball team

- *Honeywell v. Victor Company of Japan Ltd.* – Successfully defended JVC against claims of willful patent infringement

- *NFLPA v. NFL* – Successfully represented NFLPA in challenge to provisions of the NFL TV contracts used to fund the NFL 2011 Lockout

- *Ovalar Makine Ticaret Ve Sanayi, A.S., et al. v. Applied Industrial Materials Corp., et al.* – Successfully vacated arbitration award in landmark Second Circuit decision on the standards for determining arbitrator bias

© 2019 Winston & Strawn LLP

- *Cinram v. Matsushita* – Obtained summary judgment in defense of antitrust claim against the DVD 6 C patent pool

- *Global Cartel Defense* – Represent major international companies in more than a dozen global cartel investigations, including criminal investigations in the United States and Canada, and related proceedings in the EU and worldwide.

- *Oscar Pistorius v. IAAF* – Won landmark arbitration for Oscar Pistorius, the double amputee runner, enabling him to compete against able-bodied athletes and to realize his dream of competing in the Olympics

## Honors & Awards

Jeffrey has been recognized by *The American Lawyer* as a "Litigator of the Week" in: March 2019 for his historic victory on behalf of college football and basketball players in an antitrust litigation against NCAA; in March 2018 when he and the Winston team defeated plaintiffs' second attempt to obtain class certification in a major antitrust action against Panasonic; and in September 2015 for his team's victory on behalf of Tom Brady and the NFL Players Association in the so-called "Deflategate" matter.

Jeffrey has been recognized by numerous publications, including *The Legal 500 U.S.*, *Chambers USA – America's Leading Lawyers for Business*, *Best Lawyers in America* (the Top 100 Lawyers in New York), *Elite Trial Lawyers*, and *U.S. News & World Report – Best Lawyers*® for his antitrust and sports law practices. *The Legal 500 U.S.* 2018 recognized him in Antitrust: Civil Litigation/Class Actions – Defense, Dispute Resolution: International Litigation, and Sports Law. *Chambers USA* 2018 ranked him among the nation's leading lawyers in Antitrust and Sports Law. Jeffrey was named *Best Lawyers'* New York City Sports Law "Lawyer of the Year" (2017), one of *Benchmark Litigation's* Top 100 Trial Lawyers (2017–2019), and as one of America's Top 100 High Stakes Litigators (2017). Jeffrey has also been recognized by *Guide to the World's Leading Antitrust Lawyers, Chambers Global,* Law360 (2015 and 2018 "Sports MVP"), *The National Law Journal's* "Elite Lawyers and Winning Litigators," *Who's Who Legal* (Sports & Entertainment in 2017 and Competition Lawyers numerous times), *The Lawdragon 500 Leading Lawyers in America* and *Lawdragon 500 Leading Litigators in America,* and has been repeatedly listed in *Super Lawyers Magazine*, including as the "Top Rated Antitrust Litigation Attorney" and "Top 100 Lawyers in New York." Jeffrey has also been named as one of The 50 Most Influential People in the Sports Business by *Street & Smith's SportsBusiness Journal* and has been named a National General Commercial Litigation Star by *Benchmark Litigation*.

Winston & Strawn's Sports Law group has been recognized by *U.S. News & World Reports – Best Lawyers*® – "*Best Law Firms*" as "Law Firm of the Year" for Sports Law for 2013. Winston & Strawn's Antitrust/Competition Practice was named "2015 Team of the Year" in cartel defense by *The Legal 500*.

## Activities

Jeffrey is a Lecturer-in-Law at Columbia Law School, where he teaches a course on complex litigation. He has written and lectured extensively on a wide variety of antitrust, sports law, and related topics. Jeffrey has published several editions of *International Trade and U.S Antitrust Law,* a treatise on antitrust and trade law issues in a global economy. He also was co-editor-in-chief of *State Antitrust Practice and Statutes*, published by the ABA Antitrust Law Section. He was a member of the Council and was formerly co-chairman of the Publications Committee and chairman of the International Antitrust Law Committee, of the Antitrust Section of the American Bar Association (ABA). He was also a member of the ABA's NAFTA Tri-National Committee and an Adjunct Professor of Law at Fordham Law School. He was a founding member of the Board of Advisors of the Georgetown University Study of Private Antitrust Litigation. He is a member of the Board of the Legal Aid Society, as well as the Board of Visitors at Columbia Law School. He is also a fellow of the International Academy of Trial Lawyers.

## Credentials

Jeffrey received a J.D. from Columbia Law School in 1977, where he was a Kent Scholar and on the board of editors for the *Columbia Law Review*. He received a B.A., *summa cum laude*, from Columbia University in 1975.

## Publications & Speaking Engagements

- Speaker, "High-Profile Sports Litigation," Mecklenburg County Bar, January 21, 2015

- "After Further Review: How the Eighth Circuit's Misinterpretation of the Norris-LaGuardia Act Fumbled the District Court's Ruling in *Brady v. NFL*," *1 Berkeley J. Ent. & Sports L.*, 2012

- Co-author, *International Trade and U.S. Antitrust Law*, 2nd Edition, 2006

- "The Supreme Court's Decision in Dagher: Canary in a Coal Mine or Antitrust Business as Usual?," *Antitrust*, 2006

- *Inside the Minds: Antitrust Laws*, 2005

- "Strategies for Litigation," *The Litigation Leadership Roundtable*, 2005

- *The Corporate Counselor and Antitrust/The Corporate Counselor's Deskbook*, 2003

- Editorial Board, *Competition Laws Outside the United States*, 2001–2003

- "Protecting DVD Trade Secrets in an Internet World," 2002

- "Understanding Business and Legal Aspects of Sports Industry," Practising Law Institute, Co-Chair, 1999–2000

- "What Justice Breyer Could Not Know at His Mother's Knee: The Adverse Effects of *Brown v. Pro Football* on Labor Relations in Professional Sports," 2000

- Co-Editor-In-Chief, *State Antitrust Practice and Statutes*, 2nd Edition (1999)

- "Consents and Settlement Agreements," *Antitrust Law in New York State* (1995)

- "The New Wave of Antitrust CIDs: What To Do When The Department Of Justice Comes Knocking On Your Door," *The Metropolitan Corporate Counsel*, 1995

- "New International Antitrust Guidelines," *ANTITRUST*, Summer 1989

- "The Antitrust Legacy of the Reagan Administration," *The Antitrust Bulletin*, 1988

- "Litigating International Antitrust Cases," *The Practitioner's Viewpoint*, 1987

- "S. 1300-H.R. 4831 – An Overdue Antitrust Reform," *The Antitrust Bulletin*, 1986

- "Integrated Reform Suggested for Antitrust Remedies," 1983





# David Greenspan

Partner, New York
+1 212-294-4616
dgreenspan@winston.com

**An accomplished antitrust, sports, and commercial litigator, and chair of the firm's college sports sub-practice, David has represented clients in complex commercial disputes at both the trial and appellate court levels, as well as before arbitration panels and government agencies.**

| | |
|---|---|
| **Services** | Litigation, Antitrust Litigation, Complex Commercial Litigation, Class Actions, Sports Litigation, Asia Competition & Regulatory Advice |
| **Sectors** | Sports, Litigation & Arbitration |
| **Admissions** | New York |
| **Court Admissions** | Eastern District of New York, Southern District of New York, Eastern District of Michigan, USCA – 2nd Circuit, USCA - 5th Circuit, USCA - 6th Circuit, USCA - 8th Circuit, USCA - 9th Circuit |
| **Education** | University of Pennsylvania, JD, 2001 University of Pennsylvania, BA, 1998 |

In connection with antitrust matters, David Greenspan has acted as plaintiffs and defense counsel in cases involving monopolization, predatory pricing, price-fixing, group boycotts, and other restraints of trade. Representative cases include the defense of alleged cartel activities in multidistrict class actions and the defense of unlawful monopolization claims under various federal and state antitrust laws. He has also defended companies in criminal and administrative proceedings brought by the U.S. Department of Justice (DOJ) and international competition authorities.  David regularly counsels clients on antitrust matters, including implementing antitrust compliance policies and programs.

With respect to sports-related litigation, David has litigated cases involving antitrust law, labor law, licensing, agent regulation, active and retired player rights, and collegiate athlete rights. He regularly represents the NFL Players Association and NFL players, and has appeared in numerous matters involving players such as Tom Brady, Colin Kaepernick, Ray Rice, Adrian Peterson, Ezekiel Elliott, Eric Reid, Terrell Owens, Michael Vick, Plaxico Burress, and Ricky Williams. David has also represented NBA players, the NBA Players Association, the MLB Players Association,

© 2019 Winston & Strawn LLP

the NHL Players' Association, classes of D-I collegiate athletes, professional poker players, a prospective NHL owner, professional sports agents, and an Olympic gold medalist.

## Experience

*Some of the experience represented below may have been handled at a previous firm.*

*Some of the experience represented below may have been handled at a previous firm.*

- *Jenkins v.NCAA* – Represents classes of collegiate players in their antitrust lawsuit against the NCAA and Power Conferences concerning restraints on compensation.

- Currently involved in several confidential matters on behalf of multinational companies subject to DOJ and foreign criminal investigations for alleged cartel activities.

- *NFL National Anthem grievances* – Represents the NFLPA and certain NFL players in several arbitrations concerning NFL player protests during the playing of the national anthem.

- *Panasonic class action defense.* Represents Panasonic Corp. and Panasonic Corp. of North America in their defense of various class actions.

- *In re Tom Brady* –Represented the NFLPA and Mr. Brady in arbitration and litigation challenges to discipline imposed on Mr. Brady in connection with so-called "Deflate-gate."

- *Brady v. NFL* –Represented Tom Brady and other NFL players in an antitrust lawsuit against the NFL and NFL teams.

- *NBPA/NBA Player Litigations* –Represented the NBPA in a declaratory judgment action filed by the NBA and represented individual NBA players in antitrust litigation filed against the League.

- *In re Ray Rice* – Represented the NFLPA and Mr. Rice in a successful appeal of the indefinite suspension imposed on Mr. Rice.

- *In re Adrian Peterson* –Represented the NFLPA and Mr. Peterson in arbitration and litigation challenges to discipline imposed on Mr. Peterson.

- *NFLPA v. NFL (Saints "Bounty" Discipline)* – Represented the NFLPA and certain NFL players in litigation and multiple arbitrations that resulted in all discipline being vacated.

- *Thales v. Panasonic Avionics Corp* –Represented Panasonic Avionics Corporation in a matter in which Panasonic achieved summary judgment and defeated charges of unlawful monopolization and predatory pricing.

- *White v. NFL (Broadcast Revenues)* –Represented the White class and the NFLPA in a proceeding challenging the NFL's negotiation of its national TV contracts.

- *White v. NFL (Michael Vick)* –Represented NFL player Michael Vick before trial and appellate courts in defeating the Atlanta Falcons' attempt to recover bonus money from Mr. Vick after he was incarcerated and suspended.

- *Ferguson v. WPT Enterprises, Inc.* – Represented seven of the world's top poker players in an antitrust lawsuit filed against the World Poker Tour.

- *In re Dewey Ranch Holdings* –Represented PSE Sports & Entertainment in James Balsillie's bid to purchase and relocate the Phoenix Coyotes hockey franchise out of bankruptcy.

## Honors & Awards

David has been recognized for his legal acumen by a number of publications:

- Recognized in *The Legal 500 U.S.* 2018 for his work in Sports Law

© 2019 Winston & Strawn LLP

- Ranked in *Chambers USA* 2018 as one of the nation's leading attorneys in Sports Law

- Selected by his peers for inclusion in *The Best Lawyers in America*© 2019 in the field of Sports Law

- 2016 "Under 40 Hot List" by *Benchmark Litigation*

- 2016 "Rising Star" by *Law360* in its list of four Sports lawyers under 40 to watch

- 2016 *Law360* Sports Editorial Advisory Board Member

- 2016 and 2014 "40 Under 40" by *Sports Business Journal* as one of the top young executives in the sports industry

- 2015 "Leaders in Their Field" and "Up & Coming" rankings by *Chambers USA* for Sports Law

- 2015 and 2014 "Rising Star" by *Super Lawyers*

- 2014 "Rising Star" by the *New York Law Journal* as a top contributor to the practice of law and the community

- 2013 "Rising Star" by *Law360* in its list of four Media & Entertainment lawyers under 40 to watch

- 2010 recognition by *Legal 500 US* in 2010 in the area of Sports Law

- 2004 "Rights of Workers" Pro Bono Award from the Legal Aid Society in 2004 for achieving summary judgment in a matter of first impression on behalf of low-income childcare worker

## Activities

David formerly served as the chair of the New York City Bar Association's Sports Law Committee.

He serves as chair of Winston & Strawn's Associate Evaluation Committee.

## Credentials

David received a J.D. from the University of Pennsylvania Law School in 2001, and a B.A., *cum laude*, from the University of Pennsylvania in 1998.

## Publications & Speaking Engagements

- ABA Trade, Sports, and Professional Associations Committee, "Hot Topics in Sports and Antitrust" (Panelist, March 9, 2018)

- Fifth Annual Penn Law Sports Law Symposium, Sponsored by Penn Law, COP, and the Entertainment and Sports Law Society (Panelist, February 9, 2018)

- Association of Business Trial Lawyers, Tackling NFL Player Litigation: From Bountygate to Deflategate (Panelist, February 6, 2018)

- ABA International Committee Monthly Corporate Counsel Update (November 2017)

- NYU Law School Sports Law Colloquium (Panelist, March 2016)

- NYU School of Professional Studies, "Labor Relations in Sports," Guest Lecturer, February 2016

- University of New Hampshire, Professor Michael McCann's Deflategate Course, Guest Lecturer, October 2015

- William B. Bryant Inn of Court, "Deflategate Goes to Federal Court," Guest Lecturer, October 2015

- NY State Bar Association Antitrust Law Section Annual Meeting, "Amateur in Name Only? The Intersection Between Antitrust Law and College Athletics," Panelist, January 2015

- NYU School of Professional Studies, "Labor Relations in Sports," Guest Lecturer, December 2014

- CSE Sports Marketing Symposium, "College Sports: The Changing Relationship with Athletes and the Implications on Sports and Sports Marketing," Panelist, October 2014

- Federal Bar Council, "The Role of Federal Litigation in Governing Sports in the 21st Century," Panelist, September 2014

- University of Pennsylvania Law School, Sports Law Symposium, Panelist, February 2014

- CPI Antitrust Chronicle, *Litigating Change in CollegeSports*, Author, January 2014

- Bloomberg TV, Market Makers, Discussing Alex Rodriguez lawsuit, October 2013

- ABA Section of Antitrust Law: Cartel and Criminal Practice and Economics Committee, "The Economics of Collusion," Moderator, July 2013





## David G. Feher

Partner, New York
Co-Chair, Sports Practice
+1 212-294-4613
dfeher@winston.com

**David has been recognized in *Chambers USA – America's Leading Lawyers for Business* from 2005–2018 as "one of the country's leading sports attorneys." He also was recognized in *The Legal 500 U.S.* 2018 for his work in Sports Law and International Litigation, selected by his peers for inclusion in *The Best Lawyers in America©* 2019 in the field of Sports Law, selected in the first 100 *Lawdragon*'s "New Stars" in 2006, and honored in 2010–2018 by *New York Super Lawyers*.**

| | |
|---|---|
| **Services** | Litigation, Antitrust Litigation, Sports Litigation |
| **Sectors** | Sports, Litigation & Arbitration, Media & Entertainment |
| **Admissions** | New York |
| **Court Admissions** | Northern District of California, USCA - D.C. Circuit, Eastern District of New York, Northern District of New York, Southern District of New York, USCA – 2nd Circuit, USCA - 5th Circuit, USCA - 8th Circuit, USCA - 9th Circuit, U.S. Supreme Court, USDC - District of Columbia, Eastern District of Louisiana |
| **Education** | Duke University, JD, 1984
Georgetown University, BA, 1980 |

David Feher is the co-chair of the firm's Sports Law Practice. He is one of the leading sports lawyers in the country, with extensive experience in complex litigations, negotiations, and arbitrations involving contract, intellectual property, antitrust, and international issues.

He has been outside counsel for the NFL Players Association (NFLPA) and the NBA Players Association (NBPA) for many years. He is one of the prime negotiators of the collective bargaining agreements and antitrust settlements in the NFL (1993, 1996, 1998, 2002, 2006, and 2011) and the NBA (1995, 1999, 2005, 2011, and 2017).

## Experience

David has represented clients in many prominent sports lawsuits and arbitrations, including:

- U.S. Women's National Soccer Team in litigation and negotiations with the U.S. Soccer Federation

© 2019 Winston & Strawn LLP

- *Jenkins v. NCAA* antitrust action challenging NCAA and major conference restrictions on competition for player services in Division I basketball and Football Bowl Subdivision (FBS) football

- Oakley/Rory McIlroy/Nike litigation (concerning a right of first refusal in Mr. McIlroy's contract with Oakley, which resulted in a settlement with Mr. McIlroy)

- Represented North American Soccer League (NASL) in antitrust litigation against the U.S. Soccer Federation (USSF) and Major League Soccer regarding USSF sanctioning decisions and other conduct adverse to NASL

- *NCAA/NIT* litigation (which resulted in a favorable settlement for the five New York City colleges and universities that operated the NIT)

- Co-led the historic pro bono representation of double-amputee Oscar Pistorius in the successful effort to overturn the ban against Mr. Pistorius competing in IAAF track events and the Olympics (which led to Mr. Pistorius competing in the 2012 London Olympics), and 800M World Champion sprinter Caster Semenya in her successful eligibility dispute with the IAAF

- One of the lead lawyers for the NFLPA and three NFL players in the *New Orleans Saints Bounty Case* that overturned the discipline the NFL had imposed on the players for allegedly participating in an undisclosed "pay for performance/bounty" program operated by the team

- He was the principal author of the brief submitted by all of the major player associations to the U.S. Supreme Court in the landmark *American Needle* case, which rejected the NFL's efforts to characterize itself as a "single entity" for antitrust purposes

- Represented agents and their clients at Creative Artists Agency (CAA), Wasserman Media Group (WMG), and other such firms in various matters

- Negotiated Avon's sponsorship of the Olympic Games and Avon's licensing contract with Derek Jeter.

- Successfully represented noted nutritionist and *The New York Times* best-selling author Dr. Joel Fuhrman in an arbitration and negotiation regarding the terms of a joint venture

- *Freeman McNeil/NFL* antitrust trial

- Reggie White and Patrick Ewing class actions

- NFL lockout insurance/network TV contract case

- Jeremy Lin "Bird Rights" arbitration

- Drew Brees Franchise Player arbitration

- Michael Vick roster bonus forfeiture arbitration

- Terrell Owens arbitrations

- Arena Football League class action

- Bill Belichick/New York Jets litigation

- Latrell Sprewell grievance

In addition, David has represented a number of large U.S. and international companies in various matters, and has extensive experience litigating complex commercial disputes. He has negotiated numerous commercial contracts in the sports and other industries. He has been involved in numerous other major cases, including:

- NASDAQ price-fixing class action

- Successfully defended Avon Products, Inc. against a $100 million false advertising claim in the *S.C. Johnson v. Avon Products* trial

- Represented the New York Stock Exchange in connection with the "decimalization" of NYSE trading operations, and has advised companies involved in price-fixing investigations by the U.S. Department of Justice

- Represented a Turkish company in successfully vacating an arbitration award on grounds of evident partiality

## Honors & Awards

David has been recognized in *Chambers USA – America's Leading Lawyers for Business* from 2005–2018 as "one of the country's leading sports attorneys." He also was recognized in *The Legal 500 U.S.* 2018 for his work in Sports Law and International Litigation, selected by his peers for inclusion in *The Best Lawyers in America©* 2019 in the field of Sports Law, selected in the first 100 *Lawdragon*'s "New Stars" in 2006, and named by *Super Lawyers Magazine* to the New York Super Lawyers list from 2010–2018.

David is part of the group awarded the "2015 Team of the Year" in Cartel Defense by *The Legal 500*. Winston & Strawn's Sports Law Practice has been recognized by *U.S. News & World Reports – Best Lawyers* as "Law Firm of the Year" in Sports Law for 2012–2013.

## Activities

David is a member of the American Bar Association and the Sports Lawyers Association. He also often writes and speaks on antitrust and sports topics, and served as an Adjunct Professor of Law at the Benjamin Cardozo School of Law.

## Credentials

David received a J.D. from Duke University in 1984, where he was an article editor for the *Duke Law Journal*. He received an A.B., *magna cum laude*, from Georgetown University in 1980.

## Publications & Speaking Engagements

### Publications

- "A Structural Overview of Competition Law as Applied to U.S. Major League Team Sports," *Concurrences Journal* N° 2-2014, Art. N° 65481, May 2014

- *Inside the Minds: Winning Legal Strategies for Entertainment, Sports, and Media Law*, Chapter (Aspatore Books 2006)

- "The Supreme Court's Decision in Dagher: Canary in a Coal Mine or Antitrust Business as Usual?," *Antitrust*, co-author (Fall 2006 Issue)

- Chapter 12, "The Corporate Counsellor & Antitrust," *Corporate Counsellor's Deskbook*, co-author (5th ed.)

- "The Adverse Effects of Brown v. Pro Football on Labor Relations in Professional Sports," *Antitrust Magazine*, co-author (Spring 2000 Issue)

### Speeches and Programs

- Speaker, Duke Exchange, Duke University Fuqua School of Business, "The Law of College Sports: An Inside Look at NCAA Rules, Infractions, and the Regulation of College Athletics," Durham, NC, February 10, 2018

- Speaker, Minnesota State Bar Association, "Sports Antitrust: The Rules Off the Field are Changing," Minneapolis, MN, April 20, 2017

- Speaker, 6th Annual NYU Sports Law Colloquium, "Team Relocations & League Expansion," New York, NY, April 14, 2017

- Speaker, New York Law School, "Sports Law Symposium," New York, NY, March 30, 2017

- Speaker, University of Pennsylvania Law School Entertainment & Sports Law Society, Fourth Annual Penn Law Sports Law Symposium, "Gender Equality in Sports: On the Field and in the Front Office," Philadelphia, PA, January 27, 2017

- Panelist, Sport Arbitration, Georgetown International Arbitration Society, Georgetown University Law Center, Washington, D.C., April 19, 2016

- Panelist, ABA Forum on the Entertainment and Sports Industries, 2016 International Legal Symposium on the World of Music, Film, Television, and Sports, Miami, Florida, March 7, 2016

- Speaker, FIFPro Legal Conference 2015, "Legal Legends in Sport and the Future of Sports Law," Amsterdam, Netherlands, December 14, 2015

- Guest Lecturer, NYU School of Professional Studies, "Sports Economics," New York, New York, December 1, 2015

- Guest Lecturer, Sports Law, St. John's University School of Law, October 22, 2015

- Speaker, "An Inside Look at the World of Agents: Past, Present and Future," The Jeffrey S. Moorad Sports Law Journal Annual Symposium 2014, Villanova University School of Law, March 21, 2014

- Panelist, "The Litigation-ization of Sports," American Bar Association, 2013 ABA Annual Meeting, Section of Litigation, San Francisco, California, August 8, 2013

- Panelist, "Sports Law Developments," Practising Law Institute, New York, New York, May 8, 2012

- Keynote Speaker, Harvard Law School, 2012 Sports Law Symposium, Cambridge, Massachusetts, March 23, 2012

- Panelist, Collective Bargaining, Duke Law School, Sports and Entertainment Law Symposium, Durham, North Carolina, March 16, 2012

- Panelist, Sports Law Practitioners, Columbia Law School, New York, New York, March 5, 2012





## Sean D. Meenan

Partner, San Francisco
+1 415-591-1586
smeenan@winston.com

**Sean is a complex commercial litigator, who focuses his practice on antitrust, unfair competition, false advertising, and business disputes. Sean also counsels clients on a variety of matters, including regulatory compliance and contract drafting.**

| | |
|---|---|
| **Services** | Antitrust Litigation, Complex Commercial Litigation, White Collar, Regulatory Defense & Investigations, Class Actions, Compliance & Counseling, Government Investigations, Trade Secrets, Global Cartel Defense |
| **Sectors** | Food, Beverage & Agriculture, Food & Beverage Litigation |
| **Admissions** | California |
| **Court Admissions** | Eastern District of California, Northern District of California, Central District of California |
| **Education** | University of California, Hastings, JD, 2008 Boston College, BS, 2001 |

Sean Meenan has extensive experience in a variety of commercial litigation matters, ranging from small business disputes to class actions involving antitrust, unfair competition, and false advertising claims. He represents clients in a variety of industries, including technology, financial services, food, and consumer products. Regardless of the matter or industry, Sean handles each case in a cost-efficient manner designed to obtain results consistent with each client's business and legal interests.

## Experience

### Antitrust Experience

- Defended credit card network in putative class action alleging a conspiracy to shift liability in connection with rollout of security-enhanced "chip" cards

- Represented a class of college football and basketball players challenging the NCAA's restraint on competition for the services of players in the case captioned *In re National Collegiate Athletic Grant-in-Aid Antitrust Litigation*

- Defended electronics manufacturers in class actions alleging conspiracies to fix prices and reduce the output of electronic components in *In re Static Random Access Memory Antitrust Litigation*, *In re Optical Disk Drive Antitrust Litigation*, and *In re Lithium Ion Batteries Antitrust Litigation*

- Defended major networking manufacturer in antitrust action alleging abuse of monopoly power

**Investigation Experience**

- Conducted internal investigations related to DOJ subpoenas, whistleblower allegations, and reported violations of the Foreign Corrupt Practices Act and anti-money-laundering statutes

- Represented corporations and individuals in connection with federal criminal investigations related to antitrust and other matters from the receipt of subpoenas through grand jury testimony

**Unfair Competition Experience**

- Defended internet startup in dispute regarding terms of service and arbitration agreement

- Defended unfair competition and false advertising class actions, including numerous labeling cases against food manufacturers and retailers

**Commercial Litigation Experience**

- Defended a number of Proposition 65 cases, including cases against companies in the manufacturing, food, and dietary supplement industries

- Defended patent infringement action relating to SDRAM technology

- Represented corporation in trade secret action relating to protocol analyzer technology

- Defended financial institution in trade mark dispute

- Represented plaintiff in dispute regarding real estate contract

**Employment Experience**

- Defended employers in actions alleging wrongful termination and ERISA violations

- Drafted employment contracts, including independent contractor, confidentiality, and termination agreements

**Pro Bono**

- Represented state prison inmate in lawsuit alleging cruel and unusual punishment

- Represented tenant in unlawful eviction action

- Represented indigent client facing criminal allegations that presented the risk of jail time and deportation

## Honors & Awards

- Ranked in *The Legal 500 U.S.* for Antitrust: Civil Litigation/Class Actions – Defense (2018)

- Named a "Rising Star" of Northern California lawyers by *Super Lawyers* (2011 - 2017)

- Member of Winston & Strawn's Antitrust/Competition Practice, which was named "2015 Team of the Year" in cartel defense by *The Legal 500*

- Member of Winston & Strawn's Food & Beverage Practice, which was identified as "Food & Beverage Group of the Year" (2016)

- Member of Winston & Strawn's Sports Law Practice, which was awarded "Sports Group of the Year" by Law360 (2016)

- Received two Winston & Strawn LLP "Pro Bono Commitment to Service" Awards (2016)

- Is honored to have taught hundreds of seventh graders prior to law school and is proud that his former students are now successful young adults

## Credentials

Sean received a B.S., *cum laude*, in Management from Boston College in 2001 and a J.D., *cum laude*, in 2008 from the University of California, Hastings College of Law.





## Joseph A. Litman

Associate, New York
+1 212-294-3509
jlitman@winston.com

**Joseph concentrates his practice on sports, antitrust, and labor law matters. He has represented clients in federal and state courts, before arbitrators, and in Department of Justice investigations.**

| | |
|---|---|
| **Services** | Antitrust / Competition, Antitrust Litigation, Government Investigations, Litigation, White Collar, Regulatory Defense & Investigations, Sports Litigation |
| **Sectors** | Sports, Automotive |
| **Admissions** | New York<br>Illinois |
| **Clerkships** | US Bankruptcy Court, District of Arizona for the Honorable Eileen Hollowell |
| **Education** | Washington University - St Louis, JD, 2011<br>University of Michigan, BA, 2003 |

Joseph Litman regularly represents the National Football League Players Association and NFL players. He has served as counsel in notable cases including the Tom Brady "Deflategate" arbitration and litigation, the Adrian Peterson arbitration and litigation, the Jimmy Graham contract arbitration, and in successfully defending against class-action litigation. He also represents classes of college athletes challenging NCAA and Power Conference compensation rules as anticompetitive restraints of trade.

In addition to his sports work, Joseph has represented clients in white-collar criminal investigations, antitrust price fixing cases, and employment disputes.

Before joining Winston & Strawn, Joseph clerked for the Honorable Eileen Hollowell in the U.S. Bankruptcy Court, District of Arizona, where he worked on Chapter 11 confirmation and absolute-priority issues, claims classification, asset sales, 1111(b) elections, substantive consolidation, and single-asset real estate cases.

© 2019 Winston & Strawn LLP

## Experience

REPRESENTATIVE MATTERS:

- *Jenkins v. NCAA*: Joseph represents classes of collegiate players in their antitrust lawsuit against the NCAA and Power Conferences concerning restraints on compensation.

- *Brady v. NFL* ("Deflategate"): Joseph represented New England Patriots Quarterback Tom Brady in arbitration and court proceedings challenging his four-game suspension imposed by the NFL for his alleged role in the so-called "deflategate" scandal.

- *NFLPA Concussion Litigation*: Joseph represented the NFLPA in class-action lawsuits related to the NFL's concussion settlement with former players.

- *Peterson v. NFL*: Joseph represented Minnesota Vikings Running Back Adrian Peterson in arbitration and court proceedings challenging his NFL suspension.

- *Graham v. NFL*: Joseph represented the New Orleans Saints' Jimmy Graham and the NFLPA in an action challenging Franchise Player provisions under the governing collective bargaining agreement.

- *White v. NFL*: Joseph represented the NFLPA in an action alleging collusion arising out of the NFL's collective bargaining agreement.

- *Miller v. NFL*: Joseph represented Denver Broncos Linebacker Von Miller and the NFLPA in an action for signing-bonus forfeiture.

- Successfully negotiated a settlement award with USATF on behalf of a national champion female athlete who challenged eligibility and prize money restrictions on the basis of gender.

- Represented a multinational company subject to DOJ and foreign criminal investigations for alleged cartel activities.

- Represented an international consultancy in employment litigation.

- Represented Madoff Ponzi scheme victims against clawback claims asserted by the BLMIS Trustee.

## Activities

Joseph is a member of the New York County Lawyers' Association.

## Credentials

Joseph received a B.A. in Political Science from the University of Michigan in 2003. He earned his J.D. from Washington University School of Law in 2011, where he was a Senior Editor of the *Washington University Law Review*.

## Publications & Speaking Engagements

Greenspan, David and Joseph Litman, "Litigating Change in College Sports," CPI Antitrust Chronicle, January 2014





## Jeanifer E. Parsigian

Associate, San Francisco
+1 415-591-1469
jparsigian@winston.com

**Jeanifer received the Winston & Strawn Pro Bono Commitment to Service Award for her work on behalf of a Cameroonian refugee fleeing persecution on account of his sexual orientation.**

| | |
|---|---|
| **Services** | Litigation, Complex Commercial Litigation, Antitrust / Competition, Antitrust Litigation, Class Actions, Global Cartel Defense, Sports Litigation |
| **Admissions** | California |
| **Education** | Harvard University, JD, 2012 <br> University of Michigan, BA, 2006 |

Jeanifer Parsigian is a litigation associate in the firm's San Francisco office, where she concentrates her practice on complex commercial litigation matters, specifically consumer class actions and antitrust matters. Jeanifer represents several major U.S. and multinational corporations in cases involving a variety of federal and state antitrust and unfair competition issues. Jeanifer has experience litigating high-profile, complex antitrust conspiracy and monopolization cases and specializes in mixed issues of antitrust and intellectual property law, including the antitrust implications of intellectual property licensing. Jeanifer has represented clients in all stages of litigation, from drafting pre-trial dispositive motions and participating in discovery through settlement and trial. She also has experience in alternative dispute resolution, including commercial arbitration and mediation.

## Experience

- Representation of a putative class of college athletes against the NCAA in challenging financial aid and compensation restrictions under federal antitrust laws.

- Representation of a major electronics manufacturer in the multidistrict, putative class action, optical disk drive products antitrust litigation.

- Representation of a major electronics manufacturer in multidistrict class action alleging conspiracy to fix prices of lithium ion batteries.

- Representation of TreeHouse Foods, Inc., Bay Valley Foods, LLC, and Sturm Foods, Inc. in their antitrust lawsuit against Keurig Green Mountain, Inc. alleging anticompetitive exclusive dealing, conspiracy, monopolization, unfair competition, tying, anticompetitive product redesign, patent misuse, and sham litigation claims.

© 2019 Winston & Strawn LLP

**Honors & Awards**

In 2013, Jeanifer received the Winston & Strawn Pro Bono Commitment to Service Award for her work obtaining withholding of removal for a Cameroonian refugee fleeing persecution on account of his sexual orientation.

**Activities**

Jeanifer currently serves as a California Young Lawyers Association Liaison to the Antitrust, UCL & Privacy Section of the California Bar.





## Georgino E. Hyppolite

Associate, New York
+1 212-294-5387
ghyppolite@winston.com

**Georgino concentrates his litigation practice on sports, antitrust, and labor law. He has represented clients from various industries, including the sports and entertainment, financial services, and shipping industries.**

| | |
|---|---|
| **Services** | Litigation |
| **Admissions** | New York |
| **Education** | Harvard University, JD, 2015 |
| | Dartmouth College, BA, 2012 |

Georgino Hyppolite is an associate in Winston & Strawn's New York office. He focuses his practice on sports, antitrust, and labor law matters.

In Georgino's sports practice, his clients include the National Football League Players Association and the National Basketball Players Association. He also represents college athletes in the Jenkins v. NCAA case, an antitrust lawsuit against the NCAA and the Power Five Conferences that challenges restrictions on athlete compensation.

In addition to his sports work, Georgino has represented clients in commercial law disputes and investigations into alleged violations of antitrust law. He also maintains an active pro bono practice.

## Activities

In law school, Georgino served as an intern for a non-profit organization providing workplace-related legal counsel to low-wage immigrant workers.

## Credentials

Georgino received a B.A., *cum laude*, with Honors in Sociology from Dartmouth College in June 2012, and a J.D. from Harvard Law School in May 2015.





## Adam I. Dale

Associate, New York
+1 212-294-5329
aidale@winston.com

**Adam's practice focuses on sports, antitrust, and labor law.  He regularly represents athletes and other high profile sports industry clients in arbitration and litigation.**

| | |
|---|---|
| **Services** | Litigation, Antitrust Litigation, Sports Litigation, Labor, Employment, Employee Benefits & Executive Compensation |
| **Sectors** | Sports |
| **Admissions** | New York |
| **Education** | New York University, JD, 2015<br>George Washington University, BA, 2012 |

Adam Dale is an Associate in Winston & Strawn LLP's New York office.  His practice focuses on sports, antitrust and labor law.

Adam counsels and represents a variety sports industry clients including Athletes First LLC, MVP Sports Group, North American Soccer League (NASL), WME | IMG, and a global eSports League. He has negotiated employment contracts for several top sports agents.

He frequently serves as counsel for the National Football League Players Association and NFL players in litigation and arbitration matters, including in notable cases such as the *Ezekiel Elliott* arbitration and litigation.

Adam is a member of the *Jenkins v. NCAA* case team, a landmark antitrust suit filed against the NCAA and its five power conferences by a group of current and former college athletes seeking to strike down unlawful compensation restraints imposed by the NCAA on Division I Men's and Woman's basketball and FBS Football programs.

## Activities

In his pro bono work Adam focuses on prison reform. He represented two clients serving life sentences for drug-related crimes in their successful petitions to the President of the United States for sentence commutations. Mr. Dale also negotiated a five-figure settlement for a state prison inmate in a civil rights action. He was a recipient of the Empire State Counsel Award in 2016 and 2017 for his commitment to pro bono.

In 2018, Adam was honored with The Legal Aid Society's Pro Bono Publico Award.

## Credentials

He received his J.D. from New York University School of Law in May 2015, where he was Senior Editor of the *Journal of Intellectual Property and Entertainment Law* and the Chair of the NYU Sports Law Society.  He received a B.A. in Political Communication, *cum laude*, in May 2012 from The George Washington University.





## Benjamin S. Gordon

Associate, New York
+1 212-294-6726
bgordon@winston.com

**Benjamin's practice focuses on sports, antitrust and labor law.**

| | |
|---|---|
| **Services** | Antitrust Litigation, Litigation, Sports Litigation, Labor, Employment, Employee Benefits & Executive Compensation |
| **Sectors** | Sports |
| **Admissions** | New York |
| **Education** | University of California-Los Angeles, JD, 2016<br>University of Miami, BS, 2012 |

Benjamin Gordon is a litigation associate in Winston & Strawn LLP's New York office. His practice focuses on sports, antitrust, and labor law.

Benjamin is a member of the *Jenkins v. NCAA* case team, a landmark antitrust suit filed against the NCAA and its five power conferences by a group of current and former college athletes seeking to strike down unlawful compensation restraints imposed by the NCAA on Division I Men's and Women's basketball and FBS Football programs.

He frequently serves as counsel for the National Football League Players Association and NFL players in litigation and arbitration matters, including cases such as the *Ezekiel Elliott* arbitration and litigation and grievances challenging the NFL's National Anthem policy.

Benjamin represented a European football club in an arbitration before the Court of Arbitration for Sport.

Prior to joining the firm, Benjamin participated in Winston & Strawn's Public Interest Fellowship Program at Neighborhood Legal Services of Los Angeles County, where he worked on a variety of Workers' Rights Litigation matters.

## Activities

Benjamin maintains an active pro bono practice, where he dedicates his time to the representation of clients seeking asylum in the United States.

© 2019 Winston & Strawn LLP

## Credentials

Benjamin received a B.S., *magna cum laude*, in Education in 2012 from University of Miami. He received a J.D. in 2016 from UCLA School of Law where he also received the Masin Family Academic Excellence Award in Sports Law and was president of the Sports Law Federation, co-chair of the Homelessness Prevention Law Clinic, and co-chair of the Public Counsel CARES Law Clinic.

# EXHIBIT B



# Antitrust/Competition Practice



**Winston & Strawn's global antitrust/competition attorneys help clients resolve their most complex problems.** Our team is proud to offer a full range of services, including advice and representation related to all aspects of global cartel defense, civil and criminal litigation, government investigations, mergers and acquisitions, and regulatory counseling and compliance.

## Antitrust Litigation

Our antitrust/competition lawyers have decades of experience representing major corporations headquartered worldwide in both government and private antitrust litigation. We routinely handle the most complex disputes for our clients, often coordinating defenses across jurisdictions with simultaneous government investigations and private litigation. We have handled cases ranging from market-division and price-fixing conspiracies to antitrust claims arising in connection with patent, contract, Lanham Act, and unfair trade practice issues. Our private antitrust litigation experience includes the representation of both plaintiffs and defendants.

Additionally, we have extensive private antitrust litigation experience in matters that involve both antitrust and other legal claims. These include competition issues that arise in contract disputes, *qui tam* litigation, and claims grounded in torts, the Foreign Corrupt Practices Act (FCPA), the False Claims Act, securities laws, as well as RICO, unfair business practices, sports, and distribution and franchising laws. Many patent infringement actions also involve antitrust claims. Our lawyers have handled a wide range of antitrust matters related to intellectual property rights for clients, including in the monoclonal antibody, automotive, computer, consumer electronics, defense, entertainment, medical device, pharmaceutical, agriculture-biotech, and publishing industries.

As antitrust agencies in the United States, EU, Asia, and around the world have grown more vigilant and committed than ever to aggressive competition law enforcement, it is critical that sophisticated global companies have experienced antitrust litigation counsel by their side.

## Global Cartel Defense

Winston & Strawn's antitrust/competition team, composed of lawyers with decades of experience in antitrust law, private litigation, and white-collar and regulatory defense, offers clients a preeminent global cartel defense practice. As a result of our extensive experience with leniency programs in the United States, the EU, and other jurisdictions worldwide, large multi-national corporations, closely held companies, and key executives trust our group with their most pressing cartel matters on a regular basis. In fact, we are currently handling some of the largest cartel investigations and related private litigation in the world today.

Our attorneys have defended companies involved in international cartel investigations from the inception of the enforcers' push into this arena. At any given time, we are typically handling the defense of no less than a dozen major international cartel matters. These cases often involve the threat of significant criminal fines and incarcerations. Many of these cases also involve direct



**BENCHMARK LITIGATION**

**2018 Antitrust Practice of the Year**

1   Attorney advertising materials – © 2019 Winston & Strawn LLP

## Winston Team Ensures Massive Text Messaging Class Action Gets No Reception

**Challenge:** On the heels of a letter by then-U.S. Senator Herb Kohl of Wisconsin asking for an explanation of their pricing practices, Verizon Wireless and other U.S. wireless carriers were hit with more than 35 nationwide class action complaints alleging that they conspired to fix prices for pay-per-use text messaging services in the United States. Plaintiffs sought damages approaching $10 billion dollars.

**Solution:** In 2009, we successfully obtained a dismissal of plaintiffs' first amended complaint. Plaintiffs' then filed a further amended complaint in 2012. In May 2014, the Northern District of Illinois granted our client's motion for summary judgment. Plaintiffs appealed the decision, and oral arguments were heard by the Seventh Circuit in February 2015.

**Result:** A three-judge panel of the Seventh Circuit affirmed the lower court's decision granting summary judgment in April 2015.

and indirect purchaser multi-district litigation (MDL) class actions with billions of dollars in alleged damages, opt-out cases, and State Attorney General actions. Our clients in cartel defense matters include both corporations and individuals from the United States, Asia, and Europe. Our lawyers are well versed in dealing with cross-cultural issues and helping non-U.S. clients understand and comply with U.S. legal obligations.

As U.S. and other antitrust authorities have continued to increase the resources devoted to price-fixing and international cartel investigations, and intergovernmental cooperation has grown in the form of information sharing, coordinated investigations, and even extradition, cartel enforcement has become increasingly globalized. Our firm has extensive experience in handling these matters on a multi-jurisdictional basis, working with both our own

GLOBAL COMPETITION REVIEW

# "Highly recommended"

lawyers and a network of professionals that enables us to defend and resolve the most sophisticated and extensive global cartel investigations and collateral private actions.

## European Competition and Regulatory Advice

Winston & Strawn has extensive experience in advising both private and governmental entities in connection with European state aid clearances, analyzing state aid aspects of proposed projects, and responding to alleged breaches of state aid rules. Through our U.S., London, and Brussels offices, we are routinely involved in some of the leading cases at both European and national levels. We represent clients in cases before the European Commission, as well as the European community courts and national courts in relation to the provision and recovery of state aid.

## Asian Competition and Regulatory Advice

Winston & Strawn has extensive experience advising multinational companies in connection with merger reviews in numerous Asian jurisdictions, including China, Japan, Korea, and Taiwan, as well as in connection with government investigations and litigation. Through our offices in the Asia-Pacific region, as well as through our experienced practitioners based in the United States, we are frequently involved in leading merger and cartel cases and investigations. While many of these cases run parallel to related proceedings in the United States, EU, and other jurisdictions, we have mastered successful coordination to ensure an efficient and consistent worldwide approach with proven results.

## Government Investigations

Aggressive enforcement of competition law has resulted in an increase in the number of investigations into a broad range of conduct by the Federal Trade Commission (FTC), Department of Justice (DOJ), and numerous other government agencies, including conduct related to cartels, mergers and acquisitions, as well as areas such as standard setting, patent settlements, marketing and distribution practices, joint ventures, and alliances.

# Winston Wins $1 Billion Verdict for Monsanto

**Challenge:** Monsanto sued DuPont for breach of the parties' licensing agreement and infringement of Monsanto's patent by inappropriately stacking its technology with Monsanto's Roundup Ready® technology, a ground-breaking biotechnology patent in the field of genetic engineering technologies. In turn, DuPont countersued Monsanto, claiming Monsanto's patent was invalid under U.S. antitrust laws.

**Solution:** On behalf of Monsanto, we argued that DuPont tried to create a competing technology by stacking traits, which the license agreement specifically prohibited. DuPont claimed that they did not infringe Monsanto's patent and that it was invalid on eight different grounds.

**Result:** After a three-week trial, the jury determined that DuPont had infringed Monsanto's patent and returned a $1 billion verdict for Monsanto.

In addition to our experience handling global cartel matters, Winston & Strawn's antitrust and competition attorneys have significant experience with all issues related to government investigations, helping clients in every industry safely navigate the challenges that arise out of government investigations. We have particularly noteworthy experience counseling clients with respect to government investigations in the financial services, electronics, health care, consumer products, construction, marine services, manufacturing, medical diagnostic equipment and devices, wood and paper products, telecommunications, construction materials, transportation, power cables, auto parts, industrial components, and container shipping industries.

## Merger Reviews and Challenges

Winston & Strawn's antitrust/competition group routinely handles all aspects of the merger review and antitrust clearance process, from international filings on multi-billion-dollar mergers, to third-party complaints, to facilitating the purchase of assets to be divested. Our lawyers are able to handle every aspect of the competition law issues on the transaction, including not only the competition issues connected with regulatory clearances, but also antitrust advice for integration planning and antitrust risk allocation.

Our lawyers provide clients with a strategic advantage in the form of decades of practical experience, solid agency knowledge and mutual respect, and good judgment applied to the unique facts of each matter. We recognize the importance of understanding the client's objectives. When international filings are required, they need to speak with a single voice, as the agencies in different jurisdictions often cooperate with each other.

Our lawyers have regularly appeared before competition agencies around the globe and, along with our network of local firms, we effectively coordinate consistent worldwide merger clearance positions. Whether remedies are needed or not, this close coordination, combined with understanding the client's objectives, provides substantial benefits.

## Compliance and Counseling

An ounce of antitrust prevention is worth millions in litigation costs. We help our clients avoid those costs with counseling for every area of antitrust risk. This includes intellectual property issues; exclusive dealing, tying, and monopolization practices; relationships with suppliers; distribution issues, including Robinson-Patman Act compliance and minimum advertised price programs; relationships with competitors, trade associations, and industry groups; the formation and operation of joint ventures; and merger planning.

With antitrust agencies worldwide focusing on compliance training, our extensive experience enables us to provide customized on-site antitrust training, CLE antitrust seminars, compliance programs, audits, antitrust manuals and guidelines, and computer training materials. We can also provide compliance program review and advice on restructuring to comport with the most recent enforcer guidelines and expectations.

## Representative Antitrust/ Competition Experience

The representation of **WestRock** in industry-wide antitrust litigation filed in the Northern District of Illinois by plaintiffs alleging that defendants, manufacturers of containerboard products, conspired to fix prices and reduce production over the course of a seven-year period in violation of the Sherman Act. Winston scored a huge victory when the court granted summary judgment in favor of WestRock. This was a significant win and rare complete victory for a defendant in an antitrust conspiracy case.

The representation of **Panasonic** and **NEC** in a series of class actions brought by direct and indirect purchasers alleging a conspiracy to fix, maintain, artificially stabilize, and raise the prices of lithium ion rechargeable battery cells. The plaintiffs alleged a case involving multiple categories of consumer products that contained the lithium ion batteries over an 11 and-a-half year time period. As a result, the claimed damages for the entire class were more than $1.7 billion. After successfully leading the charge to narrow the case, Winston led the fight against the plaintiffs' first attempt to certify their classes, and in 2017, the court agreed with Winston's arguments and denied certification with leave to try again. In the months that followed, every other defendant settled. In 2018, the Northern District of California again refused to certify a class of plaintiffs, denied another request for leave to try again, and ultimately granted our client a significant victory.

The representation of **Motorola Solutions, Inc.** in antitrust litigation in the District of New Jersey brought by plaintiffs alleging that our client orchestrated a scheme to monopolize the U.S. market for land mobile radios.

The representation of **Baxter Healthcare Corporation** in a number of consolidated antitrust class actions in the Northern District of Illinois brought by plaintiffs who allege that our client conspired with competitors to restrict output and artificially raise prices of sterile intravenous saline solution through, among other things, public recall and shortage communications with the U.S. Food and Drug Administration. In 2018, the court granted our client's motion to dismiss the cases.



**100+**

Global Antitrust and
Competition Attorneys

The representation of **Claxton Poultry Farms** in a series of over 15 antitrust class actions consolidated in the Northern District of Illinois brought by plaintiffs who allege that Claxton and the nation's other largest poultry producers conspired to fix the price of broiler chickens. Defendants are accused of participating in a price-fixing scheme from 2008 to 2016 that raised the price for broiler chickens 50 percent by artificially reducing supply.

The representation of **Panasonic Corporation** in connection with government investigations in the United States and countries around the world into alleged price-fixing practices in the international market for cathode ray tubes (CRTs). This engagement also included the defense of Panasonic in related direct and indirect purchaser class actions, in addition to litigation brought by numerous state Attorneys General and individual plaintiffs.

The representation of plaintiff **TreeHouse Foods** in massive multi-district antitrust litigation against Keurig Green Mountain alleging that Keurig monopolized the K-Cup market by, among other things, entering into hundreds of tying and exclusionary agreements, leveraging its monopoly in the brewer market to extract monopoly profits and exclusionary contracts, disparaging competitors' products, filing sham litigations against competitors, redesigning its brewers to lock out cups made by competitors, and interfering with TreeHouse's business relations. In 2017, the Southern District of New York refused to dismiss our client's complaint.

The representation of plaintiff **Solyndra LLC** as lead counsel in an antitrust case alleging that several Chinese solar companies engaged in a conspiracy to dump solar panels in the U.S. market at below-cost prices, and to drive U.S. solar panel manufacturers out of business. Following the Northern District of California's ruling in favor of our client at the motion to dismiss stage, all defendants agreed to favorable settlements with our client.



# National Tier 1 Practice

*U.S. News & World Report*—Best Law Firms® 2018

The successful defense of **Discover Financial Services** in antitrust multidistrict litigation brought by plaintiffs who alleged that leading credit card issuers conspired to adopt and maintain arbitration provisions with class action waivers in their cardholder agreements. After the Southern District of New York ruled in our client's favor after a two-week trial, the Second Circuit affirmed the result.

The representation of **a group of college football and basketball athletes** in a landmark antitrust suit filed against the NCAA and the five NCAA "power conferences" (the SEC, the Big Ten, the Pac-12, the ACC, and the Big-12), alleging that the defendants illegally restrained competition for the services of players. In 2018, the court rejected the NCAA's arguments in defense of virtually all critical claims, siding with Winston on key issues related to agreement, anticompetitive effect, and relevant markets.

The representation of plaintiff **PNY Technologies** in an antitrust lawsuit against Sandisk alleging that the defendant's licensing activities were anticompetitive and enabled Sandisk to maintain a monopoly in the flash memory technology market in violation of the Sherman Act.

The representation of **Monsanto** in a significant monopolization case brought by a plaintiff seeking the certification of a class of all purchasers of Roundup, the best-selling herbicide in the United States. In a 129-page opinion, issued after extensive briefing and a three-day evidentiary hearing, the court found in favor of our client.

The defense of **Panasonic Corporation** and **NEC** in purported direct and indirect purchaser class actions alleging a massive, industry-wide conspiracy to fix prices of optical disk drives.

The representation of **Qualcomm** in matters related to the National Development and Reform Commission's (NDRC)

recently completed investigation of the company under China's Anti-Monopoly Law (AML). This investigation was one of the rare cases that the AML has been used to address IP licensing practice and marks the highest antitrust fines ever imposed in China.

The representation of **Motorola Solutions** in the sale of its wireless network infrastructure business to Nokia Siemens Networks, a divestiture that included the sale of assets worldwide. Antitrust approval was received in nine jurisdictions, including China.

The defense of **Microsoft Corporation** in connection with claims pursued by nine U.S. states that chose not to settle a highly publicized antitrust dispute. Our attorneys obtained a ruling in Microsoft's favor.

The representation of **NEC Corporation** in connection with a government investigation into alleged price-fixing by manufacturers of dynamic random-access memory (DRAM). Our representation also included direct and indirect purchaser class actions, as well as litigation brought by 41 state Attorneys General. We obtained a non-prosecution and cooperation agreement from the DOJ, after it obtained near-record criminal fines from other corporate defendants, as well as 18 plea agreements for individual defendants.

The representation of the **North American Soccer League** in a dispute with the U.S. Soccer Federation, FIFA's regional arm in the U.S., and Major League Soccer. The North American Soccer League contends that the Federation has promulgated "Professional League Standards" designed to exclude it from Division I, and that this has caused significant financial damages to the League in terms of its marketability, sponsorships, and reputation among both players and fans.

The representation of **Goldman Sachs** in multidistrict litigation (MDL) encompassing multiple putative nationwide antitrust class actions that were filed on the heels of parallel U.S. and European antitrust investigations into the domestic and international credit default swaps (CDS) markets.

The representation of private equity firm **Sycamore** Partners in its acquisition of more than 330 retail stores that Dollar Tree agreed to divest in order to receive FTC

clearance of its acquisition of competitor Family Dollar. The sale, the value of which remains confidential, is received FTC approval.

The representation of more than a half-dozen **automobile part manufacturers** in government investigations and a sprawling series of MDLs that include allegations of price-fixing, market allocation, and bid-rigging. These representations include work on behalf of Panasonic, Nippon Seiki, NTN Corporation, Corning, Hitachi Metals, and JTEKT. These investigations represent the largest criminal antitrust investigation, and one of the largest criminal investigations of any kind, in U.S. history.

The representation of **NorthShore University HealthSystem** in its negotiation and attempted execution of a merger and Affiliation Agreement with Advocate Health Care. The proposed merger would have created a health system with 16 hospitals, 4,438 beds and 45,000 employees, the largest in Illinois and the 11th largest not-for-profit health care system in the United States, serving 3 million patients annually.

The representation of **Dell** as a plaintiff in this litigation in the Northern District of California. Dell, as a direct purchaser of liquid crystal displays (LCDs), opted out of a class action charging various foreign companies with price-fixing. Dell then pursued its own antitrust claim against various LCD vendors/defendants. Prior to trial, the defendants publicly announced that they would settle our client's case on terms very favorable to Dell.

The representation of **Panasonic** in litigation brought by direct and indirect purchaser plaintiffs who allege that the defendants conspired to fix, maintain, or stabilize prices for film and electrolytic capacitors. Plaintiffs further allege that, as a result of the defendants' actions, the plaintiffs and the putative class members paid artificially inflated prices for capacitors and suffered antitrust injury. The plaintiffs also allege violations of various state antitrust and consumer protection laws. Since the outset of the litigation, the indirect purchaser plaintiffs already have voluntarily dismissed all claims on behalf of consumers, which has significantly reduced the size of the putative class.



**CHAMBERS USA 2018 (ILLINOIS) – CLIENT QUOTE**

"They are outstanding; **their intellectual capital and their knowledge are exceptional.**"

**CHAMBERS USA 2018 (CALIFORNIA) – CLIENT QUOTE**

"They are all knowledgeable about the law, all have **good communication skills and they are all genuinely nice people.**"

**CHAMBERS USA 2018 (NEW YORK) – CLIENT QUOTE**

"**The entire team is fantastic.** They are very competent, highly motivated, and understand the client."

**CHAMBERS USA 2018 (NATIONWIDE) – CLIENT QUOTE**

"From a client service standpoint, **they are top tier.**"



**About Winston & Strawn**

Winston & Strawn LLP is an international law firm with 1,000 attorneys across 16 offices in Brussels, Charlotte, Chicago, Dallas, Dubai, Hong Kong, Houston, London, Los Angeles, Moscow, New York, Paris, San Francisco, Shanghai, Silicon Valley, and Washington, D.C. The exceptional depth and geographic reach of our resources enable Winston & Strawn to manage virtually every type of business-related legal issue. We serve the needs of enterprises of all types and sizes, in both the private and the public sector. We understand that clients are looking for value beyond just legal talent. With this in mind, we work hard to understand the level of involvement our clients want from us. We take time to learn about our clients' organizations and their business objectives. And, we place significant emphasis on technology and teamwork in an effort to respond quickly and effectively to our clients' needs.

Visit **winston.com** if you would like more information about our legal services, our experience, or the industries we serve.

Attorney advertising materials. Winston & Strawn is a global law firm operating through various separate and distinct legal entities.



# Sports Law Practice



**Winston & Strawn has one of the premier sports law practices in the world.** Our attorneys have an exceptional depth of knowledge in the sports industry, with a comprehensive practice that offers a wide range of services throughout the country and abroad. These services include Litigation and Arbitration, Contracts, Corporate Transactions, Intellectual Property, Endorsements and Advertising Agreements, Sponsorships, Licensing Transactions, and Tax and Estate Planning.

## Litigation & Arbitration

Winston & Strawn's sports litigation and arbitration practice is second to none. Our practice was named the 2018 "Sports Practice of the Year" by both *Law360* and *U.S. News* "Best Law Firms".

**Members of the group have represented clients across the spectrum in the sports industry.** These matters include representations of all of the leading player associations in the United States, professional athletes, player classes in antitrust and other litigation, sports ownership groups, sports event organizers, intellectual property licensees and licensors, media companies, sports agents, lenders and underwriters of team and sports facility debt, governmental entities, coaches, competing sports leagues, sponsors, and others involved in disputes and transactions in the sports industry.



**U.S. NEWS BEST LAW FIRMS**

**2018
Sports Practice
of the Year**

**Our sports litigation and arbitration practice includes comprehensive legal services for clients involved in all aspects of college and amateur athletics as well.** Our attorneys have represented colleges, universities, student-athletes, coaches, and other individuals and entities involved in disputes with the National Collegiate Athletic Association (NCAA), including NCAA enforcement investigations and cases before the NCAA Committee on Infractions. The practice features a former NCAA lead investigator with experience handling high-profile NCAA enforcement cases. Our attorneys have litigated cases against the top sports associations in the world, including the NCAA, and bring to the college sphere decades of experience helping clients assert their rights in matters that have transformed the business of sports.

**The firm's sports litigation attorneys have played a leading role in the sports industry for decades and have litigated some of the most closely watched sports litigations in history.** Those litigations include:

- The landmark antitrust suits that led to the current free-agency/salary cap systems in the National Football League (NFL) and the National Basketball Association (NBA).

- The historic arbitration before the Court of Arbitration for Sport (CAS) establishing that 400m double-amputee sprinter Oscar Pistorius would be eligible to compete in

1   Attorney advertising materials – © 2019 Winston & Strawn LLP

the Olympics and track and field events sanctioned by the International Athletics Association Federation (IAAF).

- The antitrust trial that led to the NCAA purchasing and continuing the historic college basketball National Invitational Tournament (NIT).

**Winston & Strawn attorneys also have represented parties in numerous historic sports arbitrations.** For example, our attorneys successfully represented Latrell Sprewell in his controversial suspension arbitration, as well as players, agents, coaches, and other parties in numerous other arbitrations, including the NFL Players Association (NFLPA), the National Basketball Players Association (NBPA), Peyton Manning, Drew Brees, John Elway, Steve Young, Patrick Ewing, Barry Sanders, Bill Belichick, Terrell Owens, Curtis Martin, Steve McNair, Steve Hutchinson, Terry Glenn, Chad Morton, Joey Galloway, Tim Brown, Ricky Williams, Jason Kendall, the players in the Indiana Pacers/Detroit Pistons incident, Joe Smith, John Starks, Ben Wallace, Michael Vick, and Plaxico Burress.

As detailed more extensively below, most recently, our attorneys have represented:

- Guggenheim Baseball Management and Magic Johnson, as co-counsel, in multiple arbitration and mediation sessions in connection with the $2.15 billion acquisition of the Los Angeles Dodgers.

- Players from the NFLPA and the NBPA in antitrust litigation against the NFL and NBA lockouts.

- The NFLPA in litigation over the New Orleans Saints bounty dispute as well as an arbitration relating to the team's designation of Drew Brees as a "Franchise Player" under the free-agency system in the NFL.

- Represented the Los Angeles Dodgers and American Media Productions (AMP) in a $1 billion dollar putative California class action related to the record-setting media deal for the rights to broadcast Dodgers games.

- The NBPA in an arbitration involving the rights of Jeremy Lin and other NBA players placed on waivers.



**LAW360**

# 2018
# Sports Practice
# of the Year

In perhaps the most high-profile sports antitrust litigation in history – *Brady v. National Football League* – our attorneys served as co-lead counsel on behalf of Tom Brady and nine other professional football players (the "Brady Plaintiffs") in an antitrust lawsuit filed against the NFL and NFL teams **challenging the legality of the NFL's lockout imposed on all NFL players**. In a case that drew intense interest from the media and all NFL fans, the Brady Plaintiffs challenged the NFL's lockout as an illegal group boycott and price-fixing agreement designed to completely eliminate competition for the services of NFL players and to coerce them into accepting a substantial reduction in compensation as well as other restraints on competition in the player market. The federal district court of Minnesota agreed with the players and preliminarily enjoined the NFL's lockout. After the Eighth Circuit affirmed in part and reversed in part, court-ordered mediation ultimately led to a settlement of the *Brady* litigation, an end to the NFL lockout, and a new system of rules for the NFL player market on terms that were agreeable to the NFL players.

Similarly, our sports litigation team served as chief outside counsel for the NBPA – the NBA players' union – and represented the NBPA and its player members in the Southern District of New York, as well as in the affirmative **antitrust class action litigation against the 2011 NBA lockout**. All of this high-profile litigation eventually was settled and led to the end of the NBA lockout and the negotiation of a new collective bargaining agreement in the NBA.

Our attorneys led the NFLPA to a victory in the Southern District of New York, **vacating the four-game suspension imposed on New England Patriots quarterback and Winston client Tom Brady** by NFL Commissioner Roger Goodell in connection with the so-called "Deflategate" scandal. A court of appeals panel of three judges thereafter reversed the district court, but with a strong dissent from the Chief Judge of the Second Circuit.

## MARKET RECOGNITION

*Law360* 2018
- Winston named **"Sports Practice of the Year"**

*The Best Lawyers in America*® 2017
- Winston attorney named Sports Law **"Lawyer of the Year"** for New York City

*Chambers USA* 2018
- **National Band 2** ranking for Sports Law
- Practice co-chairs nationally ranked in **Band 1** and **Band 3** for Sports Law

*U.S. News–Best Lawyers*® "Best Law Firms" 2018
- **"Practice of the Year"** for Sports Law

*Street & Smith's Sports Business Journal*
- Winston attorney named to **"50 Most Influential People in the Sports Business"** list
- Winston attorney named to **"Forty Under 40"** list

*Forbes Magazine*
- Winston attorney named to **"30 Under 30"** Sports list

*USA Today*
- Winston attorney named to **"NFL's 100 Most Important People"**

In a case that has received widespread media coverage, Winston & Strawn won a major victory on behalf of college football and basketball players in a federal class action antitrust lawsuit against the NCAA and the "big five" athletic conferences. The players allege that the NCAA and the conferences have acted as a cartel to impose rules that eliminate competition for collegiate athletes and unlawfully restrain the markets for top-tier college sports talent. Winston attorneys recently defeated NCAA's motion for summary judgment and obtained a partial summary judgment in favor of our clients. The case is set for a potentially history-making trial that could forever change the landscape of college sports in America.

We also recently filed a landmark action on behalf of five members of the World Cup Champion United States Women's National Soccer Team (USWNT) with the Equal Employment Opportunity Commission (EEOC) **accusing the United States Soccer Federation (USSF) of wage discrimination on the basis of gender.** This action has received global media attention as an inspirational model for the important issue of equal pay for equal work.

Our attorneys recently represented the NFLPA and various players **challenging the discipline imposed on certain members of the New Orleans Saints for allegedly participating in a "bounty" program.** In a resounding victory for the NFLPA and the players, the final decision on appeal vacated all of the suspensions imposed by the NFL on Scott Fujita, Anthony Hargrove, Will Smith, and Jonathan Vilma. The arbitrator found that the suspensions were unjustified, and all player discipline was vacated. Based upon this total victory, Winston & Strawn withdrew pending litigation against the NFL over this decision before the Eastern District of Louisiana, and the matter has been concluded.

The firm also recently won an arbitration proceeding filed on behalf of New Orleans Saints quarterback Drew Brees and the NFLPA **concerning the effect of the Saints designating Brees as its "Franchise Player" under the free-agency system in the NFL.** The System Arbitrator agreed with the NFLPA and Brees that a player should receive the benefit of a higher level of salary for his guaranteed one-year contract once he has been designated as a Franchise Player "for the third time," regardless of how many different teams have designated him as a Franchise Player. Winston & Strawn attorneys argued that the Franchise Player designation is an exception to a player's free-agency rights, and the arbitrator agreed that the language should be construed with that in mind.

Similarly, our attorneys **represented former NFL defensive lineman Jonathan Fanene in an arbitration** in which the New England Patriots sought the return of a $2.5 million signing bonus after Mr. Fanene was unable to play for the Patriots due to injury. The Patriots based their claim on Mr. Fanene's purported failure to disclose a prior medical condition and alleged use of medication in order to play football. After a hearing in which Mr. Fanene testified and Patriots head coach Bill Belichick and the team medical director were cross-examined, the two sides reached a settlement that enabled Mr. Fanene to keep the entirety of the bonus he had already been paid.

In addition, **we prevailed on behalf of the NBPA in a System Arbitration against the NBA.** The Winston & Strawn team secured a significant victory on behalf of NBA players Chauncey Billups, J.J. Hickson, Jeremy Lin, Steve Novak, and future similarly situated players. The NBPA challenged as a violation of the parties' collective bargaining agreement (CBA) the NBA's assertion that players claimed off of waivers could not negotiate new

contracts using the "bird" or "early bird" salary cap exceptions. The System Arbitrator's decision for the NBPA confirmed that veteran players who are waived by their former teams and then claimed off of waivers by new teams retain their "early bird" rights. The NBA and NBPA arrived at a post-decision settlement of the further arbitration appeal by which players claimed off of waivers will retain their "early bird" rights (per the decision of the arbitrator).

With respect to the recent **$2.15 billion acquisition of the Los Angeles Dodgers** noted above, Winston & Strawn attorneys first-chaired multiple arbitration and mediation sessions that arose out of the transaction due to the fact that the team was emerging from bankruptcy and given the unique agreements between the debtors and Major League Baseball (MLB).

Additional sports litigation matters recently handled by Winston & Strawn include the representation of American Media Productions (owner of SportsNet LA) in consumer class action litigation challenging its $8 billion media deal with Time Warner relating to the broadcast of the Los Angeles Dodgers baseball games. Our attorneys also recently represented apparel and eyewear company Oakley in **federal court litigation concerning Oakley's right of refusal in former World No. 1 golfer Rory McIlroy's endorsement contract** and his ability to sign a new contract with Nike. The litigation resulted in a settlement with Mr. McIlroy.

Our attorneys have represented prominent sports agents or their player clients at **CAA Sports**, **Wasserman Media Group**, **SFX Sports**, **MVP Sports**, and **Excel**, among others, in a wide variety of contested matters. We have represented governmental entities in litigations, arbitrations, and other disputes relating to the location and operation of sports franchises. We also have represented owners and potential owners of professional sports franchises in litigation against sports leagues, governmental entities, and other bodies, including in disputes relating to the ownership of teams. In addition, we have represented sponsors, licensing, and other commercial entities in disputes with athletes, leagues, and other entities, including in intellectual property litigation.

## Negotiations & Transactions

Winston & Strawn attorneys regularly advise clients in the sports industry in negotiations, transactions, and related matters. For example, our attorneys have represented the

CHAMBERS USA 2017

# The firm's sports lawyers "are an invaluable resource" who "provide a tremendous amount of quality legal work."

player board members of the Women's Tennis Association (WTA) in matters relating to the structure and operation of the WTA Tour. Our attorneys also represented Olympic athlete and world champion sprinter Caster Semenya in her successful negotiation for eligibility. In addition, our attorneys have represented the NFL Players Association (NFLPA) and the National Basketball Players Association (NBPA) in their negotiation of every collective bargaining agreement in their respective sports for more than two decades.

**In the corporate area, our attorneys have assisted sports industry clients in connection with a wide range of significant transactions, including acquisitions and public finance.**

Notable matters include the following:

• Represented Guggenheim Baseball Management and Magic Johnson, as co-counsel, in their **historic bid to purchase the Los Angeles Dodgers for $2.15 billion**. The purchase price is the largest ever for a professional sports franchise and included the purchase of a 50 percent interest in the property surrounding Chavez Ravine and stadium parking lots.

• Represented the Los Angeles Dodgers, as borrower's counsel, in connection with **a $500 million senior secured delayed-draw term loan financing**, the structure of which included novel combinations of both stadium and team collateral.

• Represented LA Sports Partners, LLC in its **acquisition of the Los Angeles Sparks WNBA team**. LA Sports Partners is controlled by a group of investors that includes Magic Johnson, Mark Walter (CEO of

Guggenheim Capital, LLC), Todd Boehly (president of Guggenheim Capital, LLC), Robert Patton, and Stan Kasten, each of whom also is part of the ownership group of the Los Angeles Dodgers.

- Represented institutional investors in connection with **four issuances of private placement notes** by the holding company and the operating company of the Boston Celtics, the proceeds of which will be used for structural improvements and other working capital purposes.

- Represented institutional investors and lenders in connection with an **$850 million construction financing of a new 68,500-seat professional football stadium** in Santa Clara, California, for use by the San Francisco 49ers. The transaction included $449 million of fixed rate notes, $301 million of senior bank debt, and $100 million of floating rate notes.

- Represented a large Canadian bank in presenting different structures to the National Hockey League (NHL) relating to its **league-wide revolving credit facility**, as well as a credit facility extended to the NHL itself.

- Represented lenders to Legends Hospitality, LLC (owned partially by the New York Yankees and Dallas Cowboys) in connection with a **$225 million senior secured credit facility**.

- Represented the lenders to Yankee Global Enterprises LLC in connection with a **$275 million senior secured credit facility (2009) and its $175 million refinancing (2012)**. The 2012 facility also contained provisions governing any future sale of equity interests in the YES Network, the Yankees regional sports TV network.

- Represented the lenders in connection with a **term loan financing for Yankee Stadium Holdings LLC** for the construction of the new Yankee Stadium.

- Represented the New York City Industrial Development Agency (NYCIDA) as underwriter's counsel, in connection with its **issuance of $942 million PILOT revenue bonds and $25 million rental revenue bonds for the Yankee Stadium Project**. The project consisted of the design, development, acquisition, construction, and fitting out of the new Yankee Stadium, owned by the issuer.

# $942 Million

### bond offering for the Yankee Stadium Project

- Represented NYCIDA, as bond counsel, in its $101 million issuance of civic facility revenue refunding bonds and the initial **issuance of its $150 million civic facility revenue bonds for the USTA National Tennis Center Incorporated Project**. The bonds were issued for the purpose of financing a portion of the acquisition, construction, and installation of renovations to the USTA National Tennis Center in Flushing, New York, the site of the annual U.S. Open Tennis Tournament.

- Represented the owner of the New York Islanders NHL franchise in **negotiations with Nassau County to rebuild the Nassau Coliseum** and to lease it for an extended term, as well as an agreement to acquire by lease and, ultimately, to purchase all of the land surrounding the Coliseum, including 75 acres of parking lots on which our client planned to construct an urban development.

- Represented the Gillett family and Booth Creek Management in a variety of sports interests, including **the purchase (and later the sale) of a controlling interest in the Montreal Canadiens NHL team** and the Molson Center Arena (now Centre Bell), including the team acquisition, purchase of the arena and related real estate issues, financing, and NHL approval process. We also assisted George Gillett in the purchase of NASCAR's (National Association for Stock Car Auto Racing) Evernham Motorsports racing group, and advised in the purchase and potential sale of the Liverpool Football Club of the English Premier League.

Winston & Strawn attorneys have served as outside counsel to the **Harlem Globetrotters**' basketball event business, as general counsel to the **Major League Umpires Association**, and as general counsel to the **NBA Referees**. Our significant tax practice, which includes more than 50 attorneys, provides assistance in virtually every area of this broad field that is of interest to our sports industry clients, from tax planning to federal and state tax advice in connection with private foundations, public charities, and other non-profit organizations.

 © 2019 Winston & Strawn LLP

## Intellectual Property

With more than 200 attorneys, Winston & Strawn's intellectual property practice is one of the most active and highly regarded in the country. The trust of our clients is consistent with the industry-wide recognition we have earned. For example, Winston & Strawn was the most honored litigation group in *The American Lawyer*'s January 2014 biennial "Litigation Department of the Year" review. As in 2010, our IP litigators were selected as one of four finalists for "IP Department of the Year" (one of only six firms to be honored more than once), and our department chair was selected as one of the six "Litigators of the Year" (the second Winston & Strawn IP lawyer to be chosen since the award's inception in 2012).

**Winston & Strawn also is one of a few large law firms in the United States with an IP practice dedicated to advertising, marketing, sports, and entertainment law.** This practice recently was named a "Media and Entertainment Practice Group of the Year" by *Law360,* and has been ranked nationally by *Chambers USA, The Legal 500 US,* and *U.S. News–Best Lawyers®,* among other publications.

The firm's sports law attorneys regularly handle a wide range of IP and advertising-related matters for our clients in this sector. In addition to disputes and negotiations, the group advises sponsors, athletes, sports property owners, agents, and sports broadcasters in connection with contracts, business activities, trademark registrations, advertising agreements, motion picture and television production deals, sponsorships and endorsement agreements.

For example, we represented Avon Products Inc. in its sponsorship of the Olympic Games, and in **negotiations with Derek Jeter in his endorsement of Avon's "Driven" line of products,** as well as negotiating other Olympic sponsorship deals. Our attorneys also represented Players Inc. – the licensing subsidiary of the NFL Players Association (NFLPA) – in cutting-edge litigation regarding the application of group licensing contracts to intellectual property rights utilized on the Internet and in a class action concerning the licensing of retired NFL player rights. Winston & Strawn secured a significant victory for a Miami Heat player in recovering his Internet domain name, and represents many other professional athletes, as well as sponsors, with respect to their intellectual property and endorsement rights. Our advertising attorneys also have significant experience representing agency clients in endorsement and related matters.

Additional intellectual property representations include:

- **FieldTurf,** the market leader in artificial turf fields, in patent litigation against Astroturf that ESPN called "the nastiest rivalry in sports."

- **MasterCard International Incorporated** in its worldwide sponsorship of MLB and Major League Baseball Advanced Media, as well as its sponsorship of various MLB clubs, including the Chicago Cubs, New York Yankees, Atlanta Braves, and Los Angeles Dodgers, as well as the Open Championship (British Open) and Rugby World Cup.

- **A professional sports team** in a successful domain name infringement claim.

- **Professional athletes** with respect to disability insurance issues, social media and publishing issues, and charitable foundation issues.

- **Four professional minor league baseball teams** in their successful efforts to transfer their franchises from one league to another.

- **Sponsors and promoters** of tennis tournaments and international soccer matches in connection with sponsorship and promotion agreements.

Winston & Strawn's intellectual property practice in Europe also has extensive sports industry experience with regard to content acquisition and protection on behalf of rights-holders, broadcasters, agencies, sponsors, and talent, including:

- Representing **television broadcasters in the acquisition of rights pertaining to majors sport events in France**, including Rugby World Cup, Six Nations Rugby tournament, French Open Tennis Tournament, Tour de France, and Winter and Summer Olympic Games.

- Advising an agent with respect to a tender process for the centralized award of **media rights relating to the European Football Championship** and related litigation against a competitor.

- Counseling and defending **the European leader in the management of sport and leisure installations** in connection with a disputes related to contractual relationships with suppliers, subcontractors, and providers.

**About Winston & Strawn**

Winston & Strawn LLP is an international law firm with 1,000 attorneys across 16 offices in Brussels, Charlotte, Chicago, Dallas, Dubai, Hong Kong, Houston, London, Los Angeles, Moscow, New York, Paris, San Francisco, Shanghai, Silicon Valley, and Washington, D.C. The exceptional depth and geographic reach of our resources enable Winston & Strawn to manage virtually every type of business-related legal issue. We serve the needs of enterprises of all types and sizes, in both the private and the public sector. We understand that clients are looking for value beyond just legal talent. With this in mind, we work hard to understand the level of involvement our clients want from us. We take time to learn about our clients' organizations and their business objectives. And, we place significant emphasis on technology and teamwork in an effort to respond quickly and effectively to our clients' needs.

Visit **winston.com** if you would like more information about our legal services, our experience, or the industries we serve.

Attorney advertising materials. Winston & Strawn is a global law firm operating through various separate and distinct legal entities.

# EXHIBIT C

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
OAKLAND DIVISION

IN RE: NATIONAL COLLEGIATE
ATHLETIC ASSOCIATION
ATHLETIC GRANT-IN-AID CAP
ANTITRUST LITIGATION

:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:

Case No. 4:14-md-2541-CW
Case No. 4:14-cv-02758-CW

DECLARATION OF DANIEL A. RASCHER

ON ECONOMIC VALUE OF ORDERED

INJUNCTIVE RELIEF


March 26, 2018

## 1.   QUALIFICATIONS

1.     My name is Daniel A. Rascher.  I have previously submitted six expert reports in this matter, and I also provided written and live testimony at trial.[1]  A fuller list of my credentials appears in my initial merits report submitted in March 2017, and an updated current curriculum vitae (including a list of all cases in the last 4 years where I testified at trial or was deposed) is attached as Appendix A.  I am still being compensated at $500 per hour, the usual and customary hourly rate that was effective at the time this engagement began, plus reimbursement of expenses.  In my work on this matter, I have been assisted by OSKR staff, working under my supervision and control.  I have no direct financial interest in the outcome of this matter.

## 2.   SCOPE OF WORK AND SUMMARY OF OPINIONS

2.     Class Counsel have asked me to review the *Findings of Fact and Conclusions of Law* (herein "FFCL") and the *Permanent Injunction* (herein, "Injunction"), both issued in this case on March 8, 2019, and to assess the economic value to the class of the relief granted by the Court.  My focus has been on Paragraphs One, Two, and Five of the Injunction.  Paragraphs One and Two lay out the forms of educational compensation that cannot be capped at the national (Division 1) level or capped across more than one conference; Paragraph Five lays out the forms of educational compensation that <u>can</u> be capped by the NCAA, but not below a floor established by the Injunction.  In performing these calculations, I have relied on the materials in Appendix B to this declaration, public data, and analyses done during the expert discovery phase of the case in which I and other experts assessed the value of various forms of NCAA-approved compensation.

---

[1]  (a) Expert Report of Daniel A. Rascher on Injunctive Class Certification, June 25, 2015 (herein "Rascher Injunctive Class Report");  (b) Expert Report of Daniel A. Rascher on Damages Class Certification, February 16, 2016 (herein "Rascher Damages Class Report"); (c) Corrected Expert Reply Report of Daniel A. Rascher on Damages Class Certification, October 12, 2016 (herein "Rascher Damages Class Reply Report"), (d) Expert Declaration of Daniel A. Rascher in Support of Motion for Preliminary Approval of Damages Classes, February 2, 2017 (herein "Rascher Settlement Declaration"), and (e) Expert Report of Daniel A. Rascher on Economic Liability Issues for the Injunctive Classes, March 21, 2017 (herein "Rascher Merits Report"), Expert Reply Report of Daniel A. Rascher on Economic Liability Issues for the Injunctive Classes, June 21, 2017 (herein "Rascher Merits Reply Report"), Direct Testimony of Dr. Daniel A. Rascher, July 3, 2018 (herein "Rascher Direct"), Rebuttal Testimony of Dr. Daniel A. Rascher, July 17, 2018 (herein "Rascher Rebuttal"), and NO. 14-MD-2541 CW, TUESDAY, SEPTEMBER 4, 2018, Trial Transcript Volume 1, pp. 10-190 (herein "Rascher Trial Transcript").

3.   Based on my review of the FFCL and the Injunction, it is my opinion that:

    a.   It is likely that between 104 and 122 FBS programs will offer educational compensation above COA to their Full GIA football and basketball athletes (at the high end, this is virtually the full set of FBS programs).  It is also likely that between 184 and 265 D1 basketball programs will offer educational compensation above COA to their Full GIA men's and women's basketball athletes; i.e., an additional 80 to 143 non-FBS programs.

    b.   The relief granted in Paragraphs 1 and 2 of the Injunction, which specifies the types of educational compensation which the NCAA may not cap, has a likely value to the class of athletes of between $71 and $90 million per year, based on the value of the compensation and the set of schools likely to adopt such forms of compensation.

    c.   The relief granted in Paragraph 5 of the Injunction, which specifies the types of educational compensation ("academic and graduation awards") which the NCAA may continue to cap, but at a higher level (as laid out in the Injunction), has a likely value to the class of athletes of $116 and $145 million per year, based on the value of the compensation and the set of schools likely to adopt such forms of compensation.

    d.   Thus, my best conservative estimate of the value of the total relief to the three classes of athletes is between $187 and $235 million per year.

    e.   For an individual class member, the value of the relief granted in the Injunction will vary depending on the choices made by that class member, but, in general, they would likely range in value between approximately $60,000 for four years of academic achievement and graduation and $100,000 or more for class members who take advantage of a full graduate scholarship, new computer, scientific instruments, paid internship, study abroad, tutoring and other education related benefits that may now be available if their schools and conferences choose to offer them.

4.   In addition, the provided-for relief also indicates that certain educational benefits would be available to athletes based on athletic compensation that is currently unspecified[2] or for which the value is clearly positive, but difficult to quantify.  While I have not reached any opinions as to the expected value of those benefits, I have provided a discussion of the types of valuable benefits made available by the Injunction.

5.   The remainder of this declaration details the support for these opinions.

---

[2]   For example, one particular award allows the NCAA to provide "unlimited" benefits.

### 3.   THE VAST MAJORITY OF FBS PROGRAMS AND A SIZABLE PORTION OF NON-FBS D1 PROGRAMS ARE LIKELY TO ADOPT THE NEWLY ALLOWED FORMS OF EDUCATIONAL COMPENSATION

6.   The first step in estimating the value of the injunctive relief granted by the Injunction is to determine the likely set of schools whose rational response to the relaxation of the recently enjoined anticompetitive restraints will be to offer more educational compensation, i.e., the set of schools that have an economic incentive to adopt this form of compensation.  If the current NCAA caps were a realistic measure of the actual value of athletes to schools (which they are not) or if there were economic evidence that such compensation would harm demand (which there is not), then we might expect that few, if any, schools would incur the additional expenses of providing these newly allowed forms of educational compensation, but because it is clear the current caps far understate the value of athletes to their programs (even when factoring any purported negative impact of compensation on demand), the rational economic response will be for those schools constrained by the current cap to exceed that cap once allowed, in an effort to meet consumer demand.

7.   During the damages phase of this case, since settled, I developed an econometric model that predicted, with a high degree of accuracy, which schools would adopt Full COA stipends over time, based on economic factors and each school's place within the competitive hierarchy of college sports.  This model was conservative, in that it focused on the likely rate of adoption as of 2010, and in the meantime the value of athletics to schools has only grown, meaning that the set of 2010 adopters likely understated the set of 2015 (and beyond) adopters.

8.   The conservativism of this model was confirmed when the damages portion of the case settled and a far greater number of D1 basketball schools were revealed to have adopted some amount of COA over the period from 2015-2017 than the model had predicted for 2010.  Thus, I use two results – a lower bound based on my conservative econometric model and an upper bound based on the set of schools that acknowledged that they have, in fact, adopted some form of COA compensation – to estimate a range of likely adoption.[3]  In the conservative estimate, 184 schools are assumed to adopt above-COA educational

---

[3]   This estimate excludes the Ivy League schools and the three Service Academies.

compensation for their basketball athletes.  In the more expansive estimate, I assume the 265 D1 schools that actually adopted COA per the settlement will also adopt above-COA compensation for their basketball athletes.[4]

9.    In the case of FBS football, the conservative estimate based on my econometric model assumes 104 schools will adopt above-COA educational compensation for their football athletes.  In the more expansive estimate, I assume the 122 FBS schools that actually adopted COA per the settlement will also adopt above-COA compensation for their football athletes.

10.   Once the set of schools likely to adopt above-COA educational compensation is set, I then estimate a number of athletes from each class (i.e., each sport) that would be eligible for the relief granted by the Injunction.  From the data made available in this litigation, I estimate an FBS program has an average of 82 Full GIA football athletes, and a D1 program has an average of 11 men's and 11 women's Full GIA basketball athletes.

11.   I use this range of schools (104 and 122 for football and between 184 and 265 for men's and women's basketball) and these estimate of athletes (82 football, and 11 in men's and women's basketball) in the work that follows.  This implies that in any given year, I estimate that as many as 10,004 football, 2,915 MBB, and 2,915 WBB athletes are likely to receive additional educational compensation.

## 4.    THE RELIEF GRANTED IN PARAGRAPHS ONE AND TWO OF THE INJUNCTION HAS A LIKELY VALUE TO THE CLASS OF BETWEEN 71 AND 90 MILLION DOLLARS PER YEAR

12.   The next step in the process is to estimate the value of the compensation these adopting schools would provide.  In this section I focus on the value of the relief granted in Paragraphs One and Two, forms of educational compensation that cannot be capped by cross-conference agreements per the Injunction.  Then in Section 5, I focus on Paragraph Five, forms of academic achievement or graduation awards or incentives

---

[4]    As I understand it, Paragraphs Six and Seven allow any single NCAA conference to ban any and all forms of educational compensation or academic or graduation awards as long as that decision is made without collusion with other conferences.  Thus, it is possible some conferences choose not to adopt any of these allowed benefits.  However, it was argued in the past it was unlikely that any more than 65 or so schools (those within the "Autonomy Five") would adopt COA, but as discussed above, 265 schools, approximately 75% of all of D1, adopted COA in some form.

that <u>can</u> be capped by cross-conference agreements per the Injunction, but not below a minimum level established by the Court.

13.  Paragraphs One and Two of the Injunction reads as follows (with my emphasis in bold):

> "Defendant National Collegiate Athletic Association, and its officers, agents, servants, employees, and any person in active concert or participation with them, including its member schools and conferences, who receive actual notice of this Order by personal service or otherwise (hereinafter, **the NCAA**), are hereby **permanently restrained and enjoined from agreeing to fix or limit compensation or benefits related to education that may be made available from conferences or schools to Division I women's and men's basketball and FBS football student-athletes on top of a grant-in-aid**.

> "The compensation and benefits related to education provided on top of a grant-in-aid that the NCAA may not agree to fix or limit pursuant to paragraph 1 of this Order are the following: **computers, science equipment, musical instruments**, and **other tangible items** not included in the cost of attendance calculation but nonetheless related to the pursuit of academic studies; **post-eligibility scholarships** to complete **undergraduate or graduate degrees at any school**; scholarships to attend **vocational school**; **tutoring**; **expenses related to studying abroad** that are not included in the cost of attendance calculation; and **paid post-eligibility internships**."

14.  As I understand this section of the Injunction, the Court has not mandated any specific form or amount of educational compensation be paid to any athletes, but rather merely that the NCAA (and/or its members) may not enact or enforce any inter-conference rule that restricts conferences' or schools' ability to provide the types of educational compensation listed in Paragraph Two of the Injunction.  This would seem to ban any cap on educational compensation that covered all of Division 1, or even a subset of conferences, such as the so-called "Autonomy Five" schools.  Only a school or conference acting unilaterally could impose such a cap.  Thus, as I understand the Injunction, it would be permissible for schools recruiting an athlete out of high school, in addition to competing by offering four or five years of a Full COA grant-in-aid in exchange for his/her athletic services, to also add a laptop computer or the guarantee of paid-for graduate school if an athlete completed his/her eligibility and graduated, or otherwise qualified for graduate school.

15.  In this section I assess the value of two categories of this type of educational compensation: *during-eligibility* educational compensation (such as computers, science equipment, and musical instruments), and *post-eligibility* educational compensation (including graduate school, paid internships, or vocational school).  After this, I discuss, but do not quantify, value implicit in the "other tangible items" allowed by the relief granted in Paragraph Two.

Page 5

## 4.1    THE VALUE OF COMPUTERS, SCIENCE EQUIPMENT, AND MUSICAL INSTRUMENTS

16.   The first component of value in Paragraph Two that I assess is the value of items of tangible value made available by additional educational compensation *during athletes' period of athletic eligibility*.  Here I focus on computers and musical instruments.  To estimate this value, first I assume that every school identified as likely to provide above-COA educational compensation will choose to provide each of its class-member athletes with a high-quality laptop computer and, for those athletes majoring in music, a high-quality musical instrument.

17.   A solid notebook computer can cost between $1,000 and $2,000.  For example, when I recently checked, the ThinkPad X1 Carbon (6th Gen) by Lenovo, which my firm uses for some of our data work – some of which is done by college-level summer associates – had a list price of $1,274.99.[5]  So for this portion of the ordered relief, I have simply used my estimate of the number of future class members who will attend schools likely to provide above-COA educational compensation, and multiplied this estimated by $1,275, as a reasonable estimate of the value of the computers these schools would provide.  The product of these estimates is between $16,034,400 and $20,188,350 per year across all class members.

18.   Quality musical instruments cost between $450 and $2,950.[6]  According to the National Center for Education Statistics, 1.4% of all college graduates major in music of some form, so here I use the same estimate of schools and class members, but I focus only on an estimated 1.4% that major in music.  Using a point estimate of $1,700 for the value of an instrument, the product of these estimates is between $299,309 and $376,849 per year across all class members.

19.   In this work, I am assuming that under the Injunction, the NCAA will not be able to prohibit athletes from full exercise of the property rights to these supplies.  For example, an athlete would not be restricted from selling a musical instrument after his/her musical studies ended (similar to other students).  To the extent that the NCAA is able to restrict those property rights, the valuation calculated here would be an overstatement – part of the value of any tangible asset is the ability to resell it, and any restriction on that

---

[5]   On March 21, I found a 2018 Premium 6th Gen Lenovo ThinkPad X1 Carbon 14" FHD IPS Laptop for sale on Amazon for $1,274.99, with free shipping.
     https://www.amazon.com/gp/product/B07FTT2ZQQ/ref=ox_sc_saved_title_1?smid=A3I8SIV4ZMJMWX&psc=1
[6]   See, e.g., https://bit.ly/2WmKVKo and https://bit.ly/2HDkuNv

resale would lower the value.  On the other hand, to the extent that an athlete receives more than one of these tangible educational items, say multiple musical instruments and a second specialized computer as part of a sound studio class, then the estimate above would be an understatement.

20.  Obviously, the injunctive relief provided during athletes' period of eligibility consists of more than just computers and musical instruments.  The Court also points to science equipment, tutoring services, and "other tangible items."  For science equipment, the primary tool is likely to be the laptop computer, and for the purpose of this estimate I adopt the conservative assumption that while the average value to each class member of other scientific equipment, such as safety goggles, lab coats, etc., is certainly positive, using an estimate of zero is a reasonable, conservative estimate.  Similarly, it is certain that for athletes that spend days or weeks away from school over the course of a season, the ability to receive as much tutoring as the school deems appropriate (rather than being constrained by NCAA rules that prohibit unlimited tutoring) has a positive value.[7]  Indeed, to the extent the Injunction ends the current NCAA prohibition on providing tutoring to *prospective* college athletes, such as assisting a high school student with tuition in a standardized test preparation class (currently prohibited by rule 13.2.1.1(k)), this element could provide substantial additional value to future class members.  Nevertheless in my calculations I have not assigned a specific value to this element of educational compensation.

21.  I summarize the results of this process in Exhibit 1 below, where I lay out my estimates of the number of class athletes eligible each year for these forms of educational compensation and then multiply that by my estimate of $1,275 per athlete for a laptop and $1,700 per athlete who majors in music.

---

[7]   As would tutoring of athletes after their eligibility runs out for such things as preparation for graduate school entrance exams.

**Exhibit 1: Estimate of Computer and Supplies Prices**

*Estimated using 104 schools for Football and 184 Schools for Basketball*

|  | Number of Athletes | Pct. Of Athletes | Price | Total Price |
|---|---|---|---|---|
| Computer | 12,576 | 100% | $1,275 | $16,034,400 |
| Musical Instruments | 12,576 | 1.4% | $1,700 | $299,309 |

*Estimated using 122 schools for Football and 265 Schools for Basketball*

|  | Number of Athletes | Pct. Of Athletes | Price | Total Price |
|---|---|---|---|---|
| Computer | 15,834 | 100% | $1,275 | $20,188,350 |
| Musical Instruments | 15,834 | 1.4% | $1,700 | $376,849 |

*Sources:*

*[1] On March 21, I found a 2018 Premium 6th Gen Lenovo ThinkPad X1 Carbon 14" FHD IPS Laptop for sale on Amazon for $1,274.99, with free shipping. https://www.amazon.com/gp/product/B07FTT2ZQQ/ref=ox_sc_saved_title_1?smid=A3I8SIV4ZMJMWX&psc=1*

*[2] Musical instruments price based on average of $450 for a student trumpet and $2,950 for a student Double Bass (https://bit.ly/2WmKVKo and https://bit.ly/2HDkuNv).*

*[3]Music degree rate based on 26,538 music graduates, from DataUSA and 1,920,718 total graduates from IPEDS. (https://bit.ly/2uIUfw2 and https://bit.ly/2HGmx3o)*

## 4.2   THE VALUE OF GRADUATE SCHOOL SCHOLARSHIPS, POST-GRADUATE INTERNSHIPS, AND VOCATIONAL SCHOOL

22.   The second portion of the relief granted in Paragraphs One and Two is the value of *post-eligibility* educational compensation, specifically the freedom for schools to compete during the recruiting process by contracting to pay for athletes' graduate school, internships, or vocational school.  As I understand the Injunction, it would now become permissible for schools recruiting an athlete out of high school, in addition to the existing economic competition (offering as much as five years of a Full COA grant-in-aid in exchange for athletic services), to also add the guarantee of paid-for graduate school if the athlete completes his eligibility and qualifies for graduate school;[8] to provide supplementary compensation to an athlete who did a post-eligibility internship; and/or to pay for an athlete's attendance at a vocational school.

---

[8]   Usually this would require graduation, but not always.  As an example, as I understand it, dental schools often only require two years' of undergraduate work to enroll in a DDS program.

23.  As I understand the current rules, such a guaranteed offer is forbidden, and the rules also forbid any school from promising to pay for an athlete to attend graduate school at another institution.  Similarly, as I understand the current rules, during the recruiting process, a school cannot offer to provide a future scholarship to attend vocational school after the completion of eligibility.  As I understand the Injunction, this sort of educational compensation would become fully allowed, as schools and conferences individually deemed appropriate, without interference from any combination of schools outside of a single conference (e.g., the NCAA, the Autonomy Five voting collectively, a bilateral agreement of two conferences, or even an agreement across two or more schools that are not in a single conference).  Of course, an individual school or conference could choose not to provide this form of compensation if it determined it would harm consumer demand, but as I testified during trial, I have seen no evidence of any impact on demand.

24.  For an individual athlete, the ability to bargain, in advance of committing to a school, to secure a guarantee of educational compensation of this nature is potentially very valuable.  During the course of discovery in this case, NCAA President Mark Emmert testified that if the NCAA rules permitted schools to promise to pay for graduate school during recruitment, it would be the economic equivalent of offering the athlete a Ferrari.[9]

25.  As discussed above in Section 3, not all schools are likely to adopt this compensation, and so in this section I continue to use my estimated numbers for schools adopting this form of educational compensation as well as the average number of class members attending those schools. Unlike the annual figures above, in each of these post-graduate opportunities, each athlete is assumed to only use the benefit once, hence to estimate the annual figure I divide the total by 4.5 to approximate the share of athletes who graduate each year.[10]

---

[9]  Deposition of Mark Emmert, January 12, 2017, pp. 162-163.
"No, I didn't say that at all. When they're an undergraduate, they are, indeed, a member of the undergraduate student body, and they're participating in their sport as part of that undergraduate experience.  When you add to that a – a form of compensation, a commitment that you're going to go way above and beyond whatever your education expense is here at – at my college or university are, and you say, I'm going to – in addition to that, I'm going to give you something worth hundreds of thousands of dollars, it could be that you're going to give them a Ferrari, it could be that you're going to give them a medical degree, it costs the university the same amount."

[10]  I use 4.5 as the approximate length of a collegiate athletic career for an athlete who graduates rather than, say, 4, because many athletes, especially in FBS football, participate in athletics for five years because of redshirting.  While some athletes leave early, those who graduate are more likely to be in school for five years than three or fewer.

26.  Similarly, I see nothing in the Injunction that prevents a conference from allowing more than one of these three forms of post-eligibility compensation.  In fact, in my role as academic director of the Sport Management program at the University of San Francisco, I frequently work with former D1 athletes who have become graduate students and who also take unpaid or low-paying internships.  Nevertheless, to make the estimate of the value of this portion of the Injunction tractable, I assume that each athlete will only take advantage of one of these three possible benefits.

**4.2.1   Assigning Class Members to One of Three Possible Forms of Post-graduate Education**

27.  In essence, I am assuming every member of the class who attends a school predicted to provide these post-graduate benefits will receive exactly one of the three types.  The first step is then to determine the percent of each class assigned to each of these three benefits and to assign each athlete to one of the three possible categories.  For athletes who do not graduate, I assume each will take advantage of some form of vocational training.  For those who do graduate, I assume that the minority will attend graduate school (at the same rate as all college graduates attend graduate school, i.e., 17.5%) and that the rest instead will take advantage of the opportunity to supplement their income during a post-graduate internship.[11]

28.  Among the three classes, many athletes still do not finish their undergraduate degree.  FBS football athletes graduate at a rate of 62%.  For D1 MBB and WBB athletes, the federal graduation rates are 47% and 63%, respectively.[12]  Thus, I assume that the complement of these figures, i.e., 38% of eligible FBS football athletes, 53% of D1 men's basketball athletes and 37% of D1 women's basketball athletes will attend vocational school.  This sums to between 5,062 and 6,425 across the three classes: between 3,241 and 3,802 in football, between 1,073 and 1,545 and between 749 and 1,079 in men's and women's basketball, respectively.

---

[11]  I have seen no evidence whether Full GIA athletes attend graduate school at higher or lower rates than the general student population, but as I discuss below, if these athletes were provided with a no-cost scholarship as part of their educational compensation, the usage rate would certainly increase relative to the current rate where the education might cost tens or hundreds of thousands of dollars.  As a second point of reference, in the publicly available ELS data on which Dr. Heckman relied in his work, 23% of all college graduates went on to some form of post-graduate study within 10 years of having entered tenth grade.  See Education Longitudinal Study of 2002 (ELS:2002).

[12]  https://www.ncaa.org/about/resources/research/division-i-graduation-rates-database.

29.  Of those athletes who do graduate, not all attend graduate programs.  On average in the United States, 17.5% of all college graduates go on to attend graduate school.[13]  So for each sport, I assume 82.5% of the graduates take advantage of supplementary income during an internship, rather than receiving a paid graduate-school education.  Across the three sports, this is approximately 49% of the class.

30.  Finally, for the 17.5% of the graduates who attend graduate school (approximately 10% of the class in total), I assume each will receive value equal to an estimated average price of a graduate school program.  I have also provided context by assessing the lower and higher end of the likely range of graduate school program pricing, up to the cost of four years of medical school.

---

[13]   https://www.naceweb.org/job-market/graduate-outcomes/first-destination/class-of-2017/

**Exhibit 2: Class Members by Assumed Post-eligibility Educational Compensation**
*Estimated using 104 schools for Football and 184 Schools for Basketball*

|  | MFB | MBB | WBB | Total |
|---|---|---|---|---|
| Number of Schools | 104 | 184 | 184 | |
| Number of Athletes | 82 | 11 | 11 | |
| 2018 Graduation Rate | 62% | 47% | 63% | |
| Number of Graduates | 5,287 | 951 | 1,275 | 7,514 |
| Number of Graduates going to Graduate School (17.5%) | 925 | 166 | 223 | 1,315 |
| Number of Graduates going to Internships (82.5%) | 4,362 | 785 | 1,052 | 6,199 |
| Number of Non-Graduates | 3,241 | 1,073 | 749 | 5,062 |
| Number of Non-Graduates going to Vocational School (100%) | 3,241 | 1,073 | 749 | 5,062 |
| Total | 8,528 | 2,024 | 2,024 | 12,576 |

*Estimated using 122 schools for Football and 265 Schools for Basketball*

|  | MFB | MBB | WBB | Total |
|---|---|---|---|---|
| Number of Schools | 122 | 265 | 265 | |
| Number of Athletes | 82 | 11 | 11 | |
| 2018 Graduation Rate | 62% | 47% | 63% | |
| Number of Graduates | 6,202 | 1,370 | 1,836 | 9,409 |
| Number of Graduates going to Graduate School (17.5%) | 1,085 | 240 | 321 | 1,647 |
| Number of Graduates going to Internships (82.5%) | 5,117 | 1,130 | 1,515 | 7,762 |
| Number of Non-Graduates | 3,802 | 1,545 | 1,079 | 6,425 |
| Number of Non-Graduates going to Vocational School (100%) | 3,802 | 1,545 | 1,079 | 6,425 |
| Total | 10,004 | 2,915 | 2,915 | 15,834 |

*Sources:*

*[1] "Master Data" from settlement backup*

*[2] Rascher Damages Class Reply Report, ¶254*

*[3] Rascher Damages Class Reply Report, ¶257*

*[4] https://www.ncaa.org/about/resources/research/division-i-graduation-rates-database.*

*[5] https://www.naceweb.org/job-market/graduate-outcomes/first-destination/class-of-2017/*

#### 4.2.1.1   Real World Data is Likely to Understate Post-Injunction Usage

31. As a check on these last two assumptions, I looked at the University of Nebraska's PEO program, about which I testified and to which the FFCL cited. According to Nebraska's own figures, over the course

of approximately 2.5 years, 121 athletes took advantage of the PEO program, with 87 doing internships, 19 attending graduate school (7 of those went to medical school), with 15 choosing to study abroad. According to past Nebraska public information, annually Nebraska has approximately 450 scholarship athletes per year, which translates to approximately 100 graduates per year, or 250 in the 2.5 year period for which PEO data is available. This implies about a 7.5% usage rate for graduate school, which compares to the 10% I have assumed here. It also implies a usage rate of 35% for internships, compared to the 49% I have assumed here. In total, almost half of the eligible Nebraska graduates appear to have used one of the options. For the obvious reason that the Nebraska benefit is capped at $7,500 and the Injunction is specifically not capped, this likely understates the usage rate of the relief provided.

32.   In fact, this is a general issue that will tend to understate usage today relative to the likely usage under the Injunction. The current rate of graduate school attendance should be recognized as a lower bound because it does not take into account the positive effect that this form of educational compensation will have on rates of graduation and graduate school attendance; the change in the rules themselves is likely to lead to more positive academic outcomes. In his testimony, Dr. Heckman explained that lowering the cost of the next level of educational attainment creates an incentive to graduate from the prior level.[14] Hence, just as Dr. Heckman argued that the existence of undergraduate scholarships led to increased high school grades and graduation rates, we would expect more athletes to graduate from college (and with better grades) if they knew they would be able to tap into educational compensation in the form of graduate school scholarships. And of course, even for athletes already inclined to graduate from college, the lowered cost of attending graduate school is also likely to increase rates of attendance in graduate school.

33.   Thus, my calculations below should be seen as a lower bound on the true value of this element of relief granted to the class by means of the Injunction. Because the estimated value of the graduate school

---

[14]   See Expert Direct Examination Declaration of Professor James J. Heckman, July 11, 2018:

> "The possibility of playing collegiate athletics and receiving an athletic scholarship to college likely provides benefits even before college enrollment by providing incentives for high school students to invest more intensively in their human capital through participation in high school athletics, studying to earn better grades, and graduating from high school."

Page 13

benefit exceeds the estimated value of the internship in my calculations, shifting athletes from an internship to graduate school will tend to increase the value of the relief granted by the Injunction.

**4.2.2   Valuing each form of Post-graduate Education**

34.  The next step in the process is to estimate the value of a vocational program, internship, or graduate school program.  I do this based on current price data for each of the three options.

35.  For vocational school, I have identified the following range of prices.

**Exhibit 3: Vocational and Associate Degrees Annual and Total Prices**

|  | CDL Truck Driving | Barber College | Electro-mechanical Technologies | Auto Technician | Building Inspector |
|---|---|---|---|---|---|
| Annual Program Price | $4,750 | $11,074 | $20,980 | $18,270 | $20,553 |
| Program Duration (yrs.) | 1 | 1 | 1 | 2 | 2 |
| **Program Total** | **$4,750** | **$11,074** | **$20,980** | **$36,540** | **$41,106** |

*Notes:*

*[1] Only includes tuition and fees.*

*[2] See Appendix C for sources.*

36.  Based on this, I assume the 40% of the class I estimate will use this option will receive, on average, value equal to $21,176.

37.  With respect to the 49% of the class I estimate will take advantage of the internship program, as I understand the Injunction, there is no NCAA dollar limit on what a conference can offer recruits for their paid internships.  Nebraska's existing program offers $7,500, but does so in a relative vacuum of competitive offers.  Now that other schools will be allowed to compete on this dimension, it is likely the long-run compensation offer will exceed this current amount.  And in fact, some Silicon Valley firms already pay over $7,500 *per month* to interns, so that a $7,500 per year estimate is likely a very low estimate.[15]  Nevertheless, given there is already evidence of a school providing this much for internships, the Nebraska PEO provides a reliable lower bound on the likely value of the internships under the Injunction.

---

[15]   See for example, https://www.fastweb.com/career-planning/articles/top-10-highest-paid-US-internships

**Exhibit 4: Estimated Internship Value**

*Estimated using 104 schools for Football and 184 Schools for Basketball*

| Sport | Number of Schools | Number of Athletes | Pct. Graduated | Pct. Internship | Estimated Players | Internship Price | Total Value |
|-------|------|------|------|------|------|------|------|
| MFB | 104 | 82 | 62% | 82.5% | 4,362 | $7,500 | $32,715,540 |
| MBB | 184 | 11 | 47% | 82.5% | 785 | $7,500 | $5,886,045 |
| WBB | 184 | 11 | 63% | 82.5% | 1,052 | $7,500 | $7,889,805 |

*Estimated using 122 schools for Football and 265 Schools for Basketball*

| Sport | Number of Schools | Number of Athletes | % grad | % internship | Estimated Players | Internship Price | Total Value |
|-------|------|------|------|------|------|------|------|
| MFB | 122 | 82 | 62% | 82.5% | 5,117 | $7,500 | $38,377,845 |
| MBB | 265 | 11 | 47% | 82.5% | 1,130 | $7,500 | $8,477,184 |
| WBB | 265 | 11 | 63% | 82.5% | 1,515 | $7,500 | $11,363,034 |

Sources:

[1] "Master Data" from settlement backup

[2] Rascher Damages Class Reply Report, ¶254

[3] Rascher Damages Class Reply Report, ¶257

[4] https://www.ncaa.org/about/resources/research/division-i-graduation-rates-database.

[5] https://www.naceweb.org/job-market/graduate-outcomes/first-destination/class-of-2017/

[6] Nebraska Post Eligibility Program.pdf

38.  For the 10% of the class I assume will attend graduate school, I estimate the value as follows.  Post-graduate education prices vary widely, from, for example, a one-year teaching certificate to potentially three years of law school or four years of medical school.  I have not found data on the range of usage among former college athletes, so instead I have estimated the price of a handful of graduate programs across the spectrum of price, and I used these to create a range of value.  Obviously not every football or basketball player will attend medical school, and so the high end of the range likely overstates the value, but similarly, some athletes do attend those expensive programs and so the low-end, based on the value of a one-year Masters in History is also an understatement.  Combining these estimates and ranges yields the range of values laid out below in Exhibit 5.  I used the mean of these values in my calculations.

**Exhibit 5: Graduate School Annual and Total Tuition and Fees Price by Degree**

| Type | Teaching Certificate | MA in Teaching | Masters in History | Nursing School | MBA | Law School | Medical School |
|------|------|------|------|------|------|------|------|
| Private | $40,811 | $58,180 | $29,500 | $60,646 | $74,560 | $49,095 | $57,246 |
| Public- In state | $8,851 | $17,727 | $16,338 | $13,311 | $7,536 | $27,591 | $34,451 |
| Public- Out-of-state | $24,901 | $32,157 | $28,629 | $19,916 | $20,685 | $40,725 | $58,497 |
| **Annual Total Average** | **$24,854** | **$36,021** | **$24,822** | **$31,291** | **$34,260** | **$39,137** | **$50,065** |
| Typical Program Length (yrs.) | 1 | 1 | 1 | 2.5 | 2 | 3 | 4 |
| **Program Total Average** | **$24,854** | **$36,021** | **$24,822** | **$78,227** | **$68,521** | **$117,411** | **$200,259** |

Notes

[1] Only includes tuition and fees.

[2] See Appendix C for sources.

Page 15

39.  Once I estimate the value of each form of post-eligibility compensation, and the estimated number of class members likely to be offered each opportunity, the rest is simply arithmetic.  I perform this final step for all of the various benefits in Section 6 below.

### 4.3   THE VALUE OF OTHER ELEMENTS OF RELIEF IN PARAGRAPHS ONE AND TWO

40.   As discussed above, there are other elements of relief granted in Paragraphs One and Two for which I provide no value estimate.  In each case, it is clear that these elements have positive value, but I have not attempted to quantify the benefit to the class.  These items include the completion of undergraduate education (even if an athlete ends his eligibility by turning professional), and other tangible items not included in COA.  For example, I have not included an estimate of the value of a paid-for semester abroad.  Similarly, according to *edvisors.com*, a source for data on the cost of attending college, "textbook and transportation allowances in the cost of attendance often underestimate the actual costs,"[16] but I have assigned no specific value to these other forms of educational compensation.  This should not be taken to mean they have no value.  Rather, my opinion is that these add to the value of the Injunction, but I have not quantified the amount.

## 5.   THE RELIEF GRANTED IN PARAGRAPH FIVE ON THE INJUNCTION HAS A LIKELY VALUE TO THE CLASS OF BETWEEN 116 AND 145 MILLION DOLLARS PER YEAR

41.  Paragraph Five of the Injunction reads as follows (with my emphasis added in bold):

> Notwithstanding the foregoing paragraphs, the NCAA may agree, now or in the future, to fix or limit academic or graduation awards or incentives that may be made available from conferences or schools to Division I women's and men's basketball and FBS football student- athletes on top of a grant-in-aid. **Any limit adopted, enacted, or agreed to by the NCAA under this paragraph shall not, at any time, be less than the maximum amount of compensation that an individual student- athlete could receive in an academic school year in participation, championship, or special achievement awards (combined) under Division I Bylaw, Article 16, and listed in Figures 16-1, 16-2, and 16-3 of the 2018- 2019 Division I Manual** (hereinafter, the athletics participation awards limit). Any limit adopted, enacted, or agreed to by the NCAA under this paragraph shall be increased in the event that the athletics participation awards limit is increased, to ensure that the limit on academic achievement or graduation awards or incentives is never less than the athletics participation awards limit.

---

[16]   https://www.edvisors.com/fafsa/estimate-aid/cost-of-attendance-coa/

42.   As I understand this section of the Injunction, the Court has not mandated any specific form or amount of academic or graduation awards or incentives be paid to any athletes, and in fact has made clear the NCAA may continue to enforce a national cap on such benefits, if it deems such a cap necessary.  Rather, the court has merely enjoined the NCAA (and/or its members) from adopting any Division 1-wide or inter-conference cap on academic achievement or graduation awards or incentives that is *lower* than the currently allowed maximum potential benefits incidental to competition enumerated in NCAA Bylaws Figures 16-1, 16-2, and 16-3 that could be earned by an individual college athlete.  That is, whatever the maximum extent a single athlete could accumulate in athletic awards based on the categories in those three figures over the course of a year, under the Injunction that becomes a floor below which the NCAA may not set a national or inter-conference cap on the economic value of *academic or graduation* awards.  Again, each school or individual could choose to offer less if it perceived any potential negative impact on demand (though I have seen no such economic evidence) or based on financial constraints.

## 5.1   THE VALUE OF "GIFT SUITE" AWARDS IN FIGURES 16-1 AND 16-2

43.    In my written expert testimony in the trial in this matter, I explained that athletics-based non-educational compensation is sometimes provided in the form of "gift suites."  I testified as follows:

> Oftentimes players obtain this category of compensation of athletic bonus payments above Full COA via "gift suites," wherein all of the available goods are showcased, and athletes examine and test out the merchandise before deciding what goods they would like to receive as their compensation.  In a video posted online by the Oklahoma State Athletics YouTube account, a reporter interviews an athlete in the gift suite for the 2016 Sugar Bowl as he remarks upon the available goods: microwaves and refrigerators, headphones and electronic gadgets, luxury watches, and mountain bikes.  At one point the athlete remarks, "40-inch TV...that's pretty sizeable...last year we were offered 28-inch TVs, so that is definitely a step up.")

> In total, for an athlete who is him/herself an elite talent who plays for a team that is very successful, the total available post-season compensation can be several thousand dollars, and is available to an athlete receiving Full COA and also SAF payments.  As of 2016-17, an FBS football player could receive an additional $5,620 in goods or prepaid cash-cards, based on his, and his team's, athletic success, untethered to any educational expense.).

44.   This testimony summarized my analysis in *Rascher Merits Report*, §5.3 (¶¶142-147) entitled "Postseason Gift Suites Constitute Large Financial Benefits Above COA," where I explained I was valuing the benefits available just from gift suites, which is essentially the set of Awards allowed under Figure 16-1

Page 17

(except for the basic "participation award" available to all athletes) and 16-2 of the NCAA manual, but not 16-3.[17]  As I explained: "As of 2016-17, an NCAA college football player could receive an additional $5,620 in goods or gift cards, based on his and his team's athletic success, untethered to any educational expense," from awards for appearing in a conference championship, winning a conference championship, appearing in a bowl game, winning a bowl game, appearing in the national championship, and winning the national championship.  This analysis cited to and matched with an analysis presented in the *Sports Business Journal*.[18]

45.  As I testified, the receipt of athletic award compensation of this type has not had any noticeable impact on consumer demand.[19]

46.  However, the awards from "Gift Suites" only captures a subset of the possible Athletic Awards an athlete can earn, this analysis by itself it is not a reasonable estimate of the maximum value an exceptional athlete could earn in a single year under current rules.  On top of these team-results-oriented forms of athletic compensation, one must also add benefits listed in Figure 16-3, which are more focused on individual athletic achievement, as well as the basic participation award from 16-1.  Thus, in addition to the $5,620 of compensation an athlete can earn from gift-suites listed in Figures 16-1 and 16-2 about which I testified in my written direct testimony, one must assess the value of Figure 16-3 as well.

**5.2   THE VALUE OF THE PARTICIPATION AWARD IN 16-1**

47.  The NCAA allows every athlete who participates on an FBS football or D1 basketball team to receive an award worth $425 (for seniors) or $225 for other athletes.  This should be included in any calculation of the maximum possible cumulative annual value of athletic awards.

---

[17]  The current manual appears to have the same limits on these awards, though one new category has been added in 16-3. See 2018-19 NCAA® Division I Manual, pp. 237-8.

[18]  Broughton, David; "CFP champ has shot at up to $5,600 in gifts"; December 5, 2016; *SportsBusiness Journal* (sportsbusinessdaily.com); (bit.ly/2mcaQ6K).  For example, the Champs Sports Bowl gave each player a commemorative watch and a $400 Best Buy gift card.  See Broughton, David; "Sony's suite is latest innovation in bowl gifts"; December 8, 2008; *SportsBusiness Journal* (sportsbusinessdaily.com); (bit.ly/2lxfUp5).

[19]  See Rascher Direct, ¶46: "the economic evidence shows that consumer demand has only increased — not decreased — since the rules that allowed pervasive above-COA payments were adopted after O'Bannon."

**5.3    THE VALUE OF AWARDS IN FIGURE 16-3**

48.   In the paragraph of my testimony that followed my analysis of "gift suites," I provided *examples* of the sorts of additional *individual* award benefits available to star athletes.[20]   I testified that "In 2015-16, DeShaun Watson of Clemson University was … eligible for another $2,675 because he also won five individual awards—the Orange Bowl MVP, the Davey O'Brien Award, the Manning Award, ACC Athlete of the Year, and Clemson Athlete of the Year."[21]   And similarly, "In 2015-16, Breanna Stewart of the University of Connecticut women's basketball team also won eight individual awards—the National Championship MVP, AP Player of the Year, the Wade Trophy, the Naismith Trophy, the Ann Meyers Drysdale Award, the John R. Wooden Award, the James E. Sullivan Award, and the Honda Sport Award— entitling her to approximately $2,625 in additional Athletics Awards."[22]   This testimony illustrated some, but not all, of the additional athletic compensation available to high-performing athletes per Figure 16-3.

49.   To determine the full value of this sort of athletic compensation, one must identify the outer range of possible compensation allowed per Figure 16-3.   This is complicated by the fact that several of those awards do not have a specified limited in the value of the award or in the number of times an athlete can receive certain awards.   For the set which are limited in value but not in frequency, what I have done is simply look at a set of awards that could be granted to a stellar athlete who was head-and-shoulders above the rest of his teammates and also other athletes playing his position at other schools.   Thus, I have calculated the value of the non-gift-suite awards as if this (senior) athlete were to receive virtually every available team and national award for a player at his position – and I used quarterback (QB), since that is often the most decorated position.   For in-kind items of without a specified maximum value, I have noted, but not estimated, a specific numerical value.

50.   From the first three categories in Figure 16-3, this QB could thus have won $175 for being his team's MVP; could have won $325 for being MVP of a special event (which can be awarded by at least three

---

[20]   These examples were not intended to represent the maximum a single athlete could win.
[21]   Rascher Direct ¶73.
[22]   Rascher Direct ¶74.

different awarding entities; I assume this is the CFP finals) and another $350 for being MVP of a bowl game (I assume this is the semi-finals). This would sum to $1,500.

51. The fourth category of awards, listed as "Established regional/national recognition awards (e.g., Wade Trophy, Heisman Trophy)," provides $325/year for each award received. I have developed a reasonable scenario in which an outstanding quarterback could win fourteen such awards.

52. Each year, ESPN broadcasts the annual "National College Football Awards Association" (NCFAA) awards show on ESPN, which is sponsored by The Home Depot. This theoretical all-star QB could receive 6 of these awards: $325 for winning the Maxwell Award for the College Player of the Year, $325 for winning the Davey O'Brien National Quarterback Award, and $325 for being named to the Walter Camp All-America team and another $325 for being named the Walter Camp Player of the Year. If our hypothetical senior was also an excellent student and also involved in community service he could win another $325 for receiving the William V. Campbell Trophy for being a premier Scholar-Athlete[23] and $325 for being named to the Allstate AFCA Good Works Team, which is awarded to 22 athletes for dedication to volunteerism. This would sum to $1,950.

53. In addition to the awards announced on this one awards show, there are many other national awards, particularly for quarterbacks. Most famously the Heisman Trophy is awarded by the Heisman Trophy Trust for "outstanding college football player whose performance best exhibits the pursuit of excellence with integrity."[24] The Touchdown Club of Columbus awards a number of nationally recognized awards. Our senior QB would been eligible for the Sammy Baugh Trophy, awarded to the most prolific passer in college football; the Archie Griffin Award, awarded to the overall most valuable player in college football; the Chic Harley Award for the college football Player of the Year; the Kellen Moore Award for the top quarterback. The Golden Arm Foundation awards the Johnny Unitas Golden Arm Award to the nation's outstanding senior (or fourth-year) quarterback in college football. Both the Associated Press and the

---

[23] Several excellent quarterbacks have won this award in the same year they won other prestigious awards. For example in 1996, Danny Wuerfel received the Campbell Trophy in addition to receiving the Heisman Trophy, the Maxwell Award, the Davey O'Brien Award, and the Walter Camp Award. Wuerfel also won several other national awards that year.

[24] https://www.heisman.com/heisman-trust/

Sporting News awards a College Football Player of the Year Award.  An athlete winning each of these 8 awards could receive another $2,600.

54.  While there are likely other awards of this type, I have limited the value to just the fourteen listed in these two paragraphs, meaning the fourth category of Figure 16-3 has a potential value of at least $4,550.[25]

55.  The sixth and seventh categories in Figure 16-3 are $1,500 awards for conference "athlete of the year" and "scholar-athlete of the year."  Combined, these are worth $3,000.[26]

56.  It is quite common for a single athlete to win many awards in the same year.  For example, in 2017, Baker Mayfield won the Heisman Trophy, the Maxwell Award, the Walter Camp Award, the Davey O'Brien Award, and the Chic Harley Award, and had previously won the Kellen Moore Award.  Mayfield was also named as the College Football Player of the Year by the Associated Press.  He was the Big-12 athlete of the year as well.  The nature of the quarterback position lends itself to stacking multiple awards.  While to my knowledge, no one person has ever won all of these awards in one year, many quarterbacks have won most of them.

57.  Categories eight and nine are limited in value to $80 each, but they may be given an unlimited number of times.  If I conservatively assume our star won two of each, this adds another $320.

**Exhibit 6: Total Estimated Value of Paragraph 5 Relief Aside From Gift Suites**

| Category | Estimated Value |
|---|---|
| Senior Participation (from 16-1) | $425 |
| Team MVP | $175 |
| Special Event MVP | $975 |
| Semi-Final Bowl MVP | $350 |
| 14 National/Regional Awards | $4,550 |
| Conference "athlete of the year" | $1,500 |
| Conference "scholar-athlete of the year" | $1,500 |
| 2 Player of the Game/Week | $160 |
| 2 Hometown awards | $160 |
| Total 16-1 & 16-3 excluding "gift suites" | $9,795 |

---

[25]  14 x $325= $4,550.

[26]  I put to the side category five – these are trophies with any specified maximum value which I simply note have some positive value but I have not quantified.  In at least one case, the Heisman Trophy, the issuing organization essentially forbids resale of the trophy as a condition of receipt.

58.   In total, these categories sum to $9,795.  When added to the previously established value of gift suites, this provides a potential estimate of the total value made available through academic and graduation awards of $15,415 per year, all without there being any evidence of a negative impact on consumer demand.

59.   These awards are potentially available to every class member for every year they are in school – that is this cap is $15,415 *per year*.  Every athlete who graduates could receive these payments for three to five years.  Again, as an estimate of adoption based on work done during the damages phase of the case, I have assumed all of the predicted Full COA adopters will, eventually, offer academic compensation designed to encourage graduation.  That is, I limit these academic or graduation awards or incentives to those schools identified in Section 3 above, and I limit the award just to the portion of athletes who graduate, based on average graduation rates.

**Exhibit 7: Total Estimated Value of Paragraph 5 Relief**

| | |
|---|---|
| Total "gift suites" (from 16-1 & 16-2) | $5,620 |
| Total non-"gift suites" (from 16-1 & 16-3) | $9,795 |
| Total of 16-1, 16-2, and 16-3 | $15,415 |

## 5.4   THIS ESTIMATE IS A LOWER BOUND

60.   There are several reasons why the estimate above is a lower bound.  For example, there is no real reason to think an all-star QB capable of winning 14 national awards in his senior year would only be the player of the week twice in that season, or that his home town would only present him with two awards.  But more importantly for the aggregate value to the class, I have treated this form of educational compensation as a graduation award/incentive, meaning I limit receipt of this educational compensation to a set of the class based on how many currently graduate.  This is likely a lower bound for at least three reasons.  First, by offering these incentives for graduation, it is likely more athletes will graduate, raising the annual value of these awards.  Second, many schools may choose to adopt academic awards or incentives that are not tied just to graduation, but instead pay out each year, for successful progress towards a degree, rather than reserving all payment for graduation.  One can easily imagine half of the $15,415 coming for progress towards a degree, with the rest given upon graduation, etc.  But in my opinion, a

reasonable lower bound for the value of this element of the relief granted by the Injunction can be based only on graduating athletes and on the current graduation rate. Third, as shown in my analysis and testimony throughout this case, initial rates of adoption tend to grow over time, as competition works its way down the system. For example, the initial set of schools that offered Full COA has since grown.

**6. THE RELIEF GRANTED BY THE INJUNCTION HAS A LIKELY TOTAL VALUE TO THE CLASS OF BETWEEN 187 AND 235 MILLION DOLLARS PER YEAR**

61. With all of the components of valuation in place, what remains is simply to assess the total value of the likely benefits that will emerge under enhanced competition among schools for athletes. For each sport, the process is essentially to multiply the number of likely adopting schools by the number of Full GIA athletes on each team by the estimated value of each form of educational compensations. For Football, this process looks like this.

**Exhibit 8: Process for Calculating Value to the Football Class**



62.   This results in an estimated range of value to the football class of the relief granted by the Injunction of between $130 and $152 million.  For men's and woman's basketball, the process is similar and results in an estimate range of value between $57 and $83 million.

**Exhibit 9: Process for calculating value to the Basketball Classes**



63.   Following this process yields the following valuation of each.  I multiply the number of class members estimated to use each of these types of educational compensation by the estimated value of each, resulting in a total value to the class of between $187 and $235 million.

64.   What an individual athlete will receive will vary widely under the Injunction.  For example, an athlete who finishes his eligibility without graduating and then ultimately opts to enroll in a vocational program might receive something on the order of $21,000: a $1,275 laptop and $20,000 of vocational education.  A three-year athlete majoring in music who graduates and chooses an internship might accumulate $3,000 in computers/instruments, $45,000 in annual academic awards (payable upon graduation), and then receive $7,500 as a supplement to her earnings in a post-graduate internship; this would total a little over $55,000.  A five-year graduate who then enrolls in an MBA program might earn closer to $150,000 ($1,300 in

supplies, $75,000 at graduation, and $69,000 towards a degree).  If that athlete chose medical school, the total could exceed $250,000.

65.  In general, the additional benefits stemming from the Injunction would likely range in value between approximately $60,000 in cash incentives for four years of academic achievement and graduation to $100,000 or even more for class members who also take advantage of a full graduate scholarship, new computer, scientific instruments, paid internship, study abroad, tutoring and other education-related benefits that may now be available if their schools and conferences choose to offer them.  The choices the school and the athlete settle on, in the context of the increased economic competition, are difficult to predict at the individual level, but it is clear that all class members will benefit from the increased ability to bargain for these benefits in the context of conference-level competition, which will somewhat reduce the anticompetitive impact of the current restraints.

### Exhibit 10: Annual Valuation of Injunctive Relief: Two Estimated Rates of Adoption

*Estimated using 104 schools for Football and 184 Schools for Basketball*

| | Educational Compensation | | | | | Academic/Grad Awards/Incentives | |
| --- | --- | --- | --- | --- | --- | --- | --- |
| | *During Eligibility* | | *Annual Value of Post Eligibility* | | | *Upon Graduation* | |
| | Computers | Musical Instruments | Vocational School | Internship | Graduate School | Graduation Bonuses | Total |
| MFB | $10,873,200 | $202,966 | $15,249,415 | $7,270,120 | $14,630,616 | $81,504,654 | $129,730,972 |
| (Athletes) | (n=8,528) | (n=119) | (n=3,241) | (n=4,362) | (n=925) | (n=5,287) | |
| MBB | $2,580,600 | $48,171 | $5,047,877 | $1,308,010 | $2,632,280 | $14,663,981 | $26,280,920 |
| (Athletes) | (n=2,024) | (n=28) | (n=1,073) | (n=785) | (n=166) | (n=951) | |
| WBB | 2580600 | $48,171 | $3,523,990 | $1,753,290 | $3,528,376 | $19,655,975 | $31,090,401 |
| (Athletes) | (n=2,024) | (n=28) | (n=749) | (n=1,052) | (n=223) | (n=1,275) | |
| Total | $16,034,400 | $299,309 | $23,821,282 | $10,331,420 | $20,791,272 | $115,824,610 | $187,102,293 |
| (Athletes) | (n=12,576) | (n=176) | (n=5,062) | (n=6,199) | (n=1,315) | (n=7,514) | |

*Estimated using 122 schools for Football and 265 Schools for Basketball*

| | Educational Compensation | | | | | Academic/Grad Awards/Incentives | |
| --- | --- | --- | --- | --- | --- | --- | --- |
| | *During Eligibility* | | *Annual Value of Post Eligibility* | | | *Upon Graduation* | |
| | Computers | Musical Instruments | Vocational School | Internship | Graduate School | Graduation Bonuses | Total |
| MFB | $12,755,100 | $238,095 | $17,888,737 | $8,528,410 | $17,162,839 | $95,611,229 | $152,184,410 |
| (Athletes) | (n=10,004) | (n=140) | (n=3,802) | (n=5,117) | (n=1,085) | (n=6,202) | |
| MBB | $3,716,625 | $69,377 | $7,270,040 | $1,883,819 | $3,791,056 | $21,119,321 | $37,850,237 |
| (Athletes) | (n=2,915) | (n=41) | (n=1,545) | (n=1,130) | (n=240) | (n=1,370) | |
| WBB | 3716625 | $69,377 | $5,075,311 | $2,525,119 | $5,081,628 | $28,308,877 | $44,776,936 |
| (Athletes) | (n=2,915) | (n=41) | (n=1,079) | (n=1,515) | (n=321) | (n=1,836) | |
| Total | $20,188,350 | $376,849 | $30,234,088 | $12,937,348 | $26,035,522 | $145,039,427 | $234,811,583 |
| (Athletes) | (n=15,834) | (n=222) | (n=6,425) | (n=7,762) | (n=1,647) | (n=9,409) | |

*Note:*

*Average graduate school/ vocational prices calculated as average annual price * average program duration.*

## 7.   SIGNATURE

66.   I declare under penalty of perjury under the laws of the United States and the State of California that the foregoing is true and correct.

Executed this March 26, 2019, at Emeryville, California.

Daniel A. Rascher

## APPENDIX A

## DANIEL A. RASCHER, PH.D.

### EDUCATION

B.A., Economics, University of California at San Diego.

Ph.D., Economics, University of California at Berkeley.
Dissertation Title, *Organization and Outcomes: A Study of the Sports Industry*

Certified Valuation Analyst (CVA) by the National Association of Certified Valuators and Analysts

### PRESENT POSITIONS

University of San Francisco
Director of Academic Programs for the Sport Management Program, 2002-current

Professor of Sport Management, 2010-current

Associate Professor of Sport Management, 2005-2010

Assistant Professor of Sport Management, 2000-2005

Adjunct Professor of Sport Management, 1999-2000

- M.A. Course – Economics and Finance for Sport Management
- M.A. Course – Master's Project in Sport Management
- M.A. Course – Sport Business Research Methods

Institute of Sports Law and Ethics (University of the Pacific).  Board Member, 2011-2017

SportsEconomics, LLC (www.sportseconomics.com)
Founder and President, 1998-current

Performed economic analysis for sports industry clients including multiple projects involving the NFL, NBA, NASCAR, NCAA, NHRA, NHL, MLS, ATP, AHL, professional cycling, media companies, sports commissions and government agencies, event management, B2B enterprises, and IHRSA.  Specialized in industrial organization, antitrust, valuations, market research, labor issues, financial modeling, strategy, economic impact, and feasibility research.

OSKR, LLC (www.oskr.com)
Co-Founder and Partner, 2008-current

Performed economic analysis for clients involved in sports and other industries, including insurance, technology, automotive, television, and consumer products.

### PREVIOUS ACADEMIC EXPERIENCE

NORTHWESTERN UNIVERSITY
Adjunct Professor, Winter 2014

NEW YORK UNIVERSITY (NYU)
Faculty-in-Residence Program, Fall 2013

IE BUSINESS SCHOOL (Madrid, Spain), Visiting Professor, 2010-2013

UNIVERSITY OF MASSACHUSETTS AT AMHERST, Sport Management Department
<u>Assistant Professor</u>, 1997-1998

* M.S. Courses—Principles of Sport Business Management, Applied Sport Business Management
* B.S. Courses—Sport Business Finance, Sports Economics

UNIVERSITY OF CALIFORNIA AT BERKELEY, Department of Economics
<u>Teaching Assistant</u>

* Economic Principles & Intermediate Microeconomics.


**PREVIOUS CONSULTING EXPERIENCE**

LECG, LLC
<u>Affiliate</u>, 2003-2007; <u>Principal</u>, 2000-2003; <u>Senior Economist,</u> 1998-2000

* Performed economic analysis for sports industry clients including multiple projects involving the NFL, MLB, NBA, NHL, PGA, Formula One racing, CART, and Premier League Football (soccer). Specialized in industrial organization, antitrust, M&As, valuations, and damages analysis.
* Provided testimony for cases involving sports industry clients, including damages analysis and liability.
* 40% of work is related to antitrust litigation, 20% is IP and breach of contract damages litigation, 20% is merger related, and 20% is management consulting.
* 60% of work involves the sports and entertainment industries, 15% involves technology, and 25% is in other industries including agriculture, transportation, and energy.

UNIVERSITY OF CALIFORNIA AT BERKELEY, Competitive Semiconductor Manufacturing Program
<u>Visiting Scholar</u>, Institute of Industrial Relations, 1998-2000

<u>Research Fellow</u>, 1995-1997

* Funded by the Alfred P. Sloan Foundation, the CSM study is an interdisciplinary project that analyzes the determinants of high performance in semiconductor manufacturing.
* Research on HR, training, small sample analyses and generalizability of case study results.

NATIONAL ECONOMIC RESEARCH ASSOCIATES, Summer 1994; January-August 1995
<u>Research Assistant</u>

* Research on the energy industry, on transmission pricing, and on the economic damages of contract breaches.

QUANTUM CONSULTING, 1992-1994
<u>Research Assistant</u>

* Developed a model and a software package using spline techniques to weather-normalize energy usage, allowing the PUC to evaluate regulation policies.


**HONORS AND AWARDS**

Applied Sport Management Association Lifetime Achievement Award, 2019

Research Fellow of the North American Society for Sport Management, 2009

College of Arts & Sciences Collective Achievement Award, 2009

Innovation Award Winner (for the innovative use of technology in teaching), 2004.  From the *Center for Instruction and Technology*, University of San Francisco.

Alfred P. Sloan Foundation Research Grant for the Study of Human Resource Systems, 1995-1997.

Newton-Booth Fellowship for graduate study at University of California at Berkeley, 1990-1991.

## PEER-REVIEWED JOURNAL ARTICLES

"The Unique Economic Aspects of Sports," with Joel Maxcy and Andrew D. Schwarz.  *Journal of Global Sport Management* (forthcoming).

"Determining fair market value for Duke's Sporting Goods Store," with Michael Goldman.  In *Case Studies in Sport Management, 6*(1), 2017.

"The Beckham Effect: Examining the Longitudinal Impact of a Star Performer on League Marketing, Novelty, and Scarcity," with Stephen Shapiro and Tim DeSchriver.  In *European Sport Marketing Quarterly, 17*(5), 2017.

"What Drives Endorsement Earnings for Superstar Athletes?" with Terence Eddy and Giseob Hyun.  In *Journal of Applied Sport Management*, Vol. 9, No. 2, Summer 2017.

"A Smaller Window to the University: The Impact of Athletic De-Escalation on Status and Reputation," with Michael Hutchinson and Kimi Jennings.  In *Journal of Intercollegiate Sport,* Vol. 9, No. 1, June 2016.

"If We Build It, Will They Come?: Examining the Effect of Expansion Teams and Soccer-Specific Stadiums on Major League Soccer Attendance," with Steve Shapiro and Tim DeSchriver.  In *Sport, Business, and Management: An International Journal,* Vol. 6, No. 2, Spring 2016.

"An Explanation of Economic Impact: Why Positive Impacts Can Exist for Smaller Sports," with Nola Agha.  In *Sport, Business, and Management: An International Journal,* Vol. 6, No. 2, Spring 2016.

"The Demand for College Football Bowl Games," with Terence Eddy.  In *International Journal of Sport Finance*, Vol. 11, No. 2, February 2016.

"Tracking the Dollars: How Economic Impact Studies can Actually Benefit Managerial Decision Making," with Michael Goldman.  In *Sport & Entertainment Review,* Vol 1, No. 1, February 2015.

"Sport Pricing Research: Past, Present, and Future," with Joris Drayer.  In *Sport Marketing Quarterly*, Vol. 22, No. 3, September 2013.

"The Antitrust Implications of "Paperless Ticketing" on Secondary Markets," with Andrew D. Schwarz.  In *Journal of Competition Law and Economics*, Vol. 9, No. 3, 2013.

"An Examination of Underlying Consumer Demand and Sport Pricing Using Secondary Market Data" with Joris Drayer and Chad McEvoy.  In *Sport Management Review*, Vol. 15, No. 4, November 2012.

"Financial Risk Management:  The Role of a New Stadium in Minimizing the Variation in Franchise Revenues" with Matt Brown, Mark Nagel, and Chad McEvoy.  In *Journal of Sports Economics*, Vol. 13, No. 3, August 2012.

"Factors Affecting the Price of Luxury Suites in Major North American Sports Facilities" with Tim DeSchriver and Steve Shapiro.  In *Journal of Sport Management,* Vol. 26, No. 3, May 2012.

"Free Ride, Take it Easy: An Empirical Analysis of Adverse Incentives Caused by Revenue Sharing" with Matthew Brown, Mark Nagel, and Chad McEvoy.  In *Journal of Sport Management,* Vol. 25, No. 5, September 2011.

"Simulation in Sport Finance," with Joris Drayer.  *Simulation & Gaming: An Interdisciplinary Journal of Theory, Practice, and Research* Vol. 41, No. 2, April 2010.

"Where did National Hockey League Fans go During the 2004-2005 Lockout?: An Analysis of Economic Competition Between Leagues," with Matthew Brown, Mark Nagel, and Chad McEvoy.  In *International Journal of Sport Management and Marketing*, Vol. 5, Nos. 1, 2, January 2009.

"The Effects of Roster Turnover on Demand in the National Basketball Association," with Steve Shapiro, Alan Morse, and Chad McEvoy.  In *International Journal of Sport Finance*, Vol. 3, No. 1, February 2008.

"Variable Ticket Pricing in Major League Baseball" with Chad McEvoy, Mark Nagel, and Matthew Brown.  In *Journal of Sport Management*, Vol. 21, No. 3, July 2007.

"Do Fans Want Close Contests?: A Test of the Uncertainty of Outcome Hypothesis in the National Basketball Association" with John Paul Solmes.  In *International Journal of Sport Finance*, Vol. 3, No. 2, August 2007.

"The Use of Simulation Technology in Sport Finance Courses: The Case of the Oakland A's Baseball Business Simulator" with Joris Drayer.  In *Sport Management Education Journal* Vol. 1, No. 1, May 2007.

"Washington "Redskins" – Disparaging Term or Valuable Tradition?: Legal and Economic Issues Concerning *Harjo v. Pro-Football, Inc.*" with Mark Nagel.  In *Fordham Intellectual Property, Media, and Entertainment Law Journal*, Vol. XVII, No. 3, Spring 2007.

"Treatment of Travel Expenses by Golf Course Patrons: Sunk or Bundled Costs and the First and Third Laws of Demand," with Matthew Brown, Chad McEvoy, and Mark Nagel.  In *International Journal of Sport Finance*, Vol. 2, No. 1, February 2007.

"Major League Baseball Anti-Trust Immunity: Examining the Legal and Financial Implications of Relocation Rules" with Mark Nagel, Matthew Brown, and Chad McEvoy.  In *Entertainment and Sports Law Journal,* Vol. 4, No. 3, December 2006.

"The Use of Public Funds for Private Benefit: An Examination of the Relationship between Public Stadium Funding and Ticket Prices in the National Football League" with Matthew Brown and Wesley Ward.  In *International Journal of Sport Finance*, Vol. 1, No. 2, June 2006.

"An Analysis of Expansion and Relocation Sites for Major League Soccer" with Matthew Baehr, Jason Wolfe, and Steven Frohwerk.  In *International Journal of Sport Management,* Vol. 7, No. 1, January 2006.

"Revenue and Wealth Maximization in the National Football League: The Impact of Stadia" with Matthew Brown, Mark Nagel, and Chad McEvoy.  In *Sport Marketing Quarterly*, Vol. 13, No. 4, December 2004.

"NBA Expansion and Relocation: A Viability Study of Various Cities" with Heather Rascher.  In *Journal of Sport Management*, Vol. 18, No. 3, July 2004.

"Does Bat Day Make Cents?: The Effect of Promotions on the Demand for Baseball," with Mark McDonald.  In *Journal of Sport Management*, Vol. 14, No. 1, January 2000.

"The NBA, Exit Discrimination, and Career Earnings," with Ha Hoang.  In *Industrial Relations*, Vol. 38, No. 1, January 1999.

## BOOKS

"Financial Management in the Sport Industry" 2nd ed. with Matthew Brown, Mark Nagel, and Chad McEvoy.  Routledge, Inc., 2015.  A textbook.

"Financial Management in the Sport Industry" with Matthew Brown, Mark Nagel, and Chad McEvoy.  Holcomb Hathaway, Inc., June 2010.  A textbook.

## BOOK CHAPTERS

"The application of sports technology and sports data for commercial purposes," with Kenneth Cortsen in *The Use of Technology in Sport – Emerging Challenges,* (2018).

"Valuing Highly Profitable Sports Franchises – A Hybrid Income and Market Approach," in *Sports Business* edited by Kenneth Cortsen (forthcoming).

"The Use of Price-to-Revenue Ratios in Valuing Sports Franchises," in *Sports Business* edited by Kenneth Cortsen (forthcoming).

"Competitive Equity: Can there be Balance between Athletes' Rights and a Level Playing Field?" with Andrew D. Schwarz in E. Comeaux (ed.), *College Athletes' Rights and Well-Being: Critical Perspectives on Policy and Practice*.  Baltimore: Johns Hopkins University Press, (2017).

"Illustrations of Price Discrimination in Baseball" with Andrew D. Schwarz in L. Kahane and S. Shmanske eds., *Economics Through Sports*, Oxford: Oxford University Press, (2012).

"The Expanding Global Consumer Market for American Sports: The World Baseball Classic" with Mark Nagel, Chad McEvoy, and Matt Brown in G. Mildner, and C. Santo, eds., *Sport and Public Policy*, Champaign, IL: Human Kinetics, 2010.

"Franchise Relocations, Expansions, and Mergers in Professional Sports Leagues." In B. Humphreys, and D. Howard, eds., *The Business of Sports*, pp. 67-106.  Westport, CT: Praeger, 2008.

"Collective Bargaining in Sport" with M. Nagel, M. Brown, and C. McEvoy.  In *Encyclopedia of World Sport*, pp.335-339. Great Barrington, MA: Berkshire Publishing, 2005.

"The Role of Stadia in the USA: Wealth Maximization in the National Football League" with Matthew Brown and Mark Nagel in G. Trosien & M. Dinkel (eds.), *Grenzen Des Sportkonsums* (Frontiers of Sport Commerce), Heidelberg, Germany: SRH Learnlife AG, 2003.

"A Test of the Optimal Positive Production Network Externality in Major League Baseball," in E. Gustafson and L. Hadley, eds., *Sports Economics: Current Research*, 1999.  Praeger Press.

"A Model of a Professional Sports League," in W. Hendricks (ed.), *Advances in the Economics of Sport*, vol. 2. June 1997, JAI Press, Inc.

## BOOK REVIEWS

"Review of: Much More Than a Game: Players, Owners, and American Baseball Since 1921", by Robert F. Burk in *Journal of Economic Literature*, Vol. 40(3), September 2002, pp. 949-951.

## NON-PEER REVIEWED ARTICLES

"Rich Men's Toys – Applying Valuation Methods to the Business of Professional Sports" in *Valuation Strategies*, March/April 2015.

"Competitive Balance in Sports: "Peculiar Economics" Over the Last Quarter Century," with Andrew. D. Schwarz.  In *Entertainment, Arts, and Sports Law Journal*, 24(1), Spring 2013.

"The Impact on Demand from Winning in College Football and Basketball: Are College Athletes More Valuable than Professional Athletes?" with Chad McEvoy.  In *Selected Proceedings of the Santa Clara University Sports Law Symposium*, September 2012.

"Smooth Operators: Recent Collective Bargaining in Major League Baseball" with Tim DeSchriver, 2012.  In *International Journal of Sport Finance*, 7(2).

"The Economics of Competitive Balance on the Field and in the Courts" in *Selected Proceedings of the Santa Clara University Sports Law Symposium*, 2011.

"5 Themes from 50 Economic Impact Studies" in *SportsEconomics Perspectives*, Issue 5, 2010.

"What is the Value of Control of a Sports Enterprise?: Controlling Interest Premiums in Sports Valuations" in *SportsEconomics Perspectives*, Issue 4, April 2008.

"Executive Interview: Charlie Faas, Executive Vice President and CFO of Silicon Valley Sports and Entertainment." in *International Journal of Sport Finance*, Vol. 2, No. 2, June 2007.

"Executive Interview: Dan Champeau, Managing Director, and Chad Lewis, Analyst with Fitch." in *International Journal of Sport Finance*, Vol. 2, No. 1, February 2007.

"Executive Interview: Dennis Wilcox, Principal with Climaco, Lefkowitz, Peca, Wilcox & Garofoli Co., L.P.A." in *International Journal of Sport Finance*, Vol. 1, No. 4, November 2006.

"Executive Interview: Randy Vataha, Founder of Game Plan, LLC" with Dennis Howard in *International Journal of Sport Finance*, Vol. 1, No. 2, June 2006.

"Executive Interview: Mitchell H. Ziets, President and CEO of MZ Sports, LLC" in *International Journal of Sport Finance*, Vol. 1, No. 1, February 2006.

"The Oakland Baseball Simworld: Enabling Students to Simulate the Management of a Baseball Organization" in *Journal of Sports Economics*, Vol. 6, No. 3, August 2005.

"Examining the Viability of Various Cities for NBA Expansion or Relocation" with Heather Rascher in *SportsEconomics Perspectives*, Issue 2, April 2002.

"Following a Dollar: the economic impact of a sports event is greater than the sum of its parts" by Nola Agha in *SportsTravel Magazine*, Vol. 6, No. 10, November/December 2002.  Heather Rascher and Daniel Rascher contributed to the article.

"Real Impact: understanding the basics of economic impact generated by sports events" in *SportsTravel Magazine*, Vol. 6, No. 7, July/August 2002.  Reprinted in four regional sports commission newsletters.

"What is the Size of the Sports Industry?," in *SportsEconomics Perspectives*, Issue 1, August 2001.

"Neither Reasonable nor Necessary: "Amateurism" in Big-Time College Sports", with Andrew D. Schwarz.  In *Antitrust* (Spring 2000 Special Sports Issue).

"What Brings Fans to the Ballpark?," with Nola Agha in *FoxSportsBiz.com*, Spring 2000.

## RE-PUBLICATIONS

Republication of "Do Fans Want Close Contests? A Test of the Uncertainty of Outcome Hypothesis in the National Basketball Association", with John Paul G. Solmes in *Recent Developments in the Economics of Sport*, ed. Wladimir Andreff; *The International Library of Critical Writings in Economics*, 2011, Elgar Pub., United Kingdom.

Republication of "What Brings Fans to the Ballpark?," with Nola Agha in *Brilliant Results* 2005.

Republication of "What is the Size of the Sports Industry?," in *Brilliant Results* 2005.

Republication of "Neither Reasonable nor Necessary: "Amateurism" in Big-Time College Sports", with Andrew D. Schwarz in *The Economics of Sport, Vol. I*, ed. Andrew Zimbalist; *The International Library of Critical Writings in Economics* 135, 2001, Elgar, Northampton, MA.

## PEER-REVIEWED JOURNAL ARTICLES UNDER REVIEW

"Making a Difference: Bridging the Gap Between the Ivory Tower & the Community." 2019.

"Because It's Worth It: Why Schools Violate NCAA Rules and the Impact of Getting Caught in Division I Basketball," with Andrey Tselikov, Andrew D. Schwarz, and Mark Nagel.  2018.

"College Football and Basketball Fans Don't Root for Laundry: A Comparison of the Effect of Winning on Demand between College and Professional Football and Basketball," with Mark Nagel and Giseob Hyun.  2018.

## MONOGRAPHS

"The Effect of Human Resource Systems on Fab Performance," with Clair Brown, in C. Brown (ed.), *The Competitive Semiconductor Manufacturing Human Resources Project:  Final Report*, 1997.

"Inter-industry Comparisons: Lessons from the Semiconductor Industry," with Rene Kamita, in C. Brown (ed.), *The Competitive Semiconductor Manufacturing Human Resources Project:  Final Report*, 1997.

"Problem-Solving Structures; A Case Study of Two U.S. Semiconductor Fabs," in C. Brown (ed.), *The Competitive Semiconductor Manufacturing Human Resources Project:  Final Report*, 1997.

"Transferability of Case Study Research:  An Example from the Semiconductor Industry," with Clair Brown, in C. Brown (ed.), *The Competitive Semiconductor Manufacturing Human Resources Project:  2nd Interim Report*, 1996.

"Headcount and Turnover," in C. Brown (ed.), *The Competitive Semiconductor Manufacturing Human Resources Project:  2nd Interim Report*, 1996.

"Training," with Jumbi Edulbehram in C. Brown (ed.), *The Competitive Semiconductor Manufacturing Human Resources Project:  2nd Interim Report*, 1996.

## WORKING PAPERS

"The Governance of Sports Licensing and Sporting Goods," with Mark Nagel.  2019.

"Economic Development Effects of Major and Minor League Teams and Stadia," with Nola Agha.  2018.

"An Analysis of National Collegiate Athletic Association (NCAA) Football Enforcement Actions from 1990-2011," with Nicholas Fulton, Mark Nagel, and Richard Southall.  2017.

"Salary Disparity and Team Performance: Evidence from the Football Bowl Subdivision," with Alex Traugutt and Alan Morse.  2017.

"Would the Oakland A's Relocation to San Jose Harm the Sharks – A Case Study of Competition Across Professional Sports Teams" with Chad McEvoy, Matt Brown, and Mark Nagel.  2016.

"The Practical Use of Variable Ticket Pricing in Major League Baseball" with Chad McEvoy, Matt Brown, and Mark Nagel.  2012.

"Counting Local Residents in Economic Impact Analysis: New Findings from Sporting Events" with Richard Irwin.  2008.

"Perverse Incentives with the NCAA Basketball Tournament Seeding Process" with Matthew Brown, Chad McEvoy, and Mark Nagel.  2006.

"Do the Giants Compete with the A's: The Degree of Competition Between Teams" with Matthew Brown, Chad McEvoy and Mark Nagel.  2006.

"Forecasting Model of Airport Economic Impacts" with Alan Rozzi and Christopher Gillis.  2004.

"Psychic Impact of Professional Sports: A Case Study of a City Without Major Professional Sports" with Matthew Brown, Mark Nagel, and Chad McEvoy.  2003.

"The Use of New Technology and Human Resource Systems in Improving Semiconductor Manufacturing Performance", with Clair Brown and Greg Pinnsoneault, Working Paper, University of California at Berkeley, 1999.

## INVITED SPEAKING ENGAGEMENTS

"Forging Industry Partnerships and Engaging in Applied Sport Management Research," with Weight, E., Love, A., McEvoy, C.  Presentation for the Applied Sport Management Conference, 2019.

"Making a Difference: Bridging the Gap Between the Ivory Tower & the Community."  Keynote Address, Applied Sport Management Association, 2019.

"Economics of Sports."  Lectures at the Oregon Law Summer Sports Institute, University of Oregon, 2018.

"The Business of Sports", presented at the Sports Business Club at Sonoma State University Business School, May 2018.

"The Business of the Olympics," guest speaker in sports journalism course at Medill School of Journalism at Northwestern University, 2018.

"Economics of Sports."  Lectures at the Oregon Law Summer Sports Institute, University of Oregon, 2017.

"College-Sport Research and Litigation: Theory and Practice Leading to Action." Panelist at College Sport Research Institute Symposium at the University of South Carolina, 2017.

"Economics of Sports."  Lectures at the Oregon Law Summer Sports Institute, University of Oregon, 2016.

"The Business of Intercollegiate Sports," presented in the sport management department's sport law course, University of Toronto, 2016.

"Economics of Sports."  Lectures at the Oregon Law Summer Sports Institute, University of Oregon, 2015.

"The Business of Intercollegiate Sports" presented in the sport management masters program, University of Arkansas, 2015.

Panelist on "The Future of Intercollegiate Athletics: The Players' Perspective," at the Sports Law and Business Conference at Arizona State University, 2015.

Panelist on "Intersection of Business and Sports Law," at the Sports and Entertainment Law Forum, presented by the University of Oregon Law School, 2015.

"The Economics of College Athletics Departments" presented in the masters in collegiate athletics program, college athletics in a digital era course, University of San Francisco, 2015.

"The Business of Intercollegiate Sports," presented in the sport management department's sport law course, University of Toronto, 2014.

"Economics of Sports."  Lectures at the Oregon Law Summer Sports Institute, University of Oregon, 2014.

"The Finances of College Sports," presented in Matthew Brown's sport finance course, Ohio University, 2014.

"Antitrust Economics and Sports," presented in Professor Robert Elias's Politics and Sport course, University of San Francisco, 2014.

"The Economics of the Sports Industry," presented to the Haas School of Business, U.C. Berkeley, 2014.

"Economic Impact in Sports." Presentation in the masters in sports business program at New York University (NYU).  2013.

"Pricing the Game Experience," with Stephen Shapiro and Tim DeSchriver.  Invited research presentation at *Sport Entertainment & Venues Tomorrow* conference, 2013, University of South Carolina.

"Academia and the Industry: Opportunities for Meaningful Research Collaboration."  Invited panelist at *Sport Entertainment & Venues Tomorrow* conference, 2013, University of South Carolina.

"Sports Sponsorships in 2013," Panelist at Court Vision (Sheppard Mullin Sports Law Speaker Series and SLA).  Continuing Legal Education (CLE) units program.  2013.

"Using Contract Law to Tackle the Coaching Carousel – Commentary."  Presented at University of San Francisco, *Sports & Entertainment Law Association*, 2013.

"Sports Economics, Analytics, and Decision Making: 8 Examples." Invited speaker at the *IEG Sports Analytics Innovation Summit*, 2012

" 'Paperless Ticketing' and its Impact on the Secondary Market: An Economic Analysis with Antitrust Implications" with Andy Schwarz.  Presented at U.C. Berkeley, Boalt Law School's *Sports and Entertainment Law Society*, 2011.

"Financial Valuation of Sports Assets," presented at the *Sport Management Today Video Conference Series* at the IE Business School, 2011

"Financial Valuation of Sports Assets," presented to the *Sport Management Department* at the University of Northern Denmark, 2011.

"Economic Impact in Sports," presented to the *Sport Management Department* at the <u>University of Northern Denmark</u>, 2011.

"The Economics of the Sports Industry," presented to the *Sports Business Association* at <u>U.C. Irvine</u>, 2011.

"Is Free Riding a Problem in Sports Leagues?: Adverse Incentives Caused by Revenue Sharing" with Mark Nagel, Chad McEvoy, and Matt Brown.  Presented at the *Economics Lecture Series* at <u>Sonoma State University Business School</u>, April 2010.

"Economics for Antitrust Lawyers: Application to Class Certification" presented to <u>Lieff Cabraser Heimann & Bernstein</u> for Continuing Legal Education (CLE) units.  November 2009.

"Economics for Antitrust Lawyers: Market Structure and Economic Modeling" presented to <u>Lieff Cabraser Heimann & Bernstein</u> for Continuing Legal Education (CLE) units.  October 2009.

"Sports Stadium Financing in Today's Economy" presented to the <u>Rotary Club of San Jose</u>, May 2009.

"The Economic Impact of Liberty Bowl Memorial Stadium," presented at the <u>University of Memphis</u>, *Issues in College Sports* lecture series (invited panelist), March 2007.

"The Economics of the Sports Industry," presented to the MBA Program at the Haas School of Business, <u>U.C. Berkeley</u>, January 2007.

"Stadium Financing – Dallas Cowboys Case," presented to the MBA Program at the Graduate School of Business, <u>Stanford University</u>, 2006.

"Taking the Gown to Town: Research and Consulting for the Sport Industry."  Invited presentation at the Past President's Workshop, *North American Society for Sport Management*, June 2006.

"Various Topics in Sports Economics," presented at the Wednesday Workshop on Economics Research, <u>California State University, East Bay</u>, 2005.

"Stadium Financing – Dallas Cowboys Case," presented to the MBA Program at the Graduate School of Business, <u>Stanford University</u>, 2005.

"The Economics of the Sports Industry," presented to the MBA Program at the Haas School of Business, <u>U.C. Berkeley</u>, 2005.

"The Economic Impact of General Aviation Airports: An Econometric Model," presented at <u>Niche Ventures</u> Spring Meeting, 2004.

"The Economics of the Sports Industry," presented to the MBA Program at the Haas School of Business, <u>U.C. Berkeley</u>, 2004.

"Oral Testimony Regarding California State Senate Bill 193, Student Athletes' Bill of Rights". 2003.  Testimony to the California State Senate Subcommittee on Entertainment.

"The Economics of the Sports Industry," presented to the MBA Program at the Haas School of Business, U.C. Berkeley, 2003.

"The Use of New Technology and Human Resource Systems in Improving Semiconductor Manufacturing Performance," with Clair Brown and Greg Pinsonneault.  Presented at *The Wharton School*, University of Pennsylvania, 1999.

## CONFERENCE PRESENTATIONS

"Because It's Worth It: Why Schools Violate NCAA Rules and the Impact of Getting Caught in Division I Basketball," with Andrey Tselikov, Andrew D. Schwarz, and Mark Nagel.  Presentation at *Applied Business and Entrepreneurship Association International*, November 2018.

"College Football and Basketball Fans Don't Root for Laundry: A comparison of the effect of winning on attendance and television viewership between big-time college football and basketball and the NBA and NFL," with Mark Nagel.  Presentation at *Applied Business and Entrepreneurship Association International*, November 2017.  (voted Best Paper Award for session)

"Financial Valuation of a Sporting Goods Retail Store," with Mark Nagel and Matthew Brown.  Poster presentation at *North American Society for Sport Management*, May 2016.

"Cartel Behavior in United States College Sports: An Analysis of National Collegiate Athletic Association Football Enforcement Actions from 1990 to 2011," with Mark Nagel, Richard Southall, and Nick Fulton.  Presented at *Western Economics Association International*, January 2016.

"The College Basketball Players' Labor Market: *Ex Ante* versus *Ex Post* Valuations" with David Berri and Robert Brown.  Presented at *Western Economics Association International*, July 2015.

"What drives Endorsement Values for Superstar Athletes?" with Terry Eddy and Giseob Hyun.  Presented at *Sport Management Association of Australia and New Zealand*, November 2014.

"The Beckham Effect: David Beckham's Impact on Major League Soccer, 2007-2012," with Stephen Shapiro and Tim DeSchriver.  Presented at *North American Society for Sport Management*, May 2014.

"Where is Everyone? An Examination of Consumer Demand for College Football Bowl Games," with Terry Eddy and Rebecca Stewart.  Presented at *Collegiate Sports Research Institute* conference, April 2014.

"If We Build It, Will You Come?: Examining the Effect of Expansion Teams and Soccer-Specific Stadiums on Major League Soccer Attendance," with Stephen Shapiro and Tim DeSchriver.  Presented at *North American Society for Sport Management*, May 2013.

"Should San Jose say 'No Way' to the Oakland A's," with Mark Nagel and Matt Brown.  Presented at *North American Society for Sport Management*, May 2013.

Panel member for "Financial Issues in Intercollegiate Sports." Presented at the *Santa Clara University Sports Law Symposium*, 2012.

"What's in a Name?: Does the Amount and Source of Public Financing Impact Team Names?" with Nola Agha and Matt Brown.  Presented at *Western Economics Association International*, July 2012.

"When Can Economic Impact be Positive?  Twelve conditions that explain why smaller sports have bigger impacts" with Nola Agha.  Presented at *Western Economics Association International*, July 2012.

"Reflections on the MLB Collective Bargaining Agreement."  Part of a symposium on the Economics of Labor-Management Relations in Sports Today at *Western Economics Association International*, July 2012.

"The Economics of Competitive Balance on the Field and in the Courts." Presented at the *Santa Clara University Sports Law Symposium*, 2011.

" 'Paperless Ticketing' and its Impact on the Secondary Market: An Economic Analysis with Antitrust Implications" with Andy Schwarz.  Presented at *International Association of Venue Managers*, July 2011.

" 'Paperless Ticketing' and its Impact on the Secondary Market: An Economic Analysis with Antitrust Implications" with Andy Schwarz.  Presented at *TicketSummit*, July 2011.

" 'Paperless Ticketing' and its Impact on the Secondary Market: An Economic Analysis with Antitrust Implications" with Andy Schwarz.  Presented at *Western Economics Association International*, July 2011.

"Financial Risk Management: The Role of a New Stadium in Minimizing the Variation in Franchise Revenues" with Matt Brown, Chad McEvoy, and Mark Nagel.  Presented at *Western Economics Association International*, July 2011.

"A Panel Study of Factors Affecting Attendance at Major League Soccer Contests: 2007-2010" with Tim DeSchriver.  Presented at the *Sport Marketing Association IX* conference in New Orleans, October 2010.

"The NCAA and the Prisoner's Dilemma".  Presented at the *Sports Law Symposium* at the University of Santa Clara Law School, September 2010.

"Financial Risk Management: The Role of a New Stadium in Minimizing the Variation in Franchise Revenues" with Matt Brown, Chad McEvoy, and Mark Nagel.  Presented at *North American Society for Sport Management*, May 2010.

"An Analysis of the Value of Intercollegiate Athletics to its University: Methods".  Presented at the *Scholarly Conference on College Sport*, April 2010.

"Demand, Consumer Surplus, and Pricing Inefficiency in the NFL: A Case Study of the Secondary Ticket Market Using StubHub" with Joris Drayer and Chad McEvoy.  Presented at *North American Society for Sport Management*, May 2009.

"Luxury Suite Pricing in North American Sports Facilities" with Tim DeSchriver.  Presented at *North American Society for Sport Management*, May 2009.

"A Smorgasbord of Lessons Learned from Economic Impact Studies"  Presented at *North American Society for Sport Management*, June 2008.

"Globalization and Sport Finance: What is True and What is Myth?" with Mark Nagel and Ross Booth.  Presented at the *Sport Management Association of Australia and New Zealand*, November 2007.

"Exploring the Myth that a Better Seed in the NCAA Men's Basketball Tournament results in an *ex ante* Higher Payout" with Mark Nagel, Matt Brown, and Chad McEvoy.  Presented at the *Sport Management Association of Australia and New Zealand*, November 2007.

"Oakland A's Baseball Simulator" with Joris Drayer.  Presented at *North American Society for Sport Management*, June 2007.

"Teaching Sport Financial Management: A Symposium" with Timothy DeSchriver, Matthew Brown, and Michael Mondello.  Presented at *North American Society for Sport Management*, June 2007.

"The Economics of the Sports Industry," presented to the MBA Program at the Haas School of Business, U.C. Berkeley, January 2007.

"Practical Strategies for Variable Ticket Pricing in Professional Sports" with Chad McEvoy, Matt Brown, and Mark Nagel.  Presented at *Sport Marketing Association IV*, November 2006.

"Do the Giants Compete with the A's: The Degree of Competition Between Teams", presented at *Western Economic Association International*, July 2006.

"Do the Giants Compete with the A's: The Degree of Competition Between Teams", presented at *North American Society for Sport Management*, June 2006.

"Measuring Sponsorship Return on Investment: A Need for Quantitative Analysis" with Matt Brown, Mark Nagel, and Chad McEvoy.  Presented at *Sport Marketing Association III*, November 2005.

"The Use of Economic Impact Analysis for Marketing Purposes" with Dick Irwin and Matt Brown. Presented at *Sport Marketing Association III*, November 2005.

"Is Free Riding a Problem in Sports Leagues?: Adverse Incentives Caused by Revenue Sharing" with Mark Nagel, Chad McEvoy, and Matt Brown.  Presented at *Western Economic Association International*, July 2005.

"Public Funds for Private Benefit: Equity Issues in Sport Stadia Funding and the Question of Who Really Pays," with Matt Brown and Mark Nagel.  Presented at *North American Society for Sport Management*, June 2005.

"Is Free Riding a Problem in Sports Leagues?: Adverse Incentives Caused by Revenue Sharing" with Mark Nagel, Chad McEvoy, and Matt Brown.  Presented at *North American Society for Sport Management*, June 2005.

"Is Free Riding a Problem in Sports Leagues?: Adverse Incentives Caused by Revenue Sharing" with Mark Nagel, Chad McEvoy, and Matt Brown.  Accepted by *Sport Management Association of Australia and New Zealand*, Nov. 2004.

"Redskins: Legal, Financial, and Policy Issues relative to Harjo v. Pro-Football, Inc." with Richard Southall, Matt Brown, and Mark Nagel.  Presented at *North American Society for the Sociology of Sport*, Nov. 2004.

"An Analysis of Distance Traveled and Tourism Economic Impact: A Test of the Alchian-Allen Theorem" with Matt Brown, Mark Nagel, and Chad McEvoy.  Presented at *Sport Marketing Association II* conference, Nov. 2004.

"Is Free Riding a Problem in Sports Leagues?: Adverse Incentives Caused by Revenue Sharing" with Mark Nagel, Chad McEvoy, and Matt Brown.  Presented at *Sport Marketing Association II* conference, Nov. 2004.

"Beyond The Economic Impact Study: Examining Economic Impact Data for Support of the Third Law of Demand" with Matthew Brown, Mark Nagel, and Chad McEvoy.  Presented at *North American Society for Sport Management*, 2004.

"Optimal Variable Ticket Pricing in Major League Baseball" with Mark Nagel, Chad McEvoy, and Matthew Brown.  Presented at *North American Society for Sport Management*, 2004.

"*Clarett v. NFL*: Age Eligibility Rules and Antitrust Law in Professional Sports" with Chad McEvoy, Mark Nagel, and Matt Brown.  Presented at *Sport and Recreation Law Association*, 2004.

"Variable Pricing in Baseball: Or, What Economists Would Just Call 'Pricing'," presented at *Western Economic Association International*, 2003.

"The Impact of Stadia on Wealth Maximization in the National Football League: To Build or Renovate?" with Matthew Brown, Mark Nagel, and Chad McEvoy.  Presented at *North American Society for Sport Management*, 2003.

"Major League Baseball's Antitrust Immunity: Examining the Financial Implications of Relocation Rules," with Matthew Brown and Mark Nagel.  Presented at *Society for the Study of the Legal Aspects of Sport and Physical Activity*, 2003.

"Locational Choice in the NBA: An Examination of Potential Cities for Expansion or Relocation," presented at *North American Society for Sport Management*, 2002.

Panel discussant on the effects of the economy on the business of sports at *Sports Facilities and Franchises Forum*, Dallas, TX 2002 (presented by SportsBusiness Journal).

"Psychic Impact Findings in Sports," presented at *Sport Management Association of Australia and New Zealand*, 2001.

"Locational Choice in the NBA: An Examination of Potential Cities for Expansion or Relocation" presented at *Sport Management Association of Australia and New Zealand*, 2001.

"Psychic Impact as a Decision Making Criterion," presented at the *North American Society for Sport Management*, 2000.

"Economic Impact Methods," presented at the *North American Society for Sport Management*, 2000.

"Valuation of Naming Rights," presented at the *Sports Finance Forum*, 2000.

" 'Amateurism' in Big-Time College Sports," presented at the *Western Economic Association International*, 1999.

"Does Bat Day Make Cents?: The Effect of Promotions on the Demand for Baseball," with Mark McDonald.  Presented at the *17th Annual Consumer Psychology Conference*, 1998.

"A Test of the Optimal Positive Production Network Externality in Major League Baseball," presented at the *North American Society for Sport Management Conference*, 1998.

"A Test of the Optimal Positive Production Network Externality in Major League Baseball," presented at the *Western Economic Association International*, 1998.

"The NBA, Exit Discrimination, and Career Earnings," presented at the *Western Economic Association International*, 1997.

"Sports Salary Determination," presented at the *International Atlantic Economic Society Conference*, 1997.

"A Model of a Professional Sports League," presented at the *International Atlantic Economic Society Conference*, 1996.

"Transferability of Case Study Research:  An Example from the Semiconductor Industry," presented at the *American Society of Training and Development Conference*, 1996.

## EDITORIAL/REVIEWER BOARDS OF PEER-REVIEWED JOURNALS

*Case Studies in Sport Management,* 2011 – present (founding member)
*International Journal of Sport Finance,* 2006 – present (founding member)
*International Journal of Sport Management and Marketing,* 2011-present
*Journal of Quantitative Analysis in Sports,* 2005 – 2012 (founding member)
*Journal of Risk and Financial Management,* 2019-present (Reviewer Board member)
*Journal of Sport Management,* 2003 – present
    Associate Editor, 2010 – 2012
*Sport Management Review,* 2001 – 2008

Global Interdisciplinary Business-Economics Advancement Conference, 2014
    Scientific Committee member

## REFEREE FOR PEER-REVIEWED JOURNALS & GRANTING AGENCIES

*American Behavioral Scientist*, 2008
*Applied Economics Letters,* 2018
*Axioms,* 2017
*Case Studies in Sport Management*, 2012, 2014a, 2014b, 2015, 2017, 2019
*Communication & Sport*, 2019

*Contemporary Economic Policy*, 2004
*Eastern Economic Journal,* 2010
*Economic Inquiry,* 2008, 2010, 2011
*Economics and Business Letters,* 2018
*European Sport Management Quarterly,* 2012
*Future Internet,* 2019
*Industrial Relations*, 1993, 2000, 2000, 2001, 2013
*International Journal of Financial Studies,* 2018
*International Journal of Sport Communication,* 2011
*International Journal of Sport Finance*, 2005, 2006a, 2006b, 2006c, 2007a, 2007b, 2008a, 2008b, 2010, 2011, 2012, 2013, 2014a, 2014b, 2014c, 2015, 2017, 2018, 2019
*International Journal of Sport Management and Marketing*, 2005, 2010, 2013, 2014, 2017
*International Journal of Sports Marketing and Sponsorship*, 2016, 2018a, 2018b, 2019
*International Journal of Sport Policy and Politics,* 2014
*International Review for the Sociology of Sport*, 2012
*Journal of Functional Morphology and Kinesiology,* 2018
*Journal of Global Sport Management,* 2018
*Journal of Industrial Economics*, 1997
*Journal of Intercollegiate Sport*, 2016
*Journal of Sport Management,* 2001, 2002, 2003a, 2003b, 2004a, 2004b, 2004c, 2004d, 2004e, 2005a, 2005b, 2005c, 2005d, 2006a, 2006b, 2006c, 2006d, 2006e, 2006f, 2006g, 2006h, 2006i, 2007a, 2007b, 2007c, 2007d, 2008a, 2008b, 2008c, 2008d, 2009a, 2009b, 2009c, 2009d, 2009e, 2009f, 2009g, 2010a, 2010b, 2010c, 2010d, 2011a, 2011b, 2013, 2013b, 2014, 2015a, 2015b, 2016a, 2016b, 2016c, 2016d, 2017a, 2017b, 2017c, 2017d, 2018a, 2018b, 2018c, 2018d, 2019a, 2019b
*Journal of Sports Economics*, 2003, 2007, 2008a, 2008b, 2009, 2010, 2011, 2012a, 2012b, 2014a, 2014b, 2015a, 2015b, 2016, 2018, 2019
*Journal of Venue and Event Management,* 2012
*Journal of the Quantitative Analysis of Sports*, 2005, 2006a, 2006b, 2007
*Mathematical Problems in Engineering,* 2018
*Perceptual and Motor Skills*, 2009
*Review of Economics and Statistics,* 2017
*Review of Industrial Organization*, 2012, 2013, 2015
*Soccer & Society*, 2014
*Southern Economic Journal*, 2001, 2007a, 2007b
*Sport, Business and Management: An International Journal*, 2011, 2012, 2013, 2017, 2018
*Sport Management Review*, 2002a, 2002b, 2003a, 2003b, 2003c, 2003d, 2004a, 2004b, 2004c, 2006a, 2006b, 2006c, 2007a, 2007b, 2007c, 2010a, 2010b, 2011, 2015, 2016, 2017
*Sport Marketing Quarterly*, 2015, 2018
*Sustainability,* 2018

External review of $250,000 grant proposal for the *Social Sciences and Humanities Research Council of Canada*, 2008

## PROFESSIONAL AFFILIATIONS (CURRENT AND PREVIOUS)

American Bar Association
American Economic Association

National Association of Certified Valuation Analysts
North American Society for Sport Management
North American Association of Sports Economists
Sport and Recreation Law Association
Sport Marketing Association
Sports Lawyers Association
Western Economic Association International

**TESTIMONY**

Provided expert report and deposition pertaining to financial harm of alleged misleading advertising in *The People of the State of California v. Hertz et al.* 2019.

Financial and economic analysis and testimony of baseball and *AT&T Park* for Assessment Appeals Board (property tax dispute). 2018.

Provided arbitration testimony on damages regarding an NBA agent and agency in *ISE v. Dan Fegan*. 2018.

Provided trial and deposition testimony and six expert reports pertaining to class certification, liability, damages, and injunction issues in college sports in the federal lawsuit *In Re: NCAA Athletic GIA Cap Antitrust Litigation*. 2015-18.

Provided expert report pertaining to damages in auto racing case between a driver and his agent in *Sports Management Network v. Kurt Busch*. 2018.

Public testimony on forecast of economic impact of Rocky Mountain Sports Park on Windsor, CO to the Windsor City Council. 2017.

Provided expert report pertaining to the economics of ticketing and personal seat licenses (PSLs) in *RCN Capital v. Los Angeles Rams*. 2017.

Provided trial testimony (and multiple reports and depositions) on financial harm pertaining to *FTC v. DirecTV*. 2017.

Provided declaration pertaining to the economics of ticketing for sports and entertainment in *Glickman et al. v. Live Nation et al*. 2016.

Provided declaration pertaining to the economics of ticketing for sports and entertainment in *Pollard v. AEG Live, et al*. 2016.

Provided declaration pertaining to the economics of ticketing for sports and entertainment in *Finkelman v. NFL*. 2016.

Provided deposition testimony and submitted two expert reports pertaining to class certification issues in college football in *Rock v. NCAA*. 2014-16.

Submitted an expert report on damages pertaining to an endorsement relationship in *Frank Thomas v. Reebok*. 2015.

Provided deposition testimony and submitted an expert report pertaining to the economic relationship between two boxing entities in *Garcia v. Top Rank, Inc.* 2015.

Provided trial testimony (and multiple reports and depositions) on class certification issues, damages, and antitrust economics in regards to group licensing for former and current college football and basketball players in *O'Bannon et al. v. NCAA.* 2013-14.

Submitted three expert reports regarding lost earnings for a Major League Baseball player in *Backe et al. v. Fertitta Hospitality, LLC et al.* 2013.

Submitted two expert reports on class certification issues in regards to ticket holder lawsuit in *Phillips et al. v. Comcast Spectacor et al.* 2013.

Submitted expert report in a federal case involving defamation of character in the boxing industry (*Pacquiao v. Mayweather Jr. et al.*). 2012.

Provided deposition testimony and prepared expert report regarding an alleged sponsorship breach of contract in motorsports (*Vici Racing, LLC v. T-Mobile USA, Inc.*). 2012.

Prepared expert witness testimony on trade secrets case involving the sports consulting industry (*Sport Management Research Institute v. Keehn*). 2011.

Provided deposition testimony on the value of a minor league baseball team and related damages from an alleged breach of a facility lease permit (*Long Beach Armada v. City of Long Beach*). 2011.

Provided deposition testimony on the value of athlete endorsements in a breach of contract case involving an NBA player and a charter school business in an arbitration proceeding (*D Wade's Place v. Dwyane Wade*). 2010.

Provided deposition testimony on the value of athlete endorsements in a breach of contract case involving an NBA player and a restaurant investment in a state court proceeding (*Rodberg v. Dwyane Wade*). 2010.

Submitted two reports and provided deposition and arbitration testimony regarding damages related to how media coverage has impacted an NFL team's brand (*Kiffin v. Raiders*). 2009.

Submitted expert report, rebuttal report, gave deposition and trial testimony in federal court (*Adderley et al. v NFLPA & NFLPI*). 2008.

Public testimony on economic impact of a Major League Soccer stadium in San Jose to the San Jose City Council. 2008.

Public testimony on economic impact of six sports and cultural events in San Jose to the San Jose City Council. 2007.

Submitted expert report, rebuttal report, and testified at arbitration hearing on the financial valuation of Major League Soccer (*Rothenberg v. Major League Soccer, LLC*). 2006.

Named expert witness for a Major League Baseball club to analyze a punitive damages claim from an injury at a baseball game (*Bueno v. Rangers*).  2006.

Prepared expert testimony on liability and damages related to the operations of a minor baseball league on behalf of the league's owner (*Don Altman et al., v. Jeffrey Mallet, et al.*).  Case was settled prior to deposition.  2004.

Public testimony on economic impact of an existing and new professional football stadium in Irving, TX to the Irving City Council (two council meetings).  2004.

Testimony on college athletics regarding Senate Bill 193 to the California State Senate Subcommittee on Entertainment.  2003.

Public testimony on economic impact of a downtown entertainment district in Sacramento to the Sacramento City Council (two council meetings).  2003.

Determination of IP valuation and damages from a clothing endorsement alleged breach of contract for PGA Tour player (*Stankowski v. Bugle Boy*).  Submitted expert report.  Case was settled prior to deposition.  2000.

Deposition testimony in breach of contract matter concerning damages analysis in the auto racing industry (*Parente v. Della Penna Racing*).  2000.

Public testimony on forecast of economic impact of Pan Am Games on San Antonio to the San Antonio City Council.  1999.

Updated March 2019

## APPENDIX B

### DOCUMENTS CONSIDERED

### DATA

"master_data.sas7bdat" from Settlement Backup Data.

### DEPOSITION

Deposition of Mark Emmert, January 12, 2017. pp. 162-163.

### EXPERT REPORTS

Expert Report of Daniel A. Rascher on Injunctive Class Certification, June 25, 2015.
Expert Report of Daniel A. Rascher on Damages Class Certification, February 16, 2016.
Corrected Expert Reply Report of Daniel A. Rascher on Damages Class Certification, October 12, 2016.
Expert Declaration of Daniel A. Rascher in Support of Motion for Preliminary Approval of Damages Classes, February 2, 2017.
Expert Report of Daniel A. Rascher on Economic Liability Issues for the Injunctive Classes, March 21, 2017.
Expert Reply Report of Daniel A. Rascher on Economic Liability Issues for the Injunctive Classes, June 21, 2017.

### TESTIMONY

Direct Testimony of Dr. Daniel A. Rascher, July 3, 2018.
Expert Direct Examination Declaration of Professor James J. Heckman, July 11, 2018.
Rebuttal Testimony of Dr. Daniel A. Rascher, July 17, 2018.

### TRANSCRIPTS

NO. 14-MD-2541 CW, TUESDAY, SEPTEMBER 4, 2018, Trial Transcript Volume 1, pp. 10-190.

### WEBSITES

Broughton, David; "CFP champ has shot at up to $5,600 in gifts." *SportsBusiness Journal*, 5 December 2016, (bit.ly/2mcaQ6K).
Broughton, David; "Sony's suite is latest innovation in bowl gifts." *SportsBusiness Journal*, 8 December 2008, bit.ly/2lxfUp5.
Hoyt, Elizabeth. "Top 10 Highest Paid U.S. Internships." *Fastweb*, 12 May 2017, https://bit.ly/2U91Lir
Kowarski, Ilana. "See the Price, Payoff of Law School Before Enrolling." *U.S. News & World Report*, 12 March 2019, https://bit.ly/2JBA6Tg
"2018 Premium 6th Gen Lenovo ThinkPad X1 Carbon 14" FHD IPS Laptop." *Amazon.com*, n.d., accessed 21 March 2019, https://amzn.to/2OsESS2
"500 Hour Master Barber Program." *American Barber Institute*, n.d., https://bit.ly/2HGVVPs
"Adult Education Graduate Certificate." *Auburn University College of Education*, Auburn University, n.d., https://bit.ly/2YpaKeE
"Annual Tuition & Fees." *Office of Planning and Budgeting*, University of Washington, n.d., https://bit.ly/2HRUv3V

"Bachelor's degrees conferred by postsecondary institutions, by field of study: selected years, 1970-71 through *2015-16." Digest of Education Statistics, IES: National Center for Education Statistics (NCES)*, n.d., https://bit.ly/2uIUfw2

"Barbering (BAR)." *Lawson State Community College*, n.d., https://bit.ly/2TtigBC

"Bursar: Graduate Fees." *Brown University*, n.d., https://bit.ly/2WmOgt2.

"Cheapest Colleges for Automobile/Automotive Mechanics Technology/Technician." *College Calc*, n.d., https://bit.ly/2HR7EKM

"Cheapest Colleges for Building/ Home/ Construction Inspection/ Inspector.*" College Calc*, n.d., https://bit.ly/2HSV2mi

"Cost Information." *Yale School of Management*, Yale University, n.d., https://bit.ly/2UcwgnH

"Cost of Attendance (COA)." *Edvisors*, n.d., https://bit.ly/2UWaWQo

"Cost of CDL License Classes." *CDL Career Now*, n.d., https://bit.ly/2UR1bTO

"Division I Graduation Rates Database: Four- Class Rate by Sport- Federal Graduation Rate." *NCAA®*, n.d., https://on.ncaa.com/2Yjg6Ix

"Double Basses." *Music & Arts*, n.d., accessed 24 March 2019, https://bit.ly/2HDkuNv

"ECU's Estimated Cost of Attendance (COA)." *East Carolina University*, n.d., https://bit.ly/2mpETv1

"Fall 2018/ Winter 2019 Tuition Rates." *University of Michigan-Flint*, n.d., https://bit.ly/2FEeLUf

"First Destinations for the College Class of 2017." *National Association of Colleges and Employers (NACE)*, December 2018, https://bit.ly/2HDWidH

"Heisman Trust." *Heisman Trophy*, n.d., https://bit.ly/2HXeVsB

"Lawson State Community College- Tuition & Fees." *Lawson State Community College*, n.d., https://bit.ly/2usPO8P

"Master of Arts in Teaching." *Brown University*, n.d., https://bit.ly/2JCiXcd

"Master of Science in Nursing (MSN) Entry into Nursing Program." *Johns Hopkins School of Nursing*, Johns Hopkins, n.d., https://bit.ly/2M7qwIO

"Master of Science in Nursing (MSN) Program: About the Program." *University of Michigan-Flint*, n.d., https://bit.ly/2WlwXIL

"Most expensive full-time MBA programs in America." *The Economist*, 16 March 2018, https://bit.ly/2HGJcfA

"Music." *Data USA*, Datawheel, n.d., https://bit.ly/2HGmx3o

"Post- Eligibility Opportunities Program: Setting the Standard for Life Beyond Athletics." *University of Nebraska at Lincoln*, n.d., https://bit.ly/2UXbdT9

"Preliminary Mild/ Moderate Education Specialist Instruction Credential." *Pacific Oaks College*, 8 February 2019, https://bit.ly/2FBCoOq

"Student Bb Trumpets." *Music & Arts.com*, n.d., accessed 24 March 2019, https://bit.ly/2WmKVKo

"The 10 Most Affordable Business Schools." *Affordable Schools*, n.d., https://bit.ly/2FCRvXX

"The 5 Most Expensive Nursing Schools in the U.S." *The Journal of Advanced Practice Nursing*, American Society of Registered Nurses, 15 January 2015, https://bit.ly/2TZzyeI

"Top 10 Most Affordable Traditional Nursing Degree Programs." *Nursing School Hub*, n.d., https://bit.ly/2UUTtl7

"Tuition & Credit Hours- RSI." *The Refrigeration School*, n.d., https://bit.ly/2FmT8r2

"Tuition and Fees." *Pacific Oaks College*, 22 Jan. 2019, https://bit.ly/2TZzmfu

"Tuition and Student Fees." *AAMC, Association of Medical Colleges*, n.d., https://bit.ly/2TW1MqJ

"Tuition Information." *Auburn University*, n.d., https://bit.ly/2Tz6cP8

"Tuition Rates by Field." *Cornell University Graduate School*, Cornell University, 2019, https://bit.ly/2uqzW6O

2018-19 NCAA® Division I Manual, pp. 237-8

APPENDIX C

SOURCES FOR EXHIBITS 3 AND 5

**EXHIBIT 3 SOURCES**

"500 Hour Master Barber Program." *American Barber Institute*, n.d., https://bit.ly/2HGVVPs

"Barbering (BAR)." *Lawson State Community College*, n.d., https://bit.ly/2TtigBC

"Cheapest Colleges for Automobile/Automotive Mechanics Technology/Technician." *College Calc*, n.d.,
    https://bit.ly/2HR7EKM

"Cheapest Colleges for Building/ Home/ Construction Inspection/ Inspector." *College Calc*, n.d.,
    https://bit.ly/2HSV2mi

"Cost of CDL License Classes." *CDL Career Now*, n.d., https://bit.ly/2UR1bTO

"Lawson State Community College- Tuition & Fees." *Lawson State Community College*, n.d.,
    https://bit.ly/2usPO8P

"Tuition & Credit Hours- RSI." *The Refrigeration School*, n.d., https://bit.ly/2FmT8r2

**EXHIBIT 5 SOURCES**

Kowarski, Ilana. "See the Price, Payoff of Law School Before Enrolling." *U.S. News & World Report*, 12
    March 2019, https://bit.ly/2JBA6Tg

"Adult Education Graduate Certificate." *Auburn University College of Education*, Auburn University,
    n.d., https://bit.ly/2YpaKeE

"Annual Tuition & Fees." *Office of Planning and Budgeting*, University of Washington, n.d.,
    https://bit.ly/2HRUv3V

"Bursar: Graduate Fees." Brown University, n.d., https://bit.ly/2WmOgt2.

"Cost Information." *Yale School of Management*, Yale University, n.d., https://bit.ly/2UcwgnH

"ECU's Estimated Cost of Attendance (COA)." *East Carolina University*, n.d., https://bit.ly/2mpETv1

"Fall 2018/ Winter 2019 Tuition Rates." *University of Michigan-Flint*, n.d., https://bit.ly/2FEeLUf

"Master of Arts in Teaching." *Brown University*, n.d., https://bit.ly/2JCiXcd

"Master of Science in Nursing (MSN) Entry into Nursing Program." *Johns Hopkins School of Nursing*,
    Johns Hopkins, n.d., https://bit.ly/2M7qwIO

"Master of Science in Nursing (MSN) Program: About the Program." *University of Michigan-Flint*, n.d.,
    https://bit.ly/2WlwXIL

"Most expensive full-time MBA programs in America." *The Economist*, 16 March 2018,
    https://bit.ly/2HGJcfA

"Preliminary Mild/ Moderate Education Specialist Instruction Credential." *Pacific Oaks College*, 8
    February 2019, https://bit.ly/2FBCoOq

"The 10 Most Affordable Business Schools." *Affordable Schools*, n.d., https://bit.ly/2FCRvXX

"The 5 Most Expensive Nursing Schools in the U.S." *The Journal of Advanced Practice Nursing*,
    American Society of Registered Nurses, 15 January 2015, https://bit.ly/2TZzyeI

"Top 10 Most Affordable Traditional Nursing Degree Programs." *Nursing School Hub*, n.d.,
    https://bit.ly/2UUTtI7

"Tuition and Fees." *Pacific Oaks College*, 22 Jan. 2019, https://bit.ly/2TZzmfu

"Tuition and Student Fees." *AAMC*, Association of Medical Colleges, n.d., https://bit.ly/2TW1MqJ

"Tuition Information." *Auburn University*, n.d., https://bit.ly/2Tz6cP8

"Tuition Rates by Field." *Cornell University Graduate School*, Cornell University, 2019,
    https://bit.ly/2uqzW6O